

1  LATHAM & WATKINS LLP
   David J. Schindler (Bar No. 130490)
2     *david.schindler@lw.com*
   Kristen M. Tuey (Bar No. 252565)
3     *kristen.tuey@lw.com*
   Brigitte E. Mills (Bar No. 281098)
4     *brigitte.mills@lw.com*
   355 South Grand Avenue
5  Los Angeles, California 90071-1560
   Telephone: (213) 485 -1234
6  Facsimile: (213) 891-8763

7  Attorneys for Plaintiff the City of Almaty

8

FILED
CLERK, U.S. DISTRICT COURT

MAY 1 3 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

9         UNITED STATES DISTRICT COURT

10        CENTRAL DISTRICT OF CALIFORNIA

11

12  CITY OF ALMATY, a foreign state,     Case No. CV14-3650 ℞SWL-CW℣

13        Plaintiff,      Assigned To:

14      v.      **COMPLAINT FOR DAMAGES,
                     INJUNCTIVE RELIEF, AND
15  VIKTOR KHRAPUNOV, an individual;    OTHER EQUITABLE RELIEF
   LEILA KHRAPUNOV, an individual;     FOR:**
16  ILIYAS KHRAPUNOV, an individual;
   MADINA ABLYAZOVA a/k/a      **1) Violations of RICO (18 U.S.C.
17  MADINA KHRAPUNOVA, an         §§ 1962(c), 1962(d), 1964);
   individual; ELVIRA KHRAPUNOV    **2) Violation of and Conspiracy to
18  a/k/a/ ELVIRA KUDRYASHOVA a/k/a      Violate California's Unfair
   ELVIRA BALMADANI, an individual;      Competition Law (Cal. Bus. &
19  DMITRI KUDRYASHOV, an individual;      Prof. Code §§ 17200 *et seq.*);
   RPM USA, LLC, a New York       **3) Breach of Fiduciary Duty;
20  corporation; RPM-MARO LLC, a New    **4) Conversion and Conspiracy to
   York corporation; MR. FUMIGATION      Commit Conversion;
21  INC., a California corporation; MARO    **5) Fraud and Deceit and
   DESIGN LLC, a California corporation;      Conspiracy to Defraud; and
22  HAUTE HUE LLC, a California     **6) An Accounting, and Imposition
   corporation; 628 HOLDINGS LLC, a      of a Constructive Trust and
23  California Corporation; CANDIAN      Equitable Lien.**
   INTERNATIONAL LTD., a British
24  Virgin Islands corporation; ELVIRA
   KUDRYASHOVA AS TRUSTEE FOR     **DEMAND FOR JURY TRIAL**
25  THE KASAN FAMILY TRUST;
   DMITRI KUDRYASHOV AS
26  TRUSTEE FOR THE KASAN FAMILY
   TRUST; and DOES 1 through 10,

27        Defendants.

28

LATHAM&WATKINS LLP   DC\2919453.14            COMPLAINT FOR DAMAGES, INJUNCTIVE
ATTORNEYS AT LAW                  RELIEF AND OTHER EQUITABLE RELIEF
LOS ANGELES

1  Plaintiff the City of Almaty ("Almaty") hereby alleges the following claims for

2  relief against defendants Viktor Khrapunov ("VK"), Leila Khrapunov ("LK"),

3  Iliyas Khrapunov ("IK"), Madina Ablyazova a/k/a Madina Khrapunova ("MK"),

4  Elvira Khrapunov a/k/a Elvira Kudryashova a/k/a Elvira Balmadani ("EK"),

5  Dmitri Kudryashov ("DK"), RPM USA, LLC, RPM-Maro LLC, Mr. Fumigation

6  Inc., Maro Design LLC, Haute Hue LLC, 628 Holdings LLC, Candian

7  International Ltd., Elvira Kudryashova as Trustee of The Kasan Family Trust,

8  Dmitri Kudryashov as Trustee of The Kasan Family Trust, and Does 1 – 10

9  (collectively referred to as "Defendants").

10  **I.      NATURE OF THE ACTION**

11      1.      This is an action on behalf of the City of Almaty, the largest city in

12  the Republic of Kazakhstan, to recover funds that were systematically looted by

13  the former mayor of Almaty, VK, and his co-conspirators, including family

14  members who are participating in an ongoing effort to launder and conceal funds

15  looted from Almaty.   Through the scheme described herein, VK abused his

16  position of trust as a public official in order to convert and sell numerous assets

17  belonging to the people of the City of Almaty for his own benefit and the benefit of

18  his co-conspirators, and VK and his co-conspirators thereafter set out to launder

19  and conceal their ill-gotten gains by acquiring assets, including assets located in

20  the Central District of California and within the United States, and making

21  investments in entities in the United States and throughout the world.  As set forth

22  herein, Almaty seeks: (a) to hold Defendants, including VK and his co-

23  conspirators, liable for their systematic looting of public funds; (b) return of the

24  monies stolen from Almaty and its people or the return of substitute assets acquired

25  with the funds stolen from Almaty and its people; (c) injunctive relief to prevent

26  VK and his co-conspirators from engaging in any further transactions involving the

27  proceeds of the looting scheme; (d) imposition of a constructive trust over all

28  assets located within the United States that are traceable, either directly or

1    indirectly, to VK's systematic looting of public assets rightfully belonging to
2    Almaty and its people; and (e) treble and punitive damages for Defendants' myriad
3    violations of the federal anti-racketeering statute, state and federal common law,
4    and their egregious breach of the public trust over nearly a decade as detailed
5    herein.

6    **II.     THE PARTIES**

7         2.      Plaintiff Almaty is a foreign state pursuant to 28 U.S.C. § 1332(a)(4).
8    Until 1997, Almaty was the capital of Kazakhstan, which is a sovereign state
9    recognized by the Government of the United States of America. It remains a major
10   commercial and cultural center of Kazakhstan and has the country's largest
11   population. Almaty has standing to bring this Complaint and sues: (a) in its own
12   right, as the victim of Defendants' unlawful schemes, conspiracies, and acts of
13   racketeering; and (b) in a *parens patriae* capacity as the representative of its
14   people, who were victims of Defendants' conspiracies, fraudulent schemes, and
15   acts of racketeering.

16        3.      Defendant VK was the mayor of Almaty from approximately June 16,
17   1997 until approximately December 2004. In 2004, VK was nominated for the
18   position of governor of the Pavlodar province in northeast Kazakhstan, a position
19   he held until 2007, at which time he was appointed Minister of Emergency
20   Measures. In late 2007, VK announced his retreat from all public functions and his
21   retirement, ostensibly for health reasons.

22        4.      Upon information and belief, in or about 1998, VK married Defendant
23   LK. VK and LK are citizens of the Republic of Kazakhstan and, upon information
24   and belief, currently reside in Switzerland.

25        5.      Upon information and belief, Defendants IK and EK are the son and
26   daughter, respectively, of LK, and step-son and step-daughter, respectively, of VK.

27        6.      Upon information and belief, IK and MK are citizens of the Republic
28   of Kazakhstan and currently reside in Switzerland. Upon information and belief,

1   EK is a citizen of the Republic of Kazakhstan and of Switzerland, and currently

2   resides in Studio City, California.  Upon information and belief, DK is a citizen of

3   the Russian Federation and currently resides with EK in Studio City, California.

4         7.    Upon information and belief, IK is married to Defendant MK, while

5   EK is married to Defendant DK (VK and LK, along with their adult children, IK

6   and EK, and their spouses, MK and DK, are collectively referred to herein as the

7   "Individual Defendants").  Upon information and belief, Defendants Mr.

8   Fumigation Inc., Maro Design LLC, Haute Hue LLC, and 628 Holdings LLC are

9   corporations organized and existing under the laws of the State of California.

10  Upon information and belief, Defendants RPM USA LLC and RPM-Maro LLC are

11  corporations organized and existing under the laws of the State of New York.

12  Upon information and belief, Defendant Candian International Ltd. is an offshore

13  corporation organized under the laws of the British Virgin Islands.  Upon

14  information and belief, Defendants Elvira Kudryashova as Trustee of The Kasan

15  Family Trust and Dmitri Kudryashov as Trustee of The Kasan Family Trust have

16  beneficial ownership and control over a property used by IK and/or EK in

17  furtherance of the racketeering scheme described below.  Upon information and

18  belief, Mr. Fumigation Inc., Maro Design LLC, Haute Hue LLC, 628 Holdings

19  LLC, RPM USA LLC, RPM-Maro LLC, Candian International Ltd., and The

20  Kasan Family Trust (collectively, the "Entity Defendants") all are owned or

21  controlled by IK and/or EK, and also were misused by them in furtherance of the

22  racketeering scheme described below.

23        8.    Almaty is ignorant of the true names of defendants Does 1 through 10

24  (the "Doe Defendants"), inclusive, and therefore sues those defendants by such

25  fictitious names.  Almaty is informed and believes, and on that basis alleges, that

26  the Doe Defendants, inclusive, are responsible for the acts alleged in this

27  Complaint.  When the true names of such fictitious defendants are ascertained,

28

1   Almaty will seek leave of this Court to amend this Complaint to name those

2   individuals or entities.

3       9.      Almaty is informed and believes, and thereon alleges, that the

4   Defendants, including those named as Doe Defendants, were at all times relevant

5   herein the agents, servants, and/or employees of Defendants, and each of them, and

6   in doing the things herein alleged, were acting at least in part within the course and

7   scope of their authority as such agents, servants, and/or employees of Defendants,

8   and each of them.

9   **III.   JURISDICTION AND VENUE**

10      10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331(a)

11   and 18 U.S.C. § 1964(c) over the First and Second Claims for Relief of this

12   Complaint for violation of the federal Racketeer Influenced and Corrupt

13   Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* and for conspiracy to

14   violate RICO.  This Court additionally has diversity jurisdiction pursuant to 28

15   U.S.C. § 1332(a)(4) and 18 U.S.C. § 1964(c) over these Claims for Relief because

16   Almaty is a "foreign state" and the amount in controversy exceeds $75,000.00.

17   The Third through Seventh Claims for Relief allege violations of state law and of

18   federal common law.  This Court has pendent jurisdiction over such claims

19   pursuant to 28 U.S.C. § 1367(a) because those claims are joined with substantially

20   related claims under RICO and because those claims are so related to the RICO

21   claims in the action that they form part of the same case or controversy under

22   Article III of the United States Constitution and arise from a common nucleus of

23   operative facts.

24      11.     Venue is proper in this District and before this Court pursuant to 28

25   U.S.C. § 1391(b)(2) because events giving rise to Almaty's claims occurred in this

26   District, including, among other things, Defendants' purchase and use of real estate

27   located in Beverly Hills and Studio City, California.

28

1      12.    This Court has personal jurisdiction over Defendants because each of

2  them knowingly committed acts that form the basis of this Complaint in this

3  District, directed others to commit acts in this District, and purposely availed

4  themselves of the privileges of doing business in this District, as fully set forth

5  herein.

6  **IV.   FACTUAL ALLEGATIONS**

7      **A.    Overview of the Khrapunov Racketeering Enterprise**

8      13.    VK became mayor of Almaty on or about June 16, 1997, and

9  remained in that position until approximately December 2004. Before VK

10  assumed the office of the mayor of Almaty, he took an oath of office to strictly

11  obey the Constitution and laws of the Republic of Kazakhstan. Among other

12  things, VK expressly and impliedly promised and represented that he would fulfill

13  his fiduciary duties to the people of Almaty, would honor his obligation to provide

14  honest services, and would not convert money, property, or assets belonging to

15  Almaty for his own use or that of his family, friends, or associates. In fact, over

16  the span of more than six years, VK repeatedly and systematically violated those

17  promises and abused his position of power and authority to steal millions of dollars

18  of real property and assets from the people of Almaty. Aided and abetted by his

19  wife, friends, children, associates, accomplices, and other co-conspirators, VK

20  plundered the city's wealth and industry to enrich himself, his family and his co-

21  conspirators, associates, and accomplices at the expense of Almaty and its people.

22      14.    Specifically, VK organized and administered a group of persons,

23  including natural persons and numerous entities, and including the Defendants

24  named herein ("the Khrapunov Racketeering Enterprise"), associated in fact for the

25  purposes of: (a) converting and maintaining for the use and benefit of the

26  members of the Khrapunov Racketeering Enterprise assets, money, and property

27  rightfully belonging to Almaty and its people; (b) laundering and concealing the

28  proceeds of this illicit activity through the secret accumulation, transfer, and

1   investment of monies obtained through the racketeering acts described herein in

2   the United States, Switzerland, the United Arab Emirates and elsewhere; and (c)

3   continuing to conceal, launder and transfer fraudulently acquired assets following

4   VK and LK's flight into exile from the Republic of Kazakhstan on or about

5   November 9, 2007.

6        15.    Defendants carried out the scheme through various means, including

7   the wholesale corruption of VK's mandate to implement economic reforms and to

8   administer, honestly, the privatization and redevelopment of certain state assets,

9   including real estate, into viable commercial assets.  As mayor of Almaty, VK was

10  entrusted with control over valuable assets of the Almaty government and

11  entrusted with powers required to carry out economic reforms and the privatization

12  of real property owned by Almaty for the benefit of the people of Almaty.  Among

13  his powers as mayor, VK was entrusted with the right to cause state-owned real

14  estate to be sold to private parties at auction pursuant to established legal

15  procedures, the right to cause privately-owned real estate to be taken for purported

16  state use, and the right to control who could do business in Almaty through the

17  granting of licenses, concessions, and permits.

18       16.    In his capacity as mayor of Almaty, VK caused certain state-owned

19  real estate parcels to be put up for auction.  However, in violation of Kazakh law,

20  and in violation of his duties to the people of Almaty, VK, aided and abetted by

21  others involved in the Khrapunov Racketeering Enterprise, corrupted those

22  auctions by: (a) improperly influencing and directing the actions of the individuals

23  responsible for administering the auctions; and (b) improperly causing confidential

24  bid information to be disclosed to entities controlled by LK to allow these entities

25  to adjust their bids.

26       17.    By improperly directing auction officials to select entities owned or

27  controlled in whole or in part by LK, VK and/or their co-conspirators, and by

28  making use of confidential bid information that had been leaked to these same

1   entities, VK and LK succeeded in purchasing real estate and other assets put up for

2   auction by Almaty, often at artificially suppressed prices. In some instances, VK

3   thereafter caused development permits to be issued in connection with the

4   purchased sites, vastly increasing the market value of the real estate, which VK,

5   LK, and/or their co-conspirators then re-sold at a significant profit. In other

6   instances, entities controlled by LK simply ignored other restrictions placed on

7   parcels sold at auction in order to resell the parcels at a significant profit. In

8   addition, in some instances, entities controlled directly or indirectly by VK and LK

9   simply failed to pay for the assets they acquired and subsequently re-sold.

10       18.   VK thus used his position of power and authority to convert and cause

11   to be converted, to his use and that of his family, friends and associates, money,

12   funds and property rightfully belonging to Almaty and its people.

13       19.   After wrongfully appropriating assets belonging to Almaty and its

14   people, the Individual Defendants and their families, friends, associates, and

15   accomplices in the Khrapunov Racketeering Enterprise devised and executed

16   schemes to systematically and secretly transfer their ill-gotten gains out of

17   Kazakhstan. The Defendants employed several schemes to launder their ill-gotten

18   funds in an attempt to conceal their source, and, thereafter, to invest those proceeds

19   in real property and other assets located in the United States, Switzerland, and

20   elsewhere. In so doing, VK and his co-conspirators succeeded in concealing their

21   corrupt activity for years.

22       20.   The Individual Defendants transferred much of their ill-gotten

23   proceeds to Switzerland, where IK and EK were residing, using accounts and/or

24   entities owned or controlled by LK, IK, EK, and/or their co-conspirators. LK, IK

25   and EK received millions of dollars transferred out of Kazakhstan by VK and LK

26   and laundered through various offshore holding companies to appear legitimate, to

27   purchase real estate and assets in Switzerland, the United States, and elsewhere,

28   and to fund holding companies owned or controlled by LK, IK, and/or EK.

21.    In approximately late 2007, VK became aware that the Kazakh government had begun investigating him and his family, friends, and associates for criminal violations.  On or about November 9, 2007, VK and LK fled Kazakhstan via private jet to Switzerland.

22.    VK and LK took numerous steps to conceal their looting from Almaty.  Among other things, VK and LK each filed false annual tax returns with the Tax Committee of the Ministry of Finance of Kazakhstan, Kazakhstan's taxation authority, which concealed the millions of dollars in monies, properties, and assets acquired through the Racketeering enterprise. According to their 2007 tax returns, which required VK and LK to list their entire net worth accumulated through all sources as of December 31, 2007, VK and LK reported a combined  net worth of approximately $113,298 (13,671,665 ₸), in addition to three vehicles, five modest pieces of real estate, and two parking stalls.

23.    Despite claiming to have a total net worth of less than $120,000, by systematically looting and plundering assets belonging to the people of Almaty, VK and LK accumulated and amassed a personal fortune that reportedly exceeds $300 million. Indeed, according to public news reports, in 2009, VK was one of the richest people in Switzerland with a fortune of over $300 million.  Similarly, in 2012, VK was among Switzerland's 300 richest people with a fortune of approximately $324 – $432 million (300 – 400 million Swiss francs).

24.    To further conceal their scheme from the people of Almaty, the Individual Defendants, aided and abetted by their co-schemers and others, laundered the proceeds of their fraudulent activity through myriad transactions occurring in several countries, including the United States.   As a further part of the ongoing scheme to conceal the proceeds of their unlawful activity, defendants systematically moved assets from Switzerland and elsewhere into the United States.  Among other things, EK and DK purchased homes located in Beverly Hills and Studio City, California.  IK and MK purchased two additional homes in

1    Beverly Hills.  EK, DK, IK, and MK also moved assets into the U.S. using

2    companies under IK and/or EK's ownership or control, including the Entity

3    Defendants.  EK, DK, IK, and MK further formed multiple U.S. companies,

4    including the Entity Defendants, to assist in bringing funds wrongfully converted

5    from Almaty and its people and laundered through Switzerland and other countries

6    into the United States, and have used those companies to invest their ill-gotten

7    proceeds in real estate and personal property in California and elsewhere.

8        25.    On or about May 27, 2011, the Investigation Department of the

9    Agency for Economic and Corruption-Related Crimes of Kazakhstan (the

10   "Financial Police") filed two criminal cases against VK on suspicion of abuse of

11   power and fraudulent acts.  On or about July 21, 2011, the Financial Police

12   obtained a court-ordered arrest warrant for VK.

13       26.    In 2011 and 2012, additional charges were brought in Kazakhstan

14   against VK, LK, IK, and EK, stemming from the theft of public property and the

15   ultimate laundering of funds.

16       27.    On or about February 20, 2012 and September 14, 2012, the Financial

17   Police applied to the Federal Office of Justice in Switzerland for legal assistance in

18   connection with the effort to prosecute VK, LK, IK, and EK for their crimes

19   against Almaty and its people.  In or about mid-2012, the Public Prosecutor of

20   Geneva opened an investigation into VK, LK, IK, and EK on suspicion of money

21   laundering.  In or about November 2012, the Public Prosecutor of Geneva ordered

22   Swiss accounts and assets belonging to VK, LK, IK, and EK frozen, including

23   accounts held at Swiss banks Sarasin & Co. Ltd., Credit Suisse, and Schroeder &

24   Co.  The investigation by the Swiss authorities is ongoing.

25       28.    There currently are 24 criminal cases pending against VK in

26   Kazakhstan for embezzlement, fraud, money laundering, establishing and directing

27   an organized criminal group for criminal purposes, abuse of power, and bribery.

28   There currently are five criminal cases pending against LK in Kazakhstan for

1   money laundering and establishing and directing an organized criminal group for

2   criminal purposes.  There also currently is a criminal case pending against EK in

3   Kazakhstan for money laundering.

**B.   The Individual Defendants Unlawfully Converted Almaty Property, Ultimately Sold it to Third Parties, and Conveyed the Proceeds to Switzerland**

7   29.   Over the life of the Racketeering Enterprise, the Defendants carried

8   out multiple acts all directed at the same goal: to convert property belonging to

9   Almaty, sell it for a profit, launder the proceeds to conceal their origin, and

10   ultimately convey the proceeds outside of Kazakhstan for the benefit of the

11   Individual Defendants.  As a result, VK, LK, IK, EK and their co-defendants

12   looted Almaty of hundreds of millions of dollars.  Four examples of Defendants'

13   illegal acquisition of property belonging to Almaty and its people are set forth

14   below.  Through the four transactions detailed below, VK, LK, IK, EK, their

15   family and their co-conspirators generated approximately $28.57 million in illicit

16   profits resulting from the illegal conversion and re-sale of four pieces of property.

17   In total, the Khrapunov Racketeering Enterprise is believed to have illegally

18   acquired over 80 pieces of real estate, valued at approximately $300 million, from

19   Almaty and its people.

**Real Estate 1**

21   30.   In or about 2000, VK, acting in his capacity as Mayor of Almaty,

22   illegally engineered a series of transactions relating to a large tract of state-owned

23   land near two rivers in Almaty ("Real Estate 1").  Using a series of fraudulent

24   transactions and front companies controlled by LK and IK, VK ultimately

25   succeeded in having Real Estate 1 transferred to LK for a total price of

26   approximately $121,000.  Through several transactions designed to conceal the

27   illegal conduct, LK and IK ultimately sold Real Estate 1 for a total of $15.57

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\2919453.14

11

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1  million, yielding more than $15 million in illicit profit as a result of a single
2  transaction.

3       31.    VK's transfer of Real Estate 1 violated the Land Code of the Republic
4  of Kazakhstan, which requires that public property be sold via auction, as well as
5  the Water Code, which mandates that land in water conservation zones only be
6  provided to private individuals and entities for temporary use.

7       32.    To carry out the illegal conversion of Real Estate 1, VK, LK, and IK
8  utilized at least six Kazakhstan entities controlled by LK and IK, including: (a)
9  Almaty-Demalys; (b) Viled Establishment; (c) KazRealIncom LLP ("KRI"); (d)
10  Karasha Plus LLP ("Karasha"); (e) Building Services Company ("BSC"); and (f)
11  Asia Holding Development LLP ("Asia Holding"). Through a series of transfers
12  and sales engineered by VK, LK, and IK, Real Estate 1 was first transferred to
13  Almaty-Demalys, which in turn ultimately was transferred to Viled.

14       33.    On or about August 25, 2003, LK caused Viled to sell Almaty-
15  Demalys to KRI for approximately $121,000 (18,800,000 ₸). Less than six
16  months later, LK caused KRI to sell Almaty-Demalys to Karasha for the same
17  amount. Next, LK caused Karasha to transfer ownership of Real Estate 1 directly
18  to her. As a result of this series of transfers, LK obtained full ownership of Real
19  Estate 1.

20       34.    On or about October 6, 2003, LK contributed a portion of Real Estate
21  1 to BSC, which she then sold to an unrelated third party in a transaction that
22  valued that portion of Real Estate 1 at approximately $8 million (1,179,999,980 ₸).
23  LK caused the remaining portion of Real Estate 1 to be conveyed directly to IK.
24  IK, in turn, contributed it to Asia Holding, and then sold Asia Holding to a separate
25  unrelated third party for approximately $7.57 million. Of the $7.57 million, IK
26  transferred approximately $2.21 million to EK's Swiss bank accounts, including
27  accounts at Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co., and retained
28  the remainder for himself.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\2919453.14

12

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1  35. Thus, LK paid approximately $121,000 for Real Estate 1, which she

2 and IK later re-sold for a total of $15.57 million.

3  **Real Estate 2**

4  36. On or about April 16, 2001, VK directed that a public building located

5 in Almaty be sold at a public auction ("Real Estate 2"). VK used his position as

6 mayor to manipulate the auction to ensure that LK's company, KRI, won the

7 auction. Through this scheme, on or about December 26, 2001, KRI purchased

8 Real Estate 2 for approximately $347,000 (52,155,100 ₸).

9  37. Under the laws of Kazakhstan, potential buyers of state-owned

10 property are obligated to state how they intend to invest in and develop the

11 property. In an attempt to make KRI's bid appear legitimate, during the bidding

12 process, LK caused KRI to fraudulently represent that KRI would invest a

13 significant amount in Real Estate 2 to build a health center for the benefit of the

14 people of Almaty. That representation was false at the time it was made and, in

15 fact, KRI never intended to and never did build any such health center . Instead,

16 on or about October 1, 2003, LK caused KRI to sell Real Estate 2 to Karasha and,

17 two days later, LK caused Karasha to sell Real Estate 2 directly to her. Shortly

18 thereafter, LK contributed Real Estate 2 to BSC, which she then sold to an

19 unrelated third party in a transaction that valued Real Estate 2 at approximately

20 $4.1 million (611,445,206 ₸). LK and VK thus obtained illegal profit of over $3.7

21 million as a result of their illicit acquisition and re-sale of Real Estate 2.

22  **Real Estate 3**

23  38. In addition to manufacturing the sale of state-owned assets to LK and

24 other family members and co-conspirators, VK also abused his authority as mayor

25 to seize privately-owned land and transfer it to LK and others for re-sale.

26  39. On or about August 25, 2003, VK directed Almaty to seize land

27 owned by privately-owned third party Shadid Engineering LLP ("Real Estate 3").

28 Approximately one month later, VK caused Real Estate 3 to be sold to Karasha for

1  approximately $105,000 (15,600,000 ₸). LK then caused Karasha to sell Real

2  Estate 3 directly to her.  On or about October 6, 2003, LK contributed Real Estate

3  3 to BSC.  LK then sold BSC to an unrelated third party in a transaction that

4  valued Real Estate 3 at approximately $2 million, resulting in nearly $1.9 million

5  in illicit profit at the expense of Almaty and its people.

6      **Real Estate 4**

7      40.    In or about November 2004, VK caused Almaty to sell land ("Real

8  Estate 4") to two additional Kazakhstan companies owned and controlled by LK,

9  Victoriya-KMK LLP and Ademytau-KMK LLP.  Real Estate 4 was located in a

10  water conservation zone and, therefore, under Kazakh law, could be provided to

11  private entities only for temporary use.  Nevertheless, in violation of the law and

12  his obligations as mayor of Almaty, VK caused Real Estate 4 to be sold to LK's

13  companies for approximately $1.3 million (18,870,100 ₸).  On or about December

14  23, 2005 and January 25, 2006, LK sold Real Estate 4 to an unrelated third party

15  for approximately $8.6 million (1,223,950,000 ₸) – resulting in illicit profit to LK

16  and VK of approximately $7.3 million.

17      41.    Together, the illegal conversion of Real Estate 1-4, and ultimate sale

18  of the properties to unrelated third parties, resulted in profit to VK, LK, IK, EK,

19  their family members and their co-conspirators of over $28.57 million.  These are

20  merely four examples of VK and his family and co-conspirators' wrongdoing.  In

21  total, approximately 80 parcels of real estate rightfully belonging to Almaty and its

22  people were illegally alienated by the Individual Defendants for their own personal

23  gain.  On information and belief, the Individual Defendants profited by over $300

24  million from these illegal transactions, all at the expense of the people of Almaty.

25  **C.    The Individual Defendants Launder Their Illegally Obtained**
26  **Funds Through Swiss Companies Owned or Controlled by Them**

27      42.    The Individual Defendants used numerous holding companies in order

28  to launder the illicit funds they siphoned out of Kazakhstan at the expense of

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

DC\2919453.14

14

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1  Almaty and its people.  These holding companies included at least two Swiss

2  companies owned and controlled by IK and EK, SDG Capital SA ("SDG") and

3  Swiss Promotion Group SA ("SPG").  In total, IK, EK, and LK have transferred at

4  least $125 million into these two Swiss companies alone.

5       43.    IK, EK, LK, and companies they control have injected over $115

6  million in SDG between approximately 2008 and 2012.  SDG was formed in or

7  about July 2008 and, until approximately May 2009, was owned and controlled by

8  Harlem Securities, a British Virgin Islands corporation that was, in turn, owned by

9  IK.  In or about May 2009, EK purchased SDG from Harlem Securities for

10  approximately $99,000.  Following that purchase, IK continued to exert full

11  control over SDG Capital.

12       44.    IK, EK, LK, and companies they control also have contributed

13  substantial assets, believed to be in excess of $10 million, to SPG.  IK is the

14  ultimate beneficial owner of SPG via a variety of offshore holding companies.

15       45.    All of the funds contributed to SDG, SPG, and other front companies

16  controlled by IK, EK and LK represent the ill-gotten proceeds of VK and his

17  family and co-conspirators' looting of real estate and other assets rightfully

18  belonging to Almaty and its people.

19  **D.    Defendants Purchase U.S. Real Estate Using Their Ill-Gotten**
20  **      Proceeds and Create U.S. Companies Through Which to Launder**
21  **      Their Money**

22       46.    EK and her husband, DK, and IK and his wife, MK, used the ill-

23  gotten proceeds from the looting of Almaty by the Khrapunov Racketeering

24  Enterprise, laundered through Switzerland and elsewhere, to purchase luxurious

25  homes and fund lavish lifestyles in Los Angeles, California.

26       47.    EK and DK used the profits generated by VK, LK, and IK's criminal

27  activity in Kazakhstan to purchase a luxurious single-family home located at 2578

28

1    Hutton Drive in Beverly Hills, California, for approximately $3.65 million in or
2    about December 2010.

3        48.    IK and MK, also using the ill-gotten proceeds of the looting scheme,
4    purchased a lavish single-family home located at 606 North Alta Drive in Beverly
5    Hills, California, for approximately $5.45 million in or about March 2012.  IK and
6    MK attempted to conceal the source of the funds used to make this purchase by
7    using Defendant Candian International Ltd. to complete the purchase.

8        49.    IK and MK purchased a second mansion in Beverly Hills in or about
9    January 2013.  Using another front company, Defendant 628 Holdings LLC, to
10   launder and conceal the source of the illicit funds, IK and MK paid $6.2 million for
11   a five-bedroom single-family home located at 628 North Alta Drive in Beverly
12   Hills, California.  EK is listed in public records as an officer of Defendant 628
13   Holdings LLC.

14       50.    In or about July 2013, EK and DK sold the house at 2578 Hutton
15   Drive for approximately $4.97 million and purchased an expansive, two-acre estate
16   located at 11986 Lockridge Road in Studio City, California for approximately $5.7
17   million.  Shortly thereafter, in a further attempt to conceal their possession and use
18   of funds that rightfully belong to Almaty and its people, EK and DK transferred
19   that Studio City estate to The Kasan Family Trust, a trust for which they serve as
20   trustees.

21       51.    IK and MK sold the house at 606 North Alta Drive in or about
22   September 2013 for approximately $6.975 million.

23       52.    The Individual Defendants' luxurious lifestyles in the United States
24   were not limited to the purchase of Beverly Hills mansions.  In or about April
25   2013, EK leased a 2013 Rolls Royce sedan valued at approximately $302,000.  In
26   addition to the Rolls Royce, EK leased a 2013 Bentley sedan valued at
27   approximately $320,000.  EK is the registered owner of a 2013 Mercedes Benz
28

1    sport utility vehicle valued at approximately $114,000 and a 2011 Cadillac sport

2    utility vehicle valued at approximately $75,000.

3       53.    EK, DK, IK and MK have further attempted to launder funds they

4    obtained by plundering Almaty by making investments in multiple American

5    companies, including Defendants Mr. Fumigation Inc., Maro Design LLC, Haute

6    Hue LLC, RPM USA LLC, and RPM-Maro LLC. EK, DK, IK and/or MK own or

7    control all of the Entity Defendants and, on information and belief, all of the

8    monies used to fund investments in the Entity Defendants are traceable to illegal

9    transactions, including money laundering, engineered by the Individual

10    Defendants.

11       54.    IK and EK have caused SDG and SPG to move assets into the United

12    States by, among other things, using a chain of Luxembourg and Delaware entities

13    to invest in real estate in New York. Defendant RPM USA LLC, which is owned

14    or controlled by IK, is a wholly owned subsidiary of SPG, and has invested

15    approximately $6 million in a New York-based medical device company.

16    Additionally, RPM USA and Defendant Maro Design LLC, which is owned or

17    controlled by EK, own 49% and 51%, respectively, of Defendant RPM-Maro LLC.

18       55.    Upon information and belief, in 2013, IK invested approximately

19    $67.5 million to purchase a luxury hotel in New York. In order to conceal the

20    source of the funds used to make this investment, IK used a series of holding

21    companies ultimately owned by SDG and controlled by him. The hotel currently is

22    in the process of being converted into condominiums.

23       56.    All of the funds used by EK and IK to make purchases and

24    investments in companies in California, New York, and elsewhere in the United

25    States represent the ill-gotten proceeds of the illegal scheme to loot property and

26    assets rightfully belonging to Almaty and its people. All of those funds were

27    laundered through Switzerland and other countries into the United States via SDG,

28    SPG, and/or other companies owned or controlled by the Individual Defendants.

1   Further, upon information and belief, Defendants have moved their illicitly-

2   obtained funds into various U.S. banking institutions in order to facilitate their

3   investment activities in the United States.

4                          **FIRST CLAIM FOR RELIEF**

5       (For Violations of RICO, 18 U.S.C. §§ 1962(c), 1962(d), 1964(c), against all

6                                      Defendants)

7           57.   Almaty hereby incorporates by reference the allegations in paragraphs

8   1 through 56, as though fully set forth herein.

9           58.   From in or about 1997 and continuing to the present, by reason of its

10  organization, structure, and activities, the Khrapunov Racketeering Enterprise

11  constituted a RICO enterprise within the meaning of 18 U.S.C. § 1961(4).  The

12  Khrapunov Racketeering Enterprise was comprised of myriad individuals and

13  entities, all associated in fact as part of the Khrapunov Racketeering Enterprise,

14  including but not limited to the Individual Defendants and Entity Defendants

15  named herein.  The Khrapunov Racketeering Enterprise was engaged in, and the

16  activities of the Khrapunov Racketeering Enterprise affected, interstate and foreign

17  commerce.

18          59.   As alleged herein, the Khrapunov Racketeering Enterprise

19  participants, including Defendants and each of them, engaged in acts indictable

20  under federal law, including mail fraud in violation of 18 U.S.C. § 1341, wire fraud

21  in violation of 18 U.S.C. § 1343, money laundering in violation of 18 U.S.C. §

22  1956, conducting money transactions in property derived from specified unlawful

23  activity in violation of 18 U.S.C. § 1957, and/or the foreign transport of stolen

24  money or property known to be stolen, converted or taken by fraud in violation of

25  18 U.S.C. § 2314, in order to implement the objectives and accomplish the

26  unlawful purposes of the Khrapunov Racketeering Enterprise as set forth herein,

27  and thereby engaged in predicate acts of racketeering within the meaning of 18

28  U.S.C. § 1961(1)(B).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\2919453.14

18

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

60.     Each of the Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Khrapunov Racketeering Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c), consisting as applicable of multiple acts of mail fraud, wire fraud, money laundering, conducting money transactions in property derived from specified unlawful activity, and/or foreign transport of stolen money or property known to be stolen, converted or taken by fraud, as specified herein.  Each of the Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO (*i.e.*, October 15, 1970).

61.     From in or about 1997, and continuing to the present, Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Khrapunov Racketeering Enterprise and in order to implement the schemes and employ the devices described herein.

62.     In so doing, Defendants unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together, with each other and with others to commit RICO violations under 18 U.S.C. § 1962(c) and, thereby, violated 18 U.S.C. § 1962(d).  In furtherance of the conspiracy and to effect the objects thereof, Defendants committed in the Central District of California and elsewhere the overt acts as described herein, among others.

63.     As a direct and proximate result of RICO violations by the Defendants of 18 U.S.C. §§ 1962(a), 1962(b), 1962(c), and/or 1962(d), Almaty has suffered damages in an amount to be determined at trial and presently estimated to be not less than $300 million.  Almaty has been injured in its business or property by reason of each such Defendant's violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), is thereby entitled to recover threefold the damages it has suffered, together with its costs of suit and reasonable attorneys' fees.

1

**SECOND CLAIM FOR RELIEF**

2

(For Violations of RICO, 18 U.S.C. §§ 1962(a), 1962(d), 1964(c), against all

3

Defendants)

4        64.    Almaty hereby incorporates by reference the allegations in paragraphs

5    1 through 63, as though fully set forth herein.

6        65.    From in or about 1997 and continuing to the present, by reason of its

7    organization, structure, and activities, the Khrapunov Racketeering Enterprise

8    constituted a RICO enterprise within the meaning of 18 U.S.C. § 1961(4). The

9    Khrapunov Racketeering Enterprise was comprised of myriad individuals and

10   entities, all associated in fact as part of the Khrapunov Racketeering Enterprise,

11   including but not limited to the Individual Defendants and Entity Defendants

12   named herein. The Khrapunov Racketeering Enterprise was engaged in, and the

13   activities of the Khrapunov Racketeering Enterprise affected, interstate and foreign

14   commerce.

15       66.    Each of the Defendants was at the center of and was a principal

16   perpetrator of a fraudulent scheme and is liable under 18 U.S.C. § 1962(a) as a

17   direct and indirect beneficiary of the pattern of racketeering herein alleged.

18       67.    As alleged herein, the Khrapunov Racketeering Enterprise

19   participants, including Defendants and each of them, engaged in acts indictable

20   under federal law, including mail fraud in violation of 18 U.S.C. § 1341, wire fraud

21   in violation of 18 U.S.C. § 1343, money laundering in violation of 18 U.S.C. §

22   1956, conducting money transactions in property derived from specified unlawful

23   activity in violation of 18 U.S.C. § 1957, and/or the foreign transport of stolen

24   money or property known to be stolen, converted or taken by fraud in violation of

25   18 U.S.C. § 2314, in order to implement the objectives and accomplish the

26   unlawful purposes of the Khrapunov Racketeering Enterprise as set forth herein,

27   and thereby engaged in predicate acts of racketeering within the meaning of 18

28   U.S.C. § 1961(1)(B). Furthermore, each Defendant received income derived

1   directly or indirectly from a pattern of racketeering in which each of said

2   Defendants participated as a principal within the meaning of 18 U.S.C. § 2.

3       68.    During the period commencing in or about 1997 and continuing to the

4   present, the Defendants, having received income derived, directly or indirectly,

5   from a pattern of racketeering activity, used or invested, directly or indirectly, in

6   violation of 18 U.S.C. § 1962(a), income or the proceeds of income from said

7   illegal racketeering activity in the acquisition of an interest in, or the establishment

8   or operation of the Khrapunov Racketeering Enterprise or one or more affiliated

9   entities, including without limitation, the Entity Defendants.  Said uses and

10   investments in enterprises affecting interstate or foreign commerce include without

11   limitation the uses and investments described herein.

12       69.    In so doing, Defendants unlawfully, willfully and knowingly did

13   combine, conspire, confederate, and agree together, with each other and with

14   others to commit RICO violations under 18 U.S.C. § 1962(c) and, thereby, violated

15   18 U.S.C. § 1962(d).  In furtherance of the conspiracy and to effect the objects

16   thereof, Defendants committed in the Central District of California and elsewhere

17   the overt acts as described herein, among others.

18       70.    As a direct and proximate result of RICO violations by the Defendants

19   of 18 U.S.C. § 1962(a) and/or 18 U.S.C. § 1962(d), Almaty has suffered damages

20   in an amount to be determined at trial and presently estimated to be not less than

21   $300 million.  Almaty has been injured in its business or property by reason of

22   each such Defendant's violations in that financial assets stolen or otherwise

23   diverted from and thereby lost to Almaty have been used and invested, directly or

24   indirectly, to acquire an interest in and to establish and operate numerous

25   enterprises affecting interstate or foreign commerce without benefit to Almaty or

26   its people.  Accordingly, pursuant to the civil remedy provisions of 18 U.S.C. §

27   1964(c), Almaty is entitled to recover threefold the damages it has suffered,

28   together with its costs of suit and reasonable attorneys' fees.

**THIRD CLAIM FOR RELIEF**

(For Violation of and Conspiracy to Violate California's Unfair Competition Law,

Cal. Bus. & Prof. Code §§ 17200 *et seq.*, against all Defendants)

71.     Almaty hereby incorporates by reference the allegations in paragraphs 1 through 70, as though fully set forth herein.

72.     As alleged herein, the Khrapunov Racketeering Enterprise participants, including Defendants and each of them, engaged in acts indictable under federal law, including mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, money laundering in violation of 18 U.S.C. § 1956, conducting money transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, and/or the foreign transport of stolen money or property known to be stolen, converted or taken by fraud in violation of 18 U.S.C. § 2314, in order to implement the objectives and accomplish the unlawful purposes of the Khrapunov Racketeering Enterprise as set forth herein.

73.     In addition, as set forth above, Defendants failed to disclose and otherwise concealed from Almaty and others facts the disclosure of which was necessary to make the representations made by them to Almaty not materially misleading.  Defendants knew that said facts were not being disclosed and were material, and they intended by concealment of these facts to facilitate continuation of their unlawful diversion of assets belonging to Almaty and its people.  Almaty relied to its detriment on the representations of integrity by Defendants. Defendants flagrantly breached the trust and confidence of Almaty by committing numerous acts of fraud, deceit, conversion, and racketeering alleged herein, through which they plundered the assets of Almaty.

74.     As a result, Defendants, and each of them, have acted unlawfully, fraudulently, and/or unfairly within the meaning of California Business and Professions Code §§ 17200 *et seq.* as alleged herein.

1    75.    As a direct and proximate result of violations by the Defendants of

2  California Business and Professions Code §§ 17200 *et seq.*, Almaty has suffered

3  damages in an amount to be determined at trial and presently estimated to be not

4  less than $300 million and is entitled to restitution and injunctive relief.

5                    **FOURTH CLAIM FOR RELIEF**

6                 (For Breach of Fiduciary Duty against VK)

7    76.    Almaty hereby incorporates by reference the allegations in paragraphs

8  1 through 75, as though fully set forth herein.

9    77.    As alleged above, VK owed a fiduciary duty to Almaty and its people

10  to hold and control the assets of the Almaty government for the benefit of Almaty

11  and its people, and not for his personal benefit or the personal benefit of his

12  relatives, associates, and accomplices.

13    78.    By engaging in the acts alleged above, VK breached his fiduciary duty

14  to Almaty and its people.  As a direct and proximate result of such breaches,

15  Almaty has suffered damages in an amount to be determined at trial and presently

16  estimated to be not less than $300 million.

17    79.    In committing the acts and perpetrating the schemes alleged herein,

18  VK intended to injure Almaty and acted with malice and oppression and with a

19  willful and conscious disregard for the rights of Almaty and its people.  In so

20  doing, VK has acted toward Almaty and its people in such manner as to warrant

21  disgorgement of his uses and investments of Almaty's money and property

22  together with an award of punitive and exemplary damages in an amount no less

23  than $300 million.

24                    **FIFTH CLAIM FOR RELIEF**

25             (For Conversion and Conspiracy to Convert against all Defendants)

26    80.    Almaty hereby incorporates by reference the allegations in paragraphs

27  1 through 79, as though fully set forth herein.

28

1    81.    Defendants, and each of them, have wrongfully converted, aided and

2    abetted, and caused to be converted, to their own use, and that of their friends,

3    families, associates, and accomplices, money, funds, and property belonging to

4    Almaty and its people.  Such conversions have been for the benefit of the

5    Defendants and their friends, families, associates, and accomplices, and to the

6    detriment of the true owners of the property, Almaty and its people.  Such acts of

7    conversion include the acts alleged herein.

8    82.    Defendants unlawfully, willfully, and knowingly did combine,

9    conspire, confederate, and agree together, with each other, and with others to

10   convert money, funds, and property belonging to Almaty and its people to their

11   own use, and that of their friends, families, associates, and accomplices.  In

12   furtherance of the conspiracy and to affect the objects thereof, Defendants

13   committed the overt acts, among others, referenced above.

14   83.    As a direct and proximate result of these acts of conversion by

15   Defendants, Almaty has suffered damages in an amount to be determined at trial,

16   and presently estimated to be not less than $300 million.

17   84.    In committing the acts and perpetrating the schemes alleged herein,

18   Defendants intended to injure Almaty and acted with malice and oppression and

19   with a willful and conscious disregard for the rights of Almaty and its people.  In

20   so doing, Defendants acted toward Almaty and its people in such manner as to

21   warrant disgorgement of their uses and investments of Almaty's money and

22   property together with an award of punitive and exemplary damages in an amount

23   no less than $300 million.

24   **SIXTH CLAIM FOR RELIEF**

25   (For Fraud and Deceit and Conspiracy to Defraud against VK and LK)

26   85.    Almaty hereby incorporates by reference the allegations in paragraphs

27   1 through 84, as though fully set forth herein.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\2919453.14

24

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1    86.    In the course of conducting and participating in the conduct of the

2    affairs of the Khrapunov Racketeering Enterprise, VK and LK made

3    representations to Almaty and others, which representations were false and

4    necessary to implement the unlawful looting, laundering, investment and

5    obstruction schemes described above.

6    87.    As set forth above, VK, who owed a fiduciary duty to Almaty, and LK

7    failed to disclose and otherwise concealed facts from Almaty and others, the

8    disclosure of which was necessary to make the representations made by them to

9    Almaty not materially misleading.  VK and LK knew that said facts were not being

10   disclosed and were material, and they intended by concealment of these facts to

11   facilitate continuation of their unlawful diversion of assets belonging to Almaty

12   and its people.

13   88.    Almaty relied to its detriment on the representations of integrity by

14   VK and LK.  VK and LK flagrantly breached the trust and confidence of Almaty

15   by committing numerous acts of fraud, deceit, conversion, and racketeering alleged

16   herein, through which they plundered the assets of Almaty.

17   89.    In the course of developing their elaborate scheme to defraud, VK and

18   LK secured the assistance, among others, of associates and accomplices, who with

19   VK and LK unlawfully, willfully and knowingly did combine, conspire,

20   confederate, and agree together, with each other and with others to facilitate, aid

21   and abet, and conceal the scheme and artifice to defraud, and to obtain money and

22   property by false representations and promises, thereby enabling the massive

23   diversions and concealment of looted funds identified in this Complaint.

24   90.    As a direct and proximate result of the foregoing fraudulent conduct

25   and conspiracy to defraud, Almaty has suffered damages in an amount to be

26   determined at trial, and presently estimated to be not less than $300 million.

27   91.    In committing the acts and perpetrating the schemes alleged herein,

28   VK and LK intended to injure Almaty and acted with malice and oppression and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\2919453.14

25

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

1 with a willful and conscious disregard for the rights of Almaty and its people.  In

2 so doing, Defendants acted toward Almaty and its people in such manner as to

3 warrant disgorgement of their uses and investments of Almaty's money and

4 property together with an award of punitive and exemplary damages in an amount

5 no less than $300 million.

### SEVENTH CLAIM FOR RELIEF

(For an Accounting, and Imposition of a Constructive Trust and Equitable Lien

against all Defendants)

9     92.     Almaty hereby incorporates by reference the allegations in paragraphs

10 1 through 91, as though fully set forth herein.

11     93.     During VK's mayoralty of Almaty, he, acting as mayor, controlled

12 virtually all of the valuable assets of the Almaty government.  These assets

13 included money and real and personal property owned by the Almaty government,

14 the right to convey, for the benefit of the people of Almaty, real and personal

15 property owned by the Almaty government, and the right to decide who could do

16 business in Almaty through the granting of licenses, concessions, and permits.  VK

17 further was entrusted with the ability to cause privately owned property to be

18 seized by the Almaty government, purportedly for the benefit of Almaty and its

19 people.

20     94.     VK owed a fiduciary duty to Almaty and its people to hold and

21 control these assets for the benefit of Almaty and its people, and not for his

22 personal benefit or the personal benefit of his friends, families, associates, and

23 accomplices.  As alleged above, VK, aided and abetted by the other Defendants,

24 converted the assets of the Almaty government to his personal benefit and the

25 personal benefit of his friends, families, associates, and accomplices. They did so

26 by looting money and property owned by the Almaty government and/or by private

27 parties and by accepting bribes, kickbacks, gratuities, and commissions in

28 exchange for the granting of the legal right to do business in Almaty.  All such

1  conversions of assets were done in violation of VK's duties to the beneficial

2  owners of such assets, Almaty and its people.  If VK or the other Defendants are

3  permitted to retain these assets, they will be unjustly enriched at Almaty's expense.

4       95.     Defendants other than VK received money and property stolen from

5  the Almaty government by VK and other economic benefits taken or conferred

6  upon them by VK in violation of his fiduciary duty.  These Defendants received

7  such money, property, and other economic benefits without giving value for them

8  or with notice to Almaty that such assets had been stolen or otherwise acquired in

9  violation of VK's duties to Almaty and its people.  If these Defendants are

10 permitted to retain such assets, they will be unjustly enriched at Almaty's expense.

11      96.     As a result of the foregoing, Almaty is entitled to an accounting by

12 each of the Defendants of all real and personal property held, acquired, or disposed

13 of by them at any time since 1997.

14      97.     As a result of the foregoing, Almaty is entitled to a constructive trust

15 and equitable lien upon all real and personal property of Defendants, wherever

16 located worldwide.

17      98.     Defendants regularly misused and continue to misuse the corporate

18 and other forms of business organization as a cloak for committing fraud and as a

19 means of perpetrating injustice.  By reason of the elaborate and fraudulent schemes

20 used by Defendants to conceal transfers of stolen money and property and to

21 conceal ownership of Defendants' assets, it would be unjust and inequitable to

22 require Almaty to trace the source of money used to acquire specific assets, or to

23 prove that specific assets were acquired with money or property stolen from

24 Almaty. Instead, the burden should be shifted to Defendants to prove that they had

25 sources of income other than the unlawful looting and investment schemes

26 described herein, and to prove that particular assets were acquired by them with

27 such independent, lawful income.

28

LATHAM&WATKINS⸆⸆
ATTORNEYS AT LAW
LOS ANGELES
DC\2919453.14                                                               27

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.     For compensatory damages;

B.     For treble damages;

C.     For punitive damages;

D.     For prejudgment interest;

E.     For a constructive trust;

F.     For an accounting;

G.     For injunctive relief;

H.     For restitution and disgorgement;

I.     For all costs and fees incurred in prosecuting this Complaint;

J.     For such other and further relief as this Court deems just and proper.

Dated:  May 13, 2014

LATHAM & WATKINS LLP
David J. Schindler
Kristen M. Tuey
Brigitte E. Mills

By _____
David J. Schindler
Attorneys for Plaintiff the City of
Almaty

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DC\2919453.14

28

COMPLAINT FOR DAMAGES, INJUNCTIVE
RELIEF AND OTHER EQUITABLE RELIEF

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| THE CITY OF ALMATY, a foreign state | VIKTOR KHRAPUNOV, an individual; LEILA KHRAPUNOV, an individual; et al. (See Attachment for Full Case Caption) |

| (b) County of Residence of First Listed Plaintiff   N/A | County of Residence of First Listed Defendant   N/A |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| (c) Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. | Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |
|---|---|
| LATHAM & WATKINS LLP<br>David J. Schindler (Bar No. 130490)<br>355 South Grand Avenue, Los Angeles, CA 90071-1560<br>Telephone: (213) 485-1234 | |

### II. BASIS OF JURISDICTION (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. ORIGIN (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No     ☒ MONEY DEMANDED IN COMPLAINT: $ To be determined

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Defendants looted assets rightfully belonging to Plaintiff or participated in a conspiracy to loot such assets and to launder the proceeds of their looting, in violation of RICO, 18 U.S.C. §§ 1962 et seq., and Cal. Bus. & Prof. Code §§ 17200 et seq., and committed conversion, fraud, and breach of fiduciary duty.

### VII. NATURE OF SUIT (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☒ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accommodations | ☐ 740 Railway Labor Act | |
| | ☐ 220 Foreclosure | | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| FOR OFFICE USE ONLY: | Case Number: | | | **CV14-3650** |
|---|---|---|---|---|

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned.  This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes   ☒ No | ☐ Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
|  | ☐ Orange | Southern |
|  | ☐ Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| ☐ Yes   ☒ No | A PLAINTIFF? Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT? Then check the box below for the county in which the majority of PLAINTIFFS reside. |  |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | ☐ Los Angeles | Western |
|  | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
|  | ☐ Orange | ☐ Orange | Southern |
|  | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
|  | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |

| C.1. Is either of the following true? If so, check the one that applies: | C.2. Is either of the following true? If so, check the one that applies: |
|---|---|
| ☐ 2 or more answers in Column C | ☐ 2 or more answers in Column D |
| ☐ only 1 answer in Column C and no answers in Column D | ☐ only 1 answer in Column D and no answers in Column C |
| Your case will initially be assigned to the SOUTHERN DIVISION. Enter "Southern" in response to Question D, below. | Your case will initially be assigned to the EASTERN DIVISION. Enter "Eastern" in response to Question D, below. |
| If none applies, answer question C2 to the right. ➡ | If none applies, go to the box below. ⬇ |

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | **WESTERN DIVISION** |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s):

**IX(b). RELATED CASES**: Have any cases been previously filed **in this court** that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**   _Dal Schol/s_   DATE:   May 13, 2014

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

## ATTACHMENT — FULL CASE CAPTION

CITY OF ALMATY, a foreign state,

                         Plaintiff,

    v.

VIKTOR KHRAPUNOV, an individual; LEILA KHRAPUNOV, an individual; ILIYAS
KHRAPUNOV, an individual; MADINA ABLYAZOVA a/k/a MADINA KHRAPUNOVA, an
individual; ELVIRA KHRAPUNOV a/k/a/ ELVIRA KUDRYASHOVA a/k/a ELVIRA
BALMADANI, an individual; DMITRI KUDRYASHOV, an individual; RPM USA, LLC, a
New York corporation; RPM-MARO LLC, a New York corporation; MR. FUMIGATION INC.,
a California corporation; MARO DESIGN LLC, a California corporation; HAUTE HUE LLC, a
California corporation; 628 HOLDINGS LLC, a California Corporation; CANDIAN
INTERNATIONAL LTD., a British Virgin Islands corporation; ELVIRA KUDRYASHOVA AS
TRUSTEE FOR THE KASAN FAMILY TRUST; DMITRI KUDRYASHOV AS TRUSTEE
FOR THE KASAN FAMILY TRUST; and DOES 1 through 10,

                         Defendants.