# EXHIBIT A

# KAZAKHSTAN 2013 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

The Republic of Kazakhstan has a government system dominated by President Nursultan Nazarbayev and the ruling Nur Otan Party.  The constitution concentrates power in the presidency.  The president controls the legislature and the judiciary as well as regional and local governments.  Changes or amendments to the constitution require presidential consent.  The 2012 national elections for the Mazhilis (lower house of parliament) fell short of international standards, as did the 2011 presidential election, in which President Nazarbayev received 95 percent of the vote.  Civilian authorities maintained effective control over the security forces.  Some security forces committed human rights abuses.

The most significant human rights problems were severe limits on citizens' rights to change their government; restrictions on freedom of speech, press, assembly, religion, and association; and lack of an independent judiciary and due process, especially in dealing with pervasive corruption and abuses by law enforcement and judicial officials.

Other reported abuses included:  arbitrary or unlawful killings; military hazing that led to deaths; detainee and prisoner torture and other abuse; harsh and sometimes life threatening prison conditions; arbitrary arrest and detention; infringements on citizens' privacy rights; prohibitive political party registration requirements; restrictions on the activities of nongovernmental organizations (NGOs); violence and discrimination against women; abuse of children; sex and labor trafficking; discrimination against persons with disabilities and ethnic minorities; societal discrimination against lesbian, gay, bisexual, and transgender (LGBT) persons, and persons with HIV/AIDS; and child labor.

The government took modest steps to prosecute officials who committed abuses, especially in high-profile corruption cases; however, corruption was widespread and impunity existed, for those in positions of authority as well as for those with connections to government or law enforcement officials.

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

## a. Arbitrary or Unlawful Deprivation of Life

# KAZAKHSTAN                                     2

There were several reports that the government or its agents committed arbitrary or unlawful killings. The Prosecutor General's Office is responsible for examining all security force killings and evaluating whether they occurred in the line of duty or were otherwise justifiable.

On January 29, a court convicted six officers of prison colony number 159/7 in the Karaganda Region of "abuse of power" and sentenced them to between five and eight years in prison after they were found guilty of beating inmate Shamil Yaroslavlev to death. Prison officials found Yaroslavlev dead in his cell in 2011, after he incurred blows to the chest.

Military hazing led to deaths, suicides, and serious injuries. In August the Commander of the Kostanai Military Unit No 6697 reported that Private Mirbek Bakirov died of heart failure after having a seizure. Two days following the incident, Private Mukanbetov admitted to kicking Bakirov and causing his death. Officials placed Mukanbetov in a detention center, pending further investigation of the case.

There were deaths reported in prisons due to abuse (see section 1.c.).

**b. Disappearance**

There were no reports of disappearances during the year.

**c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment**

The law prohibits torture; nevertheless, police and prison officials allegedly tortured and abused detainees, most often in an effort to obtain or force confessions.

During a January meeting of law enforcement authorities chaired by the president, Procurator General Askhat Daulbayev criticized the Ministry of Internal Affairs for ignoring or covering up allegations of torture used by the police. He argued that torture undermines the people's confidence in the police and government authorities. In July the president signed legislation creating a national preventative mechanism (NPM) against torture and other cruel, inhuman, or humiliating treatment or punishment. The human rights commissioner is responsible for approving the members of the NPM committee, which can include NGO representatives, lawyers, social workers, doctors, and others with an interest in the

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

**Ex. A**
**Page 5**

protection of the rights of citizens.  According to the legislation, NPM members have the right to receive complaints and hold unaccompanied meetings with detainees in a variety of government facilities including prisons, pretrial detention centers, military and police detention centers, children's centers and special education centers, as well as facilities for the compulsory treatment of tuberculosis, drug addiction, and psychiatric issues.

According to local NGOs, torture most often occurred in pretrial detention centers in order to obtain confessions.

On June 28, two teenagers complained to the Public Monitoring Commission of Astana that they had been beaten in one of the city's pretrial detention centers. One of the teenagers said that on June 6, a prison guard slammed his head against the ground and that he was put into solitary confinement for a week before being examined by a doctor.  The other teenager reported that on May 6, he was kicked and beaten with a truncheon.  The teenagers both complained to a prosecutor but said they were subsequently threatened and warned against filing complaints.

According to Roza Akylbekova, director of the Kazakhstan Bureau for Human Rights and Coordinator of the Coalition Against Torture, during the first eight months of the year, the Coalition of NGOs against Torture received 201 complaints of torture and mistreatment, of which 35 were humiliating, 39 cruel, and 127 torturous.  The coalition recorded 362 such complaints in 2012.  In 2012 the procurator general reported that of 602 complaints of torture, the government opened only 27 criminal investigations.

Human rights activists asserted that the legal definition of torture was too vague to meet UN standards and that the penalties for the crime were too lenient.  They also asserted that in many cases perpetrators were charged with "abuse of power" rather than torture.  In 2012, the Kazakhstani Commission on Human Rights, which advises the president on human rights issues, reported cases of torture and other kinds of cruel treatment, although not systemic, continued to exist in the penitentiary system and that law enforcement officers used torture and other illegal methods in investigations.

In a 2012 report, the human rights ombudsman attributed the existence of torture, as described by prisoner and detainee complaints, NGO monitors, and the media, to a lack of professionalism among prison administration personnel.  The ombudsman can either issue a recommendation directly to the relevant agency or

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 6

release a public statement, but he cannot legally force agencies to comply with his recommendations.

In March the Baydybek District Court of South Kazakhstan Region sentenced three police officers to three and one-half years' imprisonment for the crimes of torture and bribery. The investigation revealed the police officers intentionally caused physical and mental suffering to the victim to obtain his confession. In March the City Court of Ridder in the region of East Kazakhstan sentenced the deputy chief of the criminal police to two years in prison for intentionally causing physical and mental suffering to a suspect to obtain a confession. During the hearing the officer explained that he committed the crime to improve the record of solved cases. According to the Ministry of Defense, there were 24 cases of military hazing reported in 2012, and in the same year the government did not convict any military officers of hazing. The Ministry of Defense continued unannounced inspections and required systematic reports from senior officers about hazing in their units.

## Prison and Detention Center Conditions

Prison conditions were generally harsh and sometimes life threatening, and facilities did not meet international health standards. Health problems among prisoners went untreated in many cases or were exacerbated by prison conditions, such as a widespread lack of heating and proper ventilation. There was an overall scarcity of medical care.

<u>Physical conditions</u>: As of September, there were 49,990 prisoners and detainees in pretrial and detention facilities.

Abuse occurred in police cells, pretrial detention facilities, and prisons. Observers cited severe overcrowding, poor treatment of inmates and detainees, and the lack of professional training programs for administrators as the primary problems. According to the international NGO Penal Reform International (PRI), there were 24 new cases of prisoners infected with HIV during the first half of the year. In 2012 the organization reported a total of 4,817 prisoners infected with HIV. In 2012 the chairperson of the Criminal Corrective Committee, Zhanat Keshubayev, stated 1,677 prisoners were infected with HIV. In 2012 Aigul Katrenova, head of the Committee of the State Sanitary-Epidemiology Inspectorate of the Ministry of Health, identified the following as persistent problems: insufficient access to medical care; lack of monitoring of antiretroviral treatment of HIV-infected prisoners; shortage of medical personnel; lack of infectious disease doctors; and shortages in medication. PRI reported there was a widespread lack of heating and

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 7

adequate ventilation within the prison system.  Prisoners had access to potable water.

The government reported 39 deaths in pretrial detention centers and police cells in 2012, and PRI reported 220 deaths in prisons as a result of illness and 59 due to other reasons, including suicide.  PRI also reported 37 deaths as a result of tuberculosis during the first eight months of 2013.

The government reported 14 suicides in pretrial detention facilities and police cells in 2011.  Figures for 2012 and 2013 were not released by year's end.

In 2012 (the latest period for which statistics were available) there were 340 cases of reported self-mutilation protesting harsh prison conditions and abuse.

<u>Administration</u>:  Although alternatives existed for sentencing nonviolent offenders, officials and NGOs noted that they remained underutilized.  Recordkeeping on prisoners was adequate.  While individual prison ombudsmen were not available to accept prisoners' complaints, the national human rights ombudsman received and responded to complaints from prisons.

According to observers, prisoners and detainees generally had reasonable access to visitors.  Human rights activists complained that the 2011 Law on Religious Activity eliminated prayer rooms and religious facilities in prisons, and they reported that prison administrators interfered with prisoners' religious observance. Prison authorities insisted that a representative of a registered religious organization may attend those in need of "religious rituals."

<u>Independent Monitoring</u>:  Civil society activists worked with the councils for public oversight of the Ministry of Justice and the Ministry of Internal Affairs, as well as the Human Rights Ombudsman's Counter Torture Working Group, to monitor prison and detention facilities.  Many observers criticized the councils for their lack of independence and clearly defined authority or power.

There were no international independent monitors, including from the International Committee of the Red Cross.

**d. Arbitrary Arrest or Detention**

The law prohibits arbitrary arrest and detention, but problems remained. According to the Prosecutor General's Office, during 2012 and the first half of

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 8

2013, police illegally arrested 104 individuals and illegally detained 209 individuals.  In May police arrested social activists Zhasaral Kuanyshalin, Sagat Zhusip, and Zhenis Doszhanov while they were laying wreaths at the monument for victims of political repression.  The activists, believed by the government to be associated with the banned political party Alga (Forward), had previously been warned not to hold an awards ceremony for civil society activists.  Heeding this warning, they decided to lay wreaths at the monument instead.

**Role of the Police and Security Apparatus**

The Ministry of Internal Affairs supervises the national police force, which has primary responsibility for internal security, including investigation and prevention of crimes and administrative offenses, and maintenance of public order and security.  The Agency for Combating Economic and Corruption Crimes (Financial Police) has administrative and criminal investigative powers.  The Committee for National Security (KNB) plays a role in border security, internal security, antiterrorism efforts, and the investigation and interdiction of illegal or unregistered groups, such as extremist groups, military groups, political parties, religious groups, and trade unions.  The KNB, Syrbar (a separate foreign intelligence service), and the Financial Police report directly to the president. Many government ministers maintained personal blogs where citizens could register complaints.

Although the government took modest steps to prosecute officials who committed abuses, impunity existed.

**Arrest Procedures and Treatment of Detainees**

Although the judiciary has the authority to deny or grant arrest warrants, judges authorized prosecutors' warrant requests in the vast majority of cases.  In 2012 the courts authorized 11,263 – representing 95 percent – of prosecutors' requests for warrant arrests.  Prosecutors continued to have the power to authorize investigative actions, such as search and seizure.

Persons detained, arrested, or accused of committing a crime have the right to the assistance of a defense lawyer from the moment of detention, arrest, or accusation. The law does not require police to inform detainees that they have the right to an attorney, and police did not do so.  Human rights observers alleged that law enforcement officials dissuaded detainees from seeing an attorney, gathered evidence through preliminary questioning before a detainee's attorney arrived, and

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 9

in some cases used corrupt defense attorneys to gather evidence.  The law states that the government must provide an attorney for an indigent suspect or defendant when the suspect is a minor, has physical or mental disabilities, or faces serious criminal charges, but public defenders often lacked the necessary experience and training to assist defendants.  Defendants are barred from freely choosing their defense counsel if the cases against them involve state secrets; the law allows only lawyers who have special clearance to work on such cases.

Arbitrary Arrest:  Prosecutors reported continuing problems with arbitrary arrest and detention.  According to the General Prosecutor's Office, authorities illegally arrested 104 persons and unlawfully detained 209 during 2012 and the first half of 2013.

The government frequently arrested and detained opponents and critics, sometimes for minor infractions such as unsanctioned assembly, which incurred either fines or up to 10 days of administrative arrest.  According to the law, detainees may remain in pretrial detention for up to two months.  Depending on the complexity and severity of the alleged offense, authorities may extend the term for up to one year while the investigation takes place.  The pretrial detention term cannot be longer than the potential sentence for the offense.

Pretrial Detention:  The law allows police to hold a detainee for 72 hours before bringing charges.  Human rights observers criticized this period as too lengthy and said that authorities often used this phase of detention to torture, beat, and abuse inmates to extract confessions.  A bail system exists but was not used widely, and many individuals remained in pretrial detention until their trial.  The law grants prisoners prompt access to family members; however, prisoners were sometimes sent to facilities located far from their homes and relatives, thus restricting access for those who could not afford to travel.

**e. Denial of Fair Public Trial**

The law does not provide for an independent judiciary.  The executive branch sharply limited judicial independence.  Prosecutors enjoyed a quasi-judicial role and had the authority to suspend court decisions.

Corruption was evident at every stage of the judicial process.  Although judges were among the most highly paid government employees, lawyers and human rights monitors alleged that judges, prosecutors, and other officials solicited bribes in exchange for favorable rulings in the majority of criminal cases.  For example,

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 10

in February police arrested two municipal court judges in Kostanai, Samalnek Mukhtarov and Serik Kashkinbaev, and accused them of taking bribes in exchange for favorable rulings. The corruption came to light when each of the judges allegedly accepted a bribe of 100,000 tenge ($700) for a case they adjudicated. In July the court reported that the chairman of the regional court, Galymzhan Myrzake, had been admonished for the corruption-related actions of his subordinates and that the two judges had been fired. An investigation by the financial police continued at year's end.

Military courts have jurisdiction over civilian criminal defendants in cases allegedly connected to military personnel. Military courts use the same criminal code as civilian courts.

**Trial Procedures**

All defendants enjoy a presumption of innocence and are protected from self-incrimination. Trials are public except in instances that could compromise state secrets or when necessary to protect the private life or personal family concerns of a citizen. Only defendants charged with capital crimes facing the death penalty or a life sentence are entitled to trial by jury.

Courts conducted jury trials for aggravated murder cases. Observers noted that the juror selection process was inconsistent and that judges, who deliberated with the jurors, tended to dominate the process. The Supreme Court reported that during the first nine months of the year, there were 163 jury trials.

Indigent defendants in criminal cases have the right to counsel and to a government-provided attorney. Under the criminal procedure code a defendant must be represented by an attorney when the defendant is a minor, has mental or physical disabilities, does not speak the language of the court, or faces 10 or more years of imprisonment. Defense attorneys, however, reportedly participated in only one-half of criminal cases, in part because the government failed to pay them. The law also provides defendants the right to be present at their trials, to be heard in court, to confront witnesses against them, and to call witnesses for the defense. They have the right to appeal a decision to a higher court. According to observers, prosecutors dominated trials, and defense attorneys played a minor role.

Domestic and international human rights organizations reported numerous problems in the judicial system, including lack of access to court proceedings, lack of access to government-held evidence, frequent procedural violations, poor

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 11

# KAZAKHSTAN 9

explanation of rights to defendants, denial of defense counsel motions, and failure of judges to investigate allegations that authorities extracted confessions through torture or duress. Activists also complained that approximately 98 percent of criminal cases ended with a guilty verdict and called for the use of juries for a wider range of trials.

Lack of due process was a problem, particularly in a handful of politically motivated trials involving protests by opposition activists and in cases in which there were allegations of improper political or financial influence. For example, NGOs pointed out that, when the Supreme Court decided whether or not to hear the appeal of Vladimir Kozlov, the hearing was held in Kazakh (a language that Kozlov does not speak) and interpretation into Russian was inadequate.

Human rights and international legal observers noted investigative and prosecutorial practices that emphasized a confession of guilt over collection of other evidence in building a criminal case against a defendant. Courts generally ignored allegations by defendants that officials had obtained confessions by torture or duress.

## Political Prisoners and Detainees

In 2012 the Mangystau Inter-District Court sentenced Vladimir Kozlov, leader of the unregistered political opposition party Alga, to seven and one-half years in prison for "forming a criminal group, inciting social discord, and calling for the violent overthrow of the constitutional order." The charges were linked to 2011 violence that broke out between police and striking oil workers in the western city of Zhanaozen. Kozlov and members of the now-banned Alga Party provided the strikers with support and financial assistance; however, no evidence linking them to violence or calls for the overthrow of the government was presented in court. The charge of inciting social discord was based on an interpretation of the law that established the government as a social group "analogous to a race, tribe, religion, or class," and most NGOs and international observers characterized the charges as politically motivated. On August 5, the Supreme Court refused to consider Kozlov's appeal.

A group of civil society activists published a list including the names of at least nine individuals considered to be detained or imprisoned based on politically motivated charges.

## Civil Judicial Procedures and Remedies

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 12

Economic and administrative court judges handle civil cases under a court structure that largely mirrors the criminal court structure.  Although the law and constitution provide for judicial resolution of civil disputes, observers viewed civil courts as corrupt and unreliable.  Litigants reported difficulty in having judgments enforced, particularly if they did not pay a percentage to the court administrator.

**f. Arbitrary Interference with Privacy, Family, Home, or Correspondence**

The constitution and law prohibit privacy violations; however, the government at times infringed on these rights.

The law provides prosecutors with extensive authority to limit citizens' constitutional rights.  The KNB, the Ministry of Internal Affairs, the Financial Police, and other agencies, with the concurrence of the Prosecutor General's Office, may infringe on the secrecy of private communications and financial records, as well as on the inviolability of the home.  Courts may hear an appeal of a prosecutor's decision but cannot issue an immediate injunction to cease an infringement.  The criminal procedure code allows wiretapping in medium, urgent, and grave cases.

Government opponents, religious leaders, human rights defenders, and their family members continued to report the government occasionally monitored their movements.

**Section 2. Respect for Civil Liberties, Including:**

**a. Freedom of Speech and Press**

While the constitution provides for freedom of speech and of the press, the government limited freedom of expression and controlled the media through a variety of means, including laws, harassment, licensing regulations, internet restrictions, and criminal and administrative charges.  Judicial actions against journalists and media outlets, including civil and criminal libel suits filed by government officials, led to the suspension of several media outlets and encouraged self-censorship.

<u>Freedom of Speech</u>:  The government limited individuals' ability to criticize the country's leadership, and regional leaders attempted to limit local media outlets'

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 13

criticism.  The law prohibits insulting the president, the president's family, and other senior officials.

On June 12, the Medeu District Court in Almaty found opposition politician Bulat Abilov guilty of undermining Vice Minister of Oil and Gas Berik Tolumbetov's dignity and honor.  The court ordered Abilov to pay Tolumbetov 500,000 tenge ($3,500) as compensation for moral damages.  The case was based on a December 2012 message placed on the blog of the chairman of the State Agency, which stated that Tolumbetov had not paid his business partner, Andrey Cherednikov, the appropriate dividends.

<u>Press Freedoms</u>:  According to official statistics, the government owned 16 percent of the country's media outlets.  Many privately owned newspapers and television stations received government subsidies.  Companies allegedly controlled by members of the president's family or loyal associates owned the majority of those broadcast media outlets that the government did not control outright.  According to media observers, the government wholly or partly owned most of the seven nationwide television broadcasters.  Regional governments owned several frequencies, and the Ministry of Communications and Information distributed those frequencies to independent broadcasters via a tender system.

All media were required to register with the Ministry of Culture and Information, although websites were exempt from this requirement.

The law limits the simultaneous broadcast of foreign-produced programming to 20 percent of a station's weekly airtime.  This provision burdened smaller, less developed regional television stations that lacked resources to develop programs, although the government did not sanction any media outlet under this provision.

After her website guljan.org was suspended in 2012, Gulzhan Yergaliyeva opened a new site, nuradam.kz.  On July 2, Yergaliyeva told the press that a technical examination revealed that this site had also been blocked, but the Ministry of Transport and Communications denied involvement in the blocking.  Yergaliyeva also complained that several printing houses refused to print the site's corresponding magazine, *Adam's Readers,* because of political pressure.  On August 2, Yergaliyeva reported that her site guljan.org had been blocked again on July 27 without any warning.

<u>Violence and Harassment</u>:  During the first six months of the year, press advocacy NGO Adil Soz recorded nine attacks on editorial offices and journalists, compared

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 14

with 15 in 2012. According to the NGO, police prevented reporters from carrying out their professional duties in 18 instances between January and June, compared with 34 the previous year, and as of June authorities denied or significantly restricted journalists' access to public information 180 times, compared with 190 times in all of 2012. Journalists working in opposition media and those covering stories related to corruption reported harassment and intimidation by government officials and private actors.

On June 19, local government officials attacked Dauren Mustafin, a correspondent of the national newspaper *El Birligi* (Unity of the Country), in Shymkent. Mustafin intended to interview a deputy of the Ordabasinsk District Maslikhat (city council) about the deputy's conflict with local citizens. According to Mustafin, the deputy and his colleagues stole Mustafin's thumb drive and forced him into a car, where they threatened him and inflicted light bodily injuries.

Censorship or Content Restrictions: The law enables the government to restrict media content through amendments that prohibit undermining state security or advocating class, social, race, national, or religious superiority or cruelty and violence. Owners, editors, distributors, and journalists may be held civilly and criminally responsible for content unless it came from an official source. The government used this provision to limit media freedom.

In January the license of the independent newspaper *Molodezhnaya Gazeta* (Youth Newspaper) from the city of Zhezkazgan was revoked at the "request of the owner." The editor and owner of the newspaper maintained that he neither requested nor agreed to close the paper. Many NGO activists believe that closure of the newspaper was connected to the paper's regular reports on economic and ecological problems in the region, as well as on the activities of labor unions in central Kazakhstan and labor conflicts at the mining company Kazakhmys.

Libel Laws/National Security: The law on state secrets criminalizes the release of information regarding the health, finances, or private life of the president, as well as economic information, such as data about mineral reserves or government debts to foreign creditors. To avoid possible legal problems, media outlets often practiced self-censorship regarding the president or his family.

Private parties could initiate criminal libel suits without independent action by the government, and an individual filing such a suit is also able to file a civil suit based upon the same allegations. Officials used the law's libel and defamation provisions to restrict media outlets from publishing unflattering information. Both

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 15

the criminal and civil codes contain articles establishing broad liability for libel, with no statute of limitation or maximum amount of compensation.  The requirement that owners, editors, distributors, publishing houses, and journalists prove the veracity of published information, regardless of its source, encouraged self-censorship at each level.

NGOs reported that libel cases against journalists and media outlets remained a problem.  During the first six months of the year, Adil Soz cited eight criminal cases against media outlets and journalists, including four cases where the defendants were charged with inciting interethnic and religious hatred or discord.  There were also 36 instances of civil charges against media outlets and journalists during the first six months of the year, compared with 86 during the first 10 months of 2012.

The Law on National Security prohibited "Influencing public and individual consciousness to the detriment of national security through the deliberate distortion of information."  According to experts, the term "unreliable information" is overly broad.  The law also requires owners of communication networks and service providers to obey the orders of authorities in case of terrorist attacks or the government's order to enact the suppression of mass riots.

The law prohibits publication of any statement that promotes or glorifies "extremism" or "incites social discord," terms that international legal experts said the government had not clearly defined.  The government subjected media outlets that criticized the president to intimidation, such as law enforcement actions or civil suits.  Although these actions continued to have a chilling effect on media outlets, criticism of government policies continued.  Incidents of local government pressure on the media continued.

On March 14, police detained Alexander Kharlamov, a journalist and blogger who also provided legal consultations on civil matters to local residents and wrote about corruption in local administrative and law enforcement bodies.  On September 3, authorities ordered his transfer from prison to house arrest.  During those six months, he spent several weeks involuntarily in a psychiatric clinic.  The investigation claimed that the articles he published included views the majority of religious people opposed and could lead to negative public attitudes that could create discord about religion.  At year's end, Kharlamov continued to face charges of "inciting religious hatred" in his blog posts.

**Internet Freedom**

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 16

Observers reported that the government blocked or slowed access to opposition websites, and planted progovernment propaganda in internet chat rooms.  The state regulated the country's three internet service providers, including the state-owned Kaztelecom.  Nevertheless, websites expressed a wide variety of views, including viewpoints critical of the government.  The UN Broadband Communications Commission reported that 45 percent of the population had internet access.

The Ministry of Culture and Information controlled the registration of ".kz" internet domains.  Authorities may suspend or revoke registration for locating servers outside of the country.  Observers criticized the registration process as unduly restrictive and vulnerable to abuse.

Adil Soz reported eight cases of the government blocking or restricting access to websites during the first half of the year and the government's intermittent blocking of the website LiveJournal continued, although the site remained accessible outside the country.  Bloggers reported anecdotally that their sites were periodically blocked, including the independent news sites guljan.org, krasnoetv.kz, podkazt.kz, socialismkz.info, and janaozen.net, as well as the website of the banned newspaper Golos Respubliki.  Websites such as respublika-kaz.info and kplustv.net were permanently blocked.

Courts frequently suspended the activities of opposition websites while considering claims against them.

The government implemented new regulations on internet access that mandated surveillance cameras in all internet cafes, required visitors to present identification to use the internet, demanded that internet cafes keep a log of visited websites, and authorized law enforcement officials to access the names and internet histories of users.

**Academic Freedom and Cultural Events**

The government generally did not restrict academic freedom, although academics, like other citizens, were prohibited from infringing on the dignity and honor of the president and his family.  Many academics practiced self-censorship.

**b. Freedom of Peaceful Assembly and Association**

**Freedom of Assembly**

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 17

The law provides for limited freedom of assembly, but there were significant restrictions on this right, and police used force to disrupt peaceful demonstrations. The Kazakhstan International Bureau for Human Rights reported that on May 21, an estimated 300 persons gathered in front of the presidential palace in Astana to urge the president to prevent the bank from foreclosing on their home mortgages. The police detained approximately 200 participants and sentenced the leader of the group, Yesenbek Ukteshbayev, to 10 days in jail.  A court sentenced activist Bolatbek Blyalov to seven days' incarceration and fined two other participants 17,310 tenge ($115) each.

The law defines unsanctioned gatherings, public meetings, marches, demonstrations, illegal picketing, and strikes that upset social and political stability as national security threats.

Under the laws governing public assembly, organizations must apply to local authorities for a permit to hold a demonstration or public meeting at least 10 days in advance.  Opposition figures and human rights monitors complained that complicated and vague procedures and the 10-day notification period made it difficult for groups to organize public meetings and demonstrations and noted that local authorities turned down many applications for demonstrations or only allowed them to take place outside of the city center.

For example, the Almaty city mayor's office refused to grant activists of the group For Fair Maternity Allowances permission to hold a rally on April 20 against the government's proposed pension reform legislation.  The mayor's office told the group that the progovernment People's Communist Party had already received permission to hold a rally that day.

Authorities often briefly detained and fined organizers of unsanctioned gatherings, including political party gatherings.  The Kazakhstan International Bureau for Human Rights and Rule of Law, which monitors demonstrations in the seven largest cities, recorded 84 peaceful demonstrations during the year, 92 percent of which were unsanctioned.  The government sanctioned 12 demonstrations, mostly by progovernment groups.  When the government sanctioned public protests, it frequently designated locations in less populous areas outside the city center.  In twelve cases the authorities physically prevented protesters from meeting.  In nine cases authorities detained participants of unsanctioned demonstrations and later charged them with administrative violations.  Overall, however, the organization

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 18

# KAZAKHSTAN                                                    16

noted an increase in public civic activities and a decrease in police interventions to prevent peaceful demonstrations.

The National Human Rights Action Plan 2009-12 noted that legal norms on public gatherings at times contradicted international standards. By year's end the government did not introduce recommended changes.

**Freedom of Association**

The law provides for limited freedom of association, but there were significant restrictions on this right. Any public organization set up by citizens, including religious groups, must be registered with the Ministry of Justice, as well as with the local departments of justice in every region in which the organization conducts activities. The law requires public or religious associations to define their specific activities, and any association that acts outside the scope of its charter may be warned, fined, suspended, or ultimately banned. Participation in unregistered public organizations may result in administrative or criminal penalties, such as fines, imprisonment, the closure of an organization or the suspension of its activities.

The prohibition on unregistered organizations often provided a pretext for authorities to interfere with the activities of organizations. In May authorities searched the offices of the NGO Arqa Suyeu (Support) in Almaty on the eve of an important award ceremony. The Almaty prosecutor's office had warned the group that it could not hold the award ceremony because it was associated with the banned opposition party Alga.

Membership organizations other than religious groups, which are covered under separate legislation, must have 10 members in order to register at the local level and must have branches in more than half of the country's regions for national registration. The government considered political parties and labor unions to be membership organizations but required 40,000 signatures for registration. If authorities challenge the applications by alleging irregular signatures, the registration process can continue only if the total number of eligible signatures exceeds the minimum number of signatures required. The law prohibits parties established on an ethnic, gender, or religious basis. The law also prohibits members of the armed forces, employees of national security and law enforcement organizations, and judges from participating in trade unions or political parties.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

**Ex. A**
**Page 19**

NGOs reported the NGO registration process was straightforward, although corruption in the process was common.  NGOs involved in human rights advocacy and political activities faced greater administrative delays and obstacles, although there were no reports that the government denied registration or closed organizations.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at www.state.gov/j/drl/irf/rpt/.

## d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

The law provides for freedom of movement within the country, foreign travel, emigration, and repatriation, and despite some regulatory restrictions, the government generally respected these rights.  The government cooperated with the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations to provide protection and assistance to internally displaced persons, refugees, returning refugees, asylum seekers, stateless persons, and other persons of concern.

In-country Movement:  The government required all citizens and foreigners who remained in the country for more than five days to register with migration police.  Foreigners entering the country had to register at certain border posts.  Registration in most of the country generally was routine; nonetheless, some foreign citizens reported that local authorities occasionally requested bribes before completing registration.  Migration police routinely checked the registration of foreigners, including labor migrants, and reportedly requested bribes.  Some foreigners experienced problems traveling to regions outside their registration area.  In 2011 amendments to the law on migration eased registration requirements for ethnic Kazakh returnees (oralmans).  There is a registration exemption for families of legal migrant workers for a 30-day period after the worker starts employment.  The government has broad authority to deport those who violate the regulations.

At year's end the government had not reported the number of foreigners deported for gross violation of visitor rules in 2012 or 2013.  During the first nine months of 2011, the Ministry of Internal Affairs deported 12,644 foreigners for alleged gross violations of the visitor rules, the majority of whom were citizens of countries in the Commonwealth of Independent States (CIS).  Individuals facing deportation

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 20

can request asylum if they fear persecution in their home country.  The government required persons who were suspects in criminal investigations to sign statements that they would not leave their place of residence.  Authorities routinely detained individuals for identity checks without suspicion of a criminal offense.

Authorities required foreigners to obtain prior permission to travel to certain border areas with China and cities in close proximity to military installations.  The government continued to declare particular areas closed to foreigners due to their proximity to military bases and the space launch center at Baikonur.  Foreigners could visit these areas with prior permission from the Ministry of Internal Affairs.

Foreign Travel:  Although the government did not require exit visas for the temporary travel of citizens, there were certain instances in which the government could deny exit from the country, including for travelers subject to pending criminal or civil legal proceedings, unfulfilled prison sentences, unpaid taxes or fines, or compulsory military duty.  Travelers who presented false documentation during the exit process could be denied the right to exit, and authorities controlled travel by active-duty military personnel.  The law on national security required that persons who had access to state secrets obtain permission from their employing government agency for temporary exit from the country.

Exile:  The law does not prohibit forced exile if authorized by an appropriate government agency or through a court ruling.

Emigration and Repatriation:  The law provides for the right to emigrate and the right to repatriate, and the government generally respected these rights.  An exception is the law on national security, which prohibits persons who had access to state secrets from taking up permanent residence abroad for five years after leaving government service.  The government required a permanent exit visa for emigration; obtaining this visa required criminal checks, credit checks, and letters from parents and any dependents over the age of 10 expressing no objection to exit visa issuance.

**Protection of Refugees**

The government cooperated with the UNHCR and other organizations to provide protection and assistance to refugees from countries where their lives or freedom would be threatened on account of their race, religion, nationality, membership in a particular social group, or political opinion.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 21

<u>Access to Asylum</u>:  The country's laws provide for the granting of asylum or refugee status, and the government has established a system for providing protection to refugees.  The UNHCR legally can appeal to the government and interfere on behalf of individuals facing deportation.  The law on refugees, which is implemented through a number of regulations and by-laws, regulates the granting of asylum and refugee status.

<u>Access to Basic Services</u>:  The law on refugees outlines refugee status determination procedures and access to state services, including the right to be legally registered and issued official documents.  The Committee on Migration under the Ministry of Labor and Social Protection conducts status determination procedures.  Observers reported that committee representatives lacked expertise, which the UNHCR attributed to rushed implementation of the law.  The law stipulates that refugees have the right to education and social services, but administrative regulations and the prohibitive cost of services often precluded the exercise of this right.

The government generally registered asylum seekers and determined their status; in some cases the government allowed asylum seekers and refugees to stay in the country while the UNHCR found third countries that would accept them.  Although the government performed refugee status determinations and registered refugees present in the country, it did not accept any refugees for resettlement from third countries, nor did it facilitate local integration (including naturalization) of refugees on its territory.

The UNHCR reported cordial relations with the government in assisting refugees and asylum seekers.  The government usually allowed the UNHCR access to detained foreigners to ensure proper treatment and fair determination of status.  The government was generally tolerant in its treatment of local refugee populations, except for a few citizens from former Soviet republics.  The government often did not allow refugees without passports or those who had entered the country illegally to register.

The Committee on Migration in the Ministry of Labor and Social Protection reviewed refugee claims, with the UNHCR and a local NGO, the Kazakhstan International Bureau for Human Rights, participating as observers.  Consistent with the Minsk Convention on Migration within the CIS, the government did not recognize Chechens as refugees.  Chechens were eligible for temporary legal resident status for up to 180 days, as are any other CIS citizens.  This temporary registration was renewable, but local migration officials have discretion over the

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 22

renewal process.  In some cases they solicited bribes, exploiting the vulnerability of Chechens due to their inability to return safely to Chechnya.  The government has an agreement with China not to tolerate the presence of ethnic separatists from one country on the territory of the other; the UNHCR reported no new cases of Uighur refugees.  Human rights monitors remained concerned about the status of Uighurs from China already living in the country.

The government did not forcibly return any UNHCR mandate refugees but attempted to deport a stateless individual to Uzbekistan despite UNHCR protests. On May 27, the judge of the Karatal District Court found Uzbekistan-born Protestant Pastor Viktor Lim guilty of illegal missionary activity and ordered his deportation.  On August 16, despite appeals by the UNHCR, Lim was forced to leave the country.

**Stateless Persons**

Estimates of the number of stateless persons in the country varied.  According to government statistics, 6,900 officially recognized stateless persons resided in the country.  The Ministry of Justice estimated there were approximately 21,000 stateless persons, while 57,000 persons self-identified as stateless in the 2009 census.  Stateless persons were generally holders of Soviet passports who failed to renew their documents after independence, ethnic Kazakh repatriates, and labor migrants.  Although provided with the same rights as individuals with resident permits, stateless persons reported difficulty finding legal employment and had limited access to education and health care.  The UNHCR continued to work with government officials and parliamentarians to obtain reliable data on stateless persons and improve the country's citizenship legislation.  According to the Law on Citizenship, anyone can gain nationality.  A simplified procedure exists for ethnic Kazakhs; those who have immediate relatives in Kazakhstan; and citizens of Ukraine, Belarus, Russia, and Kyrgyzstan, with which Kazakhstan has agreements. According to legislation, the government has six months to consider an application for citizenship.  Some applicants complained that, due to the lengthy bureaucratic process, obtaining citizenship often took years.

**Section 3. Respect for Political Rights: The Right of Citizens to Change Their Government**

The constitution and law provide for a democratic government with universal suffrage for those older than 18 years of age; however, the government severely limited the right of citizens to change their government.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 23

Although 2007 constitutional amendments increased legislative authority in some spheres, the constitution continues to concentrate power in the presidency. The president appoints and dismisses most high-level government officials, including the prime minister, the cabinet, the prosecutor general, the KNB chief, supreme court and lower-level judges, regional governors, and the chairman and two additional members of the Central Election Commission (CEC), which oversees presidential and parliamentary elections. The Mazhilis must confirm the president's choice of prime minister, and the senate must confirm the president's choice of prosecutor general, chief of the KNB, Supreme Court judges, and the head of the National Bank. The parliament has never failed to confirm a presidential nomination. Modifying or amending the constitution effectively requires the president's consent. The 2007 constitutional amendments exempt President Nazarbayev from the two-term presidential term limit, and an amendment passed in 2010 gives him protection from prosecution.

Two 2010 laws termed "Leader-of-the-Nation laws" establish President Nazarbayev as chair of the Kazakhstan People's Assembly, grant him lifetime membership on the Constitutional and Security Councils, allow him "to address the people of Kazakhstan at any time," and stipulate that all "initiatives on the country's development" must be coordinated through him.

**Elections and Political Participation**

Recent Elections: In 2011 President Nazarbayev dismissed the lower house of parliament (Mazhilis) and called for early parliamentary elections to take place in January 2012. The early election resulted in the formation of a multi-party parliament, with the president's party, Nur Otan, holding the majority of the seats. No members of parties considered to oppose the president were elected. According to the Organization for Security and Cooperation in Europe (OSCE), the competitiveness and pluralism of the electoral environment was undermined because the government barred several political parties and candidates from competing. Many OSCE monitors reported instances of ballot stuffing, carousel voting, and proxy voting. The OSCE's assessment was that the election "did not meet fundamental principles of democratic elections."

Political Parties: Political parties must register members' personal information, including date and place of birth, address, and place of employment. This requirement discouraged many citizens from joining political parties. There were

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

**Ex. A
Page 24**

credible allegations that authorities pressured persons entering government service to join the Nur Otan Party.

At year's end there were nine registered political parties, including the parties Ak Zhol, Rukhaniyat, and Auyl.  These parties generally did not oppose President Nazarbayev's policies.

Additionally, the effort of political parties Azat and the National Socialist Democratic Party to register as a joint party failed, with Azat losing its status as a registered political party.  In 2012 the government banned as extremist the unregistered political party Alga, which had sought registration since 2006. Authorities sentenced the party's leader, Vladimir Kozlov, to seven and one-half years in prison for creating and leading a criminal organization, inciting social discord, and calling for the violent overthrow of the government in connection with the support he and his party gave to striking oil workers prior to the 2011 violence in Zhanaozen.

In order to register, a political party must hold a founding congress with minimum attendance of 1,000 total delegates, including representatives from two-thirds of the oblasts and the cities of Astana and Almaty.  Parties must obtain at least 700 signatures from each oblast and the cities of Astana and Almaty, registration from the CEC, and registration from each oblast-level election commission.

Participation of Women and Minorities:  Traditional attitudes sometimes hindered women from holding high office or playing active roles in political life, although there were no legal restrictions on the participation of women or minorities in politics.  At year's end there were three female ministers; 26 members of the Mazhilis (lower house of parliament) and two senators were women.

## Section 4.  Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials; however, the government did not implement the law effectively, and officials frequently engaged in corrupt practices with impunity.

Corruption:  Corruption was widespread in the executive branch, various law enforcement agencies, local government administrations, the education system, and the judiciary.  The Ministry of Internal Affairs, the Financial Police, the KNB, and the Disciplinary State Service Commission are responsible for combating corruption.  Opposition leaders and human rights NGOs accused the government

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 25

of rampant corruption.  In April authorities accused former vice minister of education and science Sayat Shayakhmetov, along with one of his subordinates and a businessman, of embezzling 1.5 billion tenge (one million dollars) from state funds allocated for building schools in Ust-Kamenogorsk.  Prosecutors opened a criminal case, and in May police arrested the suspects.  At year's end the accused individuals were under house arrest on charges that carry up to 10 years in prison.

Generally, the government focused corruption investigations on lower- to middle-ranking officials and minor political figures.

Whistleblower Protection:  According to the Law on Combating Corruption, a person reporting corruption offenses or otherwise assisting in the fight against corruption is under state protection.

Financial Disclosure:  The law requires government officials, applicants for government positions, and those who have been recently released from government service to declare their income and assets in the country and abroad to tax authorities annually.  The same requirement applies to their spouses, dependents, and adult children.  Similar regulations exist for members of parliament and judges.

Public Access to Information:  Although the law mandates that the government, public associations, officials, and media outlets provide citizens with information that affects their rights and interests, citizens' requests for information were not fulfilled in a timely manner.  NGOs reported problems with access to information from state agencies, citing red tape, poor content on official websites, and long lines in state agencies.  According to an assessment by the local branch of Transparency International, all governmental ministries received poor transparency ratings except for the Ministry of Culture and Information, which was evaluated as average.

Although parliament published several draft laws, some parliamentary debates, and occasionally its recorded votes, many parliamentary activities took place outside public view.  Accredited journalists and representatives of public associations could observe some parliamentary sessions via video link from a separate room.  Transcripts of parliamentary sessions were not available to the public.  Parliament continued to prohibit public and media access to discussion of controversial legislation.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 26

**Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights**

A number of domestic and international human rights groups generally operated effectively, with relative freedom to investigate and publish their findings on human rights cases, although some restrictions on human rights NGO activities remained.  International and local human rights groups reported the government monitored NGO activities on sensitive issues and practiced harassment, including police visits and surveillance of NGO offices, personnel, and family members.

According to some activists, there was less pressure from the government than in 2012.  The activists welcomed the Ministry of Foreign Affairs initiation of a Consultative Advisory Body for dialogue on human rights and rule of law that includes government ministries and prominent international and domestic NGOs.

The Almaty Helsinki Commission, the Republican Network of Independent Monitors, the Kazakhstani International Bureau for Human Rights, Adil Soz, and PRI were among the most visible human rights NGOs active in local affairs.  They occasionally faced difficulties in registering and acquiring office space and technical facilities.  They also reported that the government audited their records and imposed various legal constraints on their activities.  In some instances government agents misrepresented themselves to attend and monitor NGO events. The government continued to participate in – and include NGOs in – roundtables and events on democracy and human rights.

NGOs affiliated with, or suspected of being affiliated with, political opposition parties or figures reported harassment.  In May police arrested social activists Zhasaral Kuanyshalin, Sagat Zhusip, and Zhenis Doszhanov while laying wreaths at the monument for victims of political repression in Almaty.  The activists, who were allegedly associated with the banned political party Alga, conducted this ceremony in lieu of the NGO Arqa Suyeu's annual awards ceremony, which the government prevented from taking place.

UN and Other International Bodies:  In general the government did not prevent international NGOs and multilateral institutions dealing with human rights from visiting the country and meeting with local human rights groups and government officials.  National security laws prohibit foreigners, international organizations, NGOs, and other nonprofit organizations from engaging in political activities. International organizations are prohibited from funding unregistered entities.

**Ex. A
Page 27**

<u>Government Human Rights Bodies</u>:  The Presidential Commission on Human Rights is a consultative and advisory body that includes members of the public appointed by the president.  The commission reviews and investigates complaints, issues recommendations, monitors fulfillment of international human rights conventions, and publishes annual human rights reports in close cooperation with several international organizations, such as the UNHCR, the OSCE, the International Organization for Migration (IOM), and the UN Children's Fund. During 2012 the commission received 2,000 written and oral complaints.  The commission does not have legal authority to remedy human rights violations or implement its recommendations.

In 2012 the presidentially appointed human rights ombudsman investigated approximately 1,300 citizen complaints of human rights violations by state agencies.  The ombudsman was not authorized to investigate complaints concerning the president, heads of government agencies, the parliament, the cabinet, the Constitutional Council, the Prosecutor General's Office, the Central Electoral Commission, or the courts.  The Ombudsman's Office has the authority to appeal to the president, cabinet, or parliament to resolve citizens' complaints; cooperate with international human rights organizations and NGOs; meet with government officials concerning human rights violations; visit certain facilities, such as military units and prisons; and publicize the results of investigations in the media.  The Ombudsman's Office also published an annual human rights report. During the year the Ombudsman's Office occasionally briefed the media and issued reports on complaints it had investigated.

According to domestic human rights observers, the Ombudsman's Office and the Human Rights Commission were unable to stop human rights abuses or to punish perpetrators.  The commission and the ombudsman avoided addressing underlying structural problems that led to human rights violations, although they advanced human rights by publicizing statistics and individual cases, and aided citizens with less controversial social problems and issues involving lower-level elements of the bureaucracy.

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

The law prohibits discrimination based on race, gender, disability, language, or social status; however, the government did not effectively enforce the law.  Cases of violence against women, trafficking in persons, and discrimination against non-Kazakhs in government, persons with disabilities, and LGBT persons were reported.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

**Ex. A**
**Page 28**

**Women**

<u>Rape and Domestic Violence</u>:  The law criminalizes rape.  The punishment for rape, including spousal rape, ranges from three to 15 years' imprisonment.  In 1,715 officially reported rape cases during the first nine months of 2012, courts convicted 1,821 persons.  Under the law a prosecutor cannot initiate a rape case absent aggravating circumstances, such as gang rape, unless the victim files a complaint.  Once a complaint is filed, the criminal investigation cannot be dismissed if the rape victim recants or refuses to cooperate further with the investigation.  This provision was intended to protect victims from coercion.  There were anecdotal reports of police and judicial reluctance to act on reports of rape, particularly in spousal rape cases.

Violence against women, including domestic violence, was a problem.  Legislation identifies various types of domestic violence, such as physical, psychological, sexual, and economic, and outlines the responsibilities of the local and national governments and NGOs in providing support to domestic violence victims.  The law also outlines mechanisms for the issuance of restraining orders and provides for the 24-hour administrative detention of abusers.  The criminal procedure code sets the maximum sentence for spousal assault and battery at 10 years in prison, which is the same as any assault.

NGOs maintained that the domestic violence law does not have an effective mechanism for implementation.  According to NGOs, domestic violence remained a serious problem.  Although official statistics were scarce, activists estimated that one in four families suffered from some form of domestic violence.  In 2012 the government registered 80,571 crimes against women.

Police intervened in family disputes only when they believed the abuse was life threatening.  According to NGO estimates, police investigated approximately 10 percent of such cases.  NGOs conducted training for police officers on how to handle victims of domestic violence.

NGOs reported that women often withdrew their complaints because of economic insecurity.  When victims pressed charges for domestic violence or spousal rape, police occasionally tried to persuade them not to pursue a case.  When domestic violence cases came to trial, the charge was most often light battery, for which judges sentenced domestic abusers to incarceration at a minimum-security labor colony and 120 to 180 hours of work.  Sentences for more serious cases of battery,

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 29

**KAZAKHSTAN**                                                                27

including spousal battery, ranged from three months to three years of imprisonment; the maximum sentence for aggravated battery is 10 years' imprisonment.

Although the government stated that 29 crisis centers assisted women and two centers assisted men, NGOs reported that the number of active centers was 20.  All the crisis centers received funding through government and international grants to NGOs.  A number of smaller NGOs assisted victims, and six of the crisis centers provided shelter for victims of violence.

Harmful Traditional Practices:  Although prohibited by law, the practice of kidnapping women and girls for forced marriage continued in some remote areas. The criminal code has a prison sentence of eight to 10 years for kidnapping.  A person who voluntarily releases an abductee is absolved of criminal responsibility if in this action he/she did not commit another offense.  Because of this law, a typical bride kidnapper is not necessarily held criminally responsible for the act. Cases were typically not pursued, as families and victims usually withdrew their complaints, finding ways to resolve the problem privately.  Only 17 percent of victims sought assistance from law enforcement agencies, while 51 percent counted on support from relatives.  Law enforcement agencies often advised abductees to sort their situation out themselves.  According to civil society organizations, making a complaint to the police could be a very bureaucratic process and often subjected families and victims to humiliation.  The government did not take action to address this issue.

Sexual Harassment:  Sexual harassment remained a problem.  The law prohibits some forms of sexual harassment, but legal and gender experts regarded the legislation as inadequate.  There were reports of incidents of harassment, but in no instance was the law used to protect the victim, nor were there reports of any prosecutions.

Reproductive Rights:  Couples and individuals have the right to decide the number, spacing, and timing of their children and had the means to do so free from discrimination, coercion, or violence.  Women and men received equal treatment for sexually transmitted infections.  According to a study published by the UN Fund for Population, approximately 50 percent of women used some form of contraception.  According to data published by the World Health Organization, skilled personnel attended more than 99 percent of births.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 30

<u>Discrimination</u>:  The constitution and law provide for equal rights and freedoms for men and women.  The gender equality law prohibits discrimination based on gender.  The law does not require equal pay for equal work.  NGOs reported that no government body assumed responsibility for implementing the legislation and asserted that the definition of gender discrimination does not comply with international standards.  More women than men were self-employed or underemployed relative to their education level.  According to observers, women in rural areas faced greater discrimination than women in urban areas and suffered from a greater incidence of domestic violence, limited education and employment opportunities, limited access to information, and discrimination in their land and property rights.  According to the World Bank's *Women, Business, and the Law 2012* report, women in the country faced discrimination obtaining work in the same industries as men, and no laws protect women from sexual harassment in the workplace.

**Children**

<u>Birth Registration</u>:  Citizenship is derived both by birth within the country's territory and from one's parents.  The government has a duty to register all births immediately.

<u>Child Abuse</u>:  There were reports of child abuse.  NGOs estimated that more than one-half of all children younger than 14 experienced at least one incident of physical or psychological abuse by adults.  Abuse was more common in rural areas.  According to the Ministry of Education, courts terminated the custody rights of approximately 782 abusive parents in 2012.  According to the Ministry of Internal Affairs, in the first 10 months of the same year, 21 criminal cases were initiated against parents charged with criminal abuse.  Minors age 16 or older have the right to file petitions related to their interests directly with a court.

The president of the NGO Union of Crisis Centers stated that the number of psychological abuse cases exceeded the number of physical abuse cases.  In the first seven months of the year, the Union of Crisis Centers' hotline for children received 2,759 calls regarding child abuse, 60 percent of which were complaints about abused girls.

<u>Forced and Early Marriage</u>:  The legal minimum age for marriage is 18 years, which can be reduced to 16 years in the case of pregnancy or mutual agreement. NGOs noted several cases of underage marriage (under 18), especially in the south. Traditionally, couples first married in mosques, and when the bride reached the

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

**Ex. A
Page 31**

legal age, the marriage would be registered officially.  The government did not take any action to address this issue.

Sexual Exploitation of Children:  The minimum age for consensual sex is not specified in the criminal code, but an article provides for eight to 15 years in prison as punishment for individuals who force boys or girls under the age of 18 to have sexual intercourse.

A statute criminalizes the production and distribution of child pornography and provides administrative penalties to cover the sale of pornographic materials to minors.  The country retains administrative penalties for child pornography.

Displaced Children:  According to the Ministry of Education, 3,984 children were identified as "street children" during 2012.  According to media reports, police placed homeless children in institutions run by the Ministry of Education for delinquent and street children.  There they received medical and psychological assistance before they were released or sent to orphanages.  During 2012 authorities sent 3,941 children back to their families and placed 25 children in orphanages and institutions for children deprived of parental care.

Institutionalized Children:  NGOs reported many incidents of violence against children in orphanages, boarding schools, and detention facilities for delinquent children, and there were increased media reports of abuses in orphanages and other institutions.  NGOs stated that half of children in orphanages or closed institutions suffered from abuse by teachers or other children.

International Child Abduction:  During the year the country acceded to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.

**Anti-Semitism**

Approximately 30,000 to 40,000 Jews lived in the country.  There were no reports of anti-Semitic acts apart from the distribution of anti-Semitic literature by Hizb ut-Tahrir.  Leaders of the Jewish community reported no incidents of anti-Semitism by the government or in society.

**Trafficking in Persons**

See the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 32

## Persons with Disabilities

According to the Ministry of Labor and Social Protection, in 2011 there were 506,000 persons with disabilities (3 percent of the total population) in the country, although analysts argued that the real number was higher.  The law prohibits discrimination against persons with physical, sensory, intellectual, and mental disabilities in employment, education, and access to health care, and in the provision of other state services, but significant discrimination existed in the areas of employment, education, and access to government services.

The law provides for access to information for persons with disabilities.  The government produced periodicals, scientific journals, reference literature, and fictional works that were recorded either on disk or in Braille.  The law requires one national television channel to broadcast news programs with sign-language translation.  NGOs stated that implementation of the law on disability was lacking, and the Nur Otan Party's Institute of Parliamentary Development concluded that access for disabled persons to information and communications was insufficient.

The law requires companies to set aside 3 percent of their jobs for persons with disabilities.  International and local observers noted some improvement regarding the rights of persons with disabilities.  Nevertheless, there were reports that persons with disabilities faced difficulty integrating into society and finding employment.  According to the Ministry of Labor and Social Protection, 3,400 persons with disabilities registered for employment in 2012, but only 1,762 were employed.  The law mandates access to buildings for persons with disabilities.  The vice minister of labor and social protection identified the two biggest problems facing persons with disabilities as poor infrastructure and lack of access to education.  Persons with disabilities had difficulty accessing public transportation.  The government did not make a concerted effort to address these problems.

Citizens with mental disabilities could be committed to state-run institutions without their consent or judicial review, and the government committed persons at a young age with the permission of their families.  Institutions were poorly managed and inadequately funded.

There are no regulations regarding the rights of patients in mental hospitals.  Human rights observers believed this led to widespread abuse of patients' rights.  NGOs reported that patients often were drugged and isolated for minor infractions and experienced poor conditions and a complete lack of privacy.  NGOs reported

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 33

that orphanages for children with physical and mental disabilities were
overcrowded and unsanitary, with insufficient staff to care adequately for
children's needs.

The government did not restrict the right of persons with disabilities to vote and
arranged home voting for individuals who could not travel to polling places as a
result of their disability.

The Ministry of Labor and Social Protection was the primary government agency
responsible for protecting the rights of persons with disabilities; the Ministries of
Health and Education also assisted in their protection.

**National/Racial/Ethnic Minorities**

Kazakh is the official state language, although organizations and bodies of local
self-administration may officially use Russian on an equal basis with Kazakh.  The
law does not require the ability to speak Kazakh for entry into the civil service and
prohibits discrimination on the basis of language.  Nonetheless, Kazakh language
ability is looked upon favorably, which non-Kazakh speakers protested is language
discrimination.  The Election Law requires presidential candidates to be fluent in
Kazakh.

The creation of Kazakh-language schools and the conversion of some Russian-
language schools to Kazakh reduced the overall number of Russian-only language
schools.

**Societal Abuses, Discrimination, and Acts of Violence Based on Sexual
Orientation and Gender Identity**

The country does not criminalize consensual same-sex sexual activity.  Although
there were no government statistics on discrimination or violence based on sexual
orientation or gender identity, there were reports of such actions.  According to
representatives of international and local organizations, negative social attitudes
towards marginalized groups, including LGBT persons, impeded willingness of
these groups to come forward, organize, or seek access to HIV/AIDS programs.
LGBT individuals, particularly gay men, were among the most oppressed groups.

According to a 2009 Soros Foundation study, 64 percent of LGBT respondents
said they did not face open discrimination in the workplace, although LGBT
individuals often concealed their sexual orientation to avoid such discrimination.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 34

LGBT individuals whose sexual orientation became publicly known risked physical and verbal abuse, possible loss of work, and unwanted attention from police and authorities.  A local NGO working on LGBT issues noted that new regulations made gender reassignment more cumbersome but cited a slight improvement in public awareness of LGBT rights.  Several LGBT organizations operating in the country reported that government-run HIV clinics occasionally breached confidentiality and reported patients' sexual orientation to their families and employers.  In 2011 and 2012, the NGO Amulet reported 16 attempts on the lives of LGBT persons and 298 cases of physical violence of varying degrees.  The organization also reported 13 instances of LGBT persons dismissed from work on the basis of their sexuality and two cases of landlords refusing to rent property to LGBT persons.  In 2011 and 2012, the organization reported 115 cases of LGBT persons denied the right to health care.

NGOs reported that members of the LGBT community seldom turned to law enforcement agencies to report violence against them, because they feared hostility, ridicule, and occasionally violence.  Additionally, they did not want law enforcement officers to notify their employers of their sexual orientation.

## Other Societal Violence or Discrimination

The law prohibits discrimination against persons with HIV and AIDS.  Observers reported that cultural stigmas against drug users and other at-risk groups resulted in societal discrimination that continued to affect general access to information, services, treatment, and care.

## Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law and related regulations protect the right of workers to form and join independent unions.  The law also protects the right of workers to collectively bargain.  The labor law provides that an individual contract between an employer and each employee sets the employee's wage and outlines the rights and responsibilities of the employee and the employer.

Although they are not per se exempt from the labor law, many illegal migrants and self-employed individuals reside in the country.  The National Statistics Agency reported that as of the year's second quarter, the most recent period for which data was available, 2.7 million persons were self-employed.  Various international

organizations and experts estimated that there were between 300,000 and one million illegal migrants in Kazakhstan.

The law protects the right of most workers to strike. Workers in the railway, civil aviation, health-care, and public transport sectors, as well as operators of water treatment plants and other public utilities, are generally prohibited from striking.

Numerous legal limitations restrict workers' rights to strike. Generally workers may not strike unless a labor dispute failed to be resolved through compulsory arbitration procedures, and decisions to strike must be taken in a meeting where at least one-half of an enterprise's workers are present. A written notice announcing a strike must be submitted to the employer at least 15 days in advance. The law further limits conditions under which workers in sectors providing essential services can strike. Essential services include railway, civil aviation, military, law enforcement, fire services, and health. Workers providing these essential services must obtain special permission to strike. The law neither sanctions nor prohibits the firing of employees for participation in an illegal strike.

To obtain legal status, a trade union must register with the Ministry of Justice. The registration procedure is similar to that of other membership organizations.

Foreign workers have the right to join unions; however, the law prohibits the operation of foreign unions and prohibits the financing of unions by foreign entities such as foreign citizens, governments, and international organizations. Workers are protected by law against antiunion discrimination, and a court can order reinstatement of a worker fired for union activity.

The government continued to restrict the right to organize, and most workers were not able to join or form trade unions of their choice. The government exercised considerable influence on organized labor and favored state-affiliated unions over independent unions. The largest trade union association, the Federation of Trade Unions, the successor to formerly state-sponsored Soviet-era labor organizations, remained affiliated with the government.

Disagreements between unions and their employers may be presented to a tripartite commission composed of representatives of the government, employer associations, and labor unions. Both state-affiliated and independent labor unions participate in tripartite commissions. The tripartite commission is responsible for developing and signing annual agreements governing most aspects of labor relations. Employers used individual contracts to discourage collective bargaining

power.  Activists stressed that political pressure on employers to avoid prolonged strikes resulted in rapid conclusions to agreements.

There were reports of employers trying to neutralize the activity of independent labor unions by creating alternative unions with which to negotiate and sign collective bargaining agreements.  The law provides that employees may establish joint representative bodies to collectively bargain.  In 2012 the International Labor Organization criticized this provision and requested the government to amend the law to ensure that these nonunion bodies cannot be used to undermine the position of trade unions in the collective bargaining process.

A dispute between employer EuroTechService and the independent labor union For Decent Labor that began in 2012 continued during the year, and the parties remained unable to reach a collective bargaining agreement.  Labor union leaders claimed that, due to poor economic conditions in the one-industry town in which EuroTechService is located, management was able to coerce employees to join a promanagement union, dramatically reducing membership in For Decent Labor and significantly reducing its bargaining power.

## b. Prohibition of Forced or Compulsory Labor

The law prohibits all forms of forced or compulsory labor, except when it is a consequence of a court sentencing or a condition of a state of emergency or martial law.  In spite of this, instances of forced labor were reported.  The government conducted interagency operations to find victims of forced labor and trafficking.

Labor inspectors are responsible for enforcing the labor laws, including prevention of forced labor.  Labor officials stated they were able to prevent the worst forms of abuse.

Violations of labor laws may result in an administrative penalty such as a fine, or in civil or criminal liability.  Although they are tasked with detecting labor law violations, inspectors are not empowered to initiate criminal proceedings.  That decision is made by law enforcement agencies.

Migrant workers were considered most at risk for forced or compulsory labor. Reports varied on the exact number of labor migrants in the country.  Estimates ranged from 300,000 to one million, with the majority of migrant workers coming from Kyrgyzstan, Tajikistan, and Uzbekistan.  Migrant workers found employment

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 37

primarily in agriculture and construction.  The Ministry of Labor and Social Protection is responsible for handling issues related to migrant labor.

Also see the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law protects children from exploitation in the workplace.  The minimum age for employment is 16.  With parental permission, children between 14 and 16 years of age can perform light work that does not interfere with their health or education.  The law also restricts the length of the workday for employees younger than 18.  The government conducted labor inspections to enforce the minimum age for employment, but enforcement was hindered by the relatively small number of government inspectors and restrictions on inspecting businesses.

Work continued on the government 2012-14 Joint Action Plan and Joint Work Plan for the Elimination of the Worst Forms of Child Labor, including awareness campaigns and conferences.

Officials reported that during the first eight months of the year, 76 violations of restrictions on child labor occurred, none of which they considered among the worst forms of child labor.  Twelve children were found unlawfully working at car washes.

The Ministry of Labor and Social Protection is responsible for enforcement of child labor laws and for administrative offenses punishable by fines.  The Ministry of Internal Affairs is responsible for investigating criminal offenses.

The government cooperated with trade unions, employers, and NGOs to raise awareness and promote interagency cooperation in eliminating child labor.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at www.dol.gov/ilab/programs/ocft/tda.htm.

## d. Acceptable Conditions of Work

The national monthly minimum wage was 18,660 tenge ($124).  Most workers earned above the minimum wage in urban areas.  At the end of June, 3.2 percent of

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 38

## KAZAKHSTAN                                                    36

the population lived below the monthly subsistence income level, which was 17,656 tenge ($115).

The law stipulates that the normal workweek should not exceed 40 hours and limits heavy manual labor or hazardous work to no more than 36 hours per week.  The law limits overtime to two hours per day, or one hour per day for heavy manual labor, and requires overtime to be paid at least a 50 percent premium.  The law prohibits compulsory overtime and overtime for work in hazardous conditions.  The law provides that labor agreements may stipulate the length of working time, holidays, and paid annual leave for each worker.  The government sets occupational health and safety standards.  The law requires employers to suspend work that could endanger the life or health of workers and to warn workers about any harmful or dangerous work conditions or the possibility of any occupational disease.  The law specifically grants workers the right to remove themselves from situations that endanger their health or safety without suffering adverse employment action.

The Ministry of Labor and Social Protection enforces the minimum wage, work hour restrictions, overtime, and occupational safety and health standards.  Ministry inspectors conducted random inspections of employers.  The Ministry of Labor and Social Protection has 320 labor inspectors.  Penalties are considered sufficient to deter violations but the number of inspectors is believed to be insufficient.

Labor advocates also reported that some employers regularly violated existing laws.  There were reports that some employers ignored regulations concerning occupational health and safety.

The Ministry of Labor and Social Protection officials reported that, in the first nine months of the year, inspectors conducted approximately 10,000 inspections, 6,000 of them unannounced, resulting in a total of 9,812 violations, of which 8,623 involved violations of occupational health and safety regulations.  In the first eight months of the year, labor inspectors referred 1,007 alleged labor law violations to law enforcement agencies for further investigation.  In that period, authorities referred 121 cases to prosecutors, including cases involving two workplace deaths, while a further 287 cases with potential civil liability were referred to the courts for disposition.  In addition to inspections by the ministry, unions conducted inspections of unionized enterprises and reported their findings to authorities for investigation.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

**Ex. A**
**Page 39**

Occupational safety and health conditions in the construction, industrial, and agricultural sectors were often substandard.  Workers in factories usually lacked quality protective clothing and sometimes worked in conditions of poor visibility and ventilation.

Some workers, particularly in the construction industry, were not free to exercise the right to remove themselves from situations that endangered their health and safety without jeopardizing their employment.  In the first half of the year, the government reported 954 people injured at their workplaces.  The government reported 121 workplace deaths during the first half of the year, down from 277 in 2012.  Officials at the Federation of Trade Unions attributed many labor-related deaths to antiquated equipment, Soviet-era infrastructure, and disregard for safety regulations in the mining, metallurgy, and construction sectors.

The National Statistics Agency reported in 2011, the last year for which such figures were available, that the informal economy constituted 19.5 percent of GDP.  The agriculture and retail sectors contributed the most to the informal economy.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

Ex. A
Page 40

# EXHIBIT B

Bundesamt für Justiz
Direktionsbereich internationale Rechtshilfe
Bundesrain 20
CH-3003 Bern
Schweiz


**Gesuch um Rechtshilfe in Strafsachen**


Sehr geehrte Damen und Herren

Wir haben die Ehre, im Zusammenhang mit einer laufenden Strafuntersuchung in der Republik Kasachstan das folgende Gesuch um Rechtshilfe einzureichen.

Entsprechend dem Bundesgesetz über internationale Rechtshilfe in Strafsachen (IRSG) wird dieses Gesuch der Republik Kasachstan an das Bundesamt für Justiz des Eidgenössischen Justiz- und Polizeidepartements in Bern eingereicht. Das Gesuch dient der Unterstützung einer in der Republik Kasachstan laufenden Strafuntersuchung, die sich unter anderem richtet gegen Khrapunov Viktor Vyacheslavovich (**Khrapunov V.V.**), Khrapunova Leyla Kalibekovna (**Khrapunova L.K.**) und deren Kinder Khrapunov Iliyas Viktorovich (**Khrapunov I.V.**) und Kudryashova, ehemals: Belmadani (Khrapunova) Elvira Viktorovna (**Kudryashova (Khrapunova) E.V.**) (zusammen die "**verdächtigten Personen**").


## I.    Ersuchende Behörde

1    Dieses Gesuch der Republik Kasachstan wird eingereicht vom Untersuchungsamt der Behörde zur Bekämpfung der Wirtschaftskriminalität und Korruption *(Агентство Республики Казахстан по борьбе с экономической и коррупционной преступностью (финансовая полиция))* (**Finanzpolizei**). Die Adresse der Finanzpolizei lautet wie folgt:

> 73 Seifullin Str., Astana 010000
> http://www.finpol.kz

> Telefon: +7 727 254 90 09 / +7 727 254 90 61 / +7 701 765 11 72
> Fax: +7 727 254 90 61

2    Die rechtlichen Rahmenbedingungen und die Organisation der Finanzpolizei sind reguliert durch das Gesetz der Republik Kasachstan über die Institutionen der Finanzpolizei Nr. 336-II vom 4. Juli 2002.


Ex. B
Page 41

3   Die Finanzpolizei ist eine unabhängige Strafverfolgungsbehörde und hat sämtliche Kompeten-
    zen zur Aufklärung und Untersuchung von Straftaten in den Bereichen Wirtschaftskriminalität
    und Korruption. Die Finanzpolizei hat insbesondere die Kompetenz, Strafuntersuchungen
    durchzuführen, untersuchungsrichterliche Handlungen vorzunehmen sowie damit zusammen-
    hängende Verwaltungsverfahren zu führen. Nach Genehmigung durch die Staatsanwaltschaft
    kann sie insbesondere Verfügungen betreffend die Beschlagnahmung von Vermögenswerten
    erlassen.

## II.   Zusammenfassung des Sachverhalts

## A.   Überblick

4   Khrapunov V.V. ist der frühere Bürgermeister (Akim) der Stadt Almaty (1997-2004) und der Ost-
    Kasachstan Oblast (2004-2007). Während seiner Amtszeit von 1997 bis 2007 haben Khrapunov
    V.V. und seine Ehefrau Khrapunova L.K. eine kriminelle Organisation gegründet und geleitet,
    um wiederholt Staatseigentum illegal zu erwerben und mit hohem Gewinn zu verkaufen und
    den daraus resultierenden Erlös zu waschen.

5   Mitglieder der kriminellen Organisation waren bzw. sind insbesondere Khrapunov V.V., seine
    Frau Khrapunova L.K., und deren Sohn Khrapunov I.V. sowie deren Tochter Kudryashova
    (Khrapunova) E.V.

6   Teil der kriminellen Organisation waren bzw. sind unter anderem auch Stryapchev Sergey
    Vladimirovich, Karymsakov Abylaykhan Uvaliyevich, Saprykina Larisa Nikolayevna, Sadykbaye-
    va Aynakul Abdigaliyevna, Nishnianidze Margarita Zauriyevna, Ilyasova Gaukhar Kalibekovna
    und Ilyasov Ayyar Kadyrovich.

7   Die kriminelle Organisation hat unrechtmässig Staatseigentum veräussert und in der Folge das
    illegal erworbene Staatseigentum sowie Vermögenswerte gewaschen. Die dabei von der krimi-
    nellen Organisation angewandten Methoden werden in den folgenden Abschnitten beschrieben.

8   Während der Zeit als Khrapunov V.V. das Amt des Akim von Almaty und des Akim der Ost-
    Kasachstan Oblast bekleidete, missbrauchte er wiederholt seine Amtskompetenz, um unrecht-
    mässig Staatseigentum an natürliche und juristische Personen zu veräussern, die ihm oder
    seiner Frau Khrapunova L.K. nahestanden bzw. von ihr beherrscht wurden. Um diese illegalen
    Transaktionen zu ermöglichen und durchzuführen, hat er unter anderem ihm untergeordnete
    Staatsbeamte und Staatsbetriebe beeinflusst, an letztere bindende Instruktionen abgegeben
    und Dekrete und Verfügungen zur unrechtmässigen Veräusserung von Staatseigentum erlas-
    sen.

9   Khrapunov V.V. und andere Mitglieder der kriminellen Organisation bewerkstelligten die
    unrechtmässigen Übertragungen an seine Familienmitglieder und nahestehenden Personen
    nach den folgenden Methoden:

— Veräusserung von Grundstücken im Gemeingebrauch, inklusive nicht veräusserbare Naturschutzgebiete, und deren Erwerb durch Familienmitglieder und nahestehende Personen;

— Veräusserung von Staatseigentum und dessen Erwerb durch Familienmitglieder und nahestehende Personen zum Nominalwert und unter Verletzung von Privatisierungsvorschriften, wonach solches Eigentum öffentlich versteigert werden muss;

— Verkauf von Staatseigentum im Rahmen von manipulierten öffentlichen Ausschreibungsverfahren, nachdem andere Bieter mit falschen Zusicherungen über Immobilien-Investitionspläne ausgebootet wurden, und dessen Erwerb durch Familienmitglieder und nahestehende Personen;

— Verkauf von Staatseigentum ohne Gegenleistung – unter anderem durch Vorschieben falscher Schulden und Unterbewertung des Staatseigentums – sowie dessen Erwerb durch Familienmitglieder und nahestehende Personen; und

— Verkauf von Staatseigentum gegen Bestechung.

10   Khrapunova L.K. ihrerseits leitete die kriminelle Organisation, rekrutierte Privatpersonen zwecks Errichtung von Gesellschaften, die durch sie und/oder ihren Mann Khrapunov V.V. kontrolliert wurden, um (i) das von Khrapunov V.V. unrechtmässig veräusserte Staatseigentum zu erwerben und (ii) in der Folge das illegal erworbene Eigentum und den Erlös aus den Verkäufen dieses Eigentums zu waschen. Ihren Anordnungen und Absprachen entsprechend verkauften die Mitglieder der kriminellen Organisation das illegal erworbene Staatseigentum an Dritte und wuschen den Erlös dieser Verkäufe durch eine Kette von Transaktionen. Insbesondere wurde illegal erworbenes Eigentum als statutarisches Grundkapital in Gesellschaften eingebracht und/oder zum Marktwert an Dritte verkauft.

11   Bis heute hat unsere strafrechtliche Untersuchung ergeben, dass mehr als 70 der Republik Kasachstan gehörende Grundstücke und Immobilien von Khrapunov V.V. illegal veräussert und in der Folge nach obigen Methoden verkauft und gewaschen wurden. Insgesamt wurden mit diesen Transaktionen Erlöse von mehr als USD 250 Millionen erzielt.

12   Eine Liste dieser Grundstücke und Immobilien liegt als Beilage 1 bei. Die Liste ist nicht vollständig. Unsere strafrechtliche Untersuchung der illegalen Machenschaften von Khrapunov V.V. und seiner Familie läuft weiter und wird wahrscheinlich weitere illegale Transaktionen zu Tage fördern.

13   Unter der Leitung von Khrapunov V.V. und Khrapunova L.K. wurden die Erlöse aus den oben beschriebenen Transaktionen aus der Republik Kasachstan weggeschafft. Die Gelder wurden über Bankkonten von Khrapunova L.K. und anderer Personen und Gesellschaften zwecks weiterer Geldwäsche auf Bankkonten transferiert, die Kudryashova (Khrapunova) E.V. (Tochter), die Offshore Gesellschaft Helvetic Capital B.V. (die vermutlich zur selben Gruppe wie die

schweizerische Helvetic Capital SA gehört) und weitere Offshore Gesellschaften bei ausländischen Banken, inklusive Schweizer Banken, unterhielten.

14   Folglich hat die Legalisierung (Wäsche) der unrechtmässig erworbenen Vermögenswerte und der daraus resultierende Gewinne sowohl auf dem Territorium der Republik Kasachstan als auch auf dem Territorium ausländischer Staaten, inklusive der Schweiz, stattgefunden.

## B.   Beispiele illegaler Transaktionen

### 1.   Einleitende Bemerkungen

15   Zur Illustration sollen im Folgenden vier Beispiele illegaler Transaktionen von Khrapunov V.V. und seinen Familienmitgliedern detailliert beschrieben werden.

16   Für sämtliche Fakten der folgenden Sachverhalte liegen Beweismittel vor, die im Zuge der laufenden Ermittlungen in der Republik Kasachstan erhoben wurden. Die ersuchende Behörde ist bereit, diese der ersuchten Behörde zur Verfügung zu stellen, soweit die Vertraulichkeit der laufenden Ermittlungen gewahrt bleibt.

### 2.   Beispiel Nr. 1

17   Am 16. April 2001 erliess Khrapunov V.V.  die Verfügung des Akimat von Almaty Nr. 226, nach welcher das Grundstück Nr. 186, der frühere Kindergarten an der 242A Furmanov-Strasse, Almaty, öffentlich versteigert werden sollte. Khrapunov V.V. wirkte in der Folge auf die Versteigerung zum Vorteil seiner Frau Khrapunova L.K. ein, die als Mitbieterin an der Versteigerung teilnahm. Insbesondere instruierte Khrapunov V.V. eine ihm nahestehende Person, das ursprünglich von Khrapunova L.K. (handelnd durch KazReallncom LLP) eingereichte Gebot nachträglich zu erhöhen, damit diese die Versteigerung gewinnt.

18   KazReallncom LLP war eines von vielen Vehikeln, das die Familie Khrapunov errichtete und betrieb, um illegal Staatseigentum zu erwerben und darüber Geld zu waschen. Die Gesellschaft KazReallncom LLP ist nach dem Recht der Republik Kasachstan inkorporiert und an der 113 Tole bi, Almaty City, domiziliert (Handelsregister der Republik Kasachstan Nr. TIN 60070022475). Sie wurde gegründet und beherrscht von General Reality LLP (67 Samal 2, Almaty Stadt; Handelsregister der Republik Kasachstan Nr. TIN 600900161854), die ihrerseits von Khrapunova L.K. gegründet und beherrscht wurde.

19   Nach dem Recht der Republik Kasachstan sind bei einer öffentlichen Versteigerung von Staatseigentum alle Bieter verpflichtet anzugeben, wie sie das Staatseigentum weiterentwickeln und welche Investitionen sie zu tätigen beabsichtigen. Anlässlich der Versteigerung sicherte Khrapunova L.K. (handelnd durch KazReallncom LLP) zu, dass sie KZT 496'000'000 (entspricht CHF 3'195'719[1]) in das Grundstück investieren werde, obwohl sie diese Absicht nie hatte. Da ihr nachträglich manipuliertes Angebot bedeutend höher ausfiel als die Angebote der anderen

---

[1] Wechselkurs CHF/KZT 1:155.207649 (16. Januar 2012).

Mitbieter, gewann Khrapunova L.K. die Versteigerung am 26. Dezember 2001 und erwarb das Grundstück zum Preis von KZT 52'155'100 (entspricht CHF 336'934). Voraussetzung für diesen Zuschlag war es, auf dem Grundstück ein Gesundheitszentrum im Wert von KZT 464'970'415 (CHF 2'995'796) zu erreichten. Ein solches Gesundheitszentrum wurde jedoch nie gebaut. Am 26. September 2003 wurde das Grundstück auf KazReallncom LLP übertragen, und ab diesem Datum lief eine zweijährige Frist, innert welcher die zugesicherten Investitionen zu tätigen waren.

20   Kurz darauf, am 1. Oktober 2003, verkaufte Khrapunova L.K. (handelnd durch KazReallncom LLP) das Grundstück an Karasha Plus LLP (1 Khaji Mukana, Almaty Stadt; Handelsregister der Republik Kasachstan Nr. TIN 600700224756), eine Gesellschaft, die im Alleineigentum von Khrapunova L.K. stand und von ihr beherrscht wurde, zum Preis von KZT 52'155'100 (CHF 336'934).

21   Am 3. Oktober 2003 verkaufte Karasha Plus LLP das Grundstück an Khrapunova L.K. zum selben Preis. Am 6. Oktober 2003 brachte diese alsdann das Grundstück als Stammkapital in die Building Service Company LLP ein (232 Gornaya Street, Almaty Stadt; Handelsregister der Republik Kasachstan Nr. TIN 600700511339), eine Gesellschaft, die ihrerseits im Alleineigentum von Khrapunova L.K. stand und von dieser beherrscht wurde. Sie bewertete dabei das Grundstück mit KZT 288'304'892 (CHF 1,857,543).

22   Schliesslich verkaufte Khrapunova L.K. am 16. Oktober 2003 ihre 100%-Beteiligung an der Building Service Company LLP an Stroytech LLP, eine Drittpartei, die der Khrapunov Familie nicht nahestand, zum Preis von 2,079,832,300 (CHF 13'400'321). Der Erlös aus dieser Transaktion wurde auf Khrapunova L.K.s privates Bankkonto Nr. 01KTZ000030110101 bei der Eurasian Bank Joint-Stock Company, Kasachstan, überwiesen.

23   Später wurde das Geld in USD und EUR konvertiert und auf ihre Bankkonten bei der Eurasian Bank in USD (No. 01USD000050110101 und 01USD000160110101) und in EUR (No. 01EUR000050110102) transferiert. Zwischen 2003 und 2007 wurden diese Gelder auf Schweizer Bankkonten von Kudryashova (Khrapunova) E.V. als "finanzielle Unterstützung" überwiesen.

## 3.   Beispiel Nr. 2

24   In zahlreichen Fällen enteignete Khrapunov V.V. unrechtmässig Eigentum von kasachischen Bürgern und Gesellschaften wegen angeblicher "staatlicher Bedürfnisse" und verkaufte dieses kurz darauf zum Nominalwert an seine Ehefrau oder an in ihrem Besitz stehende und an von ihr beherrschte Unternehmen. Das folgende Beispiel soll dieses Schema illustrieren, das auf diese Weise in zahlreichen Fällen eingesetzt wurde:

25   Am 25. August 2003 erliess Khrapunov V.V. die Verfügung des Akimat von Almaty Nr. 4/439-504 und enteignete ein Grundstück von 0.240 Hektaren Fläche von Shadid Engineering LLP wegen angeblicher "staatlicher Bedürfnisse". Am 23. September 2003 erliess er jedoch die Ver-

fügung des Akimat von Amlaty Nr. 4-508-627 und verkaufte damit das Grundstück an Karasha Plus LLP (1 Khaji Mukana, Almaty City; Handelsregister der Republik Kasachstan Nr. TIN 600700224756), eine Gesellschaft, die im Alleineigentum von Khrapunova L.K. stand und von dieser beherrscht wurde, zum Nominalwert von KZT 15'600'000 (entspricht CHF 100'511).

26   Am 4. Oktober 2003, verkaufte Karasha Plus LLP das Grundstück an Khrapunova L.K.. Am 6. Oktober 2003 brachte diese alsdann das Grundstück als Stammkapital in die Building Service Company LLP ein (232 Gornaya Street, Almaty Stadt; Handelsregister der Republik Kasachstan Nr. TIN 600700511339), die ihrerseits im Alleineigentum von Khrapunova L.K. stand und von dieser beherrscht wurde. Das Grundstück wurde dabei mit KZT 611'445'106 (entspricht CHF 3'939'529) bewertet.

27   Am 16. Oktober 2003 verkaufte Khrapunova L.K. schliesslich ihre 100%-Beteiligung an der Building Service Company LLP an Stroytech LLP, eine Drittpartei, die der Khrapunov Familie nicht nahestand, zum Preis von 2'079'832'300 (CHF 13'400'321). Am 20. Oktober 2003, wurde der Kaufpreis ihrem privaten Bankkonto bei der Eurasian Bank Joint-Stock Company gutgeschrieben. Später wurde das Geld in USD und EUR konvertiert und auf ihre Bankkonten bei der Eurasian Bank Joint-Stock Company in USD (No. 01USD000050110101) und in EUR (No. 01EUR000050110102) transferiert. Zwischen 2003 und 2007 wurden diese Gelder auf Schweizer Bankkonten von Kudryashova (Khrapunova) E.V. als "finanzielle Unterstützung" überwiesen.

## 4.   Beispiel Nr. 3

28   In den Jahren 2003 und 2004 übertrug Khrapunov V.V. im Staatseigentum stehende Grundstücke von insgesamt 8'7331 Hektaren Fläche an der 232 Gornaya-Strasse, nahe der Flüsse Malaya Almatinka und Bekenbay, Almaty, in das Privateigentum seiner Familie. Dabei verletzte er nicht nur die anwendbaren Bestimmungen über den Privatisierungsprozess von Staatseigentum, die vorsehen, dass solches Eigentum im Wege einer öffentlichen Versteigerung zu veräussern ist, sondern auch Artikel 119 des Gewässergesetzes der Republik Kasachstan, wonach Grundstücke in Gewässerschutzgebieten nur zum temporären Gebrauch an Privatpersonen überlassen, aber nicht in deren Privateigentum übertragen werden dürfen. Um die Eigentumsübertragung zu vollziehen, liess Khrapunov V.V. die Grundstücke zunächst in eine Gesellschaft einbringen, die zu 49% vom Staat und zu 51% indirekt von Khrapunova L.K. gehalten wurde. Anschliessend kaufte Khrapunova L.K. die verbleibenden 49% vom Staat.

29   Daraufhin übertrug Khrapunova L.K. einen Teil der Grundstücke und Immobilien (Wert: KZT 1'179'999'980, entspricht CHF 1'159'737) auf Building Service Company LLP (dazu Rz. 22 und 29) und die anderen Teile der Grundstücke (Wert: KZT 111'114'043, entspricht USD 7'500'000) an ihren Sohn Khrapunov I.V., der die Grundstücke als Stammkapital in die Asia Holding Development LLP (181 Gornaya-Strasse, Almaty Stadt; Handelsregister der Republik Kasachstan Nr. TIN 600900542566) einbrachte. Die Gesellschaft Asia Holding Development LLP stand im Alleineigentum von Khrapunov I.V. und wurde von ihm beherrscht. Schliesslich verkaufte Khrapunov I.V. seine 100%-Beteiligung an der Asia Holding Development LLP an Elias Import Ex-

port LTD (eine Gesellschaft, die nach dem Recht der British Virgin Islands inkorporiert und an der Tortola, Road Town, Blackbern Highway, C Madow House 116 domiziliert ist) zum Preis von insgesamt USD 7'573'450.

30     Nachdem der Erlös auf seinem persönlichen Bankkonto Nr. KZ31948USD00104000VB bei der Eurasian Bank Joint-Stock Company gutgeschrieben worden war, überwies Khrapunov I.V. in zwei Tranchen USD 2'210'076 als "finanzielle Unterstützung" an Kudryashova (Khrapunova) E.V.'s Schweizer Bankkonten wie folgt:

    —     am 13. April 2007 USD 150'076 an Credit Suisse SA, Genf, und

    —     am 8. Mai 2007 USD 2'060'000 an Credit Suisse SA, Genf.

31     Zudem bezog Khraunov I.V. USD 5'320'000 in bar.

**5.     Beispiel Nr. 4**

32     Im Jahr 2004 erliess Khrapunov V.V. zwei Verfügungen des Akimat von Almaty Nr. 4/868-10 und Nr. 4/868-398, wonach der Staat zwei Grundstücke von insgesamt 2.6321 Hektaren Fläche an die Gesellschaften Victoriya-KMK LLP (domiziliert an der Furmanov-Strasse, Ecke Gogol-Strasse 80/50, Almaty Stadt; 27 Aksai 3, Whg. 28, Almaty Stadt; Handelsregister der Republik Kasachstan Nr. TIN 600400523716) und Ademytau-KMK LLP verkauft. Beide Gesellschaften standen im Alleineigentum von Khrapunova L.K. und wurden von dieser beherrscht. Der Kaufpreis war KZT 18'870'100.30 (entspricht CHF 121,580).

33     Durch den Verkauf der beiden Grundstücke, die sich in Gewässerschutzgebieten nahe der Flüsse Yesentai und Bolshaya Almatinka befanden, missbrauchte er seine Amtsstellung und verletzte zudem Art. 119 des Gewässergesetzes der Republik Kasachstan, wonach Grundstücke in Gewässerschutzgebieten nicht veräussert, sondern nur temporär zum Gebrauch überlassen werden dürfen.

34     In der Folge wurden die zwei Grundstücke am 23. Dezember 2005 und am 25. Januar 2006 zum Preis von insgesamt KZT 1'223'950'000 (entspricht CHF 7'885'887) an Khachatryan A.S. weiterverkauft. Khachatryan A.S. überwies den Kaufpreis in zwei Teilbeträgen am 14. Dezember 2006 und am 16. Mai 2007 direkt auf das persönliche Bankkonto von Khrapunova L.K. Nr. 01KZT000030110101 bei der Eurasian Bank Joint-Stock Company und verschleierte die Zahlungen als "Rückzahlung einer finanziellen Unterstützung" durch Khrapunova L.K.

35     Diese illegale Transaktion resultierte in einem Profit von ungefähr KZT 1'223'950'000 (entspricht CHF 7'885'887) für Khrapunov V.V. und seine Ehefrau Khrapunova L.K.



**Ex. B**
**Page 47**

## C.   Fund Transfers to Swiss Banks

36   Wie oben beschrieben, wurde ein Teil der Erlöse aus dem unrechtmässigen Verkauf von Staatseigentum auf das persönliche Bankkonto von Khrapunova L.K. Nr. 01KZT000030110101 bei der Eurasian Bank Joint-Stock Company überwiesen. Diese Erlöse wurden anschliessend konvertiert in USD und EUR und auf ihre persönlichen Fremdwährungskonten Nr. 01EUR000050110102, Nr. 01USD000160110101 und Nr. 01USD000050110101 bei der Eurasian Bank Joint-Stock Company überwiesen.

37   Anschliessend, zwischen 2003 und 2007, überwies Khrapunova L.K. einen **Gesamtbetrag von USD 40,873,213** von ihrem persönlichen USD-Konto Nr. 01USD000050110101, USD 5'500'000 von ihrem persönlichen USD-Konto Nr. 01USD000160110101 und einen **Gesamtbetrag von EUR 7,769,966** von ihrem persönlichen EUR-Konto Nr. 01EUR000050110102 bei der Eurasian Bank Joint-Stock Company auf die folgenden Schweizer Bankkonten, die auf den Namen ihrer Tochter Kudryashova (Khrapunova) L.K. lauteten:

—   Bankkonto Nr. 2281611366 bei der Schroder & Co Banque SA, Genf; und

—   Bankkonto Nr. CH4204835007914232000 bei der Credit Suisse SA, Genf.

38   Wie oben beschrieben, überwies zudem Khrapunov I.V. in zwei Tranchen am 13. April 2007 und 8. Mai 2007 den **Gesamtbetrag von USD 2'210'076** als "finanzielle Unterstützung" auf folgendes Schweizer Bankkonto von Kudryashova (Khrapunova) E.V.:

—   Bankkonto Nr. CH4204835007914232000 bei der Credit Suisse SA, Genf.

39   Der Zahlungszweck wurde jeweils mit *"Financial Assistance to Belmadani-Khrapunova Elvira"* (oder ähnlich) beschrieben. Die einzelnen Überweisungen sind in den Beilage 2 aufgelistet.

40   Aufgrund der oben aufgelisteten Überweisungen an schweizerische Finanzinstitute haben wir den dringenden Verdacht, dass die obigen Bankkonten sowie andere Bankkonten bei schweizerischen Finanzinstituten, die noch nicht entdeckt worden sind, von der Familie Khrapunov zum Zwecke der Geldwäscherei verwendet worden sind.

## D.   Vermögen der Familie Khrapunov in der Schweiz

41   Wir haben den dringenden Verdacht, dass Vermögenswerte, welche auf die schweizerischen Bankkonten von Kudryashova (Khrapunova) E.V. überwiesen worden sind, in der Folge von der Familie Khrapunov verwendet worden sind, um unter anderem schweizerische Immobilien zu erwerben und schweizerische Gesellschaften zu gründen bzw. in sie zu investieren.

42   Folgende Grundstücke sind im Eigentum einer oder mehreren der verdächtigten Personen:

— Villa an der Chemin de Ruth 49, Cologny 1223, erworben von Kudryashova (Khrapunova) E.V. am 27. Juli 2007 zum Kaufpreis von CHF 32 Mio.;

— Wohnung an der Rue Rodolphe Toepffer 10, Genf; Wert im Zeitpunkt der Eintragung CHF 16 Mio.;

— Wohneigentum im siebengeschossigen Gebäude an der Rue du Mont Blanc 3, 1201 Genf;

— Wohnung im Quartier der Banken und Botschaften an der Chemin du Petit Sacconex 28B, 1209 Genf; Kaufpreis CHF 16 Mio.;

43   Khrapunov I.V. ist bzw. war in folgenden Gesellschaften beteiligt und/oder als Geschäftsführer oder Verwaltungsrat tätig:

— SaaFee Hôtels and Residence Development Group SA (Handelsregister Nummer CH-600.3.013.643-7) domiziliert an der Rue du Mont-Blanc 3, 1201 Genf; Khrapunov I.V. ist Verwaltungsratspräsident mit Kollektivunterschrift zu zweien; Garnier Nicolas und Gilliéron Marc sind Mitglieder des Verwaltungsrats ebenfalls mit Kollektivunterschrift zu Zweien. Cerrito Cesare verfügt über eine Prokura mit Kollektivunterschrift zu Zweien.

— Thermal Developments SA (Handelsregister Nummer CH-660.1.550.009-0), domiziliert an der Rue du Mont-Blanc 3, 1201 Genf; Khrapunov I.V. ist Verwaltungsratspräsident mit Kollektivunterschrift zu zweien; Garnier Nicolas und Gilliéron Marc sind Mitglieder des Verwaltungsrats ebenfalls mit Kollektivunterschrift zu Zweien. Cerrito Cesare verfügt über eine Prokura mit Kollektivunterschrift zu Zweien.

— Thermal Developments 2 SA (Handelsregister Nummer CH-660.3.003.011-2), domiziliert an der Rue du Mont-Blanc 3, 1201 Genf; Khrapunov I.V. ist Verwaltungsratspräsident mit Kollektivunterschrift zu zweien; Nicolas Garnier und Marc Gilliéron sind Mitglieder des Verwaltungsrats ebenfalls mit Kollektivunterschrift zu Zweien. Cerrito Cesare verfügt über eine Prokura mit Kollektivunterschrift zu Zweien.

— SDG Capital SA (Handelsregister Nummer CH-660.6.685.008-6), domiziliert an der Rue du Mont-Blanc 3, c/o Chabrier & Associés, avocats, 1201 Genf; Khrapunov I.V. ist Verwaltungsratspräsident mit Einzelunterschrift; Gilliéron Marc ist Mitglied des Verwaltungsrats ebenfalls mit Einzelunterschrift.

— Hôtel du Parc, Mont-Pèlerin SA (Handelsregister Nummer CH-550-0118823-5); domiziliert an Chemin de l'Hôtel-du-Parc 5, 1801 Le Mont-Pèlerin; Khrapunov I.V. ist Verwaltungsratspräsident mit Kollektivunterschrift zu zweien; Garnier Nicolas und Gilliéron Marc sind Mitglieder des Verwaltungsrats ebenfalls mit Kollektivunterschrift zu Zweien. Cerrito Cesare verfügt über eine Prokura mit Kollektivunterschrift zu Zweien.

Ex. B
Page 49

— HDP Hôtel du Parc Holding Sàrl (Handelsregister Nummer CH-550-0054785-1), domiziliert an der Chemin de l'Hôtel-du-Parc 5, Le Mont-Pèlerin; Khrapunov I.V. ist Gesellschafter und Geschäftsführer mit Kollektivunterschrift zu Zweien; Gilliéron Marc und Garnier Nicolas sind Geschäftsführer mit Kollektivunterschrift zu Zweien; SDG CAPITAL SA (CH-660-6685008-6) mit Sitz in Genf ist Gesellschafterin ohne Zeichnungsberechtigung.

— Swiss Development Group SA (Handelsregister Nummer CH-660.1.874.007-5), domiziliert an der Rue du Mont-Blanc 3, 1201 Genf; Khrapunov I.V. ist Verwaltungsratspräsident mit Kollektivunterschrift zu zweien; Nicolas Garnier und Marc Gilliéron sind Mitglieder des Verwaltungsrats ebenfalls mit Kollektivunterschrift zu Zweien. Cerrito Cesare verfügt über eine Prokura mit Kollektivunterschrift zu Zweien. Zurzeit implementiert die Gesellschaft drei Projekte: Private Residence (Schweiz), 51 SPA Residence (Leukerbad, Schweiz), Geneva Beach Development Program.

— Swiss Standard IB AG (Handelsregister Nummer CH-140.3.003.367-3), domiziliert an der Dorfstrasse 15a, 6390 Engelberg; Khrapunov I.V. ist Präsident des Verwaltungsrats mit Einzelunterschrift; Gilliéron Marc ist Mitglied des Verwaltungsrats ebenfalls mit Einzelunterschrift.

44  Kudryashova (Khrapunova) E.V. ist bzw. war in folgenden Gesellschaften beteiligt und/oder als Geschäftsführerin oder Verwaltungsrätin tätig:

— Phoenix Jewellery SA (Handelsregister Nummer CH-660.0.443.005-8), domiziliert an der Rue du Rhône 35, Genf; Kudryashova (Khrapunova) E.V. ist am 24. April 2009 als Verwaltungsrätin aus dem Handelsregister gelöscht worden. Verwaltungsratspräsident der Gesellschaft ist Garnier Nicolas. Cerrito Cesare besitzt eine Prokura mit Kollektivunterschrift zu Zweien.

— Phoenix International Holding SA (Handelsregister Nummer CH-660.1.759.004-3), domiziliert an der Rue de Rhone 35, 1200 Genf. Kudryashova (Khrapunova) E.V. ist am 24. April 2009 als Verwaltungsrätin aus dem Handelsregister gelöscht worden. Verwaltungsratspräsident der Gesellschaft ist Garnier Nicolas. Cerrito Cesare besitzt eine Prokura mit Kollektivunterschrift zu Zweien.

— DRAGON FINANCIAL COMPANY LTD (Handelsregister Nummer CH-660.0.709.004-6) domiziliert an der Rue Agasse 54, 1208 Genf; Kudryashova (Khrapunova) E.V. ist am 15. März 2006 als Verwaltungsrätin aus dem Handelsregister gelöscht worden.

— Unic LifeStyle Sàrl (Handelsregister Nummer 660.1.153.009-4); Kudryashova (Khrapunova) E.V. ist im Handelsregister als alleinige Gesellschafterin eingetragen;

45  Ausserdem ist Khrapunova L.K. Verwaltungsratspräsidentin in folgenden Schweizer Gesellschaften:

— Toepffer Investissement SA (Handelsregister Nummer CH-660.1.784.009-2), domiziliert an der Rue du Mont-Blanc 3, 1201 Genf; Khrapunova L.K. ist Verwaltungsratspräsidentin mit Kollektivunterschrift zu Zweien; Gilliéron Marc ist Mitglied des Verwaltungsrats ebenfalls mit Kollektivunterschrift zu Zweien.

— Helvetic Capital SA (Handelsregister Nummer CH-660.2.757.006-5), domiziliert an der Rue du Mont-Blanc 3, 1201 Genf; Khrapunova L.K. ist am 27. September 2010 als Verwaltungsrätin aus dem Handelsregister gelöscht worden; einziger Verwaltungsrat ist seitdem Gilliéron Marc mit Einzelunterschrift.

46    Die Helvetic Capital B.V., eine Gesellschaft mit Sitz in den Niederlanden, an die USD 4.14 Mio. überwiesen wurden (siehe oben N 13), gehört zur selben Unternehmensgruppe wie die Helvetic Capital SA mit Sitz in Genf (Handelsregister Nummer CH-660.2.757.006-5). Diese Gesellschaft ist ihrerseits eng verbunden mit der Swiss Development Group SA mit Sitz in Genf (Handelsregister Nummer CH-660.1.874.007-5). Wir haben den starken Verdacht, dass Helvetic Capital SA und/oder Swiss Development Group SA von den verdächtigten Personen als Treuhandgesellschaften verwendet werden.

47    Zusätzlich haben wir den starken Verdacht, dass Nicolas Garnier, Cesare Cerrito und der Genfer Rechtsanwalt Marc Gilliéron ihre Funktionen als Verwaltungsratsmitglieder und Zeichnungsberechtigte der oben genannten Gesellschaften treuhänderisch für die Familie Khrapunov ausüben.

E.    **Deklarationen über die Offenlegung des Vermögens von Staatsangestellten belegen die unrechtmässige Natur der gegenwärtigen Vermögenslage der Familie Khrapunov**

48    Dass die gegenwärtige finanzielle Lage von Khrapunov V.V. und Khrapunova L.K. das Ergebnis krimineller Handlungen ist, wird zusätzlich belegt durch die Deklarationen über die Offenlegung des Vermögens von Staatsangestellten, welche sie in der Republik Kasachstan zwischen 1997 und 2009 einzureichen verpflichtet waren.

49    Nach dem kasachischen Anti-Korruptionsgesetz Nr. 267-I vom 2. Juli 1998 ist jede Person in einem Regierungsamt verpflichtet, jährlich eine Deklaration über die Offenlegung ihres Einkommens und Vermögens in Kasachstan und im Ausland einzureichen. Ebenso ist die Ehegattin einer solchen Person verpflichtet, jährlich eine Deklaration über die Offenlegung ihres Einkommens und Vermögens in Kasachstan und im Ausland einzureichen.

50    Gemäss den Deklarationen von Khrapunov V.V. der Jahre 1997 bis 2009 hat Khrapunov V.V.s Vermögen drei Automobile (einen Mercedes Benz S-500l 2003, einen Range Rover 1993 und einen Range Rover 1997) sowie eine Garage nie überschritten. Nach den Deklarationen seiner Ehefrau der Jahre 2003 bis 2009 erfasste ihr Vermögen mehrere Luxusappartements und Wohnhäuser, Gewerbeimmobilien, Garagen, Parkhäuser, Luxusautomobile (Mercedes Benz,

Maybach) usw. Der Gesamtwert des Vermögens beider hat jedoch KZT 838,000,000 (entspricht CHF 5'399'218) nie überschritten.

51  Die jährlichen Deklarationen über die Offenlegung von Vermögen der Regierungsangestellten von Khrapunov V.V. und Khrapunova L.K. vermögen ihre gegenwärtige finanzielle Position nicht zu erklären. Die einzige vernünftige Erklärung ist, dass sie andere Vermögenswerte besassen, die sie – wegen ihrer kriminellen Herkunft – nicht in ihrer jährlichen Deklaration über ihr Vermögen offen legen wollten.

## III.   Die Strafuntersuchung in der Republik Kasachstan

52  Wie oben beschrieben sind Khrapunov V.V., Khrapunova L.K. und ihre Kinder Khrapunov I.V. und Kudryashova (Khrapunova) E.V Verdächtige in einer laufenden strafrechtlichen Ermittlung.

53  Am 31. März 2011 eröffnete die Finanzpolizei der Republik Kasachstan eine Strafuntersuchung gegen Khrapunov V.V. und andere Amtspersonen wegen des Verdachts der Überschreitung von Amtsbefugnissen. The Strafuntersuchung wurde eröffnet, nachdem in den Massenmedien darüber berichtet wurde, dass Khrapunov V.V. zu den 300 reichsten Personen der Schweiz gehört.

54  In den Monaten Mai, Juni und Juli 2011 erweiterte die Finanzpolizei der Republik Kasachstan die Strafuntersuchung auf zahlreiche weitere Sachverhalte der Überschreitung von Amtsbefugnissen durch Khrapunov V.V. und andere Amtspersonen sowie auf Verdacht der qualifizierten Entäusserung oder Veruntreuung von anvertrauten Vermögenswerten im Sinne von Art. 176 Abs. 3 lit. b des Strafgesetzbuches der Republik Kasachstan. Am 19. Juli 2011 wurde gegen Khrapunov V.V. ein Haftbefehl wegen Verdachts der der Verübung einer Straftat gemäss Art. 307 Abs. 4 des Strafgesetzbuches der Republik Kasachstan, und am 21. Juli 2011 wurde der Haftbefehl durch den Medeu District Court of Almaty genehmigt.

55  Am 15. August 2011 eröffnete die Finanzpolizei der Republik Kasachstan eine Strafuntersuchung gegen Khrapunov V.V., Khrapunova L.K. und andere Personen wegen Verdachts der Legalisation von Geldern oder anderen illegal erlangten Vermögenswerten (Geldwäscherei) im Sinne von Art. 193 Abs. 3 lit. c des Strafgesetzbuches der Republik Kasachstan.

56  In den Monaten September, Oktober und November wurden weitere Strafuntersuchungen eröffnet u.a. wegen des Verdachts auf Bestechung (Art. 311 Abs. 4 lit. c des Strafgesetzbuches der Republik Kasachstan) und Schaffung und Betrieb einer kriminellen Organisation oder Gruppe (Art. 235 Abs. 4 des Strafgesetzbuches der Republik Kasachstan) sowie wegen der Verübung von Straftaten gemäss Art. 307 Abs. 3 und 4, Art. 176 Abs. 3 lit. a und b, Art. 177 Abs. 3 lit. a und b, Art. 193 Abs. 3 lit. b und c, des Strafgesetzbuches der Republik Kasachstan.

57  Schliesslich erstreckte die Finanzpolizei der Republik Kasachstan am 29. Dezember 2011 die Strafuntersuchung auf auf Khrapunov I.V. und Kudryashova (Khrapunova) E.V.

58   Im Rahmen der Strafuntersuchung verfügte der Leiter der Untersuchungsbehördeam 22. November 2011 einen Vermögensarrest auf Grundstücke und andere Immobilien, die unrechtmässig als Folge der Handlungen von Khrapunov V.V. sowie anderer Personen veräussert wurden, sowie auf Bankkonten von Personen und Gesellschaften, die der Familie Khrapunov nahe stehen. Die Arreste, erlassen gestützt auf die Rechtsgrundlage in Art. 161 der Strafprozessordnung der Republik Kasachstan, wurden genehmigt durch den stellvertretenden Generalstaatsanwalt der Republik Kasachstan.

59   Im Zusammenhang mit der laufenden Strafuntersuchung wurden und werden mehrere Rechtshilfeersuchen an ausländische Staaten gerichtet.

## IV.   Anwendbare Bestimmungen des Rechts der Republik Kasachstan

60   Folgende Bestimmungen des Strafgesetzbuches der Republik Kasachstan sind anwendbar auf das Verhalten der verdächtigten Personen:

— Art. 176 (Entäusserung oder Veruntreuung anvertrauter Vermögenswerte), insbesondere durch Khrapunov V.V., der Staatseigentum, das ihm anvertraut war, an Gesellschaften veräusserte, die von Khrapunova L.K. beherrscht wurden;

— Art. 177 (Betrug), insbesondere durch Khrapunov V.V., der im Staatseigentum stehende Gesellschaften täuschte, sodass diese Vermögenswerte an seine Familienmitglieder verpfändeten und nicht existente Verbindlichkeiten akzeptierten;

— Art. 193 (Legalisation von Geldern oder anderen illegal erlangten Vermögenswerten; Geldwäscherei), von allen Personen, gegen die eine Strafuntersuchung geführt wird;

— Art. 235 (Schaffung und Betrieb einer kriminellen Organisation oder Gruppe) durch Khrapunov V.V. and Khrapunova L.K.;

— Art. 307 (Amtsmissbrauch), insbesondere durch Khrapunov V.V., der eine Amtsstellung als Akim (örtliches Exekutivorgan) innehatte;

— Art. 311 (passive Bestechung), insbesondere durch Khrapunov V.V., der eine Position als Akim (örtliches Exekutivorgan) innehatte.

61   Kopien dieser Bestimmungen und deutsche Übersetzungen davon befinden sich in der Beilage (Beilage 4)



Ex. B
Page 53

## V.    Relevante Bestimmungen des schweizerischen Rechts

### A.    Doppelte Strafbarkeit

62    Die Straftatbestände, die von Khrapunov V.V. und Mitgliedern seiner Familie begannen wurde, sind auch strafbar unter schweizerischem Recht als Amtsmissbrauch (Art. 312 StGB), Veruntreuung (Art. 138 Ziff. 1 und 2 StGB), Betrug (Art. 146 StGB), passive/aktive Bestechung (Art. 322$^{ter}$ ff. StGB), Geldwäscherei (Article 305$^{bis}$ StGB) und kriminelle Organisation (Article 260$^{ter}$ StGB). Das Erfordernis doppelter Strafbarkeit ist somit erfüllt.

### B.    Verjährung

63    Die Verfolgungsverjährung für die Straftaten, die von Khrapunov V.V. und Mitgliedern seiner Familie begangen wurden, sind weder nach schweizerischem Recht noch nach kasachischem Recht verjährt.

64    Die Straftaten, deren Khrapunov V.V. beschuldigt und seine Familienmitglieder verdächtigt werden, sind nach kasachischem Strafrecht als Verbrechen zu qualifizieren. Gemäss Art. 69 des kasachischen Strafgesetzbuches verjähren Verbrechen innert 15 Jahren. Die Verjährung beginnt am Tag, an dem das Verbrechen ausgeführt wurde. Da im vorliegenden Fall die am weitesten zurückliegende Straftat im Jahr 2001 begangen wurde, ist die Verfolgungsverjährung unter kasachischem Strafrecht noch nicht eingetreten.

65    Gemäss Art. 97 Abs. 1 lit. b StGB beträgt die Verjährung 15 Jahre, wenn eine Straftat mit einer Freiheitsstrafe von über drei Jahren bedroht ist. Alle Straftaten, die Khrapunov V.V. und Mitglieder seiner Familie mutmasslich begangen haben, werden mit einer Freiheitsstrafe von über drei Jahren bedroht. Deshalb und weil die am weitesten zurück liegende Straftat im Jahr 2001 begangen wurde, ist die Verfolgungsverjährung unter schweizerischem Recht noch nicht eingetreten.

## VI.    Identifikation der verdächtigten Personen die Wohnsitz in der Schweiz haben

66    Khrapunov Viktor Vyacheslavovich: geboren am 24. November 1948; Geburtsort: Glubokovskiy Distrikt, Region Ost-Kasachstan Oblast; registrierte Adresse: 264 Zhamakayev-Strasse, Medeu district, Almaty, Bürger der Republik Kasachstan (gegenwärtig Wohnsitz in der Schweiz); PIN 481124300025; Identitätskarte 016187453 vom 25. Juni 2004; Reisepass-Nummer N0071632 vom 7. September 1995.

67    Khrapunova (Daniyarova, Beketova) Leyla Kalibekovna: geboren am 19. Dezember 1958; Geburtsort: Glubokovskiy Distrikt, Region Ost-Kasachstan Oblast; registrierte Adresse: 264 Zhamakayev-Strasse, Medeu Distrikt, Almaty, Bürger der Republik Kasachstan (gegenwärtig Wohnsitz in der Schweiz); PIN 581219400029; Identitätskarte 016187452 vom 25. Juni 2004; Reisepass-Nummer N4147183 vom 18. Mai 2004.

68   Khrapunov (Beketov) Iliyas Viktorovich (Asylbayevich): geboren am 15. Januar 1984, Geburtsort: Taraz, Zhambyl Oblast; registrierte Adresse: 177 Gornaya-Strasse, Almaty, Bürger der Republik Kasachstan (gegenwärtig Wohnsitz in der Schweiz); PIN 840115300011; Identitätskarte 015640028 vom 25. Dezember 2003; Reisepass-Nummer N5454992 vom 6. Juli 2007.

69   Kudryashova (Khrapunova) Elvira Viktorovna (vormals Belamadani (Khrapunova) Elvira Viktorovna): geboren am 7. August 1979; Geburtsort: Taraz, Zhambyl oblast; registrierte Adresse: 177 Gornaya-Strasse, Almaty, Bürger der Republik Kasachstan (gegenwärtig Wohnsitz in der Schweiz); PIN 790807400096; Identitätskarte No. 013307356 vom 9. Juli 2002; Reisepass-Nummer N3419644 vom 9. Juli 2002.

70   Alle der oben genannten verdächtigten Personen sind Staatsbürger der Republik  Kasachstan; keiner von ihnen hat beantragt, die Staatsbürgerschaft zu ändern.

## VII.   Ersuchte Rechtshilfemassnahmen

71   Zur Unterstützung der laufenden strafrechtlichen Untersuchung gegen die oben aufgeführten Personen ersucht die Republik Kasachstan höflich um Erlass folgender Massnahmen:

1.   **Verpflichtung der nachfolgenden Banken zur Aushändigung von Kopien der Dokumente betreffend aller Konten, Depots und Safes, die direkt oder indirekt von den verdächtigten Personen gehalten oder an denen die verdächtigten Personen wirtschaftlich berechtigt sind, inklusive Kopien sämtlicher Eröffnungsunterlagen und Belege, die Transaktionen zugunsten und zulasten folgender Konten, Depots und Safes bei diesen Banken betreffen:**

   -   Schroder & Co. Banque SA, Genf, insbesondere Kontonummer 2281611366
   -   Credit Suisse SA, Genf, insbesondere Kontonummer CH4204835007914232000

2.   **Verpflichtung aller Genfer Banken zur Auskunftserteilung an die ersuchte Behörde, ob sie Vermögenswerte aufbewahren (bzw. aufbewahrt haben), die direkt oder indirekt von den verdächtigten Personen gehalten werden (bzw. gehalten worden sind) oder an denen die verdächtigten Personen wirtschaftlich berechtigt sind (bzw. waren),**

   **und, falls sie solche Vermögenswerte aufbewahrten (bzw. aufbewahrt haben),**



Verpflichtung dieser Banken zur Herausgabe von **Kopien der Dokumente betreffend alle** Konten, Depots und **Safes, die direkt oder indirekt von den** verdächtigten Personen gehalten oder an denen die verdächtigten Personen **wirtschaftlich berechtigt sind,** inklusive Kopien sämtlicher Eröffnungsunterlagen und Belege betreffend Transaktionen zugunsten und zulasten dieser Konten, Depots und Safes;

Verpflichtung dieser Banken, keine Transaktionen zulasten der Konten, Depots und Safes auszuführen, die **direkt oder indirekt von den verdächtigten Personen gehalten werden oder an denen die** verdächtigten Personen wirtschaftlich berechtigt sind;

3. Ergänzung und Ausweitung der obigen Anweisungen betreffend alle Konten, Depots und Safes, die von **Gesellschaften gehalten werden, die direkt oder indirekt von den verdächtigten Personen kontrolliert werden oder an denen die** verdächtigten Personen wirtschaftlich berechtigt sind;

4. Verpflichtung der Swiss Development Group SA, route du Pré-Bois 29, Genf, zur Auskunftserteilung an die ersuchte Behörde, welche Vermögenswerte sie treuhänderisch für die verdächtigten Personen halten (bzw. gehalten haben), und welche geschäftlichen Funktionen oder Ämter ihre Partner und Angestellten, insbesondere Nicolas Garnier, Marc Gilliéron und Cesare Cerritto im Auftrag der verdächtigten Personen innehaben oder innehatten;

5. Verpflichtung der Helvetic Capital SA, rue du Mont-Blanc 3, Genf, zur Auskunftserteilung an die ersuchte Behörde, welche Vermögenswerte sie treuhänderisch für die verdächtigten Personen halten (bzw. gehalten haben)

6. Verpflichtung der folgenden Gesellschaften zur Auskunftserteilung an die ersuchte Behörde über die Eigentümer der Aktien oder Gesellschaftsanteile:

    a) SaaFee Hôtels and Residence Development Group SA
    b) Thermal Developments SA
    c) Thermal Developments 2 SA
    d) SDG Capital SA
    e) Hôtel du Parc, Mont-Pèlerin SA;
    f) HDP Hôtel du Parc Holding Sàrl



**Ex. B**
**Page 56**

g) Swiss Developments Group SA
h) Swiss Standard IB AG
i) Phoenix Jewellery SA
j) Phoenix International Holding SA
k) DRAGON FINANCIAL COMPANY Ltd
l) Unic LifeStyle Sàrl
m) Toepffer Investissement SA
n) Helvetic Capital SA

7. **Erlaubnis für unsere Vertreter zur Teilnahme an der Sichtung der erhaltenen Information im Hinblick auf die Identifikation weiterer Vermögenswerte, Bankkonten oder Gesellschaften der verdächtigten Personen;**

8. **Übermittlung aller Informationen über die Vermögenswerte und Finanztransaktionen betreffend die untersuchten Straftaten an die Republik Kasachstan zur Unterstützung der laufenden Strafuntersuchung;**

9. **Herausgabe aller beschlagnahmten Vermögenswerte, die direkt oder indirekt aus den untersuchten Straftaten herrühren, an die Republik Kasachstan.**

## VIII. Ersuchen die Rechtshilfe vertraulich zu behandeln

72 Im Zusammenhang mit der Strafuntersuchung gegen die verdächtigten Personen wurden Rechtshilfeersuchen an die zuständigen Behörden anderer Staaten gesandt. Diese Ersuchen betreffen andere Teile der laufenden Strafuntersuchung. Um die Vertraulichkeit der Strafuntersuchung zu gewährleisten und eine internationale Koordination der Sachverhaltsermittlung zu ermöglichen, ersuchen wir Sie höflich,

10. **die Rechtshilfe bis auf Weiteres vertraulich zu behandeln, und dass die Empfänger der Verfügungen der ersuchten Behörde angewiesen werden, die Existenz des Rechtshilfeersuchens vertraulich zu behandeln und niemandem gegenüber mitzuteilen.**

## IX. Gesuch um Erlass vorsorglicher Massnahmen

73 Die verdächtigten Personen haben Kenntnis, dass in der Republik Kasachstan eine Strafuntersuchung gegen sie geführt wird. Darüber hinaus hat die ersuchende Behörde Anhaltspunkte, dass die verdächtigten Personen wissen, dass die ersuchende Behörde zur Unterstützung der Strafuntersuchung die Rechtshilfe ausländischer Behörden in Anspruch nehmen möchte. Es besteht daher ein erhebliches Risiko, dass die verdächtigten Personen versuchen,

Vermögenswerte aus der Schweiz zu bringen. Die ersuchte Behörde wird daher ersucht, die folgenden vorsorglichen Massnahmen zu erlassen:

11. **Das Grundbuchamt Genf anzuweisen, keine Verfügungen über die folgenden Grundstücke zuzulassen:**

   a)  Villa an der Chemin de Ruth 49, Cologny 1223;
   b)  Wohnung an der Rue Rodolphe Toepffer 10;
   c)  Wohneigentum im siebengeschossigen Gebäude an der Rue du Mont Blanc 3, 1201 Genf, auf den Namen einer der verdächtigten Personen lautend;
   d)  Wohnung am Chemin du Petit Sacconex 28B;

12. **Die folgenden Banken anzuweisen, ohne die vorgängige Zustimmung der ersuchten Behörde keine Überweisungen von Bankkonten oder Transaktionen betreffend Depots oder Safes auszuführen, die direkt oder indirekt von einer der verdächtigten Personen gehalten werden und über einen Betrag von mehr als CHF 10'000 lauten:**

   - Schroder & Co. Banque SA, Genf
   - Credit Suisse SA, Genf

## X.   Bestätigungen in Zusammenhang mit dem Rechtshilfeersuchen

74   Im Zusammenhang mit diesem Rechtshilfeersuchen und entsprechend dem IRSG möchte Ihnen das Untersuchungsamt der Behörde zur Bekämpfung der Wirtschaftskriminalität und Korruption (Finanzpolizei) Folgendes bestätigen:

A.   Die ersuchten Rechtshilfemassnahmen – einschliesslich z.B. der ersuchten Beschlagnahmung und Dokumentenherausgabe – sind nach dem Recht der Republik Kasachstan zulässig.

B.   Nach abgeschlossener strafrechtlicher Untersuchung werden die verdächtigten Personen nach den Artikeln 176, 177, 193, 235, 307 und 311 des Strafgesetzes der Republik Kasachstan vor Gericht angeklagt. Diese Straftatbestände haben keinen politischen Charakter. Sie betreffen Amtsmissbrauch, Veruntreuung von Vermögenswerten, Betrug, nachfolgende Wäsche von Geldern und anderen Vermögenswerten, die illegal erworben wurden, sowie die Gründung und Führung einer kriminellen Organisation für diese Zwecke – alles Straftaten, die nach unserem Verständnis das Erfordernis der doppelten Strafbarkeit nach Artikel 64 IRSG erfüllen.

C.   Herr Khrapunov V.V. geniesst keinerlei Immunität vor strafrechtlichen Untersuchungen.

D.  Die Regierung der Republik Kasachstan sichert Ihnen bezüglich Rechtshilfe in Strafsachen Gegenrecht zu. Tatsächlich hat die Republik Kasachstan der Schweiz kürzlich Rechtshilfe geleistet (betreffend Union Privée Financière, gegen Alessandro Piozzi, Vittorio Pugliese, am 23. Februar 2011; Staatsanwalt Manuele Minotti Perucchi des Kantons Tessin).

E.  Wir ersuchen Sie höflich, dass die anbegehrte Rechtshilfe und die Verfahren durch die Bundesanwaltschaft und nicht durch kantonale Behörden erlassen bzw. geführt werden.

F.  Wir bestätigen die Korrektheit der Übersetzung des vorliegenden Gesuchs und der anderen übersetzten Dokumente.

G.  Wir haben unsere Rechtsberater in Zürich, Dr. Balz Gross und/oder Dr. Claudio Bazzani und/oder Mladen Stojiljković (Homburger AG, Prime Tower, Hardstrasse 201, Postfach 314, CH-8037 Zürich, Telefon 043 222 10 00, Fax 043 222 15) beauftragt, im Rahmen allfälliger Unterstützungen oder für den Fall, dass Sie weitere Informationen benötigen, koordinierend zu wirken. Um die in dieser Angelegenheit notwendige Vertraulichkeit zu wahren, ersuchen wir Sie, weder den diplomatischen Übermittlungsweg noch offene Kommunikationswege zu benutzen. Wir ersuchen Sie, uns alle Mitteilungen in dieser Sache durch unsere Vertreter von Homburger AG zukommen zu lassen.



Wir behalten uns vor, dieses Gesuch im Verlauf unserer Untersuchung zu ergänzen. Insbesondere behalten wir uns vor, um Verhaftung und spätere Auslieferung der verdächtigten Personen zu ersuchen.

Im Namen der Regierung der Republik Kasachstan danken wir Ihnen für die wohlwollende Prüfung dieses Ersuchens und bitten Sie, uns via unsere Schweizer Vertreter zu informieren, falls Sie weitere Informationen benötigen.

Wir versichern Sie unserer höchsten Wertschätzung.

Datum: 20. 02. 2012

**Mr. Tusupbekov Rashid Toleutayevich**
Vorsitzender der Behörde zur Bekämpfung
der Wirtschaftskriminalität und Korruption
(Finanzpolizei)

Mr. Sergei Nikolayevich Perov
Oberstleutnant der Finanzpolizei, Leiter der
operationellen Untersuchungsgruppe der Behörde zur Bekämpfung der Wirtschaftskriminalität und Korruption (Finanzpolizei), Leiter
der Abteilung des Untersuchungsamtes für
die Untersuchung von Straftaten von Amtspersonen.

Untersuchungsamt der Behörde zur Bekämpfung der Wirtschaftskriminalität und Korruption
(Finanzpolizei)
*(Агентство Республики Казахстан по борьбе с экономической и коррупционной
преступностью (финансовая полиция))*



**Ex. B**
**Page 60**

21 | 21

**Verzeichnis der Beilagen**

1.  Liste des veräusserten Eigentums, vertraulich, **Dritten nicht bekannt zu geben**

2.  Bestätigung der Eurasian Bank betreffend Geldüberweisungen von Khrapunova L.K. und Khrapunov I.V. auf die Schweizer Bankkonten von Kudryashova (Khrapunova) E.V. [früher genannt Belmadani (Khrapunova) E.V. (inkl. Übersetzung auf Englisch) **Bemerkung**: Die erwähnte IBAN CH7604251079724660000 ist zu bestätigen.

3.  Kopien der Artikel 10, 69, 176, 177, 193, 235, 307 und 311 des Strafgesetzbuches der Republik Kasachstan (inkl. notariell beglaubigter Übersetzungen auf Deutsch)



**Ex. B**
**Page 61**

# EXHIBIT C

Bundesamt für Justiz [*Federal Judicial Office*]
International Legal Assistance Division
Bundesrain 20
CH-3003 Berne
Switzerland

**Letter of request in criminal cases**

Dear Madam, Dear Sir,

We have the honor to submit the following letter of request in connection with an ongoing criminal investigation in the Republic of Kazakhstan.

According to the Federal Law Regarding International Letters of Request in Criminal Cases (IRSG), this request of the Republic of Kazakhstan is submitted to the Federal Judicial Office of the Swiss Justice and Police Department in Berne. The request serves to support a criminal investigation ongoing in the Republic of Kazakhstan which targets, among others, Khrapunov Viktor Vyacheslavovich (**Khrapunov V.V.**), Khrapunova Leyla Kalibekovna (**Khrapunova L.K.**) and their children Khrapunov Iliyas Viktorovich (**Khrapunov I.V.**) and Kudryashova, formerly: Belmadani (Khrapunova) Elvira Viktorovna (**Kudryashova (Khrapunova) E.V.**) (collectively the "**Suspects**").

## I.   Requesting authority

1   This request of the Republic of Kazakhstan has been submitted by the Investigative Office of the Anti-White-Collar Crime and Corruption Agency [Russian: (Agency of the Republic of Kazakhstan to Combat Economic and Corruption-Related Crimes (Financial Police))] (**Financial Police**). The address of the Financial Police is as follows:

> 73 Seifullin Str., Astana 010000
> http://www.finpol.kz
>
> Phone: +7 727 254 90 09/+7 727 254 90 61/+7 701 765 11 72
> Fax: +7 727 254 90 61

2   The basic legal conditions and the organization of the Financial Police are regulated in the law of the Republic of Kazakhstan regarding the institutions of the Financial Police No. 336-II dated July 4, 2002.

3    The Financial Police is an independent prosecution authority and is fully authorized to clarify and investigate criminal offenses in the area of white-collar crime and corruption. In particular, the Financial Police has the authority to undertake criminal investigations, take actions proper for an investigating judge and pursue the associated administrative procedures. In particular, after obtaining permission from the Public Prosecutor's Office, it is allowed to issue orders concerning the seizure of assets.

## II.    Summary of the facts of the case

### A.    Overview

4    Khrapunov V.V. is the former mayor (Akim) of the city Almaty (1997-2004) and the East Kazakhstan Oblast (2004-2007). During his term of office from 1997 to 2007 Khrapunov V.V. and his wife Khrapunova L.K. founded and ran a criminal organization, repeatedly acquiring state property illegally, selling it subsequently at a high profit and launder the resulting proceeds.

5    Members of the criminal organization were and/or are in particular Khrapunov V.V., his wife Khrapunova L.K., their son Khrapunov I.V. as well as their daughter Kudryashova (Khrapunova) E.V.

6    Also part of the criminal organization were and/or are, among others, Stryapchev Sergey Vladimirovich, Karymsakov Abylaykhan Uvaliyevich, Saprykina Larisa Nikolayevna, Sadykbayeva Aynakul Abdigaliyevna, Nishnianidze Margarita Zauriyevna, Ilyasova Gaukhar Kalibekovna and Ilyasov Ayyar Kadyrovich.

7    The criminal organization unlawfully sold state property and subsequently laundered the illegally acquired state property and assets. The methods used in this process by the criminal organization are described in what follows.

8    During the time that Khrapunov V.V. held the office of Akim of Almaty and Akim of the East Kazakhstan Oblast, he repeatedly abused the power of his office in order to illegitimately sell state property to natural and legal entities that were close to him or his wife Khrapunova L.K. and/or were controlled by her. In order to make possible and carry out these illegal transactions, he put pressure on, among others, civil servants and state enterprises under his command, gave binding instructions to the latter and issued decrees and orders regarding the unlawful sale of state property.

9    Khrapunov V.V. and other members of the criminal organization arranged for unlawful transfers to his family members and related persons according to the following methods:

- Sale of public lands, including not-for-sale nature preserves, and their acquisition by family members and closely linked persons:

- Sale of state property and its acquisition by family members and closely linked persons at their nominal value and in violation of the privatization policy directives according to which such property must be auctioned publicly;

- Sale of state property in the framework of a manipulated public bidding process and its acquisition by family members and closely linked persons after other bidders were out-maneuvered with false promises about real estate investment plans;

- Sale of state property without good and valuable consideration – for example by claiming imaginary debts and by undervaluing state property - as well as its acquisition by family members and closely linked persons; and

- Sale of state property through bribery.

10     Khrapunova L.K. for her part ran the criminal organization, recruited individuals to establish companies controlled by her and/or her husband Khrapunov V.V. for the purpose of (i) acquiring the state property that was sold unlawfully by Khrapunov V.V and (ii) subsequently laundering the illegally acquired property and the proceeds from the sale of this property. According to her orders and in collusion with her, the members of the criminal organization sold the illegally acquired state property to third parties and laundered the proceeds of these sales through a chain of transactions. In particular, the illegally acquired assets were contributed as statutory capital stock to companies or sold to third parties at their market value.

11     So far our criminal investigation has shown that more than 70 landed properties and buildings belonging to the Republic of Kazakhstan were sold illegally by Khrapunov V.V. and subsequently laundered using above methods. Altogether the gain from these transactions was more than US$ 250 million.

12     A list of these landed properties and buildings is attached as Enclosure 1. The list is not exhaustive. Our criminal investigation of the illegal machinations of Khrapunov V.V. and his family are still in progress and it is likely that other illegal transactions will come to light.

13     Under the direction of Khrapunov V.V. and Khrapunova L.K. the income from the transactions described above was quickly moved of the Republic of Kazakhstan. The funds were transferred via bank accounts held by Khrapunova L.K. and other persons and companies for the purpose of money laundering to bank accounts which Kudryashova (Khrapunova) E.V. (daughter), the offshore company Helvetic Capital B.V. (probably belonging to the same group as

Swiss Helvetic Capital SA) and other offshore companies maintained with foreign banks, including Swiss banks.

14    Therefore the white-washing (laundering) of the unlawfully acquired assets and the resulting profits took place both on the territory of the Republic of Kazakhstan and on the territory of foreign countries, including Switzerland.

## B.    Examples of illegal transactions

### 1.    Introductory remarks

15    For illustration purposes we would like to describe in what follows four examples of illegal transactions executed by Khrapunov V.V. and his family members in detail.

16    We have evidence for all facts of the following situations, gathered in the course of the ongoing investigations in the Republic of Kazakhstan. The requesting authority is willing to make this evidence available to the accosted authority provided that the confidentiality of the current investigations is assured.

### 2.    Example No. 1

17    On April 16, 2001 Khrapunov V.V. issued decree no. 226 of the Akimat of Almaty under which property No. 186, a former kindergarten at 242A Furmanov Street, Almaty, was to be sold in public auction. Khrapunov V.V. subsequently intervened in the auction in favor of his wife Khrapunova L.K., who had participated in the auction as one of the bidders. In particular Khrapunov V.V. instructed a person close to him the increase the bid originally submitted by Khrapunova L.K. (acting through KazRealincom LLP) after the fact to ensure that the latter would be awarded the tender.

18    KazRealincom LLP was one of many vehicles established and operated by the family Khrapunov in order to illegally acquire state property and launder it via this company. The company KazRealincom LLP is incorporated under the laws of the Republic of Kazakhstan and is domiciled at 113 Tole bi, Almaty City (Trade Registers of the Republic of Kazakhstan No. TIN 60070022475). It was established and controlled by General Reality LLP (67 Samal 2, Almaty City; Trade Register of the Republic of Kazakhstan No. TIN 600900161854), which in turn was established and controlled by Khrapunova L.K.

19    Under the laws of the Republic of Kazakhstan, in a public auction of state property all bidders must indicate how they intend to improve the state property and what investments they plan to make. During the auction Khrapunova L.K. (acting via KazRealincom LLP) promised that she would invest KZT 496,000,000 (equal to SFr. 3,195,719[1]) in the property even though she never had the intention. Since her post-fact manipulated bid was substantially higher than the bid of the other

---

[1] Exchange rate SFr./KZT·1:155.207649 (January 16, 2012).

bidders, Khrapunova L.K. was awarded the tender on December 26, 2001 and acquired the property at a price of KZT 52,155,100 (equal to SFr. 336,934). One condition for this award was the construction of a health center in the amount of KZT 464,970,415 (SFr. 2,995,796) on the property. However, such a health center was never built. The property was transferred to KazRealincom LLP on September 26, 2003, which started the two-year period within which the promised investments had to be made in the property.

20.    Shortly thereafter, on October 1, 2003, Khrapunova L.K. (acting through KazRealincom LLP) sold the property to Karasha Plus LLP (1 Khaji Mukana, Almaty City; Trade Register of the Republic of Kazakhstan No. TIN 600700224756), a company solely owned and controlled by Khrapunova L.K., at the price of KZT 52,155,100 (SFr. 336,934).

21.    On October 3, 2003 Karasha Plus LLP sold the property to Khrapunova L.K. at the same price. On October 6, 2003 the latter contributed the property as nominal capital to the Building Service Company LLP (232 Gornaya Street, Almaty City; Trade Register of the Republic of Kazakhstan No. TIN 600700511339), a company that in turn was wholly owned and controlled by Khrapunova L.K. In this process she valued the property at KZT 288,304,892 (SFr. 1,857,543).

22.    Finally, on October 16, 2003, Khrapunova L.K. sold her 100% share in the Building Service Company LLP to Stroytech LLP, a third party not close to the Khrapunov family, at the price of 2,079,832,300 (SFr. 13,400,321). The proceeds from this transaction were transferred to Khrapunova L.K.'s private bank account No. 01KTZ000030110101 with the Eurasian Bank Joint-Stock Company, Kazakhstan.

23    The funds were converted later into US$ and EUR and transferred to her bank accounts with the Eurasian Bank in US$ (No. 01USD000050110101 and 01USD000160110101) and in EUR (No. 01EUR000050110102). Between 2003 and 2007 these funds were transferred to Swiss bank accounts held by Kudryashova (Khrapunova) E.V. as "financial support".

**3.    Example No. 2**

24    In many cases Khrapunov V.V. unlawfully expropriated the property of Kazakh citizens and companies for alleged "national emergencies" and sold them immediately thereafter at their nominal value to his wife or to companies owned or controlled by her. The following example is meant to illustrate this pattern which was used as such in many cases:

25    On August 25, 2003 Khrapunov V.V. issued decree No. 4/439 504 of the Akimat of Almaty and expropriated a piece of land covering 0.24 hectares that belonged to Shadid Engineering LLP for alleged "national emergencies". On September 23, 2003 he issued however

decree No. 4-508-627 of the Akimat of Almaty and thereby sold the property to Karasha Plus LLP (1 Khaji Mukana. Almaty City; Trade Register of the Republic of Kazakhstan No. TIN 600700224756), a company wholly owned and controlled by Khrapunova L.K., at the nominal value of KZT 15,600,000 (equal to SFr. 100,511).

26.   On October 4, 2003, Karasha Plus LLP sold the property to Khrapunova L.K. On October 6, 2003 the latter contributed the property as nominal capital to the Building Service Company LLP (232 Gornaya Street, Almaty City; Trade Register of the Republic of Kazakhstan No. TIN 600700511339), which in turn was wholly owned and controlled by Khrapunova L.K. In this process the property was valued at KZT 611,445,106 (equal to SFr. to 3,939,529).

27   Finally, on October 16, 2003, Khrapunova L.K. sold her 100% share in the Building Service Company LLP to Stroytech LLP, a third party not close to the Khrapunov family, at the price of 2,079,832,300 (SFr. 13,400,321). On October 20, 2003 the purchase price was credited to her private bank account with the Eurasian Bank Joint-Stock Company. Later the money was converted to US$ and EUR and transferred to her bank accounts with the Eurasian Bank Joint-Stock Company in US$ (No. 01USD000050110101) and in EUR (No. 01EUR000050110102). Between 2003 and 2007 these funds were transferred to the Swiss bank accounts of Kudryashova (Khrapunova) E.V. as "financial support".

## 4.   Example No. 3

28.   In the years 2003 and 2004 Khrapunov V.V. transferred land totaling 8.7331 hectares and belonging to the state on 232 Gornaya Street close to the rivers Malaya Almatinka and Bekenbay, Almaty, into the private ownership of his family. In doing so he not only violated the applicable provisions regarding the privatization process for state property, which provide that such property must be sold by way of a public auction, but also Article 119 of the Public Waters Act of the Republic of Kazakhstan, according to which properties in water protection areas may be transferred to private individuals only for temporary use but not into their private ownership. In order to complete the transfer of title, Khrapunov V.V. first contributed the properties to a company, 49% of which was held by the state and 51% indirectly by Khrapunova L.K. Later Khrapunova L.K. bought the remaining 49% from the state.

29   Subsequently Khrapunova L.K. transferred some of the land and buildings (value KZT 1,179,999,980, equal to SFr. 1,159,737) to Building Service Company LLP (see in this respect margin no. 22 and 29) and the other parts of the properties (value: KZT 111,114,043, equal to US$ 7,500,000) to her son Khrapunov I.V., who contributed the properties as nominal capital to Asia Holding Development LLP (181 Gornaya Street, Almaty City; Trade Register of the Republic of Kazakhstan No. TIN 600900542566). The company Asia Holding Development LLP was wholly owned and controlled by Khrapunov IV. Finally, Khrapunov I.V. sold his 100% share in Asia Holding Development LLP to Elias Import

Export LTD (a company incorporated under the laws of the British Virgin Islands and domiciled at Tortola, Road Town, Blackbern Highway, C Madow House 116) at the total price of US$ 7,573,450.

30    After the proceeds had been credited to his personal bank account No. KZ31948USD00104000VB with the Eurasian Bank Joint-Stock Company, Khrapunov I.V. transferred US$ 2,210,076 in two tranches to Kudryashova (Khrapunova) E.V.'s Swiss bank accounts as "financial support" as follows:

   -   on April 13, 2007 US$ 150,076 to Credit Suisse SA, Geneva, and

   -   on May 8, 2007 US$ 2,060,000 to Credit Suisse SA, Geneva.

31    In addition Khrapunov I.V. withdrew US$ 5,320,000 in cash.

**5.    Example Nr.4**

32    In the year 2004 Khrapunov V.V. issued two decrees, No. 4/868-10 and No. 4/868-398, of the Akimat of Almaty according to which the state sold two properties totaling 2.6321 hectares to the companies Victoriya-KMK LLP (domiciled on Furmanov Street corner Gogol Street 80/50, Almaty City; 27 Aksai 3, apartment 28, Almaty City; Trade Register of the Republic of Kazakhstan No. TIN 600400523716) and Ademytau-KMK LLP. Both companies were wholly owned and controlled by Khrapunova L.K. The purchase price was KZT 18,870,100.30 (equal to SFr. 121,580).

33    With the sale of the two properties, which were in water protection areas close to the rivers Yesentai and Bolshaya Almatinka, he abused the power of his office and also violated Art. 119 of the Public Waters Act of the Republic of Kazakhstan, according to which properties in water protection areas may not be sold but only transferred for temporary use.

34    The two properties were then sold on December 23, 2005 and January 25, 2006 at the total price of KZT 1,223,950,000 (equal to SFr. 7,885,887) to Khachatryan A.S. On December 14, 2006 and May 16, 2007 Khachatryan A.S. transferred the purchase price in two partial amounts directly to the personal bank account of Khrapunova L.K. No. 01 KZT000030110101 with the Eurasian Bank Joint-Stock Company and disguised the payments as "repayment for financial support" by Khrapunova L.K.

35    This illegal transaction resulted in a profit of approximately KZT 1,223,950,000 (equal to SFr. 7,885,887) for Khrapunov V.V. and his wife Khrapunova L.K.

C.      **Fund Transfers to Swiss Banks**

36      As described above, part of the revenues from the illegal sale of state property was transferred to the personal bank account of Khrapunova L.K. No. 01KZT000030110101 with Eurasian Bank Joint-Stock Company. This income was subsequently converted to US$ and EUR and transferred to her personal foreign currency accounts No. 01EUR000050110102, No. 01USD000160110101 and No. 01USD000050110101 with the Eurasian Bank Joint-Stock Company.

37      Subsequently, between 2003 and 2007, Khrapunova L.k. transferred a **total amount** of **US$ 40,873,213** from her personal US$ account No. 01USD000050110101, US$ 5,500,000 from her personal US$ account No. 01USD000160110101 and a **total amount** of **EUR 7,769,966** from her personal EUR account No. 01EUR000050110102 with the Eurasian Bank Joint-Stock Company to the following Swiss bank accounts under the name of her daughter Kudryashova (Khrapunova) E.V:

-     Bank account No. 2281611366 with Schroder & Co Banque SA, Geneva; and

-     Bank account No. CH4204835007914232000 with Credit Suisse SA, Geneva.

38      As described above, Khrapunov I.V. also transferred, on April 13, 2007 and May 8, 2007, a **total amount of US$ 2,210,076** in two tranches as "financial support" to the following Swiss bank account of Kudryashova (Khrapunova) E.V.:

-     Bank account No. CH4204835007914232000 with Credit Suisse SA, Geneva.

39      The reason for the payment was in each case described as "*Financial Assistance to Belmadani-Khrapunova Elvira*" (or similar). The individual transfers are listed in Enclosure 2.

40      Because of the transfers to the Swiss financial institutions listed above we have the grave suspicion that the above bank accounts as well as other bank accounts with not yet uncovered Swiss financial institutions have been used by the Khrapunov family for the purpose of money laundering.

D.      **Assets of the Khrapunov family in Switzerland**

41      We have the grave suspicion that assets which were transferred to the Swiss bank accounts by Kudryashova (Khrapunova) E.V. were subsequently used by the Khrapunov family to acquire, among other things, Swiss real estate and establish or invest in Swiss companies.

42      The following properties are owned by one or several of the Suspects:

- Villa on Chemin de Ruth 49, Cologny 1223, acquired by Kudryashova (Khrapunova) E.V. on July 27, 2007 at a purchase price of SFr. 32 million;

- Residence on Rue Rodolphe Toepffer 10, Geneva; worth SFr. 16 million at the time of registration;

- Apartment in the seven-story building on Rue du Mont Blanc 3, 1201 Geneva;

- Residence in the bank and embassy quarter on Chemin du Petit Sacconex 28B, 1209 Geneva; Purchase price SFr. 16 million;

43   Khrapunov I.V. has or had shares and is or was active as business manager or on the board of directors in the following companies:

- SaaFee Hôtels and Residence Development Group SA (Trade Register number CH-600.3.013.643-7) domiciled at Rue du Mont Blanc 3, 1201 Geneva; Khrapunov I.V. is president of the board of directors having joint signature authority with another signatory; Nicolas Garnier and Marc Gilliéron are also members of the board of directors having joint signature authority with another signatory. Cesare Cerrito has a power of attorney and joint signature authority with another signatory.

- Thermal Development SA (Trade Register number CH-660.1.550.009-0), domiciled at Rue du Mont Blanc 3, 1201 Geneva; Khrapunov I.V. is president of the board of directors having joint signature authority with another signatory; Nicolas Garnier and Marc Gilliéron are members of the board of directors and also have joint signature authority with another signatory. Cesare Cerrito has a power of attorney and joint signature authority with another signatory.

- Thermal Developments 2 SA (Trade Register number CH-660.3.003.011-2), domiciled at Rue du Mont Blanc 3, 1201 Geneva; Khrapunov I.V. is president of the board of directors having joint signature authority with another signatory; Nicolas Garnier and Marc Gilliéron are members of the board of directors and also have joint signature authority with another signatory. Cesare Cerrito has a power of attorney and joint signature authority with another signatory.

- SDG Capital SA (Trade Register number CH-660.6.685.00B-6), domiciled at Rue du Mont Blanc 3, c/o Chabrier & Associés, avocats, 1201 Geneva; Khrapunov I.V. is president of the board of directors having single signature authority; Marc Gilliéron is a member of the board of directors, also with single signature authority.

- Hôtel du Parc, Mont-Pèlerin SA (Trade Register number CH-550-0118823-5); domiciled at Chemin de l'Hôtel-du-Parc 5, 1801 Le Mont-Pèlerin; Khrapunov I.V. is president of the board of directors having joint signature authority with another signatory; Nicolas Garnier and Marc Gilliéron are members of the board of directors and also have joint signature authority with another signatory. Cesare Cerrito has a power of attorney and joint signature authority with another signatory.

- HDP Hôtel du Parc Holding Sàrl (Trade Register number CH-550-0054785-1), domiciled at Chemin de l'Hôtel-du-Parc 5, Le Mont-Pèlerin; Khrapunov I.V. is a partner and director having joint signature authority with another signatory; Marc Gilliéron and Nicolas Garnier are directors having joint signature authority with another signatory; SDG CAPITAL SA (CH-660-6685008-6) headquartered in Geneva is a partner without signature authority.

- Swiss Development Group SA (Trade Register number CH-660.1.874.007-5), domiciled at Rue du Mont-Blanc 3, 1201 Geneva; Khrapunov I.V. is president of the board of directors having joint signature authority with another signatory; Nicolas Garnier and Marc Gilliéron are members of the board of directors and also have joint signature authority with another signatory. Cesare Cerrito has a power of attorney and joint signature authority with another signatory. At present the company is working on three projects: Private Residence (Switzerland), 51 SPA Residence (Leukerbad, Switzerland), Geneva Beach Development Program.

- Swiss Standard IB AG (Trade Register number CH-140.3.003.367-3), domiciled at Dorfstraße 15a, 6390 Engelberg; Khrapunov I.V. is president of the board of directors having single signature authority; Marc Gilliéron is a member of the board of directors, also with single signature authority.

44    Kudryashova (Khrapunova) E.V. has or had shares and is or was active as business manager or on the board of directors in the following companies:

- Phoenix Jewelry SA (Trade Register number CH-660.0.443.005-8), domiciled at Rue du Rhône 35, Geneva; Kudryashova (Khrapunova) E.V. was deleted from the Trade Register as president of the board of directors on April 24, 2009. The current president of the board of directors of the company is Nicolas Garnier. Cesare Cerrito has a power of attorney and joint signature authority with another signatory.

- Phoenix International Holding SA (Trade Register number CH-660.1.759.004-3), domiciled at Rue du Rhône 35, 1200 Geneva. Kudryashova (Khrapunova) E.V. was deleted from the Trade Register as president of the board of directors on April 24, 2009. The current president of the board of directors of the company is Nicolas Garnier. Cesare Cerrito has a power of attorney and joint signature authority with another signatory.

- DRAGON FINANCIAL COMPANY LTD (Trade Register number CH-660.0.709.004-6), domiciled at Rue Agasse 54, 1208 Geneva; Kudryashova (Khrapunova) E.V. was deleted from the Trade Register as president of the board of directors on March 15, 2006.

- Unic LifeStyle Sàrl (Trade Register number 660.1.153.009-4); Kudryashova (Khrapunova) E.V. is registered in the Trade Register as the sole partner;

45    In addition, Khrapunova L.K. is president of the board of directors in the following Swiss companies:

- Toepffer lnvestissement SA (Trade Register number CH-660.1.784.009-2), domiciled at Rue du Mont-Blanc 3, 1201 Geneva; Khrapunova L.K. is president of the board of directors having joint signature authority with another signatory; Marc Gilliéron is a member of the board of directors and also has joint signature authority with another signatory.

- Helvetic Capital SA (Trade Register number CH-660.2.757.006-5), domiciled at Rue du Mont- Blanc 3, 1201 Geneva; Khrapunova L.K. was deleted from the Trade Register as president of the board of directors on September 27, 2010. The sole member of the board of directors has since then been Marc Gilliéron with single signature authority.

46      Helvetic Capital B. V., a company with corporate seat in the Netherlands, to which USD 4.14 million were transferred (see above N 13), belongs to the same corporate group as Helvetic Capital SA with corporate seat in Geneva (Trade Register number CH-660.2.757.006-5). This company in turn is closely linked to the Swiss Development Group SA with corporate seat in Geneva (Trade Register number CH-660.1.874.007-5). We have the strong suspicion that Helvetic Capital SA and/or Swiss Development Group SA are used by the Suspects as trust companies.

47      We also have the strong suspicion that Nicolas Garnier, Cesare Cerrito and Geneva attorney Marc Gilliéron exercise their functions as member of the board of directors and authorized signatories of the companies mentioned above in trust for the Khrapunov family.

## E.      Declarations regarding the disclosure of assets by civil servants prove the illegal nature of the current wealth of the Khrapunov family

48      The fact that the current financial situation of Khrapunov V.V. and Khrapunova L.K. is the result of criminal actions is also proven by the declarations regarding the disclosure of assets by civil servants which they were obligated to submit to the Republic of Kazakhstan between 1997 and 2009.

49      According to the Kazakhstan Anti-Corruption Act No. 267-1 of July 2, 1998, every person in a government office is obligated to submit annually a declaration regarding the disclosure of income and assets in Kazakhstan and abroad. By the same token the wife of such a person is also obligated to submit annually a declaration regarding the disclosure of income and assets in Kazakhstan and abroad.

50      According to the declarations submitted by Khrapunov V.V. for the years 1997 to 2009, Khrapunov V.V.'s wealth never exceeded three automobiles (a Mercedes Benz S-500I 2003, a Range Rover 1993 and a Range Rover 1997) and a garage. According to the declarations submitted by his wife for the years 2003 to 2009, her assets consisted of several luxury apartments and residential buildings, commercial properties, garages, multi-story car parks, luxury automobiles (Mercedes Benz,

Maybach) etc. The total value of the net assets of both never exceeded however KZT 838,000,000 (equal to SFr. 5,399,218).

51      The annual declarations regarding the disclosure of assets by civil servants submitted by Khrapunov V.V. and Khrapunova L.K. are not able to explain their current financial situation. The only reasonable explanation is that they possessed other assets which they did not want to disclose in their annual declaration regarding their assets because of their criminal provenance.

## III.      The criminal investigation in the Republic of Kazakhstan

52      As described above, Khrapunov V.V., Khrapunova L.K. and their children Khrapunov L.V. and Kudryashova (Khrapunova) E.V. are suspects in the current criminal investigation.

53      On March 31, 2011 the Financial Police of the Republic of Kazakhstan opened a criminal investigation against Khrapunov V.V. and other office holders for suspected abuse of their official powers. The criminal investigation was opened after the mass media reported that Khrapunov V.V. was among the 300 richest people in Switzerland.

54      In the months of May, June and July 2011 the Financial Police of the Republic of Kazakhstan extended the criminal investigation to many occurrences of abuse of official powers by Khrapunov V.V. and other office holders as well as the suspicion of the qualified sale or embezzlement of entrusted assets within the meaning of Art. 176 para. 3 lit. b of the Penal Code of the Republic of Kazakhstan. On July 19, 2011 a warrant of arrest for the suspected commission of a criminal offense under Art. 307 para. 4 of the Penal Code of the Republic of Kazakhstan was requested against Khrapunov V.V., and on July 21, 2011 the warrant of arrest was approved by the Medeu District Court of Almaty.

55      On August 15, 2011 the Financial Police of the Republic of Kazakhstan opened a criminal investigation against Khrapunov V.V., Khrapunova L.K. and other persons because of the suspected laundering of funds or other illegally obtained assets (money laundering) within the meaning of Art. 193 para. 3 lit. c of the Penal Code of the Republic of Kazakhstan.

56      In the months of September, October and November other criminal investigations were opened, for example for suspicion of bribery (Art. 311 para. 4 lit. c of the Penal Code of the Republic of Kazakhstan) and the establishment and operation of a criminal organization or group (Art. 235 para. 4 of the Penal Code of the Republic of Kazakhstan) as well as for committing criminal acts pursuant to Art. 307 para. 3 and 4, Art. 176 para. 3 lit. a and b, Art. 177 para. 3 lit. a and b, Art. 193 para. 3 lit. b and c, of the Penal Code of the Republic of Kazakhstan.

57      Finally, on December 29, 2011 the Financial Police of the Republic of Kazakhstan extended the criminal investigation to Khrapunov I.V. and Kudryashova (Khrapunova) E. V.

58      In the context of the criminal investigation the director of the investigation authority on November 22, 2011 ordered the seizure of land and buildings that had been sold illegally as a result of the actions of Khrapunov V.V. and other persons, as well as of bank accounts of persons and companies with close links to the Khrapunov family. The seizures, issued on the legal basis enshrined in Art. 161 of the Code of Criminal Procedure of the Republic of Kazakhstan, were approved by the deputy prosecutor general of the Republic of Kazakhstan.

59      Several letters of request have been or are being addressed to foreign countries in connection with the current criminal investigation.

## IV.    Applicable provisions of the laws of the Republic of Kazakhstan

60      The following provisions of the Penal Code of the Republic of Kazakhstan are applicable to the conduct of the Suspects:

-   Art. 176 (sale or embezzlement of entrusted assets), in particular by Khrapunov V.V., who sold state property entrusted to him to companies controlled by Khrapunova L.K.;

-   Art. 177 (fraud), in particular by Khrapunov V.V., who deceived companies under state ownership, having them pledge these assets to his family members and accept non-existing liabilities;

-   Art. 193 (white-wash of funds or other illegally obtained assets; money laundering), by all persons against whom a criminal investigation is pending;

-   Art. 235 (establishment and operation of a criminal organization or group) by Khrapunov V.V. and Khrapunova L.K.;

-   Art. 307 (abuse of office), in particular by Khrapunov V.V., who held the office of Akim (local executive);

-   Art. 311 (passive bribery), in particular by Khrapunov V.V., who held the office of Akim (local executive).

61      Copies of these provisions and the German translations can be found in the enclosures (Enclosure 4)

*[seal of the Financial Police]*
**Ex. C**
**Page 75**

## V.  Relevant provisions of Swiss law

### A.  Double punishability

62      The criminal offenses committed by Khrapunov V.V. and members of his family are also
        punishable under Swiss law as abuse of office (Art. 312 StGB [*Swiss Criminal Code*]),
        embezzlement (Art. 138 Point 1 and 2 StGB), fraud (Art. 146 StGB), passive/active bribery (Art.
        322$^{ter}$ et seq. StGB), money laundering (Article 305$^{bis}$ StGB) and criminal organization (Article
        260$^{ter}$ StGB). The requirement of double punishability is thus fulfilled

### B.  Statute of limitations

63      The statute of limitations for prosecuting the criminal offenses committed by Khrapunov V.V.
        and members of his family has not run out either under Swiss law or under Kazakh law.

64      The criminal offenses of which Khrapunov V.V. and his family members are accused must be
        qualified as crimes under Kazakh criminal law. Pursuant to Art. 69 of the Kazakh Penal Code,
        crimes fall under the statute of limitations after 15 years. The statute of limitations begins on the
        day on which the crime was committed. Since in this case the earliest criminal offense was
        committed in the year 2001, the statute of limitations for prosecuting it has not yet run out under
        Kazakh criminal law.

65      Pursuant to Art. 97 para. 1 lit. b StGB, the statute of limitations is 15 years if a criminal offense is
        punishable with a prison term exceeding three years. All criminal offenses allegedly committed
        by Khrapunov V.V. and members of his family are punishable with a prison term exceeding three
        years. For this reason, and because the earliest criminal offense was committed in the year 2001,
        the statute of limitations for prosecuting it has not yet run out under Swiss law.

## VI.  Identification of the Suspects domiciled in Switzerland

66      Khrapunov Viktor Vyacheslavovich: born on November 24, 1948: Place of birth: Glubokovskiy
        district, region East Kazakhstan Oblast: registered address: 264 Zhamakayev Street, Medeu
        district, Almaty, citizen of the Republic of Kazakhstan (currently domiciled in Switzerland); PIN
        481124300025; personal identification card 016187453 dated June 25, 2004; passport number
        N0071632 dated September 7, 1995.

67      Khrapunova (Daniyarova, Beketova) Leyla Kalibekovna: born on December 19, 1958; Place of
        birth: Glubokovskiy district, region East Kazakhstan Oblast; registered address: 264 Zhamakayev
        road, Medeu district, Almaty, citizen of the Republic of Kazakhstan (currently domiciled in
        Switzerland); PIN 581219400029; personal identification card 016187452 dated July 25, 2004;
        passport number N4147183 dated May 18, 2004.

68      Khrapunov (Beketov) Iliyas Viktorovich (Asylbayevich): born on January 15, 1984, place of birth: Taraz, Zhambyl Oblast; registered address: 177 Gornaya Street, Almaty, citizen of the Republic of Kazakhstan (currently domiciled in Switzerland); PIN 840115300011; personal identification card 015640028 dated December 25, 2003; passport number N5454992 dated July 6, 2007.

69      Kudryashova (Khrapunova) Elvira Viktorovna (formerly Belamadani (Khrapunova) Elvira Viktorovna): born on August 7, 1979; place of birth: Taraz, Zhambyl oblast: registered address: 177 Gornaya Street, Almaty, citizen of the Republic of Kazakhstan (currently domiciled in Switzerland); PIN 790807400096; personal identification card No. 013307356 dated July 9, 2002; passport number N3419644 dated July 9, 2002.

70      All of the Suspects mentioned above are citizens of the Republic of Kazakhstan; none of them has requested a change of nationality.

## VII.    Requested legal assistance

71      In order to support the ongoing criminal investigations against the persons specified above, the Republic of Kazakhstan kindly requests that the following measures be ordered:

1.  **Obligation of the following banks to hand over copies of the documents concerning all accounts, custody accounts and safe-deposit boxes which are held directly or indirectly by the Suspects or for which the Suspects are the economic beneficiaries, including copies of all opening records and supporting documents concerning transactions credited or debited to the following accounts, custody accounts and safe-deposit boxes with these banks:**

    -   Schroder & CO. Banque SA, Geneva, in particular account number 2281611366

    -   Credit Suisse SA, Geneva, in particular account number CH4204835007914232000

2.  **Obligation of all Geneva banks to provide information to the accosted authority as to whether they have (or had) in custody assets which are (or were) held directly or indirectly by the Suspects or for which the Suspects are (or were) the economic beneficiaries,**

    **and, if they hold (or held) such assets in custody,**

*[seal of the Financial Police]*
**Ex. C**
**Page 77**

obligation of these banks to hand over copies of the documents concerning all accounts, custody accounts and safe-deposit boxes which are held directly or indirectly by the Suspects or for which the Suspects are the economic beneficiaries, including copies of all opening records and supporting documents concerning transactions credited or debited to the following accounts, custody accounts and safe-deposit boxes;

obligation of these banks not to execute any transactions debiting the accounts, custody accounts and safe-deposit boxes which are held directly or indirectly by the Suspects or for which the Suspects are the economic beneficiaries,

3. Supplementation and expansion of the above instructions concerning all accounts, custody accounts and safe-deposit boxes which are held by companies controlled directly or indirectly by the Suspects or in which the Suspects are the economic beneficiaries;

4. Obligation of the Swiss Development Group SA, route du Pré-Bois 29, Geneva, to provide information to the accosted authority as to what assets they are holding (or have held) in trust for the Suspects, and what business functions or offices its partners and employees, in particular Nicolas Garnier, Marc Gilliéron and Cesare Cerritto are holding or have held on behalf of the Suspects;

5. Obligation of Helvetic Capital SA, rue du Mont-Blanc 3, Geneva, to provide information to the accosted authority as to what assets it is holding (or has held) in trust for the Suspects;

6. Obligation of the following companies to provide information to the accosted authority about the owners of the shares or participations in:

   a) SaaFee Hôtels and Residence Development Group SA
   b) Thermal Developments SA
   c) Thermal Developments 2 SA
   d) SDG Capital SA
   e) Hôtel du Parc, Mont-Pèlerin SA;
   f) HDP Hôtel du Parc Holding Sàrl

[*seal of the Financial Police*]
**Ex. C**
**Page 78**

g)  Swiss Developments Group SA
h)  Swiss Standard IB AG
i)  Phoenix Jewelry SA
j)  Phoenix International Holding SA
k)  DRAGON FINANCIAL COMPANY Ltd
l)  Unic LifeStyle Sàrl
m)  Toepffer Investissement SA
n)  Helvetic Capital SA

**7. Permission for our representatives to participate in the review of the received information with a view to identify other assets, bank accounts or companies owned by the Suspects;**

**8. Transmission of all information about the assets and financial transactions concerning the investigated criminal offenses to the Republic of Kazakhstan in support of the current criminal investigation;**

**9. Surrender of all seized assets derived directly or indirectly from the investigated criminal offenses to the Republic of Kazakhstan.**

## VIII.        Plea to keep the letter of request confidential

72      Letters of request were also sent to the competent authorities of other countries in connection with the criminal investigation against the Suspects. These letters of request concern different parts of the current criminal investigation. In order to ensure the confidentiality of the criminal investigation and facilitate the international coordination of facts, we kindly ask

**10. to keep the letter of request confidential until further notice and that the recipients of the orders of the accosted authority be instructed to keep the letter of request confidential and not disclose it to anyone.**

## IX.     Request for the issuance of preliminary injunctions

73      The Suspects are aware that a criminal investigation is conducted against them in the Republic of Kazakhstan. In addition, the requesting authority has indications that the Suspects know that the requesting authority would like to obtain legal assistance from foreign authorities in support of the criminal investigation. There is therefore a substantial risk that the Suspects will attempt

to move assets out of Switzerland. The accosted authority is therefore asked to issue the following preliminary injunctions:

**11. To instruct the land register Geneva not to allow any disposition over the following properties:**

a) Villa on Chemin de Ruth 49, Cologny 1223;
b) Residence on Rue Rodolphe Toepffer 10;
c) Apartment in the seven-story building on Rue du Mont-Blanc 3, 1201 Geneva registered in the name of one of the Suspects;
d) Residence on Chemin du Petit Sacconex 28B;

**12. To instruct the following banks not to execute any transfers from bank accounts or transactions concerning custody accounts or safe-deposit boxes held directly or indirectly by one of the Suspects and exceeding the amount of SFr. 10,000 without the prior approval of the accosted authority:**

- Schroder & Co. Banque SA, Geneva
- Credit Suisse SA, Geneva

## X.   Confirmations in connection with the letter of request

74   The investigating office for of the Anti-White-Collar Crime and Corruption Agency (Financial Police) would like to confirm the following in connection with this letter of request and in accordance with the IRSG:

A.    The requested legal assistance - including e.g. the requested seizure and surrender of documents – is permitted under the law of the Republic of Kazakhstan.

B.    After the completion of the criminal investigation the Suspects will have to stand trial pursuant to Articles 176, 177, 193, 235, 307 and 311 of the Penal Code of the Republic of Kazakhstan. The facts constituting an offense do not have a political motive. They concern abuse of office, embezzlement of assets, fraud, the subsequent laundering of money and other illegally acquired assets, as well as the establishment and operation of a criminal organization for these purposes - all criminal offenses that fulfill in our understanding the requirement of double punishability under Article 64 IRSG.

C.    Mr. Khrapunov V.V. does not enjoy any immunity from criminal investigations;

D.      The Government of the Republic of Kazakhstan assures you a similar right in the matter of legal assistance in criminal cases. In fact, the Republic of Kazakhstan recently provided legal assistance to Switzerland (concerning Union Privée Financière, against Alessandro Piozzi, Vittorio Pugliese, on February 23, 2011; public prosecutor Manuele Minotti Perucchi of the Canton Ticino).

E.      We kindly request that the requested legal assistance and procedures be issued and/or implemented by the Federal Prosecutor's Office and not by cantonal authorities.

F.      We confirm the correctness of the translation of this letter of request and other translated documents.

G.      We have instructed our legal advisers in Zurich, Dr. Balz Gross and/or Dr. Claudio Bazzani and/or Mladen Stojiljkovic (Homburger AG, Prime Tower, Hardstrasse 201, P.O. Box 314, CH-8037 Zurich, phone 043 222 10 00, fax 043 222 15) to coordinate matters in in the context of a possible assistance or if you need further information. In order to protect the confidentiality necessary in these matters we kindly ask you not to use either diplomatic channels or public means of communication. We ask you to send us all communications in this matter via our representatives at Homburger AG.

[*seal of the Financial Police*]

**Ex. C**

**Page 81**

We reserve the right to amend this request in the course of our investigation. In particular we reserve the right to ask for the arrest and subsequent extradition of the Suspects.

On behalf of the Government of the Republic of Kazakhstan we thank you for your kind review of this request and ask you to inform us via our Swiss representatives if you need further information.

We thank you in advance for your help.

Date:    [handwritten:] *February 20, 2012*


[*signature*]
**Mr.Tusupbekov Rashid Toleutayevich**
Chairman of the Anti-White-Collar Crime
and Corruption Agency (Financial Police)

[*signature*]
**Mr. Sergei Nikolayevich Perov**
Lieutenant Colonel of the Financial Police,
Director of the operational investigative team
of the Anti-White-Collar Crime and Corruption Agency
(Financial Police)
Director of the section of the office investigating
criminal offenses committed by office holders.


Investigative Office of the Anti-White-Collar Crime and Corruption Agency (Financial Police)
[Russian: (Agency of the Republic of Kazakhstan to Combat Economic and Corruption-Related Crimes
(Financial Police))]

[*seal of the Financial Police*]

**List of Enclosures**

1.  List of the sold properties, **confidential, not to be disclosed to third parties**

2.  Confirmation of the Eurasian Bank concerning monies transferred by Khrapunova L.K. and Khrapunov I.V. to the Swiss bank accounts of Kudryashova (Khrapunova) E.V. [formerly Belmadani (Khrapunova) E.V. (including translation into English)]
    **Note**: The mentioned IBAN CH7604251079724660000 is to be confirmed.

3.  Copies of the Articles 10, 69, 176, 177, 193, 235, 307 and 311 of the Penal Code of the Republic of Kazakhstan (including notarially certified translations into German)

[*seal of the Financial Police*]



City of New York, State of New York, County of New York

I, Artem Furman, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the attached document "Attachment 2, correspondence dated February 20, 2012" from German into English.

Artem Furman

Sworn to before me this

15th day of August 2014

Signature, Notary Public

ADAM M SCHEFFLAN
Notary Public – State of New York
No. 01SC6298049
Qualified in NEW YORK County
My Commission Expires MAR 10, 2018

Stamp, Notary Public

# EXHIBIT D

# Homburger

Reçu au

1 7 SEP. 2012

MINISTERE PUBLIC

LSI
Republique et canton de Genève
Pouvoir Judiciaire
Mr. Jean-Bernhard Schmid
Ministère public
Route de Chancy 6B
Case postale 3565
1211 Genève 3

Balz Gross
Dr. iur., Attorney-at-law

Claudio Bazzani
Dr. iur., Attorney-at-law

Mladen Stojiljković
lic. iur., Attorney-at-law

Homburger AG
Prime Tower
Hardstrasse 201 | CH–8005 Zurich
P.O. Box 314 | CH–8037 Zurich

T +41 43 222 10 00
F +41 43 222 15 00
lawyers@homburger.ch

September 14, 2012 | GRB | BAU | STJ
318004 | STJ | 000042.docx

## Ref. CP|73|2012 – OFJ B 228'000

Dear Mr. Schmid,

This is to inform you that the Republic of Kazakhstan withdraws its request to keep confidential the legal assistance proceedings in relation to the criminal investigation against the organized criminal group managed by Khrapunov family (i.e. the Persons Under Investigation as defined in the Legal Assistance Request of February 20, 2012).

Accordingly, the Republic of Kazakhstan respectfully requests you to undertake the actions already requested in paragraph 71 of the Legal Assistance Request of February 20, 2012 and to quickly trace and secure the assets of the Khrapunov family. In light of the additional evidence and information obtained from the investigation in Kazakhstan, the Republic of Kazakhstan amends its specific assistance requests and kindly asks you to grant these additional assistance requests (see Section IV).

This submission further provides additional information on (i) the assets of the Khrapunov family in Switzerland, (ii) the asset transfers from the Republic of Kazakhstan to Switzerland and (iii) the known members and business partners of the Khrapunov family who hold, manage, or control directly or indirectly Khrapunov family assets and financial transactions (see Section II). In addition, this submission updates you about the status of the criminal proceedings in the Republic of Kazakhstan against Viktor Khrapunov and members of his family and outlines the rights of suspected and accused persons under Kazakh criminal procedure law (see Section III).

## I.    Waiver of Confidentiality

1    We would like to draw your attention to a recent media report about Viktor Khrapunov that was broadcasted on RTS and is published on RTS' webpage. According to the report entitled "*War of Kazakh Clans on the Shores of Lake Geneva*", Viktor Khrapunov and the public apparently know of the fact that the Republic of Kazakhstan filed a request for international mutual legal assistance in Bern, which was forwarded to the prosecutor in Geneva. Moreover, the television report mentions that the legal assistance request sets out in detail how Mr. Khrapunov sold state-owned property at low prices to companies controlled by his wife Leila.[1]

2    Against this background, the Republic of Kazakhstan is no longer interested in keeping the request for legal assitance confidential. The Republic of Kazakhstan herewith withdraws its request that the legal assistance be kept confidential (request no 10 of the Request for International Mutual Legal Assistance of February 20, 2012).

3    The latest developments have significantly increased the risk that the Khrapunov family may try to hide and move their assets outside of Switzerland. The Republic of Kazakhstan therefore respectfully requests you to undertake without delay the requested actions to trace and secure the assets of the Khrapunov family (see Section IV).

## II.    Additional Information

## A.    Assets of the Khrapunov Family

4    We enclose two lists containing information about Swiss companies[2] and real estate[3] owned by or associated with the Khrapunov family.

5    In addition to the information on the Swiss companies mentioned in Paragraph 43 *et seq.* of the Legal Assistance Request of February 20, 2012, the following companies have been identified as associated with the Khrapunov family:

----    QUINTESSENTIALLY ESTATES SARL (CH-660.7.101.008-5) domiciled at Rue de Lausanne 69, 1202 Geneva;

----    Swiss Green Leasing SA (CH-660.2.486.01-8) domiciled at Rue du Mont-Blanc 3, 1201 Geneva;

---

[1]    See <http://www.rts.ch/info/suisse/4100618-guerre-des-clans-kazakhs-sur-les-bords-du-leman .html> and <http://www.rts.ch/video/info/journal-19h30/4101610-le-kazakhstan-reclame-l-extradition-de-viktor-khrapunov-ancien-maire-de-la-ville-d-almaty.html>.
[2]    Exhibit 1.
[3]    Exhibit 2.

—  Swiss Promotion Group SA (CH-660.2.756.009-1) domiciled at Route de Pré-Bois 29, 1216 Cointrin;

—  Swiss Elements SA (CH-660.2.846.009-7) domiciled at Route de Pré-Bois 29, 1216 Cointrin; and

—  Fondation pour le développement de la région Almaty-Issy Kul en liquidation (CH-626.7.008.376-7) domiciled at Rue de Stade 16, 1950 Sion.

6    The following table summarizes the known information on the Swiss companies associated with the Khrapunov family (see further Exhibit 1):

| Swiss Development Group SA (CH-660.1.874.007-5) | Purpose: Real Estate Investment Company |
| --- | --- |
| | Registered: July 27, 2007. |
| | Address: Rue du Mont-Blanc 3, 1201 Genève |
| | Officers: Nicolas Garnier -- President<br>Marc Gillieron -- Member of the Board<br>Grandjean Christian -- Member of the Board<br>Cerritto Cesare -- Signatory |
| | Link to Viktor Khrapunov: Iliyas Khrapunov was the president of the board from May 8, 2009 until June 14, 2012. |
| | Share capital amounts to CHF 100,000, mainly held by Marc Gillieron. |
| | Banking information: On July 23, 2007, a deposit account intended to receive the share capital was opened in the name of Swiss Development Group SA at Crédit Suisse in Geneva. |
| | Additional Information: In 2008, the company purchased the historic building at Chemin de l'Hôtel du Parc 5, 1801 Le Mont-Pèlerin, for CHF 18.5 million. |
| | According to its website, Swiss Development Group SA is currently selling luxury apartments at lake Geneva under the name "Du Parc Kempinski Private Residences"; the price range |

| | |
|---|---|
| | is from CHF 4 to 24 millions. |
| **Thermal Developments SA** (CH-660.1.550.009-0) | Purpose: Real Estate Investment Company |
| | Registered: July 7, 2009. |
| | Address: Rue du Mont-Blanc 3, 1201 Genève |
| | Officers: Nicolas Garnier -- Member of the Board Marc Gillieron -- Member of the Board Iliyas Khrapunov -- President Cerritto Cesare – Signatory |
| | Link to Khrapunov V.V: Iliyas Khrapunov has been president of the board since April, 2010. |
| | Share capital amounts to CHF 100,000, entirely held by Marc Gillieron. |
| | Banking Information: On June 26, 2009, deposit account No. 0251-1604012-61, intended to receive the share capital, was opened in the name of Thermal Developments SA at Crédit Suisse in Geneva (IBAN: CH7004835160401261000). |
| **Thermal Developments 2 SA** (CH-660.3.003.011-2) | Purpose: Real Estate Company |
| | Registered: November 10, 2011. |
| | Address: Rue du Mont-Blanc 3, 1201 Genève |
| | Officers: Nicolas Garnier -- Member of the Board Marc Gillieron -- Member of the Board Iliyas Khrapunov -- President Cerritto Cesare -- Signatory |
| | Link to Viktor Khrapunov: Iliyas Khrapunov has been president of the board since December 22, 2011. |
| | Share capital amounts to CHF 100,000, divided into 100 shares with a nominal value of CHF |

| | |
|---|---|
| | 1,000, entirely held by Marc Gillieron.<br><br>Banking information: On September 2, 2011, deposit account No. 0251-1521483-01-9, intended to receive the share capital, was opened in the name of Thermal Developments 2 SA at Crédit Suisse in Geneva (IBAN: CH3104835152148301009). |
| **SDG Capital SA**<br>(CH-660.6.685.008-6) | Purpose: Holding Company<br><br>Registered: July 28, 2008.<br><br>Address: c/o Chabrier & Associés avocats, 1201 Genève<br><br>Officers: Marc Gillieron -- Member of the Board<br>Iliyas Khrapunov -- President<br><br>Link to Viktor Khrapunov: Iliyas Khrapunov was president of the board from May 22, 2009 until June 14, 2012.<br><br>Banking Information: On July 24, 2008, deposit account No. 0251-1732-498-51, intended to receive the funds, was opened in the name of SDG Capital SA at Crédit Suisse in Geneva (IBAN: CH23048651732498610000).<br><br>Additional Information: On July 15, 2009 shared capital was increased from CHF 100'000 to CHF 10'000'000, by adding 9'900 shares (each CHF 1'000). The additional shares were held by Elvira Belmadani. |
| **SaaFee Hotels and Residence Development Group SA**<br>(CH-600.3.013.643-7) | Purpose: Real Estate Company<br><br>Registered: February 11, 2011.<br><br>Address: Rue du Mont-Blanc 3, 1201 Genève<br><br>Officers: Nicolas Garnier -- Member of the Board<br>Marc Gillieron -- Member of the Board<br>Iliyas Khrapunov -- President |

| | |
|---|---|
| | Cerritto Cesare -- Signatory |
| | Link to Khrapunov V.V: Iliyas Khrapunov has been president of the board since February 11, 2009. |
| | Additional information: Share capital amounts to CHF 100,000, divided into 100 shares with a nominal value of CHF 1,000, mainly held by Marc Gillieron.<br><br>The company was transferred from the corporate registry of Valais to the corporate registry of Geneva on January 13, 2011. |
| **Phoenix Jewellery SA** (CH-660.0.443.005-8) | Purpose: Jewelry Trading Company<br><br>Registered: February 25, 2005.<br><br>Address: Rue du Rhône 35,1204 Genève<br><br>Officers: Nicolas Garnier -- President<br>Karim Stadelman -- Member of the Board<br>Cerritto Cesare -- Signatory<br>Abdelkrim Belarbi - Signatory<br><br>Link to Viktor Khrapunov: Leila Khrapunova was a director until March, 2006. Elvira Kudryashova was member of the board until July 15, 2011.<br><br>Share capital amounts to CHF 300,000, divided into 3,000 shares with a nominal value of CHF 100. |
| **Phoenix International Holding SA** (CH-660.1.759.004-3) | Purpose: Holding Company<br><br>Registered: October 4, 2004.<br><br>Address: Rue du Rhône 35, 1204 Genève.<br><br>Officers: Nicolas Garnier -- President<br>Karim Stadelman -- Member of the Board<br>Cerritto Cesare -- Signatory<br>Abdelkrim Belarbi -- Signatory |

| | |
|---|---|
| | Link to Viktor Khrapunov: Leila Khrapunova was a director from February 14, 2005 until April 18, 2005.<br><br>Additional Information: Two Kazakh nationals are Leila Khrapunova's partners in Phoenix Group Companies:<br><br>— Abdul-Gaziz Shakarimovich Mukashev (Phoenix Development in Almaty)<br>— Yuriy Vladimirovich Faleyev (Phoenix VL in Almaty) |
| **Toepffer Investissement SA**<br>**(CH-660.1.784.009-2)** | Purpose: Real Estate Company<br><br>Registered: Registered July 31, 2009<br><br>Address: Rue du Mont-Blanc 3, 1201 Genève<br><br>Officers: Leila Khrapunova – President<br>Iliyas Khrapunov – President<br>Marc Gillieron – Member of the Board<br>Nicolas Garnier – Member of the Board<br>Cerritto Cesare – Signatory<br><br>Link to Viktor Khrapunov: Leila Khrapunova and Iliyas Khrapunov are president of the board<br><br>Banking Information: On July 28, 2009 a deposit account intended to receive the share capital was opened in the name of Toepffer Investissement SA at UBS in Geneva. |
| **Swiss Standard IB AG**<br>**(CH-140.3.003.367-3)** | Purpose: Credit Institution<br><br>Registered: February 4, 2009.<br><br>Address: Dorfstrasse 15a, 6390 Engelberg<br><br>Officers: Iliyas Khrapunov – President<br>Marc Gillieron – Member of the Board<br>Christian Grandjean – Member of the Board<br><br>Link to Viktor Khrapunov: Iliyas Khrapunov and |

| | |
|---|---|
| | Marc Gillieron were appointed directors of the company on March 4, 2009. Iliyas Khrapunov has been president of the board of directors since March 4, 2009.<br><br>Banking Information: Deposit account No. 308.856-114, intended to receive the share capital, was opened in the same name at Obwaldner Kantonalbank (OKB) in Sarnen. |
| **Helvetic Capital SA**<br>(CH-660.2.757.006-5) | Purpose: Investment Company<br><br>Registered: December 4, 2006.<br><br>Address: Rue du Mont-Blanc 3, 1201 Genève<br><br>Officers: Marc Gillieron – Member of the Board<br><br>Link to Viktor Khrapunov: Leila Khrapunova was president of the board of directors from September 29 2010 until April 12, 2011.<br><br>Banking information: On November 29, 2006, a deposit account intended to receive the share capital was opened in the name of Helvetic Capital SA at Crédit Suisse in Geneva. |
| **Quintessentially Estates SARL**<br>(CH-660.7.101.008-5) | Purpose: Real Estate Company<br><br>Registered: September 24, 2008.<br><br>Address: Rue de Lausanne 69, 1202 Genève<br><br>Officers: Karim Stadelmann – President<br>Cesare Cerrito – Member of the Board<br>Nicolas Garnier – Member of the Board<br>David Gaymard – Member of the Board<br>Abdelkrim Belarbi – Member of the Board<br><br>Banking information: On September 10, 2008, a deposit account intended to receive the share capital was opened in the name of Quintessentially Estates SARL at UBS in Geneva |

| HDP Hôtel du Parc Holding SARL (CH-550.0.054.785-1) | Purpose: Holding Company<br><br>Registered: Registered September 3, 1997 (initially: HTI Hotel and Tourism Institute SARL, then HTI&IFI Institutes Sàrl)<br><br>Address: Chemin de l'Hôtel-du-Parc 5, 1801 Le Mont-Pèlerin<br><br>Officers: Iliyas Khrapunov -- President<br>Nicolas Garnier -- Manager<br>Marc Gillieron -- Manager<br>Cesare Cerrito – Signatory<br><br>Link to Viktor Khrapunov: Iliyas Khrapunov is president of the board of directors.<br><br>Banking information: On August 18, 1997, deposit account n°3722.83 intended to receive share capital was opened in the name of HTI Hotel and Tourism Institute SARL at Raiffeisen Bank in Le Sépey.<br>On August 20, 2008, CHF 20,000 (resulting from share increase done in 2006) have been wired on a deposit account opened in the name of HTI & IFI Institute SARL at Banque Cantonale Vaudoise |
| Hôtel du Parc, le Mont-Pèlerin SA (CH-550.0.118.823-5) | Purpose: Real Estate Management Company<br><br>Registered: March 23, 1918.<br><br>Address: Chemin de l'Hôtel-du-Parc 5, 1801 Le Mont-Pèlerin<br><br>Officers: Iliyas Khrapunov -- President<br>Nicolas Garnier -- Manager<br>Marc Gillieron -- Manager<br>Cesare Cerrito – Signatory<br><br>Link to Viktor Khrapunov: On April 14, 2010 Iliyas Khrapunov was nominated president of the board of directors. |

| | |
|---|---|
| | Additional Information: The company is the current owner of Chemin de l'Hôtel-du-Parc 5. |
| **Swiss Green Leasing SA** (CH-660.2.486.01-8) | Purpose: Leasing of Renewable Energy Equipment<br><br>Registered: October 12, 2010.<br><br>Address: Rue du Mont-Blanc 3, 1201 Genève<br><br>Officers: Marc Gillieron -- Member of the Board<br><br>Link to Viktor Khrapunov: Marc Gillieron is sole signatory |
| **Swiss Promotion GROUP SA** (CH-660.2.756.009-1) | Purpose: Leasing of Renewable Energy Equipment<br><br>Registered: December 4, 2009.<br><br>Address: Route de Pré-Bois 29, 1216 Cointrin<br><br>Officers: Marc Gillieron -- President<br>Max Interbrick -- Member of the Board<br><br>Link to Viktor Khrapunov: Marc Gillieron has been president of the board and co-owner since December 10, 2009. |
| **Swiss Element SA** (CH-660.2.846.009-7) | Purpose: Financial Advisory<br><br>Registered: December 7, 2009.<br><br>Address: Route de Pré-Bois 29, 1216 Cointrin<br><br>Officers: Marc Gillieron -- Member of the Board<br><br>Link to Viktor Khrapunov: Marc Gillieron has been sole member of the board since December 11, 2009 |
| **Fondation pour le développement de la région Almaty-Issy Kul en liquidation** (CH- | Purpose: Fund for development of the region Almaty-Issy Kul |

| 626.7.008.376-7) | Registered: Registered June 16, 2003 and in Liquidation since July 8, 2011. |
|---|---|
| | Address: Rue de Stade 16, 1950 Sion |
| | Officers:<br>Viktor Krapunov[4] (VK) – Member of the Board<br>Taschkul Kereksizov – Member of the Board<br>Roger Dubius – President & Liquidator |
| | Link to Viktor Khrapunov: Khrapunov V.V is signatory of the company. |
| | Additional Information: |
| | According to public information this foundation was designated to develop the region between Kazakhstan and Kyrgistan investing about $200MM of private funds. According to the same sources the projects planned by the foundation were never implemented. |
| **CAZANCE SARL** (formerly Unic LifeStyle SARL) (CH-660.1.153.009-4) | Purpose: Real Estate Management Company |
| | Registered: May 14, 2009. |
| | Address: c/o ANIRIS Financial Consulting SARL<br>Rue de la Servette 93<br>1202 Genève |
| | Unic LifeStyle SARL<br>Rue du Rhône 35<br>1204 Genève |
| | Officers: Quafae Ifakren – Director<br>Hayat Charif – Manager |
| | Link to Viktor Khrapunov: Elvira Khrapunova was the sole shareholder of the company from July 22, 2011 until February 14, 2012. |

[4] Please note that VK spelled his name differently than today.



| | Banking Information: On April 29, 2009, deposit account n°0251-1692658-21, intended to receive the share capital, was opened in the name of Unic LifeStyle SARL at Crédit Suisse in Geneva (IBAN: CH3104835169295821000). Additional Information: The company seems to be no longer under direct control of the Khrapunov Family |
|---|---|

7    In addition to the Swiss real estate that has been identified in Paragraph 42 of the Legal Assistance Request of February 20, 2012 as being owned by the Khrapunov family, the enclosed lists of real estate (Exhibit 2) contains information on the following real estate apparently owned or occupied by the Khrapunov family:

—    Real Estate Property at Chemin de l'Hôtel du Parc 5, 1801 Le Mont-Pèlerin; Iliyas Khrapunov owns the Du Parc residences situated at this address via Swiss Development Group SA

    -   The building is the former Hotel du Parc and is set above Lake Geneva

    -   Building was purchased by Swiss Development Group in 2007

    -   Purchase Price: CHF 18.5 million

—    Apartment at Rue Pedro Meylan 10, 1208 Geneva; and

—    Apartment at Avenue Eugène-Pittard 15, 1206 Geneva.

8    Further, we inform you that the criminal investigation in the Republic of Kazakhstan has also revealed that the Khrapunov family's wealth is partly managed by SEQUOIA WEALTH MANAGEMENT SA (CH-660.1.225.009-0). It is affiliated with SEQUOIA ASSET MANAGEMENT SA (CH-660.2.230.998-2), and SEQUOIA GROUP SA (CH-660.3.371.011-1). All companies are domiciled at chemin Frank-Thomas 32, in 1208 Geneva. The following banks are believed to act as custodian banks for the SEQUOIA entities:

—    Pictet & Cie;

—    Banque Sarasin & Cie SA (Geneva);

—    BNP PARIBAS Suisse (Geneva); and

—    Société Générale (Geneva).

**Ex. D**
**Page 97**

9      SEQUOIA is managing at least USD 18 million that belong to the Khrapunov family. The contact between the Khrapunov family and SEQUOIA was established through Oleg Shashkin, a freelance manager of external relations. Mr. Shashkin seems to be residing in the canton of Ticino. Three possible residences have been identified:

—    Riva Paradiso 32A, 6900 Paradiso (TI);

—    Via San Gottardo 660 Muralto (TI); and

—    Innere Güterstrasse 4, 6300 Zug (ZG), business center building.

10     Pierre-Noël Formigé is the founder of SEQUOIA.

11     Finally, it appears that Khrapunov Viktor and Khrapunova Leila divorced in order to protect the assets that stem from crime.

## B.     Asset Transfers from Kazakhstan to Switzerland

12     In addition to the fund transfers to Schroder & Co Banque SA, Geneva, and to Credit Suisse SA, Geneva, that are outlined in the Legal Assistance Request of February 20, 2012, the investigation of Republic of Kazakhstan has revealed evidence that indicates further transfers of assets owned by the Khrapunov family to Switzerland by way of private aircraft.

13     According to evidence, Viktor Khrapunov and his family left Kazakhstan on a private aircraft on November 9, 2007 (Flight No. SAH 9411, Aircraft Tu-154, tail number UN85854). They travelled from Almaty – via Orsk, Russia – to Geneva. Pursuant to testimony of the Almaty International Airport Police, Viktor Khrapunov and his family were not expressly listed as passengers on this flight. Based on documents provided by the Almaty Airport, however, it is known that Viktor Khrapunov and his family transported with this flight 1,100kg of luggage (1 ton of cargo luggage and 100kg of hand luggage) to Geneva.

14     Based on the foregoing, the Republic of Kazakhstan kindly request you to investigate this matter with the Geneva airport and Swiss customs and to obtain and transfer to the Republic of Kazakhstan, in particular, the following information on:

—    the details of all passengers that arrived on November 9, 2007 with Flight No. SAH 9411, Aircraft Tu-154, tail number UN85854, in Geneva;

—    the goods that were declared at the Swiss customs;

—    the luggage and the handling of the luggage; and

—    the further use of the transported goods.

## C.   Members and Corporate Partners of the Khrapunov Family

15   In addition to the information provided in the Legal Assistance Request of February 20, 2012, we enclose information about the Khrapunov family[5] and their main corporate partners in Kazakhstan[6] and Switzerland[7], in particular on the following individuals (Exhibits 3 to 7):

— Marc Gillieron seems to be one of the Khrapunovs' main business managers and trust attorneys. He is currently working as lawyer for Chabrier Avocats in Geneva, where he is listed with experience in the real estate sector. Gillieron also provides numerous non-legal services including serving on the Board of Directors with signatory powers for more than 80 companies; at least 17 of them are owned by or connected to the Khrapunovs[8]. We are also instructed that there is suspicion that Gillieron and Chabrier Avocats are involved in transferring funds from the Khrapunov family to, among others, Green Life International S.A., which according to media reports is lending funds to Mukhtar Ablyazov, who is being accused of having embezzled several billion dollars from a bank in Kazakhstan (BTA Bank; Mr. Ablyazov is envolved in civil litigation in London, and is, to avoid court orders in London, in hiding and on the run). The Khrapunov and Ablyazov families are closely connected through the marriage of Khrapunov I.V. to Mukthar Ablyazov's daughter Madina.

— Nicolas Garnier seems to be a key person in the family's real estate business. According to the website of the Swiss Development Group, Garnier is the CEO of the company. In addition to this position, he is registered as member of the board of directors on several companies which are owned and controlled by Iliyas Khrapunov as well as by Elvira Khrapunova[9]. Swiss Development Group SA's website also indicates that Garnier leads the company's investments and real estate development.

— Cesare Cerrito holds positions within many of the entities that are associated with the Khrapunov family[10]. Cerrito has been the CFO of SDG Group SA since 2009.

— Serguei Lakoutine, who manages assets for Viktor Khrapunov's children: He has set up his own firm whose main office is located in Geneva (www.slegal.ch) and he has a Representative office in Moscow. Formerly he was an associate of Bonnant Warluzel & Partners.

— Aiyar Ilyasov and Gauchar Ilyasova: Aiyar Ilyasov is the brother in law of Khrapunova Leila. His wife, Khrapunova Leila's sister, is Gaukhar Ilyasova. He has been identified as a central figure in Khrapunova Leila's business operations. He seems to control some of the identified Kazakh entities holding assets and his wife holds numerous assets in her name within Kazakhstan.

---

[5]   Exhibit 3.
[6]   Exhibit 4.
[7]   Exhibits 5, 6, 7.
[8]   Exhibit 5.
[9]   Exhibit 6.
[10]   Exhibit 7.

## III.   Criminal Proceedings in the Republic of Kazakhstan

### A.   Status of the Investigation Against the Khrapunov Family

16   The present section provides an overview over the most important events in the ongoing criminal investigation against Viktor Khrapunov, Leila Khrapunov and their children in the Republic of Kazakhstan.

17   On March 31, 2011, the Financial Police of the Republic of Kazakhstan initiated a criminal investigation against Viktor Khrapunov and other officials.

18   In May, June, July, August, September, October, November 2011, as well as in January, April and June 2012 the Financial Police of the Republic of Kazakhstan extended the criminal investigation to several additional cases of exceeding power and official authority by Viktor Khrapunov and other officials, and for suspicion of qualified expropriation or embezzlement of entrusted alien property on a large scale, creation and management of a criminal organization, fraud committed by the criminal organization on a large scale, extortion and bribery on a large scale, and laundering illegally obtained money and property on a large scale (Articles 176 part 3 clause "b, c", 177 part 3 clause "a, b", 193 part 3 clause "a, b, c", and 235 part 4, 311 part 4 clause "a, c" of the Criminal Code of the Republic of Kazakhstan[11]). On July 19, 2011, as a preventive measure, an arrest warrant and a motion for its approval by court were issued against Viktor Khrapunov for suspicion of committing a crime under Article 307 part 4 of the Criminal Code of the Republic of Kazakhstan and on July 21, 2011, the arrest warrant was approved by the Medeu district court of Almaty.

19   On August 15, 2011, the Financial Police of the Republic of Kazakhstan opened a criminal investigation against Viktor Khrapunov, Leila Khrapunova and other persons for suspicion of legalization of monetary funds or other property obtained illegally (money laundering) in the sense of Article 193 part 3 clause "c" of the Criminal Code of the Republic of Kazakhstan.

20   In September, October, and November additional criminal investigations were opened, amongst others, for suspicion of bribery (Article 311 part 4, clause "c" of the Criminal Code of the Republic of Kazakhstan) and creation and management of an organized criminal group or criminal organization (Article 235 part 4 of the Criminal Code of the Republic of Kazakhstan) as well as other criminal acts stipulated by the Articles 307 part 3 of the Criminal Code of the Republic of Kazakhstan.

21   On December 29, 2011, the Financial Police of the Republic of Kazakhstan extended the criminal investigation to Iliyas Khrapunov and Elvira Kudryashova.

22   Within the framework of the criminal investigation, the Financial Police issued attachment orders on November 22, 2011, on land plots and other real estate property illegally alienated as a result of the

---

[11]   For further information on the cited provisions of the Criminal Code of the Republic of Kazakhstan, please refer to Exhibit 3 to the Legal Assistance Request, dated February 20, 2012.

actions committed by Viktor Khrapunov and other persons, as well as on bank accounts of individuals and legal entities affiliated with Viktor Khrapunov's family. The orders, issued in accordance with Article 161 of the Criminal Procedural Code of the Republic of Kazakhstan, were duly authorised by the Deputy General Prosecutor of the Republic of Kazakhstan.

23   At present, the criminal investigation in the Republic of Kazakhstan against Viktor Khrapunov extends to 24 cases of committed criminal actions, which were consolidated into one procedure. The ongoing investigation in the Republic of Kazakhstan continues to reveal further evidence, which is likely to give rise to the opening of additional criminal cases.

24   The criminal proceedings against Viktor Khrapunov are still in their pre-trial stage, and are currently suspended pending the outcome of the legal assistance proceedings. As and when necessary, the stay of the pre-trial proceedings is lifted.

25   In the criminal proceedings, Viktor Khrapunov and Leila Khrapunova are represented by lawyer Alexandrovich Dostovalov. In his capacity as defense counsel, Mr. Dostovalov has submitted various petitions in accordance with Article 74 of the Kazakh Code of Criminal Procedure in order to protect the interests of his clients. To date, all of Mr. Dostovalov's motions – to familiarize himself with the bases of the criminal cases, to review the regulations for an extension of the pre-trial investigation period, to review conditions for the consolidation of the criminal cases into one case, to assess the regulations that declare the search of the accused, to obtain copies of decisions on criminal cases, to obtain copies of the regulations about the subpoena and a copy of the measures of restraint issued by the criminal prosecution – have been granted. As a result, he was provided with copies of all of the aforementioned documents.

26   As of today, one person, Mr. Karymsakov, has been convicted by court for his involvement in the criminal activities of Viktor Khrapunov and his family members. Mr. Karymsakov is currently serving a prison sentence in the Republic of Kazakhstan.

## B.   The Procedural Rights of the Accused in Kazakh Criminal Procedure

27   Most rights and guarantees regarding the fairness of a criminal trial are provided for in the Kazakh Code of Criminal Procedure and in the Kazakh Constitution. In addition, Article 3 (2) of the Kazakh Code of Criminal Procedure provides that when an international treaty, ratified by the Republic of Kazakhstan, specifies any other rules for the effect of the Kazakh Code of Criminal Procedure, the rules of the international treaty will be directly applicable. The most relevant treaty in this context is the International Covenant on Civil and Political Rights (ICCPR), which the Republic of Kazakhstan ratified in 2006.

28   The Kazakh Constitution, the Kazakh Code of Criminal Procedure and the ICCPR provide accused persons with all basic rights and guarantees as prescribed by international fair-trial standards:

——   Presumption of innocence (Article 14 (2) ICCPR, Article 77 (3) (1) of the Kazakh Constitution, and Article 19 (1) of the Kazakh Code of Criminal Procedure.

**Ex. D**
**Page 101**

— The right to remain silent: *nemo tenetur se ipsum prodere vel accusare* (Article 77 (3) (6) and (7) of the Kazakh Constitution).

— The principle that in cases of doubt the accused is to be acquitted: *in dubio pro reo* (Article 77 (3) (8) of the Kazakh Constitution; Article 19 (3) of the Kazakh Code of Criminal Procedure).

— The right to be heard in court (Article 77 (1) (3) of the Kazakh Constitution).

— The right to an independent judge or tribunal (Article 77 (1) and (2) of the Kazakh Constitution; Article 22 of the Kazakh Code of Criminal Procedure).

— The right to a defense counsel and to qualified legal assistance (Articles 26, 28, and 69 (2) of the Kazakh Code of Criminal Procedure)

— The right to a public hearing (Article 14 (1) ICCPR; Article 29 (1) of the Kazakh Code of Criminal Procedure).

— The rule that illegally obtained evidence must be disregarded (Article 77 (3) (9) of the Kazakh Constitution; Article 116 of the Kazakh Code of Criminal Procedure).

## C.   Investigation against the Khrapunov Family Meets International Fair-Trial Standards

29   The Republic of Kazakhstan assures you that the criminal investigation against Viktor Khrapunov and the members of his family is being (and continues to be) conducted in full compliance with the above outlined procedural rules that provides the persons under investigation with all basic rights and guarantees as prescribed by international fair-trial standards.

30   In addition, the Republic of Kazakhstand would like to point out to a report of the OSCE regarding the results of a trial monitoring in the Republic of Kazakhstan in 2005 and 2006 in which the OSCE has attested that "*[g]enerally, existing provisions on criminal procedure in Kazakhstan establish basic guarantees as prescribed by international fair-trial standard.*" This report has been published on the website of the OSCE (<http://www.osce.org/astana/24153>).

31   Similarly, in an extradition case with regard to fair trial standards in the Republic of Kazakhstan, the European Court of Human Rights held in a decision of February 10, 2011, that, given the recent improvements regarding the human rights situation in Kazakhstan, a general refusal to extradite persons to the Republic of Kazakhstan cannot be justified. In that case (Dzhaksybergenov v. Ukraine; application No 12343/10), the European Court of Human Rights unanimously ruled "*that there would be no violation of Article 6 of the Convention [European Convention on Human Rights] if the applicant were extradited to Kazakhstan.*"

32   Given the above, it is established that the criminal investigation and proceedings against Viktor Khrapunov and the members of his family meet the procedural requirements of due process and

**Ex. D**
**Page 102**

international fair-trial standards as, for example, set forth the European Convention for the Protection of Human Rights and Fundamental Freedoms of November 4, 1950.

## IV. Specific Assistance Requests

33    The Republic of Kazakhstan confirms and repeats its assistance requests lodged with the Legal Assistance Request of February 20, 2012 and kindly asks you to take the additional information on (i) the assets of the Khrapunov family in Switzerland, (ii) the asset transfers from Switzerland to Kazakhstan and (iii) the members and business partners of the Khrapunov family that is provided with this report into account when taking the requested actions.

34    Further, the Republic of Kazakhstan amends its Legal Assistance Request of February 20, 2012 and respectfully requests that the following additional actions be taken:

1.  **Order the following banks to provide copies of documents relating to all bank accounts, securities accounts, and safes directly or indirectly or beneficially held or controlled by or on behalf of any of the Persons Under Investigation, including opening documents and documents showing transfers into and from these bank accounts, securities accounts, and safes, including but not limited to any such accounts or assets used to provide a loan or loans, funds or or other finance to any entity or person directly or indirectly by or on behalf of any of the Persons Under Investigation:**

    a)  Pictet & Cie, Geneva;
    b)  Banque Sarasin & Cie SA, Geneva;
    c)  PNB PARIBAS Suisse, Geneva;
    d)  Société Générale, Geneva;
    e)  Schroder & Co. Banque Ltd, Geneva;
    f)  Credit Suisse SA, Geneva;
    g)  UBS Geneva, Geneva (used for blocked account for the share capital Toepffer Investissement SA).
    h)  Obwaldner Kantonalbank, Sarnen (used for blocked bank account for the share capital of Swiss Standard IB AG)
    i)  Banque Cantonale Vaudoise (used for blocked account for the share capital increase of HDP Hôtel du Parc Holding SARL); and
    j)  Banque Raiffeisen, Le Sépey (used for blocked account for the share capital of HDP Hôtel du Parc Holding SARL).

2.  **Order these banks not to effect any transactions from the bank accounts, securities accounts, and safes directly or indirectly or**

**Ex. D**
**Page 103**

beneficially held or controlled by or on behalf of any of the
Persons Under Investigation including but not limited to any
such accounts or assets used to provide a loan or loans,
funds,or the finance to any entitiy or person directly or indirectly
by or on behalf of any of the Persons Under Investigation,  and
transfer these assets to the Republic of Kazakhstan (cf. requests
of February 28, 2012);

3.   Order Marc Gillieron, Nicolas Garner, Cesare Cerritto, and
Serguei Lakoutine to identify and inform the requested authority
which assets directly or indirectly or beneficially held, controlled,
or financed by any of the Persons Under Investigation are
managed in trust or otherwise by Marc Gillieron, Nicolas Garner,
Cesare Cerritto, and Serguei Lakoutine, and to provide respective
documentation, including bank account information, contracts or
instructions, including but not limited to any such accounts or
assets used to provide a loan or loans, funds or other finance to
any entitiy or person directly or indirectly by or on behalf of any
of the Persons Under Investigation; including but not limited to
Green Life International S.A.

4.   Order these persons not to effect any transactions from any of
these bank accounts, securities accounts, and safes directly or
indirectly or beneficially held, controlled, or financed by or on
behalf of any of the Persons Under Investigation and transfer
these assets to the Republic of Kazakhstan (cf. requests of
February 28, 2012)

5.   Order SEQUOIA WEALTH MANAGEMENT SA, SEQUOIA ASSET
MANAGEMENT SA, and SEQUOIA GROUP SA, all domiciled at
chemin Frank-Thomas 32, 1208 Geneva, and Mr. Oleg Shashkin
and Mr. Pierre-Noël Formigé to identify and inform the requested
authority which assets directly or indirectly or beneficially held
by any of the Persons Under Investigation are managed by
SEQUOIA WEALTH MANAGEMENT SA, SEQUOIA ASSET
MANAGEMENT SA, SEQUOIA GROUP SA, Mr. Oleg Shashkin
and|or Mr. Pierre-Noël Formigé; and

Order these companies not to effect any transactions from the
bank accounts, securities accounts, and safes directly or
indirectly or beneficially held, controlled, or financed by or on
behalf of any of the Persons Under Investigation and transfer
these assets to the Republic of Kazakhstan (cf. requests of

February 28, 2012)

6. **Amend and expand the** above orders to all **bank accounts, securities accounts, and** safes of companies directly **or indirectly or beneficially owned,** controlled, or financed **by any of the Persons Under Investigation;**

7. **Request the following** companies to inform the requested **authority on the founder,** owner of the shares or quotas **in the companies:**

    a) QUINTESSENTIALLY ESTATES Sàrl;
    b) Swiss Green Leasing SA;
    c) Swiss Promotion Group SA;
    d) Swiss Elements SA; and
    e) Fondation pour le développement de la région Almaty-Issy Kul en liquidation;

8. **Order the land register** office of Geneva not to allow **any disposition of the following real** assets:

    a) Real Estate Property at chemin de l'Hôtel du Parc 5, 1801 Le Mont-Pèlerin
    b) Apartment located at Rue Pedro Meylan 10, 1208 Geneva;
    c) Apartment located at Avenue Eugène-Pittard 15, 1206 Geneva

9. **Obtain from Geneva airport,** Swiss customs and/or other **competent Swiss authorities,** in particular, information on:

    a) the details of all passengers that arrived on November 9, 2007 with Flight No. SAH 9411, Aircraft Tu-154, tail number UN85854, in Geneva;
    b) the goods that were declared at the Swiss customs;
    c) the luggage and the handling of the luggage; and
    d) the further use of the transported goods

10. **Order Swiss Development Group SA,** route du Pré-Bois 29, **Geneva, to inform the** requested authority which assets used for **the project "Du Parc Kempinski Private Residences" were held directly, or indirectly, or beneficially,** by any of the Persons **Under Investigation, including** bank account information, **contracts.**

* * * * * * * * * *

On behalf of the Government of the Republic of Kazakhstan, we appreciate your consideration of this submission and, in accordance with Art. 17a IMAC, respectfully request you to execute the requested measures promptly and to decide without delay. In case you would like to receive a French translation of this submission, we kindly ask you to notify us accordingly.

Should you have any questions on the above or require further information, please do not hesitate to contact us.

Yours sincerely,

Balz Gross
Claudio Bazzani
Mladen Stojiljković

Enclosures:

—   Table of Contents
—   Exhibits 1 – 7 as per separate list of exhibits

22 | 22

**Table of Contents**

I. **Waiver of Confidentiality** ..............................................................2

II. **Additional Information** ................................................................2

    A. Assets of the Khrapunov Family ...........................................2

    B. Asset Transfers from Kazakhstan to Switzerland............................ 13

    C. Members and Corporate Partners of the Khrapunov Family ............ 14

III. **Criminal Proceedings in the Republic of Kazakhstan**............................**15**

    A. Status of the Investigation Against the Khrapunov Family ................ 15

    B. The Procedural Rights of the Accused in Kazakh Criminal Procedure ............ 16

    C. Investigation against the Khrapunov Family Meets International Fair-Trial Standards.............................................................. 17

IV. **Specific Assistance Requests**...........................................................**18**

**Ex. D
Page 107**

# EXHIBIT E

3

Copie pour information à:

Ministère public de Genève
Route de Chancy 6b
1211 Genève 3

Monsieur
Khrapunov Viktor
Chemin du Petit-Saconnex 28b
1209 Genève

5

SL. OFJ, Bundesrain 20, 3003 Berne, Suisse

Monsieur
Khrapunov Viktor
Chemin du Petit-Saconnex 28b
1209 Genève

Confédération suisse
Confederazione Svizzera
Confederaziun svizra

Département fédéral de justice et police DFJP
**Office fédéral de la justice OFJ**
Unité Extraditions

SL, OFJ, Bundesrain 20, 3003 Berne, Suisse

**Recommandé**

General Prosecutor Office of the
Republic of Kazakhstan
14 Orynbor street
Astana 010000

Votre référence : 2-013610-14-14131
Notre référence : B 229'674 /SL

Berne, le 19 juin 2014

## Demande d'extradition du Kazakhstan à l'encontre de KHRAPUNOV Viktor, né le 24 novembre 1948

Madame, Monsieur,

Nous nous référons à votre demande d'extradition du 17 mars 2014, transmise par l'Ambassade du Kazakhstan par note diplomatique Nr. 31-31-70 du 1er avril 2014 et vous communiquons ce qui suit :

L'Office fédéral de la justice, autorité compétente en matière d'extradition, souligne le fait que, au vu de l'absence d'un traité d'extradition liant la Suisse et le Kazakhstan, le droit interne suisse est applicable en l'espèce.

S'agissant du cas d'espèce, une extradition de l'intéressé vers le Kazakhstan n'est pas envisageable en raison des critères établis dans le droit interne suisse, notamment l'article 2 de la Loi fédérale sur l'entraide internationale en matière pénale (EIMP ; RS 351.1[1] ).

Toutefois, nous vous rendons attentifs au fait que les autorités du Kazakhstan ont la possibilité d'adresser une demande de délégation de la poursuite pénale de l'intéressé auprès de notre Office, accompagnée du dossier pénal, des moyens de preuve pertinents et des dispositions pénales applicables, ainsi que d'une traduction en langue française de toute la documentation.

---

[1] Lien internet : http://www.admin.ch/opc/fr/classified-compilation/19810037/index.html

Laura Nolfo
Bundesrain 20, 3003 Berne, Suisse
Téléphone : +41 58 462 43 26, Téléfax : +41 58 462 53 80
irh@bj.admin.ch

2

Nous vous rappelons que le Ministère public du Canton de Genève, suite à une demande d'entraide judiciaire envoyée à la Suisse par le Procureur Général du Kazakhstan, a ouvert une procédure pour blanchiment d'argent contre l'intéressé.

L'intéressé reçoit une copie de la présente lettre.

Nous vous prions de croire, Madame, Monsieur, à l'assurance de notre considération distinguée.

Laura Nolfo

# EXHIBIT F



3

<u>Copy for information purposes sent to:</u>

Geneva Public Prosecutor
Route de Chancy 6b
1211 Geneva 3


Mr. Viktor Khrapunov
Chemin du Petit-Saconnex 28b
1209 Geneva



<u>SL. OFJ, Bundesrain 20, 3003, Berne, Switzerland</u>

Mr. Viktor Khrapunov
Chemin du Petit-Saconnex 28b
1209 Geneva

Schweizerische Eidgenosssenschaft
Confédération Suisse
Confederazione Svizzera
Confederziun svizra

Federal Department of Justice DF JP
**Federal office of justice OFJ**
Extraditions Unit

SL. OFJ, Bundesrain 20, 3003, Berne, Switzerland
**Sent by certified mail**
General Prosecutor Office of the
Republic of Kazakhstan
14 Orynbor street
Astana 010000

Your reference: 2-013610-14-14131
Our reference: B 229'674 /SL

Berne, June 19, 2014

**Kazakhstan's extradition request against Viktor KHRAPUNOV, born on November 24, 1948**

Dear Sir, Dear Madam:

We refer to your extradition request of March 17, 2014 made by the Embassy of Kazakhstan by diplomatic memorandum no. 31-31-70 of April 1, 2014 and reply to you as follows:

The Swiss Federal Office of Justice, the authority with jurisdiction for extradition matters, would like to point out that since there is no extradition treaty between Switzerland and Kazakhstan, Swiss domestic law governs this matter.

In the case in point, Mr. Khrapunov cannot be extradited to Kazakhstan as a result of the criteria set forth in Swiss domestic law, in particular, Article 2 of the Federal Act on Mutual Assistance in Criminal Matters (EIMP; RS 351. 1[1]).

However, we inform that the authorities of Kazakhstan may file a delegation request for the criminal prosecution of Mr. Khrapunov with our Office in addition to the criminal file, the relevant evidence and the applicable criminal provisions as well as the translation into the French language of the all the documentation.

---

[1] Web link: http://www.admin.ch/opc/fr/classified-compilation/19810037/index.html

Laura Nolfo
Bundesrain 20, 3003 Berne, Switzerland
Telephone: +41 58 462 43 26. Fax: +41 58 462 53 80
irh@bi.admin.ch



2

We remind you that as a result of a mutual assistance request sent to Switzerland by the Public Prosecutor of Kazakhstan, the Public Prosecutor of the Canton of Geneva has opened a proceeding for money-laundering against Mr. Khrapunov.

Mr. Khrapunov will receive a copy of this letter.

Sincerely,

[signature]

Laura Nolfo


TRANSPERFECT

City of New York, State of New York, County of New York

I, Artem Furman, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the attached document "Attachment 1, correspondence dated June 19,2014" from French into English.

Artem Furman

Sworn to before me this

15th day of August 2014

Signature, Notary Public

ADAM M SCHEFFLAN
Notary Public – State of New York
No. 01SC6298049
Qualified in NEW YORK County
My Commission Expires MAR 10, 2018

Stamp, Notary Public

# EXHIBIT G

# Code de procédure pénale suisse

**312.0**

## (Code de procédure pénale, CPP)

du 5 octobre 2007 (Etat le 1er juillet 2014)

*L'Assemblée fédérale de la Confédération suisse,*
vu l'art. 123, al. 1, de la Constitution[1],
vu le message du Conseil fédéral du 21 décembre 2005[2],
*arrête:*

## Titre 1     Champ d'application et principes généraux
## Chapitre 1
## Champ d'application et administration de la justice pénale

### Art. 1     Champ d'application

[1] Le présent code régit la poursuite et le jugement, par les autorités pénales de la Confédération et des cantons, des infractions prévues par le droit fédéral.

[2] Les dispositions de procédure prévues par d'autres lois fédérales sont réservées.

### Art. 2     Administration de la justice pénale

[1] La justice pénale est administrée uniquement par les autorités désignées par la loi.

[2] Les procédures pénales ne peuvent être exécutées et closes que dans les formes prévues par la loi.

## Chapitre 2     Principes régissant la procédure pénale

### Art. 3     Respect de la dignité et procès équitable

[1] Les autorités pénales respectent la dignité des personnes impliquées dans la procédure, à tous les stades de celle-ci.

[2] Elles se conforment notamment:

    a.    au principe de la bonne foi;

    b.    à l'interdiction de l'abus de droit;

    c.    à la maxime voulant qu'un traitement équitable et le droit d'être entendu soient garantis à toutes les personnes touchées par la procédure;

RO **2010** 1881
[1]    RS **101**
[2]    FF **2006** 1057

1

## Section 3    Partie plaignante

**Art. 118**        Définition et conditions

[1] On entend par partie plaignante le lésé qui déclare expressément vouloir participer à la procédure pénale comme demandeur au pénal ou au civil.

[2] Une plainte pénale équivaut à une telle déclaration.

[3] La déclaration doit être faite devant une autorité de poursuite pénale avant la clôture de la procédure préliminaire.

[4] Si le lésé n'a pas fait spontanément de déclaration, le ministère public attire son attention dès l'ouverture de la procédure préliminaire sur son droit d'en faire une.

**Art. 119**        Forme et contenu de la déclaration

[1] Le lésé peut faire une déclaration écrite ou orale, les déclarations orales étant consignées au procès-verbal.

[2] Dans la déclaration, le lésé peut, cumulativement ou alternativement:

   a.    demander la poursuite et la condamnation de la personne pénalement responsable de l'infraction (plainte pénale);

   b.    faire valoir des conclusions civiles déduites de l'infraction (action civile) par adhésion à la procédure pénale.

**Art. 120**        Renonciation et retrait

[1] Le lésé peut en tout temps déclarer par écrit ou par oral qu'il renonce à user des droits qui sont les siens; la déclaration orale est consignée au procès-verbal. La renonciation est définitive.

[2] Si la renonciation n'a pas été expressément restreinte à l'aspect pénal ou à l'aspect civil, elle vaut tant pour la plainte pénale que pour l'action civile.

**Art. 121**        Transmission des droits

[1] Si le lésé décède sans avoir renoncé à ses droits de procédure, ceux-ci passent à ses proches au sens de l'art. 110, al. 1, CP[27], dans l'ordre de succession.

[2] La personne qui est subrogée de par la loi aux droits du lésé n'est habilitée qu'à introduire une action civile et ne peut se prévaloir que des droits de procédure qui se rapportent directement aux conclusions civiles.

---

[27]    RS 311.0

## Section 4      Action civile

### Art. 122      Dispositions générales

[1] En qualité de partie plaignante, le lésé peut faire valoir des conclusions civiles déduites de l'infraction par adhésion à la procédure pénale.

[2] Le même droit appartient aux proches de la victime, dans la mesure où ils font valoir contre le prévenu des conclusions civiles propres.

[3] L'action civile devient pendante dès que le lésé a fait valoir des conclusions civiles en vertu de l'art. 119, al. 2, let. b.

[4] Si la partie plaignante retire son action civile avant la clôture des débats de première instance, elle peut à nouveau faire valoir ses conclusions civiles par la voie civile.

### Art. 123      Calcul et motivation

[1] Dans la mesure du possible, la partie plaignante chiffre ses conclusions civiles dans sa déclaration en vertu de l'art. 119 et les motive par écrit; elle cite les moyens de preuves qu'elle entend invoquer.

[2] Le calcul et la motivation des conclusions civiles doivent être présentés au plus tard durant les plaidoiries.

### Art. 124      Compétence et procédure

[1] Le tribunal saisi de la cause pénale juge les conclusions civiles indépendamment de leur valeur litigieuse.

[2] Le prévenu doit pouvoir s'exprimer sur les conclusions civiles, au plus tard lors des débats de première instance.

[3] Si le prévenu acquiesce aux conclusions civiles, sa déclaration doit être consignée au procès-verbal et constatée dans la décision finale.

### Art. 125      Sûretés pour les dépenses occasionnées par les conclusions civiles

[1] La partie plaignante, sauf s'il s'agit d'une victime, doit fournir au prévenu, sur demande, des sûretés pour les dépenses estimées que lui occasionnent les conclusions civiles si:

    a.    elle n'a ni domicile ni siège en Suisse;

    b.    elle paraît insolvable, notamment lorsqu'elle a été déclarée en faillite, qu'un sursis concordataire est en cours ou qu'il existe un acte de défaut de biens;

    c.    il y a lieu pour d'autres raisons de craindre que la créance du prévenu soit considérablement mise en péril ou perdue.

[2] La direction de la procédure du tribunal statue définitivement sur la requête. Elle arrête le montant des sûretés et fixe le délai dans lequel elles doivent être fournies.

# EXHIBIT H

> *English is not an official language of the Swiss Confederation. This translation is provided for information purposes only and has no legal force.*

# Swiss Criminal Procedure Code
## (Criminal Procedure Code, CrimPC)

of 5 October 2007 (Status as of 1 July 2014)

*The Federal Assembly of the Swiss Confederation,*

on the basis of Article 123 paragraph 1 of the Federal Constitution[1],
and having considered the Federal Council Dispatch dated 21 December 2005[2],

*decrees:*

## Title 1: Scope of Application and Principles
## Chapter 1: Scope of Application and the Administration of Criminal Justice

**Art. 1**         Scope of application

[1] This Code regulates the prosecution and adjudication by the federal and cantonal criminal justice authorities of offences under federal law.

[2] The procedural regulations contained in other federal acts are reserved.

**Art. 2**         Administration of criminal justice

[1] The administration of criminal justice is the responsibility solely of the authorities specified by law.

[2] Criminal proceedings may be conducted and concluded only in the forms provided for by law.

## Chapter 2: Principles of Criminal Procedure Law

**Art. 3**         Respect for human dignity and requirement of fairness

[1] The criminal justice authorities shall respect the dignity of the persons affected by the proceedings at all stages of the proceedings.

[2] They shall in particular comply with:

AS **2010** 1881
[1]   SR **101**
[2]   BBl **2006** 1085

[2] Relatives of the victim are his or her spouse, children and parents, and persons closely related to him or her in a similar way.

### Art. 117          Status

[1] Victims have special rights, in particular:

    a.   the right to protection of personal privacy (Art. 70 para. 1 let. a, 74 para. 4, 152 para. 1);

    b.   the right to be accompanied by a confidant (Art. 70 para. 2, 152 para. 2);

    c.   the right to protective measures (Art. 152–154);

    d.   the right to remain silent (Art. 169 para. 4);

    e.   the right to information (Art. 305 and 330 para. 3);

    f.   the right to a special composition of the court (Art. 335 para. 4).

[2] In the case of victims under the age of 18, additional special provisions protecting personal privacy apply, in particular relating to:

    a.   restrictions on confrontation hearings with the accused (Art. 154 para. 4);

    b.   special protective measures during examination hearings (Art. 154 para. 2–4);

    c.   abandonment of the proceedings (Art. 319 para. 2).

[3] If relatives of a victim file civil claims, they are entitled to the same rights as the victim.

## Section 3: Private Claimants

### Art. 118          Definition and requirements

[1] A private claimant is a person suffering harm who expressly declares that he or she wishes to participate in the criminal proceedings as a criminal or civil claimant.

[2] The filing of a criminal complaint is regarded as being equivalent to such a declaration.

[3] The declaration must be made to a criminal justice authority by the end of the preliminary proceedings at the latest.

[4] If a person suffering harm has not made a declaration of his or her own volition, so the public prosecutor shall advise the person of this possibility after opening the preliminary proceedings.

### Art. 119          Form and content of the declaration

[1] A person suffering harm may submit a written declaration in writing or make the declaration orally on record.

[2] In the declaration the person suffering harm may do either or both of the following:

**Ex. H**
**Page 121**

a.   request the prosecution and punishment of the person responsible for the offence (a criminal complaint);

b.   file private law claims based on the offence (a civil claim).

### Art. 120        Waiver and withdrawal

[1] The person suffering harm may at any time declare either in writing or orally on record that he or she waives his or her rights.  The waiver is final.

[2] Unless the waiver is expressly limited, it shall be deemed to cover both the criminal and the civil proceedings.

### Art. 121        Legal successors

[1] If the person suffering harm dies without waiving his or her procedural rights as a private claimant, such rights pass to his or her relatives as defined in Article 110 paragraph 1 SCC[28] in accordance with their ranking under the law of succession.

[2] Any person who by law acquires the rights as a claimant of a person suffering harm does so only in respect of the civil claim and has only those procedural rights that relate directly to the assertion of the civil claim.

## Section 4: Civil Claims

### Art. 122        General Provisions

[1] The person suffering harm may bring civil claims based on the offence as a private claimant in the criminal proceedings.

[2] The relatives of the victim have the same right provided they bring their own civil claims against the accused.

[3] The civil proceedings become pending when a declaration in accordance with Article 119 paragraph 2 letter b is made.

[4] If a private claimant withdraws the civil claim before the end of the main hearing before the court of first instance, they may file the claim again in civil proceedings.

### Art. 123        Quantification and statement of the grounds

[1] The civil claim must if possible be quantified in the declaration made in accordance with Article 119 and a brief statement of the grounds must be provided, detailing the relevant evidence.

[2] The quantification and statement of the grounds must be specified in the party submissions at the latest.

---

[28]    SR **311.0**



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Artem Furman, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the following sections of the attached document Swiss Criminal Procedure Code 312.0 from French into English.

118

119

122

Artem Furman

Sworn to before me this

15th day of August 2014

Signature, Notary Public

ADAM M SCHEFFLAN
Notary Public - State of New York
No. 01SC6298049
Qualified in NEW YORK County
My Commission Expires MAR 10, 2018

Stamp, Notary Public

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 80 CITIES WORLDWIDE

Ex. H
Page 123

# EXHIBIT I

# Code pénal suisse

**311.0**

du 21 décembre 1937 (Etat le 1er juillet 2014)

---

*L'Assemblée fédérale de la Confédération suisse,*

vu l'art. 123, al. 1 et 3, de la Constitution[1],[2]
vu le message du Conseil fédéral du 23 juillet 1918[3],

*arrête:*

|        |                            |
|--------|----------------------------|
| **Livre 1**[4] | **Dispositions générales** |
| **Partie 1** | **Crimes et délits** |
| **Titre 1** | **Champ d'application** |

### Art. 1

1. Pas de sanction sans loi

Une peine ou une mesure ne peuvent être prononcées qu'en raison d'un acte expressément réprimé par la loi.

### Art. 2

2. Conditions de temps

[1] Est jugé d'après le présent code quiconque commet un crime ou un délit après l'entrée en vigueur de ce code.

[2] Le présent code est aussi applicable aux crimes et aux délits commis avant la date de son entrée en vigueur si l'auteur n'est mis en jugement qu'après cette date et si le présent code lui est plus favorable que la loi en vigueur au moment de l'infraction.

### Art. 3

3. Conditions de lieu.
Crimes ou délits commis en Suisse

[1] Le présent code est applicable à quiconque commet un crime ou un délit en Suisse.

[2] Si, en raison d'un tel acte, l'auteur a été condamné à l'étranger et qu'il y a subi la totalité ou une partie de la peine prononcée contre lui, le juge impute la peine subie sur la peine à prononcer.

---

RO 54 781, 57 1364 et RS 3 193
[1]   RS 101
[2]   Nouvelle teneur selon le ch. I de la LF du 30 sept. 2011, en vigueur depuis le 1er juil. 2012 (RO **2012** 2575; FF **2010** 5125 5151).
[3]   FF **1918** IV 1
[4]   Nouvelle teneur selon le ch. I de la LF du 13 déc. 2002, en vigueur depuis le 1er janv. 2007 (RO **2006** 3459; FF **1999** 1787).

Code pénal suisse                                                    **311.0**

**Art. 136**[107]

Remise à
des enfants
de substances
pouvant mettre
en danger leur
santé

Quiconque aura remis à un enfant de moins de seize ans ou aura mis à
sa disposition des boissons alcooliques ou d'autres substances dans
des quantités pouvant mettre en danger sa santé sera puni d'une peine
privative de liberté de trois ans au plus ou d'une peine pécuniaire.

**Titre 2**[108]          **Infractions contre le patrimoine**

**Art. 137**

1. Infractions
contre le
patrimoine.
Appropriation
illégitime

1. Celui qui, pour se procurer ou procurer à un tiers un enrichissement
illégitime, se sera approprié une chose mobilière appartenant à autrui
sera puni d'une peine privative de liberté de trois ans au plus ou d'une
peine pécuniaire, en tant que les conditions prévues aux art. 138 à 140
ne seront pas réalisées.

2. Si l'auteur a trouvé la chose ou si celle-ci est tombée en son pou-
voir indépendamment de sa volonté,

s'il a agi sans dessein d'enrichissement ou

si l'acte a été commis au préjudice des proches ou des familiers,

l'infraction ne sera poursuivie que sur plainte.

**Art. 138**

Abus de
confiance

1. Celui qui, pour se procurer ou procurer à un tiers un enrichissement
illégitime, se sera approprié une chose mobilière appartenant à autrui
et qui lui avait été confiée,

celui qui, sans droit, aura employé à son profit ou au profit d'un tiers
des valeurs patrimoniales qui lui avaient été confiées,

sera puni d'une peine privative de liberté de cinq ans au plus ou d'une
peine pécuniaire.

L'abus de confiance commis au préjudice des proches ou des familiers
ne sera poursuivi que sur plainte.

2. Si l'auteur a agi en qualité de membre d'une autorité, de fonction-
naire, de tuteur, de curateur, de gérant de fortunes ou dans l'exercice
d'une profession, d'une industrie ou d'un commerce auquel les pou-

---

[107]  Nouvelle teneur selon le ch. II de la LF du 20 mars 2008, en vigueur depuis le
1er juil. 2011 (RO **2009** 2623, **2011** 2559; FF **2006** 8141 8211).
[108]  Nouvelle teneur selon le ch. I de la LF du 17 juin 1994, en vigueur depuis le
1er janv. 1995 (RO **1994** 2290; FF **1991** II 933).

voirs publics l'ont autorisé, la peine sera une peine privative de liberté de dix ans au plus ou une peine pécuniaire[109].

### Art. 139

Vol

1. Celui qui, pour se procurer ou procurer à un tiers un enrichissement illégitime, aura soustrait une chose mobilière appartenant à autrui dans le but de se l'approprier sera puni d'une peine privative de liberté de cinq ans au plus ou d'une peine pécuniaire.

2. Le vol sera puni d'une peine privative de liberté de dix ans au plus ou d'une peine pécuniaire de 90 jours-amende au moins[110] si son auteur fait métier du vol.

3. Le vol sera puni d'une peine privative de liberté de dix ans au plus ou d'une peine pécuniaire de 180 jours-amende au moins[111],

si son auteur l'a commis en qualité d'affilié à une bande formée pour commettre des brigandages ou des vols,

s'il s'est muni d'une arme à feu ou d'une autre arme dangereuse ou

si de toute autre manière la façon d'agir dénote qu'il est particulièrement dangereux.

4. Le vol commis au préjudice des proches ou des familiers ne sera poursuivi que sur plainte.

### Art. 140

Brigandage

1. Celui qui aura commis un vol en usant de violence à l'égard d'une personne, en la menaçant d'un danger imminent pour la vie ou l'intégrité corporelle ou en la mettant hors d'état de résister sera puni d'une peine privative de liberté de dix ans au plus ou d'une peine pécuniaire de 180 jours-amende au moins.

Celui qui, pris en flagrant délit de vol, aura commis un des actes de contrainte mentionnés à l'al. 1 dans le but de garder la chose volée encourra la même peine.

2. Le brigandage sera puni d'une peine privative de liberté d'un an au moins[112], si son auteur s'est muni d'une arme à feu ou d'une autre arme dangereuse.

[109] Nouvelle expression selon le ch. II 1 al. 8 de la LF du 13 déc. 2002, en vigueur depuis le 1er janv. 2007 (RO **2006** 3459; FF **1999** 1787). Il a été tenu compte de cette mod. dans tout le Livre.

[110] Nouvelle expression selon le ch. II 1 al. 9 de la LF du 13 déc. 2002, en vigueur depuis le 1er janv. 2007 (RO **2006** 3459; FF **1999** 1787). Il a été tenu compte de cette mod. dans tout le Livre.

[111] Nouvelle expression selon le ch. II 1 al. 10 de la LF du 13 déc. 2002, en vigueur depuis le 1er janv. 2007 (RO **2006** 3459; FF **1999** 1787). Il a été tenu compte de cette mod. dans tout le Livre.

[112] Nouvelle expression selon le ch. II 1 al. 12 de la LF du 13 déc. 2002, en vigueur depuis le 1er janv. 2007 (RO **2006** 3459; FF **1999** 1787).

**311.0**                                                               Code pénal suisse

    c.    lésions corporelles graves (art. 122);

    c[bis].[198]mutilation d'organes génitaux féminins (art. 124);

    d.    brigandage (art. 140);

    e.    séquestration et enlèvement (art. 183);

    f.    prise d'otage (art. 185);

    g.    incendie intentionnel (art. 221);

    h.    génocide (art. 264);

    i.    crimes contre l'humanité (art. 264a);

    j.    crimes de guerre (art. 264c à 264h). [199]

[2] Celui qui, de son propre mouvement, aura renoncé à poursuivre jusqu'au bout son activité préparatoire, sera exempté de toute peine.

[3] Est également punissable celui qui commet les actes préparatoires à l'étranger lorsque les infractions doivent être commises en Suisse. L'art. 3, al. 2, est applicable.[200]

**Art. 260**[ter 201]

Organisation criminelle

1. Celui qui aura participé à une organisation qui tient sa structure et son effectif secrets et qui poursuit le but de commettre des actes de violence criminels ou de se procurer des revenus par des moyens criminels,

celui qui aura soutenu une telle organisation dans son activité criminelle,

sera puni d'une peine privative de liberté de cinq ans au plus ou d'une peine pécuniaire.

2. Le juge pourra atténuer librement la peine (art. 48a)[202] à l'égard de celui qui se sera efforcé d'empêcher la poursuite de l'activité criminelle de l'organisation.

3. Est également punissable celui qui aura commis l'infraction à l'étranger si l'organisation exerce ou doit exercer son activité criminelle en tout ou en partie en Suisse. L'art. 3, al. 2, est applicable.[203]

---

[198]  Introduite par le ch. I de la LF du 30 sept. 2011, en vigueur depuis le 1er juil. 2012 (RO **2012** 2575; FF **2010** 5125 5151).

[199]  Nouvelle teneur selon le ch. I 1 de la LF du 18 juin 2010 (Statut de Rome de la Cour pénale internationale), en vigueur depuis le 1er janv. 2011 (RO **2010** 4963; FF **2008** 3461).

[200]  Nouvelle teneur de la phrase selon le ch. II 2 de la LF du 13 déc. 2002, en vigueur depuis le 1er janv. 2007 (RO **2006** 3459; FF **1999** 1787).

[201]  Introduit par le ch. I de la LF du 18 mars 1994, en vigueur depuis le 1er août 1994 (RO **1994** 1614; FF **1993** III 269).

[202]  Nouvelle teneur du membre de phrase selon le ch. II 2 de la LF du 13 déc. 2002, en vigueur depuis le 1er janv. 2007 (RO **2006** 3459; FF **1999** 1787).

**Ex. I**
**Page 127**

### Art. 305[bis] [265]

Blanchiment d'argent[266]

1. Celui qui aura commis un acte propre à entraver l'identification de l'origine, la découverte ou la confiscation de valeurs patrimoniales dont il savait ou devait présumer qu'elles provenaient d'un crime,

sera puni d'une peine privative de liberté de trois ans au plus ou d'une peine pécuniaire.

2. Dans les cas graves, la peine sera une peine privative de liberté de cinq ans au plus ou une peine pécuniaire. En cas de peine privative de liberté, une peine pécuniaire de 500 jours-amende au plus est également prononcée.[267]

Le cas est grave, notamment lorsque le délinquant:

    a.    agit comme membre d'une organisation criminelle;

    b.    agit comme membre d'une bande formée pour se livrer de manière systématique au blanchiment d'argent[268];

    c.    réalise un chiffre d'affaires ou un gain importants en faisant métier de blanchir de l'argent.

3. Le délinquant est aussi punissable lorsque l'infraction principale a été commise à l'étranger et lorsqu'elle est aussi punissable dans l'Etat où elle a été commise.[269]

### Art. 305[ter] [270]

Défaut de vigilance en matière d'opérations financières et droit de communication[271]

[1] Celui qui, dans l'exercice de sa profession, aura accepté, gardé en dépôt ou aidé à placer ou à transférer des valeurs patrimoniales appartenant à un tiers et qui aura omis de vérifier l'identité de l'ayant droit économique avec la vigilance que requièrent les circonstances, sera puni d'une peine privative de liberté d'un an au plus ou d'une peine pécuniaire.[272]

---

[265]  Introduit par le ch. I de la LF du 23 mars 1990, en vigueur depuis le 1er août 1990 (RO **1990** 1077; FF **1989** II 961).

[266]  Nouvelle teneur selon l'art. 43 de la LF du 10 oct. 1997 sur le blanchiment d'argent, en vigueur depuis le 1er avril 1998 (RO **1998** 892; FF **1996** III 1057).

[267]  Nouvelle teneur des phrases selon le ch. II 1 al. 16 de la LF du 13 déc. 2002, en vigueur depuis le 1er janv. 2007 (RO **2006** 3459; FF **1999** 1787).

[268]  Nouvelle teneur selon l'art. 43 de la LF du 10 oct. 1997 sur le blanchiment d'argent, en vigueur depuis le 1er avril 1998 (RO **1998** 892; FF **1996** III 1057).

[269]  Rectifié par la CdR de l'Ass. féd. (art. 33 LREC; RO **1974** 1051).

[270]  Introduit par le ch. I de la LF du 23 mars 1990, en vigueur depuis le 1er août 1990 (RO **1990** 1077; FF **1989** II 961).

[271]  Nouvelle teneur selon le ch. I de la LF du 18 mars 1994, en vigueur depuis le 1er août 1994 (RO **1994** 1614; FF **1993** III 269).

[272]  Nouvelle teneur du membre de phrase selon le ch. II 1 al. 16 de la LF du 13 déc. 2002, en vigueur depuis le 1er janv. 2007 (RO **2006** 3459; FF **1999** 1787).

Code pénal suisse                                                        **311.0**

de contraindre, par la violence ou la menace de violences, un fonctionnaire de l'établissement ou toute autre personne chargée de les surveiller à faire un acte ou à s'en abstenir,

ou de s'évader en usant de violence,

seront punis d'une peine privative de liberté de trois ans au plus ou d'une peine pécuniaire de 30 jours-amende au moins.[281]

2. Ceux d'entre eux qui auront commis des violences contre les personnes ou les propriétés seront punis d'une peine privative de liberté de cinq ans au plus ou d'une peine pécuniaire de 90 jours-amende au moins.[282]

## Titre 18
## Infractions contre les devoirs de fonction et les devoirs professionnels

### Art. 312

Abus d'autorité    Les membres d'une autorité et les fonctionnaires qui, dans le dessein de se procurer ou de procurer à un tiers un avantage illicite, ou dans le dessein de nuire à autrui, auront abusé des pouvoirs de leur charge, seront punis d'une peine privative de liberté de cinq ans au plus ou d'une peine pécuniaire.

### Art. 313

Concussion    Le fonctionnaire qui, dans un dessein de lucre, aura perçu des taxes, des émoluments ou des indemnités non dus ou excédant le tarif légal sera puni d'une peine privative de liberté de trois ans au plus ou d'une peine pécuniaire.

### Art. 314[283]

Gestion déloyale des intérêts publics    Les membres d'une autorité et les fonctionnaires qui, dans le dessein de se procurer ou de procurer à un tiers un avantage illicite, auront lésé dans un acte juridique les intérêts publics qu'ils avaient mission de défendre seront punis d'une peine privative de liberté de cinq ans au plus ou d'une peine pécuniaire. En cas de peine privative de liberté, une peine pécuniaire est également prononcée.[284]

---

[281]   Nouvelle teneur du membre de phrase selon le ch. II al. 16 de la LF du 13 déc. 2002, en vigueur depuis le 1er janv. 2007 (RO **2006** 3459; FF **1999** 1787).
[282]   Nouvelle teneur du membre de phrase selon le ch. II al. 16 de la LF du 13 déc. 2002, en vigueur depuis le 1er janv. 2007 (RO **2006** 3459; FF **1999** 1787).
[283]   Nouvelle teneur selon le ch. I de la LF du 17 juin 1994, en vigueur depuis le 1er janv. 1995 (RO **1994** 2290; FF **1991** II 933).
[284]   Nouvelle teneur du membre de phrase selon le ch. II al. 16 de la LF du 13 déc. 2002, en vigueur depuis le 1er janv. 2007 (RO **2006** 3459; FF **1999** 1787).

# EXHIBIT J

311.0

> *English is not an official language of the Swiss Confederation. This translation is provided for information purposes only and has no legal force.*

# Swiss Criminal Code

of 21 December 1937 (Status as of 1 July 2014)

*The Federal Assembly the Swiss Confederation,*

based on Article 123 paragraphs 1 and 3 of the Federal Constitution[1],[2]
and having considered a Federal Council Dispatch dated 23 July 1918[3],

*decrees:*

## Book One:[4] General Provisions
## Part One: Felonies and Misdemeanours
## Title One: Scope of Application

### Art. 1

1. No penalty without a law

No one may be punished for an act unless it has been expressly declared to be an offence by the law.

### Art. 2

2. Commencement of applicability of the Code

[1] This Code applies to any person who commits a felony or misdemeanour following the date on which it comes into force.

[2] Any person who commits a felony or misdemeanour prior to this Code coming into force is only subject to its terms in the event that the penalty hereunder is reduced than the penalty that would otherwise apply.

AS **54** 757, **57** 1328 and BS **3** 203
[1]   [BS **1** 3]. The said provision now corresponds to Art. 123 of the Federal Constitution of 18 April 1999 (SR **101**).
[2]   Amended by No I of the Federal Act of 30 Sept. 2011 in force since 1 July 2012 (AS **2012** 2575; BBl **2010** 5651 5677).
[3]   BBl **1918** IV 1
[4]   Amended by No I of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979).

Book Two: Specific Provisions                                                  **311.0**

### Art. 135[105]

Representations of acts of violence

[1] Any person who produces, imports, stores, markets, promotes, exhibits, offers, shows, makes accessible or makes available sound, film or video recordings or other products in which acts of extreme violence against persons or animals are portrayed, without reasonable cultural or scientific grounds therefor, and in doing so seriously offends basic human dignity is liable to a custodial sentence not exceeding three years or to a monetary penalty.

[1bis] Any person who acquires, procures by electronic or any other means, or possesses the recordings or other products mentioned in paragraph 1 above, provided these portray acts of violence against persons or animals is liable to a custodial sentence not exceeding one year or to a monetary penalty[106].[107]

[2] The articles concerned are forfeited.

[3] If the offender acts for financial gain, he is liable to a custodial sentence not exceeding three years or to a monetary penalty. The custodial sentence must be combined with a monetary penalty.[108]

### Art. 136[109]

Administering substances capable of causing injury to children

Any person who administers or makes available for consumption to children under the age of 16 alcoholic beverages or other substances in such quantities as may endanger their health is liable to a custodial sentence not exceeding three years or to a monetary penalty.

### Title Two:[110] Offences against Property

### Art. 137

1. Offences against property. Unlawful appropriation

1. Any person who for his own or for another's unlawful gain appropriates moveable property which belongs to another is liable, unless the special requirements of Articles 138-140 apply, to a custodial sentence not exceeding three years or to a monetary penalty.

---

[105]  Amended by No I of the Federal Act of 23 June 1989, in force since 1 Jan. 1990 (AS **1989** 2449 2456; BBl **1985** II 1009).
[106]  Penalties revised by No II 1 para. 16 of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979).
[107]  Inserted by No I of the Federal Act of 5 Oct. 2001 (Offences against Sexual Integrity; Prohibition of the Possession of hard-core Pornography), in force since 1 April 2002 (AS **2002** 408 409; BBl **2000** 2943).
[108]  Term in accordance with No II 1 para. 7 of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979). This amendment has been taken into account throughout the Second Book.
[109]  Amended by No I of the Federal Act of 20 March 2008, in force since 1 July 2011 (**2009** 2623, AS **2011** 2559; BBl **2006** 8573 8645).
[110]  Amended by No I of the Federal Act of 17 June 1994, in force since 1 Jan. 1995 (AS **1994** 2290 2307; BBl **1991** II 969).

2. If the offender has found the property or if the property has inadvertently come into his possession,

if he does not act for financial gain or

if he acts only to the detriment of a relative or family member,

the offence is prosecuted only on complaint.

### Art. 138

Misappropriation

1. Any person who for his own or another's unlawful gain appropriates moveable property belonging to another but entrusted to him,

any person who makes unlawful use of financial assets entrusted to him for his own or another's benefit,

is liable to a custodial sentence not exceeding five years or to a monetary penalty.

Misappropriation to the detriment of a relative or family member is prosecuted only on complaint.

2. Any person who commits the foregoing offence in his capacity as a member of a public authority, or as a public official, guardian, adviser, professional asset manager, or in the practice of a profession or a trade or the execution of a commercial transaction for which he has been authorised by a public authority, is liable to a custodial sentence not exceeding ten years or to a monetary penalty.[111]

### Art. 139

Theft

1. Any person who for his own or for another's unlawful gain, appropriates moveable property belonging to another person with the object of permanently depriving the owner of it is liable to a custodial sentence not exceeding five years or to a monetary penalty.

2. The offender is liable to a custodial sentence not exceeding ten years or to a monetary penalty of not less than 90 daily penalty units[112] if he commits theft on a regular basis for financial gain.

3. The offender is liable to a custodial sentence not exceeding ten years or to a monetary penalty of not less than 180 daily penalty units[113],

---

[111] Term in accordance with No II 1 para. 8 of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979). This amendment has been taken into account throughout the Second Book.

[112] Term in accordance with No II 1 para. 9 of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979). This amendment has been taken into account throughout the Second Book.

[113] Term in accordance with No II 1 para. 10 of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979). This amendment has been taken into account throughout the Second Book.

    a. Intentional homicide (Art. 111);

    b. Murder (Art. 112);

    c. Serious assault (Art. 122);

    c[bis].[200] Female genital mutilation (Art. 124);

    d. Robbery (Art. 140);

    e. False imprisonment and abduction (Art. 183);

    f. Hostage taking (Art. 185);

    g. Arson (Art. 221);

    h. Genocide (Art. 264);

    i. Crimes against humanity (Art. 264a);

    j. War crimes (Art. 264c–264h).[201]

[2] If the offender, of his own volition, does not complete the preparatory act, he is not liable to any penalty.

[3] It is also an offence for any person to carry out a preparatory act abroad, provided it was intended to commit the offences in Switzerland. Article 3 paragraph 2 applies.[202]

### Art. 260[ter] [203]

Criminal organisation

1. Any person who participates in an organisation, the structure and personal composition of which is kept secret and which pursues the objective of committing crimes of violence or securing a financial gain by criminal means,

any person who supports such an organisation in its criminal activities,

is liable to a custodial sentence not exceeding five years or to a monetary penalty.

2. The court has the discretion to mitigate the penalty imposed (Art. 48a)[204] if the offender makes an effort to foil the criminal activities of the organisation.

3. The foregoing penalties also apply to any person who commits the offence outside Switzerland provided the organisation carries out or

---

[200] Inserted by No I of the Federal Act of 30. Sept. 2011 in force since 1 July 2012 (AS **2012** 2575; BBl **2010** 5651 5677).

[201] Amended by No I 1 of the Federal Act of 18 June 2010 on the Amendment of Federal Legislation in Implementation of the Rome Statue of the International Criminal Court, in force since 1 Jan. 2011 (AS **2010** 4963; BBl **2008** 3863).

[202] Wording of the sentence in accordance with No II 2 of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979).

[203] Inserted by No I of the Federal Act of 18 March 1994, in force since 1 Aug. 1994 (AS **1994** 1614 1618; BBl **1993** III 277).

[204] Wording of the first part-sentence in accordance with No II 2 of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979).

intends to carry out its criminal activities wholly or partly in Switzerland. Article 3 paragraph 2 applies.[205]

### Art. 260[quater 206]

**Endangering public safety with weapons**

Any person who sells, hires, gifts, hands over or procures firearms, weapons prohibited by law, essential components of weapons, weapons accessories, ammunition or components of ammunition, although he knows or must assume that the weapons are intended to be used to commit a felony or misdemeanour is liable, provided his activities do not constitute a more serious offence, to a custodial sentence not exceeding five years or to a monetary penalty.[207]

### Art. 260[quinquies 208]

**Financing terrorism**

[1] Any person who collects or provides funds with a view to financing a violent crime that is intended to intimidate the public or to coerce a state or international organisation into carrying out or not carrying out an act is liable to a custodial sentence not exceeding five years or to a monetary penalty.

[2] If the person merely acknowledges the possibility that the funds may be used to finance terrorism, he does not commit an offence under this Article.

[3] The act does not constitute the financing of a terrorist offence if it is carried out with a view to establishing or re-establishing a democratic regime or a state governed by the rule of law or with a view to exercising or safeguarding human rights.

[4] Paragraph 1 does not apply if the financing is intended to support acts that do not violate the rules of international law on the conduct of armed conflicts.

### Art. 261

**Attack on the freedom of faith and the freedom to worship**

Any person who publicly and maliciously insults or mocks the religious convictions of others, and in particularly their belief in God, or maliciously desecrates objects of religious veneration,

any person who maliciously prevents, disrupts or publicly mocks an act of worship, the conduct of which is guaranteed by the Constitution, or

---

[205] Wording of the sentence in accordance with No II 2 of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979).

[206] Inserted by Art. 41 of the Weapons Act of 20 June 1997, in force since 1 Jan. 1999 (SR **514.54**).

[207] New designation of criminal penalties in accordance with No II 1 para. 16 of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979).

[208] Inserted by No I 1 of the Federal Act of 21 March 2003 (Financing of Terrorism), in force since 1 Oct. 2003 (AS **2003** 3043 3047; BBl **2002** 5390).

2 The court may waive the imposition of a penalty where the person committing an offence in terms of this Article is so closely related to the person receiving his assistance that his conduct is excusable.

### Art. 305[bis] [268]

Money laundering

1. Any person who carries out an act that is aimed at frustrating the identification of the origin, the tracing or the forfeiture of assets which he knows or must assume originate from a felony,

is liable to a custodial sentence not exceeding three years or to a monetary penalty.

2. In serious cases, the penalty is a custodial sentence not exceeding five years or a monetary penalty. A custodial sentence is combined with a monetary penalty not exceeding 500 daily penalty units.[269]

A serious case is constituted, in particular, where the offender:

    a.    acts as a member of a criminal organisation;

    b.    acts as a member of a group that has been formed for the purpose of the continued conduct of money laundering activities; or

    c.    achieves a large turnover or substantial profit through commercial money laundering.

3. The offender is also liable to the foregoing penalties where the main offence was committed abroad, provided such an offence is also liable to prosecution at the place of commission.[270]

### Art. 305[ter] [271]

Insufficient diligence in financial transactions and right to report [272]

1 Any person who as part of his profession accepts, holds on deposit, or assists in investing or transferring outside assets and fails to ascertain the identity of the beneficial owner of the assets with the care that is required in the circumstances is liable to a custodial sentence not exceeding one year or to a monetary penalty.[273]

2 The persons included in paragraph 1 above are entitled to report to the internal criminal justice authorities or the federal authorities desig-

---

[268] Inserted by No I of the Federal Act of 23 March 1990, in force since 1 Aug. 1990 (AS **1990** 1077 1078; BBl **1989** II 1061).

[269] Penalties revised by No II 1 para. 16 of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979).

[270] Corrected by the Drafting Committee of the Federal Assembly [Art. 33 GVG – AS **1974** 1051].

[271] Inserted by No I of the Federal Act of 23 March 1990, in force since 1 Aug. 1990 (AS **1990** 1077 1078; BBl **1989** II 1061).

[272] Amended by No I of the Federal Act of 18 March 1994, in force since 1 Aug. 1994 (AS **1994** 1614 1618; BBl **1993** III 277).

[273] Penalties revised by No II 1 para. 16 of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979).

2. Any participant who commits acts of violence against persons or property is liable to a custodial sentence not exceeding five years or to a monetary penalty of not less than 90 daily penalty units.[283]

## Title Eighteen:
## Offences against Official or Professional Duty

### Art. 312

Abuse of public office

Any member of an authority or a public official who abuses his official powers in order to secure an unlawful advantage for himself or another or to cause prejudice to another is liable to a custodial sentence not exceeding five years or to a monetary penalty.

### Art. 313

Overcharging of taxes

Any public official who for unlawful gain levies taxes, fees or other charges which are not due or which exceed the statutory rates is liable to a custodial sentence not exceeding three years or to a monetary penalty.

### Art. 314[284]

Misconduct in public office

Any member of an authority or public official who, in the course of a legal transaction and with a view to obtaining an unlawful advantage for himself or another, damages the public interests that he has a duty to safeguard is liable to a custodial sentence not exceeding five years or to a monetary penalty. A custodial sentence must be combined with a monetary penalty.[285]

### Art. 315–316[286]

---

[282]  Penalties revised by No II 1 para. 16 of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979).
[283]  Penalties revised by No II 1 para. 16 of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979).
[284]  Amended by No I of the Federal Act of 17 June 1994, in force since 1 Jan. 1995 (AS **1994** 2290 2307; BBl **1991** II 969).
[285]  Penalties revised by No II 1 para. 16 of the Federal Act of 13 Dec. 2002, in force since 1 Jan. 2007 (AS **2006** 3459 3535; BBl **1999** 1979).
[286]  Repealed by No I 1 of the Federal Act of 22 Dec. 1999 (Revision of the Criminal Law on Corruption) (AS **2000** 1121; BBl **1999** 5497).



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Artem Furman, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the following sections of the attached document Swiss Criminal Code 311.0  from French into English.

137

138

260ter

305bis

312

314

Artem Furman

Sworn to before me this

15th day of August 2014

Signature, Notary Public

ADAM M SCHEFFLAN
Notary Public ~ State of New York
No. 01SC6298049
Qualified in NEW YORK County
My Commission Expires MAR 10, 2018

Stamp, Notary Public

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 80 CITIES WORLDWIDE

Ex. J
Page 137

# EXHIBIT K

République et canton de Genève
**POUVOIR JUDICIAIRE**
**Ministère public**

Genève, le 9 mai 2014

CP/73/2012SCJ

1211 GENEVE 3

**R** 98.41.900053.10030007

Ministère public
Route de Chancy 6 B
Case postale 3565
CH - 1211 GENEVE 3
www.geneve.ch

Monsieur
KHRAPUNOV Viktor
c/o Me HENZELIN Marc
Lalive Avocats
Rue de la Mairie 35
Case postale 6569
1211 Genève 6

Réf : **CP/73/2012** - SCJ
à rappeler lors de toute communication

REÇU le
1 2 MAI 2014

Ministère public • Case postale 3565 • www.geneve.ch
- Tél : +4122 327 64 63/64 • • www.geneve.ch/tribunaux
Horaires d'ouverture : Horaire guichet : 8h-12h 14h-17h / tél : 8h30-12h 14h-17h
Ligne de bus : Accès TPG : 14 arrêt Quidort / 2, 19 arrêt Claire-Vue • Accès parking : • Accès handicapés :
F_MP211 • IBA • Recommandé

**Ex. K**
**Page 138**



République et canton de Genève
**POUVOIR JUDICIAIRE**
**Ministère public**

Genève, le 9 mai 2014

*Recommandé*

Route de Chancy 6B
Case postale 3565
1211 Genève 3

Monsieur Marc Henzelin
Avocat
Lalive Avocats
Rue de la Mairie 35
Case postale 6569
1211 Genève 6

> Réf : CP/73/2012 – *OFJ* B 228'000
> à rappeler lors de toute communication.

Maître,

Je vous annexe, pour notification, une décision admettant la participation d'enquêteurs kazakhs aux prochaines auditions des époux Khrapunov.

D'éventuels ajustements seront effectués au fur et à mesure du déroulement des auditions, dans le respect de la jurisprudence relevante et des principes de non transmission d'information avant la clôture formelle de l'entraide, sauf accord entre les intéressés.

Sur le plan pratique, considérant que la deuxième semaine de juin comporte un jour férié, je vous propose d'en réserver soit la première semaine (du 2 au 6) soit la troisième (du 16 au 20) pour une première série d'auditions, de Leila Khrapunova plutôt que de son époux qui semble peu au fait des opérations immobilières visées.

Vous êtes invités à tenter de vous mettre d'accord entre vous sur ces points et de me le faire savoir dès que possible.

Dans l'intervalle, je vous prie d'agréer, Maître, mes salutations distinguées.

Jean-Bernard Schmid
Procureur

Annexe : mentionnée



République et Canton de Genève
**POUVOIR JUDICIAIRE**
**Ministère public**

Genève, le 9 mai 2014

Ministère public
Route de Chancy 6B
Case postale 3565
CH - 1211 Genève 3

Réf : CP 73/2012 - *OFJ* B 228'000

---

## ENTRAIDE INTERNATIONALE PENALE
Participation aux actes d'entraide - EIMP 65*a*

---

La République du Kazakhstan a sollicité de pouvoir participer, à Genève, aux auditions des époux Khrapunov entendus en exécution de leur demande d'entraide du 20 février 2012.

Invités à formuler leurs observations, les époux Khrapunov, par leurs avocats constitués, ne se sont pas opposés à cette demande de participation, sous les réserves usuelles et sans accès au dossier (entretien du 15.04.2014) ; invités à leur tour à se déterminer, les avocats de l'autorité requérante ont déclaré admettre ces restrictions lors d'un entretien téléphonique (du 08.05.2014) avec le procureur en charge de la procédure.

Considérant la complexité du dossier, notamment des opérations immobilières en cause, il se justifie d'autoriser les enquêteurs kazakhs à participer aux auditions des époux Khrapunov, en s'assurant que les éléments factuels dont ils prendraient ainsi connaissance ne soient pas utilisés comme moyens de preuve dans leur procédure avant la clôture formelle de la procédure d'entraide (art. 80*d* EIMP ; 65*a*, EIMP et 26 al. 2 OEIMP).

### Le Ministère public

**Autorise** trois enquêteurs que l'autorité requérante désignera à participer aux auditions des époux Khrapunov pour autant qu'ils s'engagent - selon les termes de la formule annexée - à ne pas utiliser comme moyen de preuve, dans leur procédure, avant la clôture formelle de l'entraide par une décision entrée en force, les éléments factuels dont ils prendront ainsi connaissance.

**Limite** leur accès au dossier à ces auditions, sauf accord entre tous les intéressés s'agissant notamment de la consultation de procès-verbaux d'auditions déjà effectuées.

**Notification** : Epoux Khrapunov et autorité requérante, par leurs avocats constitués.

**Communication** : Office fédéral de la justice, Entraide judiciaire internationale, Bundesrain 20, 3003 Berne (*art. 25 al. 3, 80h let. a EIMP ; 3, 5 OEIMP*).

**Recours** (*art. 80e - 80l EIMP*) : Quiconque subit un préjudice immédiat et irréparable de la participation des agents étrangers autorisée par la présente peut recourir dans les **dix jours** devant la cour des plaintes du Tribunal pénal fédéral, cp 2720, 6501 Bellinzone.

Ingrid Bal
Greffière

Jean-Bernard Schmid
Procureur

# EXHIBIT L

[logo]   Republic and Canton of Geneva                     Geneva, May 9, 2014
         **THE JUDICIAL BRANCH**
         **Office of the Public Prosecutor**

                                                                        CP/73/2012SCJ

                                          1211 Geneva 3
                                          R [bar code]
                                          98.41.900053.10030007

Office of the Public Prosecutor
Route de Chancy 6 B
Case postale 3565
CH-1211 GENEVA 3
www.geneve.ch

                                          Mr. Viktor KHRAPUNOV
                                          c/o Marc HENZELIN, Attorney at Law
                                          Lalive Avocats
                                          Rue de la Mairie 35
                                          Case postale 6569
                                          1211 Geneva 6

Ref. No.: CP/73/2012 – SCJ
Please refer to this number when writing.

                                          RECEIVED on
                                          May 12, 2014

Office of the Public Prosecutor – Case postale 3565 – www.geneve.ch
Tel:+4122 327 64 63/64 ** www.geneve.ch/tribunaux
Office hours: Cashier: 8 AM-12 Noon 2-5 PM / Tel. 8:30AM 12 Noon – 2-5 PM
Bus line: Access TPG: Stop 14 Quidort/2, Stop 19 Claire-Vue - Parking: Handicap access
F_MP211 – IBA - Certified

**Ex. L**
**Page 141**

[logo]   Republic and Canton of Geneva                    Geneva, May 9, 2014
         **THE JUDICIAL BRANCH**
         **Office of the Public Prosecutor**

                                                                 *Certified Mail*

Route de Chancy 6B
Case postale 3565
1211 Geneva 3

                                                        Mr. Marc Henzelin
                                                        Attorney at Law
                                                        Lalive Avocats
                                                        Rue de la Mairie 35
                                                        Case postale 6569
                                                        1211 Geneva 6

Ref. No.: CP/73/2012 – *OFJ*B 228'000
Please refer to this number when writing.

Dear Sir:

Enclosed for your information is a decision approving the participation of Kazakh investigators in the upcoming hearings of Mr. and Mrs. Khrapunov.

Any adjustments will be made as the hearings proceed, in compliance with pertinent case precedent and the principles of non-transmission of information before the formal termination of assistance, unless otherwise agreed by the parties concerned.

On the practical level, given that the second week of June includes a legal holiday, I suggest that we reserve either the first week (June 2-6) or the third week (June 16-20) for an initial series of hearings of Leila Khrapunova rather than her husband, who does not seem very knowledgeable about the real-property transactions in question.

Please try to obtain an agreement on these points and inform me of the outcome as soon as possible.

                                                        Yours sincerely,

                                                        Jean-Bernard Schmid
                                                        [signature]
                                                        Prosecutor

                                                        [stamp:]
                                                        Office of the Public Prosecutor,
                                                        Republic and Canton of Geneva]

Enclosure:  as indicated

**Ex. L**
**Page 142**

[logo]   Republic and Canton of Geneva

Geneva, May 9, 2014

**THE JUDICIAL BRANCH**
**Office of the Public Prosecutor**

Route de Chancy 6B
Case postale 3565
CH-1211 Geneva 3

Ref. No.: CP/73/2012 – *OFJ*B 228'000

**INTERNATIONAL ASSISTANCE IN PENAL MATTERS**
Participation in Acts of Cooperation – EIMP 65*a*

The Republic of Kazakhstan has asked that it be permitted to participate, in Geneva, in the hearings of Mr. and Mrs. Khrapunov, examined in execution of their request for assistance dated February 20, 2012.

When asked to comment, Mr. and Mrs. Khrapunov, through their attorneys, did not object to this request for participation, subject to the customary reservations about access by the participating authority to the case file (conversation on April 15, 2014). When asked for their opinion, the attorneys for the petitioning authority accepted these restrictions during a telephone conversation (on May 8, 2014) with the prosecutor in charge of the proceedings.

In view of the complexity of the case, particularly the real-property transactions in question, justification exists for authorizing the Kazakh investigators to participate in the hearings of Mr. and Mrs. Khrapunov, with the obtaining of assurance that the factual elements of which the investigators may learn will not be used as evidence in their proceeding before the formal termination of the cooperation procedure (Articles 80*d* EIMP [Swiss Federal Law on International Assistance in Penal Matters]; 65*a*, EIMP, and 26 (2) OEIMP) [Order on EIMP].

**The Office of the Public Prosecutor**

**Authorizes** three investigators, to be designated by the petitioning authority, to participate in the hearings of Mr. and Mrs. Khrapunov, provided that said investigators undertake—pursuant to the terms of the attached form—to refrain from using the factual elements of which they learn as evidence in their proceeding before formal termination of the cooperation in the form of a decision that has become final;

**Limits** their access to the case file to these hearings, unless otherwise agreed among all the parties concerned, concerning in particular the consultation of minutes of hearings already held.

**Service of notice**: Upon Mr. and Mrs. Khrapunov and the petitioning authority, through their attorneys at law.

**Communication**: Federal Office of Justice, International Judicial Assistance, Bundesrain 20, 3003 Bern (*Articles 25 (3), 80h (a) EIMP; 3, 5 OEIMP*).

**Recourse** (*Arts. 80e-801 EIMP*): Anyone who suffers immediate and irreparable damage because of the participation of the foreign agents hereby authorized may appeal within **ten days** to the Court of Complaints of the Swiss Federal Criminal Court, Case postale 2720, 6501 Bellinzone.

[signature]                                              [signature]
Ingrid Bal                                               Jean-Bernard Schmid
Clerk of the Court                                       Prosecutor

[stamped seal:
Office of the Public Prosecutor,
Republic and Canton of Geneva]

_____

**Ex. L**
**Page 143**

**TRANSPERFECT**

City of San Francisco, State of California, County of San Francisco

I, Jessica Ayler-Kelly, hereby certify that the document, "Attachment 7_EN" is, to the best of my knowledge and belief and within the given parameters, a true and accurate translation from French to English.

_____
Jessica Ayler-Kelly

Sworn to before me this

_____
August 15, 2014

_____
Signature, Notary Public

HEATHER SULLIVAN
Commission # 2040034
Notary Public - California
San Francisco County
My Comm. Expires Sep 1, 2017

_____
Stamp, Notary Public