JAN LAWRENCE HANDZLIK, APC
Jan L. Handzlik (Bar No. 047959)
jhandzlik@handzliklaw.com
515 South Flower Street, 36th Floor
Los Angeles, CA 90071-2221
1.213.236.3519 Direct
1.213.236.3501 Facsimile

Attorney for Defendants Elvira Kudryashova (individually and as trustee of the Kasan Family Trust), Dmitry Kudryashov (individually and as trustee of the Kasan Family Trust), RPM USA, LLC, RPM-Maro, LLC, Maro Design LLC, Haute Hue LLC, 628 Holdings LLC, and Candian International Ltd.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CITY OF ALMATY, a foreign state,<br><br>Plaintiff,<br><br>v.<br><br>VIKTOR KHRAPUNOV, an individual, *et al.*,<br><br>Defendants. | Case No. CV14-3650-FMO-CW<br><br>[**DISCOVERY MATTER**]<br><br>**JOINT STIPULATION RE: DEFENDANTS' MOTION TO COMPEL COMPLETE AND PROPER RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES**<br><br>**[Filed Concurrently with Declaration of Jan L. Handzlik]**<br><br>Judge: Hon. Fernando M. Olguin<br>Magistrate Judge: Hon. Carla Woehrle<br><br>Hearing Date: June 30, 2015<br>Hearing Time: 10:00 a.m.<br>Courtroom: 640<br><br>Action Filed: May 13, 2014<br>Discovery Cut-off: July 3, 2015<br>Pre-Trial Conference: January 8, 2016<br>Trial Date: January 26, 2016 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................... 1

I. PRELIMINARY STATEMENTS .................... 1

A. Defendants' Preliminary Statement .................... 1

B. Plaintiff City of Almaty's Preliminary Statement .................... 4

II. THE INTERROGATORIES AT ISSUE .................... 8

A. DEFENDANTS' SPECIAL INTERROGATORY NO. 1 .................... 8

i. Defendant's Argument .................... 9

ii. Plaintiff's Argument .................... 12

B. DEFENDANTS' INTERROGATORY NO. 2: .................... 16

i. Defendants' Argument .................... 17

ii. Plaintiff's Argument .................... 20

C. DEFENDANTS' SPECIAL INTERROGATORY NO. 3: .................... 23

i. Defendants' Argument .................... 24

ii. Plaintiff's Argument .................... 27

D. DEFENDANTS' SPECIAL INTERROGATORY NO. 4: .................... 31

i. Defendants' Argument .................... 31

ii. Plaintiff's Argument .................... 34

E. DEFENDANTS' SPECIAL INTERROGATORY NO. 5: .................... 37

i. Defendants' Argument .................... 38

ii. Plaintiff's Argument .................... 40

F. DEFENDANTS' SPECIAL INTERROGATORY NO. 7: .................... 44

i. Defendants' Argument .................... 44

ii. Plaintiff's Argument .................... 47

G. DEFENDANTS' SPECIAL INTERROGATORY NO. 8: .................... 49

i. Defendants' Argument .................... 51

ii. Plaintiff's Argument .......... 54

H. DEFENDANTS' SPECIAL INTERROGATORY NO. 9: .......... 57

i. Defendants' Argument .......... 66

ii. Plaintiff's Argument .......... 70

I. DEFENDANTS' SPECIAL INTERROGATORY NO. 10: .......... 72

i. Defendants' Argument .......... 82

ii. Plaintiff's Argument .......... 85

J. DEFENDANTS' SPECIAL INTERROGATORY NO. 11: .......... 87

i. Defendants' Argument .......... 90

ii. Plaintiff's Argument .......... 92

K. DEFENDANTS' SPECIAL INTERROGATORY NO. 12: .......... 92

i. Defendants' Argument .......... 95

ii. Plaintiff's Argument .......... 98

L. DEFENDANTS' SPECIAL INTERROGATORY NO. 13: .......... 98

i. Defendants' Argument .......... 101

ii. Plaintiff's Argument .......... 103

M. DEFENDANTS' SPECIAL INTERROGATORY NO. 14: .......... 103

i. Defendants' Argument .......... 106

ii. Plaintiff's Argument .......... 108

N. DEFENDANTS' SPECIAL INTERROGATORY NO. 15: .......... 108

i. Defendants' Argument .......... 112

ii. Plaintiff's Argument .......... 114

O. DEFENDANTS' SPECIAL INTERROGATORY NO. 16: .......... 114

i. Defendants' Argument .......... 120

ii. Plaintiff's Argument .......... 122

P. DEFENDANTS' SPECIAL INTERROGATORY NO. 17: .......... 122

i. Defendants' Argument .......... 134

ii. Plaintiff's Argument .......... 137

Q. DEFENDANTS' SPECIAL INTERROGATORY NO. 18: ... 137
- i. Defendants' Argument ... 149
- ii. Plaintiff's Argument ... 151

R. DEFENDANTS' SPECIAL INTERROGATORY NO. 19: ... 151
- i. Defendants' Argument ... 157
- ii. Plaintiff's Argument ... 160

S. DEFENDANTS' SPECIAL INTERROGATORY NO. 20: ... 160
- i. Defendants' Argument ... 163
- ii. Plaintiff's Argument ... 166

T. DEFENDANTS' SPECIAL INTERROGATORY NO. 21: ... 166
- i. Defendants' Argument ... 171
- ii. Plaintiff's Argument ... 174

U. DEFENDANTS' SPECIAL INTERROGATORY NO. 23: ... 174
- i. Defendants' Argument ... 176
- ii. Plaintiff's Argument ... 178

V. DEFENDANTS' SPECIAL INTERROGATORY NO. 24: ... 180
- i. Defendants' Argument ... 180
- ii. Plaintiff's Argument ... 182

W. DEFENDANTS' SPECIAL INTERROGATORY NO. 25: ... 182
- i. Defendants' Argument ... 185
- ii. Plaintiff's Argument ... 186

III. DEFENDANTS' CONCLUSION ... 186

IV. PLAINTIFF'S CONCLUSION ... 186

**INTRODUCTION**

Pursuant to Local Rule 37-2, Defendants Elvira Kudryashova (individually and as trustee of the Kasan Family Trust), Dmitry Kudryashov (individually and as trustee of the Kasan Family Trust), RPM USA, LLC, RPM-Maro, LLC, Maro Design LLC, Haute Hue LLC, 628 Holdings LLC, and Candian International Ltd. (collectively, "Defendants"), and Plaintiff the City of Almaty ("Plaintiff" or "Almaty"), respectfully submit the following Joint Stipulation regarding Defendants' Motion to Compel Complete and Proper Responses to Defendants' First Set of Interrogatories (the "Interrogatories"). Defendants sent a meet and confer letter pursuant to Local Rule 37-1 on April 30, 2015. The parties met and conferred on May 4, 2015. However, the parties were unable to eliminate the necessity of judicial intervention.

**I. PRELIMINARY STATEMENTS**

**A. Defendants' Preliminary Statement**

Plaintiff's responses to Defendants' Interrogatories are plainly defective in multiple respects. Because Plaintiff completely failed to respond to Defendants' First Set of Special Interrogatories, on April 7, 2015, this Court held that Plaintiff has waived all objections to Defendants' Interrogatories aside from privilege objections. (Dkt. 81). Since the Court's order, Plaintiff has served two sets of responses. Neither set has respected the Court's order that Plaintiff may object only on the basis of privilege. The first was served on April 21, 2015, and despite having waived all objections other than privilege, Plaintiff still refused to provide responses to several interrogatories. (Plaintiff City of Almaty's Responses and Objections to Defendants' First Set of Interrogatories, Nos. 1-5, 7, 23-24, Declaration of Jan L. Handzlik ("Handzlik Dec.") Ex. C). A month later, Plaintiff served a supplemental set of responses and objections, but rather than provide full and complete answers to Defendants' straightforward questions, Plaintiff instead decided to use a variety of creative objections and evasive responses to attempt to

deny Defendants the highly relevant information they seek. (Plaintiff City of Almaty's Amended and Supplemental Responses and Objections to Defendants' First Set of Special Interrogatories (Nos. 1-25) ("Supplemental Responses and Objections"), Handzlik Dec. Ex. E).

*First*, Plaintiff attempts to provide non-privilege objections based on confidentiality or privacy. (General Objections 4-6, Supplemental Responses and Objections, Handzlik Dec. Ex. E). Plaintiff also objects on the grounds that information is purportedly outside of Almaty's possession, custody, or control. (*Id*., General Objection 7). Plaintiff waived *all* of these objections. (Dkt. 81). And, in any event, as Defendants already demonstrated in their Motion to Compel Production of Documents, there is no legal separation between the Government of Kazakhstan and its administrative division, Almaty. (*See* Defendants' Portion of Joint Stipulation Re: Defendants' Motion to Compel Production of Documents, at 3:3-4:8 (Dkt. 69-1); Declaration of Professor Peter B. Maggs (Dkt. 69-4)). Thus, any information "available" to the Government of Kazakhstan is "available" to Almaty, and should be provided. *See* Rule 33(b)(1)(B).

*Second*, it is clear that the Interrogatories seek non-privileged, factual information. *See Moore v. Dollar Tree Stores, Inc*., No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 (E.D. Cal. May 16, 2014) ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege."). Yet, Plaintiff asserts blanket privilege objections. Further undermining Plaintiff's privilege objections is that many of the Interrogatories implicate foreign law. However, Plaintiff has provided no legal or factual basis for its privilege objections under foreign law.

Plaintiff also attempts to hide behind the "law enforcement investigatory privilege" (General Objection No. 3, Supplemental Responses and Objections,

Handzlik Dec. Ex. E), but does not identify what, if any, information supposedly subject to this privilege was withheld and why it is protected under the law enforcement investigatory privilege. *See Kerr v. U.S. Dist. Court for N. Dist. of Cal.*, 511 F.2d 192, 198 (9th Cir. 1975) (rejecting a blanket invocation of the law enforcement privilege because the "privilege must be formally asserted and delineated in order to be raised properly").

*Third*, Plaintiff's objections are defective in that they are not made with specificity, as required by Rule 33(b)(4). *See also Lynn v. Monarch Recovery Mgmt., Inc.*, 285 F.R.D. 350, 356 (D. Md. 2012) ("[O]bjections to interrogatories must be specific, non-boilerplate, and supported by particularized facts where necessary to demonstrate the basis for the objection."); *Heller v. City of Dallas*, 303 F.R.D. 466, 485 (N.D. Tex. 2014) ("A party served with written discovery must [among other things] affirmatively explain whether any responsive information or documents have been withheld.").

*Fourth*, to the extent Plaintiff purports to answer Defendants' Interrogatories, the responses are evasive and fail to provide complete answers. Plaintiff employs a highly improper technique of "interpreting" unambiguous and straightforward Interrogatories in a manner that drastically limits their scope. For example, Interrogatory Nos. 9, 10, 17, and 18 request detailed information relating to both the allegedly improper real estate transactions, the conspiracy relating to these transactions, as well as information relating to real estate sales in Almaty in general. In response, Plaintiff "interprets" each of these detailed requests "as seeking information sufficient to identify the real properties illegally converted by Defendants . . . ." (Supplemental Responses and Objections Nos. 9, 10, 11, 14, 17, 18, 19, and 21, Handzlik Dec. Ex. E). This is improper. *See Former S'holders of Cardiospectra, Inc. v. Volcano Corp.*, No. 12-CV-01535-WHO, 2013 WL 5513275, at *2-3 (N.D. Cal. Oct. 4, 2013) (compelling further responses to interrogatories

where prior responses incorporated the complaint and were not responsive to the corresponding interrogatory).

Further, many of Plaintiff's answers are not responsive to the question asked, and mostly just recite the allegations in the SAC. The Rules of Civil Procedure require that the responding party conduct a "reasonable inquiry" to properly answer Defendants' Interrogatories. Fed. R. Civ. Proc. 26(g)(1); *Nat'l Acad. of Recording Arts & Sciences, Inc. v. On Point Events, LP*, 256 F.R.D. 678, 680 (C.D. Cal. 2009) ("A party has an obligation to conduct a reasonable inquiry into the factual basis of its discovery responses."); *see also* Advisory Committee Notes to 1983 Amendment to Rule 26, Subdivision (g). Plaintiff either did not do so or has again decided to play "hide the ball," intentionally withholding relevant information. Having filed this case over a year ago, and with just a few weeks left of fact discovery, the Court should compel Plaintiff to comply with its discovery obligations and immediately serve supplemental responses that fully and directly respond to all of Defendants' Interrogatories.

**B. Plaintiff City of Almaty's Preliminary Statement**

Defendants seek to use this litigation to obtain evidence to assist in the defense of separate criminal investigations brought against them by different agencies and governments. They seek among other things the identity of every agency and investigator who is currently investigating them, the identity of all informants who have provided evidence against them, and evidence obtained by law enforcement agencies throughout the world.

Pursuant to the Court's order (Dkt. 81), on April 21, 2015 Almaty served responses to Defendants' Interrogatories. Following a meet and confer teleconference, Almaty supplemented its responses on May 22, 2015. Almaty has responded to the Interrogatories to the best of its information, knowledge and belief after reasonable inquiry, and any additional information sought is either not within Almaty's control or is privileged. Thus, the Motion should be denied in its entirety.

Defendants argue that the Court's April 7 ruling means that Almaty has "waived" objections regarding information within its possession, custody, or control, and now is obligated to provide such information. Obviously, it cannot do so. The duty to provide information within a party's possession, custody, and control is not an "objection" that can be waived and, in any event, Almaty is unable to provide information that it does not have access to or control over.

Defendants incorrectly argue that the City of Almaty and the government of Kazakhstan should be construed as the same entity, and the Almaty should therefore be obligated to provide information concerning the Kazakhstan government's investigation of Defendants' embezzlement and fraud. This argument is nonsensical. Defendants cite no legal authority that states that Almaty possesses, has custody, or controls information possessed by any and all government entities in the country of Kazakhstan. Instead, they have produced only a single vague and conclusory declaration containing an opinion that does not come close to making the required showing. *United States ex re. Kester v. Novartis Pharm. Corp*., 2014 U.S. Dist. LEXIS 164222 (S.D.N.Y. Nov. 24, 2014) ("the mere fact that a state or a state agency sues does not mean that the records of all state agencies may be discovered[.] Rather, there must be a showing that the agency at issue has control over requested information"); C*olo. v. Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652 (D.D.C. May 8, 2007) (the court "will not aggregate separate state government agencies without a strong showing [of control] by defendants").

The principle questions are (1) which governmental entities are considered parties to the case and (2) whether those entities exercise "control" over the information sought. *See New York v. Amtrak*, 233 F.R.D. 259, 266 (N.D.N.Y. 2006). The question of control turns on whether "the party is legally entitled to" or "has the practical ability to acquire" information from a third party. *Gross v. Lunduski*, 304 F.R.D. 136 (W.D.N.Y. 2014). Further, "[t]he burden of establishing control [] rests with the demanding party." *Amtrak*, 233 F.R.D. at 268. In *Amtrak*,

the court denied a motion to compel production of documents in the possession of the New York Office of the State Comptroller from Plaintiff New York Department of Transportation because "DOT and OSC are not interrelated agencies, do not have a similar mission, and are situated at different spectrums of New York State governance . . . They [] do not have the ability to share or control the other agency's agenda, documents or personnel." *Id.* at 264-65. Similarly, the City of Almaty does not control any other government agency in Kazakhstan. In support of their effort to equate Almaty with every other Kazakhstan government body, Defendants contend that Almaty is "subordinate" to the central Kazakhstan government, but they make no showing that Almaty has access to or control over information known to any other agency of the Kazakhstan government, let alone *every* governmental body in the entire country.

Plaintiff has obtained a declaration from Sergey Perov, the Deputy Chief of the Department for Pre-Court Criminal Investigations of the Anti-Corruption Service of the Republic of Kazakhstan (the "Financial Police"), which is responsible for the ongoing investigation of Defendants in Kazakhstan. (*See* Declaration of Sergey Perov, ¶ 1.) As stated in this declaration, Defendants' Interrogatories seek "confidential information [disclosure of which] would be harmful to the [] ongoing investigation." (*Id.*, ¶ 6.) Mr. Perov explains that "[i]nvestigators are still pursuing leads that would be revealed through disclosure of [] confidential documents, which include lists of potential witnesses and documents that show the nature of key evidence. Disclosure may reveal details of the investigation to perpetrators or their accomplices that are still at large, allowing them to escape arrest or conceal assets." (*Id.*; *see also* Declaration of Ulukbek Maxatbekuulu ("Maxatbekuulu Decl."), ¶¶ 8-11.) Almaty is the victim of the Defendants' crimes, and does not control the Financial Police's investigation, nor does it have access to or control over the Financial Police's investigatory files. (*See* Declaration of Bauyrzhan Darmanbekov on behalf of the City of Almaty, ¶ 3.)

Defendants' requests are improper for the separate and independent reason that they seek information protected from disclosure by the law enforcement investigatory privilege. This privilege prevents disclosure of information relevant to techniques, procedures and ongoing investigations, and is intended to preserve the confidentiality of sources, protect and safeguard the privacy of witnesses and law enforcement personnel, and prevent interference with investigations. *E.g. Jones v. City of Indianapolis* (S.D. IN. 2003) 216 F.R.D. 440, 443-444; *Kerr v. United States Dist. Court*, 511 F.2d 192, 198 (9th Cir. 1975); *Al-Kidd v. Gonzales*, 2007 U.S. Dist. LEXIS 90548 (D. Idaho Dec. 10, 2007). In the course of fulfilling its duty to conduct a reasonable inquiry, Almaty made inquiries with the Financial Police, who refused to provide the requested information. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Similarly, to the extent other countries' government authorities are investigating the Defendants' crimes, the laws of those countries prevent Almaty from disclosing any information in Almaty's possession during the pendency of those countries' investigations. *E.g.*, Swiss Criminal Code § 293. Defendants contend otherwise, but cite no authority for their interpretation of foreign laws that are plain on their face.

Information communicated to Almaty's U.S. attorneys is not subject to disclosure, as Defendants appear to (and must) concede, because the attorney-client privilege specifically protects such information. *See, e.g., United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (citing *United States v. Kovel*, 296 F.2d 918 (2nd Cir. 1961); *United States v. Torf* (In re Grand Jury Subpoena), 357 F.3d 900, 907 (9th Cir. 2004). Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Defendants' other objections are also without merit – Almaty's privilege objections are specific and not boilerplate, and Almaty has responded to the Interrogatories to the best of its knowledge, information, and belief formed after a reasonable inquiry. For these reasons, the Motion to Compel should be denied.[1]

## II. THE INTERROGATORIES AT ISSUE

### A. DEFENDANTS' SPECIAL INTERROGATORY NO. 1:

IDENTIFY all PERSONS requested, directly or indirectly, by YOU and/or the Kazakh GOVERNMENT to investigate DEFENDANTS.

**PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 1:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty further objects to this Interrogatory to the extent it seeks information regarding confidential law enforcement investigations of the Defendants' criminal activities conducted by the Swiss government, including without limitation the Public Prosecutor of Geneva, because the disclosure of such information would violate Article 293 of the Swiss Criminal Code.

Without waiving such objections, the City of Almaty answers as follows: The Investigation Team of the Anti-Corruption Service of Kazakhstan is currently conducting an investigation of Mr. Viktor Khrapunov and other members of his family and associates for violations of multiple provisions of the Criminal Code of the Republic of Kazakhstan, including Article 176 (Conversion or Embezzlement of Property), Article 177 (Fraud), Article 193 (Legalization of Monetary Funds or Other Property Obtained Illegally), Article 235 (Creation, Guidance, and/or Participation in an Organized Criminal Group or Criminal Association), Article 307 (Abuse of

---

[1] Plaintiff notes that each of Defendants' arguments in support of the disputed Interrogatories are virtually identical. Defendants' section of the Joint Stipulation is, again, largely a "cut and paste" exercise. To ensure a complete record, Plaintiff has responded to each request, and corresponding argument. Plaintiff notes the repetition to assist the Court in its effort to consider what appears to be an extremely long pleading.

Official Powers), and Article 311 (Acceptance of a Bribe). Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. <u>Defendant's Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 1 seeks information not available to Almaty." All such objections should be disregarded.

Plaintiff refused to even answer this Interrogatory in its April 21, 2015 Responses and Objections. Although Plaintiff's May 22, 2015 Supplemental Responses and Objections purports to respond to this Interrogatory, it does not comply with the Court's order, nor does it fulfill Plaintiff's discovery obligations. Plaintiff still has not identified a single "PERSON," much less "all PERSONS," that Plaintiff or the Kazakh government has requested investigate the Defendants. This information is clearly relevant, as such persons are likely to possess information relevant to Plaintiff's claims. Moreover, Plaintiff should not be permitted to avoid fully answering this Interrogatory based on a trumped-up distinction between the City of Almaty and the Government of Kazakhstan. As Defendants have already shown by expert testimony, "there is no formal legal separation between the City of Almaty and the Government of Kazakhstan. The government of the City of Almaty is, in all legal respects, an instrument of and subordinate to the central Kazakh government. The President ultimately has control over almost every facet of provincial governance. Provincial governments hold no real independent authority in Kazakhstan." (Declaration of Professor Peter B. Maggs in Support of

Defendants' Motion to Compel Production of Documents (Dkt. 69-4, at ¶¶ 17-18)). Plaintiff should be compelled to fully and properly answer this Interrogatory, including information available to the Government of Kazakhstan.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants merely ask for the identification of individuals and entities involved in investigating Defendants. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts

give rise to a particular violation are not protected by the work-product privilege."). The identity of the entities and individuals that have investigated Defendants on behalf of Kazakhstan are facts that cannot be shielded by privilege.

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

*Finally*, Plaintiff objects to this Interrogatory on the ground that it would "violate Article 293 of the Swiss Criminal Code." Plaintiff has waived objections on the basis of confidentiality. Even if it had not, this objection is inaccurate, as this provision of the Swiss Criminal Code is intended to protect the privacy of persons who are the subjects of a Swiss investigation – in this case, Defendants and defendants who were previously dismissed from this action. The provision is not intended to prevent the disclosure of information to *them*, but to protect them by prohibiting the disclosure of information to others. In addition, any information from the Swiss investigation that is in Plaintiff's possession or under its control must have been provided to Plaintiff by the Swiss authorities. It does not make sense for Plaintiff to now claim confidentiality for information that is not confidential to Defendants, and in any event, has been obtained by Plaintiff from the Swiss authorities.

Plaintiff should be compelled to immediately and fully respond to this Interrogatory.

**ii. Plaintiff's Argument**

Defendants, who are accused of serious crimes, are seeking the identity of agencies and individuals investigating them. Almaty has answered to the best of its ability without waiving any applicable privileges. Almaty has identified the entity within Kazakhstan that is investigating Defendants, specifically, the Investigation Team of the Anti-Corruption Service of the Republic of Kazakhstan (the "Financial Police"). At this time, Almaty has no other non-privileged information regarding which agencies or individuals at such agencies are conducting investigations. Moreover, Defendants' requests for the identity of investigative agencies and/or personnel is clearly improper and objectionable pursuant to the law enforcement investigatory privilege.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government regarding any agency or individual that received a request to investigate Defendants. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with the entire "Government of Kazakhstan" other than a vague, conclusory declaration that does not come close to making the required showing. *United States ex re. Kester v. Novartis Pharm. Corp*., 2014 U.S. Dist. LEXIS 164222 (S.D.N.Y. Nov. 24, 2014) ("the mere fact that a state or a state agency sues does not mean that the records of all state agencies may be discovered[.] Rather, there must be a showing that the agency at issue has control over requested information"); C*olo. v. Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652 (D.D.C. May 8, 2007) (noting that the court "will not aggregate separate state government agencies without a strong showing [of control] by defendants"). Almaty is a party to this

case, but does not exercise "control" over information relating to the investigation of Defendants by other agencies. *See New York v. Amtrak*, 233 F.R.D. 259, 266 (N.D.N.Y. 2006). The question of control turns on whether "the party is legally entitled to" or "has the practical ability to acquire" information from a third-party, *Gross v. Lunduski*, 304 F.R.D. 136 (W.D.N.Y. 2014), and in this case Almaty lacks such control. Further, "[t]he burden of establishing control [] rests with the demanding party," *Amtrak*, 233 F.R.D. at 268, and Defendants have failed to establish such control.

In *Amtrak*, the court denied a motion to compel production of documents in the possession of the New York Office of the State Comptroller, from Plaintiff New York Department of Transportation. The court reasoned that "DOT and OSC are not interrelated agencies, do not have a similar mission, and are situated at different spectrums of New York State governance as established by the constitution and legislation. They have no overlapping goals or missions and do not have the ability to share or control the other agency's agenda, documents or personnel." *Id*. at 264-65. The court also held that there was no basis for Amtrak's claim that DOT and/or the Governor of New York had control of OCS's documents and, in fact, that there was evidence that DOT did not have access to "OCS's documents without OSC's permission or the employment of a subpoena." *Id*. at 268.

Similarly, here only the City of Almaty, a regional government entity, is a party to this case. Defendants submit a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. Indeed, this is the same argument advanced by the defendant in *Amtrak* regarding the New York Governor, who has ultimate oversight of both OCS and DOT, and this argument was squarely rejected by the *Amtrak* court. To that end, Defendants themselves contend only that

Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government, let alone *every* Kazakhstan governmental body.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information regarding the identities of persons tasked with investigating the Defendants' crimes.

Defendants issued the Interrogatory to determine the identities of investigators tasked with exposing their fraud. The nature of this request – accused criminals requesting the identity of persons and agencies investigating them – implicates another objection to the request, specifically, the law enforcement investigatory privilege. The law enforcement investigatory privilege prevents disclosure of law enforcement techniques and procedures and is intended to preserve the confidentiality of sources, protect witnesses and law enforcement personnel, safeguard the privacy of individuals involved in investigations, and prevent interference with investigations. *E.g. Jones v. City of Indianapolis* (S.D. IN. 2003) 216 F.R.D. 440, 443-444; *Kerr v. United States Dist. Court*, 511 F.2d 192, 198 (9th Cir. 1975); *Al-Kidd v. Gonzales*, 2007 U.S. Dist. LEXIS 90548 (D. Idaho Dec. 10, 2007). In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police. The Financial Police refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Declaration of Sergey Perov ("Perov Decl."), ¶¶ 5, 7, 8-11; Declaration of Ulukbek Maxatbekuulu ("Maxatbekuulu Decl."), ¶¶ 8-11.) The Financial Police's

investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (citing *United States v. Kovel*, 296 F.2d 918 (2nd Cir. 1961)); *United States v. Torf* (In re Grand Jury Subpoena), 357 F.3d 900, 907 (9th Cir. 2004). Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

In addition, Defendants' demand that Almaty disclose whether it or some other agency or person in Kazakhstan asked another government agency to conduct an investigation is improper. Defendants are likely concerned about Swiss law enforcement proceedings since, according to public reports, their assets have been frozen by Swiss authorities. Article 293 of the Swiss Criminal Code makes it a crime to disclose information about any Swiss government investigations. Thus, even if Almaty had information relating to the Swiss investigation, Almaty would be prohibited by Swiss criminal law from disclosing that information. Defendants incorrectly claim that Article 293 of the Swiss Criminal Code is "intended to protect the privacy of persons subject to investigation" and thus should not shield information from disclosure to them. Defendants cite no authority for their interpretation of Article 293, which explicitly makes it a crime to disclose information about Swiss government investigations and contains no exception for disclosure to those under investigation. (*See* Declaration of Kristen M. Tuey in

support of Notice Pursuant to Federal Rule of Civil Procedure 44.1 ("Tuey Decl. i/s/o Rule 44.1 Notice"), Ex. A) (Dkt. 84-2).

In short, Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry and based on non-privileged information, and the Motion to Compel as to this Interrogatory should be denied.

**B. <u>DEFENDANTS' INTERROGATORY NO. 2</u>:**

DESCRIBE IN DETAIL every investigation (whether formal or informal) undertaken by YOU and/or the Kazakh GOVERNMENT concerning the DEFENDANTS, including, without limitation, when each investigation commenced, whether such the investigation is ongoing or concluded, and the results of the investigation.

**<u>PLAINTIFF'S RESPONSE TO INTERROGATORY NO. 2</u>:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty further objects to this Interrogatory to the extent it seeks information regarding confidential law enforcement investigations of the Defendants' criminal activities conducted by the Swiss government, including without limitation the Public Prosecutor of Geneva, because the disclosure of such information would violate Article 293 of the Swiss Criminal Code.

Without waiving such objections, the City of Almaty answers as follows: The Investigation Team of the Anti-Corruption Service of Kazakhstan is currently conducting an investigation of Mr. Viktor Khrapunov and other members of his family and associates for violations of multiple provisions of the Criminal Code of the Republic of Kazakhstan, including Article 176 (Conversion or Embezzlement of Property), Article 177 (Fraud), Article 193 (Legalization of Monetary Funds or Other Property Obtained Illegally), Article 235 (Creation, Guidance, and/or Participation in an Organized Criminal Group or Criminal Association), Article 307 (Abuse of Official Powers), and Article 311 (Acceptance of a Bribe). Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions

underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. <u>Defendants' Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 2 seeks information not available to Almaty." All such objections should be disregarded.

Plaintiff refused to even answer this Interrogatory in its April 21, 2015 Responses and Objections. Although Plaintiff's May 22, 2015 Supplemental Responses and Objections purports to respond to this Interrogatory, it does not comply with the Court's order, nor does it fulfill Plaintiff's discovery obligations. It does not purport to identify "every investigation" and instead only vaguely alludes to one investigation. And for that one investigation, Plaintiff fails to state when the investigation began or state any results of the investigation. Moreover, Plaintiff should not be permitted to avoid fully answering this Interrogatory based on a trumped-up distinction between the City of Almaty and the Government of Kazakhstan. As Defendants have already shown by expert testimony, "there is no formal legal separation between the City of Almaty and the Government of Kazakhstan. The government of the City of Almaty is, in all legal respects, an instrument of and subordinate to the central Kazakh government. The President ultimately has control over almost every facet of provincial governance. Provincial governments hold no real independent authority in Kazakhstan." (Declaration of Professor Peter B. Maggs in Support of Defendants' Motion to Compel Production of Documents (Dkt. 69-4, at ¶¶ 17-18)). Plaintiff should be compelled to fully and

properly answer this Interrogatory, including information available to the Government of Kazakhstan.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co*., 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants ask for factual information relating to investigations, including the dates the investigations took place. *See Moore*., No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product

privilege."). The identity of the entities and individuals that have investigated Defendants on behalf of Kazakhstan are facts that cannot be shielded by privilege.

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

*Finally*, Plaintiff objects to this Interrogatory on the ground that it would "violate Article 293 of the Swiss Criminal Code." Plaintiff has waived objections on the basis of confidentiality. Even if it had not, this objection is inaccurate, as this provision of the Swiss Criminal Code is intended to protect the privacy of persons who are the subjects of a Swiss investigation – in this case, Defendants and defendants who were previously dismissed from this action. The provision is not intended to prevent the disclosure of information to them, but to protect them by prohibiting the disclosure of information to others. In addition, any information from the Swiss investigation that is in Plaintiff's possession or under its control must have been provided to Plaintiff by the Swiss authorities. It does not make sense for Plaintiff to now claim confidentiality for information that is not confidential to Defendants, and in any event, has been obtained by Plaintiff from the Swiss authorities.

Plaintiff should be compelled to immediately and fully respond to this Interrogatory.

**ii. <u>Plaintiff's Argument</u>**

Defendants, who are accused of serious crimes, are seeking detailed information regarding the law enforcement investigations into their wrongdoing. Almaty has answered to the best of its ability without waiving any applicable privileges. Almaty has stated that the Financial Police are investigating the Defendants, and has listed the criminal codes the Defendants are accused of violating. At this time, Almaty has no other non-privileged information regarding this or any other investigation of Defendants. Moreover, Defendants' demand for details regarding investigations into their crimes is clearly improper and objectionable pursuant to the law enforcement investigatory privilege.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government every investigation of Defendants' crimes. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with the entire "Government of Kazakhstan" other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp.*, 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd.*, 2007 U.S. Dist. LEXIS 102652. Almaty is a party to this case, but does not exercise "control" over information relating to the investigation of Defendants by other agencies. *See Amtrak*, 233 F.R.D. at 266. The question of control turns on whether "the party is legally entitled to" or "has the practical ability to acquire" information from a third-party, *Gross*, 304 F.R.D. 136, and in this case Almaty lacks such control. Further, "[t]he burden of establishing control [] rests with the demanding party," *Amtrak*, 233 F.R.D. at 268, and Defendants have failed to establish such control.

In *Amtrak*, the court denied a motion to compel production of documents in the possession of the New York Office of the State Comptroller, from Plaintiff

New York Department of Transportation. The court reasoned that "DOT and OSC are not interrelated agencies, do not have a similar mission, and are situated at different spectrums of New York State governance as established by the constitution and legislation. They have no overlapping goals or missions and do not have the ability to share or control the other agency's agenda, documents or personnel." *Id*. at 264-65. The court also held that there was no basis for Amtrak's claim that DOT and/or the Governor of New York had control of OCS's documents and, in fact, that there was evidence that DOT did not have access to "OCS's documents without OSC's permission or the employment of a subpoena." *Id*. at 268.

Similarly, here only the City of Almaty, a regional government entity, is a party to this case. Defendants submit a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. Indeed, this is the same argument advanced by the defendant in *Amtrak* regarding the New York Governor, who has ultimate oversight of both OCS and DOT, and this argument was squarely rejected by the *Amtrak* court. To that end, Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government, let alone *every* Kazakhstan governmental body.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information regarding investigations by other government entities into Defendants' crimes.

Defendants issued the Interrogatory to obtain detailed information regarding criminal investigations into their wrongdoing. The nature of this request – accused

criminals seeking details of law enforcement investigations of them – implicates another objection to the request, specifically, the law enforcement investigatory privilege. The law enforcement investigatory privilege prevents disclosure of law enforcement techniques and procedures and is intended to preserve the confidentiality of sources, protect witnesses and law enforcement personnel, safeguard the privacy of individuals involved in investigations, and prevent interference with investigations. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police. The Financial Police refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime, protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf*, 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Defendants' request that Almaty provide details about other government agencies' investigations is also improper. Defendants are likely concerned about

Swiss law enforcement proceedings since, according to public reports, their assets have been frozen by Swiss authorities. Article 293 of the Swiss Criminal Code makes it a crime to disclose information about any Swiss government investigations. Thus, even if Almaty had information relating to the Swiss investigation, Almaty would be prohibited by Swiss criminal law from disclosing that information. Defendants incorrectly claim that Article 293 of the Swiss Criminal Code is "intended to protect the privacy of persons subject to investigation" and thus should not shield information from disclosure to them. Defendants cite no authority for their interpretation of Article 293, which explicitly makes it a crime to disclose information about Swiss government investigations and contains no exception for disclosure to those under investigation. (*See* Tuey Decl. i/s/o Rule 44.1 Notice, Ex. A) (Dkt. 84-2).

In short, Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry and based on non-privileged information, and the Motion to Compel as to this Interrogatory should be denied.

### C. <u>DEFENDANTS' SPECIAL INTERROGATORY NO. 3:</u>

IDENTIFY every PERSON responsible for initiating and supervising every investigation (whether formal or informal) undertaken by YOU and/or the Kazakh GOVERNMENT concerning DEFENDANTS.

**PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 3:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty further objects to this Interrogatory to the extent it seeks information regarding confidential law enforcement investigations of the

Defendants' criminal activities conducted by the Swiss government, including without limitation the Public Prosecutor of Geneva, because the disclosure of such information would violate Article 293 of the Swiss Criminal Code.

Without waiving such objections, the City of Almaty answers as follows: The Investigation Team of the Anti-Corruption Service of Kazakhstan is currently conducting an investigation of Mr. Viktor Khrapunov and other members of his family and associates for violations of multiple provisions of the Criminal Code of the Republic of Kazakhstan, including Article 176 (Conversion or Embezzlement of Property), Article 177 (Fraud), Article 193 (Legalization of Monetary Funds or Other Property Obtained Illegally), Article 235 (Creation, Guidance, and/or Participation in an Organized Criminal Group or Criminal Association), Article 307 (Abuse of Official Powers), and Article 311 (Acceptance of a Bribe). Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. <u>Defendants' Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 3 seeks information not available to Almaty." All such objections should be disregarded.

Plaintiff refused to even answer this Interrogatory in its April 21, 2015 Responses and Objections. Although Plaintiff's May 22, 2015 Supplemental Responses and Objections purports to respond to this Interrogatory, it does not comply with the Court's order, nor does it fulfill Plaintiff's discovery obligations. Plaintiff still has not identified a single "PERSON," much less "every PERSON," who has initiated and supervised any investigation of Defendants. This information is clearly relevant, as such persons are likely to possess information relevant to Plaintiff's claims. Moreover, Plaintiff should not be permitted to avoid fully answering this Interrogatory based on a trumped-up distinction between the City of

Almaty and the Government of Kazakhstan. As Defendants have already shown by expert testimony, "there is no formal legal separation between the City of Almaty and the Government of Kazakhstan. The government of the City of Almaty is, in all legal respects, an instrument of and subordinate to the central Kazakh government. The President ultimately has control over almost every facet of provincial governance. Provincial governments hold no real independent authority in Kazakhstan." (Declaration of Professor Peter B. Maggs in Support of Defendants' Motion to Compel Production of Documents (Dkt. 69-4, at ¶¶ 17-18)). Plaintiff should be compelled to fully and properly answer this Interrogatory, including information available to the Government of Kazakhstan.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co*., 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what

information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants merely ask for the identification of individuals and entities responsible for initiating and supervising the investigations of Defendants. The identification of such individuals, even if the individual is an attorney, is non-privileged factual information. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege."). The identity of the individuals and entities that have initiated and supervised investigations of Defendants on behalf of Kazakhstan are facts that cannot be shielded by privilege.

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

*Finally*, Plaintiff objects to this Interrogatory on the ground that it would "violate Article 293 of the Swiss Criminal Code." Plaintiff has waived objections on the basis of confidentiality. Even if it had not, this objection is inaccurate, as

this provision of the Swiss Criminal Code is intended to protect the privacy of persons who are the subjects of a Swiss investigation – in this case, Defendants and defendants who were previously dismissed from this action. The provision is not intended to prevent the disclosure of information to *them*, but to protect them by prohibiting the disclosure of information to others. In addition, any information from the Swiss investigation that is in Plaintiff's possession or under its control must have been provided to Plaintiff by the Swiss authorities. It does not make sense for Plaintiff to now claim confidentiality for information that is not confidential to Defendants, and in any event, has been obtained by Plaintiff from the Swiss authorities.

Plaintiff should be compelled to immediately and fully respond to this Interrogatory.

**ii. Plaintiff's Argument**

Like Defendants' first two requests, this requests seeks information regarding pending criminal investigations of Defendants, but even more objectionably, it seeks detail as to the management of the investigation, including the specific individuals conducting and supervising the investigation. Almaty has answered to the best of its ability without waiving any applicable privileges. Almaty has stated that the Financial Police are investigating the Defendants, and has listed the criminal codes the Defendants are accused of violating. At this time, Almaty has no other non-privileged information regarding this or any other investigation of Defendants. Moreover, Defendants' demand for details regarding investigations into their crimes is clearly improper and objectionable pursuant to the law enforcement investigatory privilege.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government regarding every investigation of Defendants' crimes. This is both practically and legally impossible, since Almaty

does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with the entire "Government of Kazakhstan" other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp*., 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652. Almaty is a party to this case, but does not exercise "control" over information relating to the investigation of Defendants by other agencies. *See Amtrak*, 233 F.R.D. at 266. The question of control turns on whether "the party is legally entitled to" or "has the practical ability to acquire" information from a third-party, *Gross*, 304 F.R.D. 136, and in this case Almaty lacks such control. Further, "[t]he burden of establishing control [] rests with the demanding party," *Amtrak*, 233 F.R.D. at 268, and Defendants have failed to establish such control.

In *Amtrak*, the court denied a motion to compel production of documents in the possession of the New York Office of the State Comptroller, from Plaintiff New York Department of Transportation. The court reasoned that "DOT and OSC are not interrelated agencies, do not have a similar mission, and are situated at different spectrums of New York State governance as established by the constitution and legislation. They have no overlapping goals or missions and do not have the ability to share or control the other agency's agenda, documents or personnel." *Id*. at 264-65. The court also held that there was no basis for Amtrak's claim that DOT and/or the Governor of New York had control of OCS's documents and, in fact, that there was evidence that DOT did not have access to "OCS's documents without OSC's permission or the employment of a subpoena." *Id*. at 268.

Similarly, here only the City of Almaty, a regional government entity, is a party to this case. Defendants submit a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of

government that also report to the President. Indeed, this is the same argument advanced by the defendant in *Amtrak* regarding the New York Governor, who has ultimate oversight of both OCS and DOT, and this argument was squarely rejected by the *Amtrak* court. To that end, Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government, let alone *every* Kazakhstan governmental body.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information regarding investigations by other government entities into Defendants' crimes.

Defendants issued the Interrogatory to obtain information regarding the management of the criminal investigations into their wrongdoing. The nature of this request – accused criminals seeking information regarding the management of law enforcement investigations of them – implicates another objection to the request, specifically, the law enforcement investigatory privilege. The law enforcement investigatory privilege prevents disclosure of law enforcement techniques and procedures and is intended to preserve the confidentiality of sources, protect witnesses and law enforcement personnel, safeguard the privacy of individuals involved in investigations, and prevent interference with investigations. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police. The Financial Police refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime, protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-

11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf*, 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Defendants' request that Almaty provide details about other government agencies' investigations is also improper. Defendants are likely concerned about Swiss law enforcement proceedings since, according to public reports, their assets have been frozen by Swiss authorities. Article 293 of the Swiss Criminal Code makes it a crime to disclose information about any Swiss government investigations. Thus, even if Almaty had information relating to the Swiss investigation, Almaty would be prohibited by Swiss criminal law from disclosing that information. Defendants incorrectly claim that Article 293 of the Swiss Criminal Code is "intended to protect the privacy of persons subject to investigation" and thus should not shield information from disclosure to them. Defendants cite no authority for their interpretation of Article 293, which explicitly makes it a crime to disclose information about Swiss government investigations and contains no exception for disclosure to those under investigation. (*See* Tuey Decl. i/s/o Rule 44.1 Notice, Ex. A) (Dkt. 84-2).

In short, Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry and based on

non-privileged information, and the Motion to Compel as to this Interrogatory should be denied.

**D. <u>DEFENDANTS' SPECIAL INTERROGATORY NO. 4</u>:**

IDENTIFY all persons employed or retained by YOU and/or the Kazakh GOVERNMENT who have DOCUMENTS concerning DEFENDANTS.

**<u>PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 4</u>:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege.

The City of Almaty has documents relating to the Defendants. Bauyrzhan Darmanbekov, employee of the City of Almaty, has access to these documents. Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. <u>Defendants' Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 4 seeks information not available to Almaty." All such objections should be disregarded.

Plaintiff refused to even answer this Interrogatory in its April 21, 2015 Responses and Objections. Although Plaintiff's May 22, 2015 Supplemental

Responses and Objections purports to respond to this Interrogatory, it does not comply with the Court's order, nor does it fulfill Plaintiff's discovery obligations. Plaintiff has not purported to identify "all persons" who have documents concerning Defendants; instead Plaintiff identifies just one person (other than Plaintiff itself) who has access to "these documents." This information is clearly relevant, as such persons are likely to possess information and documents relevant to Plaintiff's claims. Moreover, Plaintiff should not be permitted to avoid fully answering this Interrogatory based on a trumped-up distinction between the City of Almaty and the Government of Kazakhstan. As Defendants have already shown by expert testimony, "there is no formal legal separation between the City of Almaty and the Government of Kazakhstan. The government of the City of Almaty is, in all legal respects, an instrument of and subordinate to the central Kazakh government. The President ultimately has control over almost every facet of provincial governance. Provincial governments hold no real independent authority in Kazakhstan." (Declaration of Professor Peter B. Maggs in Support of Defendants' Motion to Compel Production of Documents (Dkt. 69-4, at ¶¶ 17-18)). Plaintiff should be compelled to fully and properly answer this Interrogatory, including information available to the Government of Kazakhstan.

Plaintiff objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are inappropriate for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice

rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants merely ask for the identification of individuals and entities in possession of documents concerning Defendants. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege."). The identity of individuals and entities in possession of documents concerning Defendants are *facts* that cannot be shielded by privilege.

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A

mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

Plaintiff should be compelled to immediately and fully respond to this Interrogatory.

**ii. Plaintiff's Argument**

Plaintiff has responded to this Interrogatory with the best information it has – it disclosed the individual responsible for documents within the City of Almaty's custody and control. This answer should be sufficient to satisfy the Defendants' Interrogatory.

Almaty does not have within its possession, custody or control the name of individuals responsible for documents possessed by other Kazakhstan government agencies. Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government regarding any agency or individual who may be in possession of documents concerning Defendants. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with the entire "Government of Kazakhstan" other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp.*, 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd.*, 2007 U.S. Dist. LEXIS 102652. Almaty is a party to this case, but does not exercise "control" over information relating to the investigation of Defendants by other agencies. *See Amtrak*, 233 F.R.D. at 266. The question of control turns on whether "the party is legally entitled to" or "has the practical ability to acquire" information from a third-party, *Gross*, 304 F.R.D. 136, and in this case Almaty lacks such control. Further, "[t]he burden of establishing control [] rests with the demanding party," *Amtrak*, 233 F.R.D. at 268, and Defendants have failed to establish such control.

In *Amtrak*, the court denied a motion to compel production of documents in the possession of the New York Office of the State Comptroller, from Plaintiff New York Department of Transportation. The court reasoned that "DOT and OSC are not interrelated agencies, do not have a similar mission, and are situated at different spectrums of New York State governance as established by the constitution and legislation. They have no overlapping goals or missions and do not have the ability to share or control the other agency's agenda, documents or personnel." *Id*. at 264-65. The court also held that there was no basis for Amtrak's claim that DOT and/or the Governor of New York had control of OCS's documents and, in fact, that there was evidence that DOT did not have access to "OCS's documents without OSC's permission or the employment of a subpoena." *Id*. at 268.

Similarly, here only the City of Almaty, a regional government entity, is a party to this case. Defendants submit a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. Indeed, this is the same argument advanced by the defendant in *Amtrak* regarding the New York Governor, who has ultimate oversight of both OCS and DOT, and this argument was squarely rejected by the *Amtrak* court. To that end, Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government, let alone *every* Kazakhstan governmental body.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information regarding investigations by other government entities into Defendants' crimes.

Defendants issued the Interrogatory to obtain information regarding the investigators working to expose Defendants' wrongdoing. The nature of this request – accused criminals requesting the identity of persons and agencies investigating them – implicates another objection to the request, specifically, the law enforcement investigatory privilege. The law enforcement investigatory privilege prevents disclosure of law enforcement techniques and procedures and is intended to preserve the confidentiality of sources, protect witnesses and law enforcement personnel, safeguard the privacy of individuals involved in investigations, and prevent interference with investigations. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police. The Financial Police refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime, protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf*, 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Defendants' request that Almaty provide details about other government agencies' investigations is also improper. Defendants are likely concerned about Swiss law enforcement proceedings since, according to public reports, their assets have been frozen by Swiss authorities. Article 293 of the Swiss Criminal Code makes it a crime to disclose information about any Swiss government investigations. Thus, even if Almaty had information relating to the Swiss investigation, Almaty would be prohibited by Swiss criminal law from disclosing that information. Defendants incorrectly claim that Article 293 of the Swiss Criminal Code is "intended to protect the privacy of persons subject to investigation" and thus should not shield information from disclosure to them. Defendants cite no authority for their interpretation of Article 293, which explicitly makes it a crime to disclose information about Swiss government investigations and contains no exception for disclosure to those under investigation. (*See* Tuey Decl. i/s/o Rule 44.1 Notice, Ex. A) (Dkt. 84-2).

In short, Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry and based on non-privileged information, and the Motion to Compel as to this Interrogatory should be denied.

**E. DEFENDANTS' SPECIAL INTERROGATORY NO. 5:**

IDENTIFY and DESCRIBE IN DETAIL all databases, shared drives, networks, servers, and other electronic or hard-copy repositories maintained by YOU and/or the Kazakh GOVERNMENT that have DOCUMENTS concerning DEFENDANTS.

**PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 5:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty

further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege.

Without waiving such objections, the City of Almaty answers as follows: The City of Almaty has physical records of City actions relating to Defendant's actions, which include decrees issued by Viktor Khrapunov and other Mayors. Hard copies of such records are kept in the City of Almaty's Protocol Department typically for 5 years, but sometimes for longer. Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. Defendants' Argument**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 5 seeks information not available to Almaty." All such objections should be disregarded.

Plaintiff refused to even answer this Interrogatory in its April 21, 2015 Responses and Objections. Although Plaintiff's May 22, 2015 Supplemental Responses and Objections purports to respond to this Interrogatory, it does not comply with the Court's order, nor does it fulfill Plaintiff's discovery obligations. Plaintiff has not purported to identify "all databases, shared drives, networks, servers, and other electronic or hard-copy repositories" that contains documents related to Defendants; instead Plaintiff identifies only one purported source of *hard copy* documents and fails to identify any electronic repositories, such as databases, shared drives, networks, and servers. Moreover, Plaintiff should not be permitted to avoid fully answering this Interrogatory based on a trumped-up distinction between the City of Almaty and the Government of Kazakhstan. As Defendants have already shown by expert testimony, "there is no formal legal separation

between the City of Almaty and the Government of Kazakhstan. The government of the City of Almaty is, in all legal respects, an instrument of and subordinate to the central Kazakh government. The President ultimately has control over almost every facet of provincial governance. Provincial governments hold no real independent authority in Kazakhstan." (Declaration of Professor Peter B. Maggs in Support of Defendants' Motion to Compel Production of Documents (Dkt. 69-4, at ¶¶ 17-18)). Plaintiff should be compelled to fully and properly answer this Interrogatory, including information available to the Government of Kazakhstan.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co*., 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants merely ask for the identities and locations of repositories of documents concerning them. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege."). The identities and locations of repositories documents concerning Defendants are *facts* that cannot be shielded by privilege.

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

Plaintiff should be compelled to immediately and fully respond to this Interrogatory.

**ii. <u>Plaintiff's Argument</u>**

Plaintiff has responded to this Interrogatory with the best information it has – it disclosed fact that Almaty is in possession of physical documents held by Almaty's Protocol Department, which are typically retained for five years. This answer should be sufficient to satisfy the Defendants' Interrogatory.

Almaty does not have within its possession, custody or control information about document repositories maintained by other Kazakhstan government agencies. Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government regarding any agency or individual that received a request to investigate Defendants. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with the entire "Government of Kazakhstan" other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp*., 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652. Almaty is a party to this case, but does not exercise "control" over information relating to the investigation of Defendants by other agencies. *See Amtrak*, 233 F.R.D. at 266. The question of control turns on whether "the party is legally entitled to" or "has the practical ability to acquire" information from a third-party, *Gross*, 304 F.R.D. 136, and in this case Almaty lacks such control. Further, "[t]he burden of establishing control [] rests with the demanding party," *Amtrak*, 233 F.R.D. at 268, and Defendants have failed to establish such control.

In *Amtrak*, the court denied a motion to compel production of documents in the possession of the New York Office of the State Comptroller, from Plaintiff New York Department of Transportation. The court reasoned that "DOT and OSC are not interrelated agencies, do not have a similar mission, and are situated at different spectrums of New York State governance as established by the constitution and legislation. They have no overlapping goals or missions and do not have the ability to share or control the other agency's agenda, documents or personnel." *Id*. at 264-65. The court also held that there was no basis for Amtrak's claim that DOT and/or the Governor of New York had control of OCS's

documents and, in fact, that there was evidence that DOT did not have access to "OCS's documents without OSC's permission or the employment of a subpoena." *Id*. at 268.

Similarly, here only the City of Almaty, a regional government entity, is a party to this case. Defendants submit a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. Indeed, this is the same argument advanced by the defendant in *Amtrak* regarding the New York Governor, who has ultimate oversight of both OCS and DOT, and this argument was squarely rejected by the *Amtrak* court. To that end, Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government, let alone *every* Kazakhstan governmental body.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information regarding documents held by other government entities relating Defendants' crimes.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking the location of documents about their crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. The law enforcement investigatory privilege prevents disclosure of law enforcement techniques and procedures and is intended to preserve the confidentiality of sources, protect witnesses and law enforcement personnel, safeguard the privacy of individuals involved in investigations, and prevent

interference with investigations. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police. The Financial Police refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime, protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf*, 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Defendants' request that Almaty provide details about other government agencies' investigations is also improper. Defendants are likely concerned about Swiss law enforcement proceedings since, according to public reports, their assets have been frozen by Swiss authorities. Article 293 of the Swiss Criminal Code makes it a crime to disclose information about any Swiss government investigations. Thus, even if Almaty had information relating to the Swiss investigation, Almaty would be prohibited by Swiss criminal law from disclosing that information. Defendants incorrectly claim that Article 293 of the Swiss

Criminal Code is "intended to protect the privacy of persons subject to investigation" and thus should not shield information from disclosure to them. Defendants cite no authority for their interpretation of Article 293, which explicitly makes it a crime to disclose information about Swiss government investigations and contains no exception for disclosure to those under investigation. (*See* Tuey Decl. i/s/o Rule 44.1 Notice, Ex. A) (Dkt. 84-2).

In short, Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry and based on non-privileged information, and the Motion to Compel as to this Interrogatory should be denied.

**F. DEFENDANTS' SPECIAL INTERROGATORY NO. 7:**

IDENTIFY each PERSON investigated since 2004 by Kazakhstan's Agency on Combating Economic and Corruption-Related Crimes or the Agency of the Republic of Kazakhstan on Fight Against Economic and Corruption Crimes.

**PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 7:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege.

**i. Defendants' Argument**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the

grounds that Interrogatory No. 7 seeks information not available to Almaty." All such objections should be disregarded.

In any event, Plaintiff should not be permitted to avoid answering this Interrogatory based on a trumped-up distinction between the City of Almaty and the Government of Kazakhstan. As Defendants have already shown by expert testimony, "there is no formal legal separation between the City of Almaty and the Government of Kazakhstan. The government of the City of Almaty is, in all legal respects, an instrument of and subordinate to the central Kazakh government. The President ultimately has control over almost every facet of provincial governance. Provincial governments hold no real independent authority in Kazakhstan." (Declaration of Professor Peter B. Maggs in Support of Defendants' Motion to Compel Production of Documents (Dkt. 69-4, at ¶¶ 17-18)). Plaintiff should be compelled to fully and properly answer this Interrogatory, including information available to the Government of Kazakhstan.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co*., 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden

is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies here.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants merely ask for identification of persons investigated by two Kazakh agencies since 2004. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege."). The identities of any person investigated by two Kazakh agencies are *facts* that cannot be shielded by privilege.

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

Plaintiff should be compelled to immediately and fully respond to this Interrogatory.

**ii. Plaintiff's Argument**

Almaty provided no answer to this Interrogatory because it has none – Almaty does not have custody, possession or control over the documents belonging to Kazakhstan's Agency on Combating Economic and Corruption-Related Crimes or Agency of the Republic of Kazakhstan on Fight Against Economic and Corruption Crimes. Again, this request is nonsensical and is akin to asking the City of Los Angeles to disclose the identity of every individual ever investigated by the Federal Bureau of Investigation.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp*., 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking the identities of every person who may have information regarding Defendants' crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf,* 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

In short, Almaty is unable to respond to this Interrogatory after conducting a reasonable inquiry, and the Motion to Compel as to this Interrogatory should be denied.

**G. DEFENDANTS' SPECIAL INTERROGATORY NO. 8:**

IDENTIFY all PERSONS (other than DEFENDANTS) with knowledge concerning any aspect of the Khrapunov Racketeering Scheme, including, without limitation, the "individuals responsible for administering the auctions" referenced in paragraph 25 of the SECOND AMENDED COMPLAINT, the "co-conspirators" in paragraphs 1, 2, 6, 19, 22, 23, 26, 29, 37, 38, 47, 50, and 55 of the SECOND AMENDED COMPLAINT, and all PERSONS with whom YOU have communicated regarding any aspect of the alleged Khrapunov Racketeering Scheme.

**PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 8:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty further objects to this Interrogatory on the grounds that it seeks information regarding confidential law enforcement investigations of the Defendants' criminal activities conducted by the Swiss government, including without limitation the Public Prosecutor of Geneva, and the disclosure of such information would violate Article 293 of the Swiss Criminal Code. Almaty interprets this Interrogatory as seeking information sufficient to identify the persons or entities which may have knowledge of some aspect of the Khrapunov Racketeering Scheme, as described in the Second Amended Complaint.

Subject to and without waiver of the foregoing objections, Almaty responds as follows: Almaty is informed and believes that the following individuals and entities may have knowledge of some aspect of the Khrapunov Racketeering Scheme:

1. Almaty-Demalys, a Kazakhstan company

2. Viled Establishment, a Kazakhstan company

3. KazRealIncom LLP, a Kazakhstan company

4.   Karasha Plus LLP, a Kazakhstan company

5.   Building Services Company, a Kazakhstan company

6.   Asia Holding Development LLP, a Kazakhstan company

7.   Victoriya-KMK LLP, a Kazakhstan company

8.   Ademytau-KMK LLP, a Kazakhstan company

9.   Mr. Fumigation, Inc., a California corporation

10.   Douglas Fierro

11.   Michelle Smirnov, 1333 N. Curson Ave., Apt. 206, Los Angeles, CA 90046-3183

12.   CAAHolding Company, a California company

13.   MD Holding Company, a California company

14.   Phoenix International USA Inc., a Delaware corporation

15.   Tridaou SPV SA, a Luxembourg company

16.   CF 135 West Member LLC, a Delaware limited liability corporation

17.   135 West 52nd Street Holder LLC, a Delaware limited liability corporation

18.   135 West 52nd Street Mezz LLC, a Delaware limited liability corporation

19.   135 West 52nd Street Owner LLC, a Delaware limited liability corporation

20.   Flatotel, a New York company

21.   Health Service Network Inc., a New York company

22.   RPM HSNI LLC, a New York limited liability corporation

23.   Mukhtar Ablyazov

24.   Swiss Promotion Group SA, a Swiss company

25.   Harlem Securities Ltd., a British Virgin Islands company

26.   Swiss Development Group SA, a Swiss company

Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. Defendants' Argument**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 8 seeks information not available to Almaty." All such objections should be disregarded.

In any event, Plaintiff should not be permitted to avoid fully answering this Interrogatory based on a trumped-up distinction between the City of Almaty and the Government of Kazakhstan. As Defendants have already shown by expert testimony, "there is no formal legal separation between the City of Almaty and the Government of Kazakhstan. The government of the City of Almaty is, in all legal respects, an instrument of and subordinate to the central Kazakh government. The President ultimately has control over almost every facet of provincial governance. Provincial governments hold no real independent authority in Kazakhstan." (Declaration of Professor Peter B. Maggs in Support of Defendants' Motion to Compel Production of Documents (Dkt. 69-4, at ¶¶ 17-18)). Plaintiff should be compelled to fully and properly answer this Interrogatory, including information available to the Government of Kazakhstan.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan and Switzerland, implicating foreign privilege law. When faced with the potential

application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants merely ask for the identification of individuals and entities with knowledge of the purported RICO scheme. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege."). The identities of individuals with knowledge of the purported RICO scheme are *facts* that cannot be shielded by privilege.

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by

the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

*Finally*, Plaintiff objects to this Interrogatory on the ground that it would "violate Article 293 of the Swiss Criminal Code." Plaintiff has waived objections on the basis of confidentiality. Even if it had not, this objection is inaccurate, as this provision of the Swiss Criminal Code is intended to protect the privacy of persons who are the subjects of a Swiss investigation – in this case, Defendants and defendants who were previously dismissed from this action. The provision is not intended to prevent the disclosure of information to them, but to protect them by prohibiting the disclosure of information to others. In addition, any information from the Swiss investigation that is in Plaintiff's possession or under its control must have been provided to Plaintiff by the Swiss authorities. It does not make sense for Plaintiff to now claim confidentiality for information that is not confidential to Defendants, and in any event, has been obtained by Plaintiff from the Swiss authorities.

To the extent Plaintiff has attempted to answer the Interrogatory, its response is plainly insufficient. Plaintiff has unilaterally decided to "interpret" Interrogatory No. 8 as "seeking information sufficient to identify the persons or entities which may have knowledge of some aspect of the Khrapunov Racketeering Scheme . . ." Plaintiff should be compelled to supplement its response to this Interrogatory to the extent its "interpretation" limits Plaintiff's answer to this Interrogatory. Further, it is clear that Plaintiff's response is not complete—as of the date of this stipulation, Plaintiff has served thirteen third-party subpoenas on individuals and entities not identified in response to Interrogatory No. 8. (Handzlik Dec., ¶ 9). Plaintiff also

identifies, in response to Interrogatory No. 2, a team purportedly investigating Defendants but fails to list any of its members or supervisors here. Similarly, in response to Interrogatory Nos. 9 and 10, Plaintiff refers to Defendant Leila's mother and sister, yet fails to list them here. Clearly, therefore, Plaintiffs have failed to make even a good-faith attempt to obtain and provide information responsive to this Interrogatory.

Plaintiff should be compelled to immediately and fully supplement its response to this Interrogatory.

**ii. <u>Plaintiff's Argument</u>**

Almaty has answered this question to the best of its ability. It has listed 26 different persons and entities who it has reason to believe have knowledge of Defendants' crimes, including persons and entities located in California, Delaware, New York, Kazakhstan, Switzerland, and the British Virgin Islands. This answer should be a satisfactory response to the Defendants' Interrogatory.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp.*, 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd.*, 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has

access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking the identities of every person who may have information regarding Defendants' crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing

*Kovel*, 296 F.2d 918); *Torf*, 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Defendants' request that Almaty provide details about other government agencies' investigations is also improper. Defendants are likely concerned about Swiss law enforcement proceedings since, according to public reports, their assets have been frozen by Swiss authorities. Article 293 of the Swiss Criminal Code makes it a crime to disclose information about any Swiss government investigations. Defendants incorrectly claim that Article 293 of the Swiss Criminal Code should not shield information from disclosure to them, but cite no authority for their interpretation of Article 293, which explicitly makes it a crime to disclose information about Swiss government investigations and contains no exception for disclosure to those under investigation. (*See* Tuey Decl. i/s/o Rule 44.1 Notice, Ex. A) (Dkt. 84-2).

Furthermore, Defendants argue that because Almaty served third party subpoenas on multiple entities, its answer here must be incomplete. This inference is incorrect. The Interrogatory seeks information concerning individuals "with knowledge of" the racketeering scheme. The fact that Plaintiffs sent subpoenas to third parties seeking documents does not imply that those third parties had knowledge of the racketeering scheme. For example, many third party subpoenas were issued to Defendants' banks, which likely were innocent third parties whose services were abused by the Defendants in pursuit of their money laundering scheme. As for Defendants' requests for the individuals at law enforcement agencies conducting the investigation of their conduct, as explained above with respect to Almaty's Argument with respect to Interrogatory No. 2, Almaty has no

additional information concerning the Financial Police's investigation of Defendants.

In short, Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry and based on non-privileged information, and the Motion to Compel as to this Interrogatory should be denied.

### H. **DEFENDANTS' SPECIAL INTERROGATORY NO. 9:**

DESCRIBE IN DETAIL every sale of real estate by ALMATY from 1996 through 2010 (inclusive).

**PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 9:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty further objects to this Interrogatory as overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence. Almaty interprets this Interrogatory as seeking information sufficient to identify the real properties illegally converted by Defendants which rightfully belong to the people of the City of Almaty, as described in the Second Amended Complaint, and responds accordingly.

Subject to and without waiver of the foregoing objections, Almaty responds as follows:

**Real Estate 1**

In or about 2000, Viktor Khrapunov ("Viktor") abused his position as Mayor of Almaty to cause a large tract of state-owned land near two rivers in Almaty ("Real Estate 1") to be transferred to Leila Khrapunova ("Leila") for a total price of approximately $121,000. The transfer was accomplished via a series of fraudulent transactions and front companies controlled by Leila and Iliyas Khrapunov ("Iliyas). Through several more transfers designed to conceal the illegal conduct, Leila and Iliyas ultimately sold Real Estate 1 for a total of $15.57 million, yielding more than $15 million in illicit profit as a result of this single transaction.

Viktor' s transfer of Real Estate 1 violated the Land Code of the Republic of Kazakhstan, which requires that this type of public property not be sold, as well as the Water Code, which mandates that land in water conservation zones may only be provided to private individuals and entities for temporary use.

To carry out the illegal conversion of Real Estate 1, Viktor, Leila, Iliyas, Rassilya Daniyarova (mother of Leila), and Gaukhar Iliyasova (sister of Leila) utilized at least six Kazakhstan entities controlled by Leila and Iliyas, including: (a) Almaty-Demalys; (b) Viled Establishment ("Viled"); (c) KazRealIncom LLP ("KRI"); (d) Karasha Plus LLP ("Karasha"); (e) Building Services Company ("BSC"); and (f) Asia Holding Development LLP ("Asia Holding").

On or about September 22, 1998, Viktor signed a decree to transfer management of the property to Almaty-Demalys, a closed Joint Stock Company. Almaty-Demalys was owned by Altai LLC ("Altai"), which had 51% interest in Almaty-Demalys, and Almaty, which owned the other 49%. Altai was controlled by a man whose family member worked for Viktor. On or about May 15, 2000, Altai changed the 51% ownership in Almaty-Demalys from Altai to Viled. Altai did not receive any consideration in return for its ownership interest. On or about April 18, 2001, Viktor caused Almaty to sell its 49% ownership interest in Almaty-Demalys to Viled for approximately $121,000.

On or about August 25, 2003, Leila caused Viled to sell Almaty-Demalys to KRI for approximately $121,000 (18,800,000 ₸). Leila then caused KRI to sell Almaty-Demalys to Karasha for the same amount. Leila controlled Karasha through, among others, her sister. Next, on or about October 3, 2003, Leila caused Karasha to transfer ownership of Real Estate 1 directly to her. As a result of this series of transfers, Leila obtained full ownership of Real Estate 1. On or about May 6, 2004, Almaty-Demalys was officially dissolved.

On or about October 6, 2003, Leila contributed a portion of Real Estate 1 to BSC, which she then sold to a third party in a transaction that valued that portion of Real Estate 1 at approximately $8 million (1,179,999,980 ₸). Leila aused the remaining portion of Real Estate 1 to be conveyed directly to Iliyas. Iliyas, in turn, contributed it to Asia Holding, and then sold Asia Holding to a separate unrelated third party for approximately $7.57 million. Of the $7.57 million, Iliyas transferred approximately $2.21 million to Swiss bank accounts held by or on behalf of Elvira Kudryshova ("Elvira"), including accounts at Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co., and retained the remainder for himself.

Thus, Leila paid approximately $121,000 for Real Estate 1, which she and Iliyas later re-sold for a total of $15.57 million.

**Real Estate 2**

Starting in April 2001, Viktor used his position as mayor to cause a public building in Almaty to be sold to Leila's company, KRI, for approximately $347,000 (52,155,100 ₸). On or about April 16, 2001, Viktor signed a decree privatizing the property at Kindergarden No. 186, 242A Furmanov Street, Almaty. Viktor then manipulated a public auction to ensure that KRI won the auction. On December 18, 2001, KRI was declared the winner of the auction and on December 21, 2001, Viktor arranged for the property to be transferred to KRI.

Under the laws of Kazakhstan, potential buyers of state-owned property are obligated to state how they intend to invest in and develop the property before acquiring. In an attempt to make KRI's bid appear legitimate, during the bidding process Leila caused KRI to fraudulently represent that KRI would invest a significant amount in Real Estate 2 to build a health center for the benefit of the people of Almaty. That representation was false at the time it was made and, in fact, KRI never intended to and never did build any such health center or invest in the center.

At Viktor's direction, KRI won the auction and, instead of investing in the property as promised, on or about October 1, 2003, Leila caused KRI to sell Real Estate 2 to Karasha. Two days later, Leila caused Karasha to sell Real Estate 2 directly to her. Shortly thereafter, Leila contributed Real Estate 2 to BSC, which she then sold to an unrelated third party in a transaction that valued Real Estate 2 at approximately $4.1 million (611,445,206 ₸). Leila and Viktor thus obtained illegal profit of over $3.7 million as a result of their illicit acquisition and re-sale of Real Estate 2.

**Real Estate 3**

In addition to manufacturing the sale of state-owned assets to Leila and other family members and co-conspirators, Viktor also abused his authority as mayor to seize privately-owned land and transfer it to Leila and others for re-sale.

On or about August 25, 2003, Viktor caused Almaty to seize property owned by privately-owned third party Shadid Engineering LLP ("Real Estate 3"). Prior to the seizure, Shadid had obtained a series of approvals to allow them to bring infrastructure to the land, including power lines, water lines, sewage lines, and materials to begin building. After Shadid had made these improvements, Viktor denied Shadid a permit to build on the land and instead caused Almaty to seize the property.

On September 4, 2003 Viktor caused Almaty to sell landplots associated with Shadid to KazRealIncome. On September 23, 2003, Viktor arranged for a decree to change the purchaser of the property from KazRealIncome to KarashaPlus. On October 3, 2003 Leila Khrapunov arranged for KarashaPlus to transfer its interest to her. On October 6, 2003,

Leila Khrapunov contributed the interest to Building Services Corp, and then sold Building Services Corp. to a third party.  On September 4, 2003 Viktor caused Almaty to sell landplots associated with Shadid to KazRealIncome.  On September 23, 2003, Viktor arranged for a decree to change the purchaser of the property from KazRealIncome to KarashaPlus.  On October 3, 2003 Leila Khrapunov arranged for KarashaPlus to transfer its interest to her.  On October 6, 2003, Leila Khrapunov contributed the interest to Building Services Corp, and then sold Building Services Corp. to a third party.

In this sale, Real Estate 3 was valued at approximately $2 million.  As a result, Leila obtained nearly $1.9 million in illicit profit at the expense of Almaty and its people.

**Real Estate 4**

Between November and December 2004, Viktor caused Almaty to sell land ("Real Estate 4") to two additional Kazakhstan companies owned and controlled by Leila, Victoriya-KMK LLP and Ademytau-KMK LLP.  Real Estate 4 was located in a water conservation zone and, therefore, under Kazakh law, could be provided to private persons or entities only for temporary use.  Nevertheless, in violation of the law and his obligations as mayor of Almaty, Viktor caused Real Estate 4 to be sold to Leila's companies for approximately $1.3 million (18,870,100 ₸).  On or about December 23, 2005 and January 25, 2006, Leila sold Real Estate 4 to an unrelated third party for approximately $8.6 million (1,223,950,000 ₸) – resulting in illicit profit to Leila and Viktor of approximately $7.3 million.

**Real Estate 5**

On or about March 18, 2004, a company owned and/or controlled by Leila, Phoenix LV ("Phoenix"), and third party Ahsell Holdings ("Ahsell") formed Ayt Holding Complex ("Ayt"), each with a 50% ownership interest.  On or about May 6, 2004, Viktor illegally caused one of the most valuable plots of land in Almaty at the time ("Real Estate 5") to be sold to Ayt for approximately $450,000.  Real Estate 5 was located in a zone protected as mountain lands and was by law not permitted to be sold to private parties.  Nevertheless, Viktor caused Real Estate 5 to be sold to Ayt, and Ayt then built multiple homes on the property, each of which later was sold for up to $4 million.  In or about July 2004, Phoenix transferred its ownership interest in Ayt to Ahsell for approximately $8 million.

**Billboard Land Plots**

Viktor caused a total of 55 plots of land to be sold illegally to various companies owned or controlled by Leila, including Viled, to be used to erect billboards.  The companies paid only nominal amounts for the land, and then rented the billboards to third parties.  As an example of the value of the land plots, 11 of the plots were rented to third parties for a single year in return for rents of approximately $10 million.  In total, Leila, Viktor, Iliyas, Elvira, and

their coconspirators profited by tens of millions of dollars as a result of their illegal acquisition of these plots of land.

In addition, the Khrapunov Racketeering Scheme illegally converted the following real property:

7. Land plot and residential premises located at: 177 Gornaya street, Medeu district, Almaty (land cadastral number 20-315-912-121);

8. Land plot and residential premises located at: 179 Gornaya street, Medeu district, Almaty (land cadastral number 20-315-912-113);

9. Land plot and residential premises located at: 181 Gornaya street, Medeu district, Almaty (land cadastral number 20-315-912-114)

10. Land plot located at: 242a Furmanova street, Medeu district, Almaty (land cadastral number 20-315-021-293);

11. Land plot located at: to the west of Mendikulov street, to the north of Khadzhi-Mukan street, Medeu district, Almaty (land cadastral number 20-315-021-292);

12. Office building (former policlinic building of WWV) located at: 63 Tole Bi street, Almaty (land cadastral number 20-311-006-061);

13. Nonresidential premises and land plot located at: 160 Tole Bi street, Almaty (land cadastral number 20-311-011-038);

14. Land plot located at: to the south of Al-Farabi Avenue, to the east of Esentai River, Medeu district, Almaty (land cadastral number 20-315-028-530).

15. Land plot located at: to the south of Al-Farabi Avenue, to the east of Muhammed-Khaidar Dulati Avenue, Almaty (land cadastral number 20-313-021-490).

16. Nonresidential premises (former building of municipal state-owned public enterprise “Guest house of Ministry of Foreign Affairs”) located at: 165/167 Zheltoksan street, Almaty;

17. Land plot micro district Shanyrak 1, to the north of Ryskulov avenue, to the west of bolshaya Almatinka River (Thermal spring) (land cadastral number 20-312-919-083);

18. Land plot with total area 3.9 hectares located at: 235 Gorniy gigant street (Oak-wood), Almaty (land cadastral number 20-315-912-031);

19. Passenger terminal building of Almaty airport with area 2481.92 sq. m. in the amount of 333 735 805 tenge;

20. Real estate properties located at: 36 Belinskiy street, 76 Ushanov street, 95 Gorkiy street, Ust-Kamenogorsk city, East Kazakhstan Region;

21. Land plot with area 44.2310 hectares located at: to the north of Tashkentskaya street, to the west of micro district Akbulak, Almaty (land cadastral number 20-312-941-009);

22. Land plots located on the territory of micro district “Edelveis” at: to the south of Esentai River, to the west of Zhamakayev street, Agricultural production cooperative Gorniy gigant, Auezov district, Almaty (land cadastral number 20-315-936-080);

23. Land plot (billboards) located at: to the north of Abai avenue, to the east of Tulebayev street, Medeu district, Almaty (land cadastral number 20-315-021-300);

24. Land plot (billboards) located at: to the south of Gogol street, to the west of Abylai-khan avenue, Almaly district, Almaty (land cadastral number 20-311-006-066);

25. Land plot (billboards) located at: 15a to the north of Khodzhanov street, to the west of Al-Farabi avenue (land cadastral number 20-313-011-374);

26. Land plot (billboards) located at: to the north of Gogol street, to the west of Abylai-khan avenue, Zhetysu district, Almaty (land cadastral number 20-314-020-140);

27. Land plot (nonresidential) located at: to the south of Gogol street, to the east of Furmanov street, Medeu district, Almaty (land cadastral number 20-315-029-620);

28. Land plot (nonresidential) located at: to the north of Abai avenue, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-021-270);

29. Land plot (billboards) located at: to the north of Zhibek zholy avenue, to the east of Abylai-khan avenue, Zhetysu district, Almaty (land cadastral number 20-314-020-141);

30. Land plot (billboards) located at: to the west of Mailin street, to the south of Bekmakhanov street, Turksib district, Almaty (land cadastral number 20-317-039-108);

31. Land plot (nonresidential) located at: to the south of Al-Farabi avenue, to the east of Mendikulov boulevard, Medeu district, Almaty (land cadastral number 20-315-021-269);

32.     Land plot (nonresidential) located at:  Chimbulak area, Medeu district, Almaty (land cadastral number 20-315-944-033);

33.     Land plot (billboards) located at:  to the north of Gogol street, to the west of Nauryzbay batyr street, Zhetysu district, Almaty (land cadastral number 20-314-019-061);

34.     Land plot (billboards) located at:  to the north of Gogol street, to the west of Nauryzbay batyr street, Zhetysu district, Almaty (land cadastral number 20-314-019-060);

35.     Land plot (nonresidential) located at:  to the south of Al-Farabi avenue, to the west of Furmanov avenue, Medeu district, Almaty (land cadastral number 20-315-029-621);

36.     Land plot (nonresidential) located at:  to the south of Khadzhi-Mukan street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-024-232);

37.     Land plot (billboards) located at:  to the south of Bogenbay street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-012-235);

38.     Land plot (billboards) located at:  to the south of Gogol street, to the west of Furmanov street, Medeu district, Almaty (land cadastral number 20-315-011-103);

39.     Land plot (nonresidential) located at:  to the north of Tole Bi street, to the east of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-011-104);

40.     Land plot (nonresidential) located at:  to the north of Zholdasbekov street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-021-296);

41.     Land plot (nonresidential) located at:  to the south of Al Farabi avenue, to the east of Furmanova street, Medeu district, Almaty (land cadastral number 20-315-021-297);

42.     Land plot (billboards) located at:  to the east of Dostyk avenue, to the south of Karasai batyr avenue, Medeu district, Almaty (land cadastral number 20-315-012-234);

43.     Land plot (billboards) located at:  to the south of Zhibek-zholy avenue, to the east of Panfilov street, Zhetysu district, Almaty (land cadastral number 20-314-020-151);

44.     Land plot (billboards) located at:  to the south of Zhibek-zholy avenue, to the east of Frunze street, Zhetysu district, Almaty (land cadastral number 20-314-020-154);

45.     Land plot (billboards) located at:  to the west of Abylai-khan avenue, to the south of Rayimbek avenue, Zhetysu district, Almaty (land cadastral number 20-314-014-099);

46.     Land plot (billboards) located at:  to the east of Furmanov street, to the north of Alimzhanov street, Zhetysu district, Almaty (land cadastral number 20-314-020-155);

47.     Land plot (billboards) located at:  to the south of Zhibek-zholy avenue, to the east of Abylai-khan avenue, Zhetysu district, Almaty (land cadastral number 20-314-020-152);

48.     Land plot (billboards) located at:  to the north of Rayimbekov avenue, to the west of Seifullin street, Almaty (land cadastral number 20-314-013-351);

49.     Land plot (billboards) located at:  to the north of Zhibek-zholy avenue, to the east of Abylai street, Zhetysu district, Almaty (land cadastral number 20-314-020-153);

50.     Land plot (billboards) located at:  to the east of Dostyk avenue, to the north of Kamenistaya street, Medeu district, Almaty (land cadastral number 20-315-022-205);

51.     Land plot (nonresidential) located at:  to the north of Satpayev street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-021-299);

52.     Land plot (nonresidential) located at:  to the south of Kurmangazy street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-015-345);

53.     Land plot (nonresidential) located at:  to the north of Tole Bi street, to the west of Tulebayev street, Medeu district, Almaty (land cadastral number 20-315-013-138);

54.     Land plot (billboards) located at:  to the south of Kabanbai batyr street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-015-344);

55.     Land plot (nonresidential) located at:  to the north of Gogol street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-011-105);

56.    Land plot (nonresidential) located at:  to the north of Abai avenue, to the east of Furmanov street, Medeu district, Almaty (land cadastral number 20-315-014-162);

57.    Land plot (nonresidential) located at:  Abai avenue, to the north-east of Altynsarin avenue, Auezov district, Almaty (land cadastral number 20-312-057-511);

58.    Land plot (billboards) located at:  15a to the east of Baitursynov street, to the south of Satpayev street, Bostandyk, Bostandyk district, Almaty (land cadastral number 20-313-004-354);

59.    Land plot (billboards) located at:  15a to the west of Furmanov street, to the south of Gandi street, Bostandyk, Bostandyk district, Almaty (land cadastral number 20-313-006-402);

60.    Land plot (billboards) located at:  15a to the south of Abai avenue, to the east of Masanchi street, Bostandyk district, Almaty (land cadastral number 20-313-004-353);

61.    Land plot (billboards) located at:  to the north of Tole Bi street, to the west of Zheltoksan street, Almaly district, Almaty (land cadastral number 20-311-005-124);

62.    Land plot (billboards) located at:  to the west of Furmanov street, to the south of Gogol street, Almaly district, Almaty (land cadastral number 20-311-006-070);

63.    Land plot (billboards) located at:  to the north of Kurmangazy street, to the west of Seifullin street, Almaly district, Almaty (land cadastral number 20-311-016-105);

64.    Land plot (billboards) located at:  to the south of Gogol street, to the west of Seifullin street, Almaly district, Almaty (land cadastral number 20-311-005-125);

65.    Land plot (billboards) located at:  to the south of Bogenbay street, to the west of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-007-087);

66.    Land plot (billboards) located at:  to the north of Abai avenue, to the west of Gagarin avenue, Almaly district, Almaty (land cadastral number 20-311-013-266);

67.    Land plot (billboards) located at:  to the north of Kurmangazy street, to the west of Baitursynov street, Almaly district, Almaty (land cadastral number 20-311-015-239);

68. Land plot (billboards) located at: to the north of Tole Bi street, to the west of Turgut Ozaly street, Almaly district, Almaty (land cadastral number 20-311-021-375);

69. Land plot (billboards) located at: to the south of Kabanbai batyr street, to the east of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-018-150);

70. Land plot (billboards) located at: to the south of Gogol street, to the east of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-006-069);

71. Land plot (billboards) located at: to the south of Gogol street, to the west of Panfilov street, Almaly district, Almaty (land cadastral number 20-311-006-071);

72. Land plot (billboards) located at: to the south of Kabanbai batyr street, to the west of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-018-151);

73. Land plot (billboards) located at: to the south of Bogenbay batyr street, to the west of Furmanov street, Almaly district, Almaty (land cadastral number 20-311-007-086);

74. Land plot (billboards) located at: Almaty-1 railway station square, Turksib district, Almaty (land cadastral number 20-317-031-172);

75. Land plot (billboards) located at: to the west of Suyunbay avenue, to the north of Khmelnickiy street, Turksib district, Almaty (land cadastral number 20-317-044-126);

76. Land plot (billboards) located at: to the west of Rozybakiev street, intersection with Abai avenue, Almaly district, Almaty (land cadastral number 20-311-019-287);

77. Land plot (billboards) located at: to the south of Gogol street, to the east of Furmanov street, Medeu district, Almaty (cadastral number 20-315-011-094).

Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. <u>Defendants' Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based

on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 9 seeks information not available to Almaty."[2] Indeed, in its supplemental response, Plaintiff again flagrantly disregards the Court's order, adding several more (baseless) objections: "overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence." All such objections should be disregarded.

In any event, Plaintiff should not be permitted to avoid fully answering this Interrogatory based on a trumped-up distinction between the City of Almaty and the Government of Kazakhstan. As Defendants have already shown by expert testimony, "there is no formal legal separation between the City of Almaty and the Government of Kazakhstan. The government of the City of Almaty is, in all legal respects, an instrument of and subordinate to the central Kazakh government. The President ultimately has control over almost every facet of provincial governance. Provincial governments hold no real independent authority in Kazakhstan." (Declaration of Professor Peter B. Maggs in Support of Defendants' Motion to Compel Production of Documents (Dkt. 69-4, at ¶¶ 17-18)). Plaintiff should be compelled to fully and properly answer this Interrogatory, including information available to the Government of Kazakhstan.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged

---

[2] This objection is non-sensical, given that the Interrogatory asks for details regarding real estate sales by Almaty.

information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co*., 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants merely ask for information regarding real estate sales by Almaty. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege."). The identification and description of real estate sales are facts that cannot be shielded by privilege.

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos*., No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2)

assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

To the extent Plaintiff has attempted to answer the Interrogatory, its response is plainly insufficient. Plaintiff has unilaterally decided to "interpret" Interrogatory No. 9 as "seeking information sufficient to identify the real properties illegally converted by Defendants . . . ." But the Interrogatory is clear on its face and is not so limited. In addition to information about the real property allegedly converted by Defendants – which is the subject of Interrogatory No. 10 – this Interrogatory seeks information relating to sales of real estate by Almaty *before* and *after* former defendant Viktor Khrapunov's tenure as *akim*, as well as any sale of real property during Viktor's tenure that Plaintiff does not allege was "illegally converted," so that Defendants may compare "valid" transactions with the allegedly illicit transactions undertaken by Viktor.

Further, Plaintiff's response is wholly insufficient – even as inappropriately limited – because it does not provide any description of the real estate sales, as plainly called for by the Interrogatory. Except for the four examples already described in the SAC and one additional piece of property ("Real Estate 5"), Plaintiff offers only the vaguest references to an additional 125 properties, including 55 lumped together as "Billboard Land Plots" and another 70 that are only referred to by the locations of the properties. This does not come close to what Interrogatory No. 9 requests and what the Court's order requires.

Plaintiff should be compelled to immediately and fully supplement its response to this Interrogatory.

**ii. <u>Plaintiff's Argument</u>**

Almaty has answered this question to the best of its ability based on information known to it at this time. Almaty described in exhaustive detail multiple wrongful transactions entered into by Defendants, including approximate dates, listing the entities and persons involved at each stage of each transaction, and describing the real estate at issue. Furthermore, Almaty has identified over 100 additional properties wrongfully converted by Defendants. This answer should be a more than satisfactory response to the Defendants' Interrogatory. Further, as explained in Almaty's response to Interrogatory No. 5, Almaty generally maintains records of transactions for five years. This Interrogatory seeks information between 1996 through 2010, beyond the scope of Almaty's general practice for maintenance of records which it could consult in order to provide the requested information.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp.*, 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd.*, 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also

report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking the identities of every person who may have information regarding Defendants' crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf*, 357 F.3d at 907. Similarly, to the extent that any

information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry, and the Motion to Compel as to this Interrogatory should be denied.

**I. <u>DEFENDANTS' SPECIAL INTERROGATORY NO. 10</u>:**

DESCRIBE IN DETAIL all allegedly improper real estate transactions in Kazakhstan engaged in by or at the direction of DEFENDANTS since 1996.

**<u>PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 10</u>:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty further objects to this Interrogatory as overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence. Almaty interprets this Interrogatory as seeking information sufficient to identify the real properties illegally converted by Defendants which rightfully belong to the people of the City of Almaty, as described in the Second Amended Complaint, and responds accordingly.

Subject to and without waiver of the foregoing objections, Almaty responds as follows:

**<u>Real Estate 1</u>**

In or about 2000, Viktor Khrapunov ("Viktor") abused his position as Mayor of Almaty to cause a large tract of state-owned land near two rivers in Almaty ("Real Estate 1") to be transferred to Leila Khrapunova ("Leila") for a total price of approximately $121,000. The transfer was accomplished via a series of fraudulent transactions and front companies controlled by Leila

and Iliyas Khrapunov ("Iliyas). Through several more transfers designed to conceal the illegal conduct, Leila and Iliyas ultimately sold Real Estate 1 for a total of $15.57 million, yielding more than $15 million in illicit profit as a result of this single transaction.

Viktor's transfer of Real Estate 1 violated the Land Code of the Republic of Kazakhstan, which requires that this type of public property not be sold, as well as the Water Code, which mandates that land in water conservation zones may only be provided to private individuals and entities for temporary use.

To carry out the illegal conversion of Real Estate 1, Viktor, Leila, Iliyas, Rassilya Daniyarova (mother of Leila), and Gaukhar Iliyasova (sister of Leila) utilized at least six Kazakhstan entities controlled by Leila and Iliyas, including: (a) Almaty-Demalys; (b) Viled Establishment ("Viled"); (c) KazRealIncom LLP ("KRI"); (d) Karasha Plus LLP ("Karasha"); (e) Building Services Company ("BSC"); and (f) Asia Holding Development LLP ("Asia Holding").

On or about September 22, 1998, Viktor signed a decree to transfer management of the property to Almaty-Demalys, a closed Joint Stock Company. Almaty-Demalys was owned by Altai LLC ("Altai"), which had 51% interest in Almaty-Demalys, and Almaty, which owned the other 49%. Altai was controlled by a man whose family member worked for Viktor. On or about May 15, 2000, Altai changed the 51% ownership in Almaty-Demalys from Altai to Viled. Altai did not receive any consideration in return for its ownership interest. On or about April 18, 2001, Viktor caused Almaty to sell its 49% ownership interest in Almaty-Demalys to Viled for approximately $121,000.

On or about August 25, 2003, Leila caused Viled to sell Almaty-Demalys to KRI for approximately $121,000 (18,800,000 ₸). Leila then caused KRI to sell Almaty-Demalys to Karasha for the same amount. Leila controlled Karasha through, among others, her sister. Next, on or about October 3, 2003, Leila caused Karasha to transfer ownership of Real Estate 1 directly to her. As a result of this series of transfers, Leila obtained full ownership of Real Estate 1. On or about May 6, 2004, Almaty-Demalys was officially dissolved.

On or about October 6, 2003, Leila contributed a portion of Real Estate 1 to BSC, which she then sold to a third party in a transaction that valued that portion of Real Estate 1 at approximately $8 million (1,179,999,980 ₸). Leila caused the remaining portion of Real Estate 1 to be conveyed directly to Iliyas. Iliyas, in turn, contributed it to Asia Holding, and then sold Asia Holding to a separate unrelated third party for approximately $7.57 million. Of the $7.57 million, Iliyas transferred approximately $2.21 million to Swiss bank accounts held by or on behalf of Elvira Kudryshova ("Elvira"),

including accounts at Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co., and retained the remainder for himself.

Thus, Leila paid approximately $121,000 for Real Estate 1, which she and Iliyas later re-sold for a total of $15.57 million.

**Real Estate 2**

Starting in April 2001, Viktor used his position as mayor to cause a public building in Almaty to be sold to Leila's company, KRI, for approximately $347,000 (52,155,100 ₸). On or about April 16, 2001, Viktor signed a decree privatizing the property at Kindergarden No. 186, 242A Furmanov Street, Almaty. Viktor then manipulated a public auction to ensure that KRI won the auction. On December 18, 2001, KRI was declared the winner of the auction and on December 21, 2001, Viktor arranged for the property to be transferred to KRI.

Under the laws of Kazakhstan, potential buyers of state-owned property are obligated to state how they intend to invest in and develop the property before acquiring. In an attempt to make KRI' s bid appear legitimate, during the bidding process Leila caused KRI to fraudulently represent that KRI would invest a significant amount in Real Estate 2 to build a health center for the benefit of the people of Almaty. That representation was false at the time it was made and, in fact, KRI never intended to and never did build any such health center or invest in the center.

At Viktor's direction, KRI won the auction and, instead of investing in the property as promised, on or about October 1, 2003, Leila caused KRI to sell Real Estate 2 to Karasha. Two days later, Leila caused Karasha to sell Real Estate 2 directly to her. Shortly thereafter, Leila contributed Real Estate 2 to BSC, which she then sold to an unrelated third party in a transaction that valued Real Estate 2 at approximately $4.1 million (611,445,206 ₸). Leila and Viktor thus obtained illegal profit of over $3.7 million as a result of their illicit acquisition and re-sale of Real Estate 2.

**Real Estate 3**

In addition to manufacturing the sale of state-owned assets to Leila and other family members and co-conspirators, Viktor also abused his authority as mayor to seize privately-owned land and transfer it to Leila and others for re-sale.

On or about August 25, 2003, Viktor caused Almaty to seize property owned by privately-owned third party Shadid Engineering LLP ("Real Estate 3"). Prior to the seizure, Shadid had obtained a series of approvals to allow them to bring infrastructure to the land, including power lines, water lines, sewage lines, and materials to begin building. After Shadid had made these improvements, Viktor denied Shadid a permit to build on the land and instead caused Almaty to seize the property.

On September 4, 2003 Viktor caused Almaty to sell landplots associated with Shadid to KazRealIncome. On September 23, 2003, Viktor arranged for a decree to change the purchaser of the property from KazRealIncome to KarashaPlus. On October 3, 2003 Leila Khrapunov arranged for KarashaPlus to transfer its interest to her. On October 6, 2003, Leila Khrapunov contributed the interest to Building Services Corp, and then sold Building Services Corp. to a third party. On September 4, 2003 Viktor caused Almaty to sell landplots associated with Shadid to KazRealIncome. On September 23, 2003, Viktor arranged for a decree to change the purchaser of the property from KazRealIncome to KarashaPlus. On October 3, 2003 Leila Khrapunov arranged for KarashaPlus to transfer its interest to her. On October 6, 2003, Leila Khrapunov contributed the interest to Building Services Corp, and then sold Building Services Corp. to a third party.

In this sale, Real Estate 3 was valued at approximately $2 million. As a result, Leila obtained nearly $1.9 million in illicit profit at the expense of Almaty and its people.

**Real Estate 4**

Between November and December 2004, Viktor caused Almaty to sell land ("Real Estate 4") to two additional Kazakhstan companies owned and controlled by Leila, Victoriya-KMK LLP and Ademytau-KMK LLP. Real Estate 4 was located in a water conservation zone and, therefore, under Kazakh law, could be provided to private persons or entities only for temporary use. Nevertheless, in violation of the law and his obligations as mayor of Almaty, Viktor caused Real Estate 4 to be sold to Leila's companies for approximately $1.3 million (18,870,100 ₸). On or about December 23, 2005 and January 25, 2006, Leila sold Real Estate 4 to an unrelated third party for approximately $8.6 million (1,223,950,000 ₸) — resulting in illicit profit to Leila and Viktor of approximately $7.3 million.

**Real Estate 5**

On or about March 18, 2004, a company owned and/or controlled by Leila, Phoenix LV ("Phoenix"), and third party Ahsell Holdings ("Ahsell") formed Ayt Holding Complex ("Ayt"), each with a 50% ownership interest. On or about May 6, 2004, Viktor illegally caused one of the most valuable plots of land in Almaty at the time ("Real Estate 5") to be sold to Ayt for approximately $450,000. Real Estate 5 was located in a zone protected as mountain lands and was by law not permitted to be sold to private parties. Nevertheless, Viktor caused Real Estate 5 to be sold to Ayt, and Ayt then built multiple homes on the property, each of which later was sold for up to $4 million. In or about July 2004, Phoenix transferred its ownership interest in Ayt to Ahsell for approximately $8 million.

**Billboard Land Plots**

Viktor caused a total of 55 plots of land to be sold illegally to various companies owned or controlled by Leila, including Viled, to be used to erect billboards. The companies paid only nominal amounts for the land, and then rented the billboards to third parties. As an example of the value of the land plots, 11 of the plots were rented to third parties for a single year in return for rents of approximately $10 million. In total, Leila, Viktor, Iliyas, Elvira, and their coconspirators profited by tens of millions of dollars as a result of their illegal acquisition of these plots of land.

In addition, the Khrapunov Racketeering Scheme illegally converted the following real property:

7. Land plot and residential premises located at: 177 Gornaya street, Medeu district, Almaty (land cadastral number 20-315-912-121);

8. Land plot and residential premises located at: 179 Gornaya street, Medeu district, Almaty (land cadastral number 20-315-912-113);

9. Land plot and residential premises located at: 181 Gornaya street, Medeu district, Almaty (land cadastral number 20-315-912-114)

10. Land plot located at: 242a Furmanova street, Medeu district, Almaty (land cadastral number 20-315-021-293);

11. Land plot located at: to the west of Mendikulov street, to the north of Khadzhi-Mukan street, Medeu district, Almaty (land cadastral number 20-315-021-292);

12. Office building (former policlinic building of WWV) located at: 63 Tole Bi street, Almaty (land cadastral number 20-311-006-061);

13. Nonresidential premises and land plot located at: 160 Tole Bi street, Almaty (land cadastral number 20-311-011-038);

14. Land plot located at: to the south of Al-Farabi Avenue, to the east of Esentai River, Medeu district, Almaty (land cadastral number 20-315-028-530).

15. Land plot located at: to the south of Al-Farabi Avenue, to the east of Muhammed-Khaidar Dulati Avenue, Almaty (land cadastral number 20-313-021-490).

16. Nonresidential premises (former building of municipal state-owned public enterprise "Guest house of Ministry of Foreign Affairs") located at: 165/167 Zheltoksan street, Almaty;

17.    Land plot micro district Shanyrak 1, to the north of Ryskulov avenue, to the west of bolshaya Almatinka River (Thermal spring) (land cadastral number 20-312-919-083);

18.    Land plot with total area 3.9 hectares located at:  235 Gorniy gigant street (Oak-wood), Almaty (land cadastral number 20-315-912-031);

19.    Passenger terminal building of Almaty airport with area 2481.92 sq. m. in the amount of 333 735 805 tenge;

20.    Real estate properties located at:  36 Belinskiy street, 76 Ushanov street, 95 Gorkiy street, Ust-Kamenogorsk city, East Kazakhstan Region;

21.    Land plot with area 44.2310 hectares located at:  to the north of Tashkentskaya street, to the west of micro district Akbulak, Almaty (land cadastral number 20-312-941-009);

22.    Land plots located on the territory of micro district "Edelveis" at: to the south of Esentai River, to the west of Zhamakayev street, Agricultural production cooperative Gorniy gigant, Auezov district, Almaty (land cadastral number 20-315-936-080);

23.    Land plot (billboards) located at:  to the north of Abai avenue, to the east of Tulebayev street, Medeu district, Almaty (land cadastral number 20-315-021-300);

24.    Land plot (billboards) located at:  to the south of Gogol street, to the west of Abylai-khan avenue, Almaly district, Almaty (land cadastral number 20-311-006-066);

25.    Land plot (billboards) located at:  15a to the north of Khodzhanov street, to the west of Al-Farabi avenue (land cadastral number 20-313-011-374);

26.    Land plot (billboards) located at:  to the north of Gogol street, to the west of Abylai-khan avenue, Zhetysu district, Almaty (land cadastral number 20-314-020-140);

27.    Land plot (nonresidential) located at:  to the south of Gogol street, to the east of Furmanov street, Medeu district, Almaty (land cadastral number 20-315-029-620);

28.    Land plot (nonresidential) located at:  to the north of Abai avenue, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-021-270);

29.     Land plot (billboards) located at:  to the north of Zhibek zholy avenue, to the east of Abylai-khan avenue, Zhetysu district, Almaty (land cadastral number 20-314-020-141);

30.     Land plot (billboards) located at:  to the west of Mailin street, to the south of Bekmakhanov street, Turksib district, Almaty (land cadastral number 20-317-039-108);

31.     Land plot (nonresidential) located at:  to the south of Al-Farabi avenue, to the east of Mendikulov boulevard, Medeu district, Almaty (land cadastral number 20-315-021-269);

32.     Land plot (nonresidential) located at:  Chimbulak area, Medeu district, Almaty (land cadastral number 20-315-944-033);

33.     Land plot (billboards) located at:  to the north of Gogol street, to the west of Nauryzbay batyr street, Zhetysu district, Almaty (land cadastral number 20-314-019-061);

34.     Land plot (billboards) located at:  to the north of Gogol street, to the west of Nauryzbay batyr street, Zhetysu district, Almaty (land cadastral number 20-314-019-060);

35.     Land plot (nonresidential) located at:  to the south of Al-Farabi avenue, to the west of Furmanov avenue, Medeu district, Almaty (land cadastral number 20-315-029-621);

36.     Land plot (nonresidential) located at:  to the south of Khadzhi-Mukan street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-024-232);

37.     Land plot (billboards) located at:  to the south of Bogenbay street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-012-235);

38.     Land plot (billboards) located at:  to the south of Gogol street, to the west of Furmanov street, Medeu district, Almaty (land cadastral number 20-315-011-103);

39.     Land plot (nonresidential) located at:  to the north of Tole Bi street, to the east of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-011-104);

40.     Land plot (nonresidential) located at:  to the north of Zholdasbekov street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-021-296);

41.     Land plot (nonresidential) located at:  to the south of Al Farabi avenue, to the east of Furmanova street, Medeu district, Almaty (land cadastral number 20-315-021-297);

42.     Land plot (billboards) located at:  to the east of Dostyk avenue, to the south of Karasai batyr avenue, Medeu district, Almaty (land cadastral number 20-315-012-234);

43.     Land plot (billboards) located at:  to the south of Zhibek-zholy avenue, to the east of Panfilov street, Zhetysu district, Almaty (land cadastral number 20-314-020-151);

44.     Land plot (billboards) located at:  to the south of Zhibek-zholy avenue, to the east of Frunze street, Zhetysu district, Almaty (land cadastral number 20-314-020-154);

45.     Land plot (billboards) located at:  to the west of Abylai-khan avenue, to the south of Rayimbek avenue, Zhetysu district, Almaty (land cadastral number 20-314-014-099);

46.     Land plot (billboards) located at:  to the east of Furmanov street, to the north of Alimzhanov street, Zhetysu district, Almaty (land cadastral number 20-314-020-155);

47.     Land plot (billboards) located at:  to the south of Zhibek-zholy avenue, to the east of Abylai-khan avenue, Zhetysu district, Almaty (land cadastral number 20-314-020-152);

48.     Land plot (billboards) located at:  to the north of Rayimbekov avenue, to the west of Seifullin street, Almaty (land cadastral number 20-314-013-351);

49.     Land plot (billboards) located at:  to the north of Zhibek-zholy avenue, to the east of Abylai street, Zhetysu district, Almaty (land cadastral number 20-314-020-153);

50.     Land plot (billboards) located at:  to the east of Dostyk avenue, to the north of Kamenistaya street, Medeu district, Almaty (land cadastral number 20-315-022-205);

51.     Land plot (nonresidential) located at:  to the north of Satpayev street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-021-299);

52.     Land plot (nonresidential) located at:  to the south of Kurmangazy street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-015-345);

53.    Land plot (nonresidential) located at:  to the north of Tole Bi street, to the west of Tulebayev street, Medeu district, Almaty (land cadastral number 20-315-013-138);

54.    Land plot (billboards) located at:  to the south of Kabanbai batyr street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-015-344);

55.    Land plot (nonresidential) located at:  to the north of Gogol street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-011-105);

56.    Land plot (nonresidential) located at:  to the north of Abai avenue, to the east of Furmanov street, Medeu district, Almaty (land cadastral number 20-315-014-162);

57.    Land plot (nonresidential) located at:  Abai avenue, to the north-east of Altynsarin avenue, Auezov district, Almaty (land cadastral number 20-312-057-511);

58.    Land plot (billboards) located at:  15a to the east of Baitursynov street, to the south of Satpayev street, Bostandyk, Bostandyk district, Almaty (land cadastral number 20-313-004-354);

59.    Land plot (billboards) located at:  15a to the west of Furmanov street, to the south of Gandi street, Bostandyk, Bostandyk district, Almaty (land cadastral number 20-313-006-402);

60.    Land plot (billboards) located at:  15a to the south of Abai avenue, to the east of Masanchi street, Bostandyk district, Almaty (land cadastral number 20-313-004-353);

61.    Land plot (billboards) located at:  to the north of Tole Bi street, to the west of Zheltoksan street, Almaly district, Almaty (land cadastral number 20-311-005-124);

62.    Land plot (billboards) located at:  to the west of Furmanov street, to the south of Gogol street, Almaly district, Almaty (land cadastral number 20-311-006-070);

63.    Land plot (billboards) located at:  to the north of Kurmangazy street, to the west of Seifullin street, Almaly district, Almaty (land cadastral number 20-311-016-105);

64.    Land plot (billboards) located at:  to the south of Gogol street, to the west of Seifullin street, Almaly district, Almaty (land cadastral number 20-311-005-125);

65.     Land plot (billboards) located at:  to the south of Bogenbay street, to the west of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-007-087);

66.     Land plot (billboards) located at:  to the north of Abai avenue, to the west of Gagarin avenue, Almaly district, Almaty (land cadastral number 20-311-013-266);

67.     Land plot (billboards) located at:  to the north of Kurmangazy street, to the west of Baitursynov street, Almaly district, Almaty (land cadastral number 20-311-015-239);

68.     Land plot (billboards) located at:  to the north of Tole Bi street, to the west of Turgut Ozaly street, Almaly district, Almaty (land cadastral number 20-311-021-375);

69.     Land plot (billboards) located at:  to the south of Kabanbai batyr street, to the east of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-018-150);

70.     Land plot (billboards) located at:  to the south of Gogol street, to the east of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-006-069);

71.     Land plot (billboards) located at:  to the south of Gogol street, to the west of Panfilov street, Almaly district, Almaty (land cadastral number 20-311-006-071);

72.     Land plot (billboards) located at:  to the south of Kabanbai batyr street, to the west of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-018-151);

73.     Land plot (billboards) located at:  to the south of Bogenbay batyr street, to the west of Furmanov street, Almaly district, Almaty (land cadastral number 20-311-007-086);

74.     Land plot (billboards) located at:  Almaty-1 railway station square, Turksib district, Almaty (land cadastral number 20-317-031-172);

75.     Land plot (billboards) located at:  to the west of Suyunbay avenue, to the north of Khmelnickiy street, Turksib district, Almaty (land cadastral number 20-317-044-126);

76.     Land plot (billboards) located at:  to the west of Rozybakiev street, intersection with Abai avenue, Almaly district, Almaty (land cadastral number 20-311-019-287);

77. Land plot (billboards) located at: to the south of Gogol street, to the east of Furmanov street, Medeu district, Almaty (cadastral number 20-315-011-094).

Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. Defendants' Argument**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 10 seeks information not available to Almaty." Indeed, in its supplemental response, Plaintiff again flagrantly disregards the Court's order, adding several more (baseless) objections: "overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence." All such objections should be disregarded.

In any event, Plaintiff should not be permitted to avoid fully answering this Interrogatory based on a trumped-up distinction between the City of Almaty and the Government of Kazakhstan. As Defendants have already shown by expert testimony, "there is no formal legal separation between the City of Almaty and the Government of Kazakhstan. The government of the City of Almaty is, in all legal respects, an instrument of and subordinate to the central Kazakh government. The President ultimately has control over almost every facet of provincial governance. Provincial governments hold no real independent authority in Kazakhstan." (Declaration of Professor Peter B. Maggs in Support of Defendants' Motion to Compel Production of Documents (Dkt. 69-4, at ¶¶ 17-18)). Plaintiff should be compelled to fully and properly answer this Interrogatory, including information available to the Government of Kazakhstan.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies here.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants ask for information regarding Defendants' allegedly improper real estate transactions. It is highly unlikely that all responsive information derives from an attorney-client communication, was prepared in anticipation of litigation, or somehow implicates the law enforcement investigatory privilege. See Moore, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying

facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege.").

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

To the extent Plaintiff has attempted to answer the Interrogatory, its response is plainly insufficient. Plaintiff has unilaterally decided to "interpret" Interrogatory No. 10 as "seeking information sufficient to identify the real properties illegally converted by Defendants . . . ." Interrogatory No. 10 is clear on its face, and seeks details regarding the allegedly improper transactions, not just an identification of the parcels of property. Such details are necessary so Defendants can evaluate and defend themselves against Plaintiff's allegations that these transactions were illegal and damaging to Plaintiff. However, except for the four examples already described in the SAC and one additional piece of property ("Real Estate 5"), Plaintiff offers only the vaguest references to an additional 125 properties, including 55 lumped together as "Billboard Land Plots" and another 70 that are only referred to by the locations of the properties. This does not come close to what Interrogatory No. 10 requests and what the Court's order requires.

Plaintiff should be compelled to immediately and fully supplement its response to this Interrogatory.

**ii. Plaintiff's Argument**

Almaty has answered this question to the best of its ability based on information known to it at this time. Almaty described in exhaustive detail multiple wrongful transactions entered into by Defendants, including approximate dates, listing the entities and persons involved at each stage of each transaction, and describing the real estate at issue. Furthermore, Almaty has identified over 100 additional properties wrongfully converted by Defendants. This answer should be a more than satisfactory response to the Defendants' Interrogatory.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp*., 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking detailed information regarding law enforcement agencies' evidence of their crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf,* 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Defendants' request that Almaty provide details about other government agencies' investigations is also improper. Defendants are likely concerned about Swiss law enforcement proceedings since, according to public reports, their assets have been frozen by Swiss authorities. Article 293 of the Swiss Criminal Code makes it a crime to disclose information about any Swiss government investigations. Defendants incorrectly claim that Article 293 of the Swiss Criminal Code should not shield information from disclosure to them, but cite no authority for their interpretation of Article 293, which explicitly makes it a crime to disclose information about Swiss government investigations and contains no exception for disclosure to those under investigation. (*See* Tuey Decl. i/s/o Rule 44.1 Notice, Ex. A) (Dkt. 84-2).

Furthermore, as explained in Almaty's response to Interrogatory No. 5, Almaty generally maintains records of transactions for five years. This Interrogatory seeks information between 1996 through 2010, beyond the scope of Almaty's general practice for maintenance of records which it could consult in order to provide the requested information. To the extent the Financial Police have maintained in their possession such records, Almaty thus far has been unable to obtain access to them. Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry, and the Motion to Compel as to this Interrogatory should be denied.

**J. DEFENDANTS' SPECIAL INTERROGATORY NO. 11:**

DESCRIBE IN DETAIL all ASSETS in the United States YOU claim are owned, maintained, or controlled (directly or indirectly) by DEFENDANTS.

**PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 11:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from

disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine.  Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege.  Almaty further objects to this Interrogatory as overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence.  Almaty interprets this Interrogatory as seeking information sufficient to identify the real properties illegally converted by Defendants which rightfully belong to the people of the City of Almaty, as described in the Second Amended Complaint, and responds accordingly.

Subject to and without waiver of the foregoing objections, Almaty responds as follows:

In or about July 2012, Elvira, with the knowledge and assistance of Viktor, Leila, Dmitri Kudryshov ("Dmitri"), Iliyas, and Madina Ablyazova ("Madina"), caused over $3 million to be transferred into a United States bank account owned or controlled by her.  Before transferring these funds into the United States, the Defendants caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.

In or about November 2012, Iliyas, with the full knowledge and assistance of the other Defendants, caused approximately $1.3 million to be transferred from an off-shore bank account owned or controlled by him into a United States bank account owned by RPM USA and controlled by Iliyas.  Before transferring these funds into the United States, Iliyas and the other Individual Defendants caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.

In or about June 2012, Elvira and Iliyas – again, with the full knowledge and assistance of the other Individual Defendants – caused approximately $25,000 to be transferred from a Swiss bank account owned or controlled by Iliyas into a United States bank account owned or controlled by Elvira.  Before transferring these funds into the United States, the Individual Defendants caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.

In or about December 2010, Elvira and Dmitri used funds illegally obtained through the Khrapunov Racketeering Enterprise's criminal activity in Kazakhstan and laundered through various off-shore bank accounts and entities to appear legitimate to purchase a luxurious single-family home located at 2578 Hutton Drive in Beverly Hills, California, for approximately

$3.65 million. In March 2012, Iliyas and Madina, also using ill-gotten proceeds of the looting scheme laundered through various off-shore bank accounts and entities to appear legitimate, purchased a lavish single-family home located at 606 North Alta Drive in Beverly Hills, California, for approximately $5.45 million. Iliyas and Madina attempted to conceal the source of the stolen funds used to make this purchase by using Defendant Candian International Ltd. to complete the purchase. On December 30, 2011, defendants caused $163,492.50 to be wired from Candian International Ltd.'s account with originating bank Compagnie Privee de Conseils to Granite Escrow as a down payment on the property. On March 15, 2012, a law firm representing Iliyas wired $5,366,212.53 to complete the transaction.

In January 2013, Iliyas and Madina, with Elvira's assistance, used another sham holding company, 628 HOLDINGS, to purchase a second mansion in Beverly Hills using illicit funds stolen from Almaty and laundered through various off-shore bank accounts and entities to appear legitimate. To that end, Iliyas and Madina caused 628 HOLDINGS to purchase for $6.2 million a five-bedroom single-family home located at 628 North Alta Drive in Beverly Hills, California for the benefit and use of Iliyas and Madina. Defendants retained the firm Hilton & Hyland to represent them in their purchase of the property. A realtor working for Hilton & Hyland described Iliyas as the "boss" and Elvira as the "point person on the ground." Granite Escrow, the escrow company facilitating the purchase of the property, sent the closing package directly to Iliyas. Iliyas's realtor described Iliyas as the "owner" of buyer 628 HOLDINGS, and Elvira as the "Manager and signatory authority."

In or about July 2013, Elvira and Dmitri purchased an expansive, two-acre estate located at 11986 Lockridge Road in Studio City, California for approximately $5.7 million, again using funds stolen from Almaty and laundered through various off-shore bank accounts and entities to appear legitimate. Elvira and Dmitri knew that the money they used to engage in this transaction was stolen from the people of Almaty, and illegally laundered to appear legitimate. Indeed, shortly after they purchased this property, in a further attempt to conceal their possession and use of those funds, Elvira and Dmitri transferred it to The Kasan Family Trust, a trust for which they serve as trustees.

In or about April 2013, Elvira leased a 2013 Rolls Royce sedan valued at approximately $302,000. In addition to the Rolls Royce, Elvira leased a 2013 Bentley sedan valued at approximately $320,000. Elvira is the registered owner of a 2013 Mercedes Benz sport utility vehicle valued at approximately $114,000 and a 2011 Cadillac sport utility vehicle valued at approximately $75,000.

Elvira, Dmitri, Iliyas, and Madina also have attempted to launder funds obtained from the plundering of Almaty by making investments in multiple U.S. companies, including Defendants Maro Design LLC, Haute Hue LLC,

RPM USA LLC, and RPM-Maro LLC. Further, Iliyas and Elvira have caused SDG and SPG to move additional assets stolen from Almaty into the United States by, among other things, using a chain of Luxembourg and Delaware entities to invest in real estate in New York. In or about July 2012, Defendant RPM USA LLC, which is owned or controlled by Iliyas and is a wholly owned subsidiary of SPG, invested approximately $6 million in a New York-based medical device company.

In 2013, Iliyas invested approximately $67.5 million stolen from the people of Almaty to purchase a 37.5% interest in a luxury hotel in New York, the Flatotel. In order to conceal the source of the funds used to make this investment, Iliyas used a series of holding companies ultimately owned by SDG and controlled by him. SDG is the owner of a Luxembourg entity, Tridaou SPV SA. Triadou SPV SA owns 50% of a Delaware limited liability company, CF 135 West Member LLC. CF 135 West Member LLC owns 75% of another Delaware limited liability company, 135 West Street Holder LLC. 135 West Street Holder LLC owns another Delaware limited liability company, 135 West 52nd Street Mezz LLC. 135 West 52nd Street Mezz LLC owns yet another Delaware limited liability company, 135 West 52nd Street Owner LLC. 135 West 52nd Street Owner LLC, in turn, is the owner of the Flatotel, which was purchased in 2013 for $180 million. Following the filing of this lawsuit, Iliyas attempted to liquidate this investment by assigning his 37.5% interest in the Flatotel to the other owners of , CF 135 West Member LLC in return for $28 million, full payment of which was to be complete by June 2015.

Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. <u>Defendants' Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 11 seeks information not available to Almaty." Indeed, in its supplemental response, Plaintiff again flagrantly disregards the Court's order, adding several more (baseless) objections: "overbroad, unduly burdensome,

and unlikely to lead to the discovery of admissible evidence." All such objections should be disregarded.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, even a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants ask for identification of assets in the United States that allegedly belong to Defendants. *See Moore* , No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege."). The identification of assets are facts that cannot be shielded by privilege.

*Second*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos*., No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

To the extent Plaintiff has attempted to answer the Interrogatory, its response is plainly insufficient. Plaintiff has unilaterally decided to "interpret" Interrogatory No. 11 as "seeking information sufficient to identify the real properties illegally converted by Defendants which rightfully belong to the people of the City of

Almaty" Interrogatory No. 11 is clear on its face, and seeks identification of *all* assets in the United States allegedly belonging to Defendants, whether or not the asset is traceable to funds allegedly belonging to the people of the City of Almaty.

Plaintiff should be compelled to immediately and fully supplement its response to this Interrogatory.

**ii. <u>Plaintiff's Argument</u>**

Almaty has answered this question to the best of its ability based on information known to it at this time. Almaty has described in exhaustive detail multiple wrongful transactions entered into by Defendants in the United States, including millions of dollars in stolen funds transferred into the United States by Defendants, Defendants' purchases of multiple luxury estates in the Central District of California, investments made by Defendants in New York and elsewhere totaling over $70 million, and others. This answer should be a more than satisfactory response to the Defendants' Interrogatory.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp*., 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has

access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking detailed information regarding law enforcement agencies' evidence of their crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing

*Kovel*, 296 F.2d 918); *Torf*, 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry, and the Motion to Compel as to this Interrogatory should be denied.

**K. <u>DEFENDANTS' SPECIAL INTERROGATORY NO. 12</u>:**

DESCRIBE IN DETAIL all ACCOUNTS YOU allege have been controlled, directly or indirectly, by DEFENDANTS at any time since 1997.

**<u>PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 12</u>:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty further objects to this Interrogatory on the grounds that it seeks information regarding confidential law enforcement investigations of the Defendants' criminal activities conducted by the Swiss government, including without limitation the Public Prosecutor of Geneva, and the disclosure of such information would violate Article 293 of the Swiss Criminal Code. Almaty interprets this Interrogatory as seeking information sufficient to identify the Defendants' accounts of which Almaty is aware which Almaty believes hold or held funds directly traceable to the funds that rightfully belong to the people of the City of Almaty, as described in the Second Amended Complaint.

Subject to and without waiver of the foregoing objections, Almaty responds as follows: Almaty is aware of the following accounts belonging to Defendants:

- Deutsche Bank account in the name of Defendant Elvira Kudryashova
- American Express Bank Ltd. account in the name of Defendant Elvira Kudryashova
- Schroder & Co. Banque SA account in the name of Defendant Elvira Kudryashova
- Credit Suisse account in the name of Defendant Elvira Kudryashova
- Bank Sarasin and Co. Ltd. account in the names of Defendants Dmitry Kudryashov and Elvira Kudryshova
- Compagnie Privee de Conseils et d'Investissements S.A. account in the name of Defendant Candian International Ltd.
- UBS AG account in the name of Chabrier & Associates
- FBME Bank Ltd. account in the name of Vilder Company SA c/o Chabrier Avocats
- Wells Fargo Bank account in the names of Defendants Dmitry Kudryashov and Elvira Kudryashova
- Bank of America, N.A. account in the name of Elena Petelina

Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. <u>Defendants' Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 12 seeks information not available to Almaty." All such objections should be disregarded.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, to the extent Plaintiff is withholding information based on the assertion of foreign privilege law, such assertion is unavailing. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants ask for identification of bank accounts that Plaintiff alleges belong to Defendants. The mere identification of a bank account is non-privileged, factual information. See Moore, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege.").

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

Plaintiff also objects to this Interrogatory on the ground that it would "violate Article 293 of the Swiss Criminal Code." Plaintiff has waived objections on the basis of confidentiality. Even if it had not, this objection is inaccurate, as this provision of the Swiss Criminal Code is intended to protect the privacy of persons who are the subjects of a Swiss investigation – in this case, Defendants and defendants who were previously dismissed from this action. The provision is not intended to prevent the disclosure of information to *them*, but to protect them by prohibiting the disclosure of information to others. In addition, any information from the Swiss investigation that is in Plaintiff's possession or under its control must have been provided to Plaintiff by the Swiss authorities. It does not make sense for Plaintiff to now claim confidentiality for information that is not confidential to Defendants, and in any event, has been obtained by Plaintiff from the Swiss authorities.

*Finally*, to the extent Plaintiff has attempted to answer the Interrogatory, its response is plainly insufficient. Plaintiff has unilaterally decided to "interpret" Interrogatory No. 12 as "seeking information sufficient to identify the Defendants' accounts of which Almaty is aware which Almaty believes hold[s] or held funds

directly traceable to the funds that rightfully belong to the people of the City of Almaty . . . ." Interrogatory No. 12 is clear on its face, and seeks identification of all accounts allegedly belonging to Defendants, regardless of whether the funds contained in them are traceable to allegedly illicit dealings. Plaintiff's answer is also wholly insufficient because it does not "describe in detail" the bank accounts allegedly belonging to Defendants, for instance by providing the dates when each Defendant allegedly controlled the account, and which country the account is located in.

Plaintiff should be compelled to immediately and fully supplement its response to this Interrogatory.

**ii. Plaintiff's Argument**

Almaty has answered this question to the best of its ability based on information known to it at this time. Almaty has described ten different bank accounts held by Defendants (including one believed to be held by Defendant Elvira Khrapunova under an apparently false name). This answer should be a more than satisfactory response to the Defendants' Interrogatory.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp*., 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan"

by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking detailed information regarding law enforcement agencies' evidence of their crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf,* 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry, and the Motion to Compel as to this Interrogatory should be denied.

**L. <u>DEFENDANTS' SPECIAL INTERROGATORY NO. 13</u>:**

State the amount of money YOU allege was allegedly laundered by DEFENDANTS in violation of 18 U.S.C. § 1956.

**<u>PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 13</u>:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege.

Subject to and without waiver of the foregoing objections, Almaty responds as follows: Almaty believes that the Defendants profited by over $300 million from the illegal transactions by which they stole funds rightfully belonging to the people of the City of Almaty, as described in the Second Amended Complaint. Almaty currently is unaware of the precise amount of money laundered by Defendants into the United States in violation of 18 U.S.C. § 1956, but believes the total to be in excess of $100 million.

Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. Defendants' Argument**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 13 seeks information not available to Almaty." All such objections should be disregarded.

In any event, Plaintiff should not be permitted to avoid fully answering this Interrogatory based on a trumped-up distinction between the City of Almaty and the Government of Kazakhstan. As Defendants have already shown by expert testimony, "there is no formal legal separation between the City of Almaty and the Government of Kazakhstan. The government of the City of Almaty is, in all legal respects, an instrument of and subordinate to the central Kazakh government. The President ultimately has control over almost every facet of provincial governance. Provincial governments hold no real independent authority in Kazakhstan." (Declaration of Professor Peter B. Maggs in Support of Defendants' Motion to Compel Production of Documents (Dkt. 69-4, at ¶¶ 17-18)). Plaintiff should be compelled to fully and properly answer this Interrogatory, including information available to the Government of Kazakhstan.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, to the extent Plaintiff is withholding information based on the assertion of foreign privilege law, such assertion is unavailing. When faced with the potential

application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co*., 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants ask for the amount of money Plaintiff alleges was laundered by Defendants. The mere identification of an amount of money is non-privileged, factual information. *See Moore*., No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege.").

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos*., No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2)

assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

*Finally*, to the extent Plaintiff has attempted to answer the Interrogatory, its response is plainly insufficient. Plaintiff claims it is "currently unaware of the precise amount of money laundered by Defendants into the United States in violation of 18 U.S.C. § 1956, but believes the total to be in excess of $100 million." This case has been pending for more than a year. Defendants are entitled to know their potential exposure. Plaintiff should be compelled to immediately supplement its response to this Interrogatory with the precise amount it alleges Defendants laundered in the United States.

**ii. <u>Plaintiff's Argument</u>**

Almaty has answered this question to the best of its ability based on information known to it at this time. Defendants are well aware of how much money they have stolen, and Almaty has provided the amount located in the United States that it has been able to support based on the information it has obtained to date. If that figure changes through discovery, Almaty will amend or supplement its response. This answer should be a more than satisfactory response to the Defendants' Interrogatory.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis*

*Pharm. Corp.*, 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd.*, 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking detailed information regarding law enforcement agencies' evidence of their crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional

crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf*, 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry, and the Motion to Compel as to this Interrogatory should be denied.

## M. <u>DEFENDANTS' SPECIAL INTERROGATORY NO. 14</u>:

DESCRIBE IN DETAIL the nature and value of each property derived from unlawful activity in which DEFENDANTS allegedly transacted in violation of 18 U.S.C. §§ 1956 and/or 1957.

### <u>PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 14</u>:

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty further objects to this Interrogatory as overbroad, unduly

burdensome, and unlikely to lead to the discovery of admissible evidence. Almaty interprets this Interrogatory as seeking information sufficient to identify the real properties illegally converted by Defendants which rightfully belong to the people of the City of Almaty, as described in the Second Amended Complaint, and responds accordingly.

Subject to and without waiver of the foregoing objections, Almaty responds as follows: Almaty believes that the Defendants profited by over $300 million from the illegal transactions by which they stole funds rightfully belonging to the people of the City of Almaty, as described in the Second Amended Complaint. Almaty currently is unaware of the precise nature and value of each property derived from unlawful activity in which Defendants transacted in violation of 18 U.S.C. §§ 1956 and/or 1957, but believes the total value to be in excess of $100 million:

1. 606 North Alta Drive, Beverly Hills, California
2. 628 North Alta Drive, Beverly Hills, California
3. 11986 Lockridge Drive, Studio City, California
4. 2 Narbonne Drive, Long Beach, California
5. 2578 Hutton Drive, Beverly Hills, California
6. 2013 Rolls Royce sedan
7. 2013 Bentley sedan
8. 2013 Mercedes Benz sport utility vehicle
9. 2011 Cadillac sport utility vehicle valued at approximately $75,000.
10. Flatotel, 135 52nd Street, New York, New York

Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. <u>Defendants' Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the

Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 14 seeks information not available to Almaty." Indeed, in its supplemental response, Plaintiff again flagrantly disregards the Court's order, adding several more (baseless) objections: "overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence." All such objections should be disregarded.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, to the extent Plaintiff is withholding information based on the assertion of foreign privilege law, such assertion is unavailing. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co*., 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants ask for the nature and value of property Plaintiff alleges was derived from unlawful activity. The mere

description of property is non-privileged, factual information. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege.").

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

To the extent Plaintiff has attempted to answer the Interrogatory, its response is plainly insufficient. Plaintiff does not identify the nature or value of *each* property derived from unlawful activity, and rather simply states that it "believes that the Defendants profited by over $300 million . . . ."; and lists ten properties it alleges were derived from unlawful activity. But Plaintiff refuses to even approximate the value of nine of the ten pieces of property, as required by this Interrogatory.

Plaintiff should be compelled to immediately and fully supplement its response to this Interrogatory.

**ii. <u>Plaintiff's Argument</u>**

Almaty has answered this question to the best of its ability based on information known to it at this time. Almaty has not yet conducted appraisals or

otherwise attempted to estimate the value of each property Defendants acquired in the United States using stolen funds. Defendants are well aware of how much money they have stolen and what they have purchased with that money, and Almaty has provided the amount it has been able to support based on the information it has obtained to date. If that figure changes through discovery, Almaty will amend or supplement its response. This answer should be a more than satisfactory response to the Defendants' Interrogatory.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp*., 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking detailed information regarding law enforcement agencies' evidence of their crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf,* 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry, and the Motion to Compel as to this Interrogatory should be denied.

**N.    DEFENDANTS' SPECIAL INTERROGATORY NO. 15:**

DESCRIBE IN DETAIL the nature and value of each stolen property DEFENDANTS allegedly transported in violation of 18 U.S.C. § 2314.

**PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 15:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty further objects to this Interrogatory as overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence. Almaty interprets this Interrogatory as seeking information sufficient to identify the real properties illegally converted by Defendants which rightfully belong to the people of the City of Almaty, as described in the Second Amended Complaint, and responds accordingly.

Subject to and without waiver of the foregoing objections, Almaty responds as follows: Almaty believes that the Defendants profited by over $300 million from the illegal transactions by which they stole funds rightfully belonging to the people of the City of Almaty, as described in the Second Amended Complaint. Almaty currently is unaware of the precise the nature and value of each stolen property Defendants transported in violation of 18 U.S.C. § 2314, but believes the total value to be in excess of $100 million:

1. 606 North Alta Drive, Beverly Hills, California

2. 628 North Alta Drive, Beverly Hills, California

3. 11986 Lockridge Drive, Studio City, California

4. 2 Narbonne Drive, Long Beach, California

5. 2578 Hutton Drive, Beverly Hills, California

6. 2013 Rolls Royce sedan

7. 2013 Bentley sedan

8. 2013 Mercedes Benz sport utility vehicle

9. 2011 Cadillac sport utility vehicle valued at approximately $75,000.

10. Flatotel, 135 52nd Street, New York, New York

Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. Defendants' Argument**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 15 seeks information not available to Almaty." Indeed, in its supplemental response, Plaintiff again flagrantly disregards the Court's order, adding several more (baseless) objections: "overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence." All such objections should be disregarded.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan and Switzerland, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal

advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants ask for the nature and value of property Plaintiff alleges was transported by Defendants. The mere description of properly is non-privileged, factual information. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege.").

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

To the extent Plaintiff has attempted to answer the Interrogatory, its response is plainly insufficient. Plaintiff's response does not refer to transportation. Further, Plaintiff did not describe in detail the nature and value of *each* stolen property, and rather simply states that it "believes that the Defendants profited by over $300 million . . . ."; and lists ten properties it alleges derived from unlawful activity. But Plaintiff refuses to even approximate the value of nine of the ten pieces of property, as required by this Interrogatory.

Plaintiff should be compelled to immediately and fully supplement its response to this Interrogatory.

**ii. <u>Plaintiff's Argument</u>**

Almaty has answered this question to the best of its ability based on information known to it at this time. Almaty has not yet conducted appraisals or otherwise attempted to estimate the current value of each property Defendants acquired in the United States using stolen funds. Defendants are well aware of how much money they have stolen and what they have purchased with that money, and Almaty has provided the amount it has been able to support based on the information it has obtained to date. If that figure changes through discovery, Almaty will amend or supplement its response. This answer should be a more than satisfactory response to the Defendants' Interrogatory.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp.*, 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd.*, 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over

information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities. Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking detailed information regarding law enforcement agencies' evidence of their crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the

Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf*, 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry, and the Motion to Compel as to this Interrogatory should be denied.

**O. DEFENDANTS' SPECIAL INTERROGATORY NO. 16:**

DESCRIBE IN DETAIL each "property," "business transaction," "sham company" and "disguised entity" referenced in the following sentence of the SECOND AMENDED COMPLAINT: "They did so by acquiring property, including property in the Central District of California, and engaging in business transactions in the names of Iliyas, Madina, Elvira, Dmitri, and/or sham companies and disguised entities in order to hide the true identity of the source of the stolen funds and in order to avoid detection by Kazakh, Swiss and U.S. authorities."

**PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 16:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty further objects to this Interrogatory on the grounds that it

seeks information regarding confidential law enforcement investigations of the Defendants' criminal activities conducted by the Swiss government, including without limitation the Public Prosecutor of Geneva, and the disclosure of such information would violate Article 293 of the Swiss Criminal Code.  Almaty interprets this Interrogatory as seeking information sufficient to identify the transactions in the United States of which Almaty is aware that utilized assets traceable to the funds that rightfully belong to the people of the City of Almaty, as described in the Second Amended Complaint.

Subject to and without waiver of the foregoing objections, Almaty responds as follows:

In or about July 2012, Elvira, with the knowledge and assistance of Viktor, Leila, Dmitri, Iliyas, and Madina, caused over $3 million to be transferred into a United States bank account owned or controlled by her. Before transferring these funds into the United States, the Defendants caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.

In or about November 2012, Iliyas, with the full knowledge and assistance of the other Defendants, caused approximately $1.3 million to be transferred from an off-shore bank account owned or controlled by him into a United States bank account owned by RPM USA and controlled by Iliyas. Before transferring these funds into the United States, Iliyas and the other Individual Defendants caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.

In or about June 2012, Elvira and Iliyas – again, with the full knowledge and assistance of the other Individual Defendants – caused approximately $25,000 to be transferred from a Swiss bank account owned or controlled by Iliyas into a United States bank account owned or controlled by Elvira.  Before transferring these funds into the United States, the Individual Defendants caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.

In or about December 2010, Elvira and Dmitri used funds illegally obtained through the Khrapunov Racketeering Enterprise's criminal activity in Kazakhstan and laundered through various off-shore bank accounts and entities to appear legitimate to purchase a luxurious single-family home located at 2578 Hutton Drive in Beverly Hills, California, for approximately $3.65 million.  In March 2012, Iliyas and Madina, also using ill-gotten

proceeds of the looting scheme laundered through various off-shore bank accounts and entities to appear legitimate, purchased a lavish single-family home located at 606 North Alta Drive in Beverly Hills, California, for approximately $5.45 million. Iliyas and Madina attempted to conceal the source of the stolen funds used to make this purchase by using Defendant Candian International Ltd. to complete the purchase. On December 30, 2011, defendants caused $163,492.50 to be wired from Candian International Ltd.'s account with originating bank Compagnie Privee de Conseils to Granite Escrow as a down payment on the property. On March 15, 2012, a law firm representing Iliyas wired $5,366,212.53 to complete the transaction.

In January 2013, Iliyas and Madina, with Elvira's assistance, used another sham holding company, 628 HOLDINGS, to purchase a second mansion in Beverly Hills using illicit funds stolen from Almaty and laundered through various off-shore bank accounts and entities to appear legitimate. To that end, Iliyas and Madina caused 628 HOLDINGS to purchase for $6.2 million a five-bedroom single-family home located at 628 North Alta Drive in Beverly Hills, California for the benefit and use of Iliyas and Madina. Defendants retained the firm Hilton & Hyland to represent them in their purchase of the property. A realtor working for Hilton & Hyland described Iliyas as the "boss" and Elvira as the "point person on the ground." Granite Escrow, the escrow company facilitating the purchase of the property, sent the closing package directly to Iliyas. Iliyas's realtor described Iliyas as the "owner" of buyer 628 HOLDINGS, and Elvira as the "Manager and signatory authority."

In or about July 2013, Elvira and Dmitri purchased an expansive, two-acre estate located at 11986 Lockridge Road in Studio City, California for approximately $5.7 million, again using funds stolen from Almaty and laundered through various off-shore bank accounts and entities to appear legitimate. Elvira and Dmitri knew that the money they used to engage in this transaction was stolen from the people of Almaty, and illegally laundered to appear legitimate. Indeed, shortly after they purchased this property, in a further attempt to conceal their possession and use of those funds, Elvira and Dmitri transferred it to The Kasan Family Trust, a trust for which they serve as trustees.

In or about April 2013, Elvira leased a 2013 Rolls Royce sedan valued at approximately $302,000. In addition to the Rolls Royce, Elvira leased a 2013 Bentley sedan valued at approximately $320,000. Elvira is the registered owner of a 2013 Mercedes Benz sport utility vehicle valued at approximately $114,000 and a 2011 Cadillac sport utility vehicle valued at approximately $75,000.

Elvira, Dmitri, Iliyas, and Madina also have attempted to launder funds obtained from the plundering of Almaty by making investments in multiple U.S. companies, including Defendants Maro Design LLC, Haute Hue LLC, RPM USA LLC, and RPM-Maro LLC. Further, Iliyas and Elvira have

caused SDG and SPG to move additional assets stolen from Almaty into the United States by, among other things, using a chain of Luxembourg and Delaware entities to invest in real estate in New York. In or about July 2012, Defendant RPM USA LLC, which is owned or controlled by Iliyas and is a wholly owned subsidiary of SPG, invested approximately $6 million in a New York-based medical device company.

In 2013, Iliyas invested approximately $67.5 million stolen from the people of Almaty to purchase a 37.5% interest in a luxury hotel in New York, the Flatotel. In order to conceal the source of the funds used to make this investment, Iliyas used a series of holding companies ultimately owned by SDG and controlled by him. SDG is the owner of a Luxembourg entity, Tridaou SPV SA. Triadou SPV SA owns 50% of a Delaware limited liability company, CF 135 West Member LLC. CF 135 West Member LLC owns 75% of another Delaware limited liability company, 135 West Street Holder LLC. 135 West Street Holder LLC owns another Delaware limited liability company, 135 West 52nd Street Mezz LLC. 135 West 52nd Street Mezz LLC owns yet another Delaware limited liability company, 135 West 52nd Street Owner LLC. 135 West 52nd Street Owner LLC, in turn, is the owner of the Flatotel, which was purchased in 2013 for $180 million. Following the filing of this lawsuit, Iliyas attempted to liquidate this investment by assigning his 37.5% interest in the Flatotel to the other owners of , CF 135 West Member LLC in return for $28 million, full payment of which was to be complete by June 2015.

Almaty is informed and believes that the following individuals and entities may have been involved in some aspect of the Khrapunov Racketeering Scheme:

1. Almaty-Demalys, a Kazakhstan company
2. Viled Establishment, a Kazakhstan company
3. KazRealIncom LLP, a Kazakhstan company
4. Karasha Plus LLP, a Kazakhstan company
5. Building Services Company, a Kazakhstan company
6. Asia Holding Development LLP, a Kazakhstan company
7. Victoriya-KMK LLP, a Kazakhstan company
8. Ademytau-KMK LLP, a Kazakhstan company
9. Mr. Fumigation, Inc., a California corporation
10. Douglas Fierro

11. Michelle Smirnov, 1333 N. Curson Ave., Apt. 206, Los Angeles, CA 90046-3183

12. CAAHolding Company, a California company

13. MD Holding Company, a California company

14. Phoenix International USA Inc., a Delaware corporation

15. Tridaou SPV SA, a Luxembourg company

16. CF 135 West Member LLC, a Delaware limited liability corporation

17. 135 West 52nd Street Holder LLC, a Delaware limited liability corporation

18. 135 West 52nd Street Mezz LLC, a Delaware limited liability Corporation

19. 135 West 52nd Street Owner LLC, a Delaware limited liability corporation

20. Flatotel, a New York company

21. Health Service Network Inc., a New York company

22. RPM HSNI LLC, a New York limited liability corporation

23. Mukhtar Ablyazov

24. Swiss Promotion Group SA, a Swiss company

25. Harlem Securities Ltd., a British Virgin Islands company

26. Swiss Development Group SA, a Swiss company

Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

i. **Defendants' Argument**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the

Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 16 seeks information not available to Almaty." All such objections should be disregarded.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, even a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants ask for identification of each "property," "business transaction," "sham company" and "disguised entity" referenced in the SAC. The mere identification of properly and entities is non-privileged, factual information. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege.").

*Second*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos*., No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

*Third*, Plaintiff objects to this Interrogatory on the ground that it would "violate Article 293 of the Swiss Criminal Code." Plaintiff has waived objections

on the basis of confidentiality. Even if it had not, this objection is inaccurate, as this provision of the Swiss Criminal Code is intended to protect the privacy of persons who are the subjects of a Swiss investigation – in this case, Defendants and defendants who were previously dismissed from this action. The provision is not intended to prevent the disclosure of information to them, but to protect them by prohibiting the disclosure of information to others. In addition, any information from the Swiss investigation that is in Plaintiff's possession or under its control must have been provided to Plaintiff by the Swiss authorities. It does not make sense for Plaintiff to now claim confidentiality for information that is not confidential to Defendants, and in any event, has been obtained by Plaintiff from the Swiss authorities.

To the extent Plaintiff has attempted to answer the Interrogatory, its response is plainly insufficient. Plaintiff does not describe in detail each "property," "business transaction," "sham company" and "disguised entity," and rather mostly recites its allegations in the SAC relating to money laundering and lists "individuals and entities [that] may have been involved in some aspect of the Khrapunov Racketeering Scheme," most of which were already identified in Plaintiff's Initial Disclosures.

Plaintiff should be compelled to immediately and fully supplement its response to this Interrogatory.

**ii. <u>Plaintiff's Argument</u>**

Almaty has answered this question to the best of its ability based on information known to it at this time. Almaty has described in exhaustive detail multiple wrongful transactions entered into by Defendants in the United States, including millions of dollars in stolen funds transferred into the United States by Defendants, Defendants' purchases of multiple luxury estates in the Central District of California, investments made by Defendants in New York and elsewhere totaling over $70 million, and others. In addition, Almaty has listed 26

different persons and entities who it has reason to believe have knowledge of Defendants' crimes, including persons and entities located in California, Delaware, New York, Kazakhstan, Switzerland, and the British Virgin Islands. This answer should be a more than satisfactory response to the Defendants' Interrogatory.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp.*, 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd.*, 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking detailed information regarding law enforcement agencies' evidence of their crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf,* 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry, and the Motion to Compel as to this Interrogatory should be denied.

**P. <u>DEFENDANTS' SPECIAL INTERROGATORY NO. 17</u>:**

DESCRIBE IN DETAIL each "property," "fictitious and sham entity," "sham transaction," and "illicit government action" referenced in the following sentence of the SECOND AMENDED COMPLAINT: "Defendants carried out the scheme through various means, including: (a) secretly acquiring property owned by Almaty through fictitious and sham entities for a fraction of what the property was worth, then selling the property for tens of millions of dollars in illicit profits; (b) acquiring property without even paying for it through sham transactions; and (c) secretly acquiring property at a discount then taking illicit government action that vastly increased the value of the property solely to benefit Viktor and his co-conspirators."

**<u>PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 17</u>:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty further objects to this Interrogatory as overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence. Almaty interprets this Interrogatory as seeking information sufficient to identify the real properties illegally converted by Defendants which rightfully belong to the people of the City of Almaty, as described in the Second Amended Complaint, and responds accordingly.

Subject to and without waiver of the foregoing objections, Almaty responds as follows:

**<u>Real Estate 1</u>**

In or about 2000, Viktor Khrapunov ("Viktor") abused his position as Mayor of Almaty to cause a large tract of state-owned land near two rivers in Almaty ("Real Estate 1") to be transferred to Leila Khrapunova ("Leila") for a total price of approximately $121,000. The transfer was accomplished via a series of fraudulent transactions and front companies controlled by Leila and Iliyas Khrapunov ("Iliyas). Through several more transfers designed to conceal the illegal conduct, Leila and Iliyas ultimately sold Real Estate 1 for a total of $15.57 million, yielding more than $15 million in illicit profit as a result of this single transaction.

Viktor' s transfer of Real Estate 1 violated the Land Code of the Republic of Kazakhstan, which requires that this type of public property not be sold, as well as the Water Code, which mandates that land in water conservation zones may only be provided to private individuals and entities for temporary use.

To carry out the illegal conversion of Real Estate 1, Viktor, Leila, Iliyas, Rassilya Daniyarova (mother of Leila), and Gaukhar Iliyasova (sister of Leila) utilized at least six Kazakhstan entities controlled by Leila and Iliyas, including: (a) Almaty-Demalys; (b) Viled Establishment ("Viled"); (c) KazRealIncom LLP ("KRI"); (d) Karasha Plus LLP ("Karasha"); (e) Building Services Company ("BSC"); and (f) Asia Holding Development LLP ("Asia Holding").

On or about September 22, 1998, Viktor signed a decree to transfer management of the property to Almaty-Demalys, a closed Joint Stock Company. Almaty-Demalys was owned by Altai LLC ("Altai"), which had 51% interest in Almaty-Demalys, and Almaty, which owned the other 49%. Altai was controlled by a man whose family member worked for Viktor. On or about May 15, 2000, Altai changed the 51% ownership in Almaty-Demalys from Altai to Viled. Altai did not receive any consideration in return for its ownership interest. On or about April 18, 2001, Viktor caused Almaty to sell its 49% ownership interest in Almaty-Demalys to Viled for approximately $121,000.

On or about August 25, 2003, Leila caused Viled to sell Almaty-Demalys to KRI for approximately $121,000 (18,800,000 ₸). Leila then caused KRI to sell Almaty-Demalys to Karasha for the same amount. Leila controlled Karasha through, among others, her sister. Next, on or about October 3, 2003, Leila caused Karasha to transfer ownership of Real Estate 1 directly to her. As a result of this series of transfers, Leila obtained full ownership of Real Estate 1. On or about May 6, 2004, Almaty-Demalys was officially dissolved.

On or about October 6, 2003, Leila contributed a portion of Real Estate 1 to BSC, which she then sold to a third party in a transaction that valued that portion of Real Estate 1 at approximately $8 million (1,179,999,980 ₸). Leila caused the remaining portion of Real Estate 1 to be conveyed directly to Iliyas. Iliyas, in turn, contributed it to Asia Holding, and then sold Asia Holding to a separate unrelated third party for approximately $7.57 million. Of the $7.57 million, Iliyas transferred approximately $2.21 million to Swiss bank accounts held by or on behalf of Elvira Kudryshova ("Elvira"), including accounts at Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co., and retained the remainder for himself.

Thus, Leila paid approximately $121,000 for Real Estate 1, which she and Iliyas later re-sold for a total of $15.57 million.

**Real Estate 2**

Starting in April 2001, Viktor used his position as mayor to cause a public building in Almaty to be sold to Leila's company, KRI, for approximately $347,000 (52,155,100 ₸). On or about April 16, 2001, Viktor signed a decree privatizing the property at Kindergarden No. 186, 242A Furmanov Street, Almaty. Viktor then manipulated a public auction to ensure that KRI won the auction. On December 18, 2001, KRI was declared the winner of the auction and on December 21, 2001, Viktor arranged for the property to be transferred to KRI.

Under the laws of Kazakhstan, potential buyers of state-owned property are obligated to state how they intend to invest in and develop the property before acquiring. In an attempt to make KRI's bid appear legitimate, during the bidding process Leila caused KRI to fraudulently represent that KRI would invest a significant amount in Real Estate 2 to build a health center for the benefit of the people of Almaty. That representation was false at the time it was made and, in fact, KRI never intended to and never did build any such health center or invest in the center.

At Viktor's direction, KRI won the auction and, instead of investing in the property as promised, on or about October 1, 2003, Leila caused KRI to sell Real Estate 2 to Karasha. Two days later, Leila caused Karasha to sell Real Estate 2 directly to her. Shortly thereafter, Leila contributed Real Estate 2 to BSC, which she then sold to an unrelated third party in a transaction that valued Real Estate 2 at approximately $4.1 million (611,445,206 ₸). Leila and Viktor thus obtained illegal profit of over $3.7 million as a result of their illicit acquisition and re-sale of Real Estate 2.

**Real Estate 3**

In addition to manufacturing the sale of state-owned assets to Leila and other family members and co-conspirators, Viktor also abused his authority as mayor to seize privately-owned land and transfer it to Leila and others for re-sale.

On or about August 25, 2003, Viktor caused Almaty to seize property owned by privately-owned third party Shadid Engineering LLP ("Real Estate 3"). Prior to the seizure, Shadid had obtained a series of approvals to allow them to bring infrastructure to the land, including power lines, water lines, sewage lines, and materials to begin building. After Shadid had made these improvements, Viktor denied Shadid a permit to build on the land and instead caused Almaty to seize the property.

On September 4, 2003 Viktor caused Almaty to sell landplots associated with Shadid to KazRealIncome. On September 23, 2003, Viktor arranged for a decree to change the purchaser of the property from KazRealIncome to KarashaPlus. On October 3, 2003 Leila Khrapunov arranged for KarashaPlus to transfer its interest to her. On October 6, 2003,

Leila Khrapunov contributed the interest to Building Services Corp, and then sold Building Services Corp. to a third party. On September 4, 2003 Viktor caused Almaty to sell landplots associated with Shadid to KazRealIncome. On September 23, 2003, Viktor arranged for a decree to change the purchaser of the property from KazRealIncome to KarashaPlus. On October 3, 2003 Leila Khrapunov arranged for KarashaPlus to transfer its interest to her. On October 6, 2003, Leila Khrapunov contributed the interest to Building Services Corp, and then sold Building Services Corp. to a third party.

In this sale, Real Estate 3 was valued at approximately $2 million. As a result, Leila obtained nearly $1.9 million in illicit profit at the expense of Almaty and its people.

**Real Estate 4**

Between November and December 2004, Viktor caused Almaty to sell land ("Real Estate 4") to two additional Kazakhstan companies owned and controlled by Leila, Victoriya-KMK LLP and Ademytau-KMK LLP. Real Estate 4 was located in a water conservation zone and, therefore, under Kazakh law, could be provided to private persons or entities only for temporary use. Nevertheless, in violation of the law and his obligations as mayor of Almaty, Viktor caused Real Estate 4 to be sold to Leila's companies for approximately $1.3 million (18,870,100 ₸). On or about December 23, 2005 and January 25, 2006, Leila sold Real Estate 4 to an unrelated third party for approximately $8.6 million (1,223,950,000 ₸) – resulting in illicit profit to Leila and Viktor of approximately $7.3 million.

**Real Estate 5**

On or about March 18, 2004, a company owned and/or controlled by Leila, Phoenix LV ("Phoenix"), and third party Ahsell Holdings ("Ahsell") formed Ayt Holding Complex ("Ayt"), each with a 50% ownership interest. On or about May 6, 2004, Viktor illegally caused one of the most valuable plots of land in Almaty at the time ("Real Estate 5") to be sold to Ayt for approximately $450,000. Real Estate 5 was located in a zone protected as mountain lands and was by law not permitted to be sold to private parties. Nevertheless, Viktor caused Real Estate 5 to be sold to Ayt, and Ayt then built multiple homes on the property, each of which later was sold for up to $4 million. In or about July 2004, Phoenix transferred its ownership interest in Ayt to Ahsell for approximately $8 million.

**Billboard Land Plots**

Viktor caused a total of 55 plots of land to be sold illegally to various companies owned or controlled by Leila, including Viled, to be used to erect billboards. The companies paid only nominal amounts for the land, and then rented the billboards to third parties. As an example of the value of the land plots, 11 of the plots were rented to third parties for a single year in return for rents of approximately $10 million. In total, Leila, Viktor, Iliyas, Elvira, and

their coconspirators profited by tens of millions of dollars as a result of their illegal acquisition of these plots of land.

In addition, the Khrapunov Racketeering Scheme illegally converted the following real property:

7.      Land plot and residential premises located at:  177 Gornaya street, Medeu district, Almaty (land cadastral number 20-315-912-121);

8.      Land plot and residential premises located at:  179 Gornaya street, Medeu district, Almaty (land cadastral number 20-315-912-113);

9.      Land plot and residential premises located at:  181 Gornaya street, Medeu district, Almaty (land cadastral number 20-315-912-114)

10.     Land plot located at:  242a Furmanova street, Medeu district, Almaty (land cadastral number 20-315-021-293);

11.     Land plot located at:  to the west of Mendikulov street, to the north of Khadzhi-Mukan street, Medeu district, Almaty (land cadastral number 20-315-021-292);

12.     Office building (former policlinic building of WWV) located at: 63 Tole Bi street, Almaty (land cadastral number 20-311-006-061);

13.     Nonresidential premises and land plot located at:  160 Tole Bi street, Almaty (land cadastral number 20-311-011-038);

14.     Land plot located at:  to the south of Al-Farabi Avenue, to the east of Esentai River, Medeu district, Almaty (land cadastral number 20-315-028-530).

15.     Land plot located at:  to the south of Al-Farabi Avenue, to the east of Muhammed-Khaidar Dulati Avenue, Almaty (land cadastral number 20-313-021-490).

16.     Nonresidential premises (former building of municipal state-owned public enterprise "Guest house of Ministry of Foreign Affairs") located at:  165/167 Zheltoksan street, Almaty;

17.     Land plot micro district Shanyrak 1, to the north of Ryskulov avenue, to the west of bolshaya Almatinka River (Thermal spring) (land cadastral number 20-312-919-083);

18.     Land plot with total area 3.9 hectares located at:  235 Gorniy gigant street (Oak-wood), Almaty (land cadastral number 20-315-912-031);

19.     Passenger terminal building of Almaty airport with area 2481.92 sq. m. in the amount of 333 735 805 tenge;

20.     Real estate properties located at:  36 Belinskiy street, 76 Ushanov street, 95 Gorkiy street, Ust-Kamenogorsk city, East Kazakhstan Region;

21.     Land plot with area 44.2310 hectares located at:  to the north of Tashkentskaya street, to the west of micro district Akbulak, Almaty (land cadastral number 20-312-941-009);

22.     Land plots located on the territory of micro district "Edelveis" at:  to the south of Esentai River, to the west of Zhamakayev street, Agricultural production cooperative Gorniy gigant, Auezov district, Almaty (land cadastral number 20-315-936-080);

23.     Land plot (billboards) located at:  to the north of Abai avenue, to the east of Tulebayev street, Medeu district, Almaty (land cadastral number 20-315-021-300);

24.     Land plot (billboards) located at:  to the south of Gogol street, to the west of Abylai-khan avenue, Almaly district, Almaty (land cadastral number 20-311-006-066);

25.     Land plot (billboards) located at:  15a to the north of Khodzhanov street, to the west of Al-Farabi avenue (land cadastral number 20-313-011-374);

26.     Land plot (billboards) located at:  to the north of Gogol street, to the west of Abylai-khan avenue, Zhetysu district, Almaty (land cadastral number 20-314-020-140);

27.     Land plot (nonresidential) located at:  to the south of Gogol street, to the east of Furmanov street, Medeu district, Almaty (land cadastral number 20-315-029-620);

28.     Land plot (nonresidential) located at:  to the north of Abai avenue, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-021-270);

29.     Land plot (billboards) located at:  to the north of Zhibek zholy avenue, to the east of Abylai-khan avenue, Zhetysu district, Almaty (land cadastral number 20-314-020-141);

30.     Land plot (billboards) located at:  to the west of Mailin street, to the south of Bekmakhanov street, Turksib district, Almaty (land cadastral number 20-317-039-108);

31.     Land plot (nonresidential) located at:  to the south of Al-Farabi avenue, to the east of Mendikulov boulevard, Medeu district, Almaty (land cadastral number 20-315-021-269);

32. Land plot (nonresidential) located at: Chimbulak area, Medeu district, Almaty (land cadastral number 20-315-944-033);

33. Land plot (billboards) located at: to the north of Gogol street, to the west of Nauryzbay batyr street, Zhetysu district, Almaty (land cadastral number 20-314-019-061);

34. Land plot (billboards) located at: to the north of Gogol street, to the west of Nauryzbay batyr street, Zhetysu district, Almaty (land cadastral number 20-314-019-060);

35. Land plot (nonresidential) located at: to the south of Al-Farabi avenue, to the west of Furmanov avenue, Medeu district, Almaty (land cadastral number 20-315-029-621);

36. Land plot (nonresidential) located at: to the south of Khadzhi-Mukan street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-024-232);

37. Land plot (billboards) located at: to the south of Bogenbay street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-012-235);

38. Land plot (billboards) located at: to the south of Gogol street, to the west of Furmanov street, Medeu district, Almaty (land cadastral number 20-315-011-103);

39. Land plot (nonresidential) located at: to the north of Tole Bi street, to the east of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-011-104);

40. Land plot (nonresidential) located at: to the north of Zholdasbekov street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-021-296);

41. Land plot (nonresidential) located at: to the south of Al Farabi avenue, to the east of Furmanova street, Medeu district, Almaty (land cadastral number 20-315-021-297);

42. Land plot (billboards) located at: to the east of Dostyk avenue, to the south of Karasai batyr avenue, Medeu district, Almaty (land cadastral number 20-315-012-234);

43. Land plot (billboards) located at: to the south of Zhibek-zholy avenue, to the east of Panfilov street, Zhetysu district, Almaty (land cadastral number 20-314-020-151);

44.     Land plot (billboards) located at:  to the south of Zhibek-zholy avenue, to the east of Frunze street, Zhetysu district, Almaty (land cadastral number 20-314-020-154);

45.     Land plot (billboards) located at:  to the west of Abylai-khan avenue, to the south of Rayimbek avenue, Zhetysu district, Almaty (land cadastral number 20-314-014-099);

46.     Land plot (billboards) located at:  to the east of Furmanov street, to the north of Alimzhanov street, Zhetysu district, Almaty (land cadastral number 20-314-020-155);

47.     Land plot (billboards) located at:  to the south of Zhibek-zholy avenue, to the east of Abylai-khan avenue, Zhetysu district, Almaty (land cadastral number 20-314-020-152);

48.     Land plot (billboards) located at:  to the north of Rayimbekov avenue, to the west of Seifullin street, Almaty (land cadastral number 20-314-013-351);

49.     Land plot (billboards) located at:  to the north of Zhibek-zholy avenue, to the east of Abylai street, Zhetysu district, Almaty (land cadastral number 20-314-020-153);

50.     Land plot (billboards) located at:  to the east of Dostyk avenue, to the north of Kamenistaya street, Medeu district, Almaty (land cadastral number 20-315-022-205);

51.     Land plot (nonresidential) located at:  to the north of Satpayev street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-021-299);

52.     Land plot (nonresidential) located at:  to the south of Kurmangazy street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-015-345);

53.     Land plot (nonresidential) located at:  to the north of Tole Bi street, to the west of Tulebayev street, Medeu district, Almaty (land cadastral number 20-315-013-138);

54.     Land plot (billboards) located at:  to the south of Kabanbai batyr street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-015-344);

55.     Land plot (nonresidential) located at:  to the north of Gogol street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-011-105);

56.     Land plot (nonresidential) located at:  to the north of Abai avenue, to the east of Furmanov street, Medeu district, Almaty (land cadastral number 20-315-014-162);

57.     Land plot (nonresidential) located at:  Abai avenue, to the north-east of Altynsarin avenue, Auezov district, Almaty (land cadastral number 20-312-057-511);

58.     Land plot (billboards) located at:  15a to the east of Baitursynov street, to the south of Satpayev street, Bostandyk, Bostandyk district, Almaty (land cadastral number 20-313-004-354);

59.     Land plot (billboards) located at:  15a to the west of Furmanov street, to the south of Gandi street, Bostandyk, Bostandyk district, Almaty (land cadastral number 20-313-006-402);

60.  Land plot (billboards) located at:  15a to the south of Abai avenue, to the east of Masanchi street, Bostandyk district, Almaty (land cadastral number 20-313-004-353);

61.     Land plot (billboards) located at:  to the north of Tole Bi street, to the west of Zheltoksan street, Almaly district, Almaty (land cadastral number 20-311-005-124);

62.     Land plot (billboards) located at:  to the west of Furmanov street, to the south of Gogol street, Almaly district, Almaty (land cadastral number 20-311-006-070);

63.     Land plot (billboards) located at:  to the north of Kurmangazy street, to the west of Seifullin street, Almaly district, Almaty (land cadastral number 20-311-016-105);

64.     Land plot (billboards) located at:  to the south of Gogol street, to the west of Seifullin street, Almaly district, Almaty (land cadastral number 20-311-005-125);

65.     Land plot (billboards) located at:  to the south of Bogenbay street, to the west of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-007-087);

66.     Land plot (billboards) located at:  to the north of Abai avenue, to the west of Gagarin avenue, Almaly district, Almaty (land cadastral number 20-311-013-266);

67.     Land plot (billboards) located at:  to the north of Kurmangazy street, to the west of Baitursynov street, Almaly district, Almaty (land cadastral number 20-311-015-239);

68. Land plot (billboards) located at: to the north of Tole Bi street, to the west of Turgut Ozaly street, Almaly district, Almaty (land cadastral number 20-311-021-375);

69. Land plot (billboards) located at: to the south of Kabanbai batyr street, to the east of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-018-150);

70. Land plot (billboards) located at: to the south of Gogol street, to the east of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-006-069);

71. Land plot (billboards) located at: to the south of Gogol street, to the west of Panfilov street, Almaly district, Almaty (land cadastral number 20-311-006-071);

72. Land plot (billboards) located at: to the south of Kabanbai batyr street, to the west of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-018-151);

73. Land plot (billboards) located at: to the south of Bogenbay batyr street, to the west of Furmanov street, Almaly district, Almaty (land cadastral number 20-311-007-086);

74. Land plot (billboards) located at: Almaty-1 railway station square, Turksib district, Almaty (land cadastral number 20-317-031-172);

75. Land plot (billboards) located at: to the west of Suyunbay avenue, to the north of Khmelnickiy street, Turksib district, Almaty (land cadastral number 20-317-044-126);

76. Land plot (billboards) located at: to the west of Rozybakiev street, intersection with Abai avenue, Almaly district, Almaty (land cadastral number 20-311-019-287);

77. Land plot (billboards) located at: to the south of Gogol street, to the east of Furmanov street, Medeu district, Almaty (cadastral number 20-315-011-094).

Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. <u>Defendants' Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based

on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 17 seeks information not available to Almaty." Indeed, in its supplemental response, Plaintiff again flagrantly disregards the Court's order, adding several more (baseless) objections: "overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence." All such objections should be disregarded.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

First, it is clear that this Interrogatory calls for information from Kazakhstan, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co*., 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants ask for identification of each "property," "business transaction," "fictitious and sham entity" "sham transaction" and "illicit government action" referenced in the SAC. The mere description of property, alleged sham entities and transactions, and allegedly illicit government action is non-privileged, factual information. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege.").

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos*., No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

*Finally*, Plaintiff's answer is deficient. Plaintiff has unilaterally decided to "interpret" Interrogatory No. 17 as "seeking information sufficient to identify the real properties illegally converted by Defendants . . . ." But that is not what the Interrogatory asks. Plaintiff was required to "describe in detail" each "property," "business transaction," "fictitious and sham entity" "sham transaction" and "illicit government action" referenced in a specific sentence of the SAC. Except for four examples from the SAC and some information about another piece of property

("Real Estate 5"), Plaintiff lumps together 55 properties in a category labeled "Billboard Land Plots" and then identifies more than 70 properties by vague references to their locations. This does not come close to what Interrogatory No. 17 requests.

Plaintiff should be compelled to immediately and fully supplement its response to this Interrogatory.

**ii. <u>Plaintiff's Argument</u>**

Almaty has answered this question to the best of its ability based on information known to it at this time. Almaty described in exhaustive detail multiple wrongful transactions entered into by Defendants, including approximate dates, listing the entities and persons involved at each stage of each transaction, and describing the real estate at issue. Furthermore, Almaty has identified over 100 additional properties wrongfully converted by Defendants. This answer should be a more than satisfactory response to the Defendants' Interrogatory.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp*., 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has

access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking detailed information regarding law enforcement agencies' evidence of their crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing

*Kovel*, 296 F.2d 918); *Torf,* 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry, and the Motion to Compel as to this Interrogatory should be denied.

**Q. <u>DEFENDANTS' SPECIAL INTERROGATORY NO. 18</u>:**

DESCRIBE IN DETAIL how "the Individual Defendants conspired together to have Viktor abuse his position of trust as mayor of Almaty to steal from the people of Almaty various state-owned assets cumulatively valued at over $300 million," as alleged in paragraph 20 of the SECOND AMENDED COMPLAINT, including, without limitation, the dates of the conspiratorial communications, where they occurred (city, country), and what was said by each DEFENDANT.

**<u>PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 18</u>:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty further objects to this Interrogatory as overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence. Almaty interprets this Interrogatory as seeking information sufficient to identify the real properties illegally converted by Defendants which rightfully belong to the people of the City of Almaty, as described in the Second Amended Complaint, and responds accordingly.

Subject to and without waiver of the foregoing objections, Almaty responds as follows:

**Real Estate 1**

In or about 2000, Viktor Khrapunov ("Viktor") abused his position as Mayor of Almaty to cause a large tract of state-owned land near two rivers in Almaty ("Real Estate 1") to be transferred to Leila Khrapunova ("Leila") for a total price of approximately $121,000. The transfer was accomplished via a series of fraudulent transactions and front companies controlled by Leila and Iliyas Khrapunov ("Iliyas). Through several more transfers designed to conceal the illegal conduct, Leila and Iliyas ultimately sold Real Estate 1 for a total of $15.57 million, yielding more than $15 million in illicit profit as a result of this single transaction.

Viktor' s transfer of Real Estate 1 violated the Land Code of the Republic of Kazakhstan, which requires that this type of public property not be sold, as well as the Water Code, which mandates that land in water conservation zones may only be provided to private individuals and entities for temporary use.

To carry out the illegal conversion of Real Estate 1, Viktor, Leila, Iliyas, Rassilya Daniyarova (mother of Leila), and Gaukhar Iliyasova (sister of Leila) utilized at least six Kazakhstan entities controlled by Leila and Iliyas, including: (a) Almaty-Demalys; (b) Viled Establishment ("Viled"); (c) KazRealIncom LLP ("KRI"); (d) Karasha Plus LLP ("Karasha"); (e) Building Services Company ("BSC"); and (f) Asia Holding Development LLP ("Asia Holding").

On or about September 22, 1998, Viktor signed a decree to transfer management of the property to Almaty-Demalys, a closed Joint Stock Company. Almaty-Demalys was owned by Altai LLC ("Altai"), which had 51% interest in Almaty-Demalys, and Almaty, which owned the other 49%. Altai was controlled by a man whose family member worked for Viktor. On or about May 15, 2000, Altai changed the 51% ownership in Almaty-Demalys from Altai to Viled. Altai did not receive any consideration in return for its ownership interest. On or about April 18, 2001, Viktor caused Almaty to sell its 49% ownership interest in Almaty-Demalys to Viled for approximately $121,000.

On or about August 25, 2003, Leila caused Viled to sell Almaty-Demalys to KRI for approximately $121,000 (18,800,000 ₸). Leila then caused KRI to sell Almaty-Demalys to Karasha for the same amount. Leila controlled Karasha through, among others, her sister. Next, on or about October 3, 2003, Leila caused Karasha to transfer ownership of Real Estate 1 directly to her. As a result of this series of transfers, Leila obtained full ownership of Real Estate 1. On or about May 6, 2004, Almaty-Demalys was officially dissolved.

On or about October 6, 2003, Leila contributed a portion of Real Estate 1 to BSC, which she then sold to a third party in a transaction that valued that

portion of Real Estate 1 at approximately $8 million (1,179,999,980 ₸). Leila caused the remaining portion of Real Estate 1 to be conveyed directly to Iliyas. Iliyas, in turn, contributed it to Asia Holding, and then sold Asia Holding to a separate unrelated third party for approximately $7.57 million. Of the $7.57 million, Iliyas transferred approximately $2.21 million to Swiss bank accounts held by or on behalf of Elvira Kudryshova ("Elvira"), including accounts at Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co., and retained the remainder for himself.

Thus, Leila paid approximately $121,000 for Real Estate 1, which she and Iliyas later re-sold for a total of $15.57 million.

**Real Estate 2**

Starting in April 2001, Viktor used his position as mayor to cause a public building in Almaty to be sold to Leila's company, KRI, for approximately $347,000 (52,155,100 ₸). On or about April 16, 2001, Viktor signed a decree privatizing the property at Kindergarden No. 186, 242A Furmanov Street, Almaty. Viktor then manipulated a public auction to ensure that KRI won the auction. On December 18, 2001, KRI was declared the winner of the auction and on December 21, 2001, Viktor arranged for the property to be transferred to KRI.

Under the laws of Kazakhstan, potential buyers of state-owned property are obligated to state how they intend to invest in and develop the property before acquiring. In an attempt to make KRI' s bid appear legitimate, during the bidding process Leila caused KRI to fraudulently represent that KRI would invest a significant amount in Real Estate 2 to build a health center for the benefit of the people of Almaty. That representation was false at the time it was made and, in fact, KRI never intended to and never did build any such health center or invest in the center.

At Viktor's direction, KRI won the auction and, instead of investing in the property as promised, on or about October 1, 2003, Leila caused KRI to sell Real Estate 2 to Karasha. Two days later, Leila caused Karasha to sell Real Estate 2 directly to her. Shortly thereafter, Leila contributed Real Estate 2 to BSC, which she then sold to an unrelated third party in a transaction that valued Real Estate 2 at approximately $4.1 million (611,445,206 ₸). Leila and Viktor thus obtained illegal profit of over $3.7 million as a result of their illicit acquisition and re-sale of Real Estate 2.

**Real Estate 3**

In addition to manufacturing the sale of state-owned assets to Leila and other family members and co-conspirators, Viktor also abused his authority as mayor to seize privately-owned land and transfer it to Leila and others for re-sale.

On or about August 25, 2003, Viktor caused Almaty to seize property owned by privately-owned third party Shadid Engineering LLP ("Real Estate 3"). Prior to the seizure, Shadid had obtained a series of approvals to allow them to bring infrastructure to the land, including power lines, water lines, sewage lines, and materials to begin building. After Shadid had made these improvements, Viktor denied Shadid a permit to build on the land and instead caused Almaty to seize the property.

On September 4, 2003 Viktor caused Almaty to sell landplots associated with Shadid to KazRealIncome. On September 23, 2003, Viktor arranged for a decree to change the purchaser of the property from KazRealIncome to KarashaPlus. On October 3, 2003 Leila Khrapunov arranged for KarashaPlus to transfer its interest to her. On October 6, 2003, Leila Khrapunov contributed the interest to Building Services Corp, and then sold Building Services Corp. to a third party. On September 4, 2003 Viktor caused Almaty to sell landplots associated with Shadid to KazRealIncome. On September 23, 2003, Viktor arranged for a decree to change the purchaser of the property from KazRealIncome to KarashaPlus. On October 3, 2003 Leila Khrapunov arranged for KarashaPlus to transfer its interest to her. On October 6, 2003, Leila Khrapunov contributed the interest to Building Services Corp, and then sold Building Services Corp. to a third party.

In this sale, Real Estate 3 was valued at approximately $2 million. As a result, Leila obtained nearly $1.9 million in illicit profit at the expense of Almaty and its people.

**Real Estate 4**

Between November and December 2004, Viktor caused Almaty to sell land ("Real Estate 4") to two additional Kazakhstan companies owned and controlled by Leila, Victoriya-KMK LLP and Ademytau-KMK LLP. Real Estate 4 was located in a water conservation zone and, therefore, under

Kazakh law, could be provided to private persons or entities only for temporary use. Nevertheless, in violation of the law and his obligations as mayor of Almaty, Viktor caused Real Estate 4 to be sold to Leila's companies for approximately $1.3 million (18,870,100 ₸). On or about December 23, 2005 and January 25, 2006, Leila sold Real Estate 4 to an unrelated third party for approximately $8.6 million (1,223,950,000 ₸) – resulting in illicit profit to Leila and Viktor of approximately $7.3 million.

**Real Estate 5**

On or about March 18, 2004, a company owned and/or controlled by Leila, Phoenix LV ("Phoenix"), and third party Ahsell Holdings ("Ahsell") formed Ayt Holding Complex ("Ayt"), each with a 50% ownership interest. On or about May 6, 2004, Viktor illegally caused one of the most valuable plots of land in Almaty at the time ("Real Estate 5") to be sold to Ayt for

approximately $450,000.  Real Estate 5 was located in a zone protected as mountain lands and was by law not permitted to be sold to private parties.  Nevertheless, Viktor caused Real Estate 5 to be sold to Ayt, and Ayt then built multiple homes on the property, each of which later was sold for up to $4 million.  In or about July 2004, Phoenix transferred its ownership interest in Ayt to Ahsell for approximately $8 million.

**Billboard Land Plots**

Viktor caused a total of 55 plots of land to be sold illegally to various companies owned or controlled by Leila, including Viled, to be used to erect billboards.  The companies paid only nominal amounts for the land, and then rented the billboards to third parties.  As an example of the value of the land plots, 11 of the plots were rented to third parties for a single year in return for rents of approximately $10 million.  In total, Leila, Viktor, Iliyas, Elvira, and their coconspirators profited by tens of millions of dollars as a result of their illegal acquisition of these plots of land.

In addition, the Khrapunov Racketeering Scheme illegally converted the following real property:

7.     Land plot and residential premises located at:  177 Gornaya street, Medeu district, Almaty (land cadastral number 20-315-912-121);

8.     Land plot and residential premises located at:  179 Gornaya street, Medeu district, Almaty (land cadastral number 20-315-912-113);

9.     Land plot and residential premises located at:  181 Gornaya street, Medeu district, Almaty (land cadastral number 20-315-912-114)

10.     Land plot located at:  242a Furmanova street, Medeu district, Almaty (land cadastral number 20-315-021-293);

11.     Land plot located at:  to the west of Mendikulov street, to the north of Khadzhi-Mukan street, Medeu district, Almaty (land cadastral number 20-315-021-292);

12.     Office building (former policlinic building of WWV) located at: 63 Tole Bi street, Almaty (land cadastral number 20-311-006-061);

13.     Nonresidential premises and land plot located at:  160 Tole Bi street, Almaty (land cadastral number 20-311-011-038);

14.     Land plot located at:  to the south of Al-Farabi Avenue, to the east of Esentai River, Medeu district, Almaty (land cadastral number 20-315-028-530).

15.     Land plot located at:  to the south of Al-Farabi Avenue, to the east of Muhammed-Khaidar Dulati Avenue, Almaty (land cadastral number 20-313-021-490).

16.     Nonresidential premises (former building of municipal state-owned public enterprise "Guest house of Ministry of Foreign Affairs") located at:  165/167 Zheltoksan street, Almaty;

17.     Land plot micro district Shanyrak 1, to the north of Ryskulov avenue, to the west of bolshaya Almatinka River (Thermal spring) (land cadastral number 20-312-919-083);

18.     Land plot with total area 3.9 hectares located at:  235 Gorniy gigant street (Oak-wood), Almaty (land cadastral number 20-315-912-031);

19.     Passenger terminal building of Almaty airport with area 2481.92 sq. m. in the amount of 333 735 805 tenge;

20.     Real estate properties located at:  36 Belinskiy street, 76 Ushanov street, 95 Gorkiy street, Ust-Kamenogorsk city, East Kazakhstan Region;

21.     Land plot with area 44.2310 hectares located at:  to the north of Tashkentskaya street, to the west of micro district Akbulak, Almaty (land cadastral number 20-312-941-009);

22.     Land plots located on the territory of micro district "Edelveis" at: to the south of Esentai River, to the west of Zhamakayev street, Agricultural production cooperative Gorniy gigant, Auezov district, Almaty (land cadastral number 20-315-936-080);

23.     Land plot (billboards) located at:  to the north of Abai avenue, to the east of Tulebayev street, Medeu district, Almaty (land cadastral number 20-315-021-300);

24.     Land plot (billboards) located at:  to the south of Gogol street, to the west of Abylai-khan avenue, Almaly district, Almaty (land cadastral number 20-311-006-066);

25.     Land plot (billboards) located at:  15a to the north of Khodzhanov street, to the west of Al-Farabi avenue (land cadastral number 20-313-011-374);

26.     Land plot (billboards) located at:  to the north of Gogol street, to the west of Abylai-khan avenue, Zhetysu district, Almaty (land cadastral number 20-314-020-140);

27.     Land plot (nonresidential) located at:  to the south of Gogol street, to the east of Furmanov street, Medeu district, Almaty (land cadastral number 20-315-029-620);

28.     Land plot (nonresidential) located at:  to the north of Abai avenue, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-021-270);

29.     Land plot (billboards) located at:  to the north of Zhibek zholy avenue, to the east of Abylai-khan avenue, Zhetysu district, Almaty (land cadastral number 20-314-020-141);

30.     Land plot (billboards) located at:  to the west of Mailin street, to the south of Bekmakhanov street, Turksib district, Almaty (land cadastral number 20-317-039-108);

31.     Land plot (nonresidential) located at:  to the south of Al-Farabi avenue, to the east of Mendikulov boulevard, Medeu district, Almaty (land cadastral number 20-315-021-269);

32.     Land plot (nonresidential) located at:  Chimbulak area, Medeu district, Almaty (land cadastral number 20-315-944-033);

33.     Land plot (billboards) located at:  to the north of Gogol street, to the west of Nauryzbay batyr street, Zhetysu district, Almaty (land cadastral number 20-314-019-061);

34.     Land plot (billboards) located at:  to the north of Gogol street, to the west of Nauryzbay batyr street, Zhetysu district, Almaty (land cadastral number 20-314-019-060);

35.     Land plot (nonresidential) located at:  to the south of Al-Farabi avenue, to the west of Furmanov avenue, Medeu district, Almaty (land cadastral number 20-315-029-621);

36.     Land plot (nonresidential) located at:  to the south of Khadzhi-Mukan street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-024-232);

37.     Land plot (billboards) located at:  to the south of Bogenbay street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-012-235);

38.     Land plot (billboards) located at:  to the south of Gogol street, to the west of Furmanov street, Medeu district, Almaty (land cadastral number 20-315-011-103);

39.     Land plot (nonresidential) located at:  to the north of Tole Bi street, to the east of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-011-104);

40.     Land plot (nonresidential) located at:  to the north of Zholdasbekov street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-021-296);

41.     Land plot (nonresidential) located at:  to the south of Al Farabi avenue, to the east of Furmanova street, Medeu district, Almaty (land cadastral number 20-315-021-297);

42.     Land plot (billboards) located at:  to the east of Dostyk avenue, to the south of Karasai batyr avenue, Medeu district, Almaty (land cadastral number 20-315-012-234);

43.     Land plot (billboards) located at:  to the south of Zhibek-zholy avenue, to the east of Panfilov street, Zhetysu district, Almaty (land cadastral number 20-314-020-151);

44.     Land plot (billboards) located at:  to the south of Zhibek-zholy avenue, to the east of Frunze street, Zhetysu district, Almaty (land cadastral number 20-314-020-154);

45.     Land plot (billboards) located at:  to the west of Abylai-khan avenue, to the south of Rayimbek avenue, Zhetysu district, Almaty (land cadastral number 20-314-014-099);

46.     Land plot (billboards) located at:  to the east of Furmanov street, to the north of Alimzhanov street, Zhetysu district, Almaty (land cadastral number 20-314-020-155);

47.     Land plot (billboards) located at:  to the south of Zhibek-zholy avenue, to the east of Abylai-khan avenue, Zhetysu district, Almaty (land cadastral number 20-314-020-152);

48.     Land plot (billboards) located at:  to the north of Rayimbekov avenue, to the west of Seifullin street, Almaty (land cadastral number 20-314-013-351);

49.     Land plot (billboards) located at:  to the north of Zhibek-zholy avenue, to the east of Abylai street, Zhetysu district, Almaty (land cadastral number 20-314-020-153);

50.     Land plot (billboards) located at:  to the east of Dostyk avenue, to the north of Kamenistaya street, Medeu district, Almaty (land cadastral number 20-315-022-205);

51. Land plot (nonresidential) located at: to the north of Satpayev street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-021-299);

52. Land plot (nonresidential) located at: to the south of Kurmangazy street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-015-345);

53. Land plot (nonresidential) located at: to the north of Tole Bi street, to the west of Tulebayev street, Medeu district, Almaty (land cadastral number 20-315-013-138);

54. Land plot (billboards) located at: to the south of Kabanbai batyr street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-015-344);

55. Land plot (nonresidential) located at: to the north of Gogol street, to the west of Dostyk avenue, Medeu district, Almaty (land cadastral number 20-315-011-105);

56. Land plot (nonresidential) located at: to the north of Abai avenue, to the east of Furmanov street, Medeu district, Almaty (land cadastral number 20-315-014-162);

57. Land plot (nonresidential) located at: Abai avenue, to the north-east of Altynsarin avenue, Auezov district, Almaty (land cadastral number 20-312-057-511);

58. Land plot (billboards) located at: 15a to the east of Baitursynov street, to the south of Satpayev street, Bostandyk, Bostandyk district, Almaty (land cadastral number 20-313-004-354);

59. Land plot (billboards) located at: 15a to the west of Furmanov street, to the south of Gandi street, Bostandyk, Bostandyk district, Almaty (land cadastral number 20-313-006-402);

60. Land plot (billboards) located at: 15a to the south of Abai avenue, to the east of Masanchi street, Bostandyk district, Almaty (land cadastral number 20-313-004-353);

61. Land plot (billboards) located at: to the north of Tole Bi street, to the west of Zheltoksan street, Almaly district, Almaty (land cadastral number 20-311-005-124);

62. Land plot (billboards) located at: to the west of Furmanov street, to the south of Gogol street, Almaly district, Almaty (land cadastral number 20-311-006-070);

63. Land plot (billboards) located at: to the north of Kurmangazy street, to the west of Seifullin street, Almaly district, Almaty (land cadastral number 20-311-016-105);

64. Land plot (billboards) located at: to the south of Gogol street, to the west of Seifullin street, Almaly district, Almaty (land cadastral number 20-311-005-125);

65. Land plot (billboards) located at: to the south of Bogenbay street, to the west of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-007-087);

66. Land plot (billboards) located at: to the north of Abai avenue, to the west of Gagarin avenue, Almaly district, Almaty (land cadastral number 20-311-013-266);

67. Land plot (billboards) located at: to the north of Kurmangazy street, to the west of Baitursynov street, Almaly district, Almaty (land cadastral number 20-311-015-239);

68. Land plot (billboards) located at: to the north of Tole Bi street, to the west of Turgut Ozaly street, Almaly district, Almaty (land cadastral number 20-311-021-375);

69. Land plot (billboards) located at: to the south of Kabanbai batyr street, to the east of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-018-150);

70. Land plot (billboards) located at: to the south of Gogol street, to the east of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-006-069);

71. Land plot (billboards) located at: to the south of Gogol street, to the west of Panfilov street, Almaly district, Almaty (land cadastral number 20-311-006-071);

72. Land plot (billboards) located at: to the south of Kabanbai batyr street, to the west of Abylay khan avenue, Almaly district, Almaty (land cadastral number 20-311-018-151);

73. Land plot (billboards) located at: to the south of Bogenbay batyr street, to the west of Furmanov street, Almaly district, Almaty (land cadastral number 20-311-007-086);

74. Land plot (billboards) located at: Almaty-1 railway station square, Turksib district, Almaty (land cadastral number 20-317-031-172);

75. Land plot (billboards) located at: to the west of Suyunbay avenue, to the north of Khmelnickiy street, Turksib district, Almaty (land cadastral number 20-317-044-126);

76. Land plot (billboards) located at: to the west of Rozybakiev street, intersection with Abai avenue, Almaly district, Almaty (land cadastral number 20-311-019-287);

77. Land plot (billboards) located at: to the south of Gogol street, to the east of Furmanov street, Medeu district, Almaty (cadastral number 20-315-011-094).

In connection with these transactions, the DEFENDANTS communicated with themselves, their nominees who acted on their behalf, and their attorneys through email.

Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. <u>Defendants' Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 18 seeks information not available to Almaty." Indeed, in its supplemental response, Plaintiff again flagrantly disregards the Court's order, adding several more (baseless) objections: "overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence." All such objections should be disregarded.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan, implicating foreign privilege law. When faced with the potential application of

foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants simply ask for details relating to Plaintiffs allegations of conspiracy and theft in the SAC, which is non-privileged, factual information. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege.").

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2)

assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

*Finally*, to the extent Plaintiff has attempted to answer the Interrogatory, its response is plainly insufficient. Plaintiff has unilaterally decided to "interpret" Interrogatory No. 18 as "seeking information sufficient to identify the real properties illegally converted by Defendants. . . ." Interrogatory No. 18 is clear on its face and is not so limited. Defendants are seeking the details that support Plaintiff's allegations of conspiracy and theft of the various assets allegedly owned by Almaty, in addition to the identity of each piece of real property allegedly converted by Defendants. Such details, such as what facts, communications, and actions were purportedly taken in furtherance of the alleged conspiracy are critical to the defense of a RICO action. Despite this clear request for information and its readily-apparent import, Plaintiff interprets the Interrogatory in a narrow, self-serving way in a blatant attempt to elude the Court's order, which states that all but privilege objections are waived. Plaintiff should be compelled to immediately supplement its response to this Interrogatory.

**ii. <u>Plaintiff's Argument</u>**

Almaty has answered this question to the best of its ability based on information known to it at this time. Almaty described in exhaustive detail multiple wrongful transactions entered into by Defendants, including approximate dates, listing the entities and persons involved at each stage of each transaction, and describing the real estate at issue. Furthermore, Almaty has identified over 100 additional properties wrongfully converted by Defendants. This answer should be a more than satisfactory response to the Defendants' Interrogatory.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp*., 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking detailed information regarding law enforcement agencies' evidence of their crimes – implicates another objection to the request, specifically, the law

enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf*, 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry, and the Motion to Compel as to this Interrogatory should be denied.

**R. <u>DEFENDANTS' SPECIAL INTERROGATORY NO. 19</u>:**

DESCRIBE IN DETAIL how "the Individual Defendants conspired together to transport and to launder those stolen assets out of Kazakhstan and to the United States, among other places, in order to escape the reach of the Kazakh authorities," as alleged in paragraph 20 of the SECOND AMENDED COMPLAINT, including, without limitation, the dates of the conspiratorial

communications, where they occurred (city, country), and what was said by each DEFENDANT.

**PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 19:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty further objects to this Interrogatory on the grounds that it seeks information regarding confidential law enforcement investigations of the Defendants' criminal activities conducted by the Swiss government, including without limitation the Public Prosecutor of Geneva, and the disclosure of such information would violate Article 293 of the Swiss Criminal Code. Almaty further objects to this Interrogatory as overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence. Almaty interprets this Interrogatory as seeking information sufficient to identify the real properties illegally converted by Defendants which rightfully belong to the people of the City of Almaty, as described in the Second Amended Complaint, and responds accordingly.

Subject to and without waiver of the foregoing objections, Almaty responds as follows:

The Individual Defendants laundered the proceeds of their crimes out of Kazakhstan and into Switzerland and the United States in order to hide the assets from authorities and reap the rewards of their wrongdoing. The Individual Defendants used numerous holding companies in order to hide and to launder the illicit funds they siphoned out of Kazakhstan through Switzerland and ultimately into and within the United States and other countries. These holding companies included at least two Swiss companies owned and controlled by Iliyas and Elvira, SDG Capital SA ("SDG") and Swiss Promotion Group SA ("SPG"). In total, Iliyas, Elvira, and Leila have transferred at least $125 million into these two Swiss companies alone.

Between 2008 and 2012, Iliyas, Elvira, Leila, and sham companies they control have injected over $115 million into SDG. SDG was formed in or about July 2008 and, until approximately May 2009, was owned and controlled by Harlem Securities, a British Virgin Islands corporation that was, in turn, owned by Iliyas. In or about May 2009, Elvira purchased SDG from Harlem Securities for approximately $99,000. Following that purchase, Iliyas continued to exert full control over SDG Capital.

Iliyas, Elvira, Leila, and sham companies they control also have contributed substantial assets, believed to be in excess of $10 million, to SPG. Iliyas is the ultimate beneficial owner of SPG via a variety of offshore holding companies.

All of the funds contributed to SDG, SPG, and other front companies controlled by Iliyas, Elvira, and Leila represent and are traceable to the ill-gotten proceeds of Viktor and his family and co-conspirators' looting of real estate and other assets rightfully belonging to Almaty and its people.

In an ongoing effort to launder and conceal the source of the funds they stole from the people of Almaty, after moving the funds to various accounts and holding companies in Switzerland, the Individual Defendants began transferring the stolen funds into the United States.

In or about July 2012, Elvira, with the knowledge and assistance of Viktor, Leila, Dmitri , Iliyas, and Madina, caused over $3 million to be transferred into a United States bank account owned or controlled by her. Before transferring these funds into the United States, the Defendants caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.

In or about November 2012, Iliyas, with the full knowledge and assistance of the other Defendants, caused approximately $1.3 million to be transferred from an off-shore bank account owned or controlled by him into a United States bank account owned by RPM USA and controlled by Iliyas. Before transferring these funds into the United States, Iliyas and the other Individual Defendants caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.

In or about June 2012, Elvira and Iliyas – again, with the full knowledge and assistance of the other Individual Defendants – caused approximately $25,000 to be transferred from a Swiss bank account owned or controlled by Iliyas into a United States bank account owned or controlled by Elvira. Before transferring these funds into the United States, the Individual Defendants caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.

In or about December 2010, Elvira and Dmitri used funds illegally obtained through the Khrapunov Racketeering Enterprise's criminal activity in Kazakhstan and laundered through various off-shore bank accounts and

entities to appear legitimate to purchase a luxurious single-family home located at 2578 Hutton Drive in Beverly Hills, California, for approximately $3.65 million.  In March 2012, Iliyas and Madina, also using ill-gotten proceeds of the looting scheme laundered through various off-shore bank accounts and entities to appear legitimate, purchased a lavish single-family home located at 606 North Alta Drive in Beverly Hills, California, for approximately $5.45 million.  Iliyas and Madina attempted to conceal the source of the stolen funds used to make this purchase by using Defendant Candian International Ltd. to complete the purchase.  On December 30, 2011, defendants caused $163,492.50 to be wired from Candian International Ltd.'s account with originating bank Compagnie Privee de Conseils to Granite Escrow as a down payment on the property.  On March 15, 2012, a law firm representing Iliyas wired $5,366,212.53 to complete the transaction.

In January 2013, Iliyas and Madina, with Elvira's assistance, used another sham holding company, 628 HOLDINGS, to purchase a second mansion in Beverly Hills using illicit funds stolen from Almaty and laundered through various off-shore bank accounts and entities to appear legitimate.  To that end, Iliyas and Madina caused 628 HOLDINGS to purchase for $6.2 million a five-bedroom single-family home located at 628 North Alta Drive in Beverly Hills, California for the benefit and use of Iliyas and Madina.  Defendants retained the firm Hilton & Hyland to represent them in their purchase of the property.  A realtor working for Hilton & Hyland described Iliyas as the "boss" and Elvira as the "point person on the ground."  Granite Escrow, the escrow company facilitating the purchase of the property, sent the closing package directly to Iliyas.  Iliyas's realtor described Iliyas as the "owner" of buyer 628 HOLDINGS, and Elvira as the "Manager and signatory authority."

In or about July 2013, Elvira and Dmitri purchased an expansive, two-acre estate located at 11986 Lockridge Road in Studio City, California for approximately $5.7 million, again using funds stolen from Almaty and laundered through various off-shore bank accounts and entities to appear legitimate.  Elvira and Dmitri knew that the money they used to engage in this transaction was stolen from the people of Almaty, and illegally laundered to appear legitimate.  Indeed, shortly after they purchased this property, in a further attempt to conceal their possession and use of those funds, Elvira and Dmitri transferred it to The Kasan Family Trust, a trust for which they serve as trustees.

In or about April 2013, Elvira leased a 2013 Rolls Royce sedan valued at approximately $302,000.  In addition to the Rolls Royce, Elvira leased a 2013 Bentley sedan valued at approximately $320,000.  Elvira is the registered owner of a 2013 Mercedes Benz sport utility vehicle valued at approximately $114,000 and a 2011 Cadillac sport utility vehicle valued at approximately $75,000.

Elvira, Dmitri, Iliyas, and Madina also have attempted to launder funds obtained from the plundering of Almaty by making investments in multiple U.S. companies, including Defendants Maro Design LLC, Haute Hue LLC, RPM USA LLC, and RPM-Maro LLC. Further, Iliyas and Elvira have caused SDG and SPG to move additional assets stolen from Almaty into the United States by, among other things, using a chain of Luxembourg and Delaware entities to invest in real estate in New York. In or about July 2012, Defendant RPM USA LLC, which is owned or controlled by Iliyas and is a wholly owned subsidiary of SPG, invested approximately $6 million in a New York-based medical device company.

In 2013, Iliyas invested approximately $67.5 million stolen from the people of Almaty to purchase a 37.5% interest in a luxury hotel in New York, the Flatotel. In order to conceal the source of the funds used to make this investment, Iliyas used a series of holding companies ultimately owned by SDG and controlled by him. SDG is the owner of a Luxembourg entity, Tridaou SPV SA. Triadou SPV SA owns 50% of a Delaware limited liability company, CF 135 West Member LLC. CF 135 West Member LLC owns 75% of another Delaware limited liability company, 135 West Street Holder LLC. 135 West Street Holder LLC owns another Delaware limited liability company, 135 West 52nd Street Mezz LLC. 135 West 52nd Street Mezz LLC owns yet another Delaware limited liability company, 135 West 52nd Street Owner LLC. 135 West 52nd Street Owner LLC, in turn, is the owner of the Flatotel, which was purchased in 2013 for $180 million. Following the filing of this lawsuit, Iliyas attempted to liquidate this investment by assigning his 37.5% interest in the Flatotel to the other owners of , CF 135 West Member LLC in return for $28 million, full payment of which was to be complete by June 2015. Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. <u>Defendants' Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 19 seeks information not available to Almaty." Indeed, in its supplemental response, Plaintiff again flagrantly disregards the Court's order, adding several more (baseless) objections: "overbroad, unduly burdensome,

and unlikely to lead to the discovery of admissible evidence." All such objections should be disregarded.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan and Switzerland, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants merely request details to support Plaintiffs allegations of conspiracy and money laundering. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege.").

Details relating to Defendants' alleged money laundering are facts that cannot be shielded by privilege.

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

Plaintiff also objects to this Interrogatory on the ground that it would "violate Article 293 of the Swiss Criminal Code." Plaintiff has waived objections on the basis of confidentiality. Even if it had not, this objection is inaccurate, as this provision of the Swiss Criminal Code is intended to protect the privacy of persons who are the subjects of a Swiss investigation – in this case, Defendants and defendants who were previously dismissed from this action. The provision is not intended to prevent the disclosure of information to them, but to protect them by prohibiting the disclosure of information to others. In addition, any information from the Swiss investigation that is in Plaintiff's possession or under its control must have been provided to Plaintiff by the Swiss authorities. It does not make sense for Plaintiff to now claim confidentiality for information that is not confidential to Defendants, and in any event, has been obtained by Plaintiff from the Swiss authorities.

*Finally*, to the extent Plaintiff has attempted to answer the Interrogatory, its response is plainly insufficient. Plaintiff has unilaterally decided to "interpret"

Interrogatory No. 19 as "seeking information sufficient to identify the real properties illegally converted by Defendants." Interrogatory No. 19 is clear on its face and is not so limited. Defendants are seeking the details that support Plaintiffs allegations of conspiracy and money laundering, for instance including details relating to each Defendants' role in the conspiracy, the date and substance of conspiratorial communications, and evidence relating to Defendants' intent to launder assets, not just "information sufficient to identify" transactions.

Plaintiff should be compelled to immediately and fully supplement its response to this Interrogatory.

**ii. Plaintiff's Argument**

Almaty has answered this question to the best of its ability based on information known to it at this time. Almaty has described in exhaustive detail multiple wrongful transactions entered into by Defendants in the United States, including millions of dollars in stolen funds transferred into the United States by Defendants, Defendants' purchases of multiple luxury estates in the Central District of California, investments made by Defendants in New York and elsewhere totaling over $70 million, and others. In addition, Almaty has listed 26 different persons and entities who it has reason to believe have knowledge of Defendants' crimes, including persons and entities located in California, Delaware, New York, Kazakhstan, Switzerland, and the British Virgin Islands. This answer should be a more than satisfactory response to the Defendants' Interrogatory.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis*

*Pharm. Corp.*, 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd.*, 2007 U.S. Dist. LEXIS 102652.  Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies.  (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan.  That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President.  *See Amtrak*, 233 F.R.D. at 264-266, 268.  Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry.  *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing.  The nature of this request – accused criminals seeking detailed information regarding law enforcement agencies' evidence of their crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege.  *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548.  In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional

crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf*, 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry, and the Motion to Compel as to this Interrogatory should be denied.

**S. <u>DEFENDANTS' SPECIAL INTERROGATORY NO. 20</u>:**

DESCRIBE IN DETAIL every law or regulation (both foreign and domestic) YOU allege DEFENDANTS to have violated as part of the conspiracy alleged in the SECOND AMENDED COMPLAINT, including, without limitation, every alleged violation by DEFENDANTS of each such law or regulation identified.

**<u>PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 20</u>:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory

privilege and that it calls for a legal conclusion. Almaty further objects to this Interrogatory on the grounds that it seeks information regarding confidential law enforcement investigations of the Defendants' criminal activities conducted by the Swiss government, including without limitation the Public Prosecutor of Geneva, and the disclosure of such information would violate Article 293 of the Swiss Criminal Code. Almaty interprets this Interrogatory as seeking information sufficient to identify the laws and regulations in Kazakhstan and the United States that Defendants violated in furtherance of the Khrapunov Racketeering Scheme, as described in the Second Amended Complaint.

Subject to and without waiver of the foregoing objections, Almaty responds as follows: Defendants have violated and are continuing to violate the following laws and regulations: Criminal Code of the Republic of Kazakhstan, Articles 176 (Conversion or Embezzlement of Entrusted Other People's Property), 177 (Fraud), 193 (Legalization of Monetary Funds or Other Property Obtained Illegally), 235 (Creation and Guidance of an Organized Criminal Group or Criminal Association, and Participation in Criminal Organization), 307 (Abuse of Official Powers), 311 (Acceptance of a Bribe); 18 U.S.C. §§ 1962 (Civil RICO), 1956 (Money Laundering), 1957 (Money Transactions in Property Derived from Specified Unlawful Activity), 2314 (Foreign Transport of Stolen Money or Property Known To Be Stolen), 1341 (Mail Fraud), and 1343 (Wire Fraud); breach of fiduciary duty, conversion and conspiracy to convert, fraud and deceit, and conspiracy to defraud.

Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. <u>Defendants' Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 20 seeks information not available to Almaty." Indeed, in its supplemental response, Plaintiff again flagrantly disregards the Court's order, adding the objection that this Interrogatory "calls for a legal conclusion." All such objections should be disregarded.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan and Switzerland, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants merely request the identification of laws and regulations allegedly violated by Defendants, and the identification of each alleged violation. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege."). The identification of laws and regulations are *facts* that cannot be shielded by privilege.

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos*., No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

Plaintiff also objects to this Interrogatory on the ground that it would "violate Article 293 of the Swiss Criminal Code." Plaintiff has waived objections on the basis of confidentiality. Even if it had not, this objection is inaccurate, as this provision of the Swiss Criminal Code is intended to protect the privacy of persons who are the subjects of a Swiss investigation – in this case, Defendants and defendants who were previously dismissed from this action. The provision is not intended to prevent the disclosure of information to them, but to protect them by prohibiting the disclosure of information to others. In addition, any information from the Swiss investigation that is in Plaintiff's possession or under its control mus have been provided to Plaintiff by the Swiss authorities. It does not make sense for Plaintiff to now claim confidentiality for information that is not confidential to Defendants, and in any event, has been obtained by Plaintiff from the Swiss authorities.

*Finally*, to the extent Plaintiff has purported to answer the Interrogatory, its response is plainly insufficient. Plaintiff has unilaterally decided to "interpret" Interrogatory No. 20 as "seeking information sufficient to identify the laws and regulations in Kazakhstan and the United States that Defendants violated in

furtherance of the Khrapunov Racketeering Scheme . . . ." Interrogatory No. 20 is clear on its face and is not so limited. Defendants are seeking more than just "information sufficient to identify" the laws and regulations allegedly violated by Defendants —they seek an identification of *every alleged violation of those laws*. Further, despite clear references to violations of Swiss law in the SAC (see SAC ¶ 35), Plaintiff has not identified which Swiss laws were violated, much less every alleged violation of Swiss law by each of the Defendants.

Plaintiff should be compelled to immediately and fully supplement its response to this Interrogatory.

**ii. <u>Plaintiff's Argument</u>**

Almaty has answered this question to the best of its ability without waiving any applicable privileges based on information known to it at this time. Almaty has listed the laws and regulations that it believes that Defendants have violated. This answer should be a more than satisfactory response to the Defendants' Interrogatory. To the extent this Interrogatory calls for attorney work product because it requires Almaty to disclose its attorneys' determinations as to which facts support which violations, it is improper.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp*., 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.)

Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking detailed information regarding law enforcement agencies' evidence of their crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf,* 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity." That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry, and the Motion to Compel as to this Interrogatory should be denied.

**T. <u>DEFENDANTS' SPECIAL INTERROGATORY NO. 21</u>:**

DESCRIBE IN DETAIL all facts supporting YOUR contention that DEFENDANT[S] conducted "numerous financial transactions" using illegally obtained funds and "knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds," as alleged in Paragraph 74 of the SECOND AMENDED COMPLAINT.

**<u>PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 21</u>:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty further objects to this Interrogatory as overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence. Almaty interprets this Interrogatory as seeking information sufficient to identify the real properties illegally converted by Defendants which rightfully belong to the people of the City of Almaty, as described in the Second Amended Complaint, and responds accordingly.

Subject to and without waiver of the foregoing objections, Almaty responds as follows:

In or about July 2012, Elvira, with the knowledge and assistance of Viktor, Leila, Dmitri, Iliyas, and Madina, caused over $3 million to be transferred into a United States bank account owned or controlled by her. Before transferring these funds into the United States, the Defendants caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.

In or about November 2012, Iliyas, with the full knowledge and assistance of the other Defendants, caused approximately $1.3 million to be transferred from an off-shore bank account owned or controlled by him into a United States bank account owned by RPM USA and controlled by Iliyas. Before transferring these funds into the United States, Iliyas and the other Individual Defendants caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.

In or about June 2012, Elvira and Iliyas – again, with the full knowledge and assistance of the other Individual Defendants – caused approximately $25,000 to be transferred from a Swiss bank account owned or controlled by Iliyas into a United States bank account owned or controlled by Elvira.  Before transferring these funds into the United States, the Individual Defendants caused the funds to be moved through various off-shore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.

In or about December 2010, Elvira and Dmitri used funds illegally obtained through the Khrapunov Racketeering Enterprise's criminal activity in Kazakhstan and laundered through various off-shore bank accounts and entities to appear legitimate to purchase a luxurious single-family home located at 2578 Hutton Drive in Beverly Hills, California, for approximately $3.65 million.  In March 2012, Iliyas and Madina, also using ill-gotten proceeds of the looting scheme laundered through various off-shore bank accounts and entities to appear legitimate, purchased a lavish single-family home located at 606 North Alta Drive in Beverly Hills, California, for approximately $5.45 million.  Iliyas and Madina attempted to conceal the source of the stolen funds used to make this purchase by using Defendant Candian International Ltd. to complete the purchase.  On December 30, 2011, defendants caused $163,492.50 to be wired from Candian International Ltd.'s account with originating bank Compagnie Privee de Conseils to Granite Escrow as a down payment on the property.  On March 15, 2012, a law firm representing Iliyas wired $5,366,212.53 to complete the transaction.

In January 2013, Iliyas and Madina, with Elvira's assistance, used another sham holding company, 628 HOLDINGS, to purchase a second mansion in Beverly Hills using illicit funds stolen from Almaty and laundered through various off-shore bank accounts and entities to appear legitimate. To that end, Iliyas and Madina caused 628 HOLDINGS to purchase for $6.2 million a five-bedroom single-family home located at 628 North Alta Drive in Beverly Hills, California for the benefit and use of Iliyas and Madina. Defendants retained the firm Hilton & Hyland to represent them in their purchase of the property. A realtor working for Hilton & Hyland described Iliyas as the "boss" and Elvira as the "point person on the ground." Granite Escrow, the escrow company facilitating the purchase of the property, sent the closing package directly to Iliyas. Iliyas's realtor described Iliyas as the "owner" of buyer 628 HOLDINGS, and Elvira as the "Manager and signatory authority."

In or about July 2013, Elvira and Dmitri purchased an expansive, two-acre estate located at 11986 Lockridge Road in Studio City, California for approximately $5.7 million, again using funds stolen from Almaty and laundered through various off-shore bank accounts and entities to appear legitimate. Elvira and Dmitri knew that the money they used to engage in this transaction was stolen from the people of Almaty, and illegally laundered to appear legitimate. Indeed, shortly after they purchased this property, in a further attempt to conceal their possession and use of those funds, Elvira and Dmitri transferred it to The Kasan Family Trust, a trust for which they serve as trustees.

In or about April 2013, Elvira leased a 2013 Rolls Royce sedan valued at approximately $302,000. In addition to the Rolls Royce, Elvira leased a 2013 Bentley sedan valued at approximately $320,000. Elvira is the registered owner of a 2013 Mercedes Benz sport utility vehicle valued at approximately $114,000 and a 2011 Cadillac sport utility vehicle valued at approximately $75,000.

Elvira, Dmitri, Iliyas, and Madina also have attempted to launder funds obtained from the plundering of Almaty by making investments in multiple U.S. companies, including Defendants Maro Design LLC, Haute Hue LLC, RPM USA LLC, and RPM-Maro LLC. Further, Iliyas and Elvira have caused SDG and SPG to move additional assets stolen from Almaty into the United States by, among other things, using a chain of Luxembourg and Delaware entities to invest in real estate in New York. In or about July 2012, Defendant RPM USA LLC, which is owned or controlled by Iliyas and is a wholly owned subsidiary of SPG, invested approximately $6 million in a New York-based medical device company.

In 2013, Iliyas invested approximately $67.5 million stolen from the people of Almaty to purchase a 37.5% interest in a luxury hotel in New York, the Flatotel. In order to conceal the source of the funds used to make this investment, Iliyas used a series of holding companies ultimately owned by

SDG and controlled by him. SDG is the owner of a Luxembourg entity, Tridaou SPV SA. Triadou SPV SA owns 50% of a Delaware limited liability company, CF 135 West Member LLC. CF 135 West Member LLC owns 75% of another Delaware limited liability company, 135 West Street Holder LLC. 135 West Street Holder LLC owns another Delaware limited liability company, 135 West 52nd Street Mezz LLC. 135 West 52nd Street Mezz LLC owns yet another Delaware limited liability company, 135 West 52nd Street Owner LLC. 135 West 52nd Street Owner LLC, in turn, is the owner of the Flatotel, which was purchased in 2013 for $180 million. Following the filing of this lawsuit, Iliyas attempted to liquidate this investment by assigning his 37.5% interest in the Flatotel to the other owners of , CF 135 West Member LLC in return for $28 million, full payment of which was to be complete by June 2015. Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. <u>Defendants' Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 21 seeks information not available to Almaty." Indeed, in its supplemental response, Plaintiff again flagrantly disregards the Court's order, adding several more (baseless) objections: "overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence." All such objections should be disregarded.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan and Switzerland, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then

defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants merely seek the (a) facts supporting Plaintiff's contentions regarding financial transactions using allegedly illegally obtained funds; (b) facts supporting Plaintiff's contention that Defendants knew the funds were illegal; and (c) facts supporting Plaintiffs contention that the financial transactions were undertaken with the intent to conceal the source of funds. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege."). Details regarding financial transactions, and evidence supporting Defendants' state of mind regarding financial transactions, are *facts* that cannot be shielded by privilege.

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-

779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

*Finally*, to the extent Plaintiff has attempted to answer the Interrogatory, its response is plainly insufficient. Plaintiff has unilaterally decided to "interpret" Interrogatory No. 21 as "seeking information sufficient to identify the real properties illegally converted by Defendants." Interrogatory No. 21 is clear on its face and is not so limited. Defendants are seeking identification of every financial transaction Plaintiff alleges involved funds stolen from Almaty (including those taking place in Switzerland, *see* SAC ¶¶ 2-3, 29-30, 51-52, 56, 59, 78, and 94), and Plaintiff's factual support for its contention that Defendants knew the funds were illegally obtained, and intended to conceal the source of the funds through financial transactions. Plaintiff's answer is wholly insufficient, as it does not "describe in detail" financial transactions allegedly involving funds stolen from Almaty occurring outside of the United States, or state any facts supporting Plaintiff's contention that the financial transactions were conducted knowing that the funds were illegally obtained, or that the transactions were conducted with the intent of concealing the source of the funds. In response to this interrogatory, Plaintiff merely regurgitates allegations from the SAC. This does not come close to the detail Interrogatory No. 21 requests.

Plaintiff should be compelled to immediately supplement its response to this Interrogatory.


**ii. Plaintiff's Argument**

Almaty has answered this question to the best of its ability based on information known to it at this time. Almaty has described in exhaustive detail multiple wrongful transactions entered into by Defendants in the United States, including millions of dollars in stolen funds transferred into the United States by Defendants, Defendants' purchases of multiple luxury estates in the Central District of California, investments made by Defendants in New York and elsewhere totaling over $70 million, and others. This answer should be a more than satisfactory response to the Defendants' Interrogatory.

Defendants contend that Almaty should be held responsible for obtaining and providing information known to each and every other department, branch, and authority of the Kazakhstan government. This is both practically and legally impossible, since Almaty does not have the ability to provide such information. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp*., 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control

over information known to any other agency or office of the Kazakhstan government.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief after a reasonable inquiry. *See* Fed. R. Civ. Proc. 26(g)(1). Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking detailed information regarding law enforcement agencies' evidence of their crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Defendants do not argue that information communicated to Almaty's U.S. attorneys is subject to disclosure, as they cannot, since the attorney-client privilege specifically protects such information. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf*, 357 F.3d at 907. Similarly, to the extent that any information was communicated to Almaty's Kazakhstan attorneys, including prosecutors investigating the Defendants' crimes, it too is protected from disclosure by Kazakhstan's analogous privilege, entitled "On Advocate Activity."

That law provides that communications between an advocate and client (as well as the advocate's work product) cannot be disclosed.

Almaty has responded to this Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry, and the Motion to Compel as to this Interrogatory should be denied.

**U. DEFENDANTS' SPECIAL INTERROGATORY NO. 23:**

On a claim-by-claim basis, DESCRIBE IN DETAIL all facts YOU allege support each claim for relief in the SECOND AMENDED COMPLAINT.

**PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 23:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it is unduly burdensome and seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation.

**i. Defendants' Argument**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds tha Interrogatory No. 23 seeks information not available to Almaty." Indeed, in its supplemental response, Plaintiff again flagrantly disregards the Court's

order, by including additional (baseless) objections, that the Interrogatory "is overbroad and unduly burdensome." All such objections should be disregarded.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan and Switzerland, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants merely ask for all facts supporting each claim for relief in the SAC. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL 2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular

violation are not protected by the work-product privilege."). The *facts* supporting each claim for relief cannot be shielded by privilege.

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

*Finally*, it is unfathomable that this late in the game, Plaintiff is unable to identify a single fact in support of the claims made in the SAC. Plaintiff filed this action over one year ago, and fact discovery closes in less than one month. Plaintiff should be compelled to immediately and fully supplement its response and describe in detail, on a claim-by-claim basis, all the facts supporting the allegations in the SAC.

**ii. <u>Plaintiff's Argument</u>**

This Interrogatory improperly calls for attorney work product because it requires Almaty to disclose its attorneys' determinations as to the facts that support each claim, on a claim by claim basis. Such a legal analysis necessarily must be conducted by Almaty's attorneys and would reflect Almaty's attorneys' judgments as to how the facts apply to the legal standards at issue for each claim. Almaty has adequately answered multiple Interrogatories with detailed descriptions of the Defendants' fraudulent scheme, money laundering, and the property they acquired as a result of their criminal conduct. Defendants cannot demand, and Almaty

cannot be required to supply, a legal analysis applying those facts to each element of each claim and summarizing the ways in which Defendants are liable. *See, e.g.*, *Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf*, 357 F.3d at 907.

To the extent the request seeks information held by other Kazakhstan government agencies, Almaty cannot provide such information because Almaty does not have access to or control over information in the possession of such agencies. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp*., 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government. Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking detailed information regarding law enforcement agencies' evidence of their crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511

F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Almaty has refused to respond to Interrogatory, which improperly seeks discovery Almaty's attorneys' work product. The Motion to Compel as to this Interrogatory should be denied.

**V. <u>DEFENDANTS' SPECIAL INTERROGATORY NO. 24</u>:**

On a claim-by-claim basis, IDENTIFY all DOCUMENTS YOU allege support each claim for relief in the SECOND AMENDED COMPLAINT.

**<u>PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 24</u>:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by the law enforcement investigatory privilege. Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation.

**i. <u>Defendants' Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based

on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 24 seeks information not available to Almaty." All such objections should be disregarded.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, it is clear that this Interrogatory calls for information from Kazakhstan and Switzerland, implicating foreign privilege law. When faced with the potential application of foreign privilege law, a court must first determine whether the privileged information "touches base" with the United States or foreign law, then defers to the law of the county that has the "predominant" or "most direct and compelling interest." *Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019, 1022 (S.D. Cal. 2014) (applying German privilege law to legal advice rendered in Germany); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 522 (S.D.N.Y. 1992) (applying Norwegian, German, and Israeli law to determine confidentiality of communications between Italian corporation and Norwegian, German, and Israeli patent agents). Where foreign privilege law applies, the burden is on the party invoking privilege to establish that foreign law protects the information from disclosure. *See Cadence*, 996 F. Supp. 2d at 1019. However, Plaintiff's boilerplate objections fails to provide any information to determine what information is being withheld pursuant to privilege, which foreign privilege law might be applicable, and why it purportedly applies.

*Second*, even if U.S. law applies, a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants seek identification of documents supporting Plaintiffs claims in the SAC, which is non-privileged, factual information. *See Moore*, No. 1:13-CV-01336-LJO, 2014 WL

2039995, at *5 ("The plain language of Rule 26 limits the scope of the attorney work product doctrine to documents and tangible things, not the underlying facts. . . Plaintiff's contentions as to what facts give rise to a particular violation are not protected by the work-product privilege.").

*Third*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

*Finally*, it is unfathomable that this late in the game, Plaintiff is unable to identify a single document in support of the claims made in the SAC. Plaintiff filed this action over one year ago, and fact discovery closes in less than one month. Plaintiff should be compelled to immediately supplement its response pursuant to and describe in detail, on a claim-by-claim basis, all the documents supporting the allegations in the SAC.

Plaintiff should be compelled to immediately and fully respond to this Interrogatory.

**ii. <u>Plaintiff's Argument</u>**

This Interrogatory improperly calls for attorney work product because it requires Almaty to disclose its attorneys' determinations as to the documents that support each claim, on a claim by claim basis. Such a legal analysis necessarily must be conducted by Almaty's attorneys and would reflect Almaty's attorneys'

judgments as to how the facts apply to the legal standards at issue for each claim. Almaty has adequately answered multiple Interrogatories with detailed descriptions of the Defendants' fraudulent scheme, money laundering, and the property they acquired as a result of their criminal conduct. Defendants cannot demand, and Almaty cannot be required to supply, a legal analysis applying those facts and documents to each element of each claim and summarizing the ways in which Defendants are liable. *See, e.g., Richey*, 632 F.3d at 566 (citing *Kovel*, 296 F.2d 918); *Torf*, 357 F.3d at 907.

To the extent the request seeks information held by other Kazakhstan government agencies, Almaty cannot provide such information because Almaty does not have access to or control over information in the possession of such agencies. Defendants cite no authority in support of their attempt to equate Almaty with other agencies of the government of Kazakhstan other than a vague, conclusory declaration that does not come close to making the required showing. *Novartis Pharm. Corp.*, 2014 U.S. Dist. LEXIS 164222; *Warner Chilcott Holdings Co. III, Ltd*., 2007 U.S. Dist. LEXIS 102652. Almaty does not exercise "control" over information relating to the investigation of Defendants by other agencies. (*See* Darmanbekov Decl., ¶ 3; Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) Defendants attempt to equate Almaty with a broader "Government of Kazakhstan" by submitting a declaration that claims the mayor of Almaty reports to the President of Kazakhstan. That fact, however, does not establish that Almaty has access to information held by any or all other branches of government that also report to the President. *See Amtrak*, 233 F.R.D. at 264-266, 268. Defendants themselves contend only that Almaty is "subordinate" to the so-called central Kazakh Government, and make no showing that Almaty has access to or control over information known to any other agency or office of the Kazakhstan government. Almaty is not in possession of and cannot provide any additional information held by other Kazakhstan government entities.

Defendants issued the Interrogatory to obtain information regarding the investigation into their wrongdoing. The nature of this request – accused criminals seeking detailed information regarding law enforcement agencies' evidence of their crimes – implicates another objection to the request, specifically, the law enforcement investigatory privilege. *E.g. Jones*, 216 F.R.D. at 443-444; *Kerr*, 511 F.2d at 198; *Al-Kidd*, 2007 U.S. Dist. LEXIS 90548. In the course of fulfilling its duty to conduct a reasonable inquiry in response to this Interrogatory, Almaty requested information from the Financial Police, who refused to provide the information requested on the basis that doing so would interfere with their interest in solving crime and protecting the identities of individuals providing testimony, jeopardize the safety of witnesses and investigators, and may lead to additional crimes. (*See* Perov Decl., ¶¶ 5, 7, 8-11; Maxatbekuulu Decl., ¶¶ 8-11.) The Financial Police's investigation into the Defendants' crimes remains ongoing, (*id.*), further highlighting the potential damage that would be caused by disclosure. *See Kerr*, 511 F.2d at 198.

Almaty has refused to respond to Interrogatory, which improperly seeks discovery Almaty's attorneys' work product. The Motion to Compel as to this Interrogatory should be denied.

**W. <u>DEFENDANTS' SPECIAL INTERROGATORY NO. 25</u>:**

DESCRIBE IN DETAIL the total amount of monetary damages YOU seek from the CURRENT DEFENDANTS and the methodology used to calculate the amount.

**<u>PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORY NO. 25</u>:**

Almaty incorporates herein its General Objections. Almaty further objects to this Interrogatory on the grounds that it seeks information not available to Almaty. Almaty is able to respond based only on the information currently available to it. Almaty further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by applicable privileges and protections, including without limitation the attorney-client privilege and work product doctrine. Almaty further objects to this Interrogatory on the grounds that it seeks information

that is protected from disclosure by the law enforcement investigatory privilege.

Subject to and without waiver of the foregoing objections, Almaty responds as follows: Almaty has not fully completed its investigation of the facts relating to this case and has not fully completed its discovery or investigation of the events and transactions underlying this litigation; therefore, Almaty has not yet calculated the total amount of monetary damages it seeks from the current Defendants. Almaty reserves the right to supplement, amend, or modify its response to this Interrogatory.

**i. <u>Defendants' Argument</u>**

By virtue of its failure to timely serve responses, this Court already held that Plaintiff has waived all objections to Defendants' Interrogatories other than based on privilege. (Dkt. 81). Plaintiff failed to seek reconsideration of this order, nor did it seek review by the District Judge. Instead, Plaintiff decided to ignore the Court's order by asserting non-privilege objections anyway, including "on the grounds that Interrogatory No. 25 seeks information not available to Almaty." All such objections should be disregarded.

Plaintiff also objects to this Interrogatory on the ground that it calls for privileged information. Plaintiff's privilege objections are flawed for a number of reasons.

*First*, even a cursory reading of this Interrogatory shows that Plaintiff's privilege assertion is frivolous—Defendants merely ask Plaintiff to describe the monetary damages it claims and the method of calculation of those damages (*i.e.*, information required to be disclosed by Rule 26(a)(1)(A)(iii)).

*Second*, Plaintiff claims that responsive information is protected from disclosure by the law enforcement investigatory privilege, but Plaintiff has failed to properly invoke this privilege. *See United States v. McGraw-Hill Cos.*, No. CV 13-779-DOC (JCGx), 2014 WL 1647385, at *6 (C.D. Cal. Apr. 15, 2014) (noting that to assert the investigatory privilege "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2)

assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege."). A mere boilerplate reference to "law enforcement investigatory privilege" is insufficient.

Plaintiff should be compelled to immediately and fully respond to this Interrogatory to provide a computation of each category of damages.

**ii. <u>Plaintiff's Argument</u>**

Almaty provided no answer to this Interrogatory because it has none – as explained in Almaty's response, Almaty has not yet calculated the total amount of monetary damages it seeks from the Defendants. In response to multiple other Interrogatories, Almaty has provided estimates regarding the amount of money Defendants stole from Almaty and are currently concealing in the United States. Furthermore, Almaty has provided extensive information regarding the transactions entered into by Defendants in the United States and the amount of the stolen funds that, to the best of Almaty's current information, the Defendants used in connection with those transactions. Almaty cannot at this time provide any further information in response to this Interrogatory.

## III. DEFENDANTS' CONCLUSION

Defendants respectfully request that the Court compel responses to Defendants' Interrogatories as specified above. The responses sought are highly relevant and material to the claims in the action, and are necessary for Defendants to prepare their defense, which has already been irreparably undermined by Plaintiff's failure to provide any meaningful discovery with less than one month before the discovery cut-off.

## IV. PLAINTIFF'S CONCLUSION

For the reasons stated above, Almaty has responded to each Interrogatory to the best of its knowledge, information, and belief formed after a reasonable inquiry,

and Almaty respectfully requests that the Court deny Defendants' Motion to Compel.

DATED: June 9, 2015 JAN LAWRENCE HANDZLIK, APC

By:/s/
Jan L. Handzlik

Attorneys for Defendants Elvira Kudryashova (individually and as trustee of the Kasan Family Trust), Dmitry Kudryashov (individually and as trustee of the Kasan Family Trust), RPM USA, LLC, RPM-Maro, LLC, Maro Design LLC, Haute Hue LLC, 628 Holdings LLC, and Candian International Ltd.

DATED: June 9, 2015 LATHAM & WATKINS LLP

By:/s/
David J. Schindler

Manny A. Abascal
Julie R. F. Gerchik
Kristen M. Tuey
Attorneys for Plaintiff City of Almaty