LATHAM & WATKINS LLP
  David J. Schindler (Bar No. 130490)
    *david.schindler@lw.com*
  Julie R. F. Gerchik (Bar No. 237764)
    *julie.gerchik@lw.com*
  Kendall M. Howes (Bar No. 294285)
    *kendall.howes@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California  90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763

Attorneys for Plaintiff the City of Almaty

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF ALMATY, a foreign state,<br><br>                Plaintiff,<br><br>        v.<br><br>VIKTOR KHRAPUNOV, an individual; LEILA KHRAPUNOVA, an individual; ILIYAS KHRAPUNOV a/k/a ILYAS KHRAPUNOV, an individual; MADINA ABLYAZOVA a/k/a MADINA KHRAPUNOVA, an individual; ELVIRA KHRAPUNOVA a/k/a/ ELVIRA KUDRYASHOVA a/k/a ELVIRA BALMADANI, an individual; DMITRY KUDRYASHOV a/k/a DMITRI KUDRYASHOV, an individual; RPM USA, LLC, a New York corporation; RPM-MARO LLC, a New York corporation; MARO DESIGN LLC, a California corporation; HAUTE HUE LLC, a California corporation; 628 HOLDINGS LLC, a California Corporation; CANDIAN INTERNATIONAL LTD., a British Virgin Islands corporation; ELVIRA KUDRYASHOVA AS TRUSTEE FOR THE KASAN FAMILY TRUST; DMITRY KUDRYASHOV AS TRUSTEE FOR THE KASAN FAMILY TRUST; CROWNWAY LTD, a Belize corporation; VILDER COMPANY S.A., a Panama corporation;  WORLD HEALTH NETWORKS, INC. f/k/a HEALTH STATION NETWORKS INC., a Delaware corporation, and DOES 1 through 10,<br><br>                Consolidated Defendants. | Case No. CV14-3650-FMO-CW<br><br>Assigned To: Hon. Fernando M. Olguin<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND OTHER EQUITABLE RELIEF FOR:**<br><br>1) **Violations of RICO (18 U.S.C. §§ 1962(c), 1962(d), 1964);**<br>2) **Breach of Fiduciary Duty;**<br>3) **Conversion and Conspiracy to Commit Conversion;**<br>4) **Fraud and Deceit and Conspiracy to Defraud; and**<br>5) **An Accounting, and Imposition of a Constructive Trust and Equitable Lien.**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1    Plaintiff the City of Almaty ("Almaty") hereby alleges the following claims
2  for relief against defendants Viktor Khrapunov ("Viktor"), Leila Khrapunova
3  ("Leila"), Iliyas Khrapunov a/k/a Ilyas Khrapunov ("Iliyas"), Madina Ablyazova
4  a/k/a Madina Khrapunova ("Madina"), Elvira Khrapunova a/k/a Elvira
5  Kudryashova a/k/a Elvira Balmadani ("Elvira"), Dmitry Kudryashov a/k/a Dmitri
6  Kudryashov ("Dmitry"), RPM USA, LLC ("RPM USA"), RPM-Maro LLC
7  ("RPM-Maro"), Maro Design LLC ("Maro Design"), Haute Hue LLC ("Haute
8  Hue"), 628 Holdings LLC ("628 Holdings"), Candian International Ltd.
9  ("Candian"), Elvira Kudryashova as Trustee of The Kasan Family Trust, Dmitry
10  Kudryashov as Trustee of The Kasan Family Trust, Crownway Ltd.
11  ("Crownway"), Vilder Company S.A. ("Vilder"), and World Health Networks, Inc.
12  f/k/a Health Station Networks Inc. ("World Health Networks"), and Does 1
13  through 10 (collectively, "Defendants").

14  **I.    NATURE OF THE ACTION**

15    1.    This is an action on behalf of the City of Almaty, the largest city in
16  the Republic of Kazakhstan, to recover funds that were stolen by its corrupt former
17  mayor, Viktor, and his co-conspirators – his wife Leila, their children Iliyas and
18  Elvira, and their children's spouses Madina and Dmitry (collectively, the
19  "Individual Defendants").  The Individual Defendants employed a scheme that
20  involved two related objectives:  (a) first to steal money from Almaty; and then (b)
21  to transfer, launder, and hide that stolen money in the United States where they
22  believed it would be out of reach of Kazakh and other governmental authorities
23  (the "Khrapunov Racketeering Enterprise").

24    2.    From 1997 to 2004, Viktor, Leila, Iliyas, Elvira, and their co-
25  conspirators systematically stole money from Almaty through Viktor's corrupt use
26  of his political power and a series of fraudulent real estate transactions that allowed
27  the Khrapunovs to convert public assets to their personal use.  In 2007, fearing
28  discovery of their fraud, Viktor and Leila fled to Switzerland, where Iliyas and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

1

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Elvira resided at the time, and attempted to launder and hide the stolen money in Switzerland.  The Kazakh authorities continued to investigate Viktor, Leila, Iliyas, and Elvira, and sought the assistance of the Swiss authorities.  In May 2011, the Kazakh authorities began bringing formal criminal charges against Viktor, Leila, and Elvira, and in mid-2012 the Swiss authorities initiated an investigation of Viktor and Leila on suspicion of money laundering.  In November 2012, the Swiss authorities began freezing assets in Switzerland belonging to Viktor, Leila, Iliyas, and Elvira.

3.     In or around 2010, understanding that they risked losing the proceeds of their fraudulent scheme if they kept the stolen money in Switzerland, the Individual Defendants and their co-conspirators engaged in racketeering activity to launder and hide the stolen money in and through the United States using various sham companies and disguised entities in the United States.  Upon information and belief, the Individual Defendants and their co-conspirators selected the United States to launder the stolen proceeds because they believed it was beyond the reach of the Kazakh authorities.  At that time, the United States did not have a mutual legal assistance treaty or extradition treaty with Kazakhstan.

4.     The Individual Defendants and their co-conspirators engaged in racketeering activities in the United States by engaging in money laundering with stolen funds in violation of 18 U.S.C. § 1956; transacting in property derived from unlawful activity in violation of 18 U.S.C. § 1957; transporting stolen property in violation of 18 U.S.C. § 2314; mail fraud in violation of 18 U.S.C. § 1341; and wire fraud in violation of 18 U.S.C. §1343.  They orchestrated these racketeering activities by using the stolen funds to acquire property, including property in the Central District of California, and then engaging in business transactions in the names of Iliyas, Madina, Elvira, Dmitry, and/or sham companies and disguised entities, in order to hide the true identity of the source of the stolen funds and to avoid detection by Kazakh, Swiss, and U.S. authorities.  These activities in the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

2

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1    United States were critical to the success of the criminal enterprise because without

2    a perceived safe haven for the stolen funds, the Individual Defendants and their co-

3    conspirators would not have been able to use Almaty's stolen funds for their

4    personal benefit.  Moreover, the Individual Defendants targeted their activity in the

5    United States with the mistaken belief that they could launder funds in the United

6    States without risk of detection, prosecution, or consequences.

7         5.    The Individual Defendants and their co-conspirators violated United

8    States law in order to achieve their end goal of securing and using their stolen

9    proceeds.  It was a two part scheme:  (1) steal (the Kazakh equivalent of) hundreds

10   of millions of dollars from the city of Almaty, and (2) avoid detection and/or

11   seizure of the stolen proceeds by using banks, sham entities, real estate

12   transactions, and the acquisition of other assets in the United States to hide and

13   "clean" the stolen funds with the ultimate goal of being able to lead a lavish

14   lifestyle in the United States and elsewhere.  In short, the Individual Defendants

15   and their co-conspirators undertook to use, and continue to use, the United States

16   as a safe haven for international money laundering.

17        6.    As set forth herein, Almaty seeks: (a) to hold Defendants, including

18   the Individual Defendants and their co-conspirators, liable for their laundering and

19   transportation of stolen funds to and within the United States; (b) the return of the

20   money stolen from Almaty and its people, or the return of substitute assets located

21   in the United States acquired with funds stolen from Almaty and its people; (c)

22   injunctive relief to prevent the Individual Defendants and their co-conspirators

23   from engaging in any further laundering or other transactions in the United States

24   in violation of federal law involving the proceeds of the looting scheme; (d)

25   imposition of a constructive trust over all monies and other assets located within

26   the United States that are traceable, either directly or indirectly, to Viktor and his

27   co-conspirators' systematic looting of Almaty's funds; and (e) treble and punitive

28

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

3

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   damages for Defendants' myriad violations of the federal anti-racketeering statute,

2   as well as state and federal common law.

3   **II.   THE PARTIES**

4        7.      Plaintiff Almaty is a foreign state within the meaning of 28 U.S.C. §

5   1332(a)(4).  Until 1997, Almaty was the capital of Kazakhstan, which is a

6   sovereign state recognized by the Government of the United States of America.

7   Almaty remains a major commercial and cultural center of Kazakhstan and is the

8   largest city in Kazakhstan by population.  Almaty has standing to bring this

9   Complaint and sues: (a) in its own right, as the victim of Defendants' unlawful

10  schemes, conspiracies, and acts of racketeering; and (b) in a *parens patriae*

11  capacity as the representative of the city and its people, who were the ultimate

12  victims of Defendants' conspiracies, fraudulent schemes, and acts of racketeering

13  and who are the rightful owners of funds and assets unlawfully held by the

14  Defendants and their co-conspirators in the United States.

15       8.      Defendant Viktor was the mayor of Almaty from approximately June

16  16, 1997 until approximately December 2004.  In 2004, Viktor was nominated for

17  the position of governor of the Pavlodar province in northeast Kazakhstan, a

18  position he held until 2007, at which time he was appointed Minister of Emergency

19  Measures.  In late 2007, Viktor announced his retreat from all public functions and

20  his retirement, ostensibly for health reasons.

21       9.      Upon information and belief, in or about 1998, Viktor married

22  Defendant Leila.  Viktor and Leila are citizens of the Republic of Kazakhstan and,

23  upon information and belief, currently reside in Switzerland.

24       10.     Upon information and belief, Defendants Iliyas and Elvira are the son

25  and daughter, respectively, of Leila, and stepson and stepdaughter, respectively, of

26  Viktor.

27       11.     Upon information and belief, Iliyas is married to Defendant Madina,

28  while Elvira is married to Defendant Dmitry.  Upon information and belief, Iliyas

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

4

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   and Madina are citizens of the Republic of Kazakhstan and currently reside in

2   Switzerland.  Upon information and belief, Elvira is a citizen of the Republic of

3   Kazakhstan and of Switzerland, and currently resides in Irvine, California.  Upon

4   information and belief, Dmitry is a citizen of the Russian Federation and currently

5   resides with Elvira in Irvine, California.

6       12.     Upon information and belief, Defendants Maro Design LLC, Haute

7   Hue LLC, and 628 Holdings LLC are corporations organized and existing under

8   the laws of the State of California.  Upon information and belief, Defendants RPM

9   USA LLC and RPM-Maro LLC are corporations organized and existing under the

10  laws of the State of New York.  Upon information and belief, World Health

11  Networks, formally known as Health Station Networks Inc. ("HSNI"), is a

12  corporation organized and existing under the laws of the State of Delaware.  Upon

13  information and belief, Defendant Candian is an offshore corporation organized

14  under the laws of the British Virgin Islands.  Upon information and belief,

15  Crownway is an offshore corporation organized under the laws of Belize.  Upon

16  information and belief, Vilder is an offshore company organized under the laws of

17  Panama.  Upon information and belief, Defendants Elvira Kudryashova as Trustee

18  of The Kasan Family Trust and Dmitry Kudryashov as Trustee of The Kasan

19  Family Trust have beneficial ownership and control over a property used by Iliyas

20  and/or Elvira in furtherance of the racketeering scheme described below.

21      13.     Upon information and belief, Maro Design, Haute Hue, 628 Holdings,

22  RPM USA, RPM-Maro, World Health Networks, Candian, Crownway, Vilder, and

23  The Kasan Family Trust (collectively, the "Entity Defendants") all are or were at

24  the relevant time owned or controlled by Iliyas, Elvira, and/or Dmitry and were

25  misused by them and the other Individual Defendants in order to carry out the

26  racketeering scheme described below.

27      14.     Almaty is ignorant of the true names of defendants Does 1 through 10

28  (the "Doe Defendants"), inclusive, and therefore sues those defendants by such

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

5

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1    fictitious names.  Almaty is informed and believes, and on that basis alleges, that
2    the Doe Defendants, inclusive, are responsible for the acts alleged in this
3    Complaint.  When the true names of such fictitious defendants are ascertained,
4    Almaty will seek leave of this Court to amend this Complaint to name those
5    individuals or entities.

6        15.    Almaty is informed and believes, and thereon alleges, that the
7    Defendants were at all times relevant herein the agents, servants, and/or employees
8    of the Individual Defendants, and each of them, and in performing the deeds herein
9    alleged, were acting at least in part within the course and scope of their authority as
10   such agents, servants, and/or employees of Defendants and each of them.

11   **III.    JURISDICTION AND VENUE**

12       16.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331(a)
13   and 18 U.S.C. § 1964(c) over the First and Second Claims for Relief of this
14   Complaint for violation of the federal Racketeer Influenced and Corrupt
15   Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* and for conspiracy to
16   violate RICO.  The Third through Seventh Claims for Relief allege violations of
17   state law and of federal common law.  This Court has pendent jurisdiction over
18   such claims pursuant to 28 U.S.C. § 1367(a) because those claims are joined with
19   substantially related claims under RICO and because those claims are so related to
20   the RICO claims in the action that they form part of the same case or controversy
21   under Article III of the United States Constitution and arise from a common
22   nucleus of operative facts.

23       17.    Venue is proper in this District and before this Court pursuant to 28
24   U.S.C. § 1391(b)(2) because events giving rise to Almaty's claims occurred in this
25   District, including, among other things, Defendants' purchase, in violation of U.S.
26   law, of real estate and other assets located in Beverly Hills, Studio City, and
27   Orange County, California.

28

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

6

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

18.     This Court has personal jurisdiction over Defendants because each of them knowingly committed acts that form the basis of this Complaint in this District, directed or conspired with others to commit acts in this District, or purposely availed themselves of the privileges of doing business in this District, as fully set forth herein.

## IV.     FACTUAL ALLEGATIONS

### A.     Overview of the Khrapunov Racketeering Enterprise and Conspiracy

19.     In 1991, Kazakhstan declared its independence from the former Soviet Union and initiated the process of becoming a free society.  Rather than assist their country in embracing this move toward freedom, Viktor and his co-conspirators exploited Viktor's position of trust and authority to steal hundreds of millions of dollars from the people of Almaty and laundered, hid, and spent this money in the United States.

20.     The Khrapunov Racketeering Enterprise is comprised of two interrelated parts.  First, the Individual Defendants conspired together to have Viktor abuse his position as mayor of Almaty to convert and steal state-owned assets cumulatively valued at over $300 million.  Second, the Individual Defendants conspired to transport and to launder those stolen assets out of Kazakhstan and into the United States, among other places, in order to escape the reach of the authorities and to attempt to prevent Almaty from recovering monies that rightfully belong to it.  The transporting and laundering of the stolen assets to the United States was essential to the success of the enterprise because it enabled the Individual Defendants and their co-conspirators to use the stolen assets for their own personal benefit.

21.     Viktor became mayor of Almaty on or about June 16, 1997, and remained in that position until approximately December 2004.  Before Viktor assumed the office of the mayor of Almaty, he took an oath of office to strictly

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

7

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

obey the Constitution and laws of the Republic of Kazakhstan.  Among other things, Viktor expressly and impliedly promised and represented that he would fulfill his fiduciary duties to the people of Almaty, would honor his obligation to provide honest services, and would not convert money, property, or assets belonging to Almaty for his own use or that of his family, friends, or associates.

22.    In fact, over the span of more than six years, Viktor repeatedly and systematically violated those promises and abused his position of power and authority to steal millions of dollars of real property and assets from the city and people of Almaty and to launder and conceal that money in the United States and elsewhere in the hopes of escaping prosecution and seizure of funds that rightfully belong to the Almaty.  Aided and abetted by his wife, children, associates, accomplices, and other co-conspirators, Viktor plundered the city's wealth and industry to enrich himself, his family, and his co-conspirators at the expense of Almaty and its people, and the Individual Defendants and their co-conspirators now seek to conceal and enjoy their ill-gotten gains in the United States.

23.    Defendants and their co-conspirators carried out the scheme through various means, including: (a) secretly acquiring property owned by Almaty through fictitious sham entities for a fraction of what the property was worth, then selling the property for tens of millions of dollars in illicit profits; (b) acquiring property without payment through sham transactions; and (c) secretly acquiring property at a discount then using Viktor's position of power to take illegal government action that vastly increased the value of the property solely to benefit Viktor and his co-conspirators.

24.    As mayor, Viktor was entrusted with the right to cause state-owned real estate to be sold to private parties at auction pursuant to established legal procedures, the right to cause privately-owned real estate to be taken for purported state use, and the right to control who could do business in Almaty through the granting of licenses, concessions, and permits.  As mayor, Viktor did not have the

LATHAM&WATKINS LLP   US-DOCS\91976251.11
ATTORNEYS AT LAW
LOS ANGELES

8

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

authority to take these actions solely for his personal benefit or for the personal benefit of his family members.

25.     In his capacity as mayor of Almaty, Viktor caused certain state-owned real estate parcels to be made available for auction, ostensibly to generate revenue for Almaty or to allow for the privatization of government assets.  However, in violation of Kazakh law and his duty to the people of Almaty, Viktor – aided and abetted by others involved in the Khrapunov Racketeering Enterprise – corrupted those auctions by: (a) improperly influencing and directing the actions of the individuals responsible for administering the auctions; and (b) improperly causing confidential bid information to be disclosed to entities controlled by his co-conspirator Leila, which allowed these entities to adjust their bids in order to win the auction.

26.     Through these corrupt activities, Viktor and Leila succeeded in purchasing real estate and other assets put up for auction by Almaty, often at artificially suppressed prices.  In some instances, Viktor thereafter caused development permits to be issued in connection with the purchased sites, vastly increasing the market value of the real estate, which Viktor, Leila, and/or their co-conspirators then re-sold at a significant profit.  In other instances, entities controlled by Leila simply ignored restrictions placed on parcels sold at auction in order to resell the parcels at a significant profit.  In addition, in some instances, entities controlled directly or indirectly by Viktor and Leila simply failed to pay for the assets they acquired and subsequently re-sold them.

27.     Viktor thus conspired with the other Individual Defendants and their co-conspirators to use his position of power and authority to convert and cause to be converted to his use and that of his family, friends and associates money, funds and property rightfully belonging to Almaty and its people.

28.     After wrongfully appropriating assets belonging to the people of Almaty, Viktor, Leila, Elvira, and Iliyas, along with their families, friends,

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

9

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

associates, and accomplices in the Khrapunov Racketeering Enterprise, devised and executed schemes to systematically and secretly transfer their ill-gotten gains out of Kazakhstan to escape the reach of the authorities and to prevent the seizure and return of monies to Almaty.  To that end, the Individual Defendants and their co-conspirators ultimately transferred millions of dollars of Almaty's stolen funds into the United States in violation of U.S. law through accounts, sham companies, and disguised entities owned or ultimately controlled by Elvira, Dmitry, Iliyas, and/or Madina.

29.     The Individual Defendants and their co-conspirators first transferred Almaty's funds to Switzerland, where Iliyas and Elvira were residing, and elsewhere using accounts and sham entities owned or ultimately controlled by Leila, Iliyas, Elvira, and/or their co-conspirators.  Leila, Iliyas, and Elvira laundered hundreds of millions of dollars through various offshore holding companies with the goal of making the funds appear legitimate.

30.     In an effort to further obscure the funneling of the stolen funds through sham entities and bank accounts based in Switzerland, Cyprus, and elsewhere, the Khrapunovs partnered with Madina's father (Iliyas' father-in-law) Mukhtar Ablyazov ("Ablyazov").  Ablyazov served as the Chairman of BTA bank, a Kazakh bank headquartered in Almaty, from 2005 to 2009.  During his tenure, Ablyazov stole over $6 billion from BTA Bank through fraudulent loan schemes— for example, Ablyazov would issue enormous loans to valueless entities (ultimately owned by Ablyazov), which would then be obscured by transfers among different shell corporations and never repaid.  BTA bank obtained a worldwide freezing order and a $4 billion dollar judgment in the United Kingdom against Ablyazov in 2012.  Upon information and belief, the Khrapunovs comingled certain of their stolen assets with Ablyazov's, and then Iliyas hid these funds in sham investments and entities through which he would move hundreds of millions of dollars in illicit proceeds for both families.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

10

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

31.     In or around 2010, Leila, Iliyas, and Elvira began transferring portions of the stolen funds out of bank accounts in Switzerland and Cyprus, through various offshore holding companies, and ultimately into the United States in violation of U.S. law via accounts and entities owned or ultimately controlled by Elvira, Dmitry, Iliyas, and/or Madina.  The Individual Defendants used an intricate web of individuals and offshore holding companies to transfer the funds stolen from Almaty into the United States, and caused further harm to Almaty by making it significantly more difficult and costly for Almaty to trace and recover its funds in the United States.

32.     Iliyas, Madina, Elvira, and Dmitry conspired with the other Individual Defendants to use Almaty's stolen funds in the United States to purchase real estate and other assets in California and New York, to fund U.S. holding companies owned or controlled by Leila, Iliyas, Madina, Elvira, and/or Dmitry, and to invest in United States businesses.  Each new purchase and business investment Defendants made in the United States using Almaty's money harmed Almaty in the United States by impeding Almaty's attempts in the United States to trace and recover the stolen funds.

33.     Upon information and belief, the Individual Defendants and their co-conspirators increased their efforts to transfer Almaty's funds to and within the United States following the initiation of investigation of Viktor and Leila by Swiss authorities in mid-2012, which led to the Swiss authorities freezing Swiss bank accounts held by the Individual Defendants and their co-conspirators in November 2012.

34.     For years, Viktor and Leila took numerous steps to conceal their looting from Almaty and the Kazakh authorities.  Among other things, Viktor and Leila each filed false annual tax returns with the Tax Committee of the Ministry of Finance of Kazakhstan, Kazakhstan's taxation authority, which concealed the millions of dollars in monies, properties, and assets acquired through the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

11

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Khrapunov Racketeering Enterprise.  According to their 2007 tax returns, which required Viktor and Leila to list their entire net worth accumulated through all sources as of December 31, 2007, Viktor and Leila reported a combined net worth of approximately $113,298 (13,671,665 ₸), in addition to three vehicles, five modest pieces of real estate, and two parking stalls.

35.     Despite claiming to have a total net worth of less than $120,000, Viktor and Leila amassed a fortune that reportedly exceeds $300 million by systematically looting and plundering assets belonging to the people of Almaty. Indeed, according to public news reports, in 2009 Viktor was one of the richest people in Switzerland with a fortune of over $300 million.  Similarly, in 2012 Viktor was among Switzerland's 300 richest people with a fortune of approximately $324 – $432 million (300 – 400 million Swiss francs).

**B.     Pending Investigations:  The Kazakh and Swiss Authorities Are Proceeding Against the Individual Defendants and Their Co-Conspirators for Crimes Committed in Those Countries**

36.     In approximately late 2007, Viktor became aware that the Kazakh government had begun investigating him and his family, friends, and associates for criminal violations.  On or about November 9, 2007, Viktor and Leila fled Kazakhstan via private jet to Switzerland, where Iliyas and Elvira resided at the time.

37.     On or about May 27, 2011, the Investigation Department of the Agency for Economic and Corruption-Related Crimes of Kazakhstan (the "Financial Police") filed two criminal cases against Viktor on suspicion of abuse of power and fraudulent acts.  On or about July 21, 2011, the Financial Police obtained a court-ordered arrest warrant for Viktor.  In 2011 and 2012, additional charges were brought in Kazakhstan against Viktor, Leila, Iliyas, and Elvira stemming from the theft of public property and the ultimate laundering of funds.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

12

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

38.     On or about February 20, 2012 and September 14, 2012, the Financial Police applied to the Federal Office of Justice in Switzerland for legal assistance in connection with the effort to prosecute Viktor, Leila, Iliyas, and Elvira for their crimes in Switzerland and Kazakhstan against Almaty and its people.  In or about mid-2012, the Public Prosecutor of Geneva opened an investigation into Viktor, Leila, Iliyas, and Elvira on suspicion of money laundering in violation of Swiss law.  In or about November 2012, the Public Prosecutor of Geneva ordered Swiss accounts and assets belonging to Viktor, Leila, Iliyas, and Elvira frozen, including accounts held at Swiss banks Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co.  The investigation by the Swiss authorities is ongoing.  The various Swiss investigations contributed to the Individual Defendants' attempts to direct their money laundering activities to the United States.

39.     There currently are 24 criminal cases pending against Viktor in Kazakhstan for embezzlement, fraud, money laundering, establishing and directing an organized criminal group for criminal purposes, abuse of power, and bribery. There currently are five criminal cases pending against Leila in Kazakhstan for money laundering and establishing and directing an organized criminal group for criminal purposes.  There also currently is a criminal case pending against Elvira in Kazakhstan for money laundering.

## C.     The Theft of Property:  The Individual Defendants and Their Co-Conspirators Unlawfully Converted Almaty's Property and Sold it to Third Parties at an Enormous Profit

40.     Over the life of the Khrapunov Racketeering Enterprise, the Defendants and their co-conspirators carried out multiple acts all directed at the same goal: to convert property rightfully belonging to the people of Almaty, sell it for a profit, then launder the proceeds out of Kazakhstan in order to escape the reach of the authorities and get away with their crimes.  As a result, Viktor, Leila, Iliyas, Elvira, and their co-conspirators stole hundreds of millions of dollars from

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

13

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   Almaty and laundered these stolen funds into and within the United States in
2   violation of U.S. law.

3       41.    Five examples of Defendants' illegal acquisition of property from
4   Almaty are set forth below.  Through the five transactions detailed below, Viktor,
5   Leila, Iliyas, Elvira, their family and their co-conspirators generated millions in
6   illicit profits resulting from the illegal conversion and re-sale of several pieces of
7   property.  In total, the Khrapunov Racketeering Enterprise is believed to have
8   illegally acquired over 80 pieces of real estate, valued at approximately $300
9   million, from Almaty and its people.  They have sought to further their wrongdoing
10  by hiding stolen funds in the United States.

11  **Fraudulent Transaction Example 1**

12      42.    In or about 2000, Viktor abused his position as Mayor of Almaty to
13  cause a large tract of state-owned land near two rivers in Almaty located at 232
14  Gornaya Street (the "Gornaya Property") to be transferred to Leila for a total price
15  of approximately $689,000 (101,886,477 ₸).  The transfer was accomplished via a
16  series of fraudulent transactions and front companies controlled by Leila and
17  Iliyas.  Through several more transfers designed to conceal the illegal conduct,
18  Leila and Iliyas ultimately sold the Gornaya Property for a total of $15.57 million,
19  yielding nearly $15 million in illicit profit as a result of this single transaction.

20      43.    To carry out the illegal conversion of the Gornaya Property, Viktor,
21  Leila, and Iliyas utilized at least six Kazakhstan entities controlled by Leila and
22  Iliyas, including: (a) Almaty-Demalys; (b) Viled Establishment; (c) KazRealIncom
23  LLP ("KRI"); (d) Karasha Plus LLP ("Karasha"); (e) Building Services Company
24  ("BSC"); and (f) Asia Holding Development LLP ("Asia Holding").

25      44.    In 2000, Viktor unlawfully ordered the Gornaya Property to be
26  transferred to Almaty-Demalys, an entity ultimately controlled by Leila.  Almaty-
27  Demalys purchased the Gornaya Property on or about November 20, 2001.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

14

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

45.     Viktor's transfer of the Gornaya Property violated the Land Code of the Republic of Kazakhstan, which requires that public property be sold via auction.  Viktor's transfer also violated the Water Code, which mandates that land in water conservation zones may only be provided to private individuals and entities for temporary use.  The fraudulent transfer did not involve an auction nor was the property provided for temporary use only.

46.     On or about August 29, 2003, Leila caused Almaty-Demalys to transfer two small portions of land from the Gornaya Property directly to Leila.  Upon information and belief, although Leila purported to purchase these plots for approximately $72,000 (10,660,352 ₸), Leila never transferred money to Almaty-Demalys for these purchases.

47.      On or about September 30, 2003, Leila caused Almaty-Demalys to transfer a separate, large portion of land from the Gornaya Property to Karasha, an entity ultimately controlled by Leila.  Upon information and belief, Karasha purported to purchase the land for $613,000 (91,226,125 ₸).  Karasha never paid for this purchase.

48.     Days later, on or about October 3, 2003, Leila caused Karasha to transfer the land plot directly to Leila.  Upon information and belief, Leila similarly never paid for the acquisition of this property.

49.     On or about October 6, 2003, Leila contributed the same portion of the Gornaya Property to BSC, of which she was the sole owner.  Ten days later, Leila sold her interest in BSC to a third party in a transaction that valued that portion of the Gornaya Property at approximately $8 million (1,179,999,980 ₸).

50.     Leila transferred the proceeds to Elvira's bank accounts in Switzerland, including Deutsch Bank and American Express Ltd. NY, and Viled Establishment's bank accounts in Liechtenstein.

51.      Leila caused the smaller portions of the Gornaya Property to be conveyed directly to Iliyas.  Iliyas, in turn, contributed it to Asia Holding, and then

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

15

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   sold Asia Holding to a separate unrelated third party for approximately $7.57

2   million.  Of the $7.57 million, Iliyas transferred approximately $2.21 million to

3   Elvira's Swiss bank accounts, including accounts at Sarasin & Co. Ltd., Credit

4   Suisse, and Schroeder & Co., and retained the remainder for himself.

5       52.  Thus, Leila paid approximately $689,000 for the Gornaya Property,

6   which she and Iliyas later re-sold for a total of $15.57 million.

7       **Fraudulent Transaction Example 2**

8       53.  On or about April 16, 2001, Viktor used his position as mayor to

9   cause public land and a building in Almaty known as Kindergarten No. 186 to be

10   auctioned and ultimately sold to Leila's company, KRI, for approximately

11   $347,000 (52,155,100 ₸).  Viktor did so by manipulating a public auction, through

12   members of the Territorial Committee and Investment Tender Committee, to

13   ensure that KRI won the auction.

14       54.  Under the laws of Kazakhstan, potential buyers of state-owned

15   property are obligated to state how they intend to invest in and develop the

16   property.  In an attempt to make KRI's bid appear legitimate and to ensure KRI

17   won the bid, Leila caused KRI to fraudulently represent that KRI would invest

18   more money than its competitors (based off inside information about the

19   competitors' bids) in Kindergarten No. 186 to build a health center for the benefit

20   of the people of Almaty.  That representation was false at the time it was made

21   and, in fact, KRI never intended to and never did build any such health center.

22       55.  Instead, on or about September 30, 2003, Leila caused KRI to sell

23   Kindergarten No. 186 to Karasha and, three days later, Leila caused Karasha to sell

24   Kindergarten No. 186 directly to her.  The investment promise KRI used to win the

25   bid was not passed on to Karasha or Leila in the subsequent purchase agreements.

26   On or about October 6, 2003, Leila contributed Kindergarten No. 186 to BSC,

27   which she then sold to an unrelated third party ten days later in a transaction that

28   valued Kindergarten No. 186 at approximately $4.1 million (611,445,206 ₸).  Leila

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

16

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1    and Viktor thus obtained illegal profit of over $3.7 million as a result of their illicit

2    acquisition and re-sale of Kindergarten No. 186.

3            **Fraudulent Transaction Example 3**

4            56.     In addition to manufacturing the sale of state-owned assets to Leila

5    and other family members and co-conspirators, Viktor also abused his authority as

6    mayor to seize privately-owned land and transfer it to Leila and others for re-sale.

7            57.     On or about April 3, 2001, Viktor caused Almaty to seize land owned

8    by certain private unrelated individuals.  On or about August 25, 2003, Viktor

9    caused Almaty to seize land owned by a private third party, Shadid Engineering

10   LLP.  On or about September 16, 2003, Viktor caused Almaty to seize land owned

11   by various private entities, including Kazkommertsbank, Arman Garage, Bulat

12   Enterprise, and Argymak LLP.

13           58.     On or about September 23, 2003, Viktor combined all properties with

14   an additional property into a single plot (the "Seized Property") and caused the

15   Seized Property to be sold to Leila's company Karasha for approximately

16   $105,000 (15,637,100 ₸).  Leila then caused Karasha to sell the Seized Property

17   directly to her on or about October 4, 2003.  Two days later, Leila contributed the

18   Seized Property to BSC, and sold BSC to an unrelated third party in a transaction

19   that valued the Seized Property at approximately $2 million.  As a result, Leila

20   obtained nearly $1.9 million in illicit profit at the expense of Almaty and its

21   people.

22           **Fraudulent Transaction Example 4**

23           59.     In or about November 2004, Viktor caused Almaty to sell two plots of

24   land to two additional Kazakh companies owned and controlled by Leila,

25   Ademytau-KMK LLP and Viktoriya-KMK LLP (the plot transferred to Ademytau-

26   KMK LLP, the "Ademytau Property," and the plot transferred to Viktoriya-KMK

27   LLP, the "Viktoriya Property").  Both plots were located in a water conservation

28   zone and, therefore, under Kazakh law (Part 1 of Article 119 of the Water Code of

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

17

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

the Republic of Kazakhstan), could be provided to private persons or entities only for temporary use.  Nevertheless, in violation of the law and his obligations as mayor of Almaty, Viktor caused both the Ademytau Property and the Viktoriya Property to be sold to Leila's companies for 16,640,900 ₸ and 2,229,200 ₸, respectively – approximately $1.3 million total (18,870,100 ₸).

60.     On or about April 12, 2005, Leila caused Ademytau-KMK LLP to transfer the Ademytau Property to Elvira.

61.     On the same day, April 12, 2005, Leila caused Viktoriya-KMK LLP to transfer the Viktoriya Property to Phoenix, VL., LLP, another entity that she owned and controlled.  Two months after Leila transferred the property to Phoenix, VL., LLP, Phoenix, VL., LLP (previously known as Phenix-Kh Company LLP) proceeded to change its name a second time to Swiss Kazakh Phoenix Holding, LLP ("Swiss Kazakh").

62.     On or about December 23, 2005, Elvira transferred the Ademytau Property to a co-conspirator, Armen Sanasarovich Khachatryan ("Khachatryan") for 16,640,900 ₸.

63.     About one month later, on or about January 25, 2006, Leila caused Swiss Kazakh to transfer the Viktoriya Property to Khachatryan for 3,237,860 ₸. From December 2006 through May 2007, Khachatryan made payments, labeled as the return of temporary financial aid, totaling approximately $8.6 million (1,223,950,000 ₸) to Leila for the Ademytau and Viktoriya Properties and six additional properties.  On information and belief, these illicit proceeds were transferred from Leila's Kazakh bank accounts to Elvira's Swiss bank accounts as "financial aid."

**Fraudulent Transaction Example 5**

64.     Between 2002 and 2005, Viktor sold more than 55 plots of public land to private companies for billboards to be used for outdoor advertisements. Viktor violated Kazakh law by privatizing these public lands, including Article 18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

18

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

of the Law "On Land," which provided that public land could not be in private

ownership.  As part of this billboard scheme, Viktor ordered the privatization and

sale of public land to companies owned by or affiliated with himself and Leila.

65.     Viktor's and Leila's companies subsequently leased the land at

inflated prices to secure profits.  Generally, the land would be sold to one company

in particular, GeFest LLP ("GeFest"), for a nominal price.  GeFest was founded by

Leila and Viktor's brother-in-law, Aijar Kadyrovich Ilyasov, who served as

GeFest's Executive Director.

66.     GeFest sold the land to Swiss Kazakh.  Swiss Kazakh also was

founded by Leila.

67.     Swiss Kazakh then sold the land to Vostochny Media Ekspress, LLC

("Vostochny").  Vostochny was founded by Aijar Ilyasov, Viktor's brother-in-law.

68.     Vostochny then leased the billboard space to third parties and

collected profits.

69.     As a specific example, on November 7, 2002, Viktor signed a

"decision" to sell GeFest the public land described as south of Baitursynov St.,

south of Satpaev St., in Bostandyk District.  On January 15, 2004, Viktor and

GeFest entered into a purchase agreement for this state-owned land plot.  The

purchase price was $11,472 ₸ (approximately $35.22 USD).

70.     On July 18, 2005, GeFest entered into a purchase agreement to sell the

land to Swiss Kazakh.  Swiss Kazakh purchased the land for the same nominal

price, $11,472 ₸ (approximately $35.22 USD).

71.     On November 27, 2006, Swiss Kazakh entered into a purchase

agreement to sell the land to Vostochny for $19,600 ₸ (approximately $60.00

USD).

72.     Vostochny then leased the outdoor advertising space for a profit.  For

example, on January 1, 2009, Vostochny entered into an agreement with F.I.R.S.T.

Agency LLP to lease the billboard space for one month for $210,600 ₸

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

19

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  (approximately $646.55 USD) and an installation fee of $27,000 ₸ (approximately
2  $83.00 USD).  Additional lease agreements were entered into and resulted in
3  increased profits over an extended period of time.

4      73.    As a result of this billboard scheme, Khrapunov-related companies
5  leased out billboard space for more than 55 plots of land for approximately 6 years.
6  Almaty alleges on information and belief that the Khrapunov family earned
7  millions of dollars in ill-gotten gains through their illegal billboard scheme.

8      74.    Together, the illegal conversion of properties described in Fraudulent
9  Transactions 1-5 and the ultimate sale of those properties to third parties, resulted
10  in tens of millions in profits to Viktor, Leila, Iliyas, Elvira, their family members,
11  and their co-conspirators.  These are merely five examples of Viktor and his family
12  and co-conspirators' wrongdoing.  In total, approximately 80 parcels of real estate
13  rightfully belonging to Almaty and its people were illegally alienated by the
14  Individual Defendants and their co-conspirators for their own personal gain.  On
15  information and belief, the Individual Defendants and their co-conspirators
16  profited by over $300 million from these illegal transactions, all at the expense of
17  the people of Almaty, and now are seeking to use the United States as a haven in
18  which to enjoy their ill-gotten gains.

19    **D.    The Laundering of Stolen Funds:  The Individual Defendants and
20         Their Co-Conspirators Laundered Illegally Obtained Funds in
21         Switzerland and the United States**

22      75.    The Individual Defendants and their co-conspirators laundered the
23  proceeds of their crimes in Switzerland and the United States in order to hide the
24  assets from authorities and reap the rewards of their wrongdoing.  Once the Swiss
25  authorities began to investigate the Individual Defendants and their co-conspirators
26  and to freeze their assets, the Individual Defendants and their co-conspirators
27  increased their illegal laundering activities in and through the United States to
28  further conceal the proceeds and attempt to prevent their recovery by Almaty.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

20

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

76.     These funds rightfully belonged to, and still belong to, Almaty. Defendants continue to hold funds belonging to Almaty without permission and via constructive trust, and Defendants are obligated, by law, to return funds transferred into and laundered in the United States in furtherance of the Khrapunov Racketeering Enterprise.  The continued movement of Almaty's funds within the United States has hindered and continues to hinder Almaty's ability to trace and recover its funds, thereby causing Almaty ongoing harm and damage in the United States.  Upon information and belief, the Individual Defendants and their co-conspirators selected the United States as a jurisdiction in which to hide the stolen funds because they thought they would be immune from redress for their crimes here.  At the time the laundering began, the United States did not have a mutual legal assistance treaty or extradition treaty with Kazakhstan.

77.     The Individual Defendants and their co-conspirators have used and continue to use numerous holding companies in order to hide and to launder the illicit funds they siphoned out of Kazakhstan through Switzerland and other intermediary countries, and ultimately into and within the United States.  Iliyas and Elvira owned and/or controlled a number of these companies, including Defendants Vilder, Crownway, and at least two Swiss companies, SDG Capital SA ("SDG") and Swiss Promotion Group SA ("SPG").  In total, Iliyas, Elvira, and Leila have already transferred at least $125 million into these two Swiss companies alone.

78.     Between 2008 and 2012, Iliyas, Elvira, Leila, and sham companies they control injected over $115 million into SDG.  SDG was formed in or about July 2008 and, until approximately May 2009, was owned and controlled by Harlem Securities, a British Virgin Islands corporation that was, in turn, owned by Iliyas.  In or about May 2009, Elvira purchased SDG from Harlem Securities for approximately $99,000.  Following that purchase, Iliyas continued to exert full control over SDG.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

21

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

79.     Iliyas, Elvira, Leila, and sham companies they control also have contributed substantial assets, believed to be in excess of $10 million, to SPG. Iliyas is the ultimate beneficial owner of SPG via a variety of offshore holding companies.

80.     Upon information and belief, Iliyas, Elvira, Leila, and the sham companies they control have contributed substantial funds to Vilder, including millions of dollars to Vilder's account at FBME Bank ("FBME").[1]

81.     Upon information and belief, Iliyas, Elvira, Leila, and the sham companies they control have contributed substantial funds to Crownway, including millions of dollars to Crownway's account at FBME.

82.     All of the funds contributed to SDG, SPG, Vilder, Crownway, and other front companies controlled by Iliyas, Elvira, and Leila are traceable to the ill-gotten proceeds of Viktor's and his co-conspirators' looting of real estate and other assets.

### Funds Transferred to Defendants in the United States

83.     In an ongoing effort to launder and conceal the source of the funds they stole from the people of Almaty, after moving the funds to various accounts and holding companies in Switzerland and elsewhere, Defendants and their co-conspirators began transferring the stolen funds into the United States by using an intricate web of individuals and offshore holding companies to launder Almaty's funds.

84.     Defendants harmed Almaty by concealing those funds from Almaty, and thereby causing Almaty to have to devote substantial monies and time and use

---

[1] The U.S. Treasury's Financial Crimes Enforcement Network ("FinCEN") has alleged that FBME engaged in large-scale money laundering. FinCEN first reported concerns regarding FBME's role in money laundering in July of 2014. In March 2016, FinCEN imposed the "fifth special measure" against FBME, aimed at blocking FBME from doing business in the United States or using U.S. currency. On or around May 8, 2017, Tanzania's central bank revoked FBME Bank's business license.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

22

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   extraordinary means in the United States to trace and recover their funds in the

2   United States.  The ongoing detention in the United States of funds belonging to

3   Almaty causes ongoing harm and damage to Almaty.

4        85.    For example, on or about July 20, 2012, Individual Defendants and

5   their co-conspirators caused over $3 million to be transferred from Defendant

6   Crownway's FBME account into Defendant RPM-Maro LLC's United States bank

7   account.  Upon information and belief, this bank account was owned or controlled

8   by Elvira, and at all times all Individual Defendants and their co-conspirators knew

9   that was stolen money.

10       86.    On the date of this transfer, RPM-Maro was owned and controlled by

11  Elvira and Iliyas.  Indeed, from June through August 2012, RPM-Maro was jointly

12  owned by Defendant RPM USA – which was controlled by Iliyas through RPM

13  USA's sole member, SPG, and Defendant Maro Enterprises – which was wholly

14  owned and controlled by Elvira.  Upon information and belief, before transferring

15  these funds into the United States, the Individual Defendants and their co-

16  conspirators caused the funds to be moved through various offshore bank accounts,

17  including accounts held by sham holding companies, for the sole purpose of

18  illicitly concealing the source of the stolen funds to make the stolen funds appear

19  legitimate.  Upon information and belief, this $3 million transferred into the United

20  States by the Individual Defendants is traceable to the funds they looted from

21  Almaty.

22       87.    The Individual Defendants made use of the United States wires and

23  United States mail in furtherance of this illegal $3 million transaction.  The

24  Individual Defendants harmed Almaty by transferring Almaty's stolen funds into

25  the United States, concealing the illegitimate source of the funds, and impeding

26  and seeking to prevent Almaty from recovering the stolen funds in furtherance of

27  the goals of the Khrapunov Racketeering Enterprise.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11                                          23

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

88.     As another example, on or about November 7, 2012, Individual Defendants and their co-conspirators caused approximately $1.27 million to be transferred from Defendant Vilder's offshore account, into a United States bank account owned by Defendant RPM USA and controlled by Iliyas through RPM USA's sole member, SPG.  At all times, all Individual Defendants and their co-conspirators knew that money to have been stolen from the people of the City of Almaty.

89.     Upon information and belief, before transferring the $1.27 million into the United States, Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.  Upon information and belief, this $1.27 million transferred into the United States by the Individual Defendants and their co-conspirators is traceable to the funds they looted from Almaty.

90.     The Individual Defendants and their co-conspirators made use of the United States wires and United States mail in furtherance of this illegal $1.27 million transaction.  The Individual Defendants harmed Almaty by transferring Almaty's stolen funds into the United States, concealing the illegitimate source of the funds, and impeding and seeking to prevent Almaty from recovering the stolen funds in furtherance of the goals of the Khrapunov Racketeering Enterprise.

91.     Six days after the transfer of $1.27 million from Vilder to RPM-USA, RPM-USA transferred $1.2 million to RPM-USA's New York-based attorney to be held in escrow.  Upon information and belief, Defendants regularly used this attorney, who also served as attorney for RPM-Maro and World Health Networks, to assist in laundering money between various sham entities and into sham investments.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

24

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

92.     As a third example, on or about January 9, 2013, Individual Defendants and their co-conspirators caused Defendant Vilder to transfer $1 million from an offshore bank account into Defendant RPM-Maro's United States bank account, which was owned or controlled by Elvira.  At all times all Individual Defendants and their co-conspirators knew that money to have been stolen from the people of the City of Almaty.

93.     Elvira officially owned 100% interest in RPM-Maro, but Iliyas exerted informal control over the company.  Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.  Upon information and belief, this $1 million transferred into the United States by the Individual Defendants is traceable to the funds they looted from Almaty.

94.     The Individual Defendants made use of the United States wires and United States mail in furtherance of this illegal transaction.  The Individual Defendants harmed Almaty by transferring Almaty's funds into the United States, concealing the illegitimate source of the funds, and impeding and seeking to prevent Almaty from recovering the stolen funds in furtherance of the goals of the Khrapunov Racketeering Enterprise.

95.     As a fourth example, on or about February 28 and March 1, 2013, Individual Defendants and their co-conspirators caused Vilder to transfer a total of $1 million from an offshore bank account to a United States bank account owned by RPM-USA and controlled by Iliyas.  At all times, all Individual Defendants and their co-conspirators knew that money to have been stolen from the people of the City of Almaty.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

25

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

96.     Upon information and belief, before transferring the $1 million into the United States, Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts – including accounts held by their sham holding companies – for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.  Upon information and belief, this $1 million transferred into the United States by the Individual Defendants and their co-conspirators is traceable to the funds they stole from Almaty.

97.     The Individual Defendants made use of the United States wires and United States mail in furtherance of this illegal transaction.  The Individual Defendants harmed and continue to harm Almaty by transferring Almaty's funds into the United States, concealing the illegitimate source of the funds, and impeding and seeking to prevent Almaty from recovering the stolen funds in furtherance of the goals of the Khrapunov Racketeering Enterprise.

98.     As a fifth example, on or about August 5, 2013 Individual Defendants and their co-conspirators caused Vilder to transfer $1 million from its FBME bank account to Elvira's United States bank account.  Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.  Upon information and belief, this $1 million transferred into the United States by the Individual Defendants is traceable to the funds they looted from Almaty.

99.     The Individual Defendants made use of the United States wires and United States mail in furtherance of this illegal $1 million transaction.  The Individual Defendants harmed Almaty by transferring Almaty's funds into the United States, concealing the illegitimate source of the funds, and impeding and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

26

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  seeking to prevent Almaty from recovering the stolen funds in furtherance of the

2  goals of the Khrapunov Racketeering Enterprise.

3      100.   As a sixth example, upon information and belief, throughout the

4  course of 2014, Individual Defendants and their co-conspirators caused a total of

5  over $1 million to be transferred from offshore companies – including Vilder, SDG

6  Capital, and another sham company Adlux Sarl SA, a subsidiary of SPG – directly

7  to United States bank accounts owned by Elvira.

8      101.   Upon information and belief, before transferring these funds into the

9  United States, Individual Defendants and their co-conspirators caused the funds to

10  be moved through various offshore bank accounts, including accounts held by their

11  sham holding companies, for the sole purpose of illicitly concealing the source of

12  the stolen funds to make the stolen funds appear legitimate.  Upon information and

13  belief, these funds transferred into the United States by the Individual Defendants

14  and their co-conspirators is traceable to the funds they stole from Almaty.

15      102.   The Individual Defendants made use of the United States wires and

16  United States mail in furtherance of this illegal transaction.  The Individual

17  Defendants harmed, and continue to harm, Almaty by transferring Almaty's funds

18  into the United States, concealing the illegitimate source of the funds, and

19  impeding and seeking to prevent Almaty from recovering the stolen funds in

20  furtherance of the goals of the Khrapunov Racketeering Enterprise.

21      103.   The funds identified in the above six examples, in addition to all other

22  funds stolen from Almaty and transferred into the United States in furtherance of

23  the Khrapunov Racketeering Enterprise, rightfully belonged and still belong to

24  Almaty, and Defendants hold these funds without permission and through a

25  constructive trust or otherwise.  The continued movement of Almaty's funds

26  within the United States continues to cause Almaty harm and damage by hindering

27  Almaty's ability to trace and recover its funds and forcing Almaty to expend

28  substantial assets and time in its efforts to do so.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

27

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

104.    Elvira, Dmitry, Iliyas, and Madina have laundered the funds transferred into the United States by making investments in multiple U.S. companies, including World Health Networks.  Upon information and belief, between July 2012 and October 2014, Defendants invested approximately $6.3 million in a World Health Networks, a medical device company registered to do business in New York and California.  The funds are traceable to the money the Individual Defendants and their co-conspirators stole from Almaty and laundered through various offshore bank accounts, before Defendants transferred the funds into the United States.  Approximately $1.9 million of the $6.3 million investment was provided by Defendant RPM USA – which is owned or controlled by Iliyas and is a wholly owned subsidiary of SPG – on RPM-Maro's behalf.  The remainder of the funds came from RPM-Maro, and directly from Elvira and Dmitry.  All of these funds had been transferred into the United States from offshore companies controlled by Individual Defendants, as described in the six examples above.  The individual defendants, along with Defendants RPM-Maro and RPM USA, used those funds to invest in the medical device company with the intent to conceal further the illicit source of those funds.

105.    Upon information and belief, Individual Defendants used this sham investment into World Health Networks as a front for obtaining United States visas for Elvira and Dmitry.

106.    Furthermore, upon information and belief, Elvira, Dmitry, Iliyas, and Madina made use of the United States mail and wires, as well as United States financial institutions, to engage in these investments.  As a result, Elvira, Dmitry, Iliyas, and Madina again acted in violation of 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

107.    They at all times acted with the agreement and knowledge of Viktor and Leila, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

28

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

108.   In or about October 2014 – months after Almaty first filed its initial complaint against the Khrapunovs in this action in May 2014 – Elvira caused RPM-Maro to sell its interest in World Health Networks to Techvest S.A, an entity based in Luxembourg.  Upon information and belief, Elvira sold its interest in World Health Networks in a further attempt to launder and conceal the source of the funds, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

### Funds Laundered Into Real Estate and Other Assets

109.   As part of their ongoing effort to launder and conceal the source of the funds they stole from Almaty, after moving funds to various offshore accounts and holding companies, Defendants and their co-conspirators injected funds directly into real estate located in the United States.

110.   Defendants harmed Almaty by concealing those funds from Almaty, and thereby causing Almaty to have to devote substantial monies and time, and to use extraordinary means in the United States to trace and recover their stolen funds hidden in the United States.  The ongoing detention in the United States of funds belonging to Almaty causes ongoing harm and damage to Almaty.

111.   On or about October 20, 2010 and December 2, 2010, Elvira and Dmitry caused $365 thousand and $3.3 million, respectively, to be transferred from their Swiss bank accounts at Schroder & Co. Bank AG and Bank Sarasin and Co. Ltd., respectively, directly to Escrow of the West, an escrow company based in Los Angeles, California.  Elvira and Dmitry used these laundered funds to purchase a luxurious single-family home located at 2578 Hutton Drive in Beverly Hills, California, for approximately $3.65 million.

112.   Elvira and Dmitry knew that the money they used to engage in this transaction was stolen from Almaty and illegally laundered to appear legitimate.  Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

29

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.  They purchased this property with the intent to use the transaction to further conceal the illegitimate source of the funds, which are traceable to the funds the Individual Defendants and their co-conspirators embezzled from Almaty.

113.  Because the funds used to purchase this property were wrongfully detained from Almaty, Elvira and Dmitry held this real property as constructive trustees for the benefit of Almaty.  The unlawful purchase of this property caused additional harm to Almaty in the United States by preventing Almaty access to its property and made it more difficult and costly for Almaty to trace and recover its U.S.-based assets.

114.  Furthermore, Elvira and Dmitry made use of the United States mail and wires, as well as United States financial institutions, to engage in this transaction.  As a result of the foregoing, Elvira and Dmitry violated, among other U.S. laws, 18 U.S.C. §§ 1956 (money laundering and conspiracy to commit money laundering), 1957 (transactions in property derived from unlawful activity), 2314 (transport of stolen money), 1341 (mail fraud), and 1343 (wire fraud).

115.  Elvira and Dmitry acted with the agreement and knowledge of Viktor, Leila, Iliyas, and Madina, and as a result, all Individual Defendants also violated 18 U.S.C. § 371 (conspiracy).

116.  On or about December 30, 2011 and March 15, 2012, Iliyas and Madina caused Defendant Candian to transfer $163 thousand and $5.366 million, respectively, directly to Granite Escrow Services ("Granite Escrow") in Beverly Hills, California from its Swiss bank account.  Iliyas and Madina used these funds to purchase a lavish single-family home located at 606 North Alta Drive in Beverly Hills, California, for approximately $5.45 million.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

30

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

117.   Iliyas and Madina knew that the money they used to engage in this transaction was stolen from the people of Almaty, and illegally laundered to appear legitimate.  Indeed, Iliyas and Madina attempted to further conceal the source of the stolen funds used to make this purchase by using Defendant Candian to complete the purchase, and they purchased this property with the intent to use the transaction to further conceal the illegitimate source of the funds, which are traceable to the funds the Individual Defendants and their co-conspirators embezzled from the people of Almaty.  Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.

118.   Because the funds used to purchase this property were wrongfully detained from Almaty, Iliyas, Madina, and/or Candian International Ltd. held this real property as constructive trustees for the benefit of Almaty.  The unlawful purchase of this property caused additional harm to Almaty in the United States by preventing Almaty access to its property and making it more difficult and costly for Almaty to trace and recover its U.S.-based assets.

119.   Furthermore, Iliyas and Madina made use of the United States mail and wires, as well as United States financial institutions, to engage in this transaction.  As a result of the foregoing, Iliyas and Madina violated, among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

120.   Iliyas and Madina acted with the agreement and knowledge of Viktor, Leila, Elvira, and Dmitry, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

121.   In or about mid-2012, the Public Prosecutor of Geneva opened an investigation into Viktor, Leila, Iliyas, and Elvira on suspicion of money

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

31

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

laundering in violation of Swiss law.  In or about November 2012, the Public Prosecutor of Geneva ordered frozen certain Swiss accounts and assets belonging to Viktor, Leila, Iliyas, and Elvira.  After this action by Swiss government authorities, the Individual Defendants and their co-conspirators continued and increased their laundering activities in the United States.

122.  For example, Iliyas moved significant amounts of money into New York real estate investments.  On or around November 2012, Iliyas began investing tens of millions (of the equivalent) of dollars stolen from the people of Almaty and others to purchase a partial interest in a luxury hotel in New York.  Additionally, in order to conceal the source of the funds used to make this investment, Iliyas used Luxembourg shell entity Triadou SPV S.A. ("Triadou"), together with a series of at least four Delaware holding companies, all of which were ultimately owned by SDG and controlled by Iliyas.  Iliyas invested additional funds in the Cabrini Medical Center in New York.

123.  Individual Defendants also increased their laundering of the stolen funds into California at this time as well.  On or about November 30, 2012 and January 18, 2013, Individual Defendants caused Defendant Vilder to transfer $186 thousand and $6 million, respectively, from its FBME bank account located in Cyprus directly to Granite Escrow in Beverly Hills, California.  Iliyas and Madina used these funds to purchase a second mansion in Beverly Hills using Almaty's funds illegally obtained through the Khrapunov Racketeering Enterprise's criminal activity and laundered through various offshore bank accounts and entities into the U.S.  Iliyas and Madina knew that the money they used to engage in this transaction was stolen from the people of Almaty and illegally laundered to appear legitimate.

124.  Indeed, Iliyas and Madina, with Elvira's assistance, used another sham holding company, Defendant 628 Holdings LLC, to launder and conceal the source of the illicit funds.  To that end, Iliyas and Madina caused 628 Holdings

LATHAM&WATKINS℠
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

32

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

LLC to purchase with Almaty's money a $6.2 million five-bedroom single-family home located at 628 North Alta Drive in Beverly Hills, California for the benefit and use of Iliyas and Madina. Elvira is listed in public records as an officer of Defendant 628 Holdings LLC.

125.   Iliyas and Madina purchased this property with the intent to use the transaction to further conceal the illegitimate source of the funds, which are traceable to the funds the Individual Defendants and their co-conspirators embezzled from the people of Almaty. Because the funds used to purchase this property were wrongfully detained from Almaty, Iliyas, Madina, and/or 628 Holdings LLC held this real property as constructive trustees for the benefit of Almaty. The unlawful purchase of this property caused additional harm to Almaty in the United States by preventing Almaty access to its property and making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

126.   Furthermore, Iliyas and Madina made use of the United States mail and wires, as well as United States financial institutions, to engage in this transaction. As a result of the foregoing, Iliyas, Madina, and Elvira violated, among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

127.   Iliyas, Madina, and Elvira acted with the agreement and knowledge of Viktor, Leila, and Dmitry, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

128.   On or about April 5, 2013 and April 28, 2013, Elvira, with the full knowledge and assistance of the other Individual Defendants and their co-conspirators, caused Defendant Crownway to transfer over $5 million and $250 thousand, respectively, from its FBME bank account into Elvira's United States bank account. Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

33

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   source of the stolen funds to make the stolen funds appear legitimate.  Upon

2   information and belief, this $5 million transferred into the United States by the

3   Individual Defendants is traceable to the funds they stole from Almaty.

4        129.   On or about April 16, April 25, and April 29, 2013, Elvira transferred

5   a total of approximately $3.2 million of the funds moved into the U.S. by

6   Crownway to a New York-based real estate attorney, Martin Jajan, for the

7   purchase of three condominiums – units 3203, 3310, and 3311 – in the Trump

8   Soho tower located at 246 Spring Street, New York, New York.  All three units

9   were purchased on or about April 30, 2013 for $879,833, $1,407,321 and $829,351

10  respectively.  Elvira knew that the funds they used to engage in this transaction

11  were stolen from the people of Almaty, and illegally laundered to appear

12  legitimate.  Indeed, in a further attempt to conceal their wrongful possession and

13  use of Almaty's funds, Elvira used three separate LLCs – Soho 3203 LLC, Soho

14  3310 LLC, and Soho 3311 LLC – to make these purchases.

15       130.   Elvira purchased these properties with the intent to use the transaction

16  to further conceal the illegitimate source of the funds, which are traceable to the

17  funds the Individual Defendants and their co-conspirators embezzled from the

18  people of Almaty.  Because the funds used to purchase these properties were

19  wrongfully detained from Almaty, Elvira held these real properties as constructive

20  trustees for the benefit of Almaty.  The unlawful purchase of these properties

21  caused additional harm to Almaty in the United States by preventing Almaty

22  access to its property and making it more costly and difficult for Almaty to trace

23  and recover its U.S.-based assets.

24       131.   Furthermore, Elvira made use of the United States mail and wires, as

25  well as United States financial institutions, to engage in this transaction.  As a

26  result of the foregoing, Elvira violated, among other U.S. laws, 18 U.S.C. §§ 1956,

27  1957, 2314, 1341, and 1343.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

34

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

132.   Elvira acted with the agreement and knowledge of Iliyas, Madina, Viktor, Leila, and Dmitry, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

133.   In attempts to bury Almaty's money deeper in California, on or about July 19, 2013, Elvira and Dmitry sold the house at 2578 Hutton Drive for approximately $4.97 million.  Upon information and belief, Elvira and Dmitry sold this property in furtherance of the Khrapunov Racketeering Enterprise, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

134.   That same day, Elvira and Dmitry purchased an expansive, two-acre estate located at 11986 Lockridge Road in Studio City, California for approximately $5.7 million.  Upon information and belief, nearly $1 million of the funds used to effectuate this purchase were derived from Crownway's $5.25 million transfer in April 2013.  The remainder was funded by the proceeds from the sale of 2578 Hutton Drive.

135.   Elvira and Dmitry knew that the money they used to engage in this transaction was stolen from the people of Almaty, and illegally laundered to appear legitimate.  Indeed, shortly after they purchased this property, in a further attempt to conceal their wrongful possession and use of Almaty's funds, Elvira and Dmitry transferred it to The Kasan Family Trust, a trust for which they serve as trustees.

136.   Elvira and Dmitry purchased this property with the intent to use the transaction to further conceal the illegitimate source of the funds, which are traceable to the funds the Individual Defendants and their co-conspirators embezzled from the people of Almaty.  Because the funds used to purchase this property were wrongfully detained from Almaty, Elvira, Dmitry, and/or The Kasan Family Trust held this real property as constructive trustees for the benefit of Almaty.  The unlawful purchase of this property caused additional harm to Almaty

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

35

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  in the United States by preventing Almaty access to its property and making it
2  more costly and difficult for Almaty to trace and recover its U.S.-based assets.

3       137.   Furthermore, Elvira and Dmitry made use of the United States mail
4  and wires, as well as United States financial institutions, to engage in this
5  transaction.  As a result of the foregoing, Elvira and Dmitry violated, among other
6  U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

7       138.   Elvira and Dmitry acted with the agreement and knowledge of Viktor,
8  Leila, Iliyas, and Madina, and as a result, all Individual Defendants also violated
9  18 U.S.C. § 371.

10      139.   On or about July 30, 2013, Iliyas and Madina sold the house at 606
11 North Alta Drive for approximately $6.975 million.  Upon information and belief,
12 Iliyas and Madina sold this property less than 18 months after they purchased it in
13 a further attempt to launder and conceal the source of the funds, causing additional
14 harm to Almaty by making it more costly and difficult for Almaty to trace and
15 recover its U.S.-based assets.

16      140.   Almaty filed its initial complaint in this present action on or about
17 May 13, 2014.  Elvira was served that same day, and Dmitry was served the day
18 after.

19      141.   On or about May 27, 2014, the Elvira caused Soho 3310 LLC to sell
20 the Soho 3310 property for $1.4 million.  Upon information and belief, Elvira sold
21 this property a little more than a year after she purchased it in a further attempt to
22 launder and conceal the source of the funds, causing additional harm to Almaty by
23 making it more costly and difficult for Almaty to trace and recover its U.S.-based
24 assets.

25      142.   On or about August 4, 2014, Elvira and Dmitry as trustees of the
26 Kasan Family Trust caused the Kasan Family Trust to sell the house at 11986
27 Lockridge Rd. for approximately $6.5 million.  As Almaty already had filed the
28 present action at this time, the parties entered into a stipulation agreement to ensure

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

36

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1    that the proceeds from the sale were not transferred outside of the Central District
2    of California.  In accordance with that stipulation, the proceeds were placed in an
3    escrow account.

4        143.   That same day, without Almaty's knowledge, Triadou assigned its
5    partial interest in the New York luxury hotel to the developers of the hotel for a
6    fraction of the initial investment.  Upon information and belief, Iliyas caused
7    Triadou to make this assignment in an attempt to move millions of Almaty's
8    money out of the United States and further conceal it from Almaty.

9        144.   On or about September 8, 2014, Elvira and Dmitry purchased a
10   property located at 2 Narbonne in Newport Beach, California for approximately
11   $4.1 million, using a portion of the proceeds from the sale of 11986 Lockridge Rd.
12   property.  These funds were derived from the funds stolen from Almaty and
13   laundered through various offshore bank accounts and entities into the U.S.  Elvira
14   and Dmitry knew that the money they used to engage in this transaction was stolen
15   from the people of Almaty, and illegally laundered to appear legitimate.  Elvira and
16   Dmitry named The Kasan Family Trust as owner, a trust for which they serve as
17   trustees.

18       145.   Because the funds used to purchase this property were wrongfully
19   detained from Almaty, Elvira, Dmitry, and/or The Kasan Family Trust held this
20   real property as constructive trustees for the benefit of Almaty.  The unlawful
21   purchase of this property caused additional harm to Almaty in the United States by
22   preventing Almaty access to its property and making it more costly and difficult
23   for Almaty to trace and recover its U.S.-based assets.

24       146.   Furthermore, Elvira and Dmitry made use of the United States mail
25   and wires, as well as United States financial institutions, to engage in this
26   transaction.  As a result of the foregoing, Elvira and Dmitry violated, among other
27   U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
US-DOCS\91976251.11
37
CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

147.   Elvira and Dmitry acted with the agreement and knowledge of Viktor, Leila, Iliyas, and Madina, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

148.   On or about September 24, 2014 – a little over four months after Almaty initially brought this action –  Elvira caused Soho 3203 LLC to sell the Soho 3203 property for $840 thousand.  Upon information and belief, Elvira sold this property less than 18 months after she purchased it in a further attempt to launder and conceal the source of the funds, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

149.   On or about October 16, 2015, Elvira caused Soho 3311 LLC to sell the Soho 3311 property for $777,000.  Upon information and belief, Elvira sold this property it in a further attempt to launder and conceal the source of the funds, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

150.   On or about March 29, 2016, Iliyas and Madina caused 628 Holdings to sell the house at 628 N. Alta for approximately $7.2 million.  Upon information and belief, Iliyas and Madina sold this property in furtherance of the Khrapunov Racketeering Enterprise, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

151.   On or about August 26, 2016, Elvira and Dmitry as trustees of the Kasan Family Trust caused the Kasan Family Trust to sell the house at 2 Narbonne for approximately $6.375 million.  Upon information and belief, Elvira and Dmitry sold this property in furtherance of the Khrapunov Racketeering Enterprise, causing additional harm to Almaty by making it more costly difficult for Almaty to trace and recover its U.S.-based assets.

152.   The Individual Defendants' luxurious lifestyles in the United States were not limited to the purchase of Beverly Hills mansions.  In or about April

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

38

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

2013, Elvira leased a 2013 Rolls Royce sedan valued at approximately $302,000. In addition to the Rolls Royce, Elvira leased a 2013 Bentley sedan valued at approximately $320,000.  Elvira is also the registered owner of a 2013 Mercedes Benz sport utility vehicle valued at approximately $114,000 and a 2011 Cadillac sport utility vehicle valued at approximately $75,000.  Upon information and belief, Individual Defendants also purchased numerous pieces of valuable art and home furnishings.

153.   Elvira used funds stolen from Almaty and laundered through various offshore bank accounts and entities to acquire these vehicles and other personal assets, and appear legitimate, while knowing those funds were stolen.

154.   Upon information and belief, the funds used to purchase or lease these vehicles, artwork, and other property are traceable to the funds stolen from Almaty. Because the funds used to purchase and lease these assets were wrongfully detained from Almaty, Elvira held and continues to hold these assets as constructive trustee for the benefit of Almaty.  The unlawful purchase of this property caused additional harm to Almaty in the United States by preventing Almaty access to its property and making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

155.   Furthermore, upon information and belief, Elvira made use of the United States mail and wires, as well as United States financial institutions, to engage in these purchase and lease transactions.  As a result of the foregoing, Elvira violated, among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

156.   Elvira engaged in these transactions with the agreement and knowledge of Viktor, Leila, Dmitry, Iliyas, and Madina, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

39

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

157.   Each U.S. investment and transaction made in furtherance of the Khrapunov Racketeering Enterprise harmed Almaty by making it significantly more difficult and costly for Almaty to trace and recover its U.S.-based assets.

158.   By this lawsuit, Almaty seeks to hold Defendants responsible for their illegal conduct in the United States in violation of U.S. law.  Almaty further seeks to hold Defendants liable for the ongoing harm they have caused Almaty in the United States and continue to cause Almaty in the United States.

**FIRST CLAIM FOR RELIEF**

(For Violations of RICO, 18 U.S.C. §§ 1962(c), 1962(d), 1964(c), against all Defendants)

159.   Almaty hereby incorporates by reference the allegations in paragraphs 1 through 158, as though fully set forth herein.

160.   From in or about 1997 and continuing to the present, by reason of its organization, structure, and activities, the Khrapunov Racketeering Enterprise constituted a RICO enterprise within the meaning of 18 U.S.C. § 1961(4).  The Khrapunov Racketeering Enterprise was comprised of myriad individuals and entities, all associated in fact as part of the Khrapunov Racketeering Enterprise, including but not limited to the Individual Defendants and Entity Defendants named herein.  The Khrapunov Racketeering Enterprise was engaged in, and the activities of the Khrapunov Racketeering Enterprise affected, interstate and foreign commerce.

161.   As alleged herein, the Khrapunov Racketeering Enterprise participants, including Defendants and each of them, engaged and conspired to engage in acts in the United States to further the goals of their criminal enterprise, in violation of U.S. law.

162.   Defendants engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting numerous financial transactions using illegally obtained funds laundered through various off-shore accounts and entities

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

40

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  to, among other things, purchase real estate and other assets in Beverly Hills,

2  Studio City, and elsewhere and to fund business entities, including the Entity

3  Defendants, in furtherance of the Khrapunov Racketeering Enterprise, knowing

4  that such funds were stolen from the people of Almaty and with the intent of

5  concealing the source of those funds.

6      163.   Defendants further engaged and conspired to engage in money

7  laundering in violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or

8  transferring funds stolen from the people of Almaty and laundered through various

9  off-shore accounts and entities into and within the United States in order to, among

10  other things, purchase real estate and assets in Beverly Hills, Studio City, and

11  elsewhere and to fund business entities, including the Entity Defendants, in

12  furtherance of the Khrapunov Racketeering Enterprise, knowing that such funds

13  were stolen from the people of Almaty and with the intent of concealing the source

14  of those funds.

15      164.   Defendants further engaged and conspired to engage in money

16  laundering in violation of 18 U.S.C. § 1956 by conducting financial transactions

17  using those stolen funds by, among other things, using stolen funds laundered

18  through various off-shore accounts and entities to purchase real estate and other

19  assets in Beverly Hills, Studio City, and elsewhere and to fund business entities,

20  including the Entity Defendants, in furtherance of the Khrapunov Racketeering

21  Enterprise, knowing that such funds were stolen from the people of Almaty and

22  with the intent of concealing the source of those funds.

23      165.   Defendants engaged and conspired to engage in money transactions in

24  property derived from specified unlawful activity in violation of 18 U.S.C. § 1957

25  by, among other things, knowingly transferring funds in excess of $10,000 stolen

26  from Almaty into and within the United States via United States financial

27  institutions to purchase real estate and other assets in Beverly Hills, Studio City,

28  and elsewhere and to fund business entities, including the Entity Defendants,

1  knowing that such funds were derived from and traceable to funds stolen from the

2  people of Almaty.

3      166.  Defendants engaged and conspired to engage in the foreign transport

4  of stolen money or property known to be stolen, converted or taken by fraud in

5  violation of 18 U.S.C. § 2314 by transferring funds derived from and traceable to

6  funds stolen from the people of Almaty into and within the United States, in excess

7  of $5,000, knowing those funds to have been stolen from the people of Almaty

8  and/or obtained from the people of Almaty by means of false or fraudulent

9  pretenses, representations, or promises by, among other things, transferring such

10  funds from bank accounts in Switzerland into the United States via United States

11  financial institutions and using those funds to purchase real estate and other assets

12  in Beverly Hills, Studio City, and elsewhere and to fund business entities,

13  including the Entity Defendants.

14      167.  Defendants, and each of them, conspired to commit the violations of

15  U.S. law described herein, and one or more of the Defendants or their co-

16  conspirators acted to violate such laws.  Defendants, and each of them, thus also

17  violated 18 U.S.C. § 371.

18      168.  Defendants engaged and conspired to engage in mail fraud in

19  violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by

20  knowingly using the United States mails and wires to transfer illegally obtained

21  funds into and within the United States, for the purpose of furthering the

22  Khrapunov Racketeering Enterprise and, while concealing the funds' illegal

23  source, used those funds to purchase real estate in Beverly Hills and Studio City,

24  California and to fund business entities, including the Entity Defendants, to enable

25  those entities to conduct business in the United States using the illegally-obtained

26  funds.

27      169.  Defendants engaged and conspired to engage in the above violations

28  of U.S. law in order to implement the objectives and accomplish the unlawful

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

42

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

purposes of the Khrapunov Racketeering Enterprise as set forth herein, and thereby engaged in predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B).

170.   Each of the Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Khrapunov Racketeering Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c), consisting as applicable of multiple acts of money laundering, conducting money transactions in property derived from specified unlawful activity, foreign transport of stolen money or property known to be stolen, converted or taken by fraud, mail fraud, and/or wire fraud, as specified herein.  Each of the Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO (*i.e.*, October 15, 1970).

171.   From in or about 1997, and continuing to the present, Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Khrapunov Racketeering Enterprise and in order to implement the schemes and employ the devices described herein.

172.   In so doing, Defendants unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together, with each other and with others to commit RICO violations under 18 U.S.C. § 1962(c) and, thereby, violated 18 U.S.C. § 1962(d).  In furtherance of the conspiracy and to effect the objects thereof, Defendants committed in the Central District of California and elsewhere the overt acts as described herein, among others.

173.   As a direct and proximate result of RICO violations by the Defendants of 18 U.S.C. §§ 1962(a), 1962(b), 1962(c), and/or 1962(d), Almaty has suffered damages in an amount to be determined at trial and presently estimated to be not less than $300 million.  Almaty has been injured in its business or property by reason of each such Defendant's violations and, pursuant to the civil remedy

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

43

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   provisions of 18 U.S.C. § 1964(c), is thereby entitled to recover threefold the

2   damages it has suffered, together with its costs of suit and reasonable attorneys'

3   fees.

4                    **SECOND CLAIM FOR RELIEF**

5   (For Violations of RICO, 18 U.S.C. §§ 1962(a), 1962(d), 1964(c), against all

6                            Defendants)

7        174.   Almaty hereby incorporates by reference the allegations in paragraphs

8   1 through 173, as though fully set forth herein.

9        175.   From in or about 1997 and continuing to the present, by reason of its

10  organization, structure, and activities, the Khrapunov Racketeering Enterprise

11  constituted a RICO enterprise within the meaning of 18 U.S.C. § 1961(4).  The

12  Khrapunov Racketeering Enterprise was comprised of myriad individuals and

13  entities, all associated in fact as part of the Khrapunov Racketeering Enterprise,

14  including but not limited to the Individual Defendants and Entity Defendants

15  named herein.  The Khrapunov Racketeering Enterprise was engaged in, and the

16  activities of the Khrapunov Racketeering Enterprise affected, interstate and foreign

17  commerce.

18       176.   Each of the Defendants was at the center of and was a principal

19  perpetrator of a fraudulent scheme and is liable under 18 U.S.C. § 1962(a) as a

20  direct and indirect beneficiary of the pattern of racketeering herein alleged.

21       177.   As alleged herein, the Khrapunov Racketeering Enterprise

22  participants, including Defendants and each of them, engaged and conspired to

23  engage in acts in the United States to further the goals of their criminal enterprise,

24  in violation of U.S. law.

25       178.   Defendants engaged and conspired to engage in money laundering in

26  violation of 18 U.S.C. § 1956 by conducting numerous financial transactions using

27  illegally obtained funds laundered through various off-shore accounts and entities

28  to, among other things, purchase real estate and other assets in Beverly Hills,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

44

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Studio City, and elsewhere and to fund business entities, including the Entity
Defendants, in furtherance of the Khrapunov Racketeering Enterprise, knowing
that such funds were stolen from the people of Almaty and with the intent of
concealing the source of those funds.

179.   Defendants further engaged and conspired to engage in money
laundering in violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or
transferring funds stolen from the people of Almaty and laundered through various
off-shore accounts and entities into and within the United States in order to, among
other things, purchase real estate and assets in Beverly Hills, Studio City, and
elsewhere and to fund business entities, including the Entity Defendants, in
furtherance of the Khrapunov Racketeering Enterprise, knowing that such funds
were stolen from the people of Almaty and with the intent of concealing the source
of those funds.

180.   Defendants further engaged and conspired to engage in money
laundering in violation of 18 U.S.C. § 1956 by conducting financial transactions
using those stolen funds by, among other things, using stolen funds laundered
through various off-shore accounts and entities to purchase real estate and other
assets in Beverly Hills, Studio City, and elsewhere and to fund business entities,
including the Entity Defendants, in furtherance of the Khrapunov Racketeering
Enterprise, knowing that such funds were stolen from the people of Almaty and
with the intent of concealing the source of those funds.

181.   Defendants engaged and conspired to engage in money transactions in
property derived from specified unlawful activity in violation of 18 U.S.C. § 1957
by, among other things, knowingly transferring funds in excess of $10,000 stolen
from Almaty into and within the United States via United States financial
institutions to purchase real estate and other assets in Beverly Hills, Studio City,
and elsewhere and to fund business entities, including the Entity Defendants,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

45

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  knowing that such funds were derived from and traceable to funds stolen from the

2  people of Almaty.

3      182.   Defendants engaged and conspired to engage in the foreign transport

4  of stolen money or property known to be stolen, converted or taken by fraud in

5  violation of 18 U.S.C. § 2314 by transferring funds derived from and traceable to

6  funds stolen from the people of Almaty into and within the United States, in excess

7  of $5,000, knowing those funds to have been stolen from the people of Almaty

8  and/or obtained from the people of Almaty by means of false or fraudulent

9  pretenses, representations, or promises by, among other things, transferring such

10  funds from bank accounts in Switzerland into the United States via United States

11  financial institutions and using those funds to purchase real estate and other assets

12  in Beverly Hills, Studio City, and elsewhere and to fund business entities,

13  including the Entity Defendants.

14      183.   Defendants, and each of them, conspired with each other and with

15  others to commit the violations of U.S. law described herein, and one or more of

16  the Defendants or their co-conspirators acted to violate such laws.  Defendants, and

17  each of them, thus also violated 18 U.S.C. § 371.

18      184.   Defendants engaged and conspired to engage in mail fraud in

19  violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by

20  knowingly using the United States mails and wires to transfer illegally obtained

21  funds into and within the United States, for the purpose of furthering the

22  Khrapunov Racketeering Enterprise and, while concealing the funds' illegal

23  source, used those funds to purchase real estate in Beverly Hills and Studio City,

24  California and to fund business entities, including the Entity Defendants, to enable

25  those entities to conduct business in the United States using the illegally-obtained

26  funds.

27      185.   Defendants engaged and conspired to engage in the above violations

28  of U.S. law in order to implement the objectives and accomplish the unlawful

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

46

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

purposes of the Khrapunov Racketeering Enterprise as set forth herein, and thereby engaged in predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B).

186.   Furthermore, each Defendant received income derived directly or indirectly from a pattern of racketeering in which each of said Defendants participated as a principal within the meaning of 18 U.S.C. § 2.

187.   During the period commencing in or about 1997 and continuing to the present, the Defendants, having received income derived, directly or indirectly, from a pattern of racketeering activity, used or invested, directly or indirectly, in violation of 18 U.S.C. § 1962(a), income or the proceeds of income from said illegal racketeering activity in the acquisition of an interest in, or the establishment or operation of the Khrapunov Racketeering Enterprise or one or more affiliated entities, including without limitation, the Entity Defendants.  Said uses and investments in enterprises affecting interstate or foreign commerce include without limitation the uses and investments described herein.

188.   In so doing, Defendants unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together, with each other and with others to commit RICO violations under 18 U.S.C. § 1962(c) and, thereby, violated 18 U.S.C. § 1962(d).  In furtherance of the conspiracy and to effect the objects thereof, Defendants and their co-conspirators committed in the Central District of California and elsewhere the overt acts as described herein, among others.

189.   As a direct and proximate result of RICO violations by the Defendants of 18 U.S.C. § 1962(a) and/or 18 U.S.C. § 1962(d), Almaty has suffered damages in an amount to be determined at trial and presently estimated to be not less than $300 million.  Almaty has been injured in its business or property by reason of each such Defendant's violations in that financial assets stolen or otherwise diverted from and thereby lost to Almaty have been used and invested, directly or indirectly, to acquire an interest in and to establish and operate numerous

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

47

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   enterprises affecting interstate or foreign commerce without benefit to Almaty or

2   its people.  Accordingly, pursuant to the civil remedy provisions of 18 U.S.C. §

3   1964(c), Almaty is entitled to recover threefold the damages it has suffered,

4   together with its costs of suit and reasonable attorneys' fees.

5               **THIRD CLAIM FOR RELIEF**

6               (For Breach of Fiduciary Duty against Viktor)

7       190.   Almaty hereby incorporates by reference the allegations in paragraphs

8   1 through 189, as though fully set forth herein.

9       191.   As alleged above, Viktor owed a fiduciary duty to Almaty and its

10  people to hold and control the assets of the Almaty government for the benefit of

11  Almaty and its people, and not for his personal benefit or the personal benefit of

12  his relatives, associates, and accomplices.

13      192.   By engaging in the acts alleged above, Viktor breached his fiduciary

14  duty to Almaty and its people.  As a direct and proximate result of such breaches,

15  Almaty has suffered damages in an amount to be determined at trial and presently

16  estimated to be not less than $300 million.

17      193.   In committing the acts and perpetrating the schemes alleged herein,

18  Viktor intended to injure Almaty and acted with malice and oppression and with a

19  willful and conscious disregard for the rights of Almaty and its people.  In so

20  doing, Viktor has acted toward Almaty and its people in such manner as to warrant

21  disgorgement of his uses and investments of Almaty's money and property

22  together with an award of punitive and exemplary damages in an amount no less

23  than $300 million.

24              **FOURTH CLAIM FOR RELIEF**

25              (For Conversion and Conspiracy to Convert against all Defendants)

26      194.   Almaty hereby incorporates by reference the allegations in paragraphs

27  1 through 193, as though fully set forth herein.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

48

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

195.   Defendants, and each of them, have wrongfully converted, aided and abetted, and caused to be converted, to their own use, and that of their friends, families, associates, and accomplices, money, funds, and property belonging to Almaty and its people.  Such conversions have been for the benefit of the Defendants and their friends, families, associates, and accomplices, and to the detriment of the true owners of the property, Almaty and its people.  Such acts of conversion include the acts alleged herein.

196.   Defendants unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together, with each other, and with others to convert money, funds, and property belonging to Almaty and its people to their own use, and that of their friends, families, associates, and accomplices.  In furtherance of the conspiracy and to affect the objects thereof, Defendants committed the overt acts, among others, referenced above.

197.   As a direct and proximate result of these acts of conversion by Defendants, Almaty has suffered damages in an amount to be determined at trial, and presently estimated to be not less than $300 million.

198.   In committing the acts and perpetrating the schemes alleged herein, Defendants intended to injure Almaty and acted with malice and oppression and with a willful and conscious disregard for the rights of Almaty and its people.  In so doing, Defendants acted toward Almaty and its people in such manner as to warrant disgorgement of their uses and investments of Almaty's money and property together with an award of punitive and exemplary damages in an amount no less than $300 million.

## FIFTH CLAIM FOR RELIEF

(For Fraud and Deceit and Conspiracy to Defraud against Viktor and Leila)

199.   Almaty hereby incorporates by reference the allegations in paragraphs 1 through 198, as though fully set forth herein.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

49

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

200. In the course of conducting and participating in the conduct of the affairs of the Khrapunov Racketeering Enterprise, Viktor and Leila made representations to Almaty and others, which representations were false and necessary to implement the unlawful looting, laundering, investment and obstruction schemes described above.

201. As set forth above, Viktor, who owed a fiduciary duty to Almaty, and Leila failed to disclose and otherwise concealed facts from Almaty and others, the disclosure of which was necessary to make the representations made by them to Almaty not materially misleading. Viktor and Leila knew that said facts were not being disclosed and were material, and they intended by concealment of these facts to facilitate continuation of their unlawful diversion of assets belonging to Almaty and its people.

202. Almaty relied to its detriment on the representations of integrity by Viktor and Leila. Viktor and Leila flagrantly breached the trust and confidence of Almaty by committing numerous acts of fraud, deceit, conversion, and racketeering alleged herein, through which they plundered the assets of Almaty.

203. In the course of developing their elaborate scheme to defraud, Viktor and Leila secured the assistance, among others, of associates and accomplices, who with Viktor and Leila unlawfully, willfully and knowingly did combine, conspire, confederate, and agree together, with each other and with others to facilitate, aid and abet, and conceal the scheme and artifice to defraud, and to obtain money and property by false representations and promises, thereby enabling the massive diversions and concealment of looted funds identified in this Complaint.

204. As a direct and proximate result of the foregoing fraudulent conduct and conspiracy to defraud, Almaty has suffered damages in an amount to be determined at trial, and presently estimated to be not less than $300 million.

205. In committing the acts and perpetrating the schemes alleged herein, Viktor and Leila intended to injure Almaty and acted with malice and oppression

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

50

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   and with a willful and conscious disregard for the rights of Almaty and its people.

2   In so doing, Defendants acted toward Almaty and its people in such manner as to

3   warrant disgorgement of their uses and investments of Almaty's money and

4   property together with an award of punitive and exemplary damages in an amount

5   no less than $300 million.

6   ## SIXTH CLAIM FOR RELIEF

7   (For an Accounting, Imposition of a Constructive Trust and Equitable Lien against

8   all Defendants)

9       206.  Almaty hereby incorporates by reference the allegations in paragraphs

10  1 through 205, as though fully set forth herein.

11      207.  During Viktor's mayoralty of Almaty, he, acting as mayor, controlled

12  virtually all of the valuable assets of the Almaty government.  These assets

13  included money and real and personal property owned by the Almaty government,

14  the right to convey, for the benefit of the people of Almaty, real and personal

15  property owned by the Almaty government, and the right to decide who could do

16  business in Almaty through the granting of licenses, concessions, and permits.

17  Viktor further was entrusted with the ability to cause privately owned property to

18  be seized by the Almaty government, purportedly for the benefit of Almaty and its

19  people.

20      208.  Viktor owed a fiduciary duty to Almaty and its people to hold and

21  control these assets for the benefit of Almaty and its people, and not for his

22  personal benefit or the personal benefit of his friends, families, associates, and

23  accomplices.  As alleged above, Viktor, aided and abetted by the other Defendants

24  and co-conspirators, converted the assets of the Almaty government to his personal

25  benefit and the personal benefit of his friends, families, associates, and

26  accomplices.  They did so by looting money and property owned by the Almaty

27  government and/or by private parties and by accepting bribes, kickbacks,

28  gratuities, and commissions in exchange for the granting of the legal right to do

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

51

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1    business in Almaty.  All such conversions of assets were done in violation of

2    Viktor's duties to the beneficial owners of such assets, Almaty and its people.  If

3    Viktor or the other Defendants are permitted to retain these assets, they will be

4    unjustly enriched at Almaty's expense.

5         209.   Defendants other than Viktor received money and property stolen

6    from the Almaty government by Viktor and other economic benefits taken or

7    conferred upon them by Viktor in violation of his fiduciary duty.  These

8    Defendants received such money, property, and other economic benefits without

9    giving value for them or with notice to Almaty that such assets had been stolen or

10   otherwise acquired in violation of Viktor's duties to Almaty and its people.  If

11   these Defendants are permitted to retain such assets, they will be unjustly enriched

12   at Almaty's expense.

13        210.   As a result of the foregoing, Almaty is entitled to an accounting by

14   each of the Defendants of all real and personal property held, acquired, or disposed

15   of by them at any time since 1997.

16        211.   As a result of the foregoing, Almaty is entitled to an imposition of a

17   constructive trust for the benefit of Almaty over all monies or assets belonging to

18   Almaty currently held or controlled by Defendants and Almaty is further entitled to

19   an  equitable lien upon all real and personal property of Defendants, wherever

20   located worldwide.

21        212.   Defendants regularly misused and continue to misuse the corporate

22   and other forms of business organization as a cloak for committing fraud and as a

23   means of perpetrating injustice.  By reason of the elaborate and fraudulent schemes

24   used by Defendants to conceal transfers of stolen money and property and to

25   conceal ownership of Defendants' assets, it would be unjust and inequitable to

26   require Almaty to trace the source of money used to acquire specific assets, or to

27   prove that specific assets were acquired with money or property stolen from

28   Almaty.  Instead, the burden should be shifted to Defendants to prove that they had

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

52

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   sources of income other than the unlawful looting and investment schemes

2   described herein, and to prove that particular assets were acquired by them with

3   such independent, lawful income.

4                                    **PRAYER**

5           WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

6       A.      For compensatory damages;

7       B.      For treble damages;

8       C.      For punitive damages;

9       D.      For prejudgment interest;

10      E.      For a constructive trust;

11      F.      For an accounting;

12      G.      For injunctive relief;

13      H.      For disgorgement;

14      I.      For all costs and fees incurred in prosecuting this Complaint; and

15      J.      For such other and further relief as this Court deems just and proper.

16                               **JURY DEMAND**

17          Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Civil L.R.

18  38-1, Plaintiff hereby demands a trial by jury.

19  Dated:  August 21, 2017                LATHAM & WATKINS LLP

20

21                                          By: /s/ David J. Schindler___
                                                David J. Schindler
22                                              Julie R. F. Gerchik
                                                Kendall M. Howes
23
                                                *Attorneys for Plaintiff*
24                                              The City of Almaty

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\91976251.11

53

CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF