LATHAM & WATKINS LLP
  David J. Schindler (Bar No. 130490)
    *david.schindler@lw.com*
  Jonathan M. Jackson (Bar No. 257554)
    *jonathan.jackson@lw.com*
  Kendall M. Howes (Bar No. 294285)
    *kendall.howes@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California  90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763

*Attorneys for Plaintiff the City of Almaty*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF ALMATY,<br><br>              Plaintiff,<br><br>    v.<br><br>VIKTOR KHRAPUNOV, *et al.*,<br><br>              Defendants. | Case No. 14-cv-03650-FMO<br>*Consolidated with Case No. 15-cv-02628-FMO*<br><br>Assigned To: Hon. Fernando M. Olguin<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF CITY OF ALMATY'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**<br><br>*Proposed Order; Plaintiff's Opposition to Defendants' Motion to Dismiss Consolidated Amended Complaint Filed Concurrently Herewith*<br><br>Action Filed:    May 13, 2014<br><br>Hearing Date:    December 21, 2017<br>Hearing Time:    10:00 a.m.<br>Courtroom:    6D |

LATHAM&WATKINS LLP  US-DOCS\96641615
ATTORNEYS AT LAW
LOS ANGELES

REQUEST FOR JUDICIAL NOTICE ISO PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED AMENDED COMPLAINT

Pursuant to Federal Rule of Evidence 201, Plaintiff the City of Almaty ("Plaintiff") hereby requests that this Court take judicial notice of certain orders and pleadings in other court proceedings and other publically available documents described below.  This request, and the documents for which it seeks judicial notice, is submitted in support of Plaintiff's Opposition to Defendants' Motion to Dismiss Consolidated Amended Complaint ("Opposition") filed concurrently herewith.

I.   **DESCRIPTION OF DOCUMENTS**

Plaintiff respectfully requests that this Court take judicial notice of the following documents, which are attached as exhibits hereto:

1. INTERPOL Red Notice for Ilyas (Iliyas) Khrapunov, *available at* https://www.interpol.int/notice/search/wanted/2014-26980, a true and correct copy of which is attached hereto as **Exhibit A**.

2. INTERPOL Red Notice for Viktor Khrapunov, *available at* https://www.interpol.int/notice/search/wanted/2012-10416*,* a true and correct copy of which is attached hereto as **Exhibit B**.

3. INTERPOL Red Notice for Leila Khrapunova, *available at* https://www.interpol.int/notice/search/wanted/2012-334222, a true and correct copy of which is attached hereto as **Exhibit C**.

4. A judgment dated November 26, 2013, issued by the U.K. Courts in *JSC BTA Bank v. Ablyazov*, 2013 EWHC 3691, a true and correct copy of which is attached hereto as **Exhibit D**.

5. A memorandum and order dated June 21, 2016 (Dkt. No. 174), issued by Judge Nathan, District Judge of the Southern District of New York, in *CF 135 Flat LLC v. Triadou SPV N.A.*, No. 15-cv-5345 (AJN), a true and correct copy of which is attached hereto as **Exhibit E.**

6. A Memorandum and Order, dated June 24, 2016 (Dkt. No. 175), issued by Judge Nathan, District Judge of the Southern District of

LATHAM&WATKINS ʟʟᴘ US-DOCS\96641615
ATTORNEYS AT LAW
LOS ANGELES

1

REQUEST FOR JUDICIAL NOTICE ISO PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED AMENDED COMPLAINT

New York, in *CF 135 Flat LLC v. Triadou SPV N.A.*, No. 15-cv-5345 (AJN), a true and correct copy of which is attached hereto as **Exhibit F.**

7.    A Memorandum and Order of Attachment, dated July 18, 2016 (Dkt. No. 192), issued by Judge Nathan, District Judge of the Southern District of New York, in *Almaty v. Ablyazov*, No. 15-cv-05345 (AJN), a true and correct copy of which is attached hereto as **Exhibit G.**

8.    Amended Crossclaims of City of Almaty and BTA Bank (Dkt. No. 219), filed September 7, 2016, in *Almaty v. Ablyazov*, No. 15-cv-05345 (AJN), a true and correct copy of which is attached hereto as **Exhibit H.**

9.    A Memorandum and Order, dated December 23, 2016 (Dkt. No. 257), issued by Judge Nathan, District Judge of the Southern District of New York, in *Almaty v. Ablyazov*, No. 15-cv-05345 (AJN), a true and correct copy of which is attached hereto as **Exhibit I.**

10.   The Khrapunovs' Memorandum in Opposition to the City of Almaty and BTA Bank's Motion for Certification of the Court's December 23, 2017 Order for Interlocutory Appeal, dated February 3, 2017 (Dkt. No. 276), in *Almaty v. Ablyazov*, No. 15-cv-05345 (AJN), a true and correct copy of which is attached hereto as **Exhibit J.**

11.   An order dated April 20, 2017 (Dkt. No. 304), issued by Judge Nathan, District Judge of the Southern District of New York, in *Almaty v. Ablyazov*, No. 15-cv-05345 (AJN), a true and correct copy of which is attached hereto as **Exhibit K.**

12.   Amended Memorandum and Order, dated September 26, 2017 (Dkt. No. 426), issued by Judge Nathan, District Judge of the Southern District of New York, in *Almaty v. Ablyazov*, No. 15-cv-05345 (AJN), a true and correct copy of which is attached hereto as **Exhibit L.**

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\96641615

2

REQUEST FOR JUDICIAL NOTICE ISO PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED AMENDED COMPLAINT

## II. THE DOCUMENTS ARE JUDICIALLY NOTICEABLE

In ruling on a motion to dismiss, courts may consider materials that are judicially noticeable under Rule 201 of the Federal Rules of Evidence.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).  Under Rule 201, a court may take judicial notice of facts that are "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  A court must take judicial notice at a party's request when "supplied with the necessary information."  Fed. R. Evid. 201(c).

Pursuant to Rule 201, courts routinely take judicial notice of the findings and orders of other courts, as well as pleadings in other court proceedings.  *Callan v. New York Cmty. Bank*, 643 F. App'x 666, 666-67 (9th Cir. 2016) (affirming judicial notice of complaint, demurrer and judgment in another case in ruling on a motion to dismiss); *Reyn's Pasta Bella, LLC v. Visa USA, Inc*., 442 F.3d 741, 746 n.6 (9th Cir. 2006) (courts "may take judicial notice of court filings and other matters of public record"); *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (taking judicial notice of factual findings in other proceedings regarding the defendant's support of a terrorist organization).

Likewise, foreign judgments are subject to judicial notice.  *Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*, 575 F.3d 693, 696 (7th Cir. 2009) ("An American court can take judicial notice of a foreign judgment[.]"); *Lichtenstein v. Cader*, No. 13-2690, 2013 WL 4774717, at *2 (S.D.N.Y. Sept. 6, 2013) ("Notably, foreign judgments are matters subject to judicial notice.").

Finally, the Court may take judicial notice of an Interpol Red Notice as a matter of public record.  "An Interpol Red Notice is the closest instrument to an international arrest warrant in use today.  Interpol (the International Criminal Police Organization) circulates notices to member countries listing persons who

LATHAM&WATKINS<sup></sup>
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\96641615

3

REQUEST FOR JUDICIAL NOTICE ISO PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED AMENDED COMPLAINT

1   are wanted for extradition."  United States Department of Justice, *U.S. Attorneys'*

2   *Criminal Resource Manual* § 611, https://www.justice.gov/usam/criminal-

3   resource-manual-611-interpol-red-notices (last visited Nov. 22, 2017).  Arrest

4   warrants are considered matters of public record and are subject to judicial notice.

5   *Ferguson v. United States*, No. 15-1253, 2016 WL 4793180, at *3 (S.D. Cal. Sept.

6   14, 2016) (taking judicial notice of arrest warrant as a matter of public record);

7   *Klahn v. Alameda Cty. Sheriff's Dep't*, No. 16-833, 2017 WL 565050, at *11 (N.D.

8   Cal. Feb. 13, 2017) (same).

9        For the reasons set forth above, Plaintiff respectfully requests that this Court

10  take judicial notice of the documents described above and attached hereto.

11

12  Dated:  November 22, 2017                    LATHAM & WATKINS LLP

13                                              By   /s/ Jonathan M. Jackson
                                                     David J. Schindler
14                                                   Jonathan M. Jackson
                                                     Kendall M. Howes
15
                                                *Attorneys for Plaintiff the City of Almaty*
16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\96641615

4

REQUEST FOR JUDICIAL NOTICE ISO PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED AMENDED COMPLAINT

11/21/2017                                      - INTERPOL

Search : | Keyword            |  🔍  English

## CONNECTING POLICE FOR A SAFER WORLD

HOME        ABOUT INTERPOL        NEWS AND MEDIA        MEMBER COUNTRIES        INTERPOL EXPERTISE        CRIME AREAS

Back to Search result



### KHRAPUNOV, ILYAS (ILIYAS)
**WANTED BY THE JUDICIAL AUTHORITIES OF KAZAKHSTAN**

#### IDENTITY PARTICULARS

| | |
|---|---|
| Present family name: | **KHRAPUNOV** |
| Forename: | **ILYAS (ILIYAS)** |
| Sex: | **Male** |
| Date of birth: | **15/01/1984 (33 years old)** |
| Place of birth: | **TARAZ CITY, ZHAMBYL REGION, Kazakhstan** |
| Language spoken: | **Kazakh, Russian, English, French** |
| Nationality: | **Kazakhstan** |

#### CHARGES  Published as provided by requesting entity

Charges:  **The creation and guidance of an organised criminal group or criminal association (criminal organisation), and participation in a criminal association; Legalization of monetary funds or other property obtained illegally**

#### PHOTOS

 

#### IF YOU HAVE ANY INFORMATION PLEASE CONTACT

Your national or local police
General Secretariat of INTERPOL

**This extract of the Red Notice has been approved for public dissemination**

Site map    |    FAQs    |    Terms of use    |    Calls for tender    |    Recruitment    |    Contact INTERPOL    |    e-Learning
© INTERPOL 2017. All rights reserved.

EXHIBIT A

11/21/2017                                          - INTERPOL

Search : [ Keyword ]  🔍  English

## CONNECTING POLICE FOR A SAFER WORLD

HOME        ABOUT INTERPOL        NEWS AND MEDIA        MEMBER COUNTRIES        INTERPOL EXPERTISE        CRIME AREAS

Back to Search result



### KHRAPUNOV, VIKTOR

WANTED BY THE JUDICIAL AUTHORITIES OF KAZAKHSTAN

#### IDENTITY PARTICULARS

| | |
|---|---|
| Present family name: | **KHRAPUNOV** |
| Forename: | **VIKTOR** |
| Sex: | **Male** |
| Date of birth: | **24/11/1948 (68 years old)** |
| Place of birth: | **EAST-KAZAKHSTAN REGION, Kazakhstan** |
| Language spoken: | **Russian** |
| Nationality: | **Kazakhstan** |

#### CHARGES    Published as provided by requesting entity

Charges:    **The Creation and Guidance of an Organised Criminal Group or Criminal Association (Criminal Organisation), and Participation in a Criminal Association; Expropriation or Embezzlement of Trusted Property; Fraud; Legalization of Monetary Funds or Other Property Obtained Illegally; Abuse of Official Powers; Receipt of a Bribe**

#### PHOTOS



#### IF YOU HAVE ANY INFORMATION PLEASE CONTACT

Your national or local police
General Secretariat of INTERPOL

**This extract of the Red Notice has been approved for public dissemination**

Site map    |    FAQs    |    Terms of use    |    Calls for tender    |    Recruitment    |    Contact INTERPOL    |    e-Learning

© INTERPOL 2017. All rights reserved.

EXHIBIT B

11/21/2017                                        - INTERPOL

Search :  [Keyword]        English

## CONNECTING POLICE FOR A SAFER WORLD

HOME        ABOUT INTERPOL        NEWS AND MEDIA        MEMBER COUNTRIES        INTERPOL EXPERTISE        CRIME AREAS

Back to Search result



### KHRAPUNOVA, LEILA (LEYLA)

WANTED BY THE JUDICIAL AUTHORITIES OF KAZAKHSTAN

#### IDENTITY PARTICULARS

| | |
|---|---|
| Present family name: | KHRAPUNOVA |
| Forename: | LEILA (LEYLA) |
| Sex: | Female |
| Date of birth: | 19/12/1958 (58 years old) |
| Place of birth: | EAST-KAZAKHSTAN REGION (VOSTOCHNO-KAZAKHSTANSKAYA OBL.), Kazakhstan |
| Language spoken: | Kazakh, Russian |
| Nationality: | Kazakhstan |

#### CHARGES   Published as provided by requesting entity

Charges:    Fraud; Legalization of Monetary Funds or Other Property Obtained Illegally; The Creation and
Guidance of an Organised Criminal Group or Criminal Association (Criminal Organisation),
and Participation in a Criminal Association

#### PHOTOS



#### IF YOU HAVE ANY INFORMATION PLEASE CONTACT

Your national or local police
General Secretariat of INTERPOL

This extract of the Red Notice has been approved for public dissemination

Site map    |    FAQs    |    Terms of use    |    Calls for tender    |    Recruitment    |    Contact INTERPOL    |    e-Learning

© INTERPOL 2017. All rights reserved.

EXHIBIT C

Case No: HC10C02462

Neutral Citation Number: [2013] EWHC 3691 (Ch)
**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Rolls Building,
Royal Courts of Justice
Fetter Lane, London, EC4A 1NL

Date: 26/11/2013

**Before** :

**MR JUSTICE HENDERSON**
- - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **JSC BTA BANK** | **Claimant/ Applicant** |
| **- and -** | |
| **MUKHTAR KABULOVICH ABLYAZOV** | **18th Defendant/ Respondent** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Mr Stephen Smith QC and Ms Emily Gillett** (instructed by **Hogan Lovells International LLP**) for the **Claimant**

Hearing dates: 8 and 9 October 2013
- - - - - - - - - - - - - - - - - - - -
Judgment

EXHIBIT D

**Mr Justice Henderson:**

**Introduction**

1. On 8 and 9 October 2013 I heard the adjourned application by the claimant JSC BTA Bank ("the Bank") for summary judgment against the 18th defendant, Mukhtar Kabulovich Ablyazov ("Mr Ablyazov").  The application was undefended, as Mr Ablyazov's solicitors (Addleshaw Goddard LLP) had informed the Bank's solicitors (Hogan Lovells International LLP) by a letter dated 12 September 2013 that he would "not be further defending" the application.  This statement was accompanied by the following explanation and reservation of rights:

    > "You and your client are well aware of our client's current personal circumstances, and that of his family.
    >
    > All of our client's rights are reserved and our client's decision not to defend the application further should not be taken as an admission or acceptance of liability for factual findings in the AAA proceedings or those already made against him in the wider proceedings, including the committal proceedings."

    On the eve of the hearing, Addleshaw Goddard confirmed that Mr Ablyazov's instructions remained unchanged.

2. Behind the brief introduction which I have just given, there lies a background of ever-increasing, and at times bewildering, complexity.  The present action ("the AAA proceedings") is just one of a total of 11 sets of proceedings in England and Wales in which the Bank, a major bank in Kazakhstan which was effectively nationalised in February 2009, seeks to recover sums in excess of US$5 billion which it alleges were fraudulently misappropriated by its former chairman, Mr Ablyazov, acting in concert with other former members of the Bank's senior management, for the ultimate benefit of Mr Ablyazov himself.  It is alleged that he has obtained this benefit through a web of offshore companies controlled and managed on his behalf by, or through, a network of nominees and trusted associates.

3. All of the proceedings, apart from the AAA proceedings, were begun in the Commercial Court, where they have been principally managed by Teare J.  He has delivered a number of major judgments, including two which are of particular importance for present purposes.

4. First, on 16 February 2012 Teare J gave judgment following the hearing of committal proceedings based on three sample allegations of contempt of court made by the Bank against Mr Ablyazov: see JSC BTA Bank v Mukhtar Ablyazov [2012] EWHC 237 (Comm).  Teare J held all three allegations to be proved to the criminal standard of proof, that is to say beyond reasonable doubt.  One of the allegations was that Mr Ablyazov had failed, in breach of the worldwide freezing order previously made against him, to disclose his beneficial ownership of the shares in a company incorporated in the British Virgin Islands ("BVI") called Bubris Investments Limited ("Bubris").  Under its later name of Celina Holding Investments Limited, Bubris is the fourth defendant in the AAA proceedings and is alleged by the Bank to have played a key role, together with four other BVI companies which are the fifth to

EXHIBIT D

eighth defendants (together "the BVI Defendants"), in the alleged fraud which forms the subject matter of those proceedings. In the committal proceedings, which were heard over a period of about three weeks between 30 November and 21 December 2011, Mr Ablyazov was represented by a team of two leading and two junior counsel, instructed by Addleshaw Goddard.  During the hearing, he elected to give evidence and was cross-examined for two and a half days.

5.   Mr Ablyazov failed to attend the handing down of judgment in the committal proceedings, and instead absconded. He was sentenced in his absence to 22 months' imprisonment on each count, the terms to run concurrently.  The judge also made an "unless" order ("the Unless Order") debarring him from defending the claims made against him in the Commercial Court proceedings, and striking out his defences, unless within a stated period he both surrendered  to custody and made proper disclosure of all his assets and his dealings with them.  The stated periods for compliance with these conditions expired in March 2012, but the order also provided that, in the event of an appeal, the sanctions for non-compliance would not take effect until seven days after the dismissal of the appeal.  Mr Ablyazov had an unfettered right to appeal against the committal order and sentence; the judge also granted him permission to appeal from the Unless Order.

6.   Mr Ablyazov has remained a fugitive from justice since February 2012, and his whereabouts remained unknown to the Bank until he was discovered in the South of France on 31 July 2013.  Since then he has been held in custody by the French authorities, while extradition proceedings against him by at least three countries (which do not include the United Kingdom, because civil contempt of court is not an extraditable offence) are pending.

7.   Despite his flight from the jurisdiction of the English court, Mr Ablyazov has continued to give instructions to his lawyers and to be represented in court proceedings when it has suited his interests to do so (although more recently courts have begun to refuse to hear submissions on his behalf while his multiple contempts remain unpurged). His appeals in the committal proceedings, including an appeal from the Unless Order, were heard by the Court of Appeal (Maurice Kay LJ VP, Rix and Toulson LJJ) in early July 2012, and judgment was handed down on 6 November 2012: see JSC BTA Bank v Mukhtar Ablyazov [2012] EWCA Civ 1411. All of Mr Ablyazov's grounds of appeal were comprehensively dismissed, subject to one minor point of disagreement which made no difference to the outcome (Toulson LJ considered that surrender to custody should not have been made a condition of the Unless Order, whereas the majority agreed with Teare J that it should). The leading judgment was delivered by Rix LJ, who (among much else) reviewed the evidence relating to the beneficial ownership of Bubris before concluding at paragraph [74]:

> "There is thus compelling circumstantial evidence that Mr Ablyazov was the true owner of Bubris. There is no documentary evidence to the contrary … The judge was entitled and right to discount the evidence of Mr Ablyazov and his other witnesses, and indeed to find that such evidence was incredible and to be lies."

8.   Having considered, and rejected, Mr Ablyazov's appeal in relation to the other two alleged contempts, Rix LJ concluded the relevant part of his judgment as follows:

EXHIBIT D

"96. I would end this section of my judgment by saying this. It is noticeable from the facts of this case, both as found by the judge, but also in the nature of the structure of the arguments as they have developed, how time and time again, as some aspect of Mr Ablyazov's conduct has come under question, so the evidence deployed has become remarkable for the way in which it has taken tortuous turnings which have asked the court to suspend its belief in reality in favour of reduplicating unrealities. Thus in the case of Bubris, the court was asked to believe both that Mr Batyrgarejev, one of Mr Ablyazov's dedicated lieutenants, had been appointed UBO [*ultimate beneficial owner*] of Bubris by mistake, and that the true UBO had only emerged in September 2010, albeit backdated to May 2010, after two years in which a succession of nominal UBOs had been declared. The significance of September 2010 is that the freezing order against Bubris was served at the end of July 2010.

…

100. As this series of coincidences, misfortunes, errors, misunderstandings and inexplicable developments multiply, the court is entitled to stand back and ask whether there is in truth a defence or defences as alleged, even if no burden rests on Mr Ablyazov, and the burden remains on the bank, or whether there is at any rate the realistic possibility of such, or on the other hand whether the court is being deceived. The trial judge decided that it was being deceived by witnesses without credibility. It is not for this court to say that he was wrong without strong grounds for doing so, grounds which have simply not been formulated.

101. I would therefore conclude that the appeal on each element of the committal judgment should be dismissed."

9.     In his short concurring judgment, Maurice Kay LJ said this:

"202. It is difficult to imagine a party to commercial litigation who has acted with more cynicism, opportunism and deviousness towards court orders than Mr Ablyazov. Rix LJ has described in trenchant terms the factors which cause me to express myself in this way. There can be no complaint that Teare J decided that the court's powers should be deployed so as to put the maximum pressure on Mr Ablyazov to comply with its orders so as to endeavour to prevent its fair procedures from being subverted."

10.    The effect of the dismissal of Mr Ablyazov's appeal was to trigger the Unless Order, and on 9 November 2012 Teare J made a declaration that Mr Ablyazov had failed to comply with the surrender and disclosure obligations, as a result of which he was debarred from defending the Bank's Commercial Court proceedings with effect from

13 November 2012.  The trial of three of those proceedings (known as the Drey, Granton and Chrysopa proceedings) had begun before Teare J on 7 November, the day after the Court of Appeal's judgment. Mr Ablyazov was the first defendant in each of them.  After Mr Ablyazov's defences had been struck out, the trial continued against the remaining defendants until its conclusion on 14 February 2013.  On 19 March 2013 Teare J handed down his judgment ("the Trial Judgment"): see [2013] EWHC 510 (Comm).  This is the second of the important judgments of Teare J to which I referred in paragraph 3 above. For present purposes, its main significance lies in the findings which Teare J made, having heard expert evidence on both sides, about various disputed issues of Kazakh law.  It should also be noted that the first issue for consideration in each case was whether Mr Ablyazov had committed a fraud on the Bank: see paragraph [7].  The reason for this was that primary liability on the part of Mr Ablyazov had to be established before accessory liability for knowing assistance by other defendants could be established.  In each case, Teare J held that both the primary liability of Mr Ablyazov and the relevant accessory liability were established to his satisfaction.

11. As a result of the Unless Order, default judgments totalling at least US$3.6 billion have now been entered against Mr Ablyazov in various of the Commercial Court proceedings, as well as a judgment for damages to be assessed in the Chrysopa proceedings.  In addition, very substantial costs orders have been made against him.  None of these judgments and orders has been satisfied.

12. To complete the picture, I should mention that in the committal proceedings the Court of Appeal refused to grant Mr Ablyazov permission to appeal to the Supreme Court.  Mr Ablyazov subsequently sought permission from the Supreme Court, although only in relation to the debarring provisions of the Unless Order.  On 21 February 2013, the Supreme Court rejected Mr Ablyazov's application, holding that it did not raise an arguable point of law of general public importance.

**The AAA proceedings**

13. The main difference between the AAA proceedings and the Commercial Court proceedings lies in the general nature of the fraud alleged.  In the Commercial Court proceedings, the claims typically concern huge unsecured loans made by the Bank, on very unfavourable terms, to offshore companies alleged to be beneficially owned by Mr Ablyazov.  By contrast, the AAA proceedings concern a portfolio of ten holdings of AAA-rated securities with a market value of approximately US$300 million (hence the label attached to the proceedings) which was allegedly misappropriated for the ultimate benefit of Mr Ablyazov by a series of linked transactions which took place in 2008 and early 2009.  This difference of subject matter may explain why the AAA proceedings were the only ones to be started in the Chancery Division of the High Court, on 28 July 2010.  At that stage, the Bank had insufficient evidence to implicate Mr Ablyazov in the alleged fraud, so he was not joined as a party.  The first defendant, Roman Vladimirovich Solodchenko ("Mr Solodchenko"), had been chairman of the Bank's management board at all material times until 3 February 2009, and the impugned transfers of the AAA securities to the BVI Defendants in January 2009 were made under his signature.  The BVI Defendants, as I have already said, were the fourth to eighth defendants.  The ninth to twelfth defendants (three more companies incorporated in the BVI, and one incorporated in the Seychelles) constituted a second tier of offshore companies involved in the alleged fraud ("the

EXHIBIT D

Further Recipients").   Mr Ablyazov was not joined as a defendant until 14 March 2011, when permission was granted to the Bank to re-amend its particulars of claim. No freezing or ancillary relief was sought against Mr Ablyazov at that date, but only because a worldwide freezing order had already been made against him in the Commercial Court proceedings and his assets were subject to a receivership order which by then extended over several hundred companies, including the BVI Defendants and the Further Recipients.

14.   The general nature of the alleged fraud is pleaded as follows in the Bank's re-amended particulars of claim:

> "1. As set out in more detail below, this claim concerns the transfers of certain AAA-rated investment bonds (the "AAA Investments"), which were acquired by the [*Bank*] in May 2008 with a nominal value of US$292 million and a market value in excess of US$300 million, to the [*BVI Defendants*] on or around 22 January 2009 (the "January 2009 Transfers"). The January 2009 Transfers were effected upon the instructions and orders of [*Mr Solodchenko*], for the ultimate undisclosed benefit of [*Mr Ablyazov*].

> 2. The [*Bank*] received no payment or other consideration in exchange for the transfer of the AAA Investments. The [*BVI*] Defendants no longer hold the AAA Investments. The [*Bank*] claims that, it is to be inferred, [that] the January 2009 Transfers were consequent on [*Mr Solodchenko*] and/or [*Mr Ablyazov*], in June 2008, having allowed or caused the AAA Investments to be used as a form of security (formal or otherwise) for obligations owed by the [*BVI*] Defendants to a third party (the "June 2008 Security"). At present the [*Bank*] does not know the precise nature of the June 2008 Security.

> 3. Neither the grant of the June 2008 Security nor the January 2009 Transfers had any commercial purpose or benefit for the [*Bank*], and they both lacked any justification from the [*Bank's*] perspective.  The June 2008 Security and/or the January 2009 Transfers were a means of misappropriating and/or wrongfully dissipating the [*Bank's*] assets."

15.   In a little more detail, the main stages in the alleged fraud, as pleaded by the Bank and as evidenced by the documents in the chronological bundle prepared by the Bank, appear to have been as follows:

(1)   Between 21 and 22 May 2008, the Bank acquired the AAA Investments. These were initially held on the Bank's behalf by State Street Corporation, a company incorporated in Massachusetts. On or about 22 May 2008, the Bank arranged to, and did, transfer the AAA Investments to an account in the Bank's name with an affiliate in Kazakhstan of OJSC Alfa-Bank ("Alfa Russia").

(2)   On 23 May 2008, the Bank, acting by Mr Solodchenko, entered into a brokerage agreement with Alfa Equity Investments Limited ("Alfa Equity"), a

EXHIBIT D

BVI company affiliated to Alfa Russia which provided brokerage services to the Bank and the BVI Defendants (with whom it also entered into brokerage agreements around the same time). The brokerage agreement with the Bank provided, by clause 1.4, that the Bank would remain at all times the sole beneficial owner of securities transferred to or acquired by Alfa Equity under the agreement.

(3)     Between 23 May and 10 June 2008, Mr Solodchenko procured the transfer of the AAA Investments from the Bank's account at Alfa Russia to an account in the name of the Bank at Alfa Equity.  No payment was made for the transfers, and once they had been effected Alfa Equity was obliged to hold the AAA Investments in accordance with the terms of the brokerage agreement. Alfa Equity then continued to hold the AAA Investments on behalf of the Bank until they were transferred to the BVI Defendants on 22 January 2009.

(4)     On 9 June 2008, each BVI Defendant entered into a separate loan agreement with one of the Further Recipients. Under these agreements, the BVI Defendants together purported to lend to the Further Recipients sums totalling US$250.1 million within the next ten days, the money to be transferred to bank accounts held by the borrowers with Trasta Komercbanka in Riga, Latvia ("TKB" or "Trasta"). The loans were purportedly repayable over periods of either eight, nine or  ten years by one or more instalments, with interest at the rate of either 5% or 6% per annum to be repaid with the principal amount of the loan.  Thus it was apparently open to the borrower to defer repayment of both principal and interest until a date which (depending on the agreement) was either 9 June 2016, 9 June 2017 or 9 June 2018.  Furthermore, the loans were apparently unsecured.

(5)     Between 10 and 17 June 2008, the BVI Defendants contracted to sell securities of the same descriptions and amounts as the AAA Investments to Alfa Equity, for a consideration of approximately US$294.1 million. These appear to have been "short" sales, because the BVI Defendants did not at that time own the securities which they contracted to sell.   The purchase price under the agreements was payable almost immediately, but delivery of the securities did not have to be made until 31 December 2008 (or, in the case of two transactions with the fifth defendant, 10 June 2009).

(6)     The consideration for the short sales was duly paid by Alfa Equity to the BVI Defendants at Alfa Equity, and was then transferred to accounts held by them at TKB in Latvia.

(7)     Around the same time, in mid-June 2008, approximately US$250 million of the proceeds of the transfers to the BVI Defendants' accounts at TKB were paid to further accounts at TKB in the names of the Further Recipients. These payments were, at least ostensibly, made pursuant to the loan agreements dated 9 June 2008.  The remaining US$44 million-odd was not paid to the Further Recipients. Most of this balance (amounting to some US$42.5 million) appears to have been retained by Bubris which then used it to deal in bonds.

(8)     On this application, the Bank does not allege that Alfa Equity was complicit in the fraud.    Accordingly, to make commercial sense of the short sale

EXHIBIT D

agreements, it invites the court to infer that the Bank must have pledged the AAA Investments to Alfa Equity, or granted some form of security over them, in order to secure the delivery obligations of the BVI Defendants under the sale agreements.  On the available evidence, I agree that this inference should be drawn.  It is incredible that Alfa Equity would have agreed to pay the purchase price under the sale agreements to the BVI Defendants in June 2008, without the assurance that the BVI Defendants would in due course be able to honour their delivery obligations, whether at the end of December 2008 or in June 2009.

(9)   On 13 June 2008, a potentially significant email was sent by Anton Rybalkin, a lawyer at Eastbridge Capital (Moscow) Limited ("Eastbridge Moscow"), the Russian subsidiary of the thirteenth defendant Eastbridge Capital Limited ("Eastbridge"), an English company providing corporate services of which the fifteenth defendant, Aleksandr Udovenko ("Mr Udovenko") and the seventeenth defendant, Anatoly Ereshchenko ("Mr Ereshchenko") were then directors.  The email was copied to Mr Udovenko, and its subject was "Agreements to be signed by R. Solodchenko".  It read as follows:

"As agreed: I am sending the documents that need to be signed by [*Mr Solodchenko*]. The seal is required. Please sign the scans and transfer the signed documents to me with Igor in Moscow. The original documents go to Moscow, as we get them – we will send them for the subsequent signature. The transaction with Alfa Bank is under the control of MKA [*i.e. Mr Ablyazov*].  If necessary the explanation can be given by [*Mr Udovenko*], [*Mr Ereshchenko*] and me.

Thanks for the co-operation."

(10)  The Bank relies on this email as contemporary evidence that the transactions with Alfa Bank relating to the AAA Investments were under the personal control of Mr Ablyazov. Mr Ablyazov accepts that the reference to "MKA" is probably a reference to himself, but says he had never seen the email before it was put to him in cross-examination in the committal trial, and he has no knowledge of its subject matter or the transaction to which it refers.  He says that employees of the Bank were keen to use his name "in order to give weight to proposals of all kinds", even when he had nothing to do with them.  He adds (paragraph 45 of his first witness statement in opposition to the summary judgment application):

"This might happen in relation to the holding of festivities or holidays, or in relation to arrangements that the [*Bank*] was to enter into.  It was part of the psychology of employees in large companies in the CIS countries to do this by using the name of the head of the organisation to lend weight to a proposal.  I anticipate that this is what Mr Rybalkin was doing in this document."

(11)  On 22 January 2009, Mr Solodchenko signed transaction forms instructing Alfa Equity to transfer the AAA Investments from the Bank's Alfa Equity account to the BVI Defendants' Alfa Equity accounts.  The Bank alleges that it

EXHIBIT D

received no consideration for these transfers.  It is the Bank's case that this
was the means whereby the BVI Defendants were enabled to fulfil their
delivery obligations under the June 2008 sale contracts.  As it is put in the re-
amended particulars of claim:

"71. Having received the AAA Investments on behalf of the
BVI Defendants, Alfa Equity then acquired the AAA
Investments from the BVI Defendants in satisfaction of the
Delivery Obligations.  The BVI Defendants no longer hold the
AAA Investments.

72. In summary, as at the end of January 2009 and as a result of
the matters set out above:

(a) the BVI Defendants obtained the benefit of substantial
payments from Alfa Equity totalling US$294,138,715.27 …;
and

(b) the Bank was deprived of the AAA Investments.  It did not
receive and has still not received any consideration in return,
whether a sum representing the nominal value of the AAA
Investments or their market value or any other value.

In short, as a result of the matters set out above, the Bank no
longer has the AAA Investments or any sum in return for
them."

16.   Mr Ablyazov's defence was served on 31 May 2011 by the solicitors then acting for
him, Stephenson Harwood.  It was settled by counsel instructed on his behalf, Mr
George Hayman, and runs to some 60 pages.  The nub of his defence is contained in
the following three paragraphs:

"15. Because of his position within the [*Bank*] Mr Ablyazov
had no involvement in (and has no knowledge of) the
transactions and documents which form the basis of this claim.

16. At all times Mr Ablyazov complied with his duties under
the JSC Law, the Regulations of the Board of Directors, the
[*Bank's*] Charter, the Civil Code, duties of a fiduciary nature
(which are denied in any event), the Code of Corporate
Governance of the [*Bank*], his Contract of Employment and the
Labour Code.

17. It is denied that Mr Ablyazov was or is the ultimate
beneficial owner of the BVI Defendants and the Further
Recipients."

17.   In view of Mr Ablyazov's denial that he was involved in the transactions, and his
disclaimer of any knowledge of them, it is unsurprising that much of his defence
consists of bare denials or non-admissions of matters which are said to be outside his

EXHIBIT D

knowledge.  The defence also sets out his contentions in relation to various issues of Kazakh law, to which I will need to return.

18.     It should also be noted that Mr Ablyazov claims to be "significantly disadvantaged … by the paucity of documentation available to him", because he is no longer employed by the Bank and therefore has no access to documentation, and because of the circumstances in which he left Kazakhstan (paragraph 3 of the defence). By contrast, he says, the Bank "has control over the vast majority of the documentation relating to the matters in dispute", and he is "entirely dependent" upon the Bank for the release of that documentation (*ibid*.).

**The history of the summary judgment application**

19.     The Bank issued its application for summary judgment against Mr Ablyazov and the BVI Defendants on 15 March 2012, a few weeks after Teare J had delivered his judgment on the committal application and sentenced Mr Ablyazov in his absence to 22 months' imprisonment. In support of the application, the Bank relied on the re-amended particulars of claim, the eighteenth witness statement of Christopher Hardman (the partner at Hogan Lovells who has throughout had conduct of the proceedings on the Bank's behalf) and an expert report on Kazakh law dated 14 March 2012 prepared by Vsevolod Markov ("Mr Markov"), a citizen of Kazakhstan who has significant experience of practising law in that country, specialising in cross-border and domestic finance and capital market transactions. Mr Markov is currently a partner at BMF Group LLP, a Kazakh law firm that has provided legal services in Kazakhstan for more than 17 years.

20.     In his eighteenth statement, Mr Hardman set out much of the relevant background, explained the nature of the Bank's claims against Mr Ablyazov and the BVI Defendants, and went through the matters relied on in support of the application, including the judgment of Teare J in the committal proceedings regarding the true ultimate beneficial ownership of Bubris. He pointed out that, although Teare J's judgment related only to Bubris, the BVI Defendants had consistently made common cause, and in their joint defence served on 21 November 2011 they had themselves asserted that they were in common beneficial ownership, albeit not the ownership of Mr Ablyazov. Their pleaded case was that they were in the common beneficial ownership of a Mr Sadykov, who managed the companies through his own nominees, and had never himself been a nominee of Mr Ablyazov.

21.     In the section of his statement dealing with the alleged inherent implausibility of the defences, Mr Hardman said this:

> "62. The overall tenor of the defences advanced by Mr Ablyazov and the BVI Defendants is inherently implausible and does not suggest any commercial rationale for the AAA Transactions.  Even aside from Mr Justice Teare's findings and the evidence I refer to above showing that the story about Mr Sadykov being the UBO of the BVI Defendants is untrue, it is wholly implausible that the series of transactions set out at paragraphs 55 to 75 of the RAPOC [*re-amended particulars of claim*] were ordinary commercial transactions conducted with parties who were at arms' length with the Bank. No payment

EXHIBIT D

was ever made to the Bank in consideration for the January 2009 Transfers and (notwithstanding the circulation of unsigned draft agreements apparently intended for backdated execution) no agreements were ever executed to underpin those transfers. Further, the BVI Defendants have provided no explanation about how loans made by the Bank might ever have been properly repaid.

63. The only attempt at an explanation provided by the BVI Defendants was that the Further Recipients purchased bonds issued by the Bank using (some of) the money they had received as a result of the Onward Transfers from the BVI Defendants. Even if it is the case that the Further Recipients purchased such bonds, the receipt by the Bank of monies in consideration for the purchase of those securities is not the repayment of monies to the Bank owed by the BVI Defendants or others, nor does it amount to consideration for the AAA Investments themselves (being, on the BVI Defendants' own case, consideration for the purchase of entirely different bonds)."

22.     I will have to return later to Teare J's rejection of the story about Mr Sadykov being the UBO of the BVI Defendants, and to the apparent attempt by Mr Solodchenko and others to provide a retrospective justification for the January 2009 transfers by means of back-dated sale and purchase agreements. As to the point made by Mr Hardman in paragraph 63, I agree with him that even if much of the money did eventually return to the Bank as the purchase price of different bonds, such payment would have been made for fresh consideration and could not possibly have constituted repayment of any part of the value of the AAA Investments.

23.     Mr Ablyazov's evidence in answer to the application consisted of a witness statement by himself dated 2 May 2012, and an expert report dated 3 May 2012 by Professor Peter Maggs, who is Professor of Law at the University of Illinois College of Law and specialises in the law of the former Soviet Republics, including Kazakhstan. Professor Maggs has published widely in these areas, and is an experienced expert witness in cases involving Soviet law and the law of Kazakhstan. It was in this statement that Mr Ablyazov gave the explanation of the email dated 13 June 2008 to which I have already referred: see paragraph 15(10) above. He also commented that the email was "just one item of correspondence" held by the Bank, upon which it sought to rely. He suggested that once full disclosure had been given by the Bank of documents from its own records, "a fuller (and perhaps complete) picture of the AAA Transactions will become apparent at trial". Mr Ablyazov continued to deny his beneficial ownership of Bubris, and also denied his ownership of the Further Recipients. Replying to what Mr Hardman had said about the alleged inherent implausibility of the defences, he said:

"58. Given that I do not own any of the companies involved in the AAA Transactions, did not control or authorise any of the transactions, and knew nothing about the transactions, it is impossible for me to give any explanation for them. All I could do is speculate as to the commercial rationale having now seen

> some of the transactional documents (albeit many of them are only draft documents)."

24. While conceding that he was necessarily speculating, Mr Ablyazov went on to suggest that the transactions might have constituted, or formed part of, a "repo deal", by which he meant "a repurchase transaction under a contract for the sale of a property with its subsequent purchase back at a fixed price". He added that the purpose of the "repo deal" is not the sale of the asset, but a secured loan. He said he was aware that the Bank had entered into treasury transactions of that nature before his appointment as chairman, and expressed his belief that the practice had continued after his appointment because the same treasury personnel had remained in post, including the Head of Treasury, Mr Mukhametzhanov.

25. In another section of his statement (paragraphs 64 to 75), Mr Ablyazov set out a number of reasons why he claimed that he would be unable to receive a fair trial. He referred to the political position in Kazakhstan, and the power wielded by President Nazarbayev, Mr Ablyazov's former political opponent. He said that any statement given by anyone at the Bank was likely to be given under duress, and that pressure had already been exerted on persons who were, or were perceived to be, associated with him. He repeated his belief that the only way for a complete picture of the AAA transactions to emerge would be for the case to proceed to trial, with full disclosure and cross-examination of relevant employees of the Bank.

26. By way of reply to the evidence served on behalf of Mr Ablyazov, the Bank filed a further statement by Mr Hardman (his nineteenth, dated 24 May 2012) and a statement by Mr Mukhametzhanov of the same date.

27. Mr Hardman recorded that no evidence had been filed by the BVI Defendants, and their solicitors (Keystone Law) had confirmed that they had no further evidence to serve in connection with the application. Mr Hardman also pointed out that Mr Ablyazov had not adduced any evidence from Mr Solodchenko to support his defence, despite the fact that they were both represented by the same solicitors. Similarly, no evidence had been adduced from Mr Sadykov (a former senior employee of the Bank) or from Syrym Shalabayev (Mr Ablyazov's brother in law, who administered the BVI Defendants, and was their "nominee ultimate beneficial owner" from October 2008 to April 2009), even though both had given evidence on behalf of Mr Ablyazov at the trial of the committal proceedings.

28. In relation to an issue of causation under Kazakh law raised by Professor Maggs, Mr Hardman said that he had spoken to Jyrkie Talvitie ("Mr Talvitie"), who had been an independent member of the Bank's board of directors at the relevant time, and who was still on the board. When the AAA transactions had been explained to him, Mr Talvitie:

> "… confirmed to me, in his capacity as Board member representing the interests of a major shareholder of the Bank, that he would not have voted to approve the Bank entering into those transactions had they come before the Board of Directors of the Bank because of the extremely high risks involved for the Bank and the lack of any apparent commercial reason for the Bank to do so."

EXHIBIT D

Likewise, Mr Talvitie said he would not have voted in favour of the Bank granting security in 2008 in favour of Alfa Equity so that the BVI Defendants could enter into the short sale agreements, nor would he have voted in January 2009 for the Bank to transfer the AAA Investments for no consideration.  He said "he would have regarded such a transaction as of no value to the Bank and completely uncommercial".

29.     Mr Mukhametzhanov explained in his evidence that he had held the position of Head of Treasury of the Bank since 2002. Between 2005 and May 2008 he reported to Mr Solodchenko. Thereafter, until the nationalisation in February 2009, he reported to Mr Zharimbetov.  He set out his understanding of "repo" transactions, and the limited circumstances in which the Bank made use of them.  He said that the counterparties to such transactions which the Bank entered into before February 2009 were either "recognised international financial institutions", or the transaction was conducted through the Kazakh stock exchange, in which case the ultimate counterparty would not be known to the Bank.  He continued:

> "I cannot recall any REPO transactions where the counter party was known to the Bank and was not a bank or other financial institution. As far as I remember, the Bank did not ever enter into REPO transactions with related parties."

30.     In relation to the initial transfer of the AAA Investments to Alfa Equity, Mr Mukhametzhanov said that as far as he was aware it was a routine operational transfer, probably made because unlike other custodians Alfa Equity agreed not to charge the Bank for holding the securities.  The AAA Investments formed part of the Bank's investment portfolio, as opposed to its trading portfolio, and if the Bank was to hold them for a significant period, the reduction in custody fees was an obvious attraction.

31.     At a hearing for directions on 26 March 2012, Mann J had set a timetable for evidence on the summary judgment application and ordered that it be expedited and listed for hearing with a three day time estimate before 18 July 2012. It appears to have been common ground at that stage that the application was a relatively straightforward one, that the scope of the evidence would not go beyond matters raised by the Bank in its initial evidence in support, and that the Bank's evidence in reply would be evidence in reply, strictly so called. In the light of that understanding, and the directions given by Mann J, a dispute arose as to whether the Bank's evidence in reply, including in particular the statement of Mr Mukhametzhanov, fell within the scope of the order. This concern was raised by Mr Ablyazov, in a second statement of his dated 23 June 2012.  He also took the opportunity to reply to Mr Hardman's nineteenth statement, and expressed some disparaging views about Mr Talvitie's knowledge and experience.

32.     Two further statements were also filed on Mr Ablyazov's behalf: one from Mr Solodchenko, and the other from Lara Melrose, an associate of Addleshaw Goddard. Mr Solodchenko responded to the Bank's evidence in reply, and among other things firmly denied that he had authorised or overseen the AAA transactions.  He did not, however, offer any explanation of his apparent role in them.  The evidence of Ms Melrose was primarily directed to challenges to the receivership order over Mr Ablyazov's assets, and submissions that it would be unjust to allow the Bank to rely

on Teare J's findings about the beneficial ownership of Bubris because only limited disclosure had taken place in the committal proceedings.

33.     On 5 July 2012, Mr Hardman responded to this additional evidence in his twenty-first statement.  He also said it had been "noticed" that not all of the documents relied upon by Teare J in relation to Bubris, nor all of the documents referred to in the re-amended particulars of claim, were in evidence before the court. He sought to remedy these deficiencies by exhibiting key further documents in his exhibits CGH 39 and 40.

34.     On 6 July 2012, the Bank issued an application for permission to rely on additional materials in relation to the summary judgment application, including Mr Hardman's twenty-first statement with its exhibits and a supplementary expert report from Mr Markov.  Meanwhile, on 2 to 4 July the Court of Appeal had heard Mr Ablyazov's appeal from the orders made by Teare J on the committal application and the Unless Order.  The Court of Appeal had reserved judgment, and it was thought unlikely that its decision would be available before the end of term on 31 July.

35.     It was against this background that the summary judgment application came on for hearing before Vos J on 11 July 2012.  On that day and the next, he heard argument on behalf of the Bank from leading counsel (then, as now, Mr Stephen Smith QC leading Ms Emily Gillett).  Mr Ablyazov was represented by Mr Charles Béar QC leading Mr George Hayman. On the third day of the hearing, Friday 13 July 2012, Vos J heard and determined a formal application by Mr Ablyazov to strike out the summary judgment application. Vos J dismissed the application, giving his reasons in an extempore judgment: see JSC BTA Bank v Solodchenko and others [2012] EWHC 1983 (Ch). Mr Ablyazov subsequently applied for permission to appeal from this decision, but his application was dismissed by Mummery LJ on 2 October 2012.

36.     The strike out application having been dismissed, it is hardly surprising that Vos J then decided that the further hearing of the summary judgment application should be adjourned until after the Court of Appeal had delivered its judgment. It would plainly have been undesirable for Vos J to reach a conclusion on the beneficial ownership of Bubris, whether on the basis of issue estoppel or of an independent review of the underlying material, before the views of the Court of Appeal were known. Accordingly, by an order made on 13 July 2012 he adjourned the summary judgment application part-heard to be fixed on the first available date on or after 15 October 2012 for three days.  He directed that the Bank's oral submissions (both in continuation of its opening submissions, and in reply) should be limited to a total of one day, and that Mr Ablyazov's oral submissions should be limited to a total of two days. In relation to evidence, Vos J gave the Bank permission to file any further evidence on which it wished to rely by 1 August 2012, and similar permission to Mr Ablyazov to file further evidence by 12 September 2012, with any evidence in reply (strictly so called) to be filed by the Bank by 26 September.  In relation to the Bank's application of 6 July, Vos J granted permission to the Bank to rely on the documents which had been before Teare J on the Bubris issue, namely those contained in exhibit CGH 39, but adjourned the balance of the application to be dealt with at the further hearing in October.  Permission was also granted to Mr Ablyazov to rely on the evidence already filed on his behalf.

37.     In his judgment dismissing the strike out application, Vos J summarised the three arguments advanced by Mr Béar in support of the application.  First, Mr Béar

submitted that the application was no longer based upon the same evidence as it had
been at the outset, and the Bank had failed to comply with the procedural
requirements of CPR Part 24.  Secondly, he submitted that the case was anyway not
suitable for summary judgment, in view of its huge complexity and the allegations of
fraud made against Mr Ablyazov.  Thirdly, he submitted that the application was
pointless, because on the assumption that the Unless Order was not reversed by the
Court of Appeal, there would be a judgment against Mr Ablyazov for billions of
dollars to which an additional judgment for US$300 million plus interest would be
completely irrelevant.

38.    After setting out the principles by reference to which the court may give summary
judgment under CPR Part 24, and citing from the decision of the Court of Appeal in
Mentmore International Ltd v Abbey Healthcare [2010] EWCA Civ 761 at [20] to
[23], Vos J dealt in turn with the three arguments advanced on behalf of Mr
Ablyazov.

39.    In relation to the first argument, he said this:

> "26. As I have indicated, Mr Béar argues that I should not
> override the rules that I have set out as to the filing of evidence
> so as to allow the Bank effectively to change its case and rely
> on a far wider gamut of documentation than was referred to in
> their original application.
>
> 27. This would normally be a very strong point to make. In this
> case, however, whilst it is true that the Bank has widened the
> scope of the application, it has done so with an understanding
> of what is really in issue before the court.  As Mr Béar said in
> his skeleton argument, citing a point that I made yesterday to
> Mr Smith:
>
>> "But you confine yourself to saying, (1) here are the
>> transactions, (2) it is wholly implausible that they are honest,
>> (3) loss was caused, and (4) it is perfectly obvious from the
>> UBO material that he, Ablyazov, must have been the UBO".
>
> Mr Smith accepted that.  It is therefore now clear, even if it was
> not clear at the outset of this application, that the Bank is
> seeking to establish that on the information that was before
> Teare J it is not necessary to go into the detail of the
> transactions or to have disclosure in relation to the detail of the
> AAA transactions in order to satisfy the court that summary
> judgment is appropriate.
>
> 28. Mr Béar would plainly be correct in saying that it would be
> impossible to decide a summary judgment application if it were
> necessary to go into the details of the AAA transactions.
> Effectively, the Bank is saying that the transactions speak for
> themselves.

EXHIBIT D

29. Nonetheless, the Bank realised in the course of its argument that it needed to put me in the same position as Teare J and the Court of Appeal was in when they heard those applications. That is the reason why additional evidence has been filed (in addition to the question of Kazakh law) and in my judgment it is reasonable to allow the Bank to make sure that its application can sensibly be heard by ensuring that what is before me is as comprehensive as what was before Teare J and what was before the Court of Appeal.  But they cannot go further than that and I do not think they seek to."

Vos J then considered whether the Bank should be allowed the necessary indulgence to serve the material in question later than they should have done. He held that the indulgence should be granted: see paragraphs [31] to [34].

40.   On the second question, namely whether the case was suitable for summary judgment, Vos J also made some important observations which I need to quote:

"37. In effect, Mr Béar says that there would need to be a much higher degree of certitude in this case than in other cases, not only because it is a fraud case but because it is a complex case where cross-examination and disclosure may reveal all sorts of things which we can only imagine at this stage, and he says that this is a short cut that is wholly inappropriate in this kind of case.

38. I do not accept those submissions. I have considered the issues that have been placed before me thus far. Nothing I say should be taken as giving any indication of the way in which I may in due course decide the summary judgment application. I have not yet heard full argument and I have no view, even a provisional view, as to the likely outcome of it.

39. But it does seem to me that the Bank is seeking to raise a relatively simple argument. I say "relatively simple" because it is only relatively simple in the context of an extremely complex case.  One of the problems with this litigation has been throughout that there have been so many decisions and so many appeals in different courts with different personnel that until one understands the history, one is hardly in a position to understand the application with which the court is faced at any particular time.  But I have had the good fortune to hear, I think, six days of argument in this case on a quite separate matter of a committal motion against another defendant [*Mr Ereshchenko*] only a couple of weeks ago.  Whilst that has been the subject of complaint by Mr Béar, who says that Mr Smith and I are ahead of him because he did not attend that hearing, it has enabled me to get a grip on the complex history of this case.

…

EXHIBIT D

42. I now have an extremely clear idea of what would need to be decided in order to grant summary judgment.  I also have an extremely clear idea of the defences that Mr Ablyazov, through Mr Béar, is intending to raise.  I can say, without giving any indication as to my view, that those are in some cases formidable arguments but they are formidable arguments that need to be resolved and can be resolved in a further period of just three days' argument.

…

45. But the reason, just briefly, why I think summary judgment may be appropriate is because … it is possibly arguable on behalf of the Bank that it could be obvious from the transactions that they were not honest. I am fully conscious of Mr Béar's submission that quite the reverse is obvious, but it seems [to] me that until full argument has been heard I cannot take a view one way or the other.

46. If it were obvious that the transactions were dishonest then that would be one point in the Bank's favour. That would negate the need for what could be a massive investigation into the detail of these transactions and the personnel involved in them.

47. Likewise, I have not heard argument on the question of loss. Under Kazakhstan law it is common ground that causation of loss must be shown.  It seems to me that that could be arguably obvious and equally it could be arguably not obvious. But the Bank is simply saying: "We succeed if it is obvious and we do not succeed if it is not obvious".  As it seems to me that, again, is something that remains in play.

48. The further questions that I have to take into account are difficult questions, raised by the defendant, of Kazakhstan law. I have not yet had an opportunity to hear any argument on that and again do not have any view, even a provisional view. But from the little I have read it at least seems to me possible that the Bank will be able to argue that the very interesting disputes between the experts on Kazakhstan law are nothing to the point in this particular case. Again, I am not prejudging it.  Mr Béar may be entirely right that the arguments are substantial and need to be resolved after oral evidence.  But if he were not right and in one day's further argument on Kazakhstan law I could reach a clear view, then that would save days, and possibly weeks of court time …

49. As regards the fourth point – namely whether or not it is obvious that the UBO material shows that Mr Ablyazov must have been the UBO of the five BVI defendants – that, as it seems to me, is a question which has already been determined

EXHIBIT D

against Mr Béar by Teare J on the criminal standard. So there must be some possibility that I will decide it against him again."

41. Finally, Vos J also rejected Mr Béar's third argument, for reasons which I need not rehearse. A point not mentioned by Vos J in this context, but made to me on behalf of the Bank, is that a summary judgment on the merits is likely to be easier to enforce in foreign jurisdictions than a default judgment. For the same reason, I have been asked to produce a fully reasoned judgment on this application, even though it is undefended.

42. I must now bring the procedural position up to date. On 1 August 2012, the Bank filed a further statement by Mr Hardman (his twenty-second), to which Mr Ablyazov replied on 12 September in his third statement.  A point worth noting is the acceptance by Mr Ablyazov in this statement that he did not use email during his time at the Bank, and while there were email addresses available for him to use, this happened "very rarely", and he never sent the email himself. A further statement on behalf of Mr Ablyazov was also filed by Kitaj Woodward, an associate of Addleshaw Goddard, containing material relevant to the Bank's knowledge of the AAA transactions.  Mr Hardman then made a statement in reply (his twenty-third) on 26 September 2012.

43. Because the Court of Appeal had still not handed down its judgment, the hearing arranged for mid-October 2012 had to be vacated.  The Court of Appeal's judgment was handed down on 6 November 2012, but by then there was no realistic prospect of re-listing the summary judgment application in the near future because the Bank's legal team was fully occupied with the 14 week trial of the Drey, Granton and Chrysopa proceedings which began on 7 November 2012.  Teare J handed down his judgment in that trial on 19 March 2013.  Not long afterwards, the promotion of Vos J to the Court of Appeal was announced, with effect from 1 October 2013.  Efforts were made by the Bank to obtain a listing of the adjourned summary judgment application before Vos J during the summer of 2013, but this was not possible because of the unavailability of Mr Ablyazov's counsel.  Accordingly, the application was eventually released by Vos J and a hearing before another judge (in the event, myself) was listed for the week commencing 7 October 2013.  Meanwhile, on 6 September 2013 Mr Hardman filed another statement (his twenty-fourth) dealing with events since the matter had last been before Vos J in July 2012.

**Summary judgment: relevant principles**

44. CPR rule 24.2 provides as follows:

"The court may give summary judgment against a … defendant on the whole of a claim or on a particular issue if –

(a) it considers that –

…

(ii) that defendant has no real prospect of successfully defending the claim or issue; and

EXHIBIT D

(b) there is no other compelling reason why the case or issue should be disposed of at a trial."

By virtue of rule 24.3(2), the court may give summary judgment against a defendant "in any type of proceedings", subject to immaterial exceptions.

45.   The principles that the court should apply in deciding whether a defendant has no real prospect of successfully defending the claim have been considered by the courts in a number of well-known authorities. In respectful agreement with Vos J, I consider that for present purposes it is enough to cite the guidance given by Carnwath LJ (with whom Morgan J and Arden LJ agreed) in the <u>Mentmore</u> case at paragraphs [20] to [23], as follows:

"20. It is important to keep in mind the principles to be applied in deciding whether a case is suitable for disposal on a summary basis. The most authoritative up-to-date statement is that of Lord Hope in *Three Rivers DC v Bank of England (No. 3)* [2001] 2 All ER 513:

"In other cases it may be possible to say with confidence before trial that the factual basis for the claim is fanciful because it is entirely without substance. It may be clear beyond question that the statement of facts is contradicted by all the documents or other material on which it is based. The simpler the case the easier it is likely to be to take that view and resort to what is properly called summary judgment. But more complex cases are unlikely to be capable of being resolved in that way without conducting a mini-trial on the documents, without discovery and without oral evidence. As Lord Woolf said in *Swain v Hillman* [2001] 1 All ER 91, at p. 95 that is not the object of the rule. It is designed to deal with cases that are not fit for trial at all."

21. Another frequently cited passage on the same theme is the judgment of Colman J in *De Molestina v Ponton* [2002] 1 Lloyd's Rep 271, 280 para 3.5, speaking of the difficulty of basing summary judgment on inferences of fact in a complex case:

"…, as *Three Rivers District Council* shows, where the application in such complex cases relies on inferences of fact, the overriding objective may well require the claim to go to trial in the interest of a fair trial. That is because the relevant inference could not be safely drawn without further discovery and oral evidence at the trial. It is thus necessary, where such inferences are relevant, to guard against the temptation of drawing them as a matter of probability, because the achievement of the overriding objective requires a much higher degree of certitude. Where in a complex case, as may often be the situation, the frontier between what is

EXHIBIT D

> merely improbable and what is clearly fanciful is blurred, the
> case or issue should be left to trial."

> 22. To these familiar citations, Mr Reza adds the words of
> Potter LJ in *ED&F Man Liquid Products v Patel* [2003] EWCA
> Civ 472 para 10:

>> "However, that does not mean that the court has to accept
>> without analysis everything said by a party in his statements
>> before the court.  In some cases it may be clear that there is
>> no real substance in factual assertions made, particularly if
>> contradicted by contemporary documents.  If so, issues
>> which are dependent upon those factual assertions may be
>> susceptible of disposal at an early stage so as to save the cost
>> and delay of trying an issue the outcome of which is
>> inevitable …"

> 23. If Mr Reza was hoping to find in those words some
> qualification of Lord Hope's approach, he will be disappointed.
> The *Three Rivers* case was specifically cited by Potter LJ. He
> was in my view intending no more than a summary of the same
> principles.  Lord Hope had spoken of a statement contradicted
> by "*all* the documents or other material on which it is based"
> (emphasis added).  It was only in such a clear case that he was
> envisaging the possibility of rejecting factual assertions in the
> witness statements. It is in my view important not to equate
> what may be very powerful cross-examination ammunition,
> with the kind of "knock-out blow" which Lord Hope seems to
> have had in mind."

46.     It does not follow from these salutary principles, however, that summary judgment
can never be appropriate in a complex case where fraud is alleged.  As an example of
such a case, counsel for the Bank referred me to the decision of Hart J in R B G
Resources Plc (in liquidation) v Rastogi and others [2004] EWHC 1089 (Ch).  In that
case, summary judgment was granted, after a four day contested hearing, for a sum in
excess of US$300 million against individuals who, on the claimant's case, had
orchestrated a fraudulent scheme involving hundreds of allegedly bogus metal trading
transactions with companies which they secretly controlled.  Although the fraud was,
as Hart J said, "both massive and complex", he acknowledged that its proof turned on
the establishment of one central proposition, namely the connection between the
supposedly independent counterparties and the defendants: see paragraph [13].  As
Hart J recorded in paragraph [11], the alleged fraud involved over 250 companies and
the claimant relied on "nine voluminous witness statements and thousands of
exhibited documents".  The defendants had therefore submitted that the application
for summary judgment necessarily involved conducting a "mini trial" on the
documents, and doing so in circumstances which were manifestly unfair to the
defendants, given that there had been no disclosure by the claimant, the defendants
themselves had no access to documentation, and they were unable to test the evidence
deployed against them. Hart J nevertheless held, in paragraph [14], that:

EXHIBIT D

> "… the ability of the defendants to show a realistic prospect of
> success on the "control" issue should be determinative of this
> application so far as liability is concerned.   The litigation
> disadvantages on which they rely (absence of disclosure or
> independent sources of documentation and so forth) have to be
> seen in that context."

## The beneficial ownership of the BVI defendants

47.    In considering whether Mr Ablyazov has a realistic prospect of successfully
defending the Bank's claim, it is convenient to begin with the question of the
beneficial ownership of the BVI Defendants.  Mr Smith accepts on behalf of the Bank
that there are three propositions of fact which the Bank needs to establish to the
summary judgment standard, of which the first is that Mr Ablyazov was the ultimate
beneficial owner and controller of the BVI Defendants. The second proposition is that
the BVI Defendants received the AAA Investments without providing any
consideration for them and without ever having any intention that any, or any
meaningful, consideration would be provided for them.  The third proposition is that
the transfer of the AAA Investments caused loss to the Bank.

48.    In relation to the first proposition, the starting point is that Mr Ablyazov's beneficial
ownership of Bubris, one of the five BVI Defendants, has already been established by
Teare J in the committal proceedings to the criminal standard of proof, and Mr
Ablyazov's appeal against that conclusion has been dismissed by the Court of Appeal.
In my judgment it is clear that these findings give rise to an issue estoppel, which
would preclude Mr Ablyazov from contending the contrary in the AAA proceedings
unless he could bring himself within the narrow exception recognised by the House of
Lords in Arnold v NatWest Bank Plc [1991] 2 AC 93. In order to create an issue
estoppel, three requirements have to be satisfied.  They were stated as follows by Lord
Brandon of Oakbrook in The Sennar (No. 2) [1985] 1 WLR 490 at 499B:

> "The first requirement is that the judgment in the earlier action
> relied on as creating an estoppel must be (a) of a court of
> competent jurisdiction, (b) final and conclusive and (c) on the
> merits. The second requirement is that the parties (or privies) in
> the earlier action relied on as creating an estoppel, and those in
> the later action in which that estoppel is raised as a bar, must be
> the same.  The third requirement is that the issue in the later
> action, in which the estoppel is raised as a bar, must be the
> same issue as that decided by the judgment in the earlier
> action."

49.    It is plain, in my view, that each of those requirements is satisfied. The judgment of
Teare J was a judgment of the English High Court; it was final and conclusive as
between the Bank and Mr Ablyazov, subject only to the possibility of a successful
appeal; and it was a judgment "on the merits" in the sense explained in The Sennar
(No. 2) by Lord Diplock at 494A-C and by Lord Brandon at 499F-G. The relevant
parties in each action are the same, namely the Bank and Mr Ablyazov. The issue is
also the same, namely whether Mr Ablyazov was at the material times the beneficial
owner of Bubris.

EXHIBIT D

50.   The exception recognised by the House of Lords in <u>Arnold</u> was formulated by Lord
      Keith of Kinkel (with whose speech the other members of the House agreed) in the
      following terms, at 109A:

> "In my opinion your Lordships should affirm it to be the law
> that there may be an exception to issue estoppel in the special
> circumstance that there has become available to a party further
> material relevant to the correct determination of a point
> involved in the earlier proceedings, whether or not that point
> was specifically raised and decided, being material which could
> not by reasonable diligence have been adduced in those
> proceedings.  One of the purposes of estoppel being to work
> justice between the parties, it is open to courts to recognise that
> in special circumstances inflexible application of it may have
> the opposite result …"

51.   In the evidence adduced by him on the summary judgment application, Mr Ablyazov
      has in my judgment been unable to point to any further material which might cast
      doubt on the correctness of the conclusion reached by Teare J and affirmed by the
      Court of Appeal.  The highest he could put the point would be to say that, if the case
      went to a full trial, further material might become available which in turn might
      arguably be sufficient to trigger the exception.  In my view, however, this possibility
      is so remote that it can safely be dismissed as fanciful.  In the first place, a large
      amount of documentary and oral evidence was considered by Teare J, including the
      oral evidence of Mr Ablyazov himself, in reaching his conclusion.  Secondly, the
      question whether sufficient material was available to enable the court to adjudicate
      with safety on the issue was expressly considered, both when the Bubris issue was
      selected as one of the three sample counts of alleged contempt and when Teare J
      considered the evidence at the trial.  In each case, he concluded that the matter could
      be determined without any risk of injustice to Mr Ablyazov.  Furthermore, although
      there had been no general order for disclosure in the AAA proceedings, the Bank was
      ordered in the committal proceedings against Mr Ablyazov to give disclosure of any
      material relevant to the Bubris issue which might assist Mr Ablyazov's case.  Thirdly,
      given the nature of the issue, it seems to me inherently most improbable that the Bank
      would be in possession of any further documents which might cast doubt on Mr
      Ablyazov's beneficial ownership of Bubris.  Conversely, his contention that Mr
      Sadykov was the beneficial owner was examined in meticulous detail by Teare J and
      dismissed as a fabrication.

52.   I am accordingly satisfied that I can safely proceed on the assumption that, if the case
      were to go to trial, Mr Ablyazov would be estopped from denying his beneficial
      ownership of Bubris.  In those circumstances, it is strictly unnecessary for me to
      consider the detailed reasoning which led Teare J to his conclusion, or the reasoning
      of the Court of Appeal in dismissing Mr Ablyazov's appeal on the issue.  Still less is
      it necessary for me to undertake the same exercise for a third time myself.
      Nevertheless, I will say that I was taken through the relevant parts of both judgments
      by Mr Smith, and shown most of the underlying material upon which they were
      based. Having done this, I can only say that, were it necessary to do so, I would have
      no hesitation in reaching the same conclusion myself.

EXHIBIT D

53.     It may also be helpful if, without descending into the question in detail, I give some
        indication of the reasoning which led Teare J and the Court of Appeal to their
        respective conclusions.  Teare J dealt with the Bubris allegation in paragraphs 84 and
        following of his judgment.  After discussing the evidence relating to the successive
        nominal or ostensible UBOs of Bubris, he expressed his main conclusions as follows
        (under the heading "Who was the true beneficial owner of Bubris?"):

> "119. I accept that there is no direct evidence that Mr.
> Ablyazov was the true ultimate beneficiary of the shares in
> Bubris. In the circumstances of this case that is not a matter of
> surprise.  His ownership of assets is expressly structured to
> ensure that no paper trail leads to him.  Nevertheless, the Bank
> has the burden of making the court sure that the only
> reasonable inference to be drawn from the matters to which I
> have referred is that Mr. Ablyazov is the true beneficiary of
> those shares.
>
> 120. Mr. Sadykov has said in a written statement dated 25
> November 2011 that he was the owner of Bubris.  But he also
> said that he informed Mr. Kythreotis by post in May 2010 that
> he had been the owner or beneficiary of Bubris since April
> 2008.  The suggestion that he wrote such a letter in May 2010
> was untrue for the reasons I have already given …
>
> 121. Whether or not Mr. Sadykov is a man of such wealth as
> would enable him, through the vehicle of a creature company,
> to enter into obligations to the Bank worth $300m., the fact that
> Mr. Batyrgarejev [*an admitted close business associate and
> nominee of Mr Ablyazov's*] was appointed the UBO in April
> 2009 and remained so until February 2010 sits most unhappily
> alongside the notion that Mr. Sadykov is and always was the
> true beneficial owner. For, as I have already said, Mr.
> Batyrgarejev's appointment as UBO is a powerful indication
> that Mr. Ablyazov was the true beneficial owner.  Further, the
> circumstances in which Mr. Batyrgarejev was removed as UBO
> in February 2010 and the fact that the letter dated 7 May 2010
> from Mr. Sadykov was backdated are indicative of steps being
> taken by those administering Bubris to keep Mr. Ablyazov's
> interest in Bubris secret from the Bank. Finally, there is no
> credible reason why Mr. Sadykov, if he were the true owner of
> Bubris and had remained hidden since 2008, should choose
> September 2010 to take centre stage after Bubris had been
> made a defendant to the AAA proceedings.
>
> 122. For these reasons I am persuaded so that I am sure that
> Mr. Ablyazov is and has been at all material times the true
> beneficiary of the shares in Bubris.  The shares were held on
> his behalf, successively, by Mr. Udovenko, Syrym Shalabayev,
> Mr. Batyrgarejev, Mr. Kovalenko and finally Mr. Sadykov.  In
> reaching this conclusion I have considered all of Mr Matthews'
> submissions at pp.112-145 of his Closing Submissions but they

EXHIBIT D

do not cause me to doubt the conclusion I have reached.  Nor do I consider that Mr. Ablyazov's denial of ownership may be true.  I am sure that it is not.  I have noted the submission that in circumstances where the ownership of Bubris is an issue in the AAA action I ought not to decide the matter now when I have not heard all the evidence which will be adduced at trial and that in such circumstances I cannot be sure that Bubris is owned by Mr. Ablyazov.  When giving directions for the trial of the contempt allegation this point was considered and rejected.  There was an appeal from my decision and the appeal was dismissed; see [2011] EWCA Civ 1386. In any event I remain of the view that it is unlikely that there will be any more material evidence on this issue beyond that which has been provided on this occasion."

54.     In the Court of Appeal, Rix LJ dealt with the Bubris allegation in paragraphs 65 to 75 of his judgment.  He began by saying that there were 54 paragraphs of skeleton argument devoted to Bubris, and then summarised the complaints that were made on Mr Ablyazov's behalf.  He continued:

"66. These submissions track the whole of the evidence and arguments deployed at trial. It is an attempt simply to reargue the trial. The judge was meticulous in dealing with every aspect of that evidence and argument in his judgment.  I have considered these submissions, with the aid of the bank's skeleton and the judge's judgment, with care, but I cannot find in the submissions made on appeal any reason for doubting the judge's own careful evaluations and conclusions, which I find compelling.  It is probably superfluous, and, given this court's far lesser exposure to the materials and evidence and argument than the judge enjoyed, even problematical, to attempt to put into my own words, succinctly, the reasons why I find the bank's case on the Bubris allegation fully proved, to the criminal standard.  That is not even of course the test on appeal. There is simply no error shown in the judge's findings or reasoning. His conclusion is entirely safe."

55.     Despite that disclaimer, however, Rix LJ went on to consider the relevant arguments in considerable detail, before concluding as follows:

"74. There is thus compelling circumstantial evidence that Mr Ablyazov was the true owner of Bubris. There is no documentary evidence to the contrary (the declaration of Mr Sadykov as the UBO stands by itself in no different category from the four previous UBO declarations). The judge was entitled and right to discount the evidence of Mr Ablyazov and his other witnesses, and indeed to find that such evidence was incredible and to be lies.

75. For these reasons, which essentially track those of the judge, I would dismiss this appeal in relation to the first finding of contempt."

56.     On the assumption that Mr Ablyazov was indeed the ultimate beneficial owner of Bubris, the inference that he was also the UBO of the other four BVI Defendants is in my judgment irresistible. As I have already said, it is their own pleaded case that they have always been in the same beneficial ownership, and there is no evidence that they have ever acted independently of one another (with the single exception of the apparent retention by Bubris of approximately US$42.5 million of its share of the proceeds of the short sales: see paragraph 15(7) above).  More generally, the known facts about the impugned transactions clearly show that the BVI Defendants were throughout acting together in pursuit of a common plan.

57.     For these reasons, I am satisfied that Mr Ablyazov was the ultimate beneficial owner of all five BVI Defendants, and that there is no reasonable prospect of the court reaching a contrary conclusion if the case were to go to trial.  I emphasise that I am not merely deciding this question on a balance of probabilities, which (as the authorities show) would be insufficient at this stage. I consider the chances of a different conclusion being reached at trial to be truly insignificant.

**Possible justifications for the transactions**

58.     Pausing at this point, it is now established that in June 2008 the BVI Defendants, beneficially owned by Mr Ablyazov, entered into short sales of securities equivalent to the AAA Investments, and received the full amount of the consideration for the sales. In January 2009, the AAA Investments themselves were transferred by the Bank, under the signature of Mr Solodchenko, to the BVI Defendants for no recorded consideration, thereby enabling the BVI Defendants to honour their delivery obligations to Alfa Equity.  On the face of it, therefore, beneficial ownership of the AAA Investments passed from the Bank to the BVI Defendants, and then from the BVI Defendants to Alfa Equity, without the Bank receiving anything in return. How could such a series of transactions possibly be justified as having been in the commercial interests of the Bank?  In considering this question, it is instructive to examine the attempts which appear to have been made to provide a paper trail which might provide at least a superficial justification for the transactions.

59.     The first possible attempt of which there is some evidence concerns the email of 13 June 2008 and the documents sent with it for signature by Mr Solodchenko. It will be remembered that this email said that the "transaction with Alfa Bank" was under the control of Mr Ablyazov. The attached documents were five draft sale and purchase agreements, each entered into between the Bank as seller and one of the BVI Defendants as purchaser.  Two of the draft agreements were dated 9 June 2008; the other three were undated. Each had apparently been signed on behalf of the relevant BVI Defendant, but remained to be signed on behalf of the Bank. In addition, neither the identity of the securities to be sold, nor the purchase price, had yet been filled in. Each draft agreement provided for the purchase price to be paid ten business days after the date of delivery of the securities, which was itself three business days after the date of the agreement.  There was no provision for any form of security for either the payment or the delivery obligations.  The agreements were said to be governed by

English law, and provision was made for their execution in both English and Russian language versions, with the English version to prevail in the event of any conflict.

60.    There is no evidence that these draft agreements were ever executed, and (assuming they were intended to apply to the AAA Investments) it is hard to see how they could have been, given that most of the proceeds of the short sales were immediately paid on by the BVI Defendants to the Further Recipients.  There is no explicit connection between the draft agreements and the AAA Investments.  Nevertheless, given the terms of the covering email, and the absence of evidence of any other transactions between the Bank and the BVI Defendants at this date, there is a strong inference that the agreements were in some way intended to provide an ostensible justification for the AAA Investments ending up in the hands of the BVI Defendants.  Even if that is wrong – and I accept that the truth on this point could only be conclusively established at trial – the episode is still of significance, because on any view it establishes, as counsel for the Bank put it in their skeleton argument, "a further clear contemporaneous connection between the Bank's assets and the "short" sale entered into by the BVI Defendants".

61.    The AAA Investments were transferred by the Bank to the BVI Defendants on or around 22 January 2009.  It is unlikely to be a coincidence that 22 January 2009 was also the date when the financial regulatory authority of the Kazakh government (the Financial Market and Financial Organisations Control and Supervision Agency, the "AFN") sent its final report to the Bank following inspections which it had carried out between October and December 2008. In the Trial Judgment, Teare J described the content of this report in the following terms:

>    "41. On 22 January 2009 the AFN sent the Bank its final report following its inspections between 22 October and 12 December 2008, the purpose of which had been (a) to check on whether the Bank had implemented any plan to eliminate the violations found in the previous inspection and (b) to classify the Bank's loan portfolio.  The AFN concluded that the required steps to improve the Bank's business had not been taken.  The AFN noted the continuing practice of lending to companies in the BVI and the Seychelles and that notwithstanding the AFN's advice about a conflict of interest the Bank had, on 30 April 2008, arranged for Mr Ablyazov to chair the regional credit committees for Russia and the CIS.  Following its review of the loan portfolio (in which the AFN classified 19.46% of the portfolio as non-performing whereas the Bank had classified only 1.82% as non-performing) the AFN required additional provisions of … about US$3.58 billion based upon the financial position as at 1 October 2008."

62.    By this stage, if not before, the senior management of the Bank must have realised that the writing was on the wall, and that there was no prospect of the Bank finding the additional funding required by the AFN.  Less than two weeks later, on 2 February 2009, the Bank was nationalised, Mr Ablyazov was dismissed as chairman of the Bank's board of directors, and he fled from Kazakhstan to London. Around the same time, Mr Solodchenko's employment by the Bank also came to an end.  According to his own amended defence, he was dismissed as a member of the Bank's board of

EXHIBIT D

directors on 3 February 2009; on 17 February 2009, he was dismissed as chairman of the Bank's management board, and appointed as deputy chairman of it; he then left Kazakhstan in early March 2009, travelling to Moscow and then to London; and on 6 March 2009, he resigned from his employment with the Bank and his position as deputy chairman of the management board.  On any view, therefore, his relationship with the Bank had terminated by 6 March 2009 at the latest.

63.     Two days later, on 8 March 2009, Syrym Shalabayev (Mr Ablyazov's brother-in-law), from an email address at Eastbridge Capital Limited, sent to Mr Kythreotis a set of five new sale and purchase agreements apparently entered into between the Bank as seller and the BVI Defendants as purchasers.  The agreements were dated 5 January 2009, and unsigned.  In his email, Mr Shalabayev asked Mr Kythreotis for confirmation "that these documents can be signed".  Each agreement:

(a)     identified the relevant AAA Investments to be purchased by the relevant BVI Defendant;

(b)     required the Bank to ensure "no later than the 22nd of January, 2009" that the relevant securities were re-registered from the name of the Bank in the name of the purchaser;

(c)     provided for the specified purchase price to be paid no later than 5 January 2010 (that is to say, one year later than the ostensible date of the document);

(d)     provided for interest to accrue in the meantime at the rate of 15% per annum; and

(e)     required security to be provided under a Pledge Agreement over 100% of the shares in a company called TOO Orken Kapital KZ ("Orken Kapital").

Mr Ablyazov has admitted that he is the owner of Orken Kapital, and of Gemestra Limited ("Gemestra"), a BVI company which entered into the Pledge Agreement in order to pledge the shares in Orken Kapital.  Despite this admission, however, Mr Ablyazov claimed to know nothing about the transaction: see paragraphs 13 and 61 of his first statement.

64.     There are no signed versions of these sale and purchase agreements in evidence, but they all envisaged signature by the chairman of the Bank's management board, that is to say Mr Solodchenko.  Furthermore, there is a signed version of the Pledge Agreement which is apparently dated 22 January 2009 and signed by Mr Solodchenko on behalf of the Bank as well as by a director of a company called Primi Limited on behalf of Gemestra. The purported date of signature of the Pledge Agreement must be false, because it had been sent as an unsigned draft by Mr Ereshchenko to Mr Kythreotis on 9 March 2009.  It appears that it was then signed on behalf of Gemestra and forwarded by Mr Kythreotis to Eastbridge Moscow where it was signed by Mr Solodchenko, presumably en route to London.

65.     Even if the precise details of execution of the Pledge Agreement remain unclear, it cannot seriously be doubted, in my judgment, that it was deliberately backdated to 22 January 2009 and signed by Mr Solodchenko at a time when he no longer had any authority to act on behalf of the Bank.  It is equally clear that the sale and purchase

agreements themselves were not prepared until early March 2009, that they too were deliberately backdated, and that they were still in draft (even if they were subsequently executed) after Mr Solodchenko's resignation from the Bank.

66.   These transactions are in my view highly significant, for the following reasons. First, it was clearly perceived as necessary to provide a justification for the transfer of the AAA Investments to the BVI Defendants.  This in itself implies that, in the absence of a proper justification, the transfer would have been exposed as improper.  Secondly, the purported justification was provided after the event, by means of back-dated documents, after the dismissal and flight of Mr Ablyazov, and after the termination of Mr Solodchenko's employment by the Bank.  The need to employ such disreputable tactics speaks volumes about the true nature of the underlying transaction.  Thirdly, by the date when the Pledge Agreement was in fact executed it must have been obvious to all concerned that the security given was all but worthless. As Mr Hardman explains in his twenty-second statement, the value, if any, in the Orken Kapital shares lay in the fact that it owned a stake in the Bank.  When the Bank was nationalised on 2 February 2009, that stake was approximately 7%.   On the nationalisation, however, the Bank's capital was diluted in return for payment of the local equivalent of US$1.7 billion, thereby reducing Orken Kapital's stake to less than 1%.  Further recapitalisations of over US$10 billion have subsequently taken place, and Mr Ablyazov has accepted that his shares in the Bank are worthless. Even if the full extent of the Bank's financial plight may not have been apparent in early March 2009, the very poor quality of the Bank's loan book had already been exposed by the AFN, and it is inconceivable that the Bank's new management would have accepted shares in the Bank as security for the obligations ostensibly undertaken by the BVI Defendants under the sale and purchase agreements being circulated in draft in March 2009.

67.   In summary, I consider that not only was the attempt to provide a retrospective justification for the transactions relating to the AAA Investments demonstrably false and worthless, but the perceived need to embark on such an exercise, after the nationalisation of the Bank and the dismissal and flight of Mr Ablyazov, itself provides strong evidence of the fraud alleged by the Bank.

68.   Nor is it credible, in my judgment, to suppose that the transactions relating to the AAA Investments could have taken place without the authority, knowledge and involvement of Mr Ablyazov.  Quite apart from his beneficial ownership of the BVI Defendants, and all the circumstantial evidence linking him to the alleged fraud, there are two pieces of evidence which directly implicate him in the transactions.  The first is the email of 13 June 2008. The second is the Pledge Agreement, which purported to grant security over shares in a company which Mr Ablyazov accepts he owns.  The overall picture thus built up is in my judgment a compelling one, and the explanation for the June 2008 email proffered by Mr Ablyazov in his first statement seems to me frankly incredible.  His later suggestion that the transactions formed part of a repo deal is, if anything, even more implausible.  He has not begun to explain how the available evidence could be reconciled with a proper repo transaction, and he is in no position to contradict the evidence of the Bank's former Head of Treasury, Mr Mukhametzhanov, about the limited circumstances in which the Bank made use of such transactions: see paragraph 29 above.

EXHIBIT D

69.   To revert to the second and third of the key propositions of fact which counsel submit
lie at the heart of the Bank's claims in the present proceedings, I am satisfied in the
light of all the available evidence, to the standard of proof necessary for a summary
judgment application, that:

(a)   the BVI Defendants received the AAA Investments without providing any
consideration for them, and without ever having any intention that any, or any
meaningful, consideration would be provided for them; and

(b)   the transfer of the AAA Investments caused loss to the Bank corresponding to
their market value at the date of transfer.

**The Kazakh law issues**

70.   It has always been common ground that the Bank's claims against Mr Ablyazov must
be made good as a matter of Kazakh law, and in particular that they are not governed
by English law.  Apart from the Kazakh law claims, there is also pleaded against Mr
Ablyazov a claim for damages for conspiracy under BVI law, but that claim is not
pursued in the present application.

71.   The provisions of Kazakh law relied on by the Bank are contained in the Law No.
414-II of the Republic of Kazakhstan on Joint Stock Companies ("the JSC Law").
The Bank claims damages on the basis that Mr Ablyazov breached obligations
imposed on him by Articles 62, 67 and 71 to 73 of the JSC Law, giving rise to claims
in damages under Articles 63 and 74(2). The meaning and effect of many of the
relevant provisions were considered by Teare J in the Trial Judgment, after he had
heard expert evidence from Professor Maggs on behalf of the defendants and from Mr
Vataev, a partner in Dechert LLP in Kazakhstan, on behalf of the Bank.  Teare J
found Mr Vataev to be "an impressive witness": see paragraph 68 of the Trial
Judgment.  His assessment of Professor Maggs' evidence, in paragraph 69, included
the following:

"He gave evidence in a clear, authoritative and fair manner.  It
was a striking feature of his evidence that whatever question he
was asked he had, without hesitation, a clear answer to it. I
concluded that he had an exceptionally clear grasp and
understanding of the relevant codes. If he had a weakness it
was that he tended to give insufficient weight to Articles 2 and
6 of the Civil Code which, as the experts agreed, enabled the
Kazakhstani court to adopt a purposive construction in cases of
ambiguity or lack of clarity.  It may be that his lack of practical
experience in the Kazakhstani courts contributed to this
weakness and to his over-reliance on the apparent rigidity of
the codes."

72.   The Bank wishes to rely on the conclusions reached by Teare J in relation to a number
of matters of Kazakh law, and to that end it served a notice under CPR Rule 33.7 on
25 June 2013 giving notice that, in accordance with section 4(2) of the Civil Evidence
Act 1972, it intended at the present hearing to adduce certain specified findings made
or decisions given by Teare J in the Trial Judgment.  The effect of section 4(2) of the
1972 Act is that where any question of foreign law has been determined in specified

EXHIBIT D

proceedings (including proceedings at first instance in the High Court), then in any civil proceedings:

> "(a) any finding made or decision given on that question in the first-mentioned proceedings shall, if reported or recorded in citable form, be admissible in evidence for the purpose of proving the law of that country … with respect to that matter; and
>
> (b) if that finding or decision, as so reported or recorded, is adduced for that purpose, the law of that country … with respect to that matter shall be taken to be in accordance with that finding or decision unless the contrary is proved."

There can be no doubt that the Trial Judgment recorded the relevant findings or decisions of Teare J in citable form within the meaning of subsection (5), so by virtue of subsection (2) his findings or decisions on Kazakh law are admissible in the present proceedings for the purpose of proving that law, and are conclusive unless the contrary is proved.

73.   The Bank's claims are advanced under two main heads.  Under the first head, it is alleged that Mr Ablyazov failed to disclose a related-party transaction in breach of Articles 67, 71 to 73 and 74(2) of the JSC Law.  These provisions need to be read with the definition of "affiliates" in Article 1(3), and the list of affiliates set out in Article 64.  Article 1(3) defines "affiliates" to mean "physical or legal persons … that have the opportunity to directly and/or indirectly determine decisions, and/or influence decisions made by each other (one of the persons), including influence derived from concluded transactions". Article 64(1) provides that:

> "The following shall be an affiliate of a company:
>
> (1) a major shareholder;
>
> (2) …
>
> (3) an official of a company … except for an independent director;
>
> (4) a legal entity which is controlled by an individual who is a major shareholder or an official of the company;
>
> …"

And by virtue of Article 64(2):

> "Control of a company or another legal entity shall include the opportunity to determine decisions adopted by such company or such another legal entity, respectively."

74.   The relevant provisions of Articles 67 and 71 to 74 read as follows:

EXHIBIT D

"67. **Disclosure of information regarding affiliates of a company**

…

3. Individuals and legal entities being affiliates of a company shall be obliged to submit to the company information regarding their affiliates within seven days from the date of the occurrence of such affiliation.

4. A company shall be obliged to submit a list of its affiliates to the authorized agency according to the procedure established by the authorized agency.

…

71. **Interest in a company's effectuation of a transaction**

1. A company's affiliates shall be recognised as persons who are interested in a company carrying out a transaction (hereinafter "interested parties"), provided that they are:

(1) a party to such transaction or participate in such transaction as representatives or intermediaries; or

(2) affiliates of a legal entity which is a party to such transaction or participates in such transaction as a representative or an intermediary.

…

72. **Information regarding interest in a company's effectuation of a transaction**

1. Persons referred to in Clause 1 of Article 71 shall be obliged to provide the board of directors with the following information:

(1) that they are a party to the relevant transaction or participate in such transaction as a representative or intermediary;

(2) regarding legal entities with which they are affiliated, including legal entities in which they individually or jointly with their affiliates own ten per cent or more of the voting shares …; and

(3) regarding ongoing or proposed transactions of which they are aware and in which they may be recognised as an interested party.

EXHIBIT D

73. **Procedural requirement for the execution of a transaction in which there is an interest**

1. A decision regarding the execution of a transaction in which there is an interest shall be adopted by a simple majority of votes of the members of the board of directors who are not interested in such transaction.

…

74. **Consequences of execution by a company of transactions in respect of which special terms and conditions are established**

1. Failure to comply with this Law's requirements when effectuating a major transaction or a transaction in which there is an interest shall result in the invalidation of such transaction by a court based upon a suit from an interested party.

2. A person that is interested in the company's execution of a transaction which is concluded in violation of the procedural requirements for its conclusion shall be liable to the company in the amount of losses caused by such person to the company. If the relevant transaction is effectuated by several persons, then they shall have joint responsibility to the company.

…"

75. It is undisputed that Mr Ablyazov was at all material times an affiliate of the Bank, both because he was an officer of the Bank and because he was its majority shareholder. He was also an affiliate of the BVI Defendants, by virtue of his ultimate beneficial ownership which gave him the opportunity to directly and/or indirectly determine or influence decisions made by them: see Articles 1(3) and 64(2) of the JSC Law, and paragraphs 16 to 21 of Mr Markov's first report. I am satisfied that the assertion in Mr Ablyazov's defence to the effect that "only legally recognised and enforceable relationships" are recognised as capable of giving rise to "control" over a legal entity within the meaning of Article 64.1(4) is untenable, for the reasons given by Mr Markov, and I note that in the Trial Judgment Teare J relied on Article 1(3) in order to find that Mr Ablyazov was an affiliate of Chrysopa Holding BV, even though there was no formal documentary proof of Mr Ablyazov's ability to control that company: see paragraphs [337] to [338].  In reaching that conclusion, Teare J must have accepted that an informal relationship may suffice to establish control, and the de facto ability to determine or influence the other entity's conduct is what matters.

76. Further strong support for this conclusion is contained in a legal opinion of Professor M K Suleimenov dated 24 May 2012 which is annexed to Mr Markov's supplemental expert report. Professor Suleimenov is recognised by Professor Maggs as being "Kazakhstan's leading expert in Civil Law" (paragraph 36 of his first report in the

EXHIBIT D

present proceedings). The views of Professor Suleimenov entirely support those of Mr Markov, and include the following:

> "7. In my opinion, the *de facto* ability to determine decisions made by the BVI Companies through a nominee beneficial holding is sufficient to give rise to an affiliation, even in the absence of any documentary proof. Documentary proof of affiliation is possible where there is direct control and open ownership of a controlling stake. However, indirect forms of control may be proved either by documentation, or, depending on the nature of the relationship, may be proved otherwise."

77.   On a purposive interpretation, this view appears to me clearly correct, and I do not think Mr Ablyazov would have any reasonable prospect of establishing the contrary if the case went to trial.  Once Mr Ablyazov's affiliation with the BVI Defendants is established, the remaining steps in the argument are relatively straightforward.  It was then Mr Ablyazov's duty under Article 67(3) to inform the Bank of the existence of the affiliation within seven days of its arising.  It was also his duty, under Articles 71 and 72, to inform the Bank's board of directors of his affiliation with the BVI Defendants, and the transactions taking place between the Bank and the BVI Defendants (including the transfers of 22 January 2009). This does not appear to be disputed by Professor Maggs, who said in paragraph 17 of his first report:

> "I agree with Mr Markov, that if an official of the Bank was affiliated to an outside company, such official had an obligation to inform the Bank of this affiliation, and would be considered an interested person with respect to any transaction between the Bank and such company.  Also as pointed out by Mr Markov, this interest would trigger special approval procedures of the Law on Joint-Stock Companies."

78.   Mr Ablyazov failed to comply with these obligations, with the result that he is liable under Article 74(2) for the amount of losses thereby caused to the Bank. Mr Markov confirms (paragraph 29 of his first report) that an invalidation claim under Article 74(1) and a damages claim under Article 74(2) are independent remedies, and the company may choose whether to pursue one or the other, or both in parallel.  The existence of loss to the Bank is clearly established.  The necessary causal link must be shown as a question of fact. There is considerable discussion of this requirement in the expert evidence, but I see no reason to doubt that it would be easily satisfied, whatever the precise nature of the requirement may be.  If proper disclosure had been made to the board by Mr Ablyazov, the decision whether to transfer the AAA Investments to the BVI Defendants for no consideration would have been taken by a simple majority of the votes of the members of the board who were not interested in the transaction: see Article 73(1). No director acting properly in the best interests of the Bank could possibly have sanctioned such a transaction, and Mr Talvitie has made it clear that he would not have done so.  As Mr Markov puts it, in paragraph 20 of his supplemental report:

> "If Mr Ablyazov was the ultimate beneficial owner of the BVI Defendants and failed to disclose this fact to the Bank, then the transfer away of assets with a value of approximately US$300

> million for nothing in return would seem to be a clear example of Mr Ablyazov's omission resulting in money being taken out of one pocket (the Bank's) and put in another's (the BVI Defendant's) to the Bank's detriment."

79. A possible, if unattractive, counter-argument which I need to consider is that, even if full disclosure had been made, a majority of the board of directors of the Bank (apart from Mr Ablyazov) would still have voted in favour of the transactions, because they were either too corrupt, too supine or too frightened to thwart his wishes. Without a clear consensus of expert evidence, I would be reluctant to decide that circumstances of this nature would have broken the chain of causation. That apart, however, there is in my judgment an answer to the point. The one truly independent member of the board was Mr Talvitie, who represented the interests of East Capital, an investor in the Bank. He gave evidence to Teare J that at board meetings Mr Ablyazov had already made the decisions, and the other members of the board were "straw men": see the trial judgment at paragraph [19]. In paragraph [346] Teare J dealt with a similar argument about causation, and found that if the other members of the board were willing to approve the loan to Chrysopa in circumstances where it could be seen to be for the benefit of Mr Ablyazov rather than for the benefit of the Bank:

> "… it is more likely than not, it seems to me, that he [*Mr Talvitie*] would have informed the AFN. For it would have appeared to him an improper and unwise thing for the Board to do and such conduct would have imperilled East Capital's investment. Had he done so it is more likely than not that in those circumstances the AFN would have intervened to prevent the loan being made."

Teare J reached this conclusion after hearing Mr Talvitie give oral evidence and be cross-examined. I see no reason to doubt that a similar conclusion would be reached in the present case, if it went to trial.

80. The second main way in which the Bank puts its case against Mr Ablyazov relies on Articles 62 and 63 of the JSC Law. So far as material, those Articles provide as follows:

> "62. **Principles of activities of officials of a company**
>
> A company's officials:
>
> 1. shall fulfil their obligations faithfully and with methods which they reasonably deem to best represent the interests of the company and its shareholders;
>
> 2. may not use or permit the use of the company's property in violation of the company's charter or decisions of a general shareholders' meeting or the board of directors, or for personal purposes or abuse their powers when concluding transactions with its affiliates;
>
> …

EXHIBIT D

63. **Responsibilities of officials of a company**

1. Officials of a company shall be responsible to the company and the shareholders for damage caused by their actions (omission), pursuant to Kazakhstan legislation, as well as for damage cause by:

(1) presentation of misleading or false information;

(2) violation of the procedure for presenting information established by this Law.

2. Based upon a decision of a general shareholders' meeting, a company may file with a court a claim against an official for reimbursement of damage or losses caused by such official to the company."

81. Mr Ablyazov was an officer of the Bank, and as such he was subject to the duties imposed upon him by Article 62. In paragraph 82(a) of his defence, Mr Ablyazov has admitted that as an officer of the Bank he was obliged to "fulfil the duties placed on him in good faith and use means which to the greatest extent possible reflect the interests of the society (i.e. the Claimant) and its stockholders". He also admits in paragraph 91(b) that an officer may be obliged to pay damages for breach of such a duty in accordance with Article 63. One of the requirements of Article 63 is that a shareholder resolution is needed to authorise the company to pursue a claim for damages against an officer. In the present case, that requirement causes no difficulty. The necessary resolution was passed on 19 August 2010, before Mr Ablyazov was joined as a defendant to the present action on 14 March 2011. (Even if his joinder had pre-dated the resolution, it would not have mattered, because one of the points of Kazakh law decided by Teare J was that a resolution under Article 63(2) may be retrospective: see the Trial Judgment at paragraphs [210] to [214]).

82. In order for a claim under Article 63 to succeed, breach, loss and causation have to be established in much the same way as for a claim under Article 74. In the light of the conclusions which I have reached on the Article 74 claim, I consider that these requirements are likewise satisfied in relation to the Article 63 claim.

83. It remains to consider two further related defences under Kazakh law upon which Mr Ablyazov relies. In paragraph 10 of his defence he alleges that he was employed by the Bank under a written contract of employment, and says that any claims by the Bank against him arising out of his employment must therefore be based in contract and not in tort, because it is a general principle of post-Soviet legal systems that "where a written contract governs a relationship between two parties, a party cannot be liable in tort in respect of any act within the scope of that written contact". This doctrine is often called the prohibition of "competition of claims" and contrasts with the general freedom accorded to a claimant by English law to choose between concurrent causes of action available to him. Consistently with this alleged prohibition, Mr Ablyazov goes on to allege that Article 1(3) of the Civil Code provides that labour relations are governed by the Labour Code of Kazakhstan dated 15 May 2007 ("the Labour Code"), and by other laws only to the extent that they are not inconsistent with the Labour Code. Article 172(2) of the Labour Code provides

for a one year limitation period for bringing a claim against an employee under his contract of employment. More precisely, the permitted period is:

> "one year from the day when the employee or employer knew or should have known of the violation of its right."

Thereafter, according to Professor Maggs, the Bank's claim would be permanently time-barred.  Mr Ablyazov's argument is that the Bank's claim against him was not begun within that one year period.

84.     Despite numerous searches of the Bank's documents, no contract of employment for Mr Ablyazov has ever been found.  Nor has any copy of a contract of employment ever been disclosed by Mr Ablyazov or his co-defendants in any of the proceedings brought by the Bank.  Nevertheless, it is possible that a written contract would emerge if the present case went to trial, so I will proceed on the assumption that one exists, or at least was in existence at the material times.  On that footing, the Bank relies on the rejection by Teare J of the principle of competition of claims in the context of claims for breach of a statutory duty by an officer of a joint stock company: see the Trial Judgment at paragraphs [219] to [230].  Teare J reached this conclusion after hearing the expert evidence of Mr Vataev and Professor Maggs, and considering some extracts from a work by Professor Suleimenov (who did not give evidence).

85.     Teare J accepted that the principle of competition of claims was part of the law of Kazakhstan, but said Professor Maggs had been unable to refer him to any decided case which determined that the principle operated so as to require a company to bring claims against an officer of the company for breach of his duties as officer in accordance with the Labour Code. He continued:

> "227. In light of the acceptance by both experts of the principle in question I accept that claims in delict or tort must be brought in accordance with the Labour Code where there is a contract of employment. But I find it difficult to accept, in circumstances where Articles 62 and 63 of the JSC Law impose duties upon the officers of a company and provide an express remedy for breach of such duties, that such remedies may only be exercised in accordance with the provisions of the Labour Code where there is also a relationship of employer/employee between the company and the officer. In particular it is difficult to accept that, although the JSC Law provides for unlimited liability and a limitation period of three years, the more restrictive limitation provisions of the Labour Code must apply. I accept that this may be the reaction of a common lawyer rather than that of a lawyer familiar with the principle of the competition of claims but I take comfort from the circumstance that Mr Vataev, not a common lawyer, was also unable to accept the apparent logic of Professor Maggs' opinion.
>
> 228. Ultimately I have been persuaded that the principle which governs parallel claims in contract or tort does not apply to parallel claims for breach of a contractual duty as employee and for breach of a statutory duty as officer of a joint stock

company.  The latter is not a claim in delict or tort but one which arises from the defendant's status as an officer of the company.  The latter status gives rise to the obligations under the JSC Law whether or not the officer is an employee of the company.  In the absence of clear decisions of the Kazakhstan courts showing that the Labour Code applies exclusively to claims against officers for breach of their duties under the JSC Law I was not persuaded that the remedies for breach of those duties should be limited in the manner in which claims against an employee under the Labour Code are.

229. I have noted Mr Norbury's submission that the Labour Code, being a Code, takes precedence over the JSC Law, which is only a law and not a code.  However, I remain of the view that the clear statement as to the limitation period applicable to officers in the JSC Law must have been intended to apply where officers are sued …

230. It follows that where breach of Article 62 of the JSC Law is relied upon against an officer of the company the Bank has three years in which to bring its claim.  The one year limitation in the Labour Code is inapplicable."

86.   By virtue of section 4(2) of the Civil Evidence Act 1972, the findings and decision of Teare J on this point are conclusive in the present proceedings unless the contrary is proved.  The expert evidence in the present case of Mr Markov and Professor Suleimenov strongly supports the reasoning and conclusion of Teare J.  The only evidence to the contrary is that of Professor Maggs, who in his first report sought to rely on views expressed by Professor Suleimenov in his work "Liability in Civil Law" in support of his thesis that the Bank's claims against Mr Ablyazov are governed by the Labour Code. Professor Suleimenov explains, however, in the expert Opinion subsequently obtained from him by the Bank's solicitors and attached to Mr Markov's supplemental report, that Professor Maggs' reliance on his views was inappropriate. Section 2 of his Opinion includes the following passage:

"7. However, even if the duties in an employment agreement of an officer of the company mirror provisions of the law, it is incorrect to identify the liability of this officer arising on the basis of the law (including the JSC Law) with the liability arising on the basis of an employment agreement.  It is also incorrect to speak of liability arising from an officer's breach of statutory provisions (mirrored by provisions of an employment contract) as being a breach of the conditions of the employment agreement with liability arising under that contract.  Hence reference to my article "Liability in Civil Law" in Mr Ablyazov's response to the Bank's claim and Professor Maggs' expert report as far as competition of claims is concerned is inappropriate.

8. Accordingly, the activity of the chairman and members of the board of directors of a joint-stock company is regulated not

by the Labour Code, but by the JSC Law, the Code of Corporate Governance approved by the company's general meeting of shareholders, the company's charter, and other internal normative documents of the company."

87.   After further discussions of the JSC Law, he concluded:

"14. In light of the above, it is my opinion that the existence of any employment agreement between the Bank with members of the board of directors of the Bank (including Mr Ablyazov) does not prevent the Bank bringing claims and suing such members of the board of directors for breach of principles of officers' activities established by the JSC Law or for breach of the obligation to disclose information about affiliated persons of the company and breach of the procedure for making related-party transactions, including claims for compensation of damages on the basis of Articles 63 and 74 of the JSC Law."

88.   The debate between Professor Maggs and Professor Suleimenov continued, on this and other matters, in subsequent reports and opinions which have been put in evidence. I have read this material, but it does not cause me to change my view that, if the case went to trial, the overwhelming likelihood is that the court would reach the same conclusion as Teare J, and would not hold that the contrary had been proved for the purposes of section 4 of the 1972 Act.

89.   I would add, for completeness, that even if Professor Maggs were correct in his view that the one year limitation period in the Labour Code applied, it would still be open to the Bank to establish, if it could, that it neither became aware, nor should have become aware, of the violation of its rights by Mr Ablyazov more than one year before his joinder as a defendant on 14 March 2011; and even if that condition could not be satisfied, the court would still have a discretion to extend the limitation period where there is a "valid reason" for doing so. These issues were considered by Teare J, and decided by him in the Bank's favour, in paragraphs [231] to [242] of the Trial Judgment. It is possible, and may even be probable, that the court would reach similar conclusions in the present case after a full trial; but I accept that it is not possible to do so on an application for summary judgment.

**Is there any other compelling reason why the case should go to trial?**

90.   In view of Mr Ablyazov's decision not to defend the present application, the arguments which he has previously raised about the need for the case to go to trial may appear rather hollow. But I will briefly consider them. A recurrent theme in his defence and witness statements has been the need for full disclosure, and for oral evidence to be given by those within the Bank, both before and after its nationalisation. If it were necessary to understand every detail of the transactions relating to the AAA Investments, I would agree that a full trial was necessary. As I have explained, however, I consider that enough is now known about the transactions, on the evidence as it stands, to establish to the summary judgment standard that Mr Ablyazov must have been personally responsible for the misappropriation of the AAA Investments, and that the Bank has good causes of action under Kazakh law to hold

EXHIBIT D

him responsible accordingly. In those circumstances, it would be wrong to put the
Bank to the delay, inconvenience and expense of proving its case at trial.

91. Moreover, I can see no solid basis for Mr Ablyazov's concerns about disclosure. In
the light of his own pleaded case, it is most improbable that the Bank would turn out
to hold significant further documentation relating to the impugned transactions.
Furthermore, a substantial disclosure exercise has already been carried out by the
Bank in the context of the committal application, which included searches for
documents relating to the allegations about the ownership of Bubris.  In that context,
the Bank was obliged to, and did, search for and disclose documents which either
supported Mr Ablyazov's case or undermined the Bank's case. Teare J was clearly
satisfied that the disclosure given was sufficient to enable him to decide, to the
criminal standard of proof, that Mr Ablyazov was the beneficial owner of Bubris; and
his decision was upheld by the Court of Appeal, despite the complaints of unfairness
made by Mr Ablyazov.

92. Mr Ablyazov has also claimed that he is the victim of alleged political persecution. I
am in no position to form a view on the truth or otherwise of this contention.  I
certainly cannot dismiss it out of hand as inherently incredible. For present purposes,
however, that is not the point.  The Bank claims to have been defrauded of securities
worth some US$300 million by Mr Ablyazov. The Bank must be entitled to take legal
action to recover that sum, even on the assumption that its motivation for so doing
was mainly political. This point was clearly articulated by Teare J when dismissing an
application by Mr Ablyazov to stay the Drey proceedings on the ground of alleged
abuse of process: see JSC BTA Bank v Ablyazov (No. 6) [2011] EWHC 1136
(Comm), [2011] 1 WLR 2996, especially at paragraph [54].

**Conclusion**

93. For the reasons which I have given, I am satisfied that the Bank's application for
summary judgment should succeed.  The principal amount for which judgment is
claimed in the application notice is US$294,138,715.27, that being the total amount
paid by Alfa Bank to the BVI Defendants in June 2008.  I will order Mr Ablyazov to
pay that sum, which represents the financial benefit received by his companies as a
result of his fraud.

94. In relation to interest, Mr Smith submitted, and I agree, that it should be awarded
under section 35A of the Senior Courts Act 1981 at the rate of 7.3% per annum. This
was the rate determined by Teare J in a separate judgment on interest in the Granton,
Drey and Chrysopa proceedings which he delivered on 19 April 2013: see [2013]
EWHC 867 (Comm). On the evidence before him, Teare J was satisfied that for the
period 2006 to 2012 the average rate of interest paid by Kazakh banks when
borrowing money was just under 7.3%.  He also decided, and again I agree, that
interest should run under section 35A from the date on which the Bank's cause of
action accrued, even if a different date might be relevant under Kazakh law. As he
said in paragraph [26], interest under section 35A is essentially a procedural remedy,
and it is appropriate for the court, when awarding its own procedural remedy, to have
regard to economic reality.

EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUN 2 1 2016

CF 135 Flat LLC *et al.*,

                          Plaintiffs,

          –v–

Triadou SPV S.A. *et al.*

                          Defendants.

15-CV-5345 (AJN)

MEMORANDUM AND
ORDER

ALISON J. NATHAN, District Judge:

          CF 135 Flat LLC, CF 135 West Member LLC, and the Chetrit Group LLC ("the Chetrit

Entities") initiated this interpleader action in July 2015. Dkt. No. 1 Ex. A. On October 12, 2015,

the City of Almaty ("Almaty") and BTA Bank JSC ("BTA Bank") filed a number of

counterclaims, crossclaims, and third-party claims against the Chetrit Entities, Joseph Chetrit,

Mukhtar Ablyazov, Viktor Khrapunov, Ilyas Khrapunov, and Triadou SPV S.A. ("Triadou").

Dkt. No. 49. Presently before the Court are Almaty and BTA Bank's motion for joinder related

to those claims and Triadou's motion to dismiss the crossclaims against it. Dkt. Nos. 47, 84. For

the reasons articulated below, the motion for joinder is granted and the motion to dismiss is

granted in part and denied in part.

     I.     BACKGROUND

          This sprawling litigation originated as an interpleader action filed by the Chetrit Entities

against Almaty and Triadou in July 2015. In the interpleader complaint, the Chetrit Entities

claimed to face multiple liability under their 2014 assignment agreement with Triadou because

Triadou had allegedly acquired the assigned interest with funds stolen from Almaty. Dkt. No. 25

¶¶ 11-17. In its October 12, 2015 answer to the interpleader complaint, Almaty filed

1

EXHIBIT E

counterclaims against the Chetrit Entities, crossclaims against Triadou, and third-party claims against Joseph Chetrit, Mukhtar Ablyazov, Viktor Khrapunov, and Ilyas Khrapunov. Dkt. No. 49. Almaty purported to join the Kazakhstan-based BTA Bank as a plaintiff in these claims. *Id.* Almaty and BTA Bank settled their claims against the Chetrit Entities and Joseph Chetrit in November 2015, Dkt. Nos. 69, 71, and the Court dismissed the underlying interpleader complaint in March 2016. Dkt. No. 103. However, the claims filed by Almaty and BTA Bank against Triadou, Ablyazov, and the Khrapunovs remain pending and are the subject of the current motions.

The basic allegations in support of these claims can be summarized as follows: Almaty, a city in Kazakhstan, claims that its former mayor Victor Khrapunov and his family embezzled more than $300 million from the city by appropriating various public assets for their personal use. Dkt. No. 49 ¶¶ 21, 69-76. BTA Bank, a banking institution in Kazakhstan, alleges that its former chairman Mukhtar Ablyazov embezzled significant sums of money from that bank through a series of fraudulent loans. *Id.* ¶¶ 20, 50-55. Almay and BTA Bank further allege that the Khrapunovs and Ablyazov, who were related by marriage, worked together to launder their stolen funds throughout the world through a series of shell corporations and seemingly legitimate investments. *Id.* ¶¶ 22-25, 77-79, 93-95. To do this, the Khrapunovs and Ablyazov allegedly sold their investment entity the Swiss Development Group ("SDG") to an associate, Philippe Glatz, in a sham sale to mask their continuing involvement with the company. *Id.* ¶¶ 89-92. Triadou, a Luxembourg-based wholly owned subsidiary of SDG, then purportedly worked in tandem with the Chetrit Entities to launder money stolen from Kazakhstan into at least two New York real estate projects, the Flatotel and the Cabrini Medical Center. *Id.* ¶ 25, 93-106.

EXHIBIT E

Triadou challenges these claims on numerous grounds. First, it argues that Almaty improperly joined Ablyazov and the Khrapunovs as defendants and BTA Bank as a plaintiff to the crossclaims against it. Second, it argues that this case should be dismissed on *forum non conveniens* grounds. Third, it argues that Almaty and BTA Bank fail to state a claim for a civil RICO violation. Fourth, it argues that Almaty and BTA Bank fail to state a claim on their various state law theories. Finally, Triadou argues that the RICO allegations against it are impermissibly extraterritorial. The Court will address each argument in turn.

## II. JOINDER

Almaty seeks to join BTA Bank as a plaintiff and Ablyazov and the Khrapunovs as defendants to its crossclaim against Triadou. Dkt. No. 47. Triadou argues that joinder of these parties should not be permitted. Dkt. No. 68. The Court finds that joinder is appropriate under the circumstances.

### A. Legal Standard

Federal Rules of Civil Procedure 19 and 20 "govern the addition of a person as a party to a counterclaim or crossclaim." Fed. R. Civ. P. 13(h). Rule 20 permits parties to be joined as plaintiffs if "they assert any right to relief . . . with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and . . . any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1). Similarly, defendants may be joined if "any right to relief is asserted against them . . . with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and . . . any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2).

EXHIBIT E

Even if these criteria are satisfied, "courts maintain broad discretion concerning whether to permit joinder." *Next Phase Distrib., Inc. v. John Does 1-27*, 284 F.R.D. 165, 168 (S.D.N.Y. 2012) (internal quotation marks omitted). In exercising this discretion, the Court must evaluate whether joinder "will comport with the principles of fundamental fairness." *Shaw v. Munford*, 526 F. Supp. 1209, 1213 (S.D.N.Y. 1981) (quoting *Desert Empire Bank v. Ins. Co. of N. Am.*, 623 F.2d 1371, 1375 (9th Cir. 1980)). The Court should primarily consider whether joinder will "delay the proceedings or prejudice" the opposing party" but may also consider "the closeness of the relationship between the present parties and the parties to be joined." *Novak v. TRW, Inc.*, 822 F. Supp. 963, 973 (E.D.N.Y. 1993). However, "the impulse [of Rule 20] is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966).

### B.  Application

Almaty and BTA Bank allege that Ablyazov and the Khrapunovs laundered money stolen from them through shell corporations, including Triadou, and invested those funds in New York real estate. Dkt. No. 49 ¶¶ 22-25. Triadou does not argue, nor could it, that these allegations fail to meet the formal requirements of Rule 20. Instead, it argues that the Court should exercise its discretion not to join parties. Dkt. No. 68 at 4.

The Court will exercise its discretion to join BTA Bank as a plaintiff. Almaty sought to join BTA Bank as a plaintiff at the earliest possible opportunity, in its answer to the interpleader complaint raising the relevant claims. Dkt. No. 49. Both Almaty and BTA Bank allege that money stolen from them was laundered by Ablyazov and the Khrapunovs through Triadou into New York real estate projects. *Id.* ¶¶ 24-25. Although Almaty's claims stem from

4

EXHIBIT E

embezzlement by the Khrapunovs while BTA Bank's claims stem from embezzlement by Ablyazov, both allege that Ablyazov and the Khrapunovs worked together to launder their combined stolen funds through Triadou. *Id.* ¶¶ 22, 24-25, 50-56, 70-79, 94-95. Based on the foregoing, the Court is confident that Almaty and BTA Bank's claims involve substantial "overlapping discovery" and common "witnesses and documentary proof" regarding Triadou's alleged money laundering activities such that interests of "judicial economy" are served by resolving the interrelated money laundering allegations against Triadou at the same time. *Kalie v. Bank of Am. Corp.*, 297 F.R.D. 552, 559 (S.D.N.Y. 2013). This conclusion is informed by the ongoing preliminary injunction proceedings, which would have proceeded in an identical fashion relying on identical evidence whether or not BTA Bank had participated. The Court also notes that, because discovery in this action has not yet commenced, joinder of BTA Bank as a plaintiff at this early stage will not "significantly . . . delay the resolution of this action." *Republic Nat. Bank v. Hales*, 75 F. Supp. 2d 300, 311 (S.D.N.Y. 1999), *aff'd sub nom. HSBC Bank USA v. Hales*, 4 F. App'x 15 (2d Cir. 2001) (collecting cases declining to permissively join parties when doing so would require re-opening discovery or additional motion practice in a "soon-to-be-resolved" dispute).

For similar reasons, the Court will exercise its discretion to join Ablyazov and the Khrapunovs as defendants. The money laundering allegations against Triadou are logically dependent on Ablyazov and the Khrapunovs' embezzlement; if those individuals did not embezzle money from Almaty or BTA Bank, Triadou could not have, as alleged, laundered their stolen funds into New York real estate investments with the Chetrit Entities. *See* Dkt. No. 49 ¶¶ 24-25, 98-99, 105, 112. Furthermore, Ablyazov and the Khrapunovs are alleged to have founded Triadou for the express purpose of laundering stolen funds. *Id.* ¶¶ 93-95. As a result,

EXHIBIT E

evidence of Ablyazov and the Khrapunovs' wrongdoing will likely be presented whether or not they are parties to this action. For this reason, the Court rejects Triadou's arguments that joining them will "require substantial additional discovery[] and drastically increase the expense for the original parties," Dkt. No. 68 at 6, and finds that the interests of "judicial economy" are served by joining Ablyazov and Khrapunov alongside Triadou as defendants at this early stage. *Kalie*, 297 F.R.D. at 559; *see also Hales*, 75 F. Supp. 2d at 311.

In sum, the Court finds that the joinder of BTA Bank, Ablyazov, and the Khrapunovs will not meaningfully expand the scope of the case, delay discovery, or otherwise prejudice Triadou. As a result, the Court will permit joinder of these parties under Rule 20. The Court therefore need not consider joinder under other potentially applicable rules.

### III.   *FORUM NON CONVENIENS*

Almaty next argues that the entire action should be dismissed on *forum non conveniens* grounds because the case is more appropriately litigated in Switzerland. Dkt. No. 86 at 10. "The decision to dismiss a case" on this basis "lies wholly within the broad discretion of the district court. . . ." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (quoting *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996)). In exercising this discretion, the Court must consider three factors. First, it must evaluate the "degree of deference . . . owed a plaintiff's choice of forum." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003) (citing *Iragorri*, 274 F.3d at 73). Next, the Court must "determine whether an adequate alternative forum exists." *Id.* (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)). If so, the court must "balance factors of private and public interest to decide, based on weighing the relative hardships involved, whether the case should be

EXHIBIT E

adjudicated in the plaintiff's chosen forum or in the alternative forum suggested by the

defendant." *Id.* (citing *Gilbert*, 330 U.S. at 507-09).

### A. Almaty and BTA Bank's Choice of Forum Is Entitled to Substantial Deference

The Court must "give greater deference to a plaintiff's forum choice to the extent that it

was motivated by legitimate reasons . . . and diminishing deference to a plaintiff's forum choice

to the extent that it was motivated by tactical advantage." *Iragorri*, 274 F.3d at 73. Put another

way, "the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to

the forum of choice and the more it appears that considerations of convenience favor the conduct

of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal

for *forum non conveniens.*" *Id.* at 72 (footnote omitted). "On the other hand, the more it appears

that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less

deference the plaintiff's choice commands. . . ." *Id.* This analysis should consider the plaintiff's

choice to bring suit in a particular forum at "the time . . . the complaint was filed." *Frederiksson*

*v. HR Textron, Inc.*, 484 F. App'x 610, 612 (2d Cir. 2012).

Triadou argues that Almaty and BTA Bank's choice of forum is entitled to little

deference because the "core" allegations of the complaint have "only marginal links" to New

York and the American forum was chosen for tactical reasons to obtain treble damages under the

Racketeering Influenced Corrupt Organizations Act ("RICO"). Dkt. No. 86 at 12-13. The Court

disagrees and finds that Almaty's choice of forum "was motivated by legitimate reasons."

*Iragorri*, 274 F.3d at 73. Almaty and BTA Bank initiated their claims against Triadou in the

course of other litigation between the parties occurring in New York. Dkt. Nos. 2, 49. Triadou

first initiated litigation in New York State Supreme Court against the Chetrit Entities related to

the 2014 assignment agreement, Dkt. No. 25 ¶ 10, and the Chetrit Entities thereafter initiated the

EXHIBIT E

interpleader action in this matter with Almaty and Triadou as defendants to adjudicate the parties' rights with respect to that agreement. *Id.* ¶¶ 11-17. Although Almaty and BTA Bank "did not initiate this lawsuit" and thus did not "choose" the forum in the ordinary sense of the word, "it was perfectly reasonable" for them to bring crossclaims against Triadou in this forum once the Chetrit Entities had brought the relevant parties together in a single lawsuit in the Southern District of New York. *JW Oilfield Equip., LLC v. Commerzbank, AG*, 764 F. Supp. 2d 587, 599 (S.D.N.Y. 2011).

Furthermore, there is a "bona fide connection" between this lawsuit and the New York forum. *Iragorri*, 274 F.3d at 72. Almaty and BTA Bank allege that Triadou laundered embezzled funds stolen from Kazakhstan into New York real estate developments, including the Flatotel and Cabrini Medical Center projects. Dkt. No. 49 ¶¶ 25, 100-106, 112; *see also Skanga Energy & Marine Ltd. v. Arevenca S.A.*, 875 F. Supp. 2d 264, 273 (S.D.N.Y. 2012) (finding a bona fide connection between the forum and the lawsuit where the defendant had "transferred millions of dollars into bank accounts located in New York" although the underlying fraud occurred in South America). Based on these allegations, they seek recovery of the property interests themselves, which were allegedly acquired with embezzled funds, and any profits Triadou received from the sale of those interests.[1] Dkt. No. 49 ¶¶ 174, 180, 185. It is "legitimate" for them to seek such recovery where the properties are and located and where Triadou has initiated litigation to force the Chetrit Entities to pay what was owed under the 2014 assignment agreement. *Iragorri*, 274 F.3d at 73.

---

[1] These profits are currently subject to a New York state court Monitorship Order. Dkt. No. 132 Ex. A. Under the terms of that order, the profits shall remain in the Monitor's account and shall not be disbursed until this Court rules on the pending preliminary injunction motion. *Id.* ¶¶ C, H.

EXHIBIT E

Although the interpleader action and all claims against the Chetrit Entities have been dismissed, *see* Dkt. Nos. 71, 103, the preexisting New York litigation and links between this action and New York real estate projects demonstrate that Almaty and BTA Bank's decision to sue here "was motivated by legitimate reasons," *Iragorri*, 274 F.3d at 73, at "the time . . . the complaint was filed." *Frederiksson*, 484 F. App'x at 612. Their choice of forum is entitled to substantial deference.

### B. Switzerland Is Not an Adequate Alternative Forum for All Claims

In order to dismiss an action on *forum non conveniens* grounds, the Court must find that there is an adequate alternative forum where the dispute may be heard. *Pollux*, 329 F.3d at 74. The party seeking dismissal bears "the burden to establish that an adequate alternative forum exists." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000). This requirement is generally satisfied if "the defendant is 'amenable to process' in the other jurisdiction." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981) (quoting *Gilbert*, 330 U.S. at 507). If, however, "the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative." *Id.*

Almaty and BTA Bank argue that Switzerland is an inadequate forum for two reasons. First, they argue that Triadou has not met its burden of demonstrating that Ablyazov is amenable to process there. Dkt. No. 88 at 11-12. Second, they argue that the statute of limitations in Switzerland may bar certain of their claims. *Id.* at 13-14.

### 1. Triadou has not shown that Ablyzaov is amenable to process in Switzerland

A party is amenable to process in a foreign jurisdiction if all parties "submit to the jurisdiction" of the foreign court. *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 157 (2d Cir. 2005); *see also* 14D C. Wright, A. Miller, E. Cooper & R. Freer, Federal Practice &

EXHIBIT E

Procedure § 3828.3, at 639 (4th ed. 2013) (an alternative forum is available "if the case and all of the parties come within th[e] alternative court's jurisdiction."). Triadou has consented to jurisdiction in Switzerland, Dkt. No. 91 at 4, and the Khrapunovs reside there. Dkt. No. 86 at 14. However, Triadou has not established that a Swiss court could exercise jurisdiction over Ablyazov, who is currently incarcerated in France. Dkt. No. 88 at 12.

To overcome this apparent deficiency, Triadou first argues that it need not demonstrate that Ablyazov is amenable to process in Switzerland because he has not yet been served in this matter. Dkt. No. 91 at 4. While that was true at the time Triadou's motion was filed, Ablyazov was served on April 28, 2016. Dkt. No. 123. When some defendants in a *forum non conveniens* case have been served but have not appeared, courts generally require the moving defendant to show that those individuals are at least as amenable to suit in the foreign jurisdiction as they are in the current forum. *See Online Payment Solutions Inc. v. Svenska Handelsbanken AB*, 638 F. Supp. 2d 375, 386 n.6 (S.D.N.Y. 2009) (defendants who had not appeared would be subject to jurisdiction in the proposed alternative forum); *Zweig v. Nat'l Mortg. Bank of Greece*, No. 91-CV-5482 (CSH), 1993 WL 227663, at *8 (S.D.N.Y. June 17, 1993) (the defendant who had not appeared would be more amenable to process in Greece than New York). This requirement appears to be motivated by the availability of default judgment in the original forum against defendants who do not appear. Triadou has made no showing concerning Ablyazov's relative amenability to suit in New York and Switzerland, and thus has not demonstrated that he is at least as amenable to suit in Switzerland as he is here. As a result, Switzerland is not an adequate alternative forum for Almaty and BTA Bank's claims against Ablyazov.

Despite this failing, Triadou argues that the Court "can nevertheless sever [Ablyazov] and the claims against him to facilitate dismissal of the remaining Crossclaims on *forum non*

EXHIBIT E

*conveniens* grounds." Dkt. No. 91 at 4. As discussed at some length below, Triadou's inability

to demonstrate that a Swiss court could exercise jurisdiction over Ablyazov is not the sole reason

that dismissal on *forum non conveniens* grounds is inappropriate. As a result, severing claims

against Ablyazov would not alter the outcome here. Furthermore, the only case Triadou cites for

the proposition that severance is appropriate to facilitate *forum non conveniens* dismissal

involved a U.S.-based party who was added to "engineer jurisdiction" over "essentially a foreign

dispute." *Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd.*, 806 F. Supp. 2d 712, 722 (S.D.N.Y.

2011). There is no allegation here that Ablyazov was joined specifically to "engineer

jurisdiction" or otherwise defeat a *forum non conveniens* motion. To the contrary, the Court has

found that joinder of the claims against him is proper and promotes judicial economy as

discussed above. As a result, the Court will not sever the claims against Ablyazov to dismiss

other claims on *forum non conveniens* grounds, which the Court notes would require Almaty and

BTA Bank to prosecute their claims in multiple jurisdictions.

### 2. Triadou has not shown that Almaty and BTA's claims would not be barred by the statute of limitations in Switzerland

"[A]n adequate forum does not exist if a statute of limitations bars the bringing of the

case in that forum." *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*,

273 F.3d 241, 246 (2d Cir. 2001). Because the defendant has the burden of demonstrating the

existence of an adequate alternative forum, *see Wiwa*, 226 F.3d at 100, "[t]he burden is on the

moving party to show that there is no statute of limitations bar in the alternative forum."

*Crimson Semiconductor, Inc. v. Electronum*, 629 F. Supp. 903, 908 (S.D.N.Y. 1986). While

Triadou has agreed to "waive any statute of limitations-based defenses" in Switzerland, Dkt. No.

91 at 4, it has not (and cannot) make any such guarantee on behalf of the other defendants to this

action, namely the Khrapunovs and Ablyazov. *Id.* Almaty and BTA Bank have suggested that

11

EXHIBIT E

statute of limitations in Switzerland for some of the claims alleged here, like unjust enrichment, may be as little as one year. Dkt. No. 88 at 13. Without any guarantee that Almaty's claims against the Khrapunovs and Ablyazov could proceed in Switzerland under the applicable statute of limitations, Triadou has not met its burden of demonstrating that Switzerland is an adequate alternative forum.

### C. The Balance of Hardships Do Not Justify Disturbing Almaty and BTA Bank's Chosen Forum

Even if Switzerland were an adequate alternative forum, the third step of the *forum non conveniens* analysis demonstrates that dismissal is not appropriate here. At this step, the court "must balance two sets of factors to ascertain whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum proposed by the defendant." *Iragorri*, 274 F.3d at 73. The first set of factors, the "private interest factors," take into account the relative convenience of litigating in the forum chosen by the plaintiff and that proposed by the defendant. *Id.* at 73-74. The second set of factors, the "public interest factors," address the Court's interest in adjudicating the relevant dispute. *Id.* at 74. Dismissal is appropriate only "when trial in the chosen forum would 'establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'" *Piper*, 454 U.S. at 241 (quoting *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947).

#### 1. The private interest factors do not weigh in favor of dismissal

When weighing the private interest factors, the Court should consider "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy,

EXHIBIT E

expeditious and inexpensive." *Iragorri*, 274 F.3d at 73-74. (quoting *Gilbert*, 330 U.S. at 508).

"[T]he greater the degree of deference to which the plaintiff's choice of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing *forum non conveniens* dismissal." *Id.* at 74. "[U]nless the balance [of private interests] is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gilbert*, 330 U.S. at 508.

### a.  Access to sources of proof

Evaluating relative access to sources of proof does not identify any one forum as clearly superior to another.  Almaty and BTA Bank claim that Triadou and the Chetrit Entities worked together to launder money from Kazakhstan through Switzerland and ultimately into New York real estate developments. Dkt. No. 49 ¶¶ 24-25.  As these allegations might suggest, the evidence on which the parties may rely spans the globe.  Many relevant witnesses, including the Khrapunovs and Triadou's employees, are located in Switzerland. Dkt. No. 86 at 18; Dkt. No. 88 at 19; Dkt. No. 91 at 7.  Documentary evidence about Triadou's investment and banking activities and corporate ownership are also located in Switzerland. Dkt. No. 86 at 18.  Other relevant witnesses, including those who negotiated the challenged real estate transactions with Triadou on behalf of the Chetrit Entities, are located in New York, as are the documents related to those real estate transactions. Dkt. No. 88 at 14-15, 18.  Still other witnesses and documents related to the underlying embezzlement are located in Kazakhstan. Dkt. No. 88 15, 18.  Finally, documentary evidence about certain financial transactions may need to be obtained from additional jurisdictions including the United Arab Emirates, the United Kingdom, and Cyprus. Dkt. No. 88 at 19.  In light of the degree to which relevant evidence is spread throughout the globe, it is difficult to say that this factor meaningfully differentiates the convenience of

13

EXHIBIT E

litigating in this forum versus the proposed Swiss forum. *See Levitin v. Sony Music Entm't*, 101 F. Supp. 3d 376, 391 (S.D.N.Y. 2015) (this factor was not entitled to significant weight where "both parties will be required to call witnesses from a variety of jurisdictions") (citation omitted).

Resisting this conclusion, Triadou argues that only a "small proportion of evidence and witnesses" related to a "far removed" portion of Almaty and BTA Bank's claims are located in New York. Dkt. No. 86 at 19-20. This is not so. Just as witnesses and evidence affiliated with Triadou and SDG are largely located in Switzerland, Dkt. No. 86 at 18; Dkt. No. 91 at 7, all of the witnesses and evidence affiliated with the Chetrit Entities are located in New York. Dkt. No. 88 at 14-15, 18. And the Chetrit Entities' involvement in this dispute is far from minimal: More than eight pages of the crossclaims are dedicated to describing the Chetrit Entities' participation in Triadou's money laundering scheme and eleven out of fourteen alleged RICO predicate acts involve the Chetrit Entities. Dkt. No. 49 ¶¶ 97-114, 117-127, 140(d)-(e), (h)-(n). The extent to which the New York real estate money laundering allegations pervade the crossclaims demonstrates that the Chetrit Entities' activities undertaken in New York with Triadou constitute a central element of this case. As a result, the Court finds that the "sources of proof" available in Switzerland are roughly comparable in quantity and in relevance to the "sources of proof" available in New York. *Iragorri*, 274 F.3d at 73 (quoting *Gilbert*, 330 U.S. at 508). For this reason, this factor does not meaningfully distinguish between the forums.

### b. Attendance of witnesses

Similarly, the parties' relative ability to obtain attendance of witnesses in the two forums does not weigh strongly one way or another. Due to the settlement agreement between Almaty, BTA Bank, and the Chetrit Entities, *see* May 19, 2016 Tr. 35:3-36:3, the Court finds it likely that, as Triadou claims, "testimony from the Chetrit Entities can be obtained in connection with

EXHIBIT E

Swiss proceedings without resort to letters rogatory." Dkt. No. 91 at 7. It also appears that letters rogatory are not necessary to compel at least some witnesses located in Switzerland to testify in New York. For example, the live testimony of Nicolas Bourg and Cesare Cerrito, both of whom reside in Switzerland, was obtained on short notice in connection with the preliminary injunction hearing without resort to the issuance of letters rogatory. *See* Tr. 49:4-8, 94:12-16. Even if letters rogatory must be used to obtain some witness testimony in New York, Triadou has not pointed to "a single potential witness who would be unable or unwilling to appear in New York," a showing that "is generally required for a *forum non conveniens* dismissal." *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, No. 05-CV-9478 (GEL), 2006 WL 3230301, at *6 (S.D.N.Y. Nov. 7, 2006) (Lynch, J.) (citation omitted). As a result, the Court finds that the availability to obtain live witness testimony does not weigh strongly one way or the other.

### c.   Other practical problems

Other practical problems are similarly inconclusive. Triadou argues that proceeding in New York would require a large number of documents to be translated from French, which would be avoided with litigation in Switzerland. Dkt. No. 86 at 19. Almaty responds that a significant number of documents currently in English would need to be translated if the proceedings were held in Switzerland. Dkt. No. 88 at 15. Triadou argues that discovery from Swiss banking institutions and certain other third parties may be easier to obtain in Switzerland. Dkt. No. 86 at 18-19. Almaty responds that third-party discovery would actually be "more onerous" in Switzerland due to the involvement of Cypriot and American banking institutions and American law firms. Dkt. No. 88 at 16-17 & n.6. Triadou argues that litigating in New York requires it to incur costs to transport witnesses from Switzerland and Kazakhstan. Dkt. No. 86 at 19. Litigating in Switzerland, on the other hand, would require Almaty to incur costs to

EXHIBIT E

transport witnesses from the United States and Kazakhstan. Dkt. No. 88 at 18. These competing arguments demonstrate that litigation in Switzerland would simply present different, not fewer, "practical problems" than litigation in New York. *Iragorri*, 274 F.3d at 74 (quoting *Gilbert*, 330 U.S. at 508).

It is undeniably true that litigating in Switzerland would be, to some degree, more convenient *for Triadou*. For the purpose of *forum non conveniens*, however, the Court is interested in *net* convenience—whether litigating in the proposed alternative forum would, on the whole, be more convenient and save more resources than litigating in the plaintiff's chosen forum. *See Piper*, 454 U.S. at 241 (quoting *Koster*, 330 U.S. at 524) (the *forum non conveniens* inquiry evaluates whether "oppressiveness and vexation to a defendant" is "out of all proportion to plaintiff's convenience"). Whether this dispute is litigated in New York or Switzerland, the parties will have to obtain documents and witnesses from other jurisdictions. Similarly, whether this dispute is litigated in New York or Switzerland, the parties will have to translate a substantial number of documents. In sum, regardless of where this dispute is litigated, litigation will be inconvenient and there is little net convenience to be gained by sending this dispute to Switzerland.

The Court is mindful that "the greater the degree of deference to which the plaintiff's choice of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing *forum non conveniens* dismissal." *Iragorri*, 274 F.3d at 74. As noted above, "unless the balance [of private interests] is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gilbert*, 330 U.S. at 508. Because Almaty and BTA Bank's decision to sue here "was motivated by legitimate reasons," *Iragorri*, 274 F.3d at 73, that decision is entitled to substantial deference. As discussed above, witnesses and

16

EXHIBIT E

documentary evidence relevant to this case are located in both New York and Switzerland, as well as several other jurisdictions including Kazakhstan. Dkt. No. 86 at 17-19; Dkt. No. 88 at 14-15, 18. Even if, as Triadou argues, there are slightly more witnesses or documents located in Switzerland than in New York, Triadou has not demonstrated that the net convenience of litigating in Switzerland is substantial enough to overcome the significant deference owed to Almaty and BTA Bank's choice of forum. As a result, the private interest factors do not justify dismissal for *forum non conveniens*.

### 2. The public interest factors do not weigh in favor of dismissal

When weighing the public interest factors, the Court should consider "(a) administrative difficulties relating to court congestion; (b) imposing jury duty on citizens of the forum; (c) having local disputes settled locally; and (d) avoiding problems associated with the application of foreign law." *In re Alcon Shareholder Litig.*, 719 F. Supp. 2d 263, 275 (S.D.N.Y. 2010) (citing *Gilbert*, 330 U.S. at 508-09). An analysis of these factors further demonstrates that there is an insufficient basis to disturb Almaty and BTA Bank's choice of forum.

On the question of court congestion, Triadou concedes that Swiss courts, "like the Southern District of New York, suffer from congestion." *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 31 (2d Cir. 2002); Dkt. No. 86 at 22. Because Triadou cannot argue that Swiss courts are less congested than New York courts, it argues instead that litigation in New York will be delayed due to "the need to collect documents from multiple overseas locations, the need to seek third-party discovery from foreign entities, the need for translation services to interpret documents and witnesses, and the difficulty of obtaining the presence of foreign witnesses who are unwilling to participate without compulsion." Dkt. No. 86 at 22-23. Insofar as these concerns are even relevant to the public interest, as opposed to private interest, inquiry, the Court

EXHIBIT E

has already found that they would plague any litigation in Switzerland to a similar extent. As a result, this factor is neutral. *See Kitaru Innovations Inc. v. Chandaria*, 698 F. Supp. 2d 386, 396 (S.D.N.Y. 2010) (citing *Turedi v. Coca Cola Co.*, 460 F. Supp. 2d 507, 527 (S.D.N.Y. 2006) (finding this factor neutral, as Canadian courts are not less congested than courts in this district).

Triadou's argument on the jury duty factor merges with its arguments on the interest in settling local disputes locally. Essentially, Triadou argues that jury duty should not be imposed on U.S. citizens because Switzerland's interest in the dispute is much stronger than New York's because "the Khrapunovs and Ablyazov funneled their ill-gotten gains into Switzerland from Kazakhstan." Dkt. No. 86 at 21. The Court finds that both Switzerland and New York have legitimate interests in the dispute. The Court does not deny that Switzerland has a substantial interest in the allegations that the Khrapunovs and Ablyazov laundered money from Kazakhstan into Switzerland; indeed, this interest is demonstrated by the ongoing Swiss investigation of the Khrapunovs. *See id.* For similar reasons, however, New York has an interest in the allegations that Triadou subsequently conspired with a New York real estate group to launder embezzled funds into prominent New York real estate projects. *See* Dkt. No. 88 at 22-23 (describing recent federal, state, and city efforts to crack down on money laundering through New York real estate). Because both Switzerland and New York have legitimate interests in this dispute, as Triadou and the Chetrits allegedly laundered money through both jurisdictions, this factor does not weigh heavily one way or the other.

Finally, Triadou argues that the necessity of applying foreign law counsels in favor of dismissal for *forum non conveniens*. Dkt. No. 86 at 23. However, Triadou does not explain, and the Court does not see, how Swiss law is relevant to the resolution of this dispute. *Id.* Almaty brings claims under the RICO statute and various provisions of state law related to fraud. *See*

EXHIBIT E

Dkt. No. 49.  As Almaty and BTA Bank explain, Kazakh law may be important to the extent that it determines whether or not Ablyazov and the Khrapunovs committed the alleged underlying frauds.  *See* Dkt. No. 88 at 25.  Whether any party violated Swiss law, however, is at best minimally relevant to Almaty and BTA Bank's claims that Triadou and the Chetrits' subsequent money laundering activities violated federal and New York law.  Because Swiss law has little, if any, apparent relevance to this dispute and Swiss courts are not better adept at applying Kazakh law than American courts, this factor does not weigh in favor of dismissal.

Thus, even if Switzerland were an adequate alternative forum, neither the private interest factors nor the public interest factors outweigh the deference the Court owes to Almaty and BTA Bank's legitimate choice of forum.  Because witnesses and documentary evidence are located in New York, Switzerland, Kazakhstan, and several other locations, it would not be meaningfully more convenient for the parties to litigate in Switzerland than in New York.  Additionally, New York has a significant interest in adjudicating this dispute, which involves allegations of laundering embezzled funds into real estate here and does not implicate Swiss law.

For these reasons, the Court will not dismiss this action on *forum non conveniens* grounds.[2]

## IV.   RICO CLAIMS

As an alternative basis for dismissal of this action, Triadou argues that Almaty and BTA Bank fail to state a claim for relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and Federal Rule of Civil Procedure 9(b).  Dkt. No. 86

---

[2] Although the Court recognizes that the Central District of California reached a different conclusion in another case brought by Almaty involving the Khrapunovs alleged fraud, *see* Dkt. No. 85 Ex. 3 at 13, the case before that court differed from the case before this Court in material ways.  For example, those claims were not initiated during the course of preexisting litigation, the Chetrit Entities and Ablyazov were not parties, and the suit was not brought in the district where funds were allegedly laundered into real estate.  As a result, the fact that the Central District of California reached a different conclusion in a different action does not alter the Court's conclusion here.

EXHIBIT E

at 24, 27.  To state a claim for relief under the civil RICO provision, 18 U.S.C. § 1964, a plaintiff must allege a substantive violation of the RICO statute, "an injury to business or property," and "causation of the injury by the violation." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990).  Triadou does not challenge the sufficiency of the injury or causation allegations, so the only issue before the Court is whether Almaty and BTA Bank have adequately alleged a substantive RICO violation.  Dkt. No. 86 at 27.

Under 18 U.S.C. § 1962, the substantive portion of RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  Courts in this circuit have articulated the elements of this provision in a variety of different ways. *Compare Hinterberger v. Catholic Health Sys., Inc.*, 536 F. App'x 14, 16 (2d Cir. 2013) (quoting *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 16–17 (2d Cir. 1983)) (breaking the statute into seven elements), *with Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994) (reciting only four elements).  Despite slight differences in how courts break down the elements, however, the requirements of a § 1962 violation remain consistent: The defendant must participate in an enterprise affecting interstate or foreign commerce through a pattern of racketeering activity. *See Moss*, 719 F.2d at 17; *Azrielli*, 21 F.3d at 520.

Under Rule 9(b), allegations of "fraud or mistake" are subject to a heightened "particularity" pleading standard. *See* Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake.").  To meet this threshold, a plaintiff must ordinarily "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

EXHIBIT E

the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). In cases where no specific statement is challenged as fraudulent, the plaintiff must set forth the "particulars" of the alleged fraud, including "the time, place, particular individuals involved, and specific conduct at issue." *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 221 (S.D.N.Y. 2002) (citing *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986)). Even when a complaint raises fraud claims, however, every element of every claim need not necessarily meet the Rule 9(b) standard. With respect to RICO claims specifically, "a plaintiff must plead predicate acts sounding in fraud or mistake according to the particularity requirement of Rule 9(b)." *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 666 (2d Cir. 2014). However, "for other elements of a RICO claim—such as non-fraud predicate acts or . . . the existence of an 'enterprise'—a plaintiff's complaint need satisfy only the 'short and plain statement' standard of Rule 8(a)." *Id.* (citing *McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992)); *see also Hecht*, 897 F.2d at 26 n. 4).

In the relevant portion of its motion to dismiss, Triadou argues that particular factual allegations fail to satisfy Rule 9(b). Dkt. 86 at 25-27. Specifically, Triadou challenges allegations relating to: (1) Ablyazov and the Khrapunovs' underlying fraud; (2) the 2014 assignment agreement between Triadou and the Chetrit Entities; and (3) the sale of SDG to Philippe Glatz. *Id.* at 25-26. The Court will consider the sufficiency of these factual allegations in the context of the relevant § 1962 elements.

### A. Ablyazov and the Khrapunovs' Underlying Fraud

In two short parentheticals, Triadou argues that Almaty and BTA Bank have not alleged with sufficient particularity the underlying frauds attributed to Ablyazov and Viktor Khrapunov.

EXHIBIT E

*See* Dkt. No. 86 at 25-26. Triadou's theory, although not articulated, seems to be that if these underlying frauds are insufficiently alleged, Almaty and BTA Bank's allegations of Triadou's subsequent fraud and money laundering (predicate acts of racketeering) must fail. This argument is without merit, as Almaty and BTA Bank exhaustively detail the alleged frauds of Ablyazov and Viktor Khrapunov.[3]

With respect to Viktor Khrapunov, Almaty and BTA Bank allege three specific instances of "repeated[] and systematic[] use[ of] the powers of the office of the mayor to transfer public assets . . . to his family." Dkt. No. 49 ¶¶ 70, 72-75. For example, Almaty and BTA Bank claim that Viktor Khrapunov seized private land owned by Shadid Engineering LLP on August 25, 2003, sold that land to his wife's company one month later for approximately $105,000, and eventually had it sold to an unrelated third party for $2 million. *Id.* ¶ 75. The recitation of three specific instances of Viktor Khrapunov's fraud includes the necessary information about "the time, place, particular individuals involved, and specific conduct at issue" to satisfy Rule 9(b). *United Feature Syndicate*, 216 F. Supp. 2d at 221 (citing *Luce*, 802 F.2d at 54).

With respect to Ablyazov, Almaty and BTA Bank cite at length the findings of Justice Teare from a suit initiated against Ablyazov in the United Kingdom. Dkt. No. 49 ¶¶ 51-55. Relying on these findings, Almaty and BTA Bank allege that Ablyazov executed dozens of loans that allowed him to pocket over $2.4 billion of BTA Bank's funds. *Id.* Rather than merely describing these loans as "fraudulent," as Triadou claims, *see* Dkt. No. 86 at 25, Almaty and BTA Bank explain that Ablyazov caused large loans to be made to "companies owned or

---

[3] The Court also notes that Almaty and BTA Bank's money laundering allegations may not need to comply with Rule 9(b). *See Jus Punjabi, LLC v. Get Punjabi Inc.*, No. 1:14-CV-3318 (GHW), 2015 WL 2400182, at *7 (S.D.N.Y. May 20, 2015), *aff'd* 2016 WL 697401 (2d Cir. Feb. 22, 2016); *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 510 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009); *Leung v. Law*, 387 F. Supp. 2d 105, 118 (E.D.N.Y. 2005). If so, RICO claims based on money laundering predicates could survive even if Almaty and BTA Bank failed to describe Ablyazov and the Khrapunovs' underlying frauds with quite the level of specificity required by Rule 9(b).

EXHIBIT E

controlled" by him without disclosing his interest in those companies. Dkt. No. 49 ¶ 53. Because Almaty and BTA Bank allege that twenty such loans totaling $1,428,840,000 were made between March 2006 and August 2008, with even more loans totaling $1,031,263,000 made between November 4, 2008 and December 4, 2008, their complaint does not include the date and amount of each individual loan. *Id.* ¶¶ 53, 55. Triadou does not specifically challenge this aspect of Almaty and BTA Bank's allegations, *see* Dkt. No. 86 at 25-26, and the Court is not convinced that this information is necessary in light of the number of challenged loans and the specificity of other information about the loans. *See City of New York v. Joseph L. Balkan, Inc.*, 656 F. Supp. 536, 545 (E.D.N.Y. 1987) ("To burden the complaint with specific allegations of hundreds of such instances would serve little purpose. . . ."). Nevertheless, Justice Teare's findings, cited by Almaty and BTA Bank, contain this additional information on some number of these individual loans. *See* Dkt. No. 118 Ex. 4 ¶¶ 77, 83. Because Almaty and BTA Bank's complaint "make[s] a clear, definite, and substantial reference to" those findings, they are deemed incorporated by reference in the complaint. *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). As a result, the Court is satisfied that Almaty and BTA Bank have adequately described when and where Ablyazov's alleged loan scheme took place, as well as its fraudulent character. *See Anschutz Corp.*, 690 F.3d at 108 (quoting *Rombach*, 355 F.3d at 170).

### B. The 2014 Assignment Agreement

In another parenthetical, Triadou argues that Almaty and BTA Bank have not adequately alleged the fraudulent nature of the 2014 assignment agreement between Triadou and the Chetrit Entities. Dkt. No. 86 at 26. This argument appears to target the "pattern of racketeering activity" element of civil RICO, as it concerns one of the predicate acts Almaty and BTA Bank

EXHIBIT E

allege that Triadou committed.  *See* Dkt. No. 49 ¶ 140(k).  Again, this argument fails because
Almaty and BTA Bank's description of the fraudulent nature of the 2014 assignment agreement
is very detailed.  Specifically, Almaty and BTA Bank allege that in response to a lawsuit filed in
California against members of the Ablyazov-Khrapunov Group, those individuals sought to
liquidate their U.S.-based assets "so that the funds could be removed from the United States and
hidden." Dkt. No. 49 ¶¶ 115-116.  To that end, Triadou's director allegedly approached the
Chetrit Group and agreed to sell Triadou's interests in New York real estate for a "substantial
discount from the price originally paid" despite the fact that the interest had, in fact, appreciated
significantly. *See id.* ¶ 117.  Almaty and BTA Bank further allege that the assignment agreement
was negotiated in May 2014 but executed in August 2014 for approximately $26 million. *Id.* ¶¶
119, 140(k).  This thorough description of a below-market assignment motivated by a desire to
protect illicit assets from seizure sets forth "the time, place, particular individuals involved, and
specific conduct at issue" and thus satisfies Rule 9(b). *United Feature Syndicate*, 216 F. Supp.
2d at 221 (citing *Luce*, 802 F.2d at 54).

### C. The Sale of SDG to Philippe Glatz

Finally, Triadou argues that Almaty and BTA Bank's "allegations concerning the
purportedly fraudulent sale of SDG to Mr. Glatz are conclusory and vague." Dkt. No. 86 at 26.
This argument potentially implicates two elements of civil RICO: first, whether a pattern of
racketeering activity has been established; and second, whether Triadou has participated in the
relevant enterprise.

### 1. Pattern of Racketeering Activity

"[A] plaintiff in a civil RICO suit must establish a 'pattern of racketeering activity' . . . .
[by] plead[ing] at least two predicate acts" of racketeering. *GICC Capital Corp. v. Tech. Fin.*

24

EXHIBIT E

*Grp., Inc.*, 67 F.3d 463, 465 (2d Cir. 1995); *see also* 18 U.S.C. § 1961(5). The "sham sale of SDG to Philippe Glatz" and related "fraudulent loan" are two of the relevant predicate acts described in the complaint. Dkt. No. 49 ¶ 140(a), (b). However, the complaint details twelve other predicate acts related to Triadou's investment of embezzled funds into New York real estate and subsequent sale of its property interests at below-market prices to remove its assets from the United States after the initiation of litigation in California. *See id.* ¶¶ 93-119, 140(c)-(n). Any deficiency in the sham sale allegations, then, do not prevent Almaty and BTA Bank from adequately pleading the requisite "pattern of racketeering activity" based on the other twelve predicate acts alleged in the complaint. *See Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997) (quoting *Spira v. Nick*, 876 F. Supp. 553, 559 (S.D.N.Y. 1995) (even if "numerous allegations fail[] to meet the requirement of Rule 9(b)," a RICO claim need to be dismissed if those allegations are not "essential to the sufficiency of the complaint" because there are other "adequate allegations").

### 2. Participation

Because the alleged "sham sale" of SDG to Glatz is not a critical predicate act, the most salient aspect of the transaction is that it creates a "link between the Ablyazov/Khrapunov Group and the New York real estate investments." Dkt. No. 88 at 29. Triadou acknowledges as much in its motion, where it argues:

> [H]aving failed to properly plead that the sale of SDG to Mr. Glatz was fraudulent, or that Triadou is controlled by Ablyazov or the Khrapunovs, Almaty and BTA Bank cannot sufficiently plead that the post-sale investments made in New York fall under the umbrella of the purported schemes by Ablyazov and the Khrapunovs. *By failing to plead the predicate link between Triadou and the purported conspiracy* spearheaded by Ablyazov and the Khrapunovs with the requisite specificity, the RICO Crossclaims against Triadou should be dismissed.

EXHIBIT E

Dkt. No. 86 at 27 (emphasis added).  In other words, the sale of SDG to Glatz and the subsequent control of SDG and Triadou goes to Triadou's participation in the alleged scheme. Dkt. No. 91 at 10.

To "participate" in a RICO enterprise requires "*some* part in directing the enterprise's affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  Demonstrating participation is a "relatively low hurdle for plaintiffs to clear, especially at the pleading stage." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (citation omitted).  Because Triadou's participation in the allegedly fraudulent scheme is not an element sounding in fraud, allegations of participation need not comply with Rule 9(b).  *See D. Penguin Bros.*, 587 F. App'x at 666 (citing *McLaughlin*, 962 F.2d at 194); *see also Hecht*, 897 F.2d at 26 n. 4.  As a result, Almaty and BTA Bank need only "plead[] factual content that allows the court to draw the reasonable inference" that Triadou participated in the alleged scheme even after the sale of SDG to Glatz.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Viewed through this lens, the Court concludes that Almaty and BTA Bank have adequately pleaded "the predicate link between Triadou and the purported conspiracy spearheaded by Ablyazov and the Khrapunovs with the requisite specificity." Dkt. No. 86 at 27. Almaty and BTA Bank have alleged that Ilyas Khrapunov, acting on behalf of Ablyazov and his father, "continues to control SDG while holding himself out to mere a mere 'outside investor' to the company." Dkt. No. 49 ¶ 92.  They further allege that Ilyas Khrapunov met with the Chetrit Entities in 2012 on behalf of Triadou to negotiate its investments and "openly and repeatedly discussed the criminal charges against the Ablyazov-Khrapunov Group and the efforts of the governments of Switzerland and Kazakhstan to locate and seize the assets of the Ablyazov Group." *Id.* ¶ 99.  Importantly, they allege that, in this meeting, "Ilyas Khrapunov acted on

EXHIBIT E

behalf of SDG and Triadou, despite the Ablyazov-Khrapunov Group's purported sale of SDG a year prior." *Id.* These factual allegations about Ilyas Khrapunov's continued control over SDG and Triadou "allow[] the court to draw the reasonable inference," *Iqbal*, 556 U.S. at 678, that Triadou was a participant playing "*some* part in directing the enterprise's affairs" even after the sale of SDG to Glatz and with respect to the specific New York real estate transactions challenged here. *Reves*, 507 U.S. at 179.

Because Almaty and BTA Bank have adequately alleged that Triadou participated in the enterprise at issue here through the commission of at least two predicate acts of racketeering, the Court denies Triadou's motion to dismiss the RICO claims for failure to state a claim.

## V.    STATE CLAIMS

Next, Triadou argues that Almaty and BTA Bank's state claims should be dismissed on a variety of grounds. First, Triadou argues that all of Almaty and BTA Bank's state claims should be dismissed for failure to comply with Rule 9(b). Second, it argues that Almaty and BTA Bank's alter ego claim should be dismissed because New York law does not recognize such a claim. Third, Triadou argues that Almaty and BTA Bank's replevin claim should be dismissed because Triadou is not in possession of the relevant property. Finally, Triadou argues that Almaty and BTA Bank's constructive trust claim should be dismissed for failure to state a claim.

### A.  State Law Claims and Rule 9(b)

Triadou first argues that Almaty and BTA Bank's state law claims should be dismissed "because they are all premised on the . . . allegations that Triadou was fraudulently sold" to Glatz and those allegations "fail to satisfy Rule 9(b)'s heightened pleading standard." Dkt. No. 86 at 28. Contrary to Triadou's suggestion, none of the state law claims are directly premised on the allegedly fraudulent sale of SDG. For example, Almaty and BTA Bank's fraudulent transfer

27

EXHIBIT E

allegations are based on "[t]he 2014 assignment of Triadou's interest in the Flatotel and Cabrini Medical Center" to the Chetrit Group, Dkt. No. 49 ¶ 171, while the unjust enrichment and conversion claims are based on Triadou's purchase of New York real estate with funds embezzled from Kazakhstan. *Id.* ¶¶ 181-185, 193-196. Insofar as Triadou has challenged the sufficiency of these factual allegations under Rule 9(b) in its arguments on the RICO claims, the Court has rejected those arguments.

As a result, the Court reads Triadou's argument about the sale of SDG in this context as referencing the link between Triadou and the Ablyazov-Khrapunov Group without which Triadou's conduct would not be fraudulent. In this sense, it is the Ablyazov-Khrapunov Group's continuing control over SDG and Triadou that is relevant, not the specific date that any sham sale may have occurred. The Court finds that Almaty and BTA Bank's detailed allegations of Ilyas Khrapunov's continued involvement in SDG and Triadou after the purported sale to Glatz, *see* Dkt. No. 49 ¶¶ 92-99, 116, are sufficient to allege, even under Rule 9(b), that Ablyazov and the Khrapunovs controlled Triadou during negotiations with the Chetrit Group throughout the relevant time period. As a result, Triadou's motion to dismiss Almaty and BTA Bank's state law claims for failure to comply with Rule 9(b) is denied.

### B. Alter Ego

Triadou first argues that there is no "alter ego" cause of action under New York law. Dkt. No. 86 at 28 n.21. New York courts have repeatedly held that "an attempt of a third party to pierce the corporate veil does not constitute a cause of action independent of that against the corporation." *Morris v. N.Y. State Dep't of Taxation & Fin.*, 623 N.E.2d 1157, 1160 (N.Y. 1993); *see also Ferro Fabricators, Inc. v. 1807-1811 Park Ave. Dev. Corp.*, 11 N.Y.S.3d 548, 550 (1st Dep't 2015) ("[A]lter-ego liability is not an independent cause of action."). However,

EXHIBIT E

"veil-piercing actions may be initiated as supplementary special proceedings under New York Civil Practice Law and Rules (CPLR) § 5225(b), rather than as plenary actions." *Trust v. Kummerfeld*, 153 F. App'x 761, 762-63 (2d Cir. 2005) (citing *Morris*, 623 N.E.2d at 1160). An alter ego claim may proceed in this posture if "the corporation has already been held liable and a third party brings a[n] . . . action seeking to enforce the judgment against its owners." *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 39 F. Supp. 3d 516, 522 (S.D.N.Y. 2014). Almaty and BTA Bank's alter ego claim against Triadou does not meet these requirements. First, their complaint does not include any § 5225(b) claim to enforce a judgment. Second, the judgment they cite in support of their alter ego claim is a judgment against Ablyazov in his individual capacity, not any corporation. Dkt. No. 88 at 34 n.14. As a result, there is no basis under New York law for Almaty and BTA Bank to bring a veil-piecing action against Triadou and that claim is dismissed.

### C. Replevin

"[A] cause of action sounding in replevin must establish that the defendant is in possession of certain property of which the plaintiff claims to have a superior right." *Batsidis v. Batsidis*, 9 A.D.3d 342, 343 (2d Dep't 2004). Almaty and BTA Bank's replevin claim seeks the return of interests in the Flatotel and Carbini Medical Center projects. *See* Dkt. No. 49 ¶¶ 205-206. Almaty and BTA Bank allege in their complaint that Triadou has released its interest in the Cabrini Medical Center and assigned its interest in the Flatotel project back to the Chetrit Entities. Dkt. No. 49 ¶¶ 119, 126. As a result, Triadou is not in possession of the property interests subject to the replevin claim. *See Batsidis*, 9 A.D.3d at 343. For this reason, Triadou argues that this claim against it must be dismissed. Dkt. No. 86 at 28 n.21. Almaty and BTA Bank do not dispute that Triadou is not in possession of the property, instead responding that

EXHIBIT E

replevin is nevertheless appropriate because they "have attacked [the 2014] assignment as a fraudulent conveyance." Dkt. No. 88 at 34 n.14.

This argument, for which Almaty and BTA Bank provide no authority, fails because a replevin claim generally requires that the defendant be "currently in . . . possession" of the property. *Grosz v. Museum of Modern Art*, 403 F. App'x 575, 576 (2d Cir. 2010); *see also Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 224 F. Supp. 2d 567, 607 (S.D.N.Y. 2002), aff'd in part, vacated in part on other grounds, 380 F.3d 624 (2d Cir. 2004) ("Plaintiff has not established . . . that [the items in question] are *currently* in defendants' possession.") (emphasis added). Almaty and BTA Bank have not identified, and the Court has not found, any case in which this requirement has been relaxed because a plaintiff challenged a transfer of property as a fraudulent conveyance. Because Almaty and BTA Bank's complaint alleges that Triadou is not currently in possession of the relevant interests, their replevin claim against Triadou must be dismissed.

### D. Constructive Trust

Triadou advances two arguments to challenge Almaty and BTA Bank's constructive trust claim. First, Triadou argues that a "constructive trust is a remedy, not a cause of action . . . ." Br. at 28 n.21 (citing *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 419 (S.D.N.Y. 2010)). Numerous New York Appellate Division decisions have repeatedly referred to constructive trust as a claim or cause of action under New York law. *See Kohan v. Nehmadi*, 14 N.Y.S.3d 4, 5 (1st Dep't 2015) ("[P]laintiff's causes of action for an accounting and a constructive trust were not time-barred."); *Evans v. Winston & Strawn*, 757 N.Y.S.2d 532, 534 (1st Dep't 2003) ("Plaintiffs' claim for a constructive trust was properly dismissed. . . ."); *Matter of Sakow*, 631 N.Y.S.2d 637, 639 (1st Dep't 1995) ("[T]he statute of limitations had run on the

EXHIBIT E

cause of action for constructive trust. . . ."). Other courts in this circuit have followed suit even while recognizing that constructive trust is also an "equitable remedy." *Alterseekers, Inc. v. BrandForce SF, LLC*, No. CV 12-5392 (GRB), 2015 WL 5719759, at *11-*12 (E.D.N.Y. Sept. 29, 2015); *Berman v. Rotterman*, No. 10-CV-1044A (RJA), 2011 WL 2149431, at *5 n.1 (W.D.N.Y. June 1, 2011); *Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.*, 713 F. Supp. 2d 215, 221-22 (S.D.N.Y. 2010). Whether a constructive trust is an "independent theory of liability" or "a request for a particular equitable remedy," the Court finds that it is properly put forward in the complaint and will not dismiss it on this basis alone.

Next, Triadou argues that the claim must be dismissed because the requisite fiduciary duty is lacking. Dkt. No. 86 at 28 n.21. Under New York law, four factors govern the imposition of a constructive trust: "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject *res* made in reliance on that promise; and (4) unjust enrichment." *In re First Cent. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004) (quoting *United States v. Coluccio*, 51 F.3d 337, 340 (2d Cir. 1995)). However, "the absence of any one factor will not itself defeat the imposition of a constructive trust when otherwise required by equity." *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 353 (2d Cir. 1992). In fact, at least one court in this circuit has specifically acknowledged that "the victim of the theft . . . may be able to recover the property purchased with the stolen money . . . by virtue of a constructive trust imposed on the proceeds held by the thief or embezzler." *SEC v. Universal Express, Inc.*, No. 04-CV-2322 (GEL), 2008 WL 1944803, at *3 (S.D.N.Y. Apr. 30, 2008) (Lynch, J.) (internal quotations and alterations omitted) (collecting cases). As a result, the lack of a fiduciary duty between Almaty, BTA Bank, and Triadou standing alone does not require dismissal of Almaty and BTA Bank's constructive trust request and Triadou's motion to dismiss on that basis is

EXHIBIT E

denied. *See Simonds v. Simonds*, 380 N.E.2d 189, 194 (N.Y. 1978) (a constructive trust may be imposed "even in the absence of a confidential or fiduciary relation").

## VI. EXTRATERRITORIALITY

Finally, Triadou argues that Almaty and BTA Bank's RICO claims are impermissibly extraterritorial. Dkt. No. 86 at 29. This argument rests solely on the claim that *European Community v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014) was wrongly decided. Dkt. No. 86 at 29-32 (conducting the extraterritoriality analysis relying on "pre-*RJR Nabisco* precedent in the Second Circuit"). On June 20, 2016, the Supreme Court reversed and remanded the Second's Circuit decision in *RJR Nabisco. See RJR Nabisco Inc., v. European Cmty.*, No. 15-138, slip. op. at 28 (U.S. June 20, 2016). In light of this development, the Court invites additional briefing as to whether and how the Supreme Court's decision in *RJR Nabisco* affects this action. Triadou's briefing, not to exceed 10 pages, shall be due on or before July 6, 2016. Almaty and BTA's responsive briefing, not to exceed 10 pages, shall be due on or before July 20, 2016. Triadou's reply briefing, not to exceed 5 pages, shall be due on or before July 27, 2016.

## VII. CONCLUSION

For the foregoing reasons, Almaty and BTA Bank's motion for joinder is granted and BTA Bank, Mukhtar Ablyazov, Viktor Khrapunov, and Ilyas Khrapunov are joined in this action. Triadou's motion to dismiss is granted with respect to Almaty and BTA Bank's alter ego and replevin claims, but denied in all other respects.

The Court will schedule an initial pretrial conference by separate order.

This resolves Dkt. Nos. 47, 84.

EXHIBIT E

SO ORDERED.

Dated: June ___, 2016
       New York, New York

_____
ALISON J. NATHAN
United States District Judge

33

EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUN 2 4 2016
```

CF 135 Flat LLC *et al.*,

        Plaintiffs,

        –v–

Triadou SPV N.A. *et al.*,

        Defendants.

15-CV-5345 (AJN)

MEMORANDUM AND
ORDER

ALISON J. NATHAN, District Judge:

On April 1, 2016, Almaty and BTA Bank ("Movants") requested a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 to prevent Triadou from enforcing its $10.5 million state court judgment against CF 135 Flat LLC, CF 135 West Member LLC, and the Chetrit Group LLC ("the Chetrit Entities"). Dkt. No. 106. On May 11, 2016, Movants filed an additional motion for attachment of Triadou's assets under Federal Rule of Civil Procedure 64 and New York Civil Procedure Law and Rules ("CPLR") § 6212(a). Dkt. No. 140. The Court construed Movants' papers as requesting a temporary restraining order while the preliminary injunction motion was pending, but the Court denied that request on May 3, 2016. Dkt. No. 131. For the reasons articulated below, Movants' motion for a preliminary injunction is denied, but their motion for attachment is granted.

## I.   BACKGROUND AND PROCEDURAL HISTORY

In 2014, Triadou assigned its interest in the New York-based Flatotel condominium project to the Chetrit Entities. Dkt. No. 103 at 1. Under the contract, the Chetrit Entities were to pay Triadou $21 million in four installment payments. *Id.* The Chetrit Entities did not make the

1

EXHIBIT F

required payments and Triadou has, to date, been awarded judgments totaling $10.5 million in the course of ongoing state court litigation on the issue. *Id.*

In July 2015, the Chetrit Entities initiated an interpleader complaint based on the 2014 assignment agreement. Dkt. No. 1. In their Answer, Movants filed a number of crossclaims, counterclaims, and claims against third parties. Dkt. No. 49. Although the interpleader complaint has been dismissed, Dkt. No. 103, and Movants have settled their claims against the Chetrit Entities, Dkt. Nos. 69, 71, the Movants' claims against Triadou, Ilyas Khrapunov, Viktor Khrapunov, and Mukhtar Ablyazov are still pending. The substance of those claims is discussed at length in the Court's June 21, 2016 Memorandum and Order, Dkt. No. 174, and the Court assumes familiarity with that material. In brief, Almaty and BTA Bank allege that the Khrapunovs and Ablyazov stole substantial amounts of money from them and then laundered those funds throughout the world. Dkt. No. 49 ¶¶ 20-23. Particularly relevant here, Movants allege that Triadou worked with the Chetrit Entities to launder these stolen funds into real estate projects, including the Flatotel and Cabrini Medical Center projects in New York. *Id.* ¶¶ 24-25.

Based on their allegations that Triadou is a vehicle for money laundering, Movants now seek to enjoin Triadou from enforcing its $10.5 million state court judgment against the Chetrit Entities. Dkt. No. 106. Shortly after that motion was filed, Movants informed the Court that Triadou had filed an application in state court to enforce its judgment against the Chetrit Entities through the appointment of a receiver. Dkt. No. 113 at 1. Because the state court set a May 4, 2016 hearing date on Triadou's receiver request, Movants requested an expedited schedule to resolve the preliminary injunction hearing. *Id.* at 2. The Court construed this as a request for a temporary restraining order. Dkt. No. 131 at 1. On April 28, 2016, Triadou and the Chetrit Entities entered into a stipulation narrowing the scope of the requested receivership. Dkt. No.

EXHIBIT F

127 Ex. 1. Based in large part on this stipulation, the Court denied Movants' request for a temporary restraining order. Dkt. No. 131.

On May 11, 2016, Movants supplemented their motion for a preliminary injunction by adding an alternate request that the Court authorize attachment of Triadou's assets under Federal Rule of Civil Procedure 64 and CPLR § 6212(a). Dkt. No. 140. The Court held an evidentiary hearing on the preliminary injunction motion and motion for attachment on May 19, 2016. In connection with that hearing, Movants elicited testimony from Abigail Tudor (a paralegal), Jehoshua Graff (lawyer for the Chetrit Entities), Nicolas Bourg (former director of Triadou), Lee Eichen (a partner at a real estate financial advisory firm), and Matthew Meltsner (the project manager of the Flatotel project). Triadou elicited testimony from Cesare Cerrito, the current director of Triadou. Following trial, the parties filed post-hearing briefing and updated proposed findings of fact[1] that were fully submitted on June 20, 2016.

## II.    FINDINGS OF FACT[2]

When "essential facts are in dispute" in connection with a motion for a preliminary injunction, "there must be a hearing and appropriate findings of fact must be made." *Visual Scis., Inc. v. Integrated Commc'ns Inc.*, 660 F.2d 56, 58 (2d Cir. 1981) (first citing *Forts v. Ward*, 566 F.2d 849 (2d Cir. 1977); then citing Fed. R. Civ. P. 52(a)). "These findings are not conclusive, and may be altered after a trial on the merits" but nevertheless "must be made." *Id.* Based on the information presented in connection with the preliminary injunction proceedings, the Court makes the following findings of fact.

---

[1] Both parties submitted post-hearing findings of fact and were provided an opportunity to respond to each other's proposed findings of fact with opposing record citations. *See* Dkt. Nos. 165, 169, 171. If a party did not oppose a proposed finding of fact with an appropriate record citation, and if that unopposed proposed finding of fact was supported by an appropriate record citation, the Court deemed that fact admitted and incorporates unopposed facts as factual findings of the Court.

[2] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

EXHIBIT F

A.   **Ablyazov Embezzles From BTA Bank and Becomes the Target of an Asset-Freezing Order**[3]

Ablyazov was the Chairman and controlling shareholder of BTA Bank from 2005 until February 2009. Almaty Ex. 33 ¶¶ 15, 42. In this role, Ablyazov embezzled between $3 and $4 billion from BTA Bank by causing the bank to issue loans to or purchase at inflated prices companies in which Ablyazov had an undisclosed interest. *Id.* ¶¶ 19, 77, 83, 87-89, 93, 96-110; Almaty Ex. 22 ¶ 3; Almaty Ex. 34 ¶ 11. Based on Ablyazov's embezzlement, Justice Teare of the Commercial Division of the Queen's Bench entered a freezing order against Ablyazov's assets. Almaty Ex. 23 ¶¶ 3-5. An entity called Telford Financiers Corp. was named as an "Undisclosed Asset" in that order. Almaty Ex. 23 at 15; Almaty Ex. 24 at 3-4, 36. Although Ablyazov did not admit his ownership in Telford Financiers Corp., Almaty Ex. 24 at 3-4, other evidence in the record before Justice Teare, *id.* at 18-21 (listing each of the items in the evidentiary record), justified its inclusion in the order freezing Ablyazov's assets. The freezing order also listed a number of "Disclosed Assets" with ties to the Seychelles and Cyprus. *Id.* at 22-28.

B.   **Ilyas Khrapunov Founds SDG and Triadou**

The Swiss Development Group ("SDG") was incorporated in July 2008. Dkt. No. 169 ¶ 42. SDG only has bank accounts in Switzerland and Luxembourg and has never generated any profits. *Id.* ¶¶ 54, 57. Ilyas Khrapunov, son-in-law to Ablyazov, and his sister Elvira provided

---

[3] The factual findings in section II.A are based on the findings of UK courts in a series of proceedings against Ablyzov (the "UK Judgments"). Although this evidence is hearsay, such evidence "may be considered by a district court in determining whether to grant a preliminary injunction." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). While the fact that certain evidence is hearsay "goes to [the] weight" that the Court may afford certain evidence, it is not a basis for "preclusion" at this stage. *Id.* The Court rejects Triadou's argument that the UK Judgments "are entitled to no evidentiary weight" solely because they are hearsay, Dkt. No. 170 at 12, as inconsistent with *Mullins*. The Court is persuaded that the UK Judgments are entitled to substantial weight because they constitute "uncontroverted findings of a respected foreign court based on an appropriate evidentiary record." Dkt. No. 172 at 12. In fact, Ablyazov appeared before the UK courts and contested the claims against him until he fled the jurisdiction. Almaty Ex. 33 ¶ 3; Almaty Ex. 34 ¶¶ 4-7. Notably, Triadou does not argue that some flaw in the UK proceedings renders these factual findings unreliable, nor does it present any contrary version of these facts.

EXHIBIT F

initial funding of between 35 and 40 million Swiss Francs (CHF) to SDG. *Id.* ¶¶ 44, 48, 51. Ilyas Khrapunov and his sister were the only private individual investors in SDG. *Id.* ¶ 52.

Ilyas Khrapunov was the Chairman of SDG from July 2008 to June 2012. *Id.* ¶¶ 42-43. In or around 2011, SDG's Board, headed by Khrapunov, decided to create a real estate investment fund and retained Nicolas Bourg as an outside consultant to head that project. *Id.* ¶¶ 60-61. In 2012, Triadou was incorporated under the laws of Luxembourg as a wholly-owned investment vehicle for SDG, *id.* ¶¶ 61-62, in order "to conceal the movement and investment" of Khrapunov and Ablyzov funds. Bourg Decl. ¶ 6.[4]  Bourg was the sole director of Triadou from 2011 until November 2014, when he was fired and replaced by Cesare Cerrito. *Id.* ¶¶ 63, 117.

### C.    Triadou Invests in the Flatotel Project

In 2012, SDG's Board decided to invest in the Flatotel and Cabrini projects through Triadou. *Id.* ¶¶ 79, 83. In October of that year, Triadou acquired a 37.5% interest in the Flatotel project from the Chetrit Entities. *Id.* ¶ 83. Triadou was a passive capital investor and was entitled to half the profits of the Flatotel project. *Id.* ¶ 87.

Funds to meet Triadou's capital obligations to the Flatotel project were wired from Telford International Ltd ("Telford") to an escrow account held by the Chetrit Entities' outside counsel. *Id.* ¶ 92. Telford is 100% owned by Telford Trust, which belongs to Elena Petelina. *Id.* ¶ 73. Petelina is married to Gennady Petelin, *id.*, who is Ilyas Khrapunov's sister's father-in-law. Cerrito Decl. ¶ 9. Telford Trust was registered in Belize with an administrator and nominee located in Madagascar. Cerrito Decl. Ex. 2 at 2; Dkt. No. 169 ¶ 77. The Deed of Trust was

---

[4] Contrary to Triadou's arguments, Dkt. No. 170 at 3-8, the Court finds Bourg's testimony credible. Any bias he may hold against Triadou due to his termination does not give him a motive to implicate himself in a far-reaching money laundering conspiracy that could open him up to civil and possibly criminal liability. The release from liability he obtained from Movants is logically only valuable to the extent that Bourg *has* any liability to them based on the alleged misconduct, and thus does not cause the Court to question his credibility. Although there are several minor inconsistencies in his testimony they are not as significant as Triadou claims. Most importantly, however, the Court finds Bourg credible because his testimony, unlike that of Cerrito, is consistent with the weight of the other evidence on key issues.

EXHIBIT F

prepared by a Seychellois corporation and the Trust had bank accounts at FBME Bank Ltd in Cyprus. Cerrito Decl. Ex. 2 at 7; Dkt. No. 169 ¶ 77; Bourg Decl. ¶ 20. Telford is an Ablyazov investment entity used to move Ablyazov's funds.[5] Bourg Decl. ¶ 10. Between November 2012 and May 2013, the Chetrit Entities received approximately $34 million from Telford's accounts at FBME Bank Ltd. on Triadou's behalf. *Id.* ¶¶ 99, 102-108. In July 2015, a component of the U.S. Treasury Department designated FBME Bank Ltd. as a "foreign financial institution of primary money laundering concern" due to its prominent and permissive use by money launderers. *Id.* ¶ 109.

### D.   Ilyas Khrapunov Steps Down As Chairman

Ilyas Khrapunov stepped down from his position as Chairman in 2012 and became an adviser to the SDG Board due to "negative press" surrounding his family. *Id.* ¶ 45. At this time, members of the Khrapunov family, including Ilyas and his father Viktor Khrapunov, were under criminal investigation in Kazakhstan and Switzerland for money laundering. *Id.* ¶ 46; *see also* Almaty Ex. 26 ¶ 11. Also around this time, Ilyas and Viktor Khrapunov were added to the Interpol list of wanted persons at the request of the Government of Kazakhstan. *Id.* ¶ 47. The negative press surrounding Khrapunov's family hindered SDG's ability to do business, particularly while Khrapunov was Chairman. *Id.* ¶ 125. For example, SDG was refused loans "a few times" due to "the presence of Mr. Khrapunov." *Id.* ¶ 91. Due, in part, to this negative press, SDG's Board decided to sell SDG. *Id.* ¶ 130.

---

[5] Triadou argues that "Almaty/BTA have not adduced sufficient evidence linking Telford, the source of Triadou's investment funds [in the Chetrit investments], to Ablyazov." Dkt. No. 170 at 21. Bourg testified about the connection between Telford and Athat Telford was an "Ablyazov investment entity used to conceal and move his funds." Bourg Decl. ¶ 10. This testimony is corroborated by the UK asset freezing order naming another Telford entity, Telford Financiers Corp, as an "Undisclosed Asset" of Ablyazov's, Almaty Ex. 24 at 36; the connections Telford Trust has to the Seychelles and Cyprus that mirror other Ablyazov entities, *id.* at 22-28; and Telford's connection to FBME Bank. Dkt. No. 169 ¶¶ 108-109.

6

EXHIBIT F

### E.    SDG Is Sold to Glatz in a Sham Sale

The "sale" of SDG to Philippe Glatz closed on March 25, 2013.  *Id.* ¶ 128; Cerrito Decl. ¶ 15.  Although Khrapunov was no longer Chairman, he remained an advisor to SDG's Board of Directors for two years after the sale for an annual salary of CHF 250,000.  Dkt. No. 169 ¶ 149. During this period of transition, SDG sought financing from Black Sea Trade & Development Bank. *Id.* ¶ 145.  Black Sea declined to provide such financing and, in doing, so, indicated that it had doubts as to Glatz's ability to finance the purchase of SDG.  Almaty Ex. 7 at 4.  Based on this information, a representative of Black Sea stated: "I am not persuaded that there's been any real change in the ownership of SDG." *Id.*; Dkt. No. 169 ¶ 146.

In light of this opinion from Black Sea, Triadou's argument that the sale of SDG to Glatz was legitimate is not credible.  Triadou attempted to rebut Black Sea's conclusion through Cerrito,[6] who testified: "Although I am not privy to all of Mr. Glatz's finances, I understand, based on working with him for the past three years and on publically available information, that Mr. Glatz's finances were and are sufficient to have purchased SDG . . . ." Cerrito Decl. ¶ 14. As Cerrito admitted on cross-examination, however, he did not have any personal insight into Glatz's finances, May 19, 2016 Tr. ("Tr.") 120:11-13, "ha[d] no idea honestly" about "how much money . . . Glatz [wa]s worth," Tr. 120:22-23, and refused to even provide a rough estimate of Glatz's net worth.  Tr. 121:1-4.

Because Triadou introduced evidence about Glatz's finances through Cerrito and not Glatz himself, Movants urge the court to draw a negative inference against Triadou based on the

---

[6] The Court did not find the testimony of Cerrito credible.  Due to his current positions as Director of Triadou and CFO of SDG, Cerrito Decl. ¶ 2, he has a significant interest in denying that SDG and Triadou engaged in any misconduct.  Second, his description of his "due diligence" of Telford, *id.* ¶ 10, is not credible in light of his knowledge of the money laundering allegations against the Khrapunovs, Tr. 109:3-4, 130:11-24, 133:6-25, 134:1, and Telford's suspicious ties to Belize, Madagascar, the Seychelles, and FBME Bank.  Cerrito Decl. Ex. 2, 7. Finally, his description of the sale of SDG and the 2014 assignment are contrary to the weight of the evidence.

EXHIBIT F

absence of Glatz's testimony. Courts may "draw an adverse inference" when "a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction yet . . . fails to call those witnesses." *Sagendorf-Teal v. Cty. of Rensselaer*, 100 F.3d 270, 275 (2d Cir. 1996) (quoting *United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir. 1988)) (internal quotation marks omitted). Movants put forth evidence from Black Sea, a neutral party who was conducting due diligence in connection with a proposed loan, that the sale of SDG to Glatz may not have been legitimate. As Triadou concedes, Glatz is the owner of Triadou's parent corporation, Dkt. No. 170 at 16 n.20, and is thus "closely allied or related to" Triadou. *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 700 (S.D.N.Y. 2014). As such, he was "peculiarly within [Triadou's] power to produce," and his "testimony would [have] elucidate[d] the transaction" in question, namely the sale of SDG. *Sagendorf-Teal*, 100 F.3d at 275 (quoting *Torres*, 845 F.2d at 1169). Glatz's testimony, far from being "unnecessary," Dkt. No. 170 at 16, would have gotten at the heart of the issue, namely his financial ability to purchase SDG, in a way that Cerrito's testimony was unable to do. Because Triadou chose to call Cerrito and not Glatz to discuss Glatz's finances and the sale of SDG, the Court will "draw an adverse inference that . . . [Glatz's] testimony . . . would have been unfavorable" to Triadou by confirming that Glatz lacked the financial ability to purchase SDG.[7] *Sagendorf-Teal*, 100 F.3d at 275.

For this reason, Glatz used funds loaned to him by the Khrapunov family to purchase the company. Dkt. No. 165 ¶ 132; Bourg Decl. ¶ 33. As a result of this arrangement, SDG was

---

[7] Triadou suggests that it is improper to draw this adverse inference at this stage. Dkt. No. 170 at 16 & n.20. Although missing witness instructions are usually given in jury trials, Triadou cites no authority suggesting that it is improper for the Court to draw such an inference in deciding a preliminary injunction motion. Courts routinely draw adverse inferences in connection with preliminary injunction proceedings. *See, e.g., John Paul Mitchell Sys. v. Quality King Distributors, Inc.*, 106 F. Supp. 2d 462, 471 (S.D.N.Y. 2000) (adverse inference for invoking Fifth Amendment). Courts also draw missing witness adverse inferences in connection with bench trials. *Donziger*, 974 F. Supp. 2d at 700; *Adelson v. Hananel*, 652 F.3d 75, 87 (1st Cir. 2011). Although there are few cases on missing witness adverse inferences at the preliminary injunction stage, at least one court in this circuit has drawn such an inference, *Lopez v. Delta Funding Corp.*, No. 98-CV-7204 (CPS), 1998 WL 1537755, at *1 n.1 (E.D.N.Y. Dec. 23, 1998, and the Court can find no decision declining to do so on the grounds Triadou advances.

EXHIBIT F

"sold" for a mere CHF 3.5 million (its equity value) when Glatz's investment bank valued the enterprise value of the company at CHF 150 million. Dkt. No. 165 ¶ 133; Dkt. No. 169 ¶ 133. Khrapunov and his sister did not withdraw their CHF 35-40 million investment from SDG after the purported sale. Dkt. No. 169 ¶ 194.

### F.    Triadou Assigns Its Interest in the Flatotel Back to the Chetrits

By 2014, Triadou had invested $34,885,565 in the Flatotel project. Dkt. No. 169 ¶ 165. Bourg, still the director of Triadou at that time, valued Triadou's U.S. assets at approximately $114 million, estimating the Flatotel project alone to be worth $62 million. *Id.* ¶¶ 119-120. Bourg estimated that Triadou's U.S. assets would grow in value to $179 million. *Id.* ¶ 121. Bourg informed the SDG Board that the Flatotel investment was worth $100 million. *Id.* ¶¶ 164, 168; *see also* Tr: 129:12-17. However, Triadou's interest in the Flatotel was assigned back to the Chetrits for approximately $32 million. Dkt. No. 169 ¶ 166. This below-market assignment was motivated by the threat of litigation against the Khrapunovs.[8] Bourg Decl. ¶ 39-40.

Triadou's alternative explanation, that the Flatotel interest was sold because Triadou did not wish to meet an unexpected capital call, is wholly implausible. Bourg testified that "if a partner missed a capital call, that partner would either be diluted, or the counterparty could make that capital call instead, which would be treated as a loan at a generous rate," Bourg Rep. Decl. ¶ 4, a description of the terms of the agreement that Triadou does not dispute. Dkt. No. 169 ¶ 170. Cerrito admitted that SDG, through the assignment, agreed to "give up the investment that it believed was worth $100,000,000 for less than half of that." Tr. 130:2-5. Triadou did not present any evidence to suggest that the penalty for missing a capital call was sufficiently severe

---

[8] Although the lawsuit in California was not filed until after assignment negotiations began, Dkt. No. 169 ¶¶ 157, 159, the close temporal proximity between these events and the implausibility of Triadou's explanation demonstrates persuasively that the assignment was motivated by the threat of litigation, not a missed capital call.

EXHIBIT F

to justify assigning its interest in the Flatotel for $2 million less than it had already invested, less than half of its estimated market value, and less than a quarter of its projected value.

### G.   Triadou Attempts to Enforce the Assignment Agreement

After the assignment agreement was executed, the Chetrit Entities failed to pay Triadou the $21 million in installment payments owed under the contract. Dkt. No. 110 ¶ 3.   Triadou and the Chetrit Entities are currently engaged in state court litigation on this topic, and the state court has awarded Triadou $10.5 million in judgments.  Dkt. No. 103 at 1.  On May 5, 2016, the state court approved a Monitorship Order to which the Chetrit Entities had consented.  Dkt. No. 132 & Ex. 1.  Under the terms of the Monitorship, Herman Cahn was appointed a Monitor "for the sole purpose of monitoring the financial transactions of the Flatotel Condominium project and monitoring and collecting all distributions and any other funds to which [the Chetrit Entities] are entitled up to the amount so as to satisfy Triadou's judgments."  Dkt. No. 132 Ex. 1 ¶ A.  If Triadou recovers funds from the Chetrit Entities in connection with the 2014 assignment agreement, it will transfer its recovery to its parent, SDG, to invest in real estate projects in Switzerland.  Dkt. No. 169 ¶ 56.

### H.   Triadou's Enforcement Efforts Have Not Been Negatively Perceived by the Real Estate Press

After the Monitorship was imposed by the state court, Movants' expert Lee Eichen predicted that the public would view the Monitorship imposed by the state court, "regardless of the exact details" of that Monitorship, "the same as the appointment of a receiver." Eichen Supp. Decl. ¶ 4.  He also predicted that "the uniform perception of the marketplace, regardless of the exact details of [any monitorship or receivership], will be that the Project is experiencing extreme financial distress."  Eichen Decl. ¶ 11.  Contrary to this prediction, the real estate press has, for the most part, accurately reported the terms of the Monitorship.  One articled explained

EXHIBIT F

that "a monitor will have access to the books and will hold onto $10.5 million in sales from

Chetrit's condo conversion of the Flatotel" in what the article characterized as an "escrow

account." Almaty Ex. 39 at 1. Another described how "profits from the Chetrit Group's

Flatotel . . . [will] be frozen in court." Almaty Ex. 40 at 1. Yet another noted that "[a] court

appointed monitor will hold on to some of the profits from Joseph Chetrit's Flatotel

condominium conversation project" and goes on to explain that "[t]he monitor . . . will have

access to the books at the condominium project and eventually collect $10.5 million in condo

sales" which "will be held in an escrow account." Almaty Ex. 41 at 1. A final article indicated

that the money collected by the Monitor "will be held in escrow." Almaty Ex. 42 at 1. In

addition to reporting the details of the Monitorship, these articles also described the basic

allegations against the Khrapunovs and Ablyazov; namely, that they are accused of stealing

substantial sums of money from Kazakhstan and then "sought to launder [those funds] in the

Flatotel condo conversion." Almaty Ex. 39; *see also* Alamaty Exs. 40-42.

## III.   CONCLUSIONS OF LAW

The Court will first address whether Movants are entitled to the requested preliminary

injunction and will then consider the request for an order of attachment.

### A.   Rule 65 Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A court may issue a preliminary

injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. In

the Second Circuit, a party may demonstrate that it is entitled to such relief in one of two ways.

First, he may "show that he is likely to succeed on the merits; that he is likely to suffer

irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor;

EXHIBIT F

and that an injunction is in the public interest." *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015). Alternatively, "he may show irreparable harm and either a likelihood of success on the merits or 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Id.* (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012)).

In opposing the pending motion for a preliminary injunction, Triadou first argues that any such relief is barred by the Anti-Injunction Act. Dkt. No. 109 at 4. Second, Triadou argues that Movants have not demonstrated irreparable injury. Dkt. No. 170 at 30. Finally, Triadou argues that Almaty has not demonstrated a likelihood of success on the merits. Dkt. No. 170 at 17.

## I.    Anti-Injunction Act

The Anti-Injunction Act does not permit a court to "grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The Supreme Court has twice held that the Anti-Injunction Act does not bar a court from enjoining a party from enforcing a state court judgment if the injunctive relief is sought by "strangers to the state court proceedings." *Imperial Cty. v. Munoz*, 449 U.S. 54, 59 (1980) (quoting *Hale v. Bimco Trading*, 306 U.S. 375, 378 (1939)). The Supreme Court suggested that this is so because state proceedings do not "b[in]d the independent suitor in the federal court as though he were a party to the litigation in the state court." *Id.* (quoting *Hale*, 306 U.S. at 378). Although no court in the Second Circuit has had occasion to evaluate this language, other circuits and treatises have. *See Gottfried v. Med. Planning Servs., Inc.*, 142 F.3d 326, 329 (6th Cir. 1998) ("[T]he Anti–Injunction Act does not bar federal lawsuits filed by individuals who . . .

12

EXHIBIT F

were 'strangers to the state court proceedings.'"); *Chezem v. Beverly Enters.-Tex., Inc.*, 66 F.3d 741, 742 (5th Cir. 1995) ("[T]he Anti–Injunction Act has no application herein because [the movants] were neither parties nor privies of parties to the state court action."); 17A Charles Alan Wright *et al.*, Fed. Prac. & Proc. § 4222 (3d ed. 2007), at 66-67 ("The Anti-Injunction Act does not bar a suit by third parties for an injunction that would nullify an earlier state court judgment . . . if the persons bringing the federal action were 'strangers to the state court proceeding.'").

The Ninth Circuit, however, has addressed this situation in the most detail. In *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867 (9th Cir. 2000), the Ninth Circuit evaluated the "continued vitality" of the so-called "strangers exception" to the Anti-Injunction Act. *Id.* at 879 (internal quotation marks omitted). Noting that no Supreme Court decision had reconsidered the issue since *Imperial County* and that the exception "has been regularly applied" by circuits in recent years, the Ninth Circuit concluded that "[o]ne who is not a party to state proceedings, nor in privity with a party, may seek a federal injunction against enforcement of a judgement obtained in those proceedings." *Id.* at 879-80 (collecting cases). For determining who is a "stranger to the state court proceedings," the Ninth Circuit held that "one who is not bound directly by virtue of a sufficiently close relationship with a party [under preclusion doctrine] is not bound indirectly by the Anti-Injunction Act." *Id.* at 879. This appears to be a faithful application of binding Supreme Court precedent articulated in *Imperial County* and *Hale*, and so the Court will apply that approach here.

Triadou does not argue (nor could it) that Movants are bound by the state court proceedings between Triadou and the Chetrit Entities under any preclusion doctrine. As a result, they are "strangers to the state court proceedings" and the Anti-Injunction Act is no bar to the requested injunctive relief. *Imperial Cty.*, 449 U.S. at 59 (quoting *Hale*, 306 U.S. at 378).

13

EXHIBIT F

2.      Irreparable Harm

"The showing of irreparable harm is '[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction'". *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)). Under this prong, parties seeking a preliminary injunction "must show that, on the facts of their case" and in the absence of the requested injunction, they will suffer a harm that "cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81-82 (2d Cir. 2010).

Movants put forward three arguments on irreparable harm. First, they argue that their claims under CPLR § 5239 "would be extinguished upon enforcement of Triadou's judgments" against the Chetrit Entities. Dkt. No. 166 at 20. Next, they argue that Triadou's enforcement of its judgment against the Chetrit Entities will irreparably harm the Flatotel project. *Id.* at 21. Finally, they argue that Triadou will remove its recovery from the jurisdiction if it succeeds in enforcing its judgment. *Id.* at 22.

a.      **Movants do not establish that Triadou's enforcement efforts will irreparably harm their CPLR § 5239 claims**

Movants argue that their CPLR § 5239 claims "will be effectively mooted" if "Triadou is able to collect on its state-court judgments against Chetrit." Dkt. No. 166 at 20. At no point in any of Movants' four briefs in support of its preliminary injunction motion do they point to any authority suggesting that enforcement of a judgment necessarily "moot[s]" or "extinguishe[s]" a claim under CPLR § 5239 to vacate that judgment. *See* Dkt. No. 107 at 6; Dkt. No. 117 at 4-5; Dkt. No. 166 at 20; Dkt. No. 172 at 19-20. Movants' initial brief indicates that their real concern is that their CPLR § 5239 claim will not be viable if the Court vacates the relevant judgment after Triadou has enforced its judgment *and removed those assets from the jurisdiction.*

14

EXHIBIT F

Dkt. No. 107 at 6 ("[A] ruling vacating judgments that have already been enforced would be a nullity, *particularly if Triadou has spirited away any assets collected upon.*") (emphasis added). For this reason, the Court does view this argument as distinct from Movants' asset flight argument, which it will consider separately below.

> **b.      Movants do not establish that Triadou's enforcement efforts will irreparably harm the Flatotel project**

Relying on Eichen's testimony, Movants argue that Triadou's enforcement of its judgment against the Chetrit Entities will irreparably harm Almaty and BTA Bank.  Specifically, they argue "that the real estate press will conflate Monitorship and receivership and create an atmosphere of negative publicity about the Flatotel while units are still being marketed," which could scare investors and cause the project to fail.  Dkt. No. 166 at 21.  Movants argue that they will ultimately bear the cost of this injury because the Flatotel is "the very asset that [they] seek to reclaim" in this action.  Dkt. No. 107 at 7.

The evidence in the record refutes Movants' irreparable injury argument.  Multiple real estate press articles, *see* Almaty Exs. 39-42, accurately reflect the "details regarding the scope [and] purpose of the Monitorship," Eichen Supp. Decl. ¶ 4, and do not express any opinion that the Monitorship indicates that the Flatotel project "is experiencing extreme financial distress." Eich. Decl. ¶ 11.  To the contrary, they suggest that the project is profitable, as the articles repeatedly note that only *profits* will be held in "escrow."  Almaty Exs. 39-42.  This evidence demonstrates that there has been no "conflat[ion of] monitorship and receivership."  Dkt. No. 166 at 21.  While there is undoubtedly "negative publicity about the Flatotel" in the "real estate press" that could potentially affect the profitability of the Flatotel, *id.*, this "negative publicity" is focused on the substance of Movants' allegations that the managers of the Flatotel project worked in concert with Ablyazov and the Khrapunovs to launder money, not the Monitorship.

EXHIBIT F

Almaty Exs. 39-42. Because negative publicity of this sort is unrelated to Triadou's enforcement

efforts, Movants cannot demonstrate that they are "likely to suffer" the specific harms associated

with negative press "in the absence of" the specific preliminary injunction requested.[9] *Clapper*,

785 F.3d at 825.

The Court thus concludes that Movants have not demonstrated that Triadou's

enforcement of its judgment against the Chetrit Entities will irreparably harm the Flatotel project.

> c.   **Movants do not establish that the requested preliminary injunction is appropriate relief from the potential risk of asset flight**

Finally, Movants argue that Triadou is likely to move its assets out of the jurisdiction as

soon as it succeeds in enforcing its judgment against the Chetrit Entities. Dkt. No. 166 at 22. As

the Court found above, Triadou has conceded that it will transfer any recovery from the Chetrit

Entities to SDG for investment in Swiss real estate. Dkt. No. 169 ¶ 56.

Movants correctly note that "federal courts have found preliminary injunctions

appropriate where it has been shown that the defendant intended to frustrate any judgment on the

merits by transferring its assets out of the jurisdiction." *In re Feit & Drexler, Inc.*, 760 F.2d 406,

416 (2d Cir. 1985) (internal quotation marks and alterations omitted). However, the preliminary

injunctions granted in such cases have been limited to prohibiting the unlawful *transfer* of assets,

not prohibiting the relevant party from coming into possession of any assets for fear of later

unlawful transfer. *See id.* (a preliminary injunction was granted "to prevent [the defendant] from

making uncollectible any judgment the Trustee may eventually obtain against her); *Republic of*

*Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986) (the preliminary injunction

"prevent[ed] any transfer or encumbrance of . . . properties that would place them beyond" the

---

[9] The Court also notes that, insofar as Movants' concern is the decreased profitability of "the very asset that [they] seek to reclaim," Dkt. No. 107 at 7, they have not demonstrated that any financial harm to the Flatotel project in the form of reduced profitability would be *irreparable*.

EXHIBIT F

reach of the court).  Even the cases the Movants cite are limited to preserving available assets, not precluding enforcement of judgments.  *See Seide v. Crest Color, Inc.*, 835 F. Supp. 732, 734 (S.D.N.Y. 1993) (party sought to "enjoin the sale" of certain assets); *see also* Dkt. No. 172 at 20-21 (describing injunctions "freezing assets" and requiring "security against a possible future judgment," but not precluding enforcement of judgments).

As the Ninth Circuit has noted, "[p]reliminary injunctive relief should be narrowly tailored, and should be no more burdensome than necessary to preserve a plaintiff's ability to obtain the complete permanent relief to which it is entitled." *State of Cal. v. Am. Stores Co.*, 872 F.2d 837, 845 (9th Cir. 1989), *rev'd on other grounds by* 495 U.S. 271 (1990); *see also Constitution State Challenge, Inc. v. Nyemchek*, No. CIV A. 300CV650 (CFD), 2001 WL 640417, at *7 (D. Conn. June 1, 2001) (finding an injunction "not narrowly tailored to the irreparable harm alleged by the plaintiffs," and, as a result "arbitrary and overly broad."); *Transamerica Rental Fin. Corp. v. Rental Experts*, 790 F. Supp. 378, 382 (D. Conn. 1992) ("In fashioning an injunction, the court should make the relief as narrow as required to attain the desired result.").  Neither the Second Circuit nor the Supreme Court have directly addressed this issue.  The Supreme Court has, however, cited the Ninth Standard's "narrowly tailored" standard, albeit in passing, without disapproval.  *See Winter*, 555 U.S. at 17 ("The appellate court concluded . . . that a blanket injunction . . . was overbroad, and remanded the case to . . . narrow its injunction . . . .").  The Second Circuit and district court decisions cited above further suggest that, when confronted with the alleged irreparable harm of asset transfer, courts are expected to limit injunctive relief to enjoining asset transfer.

In light of authority suggesting that injunctions should be narrowly tailored to the alleged harm, and specifically suggesting that the appropriate relief where the threat of unlawful transfer

EXHIBIT F

of assets is alleged is an injunction against such transfer, Movants have not demonstrated that are entitled to the requested preliminary injunction on the basis of the alleged irreparable harm. Specifically, Movants have not demonstrated that an injunction enjoining Triadou from enforcing its judgment against the Chetrit Entities is necessary to prevent asset flight, particularly where a narrower injunction specifically targeting asset flight is a viable alternative.

Because Movants have not demonstrated that the requested preliminary injunction is "narrowly tailored . . . and no more burdensome than necessary," *Am. Stores.*, 872 F.2d at 845, to prevent asset flight and have not established any other basis for irreparable harm, their motion for a preliminary injunction is denied.

### B.   Rule 64 Attachment

Federal Rule of Civil Procedure 64 authorizes "[e]very remedy . . . that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a).  The rule specifically mentions attachment as an available remedy.  Fed. R. Civ. P. 64(b).  New York's Civil Procedure Law and Rules ("CPLR") permits attachment upon a showing "that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff."  CPLR § 6212(a).  Because Triadou has not brought any counterclaims against Movants, the Court will first consider whether Movants have demonstrated sufficient grounds for attachment under the relevant statute and will then evaluate whether it is probable that they will succeed on the merits.

18

EXHIBIT F

I.       **Movants have demonstrated grounds for attachment under CPLR
         §§ 6201(1) and (3)**

CPLR § 6201(1) authorizes attachment if "the defendant is a nondomiciliary residing

without the state, or is a foreign corporation not qualified to do business in the state." CPLR

§ 6201(1). This statute "is designed to serve two independent purposes: obtaining jurisdiction

over and securing judgments against nondomiciliaries residing without the state." *ITC Entm't,*

*Ltd. v. Nelson Film Partners*, 714 F.2d 217, 220 (2d Cir. 1983). Even if attachment is

"unnecessary to secure jurisdiction," it may be "appropriate to secure the judgment" against

nondomicilaires. *Id.* However, "[a]ttachment under New York law solely for security purposes

is appropriate only when it appears likely that a plaintiff will have difficulty enforcing a

judgment." *TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 586-87 (S.D.N.Y. 2012)

(quoting *Katz Agency, Inc. v. The Evening News Ass'n*, 514 F. Supp. 423, 429 (S.D.N.Y. 1981)).

In evaluating the question, the Court "must determine whether the defendant has assets within

the State that could satisfy a judgment and whether petitioner's fear that the judgment will not be

satisfied is reasonable." *Id.* (quoting *Moran v. Arcano*, No. 89-CV-6717 (CSH), 1990 WL

96761, at *2 (S.D.N.Y. July 3, 1990)). This can be made by "showing that something, whether it

is a defendant's financial position or past and present conduct, poses a real risk of the

enforcement of a future judgment." *Bank of China, N.Y. Branch v. NBM L.L.C.*, 192 F. Supp. 2d

183, 188 (S.D.N.Y. 2002) (quoting *Meridien Int'l Bank Ltd. v. Gov't of Republic of Liberia*, No.

92-CV-7039, 1996 WL 22338, at *3 (S.D.N.Y. Jan 22, 1996)). However, unlike § 6201(3), §

6201(1) does not require a showing that the risk of an unsatisfied judgment stems from the

party's "intent to defraud . . . creditors or frustrate the enforcement of a judgment." CPLR §

6201(3).

EXHIBIT F

Triadou, incorporated under the laws of Luxembourg,[10] has admitted that, if it succeeds in enforcing its judgment against the Chetrit Entities, it will transfer its recovery to its parent, SDG, to invest in real estate projects in Switzerland. Dkt. No. 169 ¶¶ 56, 62. Triadou's candid admission of its intent to transfer these funds, once obtained, to Switzerland demonstrates "a real risk of the enforcement of a future judgment," *Bank of China*, 192 F. Supp. 2d at 188 (citation omitted), thus showing the requisite likelihood "that [Movants] will have difficulty enforcing a judgment" to satisfy § 6201(1). *TAGC Mgmt.*, 842 F. Supp. 2d at 586-87.

Movants also meet the more stringent requirements of CPLR § 6201(3), which permits attachment only if "the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." Under this provision, unlike § 6201(1), "[r]emoval, assignment, or other disposition of property is not a sufficient ground for attachment; *fraudulent intent* must be proven, not simply alleged or inferred, and the facts relied upon to prove it must be fully set forth in the moving affidavits." *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 319 (E.D.N.Y. 2009) (citation omitted) (emphasis added). Because "[f]raudulent intent is rarely susceptible to direct proof . . . courts have developed 'badges of fraud' to establish the requisite actual intent to defraud." *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983). Among these "badges of fraud" are:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

---

[10] Triadou does not contest that it is "not qualified to do business in the state." CPLR § 6201(1).

20

EXHIBIT F

*Id.* at 1582-83.

These "badges of fraud" are apparent in Triadou's 2014 assignment of its Flatotel interest back to the Chetrit Entities. As the Court found, and Triadou admitted, it had invested $34,885,565 million into the Flatotel project, Bourg valued the project between $62 and $100 million, the Board was informed that the project was worth $100 million, but the assignment was consummated for approximately $32 million. Dkt. No. 169 ¶¶ 120, 164-68. On cross-examination, Cerrito admitted that, in this transaction, SDG's Board had agreed to "give up the investment that it believed was worth $100,000,000 for less than half of that." Tr. 130:2-5. Due to Triadou's implausible explanation of this below-market assignment and the temporal proximity between the sale and the initiation of litigation in California, the Court found that the assignment was motivated by the threat of litigation in California. Thus, the "inadequacy of consideration" and "general chronology of events and transactions under inquiry," notably the liquidation of assets in response to the threat of litigation in California, *see In re Kaiser*, 722 F.2d at 1582-83, demonstrate that the 2014 assignment was undertaken with fraudulent intent. As a result, Triadou has, in connection with the California litigation, already "with intent to . . . frustrate the enforcement of a judgment that might be rendered . . . assigned property" (its Flatotel interest) and has attempted, through its enforcement efforts in New York, to "remove[] . . . from the state" the consideration due on that assignment agreement. CPLR § 6201(3). This evidence, coupled with Triadou's stated intent to the assets in question in this litigation from the jurisdiction, further demonstrate that Triadou will "do . . . these acts" again in connection with the instant litigation. *Id.*

For the foregoing reasons, the Court finds the statutory grounds for attachment described in both CPLR § 6201(1) and CPLR § 6201(3) to be satisfied.

EXHIBIT F

2.    **Movants have demonstrated a probability of success on the merits**

In addition to satisfying § 6201, a party must also demonstrate "that it is probable that [it] will succeed on the merits" before a motion for attachment may be granted. CPLR § 6212(a). Triadou argues that Movants have not demonstrated a probability of success on their RICO, unjust enrichment, or conversion claims. Dkt. No. 170 at 17-21. Triadou further argues that attachment is not appropriate on Movants' fraudulent conveyance claims. *Id.* at 22. Because the Court finds that Movants have demonstrated a probability of success on their unjust enrichment claim, it need not consider Triadou's other arguments.

To prevail on an unjust enrichment claim, "[a] plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (internal quotations and alterations omitted). Triadou argues that Movants fail to meet these requirements because "the UK Judgments have no evidentiary value" and "Almaty/BTA have not adduced sufficient evidence linking Telford . . . to Ablyazov." Dkt. No. 170 at 21. The Court, rejecting these arguments, found above that the UK Judgments are entitled to weight and that Telford is an Ablyazov investment entity used to move Ablyazov funds. As a result, the only arguments Triadou advances against Movants' unjust enrichment claim fail.

The evidence submitted by Movants unquestionably demonstrates "that it is probable that the [they] will succeed on the merits" of their unjust enrichment claim. CPLR § 6212(a). Triadou was enriched when it acquired a 37.5% interest in the Flatotel project with $34,885,565.00 in funds obtained from Telford. Dkt. No. 169 ¶¶ 83, 92, 165. This enrichment was at Movants' expense, as Ablyazov had embezzled between $3 and $4 billion from BTA

EXHIBIT F

Bank, Almaty Ex. 22 ¶ 3; Almaty Ex. 34 ¶ 11, and used Telford as an entity "to conceal and move his funds." Bourg Decl. ¶ 10. It would be "against equity and good conscience to permit" Triadou to retain either the value of the money paid on its behalf by Telford or the profits from its assignment of that same 37.5% interest, *Wildenstein*, 944 N.E.2d at 1110, because Triadou, like SDG and Telford, was "used to conceal the movement and investment" of Khrapunov and Ablyzov funds. Bourg Decl. ¶¶ 6-7; *see also Amusement Indus., Inc. v. Midland Ave. Assos., LLC*, 820 F. Supp. 2d 510, 537 (S.D.N.Y. 2011) (finding unjust enrichment where defendants "improperly obtained possession of a portion of" an escrow account and "knew that they were being given [plaintiff's] money"); *Eastman Kodak Co. v. Camarata*, No. 05-CV-6384 (DGL), 2006 WL 3538944, at *15 (W.D.N.Y. Dec. 6, 2006) (finding unjust enrichment where defendant "knowingly furthered [a] scheme to defraud by means of money laundering, and . . . in so doing . . . was enriched through her receipt of substantial sums of money.").

As a result, Movants meet the requirements for attachment under CPLR § 6212(a).

### 3. The Court will not exercise its discretion to deny the motion for attachment

Finally, Triadou asks the Court to exercise its discretion to deny the motion for attachment "if the Court also dismissed Almaty/BTA's Crossclaims on *forum non conveniens* grounds." Dkt. No. 170 at 29-30. Because the Court did not dismiss Movants crossclaims on *forum non conveniens* grounds, the Court will not deny the motion for attachment on that basis. Instead, for the reasons above, the Court grants Movants' motion for attachment.

## IV. CONCLUSION

Because Movants have not demonstrated that an injunction preventing Triadou from enforcing its judgment against the Chetrit Entities is necessary to prevent any irreparable harm, its motion for preliminary injunction is denied. However, because Movants have demonstrated

EXHIBIT F

that attachment is appropriate under CPLR §§ 6201(1) and 6201(3) and that it is probable that
they will prevail on the merits of their unjust enrichment claim, their motion for attachment is
granted.

Triadou shall submit any objections to Movants' proposed order of attachment on or
before June 29, 2016.  Also by June 29, 2016, the parties shall meet and confer and submit a
proposed amount for Movants' undertaking.

This resolves Dkt. Nos. 106, 140.

SO ORDERED.

Dated: June **24**, 2016
       New York, New York

_____
ALISON J. NATHAN
United States District Judge

24

EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JUL 18 2016
```

CF 135 Flat LLC *et al.*,

                              Plaintiffs,

            –v–

Triadou SPV S.A. *et al.*,

                              Defendants.

15-CV-5345 (AJN)

MEMORANDUM
AND ORDER OF
ATTACHMENT

ALISON J. NATHAN, District Judge:

On June 24, 2016, the Court granted the motion of the City of Almaty and BTA Bank
JSC (together, "Movants") for attachment of the assets of Triadou SPV, S.A. ("Triadou") under
Federal Rule of Civil Procedure 64 and New York Civil Practice Law and Rules ("CPLR")
§§ 6201(1), 6201(3), and 6212(a). Dkt. No. 175 at 23. The Court further ordered that, by June
29, 2016, Triadou would submit any objections to Movants' proposed order of attachment and
the parties would meet and confer and submit a proposed amount for Movants' mandatory
undertaking. *Id.* at 24. By letter dated June 29, 2016, Triadou advised the Court that the parties
were in agreement as to most of the terms of a revised proposed order of attachment prepared by
Movants, but that Triadou had two remaining objections that the parties were unable to resolve.
*See* Dkt. Nos. 182 (June 29 letter); 182-1 (revised proposed order of attachment). Movants
responded by letter dated July 5, 2016, urging adoption of their proposed order substantially as
submitted and over Triadou's objections. Dkt. No. 187. Triadou replied by letter dated July 7,
2016. Dkt. No. 189. The Court resolves Triadou's objections as set forth below and
substantially adopts Movants' proposed order with a modified undertaking provision.

EXHIBIT G

I.     ASSETS SUBJECT TO ATTACHMENT

Triadou first objects to one of the provisions in Movants' proposed order identifying the assets subject to attachment.  Specifically, Triadou submits that the attachment order should reach only funds held in escrow pursuant to the May 4, 2016 Monitorship Agreement, and, accordingly, language in the proposed order subjecting to attachment additional as-yet-unidentified property and debts of Triadou should be stricken.  Dkt. No. 182 at 1.  Triadou's sole argument in support of its position is that the parties' briefing on Movants' motion for attachment "focused on the monitorship account and [Movants] argued repeatedly that Triadou had no other assets in the jurisdiction." *Id.*  As Movants correctly note, however, the express terms of the original moving papers made abundantly clear that Movants sought to attach "all assets belonging to Triadou in this jurisdiction, specifically including (*but not limited to*) those held in escrow . . . pursuant to the Monitorship Agreement."  Dkt. No. 141 at 22 (emphasis added).  The Court granted the motion for attachment without qualification, *see* Dkt. No. 175 at 23-24, and Triadou – which declined to raise any argument in its opposition briefing regarding the scope of the requested attachment – cannot credibly now claim surprise or other undue prejudice.

As Triadou concedes on reply, New York law authorizes attachment, where appropriate, of any "debt or property against which a money judgment may be enforced."  CPLR § 6202.  Courts in this District have approved accordingly broad attachments of defendants' assets. *See, e.g., OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 305 F. Supp. 2d 340, 348 (S.D.N.Y. 2004) (plaintiffs entitled to order of attachment "with respect to any assets of those defendants in the State of New York"); *Bank of China, N.Y. Branch v. NMB L.L.C.*, 192 F. Supp. 2d 183, 185, 191-92 (S.D.N.Y. 2002) (approving attachment of "any of the Defendant's assets in New York"

EXHIBIT G

with limited stay for property that was subject of ongoing bankruptcy proceeding). Triadou does not provide, and the Court is not aware, of any support in the law for the restrictive limitation that it seeks.

Triadou requests, as an alternative to striking the above-referenced provision in full, that the provision be "revised to exclude Triadou's payment of legal fees and costs to its attorneys." Dkt. No. 182 at 1 n.2. In response, Movants concede that *bona fide* payments that Triadou actually makes to its counsel for legal services previously performed may not be attached, but argue, correctly, that any funds of Triadou held in attorney escrow accounts may be subject to attachment. Dkt. No. 187 at 2-3.

The precise contours of Triadou's request on this point are not clear to the Court. To the extent that Triadou seeks a broad carve-out for any funds held in attorney escrow accounts (a position that it appears to disavow on reply), such a request is clearly unsupported by New York law. *See, e.g., Gala Enters., Inc. v. Hewlett Packard Co.*, 970 F. Supp. 212, 217 (S.D.N.Y. 1997) ("Funds placed into an escrow account are likewise subject to attachment. As a general matter, funds kept in an escrow account, such as an Interest on Lawyer Account, are funds of the client held by the attorney in his fiduciary capacity. . . . The mere fact that the escrow account is being held by a defendant's lawyer does not preclude attachment.") (internal citations omitted); *Potter v. MacLean*, 75 A.D.3d 686, 687 (3d Dep't 2010) (funds held by an attorney as a retainer for legal services to be rendered, "even if deposited in an escrow account, may be attached as long as they are subject to the judgment debtor's present or future control, or are required to be returned to the judgment debtor if not used to pay for services rendered") (internal quotation marks omitted). To the extent that Triadou seeks an explicit exception for earned fees paid to counsel for legal services previously rendered, such funds – as Movants concede – are ordinarily

EXHIBIT G

not subject to attachment in the first place, and no express provision to that effect is required. *See Gala Enters.*, 970 F. Supp. at 220-21 (nonrefundable earned fees paid to law firm not subject to attachment); *see also* 12 Carmody-Wait 2d, N.Y. Prac. § 76:121 ("Attachment will only lie against property of the debtor, and the right to attach is only the same as the debtor's own interest in it."). Should any dispute arise concerning the attachability of specific funds in the possession of Triadou's counsel, the Court will consider any applications to modify the attachment order as necessary at that time. *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 488 (S.D.N.Y. 2004). At present, however, the language in Movants' proposed order setting forth the property subject to attachment is substantially acceptable to the Court. For the sake of clarity, however, the Court will adopt Triadou's proposal on reply, Dkt. No. 189 at 2 n.3, of including in the order language limiting the attachment to assets in New York, the express target of Movants' motion. *See* Dkt. Nos. 141 at 22; 187 at 1-2.

## II.   AMOUNT OF UNDERTAKING

Triadou also objects to the amount of Movants' proposed undertaking. Dkt. No. 182 at 2-3. CPLR § 6212(b) requires, in pertinent part, that, "[o]n a motion for an order of attachment, the plaintiff shall give an undertaking, in a total amount fixed by the court, but not less than five hundred dollars." The purpose of the undertaking is to "indemnify the defendant for damages that may be sustained by reason of a wrongful attachment." *Allstate Ins. Co. v. Rozenberg*, No. 08-cv-565, 2009 WL 9081080, at *6 (E.D.N.Y. Jan. 26, 2009). Movants here propose an undertaking in the amount of $10,000 (which equates to roughly .014% of the approximately $69 million in assets subject to attachment). Dkt. Nos. 182-1 at 3; 187 at 3. Triadou maintains that

EXHIBIT G

$10,000 affords it insufficient protection and counters with a proposed undertaking of $800,000

(roughly 1.2% of the attachment).  Dkt. Nos. 182 at 2-3; 189 at 2-3.

Courts in this District do not follow any set formula when determining an appropriate

undertaking under § 6212(b).  In terms of percentage of the assets subject to attachment, both

parties' positions, although sharply divergent, do find some support in the case law.[1]  The

parties' submissions, moreover, identify a variety of competing considerations, including

Movants' likelihood of success on the merits and Triadou's interest in ensuring its ability to

recover from Movants (which are both foreign entities) in the event that it does prevail or the

attachment is ultimately deemed wrongful.  Under the circumstances, the Court finds the

approach recently taken by Judge Scheindlin in *In re Amaranth Natural Gas Commodities Litig.*

instructive, and concludes that an undertaking in the amount of $200,000 (approximately .29% of

the attachment) is appropriate to satisfy the goal of § 6212(b).  *See In re Amaranth Natural Gas*

*Commodities Litig.*, 711 F. Supp. 2d 301, 313 (S.D.N.Y. 2010) ($72.4 million attachment on

undertaking of $250,000 (.35%)); *see also JSC Foreign Econ. Ass'n Technostroyexport v. Int'l*

*Dev. & Trade Servs., Inc.*, No. 03-cv-5562, ECF No. 122 (S.D.N.Y. Mar. 23, 2004) ($200

million attachment on $500,000 undertaking (.25%)).[2]

---

[1] *Compare Bank of China*, 192 F. Supp. 2d at 185-86, 192 (confirming attachment of assets to satisfy $34 million
claim on undertaking of $5,000 (.015%)); *and OSRecovery*, 305 F. Supp. 2d at 348 ($250 million attachment on
undertaking of $100,000 (.04%)); *with N.Y. Dist. Council of Carpenters Pension Fund v. KW Construction, Inc.*, No.
07-cv-8008, 2008 WL 2115225, at *6 (S.D.N.Y. May 16, 2008) (approximately $1.1 million attachment on $50,000
undertaking (4.5%)).

[2] The Court notes that, if Triadou ultimately prevails on the merits or the attachment is deemed wrongful, Movants'
liability to Triadou "shall not be limited by the amount of the undertaking."  CPLR § 6212(e).

EXHIBIT G

### III.   CONCLUSION

Movants having moved for an order of attachment directed to the assets of Triadou in New York upon (a) the Memorandum of Law in Support of Movants' Motion for an Order of Attachment, (b) the May 2, 2016 Declaration of Nicolas Bourg, (c) the May 3, 2016 Affidavit of Jehoshua Graff, (d) the May 2, 2016 Declaration of Abigail Tudor, (e) the May 14, 2016 Supplemental Declaration of Nicolas Bourg, (f) the testimony offered at the May 19, 2016 evidentiary hearing on this motion before the Court, (g) the May 31, 2016 Findings of Fact and Conclusions of Law submitted in Support of Movants' Motion for an Order of Attachment, (h) the June 20, 2016 Reply Findings of Fact and Reply Conclusions of Law submitted in Support of Movants' Motion for an Order of Attachment, and (i) all pleadings, papers and evidence submitted in connection with the above-captioned action, including the Answer and Crossclaims filed in this Court on October 12, 2015; from which the Court has found that Triadou has not brought any counterclaims against Movants, that the statutory grounds for attachment described in both CPLR § 6201(1) and CPLR § 6201(3) have been satisfied, and that Movants have demonstrated a probability of success on their unjust enrichment claim, Dkt. No. 175 at 18, 20-22.

**NOW**, on the motion of Boies, Schiller & Flexner LLP, attorneys for Movants, sufficient cause being alleged therefore,

**IT IS HEREBY ORDERED** that Movants Motion for an Order of Attachment is **GRANTED.**

**IT IS FURTHER ORDERED** that, for good cause shown, the attorneys for Movants, Boies, Schiller & Flexner LLP, and their respective employees, are hereby specially appointed pursuant to Federal Rule of Civil Procedure 4.1 to act in the place and stead of the U.S. Marshal

EXHIBIT G

for the Southern District of New York ("U.S. Marshal") to levy upon by service of this Order of

Attachment, but refrain from taking into actual custody, the following property:

     (a)  Any funds held in escrow by the Honorable Herman Cahn, pursuant to the

          Monitorship Agreement dated May 4, 2016 between CF 135 Flat LLC, CF 135 West

          Member LLC, the Chetrit Group LLC, and Triadou, or which may accumulate in such

          escrow pursuant to the Monitorship Agreement in the future;

     (b)  Any other property in the State of New York, whether real or personal, tangible or

          intangible, presently existing or hereafter arising, which could be assigned or

          transferred as provided by CPLR § 5201, in which Triadou has an interest, to the

          extent such interest, and upon any debts in which Triadou claims a right, as will

          satisfy at least the sum of Movants' minimum recovery in this action,

          $69,275,810.00.

     **IT IS FURTHER ORDERED** that Movants shall post an undertaking in the amount of

$200,000 within ten days of this Order.

     **IT IS FURTHER ORDERED** that having been served with this Order, pursuant to

CPLR § 6219, garnishees are directed to acknowledge in  writing to the U.S. Marshal, also

served on counsel for Movants, that the debt and property attached herein will be held on behalf

of the U.S. Marshal such that you, your agents, subdivisions, servants, officers, employees, and

attorneys, and all persons in possession of the property and/or debts described above, and all

persons acting in concert or participation with the foregoing, and all persons receiving actual

notice of this Order of Attachment, will refrain from directly or indirectly transferring, or

ordering, directing, or requesting or assisting in the transfer, or in any other way affecting the

value of, any such property or debt.

EXHIBIT G

**IT IS SO ORDERED.**

Dated: July 18, 2016
New York, New York

Hon. Alison J. Nathan
United States District Judge

8

EXHIBIT G

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBERS LLC and THE CHETRIT GROUP, LLC, | ) ) ) ) Case No. 15-cv-05345-AJN |
| Interpleader Plaintiffs, | ) ) ) |
| -against- | ) **AMENDED CROSSCLAIMS** |
| TRIADOU SPV S.A., CITY OF ALMATY, a foreign city, and BTA Bank, | ) ) ) ) |
| Interpleader Defendants. | ) ) ) ) |
| CITY OF ALMATY, KAZAKHSTAN and BTA BANK, | ) ) ) ) |
| Crossclaim Plaintiffs, | ) ) ) |
| -against- | ) ) ) |
| MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, TRIADOU SPV S.A., AND FBME BANK LTD., | ) ) ) ) ) ) |
| Crossclaim Defendants. | ) |

EXHIBIT H

## Table of Contents

INTRODUCTION ................................................................................................................. 1

THE PARTIES .................................................................................................................... 5

JURISDICTION AND VENUE ............................................................................................ 6

FACTUAL BACKGROUND ................................................................................................ 8

   *Mukhtar Ablyazov Defrauded BTA Bank of in Excess of $6 billion.* ................................. 8

   *Viktor Khrapunov Defrauded the City of Almaty of Approximately $300 million.* .......... 13

   *The Khrapunovs and Ablyazov Join Together to Launder Their Stolen Money.* .............. 15

   *The Ablyazov-Khrapunov Group Conspires to Transfer and Hide Illicit Funds in the
   United States.* ............................................................................................................. 21

   *Through SDG, the Ablyazov-Khrapunov Group Creates Triadou to Hide their Illicit
   Funds in New York Real Estate Transactions with the Chetrit Group.* ........................... 22

   *Kazakh Authorities Target the Ablyazov-Khrapunov Group's Holdings in the United
   States, and the Ablyazov-Khrapunov Group Liquidates Those Assets at Below-
   Market Value with the Chetrit Group's Assistance.* ....................................................... 30

FIRST CAUSE OF ACTION .............................................................................................. 33

   *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

SECOND CAUSE OF ACTION .......................................................................................... 38

   *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

THIRD CAUSE OF ACTION .............................................................................................. 40

   *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)) Against All Defendants*

FOURTH CAUSE OF ACTION .......................................................................................... 41

   *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

FIFTH CAUSE OF ACTION ............................................................................................... 42

   *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)) Against All Defendants*

SIXTH CAUSE OF ACTION .............................................................................................. 43

   *(ACTUAL FRAUDULENT TRANSFER) Against Defendants Triadou, Ablyazov, Viktor
   Khrapunov and Ilyas Khrapunov*

SEVENTH CAUSE OF ACTION ........................................................................................ 44

   *(CONSTRUCTIVE FRAUDULENT TRANSFER) Against Defendants Triadou, Ablyazov,
   Viktor Khrapunov and Ilyas Khrapunov*

EIGHTH CAUSE OF ACTION ........................................................................................... 45

   *(UNJUST ENRICHMENT) Against Defendants Triadou, Ablyazov, Viktor Khrapunov
   and Ilyas Khrapunov*

i

EXHIBIT H

NINTH CAUSE OF ACTION ...................................................................................... 46

   *(CONVERSION) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

TENTH CAUSE OF ACTION ..................................................................................... 46

   *(CONSTRUCTIVE TRUST) Against All Defendants*

ELEVENTH CAUSE OF ACTION .............................................................................. 47

   *(PURSUANT TO CPLR § 5239 FOR FRAUD AND CONVERSION) Against All Defendants*

TWELFTH CAUSE OF ACTION ................................................................................ 48

   *(PURSUANT TO CPLR § 5303 FOR RECOGNITION AND ENFORCEMENT OF A FOREIGN JUDGMENT UNDER NEW YORK LAW) Against Defendant Ablyazov*

THIRTEENTH CAUSE OF ACTION .......................................................................... 49

   *(AIDING AND ABETTING) Against Defendant FBME*

DEMAND FOR JURY TRIAL .................................................................................... 50

DEMAND FOR RELIEF ............................................................................................. 50

EXHIBIT H

Crossclaim Plaintiffs City of Almaty ("Almaty") and BTA Bank ("BTA" or "BTA Bank," and together with Almaty, the "Kazakhstan Plaintiffs"), by and through their undersigned counsel, for the Kazakhstan Plaintiffs' crossclaims against Defendants Triadou SPV S.A., Viktor Khrapunov, Mukhtar Ablyazov, Ilyas Khrapunov, and FBME Bank Ltd. (collectively the "Ablyazov-Khrapunov Group") allege as follows:

**INTRODUCTION**

1.      Joseph Chetrit ("Chetrit") is a well-known New York based real estate developer, who, along with crossclaim defendants Mukhtar Ablyazov ("Ablyazov"), Victor Khrapunov, Ilyas Khrapunov and others known and unknown, combined, conspired, and confederated in the commission of an international scheme to launder and conceal at least $40 million stolen from the Kazakhstan Plaintiffs.  Chetrit conspired with these international criminals by, among other things, partnering with Triadou SPV S.A. ("Triadou"), a nominee entity owned, controlled, and funded by the Ablyazov-Khrapunov Group, for the purposes of converting the stolen funds into valuable New York City real estate.

2.      BTA, a bank based in Almaty, Kazakhstan, seeks to regain assets looted by its former Chairman, Mukhtar Ablyazov, who abused his position to enrich himself and treat BTA as his personal property.  BTA has commenced and successfully obtained judgments in proceedings against Ablyazov in the courts of the United Kingdom for defrauding BTA Bank of no less than $4 billion.

3.      Almaty, the largest city in the Republic of Kazakhstan, seeks to regain assets looted by its former mayor, Victor Khrapunov ("Khrapunov"), and his family and co-conspirators, to be returned for the benefit of the people of Almaty.  Khrapunov abused and corrupted his position as the mayor of Almaty for the purposes of embezzlement, fraudulent self-

1

EXHIBIT H

dealing, and blatant looting of public assets.  He reaped an estimated $300 million or more

through various  fraudulent activities, including rigged auctions, the improper sale of public

property to  friends and co-conspirators, and fraudulent abuse of eminent domain powers, before

fleeing Kazakhstan and   secreting these stolen funds across the globe.

4.      The Khrapunovs and Ablyazov, both fighting law enforcement investigations and

asset seizures by Kazakh authorities, joined forces and commingled their stolen funds.  Through

joint investments across the globe, the two renegade families combined and conspired to launder

their illicit wealth into real estate, energy assets, and other investments in locales they deemed

safe from seizure.  Ilyas Khrapunov, related by marriage to Ablyazov, helped orchestrate these

efforts and steered the families' joint investments into assets within this Court's jurisdiction.

5.      The Ablyazov-Khrapunov Group's money laundering schemes relied heavily on

the cooperation of officers within FBME Bank, Ltd ("FBME"), a Tanzanian-incorporated

financial institution operating primarily out of the Republic of Cyprus. Until 2014, FBME had

long been known as a financial institution open for business to money launderers and international

criminals. FBME joined the Ablyazov-Khrapunov Group's money laundering conspiracy by

knowingly aiding the Ablyazov-Khrapunov Group's members in hiding and laundering funds and

evading asset freezes and investigations. In 2014, FBME was designated a "foreign financial

institution of primary money laundering concern" and effectively banned from the legitimate

international financial system by the Financial Crimes Enforcement Network ("FinCEN") of the

U.S. Department of the Treasury, a decision subsequently described by FBME as a "death

sentence."

6.      Collectively, the Ablyazov-Khrapunov Group has been the subject of numerous

proceedings and investigations across the globe, arising from their theft of billions of dollars from

2

EXHIBIT H

entities and municipalities in the Republic of Kazakhstan.  They have sought to hide their stolen

wealth from investigators and law enforcement through a vast network of shell corporations and

outwardly-legitimate investments, including major New York real estate developments such as the

Flatotel and Cabrini Medical Center condominium conversions.  Through these investments, the

Chetrit Group allied itself with the Ablyazov-Khrapunov Group and their global money laundering

endeavor.

7.        The Ablyazov-Khrapunov Group laundered their ill-gotten assets through a

number  of shell corporations, including Triadou.  With the help of Chetrit and the Chetrit Group,

the  Ablyazov-Khrapunov Group parked these corrupt assets in New York City real estate,

hoping to  avoid the scrutiny of escalating international investigations into the Ablyazov-

Khrapunov Group's  illicit activities.

8.        Due to heavy scrutiny by international law enforcement, including criminal

investigations by the Kazakh and Swiss authorities, the funds that the Ablyazov-Khrapunov

Group, through Triadou, invested into the Flatotel and Cabrini Medical Center projects could not

pass through legitimate banking channels.  The Crossclaim Defendants devised a plan to

circumvent legitimate banks and transfer funds directly from the Ablyazov-Khrapunov Group's

offshore accounts with FBME to the escrow account of the Chetrit Group's long-time attorneys.

9.        In return for facilitating the Ablyazov-Khrapunov Group's money laundering

scheme, the Chetrit Group got access to the stolen funds to fund its real estate projects, and

entered into deals that entitled the Chetrit Group to a disproportionate share of the projects'

profits.

10.        Due to concern that he was partnering with reputed international criminals,

however, Chetrit conducted his communications with the Ablyazov-Khrapunov Group by using

3

EXHIBIT H

code names. For example, Chetrit used code names such as "Jose" and "Pedro" to refer to and communicate with crossclaim defendant Ilyas Khrapunov.  It was only in face-to-face meetings, many of which were secretly recorded, that Ablyazov's involvement, legal difficulties and incarceration were openly discussed.

11.     Ultimately, Almaty and BTA Bank were able to trace the stolen assets to the United States.  Rather than let Almaty and BTA reclaim their rightful property, the Ablyazov-Khrapunov Group, through Triadou, began to urgently liquidate their real estate holdings, hoping to spirit their illicit funds to more permissive locales.  In an attempt to monetize the Ablyazov-Khrapunov Group's real estate interests as quickly as possible, Triadou entered into a fraudulent, below-market assignment with the Chetrit Group for Triadou's principal New York assets, interests in the Flatotel and Cabrini Medical Center real estate developments.

12.     Specifically, in May 2014, the City of Almaty filed an action in federal court in California against members of the Ablyazov-Khrapunov Group.  With the Kazakhstan Plaintiffs' collection efforts having expanded to the United States, and with the Ablyazov-Khrapunov Group in imminent danger of having its stolen assets seized or attached, the Ablyazov-Khrapunov Group, through Triadou, took immediate steps to liquidate its U.S. assets and move its money offshore again. The Chetrit Group's assistance was essential to placing the stolen assets out of the reach of the Kazakhstan authorities.

13.     Upon information and belief, Chetrit seized on this opportunity to double cross his co-conspirators.  Understanding that the potential asset seizures or restraints put the Ablyazov-Khrapunov Group in a desperate situation, he devised scheme to acquire Triadou's investments for a fraction of their value.  To achieve this result, Chetrit bribed Triadou's Director to drive down the purchase price of the assignment.  The Chetrit Group ultimately succeeded in acquiring

EXHIBIT H

Triadou's interest in both the Flatotel and Cabrini properties for as little as $26,000,000.00 — far less than even what Triadou had originally invested — at a time when real estate values in New York were at an all-time high.

14.     Almaty and BTA Bank now seek, among other relief, to unwind and recover the proceeds of these fraudulent transactions.  Doing so will hold  the Crossclaim Defendants liable for their corruption and fraud, and  return the full value of Triadou's New York assets to their rightful owners: BTA Bank and the City of Almaty.

**THE PARTIES**

15.     Crossclaim plaintiff Almaty is a legal subdivision of the Republic of Kazakhstan. Almaty is the former capital of the country, and continues to be the largest city in the Republic of Kazakhstan, with more than 1.5 million residents.

16.     Crossclaim plaintiff BTA Bank is a Joint Stock Company and Kazakhstan bank with its headquarters in Almaty, Kazakhstan.  Until in or about September 2014, BTA Bank was majority owner and controlled by the Republic of Kazakhstan.

17.     Crossclaim defendant Triadou SPV S.A. is a special purpose  investment vehicle incorporated under the laws of Luxembourg, with a principal place of business at  3, Rue du Mont-Blanc, 1201 Geneva, Switzerland.  Triadou SPV S.A. is wholly-owned by SDG Capital S.A.

18.     Crossclaim defendant Viktor Khrapunov, an individual, is the former  Mayor of the City of Almaty, who, upon information and belief, currently resides in the  city of Geneva, Switzerland.

19.     Crossclaim defendant Mukhtar Ablyazov, an individual, is the former Chairman of BTA Bank and has been found liable for defrauding BTA of in excess of $6 billion.  Ablyazov

EXHIBIT H

was the subject of eleven proceedings commenced by BTA Bank in the United Kingdom to recover assets Ablyazov stole.  During those proceedings, Ablyazov was found by multiple international courts to have lied, misled, misconstrued, and concealed assets in blatant disregard of Court orders, and was ordered imprisoned for 22 months.  During these proceedings, Ablyazov fled the United Kingdom to avoid the many judgments against him.   He is currently incarcerated in France pending extradition to Russia or Ukraine.

20.     Crossclaim defendant Ilyas Khrapunov, an individual, is the son of Viktor Khrapunov, as well as the former president of SDG Capital S.A., who, upon  information and belief, currently resides in the city of Geneva, Switzerland.  Ilyas Khrapunov is married to Ablyazov's daughter, Madina.

21.     Crossclaim defendant FBME Bank Ltd. is a financial institution headquartered in Dar es Salaam, Tanzania and operating primarily out of Cyprus. FBME is jointly owned by Ayoub-Farid Saab and Fady Saab, but is currently controlled and administered by representatives of the Central Bank of Cyprus.

**JURISDICTION AND VENUE**

22.     The Crossclaims are brought under Rule 13 of the Federal Rules of Civil Procedure.  This Court has subject matter jurisdiction under 28 U.S.C. §  1331 and 18 U.S.C. § 1964(c) over the claims for relief alleging violations of the  federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§  1961 et seq. and for conspiracy to violate RICO.   This Court has supplemental jurisdiction  over the sixth through thirteenth claims for relief pursuant to 28 U.S.C. § 1367, as those  claims are substantially related to Almaty's and BTA Bank's claims under RICO and arise from a common  nucleus of operative facts, and thus they form part of the same case or controversy under  Article III of the United States Constitution.

6

EXHIBIT H

23.     Alternatively, this Court has supplemental jurisdiction over Almaty's and BTA Bank's claims under 28 U.S.C. § 1367, as those claims are substantially related to the original interpleader suit brought by Chetrit and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

24.     Alternatively, the City of Almaty is a "foreign state" as that term is defined in 28 U.S.C. § 1603, and this Court has jurisdiction over Almaty's and BTA Bank's claims under 28 U.S.C. §§ 1330, 1441(d), which provide for the removal of any civil action brought in a State court against a foreign state.

25.     Alternatively, this Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because at the time this action was filed (i) there was complete diversity of citizenship between the parties, and (ii) more than $75,000, exclusive of interest and costs, is at stake.

26.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Almaty's and BTA Bank's claims occurred in this District, including, among other things, the negotiation, investment and subsequent transfer of interest in the Flatotel and Cabrini Medical Center properties located in New York, New York.

27.     This Court has personal jurisdiction over Triadou, Ablyazov, Viktor Khrapunov, Ilyas Khrapunov, and FBME because each of them knowingly committed acts in New York that form the basis of this action, directed or conspired with others to commit acts in New York, and/or purposely availed themselves of the privileges of doing business in New York, as fully set forth herein.

7

EXHIBIT H

### FACTUAL BACKGROUND

*Mukhtar Ablyazov Defrauded BTA Bank of in Excess of $6 billion.*

28.     Ablyazov was the Chairman of BTA Bank from May 2005 until February 2009. He is the father-in-law of crossclaim defendant Ilyas Khrapunov, who is married to Ablyazov's daughter, Madina.  Along with crossclaim defendant Viktor Khrapunov, Ablyazov is a central member of the Ablyazov-Khrapunov Group money laundering and embezzlement conspiracy.

29.     As the Courts of the United Kingdom have found, while Chairman of BTA Bank, Ablyazov exercised virtually unfettered control over the bank's operations while hiding that control from Kazakhstan's banking regulators, and used this influence to treat BTA's assets as his own. As Justice Teare of the High Court of England and Wales (Commercial Court) found:

> [P]rior to the nationalisation of the Bank in February 2009, Mr. Ablyazov admitted to owning over 75% of the shares in the Bank. Those shares were not held by Mr. Ablyazov personally but by nine companies on his behalf. However, Mr. Ablyazov did not admit that ownership to the AFN, the banking regulator in Kazakhstan. In January 2009, shortly before the nationalisation of the Bank, the AFN requested Mr. Ablyazov to state whether he owned more than 10% of the shares in the Bank. He replied on 19 January 2009 that he did not own directly or indirectly more than 10% of the shares in the Bank. That statement was untrue.
>
> . . .
>
> Banks in Kazakhstan tend to be operated in a different manner from that in which they are typically operated in the West. It is common for banks to be owned by a single shareholder who is both chairman of the board of directors and also closely involved in the management of the bank. He therefore has considerable influence over the operation of the bank. Mr. Ablyazov's relationship with the Bank conformed with this general description of Kazakh banking practice. Thus Mr. Talvitie, the independent member of the Board of Directors of the Bank from East Capital, gave evidence that it seemed to him that at board meetings Mr. Ablyazov had already made the decisions. He described the other members of the board as "straw men". Others in the Bank, below board level, had the same impression. Thus Ms. Tleukulova (a member of the Credit Committee) gave evidence in Russia in 2012 that "all top managers of the bank, including Board Members, have to obey him". Mr. Khazhaev also gave evidence in Russia in 2012 that Mr. Ablyazov was "the main" person in the Bank who controlled the granting of the largest and most important loans. Mr. Ablyazov's control of the Bank is illustrated by his issue of an order ("the Ablyazov Order") whereby he, as Chairman, amended certain procedural rules governing the grant of loans.

EXHIBIT H

. . .

[O]fficers and staff in the Bank did not draw a clear distinction between the Bank
having an interest in a project and Mr. Ablyazov, as shareholder in the Bank,
having a personal interest in a project. Thus [Deputy Chairman] Zharimbetov,
when being crossexamined, failed to draw a clear distinction, in the context of the
offshore companies with which he dealt, between Mr. Ablyazov and the Bank.
Thus the unfortunate reality appears to have been that little, if any, distinction was
drawn by personnel in the Bank between the Bank's property and Mr. Ablyazov's
property. The Vitino port project was an example of that reality. Mr. Khazaev
told a Russian court in 2012 that Mr. Ablyazov treated the Bank as his property.

30.      Ablyazov's abuse of his position as chairman took many forms, principally

through enormous loans to valueless entities owned by Ablyazov, which would then be obscured

by transfers among different shell corporations, and never repaid.

31.      For example, in one series of loans (referred to as the "Original Loans" by the UK

court in the "Granton Action"), between March 2006 and August 2008, Ablyazov directed twenty

loans totaling $1,428,840,000 to entities with minimal assets and for no apparent reason.  These

loans were made to entities outwardly unaffiliated with Ablyazov ("Original Borrowers"), but

were actually transferred to entities controlled by Ablyazov ("Original Real Borrowers").  As the

UK court found:

Mr. Ablyazov did not disclose to the Board that he owned or controlled those
[Original] Borrowers. He has never claimed that he did so and there is no evidence
that he did. None of the represented Defendants has suggested that he did. In those
circumstances there can be only one explanation for the fact that the very large
sums of money which were advanced were immediately transferred to companies
owned or controlled by Mr. Ablyazov, namely, that the Original Loans were part
of a dishonest scheme whereby Mr. Ablyazov sought to misappropriate monies
which belonged to the Bank. The scheme was fraudulent because Mr. Ablyazov
did not disclose to the Board his interest in the Original Borrowers or that the real
purpose of the loans was to pay out the Bank's money to the Original Real
Borrowers who were to use the monies for Mr. Ablyazov's purposes. The purpose
of such nondisclosure must have been to deceive the Board so that it remained in
ignorance of the "related party" nature of the Original Loans and of their true
purpose.

32.      When, in or about 2008, Ablyazov's involvement in the Original Loans was in

9

EXHIBIT H

danger of discovery, he directed that additional fraudulent loans be made in an attempt to cover up his earlier fraud.

33.     Between November 4, 2008, and December 4, 2008 a number of loans (the "Later Loans") totaling $1,031,263,000 were made, ostensibly for the purchase of oil and gas resources. The UK court, however, found it "beyond argument" that these loans of BTA funds were made only to hide Ablyazov's earlier theft:

> The Later Loans were made between 5 November and 8 December 2012 but they were paid out, not to the Later Borrowers, but to Intermediaries who paid them on to other companies, the Recipients, who in turn paid them to the Bank in apparent discharge of the Original Loans. They were not used for the purchase of oil and gas equipment. Documents said to support and evidence the Later Loans were created after the monies had been paid out by the Bank but backdated. Thus contracts for the purchase of oil and gas equipment supposedly by the Later Borrowers were still being prepared in late November 2008 and backdated to 23 October 2008.
>  . . .
> Expert evidence as to the oil and gas industry was adduced by the Bank to establish that the oil and gas contracts were shams because of the lack of specific provisions which would be appropriate for contracts of their size. But such evidence was unnecessary. The email evidence shows that the contracts were prepared by persons within the Bank.
>  . . .
> It is beyond argument that the Later Loans were a mere cloak which sought to hide from view the reality, which was that money was being extracted from the Bank for the purpose of paying back the Original Loans. Since this circular exercise benefitted Mr. Ablyazov (because he owned or controlled the Original Borrowers) it is also clear that he must have orchestrated or, at the least, authorised this fraud.

34.     As a result of Ablyazov's siphoning billions out of the company, in 2009, BTA Bank defaulted on billions of dollars of debt held by investors including Credit Suisse Group AG, HSBC Holdings Plc, JPMorgan Chase & Co. and Royal Bank of Scotland Group Plc. Kazakhstan's sovereign wealth fund, Samruk-Kazyna, was forced to take control of BTA Bank, and Ablyazov fled to London.

EXHIBIT H

35.     BTA then commenced the first in a series of lawsuits against Ablyazov, claiming that he had misappropriated approximately $295,000,000 pursuant to this fraudulent scheme. Other proceedings followed against Ablyazov in the Chancery Division and England High Court. In every proceeding, BTA alleged (and ultimately proved) that Ablyazov treated BTA as his own private source of funds.  In all, BTA commenced eleven proceedings against Ablyazov and his lieutenants for defrauding BTA in excess of $6 billion.  The UK courts took the unprecedented legal step of granting BTA a Worldwide Freezing Order over Ablyazov's assets.

36.     As part of these UK proceedings, in late 2010 BTA obtained a number of search and disclosure orders that uncovered a vast network of undisclosed companies and assets used by Ablyazov to hold and invest his stolen wealth.  The UK courts ordered Ablyazov's assets to be put in the receivership of the accounting firm KPMG (the "Receivership Order"), finding that Ablyazov had breached various disclosure and freezing orders against him.  The Receivership Order gave the receiver the right to recover a network of many hundreds of entities, worth billions of dollars.

37.     On January 26, 2011, a further 212 companies were added to the scope of the Receivership Order and on April 8, 2011, a further 3,890 companies were added.

38.     After Ablyazov defied the Receivership Order entered by the UK courts, BTA obtained judgments and sanctions against him for, among other acts, flaunting court orders, fleeing and hiding from judicial proceedings, lying during proceedings, and refusing to comply with orders directing him to uncover assets.  For his numerous actions in contempt of court, Ablyazov was sentenced to 22 months imprisonment for his conduct.

39.     On February 16, 2012, despite having promised the court his attendance at his contempt hearing, Ablyazov did not appear.  Ablyazov left behind a 100-acre estate in the English

EXHIBIT H

countryside and a London mansion, valued at least 20 million pounds sterling (approximately $31 million) each, and no fewer than 750 shell companies used to invest his stolen funds in oil production, property development, and agriculture.

40.     On November 6, 2012, the Court of Appeal unanimously upheld the judgments and contempt orders against Ablyazov.  Concurring in the judgment, Lord Justice Maurice Kay stated that it was "difficult to imagine a party to commercial litigation who has acted with more cynicism, opportunism and deviousness towards court orders than Mr. Ablyazov."

41.     Following Ablyazov's flight from justice, BTA has been granted judgments in 5 of the 11 claims against Ablyazov and his associates, with others still pending, and has been awarded over $4 billion in damages by the UK courts, with interest continuing to accrue. (the "Ablyazov Judgments").

42.     After a global search spearheaded by BTA Bank, French special forces found and arrested Ablyazov in a luxury villa in France on July 31, 2013.  He remains detained in a French prison pending extradition, and the courts of France have refused to release him on bail three times.

43.     Following Ablyazov's capture and imprisonment, through his counsel and other channels, Ablyazov remained in regular communication with his son-in-law, Ilyas Khrapunov, who assumed operational control of much of Ablyazov's money laundering operations and, in concert with Ablyazov and Viktor Khrapunov, has continued the Ablyazov-Khrapunov Group's combined efforts to hide their wealth.

44.     Ilyas Khrapunov's continuing role in facilitating the Ablyazov-Khrapunov Group's money laundering efforts was confirmed on July 17, 2015, when Justice Males of the Commercial Division of the Queen's Bench of the U.K. High Court of Justice expanded the

EXHIBIT H

freezing order against Ablyazov to encompass specified assets of Ilyas Khrapunov. In response to

the disclosure obligations imposed by the freezing order, Ilyas Khrapunov invoked his privilege

against self-incrimination.

### *Viktor Khrapunov Defrauded the City of Almaty of Approximately $300 million.*

45.    In 1991, the Republic of Kazakhstan declared its independence from the  former

Soviet Union and began the process of transitioning from communism to an open  market

economy.  This transition required substantial privatization of vast state assets in  order to restart

the nation's economy and raise revenue for improvements to the nation's  infrastructure and

public services.

46.     Viktor Khrapunov became mayor of the City of Almaty on or about June  16,

1997, and remained in that position until approximately December 2004.  At the time  Viktor

Khrapunov took office, the Republic of Kazakhstan was experiencing the  beginning of a natural

resources boom and accompanying drive for investment,  infrastructure upgrades, and new

construction.  Almaty was the nation's former capital  and largest city, and held enormous public

assets remaining to be privatized and  developed, a responsibility which the office of the mayor

oversaw and directed.

47.    Before Viktor Khrapunov assumed the office of the mayor of Almaty, he took an

oath of office to obey the Constitution and laws of the Republic of  Kazakhstan.  Among other

things, he expressly and impliedly promised that he would  uphold his fiduciary duties to the

people of Almaty, would honor his obligation to provide honest services, and would not convert

money, property, or assets belonging to the City of Almaty for his own use or that of his family,

friends, or associates.

48.    In reality, Viktor Khrapunov, along with his son, Ilyas Khrapunov, and other

EXHIBIT H

Khrapunov family members and co-conspirators, almost immediately began a multi-year scheme to enrich themselves through the corrupt abuse of Khrapunov's public position as mayor.

49.     Viktor Khrapunov repeatedly and systemically used the powers of the office of the mayor to transfer public assets belonging to the City of Almaty to his family and their co-conspirators for prices that were a fraction of their fair value.  This  was often achieved by arranging fraudulent auctions to ensure that interested bidders won  these assets at nominal prices.  In other instances, Viktor Khrapunov used the  eminent domain powers of the office of the mayor to seize private property ostensibly for  the City of Almaty, but then promptly transferred that property to entities owned or  controlled by the Khrapunovs.  They would then pass these assets through a series  of shell or holding corporations to conceal the destination of these assets, before reselling  them for prices an order of magnitude greater than what they had paid the City of  Almaty.

50.     Three examples of these corrupt schemes to subvert and acquire the public property of the City of Almaty follow:

*Transaction One*

51.     In or about 2000, Viktor Khrapunov used his position as mayor of Almaty  to transfer a large tract of state-owned land near the two rivers area of Almaty to his  spouse and co-conspirator, Leila Khrapunov, for a total price of approximately $121,000.  The final recipient of this transfer was concealed through a series of fraudulent transactions and front  companies controlled by the Khrapunovs.  The Khrapunovs ultimately resold  this parcel of real estate for an estimated $15.57 million, a more than $15 million profit  on one interested transaction.

52.     In short, the Khrapunovs paid approximately $121,000 for a parcel of  public real estate which they later resold for a total of $15.57 million; a 128,000 percent  profit.

EXHIBIT H

*Transaction Two*

53.     On or about April 16, 2001, Viktor Khrapunov used his position as mayor to
cause a public building in Almaty to be sold at a fixed and rigged public auction to KRI, a
company owned by Leila Khrapunov, for approximately $347,000.  The property was ultimately
resold to an unrelated third party for approximately $4.1 million.

*Transaction Three*

54.      In addition to the sale of state-owned assets to Leila  Khrapunov and other
family members and co-conspirators, Viktor Khrapunov also  abused his authority as mayor to
enrich the Khrapunovs by seizing privately-owned property and transferring it to the Khrapunovs
and others for resale.  For example, on or  about August 25, 2003, Viktor Khrapunov caused the
City of Almaty to seize land owned  by privately-owned third party Shadid Engineering LLP.
Approximately one month  later, he caused the property to be sold to Leila Khrapunov's
company, Karasha, for  approximately $105,000.  Leila Khrapunov then caused Karasha to sell
the property  directly to her, whereupon she transferred it to another company, BSC, and it was
sold as part of BSC to an  unrelated third party, in a transaction that valued the parcel at
approximately $2 million.  As a result, the Khrapunovs obtained nearly $1.9 million in
unjustified profit.

55.     In short, through similar transactions uncovered and  still under investigation, the
Khrapunovs are estimated to have illegally acquired at  least 80 pieces of real estate, which they
converted into approximately $300 million in  illicit funds.

**The Khrapunovs and Ablyazov Join Together to Launder Their Stolen Money.**

56.     Seeking to avoid law enforcement attention and possible seizure of this ill-gotten
wealth, the Ablyazov-Khrapunov Group funneled their corrupt assets into real estate and
development entities located in, among other places, the United States and Switzerland.

15

EXHIBIT H

57.     Among other locations, the Ablyazov-Khrapunov Group transferred their stolen funds to Switzerland,  where Ilyas Khrapunov and Madina Ablyazov reside, using accounts and sham entities owned or ultimately  controlled by the Ablyazov-Khrapunov Group.  The Ablyazov-Khrapunov Group ultimately transferred to  Switzerland hundreds of millions of dollars, moved out of Kazakhstan by  Viktor Khrapunov and laundered through offshore holding companies to appear  legitimate.

58.     Seeking to hide the proceeds of their frauds, the Ablyazov-Khrapunov Group created a series of entities in Switzerland and overseas to launder these illicit funds into outwardly-legitimate investments.  One such entity was Swiss  Development Group, formally SDG Capital S.A., formed and controlled by Ilyas  Khrapunov for the benefit of the Ablyazov-Khrapunov Group.  Between 2008 and 2012, the  Ablyazov-Khrapunov Group and sham companies they controlled funneled at least $115 million  into SDG derived from the Ablyazov-Khrapunov Group's self-dealing and fraud.

59.     Through these foreign investment vehicles, the Ablyazov-Khrapunov Group sought  to obscure their wealth from law enforcement in the Republic of Kazakhstan and abroad, by maintaining the appearance of a modest family of civil servants.

60.     The Ablyazov-Khrapunov Group took numerous steps to maintain this facade and  conceal their looting of the City of Almaty's public assets from authorities.  Among other schemes,  Viktor Khrapunov regularly filed false annual tax returns with Kazakhstan's taxation authority, the Tax Committee of the Ministry of Finance of Kazakhstan.  The false returns concealed millions of dollars in monies, properties, and assets the  Ablyazov-Khrapunov Group had acquired and laundered through their corrupt enterprise.

61.     For example, according to their 2007 tax returns, which required Viktor  and

EXHIBIT H

Leila Khrapunov to list their entire net worth accumulated through all sources as of  December 31, 2007, Viktor Khrapunov reported a combined net worth  equivalent to $113,298, in addition to three vehicles, five modest pieces of real estate,  and two parking stalls.  While claiming to have a total net worth of less than $120,000,  Viktor Khrapunov had in fact amassed a fortune estimated at no less than $300  million.  Indeed, according to public news reports, in 2009 Viktor Khrapunov was one of the richest people in Switzerland with a fortune of over $300 million.  Similarly, in 2012  Viktor Khrapunov was again listed among Switzerland's 300 richest people, with a  fortune estimated at $324– $432 million.

### The Ablyazov-Khrapunov Group's Corruption is Exposed and Investigations Begin in Kazakhstan and Switzerland

62.      In late 2007, Viktor Khrapunov was tipped off that the Kazakh  government had begun investigating the financial dealings of the  Ablyazov-Khrapunov Group and their associates for a range of criminal acts and self-dealing.  In anticipation of possible criminal charges, on or about November 9, 2007, Viktor and Leila Khrapunov boarded a private  jet and fled Kazakhstan for Switzerland, where Ilyas Khrapunov and Madina Ablyazov resided, and  the bulk of their looted funds were held.

63.      On or about May 27, 2011, the Investigation Department of the Agency  for Economic and Corruption-Related Crimes of Kazakhstan (the "Investigation  Department") filed two criminal cases against Viktor Khrapunov for abuse of power and  fraudulent acts, and on or about July 21, 2011, obtained a court-ordered arrest warrant for  Viktor Khrapunov.  Through 2011 and 2012 additional charges were brought in  Kazakhstan against Viktor, Leila, and Ilyas Khrapunov, arising from the theft of public  property and the ultimate laundering of funds during Viktor Khrapunov's tenure as Mayor of Almaty.

64.      On or about February 20, 2012 and September 14, 2012, the Investigation

EXHIBIT H

Department applied to the Federal Office of Justice in Switzerland for legal assistance in

connection with the effort to prosecute Viktor, Leila, and Ilyas Khrapunov for crimes in

Switzerland and Kazakhstan relating to their corrupt acts in Almaty and the laundering of the

resulting funds.  In response to this request, in mid-2012 the Public Prosecutor of Geneva opened

an investigation into the Ablyazov-Khrapunov Group on suspicion of violating Swiss money

laundering laws.  The Public Prosecutor of Geneva subsequently seized financial and banking

documents from the Ablyazov-Khrapunov Group and ordered Swiss accounts and assets

belonging to them be frozen, including accounts held at Swiss banks Sarasin & Co. Ltd., Credit

Suisse, and Schroeder & Co.  This investigation by the Swiss authorities is ongoing, and in

August 2013 the Public Prosecutor of Geneva froze additional assets belonging to the Ablyazov-

Khrapunov Group.

65.     At this time, in addition to the numerous judgments against Ablyazov in the

United Kingdom, there are no less than 24 criminal charges pending against Viktor Khrapunov

in Kazakhstan for embezzlement, fraud, money laundering, establishing and directing an

organized criminal group for criminal purposes, abuse of power, and bribery.  There are

additional charges pending against Leila Khrapunov and Ilyas Khrapunov in Kazakhstan for,

among other offenses, money laundering and establishing and directing an organized criminal

group for criminal purposes.  Assets of the Ablyazov-Khrapunov Group remain frozen by Swiss

authorities, and the Government of the Republic of Kazakhstan has formally requested

extradition of Viktor Khrapunov.

66.     Despite the numerous investigations and freezing orders against the members of

the Ablyazov-Khrapunov Group, the conspirators continue to launder their commingled stolen

wealth through acts of fraud and in furtherance of the conspiracy.

EXHIBIT H

67.      As one example, from 2011 through the present, members of the Ablyazov-Khrapunov Group, including Ilyas Khrapunov and Ablyazov himself, conspired to fund Ablyazov's widespread global legal campaign with laundered funds, despite global freezing and receivership orders against Ablyazov's assets.

68.      In May of 2011, two entities that Ablyazov had been using to fund his various litigations were put in receivership, based on findings that they were not arms-length lenders, but in fact controlled and funded by Ablyazov himself. Deprived of a funding source, Ablyazov conspired with other members of the Ablyazov-Khrapunov Group to circumvent the receivership and freezing orders against him and began funding his litigation – including litigation against the Republic of Kazakhstan – through loans from a series of shell companies, including the Belizean-registered entity Green Life International SA ("Green Life").

69.      The conspirators represented to the U.K. receivers and courts that Green Life was an arms-length entity owned and funded by Gennady Petelin, but did not disclose that Petelin was related by marriage to the Ablyazov and Khrapunov families.

70.      In fact, Green Life was one more in a long series of shell entities used by the Ablyazov-Khrapunov Group to launder their stolen funds. At Ablyazov's direction, Ilyas Khrapunov and other members of the Ablyazov-Khrapunov Group transferred millions of dollars in funds from accounts controlled by the Ablyazov-Khrapunov Group through Petelin and Green Life to Ablyazov's counsel. To obscure this scheme, all funds were transferred from Green Life to Chabrier Avocats, the Swiss counsel for the Khrapunov family and SDG, before being paid to Ablyazov's counsel.

71.      Using Petelin's name to deter suspicion, the conspirators were able to launder and spend millions of dollars in stolen funds that should rightly have been placed in receivership.

19

EXHIBIT H

72.     The use of Petelin as a front for Ablyazov shell corporations such as Green Life was based in part on the close relationship between Petelin and Viktor Khrapunov. Viktor Khrapunov, whose daughter is married to Petelin's son, collaborated with Petelin on investments of the Ablyazov-Khrapunov Group's funds in Russia, where Petelin resided and had an extensive network of contacts. For example, in 2013, Viktor Khrapunov engaged in discussions with Petelin for the purpose of utilizing Petelin's contacts in Russia to facilitate the investment of the Ablyazov-Khrapunov Group's funds in Russian oil and energy assets.

73.     As another example of the Ablyazov-Khrapunov Group's continuing operations, members of the Ablyazov-Khrapunov Group hired computer hackers to illegally surveil French prosecutors and other public officials in an effort to free Ablyazov from French prison.

74.     Ablyazov was arrested by French special forces in 2013 after fleeing the U.K., but has remained in continuous contact with his coconspirators during his imprisonment. During his incarceration, Ablyazov directed his coconspirators, and his son-in-law Ilyas Khrapunov in particular, to use an array of unlawful means to secure his release.

75.     At Ablyazov's direction, in 2013 Ilyas Khrapunov hired a "black hat" computer security group to hack into the personal and work communications of numerous French public officials, including the prosecutors in Ablyazov's French extradition proceedings. Without permission and in violation of law, these hackers successfully breached the computers and mobile phones of numerous French law enforcement and justice officials, intercepted their electronic communications, and installed malicious software permitting them to remotely activate the microphones on these public officials' mobile phones to eavesdrop on and record their conversations. The hackers then transmitted French officials' intercepted communications, including emails, text messages, documents, and photographs, to Ilyas Khrapunov, who shared

EXHIBIT H

and discussed this illegally-obtained surveillance with Ablyazov himself. Ablyazov then used this information as part of his legal campaign to avoid extradition.

76.     In return for this illegally-intercepted information, the Ablyazov-Khrapunov Group paid hundreds of thousands of dollars to these hackers-for-hire, from funds traceable to the thefts from BTA Bank and the City of Almaty.

**The Ablyazov-Khrapunov Group Conspires to Transfer and Hide Illicit Funds in the United States.**

77.     In 2011 and 2012, in response to escalating pressure on the Ablyazov-Khrapunov Group from both Kazakh and Swiss authorities and legal proceedings in the United Kingdom, the Ablyazov-Khrapunov Group embarked on a scheme to secret the families' illicit wealth in real estate investments in the United States.  Upon information and belief, the Ablyazov-Khrapunov Group selected the United States as a harbor  for these stolen funds because they believed real estate investments in the United States would be difficult for Kazakh authorities to access.

78.     To execute this scheme the Ablyazov-Khrapunov Group used SDG, their Swiss real estate vehicle, and Telford International Limited ("Telford"), a Dubai-based private contracting entity controlled by the Ablyazov-Khrapunov Group.

79.     To create the appearance that SDG was independent of the Ablyazov-Khrapunov Group, in 2012 SDG was purportedly sold to a close friend and political ally of the Ablyazov-Khrapunov Group, Philippe Glatz.  This sale was in fact a sham  transaction, with the Ablyazov-Khrapunov Group maintaining beneficial ownership and control of SDG.

80.     Upon information and belief, the Ablyazov-Khrapunov Group paid Mr. Glatz to purchase SDG using the Ablyazov-Khrapunov Group's own funds:  Glatz accepted a loan from the Ablyazov-Khrapunov Group and then repaid that loan while  outwardly claiming that this payment to the Ablyazov-Khrapunov Group was for the purchase of  SDG.  In fact, the transfer

EXHIBIT H

of SDG was illusory, as Mr. Glatz was merely repaying a prior obligation, and effectively getting SDG for free.

81.     To reduce the amount of cash needed to effectuate this sham sale, Ilyas Khrapunov offered SDG to Glatz at an incredibly discounted price. Although at the time of the purported sale SDG's assets were valued at approximately $150 million, Glatz only transferred approximately $3.5 million in cash to the Khrapunov family for SDG – roughly two percent of SDG's assessed asset value.

82.     To justify this incredible discount to asset value, Ilyas Khrpaunov used his control of SDG to falsely book millions of dollars in supposed debt and liabilities to hide the fraudulent nature of the transition he had orchestrated.

83.     This sham transaction served the Ablyazov-Khrapunov Group's purposes by creating the appearance that SDG had changed ownership, although the Ablyazov-Khrapunov Group received no net consideration for the purported sale, and Glatz was left beholden to the Ablyazov-Khrapunov Group and explicitly obligated to hold their interest in the investment.

84.     The capital structure, organization, management, and illicit purpose of SDG remained the same after the purported sale, and the Ablyazov-Khrapunov Group still profits from and manages SDG's operations.  Ilyas Khrapunov continues to control SDG while holding himself out to be a mere "outside advisor" to the company, all the while protecting and reaping the benefits of the Ablyazov-Khrapunov Group's investments in SDG.

***Through SDG, the Ablyazov-Khrapunov Group Creates Triadou to Hide their Illicit Funds in New York Real Estate Transactions with the Chetrit Group.***

85.     In or about 2011, Ilyas Khrapunov, on behalf of the Ablyazov-Khrapunov Group, approached Nicolas Bourg, a Belgium-based real estate fund manager, seeking to create a new entity controlled by SDG to mask the Ablyazov-Khrapunov Group's efforts to invest in real

EXHIBIT H

estate opportunities in the United States.

86.     In consultation with Ilyas Khrapunov, Bourg formed a series of entities  under the laws of Luxembourg for the specific purpose of investing the Ablyazov-Khrapunov Group's funds in real estate in the United States.  These entities included Triadou, an investment vehicle wholly owned and controlled by SDG, which  was itself a front for the Ablyazov-Khrapunov Group's activities.

87.     Triadou is a special purpose vehicle:  a limited-liability legal  entity created to fulfill a specific purpose, often used to insulate a parent entity  from financial risk or liability. SPVs can also be used, as Triadou was, to hide the true ownership of assets held by the SPV, or to obscure relationships between individuals and  entities.  Bourg became the sole director of Triadou, operating at the direction of the   Ablyazov-Khrapunov Group, who continued to control SDG, Triadou's sole shareholder.

88.     At the direction of Ilyas Khrapunov, Bourg made contact with Eric Elkain,  an agent of Chetrit and the Chetrit Group.  Bourg and  Elkain agreed to arrange a meeting between Chetrit and Ilyas Khrapunov for the purpose  of exploring concealed investments by the Ablyazov-Khrapunov Group in the United States with the Chetrit Group.

89.     In or about 2012, Chetrit and his brother and partner Meyer  Chetrit met with Ilyas Khrapunov and Bourg in Geneva, Switzerland.  While the Ablyazov-Khrapunov Group had purportedly divested  itself of any interest in SDG by this time, Ilyas Khrapunov held himself out to Chetrit as having a controlling ownership interest in SDG.

90.     At this meeting, Chetrit and Ilyas Khrapunov discussed  possible investment strategies for the Ablyazov-Khrapunov Group in the United  States real estate sector.  In these discussions, Ilyas Khrapunov disclosed the fact that the  Ablyazov-Khrapunov Group was facing

23

EXHIBIT H

criminal charges and asset freezes directed by the  governments of Kazakhstan, Switzerland, and the United Kingdom, and needed to move funds to other  jurisdictions.   During the continuing course of his dealings with the Ablyazov-Khrapunov Group, this situation was repeatedly and unequivocally made clear to Chetrit.  Specifically, the Ablyazov-Khrapunov Group needed to move funds that were the subject of criminal charges and asset freezes as a result of the proceedings both against Ablyazov and the Ablyazov-Khrapunov Group.  Chetrit expressed sympathy with this situation, stating that his own family  had faced political sanctions in his native Morocco, a result of having defrauded the King and being forced to flee.  Chetrit and Ilyas Khrapunov agreed  in principle to seek joint investments in the United States, and agreed to meet further.

91.    Following this meeting in Geneva, Ilyas Khrapunov and Bourg met with  Chetrit again in New York City, to evaluate potential investment options.  While  discussing specific investment opportunities, the parties again openly and repeatedly  discussed the criminal charges against the Ablyazov-Khrapunov Group and the efforts of the  governments of Switzerland and Kazakhstan to locate and seize the assets of the  Ablyazov-Khrapunov Group.  Again, Ilyas Khrapunov acted on behalf of SDG and Triadou, despite the Ablyazov-Khrapunov Group's purported sale of SDG a year prior.

92.    As a result of these discussions, the Ablyazov-Khrapunov Group invested, through Triadou, with Chetrit and the  Chetrit Group in a number of real estate opportunities in New York  City.  The most significant of these were investments in the Flatotel and Cabrini Medical Center developments in New York City.

93.    The Flatotel is a 289-room business hotel opened in 1991, located at 135 West 52nd St, New York, New York.

24

EXHIBIT H

94.     The Cabrini Medical Center hospital campus closed in 2008 and is now

comprised of several buildings containing approximately 250 condominium units.

95.     Both the Flatotel and the Cabrini Medical Center properties were purchased by

members of the Chetrit Group, along with co-investors.  The developers have  been executing

plans to convert both properties into luxury condominiums, and are close to completion.

96.     The Chetrit Group owned a 75% interest in the Flatotel, and created a series of

limited liability entities to hold that interest, including Counterclaim Defendants CF 135 FLAT

LLC and CF 135 West Member LLC.

97.     The Chetrit Group offered to sell half of their 75% investment in the Flatotel to

Triadou, after which the Chetrit Group and Triadou would each own 37.5%.  Triadou would

provide 70% of the capital needed – against Chetrit's 30%, the difference amounting to an

above-market "promote fee" for Chetrit that ensured that the Chetrit Group would reap the

largest profits from the Flatotel development, even as it put in the least capital – and the parties

would then divide the profits  from the investment.  In or about March 25, 2013, Triadou

accepted this  offer, notwithstanding the fact that the terms strongly favored Chetrit, and

committed to transmit funds to the Chetrit Group to secure the 37.5% interest in the Flatotel

property.

### *The Ablyazov-Khrapunov Group Enlists FBME to Facilitate Their Money Laundering Scheme in the United States*

98.     The Ablyazov-Khrapunov Group sought to fund Triadou's investments with

money from the Ablyazov-controlled entity Telford, held in accounts with FBME.

99.     Telford's FBME accounts were managed by Eesh Aggarwal, Chairman of Azure

Consultants DMCC, and a close financial advisor to Ablyazov. Aggarwal had connected

Ablyazov and other members of the Ablyazov-Khrapunov Group to FBME through Aggarwal's

EXHIBIT H

contacts with high-level officers at FBME, and in time FBME became one of the Ablyazov-Khrapunov Group's primary banks. On information and belief, the conspirators favored FBME due to its presence inside of the European Union, its lack of anti-money laundering protections, and its eagerness to service high-risk clientele and shell corporations such as Telford.

100.    FBME promoted its weak due diligence standards to attract high-risk, high-value clients just like the Ablyazov, and was known for its willingness to do business with clients seeking to avoid regulatory oversight. In particular, FBME relied on an "Approved Third Party" program, where FBME's contacts could introduce new, high-value clients to the bank with virtually no due diligence of these new relationships. Upon information and belief, Aggarwal was one such "Approved Third Party," and with the approval of certain FBME officers, was able to launder the Ablyazov-Khrapunov Group's funds through FBME by way of entities such as the Ablyazov-controlled Telford, with effectively no scrutiny or due diligence by FBME.

101.    FBME had a history of moving funds for Aggarwal and Ablyazov with no questions asked, which led the conspirators to favor FBME for their criminal schemes aimed at the United States. For example, on June 11, 2011, FBME executed more than $27 million in transfers of Ablyazov's stolen funds to Amber Limited, a shell company registered in the U.A.E. (where Aggerwal operates) subsequently found to be an undisclosed Ablyazov asset and added to the U.K. courts' freezing and receivership orders.

102.    Telford's accounts at FBME bank were used to covertly move and invest funds stolen by Ablyazov from BTA Bank. Because the Telford accounts consisted of Ablyazov's stolen funds, Ilyas Khrapunov conferred with Ablyazov regarding investments of funds from Telford, and Ablyazov's approval was required for transfers from Telford. Even after Ablyazov's incarceration in France he remained in contact with his coconspirators, and while Ilyas

EXHIBIT H

Khrapunov took operational control of much of the Ablyazov-Khrapunov Group's network,

Ablyazov continued to direct specific transfers of funds, including those from Telford's FBME

accounts.

103.    Triadou attempted to transfer Telford's funds held in FBME for the Flatotel and

Cabrini deals through banks in Luxembourg, but those banks refused to  accept wire transfers

from the Ablyazov-Khrapunov Group's FBME accounts due in part to the investigations or

proceedings led  by the Kazakh, Swiss, and United Kingdom authorities.

104.    Bourg then contacted Chetrit about alternative wire transfer arrangements.

Informed that  commercial banks refused to handle Triadou's funds from Telford, Chetrit

conspired to launder the money, instructing Bourg to  disregard the banks and transfer funds

directly from the Ablyazov-Khrapunov Group's  offshore accounts to the escrow account of

Chetrit's personal and corporate attorneys.  Bourg then directed a series of wire transfers, on

behalf of Triadou, from Telford's accounts at FBME directly to Chetrit's counsel.

105.    FBME executed these transfers despite their blatant indicia of money laundering,

including that (1) Telford was a recently incorporated offshore shell company with no obvious

business purpose, (2) Telford was purportedly owned by another offshore nominee-shareholder

trust, (3) Telford was seeking to transfer millions of dollars into escrow accounts with no due

diligence, and (4) Telford was transferring these funds from a high-risk jurisdiction for the benefit

of an unrelated third party operating in a more financially-rigorous jurisdiction.

106.    This was not the only instance of FBME executing such obviously suspicious

transfers for Aggerwal and the Ablyazov-Khrapunov Group without concern for money

laundering red flags. At the same time FBME began to execute transfers from Telford to the

accounts of Chetrit's counsel, on or about October 9, 2013, FBME executed wire transfers for $25

EXHIBIT H

million from Telford's accounts for an investment in overseas telecommunications assets. Again Telford was transferring millions of dollars of Ablyazov's money for the benefit of another entity linked to the Ablyazov-Khrapunov Group.

107.    Subsequent to these transfers, on July 22, 2014, the U.S. Financial Crimes Enforcement Network ("FinCEN") designated FBME Bank a "foreign financial institution of primary money laundering concern."  FinCEN found that FBME Bank was regularly "used by its customers to facilitate money laundering, terrorist financing, transnational organized crime," had "systemic failures in its anti-money laundering controls that attract high-risk shell companies," and performed a "significant volume of transactions and activities that have little or no transparency and often no apparent legitimate business purpose."

108.    Under Section 311 of the PATRIOT Act, FinCEN barred U.S. financial institutions from opening or maintaining "payable-through" accounts with FBME.[1]  In the accompanying official announcement, FinCEN's then-Director emphasized that FBME was not merely negligent, but rather "promotes itself on the basis of its weak Anti Money Laundering (AML) controls in order to attract illicit finance business from the darkest corners of the criminal underworld," and "openly advertises the bank to its potential customer base as willing to facilitate the evasion of AML regulations."

109.    In its updated rule barring U.S financial institutions from dealing with FBME, FinCEN noted in particular FBME's pervasive dealings with obscure shell companies just like Telford, serving no purpose but to facilitate money laundering:

> FinCEN considered all of the relevant information and is particularly

---

[1]    FBME challenged FinCEN's rulemaking in the United States District Court for the District of Columbia and won a temporary reprieve, but FinCIN reissued the rule in substantially the same form on March 31, 2016. That updated rule is now undergoing judicial review.

EXHIBIT H

concerned with: (1) The large number of FBME customers that are either shell companies or that conduct transactions with shell companies; (2) the lack of transparency with respect to beneficial ownership or legitimate business purposes of many of FBME's shell company customers; (3) the location of many of its shell company customers in other high-risk money laundering jurisdictions outside of Cyprus; (4) the high volume of U.S. dollar transactions conducted by these shell companies with no apparent business purpose; and (5) FBME's longtime facilitation of its shell company customers' anonymity by allowing thousands of customers to use the bank's physical address in lieu of their own.

110.    The Central Bank of Cyprus has frozen all assets transfers to or from FBME, and taken control of the bank pending completion of an investigation into its operations. FBME remains under the control of the Central Bank of Cyprus, and upon information and belief, continues to hold millions in funds belonging to the Ablyazov-Khrapunov Group and shell companies they control.

### The Ablyazov-Khrapunov Group Enters a Second Deal with Chetrit, Again Funded By Telford through FBME

111.    Through Triadou, the Ablyazov-Khrapunov Group entered a second investment with  the Chetrit Group shortly thereafter.   In late 2012, Triadou agreed to invest $12  million in the Cabrini Medical Center conversion, a joint venture between the Chetrit  Group and another private developer to convert a former medical center in New  York City into luxury condominiums.

112.    Due to increasing scrutiny on the Ablyazov-Khrapunov Group's  finances, the contemplated $12 million investment became impossible.  Bourg discussed this obstacle  with Chetrit, who agreed that Triadou should invest $6 million, half the originally-agreed  amount, until further funds became available.  In return for this $6 million investment, Triadou would receive a promissory note and the right to convert that note into equity in the entity holding the Chetrit Group's interest in the Cabrini deal, 227 East 19th Holder, LLC.

113.    Again, the funds to execute the Cabrini deal were  transferred, on May 20, 2013,

29

EXHIBIT H

directly from the Ablyazov-Khrapunov Group's Telford accounts at FBME Bank to a law firm in

New  York working on Chetrit's behalf. Again, this transfer of funds from Telford was only

executed after Ilyas Khrapunov received explicit direction from Ablyazov.

> ***Kazakh Authorities Target the Ablyazov-Khrapunov Group's Holdings in the United
> States, and the Ablyazov-Khrapunov Group Liquidates Those Assets at Below-Market
> Value with the Chetrit Group's Assistance.***

114.     In 2014, Almaty filed an action in California federal court  against members of the

Ablyazov-Khrapunov Group seeking to seize assets that they had attempted to  launder through

real estate investments in California.   That action is *City of Almaty v.  Viktor Khrapunov, et al*,

Case No. 2:14-cv-03650-FMO-CW (filed May 13, 2014; dismissed September 21, 2015) (the

"California Litigation").  On information and belief, this lawsuit led the Ablyazov-Khrapunov

Group to believe their assets in the U.S. were no longer safe from seizure by the government of

Kazakhstan.

115.     In response, in late 2014, Ilyas Khrapunov directed Bourg, Triadou's  director, to

begin liquidating Triadou's assets in New York so that the funds could  be removed from the

United States and hidden.  Specifically, Ilyas Khrapunov told Bourg to liquidate Triadou's

investments in Flatotel and the Cabrini Medical Center as quickly as possible.

116.     Bourg approached Chetrit, explaining that the threat of the California  Litigation

was pressuring Triadou and the Ablyazov-Khrapunov Group into moving their assets out  of the

United States.  Chetrit offered to purchase an assignment of Triadou's interest in  the Flatotel at a

substantial discount from the price originally paid by  Triadou.  By this point, the value of

Triadou's investment had in fact increased   substantially beyond the funds originally invested.

117.     Chetrit simultaneously proposed to bribe Bourg, so Chetrit could further take

advantage of Triadou and secretly influence it to obtain a discounted price.  Specifically, Chetrit

EXHIBIT H

proposed that Bourg covertly use  his position as director of Triadou to accept a lower price for

the Chetrit Group's  purchase of an assignment, thus decreasing Triadou's recovery from the

investment and  increasing the Chetrit Group's profit.  In return for securing for Chetrit a lower

assignment price, Chetrit agreed to surreptitiously pay Bourg $3 million.

118.     In or about August  of 2014, Bourg, acting on behalf of Triadou and at the

direction of the Ablyazov-Khrapunov Group, agreed to assign Triadou's interest in the Flatotel

back  to the Chetrit Group for a price as low as $26 million, only a fraction of the fair  market

value of the properties.  At the same time, Bourg executed a release of the promissory note that

Triadou held entitling it to equity in the Cabrini Medical Center development. At the time of this

assignment and release, Viktor Khrapunov was facing criminal charges as well as possible fines

and disgorgement in Kazakhstan; the Kazakh  government had formally sought extradition of

Viktor Khrapunov from Switzerland; Ablyazov was being held in French prison awaiting

extradition; and the Swiss assets of the Ablyazov-Khrapunov Group remained frozen.  Not only

were all of these facts widely disseminated in the news, they were known by all parties to the

assignment and release transactions, including Chetrit, and it was not uncommon for their

meetings to begin with a discussion of the possibility of the incarceration of members of the

Ablyazov-Khrapunov Group.

119.     Following the assignment and release, Bourg invoiced Chetrit for $1 million of

the  agreed-upon $3 million bribe.  After  receiving the invoice, Chetrit paid Bourg $400,000, but

refused to pay the full  amount demanded by Bourg.

120.     In or about March 2015, Bourg met with Chetrit, and recorded the meeting.  As

captured on audio, Bourg demanded the  remainder of his promised compensation.  Chetrit

acknowledged that he had paid Bourg  "400 or 500," but responded that Bourg would receive the

EXHIBIT H

additional $600,000 only when Chetrit paid what he owed Triadou for the assignment, and that he had no intention of paying Triadou until forced to do so. Chetrit further stated on tape that Bourg would not receive any remaining money.

121.    At that meeting, Bourg and Chetrit repeatedly discussed the legal troubles of Mukhtar Ablyazov and Victor and Ilyas Khrapunov. Chetrit repeatedly avoided using Ilyas Khrapunov's actual name, referring to him instead by the code name "Pedro." Chetrit and Bourg discussed how "Pedro" was "sought by Interpol" and his "father-in-law [was] still in prison," and Chetrit agreed that law enforcement was "coming at [the Ablyazov-Khrapunov Group] from all sides."

122.    Also at that meeting, Chetrit and Bourg discussed the fact that due to the investigation in Switzerland, Ilyas Khrapunov could not leave the country and was under intense law enforcement pressure. In addition, Chetrit once again acknowledged his longstanding understanding that Ablyazov and his criminal situation was behind the motivations of the Ablyazov-Khrapunov investments in the United States. Chetrit further acknowledged his longstanding understanding that the Ablyazov-Khrapunov Group had made similar investments in other countries, such as Greece, to conceal and launder the proceeds of their crimes.

123.    On or about March 22, 2015, after his meeting with Chetrit, Bourg contacted Elkain, Chetrit's agent in Europe, and also recorded that phone call. In that call, Bourg sought to confirm the terms of his secret deal with Chetrit. During this recorded conversation, Bourg and Elkain agreed that the secret deal between Chetrit and Bourg called for $3 million in compensation for Bourg. Elkain agreed that he "confirmed the deal" between Chetrit and Bourg, and "would have never said that if [Chetrit] hadn't told [him] so." Bourg requested Elkain's aid in receiving the remainder of his payment, but Elkain responded that whether or not the

EXHIBIT H

agreement would be honored was up to Chetrit.

124.    Despite the finalized assignment agreement and release, the Chetrit Group

refused to make any payments to Triadou following the sale.  In response, Triadou filed a  series

of actions in New York state courts, seeking summary judgment and payment of  these

obligations under the assignment agreement.  Those actions are *Triadou SPV S.A. v.  CF 135

FLAT LLC, et al*., No. 653462/2014 (Nov. 10, 2014); *Triadou SPV S.A. v. CF  135 FLAT LLC, et

al*., No. 650239/2015 (Jan. 26, 2015); *Triadou SPV S.A. v. CF 135  FLAT LLC, et al*., No.

154681/2015 (May 11,  2015), and *Triadou SPV S.A. v. CF  135  FLAT LLC, et al*., No.

156907/2015 (July 9,  2015),

125.    Each of these actions seeks the payment of money to Triadou derived from  the

sale of property illicitly obtained by the Ablyazov-Khrapunov Group, and rightfully owned by

BTA and Almaty.

126.    By this lawsuit, BTA Bank and the City of Almaty seek to hold Crossclaim

Defendants responsible for their illegal conduct in the United States in violation of U.S. law.

### **FIRST CAUSE OF ACTION**

#### **(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))**
*Against All Defendants*

127.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 126

as if fully set forth herein.

128.    This cause of action is against all Crossclaim Defendants (the "Count 1

Defendants").

129.     From 1997 and continuing to the present, the Ablyazov-Khrapunov Group and

numerous other individuals and entities, including SDG and Telford, have constituted an

association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 1

EXHIBIT H

Enterprise").

130.    In 2012, the Chetrit Group knowingly and willfully joined the  Count 1 Enterprise by aiding the Ablyazov-Khrapunov Group's schemes to hide and launder their illicit assets through investments by SDG through Triadou in properties  owned by the Chetrit Group.

131.    The Count 1 Enterprise was engaged in, and the activities  of the Count 1 Defendants affected, interstate and foreign commerce.

132.    The Count 1 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity consisting of the following predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B):

    a.  The Count 1 Defendants engaged and conspired to  engage in money laundering in violation of 18 U.S.C. § 1956 by conducting numerous  financial transactions using illegally obtained funds to purchase real estate investments in  New York City and elsewhere and to fund business entities including SDG and Triadou, knowing that such funds were unlawfully converted from the City of Almaty and BTA Bank, with the  goal of concealing the source of those funds.  The Count 1 Defendants  further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or transferring funds stolen from Almaty and BTA into and within the United States in order to conceal their source and existence  from lawful investigations conducted by Swiss, Kazakh, and United Kingdom authorities.

    b.  The Count 1 Defendants further engaged and conspired  to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting financial  transactions

EXHIBIT H

using those stolen funds by, among other things, using stolen funds to purchase real estate and other assets in New York City and elsewhere and to fund business entities, including Triadou and SDG, with the intent to further the Count 1 Enterprise and to conceal the source of those funds.

c.  The Count 1 Defendants engaged and conspired to engage in money transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 by, among other things, knowingly transferring funds in excess of $10,000 stolen from Almaty and BTA into and within the United States to invest in real estate and other assets in New York City with the aid of the Chetrit Group, knowing that such funds were stolen from the City of Almaty and BTA Bank.

d.  The Count 1 Defendants engaged and conspired to engage in mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by knowingly using the mails and wires to transfer illegally obtained funds into and within the United States, for the purpose of furthering the Count 1 Enterprise and, while concealing the funds' illegal source, used those funds to purchase real estate in New York City and to fund business entities, including SDG and Triadou, that enabled those entities to conduct business in the United States using the illegally-obtained funds.

e.  The Count 1 Defendants unlawfully transported or caused to be transported in interstate or foreign commerce securities or money having a value of $5,000 or more which was stolen, converted or taken by fraud from Almaty and BTA Bank, and knowing the same to be stolen, converted or taken by fraud in violation of 18 U.S.C. § 2314.

35

EXHIBIT H

f.   The Count 1 Defendants received, possessed, concealed, sold, or disposed of securities or money having the value of $5,000 or more, or conspired to do the same, which crossed a state or United States boundary after being stolen, unlawfully converted, or taken from Almaty and BTA Bank, and knowing the securities or money to have been stolen, unlawfully converted, or taken in violation of 18 U.S.C. § 2315.

133.   Each of the Count 1 Defendants conducted or  participated, directly or indirectly, in the conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity, within the meaning of  18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).  Each of the Count 1 Defendants engaged or conspired to engage in two or more predicate  acts of racketeering, and each committed at least one such act of racketeering after the  effective date of RICO.  From in or about 1997, and continuing to the present,  Count 1 Defendants associated together, with one another and with  others, and acted in concert for the common and unlawful purposes of the Count 1 Enterprise and in order to implement the schemes and employ the devices  described herein.  The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, the following acts of money laundering, transactions in money and property derived  from specified unlawful activity, foreign transport of stolen money or property known to be stolen, converted or taken by fraud, mail fraud, and/or wire fraud:

a.   The 2012 sham sale of SDG to Philippe Glatz to create the appearance that SDG was independent of the Ablyazov-Khrapunov Group;

b.   the fraudulent loan from the Ablyazov-Khrapunov Group to Mr. Glatz to facilitate the SDG sale transaction;

EXHIBIT H

c.   the formation of Triadou and other entities by SDG at the direction of Bourg and in consultation with Ilyas Khrapunov;

d.   Chetrit's meetings with Ilyas Khrapunov in or about 2012 in Switzerland and New York City, and their subsequent agreement to invest the Ablyazov-Khrapunov Group's unlawfully obtained money in real estate in New York City;

e.   E-mails directly between Chetrit and Ilyas Khrapunov as well as through intermediaries discussing the Ablyazov-Khrapunov Group's possible investments in New York real estate;

f.   the formation of the investment vehicles necessary to facilitate the Flatotel and Cabrini investments;

g.   Telford's failed attempt to transfer funds held in FBME Bank for the Flatotel and Cabrini deals through banks in Luxembourg;

h.   the May 20, 2013 transfer of funds from Telford to Chetrit's attorney representing Triadou's investment of $6 million in the Cabrini deal, along with Chetrit's promissory note and Triadou's right to convert that debt into equity in Cabrini;

i.   a series of other wire transfers on behalf of Triadou from Telford's accounts at FBME Bank Ltd. to Chetrit's counsel in New York, including transfers on November 9, 2012, and January 22, February 13, February 19, April 8, April 16, and April 24, 2013;

j.   a May 22, 2013 wire transfer of $28 million from Telford to a different law firm's Citibank account in New York used for a separate New York real estate investment with Chetrit;

k.   a May 2014 agreement (executed August 2014) to transfer Triadou's interest in the

EXHIBIT H

Flatotel to the Chetrit Group at a below-market price;

l.   Chetrit's and Triadou's signed May 2014 release of the promissory note regarding Triadou's $6 million investment in the Cabrini Medical Center development;

m.   Chetrit's payment of $400,000 to Bourg in partial satisfaction of Chetrit's agreement with Bourg to pay him $3 million in exchange for securing Chetrit a lower assignment price for Triadou's interests in the Flatotel and Cabrini deals; and

n.   a payment of $1 million from Chetrit to Triadou in partial satisfaction of Chetrit's obligations under the fraudulent assignment.

134.   As a direct and proximate result of RICO violations by the Count 1 Defendants of 18 U.S.C. § 1962(c),  Almaty and BTA have suffered damages in an amount to be determined at trial and presently  estimated to be not less than $6 billion.  Almaty and BTA have been injured in their business or  property by reason of each Count 1 Defendants' violations and,  pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to  recover threefold the damages suffered, together with the costs of this suit and  reasonable attorneys' fees.

### SECOND CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
### *Against All Defendants*

135.   The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 134 as if fully set forth herein.

136.   This cause of action is against all Crossclaim Defendants (the "Count 2 Defendants").

137.   From its formation and continuing to the present, CF 135 West Member LLC, has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 2

EXHIBIT H

Enterprise").

138.    The Count 2 Enterprise was engaged in, and the activities  of the Count 2 Defendants affected, interstate and foreign commerce.

139.    The Count 2 Defendants engaged in a pattern of racketeering activity consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in paragraph 132 above.

140.    Each of the Count 2 Defendants conducted or  participated, directly or indirectly, in the conduct of the affairs of the Count 2 Enterprise through a pattern of racketeering activity, within the meaning of  18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).  Each of the Count 2 Defendants engaged in two or more predicate  acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO.  The Count 2 Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Count 2 Enterprise and in order to implement the schemes and employ the devices described herein.  The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, those acts described in paragraph 133 above.

141.    As a direct and proximate result of RICO violations by the Count 2 Defendants of 18 U.S.C. § 1962(c),  Almaty and BTA have suffered damages in an amount to be determined at trial.  Almaty and BTA have been injured in their business or  property by reason of each Count 2 Defendants' violations and,   pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to  recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

EXHIBIT H

### THIRD CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(a))
### *Against All Defendants*

142.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 141 as if fully set forth herein.

143.    This cause of action is against all Crossclaim Defendants (the "Count 3 Defendants").

144.    From its formation and continuing to the present, CF 135 West Member LLC, has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 3 Enterprise").

145.    The Count 3 Enterprise was engaged in, and the activities  of the Count 3 Defendants affected, interstate and foreign commerce.

146.    The Count 3 Defendants received income derived from a pattern of racketeering activity consisting of the related predicate acts of racketeering described in paragraphs 132 and 133 above.

147.    The Count 3 Defendants used or invested the income derived from their racketeering activity in the acquisition of an interest in, or the establishment or operation of, the Count 3 Enterprise in violation of 18 U.S.C. § 1962(a).

148.    The Count 3 Defendants used or invested the income derived from their racketeering activity in the Count 3 Enterprise in fraudulent and below-market transactions, including by accepting unreasonable contractual terms to transfer wealth to the Chetrit Group.

149.    As a direct and proximate result of RICO violations by the Count 3 Defendants of 18 U.S.C. § 1962(a),  Almaty and BTA have suffered damages in an amount to be determined at trial.  Almaty and BTA have been injured in their business or  property by reason of each Count 3

EXHIBIT H

Defendants' violations and,   pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are

thereby entitled to  recover threefold the damages suffered, together with the costs of this suit and

reasonable attorneys' fees.

### FOURTH CAUSE OF ACTION

**(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))**
*Against All Defendants*

150.   The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 149

as if fully set forth herein.

151.   This cause of action is against all Crossclaim Defendants (the "Count 4

Defendants").

152.    From its incorporation and continuing to the present, 227 East 19th Holder LLC

has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 4

Enterprise").

153.    The Count 4 Enterprise was engaged in, and the activities  of the Count 4

Defendants affected, interstate and foreign commerce.

154.    The Count 4 Defendants engaged a pattern of racketeering activity consisting of

the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in

paragraph 132 above.

155.    Each of the Count 4 Defendants conducted or  participated, directly or indirectly,

in the conduct of the affairs of the Count 4 Enterprise through a pattern of racketeering activity,

within the meaning of  18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).  Each of the

Count 4 Defendants engaged in two or more predicate  acts of racketeering, and each committed

at least one such act of racketeering after the effective date of RICO.  The Count 4 Defendants

associated together, with one another and with others, and acted in concert for the common and

EXHIBIT H

unlawful purposes of the Count 4 Enterprise and in order to implement the schemes and employ

the devices described herein.  The specific related predicate acts that constitute the pattern of

racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to,

those acts described in paragraph 133 above.

156.    As a direct and proximate result of RICO violations by the Count 4 Defendants of

18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at

trial.  Almaty and BTA have been injured in their business or  property by reason of each Count 4

Defendants' violations and,   pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are

thereby entitled to  recover threefold the damages suffered, together with the costs of this suit and

reasonable attorneys' fees.

**FIFTH CAUSE OF ACTION**

**(VIOLATIONS OF RICO, 18 U.S.C. § 1962(d))**
*Against All Defendants*

157.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 156

as if fully set forth herein.

158.    This cause of action is against all Crossclaim Defendants (the "Count 5

Defendants").

159.     As alleged herein, Count 5 Defendants conspired to engage in the acts described

above in the United States to further the goals of their criminal enterprises in violation of U.S.

law.

160.     In so doing, Count 5 Defendants unlawfully, willfully, and knowingly did

combine, conspire, confederate, and agree together, with  each other and with others to commit

RICO violations under 18 U.S.C. § 1962(c) and,  thereby, violated 18 U.S.C. § 1962(d).  In

furtherance of the conspiracy and to achieve its  objectives, Count 5 Defendants committed the

EXHIBIT H

overt acts as described in paragraph 133 in the Southern District of New York and elsewhere.

161.    As a direct and proximate result of RICO violations by the Count 5 Defendants

of 18 U.S.C. § 1962(d),  Almaty and BTA have suffered damages in an amount to be determined

at trial.  Almaty and BTA have been injured in their business or  property by reason of each Count

5 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are

thereby entitled to  recover threefold the damages suffered, together with the costs of this suit and

reasonable attorneys' fees.

### SIXTH CAUSE OF ACTION

#### (ACTUAL FRAUDULENT TRANSFER)
#### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

162.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 161

as if fully set forth herein.

163.    At all relevant times, the City of Almaty and BTA Bank have held an interest in

the illicit funds  taken by the Ablyazov-Khrapunov Group and invested by and through Triadou,

as these funds were  the unlawful profits of embezzlement, fraud, and the corruption of the public

office of the mayor of Almaty.   The intermediary transfers or investment of those funds did not

alter or diminish either Almaty or BTA's interest.

164.    The 2014 assignment of Triadou's interest in the Flatotel and Cabrini Medical

Center was not for  adequate consideration, and in fact, represented a value significantly below

the fair value of that interest, due to the improper motivations of Triadou's ownership, the

Ablyazov-Khrapunov Group, to hide their illicit assets and move them offshore, and the Chetrit

Group's  secret deal to drive down the price of the assignment through bribery.

165.    This assignment was made for the specific purpose of liquidating a fixed  asset to

frustrate a future creditor.  Defendants knew of the numerous judgments against Ablyazov in the

EXHIBIT H

United Kingdom, and of Almaty's claims against the Ablyazov-Khrapunov Group in the

California Litigation, and knew that  Triadou was owned and controlled by the defendants in

those actions.  Defendants intended and believed that the assignment of the Ablyazov-Khrapunov

Group's interest in the Flatotel and Cabrini Medical Center would hinder, delay, and  defraud

current and future judgment creditors, specifically the City of Almaty and BTA Bank.

166.     For these reasons, the assignment was fraudulently and illegally intended  to

remove an asset from the jurisdiction of the United States, namely Triadou's interests in the

Flatotel and Cabrini Medical Center, convert those assets to cash, and transfer those funds beyond

the reach of the Swiss, Kazakh, and United Kingdom authorities

167.     As a result of the foregoing, pursuant to sections 275, 276, and 279 of the  New

York Debtor and Creditor Law, the August 2014 assignment agreement should be  set aside as

the product of clearly-inequitable conduct.

## SEVENTH CAUSE OF ACTION

**(CONSTRUCTIVE FRAUDULENT TRANSFER)**
*Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

168.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 167

as if fully set forth herein.

169.     At all relevant times, the City of Almaty and BTA Bank have held an interest in

the illicit funds  taken by the Ablyazov-Khrapunov Group and invested by and through Triadou,

as these funds were  the unlawful profits of embezzlement, fraud, and corruption of the public

office of the mayor of Almaty.   The intermediary transfers or investment of those funds did not

alter or diminish either Almaty or BTA's interest.

170.     Triadou, although an arm of a massive international fraud and money laundering

conspiracy, is and has been insolvent itself.  Triadou holds no funds or other assets of its own,

EXHIBIT H

and relies on funding from other Ablyazov-Khrapunov Group entities, such as Telford, to meet its obligations. Assets that flow to Triadou are promptly moved to other Ablyazov-Khrapunov Group entities offshore.

171.    As Triadou is controlled by the Ablyazov-Khrapunov Group, whose members face multi-billion dollar judgments in other jurisdictions, Triadou is effectively kept insolvent at all times, so as to limit the Ablyazov-Khrapunov Group's exposure in the United States.

172.    Similarly, because Triadou is controlled by and is an alter ego of the Ablyazov-Khrapunov Group, at the time it liquidated the Flatotel and Cabrini interests and transferred the proceeds to other entities, it had liabilities – including resulting from the UK judgments – that far outstripped its assets.

173.    As a result of the foregoing, pursuant to sections 273 and 273-a of the  New York Debtor and Creditor Law, the August 2014 assignment agreement should be  set aside.

## EIGHTH CAUSE OF ACTION

### (UNJUST ENRICHMENT)
### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

174.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 173 as if fully set forth herein.

175.    The Crossclaim Defendants were unjustly enriched at the expense of the City of Almaty and BTA Bank when they invested funds embezzled from the City of Almaty and BTA Bank to acquire assets in the United States including an interest in the Flatotel project, and did so knowing that authorities of Switzerland, the Republic of Kazakhstan, and the United Kingdom were seeking the wrongfully-taken assets held by the Ablyazov-Khrapunov Group, and that further sales of the same assets would potentially frustrate their identification by the lawful authorities.

EXHIBIT H

176.    It would be against equity and good conscience to permit the Crossclaim Defendants to retain the profits derived from the looting of assets rightfully belonging to the City of Almaty and BTA Bank.

### NINTH CAUSE OF ACTION

### (CONVERSION)
***Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov***

177.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 176 as if fully set forth herein.

178.    None of the Defendants has a superior interest to the City of Almaty or BTA in the assets wrongfully taken by the Ablyazov-Khrapunov Group.  These  funds, and the assets they were used to purchase, are the rightful property of the people of  Almaty and BTA.

179.    Defendants knowingly bought and sold assets obtained with these funds derived from the corruption of the office of the mayor of the City of Almaty and control of BTA Bank.

180.    As a result, Defendants have wrongfully and without authorization exercised of dominion and control over property of Almaty and BTA, and thus are liable for converting the same.

### TENTH CAUSE OF ACTION

### (CONSTRUCTIVE TRUST)
***Against All Defendants***

181.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 180 as if fully set forth herein.

182.    As mayor of Almaty, Viktor Khrapunov owed fiduciary duties  to the people of Almaty, and through his oath of office, expressly promised to execute  those duties.

183.    Despite that promise, Viktor Khrapunov breached those fiduciary duties repeatedly by transferring public assets of the City of Almaty to other members of the  Ablyazov-

EXHIBIT H

Khrapunov Group for fractions of their market value, and then assisted the Ablyazov-Khrapunov Group in laundering the funds resulting from those illicit transfers of public property.  Through these breaches of fiduciary duty, the Ablyazov-Khrapunov Group has been unjustly  enriched.

184.    A constructive trust over the 50% interest in CF 135 West Member LLC assigned by Triadou, and all profits therefrom, is the appropriate equitable remedy to prevent further  dissipation of the funds resulting from these breaches of fiduciary duty.

185.    Defendants have also conspired to  fraudulently transfer Triadou's interest in the Flatotel for the purpose of hiding the  Ablyazov-Khrapunov Group's assets and frustrating any recovery resulting from Almaty and BTA's investigations and pursuits of their stolen assets. Separate and aside from the Ablyazov-Khrapunov Group's breaches of fiduciary duty,  this knowingly fraudulent transfer by Cross- and Counterclaim Defendants justifies imposition of a constructive trust to prevent any further transfers or encumbrances of this  property.

186.    Absent this remedy, the Ablyazov-Khrapunov Group will continue to use Triadou  and SDG to launder the fruits of these breaches of fiduciary duty and hide these assets from law enforcement, and the Chetrit Group will continue to be unjustly enriched by these acts of fraud.

**ELEVENTH CAUSE OF ACTION**

**(PURSUANT TO CPLR § 5239 FOR FRAUD AND CONVERSION)**
*Against All Defendants*

187.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 186 as if fully set forth herein.

188.    Triadou has filed serial actions in the courts of the state of New York  seeking payment on the fraudulent assignment agreement between Triadou and the Chetrit  Group.  While Triadou has been awarded summary judgment in some of these  actions, none of these judgments

47

EXHIBIT H

have been satisfied by any sheriff or receiver.

189.     The City of Almaty and BTA Bank are the rightful owners of Triadou's interest in the  Flatotel and Cabrini Medical Center and/or any funds derived from the sale of that interest, as the interest was  purchased with funds unlawfully converted by the Ablyazov-Khrapunov Group and laundered  through SDG and Triadou.

190.     Pursuant to CPLR § 5239, this court is empowered to vacate any such  judgments and direct the disposition of the property in question, as well as direct which  party should keep possession of the property during the pendency of this action.

191.     The court should set aside any judgments in Triadou's favor in light of the City of Almaty's and BTA's superior interest in this illicitly-obtained property, direct that Triadou's interest in the Flatotel and Cabrini Medical Center be transferred to the City of Almaty and BTA Bank, and pursuant to CPLR § 5239,  award the City of Almaty and BTA Bank its reasonable attorneys' fees in bringing this claim.

## TWELFTH CAUSE OF ACTION

### (PURSUANT TO CPLR § 5303 FOR RECOGNITION AND ENFORCEMENT OF A FOREIGN JUDGMENT UNDER NEW YORK LAW)
#### *Against Defendant Ablyazov*

192.     BTA Bank repeats and realleges paragraphs 1 through 191 as if fully set forth herein.

193.     The United Kingdom of Great Britain and Northern Ireland is a "foreign state" within the meaning of N.Y. C.P.L.R. § 5301(a).

194.     The Ablyazov Judgments are "foreign country judgments" within the meaning of N.Y. C.P.L.R. § 5301(b).

195.     The Ablyazov Judgments are "final, conclusive and enforceable" in England within the meaning of N.Y. C.P.L.R. § 5302.

EXHIBIT H

196.    The Ablyazov Judgments grant recovery of a sum of money and are enforceable

by an action on the judgments in New York pursuant to N.Y. C.P.L.R. § 5303.

197.    None of the grounds for non-recognition of a foreign country judgment set forth

in N.Y. C.P.L.R. § 5304 applies to the Ablyazov Judgments.

198.    The Ablyazov Judgments are required to be enforced pursuant to N.Y. C.P.L.R.

§ 5303.

199.    Triadou is the alter ego of the Ablyazov-Khrapunov Group, and is thus liable  for

all current and future obligations against the Ablyazov-Khrapunov Group. Maintaining the

separateness of Triadou and its alter ego, the  Ablyazov-Khrapunov Group, would allow the

Ablyazov-Khrapunov Group to avoid otherwise  enforceable obligations and would be highly

inequitable to the people of the city of  Almaty and BTA Bank.

### THIRTEENTH CAUSE OF ACTION

### (AIDING AND ABETTING)
*Against Defendant FBME*

200.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 199

as if fully set out herein.

201.    The Ablyazov-Khrapunov Group converted property that rightfully belongs to

the Kazakhstan Plaintiffs through wire transfers executed by FBME Bank, and the Ablyazov-

Khrapunov Group was unjustly enriched by the use and investment of the same funds.

202.    FBME Bank was aware that the funds wired were the proceeds of crime and that

the wire transfers were an effort by the Ablyazov-Khrapunov Group to obscure the illicit nature

of those funds.

203.    Due to its longstanding relationship with the Ablyazov-Khrapunov Group and

deliberately ineffective protocols for preventing money laundering, FBME Bank aided and

49

EXHIBIT H

abetted the Ablyazov-Khrapunov Group's laundering scheme.

204.     FBME's active participation in the Ablyazov-Khrapunov Group's money laundering network rendered substantial assistance to the Ablyazov-Khrapunov Group's acts of conversion, fraud, and subsequent unjust enrichment, and the Kazakhstan Plaintiffs seek relief from FBME to the extent Defendants are found liable for these acts.

## DEMAND FOR JURY TRIAL

Almaty and BTA Bank demand a jury trial on all claims for which trial by jury is available, including on the underlying interpleader action.

## DEMAND FOR RELIEF

WHEREFORE, Almaty and BTA Bank demand the Court enter judgment as follows:

A.     For injunctive relief and rescission of the 2014 assignment agreement and release;

B.     For compensatory, punitive, and treble damages;

C.     For declaratory relief;

D.     For all costs and fees incurred in prosecuting this Complaint;

E.     For such other and further relief as this Court deems just and proper.

EXHIBIT H

Dated:  New York, New York
         September 7, 2016

                                    Respectfully Submitted,

                                    BOIES, SCHILLER & FLEXNER LLP

                          By:    /s/ Matthew L. Schwartz
                                 Matthew L. Schwartz
                                 Randall W. Jackson
                                 Daniel G. Boyle
                                 Craig Wenner

                                 BOIES, SCHILLER & FLEXNER LLP
                                 575 Lexington Avenue
                                 New York, New York 10022
                                 Telephone: 212-446-2300
                                 Facsimile: 212-446-2350

EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: DEC 2 3 2016

City of Almaty, Kazakhstan and BTA
Bank JSC,

                    Plaintiffs,

          ─v─

Mukhtar Ablyazov, Viktor Khrapunov, Ilyas
Khrapunov, and Triadou SPV S.A.,

                    Defendants.

15-CV-5345 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

On June 21, 2016, the Court granted in part and denied in part the motion of Triadou SPV

S.A. ("Triadou") to dismiss various crossclaims that are asserted against it by the City of Almaty,

Kazakhstan ("Almaty") and BTA Bank JSC ("BTA") (together, the "Kazakh Entities"). Dkt.

No. 174. In light of the Supreme Court's decision issued the previous day in *RJR Nabisco, Inc.*

*v. European Cmty.*, 136 S.Ct. 2090 (2016), however, the Court declined to address Triadou's

argument that the Kazakh Entities' claims under the Racketeer Influenced and Corrupt

Organizations Act, ("RICO"), 18 U.S.C. § 1961 *et seq.*, are impermissibly extraterritorial.

Instead, the Court invited additional briefing as to whether and how *RJR Nabisco* affects this

action. Dkt. No. 174 at 32. Having considered the parties' briefing on that question along with

several supplemental authority letters, Dkt. Nos. 188, 195-97, 202, 240, 244, 248-50, the Court

concludes, for the reasons set forth below, that the Kazakh Entities' RICO crossclaims must now

be dismissed.

I.     **Background**

Both the procedural history of this matter and the factual allegations giving rise to the

RICO crossclaims currently at issue are complex, and an exhaustive recitation is unnecessary

1

EXHIBIT I

here.  The reader is referred to the Court's Memoranda and Orders dated June 21, 2016 and June
24, 2016, Dkt. Nos. 174 and 175, for more comprehensive background.  For present purposes,
however, the following will suffice.

A.    **Factual Allegations**

Greatly simplified, what remains of this sprawling litigation concerns an alleged
conspiracy by which prominent Kazakh citizens looted billions of dollars from the Kazakh
Entities and then laundered the stolen funds around the world, including ultimately by
investing – through Triadou – in New York City real estate projects.

Almaty, the largest city in Kazakhstan, claims that its former mayor Viktor Khrapunov,
along with certain associates and family members including his son Ilyas Khrapunov, embezzled
approximately $300 million from Almaty between approximately 1997 and 2004, principally by
appropriating various public assets for their personal use. Dkt. No. 219 ¶¶ 45-55[1]  Often,
Almaty claims, this was achieved in one of two ways: fraudulent auctions in which Khrapunov
confederates acquired valuable assets at nominal prices; or Viktor Khrapunov's exercise of
eminent domain power to seize private property and transfer it to entities owned or controlled by
the Khrapunovs. *Id.* ¶¶ 49-55.  For its part, BTA, a formerly state-owned banking institution
based in Kazakhstan, claims that its former chairman Mukhtar Ablyazov siphoned more than $6
billion out of BTA between approximately 2005 and 2009, primarily through a series fraudulent
loans to valueless entities owned or controlled by Ablyazov himself. *Id.* ¶¶ 28-33.

The Kazakh Entities further allege that, in order to evade law enforcement, the
Khrapunovs and Ablyazov – who were related by marriage – joined together to move the stolen
funds out of Kazakhstan and to launder them through a series of shell companies, sham

---

[1] All citations herein concerning the Kazakh Entities' allegations refer to the Kazakh Entities' First
Amended Crossclaims, filed on September 7, 2016, which is the operative pleading in this case.  Dkt. No. 219.
Although Triadou's motion to dismiss targeted the Kazakh Entities' crossclaims as originally set forth in Almaty's
initial pleading in this action, dated October 12, 2015, Dkt. No. 49, the Kazakh Entities filed the First Amended
Crossclaims shortly after the supplemental briefing on *RJR Nabisco* was submitted, and, for purposes of the Court's
extraterritoriality analysis, there is no meaningful difference between the original and amended versions of the
RICO crossclaims.

EXHIBIT I

transactions, and outwardly-legitimate investments. *See, e.g., id.* ¶¶ 56-59, 68-72, 77-97. To help accomplish this, the Khrapunovs and Ablyazov allegedly created, among other things, a Switzerland-based real estate investment vehicle called SDG Capital, S.A. ("SDG") into which they funneled hundreds of millions of dollars of illicit proceeds before engaging in a sham sale of the company to conceal their continued control. *Id.* ¶¶ 58, 78-84. The Khrapunovs and Ablyazov then purportedly facilitated the creation of several entities under Luxembourg law for the purpose of investing stolen funds in United States-based real estate projects. *Id.* ¶¶ 86-87. Among these entities was Triadou, a special purpose vehicle wholly owned and controlled by SDG – and thus purportedly by the Khrapunovs and Ablyazov. *Id.*

In 2012 and 2013, Triadou, acting at the direction of the Khrapunovs and Ablyazov, invested funds allegedly embezzled from the Kazakh Entities in several New York City real estate projects, including the Flatotel and the Cabrini Medical Center, with prominent New York-based real estate developer Joseph Chetrit and several of his corporate affiliates (the "Chetrit Entities"). *Id.* ¶¶ 88-97, 111-113. Funding for these investments was allegedly wired to counsel for the Chetrit Group in the United States from accounts held by a Dubai-based private contracting entity called Telford International Limited (which was allegedly controlled by the Khrapunovs and Ablyazov) in FBME Bank, a Tanzanian-headquartered institution with operations primarily in Cyprus. *Id.* ¶¶ 21, 78, 98-106, 111-113. The Kazakh Entities allege that, in order to consummate these transactions and ensure concealment of the stolen funds, Triadou accepted contract terms on at least one investment that were unreasonably favorable to Chetrit and the Chetrit Entities. *See, e.g., id.* ¶¶ 97, 148.

In 2014, facing mounting law enforcement pressure abroad and litigation initiated by Almaty in California federal court, Ablyazov and the Khrapunovs allegedly caused Triadou to liquidate its real estate assets in New York so that stolen funds could be removed from the United States and hidden once again. *Id.* ¶¶ 114-123. To that end, Triadou – acting at the direction of Ablyazov and the Khrapunovs – engaged in a sham transaction with the Chetrit

EXHIBIT I

Entities whereby Triadou assigned its interest in the Flatotel to the Chetrit Entities and released its entitlement to equity in the Cabrini Medical Center in exchange for a "fraction of the fair market value of the properties" and personal bribery payments to at least one Triadou executive. *Id.*

### B.   Procedural Posture

This litigation began its life as an interpleader action against Triadou and Almaty brought by the Chetrit Entities, which claimed to face multiple liability under their 2014 assignment agreement with Triadou.  Dkt No. 25 ¶¶ 11-17.  In its answer to the interpleader complaint, Almaty asserted a variety of counterclaims against the Chetrit Entities, crossclaims against Triadou, and third-party claims against Ablyazov, Khrapunovs, and Joseph Chetrit.  Dkt. No. 49.

All claims brought by or against the Chetrit Entities or Chetrit were ultimately resolved through dismissal or settlement.  And in June 2016, the Court consolidated the litigation further by granting Almaty's motion to join BTA, the Khrapunovs, and Ablyazov to the pending dispute between Almaty and Triadou.  Dkt. No. 174 at 6.[2]

The subject of this decision is the Kazakh Entities' RICO crossclaims.[3]  In its June 21 Order on Triadou's motion to dismiss the crossclaims, the Court rejected the argument that the Kazakh Entities fail to state RICO claims under Federal Rules of Civil Procedure 9(b) and 12(b)(6), but, as noted, it deferred decision on whether those claims are impermissibly extraterritorial pending further consideration of the *RJR Nabisco* decision.  Dkt. 174 at 19-27, 32. Triadou – now joined in pertinent part by Ablyazov and the Khrapunovs[4] – continues to press its extraterritoriality argument in light of *RJR Nabisco*, urging that the Supreme Court's decision forecloses the Kazakh Entities' RICO claims.

---

[2] The Kazakh Entities have since filed another motion for joinder, targeting FBME Bank.  *See* Dkt. No. 216.  That motion is still pending.

[3] For purposes of this discussion, Triadou, Ablyazov, and the Khrapunovs are collectively referred to as the "Crossclaim Defendants."

[4] *See* Dkt. Nos. 196-197 (letters from Ablyazov and the Khrapunovs adopting Triadou's contentions by reference).  Since their joinder, Ablyazov and the Khrapunovs have also separately filed their own motions to dismiss, which were recently fully submitted and remain pending.  *See* Dkt. Nos. 227-29, 231-33, 241, 246-47.

4

EXHIBIT I

## II.    Discussion

### A.    Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A
claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S.
at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more
than a sheer possibility that a defendant has acted unlawfully.   Where a complaint pleads facts
that are 'merely consistent with' a defendant's liability, it 'stops short of the line between
possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at
556-57) (internal quotation marks and citation omitted).

### B.    RICO Claims

#### 1.    Statutory Framework

RICO establishes four criminal offenses, and, separately, a private civil cause of action.
*RJR Nabisco*, 136 S.Ct. at 2096-97.  Sections 1962(a)-(d) make it unlawful to engage in several
specific activities involving a "pattern of racketeering activity."  Specifically, as summarized by
the Supreme Court:

> Section 1962(a) makes it unlawful to invest income derived from a pattern of
> racketeering activity in an enterprise. Section 1962(b) makes it unlawful to acquire
> or maintain an interest in an enterprise through a pattern of racketeering activity.
> Section 1962(c) makes it unlawful for a person employed by or associated with an
> enterprise to conduct the enterprise's affairs through a pattern of racketeering
> activity.  Finally, [Section] 1962(d) makes it unlawful to conspire to violate any of
> the other three prohibitions.

EXHIBIT I

*RJR Nabisco*, 136 S.Ct. at 2097.   The statue defines "racketeering activity" to include a wide variety of state and federal offenses generally referred to as "predicates." *Id.* at 2096-97; *see also* 18 U.S.C. §§ 1961(1)(A)-(G).

Section 1963(a) provides for criminal penalties for violations of the substantive prohibitions set forth in Section 1962, and Sections 1964(a)-(b) permit the Attorney General to institute civil proceedings to enforce those prohibitions.   Section 1964(c) – the provision under which the Kazakh Entities assert claims – creates a private right action for "[a]ny person injured in his business or property by reason of a violation of [S]ection 1962," and provides for recovery of treble damages, attorney's fees, and costs.

To state a viable claim for relief under Section 1964(c), a plaintiff must allege a substantive violation of the RICO statute, "injury to business or property," and "causation of the injury by the violation." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990).   While "a plaintiff must plead predicate acts sounding in fraud or mistake according to the particularity requirement of [Federal Rule of Civil Procedure] 9(b)," the "other elements" of a RICO claim, "such as non-fraud predicate acts or . . . the existence of an 'enterprise,'" need "satisfy only the 'short and plain statement' standard of Rule 8(a)." *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 666 (2d Cir. 2014) (Summary Order) (citation omitted).

> ### 2.   *RJR Nabisco* Makes Clear that Private RICO Plaintiffs Must Allege and Prove *Domestic* Injury to Their Business or Property

In *RJR Nabisco*, the Supreme Court considered whether RICO applies extraterritorially – "that is, to events occurring and injuries suffered outside the United States." 136 S.Ct. at 2096. The Court construed this question to raise two related but importantly distinct issues: first, "do RICO's substantive prohibitions, contained in [Section] 1962, apply to conduct that occurs in

EXHIBIT I

foreign countries?"; and second, "does RICO's private right of action, contained in [Section] 1964(c), apply to injuries that are suffered in foreign countries?". 136 S.Ct. at 2099. Both questions, the Court noted, implicated the canon of statutory construction known as the presumption against extraterritoriality: the proposition that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* at 2100 (citing *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)).

On the first question, the Court held that the substantive prohibitions of Section 1962 do "appl[y] to *some* foreign racketeering activity," explaining that "[a] violation of [Section] 1962 may be based on a pattern of racketeering that includes predicate offenses committed abroad, provided that each of those offense violates a predicate statute that is itself extraterritorial." *Id.* at 21003 (emphasis added). The Court reasoned that while "Congress has not expressly said" in the statutory language that RICO applies extraterritorially, its definition of "'racketeering activity' . . . to encompass violations of predicate statutes that *do* expressly apply extraterritorially" is a sufficient "clear, affirmative indication that [Section] 1962 applies to foreign racketeering activity – but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially." *Id.* at 2012-03.[5] Accordingly, conduct occurring in foreign countries may violate Section 1962, and thus give rise to criminal liability or a civil enforcement proceeding, when the state or federal statutes setting forth the underlying predicate offenses overcome the presumption against extraterritoriality.

---

[5] The Court declined to make a definitive determination on this issue with respect to the conspiracy prohibitions of Section 1962(d), instead "assum[ing] without deciding that [Section] 1962(d)'s extraterritoriality tracks that of the [substantive] provision underlying the alleged conspiracy." *Id.* at 2103. It also recognized the possibility that while Section 1962(a)'s prohibition on the use or investment of racketeering-derived income clearly applies when the relevant income is derived from foreign patterns of racketeering, the prohibition "arguably . . . extends only to domestic uses of the income." *Id.*

EXHIBIT I

On the second question, however, the Court held – with critical implications for the instant case – that "[i]rrespective of any extraterritorial application of [Section] 1962 . . . [Section] 1964(c) does not overcome the presumption against extraterritoriality," and a "private RICO plaintiff must therefore allege and prove a *domestic* injury to its business or property." *Id.* at 2106 (emphasis in original).  In reaching this conclusion, the Court first emphasized the importance of "separately apply[ing] the presumption against extraterritoriality to RICO's cause of action" notwithstanding its determination regarding the statute's substantive prohibitions, as the two questions raise "distinct extraterritoriality problems." *Id.* at 2106, 2210.  The Court rejected the notion that the presumption against extraterritoriality "is primarily concerned with the question of what *conduct* falls within a statute's purview," *id.* at 2106 (internal quotation marks omitted) (emphasis in original), and explained that "'[t]he creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion,'" *id.* (quoting *Sosa v. Alvarez-Machain,* 542 U.S. 692, 727 (2004)).  One important "issue[]," the Court noted, is that "providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct." 136 S.Ct. at 2106.  As a primary example of international friction, the Court highlighted the "danger" that "[a]llowing recovery for foreign injuries in a civil RICO action, including treble damages," could result in injured citizens of foreign countries choosing to "bypass" their home jurisdictions' "less generous remedial schemes" in order to bring suit in U.S. federal court. *Id.* at 2106-07 (citing warnings by various foreign country *amici curiae* in earlier cases that such application of U.S. antitrust and securities fraud laws would conflict with their own and sometimes "very different" choices as to how to

8

EXHIBIT I

implement certain substantive proscriptions – such as "preferring state actions, not private ones"
– and potentially "upset that delicate balance and offend the sovereign interests of foreign
nations" (internal quotation marks and brackets omitted)).  When extraterritorial application of
U.S. law raises the "risk" of "international friction" in such a manner, the Court explained, "the
need to enforce the presumption [against extraterritoriality] is at its apex."[6]  *Id.* at 2107.

        With that background, the Court proceeded to analyze Section 1964(c) independently and
concluded that nothing about that provision "provides a clear indication that Congress intended
to create a private right of action for injuries suffered outside of the United States." *Id.* at 2108.
"If anything," the Court observed, certain cabining language – such as the limitation of the
private cause of action to particular kinds of injury – "signal[s] that the civil remedy is not
coextensive with [Section] 1962's substantive prohibitions." *Id.*  Accordingly, the Court held
that "Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to
business or property and does not allow recovery for foreign injuries." *Id.* at 2111.  The Court
observed – presciently – that "disputes may arise as to whether a particular alleged injury is
'foreign' or 'domestic.'" *Id.*  But it declined to offer guidance on such issues in light of a
stipulation filed during the pendency of the appeal waiving plaintiffs' damages claims for
domestic injuries. *Id.*  As such, the Court dismissed the plaintiffs' RICO claims because they
"rest[ed] entirely on injury suffered abroad." *Id.*

_____

        [6] The Court expressly rejected the argument that concerns of international friction are inapplicable when
the plaintiffs are "not foreign citizens seeking to bypass their home countries' less generous remedial schemes but
rather the foreign countries themselves." *Id.* at 2107-08 (refusing to "discard those reservations when a foreign state
sues a U.S. entity in this country under U.S. law – instead of in its own courts and under its own laws – for conduct
committed on its own soil," and foreclosing the possibility of permitting extraterritorial RICO suits "based on a
case-by-case inquiry that turns on or looks to the consent of the affected sovereign").

EXHIBIT I

### 3.     The Kazakh Entities' Claims

The Kazakh Entities assert five causes of action under RICO based on alleged violations

of the substantive prohibitions set forth in Sections 1962(a), (c), and (d). Dkt. No. 219 ¶¶ 127-

161.  They allege that the so-called "Ablyazov-Khrapunov Group and numerous other

individuals and entities, including SDG and Telford," together constituted a RICO enterprise –

as did several of the individual Chetrit Entities – and they plead numerous predicates occurring

both abroad and in the United States, including money laundering, transactions in money or

property derived from unlawful activity, interstate or foreign transport of stolen money or

property, mail fraud, and wire fraud. *Id.*  In support of their RICO claims, the Kazakh Entities

generally allege that they "have been injured in their business or property" and "have suffered

damages in an amount . . . presently estimated to be not less than $6 billion." *See, e.g., id.* ¶ 134.

### 4.     The Parties' Contentions

Consistent with Justice Alito's prediction, the parties disagree vehemently as to whether

the Kazakh Entities' alleged RICO injuries are "domestic" or "foreign" within the meaning of

*RJR Nabisco*.  This subsection explicates the parties' contentions.

Triadou avers that courts applying *RJR Nabisco*'s domestic-injury rule should ask two

questions.  "First, what business or property . . . was injured?  Second, where was that business

or property located when the injury occurred"?[7]  Answering those questions in this case, Triadou

contends, is a straightforward exercise that compels dismissal of the RICO claims: the only

injury alleged here is the looting of Kazakhstan-based assets held by the Kazakh Entities,

occurring within the geographical boundaries of Kazakhstan.  Br. at 4-6.

---

[7] *See* Triadou's Supplemental Brief in Support of Its Motion to Dismiss the RICO Claims of the City of
Almaty and BTA Bank, Dkt. No. 188 ("Br.") at 4.

EXHIBIT I

Anticipating the Kazakh Entities' response, Triadou also argues that while several alleged

RICO predicates no doubt occurred within the United States, such acts do not convert the

otherwise foreign injury into a domestic one.  That is because, Triadou continues, those acts

(e.g., the alleged concealment of stolen funds in New York real estate) occurred only *after* the

misappropriation of the assets at issue was complete, and, as such, they cannot be said to have

proximately caused any loss.  Br. at 5-9.  To support this proposition, Triadou relies heavily on

pre-*RJR Nabisco* case law holding that "'an act which proximately caused an injury is

analytically distinct from one which furthered, facilitated, permitted, or concealed an injury

which happened or could have happened independently of the act,'"  and that a predicate, even

when "'an integral part of the underlying criminal scheme,'" may only satisfy RICO's causation

requirements when "'the plaintiff's original loss could not have occurred without the commission

of the act.'"  *See, e.g.*, Br. at 8 (internal brackets and emphasis omitted) (quoting *Leung v. Law*,

387 F. Supp. 2d 105, 122 (E.D.N.Y. 2005).

Separately, Triadou analogizes the domestic-versus-foreign-injury inquiry to identifying

the situs of an injury for the purpose of determining where a cause of action accrued under New

York's so-called "borrowing statute," CPLR § 202.   Specifically, it notes New York's default

rule that "'where an alleged injury is purely economic, the place of injury usually is where the

plaintiff resides and sustains the economic impact of the loss.'"  *Br.* at 9-10 (brackets omitted)

(quoting *Chigirinskiy v. Panchenkova*, 14-cv-4410, 2015 WL 1454646, at *15 (S.D.N.Y. Mar.

31, 2015)).  Applying a similar rule here, according to Triadou, confirms that the Kazakh

Entities' alleged injuries are wholly foreign.

The Kazakh Entities' principal argument in opposition, distilled to its simplest form, is

that they allege domestic injury because they allege domestic predicate acts with a sufficient

EXHIBIT I

causal nexus to the economic losses that they have suffered.[8]  In support of this contention, the Kazakh Entities urge that a "RICO's plaintiff's harm may have more than one proximate cause," and that it is "impossible to distinguish the underlying theft by Ablyazov and the Khrapunovs from the subsequent money laundering scheme." *Id.* at 8, 10 (internal quotation marks omitted).

The Kazakh Entities also purport to identify independent property injuries suffered within the United States.  Specifically, they maintain that Triadou's alleged money laundering and related activities in the United States have "caused the enterprise to maintain control of property that rightfully belongs to the Kazakh Entities" and that the "below-market assignment of Triadou's investment in the Flatotel back to the Chetrit Entities . . . significantly diminished the value of the Kazakh Entities' property." *Id.* at 10.

### 5.    The Kazakh Entities Fail to Allege Domestic Injury to Their Business or Property

The Court agrees with Triadou that *RJR Nabisco* forecloses the Kazakh Entities' RICO claims.  The Supreme Court, as noted, "offered no explicit framework" in that decision for determining whether a particular alleged injury is "domestic" or "foreign." *Bascuñan v. Elsaca*, 15-cv-2009, 2016 WL 5475998, at *5 (S.D.N.Y. Sept. 28, 2016).  The Court, however, sees nothing in the Kazakh Entities' pleading that provides any basis to conclude that they have plausibly alleged domestic injury.

### a.    The Location of the Alleged Injuries Must be Analyzed Independently of the Location of the Alleged Predicate Acts

As an initial matter, the Court rejects any suggestion that an alleged RICO injury may be deemed "domestic" or "foreign" purely by reference to the location of the predicate acts that

---

[8] BTA Bank and The City of Almaty, Kazakhstan's Supplemental Brief in Response to Defendants' Motion to Dismiss the RICO Claims, Dkt. No. 195 ("Op.") at 8-10.

12

EXHIBIT I

purportedly caused it.   Indeed, to accept such an argument would be to ignore, for all intents and purposes, the Supreme Court's emphatic directive that the "presumption against extraterritoriality must be applied *separately* to both RICO's substantive prohibitions and its private right of action." *RJR Nabisco*, 136 S.Ct. at 2108 (emphasis added) (rejecting related argument that a RICO plaintiff may necessarily "sue for foreign injury that was caused by the violation of a predicate statute that applies extraterritorially" and noting that "something more is needed" to bring a private RICO action). *RJR Nabisco* makes clear that "domestic injury to business or property" is an *independent* requirement for bringing a private RICO action – separate and apart from the requirement of a substantive RICO violation that is either domestic or permissibly extraterritorial – and, as such, the existence of such an injury cannot, as a matter of logic, turn entirely on whether it was caused by conduct occurring in the U.S.   Put slightly differently, "[d]etermining the location where a putative plaintiff suffered an alleged injury to determine whether that plaintiff has a private cause of action under § 1964(c) is," after *RJR Nabisco*, "an inquiry that is independent of the inquiry determining the location of a defendant's conduct to determine the applicability of § 1962's substantive prohibitions." *Bascuñan*, 2016 WL 5475998, at *5 (emphasis omitted).   Accordingly, to the extent that any party maintains either that the Kazakh Entities' injuries are necessarily domestic because they were proximately caused, in part, by conduct in the U.S., or, conversely, that the injuries are necessarily *foreign* because they were *not* proximately caused by conduct in the U.S., that argument fails.

   **b.** **Any Injury from the Alleged Misappropriation of the Kazakh Entities' Funds Was Suffered" Outside of the U.S.**

   In the Court's view, the appropriate subject of the inquiry required by *RJR Nabisco* is not the location of the Crossclaim Defendants' purportedly injurious conduct but the location where the injury itself arose. *See RJR Nabisco*, 136 S.Ct. at 2108. ("Nothing in [Section] 1964(c)

EXHIBIT I

provides a clear indication that Congress intended to create a private right of action for *injuries suffered outside of the United States.*") (emphasis added); *see also Bascuñan*, 2016 WL 5475998, at *5 (under *RJR Nabisco*, "the location where the *plaintiff suffered* the alleged injury dictates whether the plaintiff may pursue a private right of action under [Section] 1964(c).") (emphasis in original). The facts of this case compel the conclusion that the critical location is Kazakhstan.

In the only decision in this Circuit thus far interpreting the domestic-injury rule articulated in *RJR Nabisco*, Judge Daniels concluded that to determine where an alleged economic injury was suffered for purposes of Section 1964(c) the court should focus "upon where the economic impact of the injury was ultimately felt" and ask "two common-sense questions: (1) who became poorer, and (2) where did they become poorer." *Bascuñan*, 2016 WL 5475998, at *4-6 (internal citations and quotation marks omitted). This approach was adapted from the framework used to determine where an injury occurred, and thus where the corresponding cause of action accrued, for purposes of New York's borrowing statute, CPLR § 202. *Bascuñan*, 2016 WL 5475998, at *4 (citing, for example, *Deutsche Zentral-Genossenchaftsbank AG v. HSBC N. Am. Holdings, Inc.*, 12-cv-4025, 2013 WL 6667601, at *6 (S.D.N.Y. Dec. 17, 2013)). As Judge Daniels recognized, under that framework as applied by the courts of this Circuit, "[i]n cases involving economic harm, [the place of injury] is normally the state of plaintiff's residence," and foreign corporations are recognized to "reside either in their principal place of business or their place of incorporation." *Deutsche*, 2013 WL 6667601, at *5 (internal quotation marks omitted); *cf. Sack v. Low*, 478 F.2d 360, 365-66 (2d Cir. 1973) (concluding that New York courts would follow the "traditional" approach and recognize securities fraud claim as accruing "where the loss is suffered," which, in the fraud context, is where "the economic impact is felt, normally the plaintiff's residence"); *Gorlin v. Bond Richman*

14

EXHIBIT I

& Co., 706 F. Supp. 236, 239-40 (S.D.N.Y. 1989) (RICO and securities fraud claims injuries were sustained in plaintiff's state of residence).  "A limited exception to the general place of injury is where a plaintiff maintains a separate financial base and the impact of the financial loss is felt at that location," but that exception "is applied only in the extremely rare case where the party has offered unusual circumstances evincing that economic injury occurred at a place other than the plaintiff's residence." *Robb Evans & Assocs. LLC v. Sun Am. Life Ins.*, 10-cv-5999, 2012 WL 488257, at *4 (S.D.N.Y. Feb. 14, 2012) (internal quotation marks, citations, and brackets omitted).

Utilizing this approach, Judge Daniels dismissed the RICO claims at issue in *Bascuñan*. Those claims arose out of a conspiracy to embezzle millions of dollars from a Chilean citizen and resident, in large measure by fraudulently causing "New York banks holding Plaintiffs' funds to wire money from Plaintiffs' accounts to Defendants' accounts located in New York and elsewhere" and by physically removing stock certificates beneficially owned by plaintiff out of a safety deposit box in New York and transferring them abroad.  2016 WL 5475998, at *1-2. Notwithstanding substantial domestic conduct on the part of the defendants, Judge Daniels held that the economic loss alleged in the complaint constituted wholly "foreign" injury because the ultimate owner of the funds at issues "suffered the losses in Chile" by virtue of his residency and citizenship in that country.  *Id.* at *6.

The *Bascuñan* approach has garnered somewhat mixed reception among the few other courts to address the domestic-injury issue.  In a case with parallels to the instant matter, Judge Zagel of the Northern District of Illinois adopted a similar approach and held that corporate RICO plaintiffs based in the United Arab Emirates suffered injury from an alleged illegal kickback scheme "where their business and economic operations are centered" – i.e., in the

EXHIBIT I

UAB – even though "the illegally obtained kickback proceeds ultimately financed land purchases
in the United States" and certain of the kickbacks were paid via wires originating in the U.S.
*Exceed Indus., LLC v. Younis*, 15-c-14, 2016 WL 6599949, at *1-3 (N.D. Ill. Nov. 8, 2016)
(citing *Bascuñan*). Noting that plaintiffs had not "maintained a United States presence, either at
the time of the alleged scheme or now," the *Younis* court characterized the after-the-fact land
purchases as mere "downstream effects of the initial injury that impacted [plaintiffs] in the UAE"
and thus as insufficient to form the basis of a private RICO action. *Id.* at *3.

    In *Tatung Co., Ltd. v. Shu Tze Hsu*, however, Judge Carter of the Central District of
California "decline[d] to follow *Bascuñan*," citing concerns that its approach "amounts to
immunity for U.S. corporations who, acting entirely in the United States, violate civil RICO at
the expense of foreign corporation doing business in the country" and precludes suit by "foreign
individual[s] . . . for financial injuries incurred while they are working, traveling, or doing
business in this country as the result of an American RICO operation." CV 13-1743, 2016 WL
6683201, at *6-7 (C.D. Cal. Nov. 14, 2016). Reasoning that plaintiff, a foreign corporation,
"maintained a 'hub'" and did business in the U.S. and had been injured by a RICO conspiracy to
prevent it from collecting an arbitration award issued and confirmed in California and arising out
of a commercial credit dispute in the U.S., Judge Carter concluded that plaintiff had suffered a
domestic injury. *Id.* at *7-8.[9]

---

        [9] Another district court has arguably developed a third approach, which borrows from a test used to
determine whether the federal antitrust statutes may reach anticompetitive behavior occurring outside of the U.S.
and asks whether the RICO defendant's "conduct is intended to or has produced 'substantial effects' in the United
States." *See Union Comm. Servs. Ltd. v. FCA Int'l Ops. LLC*, 16-cv-10925, 2016 WL 6650399, at *4-5 (E.D. Mich.
Nov. 10, 2016) (ultimately dismissing RICO claim because plaintiff – a company incorporated overseas, owned by
Angolan citizens, and with its principal place of business in Angola – suffered its alleged lost sales and profits
wholly overseas and as a result of conduct by defendants "directed solely at the Angolan auto market"). Although
the Kazakh Entities urge this Court by supplemental letter to adopt this "effects" test, Dkt. No. 249, the Court finds
reliance on extraterritoriality jurisprudence from the antitrust context to be at odds with the *RJR Nabisco* Court's
express "reluctance" to determine the territorial scope of Section 1964(c) by reference to its past interpretations of
the antitrust statutes. *See RJR Nabisco*, 136 S.Ct. at 2109-2111 (noting that certain such interpretations were

EXHIBIT I

This Court agrees that the *Bascuñan* rule is consistent with the Supreme Court's focus in assessing the extraterritoriality of Section 1964(c) on injuries "suffered overseas." *RJR Nabisco*, 136 S.Ct. at 2109; see also *id.* at 2115-16 (Ginsburg, J., dissenting) (noting that Court's domestic-injury rule means that "U.S. defendants commercially engaged here and abroad would be answerable civilly to U.S. victims of their criminal activities, but foreign parties similarly injured would have no RICO remedy"). Nevertheless, it shares the *Tatung* court's hesitation to broadly endorse an absolutist version of the rule that would, for example, categorically preclude foreign corporations with business operations or property interests maintained in the U.S. from bringing RICO actions to recover for injuries to those assets. The instant case, however, presents no such circumstances. The Kazakh Entities are undisputedly both aliens that are not alleged to hold assets or to maintain any operations, instrumentalities, or other presence in the United States. They were not "working, traveling, or doing business" in the U.S. when they incurred their alleged injuries. *Cf. Tatung*, 2016 WL 6683201, at *6-7; *see also Akishev v. Kapustin*, C.A. 13-7152, 2016 WL 7165714, at *6-8 (D.N.J. Dec. 8, 2016) (finding domestic injury because foreign-based plaintiffs "travel[ed] by way of the Internet" to defendant's "United States-based website representing United States-based car dealerships," where they were "induced by fraud" to send funds "by wire transfer to [defendant's] U.S. bank"). The purported misappropriations giving rise to this action occurred within Kazakhstan and targeted only assets

---

rendered "before we honed our extraterritoriality jurisprudence"). Triadou recognizes this reluctance but nevertheless suggests that the *RJR Nabisco* Court's passing remarks on the passage of the Foreign Trade Antitrust Improvements Act suggest that decisions interpreting that statute, at least, "represent[] an analogous body of federal law" that should inform the Court's conclusion here. Dkt. No. 249 at 2 n.1. But the so-called "domestic effects exception" to the FTAIA's otherwise categorical exclusion from the reach of the antitrust laws of "conduct involving trade or commerce . . . with foreign nations" is based on an express statutory carve-out that sets forth specific categories of qualifying domestic "effects." *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158-59 (2004) (citing 15 U.S.C. § 6a). The RICO statute contains no express analogue, and the Court sees no reason to infer one. Accordingly, the Court declines to follow the *Union Commercial* approach.

EXHIBIT I

held overseas. Framed as to answer Judge Daniels' overarching questions, the Kazakh Entities

clearly "got poorer" in Kazakhstan. Indeed, the Kazakh Entities' own characterizations of their

crossclaims underscore that they seek to redress grievances whose economic impact has been

suffered abroad. *See, e.g.,* Dkt. No. 219 ¶¶ 2-3 (asserting that the crossclaims are aimed at

"regain[ing] assets looted by [BTA's] former Chairman, Mukhtar Ablyazov, who abused his

position to enrich himself and treat BTA as private property," as well as "assets looted by

[Almaty's] former mayor, Victor Khrapunov . . . to be returned for the benefit of the people of

Almaty").

       Nor does the RICO claims' connection to the U.S. – that is, the alleged investment of the

stolen funds in New York real estate projects – present the sort of "'extremely rare'"

circumstances contemplated by the *Bascuñan* approach under which injuries allegedly suffered

by foreign plaintiffs could be deemed domestic. *Bascuñan,* 2016 WL 5475998, at *4 (quoting

*Robb Evans,* 2012 WL 488257, at *4). The Kazakh Entities' allegations do not implicate the

most established example of such circumstances: that some "discrete financial base . . .

established away from home" suffered the brunt of the losses at issue. *In re LIBOR-Based Fin.*

*Instruments Antitrust Litig.,* 11-MDL-2262, 2015 WL 6243526, at *118-119 (S.D.N.Y. Oct. 20,

2015). And courts in this district, applying the CPLR § 202 framework from which *Bascuñan*

borrows, have consistently recognized that a plaintiff's mere "financial connection to New

York" – whether it be in the form of branch offices, investment activity, or bank accounts – is an

insufficient basis to find that a foreign entity suffered injury in New York. *See, e.g., id.* (out-of-

state fraud victims who held money in New York bank accounts, had to post collateral in New

York for the fraudulent transactions, and/or had those transactions overseen by New York-based

traders did not suffer loss in New York); *Deutsche,* 2013 WL 6667601, at *6-7 (no New York

EXHIBIT I

injury even though the "decisions, operations, accounting, diligence, and purchases for the

RMBS investments" at issue were performed in New York or out of New York bank accounts

and plaintiff's New York branch had its funds "diminished," liquidity "reduced," and workforce

"downsized" as a result of fraud). Considered against the weight of the case law, the after-the-

fact concealment in the U.S. of funds stolen entirely abroad does not constitute a basis for

concluding that the Kazakh Entities have alleged injury suffered in the U.S. *Cf. Younis*, 2016

WL 6599949, at *1-3 (use of ill-gotten kickback proceeds to purchase land in the U.S. was only

a "downstream effect[] of the initial injury that impacted Plaintiffs [abroad], where their business

and economic operations are centered").

> c.    **The Kazakh Entities' Attempts to Identify Other Injuries to
>        Their Property Occurring within the United States Fail**

Shifting gears slightly, the Kazakh Entities seemingly attempt to identify allegations of

injury to property in the United States that are entirely independent of the original

misappropriations in Kazakhstan. Assuming *arguendo* that such allegations would be sufficient

to plead domestic injury under *RJR Nabisco*, the Kazakh Entities' attempts are unavailing.

First, the Kazakh Entities aver that they were "injured . . . in the United States" because

the Crossclaim Defendants' alleged money laundering and fraudulent transactions allowed the

purported RICO enterprises to "maintain control" of property belonging to the Kazakh Entities.

Op. at 9-10. But the Kazakh Entities do not cite any authority, and the Court is aware of none,

for the proposition that a defendant's post-theft "control" of embezzled funds in and of itself

constitutes a discrete injury that that could be recognized as domestic. *Cf. Younis*, 2016 WL

6599949, at *3 (declining to adopt "broad 'continued deprivation' standard in defining domestic

injury" and focus on ill-gotten assets' current presence in U.S.); *Hourani v. Mirtchev*, 943 F.

Supp. 2d 159, 162, 167 (D.D.C. 2013), *aff'd* 796 F.3d 1 (D.C. Cir. 2015) (characterizing

EXHIBIT I

extortion victims' RICO "injuries" as "the loss of their assets in Kazakhstan," notwithstanding allegations of post-extortion money laundering in the United States). Indeed, the cases cited by the Kazakh Entities suggest only that there may be circumstances under which the concealment of stolen funds was so critical to facilitating an ongoing theft in the first place that money laundering may be recognized as having proximately caused some portion of the *original* injury. *See, e.g., City of N.Y. v. Vekataram*, 396 Fed. App'x 722, 724-25 (2d Cir. 2010) (Summary Order) (defendant's filing of fraudulent subcontractor invoices was "essential" to inducing undeserved payments by the City in the first place and "there [was] no record support for distinguishing the acts of money laundering and embezzlement"); *Maiz v. Virani*, 253 F.3d 641, 673-74 (11th Cir. 2001) (defendants' money laundering "conceal[ed] the existence of . . . profits" made on misappropriated funds contributed by plaintiff and thus "induce[d] further contributions," and plaintiff likely "would have discovered the fraud and withdrawn [its] funds were it not for the money laundering"); *U.S. v. Wilson*, 98 F.3d 281, 283-84 (7th Cir. 1996) (defendant's use of funds defrauded from investors to purchase cashier's checks to pay earlier investors "helped keep the fraudulent scheme afloat by lulling investors into a false sense of security" and thus was an "integral cog[] in continuing the scheme") (internal quotation marks omitted).[10]

As already explained, the alleged thefts in Kazakhstan cannot be deemed domestic injuries under *RJR Nabisco* purely because they may have been proximately caused, in part, by after-the-fact money laundering in the United States. In any event, the types of circumstances

---

[10] *See also Eastman Kodak Co. v. Camarata*, 05-cv-6384, 2006 WL 3538944, at *11 (W.D.N.Y. Dec. 6, 2006) ("it is certainly conceivable that [defendant's] alleged acts of money laundering had the effect of not simply concealing a completed crime, but allowed it continue for longer than it otherwise would have"); *Levine v. Torino Jewelers, Ltd.*, 05-cv-3159, 2006 WL 709098, at *4 (S.D.N.Y. Mar. 22, 2006) (it was "at least conceivable that defendants' actions assisted [embezzler] in covering her tracks and therefore helped her steal more from plaintiff than she otherwise would have").

20

EXHIBIT I

under which post-theft money laundering may proximately cause theft-related loss are not
alleged here.  To the contrary, there is no dispute that the purported misappropriations were
complete – and the embezzled funds removed from Kazakhstan – well before the Crossclaim
Defendants' alleged transactions in the United States.  *See, e.g.*, Dkt. 219 ¶¶ 28-34, 45-58, 64,
77-106, 111-119.  As such, while those transactions may have been "necessary to the
[Crossclaim Defendants'] efforts to retain the property siphoned out of the [Kazakh Entities],"
they are not alleged to have been "an indispensable part of the theft itself" and thus at most they
"may have concealed, but did not cause" the losses in Kazakhstan.  *Leung v. Law*, 387 F. Supp.
2d 105, 122 (E.D.N.Y. 2005); *see also Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*,
298 F.3d 768, 773-74 (9th Cir. 2002) (defendant's employee's laundering of proceeds after sale
of goods stolen from plaintiff was the not the proximate cause of plaintiff's RICO loss – "it was
theft"); *Picard v. Kohn*, 907 F. Supp. 2d 392, 397 (S.D.N.Y. 2012) ("Acts that merely furthered,
facilitated, permitted, or concealed an injury which happened or could have happened
independently of the act do not directly cause that [RICO] injury, and thus do not proximately
cause it.") (internal quotation marks omitted).

The Kazakh Entities also appear to contend that one aspect of Triadou's domestic
activities in particular – the "below-market assignment of [its] investment in the Flatotel back to
the Chetrit Entities" – "diminished the value of the Kazakh Entities' property."  Op. at 10.  It is
not entirely clear to the Court precisely what "property" the Kazakh Entities reference – that is,
whether they intend to suggest that the assignment lessened the value of the Flatotel itself, of the
funds stolen in Kazakhstan and invested in the Flatotel, or something else entirely.  Regardless,
the Court sees no basis to infer that the Flatotel assignment injured any property owned by the
Kazakh Entities.  First, it is unclear that the Kazakh Entities (purported embezzlement victims)

21

EXHIBIT I

had a cognizable property or business interest in the Flatotel itself (a property in which embezzled funds were allegedly invested) at the time of Triadou's assignment. *See United States v. Brimberry*, 779 F.2d 1339, 1348 (8th Cir. 1985) ("[w]hen an embezzler purchases property with stolen funds, the property may be subjected to a constructive construct in favor of the victim" but "[u]ntil a court grants the victim such a constructive trust remedy," the victim "merely has a right to seek" it and the "existence of such a right does not establish an interest in the specific property"). Even assuming they did, however, the Kazakh Entities do not plausibly allege that the assignment itself in any way decreased the intrinsic value of the Flatotel project. Finally, the transfer of stolen funds (effected by the assignment) from Triadou to other participants in the alleged RICO enterprises cannot plausibly be alleged to have somehow diminished the value of the funds themselves or to have impaired the Kazakh Entities' purported right of recovery. *Cf. Harvey v. Fresquez*, 10-cv-5291, 2011 WL 855875, at *2 (S.D.N.Y. Mar. 8, 2011) ("money is fungible" and a plaintiff "does not need to retrieve those precise dollars and cents that were taken from his bank account"). Accordingly, the Court is not persuaded that the Kazakh Entities have plausibly alleged any injury to their property occurring within the United States.

### d. The Court's Conclusion is Consistent with the Supreme Court's Express Concerns about International Comity

Finally, while not dispositive, the Court notes that its conclusion that the Kazakh Entities have failed to plausibly allege domestic injury serves the very comity interests that the Supreme Court emphasized in determining that Section 1964(c) does not apply extraterritorially. *See RJR Nabisco*, 136 S.Ct. at 2106-08. The *RJR Nabisco* Court, as discussed, premised its decision in substantial part on the risks of "international friction" associated with allowing foreign entities to "bypass" potentially "less generous remedial schemes" available in their home jurisdictions and

22

EXHIBIT I

pursue treble damages for injuries suffered abroad through civil RICO actions in the United

States. *Id.* at 2106-07 (internal quotation marks omitted). Here, the Kazakh Entities urge, in

sum and substance, that they may maintain RICO claims (and seek treble damages) in U.S.

federal court based on the post-theft investment in New York real estate of less than 1% of some

$6 billion stolen from Kazakh victims by Kazakh citizens in Kazakhstan. *See* Dkt. No. 219 ¶¶ 1,

28-55, 134 (alleging that the Crossclaim Defendants conspired to conceal approximately $40

million in New York-based real estate projects out of more than $6 billion embezzled in

Kazakhstan). They do so notwithstanding the Kazakh government's conceded interest in this

matter, as evidenced by its investigations and prosecutions of several of the Crossclaim

Defendants and its ongoing attempts to extradite, at least, Viktor Khrapunov in connection with

many of the same activities alleged here. Dkt. No. 219 ¶¶ 62-65, 118. Allowing the Kazakh

Entities' RICO claims to proceed under these circumstances would be at odds with the Supreme

Court's directive that the need to enforce the presumption against extraterritoriality is "at its

apex" when remedies available in United States courts may conflict with those available abroad.

*RJR Nabisco*, 136 S.Ct. at 2107; *see also id.* at 2107-08 (rejecting argument that courts should

discard concerns about international friction when the plaintiff is a foreign state itself suing "for

conduct committed on its own soil").

EXHIBIT I

III.   **Conclusion**

For the foregoing reasons, Triadou's motion to dismiss the Kazakh Entities' RICO claims, as joined by Ablyazov and the Khrapunovs, is GRANTED, and causes of action numbers one through five of the Amended Crossclaims are DISMISSED with prejudice.

This resolves Dkt. Nos. 84, 188, 196, and 197.


SO ORDERED.

Dated: December ___, 2016
      New York, New York

ALISON J. NATHAN
United States District Judge


24

EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

          Plaintiffs,

          -against-

MUKHTAR ABLYAZOV, VIKTOR
KHRAPUNOV, ILYAS KHRAPUNOV, and
TRIADOU SPV S.A.,

          Defendants.

No. 15-CV-05345(AJN)

**THE KHRAPUNOVS' MEMORANDUM IN OPPOSITION TO THE
CITY OF ALMATY AND BTA BANK'S MOTION FOR CERTIFICATION OF
THE COURT'S DECEMBER 23, 2017 ORDER FOR INTERLOCUTORY APPEAL**

John J. Kenney
John P. Curley
Kathleen L. Lowden
Hoguet Newman Regal & Kenney, LLP
10 East 40th Street, 35th Floor
New York, NY 10016
Phone:  212-689-8808

*Counsel for Defendants Viktor Khrapunov
and Ilyas Khrapunov*

00115784.5

EXHIBIT J

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ..............................................................................................................................2

I.      Legal Standard ..............................................................................................................2

II.     BTA/Almaty Have Not Shown That There Is a Substantial Difference of Opinion Regarding What Constitutes a Domestic Injury. ...............................................................3

        A.      There Is No Meaningful Difference of Opinion within This Circuit......................4

        B.      Courts from Other Circuits Largely Reach the Same Result..................................5

CONCLUSION...........................................................................................................................7

EXHIBIT J

## **Table of Authorities**

### **Cases**

*Ardak Akishev v. Sergey Kapustin,*
   No. 13-7152(NLH)(AMD), 2016 U.S. Dist. LEXIS 169787 (D.N.J. Dec. 8, 2016) ............... 5

*Bascuñan v. Elsaca,*
   No. 15-cv-2009 (GBD), 2016 U.S. Dist. LEXIS 133664 (S.D.N.Y. Sept. 28, 2016) ............. 4

*Cartier v. Samo's Sons, Inc.,*
   No. 04 Civ. 2268 (RMB) (GWG), 2006 U.S. Dist. LEXIS 7764 (S.D.N.Y. Jan. 26, 2006) .... 2

*Caruso v. City of N.Y.,*
   No. 06 Civ. 5997 (RA), 2013 U.S. Dist. LEXIS 175617 (S.D.N.Y. Dec. 12, 2013) .............. 2

*Century Pac., Inc. v. Hilton Hotels Corp.,*
   574 F. Supp. 2d 369 (S.D.N.Y. 2008) .................................................................................... 2

*Chandra v. Beth Isr. Med. Ctr.,*
   No. 09 Civ. 6619 (RMB) (GWG), 2011 U.S. Dist. LEXIS 4829 (S.D.N.Y. Jan. 19, 2011) .... 2

*Consub Del. L.L.C. v. Schahin Engenharia Limitada,*
   476 F. Supp. 2d 305 (S.D.N.Y. 2007) .................................................................................... 3

*Coopers & Lybrand v. Livesay ,*
   437 U.S. 463 (1978) ............................................................................................................... 3

*Credit Suisse First Bos., L.L.C. v. Intershop Communs. AG,*
   No. 04 Civ. 6854 (RJH), 2006 U.S. Dist. LEXIS 68459 (S.D.N.Y. Sept. 25, 2006) .............. 2

*Elsevier, Inc. v. Grossman,*
   No. 12 Civ. 5121 (KPF), 2016 U.S. Dist. LEXIS 103444 (S.D.N.Y. Aug. 4, 2016) .............. 4

*Exeed Indus., L.L.C. v. Younis,*
   No. 15 C 14, 2016 U.S. Dist. LEXIS 154487 (N.D. Ill. Nov. 8, 2016) ................................... 5

*Flor v. BOT Fin. Corp.* (In re Flor),
   79 F.3d 281 (2d Cir. 1996) ..................................................................................................... 3

*Frederick v. Capital One, N.A.,*
   No. 14-CV-5460 (AJN), 2015 U.S. Dist. LEXIS 164859 (S.D.N.Y. Dec. 8, 2015) .... 1, 2, 3, 4

*Gramercy Advisors, L.L.C. v. Coe,*
   No. 13-CV-9069 (VEC), 2014 U.S. Dist. LEXIS 159211 (S.D.N.Y. Nov. 12, 2014) ......... 2, 3

*Hart v. Rick's Cabaret Int'l, Inc.,*
   73 F. Supp. 3d 382 (S.D.N.Y. 2014) ..................................................................................... 2

*In re Buspirone Patent & Antitrust Litig. ,*
   210 F.R.D. 43 (S.D.N.Y. 2002) .............................................................................................. 2

EXHIBIT J

*In re WorldCom, Inc. Sec. Litig.,*
   No. 02 Civ. 3288 (DLC), 2003 U.S. Dist. LEXIS 19785 (S.D.N.Y. Nov. 6, 2003) ............... 2

*Klinghoffer v. S.N.C. Achille Lauro,*
   921 F.2d 21 (2d Cir. 1990) ............................................................................... 3

*Koehler v. Bank of Berm.,*
   101 F.3d 863 (2d Cir. 1996) ............................................................................... 2

*Ntsebeza v. Daimler AG  (In re S. African Apartheid Litig.),*
   No. 03 Civ. 4524 (SAS), 2009 U.S. Dist. LEXIS 121559 (S.D.N.Y. Dec. 31, 2009) ............. 2

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
   No. 01 Civ. 9882 (DLC), 2005 U.S. Dist. LEXIS 18410 (S.D.N.Y. Aug. 30, 2005) ............. 2

*RJR Nabisco, Inc. v. Eur. Cmty.,*
   136 S. Ct. 2090 (2016) ............................................................................... 1, 6

*Segedie v. Hain Celestial Grp., Inc.,*
   No. 14-cv-5029 (NSR), 2015 U.S. Dist. LEXIS 137613 (S.D.N.Y. Oct. 7, 2015) ............. 2, 3

*Tatung Co. v. Shu Tze Hsu,*
   No. SA CV 13-1743 (DOC) (ANx), 2016 U.S. Dist. LEXIS 157450 (C.D. Cal. Nov. 14, 2016) ............................................................................... 6

*Union Commer. Servs. v. FCA Int'l Operations L.L.C.,*
   No. 16-cv-10925, 2016 U.S. Dist. LEXIS 156098 (E.D. Mich. Nov. 10, 2016) ................... 6

*United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester County,*
   No. 06 Civ. 2860 (DLC), 2009 U.S. Dist. LEXIS 29780 (S.D.N.Y. Apr. 9, 2009) ............. 2, 5

*United States ex rel. Colucci v. Beth Isr. Med. Ctr.,*
   No. 06 Civ. 5033 (DC), 2009 U.S. Dist. LEXIS 117587 (S.D.N.Y. Dec. 15, 2009) .......... 2, 5

*Westwood Pharms., Inc. v. Nat'l Fuel Gas Distrib. Corp.,*
   964 F.2d 85 (2d Cir. 1992) ............................................................................... 3

**Statutes**

28 U.S.C. § 1292(b) (2012) ............................................................................... 2

EXHIBIT J

Defendants Viktor and Ilyas Khrapunov (the "Khrapunovs") respectfully submit this memorandum of law in opposition to BTA Bank and the City of Almaty's (together, "BTA/Almaty") motion for certification of an interlocutory appeal.  ECF No. 263.

## PRELIMINARY STATEMENT

BTA/Almaty seek certification to take an interlocutory appeal of the decision dismissing their RICO claims for failure to allege a domestic injury, which following the Supreme Court's recent decision in *RJR Nabisco, Inc. v. European Community* is a prerequisite for private RICO suits.  136 S. Ct. 2090 (2016).  The Court found that BTA/Almaty—Kazakh entities who claim to have been the victims of misappropriation in Kazakhstan—had not alleged a domestic injury and properly dismissed their RICO claims.  ECF No. 257 at 12 (the "December 23 Decision").

BTA/Almaty now seek to appeal this decision in order to resolve what they say is a split of authority regarding how to interpret the domestic injury requirement.   The criteria for certification are stringent, however, and they require the party seeking certification to demonstrate that there is substantial ground for a difference of opinion—in effect, that there is "a genuine doubt as to whether the ... court applied the correct legal standard."  *Frederick v. Capital One (USA), N.A*., No. 14-CV-5460, 2015 U.S. Dist. LEXIS 164859, at *7-8 (S.D.N.Y. Dec. 8, 2015) (Nathan, J.) (quoting *Consub Del. LLC v. Schahin Engenharia Limitada*, 476 F. Supp. 2d 305, 309 (S.D.N.Y. 2007)) .   BTA/Almaty cannot make such a showing because the December 23 Decision was a thorough and well-supported ruling that is in accord with the weight of authority that has interpreted the "domestic injury" requirement following *RJR Nabisco*.

## ARGUMENT

EXHIBIT J

The Court should deny certification because there is no reasonable basis to think the December 23 Decision applied the wrong standard or reached the wrong result.

**I.    Legal Standard.**

Discretionary interlocutory appeals are governed by 28 U.S.C. § 1292(b); to qualify, the order that movants seek to appeal "must (1) involve a controlling question of law (2) over which there is substantial ground for difference of opinion." *Credit Suisse First Bos., LLC v. Intershop Communs. AG*, 2006 U.S. Dist. LEXIS 68459, at *6 (S.D.N.Y. Sep. 25, 2006). Movants "must also show that (3) an immediate appeal would materially advance the ultimate termination of the litigation." *Id.* An interlocutory appeal is "a rare exception to the final judgment rule that generally prohibits piecemeal appeals." *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996).[1] Only "exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Frederick*, 2015 U.S. Dist.

---

[1] BTA/Almaty lists, in a footnote, a number of cases in which certification has been granted to illustrate the non-controversial point that courts can and do permit interlocutory appeals where the statutory conditions are met. *See* ECF No. 264, BTA/Almaty Br. at 4 n.2. Of course, courts routinely decline certification too. *See, e.g., Frederick v. Capital One (USA), N.A.*, No. 14-CV-5460, 2015 U.S. Dist. LEXIS 164859, at *8 (S.D.N.Y. Dec. 8, 2015) (Nathan, J.); *Segedie v. Hain Celestial Grp., Inc.,* No. 14-cv-5029 (NSR), 2015 U.S. Dist. LEXIS 137613, at *18 (S.D.N.Y. Oct. 7, 2015); *Credit Suisse First Bos., LLC*, 2006 U.S. Dist. LEXIS 68459, at *9; *Century Pac., Inc. v. Hilton Hotels Corp.*, 574 F. Supp. 2d 369, 373 (S.D.N.Y. 2008); *In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43, 52 (S.D.N.Y. 2002); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2003 U.S. Dist. LEXIS 19785, at *35 (S.D.N.Y. Nov. 6, 2003); *Hart v. Rick's Cabaret Int'l, Inc.*, 73 F. Supp. 3d 382, 396 (S.D.N.Y. 2014); *Gramercy Advisors, LLC v. Coe*, No. 13-CV-9069, 2014 U.S. Dist. LEXIS 159211, at *11 (S.D.N.Y. Nov. 12, 2014); *United States ex rel. Colucci v. Beth Israel Med. Ctr.*, No. 06 Civ. 5033, 2009 U.S. Dist. LEXIS 117587, at *6 (S.D.N.Y. Dec. 15, 2009); *Caruso v. City of New York,* No. 06 Civ. 5997, 2013 U.S. Dist. LEXIS 175617, at *5 (S.D.N.Y. Dec. 12, 2013); *Ntsebeza v. Daimler AG (In re S. African Apartheid Litig.)*, No. 02 MDL 1499,  2009 U.S. Dist. LEXIS 121559, at *10 (S.D.N.Y. Dec. 31, 2009); *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cty.*, No. 06 Civ. 2860, 2009 U.S. Dist. LEXIS 29780, at *10-11 (S.D.N.Y. Apr. 9, 2009); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*,  No. 01 Civ. 9882, 2005 U.S. Dist. LEXIS 18410, at *15 (S.D.N.Y. Aug. 30, 2005); *Cartier v. Samo's Sons, Inc.*, 04 Civ. 2268, 2006 U.S. Dist. LEXIS 7764, at *10 (S.D.N.Y. Jan. 26, 2006); *Chandra v. Beth Israel Med. Ctr.*, No. 09 Civ. 6619, 2011 U.S. Dist. LEXIS 4829, at *7 (S.D.N.Y. Jan. 19, 2011).

EXHIBIT J

LEXIS 164859, at *2 (citing *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978)).

Therefore, the Second Circuit Court of Appeals has "repeatedly cautioned . . . [that] use of this

certification procedure should be strictly limited" and has "urged the district courts to exercise

great care in making a § 1292(b) certification." *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996);

*Westwood Pharmaceuticals, Inc. v. Nat'l Fuel Gas Dist. Corp*., 964 F.2d 85, 89 (2d Cir. 1992).

In other words, "interlocutory appeals are strongly disfavored in federal practice" and the district

court's power to grant an interlocutory appeal should not be "liberally construed." *Segedie v.

Hain Celestial Grp., Inc.*, No. 14-cv-5029, 2015 U.S. Dist. LEXIS 137613, at *4 (S.D.N.Y. Oct.

7, 2015); *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990).

II.     **BTA/Almaty Have Not Shown That There Is a Substantial Difference of Opinion
        Regarding What Constitutes a Domestic Injury.**

        An interlocutory appeal is not warranted in this case because there has not been a

substantial difference of opinion regarding what constitutes a RICO "domestic injury" after *RJR

Nabisco*.  A substantial ground for difference of opinion "arise[s] out of a genuine doubt as to

whether the ... court applied the correct legal standard," such as if there is "conflicting authority"

or if the issue is "particularly difficult and of first impression" in the jurisdiction. *Frederick*,

2015 U.S. Dist. LEXIS 164859, at *7-8 (quoting *Consub Del. LLC*, 476 F. Supp. 2d at 309).

But "the mere presence of a disputed issue that is a question of first impression, standing alone,

is insufficient to demonstrate a substantial ground for difference of opinion." *Id*. (citing *In re

Flor*, 79 F.3d 281, 284 (2d Cir. 1996)).  This test "cannot be met simply because one party is

dissatisfied with the Court's ruling." *Gramercy Advisors, LLC v. Coe*, No. 13-CV-9069 (VEC),

2014 U.S. Dist. LEXIS 159211, at *9 (S.D.N.Y. Nov. 12, 2014).  In the end, "it is the duty of the

district judge . . . to analyze the strength of the arguments in opposition to the challenged ruling

EXHIBIT J

when deciding whether the issue for appeal is truly one on which there is a substantial ground for dispute." *Frederick*, 2015 U.S. Dist. LEXIS 164859, at *7-8.

    **A.**    **There Is No Meaningful Difference of Opinion within this Circuit.**

    BTA/Almaty argue that three courts in the Southern District have fashioned conflicting approaches to the domestic injury requirement, but this argument does not withstand a close reading of these cases.  This Court and the court in *Bascuñan v. Elsaca*, No. 15-cv-2009, 2016 U.S. Dist. LEXIS 133664, at *15 (S.D.N.Y. Sep. 28, 2016), applied the same test—i.e.,  "where the economic impact of the injury was ultimately felt" (December 23 Decision at 14 (quoting *Bascuñan*))—and concluded that BTA/Almaty had not suffered a domestic injury because "[t]he purported misappropriations giving rise to this action occurred within Kazakhstan and targeted only assets held overseas" (*id.* at 17).  Although this Court expressed reservation about *Bascuñan*'s "absolutist version" of the rule, which in some cases might preclude "foreign corporations with business or property interests" in the U.S. from bringing RICO actions, it did not have to reach this question on the facts of the present case, which involve alien plaintiffs with no U.S. assets, U.S. operations, or other U.S. presence.   December 23 Decision at 17.

    Nor is the test used in *Bascuñan* and by this Court markedly different from that used by the court in *Elsevier*:  "if the plaintiff has suffered an injury to his or her property, the court should ask where the plaintiff parted with the property or where the property was damaged."  2016 U.S. Dist. LEXIS 103444, at *39 (S.D.N.Y. Aug. 4, 2016).  As this Court has recognized, BTA/Almaty "parted with its property" in Kazakhstan.  December 23 Decision at 17.

    In short, there is no conflict among approaches used by this Court, *Bascuñan*, *Elsevier*, and there is thus no basis for an interlocutory appeal on this issue.

EXHIBIT J

**B.      Courts from Other Circuits Largely Reach the Same Result.**

BTA/Almaty also point to a number of decisions from outside the Circuit to argue that the state of "domestic injury" law is murky.  As a threshold matter, disagreements among courts outside the circuit does not alone support the certification of an interlocutory appeal.  *United States ex rel. Colucci v. Beth Israel Med. Ctr.*, 2009 U.S. Dist. LEXIS 117587, at *3 (S.D.N.Y. Dec. 15, 2009).  Thus, even where there is a circuit split on the proper standard to be applied under a statute, and the Second Circuit has yet to weigh in, this is not enough to justify certification.   *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cty.*, 2009 U.S. Dist. LEXIS 29780, at *3 (S.D.N.Y. Apr. 9, 2009).

Setting that aside, however, the cases BTA/Almaty identify do not support their view that the "domestic injury" requirement is unsettled.  These cases largely use approaches similar to the rationales used by this Court, *Bascuñan*, and *Elsevier*.  For example, in *Exeed Indus., LLC v. Younis*, the court, citing  *Bascuñan*, held that the domestic injury requirement was not met where plaintiffs' injury from a foreign kickback scheme "was not initially suffered by Plaintiffs in the United States, nor have Plaintiffs maintained a United States presence, either at the time of the alleged scheme or now." 2016 U.S. Dist. LEXIS 154487, at *9 (N.D. Ill. Nov. 8, 2016).  The court noted that while the kickback proceeds ultimately financed land purchases in the United States, "these are downstream effects of the initial injury that impacted Plaintiffs in the [foreign country], where their business and economic operations are centered."  *Id*.  Thus, *Exeed* is on all fours with the instant case, and both the test used and the result are consistent with this Court's December 23 Decision.

The court in *Akishev v. Kapustin*, 2016 U.S. Dist. LEXIS 169787, at *18 (D.N.J. Dec. 8, 2016), reached a different result from the instant case, but not because it applied a different test.  It held that because plaintiffs' injury was suffered when they "travel[ed] by way of the

5

EXHIBIT J

internet" to purchase a car from a U.S.-based car dealership, the injury was suffered in the U.S.  But the court also held that had the dealership been located in Russia, or even on a Russian website, then the injury would be foreign, and not subject to RICO.  Using this test, the *Akishev* court would surely find no domestic injury in the instant case, where  the injury was suffered when assets located in Kazakhstan were allegedly misappropriated from Kazakh plaintiffs by Kazakh defendants, and where there is no allegation that plaintiffs were injured when they "traveled via the internet" to deal with a U.S. entity.

In *Tatung Co., Ltd. v. Shu Tze Hsu*, the court shared this Court's reluctance to apply *Bascuñan's* "absolutist" rule, which would preclude foreign corporations with U.S. business operations or property from bringing RICO actions for injuries to those U.S. assets.  2016 U.S. Dist. LEXIS 157450, at *18-19 (C.D. Cal. Nov. 14, 2016).  But as this Court has already acknowledged, it need not decide whether the absolutist rule is prudent because it is not implicated by the facts of this case (and, by extension, an interlocutory appeal of the December 23 Decision would not present a vehicle for the Court of Appeals to decide the issue).

This Court declined to adopt the "substantial effects test" used by court in *Union Commer. Servs. v. FCA Int'l Operations LLC*, No. 16-cv-10925, 2016 U.S. Dist. LEXIS 156098, at *12-13 (E.D. Mich. Nov. 10, 2016).  This is understandable, given the Supreme Court's express reluctance to base the domestic injury requirement on antitrust law. December 23 Decision at 16, n.9 (citing *RJR Nabisco*, 136 S.Ct. at 2109-2111).  It is extremely unlikely that this test would be adopted by the Second Circuit, but arguably the result in the instant case would be the same, because the effect of defendants' alleged conduct was felt by Kazakh plaintiffs in Kazakhstan. *Compare Union Commer. Servs*., 2016 U.S. Dist. LEXIS 156098, at *13 (Angolan company that distributed cars in Angola suffered lost sales and profits in Angola).

EXHIBIT J

## CONCLUSION

For the foregoing reasons, Viktor and Ilyas Khrapunov respectfully submit that the Court should decline to certify the December 23 Decision for interlocutory appeal.

Dated: February 3, 2017
      New York, New York

HOGUET NEWMAN REGAL & KENNEY, LLP


_____/s/ John P. Curley___
John J. Kenney
John P. Curley
Kathleen L. Lowden
Hoguet Newman Regal & Kenney, LLP
10 East 40th Street, 35th Floor
New York, NY 10016
Phone:  212-689-8808

*Counsel for Viktor Khrapunov and
Ilyas Khrapunov*

EXHIBIT J

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

City of Almaty, Kazakhstan and BTA
Bank JSC,

                Plaintiffs,

     –v–

Mukhtar Ablyazov, Viktor Khrapunov, Ilyas
Khrapunov, and Triadou SPV S.A.,

                Defendants.

15-CV-5345 (AJN)

ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: **APR 2 0 2017**

ALISON J. NATHAN, District Judge:

On December 23, 2016, the Court issued a Memorandum and Order (the "December 23

Order") dismissing with prejudice crossclaims under the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, asserted by the City of Almaty,

Kazakhstan and BTA Bank JSC (together, the "Kazakh Entities") against Triadou SPV S.A.

("Triadou"), Mukhtar Ablyazov, Viktor Khrapunov, and Ilyas Khrapunov (together, the

"Crossclaim Defendants"). The basis for the Court's decision – familiarity with which is

assumed – was the Kazakh Entities' failure to satisfy the requirement, newly articulated by the

Supreme Court, that private civil RICO plaintiffs "allege and prove a *domestic* injury to [their]

business or property" in order to recover. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090,

2111 (2016) (emphasis in original). The Kazakh Entities, which continue to prosecute various

state law claims on which the parties are currently engaged in discovery, now move for an order

certifying the December 23 Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Dkt.

EXHIBIT K

Nos. 263-64.  Triadou and the Khrapunovs oppose.  Dkt. Nos. 275-76.  For the reasons that

follow, the motion is DENIED.

"[A] district court may certify an appeal pursuant to 28 U.S.C. § 1292(b) when it is 'of

the opinion that [the relevant] order [i] involves a controlling question of law [ii] as to which

there is a substantial ground for difference of opinion and [iii] that an immediate appeal from the

order may materially advance the ultimate termination of the litigation.'"  *Balintulo v. Daimler*

*AG*, 727 F.3d 174, 186 (2d Cir. 2013) (brackets in original) (quoting 28 U.S.C. § 1292(b)).

However, "'[d]istrict judges have broad discretion to deny certification even where the statutory

criteria are met.'"  *SPL Shipping Ltd. v. Gujarat Cheminex Ltd.*, 06-cv-15375, 2007 WL

1119753, *1 (S.D.N.Y. Apr. 12, 2007) (quoting *Nat'l Asbestos Workers Med. Fund v. Philip*

*Morris, Inc.*, 71 F. Supp. 2d 139, 146, 166 (E.D.N.Y. 1999) (characterizing "authority to deny

certification even where the three statutory criteria are met" as "independent" and

"unreviewable") (internal quotation marks omitted)).  "Congress passed 28 U.S.C. § 1292(b)

primarily to ensure that the courts of appeals would be able to rule on ephemeral questions of

law that might disappear in light of a complete final record," and to "assure the prompt

resolution of knotty legal problems."  *Weber v. United States Tr.*, 484 F.3d 154, 159 (2d Cir.

2007) (internal quotation marks and brackets omitted).  It was not, however, intended to function

merely "as a vehicle to provide early review of difficult rulings in hard cases."  *German v. Fed.*

*Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1398 (S.D.N.Y. 1995).  Accordingly, and as the

Court of Appeals has repeatedly cautioned, "only 'exceptional circumstances [will] justify a

departure from the basic policy of postponing appellate review until after the entry of final

judgment.'"  *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille in*

*Amministrazione Straordinaria*, 921 F.2d 21, 25 (2d Cir. 1990) (brackets in original) (quoting

EXHIBIT K

*Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 534 (S.D.N.Y. 2014) ("Interlocutory review is strictly reserved for exceptional cases and is especially rare in the early stages of litigation."). The circumstances presented here do not justify a departure from that policy.

Taking the second statutory prong first, the Court does agree with the Kazakh Entities that there exists a substantial ground for difference of opinion with respect to the December 23 Order. That requirement may be satisfied when "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." *In re Lloyd's Am. Trust Fund Litig.*, 96-cv-1262, 1997 WL 458739, at *5 (S.D.N.Y. Aug. 12, 1997) (citing, *inter alia, Klinghoffer*, 921 F.2d at 25). "[T]he mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion," however, and district courts must "analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute." *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996) (emphasis in original) (internal quotation marks omitted).

The December 23 Order, as discussed at some length therein, analyzed an emergent and potentially difficult issue presented by the Supreme Court's decision in *RJR Nabisco*: just what constitutes a "domestic" injury to business or property for purposes of alleging a viable civil RICO claim? *See* December 23 Order at 9-24. That is a question that the Supreme Court itself characterized as potentially resistant to a "self-evident" answer, and one on which, despite anticipating "disputes" in the lower courts, it expressly declined to offer authoritative guidance. *RJR Nabisco*, 136 S. Ct. at 2111. It is also an issue that has not yet been squarely addressed by any Court of Appeals. While the Court firmly maintains its view, as set forth in the December

EXHIBIT K

23 Order, that the Kazakh Entities' allegations concerning the post-theft investment of embezzled Kazakh funds in U.S.-based real estate projects do not, without more, constitute plausible allegations of "domestic" injury, the Kazakh Entities do articulate colorable arguments to the contrary and courts both within this District and around the country have adopted varying approaches to assessing the novel domestic-injury question that could at least potentially yield differing determinations. *See, e.g., Elsevier, Inc. v. Grossman*, 199 F. Supp. 3d 768, 786 (S.D.N.Y. 2016) ("If the plaintiff has suffered an injury to his or her business, the court should ask where substantial negative business consequences occurred. By contrast, if the plaintiff has suffered an injury to his or her property, the court should ask where the plaintiff parted with the property or where the property was damaged."); *Union Comm. Servs. Ltd. v FCA Int'l Ops. LLC*, 16-cv-10925, 2016 WL 6650399, at *4-5 (E.D. Mich. Nov. 10, 2016) (relying on antitrust law and asking whether RICO defendant's "conduct is intended to or has produced 'substantial effects' in the United States"). Taken together, these factors satisfy the second requirement of Section 1292(b).

Fatal to the Kazakh Entities' certification motion, however, is the simple fact that the question resolved by the December 23 Order, while perhaps novel and potentially difficult, is not a "controlling question of law" within the meaning of Section 1292(b). "In determining whether a controlling question of law exists the district court should consider whether: reversal of the district court's opinion could result in dismissal of the action; reversal of the district court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action, or; the certified issue has precedential value for a large number of cases." *S.E.C. v. Credit Bancorp, Ltd.*, 103 F. Supp. 2d 223, 227 (S.D.N.Y. 2000) (citing, *inter alia, Klinghoffer*, 921 F.2d at 24-25; *see also In re A2P SMS Antitrust Litig.*, 12-cv-2656, 2015 WL 876456, at *3-

EXHIBIT K

4 (S.D.N.Y. Mar. 2, 2015) (collecting cases). To warrant certification, the question at issue must also be "a 'pure' question of law that the reviewing court could decide quickly and cleanly without having to study the record." *In re Worldcom, Inc.*, M-47, 2003 WL 21498904, at *10 (S.D.N.Y. Jun. 30, 2003) (additional internal quotation marks omitted).

There is no dispute that reversal of the Court's December 23 Order would not terminate the instant litigation. And, while reversal could potentially have some impact on the scope of remaining discovery and, ultimately, trial, the substantial factual overlap between the Kazakh Entities' remaining state law claims and the RICO claims that would be evaluated on appeal militates strongly against a conclusion that the effect of a reversal on the conduct of the litigation going forward would be sufficiently "significant" to render the question for appeal "controlling." *See, e.g., In re Facebook*, 986 F. Supp. 2d at 537 ("given the overlap on the issues" and likelihood that at least some of the relevant claims at would survive appeal, the "proceedings subsequent" to any reversal would "not be materially affected in complexity or scope"); *cf. Century Pacific, Inc. v. Hilton Hotels Corp.*, 574 F. Supp. 2d 369, 372 (S.D.N.Y. 2008) ("While reversal of the Order may very well simplify this action or alter its course, that result would be no different from any case where a court granted summary judgment on a set of claims and denied summary judgment with respect to the counterclaims.").

Moreover, while review of the December 23 Order by the Court of Appeals would certainly yield a decision carrying – like any Court of Appeals decision – at least some precedential value, that standing alone "is not 'per se sufficient to meet the controlling issue of law standard.'" *In re Facebook*, 986 F. Supp. 2d at 537-38 (quoting *Credit Bancorp*, 103 F. Supp. 2d at 227); *see also Klinghoffer*, 921 F.2d at 24 ("impact that an appeal will have on other cases" is merely a "factor" that "may" be "take[n] into account" in determining whether a

5

EXHIBIT K

controlling question of law exists).  In any event, the Court of Appeals is scheduled to hear

argument at the end of the month in plaintiffs' appeal as of right of Judge Daniels' decision in

*Bascuñan v. Elsaca*, 15–cv–2009, 2016 WL 5475998 (S.D.N.Y. Sept. 28, 2016).  That case,

which the Court discussed – and, to some degree, relied upon – in the December 23 Order,

presents the opportunity to apply *RJR Nabisco*'s domestic-injury rule to a set of alleged facts

featuring many of the same elements on which the parties' arguments turn here – for example,

"substantial domestic conduct on the part of the defendants" in connection with the theft of funds

belonging to wholly foreign entities.  December 23 Order at 15 (discussing *Bascuñan*).  The

Court sees every reason to believe that the Court of Appeals' decision in *Bascuñan* is likely to

offer substantially similar guidance to district courts evaluating RICO claims asserted by foreign

plaintiffs as would a decision on the December 23 Order.

      Finally, while the question addressed by the December 23 Order may implicate a "pure"

question of law in the sense that it does not turn, at least at this stage of the litigation, on *disputed*

matters of fact, the December 23 Order was highly fact-specific, and the Court of Appeals'

assessment of the Order on appeal would necessarily require it to apply the relevant law to the

sprawling and complex set of facts alleged by the Kazakh Entities.  That alone makes the

December 23 Order a poor candidate for interlocutory appeal.  *See, e.g.*, *In re Facebook*, 986 F.

Supp. 2d at 535-37 (collecting cases).

      Having determined that there is no controlling question of law to warrant certification for

interlocutory appeal, the Court need not address whether certification would materially advance

the ultimate termination of the litigation.  Nevertheless, it notes that this requirement is generally

considered satisfied when immediate appeal "promises to advance the time for trial or to shorten

the time required for trial."  *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 551

EXHIBIT K

(S.D.N.Y. 2013) (internal quotation marks omitted); *see also S.E.C. v. Gruss*, 11-cv-2420, 2012 WL 3306166, at *5 (S.D.N.Y. Aug. 13, 2012) ("it is not enough that the interlocutory appeal would not delay the action; it must advance the time for trial or shorten the time required for trial") (internal quotation marks and alterations omitted).  The Court sees no basis to conclude that diverting party resources to potentially lengthy appellate proceedings on the RICO claims and away from conducting discovery on factually similar state law claims would in any way serve either of these aims.  If anything, such a step would seem likely to occasion further delay in this already long-running action.

   For these reasons, the Kazakh Entities' motion to certify the December 23 Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) is DENIED.

   This resolves Dkt. No. 263.


   SO ORDERED.

Dated: April ___, 2017
       New York, New York

_____
       ALISON J. NATHAN
       United States District Judge

7

EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>City of Almaty, Kazakhstan and BTA<br>Bank JSC,</td><td></td></tr>
<tr><td style="text-align:center">Plaintiffs,</td><td></td></tr>
<tr><td style="text-align:center">—v—</td><td></td></tr>
<tr><td>Mukhtar Ablyazov, Viktor Khrapunov, Ilyas<br>Khrapunov, and Triadou SPV S.A.,</td><td></td></tr>
<tr><td style="text-align:center">Defendants.</td><td></td></tr>
</table>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __SEP 2 6 2017__

15-CV-5345 (AJN)

AMENDED
MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

This complex litigation concerns an alleged conspiracy by which prominent citizens of

Kazakhstan purportedly looted billions of dollars from the City of Almaty, Kazakhstan

("Almaty") and BTA Bank JSC ("BTA" and, together with Almaty, the "Kazakh Entities"), a

formerly state-owned banking institution based in Kazakhstan, and then laundered the stolen

funds around the world, including ultimately by investing in New York City real estate projects.

Now before the Court are three motions to dismiss and one motion for joinder. Specifically:

(i) crossclaim Defendant Triadou SPV S.A. ("Triadou") moves to dismiss this action in its

entirety for lack of subject matter jurisdiction in light of the Court's December 2016 dismissal of

the only remaining federal claims; (ii) the Kazakh Entities move for joinder of FBME Bank Ltd.

("FBME") as a party to this action; and (iii) crossclaim Defendants Mukhtar Ablyazov, Viktor

Khrapunov, and Ilyas Khrapunov (together, the "Individual Defendants") move to dismiss all

claims asserted against them. For the reasons set forth below, Triadou's motion to dismiss is

1

EXHIBIT L

DENIED, the Kazakh Entities' motion for joinder is DENIED, and the Individual Defendants' motions to dismiss are GRANTED in part and DENIED in part.

## I.      Background

The Court has recounted the factually and procedurally complex background of this case in several prior substantive decisions. It does so again here solely to the extent necessary to contextualize the motions at issue.

### A.      Factual Allegations

Almaty, the largest city in Kazakhstan, claims that its former mayor Viktor Khrapunov, along with certain associates and family members including his son Ilyas Khrapunov, embezzled approximately $300 million from Almaty between approximately 1997 and 2004, principally by appropriating various public assets for personal use. Dkt. No. 219 ¶¶ 45-55.[1]  Often, Almaty claims, this was achieved in one of two ways: fraudulent auctions in which Khrapunov confederates acquired valuable assets at nominal prices; or Viktor Khrapunov's exercise of eminent domain power to seize private property and transfer it to entities owned or controlled by the Khrapunovs. *Id.* ¶¶ 49-55.  BTA, for its part, claims that its former chairman Mukhtar Ablyazov siphoned more than $6 billion out of BTA between approximately 2005 and 2009, primarily through a series of fraudulent loans to valueless entities owned or controlled by Ablyazov himself. *Id.* ¶¶ 28-33.

The Kazakh Entities further allege that, in order to evade law enforcement, the Individual Defendants – who were related by marriage – joined together to move the stolen funds out of Kazakhstan and to launder them through a series of shell companies, sham transactions, and

---

[1] Unless otherwise noted, all citations herein concerning the Kazakh Entities' allegations refer to the Kazakh Entities' First Amended Crossclaims, filed on September 7, 2016, which – as discussed further below – constitute the operative pleading in this case. *See* Dkt. No. 219 (the "Amended Crossclaims").

EXHIBIT L

outwardly-legitimate investments. *See, e.g., id.* ¶¶ 56-59, 68-72, 77-97. To help accomplish this, the Individual Defendants allegedly created, among other things, a Switzerland-based real estate investment vehicle called SDG Capital, S.A. ("SDG") into which they funneled hundreds of millions of dollars of illicit proceeds before engaging in a sham sale of the company to conceal their continued control. *Id.* ¶¶ 58, 78-84. The Individual Defendants then purportedly facilitated the creation of several entities under Luxembourg law for the purpose of investing stolen funds in United States-based real estate projects. *Id.* ¶¶ 86-87. Among these entities was Triadou, a special purpose vehicle wholly owned and controlled by SDG – and thus purportedly by the Individual Defendants. *Id.*

In 2012 and 2013, Triadou, acting at the direction of the Individual Defendants, invested funds allegedly embezzled from the Kazakh Entities in several New York City real estate projects, including the Flatotel and the Cabrini Medical Center, with prominent New York-based real estate developer Joseph Chetrit and several of his corporate affiliates (the "Chetrit Entities"). *Id.* ¶¶ 88-97, 111-13. Funding for these investments was allegedly wired to escrow accounts maintained by counsel for the Chetrit Entities in the United States from accounts held by a Dubai-based private contracting entity called Telford International Limited ("Telford") (which was allegedly controlled by the the Individual Defendants) in FBME, which is a Tanzanian-headquartered financial institution with operations primarily in Cyprus. *Id.* ¶¶ 21, 78, 98-106, 111-13. The Kazakh Entities allege that Telford's FBME accounts – which were managed by Eesh Aggarwal, a close financial advisor to Ablyazov – contained and were used to "covertly move and invest" funds stolen by Ablyazov from BTA, and that FBME "had a history of moving funds for Aggarwal and Ablyazov with no questions asked." *Id.* ¶¶ 99-102. True to form, the Kazakh Entities assert, FBME executed direct transfers to the Chetrit Entities' counsel "despite

EXHIBIT L

their blatant indicia of money laundering." *Id.* ¶ 105.  The Kazakh Entities further allege that, in

order to consummate these transactions and ensure concealment of the stolen funds, Triadou

accepted contract terms on at least one investment that were unreasonably favorable to Chetrit

and the Chetrit Entities. *See, e.g.*, *id.* ¶¶ 97, 148.

In 2014, facing mounting law enforcement pressure abroad and litigation initiated by

Almaty in federal court in California, Ablyazov and the Khrapunovs allegedly caused Triadou to

liquidate its real estate assets in New York so that stolen funds could be removed from the

United States and hidden once again. *Id.* ¶¶ 114-123.  To that end, Triadou – acting at the

direction of the Individual Defendants – engaged in a sham transaction with the Chetrit Entities

whereby Triadou assigned its interest in the Flatotel to the Chetrit Entities and released its

entitlement to equity in the Cabrini Medical Center in exchange for a "fraction of the fair market

value of the properties" and personal bribery payments to at least one Triadou executive. *Id.*

Since 2009, BTA has initiated multiple proceedings in the U.K. premised on Ablyazov's

purported embezzlement and has secured numerous judgments against Ablyazov and his

associates (the "U.K. Judgments"), leading to awards of over $4 billion in damages, asset freeze

and receivership orders, and sanctions against Ablyazov for violations of the same. *Id.* ¶¶ 35-41.

As of the filing of the Amended Crossclaims, Ablyazov had been sentenced to 22 months

imprisonment for contempt of court in the U.K. and was detained in a French prison pending

extradition proceedings. *Id.* ¶¶ 38-42.  The Khrapunovs, for their part, were residing in

Switzerland and facing multiples charges in Kazakhstan arising from purported theft of public

property and money laundering, among other things. *Id.* ¶¶ 62-63.  The Kazakh government had

secured the assistance of the Swiss authorities in its ongoing efforts to prosecute those charges,

and the Public Prosecutor of Geneva had ordered Swiss accounts and assets affiliated with the

EXHIBIT L

Khrapunovs frozen. *Id.* ¶¶ 64-65. Kazakhstan, moreover, had formally requested the extradition of at least Viktor Khrapunov. *Id.*

### B.    Procedural Posture

This litigation began as an interpleader action against Triadou and Almaty brought in New York State Supreme Court by the Chetrit Entities, which claimed to face multiple liability under their 2014 assignment agreements with Triadou. Dkt No. 25 ¶¶ 11-17. Almaty removed the action to federal court on July 9, 2015. Dkt. No. 1.

In its answer to the interpleader complaint, Almaty asserted counterclaims against the Chetrit Entities, crossclaims against Triadou, and third-party claims against Ablyazov, the Khrapunovs, and Joseph Chetrit, including claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and various claims under New York State law. Dkt. No. 49. All claims brought by or against the Chetrit Entities or Chetrit were ultimately resolved through dismissal or settlement.

On June 21, 2016, the Court granted a motion by Almaty and BTA to formally join BTA, the Khrapunovs, and Ablyazov to the pending dispute between Almaty and Triadou, and largely denied a motion by Triadou to dismiss the Kazakh Entities' crossclaims, while reserving judgment on whether the RICO claims were impermissibly extraterritorial pending supplemental briefing on the impact of the Supreme Court's then-recent decision in *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016). *See generally* Dkt. No. 174 (the "June 21 Decision").

Approximately one week after issuance of the June 21 Decision, the Individual Defendants appeared in the litigation for the first time and submitted letters requesting leave to move to dismiss the Kazakh Entities' claims against them, with Ablyazov, at least, representing that he had not been properly served with process prior to the Court's June 21 Decision. *See*

EXHIBIT L

Dkt. Nos. 177-81. The parties' ultimately consented to the filing of the Individual Defendants' proposed motions, and the Court entered a jointly proposed briefing schedule on July 25, 2016. Dkt. No. 200.

On July 29, 2016, the Court conducted an initial pretrial conference and entered a Civil Case Management Plan and Scheduling Order (the "Scheduling Order"). *See* Dkt. No. 205. The Scheduling Order provided, among other things, that "[a]mended pleadings may not be filed and additional parties may not be joined except with leave of the Court" and that "[a]ny motion to amend or join parties shall be filed within 30 days from the date of this Order." *Id.* at 2.

The Individual Defendants filed motions to dismiss on August 17, 2016 in accordance with the parties' agreed-upon briefing schedule. Dkt. Nos. 207-12. In response, the Kazakh Entities submitted a letter advising the Court and their adversaries of their intention to file amended crossclaims and noting that, "[i]n the process of amending the crossclaims, the Kazakh Entities may seek to join additional crossclaim defendants." Dkt. No. 213 at 1-2. The Kazakh Entities observed that their anticipated filing date of September 7, 2016 would fall outside of the 30-day period established in the Scheduling Order for motions to amend or join, but contended that "the subsequent motions to dismiss filed by the Individual Defendants" rendered that deadline inapplicable and instead that the default deadlines for motions to amend set forth in Federal Rule of Civil Procedure 15 and Rule 3.F of this Court's Individual Practices in Civil Cases were "controlling in this instance." *Id.* Triadou interposed a limited objection, arguing that any amendments should be directed solely to "allegations/claims against Mr. Ablyazov or the Khrapunovs," and not "to any allegations or claims directed at Triadou or all Crossclaim-defendants generally," given that the Kazakh Entities had foregone an earlier opportunity to amend in response to the Triadou's motion to dismiss. *Id.* Appx. A. In light of Triadou's

EXHIBIT L

objection, the Court granted the Kazakh Entities' application to file amended crossclaims and/or joinder motions by September 7, 2016 with the express caveat that "[a]ny such amendments and/or motions shall relate solely to the Kazakh Entities' claims or allegations directed against the Individual Defendants." Dkt. No. 214.

On September 7, 2016, the Kazakh Entities filed the Amended Crossclaims, as well its motion to join FBME. Dkt. Nos. 216-19.

As discussed further below, Triadou immediately objected to the joinder motion (as well as to one paragraph included in the Amended Crossclaims), arguing that the motion violated the Court's order limiting the scope of any such applications to matters concerning the Individual Defendants. Dkt. No. 223. Triadou subsequently filed a formal brief opposing FBME's joinder, later joined by the Individual Defendants. Dkt. Nos. 226, 230, 234. As for the Amended Crossclaims, the Individual Defendants filed renewed motions to dismiss on September 26, 2016, which were fully submitted on November 4, 2016. *See, e.g.*, Dkt. Nos. 227-29, 231-33, 246-47.

Separately, and as alluded to above, the Court received supplemental briefing on the question raised by Triadou's original motion to dismiss of whether the Supreme Court's June 2016 decision in *RJR Nabisco* precluded the Kazakh Entities' RICO claims as impermissibly extraterritorial. Dkt. Nos. 188, 195-97, 202, 240, 244, 248-50. In a Memorandum & Order dated December 23, 2016, the Court held that it did and, accordingly, dismissed all RICO claims with prejudice. Dkt. No. 257 (the "December 23 Decision"). Subsequently, the Court denied the Kazakh Entities' motion to certify the December 23 Decision for interlocutory appeal. Dkt. No. 304. In response to the December 23 Decision, Triadou sought leave to file a brief arguing that the Kazakh Entities' remaining claims – all of which arise under state law – should be dismissed

EXHIBIT L

for lack of subject matter jurisdiction. The Court granted the request, and briefing on that issue was completed on February 10, 2017.  Dkt. Nos. 260, 268, 278, 281.

Merits discovery has been proceeding in this matter since entry of the Court's Scheduling Order, and is being supervised by Magistrate Judge Katherine H. Parker.

## II.     Discussion

In light of the Court's own obligation to assess questions concerning its subject matter jurisdiction, it first addresses Triadou's motion to dismiss this action on that ground. Determining that it may continue to exercise jurisdiction over the case, it then proceeds to consider the Kazakh Entities' joinder motion and the Individual Defendants' motions to dismiss in order of submission.

### A.     Subject Matter Jurisdiction

Triadou contends that the Kazakh Entities' remaining claims should be dismissed for lack of subject matter jurisdiction.  Specifically, Triadou notes that with the departure of Chetrit and the Chetrit Entities from the litigation and the dismissal of the Kazakh Entities' only federal claims (i.e., the RICO claims), all that remains of this action are state law claims pending between parties – the Kazakh Entities, Triadou, and the Individual Defendants – lacking in complete diversity.  As such, Triadou argues, the Court does not have original jurisdiction over the remaining claims, and it should decline to exercise discretionary supplemental jurisdiction under 28 U.S.C. § 1367.  *See, e.g.*, Dkt. No. 268 at 1, 3-10.

The Kazakh Entities respond that the Court maintains diversity jurisdiction under 28 U.S.C. § 1332(a) because complete diversity existed both when the original interpleader action was initiated and when the Kazakh Entities filed their counter, cross, and third-party claims, and jurisdiction generally "'depends upon the state of things at the time of the action brought.'"  Dkt.

EXHIBIT L

No. 278 at 1-2, 4-7 (quoting *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570 (2004)).  Independently, the Kazakh Entities aver, because Almaty constitutes a "foreign state" as defined in the Foreign Sovereign Immunities Act ("FSIA"), original jurisdiction exists under 28 U.S.C. § 1330, which covers nonjury civil actions brought against foreign states.  And for the same reason, they argue, the Court has removal jurisdiction under 28 U.S.C. § 1441(d), which permits foreign states to remove civil actions brought against them in state court.  *Id.* at 2-4. Alternatively, the Kazakh Entities urge the Court to exercise supplemental jurisdiction over the remaining claims because, in light of the substantial time and resources invested in this matter to date, dismissal or remand at this stage purportedly "would result in enormous judicial inefficiency and unfairness to the parties."  *Id.* at 7-10.

The Court agrees that, if nothing else, Sections 1330 and Section 1441(d) provide a basis for jurisdiction, and, accordingly dismissal on jurisdictional grounds is unwarranted.

Under Section 1441(d), "[a]ny civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(d).  And under Section 1330(a), "[t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title...." 28 U.S.C. § 1330(a).

As noted above, Almaty removed this action from New York state court shortly after the Chetrit Entities' filed the original interpleader complaint.  Triadou does not – and could not – dispute that Almaty, Kazakhstan's largest city, is a foreign state within the definition set forth in Section 1603(a), which includes among other things "political subdivision[s] of a foreign state." 28 U.S.C. § 1603(a).  Triadou does argue, however, that with the dismissal of the original

9

EXHIBIT L

interpleader complaint, no claims against a foreign state remain in this action. To the contrary, it emphasizes, the only surviving claims are "brought *by* a foreign state, not '*against*' one," and, in any event, they were filed in federal court in the first instance well after removal of this action had been effected. Dkt. Nos. 268 at 4 n.4 (quoting 28 U.S.C. § 1441(d)); 281 at 3. As such, according to Triadou, any concerns about the potential sensitivities of lawsuits targeting foreign states underlying the removal provisions of Section 1441(d) simply "are not implicated here," and that Section provides no basis for jurisdiction over what remains of this case. Dkt. No. 281 at 3.

That argument, which Triadou presses essentially without authority, is inconsistent with the broad reading accorded Section 1441(d) by courts around the country. As the Eleventh Circuit has aptly summarized, both the plain language of the statute – in particular, its use of the phrase "any civil *action*" – and its legislative history demonstrate that, "where a claim has been filed against a foreign state, Congress did not intend removal jurisdiction to be limited to some subset of the claims or parties involved in that action," but rather "clearly meant to grant removal jurisdiction over more than just the 'claims' asserted against a foreign state." *In re Surinam Airways Holding Co.*, 974 F.2d 1255, 1258-59 (11th Cir. 1992); *see also Teledyne, Inc. v. Kone Corp.*, 892 F.2d 1404, 1409 (9th Cir. 1989) (noting that Congress declined to provide simply for "*separation*" of the claims against the foreign state from claims against other parties" and concluding as such that Section 1441(d) instead "expresses an intention to give sovereign foreign defendants an absolute right to a federal forum coupled with an unusually strong preference for the consolidation of claims") (emphasis in original). Indeed, several circuits, relying on that very reasoning, have concluded that Section 1441(d) "authorizes the removal of the entire case, even if there are nonforeign defendants." *Davis v. McCourt*, 226 F.3d 506, 509-11 (6th Cir. 2000)

10

EXHIBIT L

(quotation marks and citation omitted); *see also In re Asbestos Prods. Liab. Litig.*, 536 F. App'x

183, 190 (3d Cir. 2013) (Summary Order) ("[W]e conclude that, when a foreign-state defendant

removes an action under the FSIA, the district court is empowered to exercise jurisdiction over

the entire action, including claims against other non-foreign defendants."); *In re Air Crash

Disaster Near Roselawn, Ind. on Oct. 31, 1994*, 96 F.3d 932, 941-43 (7th Cir. 1996) ("Nearly all

courts to have considered this issue have . . . held that where minimal diversity exists between

parties, a foreign state may invoke § 1441(d) to remove an entire suit."); *Nolan v. Boeing Co.*,

919 F.2d 1058, 1064-66 (5th Cir. 1990) (because the "FSIA refers to an action, which is

synonymous with the word 'case' and in federal practice includes all claims made by all parties,"

when a "third-party defendant avails itself of removal jurisdiction under section 1441(d), at least

where minimal diversity exists between the parties to the main claims, it removes not just the

third-party claims but the main claims as well"); *Teledyne*, 892 F.2d at 1407-1410 ("Under the

FSIA, jurisdiction is extended over 'action[s]' against a foreign state, not simply over *claims*

against a foreign state.  This language is broad enough to cover the entire suit as brought by

Teledyne since it was an action brought, in part, against a foreign state.") (emphasis in original);

*cf. Kaiser v. Memorial Blood Ctr. of Minneapolis, Inc.*, 977 F.2d 1280, 1283 n.1 (8th Cir. 1992)

("[U]nlike removal in general, Congress intended the FSIA to be a broad removal provision in

order to render uniform in procedure and substance the treatment of foreign sovereigns subjected

to suits in American courts by assuring the availability of a federal forum.") (internal quotation

marks omitted).

     The Second Circuit does not appear to have squarely addressed the scope of removal

jurisdiction under Section 1441(d).  It has, however, relied on the Ninth Circuit's construction of

the FSIA in *Teledyne* to conclude that the analogously worded 28 U.S.C. § 1333(1) – which uses

11

EXHIBIT L

the phrase "[a]ny civil *case*" – extends admiralty jurisdiction "to an entire case, including non-admiralty claims against a second defendant." *See Rocco Carriers, Ltd. v. M/V Nurnberg Express*, 899 F.2d 1292, 1296-97 (2d Cir. 1990).  And district courts in this Circuit, have looked to the decisions cited above as persuasive authority in concluding, for example, that third-party foreign-state defendants may remove entire actions under Section 1441(d), rather than solely the subset of claims asserted against them.  *See, e.g., Kully v. Aircraft Serv. Int'l Grp, Inc.*, 662 F. Supp. 2d 259, 260-61 (E.D.N.Y. 2009).

To be sure, none of these cases presents precisely the same set of circumstances at issue here, but their reasoning – which the Court finds compelling – applies with no less force.  The Kazakh Entities' claims have, for all intents and purposes, made Triadou, Ablyazov, and the Khrapunovs additional, non-foreign-state defendants in a "civil action" originally targeting a foreign state.  There is no apparent reason why Almaty's concededly legitimate removal of that action would not bring all claims against those additional defendants (regardless of the asserting party) within the Court's jurisdiction in the same manner as, for example, a foreign-state third-party defendant's removal would all claims against the original (non-foreign-state) defendant. *Cf. id.*

Furthermore, any suggestion that the absence from this action – as currently constituted – of live claims against the original foreign-state defendant (Almaty) presents a jurisdictional defect in and of itself is without merit.  As the Third Circuit recently explained in *In re Asbestos Products Liability Litigation*, even the outright departure from the entire lawsuit of the foreign-state party that originally effected removal (a scenario not present here) "does not deprive the District Court of subject matter jurisdiction" over the remaining claims in the action, "as long as jurisdiction existed at the time the action was removed from state court." 536 F. App'x at 190

EXHIBIT L

n.15 (citing *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 558, 133 S. Ct. 1345, 1349 (2013) ("For

jurisdictional purposes, our inquiry is limited to examining the case "as of the time it was filed in

state court . . . . " (internal quotation marks and citation omitted))).

　　　　Especially in the absence of any authority to the contrary, the Court concludes that it

continues to have subject matter jurisdiction over this case in its entirety, including the Kazakh

Entities' remaining state law claims.  Accordingly, the Court need not and does not address the

question of its original jurisdiction based on complete diversity of citizenship or of supplemental

jurisdiction.  Triadou's motion to dismiss on jurisdictional grounds is DENIED.

　　　**B.**　　　**Joinder of FBME**

　　　　As intimated above, the posture of the Kazakh Entities' motion to join FBME as an

additional defendant in this matter is somewhat unusual.  The Kazakh Entities first filed a joinder

motion early in this litigation, successfully bringing the Individual Defendants and others into the

case.  *See* Dkt. Nos. 47, 174.  They did not file any additional such motions in response to

Triadou's original motion to dismiss their crossclaims.  Nor did they, following entry of the

Court's Scheduling Order on July 29, 2016, move for any further joinder during the expressly

allotted 30-day period.  Instead, the Kazakh Entities submitted a letter on August 25, 2016

(approximately four days before the expiration of that period), advising that they intended to file

amended crossclaims in response to the Individual Defendants' then-recent motions to dismiss

and requesting leave to file a belated joinder motion should the inclination arise "[i]n the process

of amending the crossclaims."  Dkt. No. 213.  Upon Triadou's objection, the Court granted

permission for the Kazakh Entities to file a further motion for joinder several days after the

deadline established by the Scheduling Order but imposed the express condition that any such

motion "relate solely to the Kazakh Entities' claims or allegations directed against the Individual

EXHIBIT L

Defendants." Dkt. No. 214. The Kazakh Entities then proceeded to move for the permissive joinder of FBME as an additional defendant to its crossclaims.

It is readily apparent from the face of the Kazakh Entities' motion papers that their joinder application does not "relate solely" to "claims or allegation directed against the Individual Defendants." The primary basis for the motion is, in sum and substance, that "FBME was a key participant in the alleged conspiracy" involving Triadou and the Individual Defendants, particularly in processing wire transfers to the United States in order to fund Triadou's – and thus, purportedly, the Individual Defendants' – investments in the Flatotel and the Cabrini Medical Center. *See, e.g.*, Dkt. No. 217 at 8-11. Indeed, the Kazakh Entities contend, for example, that joinder is appropriate in part because FBME "executed a series of wire transfers from the accounts of [Telford] to accounts in New York for at least $69 million, primarily for Triadou's benefit," and that their proposed claims against FBME "are premised upon many of the same wire transfers" as its claims against both Triadou and the Individual Defendants. Dkt. No. 217 at 9-11; *see also id.* at 10 ("[W]ithout FBME's cooperation, the transfers alleged for the benefit of Triadou would not have been possible."). They also urge that "[e]videntiary concerns favor joinder" in part because "one critical question in this action will the source of the funds transferred by Telford for Triadou's benefit." *Id.* at 12-13. The Amended Crossclaims, moreover, add a claim against FBME for aiding and abetting various torts committed – allegedly – by Triadou as well as by the Individual Defendants. Dkt. No. 219 ¶¶ 200-04.

For these reasons, Triadou, as noted above, immediately objected to the Kazakh Entities' joinder motion and requested that the Court summarily strike it as violative of its limiting order. Dkt. No. 223. The Kazakh Entities, responding to Triadou's objection, do not deny that their

14

EXHIBIT L

joinder application does not relate "solely" to Ablyazov and the Khrapunovs but maintain that it

would be "impossible" for any "new allegations" to "have nothing to do with Triadou

whatsoever," given that "joinder requires common questions of law or fact." Dkt. No. 224.

These circumstances invite, if nothing else, the threshold question of the appropriate

standard to apply to the Kazakh Entities' joinder motion. Federal Rule of Civil Procedure 13(h)

instructs that "Rules 19 and 20 govern the addition of a person as party to a counterclaim or

crossclaim." Fed. R. Civ. P. 13(h). Rules 19 and 20, in turn, set forth the generally applicable

conditions for required and permissive joinder, respectively. There is no dispute that the Kazakh

Entities' motion implicates the latter. *See, e.g.*, Dkt. Nos. 217 at 12, 226 at 2-3. Under Rule

20's permissive joinder provisions, "defendants may be joined if the claims against them arise

'out of the same transaction, occurrence, or series of transactions or occurrences,' and 'any

question of law or fact common to all defendants will arise in the action.'" *Almazo v. M.A.*

*Angeliades, Inc.*, No. 11-CV-1717(MGC), 2015 WL 6965116, at *5 (S.D.N.Y. Nov. 10, 2015).

Assuming that these prerequisites are satisfied, a court may then, under Rule 21, allow joinder

"at any time, on just terms." Fed. R. Civ. P. 21. Generally, "[i]n deciding whether to permit the

addition of a party, the court applies the same standard of liberality under Rule 21 as that

afforded motions [to amend pleadings] under Rule 15(a), which similarly states that the court

should freely give leave when justice so requires." *Otegbade v. N.Y.C. Admin. For Children*

*Servs.*, No. 12-CV-6298(KPF), 2015 WL 851631, at *2 (S.D.N.Y. Feb. 27, 2015) (quotation

marks omitted).

Importantly, however, when a motion for joinder is made after "a deadline to join parties

in a scheduling order has elapsed," it is subject to the heightened standard for untimely

amendments set forth in Rule 16(b), which requires a showing of "good cause." *See id.*

EXHIBIT L

(collecting cases); *see also Tardif v. City of New York*, No. 13-CV-4056(KMW)(FM), 2015 WL

9257069, at *3 (S.D.N.Y. Dec. 7, 2015) ("Rule 16(b) is also applicable to a motion to add a party

pursuant to Rule 21"); *Soroof Trading Dev. Co. Ltd. v GE Microgen, Inc.*, 283 F.R.D. 142, 147

n.3 (S.D.N.Y. 2012) (noting that "[c]ourts in this district have concluded that Rule 16's good

cause standard is applicable to both" amendments that add "new allegations" and those that "add

a new party"). "Whether good cause exists turns on the 'diligence of the moving party.'" *The

Port Auth. Police Benevolent Ass'n, Inc. v. The Port Auth. of N.Y. & N.J.*, No. 15-CV-

3526(AJN), 2016 WL 6083956, at *3 (S.D.N.Y. Oct. 17, 2016) (quoting *Parker v. Columbia

Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000)). In particular, "the movant must show that the

deadlines cannot be reasonably met despite its diligence." *Rent-A-Center, Inc. v. 47

Mamaroneck Ave. Corp.*, 215 F.R.D. 100, 104 (S.D.N.Y. 2003). "The Court may also consider

any prejudice to the nonmoving party and the length of delay in filing the amendment." *Tardif*,

2015 WL 9257069, at *3 (internal quotation marks and citation omitted). The mere "absence of

prejudice to a nonmoving party," however, does "not fulfill the good cause requirement of Rule

16(b)." *Estate of Ratcliffe v. Pradera Realty Co.*, No. 05-CV-10272(JFK), 2007 WL 3084977, at

*1 (S.D.N.Y. Oct. 19, 2007) (internal quotation marks omitted).

Whether decided under Rule 16(b)'s more stringent standard or the more relaxed

requirements of Rules 21 and 15(a), a district court's resolution of a motion to join parties

constitutes an exercise of its discretion and is reviewed only for abuse of that discretion. *See,

e.g., Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003); *Otegbade*, 2015 WL

851631, at *3-4.

Under the circumstances, Rule 16(b)'s "good cause" standard properly applies to the

Kazakh Entities' motion to join FBME. Directly implicating as it does the source of the

EXHIBIT L

allegedly ill-gotten monies that funded the real estate investments by Triadou that are so central

to the Kazakh Entities' claims against it, there can be no real doubt that the application "relates"

to Triadou and thus that it runs afoul of the Court's directive that any belated joinder motions

relate "solely" to the Individual Defendants.  While the Court has declined, and will continue to

decline, Triadou's invitation to simply strike the joinder motion without further consideration, it

finds, in the exercise of its discretion, that affording the motion the benefit of the Court's brief

extension of the Scheduling Order – and thus treating it as timely under that Order – would be

unwarranted.  Accordingly, the Court will resolve the motion as it if were filed after the deadline

for joinder applications set forth in the Scheduling Order.

Applying Rule 16(d), the Court concludes that the Kazakh Entities do not show good

cause to support the belated joinder of FBME.  As Triadou argues, the Kazakh Entities evidently

possessed most, if not all, of the information marshalled to support their current request to join

FBME for nearly a year before seeking leave to file the application, yet declined to include

FBME in their first joinder motion (which targeted the Individual Defendants), to amend its

pleading to include FBME in response to Triadou's original motion to dismiss, or to bring this

motion within the original 30-day period set forth in the Scheduling Order.  Dkt. Nos. 223 at 1-2,

226 at 6-8.  Indeed, the Kazakh Entities' original Answer, Counterclaims, and Crossclaims, filed

in October 2015, alleged at some length both FBME's role in the purported conspiracy and its

ties to suspected money laundering.  It asserted, for example, that "The Cross- and Counterclaim

Defendants devised a plan to circumvent legitimate banks and wire funds directly from the

Ablyazov-Khrapunov Group's offshore accounts with [FBME]" (which the United States

government subsequently labelled a "'foreign financial institution of primary money laundering

concern'") to the "escrow account of the Chetrit Group's long-time attorneys," that Telford in

EXHIBIT L

fact executed transfers from its accounts at FBME to the United States for Triadou's benefit, and that at the time FBME had been "the subject of press reports investigating the links between FBME's activities in Cyprus and Ablyazov himself." Dkt. No. 49 ¶¶ 25, 109-11, 114. Moreover, the Kazakh Entities adduced substantial evidence concerning its proposed claims against FBME during the May 19, 2016 hearing on preliminary injunction and attachment motions, and cited that evidence in post-hearing briefing that predated the instant joinder motion by more than three months. *See, e.g.*, Dkt. No. 165 ¶¶ 99-109.

The Kazakh Entities do not substantially deny that they possessed the information that now forms the basis of their proposed claims against FBME well before filing their joinder motion. If anything, they confirm, for example, that a good deal of the relevant evidence "was unearthed in preparation for the evidentiary hearing on the attachment motion, which required the Kazakh Entities to investigate Triadou's connections to its funding source, [Telford], which maintained its accounts at FBME." *See, e.g.*, Dkt. Nos. 236 at 2, 11-12. Such preparation, of course, would have taken place prior to the May 2016 hearing and thus several months before the Kazakh Entities brought the instant joinder motion. Notably, moreover, despite couching their request for leave to submit a belated joinder motion as part of the "process" of amending their crossclaims in response to the Individual Defendants' motions to dismiss, Dkt. No. 213, the Kazakh Entities do not identify anything about those motions that prompted the joinder application or give any reason why that application could not been filed within the period set forth in the Scheduling Order (or substantially earlier).

Both Triadou and the Individual Defendants maintain that the Kazakh Entities' declination to join FBME until after the Individual Defendants moved to dismiss supports a conclusion that the Kazakh Entities' application is intended only to undercut a *forum non*

EXHIBIT L

*conveniens* defense – discussed further below – first raised unsuccessfully by Triadou but then arguably resuscitated by the Individual Defendants' subsequent appearance and consent to a foreign forum. *See, e.g.*, Dkt. Nos. 226 at 6-8, 234 at 1-2. The Court is not prepared to ascribe any such improper purpose to the Kazakh Entities on basis of timing and conjecture. But it does conclude that the Kazakh Entities have not shown – or even particularly tried to show – that their joinder motion could not, despite reasonable diligence, been filed sometime prior to the deadline set forth in the Scheduling Order. *See, e.g.*, *Rent-A-Center*, 215 F.R.D. at 104-05 (denying motion to amend under Rule 16(b) because "the substance of the defendants' 'new' claim was known when the defendants filed their original amended answer and added their counterclaim" and they did not "offer [an] explanation for why they failed to include the subject matter of the proposed amendment in their earlier amendment" or "try to explain why the deadline set forth in the Court's Scheduling Order could not be reasonably met"). The Court therefore exercises its discretion to DENY the Kazakh Entities' motion to join FBME.

### C.      The Individual Defendants' Motions to Dismiss

The Court turns next to the Individual Defendants' motions to dismiss the Kazakh Entities' Amended Crossclaims. These motions – which were separately briefed by Ablyazov and the Khrapunovs but opposed in combined papers by the Kazakh Entities – raise a plethora of arguments, some of which require more discussion at this stage of the litigation than others. Notably, for example, a substantial portion of the parties' briefing addresses whether the Kazakh Entities' RICO claims should be dismissed. As discussed above, however, the Court subsequently dismissed those claims with prejudice as impermissibly extraterritorial in light of the Supreme Court's decision in *RJR Nabisco*. Naturally, then, the RICO claims warrant no further discussion here. In addition, the parties devote significant briefing to applicability of the

EXHIBIT L

doctrine of *forum non coveniens*. As discussed further below, the Court opined at some length on that issue in denying Triadou's original motion to dismiss and it will do so again here only to the extent necessary to address the Individual Defendants' novel arguments.

For purposes of this Memorandum and Order, the Individual Defendants' pertinent contentions can be divided into three groups[2]: (i) the entire action should be dismissed on the ground of *forum non conveniens*; (ii) the Kazakh Entities' individual state law claims fail under Rule 12(b)(6) as either inadequately pled or, in some cases, as time-barred; and (iii) the Court lacks personal jurisdiction over the Khrapunovs. The Court will address each set of arguments in turn.

### 1.    *Forum Non Conveniens*

#### a.    **Legal Standard**

"The decision to dismiss a case on *forum non conveniens* grounds 'lies wholly within the broad discretion of the district court and may be overturned only when . . . that discretion has been *clearly abused.*'" *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (*en banc*) (emphasis in original) (quoting *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996)). "An evaluation of a motion to dismiss on the grounds of *forum non conveniens* proceeds in several stages." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003). First, a court must determine "'whether the plaintiff's choice of forum is entitled to more or less deference.'" *Id.* (internal brackets omitted) (quoting *Iragorri*, 274 F.3d at 73). Regardless of the level of deference owed, the court "still must conduct the analysis set forth out in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)," and "determine whether an adequate

---

[2] Because the Individual Defendants' contentions overlap substantially, the Court will, for the sake of convenience and clarity, not differentiate between Ablyazov's and the Khrapunovs' positions except where they materially diverge.

EXHIBIT L

alternative forum exists." *Id.* (citing *Iragorri*, 274 F.3d at 73). If it does, "the court must go to the third step and balance factors of private and public interest to decide, based on weighing the relative hardships involved, whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum suggested by the defendant." *Id.* (citing *Gilbert*, 330 U.S. at 507-09). Dismissal based on this balancing analysis is warranted "when trial in the chosen forum would 'establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'" *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981) (alterations in original) (quoting *Koster v. (American) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)). Moreover, "the greater the degree of deference to which the plaintiff's choice of forum is entitled" pursuant to the first prong of the analysis, "the stronger a showing of inconvenience the defendant must make to prevail in securing *forum non conveniens* dismissal." *Iragorri*, 274 F.3d at 74. Indeed, "unless the balance [of interests] is strongly in favor the defendant, the plaintiff's choice of forum" – if legitimate – "should rarely be disturbed." *Gilbert*, 330 U.S. at 508.

The moving party "bears the burden of proof on all of the elements of [a] motion" seeking dismissal under *forum non conveniens* grounds. *Bank of Credit Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001).

        b.    **Dismissal Under the Doctrine of *Forum Non Conveniens* Continues to be Unwarranted**

The Court begins by noting that over a year ago it rejected, at some length, Triadou's argument in its own motion to dismiss that the Kazakh Entities' claims should be dismissed on *forum non conveniens* grounds because Switzerland provides a more appropriate forum for this litigation. *See* Dkt. No. 174 at 6-19. In the June 21 Decision, the Court determined that the

EXHIBIT L

Kazakh Entities' choice of forum – to the extent it could be characterized as their choice given

the Chetrit Entities' initiation of this action – "was 'motivated by legitimate reasons'" and that

there was "a 'bona fide connection' between this lawsuit and the New York forum" given the

purported laundering of stolen funds through New York real estate developments, thus entitling

the forum selection to "substantial deference." *Id.* at 7-9 (quoting *Iragorri*, 274 F.3d at 72-73).

It further concluded that Triadou had not carried its burden of establishing that Switzerland

would not be an adequate alternative forum for the Kazakh Entities' claims because it had failed

to demonstrate that Ablyazov (then incarcerated in France) would be amenable to process in

Switzerland and could not guarantee that the Kazakh Entities' claims against the Individual

Defendants would not be barred by Switzerland's statute of limitations – a defense that Triadou

itself had agreed to waive. *Id.* at 9-12. Finally, the Court engaged in an extensive balancing

analysis of the relevant private and public interest factors, and determined, as an alternative

ground for its holding, that the final step of the *forum non conveniens* framework

"demonstrate[d] that dismissal was not appropriate," even if Switzerland were an adequate

forum. *See id.* at 12-19 (concluding "that the sources of proof available in Switzerland are

roughly comparable in quantity and in relevance to the sources of proof available in New York";

that "the ability to obtain live witness testimony [did] not weigh strongly one way or the other";

that other litigation logistics would suffer from significant "inconvenien[ces]" regardless of the

forum; that there was "little net convenience to be gained by sending this dispute to

Switzerland"; that "both Switzerland and New York have legitimate interest in the dispute"; and

that Swiss law would have "little, if any, apparent relevant to this dispute").

  The Individual Defendants ask the Court, essentially, to revisit its holding on three main

grounds. First, the deference owed to the Kazakh Entities' choice of forum for their claims

EXHIBIT L

against the Individual Defendants is purportedly "undermined" by the fact that Almaty has also initiated related proceedings in Switzerland and has recently pursued claims in that forum against another member of the Khrapunov family. Dkt. No. 232 at 22. Second, Switzerland is indeed an adequate alternative forum, according to the Individual Defendants, because they would consent to service of process in that country and agree (like Triadou before them) to waive any statute of limitations defenses under Swiss law if this action were dismissed pursuant to the *forum non conveniens* doctrine. Dkt. Nos. 228 at 19-20, 232 at 23. And third, the balance of hardships tips in favor of dismissal because (i) the Khrapunovs are purportedly unable to travel to New York to participate in trial in person – with Viktor Khrapunov seeking political asylum in Switzerland and thus barred from international travel under Swiss law and Ilyas Khrapunov unwilling to leave Switzerland for fear of potential arrest and extradition to Kazakhstan – and (ii) there is extensive litigation underway in Switzerland involving many of the same parties and related claims. Dkt. Nos. 228 at 20-22, 232 at 23-25.

The Court, however, sees no basis to depart from its earlier conclusion that dismissal on *forum non conveniens* grounds is unwarranted here.

Even assuming *arguendo* that the Individual Defendants' offered concessions have rendered Switzerland an adequate alternative forum, the Court also grounded its original decision, as discussed above, on a determination that the Kazakh Entities' selection of this forum for their claims is entitled to substantial deference and that the balance of the competing interests is not "'strongly in favor of the defendant,'" as generally required to disturb a plaintiff's legitimate choice of forum. *See* Dkt. No. 174 at 7-9, 12-19 (quoting *Gilbert*, 330 U.S. at 508). The Individual Defendants' only contention as to deference is the summary suggestion that the Kazakh Entities are clearly "comfortable" litigating in Switzerland, as evidenced by their

EXHIBIT L

involvement in related proceedings in that jurisdiction. But the Individual Defendants do not explain – and the Court fails to see – why the Kazakh Entities' purported "comfort" with separate proceedings taking place in Switzerland should impact the Court's findings that the Kazakh Entities' choice of this forum for the particular claims asserted here was motivated by legitimate reasons (the preexisting New York litigation initiated by the Chetrit Entities and the close linkage between that pending action and the real estate-based money laundering allegations central to the Kazakh Entities' claims) and that there is a bona fide connection between those claims and the New York forum (because the Individual Defendants and Triadou allegedly laundered stolen funds through New York City real estate projects). The Individual Defendants' argument raises no specter that the Kazakh Entities' assertion of their claims was driven by forum-shopping or some other improper purpose, and accordingly, it does not bear on the deference owed to the Kazakh Entities' forum selection.

As for the balance of the hardships, the Khrapunovs' proffered inability or unwillingness to travel from Switzerland to participate personally in trial does not alter the bottom line of the Court's calculus at this stage of the proceedings. The Kazakh Entities themselves brought to the Court's attention long before its June 21 Decision on Triadou's *forum non conveniens* argument that the Khrapunovs resided in Switzerland, that they faced multiple charges in Kazakhstan, that Kazakhstan had sought assistance from Swiss authorities in its ongoing efforts to prosecute the Khrapunovs, and that Viktor Khrapunov, at least, was the subject of a formal extradition request. *See, e.g.*, Dkt. Nos. 49 ¶¶ 84-85, 174 at 10, 13. The Court was further aware at the time of the June 21 Decision that Ablyazov was incarcerated in France. Dkt. No. 174 at 10. To be sure, Triadou did not – as the Khrapunovs now do – specifically identify any witnesses "who would be unable or unwilling to appear to New York." *Id.* at 15 (internal quotation marks and citation

EXHIBIT L

omitted). But the Court, in denying Triadou's dismissal motion, accounted for the possibility that, for example, "letters rogatory" might have to "be used to obtain some witness testimony in New York." *Id.* And it nevertheless concluded, in light of the presence in New York of Chetrit-affiliated witnesses and the short-notice appearance of a number of critical Swiss witnesses for live participation in the May 2016 hearing, that the ability to "obtain live witness testimony does not weigh strongly one way or the other." *Id.* at 14-15 (internal quotation marks and citation excluded).

That is not to minimize the Khrapunovs' stated interest in possibly offering live testimony at trial. Dkt. No. 232 at 23-24. Indeed, the Court is mindful that "[t]here is a strong preference for live testimony" in the context of any *forum non conveniens* analysis, and that is particularly true when fraud claims potentially turning on factfinders' assessments of demeanor and credibility are at issue. *See, e.g., Flynn v. Nat'l Asset Mgmt. Agency*, 42 F. Supp. 3d 527, 538 n.54 (S.D.N.Y. 2014) (citing *Iragorri*, 274 F.3d at 75); *see also Alfadda v. Fenn*, 159 F.3d 41, 47-48 (2d Cir. 1998).

At the same time, the Court of Appeals has recognized that "[d]espite the preference for live testimony" alternative arrangements, such as "videotaped depositions, obtained through letters rogatory," can still "afford the jury an opportunity to assess the credibility" of absent witnesses. *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 30 (2d Cir. 2002). District courts have concluded accordingly that prejudice flowing from the inability of foreign parties to travel to the appointed forum may often be substantially ameliorated – or at least mitigated – by, for example, testimony by videoconference or deposition. *See, e.g., In re Bernard L. Madoff Inv. Secs. LLC*, 525 B.R. 871, 891 (Bankr. S.D.N.Y. 2015); *see also In re Lernout & Hauspie Sec. Litig.*, 208 F. Supp. 2d 74, 93 (D. Mass. 2002) (were litigants to encounter problems persuading third-party

EXHIBIT L

witnesses facing criminal investigations abroad to appear in the United States, "sufficient alternative arrangements, such as videotaped depositions obtained through letters rogatory, can be used"); *cf. Eclaire Advisor Ltd. v. Daewoo Engineering & Constr. Co. Ltd.*, 375 F. Supp. 2d 257, 265 (S.D.N.Y. 2005) ("In this day and age of rapid transportation and instant communications, the convenience of immediate physical proximity to documents, testimony, and other proof has become of less consequence to a *forum non conveniens analysis . . .* "). The Kazakh Entities urge that just these sorts of options are likely available should the Khrapunovs desire to testify in person, Dkt. No. 241 at 39-40 – a suggestion that the Khrapunovs do not rebut, or even acknowledge, on reply.[3] Left to conclude, then, that the Khrapunovs could – if they were to so choose – avail themselves of some alternative manner of testifying at trial, the Court finds that Khrapunovs' stated unwillingness or inability to appear in New York is not enough to carry the Individual Defendants' burden of demonstrating that private interests "strongly" favor dismissal of this action from the Kazakh Entities' legitimately chosen forum.

Nor, finally, do references to purportedly "exten[sive]" related proceedings in Switzerland involving the Individual Defendants, Almaty, and Kazakhstan more broadly counsel a different conclusion on the third prong of the *forum non conveniens* analysis. Dkt. Nos. 228 at 21-22, 232 at 24-25. Preliminarily, as with the Individual Defendants' legal and residential circumstances, the Court was aware when it rejected Triadou's original *forum non conveniens* arguments that, for example, the Kazakh Entities were "already involved in multiple Swiss

---

[3] Of some note on this point, the Honorable Katharine H. Parker, to whom the undersigned has referred this matter for general pretrial supervision, recently opined that Hague Convention procedures – albeit potentially cumbersome – would provide adequate means for taking Ilyas Khrapunov's deposition in Switzerland and that the parties would be able to secure a verbatim transcript of the proceedings, but permitted the Kazakh Entities to apply for additional compulsory testimony in a different forum should the procedures available in Switzerland prove ineffective. Dkt. No. 330 at 11-12. This Court later issued Hague Convention Requests for International Judicial Assistance to facilitate the Kazakh Entities' depositions of Ilyas & Viktor Khrapunov in Switzerland. Dkt. No. 391.

EXHIBIT L

proceedings." Dkt. No. 91 at 2 n.2, 8 n.17.  More importantly, "the existence of related litigation . . . is not listed as a relevant factor in the *forum non conveniens* analysis laid out *Gilbert*," and is generally relevant only when "the parties to the American and foreign actions [are] identical and there [is] likelihood of significant duplication of legal efforts on behalf of all the parties." *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 148 (2d Cir. 2000) (internal quotation marks and citation omitted).  That is not the case here.  As the Kazakh Entities point out, no evidence has been put before the Court that would indicate that there is any proceeding currently pending in Switzerland that involves all of the parties to this action – or, for that matter, any proceeding at all involving BTA.  Dkt. No. 241 at 42.  The Kazakh Entities are also correct in noting that there is no indication that this litigation could readily be joined, consolidated, or otherwise meaningfully coordinated with any such Swiss action to facilitate realization of the efficiency benefits of a dismissal that the Individual Defendants purport to envision.  *Id.* Furthermore, no evidence has been submitted suggesting that any Swiss tribunal could issue a restraint or judgment against the property of the Individual Defendants allegedly present in New York and targeted by the Kazakh Entities – a consideration analogous to one recently emphasized by the Ninth Circuit in reversing a California district court's dismissal on *forum non conveniens* grounds of a similar suit brought by Almaty against members of the Khrapunov family.  *See, e.g.*, *City of Almaty v. Khrapunov*, 685 F. App'x 634, 636-37 (9th Cir. 2017) (Summary Order) ("the district court failed to consider whether a judgment against Defendants could be enforced in Switzerland").  And finally, to the extent that the Individual Defendants highlight in passing that proceeding in Switzerland carries convenience benefits because claim development and discovery has progressed "substantial[lly]" in the actions apparently pending in that forum, Dkt. Nos. 228 at 21-22; 232 at 24-25, the Court simply notes that this action has itself

27

EXHIBIT L

been ongoing for over two years, featuring live hearing testimony and judicial factfinding on injunction and attachment motions, approximately a year of discovery including the issuance of several letters rogatory, and hundreds of pages' worth of substantive decisions of this Court and the United States Magistrate Judge in her diligent supervision of discovery. This litigation, too, has been "substantial," and the time for concerns about duplication of efforts is past. The Court simply does not view vague invocations of the relative progress of the foreign actions as requiring dismissal of the instant suit at this at least modestly advanced stage of the proceedings.

For all of these reasons, the Individual Defendants' motion to dismiss on *forum non conveniens* grounds is denied.

### 2.    Viability of State Law Claims Under Rule 12(b)(6)

The Individual Defendants also argue that several of the Kazakh Entities' individual state law claims should dismissed under Federal Rule of Civil Procedure 12(b)(6). Specifically, they contend that the Kazakh Entities fail to state claims for actual fraudulent conveyance (Count 6 of the Amended Crossclaims), for constructive fraudulent conveyance (Count 7), for unjust enrichment (Count 8), for common law conversion (Count 9), for constructive trust (Count 10), under Section 5239 of the New York Civil Practice Law and Rules (the "CPLR") (Count 11), and for recognition and enforcement of a foreign judgment under CPLR Section 5303 (Count 12), and that the conversion, unjust enrichment, and constructive trust claims are time-barred. The Court will address the Individual Defendants' arguments concerning the sufficiency of the Kazakh Entities' pleading one Count at a time and will then separately address arguments implicating the statute of limitations.

### a.    Legal Standard Under Rule 12(b)(6)

EXHIBIT L

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal quotation marks and citation omitted).

In deciding a motion to dismiss, a court is required to "accept[] the complaint's factual allegations as true and draw[] all reasonable inferences in the plaintiff's favor." *Steginsky v. Xcelera, Inc.*, 741 F.3d 365, 368 (2d Cir. 2014). It should not, however, give "effect to legal conclusions couched as factual allegations." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007).

<blockquote>

b.  **Sufficiency of Allegations Supporting Actual and Constructive Fraudulent Conveyance Claims Under Rule 12(b)(6) (Counts 6 and 7)**

</blockquote>

The Kazakh Entities assert claims for actual fraudulent conveyance and constructive fraudulent conveyance under the New York Debtor Creditor Law ("DCL") §§ 275, 276, 279, 273, and 273-a. Dkt. No. 219 ¶¶ 162-173. Both claims are premised on the central allegation that the 2014 assignments of Triadou's (and thus, purportedly, the Individual Defendants') interests in the Flatotel and Cabrini Medical Center to the Chetrit Entities were made in exchange for below-market consideration and in fact "represented a value significantly below the

EXHIBIT L

fair value of [those] interest[s]." *Id.* They were executed, the Kazakh Entities aver, at a time when Triadou – as, allegedly, an alter ego of the Individual Defendants – had liabilities current and/or future liabilities to the Kazakh Entities in the form of the U.K. Judgments and the claims pending in California federal court. *Id.*

The statutory provisions invoked by the Kazakh Entities "define several types of conveyances by a debtor as fraudulent, and thus recoverable by creditors." *Am. Fed. Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388, 400 (S.D.N.Y. 2015). Under DCL Section 276, for example:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

DCL § 276. "To survive a motion to dismiss on a § 276 claim, a plaintiff must allege that a defendant acted with actual intent to hinder, delay, or defraud creditors and must plead its allegations with particularity as required by Fed. R. Civ. P. 9(b)." *Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*, 971 F. Supp. 2d 368, 382 (S.D.N.Y. 2013).

By contrast, constructive "fraudulent conveyances under DCL §§ 273 and 273-a are defined exclusively by the objective conditions of the asset transfer at issue, without regard to the debtor's intent in making the transfer." *GFI*, 126 F. Supp. 3d at 400. Put differently, "[t]hese conveyances need not be intentionally harmful to creditors; it is the effect of the transfers alone, and not their purpose, that renders them constructively fraudulent." *Id.* at 400-401. A conveyance is constructively fraudulent under Section 273 if it "lacks 'fair consideration' and the debtor 'is or will be thereby rendered insolvent.'" *Id.* at 400 (quoting DCL § 273). Section 273-a, for its part, renders constructively fraudulent a transfer by debtor that "lacks 'fair consideration'" when "the debtor 'is a defendant in an action for money damages' and ultimately

30

EXHIBIT L

'fails to satisfy the [resulting final] judgment.'" *Id.* (brackets in original) (quoting DCL § 273–a).

DCL Section 275 similarly provides:

> Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

DCL § 275. To state a claim under Section 275, a plaintiff must allege both a "lack of fair consideration" and that "the Defendant intended or believed that it would incur debts beyond its ability to pay when the debts matured." *SungChang Interfashion Co., Ltd. v. Stone Mountain Accessories, Inc.*, No. 12-CV-7280(ALC), 2013 WL 5366373, at *10 (S.D.N.Y. Sept. 25, 2013).

The Individual Defendants do not distinguish between these claims in advancing what is essentially their only argument in support of dismissal: that because it is not alleged that Ablyazov or the Khrapunovs were personally party to the assignments of Triadou's real estate interests, whether as transferors or transferees, they cannot be held liable for fraudulent conveyance. Dkt. Nos. 228 at 13-14, 232 at 21-22.

It is generally true that "New York law does not recognize 'a creditor's remedy for money damages against parties who . . . were neither transferees of the assets nor beneficiaries of the conveyance.'" *See, e.g., Roselink Inv'rs, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 226-27 (S.D.N.Y. 2004) (quoting *F.D.I.C. v. Porco*, 75 N.Y.2d 840, 842 (1990)); *see also SungChang*, 2013 WL 5366373, at *11 (where individual defendants were not alleged to be "transferor, transferee, or beneficiary of the transfer," there was "no direct theory of liability for any fraudulent conveyance claim" as to them). As the Kazakh Entities point out, however, Dkt. No.

31

EXHIBIT L

241 at 27, they may – at least in theory – proceed against the Individual Defendants under a
corporate veil-piercing theory. *See, e.g., D'Mel & Assocs. v. Athco, Inc.*, 963 N.Y.S.2d 65, 66-
67 (N.Y. App. Div. 2013) (individual executives of debtors "who were not transferees of either
conveyance" could not "be held liable without piercing the corporate veil unless they benefited
from the conveyances"); *SungChang*, 2013 WL 5366373, at *11-12 (permitting fraudulent
conveyance claims against individual executive of corporation that engaged in purportedly sham
asset sale to proceed based on veil-piercing theory); *NPR, LLC v. Met. Fin. Mgmt., Inc.*, 882
N.Y.S.2d 253, 254 (N.Y. App. Div. 2009) (affirming veil piercing as to individual associated
with transferee corporation in fraudulent conveyance action).

Under New York law,[4] "those seeking to pierce a corporate veil . . . bear a heavy
burden." *TNS Holdings v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339 (1998). Specifically, a "plaintiff
seeking to pierce the corporate veil must demonstrate that a court in equity should intervene
because the owners of the corporation exercised complete domination over it in the transaction at
issue and, in doing so, abused the privilege of doing business in the corporate form, thereby
perpetrating a wrong that resulted in injury to the plaintiff." *E. Hampton Union Free Sch. Dist.
v. Sandpebble Bldrs., Inc.*, 884 N.Y.S.2d 94, 98 (N.Y. App. Div. 2009). "Factors to be
considered in determining whether the owner has abused the privilege of doing business in the
corporate form include whether there was a failure to adhere to corporate formalities, inadequate
capitalization, commingling of assets, and use of corporate funds for personal use." *Id.* at 99
(internal quotation marks and citations omitted).

---

[4] Based on the authorities cited in their briefs, the parties appear to be in agreement, if implicitly, that New York law should govern any veil-piercing inquiry, and "where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).

EXHIBIT L

Notwithstanding this ultimate evidentiary burden, New York courts have recognized that a veil-piercing theory often necessitates a "fact laden inquiry" and thus is "unsuited for resolution on a pre-answer, pre-discovery motion to dismiss." *Holme v. Glob. Minerals & Metal Corp.*, No. 600232/08, 2009 WL 387034, at *7 (N.Y. Sup. Ct. Jan. 12, 2009) (citing, *inter alia*, *Ledy v. Wilson*, 831 N.Y.S2d 61, 62 (N.Y. App. Div. 2007) ("a fact-laden claim to pierce the corporate veil . . . is particularly unsuited for resolution on summary judgment") (internal quotation marks omitted)). Accordingly, while it is generally "'not sufficient, at the pleading stage, to make conclusory allegations of control,'" "'setting forth some examples of alleged domination may provide sufficiently specific factual allegations to support an alter ego claim and result in denial of the motion to dismiss.'" *SungChang*, 2013 WL 5366373, at *11 (quoting *In re Sunbeam Corp.*, 284 B.R. 355, 366 (Bankr. S.D.N.Y. 2002)).

Although discovery may yield a different result, the Kazakh Entities have pled sufficient facts on this front for their fraudulent conveyance claims as to the Individual Defendants to survive a motion to dismiss on a veil-piercing theory. The Amended Crossclaims allege that Ilyas Khrapunov, along with Belgium-based real estate fund manager Nicolas Bourg, founded Triadou on behalf of the Individual Defendants in approximately 2011 specifically in order "to mask the Ablyazov-Khrapunov Group's efforts to invest in real estate opportunities in the U.S." Dkt. No. 219 ¶¶ 85-86. They further assert that Triadou was, from its inception, "wholly owned and controlled by SDG, which was itself a front of the Ablyazov-Khrapunov Group's Activities," and that Bourg served as the sole director of Triadou, "operating at the direction of the Ablyazov-Khrapunov Group, who continued to control SDG, Triadou's sole shareholder." *Id.* ¶¶ 85-87. In addition, the Kazakh Entities allege at some length that Ilyas Khrapunov, again acting on behalf of the Individual Defendants, conceived of and directly negotiated and

33

EXHIBIT L

otherwise facilitated Triadou's investments into the Flatotel and Cabrini Medical Center (on

terms unfavorable to Triadou itself), and that these investments were funded not by Triadou's

monies but rather by Individual Defendant-directed transfers from Telford's accounts with

FBME, which consisted of Ablyazov's ill-gotten gains and were controlled by Ablyazov and

Ilyas Khrapunov. *See, e.g., id.* ¶¶ 88-92, 97-106, 111-113. They assert, moreover, that Ilyas

Khrapunov personally directed Triadou to liquidate its holdings in the Flatotel and Cabrini

Medical Center "as quickly as possible" in order to remove the Individual Defendants'

purportedly ill-gotten funds from the United States, and that Triadou accordingly executed the

assignments cited in the fraudulent conveyance claims on roundly unfavorable, below-market

terms. *Id.* ¶¶ 114-122. More broadly, the Kazakh Entities allege that Triadou, as a general

matter, is itself "insolvent," holding "no funds or other assets of its own," and instead "relies on

funding from other Ablyazov-Khrapunov Group entities, such as Telford, to meet its

obligations." *Id.* ¶ 170. In the Court's view, such allegations are sufficient to support a veil-

piercing theory of liability as to the Individual Defendants at this stage of the litigation.

Accordingly, the Individual Defendants' motions to dismiss Counts 6 and 7 are DENIED.

        c.     **Sufficiency of Allegations as to Unjust Enrichment Claim (Count 8)**

The Kazakh Entities also plead a claim of unjust enrichment, which centers on allegations

that the Individual Defendants embezzled funds from the Kazakh Entities and then invested

those funds, acquiring assets in the United States unjustly. *Id.* ¶¶ 174-76.

A claim for unjust enrichment must allege that "(1) defendant was enriched, (2) at

plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to

retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373

F.3d 296, 306 (2d Cir. 2004). The Individual Defendants argue that the claim is not sufficiently

EXHIBIT L

pled because it fails to allege that the Khrapunovs or Ablyazov received any direct benefit from

the investments. Dkt. Nos. 228 at 15-16, 232 at 21.

The Court cannot agree. The Amended Crossclaims contain numerous allegations

suggesting that the Individual Defendants directly benefitted from the alleged embezzlement and

fraud. For example, the Ablyazov-Khrapunov Group is said to have used SDG and Telford and

Triadou to make real estate investments in the United States precisely because the Individual

Defendants believed the stolen funds would then "be difficult for Kazakh authorities to access."

Dkt. No. 219 ¶¶ 77-78, 87-88. The inference here, plausibly drawn in the Crossclaim Plaintiffs'

favor, is that they wanted to "secret the families' illicit wealth" in order to ultimately return the

laundered funds to the Individual Defendants. *Id.* ¶ 77; Dkt. No. 241 at 24. This benefit would

accrue to each individual defendant. Moreover, as the Kazakh Entities note in their brief, the

Individual Defendants also directly benefitted from the allegedly stolen assets in that they used

these funds to fight their legal battles, including by purportedly hiring hackers to surveil French

officials in the hopes of freeing Ablyazov. Dkt. No. 241 at 24 (citing Dkt. No. 219 ¶¶ 73-76).

The Individual Defendants' motion to dismiss Count 8 is DENIED.

### d.   Sufficiency of Allegations as to Common Law Conversion Claim (Count 9)

The Kazakh Entities plead a claim of conversion in Count 9 of the Amended

Crossclaims. The gravamen of the claim is their assertion that the Individual Defendants bought

and sold assets obtained with funds derived from the corruption of Viktor Khrapunov as mayor

of the City of Almaty, and of Ablyazov as Chairman of BTA Bank. Dkt. No. 219 ¶¶ 178-180.

Under New York law, conversion is "the unauthorized assumption and exercise of the

right of ownership over goods belonging to another to the exclusion of the owner's rights."

EXHIBIT L

*Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006) (quoting *Vigilant Ins.*

*Co. of Am. v. Hous. Auth.*, 87 N.Y.2d 36, 44 (1995)).  "In order to maintain an action for

conversion, a plaintiff must demonstrate (1) plaintiff's legal ownership or immediate superior

right of possession to property; and (2) defendant's unauthorized interference with plaintiff's

ownership or possession of such property." *Republic of Liberia v. Bickford*, 787 F. Supp. 397,

402 (S.D.N.Y. 1992).

The arguments made to dismiss this count on insufficiency grounds are scant.  Viktor

Khrapunov argues that the Kazakh Entities "have not made any non-conclusory allegations that

Viktor had any role in converting proceeds after 2004," an argument that essentially concedes

that, putting aside the statute of limitations issue, the allegations dated prior to 2004 are

sufficient.  Dkt. No. 232 at 21.  Ablyazov raises no arguments as to the sufficiency of the

pleadings on Count 9.[5]

Kazakh Entities have sufficiently stated a claim for conversion.  They allege that none of

the Defendants has a superior interest in the assets allegedly stolen, Dkt. No. 219 ¶ 178, and the

Individual Defendants do not argue otherwise.  They plead detailed allegations of Ablyazov and

Viktor Khrapunov's embezzlement schemes. *Id.* ¶¶ 28-61.  And they make allegations that funds

stolen from the Kazakh Entities have been within the Individual Defendants' dominion by way

of the various entities they purportedly control: Telford, SDG, and Triadou. Dkt. No. 219 ¶¶ 78-

79, 86.  These allegations are sufficient to survive a motion to dismiss pursuant to Rule 12(b)(6).

     e.    **Sufficiency of Allegations as to Constructive Trust Claim (Count 10)**

---

[5] He only asserts that it is time-barred. Dkt. No. 228 at 15.

EXHIBIT L

The Kazakh Entities seek a constructive trust over the 50% interest in CF 135 West Member LLC assigned by Triadou to prevent "further dissipation of the funds" resulting from the alleged breach of fiduciary duty owed by Viktor Khrapunov to the City of Almaty. Dkt. No. 219 ¶¶ 182-84. Alternatively, the Kazakh Entities argue that the conspiracy to fraudulently transfer Triadou's interest in the Flatotel "justifies imposition of a constructive trust to prevent any further transfers or encumbrances of this property." *Id.* ¶ 185.

Generally, New York law requires a plaintiff establish four elements before a court will impose a constructive trust: "(1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment." *Sharp v. Kosmalski*, 40 N.Y.2d 119, 121 (1976). However, it is clear that not all elements need to be met for the court to impose a constructive trust, as the factors are merely guideposts and are not rigidly applied. *In re Koreag, Controle et Revision S.A. v. Refco F/X Assoc., Inc. (In re Koreag)*, 961 F.2d 341, 352 (2d Cir. 1992).

With respect to constructive trust claim, the arguments the Individual Defendants offer for dismissal differ by individual. Ablyazov offers four reasons why the claim should be dismissed as to him. Dkt. No. 228 at 17. Viktor Khrapunov offers one. Dkt. No. 232 at 21. The Court addresses them in turn.

First, Ablyazov asserts that the claim should fall because it includes no allegations that he can provide the requested relief. Dkt. No. 228 at 17. The Kazakh Entities allege that "the Telford accounts consisted of Ablyazov's stolen funds, Ilyas Khrapunov conferred with Ablyazov regarding investments of funds from Telford, and Ablyazov's approval was required for transfers from Telford," and that the Telford accounts were purportedly used to fund the Flatotel deal. Dkt. No. 219 ¶¶ 102-06. As such, it is plausible that a constructive trust could prevent any further transfers of the allegedly stolen property.

37

EXHIBIT L

Second, Ablyazov argues that the constructive trust claim is derivative of the unjust enrichment claim. Dkt. No. 228 at 17.  Given the Court's above decision that the unjust enrichment claim is sufficiently pleaded, this argument is plainly unavailing.

Third, Ablyazov claims that the Kazakh Entities fail to allege any "confidential or fiduciary relationship" of which he was a part, thus failing to satisfy one element of the claim. *Id.* As the Kazakh Entities note, this forgets Ablyazov's position as Chairman of BTA Bank, during which time he undoubtedly was its fiduciary.  Dkt. 241 at 25.

Fourth, and finally, Ablyazov argues that he is not an appropriate defendant for the constructive trust claim, as the trust "would be properly directed to the entity holding the assets, *i.e.*, the Chetrit Group." Dkt. No. 247 at 2-3.  However, the Amended Crossclaims allege that Ablyazov controls Telford and that Telford's assets include stolen funds, thus the constructive trust claim is also properly directed towards him. Dkt. No. 219 ¶¶ 77-78, 98.

For his part, Viktor Khrapunov argues that he "is not plausibly alleged to have received any benefit from the real estate investments or to have had any involvement in money laundering generally or with the alleged New York transactions." Dkt. No. 232 at 21.  As stated above with respect to the sufficiency of the unjust enrichment claim, *see supra* Part II.C.2.c, the allegations of the Amended Crossclaims allow for the plausible inference that Viktor Khrapunov benefitted from the real estate investments, even if, as discussed below with respect to personal jurisdiction, *see infra* Part II.C.3, his personal connection to the real estate activities remains ill-defined.  The allegations are sufficient to support a claim for constructive trust at this early stage.

### f.      Sufficiency of Allegations as to  CPLR § 5239 Claim (Count 11)

Count 11 of the Amended Crossclaims asserts a claim against "All Defendants" under CPLR § 5239. Dkt. No. 219 ¶¶ 187-91.  Pursuant to that provision, an interested party may

EXHIBIT L

commence a special proceeding to determine disputed rights in property or debt that is otherwise

subject to some post-judgment collection. N.Y. CPLR § 5239.

The gravamen of the Kazakh Entities' Section 5239 claim is that Triadou has filed "serial

actions" in New York state courts seeking payment on the (purportedly fraudulent) 2014

assignment agreements between Triadou and the Chetrit Entities and has been awarded summary

judgment in at least some of those actions. Dkt. No. 219 ¶¶ 187-91. The Kazakh Entities allege

that they are "the rightful owners of Triadou's interest in the Flatotel and Cabrini Medical Center

and/or any funds derived from the sale of that interest" and request, accordingly, that the Court

"set aside any judgment in Triadou's favor . . . direct that Triadou's interest in the Flatotel and

Cabrini Medical Center be transferred to [the Kazakh Entities]," and award the Kazakh Entities

statutorily permitted attorneys' fees. *Id.*

The Individual Defendants argue that this claim – notwithstanding its label – is

substantially directed only at Triadou. Indeed, they observe, correctly, that Count 11 does not

"seek any relief against [the Individual Defendants]" and that Amended Crossclaims do not

"allege any judgment in the [Individual Defendants'] favor that could be set aside." Dkt. Nos.

228 at 18; 232 at 22. In response, the Kazakh Entities acknowledge that they currently "are only

aware of New York judgments in favor of Triadou," but assert, without citation or further

explanation, that "Ablyazov and the Khrapunovs may be in possession of property disposed by

those judgments," and, to the extent that "discovery reveals that they have such property," Count

11 is viable as to the Individual Defendants. Dkt. No. 241 at 27-28.

The Court is aware of no authority, and the Kazakh Entities provide none, for permitting

a claim to go forward based on what is essentially a speculative hypothetical unmoored from the

allegations set forth in the Amended Crossclaims. To the extent that discovery on the Kazakh

EXHIBIT L

Entities' remaining claims identifies a good-faith factual basis for a Section 5239 claim against the Individual Defendants, the Kazakh Entities are, of course, free to bring a motion to amend supported by a showing of good cause. As currently pled however, that claim must be dismissed as to the Individual Defendants. Accordingly, the motions to dismiss Count 11 as to the Individual Defendants are GRANTED.

g.   **Sufficiency of Allegations as to CPLR § 5303 Claim for Recognition and Enforcement of a Foreign Judgment (Count 12)**

The Kazakh Entities' Amended Crossclaims also assert a claim against Ablyazov under Section 5303 of the CPLR, seeking to enforce the U.K. Judgments in the U.S. Dkt. No. 219 ¶¶ 192-199. Sections 5203 and 5303 of the CPLR together provide that a "foreign country judgment" that is "final, conclusive, and enforceable where rendered" is "conclusive between the parties to the extent that it grants or denies recovery of a sum of money" and is "enforceable by an action on the judgment, a motion for summary judgment in lieu of complaint, or in a pending action by counterclaim, cross-claim or affirmative defense." N.Y. CPLR §§ 5302-5303.

The Individual Defendants' sole passing challenge to this claim is a somewhat curious one-sentence "adoption" of arguments made by Triadou in its independent objections to the Amended Crossclaims. Dkt. No. 228 at 19. As advanced by Triadou, the pertinent argument is that the Kazakh Entities' Section 5303 claim contains a paragraph inappropriately alleging that "Triadou is the alter ego of the Ablyazov-Khrapunov group, and is thus liable for the all current and future obligations against the Ablyazov-Khrapunov group." Dkt. Nos. 219 ¶ 199; 223. According to Triadou, that single allegation constitutes an end-run around the Court's August 26, 2016 Order – discussed above – limiting the Kazakh Entities' amendments to matters relating "solely" to their claims or allegations against the Individual Defendants. Dkt. No. 223 at 2.

EXHIBIT L

Separately, Triadou maintains, the allegation improperly attempts to revive a freestanding "alter ego" claim previously dismissed as unrecognized (at least as an independent cause of action) by New York law. *Id.* at 3 (citing Dkt. No. 174 at 28-29).

As the Kazakh Entities correctly note in opposing the Individual Defendants' motions here, these arguments as made by Triadou do not bear in any way on the viability of the Kazakh Entities' judgment recognition and enforcement claim as to *Ablyazov* (the only Defendant directly targeted by the claim). Dkt. 241 at 22-23. Because the Individual Defendants' motion to dismiss that claim relies entirely upon those arguments, it must be DENIED.

Independently, however, the Court will GRANT *Triadou's* longstanding application to strike paragraph 199 of the Amended Crossclaims. Dkt. No. 225. Regardless of whether the allegations in that paragraph are inappropriate as an attempted "revival" of the alter ego claim, they most assuredly do not relate "solely" to the Individual Defendants -- insofar as they assert that Triadou is liable for their debts -- and therefore violate the Court's August 26, 2016 limiting order.

        **b.**    **Timeliness of Conversion, Unjust Enrichment and Constructive Trust Claims**

In addition to attacks on the sufficiency of the Kazakh Entities' claims for conversion, unjust enrichment, and constructive trust, the Individual Defendants' motion to dismiss also asserts that are three claims all time-barred. Dkt. No. 232 at 17. This argument rests on three premises: 1) New York's statute of limitations for conversion is three years; 2) the alleged theft or embezzlement by both the Khrapunovs and Ablyazov happened no later than 2007 or 2009, respectively; and 3) the unjust enrichment and constructive trust claims are simply conversion

EXHIBIT L

claims of another name, are premised on the same alleged conduct, and so are subject to the

same statute of limitations.[6] *Id.* at 17-20; Dkt. No. 228 at 15-18.

The Kazakh Entities counter by arguing that the statutes of limitations for each of the

three claims only begins to run at the time at which the Individual Defendants "directed their

conduct into New York, which did not occur until late 2012 at the earliest." Dkt. No. 241 at 28.

That is, it was only at "the moment it was possible [for the Court] to obtain personal jurisdiction

over the [Individual Defendants]," that the statutes began to run. *Id.* at 30.

The Khrapunovs argue, for the first time in their reply brief, that even if the statute of

limitations does not accrue while the Individual Defendants are outside of the country and not

subject to personal jurisdiction, New York's borrowing statute requires the Court to apply the

shorter of New York's limitation period or the limitations period of the place in which the cause

of action accrued. Dkt. No. 246 at 7 (citing N.Y. C.P.L.R. § 202). Because this argument was

first raised in the reply, Kazakh Entities have not had a chance to rebut.

The threshold question in deciding this issue is: where and when do the actions accrue?

First, with respect to conversion, "[u]nder New York law, conversion claims are subject to a

three-year statute of limitations, which begins running when the alleged conversion takes place."

*Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014)

(citation omitted). There is one exception to this rule for when possession is originally lawful,

but this "has no application in a case where the lawful custodian of property commits an overt

and positive act of conversion by an unlawful sale or disposition of the same." *Regions Bank v.*

*Wieder & Mastroianni, P.C.*, 526 F. Supp. 2d 411, 414 (S.D.N.Y. 2007) (quoting *MacDonnell v.*

---

[6] The Court need not reach whether the unjust enrichment and constructive trust claims should be treated as conversion claims and subject to a three year statute of limitations because it would not affect the outcome here. *See infra* (discussing the operative dates of conduct and the effect of the borrowing statute).

EXHIBIT L

*Buffalo Loan, Tr. & Safe Deposit Co.*, 193 N.Y. 92, 101 (1908)), *aff'd*, 268 F. App'x 17 (2d Cir.

2008). "Where an owner pursues the party who took his property, the three-year period begins to

run when the property was taken." *DeWeerth v. Baldinger*, 836 F.2d 103, 106 (2d Cir. 1987)

(citing *Sporn v. M.C.A. Records, Inc.*, 58 N.Y.2d 482, 487–88 (1983)).

　　　　Second, with respect to unjust enrichment, the statute of limitations begins to run "upon

an occurrence of the wrongful act giving rise to a duty of restitution." *Golden Pac. Bancorp v.*

*Fed. Deposit Ins. Corp.*, 273 F.3d 509, 520 (2d Cir. 2001) (internal citations and quotation marks

omitted). The claim accrues as soon as the unjust enrichment occurs, even if the increase in

wealth is unrealized or illiquid. *JPMorgan Chase Bank, N.A. v. Maurer*, No. 13-CV-3302(NRB),

2015 WL 539494, at *6 (S.D.N.Y. Feb. 10, 2015). New York courts have held that claims for

unjust enrichment "are governed by either a three-year statute of limitations when monetary

relief is sought or a six-year statute of limitations when equitable relief is sought." *Grynberg v.*

*Eni S.p.A.*, No. 06-CV-6495(RLC), 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007). Kazakh

Entities suggest the six-year statute of limitations is applicable here, while the Individual

Defendants claim the three-year limit applies. Dkt. No. 241 at 30; Dkt. No. 228 at 16. The Court

need not decide which statute applies here, because even if it were six years, more than six years

elapsed between the latest alleged embezzlement (February 2009), and when Plaintiffs filed their

crossclaims (October 2015). Dkt. No. 228 at 16.

　　　　Third, "a cause of action to impose a constructive trust is governed by a six-year statute

of limitations and begins to accrue 'upon the occurrence of the wrongful act giving rise to a duty

of restitution and not from the time the facts constituting the fraud are discovered.'" *Reiner v.*

*Jaeger*, 855 N.Y.S.2d 613, 614 (N.Y. App. Div. 2008) (quoting *Soscia v. Soscia*, 829 N.Y.S.2d

EXHIBIT L

543 (N.Y. App. Div. 2006) and C.P.L.R. § 213); *accord Garson v. Garson*, No. 16-CV-6167(KPF), 2017 WL 2915386, at *4 (S.D.N.Y. July 6, 2017).

In the case of all three claims, then, the causes of action accrued when the allegedly wrongful acts of embezzlement occurred, no later than 2009 in the case of Ablyazov, and no later than 2007 in the case of Viktor Khrapunov. Dkt. No. 219 ¶¶ 28-33, 45-55, 62.  Moreover, it is undisputed that all three causes of action arose in Kazakhstan, the locus of the predicate wrongful conduct.

The Kazakh Entities are correct when they argue that "the statute of limitations on any action that accrues while the defendant is out of New York does not begin to run until he or she comes into the state." Dkt. No. 241 at 29 (citing N.Y. C.P.L.R. § 207).  However, as noted above, they forget New York's "borrowing statute," which states:

> An action based upon a cause of action accruing without the state cannot be
> commenced after the expiration of the time limited by the laws of either the state
> or the place without the state where the cause of action accrued, except that where
> the cause of action accrued in favor of a resident of the state the time limited by
> the laws of the state shall apply.

N.Y. C.P.L.R. § 202.[7]

When a nonresident sues on a cause of action accruing outside New York, the borrowing statute "requires the cause of action to be timely under the limitations periods of both New York and the jurisdiction where the cause of action accrued." *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 528 (1999); *Dar El-Bina Eng'g & Contracting Co. v. Republic of Iraq*, 79 F. Supp. 2d 374, 389 (S.D.N.Y. 2000).  A cause of action "accrues" under CPLR § 202 "where the injury is sustained rather than where the defendant committed the wrongful acts." *Gordon & Co. v.*

---

[7] Although the Kazakh Entities first raise the effects of the "borrowing statute" in their reply brief, the Individual Defendants should have been aware of its applicability as Triadou analogized to the statute's inquiry for determining where a cause of action accrued in its motion to dismiss. *See* Dkt. No. 257 at 11.

EXHIBIT L

*Ross,* 63 F. Supp. 2d 405, 408 (S.D.N.Y. 1999). "Where an alleged injury is purely economic,

the place of injury usually is where the plaintiff resides and sustains the economic impact of the

loss." *Global Fin. Corp.*, 93 N.Y.2d at 529.

The Kazakh Entities represent that the applicable Kazakh statute of limitations is three

years. Dkt. No. 246 at 7 (citing *Grynberg v. Giffen,* 989 N.Y.S.2d 103, 104 (N.Y. App. Div.

2014). If the Kazakh Entities are correct, given the operative dates of the conduct, the

application of the borrowing statute, and the respective New York and Kazakh statutes of

limitations, all three state claims would be dismissed as time-barred. Because the Individual

Defendants have not had a chance to rebut the Kazakh Entities' assertions with respect to the

borrowing statute, or offer their own understanding of the applicable Kazakh statute of

limitations, however, the Court reserves judgment on this argument pending supplemental

briefing.

### 3.    Personal Jurisdiction over the Khrapunovs

The Khrapunovs also move to dismiss the claims against them for lack of personal

jurisdiction. To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must

make a prima facie showing that jurisdiction exists. *Licci v. Lebanese Canadian Bank*, 732 F.3d

161, 167 (2d Cir. 2013). On this procedural posture, the Court construes the pleadings and any

supporting materials in the light most favorable to the plaintiffs, resolving any doubts in favor of

jurisdiction. *Id.* The plaintiff may satisfy the requirement of a *prima facie* showing by providing

an averment of facts that, if credited, would suffice to establish jurisdiction. *S. New Eng. Tel. Co.*

*v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (citation omitted); *Ball v. Metallurgie*

*Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). The Court need not, however, accept

a legally conclusory assertion or draw argumentative inferences. *Daventree Ltd. v. Republic of*

EXHIBIT L

*Azerbaijan*, 349 F. Supp. 2d 736, 757 (S.D.N.Y. 2004) (internal quotation marks and citations omitted).

The Court must answer two questions in determining whether there is personal jurisdiction over a defendant: (1) whether there is jurisdiction under New York law; and (2) whether the exercise of jurisdiction would be consistent with federal due process requirements. *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005). The Kazakh Entities do not suggest that the Court has general personal jurisdiction over the Khrapunovs, and the Court clearly does not, and so the present analysis focuses on specific personal jurisdiction.

> ### a)   Plaintiffs Fail To Make Prima Facie Showing of Personal Jurisdiction over Viktor Khrapunov under New York Law

Under New York's "long arm statute," a court in New York may exercise personal jurisdiction "over any non-domiciliary…who in person or through an agent" does one of four enumerated things:

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
>> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or
> 4. owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. § 302(a).

With respect to each enumerated action, the Khrapunovs are correct that Viktor Khrapunov is not alleged to have *personally* transacted business in New York, committed a tort

46

EXHIBIT L

in New York, or used, owned, or possessed anything in New York. Dkt. No. 232 at 5-6.

However, the New York statute also allows for personal jurisdiction by agency, and given the

alleged conspiracy, discussed above, the Court must also consider the existence of agency

jurisdiction over Viktor Khrapunov.

New York courts have recognized that agency jurisdiction under § 302(a)(2) includes the

so-called "conspiracy theory" of personal jurisdiction, which allows "the acts of a co-conspirator

[to] be attributed to a defendant for the purpose of obtaining personal jurisdiction over the

defendant." *In re Satyam Comput. Servs. Sec. Litig.*, 915 F. Supp. 2d 450, 484 (S.D.N.Y. 2013)

(quoting *Singer v. Bell*, 585 F. Supp. 300, 302 (S.D.N.Y. 1984) (quotation marks and citations

omitted)).  To prove personal jurisdiction under a theory of conspiracy, "a plaintiff must make a

*prima facie* showing of a conspiracy and allege specific facts warranting the inference that the

defendants were members of the conspiracy." *Emerald Asset Advisors, LLC v. Schaffer*, 895 F.

Supp. 2d 418, 431 (E.D.N.Y. 2012) (quotation marks and citation omitted); *Sea Trade Mar.*

*Corp. v. Coutsodontis*, No. 09-CV-488(BSJ), 2012 WL 3594288, at *7 (S.D.N.Y. Aug. 16,

2012).

Making the *prima facie* case involves pleading four elements: "1. a corrupt agreement

between two or more parties; 2. an overt act in furtherance of the agreement; 3. the parties['']

intentional participation in the furtherance of the plan or purpose; and 4. the resulting damage or

injury." *Emerald Asset Advisors*, 895 F. Supp. 2d at 432.

The Court finds that the complaint alleges a *prima facie* showing of a conspiracy

involving Viktor Khrapunov.  For example, paragraph 43 of the Amended Crossclaims states

that "Ablyazov remained in regular communication with his son-in-law, Ilyas Khrapunov, who

assumed operational control of much of Ablyazov's money laundering operations and, in concert

EXHIBIT L

with Ablyazov and Viktor Khrapunov, has continued the Ablyazov-Khrapunov Group's combined efforts to hide their wealth." Dkt. No. 219 ¶ 43.  The allegations of this paragraph are further supported by allegations made regarding the group's creation of accounts and sham entities owned or controlled by its members, and other steps its members took to conceal their alleged looting, and together are sufficient to state a *prima facie* case for a conspiracy. *See id.* ¶¶ 56-61 (describing their transfer of funds to entities in Switzerland), 66-76 (describing other shell entities and steps taken to avoid prosecution), & 77-97 (describing their attempts to hide the funds in the United States).  These allegations are especially sufficient given that, "great leeway should be allowed the pleader, since by nature of the conspiracy, the details may not be readily known at the time of the pleading." *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 458 (S.D.N.Y. 2008) (internal citations omitted).  Although subsequent discovery may refute these claims, the Kazakh Entities have met their limited burden at this stage with respect to this first hurdle.

But while the Court finds sufficient allegations that Viktor Khrapunov was a member of a conspiracy to launder money generally, and to launder money using entities in Switzerland, it is less clear that allegations are sufficient as to whether Viktor Khrapunov was a member of a conspiracy "to launder money into and through New York," as the Kazakh Entities claim. Dkt. No. 241 at 30.  This speaks to the second legal barrier for those plaintiffs relying on a conspiracy theory of personal jurisdiction in New York.  As to the specific membership of any particular defendant, the Court must consider whether "(1) the out-of-state coconspirator had an awareness of the effects of the activity in New York, (2) the New York coconspirators' activity was for the benefit of the out-of-state conspirators, and (3) that the coconspirators in New York acted at the behest of or on behalf of, or under the control of the out-of-state conspirators." *Emerald Asset*

EXHIBIT L

*Advisors*, 895 F. Supp. 2d at 431 (internal quotation marks and citations omitted); *Maersk, Inc.*,
554 F. Supp. 2d at 442-43.

The allegations presented to clear this jurisdictional bar are weak. The Kazakh Entities
point to four places in the Amended Crossclaims that they argue allege Khrapunov's
involvement in the conspiracy. Dkt. No. 241 at 31-32 (citing Dkt. No. 219 ¶¶ 43, 56-60, 72, &
77-97). Yet not a single paragraph expressly connects Viktor Khrapunov to the New York
activities of the "Ablyazov-Khrapunov Group." They alternatively cite to allegations that speak
to the "Group" as a whole and not to his individual involvement, Dkt. No. 219 ¶¶ 56-60, 77-97,
or to allegations that relate to Viktor individually, but that in no way relate to the Group's New
York activities. *Id.* ¶¶ 43, 72. Consequently, Crossclaim Plaintiffs simply do not sufficiently
allege Viktor Khrapunov's "awareness of the effects of the activity in New York," nor that the
coconspirators in New York "acted at the behest of or on behalf of, or under the control of"
Viktor Khrapunov. *Emerald Asset Advisors*, 895 F. Supp. 2d at 431. The mere fact that Ilyas is
Viktor's son, and that Ilyas *is* alleged to have personally directed the New York activities, is
insufficient to give rise to an inference that Viktor was involved in any New York activity, nor
that Viktor directed, knew about, or had control over the activities in New York. *See First
Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 394-95, 399 (S.D.N.Y.
2002) (finding conclusory allegations of domination and control by out-of-state mother and uncle
insufficient to confer personal jurisdiction on a conspiracy theory), *on reconsideration*, 219 F.
Supp. 2d 576, *aff'd sub nom. First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159
(2d Cir. 2004); *Ronar, Inc. v. Wallace*, 649 F. Supp. 310, 316 (S.D.N.Y. 1986) (finding
conclusory allegations that an out-of-state father exercised control over his in-state son's actions
insufficient for agency jurisdiction); *cf. Andre Emmerich Gallery, Inc. v. Segre*, No. 96-CV-

EXHIBIT L

889(CSH), 1997 WL 672009, at *5-6 (S.D.N.Y. Oct. 29, 1997) (citing letters and deposition testimony that lend credence to theory that out-of-state defendant controlled son's fraudulent acts in state and conferring personal jurisdiction).

As a result of these deficiencies, Crossclaim Plaintiffs fail to make a *prima facie* case for personal jurisdiction over Viktor Khrapunov.

### b)    Plaintiffs' Allegations Merit Jurisdictional Discovery

The Kazakh Entities suggest jurisdictional discovery as an alternative course of action "if there is any question over the extent of Viktor Khrapunov's involvement in the conspirators' New York investments," noting that the "parties have already begun merits discovery, so discovery of Viktor Khrapunov's role in the Triadou and Telford investment could proceed at the same time." Dkt. No. 241 at 32, n.8. Despite the deficiencies outlined above, the Court finds that jurisdictional discovery is merited.

Jurisdictional discovery is warranted where, even if plaintiff has "not made a *prima facie* showing, [they have] made a sufficient start toward establishing personal jurisdiction." *Stratagem Dev. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535, 547-48 (S.D.N.Y. 1994); *accord In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207-08 (2d Cir. 2003) (per curiam). A court should "take care to 'give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction'...." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).

While the Court is certainly not obligated to allow jurisdictional discovery in this circumstance, *see Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185-86 (2d Cir. 1998), it is quite easy to see how jurisdictional discovery might enhance the Kazakh Entities' allegations as to Viktor Khrapunov's knowledge of and control of the conspiracy's activities in New York. For

EXHIBIT L

example, were the Kazakh Entities to uncover evidence of communications between Ilyas Khrapunov and his father Viktor about Ilyas's dealings with the Chetrit Group, it would then stand to reason that Viktor was not only aware of the effects of the conspiracy's activities in New York, but also that the activities were partly conducted at his behest, given that it was the money Viktor allegedly embezzled from the City of Almaty that gave the conspiracy its purpose.

The allegations that the Kazakh Entities make as to the "Ablyazov-Khrapunov Group," while insufficient for a New York court's exercise of personal jurisdiction over Viktor Khrapunov at the present moment, are sufficient to warrant jurisdictional discovery. *See* Dkt. No. 219 ¶¶ 77-97.

### c)   If Allegations or Evidence Emerges Sufficient for Jurisdiction under New York's Long-Arm Statute, Federal Due Process Concerns Will Also Be Satisfied

Finally, the exercise of personal jurisdiction by the Court must also comport with federal due process requirements. *See In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 231-32 (S.D.N.Y. 2015) (finding the requirement of a due process inquiry even in cases of conspiracy jurisdiction). This means finding first, that the defendant purposefully established "minimum contacts" in the forum State, and second, that the exercise of such jurisdiction would not offend "fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-77 (1985); *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316, 320 (1945).

In this case, if the Kazakh Entities are successful at making a *prima facie* showing of personal jurisdiction over the out-of-state Viktor Khrapunov by way of New York's "conspiracy theory" of jurisdiction, there would certainly exist sufficient minimum contacts. This is because implicit in the showing that "the coconspirators in New York acted at the behest of or on behalf

EXHIBIT L

of, or under the control of" Viktor Khrapunov, is Viktor's "purposeful availment" of the forum

of New York to allegedly launder the stolen assets.

In this scenario, the exercise of jurisdiction would also comport with principles of "fair

play and substantial justice." The Court's inquiry involves balancing the following five factors:

(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of

the forum state in adjudicating the case; (3) the plaintiffs interest in obtaining convenient and

effective relief; (4) the interstate judicial system's interest in obtaining the most efficient

resolution of the controversy; and (5) the shared interest of the states in furthering substantive

social policies. *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113–114 (1987).

For many of the same reasons the Court finds the Individual Defendants' arguments in favor of

*forum non conveniens* unpersuasive, *see supra* at Part II.C.1.b, so too must the Court conclude

that exercising jurisdiction over Viktor Khrapunov here comports with federal due process

requirements. Additionally, New York has a strong interest in ensuring that its real estate market

is not utilized for the purpose of laundering money or as a safe harbor for stolen funds from

foreign authorities. *See* Dkt. No. 219 ¶ 77; Louise Story & Stephanie Saul, *Hidden Wealth Flows*

*to Elite New York Condos*, N.Y. Times, Feb. 8, 2015, at A1 (describing the flow of the proceeds

of corruption into New York real estate).

Thus, if jurisdictional discovery yields information sufficient to grant this Court personal

jurisdiction pursuant to New York's long arm statute over Viktor Khrapunov, due process

requirements will not be a barrier to its exercise.

## III.   Conclusion

For the foregoing reasons, Triadou's motion to dismiss for lack of subject matter

jurisdiction is DENIED, the Kazakh Entities' motion for joinder of FBME is DENIED, the

EXHIBIT L

Individual Defendants' motions to dismiss Counts 6, 7, and 12 are DENIED, and the Individual Defendants' motion to dismiss Count 11 is GRANTED.

While denying at this juncture the Individual Defendants' motions to dismiss Counts 8, 9, and 10 as to the sufficiency of the pleadings, the Court will consider supplemental briefing on the applicable statutes of limitation. If the statutes of limitation are not longer than three years, these claims will also be dismissed. The Kazakh Entities' supplemental brief is due within ten days of the issuance of this Memorandum and Order, and shall be no longer than five pages. The Individual Defendants may reply within five days in a brief of no longer than three pages.

Viktor Khrapunov's motion to dismiss the claims against him for lack of personal jurisdiction is DENIED without prejudice to renew his claims following jurisdictional discovery, which is referred to Magistrate Judge Parker.

Triadou's application to strike paragraph 199 of the Amended Crossclaims is GRANTED, and the Kazakh Entities are directed to file revised amended crossclaims consistent with this Memorandum and Order within seven business days of its issuance.

This resolves Dkt. Nos. 216, 227, 231, and 268.


SO ORDERED.


Dated: September____26____, 2017
       New York, New York

_____
ALISON J. NATHAN
United States District Judge

53

EXHIBIT L