LATHAM & WATKINS LLP
  David J. Schindler (Bar No. 130490)
    *david.schindler@lw.com*
  Jonathan M. Jackson (Bar No. 257554)
    *jonathan.jackson@lw.com*
  Kendall M. Howes (Bar No. 294285)
    *kendall.howes@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California  90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763

Attorneys for Plaintiff the City of Almaty

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF ALMATY, a foreign state,<br><br>Plaintiff,<br><br>v.<br><br>VIKTOR KHRAPUNOV, an individual; LEILA KHRAPUNOVA, an individual; ILIYAS KHRAPUNOV a/k/a ILYAS KHRAPUNOV, an individual; MADINA ABLYAZOVA a/k/a MADINA KHRAPUNOVA, an individual; ELVIRA KHRAPUNOVA a/k/a/ ELVIRA KUDRYASHOVA a/k/a ELVIRA BALMADANI, an individual; DMITRY KUDRYASHOV a/k/a DMITRI KUDRYASHOV, an individual; DANIEL KHRAPUNOV, an individual; RPM USA, LLC, a New York corporation; RPM-MARO LLC, a New York corporation; MARO DESIGN LLC, a California corporation; HAUTE HUE LLC, a California corporation; 628 HOLDINGS LLC, a California Corporation; THIRTYEIGHT ENTERPRISES, LLC, a California Corporation; CANDIAN INTERNATIONAL LTD., a British Virgin Islands corporation; ELVIRA KUDRYASHOVA AS TRUSTEE FOR THE KASAN FAMILY TRUST; DMITRY KUDRYASHOV AS TRUSTEE FOR THE KASAN FAMILY TRUST; CROWNWAY LTD, a Belize corporation; VILDER COMPANY S.A., a Panama corporation;  and WORLD HEALTH NETWORKS, INC. f/k/a HEALTH STATION NETWORKS INC., a Delaware corporation,<br><br>Consolidated Defendants. | Case No. CV14-3650-FMO-CW<br><br>Assigned To: Hon. Fernando M. Olguin<br><br>**FIRST CONSOLIDATED AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND OTHER EQUITABLE RELIEF FOR:**<br><br>1) **Violations of RICO (18 U.S.C. §§ 1962(c), 1962(d), 1964);**<br>2) **Breach of Fiduciary Duty;**<br>3) **Conversion and Conspiracy to Commit Conversion;**<br>4) **Fraud and Deceit and Conspiracy to Defraud; and**<br>5) **An Accounting, and Imposition of a Constructive Trust and Equitable Lien.**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Plaintiff the City of Almaty ("Almaty") hereby alleges the following claims for relief against defendants Viktor Khrapunov ("Viktor"), Leila Khrapunova ("Leila"), Iliyas Khrapunov a/k/a Ilyas Khrapunov ("Iliyas"), Madina Ablyazova a/k/a Madina Khrapunova ("Madina"), Elvira Khrapunova a/k/a Elvira Kudryashova a/k/a Elvira Balmadani ("Elvira"), Dmitry Kudryashov a/k/a Dmitri Kudryashov ("Dmitry"), Daniel Khrapunov ("Daniel"), RPM USA, LLC ("RPM USA"), RPM-Maro LLC ("RPM-Maro"), Maro Design LLC ("Maro Design"), Haute Hue LLC ("Haute Hue"), 628 Holdings LLC ("628 Holdings"), Thirtyeight Enterprises, LLC ("Thirtyeight"), Candian International Ltd. ("Candian"), Elvira Kudryashova as Trustee of The Kasan Family Trust, Dmitry Kudryashov as Trustee of The Kasan Family Trust, Crownway Ltd. ("Crownway"), Vilder Company S.A. ("Vilder"), and World Health Networks, Inc. f/k/a Health Station Networks Inc. ("World Health Networks") (collectively, "Defendants").

# I.   NATURE OF THE ACTION

1.     This is an action on behalf of the City of Almaty, the largest city in the Republic of Kazakhstan, to recover funds that were stolen by its corrupt former mayor, Viktor, and his co-conspirators – his wife Leila, their children Iliyas and Elvira, and their children's spouses Madina and Dmitry (collectively with Daniel, the "Individual Defendants"). The Individual Defendants employed a scheme that involved two related objectives: (a) first to steal money from Almaty; and then (b) to transfer, launder, and hide that stolen money in the United States where they believed it would be out of reach of Kazakh and other governmental authorities (the "Khrapunov Racketeering Enterprise").

2.     From 1997 to 2004, Viktor, Leila, Iliyas, Elvira, and their co-conspirators systematically stole money from Almaty through Viktor's corrupt use of his political power and a series of fraudulent real estate transactions that allowed the Khrapunovs to convert public assets to their personal use. In 2007, fearing discovery of their fraud, Viktor and Leila fled to Switzerland, where Iliyas and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

1

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   Elvira resided at the time, and attempted to launder and hide the stolen money in
2   Switzerland.  The Kazakh authorities continued to investigate Viktor, Leila, Iliyas,
3   and Elvira, and sought the assistance of the Swiss authorities.  In May 2011, the
4   Kazakh authorities began bringing formal criminal charges against Viktor, Leila,
5   and Elvira, and in mid-2012 the Swiss authorities initiated an investigation of
6   Viktor and Leila on suspicion of money laundering.  In November 2012, the Swiss
7   authorities began freezing assets in Switzerland belonging to Viktor, Leila, Iliyas,
8   and Elvira.

9          3.      In or around 2010, understanding that they risked losing the proceeds
10   of their fraudulent scheme if they kept the stolen money in Switzerland, the
11   Individual Defendants and their co-conspirators engaged in racketeering activity to
12   launder and hide the stolen money in and through the United States using various
13   sham companies and disguised entities in the United States.  Upon information and
14   belief, the Individual Defendants and their co-conspirators selected the United
15   States to launder the stolen proceeds because they believed it was beyond the reach
16   of the Kazakh authorities.  At that time, the United States did not have a mutual
17   legal assistance treaty or extradition treaty with Kazakhstan.

18          4.      The Individual Defendants and their co-conspirators engaged in
19   racketeering activities in the United States by engaging in money laundering with
20   stolen funds in violation of 18 U.S.C. § 1956; transacting in property derived from
21   unlawful activity in violation of 18 U.S.C. § 1957; transporting stolen property in
22   violation of 18 U.S.C. § 2314; mail fraud in violation of 18 U.S.C. § 1341; and
23   wire fraud in violation of 18 U.S.C. §1343.  They orchestrated these racketeering
24   activities by using the stolen funds to acquire property, including property in the
25   Central District of California, and then engaging in business transactions in the
26   names of Iliyas, Madina, Daniel, Elvira, Dmitry, and/or sham companies and
27   disguised entities, in order to hide the true identity of the source of the stolen funds
28   and to avoid detection by Kazakh, Swiss, and U.S. authorities.  These activities in

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

2

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

the United States were critical to the success of the criminal enterprise because without a perceived safe haven for the stolen funds, the Individual Defendants and their co-conspirators would not have been able to use Almaty's stolen funds for their personal benefit.  Moreover, the Individual Defendants targeted their activity in the United States with the mistaken belief that they could launder funds in the United States without risk of detection, prosecution, or consequences.

5.     The Individual Defendants and their co-conspirators violated United States law in order to achieve their end goal of securing and using their stolen proceeds.  It was a two part scheme:  (1) steal (the Kazakh equivalent of) hundreds of millions of dollars from the city of Almaty, and (2) avoid detection and/or seizure of the stolen proceeds by using banks, sham entities, real estate transactions, and the acquisition of other assets in the United States to hide and "clean" the stolen funds with the ultimate goal of being able to lead a lavish lifestyle in the United States and elsewhere.  In short, the Individual Defendants and their co-conspirators undertook to use, and continue to use, the United States as a safe haven for international money laundering.

6.     As set forth herein, Almaty seeks: (a) to hold Defendants, including the Individual Defendants and their co-conspirators, liable for their laundering and transportation of stolen funds to and within the United States; (b) the return of the money stolen from Almaty and its people, or the return of substitute assets located in the United States acquired with funds stolen from Almaty and its people; (c) injunctive relief to prevent the Individual Defendants and their co-conspirators from engaging in any further laundering or other transactions in the United States in violation of federal law involving the proceeds of the looting scheme; (d) imposition of a constructive trust over all monies and other assets located within the United States that are traceable, either directly or indirectly, to Viktor and his co-conspirators' systematic looting of Almaty's funds; and (e) treble and punitive

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

3

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   damages for Defendants' myriad violations of the federal anti-racketeering statute,

2   as well as state and federal common law.

3   **II.     THE PARTIES**

4         7.     Plaintiff Almaty is a foreign state within the meaning of 28 U.S.C. §

5   1332(a)(4).  Until 1997, Almaty was the capital of Kazakhstan, which is a

6   sovereign state recognized by the Government of the United States of America.

7   Almaty remains a major commercial and cultural center of Kazakhstan and is the

8   largest city in Kazakhstan by population.  Almaty has standing to bring this

9   Complaint and sues: (a) in its own right, as the victim of Defendants' unlawful

10  schemes, conspiracies, and acts of racketeering; and (b) in a *parens patriae*

11  capacity as the representative of the city and its people, who were the ultimate

12  victims of Defendants' conspiracies, fraudulent schemes, and acts of racketeering

13  and who are the rightful owners of funds and assets unlawfully held by the

14  Defendants and their co-conspirators in the United States.

15        8.     Defendant Viktor was the mayor of Almaty from approximately June

16  16, 1997 until approximately December 2004.  In 2004, Viktor was nominated for

17  the position of governor of the Pavlodar province in northeast Kazakhstan, a

18  position he held until 2007, at which time he was appointed Minister of Emergency

19  Measures.  In late 2007, Viktor announced his retreat from all public functions and

20  his retirement, ostensibly for health reasons.

21        9.     Upon information and belief, in or about 1998, Viktor married

22  Defendant Leila.  Viktor and Leila are citizens of the Republic of Kazakhstan and,

23  upon information and belief, currently reside in Switzerland.

24        10.    Upon information and belief, Defendants Iliyas, Elvira and Daniel are

25  the children of Leila and stepchildren of Viktor.

26        11.    Upon information and belief, Iliyas is married to Defendant Madina,

27  while Elvira is married to Defendant Dmitry.  Upon information and belief, Iliyas

28  and Madina are citizens of the Republic of Kazakhstan and currently reside in

LATHAM&WATKINS™
ATTORNEYS AT LAW
LOS ANGELES                          US-DOCS\97422225

4

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

Switzerland.  Upon information and belief, Elvira is a citizen of the Republic of Kazakhstan and of Switzerland, and currently resides in Irvine, California.  Upon information and belief, Dmitry is a citizen of the Russian Federation and currently resides with Elvira in Irvine, California.  Upon information and belief, Daniel is a citizen of the Republic of Kazakhstan and resides in Irvine, California, and owns and controls Defendant 628 Holdings LLC.

12.   Upon information and belief, Defendants Maro Design LLC, Haute Hue LLC, 628 Holdings LLC, and Thirtyeight Enterprises LLC are corporations organized and existing under the laws of the State of California.  Upon information and belief, Defendants RPM USA LLC and RPM-Maro LLC are corporations organized and existing under the laws of the State of New York.  Upon information and belief, World Health Networks, formally known as Health Station Networks Inc. ("HSNI"), is a corporation organized and existing under the laws of the State of Delaware.  Upon information and belief, Defendant Candian is an offshore corporation organized under the laws of the British Virgin Islands.  Upon information and belief, Crownway is an offshore corporation organized under the laws of Belize.  Upon information and belief, Vilder is an offshore company organized under the laws of Panama.  Upon information and belief, Defendants Elvira Kudryashova as Trustee of The Kasan Family Trust and Dmitry Kudryashov as Trustee of The Kasan Family Trust have beneficial ownership and control over a property used by Iliyas and/or Elvira in furtherance of the racketeering scheme described below.

13.   Upon information and belief, Maro Design, Haute Hue, 628 Holdings, Thirtyeight, RPM USA, RPM-Maro, World Health Networks, Candian, Crownway, Vilder, and The Kasan Family Trust (collectively, the "Entity Defendants") all are or were at the relevant time owned or controlled by Iliyas, Elvira, Daniel and/or Dmitry and were misused by them and the other Individual Defendants in order to carry out the racketeering scheme described below.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

5

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

14.     Other individuals and entities, both known and unknown to Almaty, also participated in the wrongful acts alleged in this complaint, including by conspiring with, and aiding and abetting, the Defendants named herein.

15.     Almaty is informed and believes, and thereon alleges, that the Defendants were at all times relevant herein the agents, servants, and/or employees of the Individual Defendants, and each of them, and in performing the deeds herein alleged, were acting at least in part within the course and scope of their authority as such agents, servants, and/or employees of Defendants and each of them.

## III.     JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331(a) and 18 U.S.C. § 1964(c) over the First and Second Claims for Relief of this Complaint for violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* and for conspiracy to violate RICO.  The Third through Seventh Claims for Relief allege violations of state law and of federal common law.  This Court has pendent jurisdiction over such claims pursuant to 28 U.S.C. § 1367(a) because those claims are joined with substantially related claims under RICO and because those claims are so related to the RICO claims in the action that they form part of the same case or controversy under Article III of the United States Constitution and arise from a common nucleus of operative facts.

17.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Almaty's claims occurred in this District, including, among other things, Defendants' purchase, in violation of U.S. law, of real estate and other assets located in Beverly Hills, Studio City, and Orange County, California.

18.     This Court has personal jurisdiction over Defendants because each of them knowingly committed acts that form the basis of this Complaint in this District, directed or conspired with others to commit acts in this District, or

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

6

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

purposely availed themselves of the privileges of doing business in this District, as fully set forth herein.

IV.    **FACTUAL ALLEGATIONS**

    A.    **Overview of the Khrapunov Racketeering Enterprise and Conspiracy**

    19.    In 1991, Kazakhstan declared its independence from the former Soviet Union and initiated the process of becoming a free society.  Rather than assist their country in embracing this move toward freedom, Viktor and his co-conspirators exploited Viktor's position of trust and authority to steal hundreds of millions of dollars from the people of Almaty and laundered, hid, and spent this money in the United States.

    20.    The Khrapunov Racketeering Enterprise is comprised of two interrelated parts.  First, the Individual Defendants conspired together to have Viktor abuse his position as mayor of Almaty to convert and steal state-owned assets cumulatively valued at over $300 million.  Second, the Individual Defendants conspired to transport and to launder those stolen assets out of Kazakhstan and into the United States, among other places, in order to escape the reach of the authorities and to attempt to prevent Almaty from recovering monies that rightfully belong to it.  The transporting and laundering of the stolen assets to the United States was essential to the success of the enterprise because it enabled the Individual Defendants and their co-conspirators to use the stolen assets for their own personal benefit.

    21.    Viktor became mayor of Almaty on or about June 16, 1997, and remained in that position until approximately December 2004.  Before Viktor assumed the office of the mayor of Almaty, he took an oath of office to strictly obey the Constitution and laws of the Republic of Kazakhstan.  Among other things, Viktor expressly and impliedly promised and represented that he would fulfill his fiduciary duties to the people of Almaty, would honor his obligation to

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

7

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

provide honest services, and would not convert money, property, or assets belonging to Almaty for his own use or that of his family, friends, or associates.

22. In fact, over the span of more than six years, Viktor repeatedly and systematically violated those promises and abused his position of power and authority to steal millions of dollars of real property and assets from the city and people of Almaty and to launder and conceal that money in the United States and elsewhere in the hopes of escaping prosecution and seizure of funds that rightfully belong to the Almaty. Aided and abetted by his wife, children, associates, accomplices, and other co-conspirators, Viktor plundered the city's wealth and industry to enrich himself, his family, and his co-conspirators at the expense of Almaty and its people, and the Individual Defendants and their co-conspirators now seek to conceal and enjoy their ill-gotten gains in the United States.

23. Defendants and their co-conspirators carried out the scheme through various means, including: (a) secretly acquiring property owned by Almaty through fictitious sham entities for a fraction of what the property was worth, then selling the property for tens of millions of dollars in illicit profits; (b) acquiring property without payment through sham transactions; and (c) secretly acquiring property at a discount then using Viktor's position of power to take illegal government action that vastly increased the value of the property solely to benefit Viktor and his co-conspirators.

24. As mayor, Viktor was entrusted with the right to cause state-owned real estate to be sold to private parties at auction pursuant to established legal procedures, the right to cause privately-owned real estate to be taken for purported state use, and the right to control who could do business in Almaty through the granting of licenses, concessions, and permits. As mayor, Viktor did not have the authority to take these actions solely for his personal benefit or for the personal benefit of his family members.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

8

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

25.     In his capacity as mayor of Almaty, Viktor caused certain state-owned real estate parcels to be made available for auction, ostensibly to generate revenue for Almaty or to allow for the privatization of government assets.  However, in violation of Kazakh law and his duty to the people of Almaty, Viktor – aided and abetted by others involved in the Khrapunov Racketeering Enterprise – corrupted those auctions by: (a) improperly influencing and directing the actions of the individuals responsible for administering the auctions; and (b) improperly causing confidential bid information to be disclosed to entities controlled by his co-conspirator Leila, which allowed these entities to adjust their bids in order to win the auction.

26.     Through these corrupt activities, Viktor and Leila succeeded in purchasing real estate and other assets put up for auction by Almaty, often at artificially suppressed prices.  In some instances, Viktor thereafter caused development permits to be issued in connection with the purchased sites, vastly increasing the market value of the real estate, which Viktor, Leila, and/or their co-conspirators then re-sold at a significant profit.  In other instances, entities controlled by Leila simply ignored restrictions placed on parcels sold at auction in order to resell the parcels at a significant profit.  In addition, in some instances, entities controlled directly or indirectly by Viktor and Leila simply failed to pay for the assets they acquired and subsequently re-sold them.

27.     Viktor thus conspired with the other Individual Defendants and their co-conspirators to use his position of power and authority to convert and cause to be converted to his use and that of his family, friends and associates money, funds and property rightfully belonging to Almaty and its people.

28.     After wrongfully appropriating assets belonging to the people of Almaty, Viktor, Leila, Elvira, and Iliyas, along with their families, friends, associates, and accomplices in the Khrapunov Racketeering Enterprise, devised and executed schemes to systematically and secretly transfer their ill-gotten gains

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

9

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

out of Kazakhstan to escape the reach of the authorities and to prevent the seizure and return of monies to Almaty.  To that end, the Individual Defendants and their co-conspirators ultimately transferred millions of dollars of Almaty's stolen funds into the United States in violation of U.S. law through accounts, sham companies, and disguised entities owned or ultimately controlled by Elvira, Dmitry, Daniel, Iliyas, and/or Madina.

29.    The Individual Defendants and their co-conspirators first transferred Almaty's funds to Switzerland, where Iliyas and Elvira were residing, and elsewhere using accounts and sham entities owned or ultimately controlled by Leila, Iliyas, Elvira, and/or their co-conspirators.  Leila, Iliyas, and Elvira laundered hundreds of millions of dollars through various offshore holding companies with the goal of making the funds appear legitimate.

30.    In an effort to further obscure the funneling of the stolen funds through sham entities and bank accounts based in Switzerland, Cyprus, and elsewhere, the Khrapunovs partnered with Madina's father (Iliyas' father-in-law) Mukhtar Ablyazov ("Ablyazov").  Ablyazov served as the Chairman of BTA bank, a Kazakh bank headquartered in Almaty, from 2005 to 2009.  During his tenure, Ablyazov stole over $6 billion from BTA Bank through fraudulent loan schemes— for example, Ablyazov would issue enormous loans to valueless entities (ultimately owned by Ablyazov), which would then be obscured by transfers among different shell corporations and never repaid.  BTA bank obtained a worldwide freezing order and a $4 billion dollar judgment in the United Kingdom against Ablyazov in 2012.  Upon information and belief, the Khrapunovs comingled certain of their stolen assets with Ablyazov's, and then Iliyas hid these funds in sham investments and entities through which he would move hundreds of millions of dollars in illicit proceeds for both families.

31.    In or around 2010, Leila, Iliyas, and Elvira began transferring portions of the stolen funds out of bank accounts in Switzerland and Cyprus, through

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

10

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   various offshore holding companies, and ultimately into the United States in

2   violation of U.S. law via accounts and entities owned or ultimately controlled by

3   Elvira, Dmitry, Daniel, Iliyas, and/or Madina.  The Individual Defendants used an

4   intricate web of individuals and offshore holding companies to transfer the funds

5   stolen from Almaty into the United States, and caused further harm to Almaty by

6   making it significantly more difficult and costly for Almaty to trace and recover its

7   funds in the United States.

8        32.    Iliyas, Madina, Daniel, Elvira, and Dmitry conspired with the other

9   Individual Defendants to use Almaty's stolen funds in the United States to

10  purchase real estate and other assets in California and New York, to fund U.S.

11  holding companies owned or controlled by Leila, Iliyas, Madina, Daniel, Elvira,

12  and/or Dmitry, and to invest in United States businesses.  Each new purchase and

13  business investment Defendants made in the United States using Almaty's money

14  harmed Almaty in the United States by impeding Almaty's attempts in the United

15  States to trace and recover the stolen funds.

16       33.    Upon information and belief, the Individual Defendants and their co-

17  conspirators increased their efforts to transfer Almaty's funds to and within the

18  United States following the initiation of investigation of Viktor and Leila by Swiss

19  authorities in mid-2012, which led to the Swiss authorities freezing Swiss bank

20  accounts held by the Individual Defendants and their co-conspirators in November

21  2012.

22       34.    For years, Viktor and Leila took numerous steps to conceal their

23  looting from Almaty and the Kazakh authorities.  Among other things, Viktor and

24  Leila each filed false annual tax returns with the Tax Committee of the Ministry of

25  Finance of Kazakhstan, Kazakhstan's taxation authority, which concealed the

26  millions of dollars in monies, properties, and assets acquired through the

27  Khrapunov Racketeering Enterprise.  According to their 2007 tax returns, which

28  required Viktor and Leila to list their entire net worth accumulated through all

LATHAM&WATKINS LLP   US-DOCS\97422225
ATTORNEYS AT LAW
LOS ANGELES                                        11

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  sources as of December 31, 2007, Viktor and Leila reported a combined net worth

2  of approximately $113,298 (13,671,665 ₸), in addition to three vehicles, five

3  modest pieces of real estate, and two parking stalls.

4      35.     Despite claiming to have a total net worth of less than $120,000,

5  Viktor and Leila amassed a fortune that reportedly exceeds $300 million by

6  systematically looting and plundering assets belonging to the people of Almaty.

7  Indeed, according to public news reports, in 2009 Viktor was one of the richest

8  people in Switzerland with a fortune of over $300 million.  Similarly, in 2012

9  Viktor was among Switzerland's 300 richest people with a fortune of

10  approximately $324 – $432 million (300 – 400 million Swiss francs).

**B.      Pending Investigations:  The Kazakh and Swiss Authorities Are Proceeding Against the Individual Defendants and Their Co-Conspirators for Crimes Committed in Those Countries**

14      36.     In approximately late 2007, Viktor became aware that the Kazakh

15  government had begun investigating him and his family, friends, and associates for

16  criminal violations.  On or about November 9, 2007, Viktor and Leila fled

17  Kazakhstan via private jet to Switzerland, where Iliyas and Elvira resided at the

18  time.

19      37.     On or about May 27, 2011, the Investigation Department of the

20  Agency for Economic and Corruption-Related Crimes of Kazakhstan (the

21  "Financial Police") filed two criminal cases against Viktor on suspicion of abuse of

22  power and fraudulent acts.  On or about July 21, 2011, the Financial Police

23  obtained a court-ordered arrest warrant for Viktor.  In 2011 and 2012, additional

24  charges were brought in Kazakhstan against Viktor, Leila, Iliyas, and Elvira

25  stemming from the theft of public property and the ultimate laundering of funds.

26      38.     On or about February 20, 2012 and September 14, 2012, the Financial

27  Police applied to the Federal Office of Justice in Switzerland for legal assistance in

28  connection with the effort to prosecute Viktor, Leila, Iliyas, and Elvira for their

1   crimes in Switzerland and Kazakhstan against Almaty and its people.  In or about

2   mid-2012, the Public Prosecutor of Geneva opened an investigation into Viktor,

3   Leila, Iliyas, and Elvira on suspicion of money laundering in violation of Swiss

4   law.  In or about November 2012, the Public Prosecutor of Geneva ordered Swiss

5   accounts and assets belonging to Viktor, Leila, Iliyas, and Elvira frozen, including

6   accounts held at Swiss banks Sarasin & Co. Ltd., Credit Suisse, and Schroeder &

7   Co.  The investigation by the Swiss authorities is ongoing.  The various Swiss

8   investigations contributed to the Individual Defendants' attempts to direct their

9   money laundering activities to the United States.

10          39.    There currently are 24 criminal cases pending against Viktor in

11  Kazakhstan for embezzlement, fraud, money laundering, establishing and directing

12  an organized criminal group for criminal purposes, abuse of power, and bribery.

13  There currently are five criminal cases pending against Leila in Kazakhstan for

14  money laundering and establishing and directing an organized criminal group for

15  criminal purposes.  There also currently is a criminal case pending against Elvira in

16  Kazakhstan for money laundering.

17          **C.    The Theft of Property:  The Individual Defendants and Their Co-
            Conspirators Unlawfully Converted Almaty's Property and Sold
18          it to Third Parties at an Enormous Profit**

19

20          40.    Over the life of the Khrapunov Racketeering Enterprise, the

21  Defendants and their co-conspirators carried out multiple acts all directed at the

22  same goal: to convert property rightfully belonging to the people of Almaty, sell it

23  for a profit, then launder the proceeds out of Kazakhstan in order to escape the

24  reach of the authorities and get away with their crimes.  As a result, Viktor, Leila,

25  Iliyas, Elvira, and their co-conspirators stole hundreds of millions of dollars from

26  Almaty and laundered these stolen funds into and within the United States in

27  violation of U.S. law.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

13

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

41.     Five examples of Defendants' illegal acquisition of property from Almaty are set forth below.  Through the five transactions detailed below, Viktor, Leila, Iliyas, Elvira, their family and their co-conspirators generated millions in illicit profits resulting from the illegal conversion and re-sale of several pieces of property.  In total, the Khrapunov Racketeering Enterprise is believed to have illegally acquired over 80 pieces of real estate, valued at approximately $300 million, from Almaty and its people.  They have sought to further their wrongdoing by hiding stolen funds in the United States.

**Fraudulent Transaction Example 1**

42.     In or about 2000, Viktor abused his position as Mayor of Almaty to cause a large tract of state-owned land near two rivers in Almaty located at 232 Gornaya Street (the "Gornaya Property") to be transferred to Leila for a total price of approximately $689,000 (101,886,477 ₸).  The transfer was accomplished via a series of fraudulent transactions and front companies controlled by Leila and Iliyas.  Through several more transfers designed to conceal the illegal conduct, Leila and Iliyas ultimately sold the Gornaya Property for a total of $15.57 million, yielding nearly $15 million in illicit profit as a result of this single transaction.

43.     To carry out the illegal conversion of the Gornaya Property, Viktor, Leila, and Iliyas utilized at least six Kazakhstan entities controlled by Leila and Iliyas, including: (a) Almaty-Demalys; (b) Viled Establishment; (c) KazRealIncom LLP ("KRI"); (d) Karasha Plus LLP ("Karasha"); (e) Building Services Company ("BSC"); and (f) Asia Holding Development LLP ("Asia Holding").

44.     In 2000, Viktor unlawfully ordered the Gornaya Property to be transferred to Almaty-Demalys, an entity ultimately controlled by Leila.  Almaty-Demalys purchased the Gornaya Property on or about November 20, 2001.

45.     Viktor's transfer of the Gornaya Property violated the Land Code of the Republic of Kazakhstan, which requires that public property be sold via auction.  Viktor's transfer also violated the Water Code, which mandates that land

in water conservation zones may only be provided to private individuals and entities for temporary use.  The fraudulent transfer did not involve an auction nor was the property provided for temporary use only.

46.     On or about August 29, 2003, Leila caused Almaty-Demalys to transfer two small portions of land from the Gornaya Property directly to Leila. Upon information and belief, although Leila purported to purchase these plots for approximately $72,000 (10,660,352 ₸), Leila never transferred money to Almaty-Demalys for these purchases.

47.      On or about September 30, 2003, Leila caused Almaty-Demalys to transfer a separate, large portion of land from the Gornaya Property to Karasha, an entity ultimately controlled by Leila.  Upon information and belief, Karasha purported to purchase the land for $613,000 (91,226,125 ₸).  Karasha never paid for this purchase.

48.     Days later, on or about October 3, 2003, Leila caused Karasha to transfer the land plot directly to Leila.  Upon information and belief, Leila similarly never paid for the acquisition of this property.

49.     On or about October 6, 2003, Leila contributed the same portion of the Gornaya Property to BSC, of which she was the sole owner.  Ten days later, Leila sold her interest in BSC to a third party in a transaction that valued that portion of the Gornaya Property at approximately $8 million (1,179,999,980 ₸).

50.     Leila transferred the proceeds to Elvira's bank accounts in Switzerland, including Deutsch Bank and American Express Ltd. NY, and Viled Establishment's bank accounts in Liechtenstein.

51.      Leila caused the smaller portions of the Gornaya Property to be conveyed directly to Iliyas.  Iliyas, in turn, contributed it to Asia Holding, and then sold Asia Holding to a separate unrelated third party for approximately $7.57 million.  Of the $7.57 million, Iliyas transferred approximately $2.21 million to

Elvira's Swiss bank accounts, including accounts at Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co., and retained the remainder for himself.

52.     Thus, Leila paid approximately $689,000 for the Gornaya Property, which she and Iliyas later re-sold for a total of $15.57 million.

**Fraudulent Transaction Example  2**

53.     On or about April 16, 2001, Viktor used his position as mayor to cause public land and a building in Almaty known as Kindergarten No. 186 to be auctioned and ultimately sold to Leila's company, KRI, for approximately $347,000 (52,155,100 ₸).  Viktor did so by manipulating a public auction, through members of the Territorial Committee and Investment Tender Committee, to ensure that KRI won the auction.

54.     Under the laws of Kazakhstan, potential buyers of state-owned property are obligated to state how they intend to invest in and develop the property.  In an attempt to make KRI's bid appear legitimate and to ensure KRI won the bid, Leila caused KRI to fraudulently represent that KRI would invest more money than its competitors (based off inside information about the competitors' bids) in Kindergarten No. 186 to build a health center for the benefit of the people of Almaty.  That representation was false at the time it was made and, in fact, KRI never intended to and never did build any such health center.

55.     Instead, on or about September 30, 2003, Leila caused KRI to sell Kindergarten No. 186 to Karasha and, three days later, Leila caused Karasha to sell Kindergarten No. 186 directly to her.  The investment promise KRI used to win the bid was not passed on to Karasha or Leila in the subsequent purchase agreements. On or about October 6, 2003, Leila contributed Kindergarten No. 186 to BSC, which she then sold to an unrelated third party ten days later in a transaction that valued Kindergarten No. 186 at approximately $4.1 million (611,445,206 ₸).  Leila and Viktor thus obtained illegal profit of over $3.7 million as a result of their illicit acquisition and re-sale of Kindergarten No. 186.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

16

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

**Fraudulent Transaction Example 3**

56.    In addition to manufacturing the sale of state-owned assets to Leila and other family members and co-conspirators, Viktor also abused his authority as mayor to seize privately-owned land and transfer it to Leila and others for re-sale.

57.    On or about April 3, 2001, Viktor caused Almaty to seize land owned by certain private unrelated individuals.  On or about August 25, 2003, Viktor caused Almaty to seize land owned by a private third party, Shadid Engineering LLP.  On or about September 16, 2003, Viktor caused Almaty to seize land owned by various private entities, including Kazkommertsbank, Arman Garage, Bulat Enterprise, and Argymak LLP.

58.    On or about September 23, 2003, Viktor combined all properties with an additional property into a single plot (the "Seized Property") and caused the Seized Property to be sold to Leila's company Karasha for approximately $105,000 (15,637,100 ₸).  Leila then caused Karasha to sell the Seized Property directly to her on or about October 4, 2003.  Two days later, Leila contributed the Seized Property to BSC, and sold BSC to an unrelated third party in a transaction that valued the Seized Property at approximately $2 million.  As a result, Leila obtained nearly $1.9 million in illicit profit at the expense of Almaty and its people.

**Fraudulent Transaction Example 4**

59.    In or about November 2004, Viktor caused Almaty to sell two plots of land to two additional Kazakh companies owned and controlled by Leila, Ademytau-KMK LLP and Viktoriya-KMK LLP (the plot transferred to Ademytau-KMK LLP, the "Ademytau Property," and the plot transferred to Viktoriya-KMK LLP, the "Viktoriya Property").  Both plots were located in a water conservation zone and, therefore, under Kazakh law (Part 1 of Article 119 of the Water Code of the Republic of Kazakhstan), could be provided to private persons or entities only for temporary use.  Nevertheless, in violation of the law and his obligations as

mayor of Almaty, Viktor caused both the Ademytau Property and the Viktoriya Property to be sold to Leila's companies for 16,640,900 ₸ and 2,229,200 ₸, respectively – approximately $1.3 million total (18,870,100 ₸).

60.     On or about April 12, 2005, Leila caused Ademytau-KMK LLP to transfer the Ademytau Property to Elvira.

61.     On the same day, April 12, 2005, Leila caused Viktoriya-KMK LLP to transfer the Viktoriya Property to Phoenix, VL., LLP, another entity that she owned and controlled.  Two months after Leila transferred the property to Phoenix, VL., LLP, Phoenix, VL., LLP (previously known as Phenix-Kh Company LLP) proceeded to change its name a second time to Swiss Kazakh Phoenix Holding, LLP ("Swiss Kazakh").

62.     On or about December 23, 2005, Elvira transferred the Ademytau Property to a co-conspirator, Armen Sanasarovich Khachatryan ("Khachatryan") for 16,640,900 ₸.

63.     About one month later, on or about January 25, 2006, Leila caused Swiss Kazakh to transfer the Viktoriya Property to Khachatryan for 3,237,860 ₸. From December 2006 through May 2007, Khachatryan made payments, labeled as the return of temporary financial aid, totaling approximately $8.6 million (1,223,950,000 ₸) to Leila for the Ademytau and Viktoriya Properties and six additional properties.  On information and belief, these illicit proceeds were transferred from Leila's Kazakh bank accounts to Elvira's Swiss bank accounts as "financial aid."

### Fraudulent Transaction Example 5

64.     Between 2002 and 2005, Viktor sold more than 55 plots of public land to private companies for billboards to be used for outdoor advertisements. Viktor violated Kazakh law by privatizing these public lands, including Article 18 of the Law "On Land," which provided that public land could not be in private

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

18

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

ownership.  As part of this billboard scheme, Viktor ordered the privatization and sale of public land to companies owned by or affiliated with himself and Leila.

65.     Viktor's and Leila's companies subsequently leased the land at inflated prices to secure profits.  Generally, the land would be sold to one company in particular, GeFest LLP ("GeFest"), for a nominal price.  GeFest was founded by Leila and Viktor's brother-in-law, Aijar Kadyrovich Ilyasov, who served as GeFest's Executive Director.

66.     GeFest sold the land to Swiss Kazakh.  Swiss Kazakh also was founded by Leila.

67.     Swiss Kazakh then sold the land to Vostochny Media Ekspress, LLC ("Vostochny").  Vostochny was founded by Aijar Ilyasov, Viktor's brother-in-law.

68.     Vostochny then leased the billboard space to third parties and collected profits.

69.     As a specific example, on November 7, 2002, Viktor signed a "decision" to sell GeFest the public land described as south of Baitursynov St., south of Satpaev St., in Bostandyk District.  On January 15, 2004, Viktor and GeFest entered into a purchase agreement for this state-owned land plot.  The purchase price was $11,472 ₸ (approximately $35.22 USD).

70.     On July 18, 2005, GeFest entered into a purchase agreement to sell the land to Swiss Kazakh.  Swiss Kazakh purchased the land for the same nominal price, $11,472 ₸ (approximately $35.22 USD).

71.     On November 27, 2006, Swiss Kazakh entered into a purchase agreement to sell the land to Vostochny for $19,600 ₸ (approximately $60.00 USD).

72.     Vostochny then leased the outdoor advertising space for a profit.  For example, on January 1, 2009, Vostochny entered into an agreement with F.I.R.S.T. Agency LLP to lease the billboard space for one month for $210,600 ₸ (approximately $646.55 USD) and an installation fee of $27,000 ₸ (approximately

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

19

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  $83.00 USD).  Additional lease agreements were entered into and resulted in

2  increased profits over an extended period of time.

3       73.    As a result of this billboard scheme, Khrapunov-related companies

4  leased out billboard space for more than 55 plots of land for approximately 6 years.

5  Almaty alleges on information and belief that the Khrapunov family earned

6  millions of dollars in ill-gotten gains through their illegal billboard scheme.

7       74.    Together, the illegal conversion of properties described in Fraudulent

8  Transactions 1-5 and the ultimate sale of those properties to third parties, resulted

9  in tens of millions in profits to Viktor, Leila, Iliyas, Elvira, their family members,

10 and their co-conspirators.  These are merely five examples of Viktor and his family

11 and co-conspirators' wrongdoing.  In total, approximately 80 parcels of real estate

12 rightfully belonging to Almaty and its people were illegally alienated by the

13 Individual Defendants and their co-conspirators for their own personal gain.  On

14 information and belief, the Individual Defendants and their co-conspirators

15 profited by over $300 million from these illegal transactions, all at the expense of

16 the people of Almaty, and now are seeking to use the United States as a haven in

17 which to enjoy their ill-gotten gains.

18  **D.    The Laundering of Stolen Funds:  The Individual Defendants and
19        Their Co-Conspirators Laundered Illegally Obtained Funds in
20        Switzerland and the United States**

21      75.    The Individual Defendants and their co-conspirators laundered the

22 proceeds of their crimes in Switzerland and the United States in order to hide the

23 assets from authorities and reap the rewards of their wrongdoing.  Once the Swiss

24 authorities began to investigate the Individual Defendants and their co-conspirators

25 and to freeze their assets, the Individual Defendants and their co-conspirators

26 increased their illegal laundering activities in and through the United States to

27 further conceal the proceeds and attempt to prevent their recovery by Almaty.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

20

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

76.     These funds rightfully belonged to, and still belong to, Almaty.
Defendants continue to hold funds belonging to Almaty without permission and via
constructive trust, and Defendants are obligated, by law, to return funds transferred
into and laundered in the United States in furtherance of the Khrapunov
Racketeering Enterprise.  The continued movement of Almaty's funds within the
United States has hindered and continues to hinder Almaty's ability to trace and
recover its funds, thereby causing Almaty ongoing harm and damage in the United
States.  Upon information and belief, the Individual Defendants and their co-
conspirators selected the United States as a jurisdiction in which to hide the stolen
funds because they thought they would be immune from redress for their crimes
here.  At the time the laundering began, the United States did not have a mutual
legal assistance treaty or extradition treaty with Kazakhstan.

77.     The Individual Defendants and their co-conspirators have used and
continue to use numerous holding companies in order to hide and to launder the
illicit funds they siphoned out of Kazakhstan through Switzerland and other
intermediary countries, and ultimately into and within the United States.  Iliyas and
Elvira owned and/or controlled a number of these companies, including
Defendants Vilder, Crownway, and at least two Swiss companies, SDG Capital SA
("SDG") and Swiss Promotion Group SA ("SPG").  In total, Iliyas, Elvira, and
Leila have already transferred at least $125 million into these two Swiss companies
alone.

78.     Between 2008 and 2012, Iliyas, Elvira, Leila, and sham companies
they control injected over $115 million into SDG.  SDG was formed in or about
July 2008 and, until approximately May 2009, was owned and controlled by
Harlem Securities, a British Virgin Islands corporation that was, in turn, owned by
Iliyas.  In or about May 2009, Elvira purchased SDG from Harlem Securities for
approximately $99,000.  Following that purchase, Iliyas continued to exert full
control over SDG.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

21

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

79.     Iliyas, Elvira, Leila, and sham companies they control also have contributed substantial assets, believed to be in excess of $10 million, to SPG. Iliyas is the ultimate beneficial owner of SPG via a variety of offshore holding companies.

80.     Upon information and belief, Iliyas, Elvira, Leila, and the sham companies they control have contributed substantial funds to Vilder, including millions of dollars to Vilder's account at FBME Bank ("FBME").[1]

81.     Upon information and belief, Iliyas, Elvira, Leila, and the sham companies they control have contributed substantial funds to Crownway, including millions of dollars to Crownway's account at FBME.

82.     All of the funds contributed to SDG, SPG, Vilder, Crownway, and other front companies controlled by Iliyas, Elvira, and Leila are traceable to the ill-gotten proceeds of Viktor's and his co-conspirators' looting of real estate and other assets.

## Funds Transferred to Defendants in the United States

83.     In an ongoing effort to launder and conceal the source of the funds they stole from the people of Almaty, after moving the funds to various accounts and holding companies in Switzerland and elsewhere, Defendants and their co-conspirators began transferring the stolen funds into the United States by using an intricate web of individuals and offshore holding companies to launder Almaty's funds.

84.     Defendants harmed Almaty by concealing those funds from Almaty, and thereby causing Almaty to have to devote substantial monies and time and use

---

[1] The U.S. Treasury's Financial Crimes Enforcement Network ("FinCEN") has alleged that FBME engaged in large-scale money laundering.  FinCEN first reported concerns regarding FBME's role in money laundering in July of 2014.  In March 2016, FinCEN imposed the "fifth special measure" against FBME, aimed at blocking FBME from doing business in the United States or using U.S. currency. On or around May 8, 2017, Tanzania's central bank revoked FBME Bank's business license.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

22

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

extraordinary means in the United States to trace and recover their funds in the United States.  The ongoing detention in the United States of funds belonging to Almaty causes ongoing harm and damage to Almaty.

85.     For example, on or about July 20, 2012, Individual Defendants and their co-conspirators caused over $3 million to be transferred from Defendant Crownway's FBME account into Defendant RPM-Maro LLC's United States bank account.  Upon information and belief, this bank account was owned or controlled by Elvira, and at all times all Individual Defendants and their co-conspirators knew that was stolen money.

86.     On the date of this transfer, RPM-Maro was owned and controlled by Elvira and Iliyas.  Indeed, from June through August 2012, RPM-Maro was jointly owned by Defendant RPM USA – which was controlled by Iliyas through RPM USA's sole member, SPG, and Defendant Maro Enterprises – which was wholly owned and controlled by Elvira.  Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.  Upon information and belief, this $3 million transferred into the United States by the Individual Defendants is traceable to the funds they looted from Almaty.

87.     The Individual Defendants made use of the United States wires and United States mail in furtherance of this illegal $3 million transaction.  The Individual Defendants harmed Almaty by transferring Almaty's stolen funds into the United States, concealing the illegitimate source of the funds, and impeding and seeking to prevent Almaty from recovering the stolen funds in furtherance of the goals of the Khrapunov Racketeering Enterprise.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

23

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

88.     As another example, on or about November 7, 2012, Individual Defendants and their co-conspirators caused approximately $1.27 million to be transferred from Defendant Vilder's offshore account, into a United States bank account owned by Defendant RPM USA and controlled by Iliyas through RPM USA's sole member, SPG.  At all times, all Individual Defendants and their co-conspirators knew that money to have been stolen from the people of the City of Almaty.

89.     Upon information and belief, before transferring the $1.27 million into the United States, Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.  Upon information and belief, this $1.27 million transferred into the United States by the Individual Defendants and their co-conspirators is traceable to the funds they looted from Almaty.

90.     The Individual Defendants and their co-conspirators made use of the United States wires and United States mail in furtherance of this illegal $1.27 million transaction.  The Individual Defendants harmed Almaty by transferring Almaty's stolen funds into the United States, concealing the illegitimate source of the funds, and impeding and seeking to prevent Almaty from recovering the stolen funds in furtherance of the goals of the Khrapunov Racketeering Enterprise.

91.     Six days after the transfer of $1.27 million from Vilder to RPM-USA, RPM-USA transferred $1.2 million to RPM-USA's New York-based attorney to be held in escrow.  Upon information and belief, Defendants regularly used this attorney, who also served as attorney for RPM-Maro and World Health Networks, to assist in laundering money between various sham entities and into sham investments.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

24

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

92.     As a third example, on or about January 9, 2013, Individual Defendants and their co-conspirators caused Defendant Vilder to transfer $1 million from an offshore bank account into Defendant RPM-Maro's United States bank account, which was owned or controlled by Elvira.  At all times all Individual Defendants and their co-conspirators knew that money to have been stolen from the people of the City of Almaty.

93.     Elvira officially owned 100% interest in RPM-Maro, but Iliyas exerted informal control over the company.  Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.  Upon information and belief, this $1 million transferred into the United States by the Individual Defendants is traceable to the funds they looted from Almaty.

94.     The Individual Defendants made use of the United States wires and United States mail in furtherance of this illegal transaction.  The Individual Defendants harmed Almaty by transferring Almaty's funds into the United States, concealing the illegitimate source of the funds, and impeding and seeking to prevent Almaty from recovering the stolen funds in furtherance of the goals of the Khrapunov Racketeering Enterprise.

95.     As a fourth example, on or about February 28 and March 1, 2013, Individual Defendants and their co-conspirators caused Vilder to transfer a total of $1 million from an offshore bank account to a United States bank account owned by RPM-USA and controlled by Iliyas.  At all times, all Individual Defendants and their co-conspirators knew that money to have been stolen from the people of the City of Almaty.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

25

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

96.     Upon information and belief, before transferring the $1 million into the United States, Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts – including accounts held by their sham holding companies – for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.  Upon information and belief, this $1 million transferred into the United States by the Individual Defendants and their co-conspirators is traceable to the funds they stole from Almaty.

97.     The Individual Defendants made use of the United States wires and United States mail in furtherance of this illegal transaction.  The Individual Defendants harmed and continue to harm Almaty by transferring Almaty's funds into the United States, concealing the illegitimate source of the funds, and impeding and seeking to prevent Almaty from recovering the stolen funds in furtherance of the goals of the Khrapunov Racketeering Enterprise.

98.     As a fifth example, on or about August 5, 2013 Individual Defendants and their co-conspirators caused Vilder to transfer $1 million from its FBME bank account to Elvira's United States bank account.  Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds and with the goal of making the stolen funds appear legitimate.  Upon information and belief, this $1 million transferred into the United States by the Individual Defendants is traceable to the funds they looted from Almaty.

99.     The Individual Defendants made use of the United States wires and United States mail in furtherance of this illegal $1 million transaction.  The Individual Defendants harmed Almaty by transferring Almaty's funds into the United States, concealing the illegitimate source of the funds, and impeding and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

26

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  seeking to prevent Almaty from recovering the stolen funds in furtherance of the

2  goals of the Khrapunov Racketeering Enterprise.

3      100.   As a sixth example, upon information and belief, throughout the

4  course of 2014, Individual Defendants and their co-conspirators caused a total of

5  over $1 million to be transferred from offshore companies – including Vilder, SDG

6  Capital, and another sham company Adlux Sarl SA, a subsidiary of SPG – directly

7  to United States bank accounts owned by Elvira.

8      101.   Upon information and belief, before transferring these funds into the

9  United States, Individual Defendants and their co-conspirators caused the funds to

10  be moved through various offshore bank accounts, including accounts held by their

11  sham holding companies, for the sole purpose of illicitly concealing the source of

12  the stolen funds to make the stolen funds appear legitimate.  Upon information and

13  belief, these funds transferred into the United States by the Individual Defendants

14  and their co-conspirators is traceable to the funds they stole from Almaty.

15      102.   The Individual Defendants made use of the United States wires and

16  United States mail in furtherance of this illegal transaction.  The Individual

17  Defendants harmed, and continue to harm, Almaty by transferring Almaty's funds

18  into the United States, concealing the illegitimate source of the funds, and

19  impeding and seeking to prevent Almaty from recovering the stolen funds in

20  furtherance of the goals of the Khrapunov Racketeering Enterprise.

21      103.   The funds identified in the above six examples, in addition to all other

22  funds stolen from Almaty and transferred into the United States in furtherance of

23  the Khrapunov Racketeering Enterprise, rightfully belonged and still belong to

24  Almaty, and Defendants hold these funds without permission and through a

25  constructive trust or otherwise.  The continued movement of Almaty's funds

26  within the United States continues to cause Almaty harm and damage by hindering

27  Almaty's ability to trace and recover its funds and forcing Almaty to expend

28  substantial assets and time in its efforts to do so.

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

27

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

104.   Elvira, Dmitry, Daniel, Iliyas, and Madina have laundered the funds transferred into the United States by making investments in multiple U.S. companies, including World Health Networks.  Upon information and belief, between July 2012 and October 2014, Defendants invested approximately $6.3 million in a World Health Networks, a medical device company registered to do business in New York and California.  The funds are traceable to the money the Individual Defendants and their co-conspirators stole from Almaty and laundered through various offshore bank accounts, before Defendants transferred the funds into the United States.  Approximately $1.9 million of the $6.3 million investment was provided by Defendant RPM USA – which is owned or controlled by Iliyas and is a wholly owned subsidiary of SPG – on RPM-Maro's behalf.  The remainder of the funds came from RPM-Maro, directly from Elvira and Dmitry, and/or from other entities controlled by Individual Defendants, including, *e.g.*, 628 Holdings.  All of these funds had been transferred into the United States from offshore companies controlled by Individual Defendants, as described in the six examples above.  The individual defendants, along with Defendants RPM-Maro and RPM USA, used those funds to invest in the medical device company with the intent to conceal further the illicit source of those funds.

105.   Upon information and belief, Individual Defendants used this sham investment into World Health Networks as a front for obtaining United States visas for Elvira and Dmitry.

106.   Furthermore, upon information and belief, Elvira, Dmitry, Daniel, Iliyas, and Madina made use of the United States mail and wires, as well as United States financial institutions, to engage in these investments.  As a result, Elvira, Dmitry, Daniel, Iliyas, and Madina again acted in violation of 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

107.   They at all times acted with the agreement and knowledge of Viktor and Leila, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

28

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

108.   In or about October 2014 – months after Almaty first filed its initial complaint against the Khrapunovs in this action in May 2014 – Elvira caused RPM-Maro to sell its interest in World Health Networks to Techvest S.A, an entity based in Luxembourg.  Upon information and belief, Elvira sold its interest in World Health Networks in a further attempt to launder and conceal the source of the funds, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

### Funds Laundered Into Real Estate and Other Assets

109.   As part of their ongoing effort to launder and conceal the source of the funds they stole from Almaty, after moving funds to various offshore accounts and holding companies, Defendants and their co-conspirators injected funds directly into real estate located in the United States.

110.   Defendants harmed Almaty by concealing those funds from Almaty, and thereby causing Almaty to have to devote substantial monies and time, and to use extraordinary means in the United States to trace and recover their stolen funds hidden in the United States.  The ongoing detention in the United States of funds belonging to Almaty causes ongoing harm and damage to Almaty.

111.   On or about October 20, 2010 and December 2, 2010, Elvira and Dmitry caused $365 thousand and $3.3 million, respectively, to be transferred from their Swiss bank accounts at Schroder & Co. Bank AG and Bank Sarasin and Co. Ltd., respectively, directly to Escrow of the West, an escrow company based in Los Angeles, California.  Elvira and Dmitry used these laundered funds to purchase a luxurious single-family home located at 2578 Hutton Drive in Beverly Hills, California, for approximately $3.65 million.

112.   Elvira and Dmitry knew that the money they used to engage in this transaction was stolen from Almaty and illegally laundered to appear legitimate. Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

29

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.  They purchased this property with the intent to use the transaction to further conceal the illegitimate source of the funds, which are traceable to the funds the Individual Defendants and their co-conspirators embezzled from Almaty.

113.   Because the funds used to purchase this property were wrongfully detained from Almaty, Elvira and Dmitry held this real property as constructive trustees for the benefit of Almaty.  The unlawful purchase of this property caused additional harm to Almaty in the United States by preventing Almaty access to its property and made it more difficult and costly for Almaty to trace and recover its U.S.-based assets.

114.   Furthermore, Elvira and Dmitry made use of the United States mail and wires, as well as United States financial institutions, to engage in this transaction.  As a result of the foregoing, Elvira and Dmitry violated, among other U.S. laws, 18 U.S.C. §§ 1956 (money laundering and conspiracy to commit money laundering), 1957 (transactions in property derived from unlawful activity), 2314 (transport of stolen money), 1341 (mail fraud), and 1343 (wire fraud).

115.   Elvira and Dmitry acted with the agreement and knowledge of Viktor, Leila, Daniel, Iliyas, and Madina, and as a result, all Individual Defendants also violated 18 U.S.C. § 371 (conspiracy).

116.   On or about December 30, 2011 and March 15, 2012, Iliyas and Madina caused Defendant Candian to transfer $163 thousand and $5.366 million, respectively, directly to Granite Escrow Services ("Granite Escrow") in Beverly Hills, California from its Swiss bank account.  Iliyas and Madina used these funds to purchase a lavish single-family home located at 606 North Alta Drive in Beverly Hills, California, for approximately $5.45 million.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

30

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

117.   Iliyas and Madina knew that the money they used to engage in this transaction was stolen from the people of Almaty, and illegally laundered to appear legitimate.  Indeed, Iliyas and Madina attempted to further conceal the source of the stolen funds used to make this purchase by using Defendant Candian to complete the purchase, and they purchased this property with the intent to use the transaction to further conceal the illegitimate source of the funds, which are traceable to the funds the Individual Defendants and their co-conspirators embezzled from the people of Almaty.  Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.

118.   Because the funds used to purchase this property were wrongfully detained from Almaty, Iliyas, Madina, and/or Candian International Ltd. held this real property as constructive trustees for the benefit of Almaty.  The unlawful purchase of this property caused additional harm to Almaty in the United States by preventing Almaty access to its property and making it more difficult and costly for Almaty to trace and recover its U.S.-based assets.

119.   Furthermore, Iliyas and Madina made use of the United States mail and wires, as well as United States financial institutions, to engage in this transaction.  As a result of the foregoing, Iliyas and Madina violated, among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

120.   Iliyas and Madina acted with the agreement and knowledge of Viktor, Leila, Daniel, Elvira, and Dmitry, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

121.   In or about mid-2012, the Public Prosecutor of Geneva opened an investigation into Viktor, Leila, Iliyas, and Elvira on suspicion of money

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

31

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

laundering in violation of Swiss law.  In or about November 2012, the Public
Prosecutor of Geneva ordered frozen certain Swiss accounts and assets belonging
to Viktor, Leila, Iliyas, and Elvira.  After this action by Swiss government
authorities, the Individual Defendants and their co-conspirators continued and
increased their laundering activities in the United States.

122.   For example, Iliyas moved significant amounts of money into New
York real estate investments.  On or around November 2012, Iliyas began
investing tens of millions (of the equivalent) of dollars stolen from the people of
Almaty and others to purchase a partial interest in a luxury hotel in New York.
Additionally, in order to conceal the source of the funds used to make this
investment, Iliyas used Luxembourg shell entity Triadou SPV S.A. ("Triadou"),
together with a series of at least four Delaware holding companies, all of which
were ultimately owned by SDG and controlled by Iliyas.  Iliyas invested additional
funds in the Cabrini Medical Center in New York.

123.   Individual Defendants also increased their laundering of the stolen
funds into California at this time as well.  On or about November 30, 2012 and
January 18, 2013, Individual Defendants caused Defendant Vilder to transfer $186
thousand and $6 million, respectively, from its FBME bank account located in
Cyprus directly to Granite Escrow in Beverly Hills, California.  Iliyas and Madina
used these funds to purchase a second mansion in Beverly Hills using Almaty's
funds illegally obtained through the Khrapunov Racketeering Enterprise's criminal
activity and laundered through various offshore bank accounts and entities into the
U.S.  Iliyas and Madina knew that the money they used to engage in this
transaction was stolen from the people of Almaty and illegally laundered to appear
legitimate.

124.   Indeed, Iliyas and Madina, with Elvira and Daniel's assistance, used
another sham holding company, Defendant 628 Holdings LLC, which is owned
and/or controlled by Daniel, to launder and conceal the source of the illicit funds.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

32

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

To that end, Iliyas and Madina and/or Daniel caused 628 Holdings LLC to purchase with Almaty's money a $6.2 million five-bedroom single-family home located at 628 North Alta Drive in Beverly Hills, California for the benefit and use of Iliyas and Madina.  Elvira is listed in public records as an officer of Defendant 628 Holdings LLC.

125.   Iliyas and Madina purchased this property with the intent to use the transaction to further conceal the illegitimate source of the funds, which are traceable to the funds the Individual Defendants and their co-conspirators embezzled from the people of Almaty.  Because the funds used to purchase this property were wrongfully detained from Almaty, Iliyas, Madina, and/or 628 Holdings LLC held this real property as constructive trustees for the benefit of Almaty.  The unlawful purchase of this property caused additional harm to Almaty in the United States by preventing Almaty access to its property and making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

126.   Furthermore, Iliyas, Madina and/or Daniel made use of the United States mail and wires, as well as United States financial institutions, to engage in this transaction.  As a result of the foregoing, Iliyas, Madina, Daniel, and Elvira violated, among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

127.   Iliyas, Madina, and Elvira acted with the agreement and knowledge of Viktor, Leila, Daniel and Dmitry, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

128.   On or about April 5, 2013 and April 28, 2013, Elvira, with the full knowledge and assistance of the other Individual Defendants and their co-conspirators, caused Defendant Crownway to transfer over $5 million and $250 thousand, respectively, from its FBME bank account into Elvira's United States bank account.  Upon information and belief, before transferring these funds into the United States, the Individual Defendants and their co-conspirators caused the funds to be moved through various offshore bank accounts, including accounts

held by sham holding companies, for the sole purpose of illicitly concealing the source of the stolen funds to make the stolen funds appear legitimate.  Upon information and belief, this $5 million transferred into the United States by the Individual Defendants is traceable to the funds they stole from Almaty.

129.   On or about April 16, April 25, and April 29, 2013, Elvira transferred a total of approximately $3.2 million of the funds moved into the U.S. by Crownway to a New York-based real estate attorney, Martin Jajan, for the purchase of three condominiums – units 3203, 3310, and 3311 – in the Trump Soho tower located at 246 Spring Street, New York, New York.  All three units were purchased on or about April 30, 2013 for $879,833, $1,407,321 and $829,351 respectively.  Elvira knew that the funds they used to engage in this transaction were stolen from the people of Almaty, and illegally laundered to appear legitimate.  Indeed, in a further attempt to conceal their wrongful possession and use of Almaty's funds, Elvira used three separate LLCs – Soho 3203 LLC, Soho 3310 LLC, and Soho 3311 LLC – to make these purchases.

130.   Elvira purchased these properties with the intent to use the transaction to further conceal the illegitimate source of the funds, which are traceable to the funds the Individual Defendants and their co-conspirators embezzled from the people of Almaty.  Because the funds used to purchase these properties were wrongfully detained from Almaty, Elvira held these real properties as constructive trustees for the benefit of Almaty.  The unlawful purchase of these properties caused additional harm to Almaty in the United States by preventing Almaty access to its property and making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

131.   Furthermore, Elvira made use of the United States mail and wires, as well as United States financial institutions, to engage in this transaction.  As a result of the foregoing, Elvira violated, among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

LATHAM&WATKINSᴸᴸᴾ US-DOCS\97422225
ATTORNEYS AT LAW
LOS ANGELES

34

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

132.   Elvira acted with the agreement and knowledge of Iliyas, Madina, Viktor, Leila, Daniel and Dmitry, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

133.   In attempts to bury Almaty's money deeper in California, on or about July 19, 2013, Elvira and Dmitry sold the house at 2578 Hutton Drive for approximately $4.97 million.  Upon information and belief, Elvira and Dmitry sold this property in furtherance of the Khrapunov Racketeering Enterprise, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

134.   That same day, Elvira and Dmitry purchased an expansive, two-acre estate located at 11986 Lockridge Road in Studio City, California for approximately $5.7 million.  Upon information and belief, nearly $1 million of the funds used to effectuate this purchase were derived from Crownway's $5.25 million transfer in April 2013.  The remainder was funded by the proceeds from the sale of 2578 Hutton Drive.

135.   Elvira and Dmitry knew that the money they used to engage in this transaction was stolen from the people of Almaty, and illegally laundered to appear legitimate.  Indeed, shortly after they purchased this property, in a further attempt to conceal their wrongful possession and use of Almaty's funds, Elvira and Dmitry transferred it to The Kasan Family Trust, a trust for which they serve as trustees.

136.   Elvira and Dmitry purchased this property with the intent to use the transaction to further conceal the illegitimate source of the funds, which are traceable to the funds the Individual Defendants and their co-conspirators embezzled from the people of Almaty.  Because the funds used to purchase this property were wrongfully detained from Almaty, Elvira, Dmitry, and/or The Kasan Family Trust held this real property as constructive trustees for the benefit of Almaty.  The unlawful purchase of this property caused additional harm to Almaty

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

35

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

in the United States by preventing Almaty access to its property and making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

137.   Furthermore, Elvira and Dmitry made use of the United States mail and wires, as well as United States financial institutions, to engage in this transaction.  As a result of the foregoing, Elvira and Dmitry violated, among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

138.   Elvira and Dmitry acted with the agreement and knowledge of Viktor, Leila, Daniel, Iliyas, and Madina, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

139.   On or about July 30, 2013, Iliyas and Madina sold the house at 606 North Alta Drive for approximately $6.975 million.  Upon information and belief, Iliyas and Madina sold this property less than 18 months after they purchased it in a further attempt to launder and conceal the source of the funds, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

140.   Almaty filed its initial complaint in this present action on or about May 13, 2014.  Elvira was served that same day, and Dmitry was served the day after.

141.   On or about May 27, 2014, the Elvira caused Soho 3310 LLC to sell the Soho 3310 property for $1.4 million.  Upon information and belief, Elvira sold this property a little more than a year after she purchased it in a further attempt to launder and conceal the source of the funds, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

142.   On or about August 4, 2014, Elvira and Dmitry as trustees of the Kasan Family Trust caused the Kasan Family Trust to sell the house at 11986 Lockridge Rd. for approximately $6.5 million.  As Almaty already had filed the present action at this time, the parties entered into a stipulation agreement to ensure

1   that the proceeds from the sale were not transferred outside of the Central District

2   of California.  In accordance with that stipulation, the proceeds were placed in an

3   escrow account.

4   143.   That same day, without Almaty's knowledge, Triadou assigned its

5   partial interest in the New York luxury hotel to the developers of the hotel for a

6   fraction of the initial investment.  Upon information and belief, Iliyas caused

7   Triadou to make this assignment in an attempt to move millions of Almaty's

8   money out of the United States and further conceal it from Almaty.

9   144.   On or about September 8, 2014, Elvira and Dmitry purchased a

10   property located at 2 Narbonne in Newport Beach, California for approximately

11   $4.1 million, using a portion of the proceeds from the sale of 11986 Lockridge Rd.

12   property.  These funds were derived from the funds stolen from Almaty and

13   laundered through various offshore bank accounts and entities into the U.S.  Elvira

14   and Dmitry knew that the money they used to engage in this transaction was stolen

15   from the people of Almaty, and illegally laundered to appear legitimate.  Elvira and

16   Dmitry named The Kasan Family Trust as owner, a trust for which they serve as

17   trustees.

18   145.   Because the funds used to purchase this property were wrongfully

19   detained from Almaty, Elvira, Dmitry, and/or The Kasan Family Trust held this

20   real property as constructive trustees for the benefit of Almaty.  The unlawful

21   purchase of this property caused additional harm to Almaty in the United States by

22   preventing Almaty access to its property and making it more costly and difficult

23   for Almaty to trace and recover its U.S.-based assets.

24   146.   Furthermore, Elvira and Dmitry made use of the United States mail

25   and wires, as well as United States financial institutions, to engage in this

26   transaction.  As a result of the foregoing, Elvira and Dmitry violated, among other

27   U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

37

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

147.   Elvira and Dmitry acted with the agreement and knowledge of Viktor, Leila, Daniel, Iliyas, and Madina, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

148.   On or about September 24, 2014 – a little over four months after Almaty initially brought this action –  Elvira caused Soho 3203 LLC to sell the Soho 3203 property for $840 thousand.  Upon information and belief, Elvira sold this property less than 18 months after she purchased it in a further attempt to launder and conceal the source of the funds, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

149.   On or about October 16, 2015, Elvira caused Soho 3311 LLC to sell the Soho 3311 property for $777,000.  Upon information and belief, Elvira sold this property it in a further attempt to launder and conceal the source of the funds, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

150.   On or about March 29, 2016, Iliyas, Madina, Elvira and/or Daniel caused 628 Holdings to sell the house at 628 N. Alta for approximately $7.2 million.  Upon information and belief, Iliyas, Madina, Elvira and/or Daniel sold this property in furtherance of the Khrapunov Racketeering Enterprise, causing additional harm to Almaty by making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

151.   On or about August 26, 2016, Elvira and Dmitry as trustees of the Kasan Family Trust caused the Kasan Family Trust to sell the house at 2 Narbonne for approximately $6.375 million.  Upon information and belief, Elvira and Dmitry sold this property in furtherance of the Khrapunov Racketeering Enterprise, causing additional harm to Almaty by making it more costly difficult for Almaty to trace and recover its U.S.-based assets.

152.   Upon information and belief, on or about September 22, 2016, Elvira and Dmitry caused Thirtyeight to purchase a luxurious waterfront property located at 310 38th Street in Newport Beach, California for approximately $3.42 million, using a portion of the proceeds from the sale of the 2 Narbonne property.  These funds were derived from the funds stolen from Almaty and laundered through various offshore bank accounts and entities into the U.S.  Elvira and Dmitry knew that the money they used to engage in this transaction was stolen from the people of Almaty, and illegally laundered to appear legitimate.

153.   Because the funds used to purchase this property were wrongfully detained from Almaty, Elvira, Dmitry, and/or Thirtyeight held this real property as constructive trustees for the benefit of Almaty.  The unlawful purchase of this property caused additional harm to Almaty in the United States by preventing Almaty access to its property and making it more costly and difficult for Almaty to trace and recover its U.S.-based assets.

154.   Furthermore, Elvira and Dmitry made use of the United States mail and wires, as well as United States financial institutions, to engage in this transaction.  As a result of the foregoing, Elvira and Dmitry violated, among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and 1343.

155.   Elvira and Dmitry acted with the agreement and knowledge of Viktor, Leila, Daniel, Iliyas, and Madina, and as a result, all Individual Defendants also violated 18 U.S.C. § 371.

156.   The Individual Defendants' luxurious lifestyles in the United States were not limited to the purchase of Beverly Hills mansions.  In or about April 2013, Elvira leased a 2013 Rolls Royce sedan valued at approximately $302,000. In addition to the Rolls Royce, Elvira leased a 2013 Bentley sedan valued at approximately $320,000.  Elvira is also the registered owner of a 2013 Mercedes Benz sport utility vehicle valued at approximately $114,000 and a 2011 Cadillac sport utility vehicle valued at approximately $75,000.  Upon information and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

39

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   belief, Individual Defendants also purchased numerous pieces of valuable art and

2   home furnishings.

3       157.   Elvira used funds stolen from Almaty and laundered through various

4   offshore bank accounts and entities to acquire these vehicles and other personal

5   assets, and appear legitimate, while knowing those funds were stolen.

6       158.   Upon information and belief, the funds used to purchase or lease these

7   vehicles, artwork, and other property are traceable to the funds stolen from Almaty.

8   Because the funds used to purchase and lease these assets were wrongfully

9   detained from Almaty, Elvira held and continues to hold these assets as

10  constructive trustee for the benefit of Almaty.  The unlawful purchase of this

11  property caused additional harm to Almaty in the United States by preventing

12  Almaty access to its property and making it more costly and difficult for Almaty to

13  trace and recover its U.S.-based assets.

14      159.   Furthermore, upon information and belief, Elvira made use of the

15  United States mail and wires, as well as United States financial institutions, to

16  engage in these purchase and lease transactions.  As a result of the foregoing,

17  Elvira violated, among other U.S. laws, 18 U.S.C. §§ 1956, 1957, 2314, 1341, and

18  1343.

19      160.   Elvira engaged in these transactions with the agreement and

20  knowledge of Viktor, Leila, Daniel, Dmitry, Iliyas, and Madina, and as a result, all

21  Individual Defendants also violated 18 U.S.C. § 371.

22      161.   Each U.S. investment and transaction made in furtherance of the

23  Khrapunov Racketeering Enterprise harmed Almaty by making it significantly

24  more difficult and costly for Almaty to trace and recover its U.S.-based assets.

25      162.   By this lawsuit, Almaty seeks to hold Defendants responsible for their

26  illegal conduct in the United States in violation of U.S. law.  Almaty further seeks

27  to hold Defendants liable for the ongoing harm they have caused Almaty in the

28  United States and continue to cause Almaty in the United States.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

40

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

### FIRST CLAIM FOR RELIEF

(For Violations of RICO, 18 U.S.C. §§ 1962(c), 1962(d), 1964(c), against all Defendants)

163.   Almaty hereby incorporates by reference the allegations in paragraphs 1 through 162, as though fully set forth herein.

164.   From in or about 1997 and continuing to the present, by reason of its organization, structure, and activities, the Khrapunov Racketeering Enterprise constituted a RICO enterprise within the meaning of 18 U.S.C. § 1961(4).  The Khrapunov Racketeering Enterprise was comprised of myriad individuals and entities, all associated in fact as part of the Khrapunov Racketeering Enterprise, including but not limited to the Individual Defendants and Entity Defendants named herein.  The Khrapunov Racketeering Enterprise was engaged in, and the activities of the Khrapunov Racketeering Enterprise affected, interstate and foreign commerce.

165.   As alleged herein, the Khrapunov Racketeering Enterprise participants, including Defendants and each of them, together with other individuals and entities known and unknown to Almaty, engaged and conspired to engage in acts in the United States to further the goals of their criminal enterprise, in violation of U.S. law.

166.   Defendants engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting numerous financial transactions using illegally obtained funds laundered through various off-shore accounts and entities to, among other things, purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities, including the Entity Defendants, in furtherance of the Khrapunov Racketeering Enterprise, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

41

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

167.   Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or transferring funds stolen from the people of Almaty and laundered through various off-shore accounts and entities into and within the United States in order to, among other things, purchase real estate and assets in Beverly Hills, Studio City, and elsewhere and to fund business entities, including the Entity Defendants, in furtherance of the Khrapunov Racketeering Enterprise, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

168.   Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting financial transactions using those stolen funds by, among other things, using stolen funds laundered through various off-shore accounts and entities to purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities, including the Entity Defendants, in furtherance of the Khrapunov Racketeering Enterprise, knowing that such funds were stolen from the people of Almaty and with the intent of concealing the source of those funds.

169.   Defendants engaged and conspired to engage in money transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 by, among other things, knowingly transferring funds in excess of $10,000 stolen from Almaty into and within the United States via United States financial institutions to purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities, including the Entity Defendants, knowing that such funds were derived from and traceable to funds stolen from the people of Almaty.

170.   Defendants engaged and conspired to engage in the foreign transport of stolen money or property known to be stolen, converted or taken by fraud in violation of 18 U.S.C. § 2314 by transferring funds derived from and traceable to

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

42

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

funds stolen from the people of Almaty into and within the United States, in excess

of $5,000, knowing those funds to have been stolen from the people of Almaty

and/or obtained from the people of Almaty by means of false or fraudulent

pretenses, representations, or promises by, among other things, transferring such

funds from bank accounts in Switzerland into the United States via United States

financial institutions and using those funds to purchase real estate and other assets

in Beverly Hills, Studio City, and elsewhere and to fund business entities,

including the Entity Defendants.

171.   Defendants, and each of them, conspired to commit the violations of

U.S. law described herein, and one or more of the Defendants or their co-

conspirators acted to violate such laws.  Defendants, and each of them, thus also

violated 18 U.S.C. § 371.

172.   Defendants engaged and conspired to engage in mail fraud in

violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by

knowingly using the United States mails and wires to transfer illegally obtained

funds into and within the United States, for the purpose of furthering the

Khrapunov Racketeering Enterprise and, while concealing the funds' illegal

source, used those funds to purchase real estate in Beverly Hills and Studio City,

California and to fund business entities, including the Entity Defendants, to enable

those entities to conduct business in the United States using the illegally-obtained

funds.

173.   Defendants engaged and conspired to engage in the above violations

of U.S. law in order to implement the objectives and accomplish the unlawful

purposes of the Khrapunov Racketeering Enterprise as set forth herein, and thereby

engaged in predicate acts of racketeering within the meaning of 18 U.S.C. §

1961(1)(B).

174.   Each of the Defendants conducted or participated, directly or

indirectly, in the conduct of the affairs of the Khrapunov Racketeering Enterprise

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

43

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1    through a pattern of racketeering activity, within the meaning of 18 U.S.C. §

2    1961(5) in violation of 18 U.S.C. § 1962(c), consisting as applicable of multiple

3    acts of money laundering, conducting money transactions in property derived from

4    specified unlawful activity, foreign transport of stolen money or property known to

5    be stolen, converted or taken by fraud, mail fraud, and/or wire fraud, as specified

6    herein.  Each of the Defendants engaged in two or more predicate acts of

7    racketeering, and each committed at least one such act of racketeering after the

8    effective date of RICO (*i.e.*, October 15, 1970).

9        175.   From in or about 1997, and continuing to the present, Defendants

10   associated together, with one another and with others, and acted in concert for the

11   common and unlawful purposes of the Khrapunov Racketeering Enterprise and in

12   order to implement the schemes and employ the devices described herein.

13       176.   In so doing, Defendants unlawfully, willfully, and knowingly did

14   combine, conspire, confederate, and agree together, with each other and with

15   others to commit RICO violations under 18 U.S.C. § 1962(c) and, thereby, violated

16   18 U.S.C. § 1962(d).  In furtherance of the conspiracy and to effect the objects

17   thereof, Defendants committed in the Central District of California and elsewhere

18   the overt acts as described herein, among others.

19       177.   As a direct and proximate result of RICO violations by the Defendants

20   of 18 U.S.C. §§ 1962(a), 1962(b), 1962(c), and/or 1962(d), Almaty has suffered

21   damages in an amount to be determined at trial and presently estimated to be not

22   less than $300 million.  Almaty has been injured in its business or property by

23   reason of each such Defendant's violations and, pursuant to the civil remedy

24   provisions of 18 U.S.C. § 1964(c), is thereby entitled to recover threefold the

25   damages it has suffered, together with its costs of suit and reasonable attorneys'

26   fees.

27

28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

44

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

## SECOND CLAIM FOR RELIEF

(For Violations of RICO, 18 U.S.C. §§ 1962(a), 1962(d), 1964(c), against all Defendants)

178.   Almaty hereby incorporates by reference the allegations in paragraphs 1 through 177, as though fully set forth herein.

179.   From in or about 1997 and continuing to the present, by reason of its organization, structure, and activities, the Khrapunov Racketeering Enterprise constituted a RICO enterprise within the meaning of 18 U.S.C. § 1961(4).  The Khrapunov Racketeering Enterprise was comprised of myriad individuals and entities, known and unknown to Almaty, all associated in fact as part of the Khrapunov Racketeering Enterprise, including but not limited to the Individual Defendants and Entity Defendants named herein.  The Khrapunov Racketeering Enterprise was engaged in, and the activities of the Khrapunov Racketeering Enterprise affected, interstate and foreign commerce.

180.   Each of the Defendants was at the center of and was a principal perpetrator of a fraudulent scheme and is liable under 18 U.S.C. § 1962(a) as a direct and indirect beneficiary of the pattern of racketeering herein alleged.

181.   As alleged herein, the Khrapunov Racketeering Enterprise participants, including Defendants and each of them, together with other individuals and entities known and unknown to Almaty, engaged and conspired to engage in acts in the United States to further the goals of their criminal enterprise, in violation of U.S. law.

182.   Defendants engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting numerous financial transactions using illegally obtained funds laundered through various off-shore accounts and entities to, among other things, purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities, including the Entity Defendants, in furtherance of the Khrapunov Racketeering Enterprise, knowing

LATHAM&WATKINS LLP  US-DOCS\97422225
ATTORNEYS AT LAW
LOS ANGELES

45

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   that such funds were stolen from the people of Almaty and with the intent of

2   concealing the source of those funds.

3       183.   Defendants further engaged and conspired to engage in money

4   laundering in violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or

5   transferring funds stolen from the people of Almaty and laundered through various

6   off-shore accounts and entities into and within the United States in order to, among

7   other things, purchase real estate and assets in Beverly Hills, Studio City, and

8   elsewhere and to fund business entities, including the Entity Defendants, in

9   furtherance of the Khrapunov Racketeering Enterprise, knowing that such funds

10  were stolen from the people of Almaty and with the intent of concealing the source

11  of those funds.

12      184.   Defendants further engaged and conspired to engage in money

13  laundering in violation of 18 U.S.C. § 1956 by conducting financial transactions

14  using those stolen funds by, among other things, using stolen funds laundered

15  through various off-shore accounts and entities to purchase real estate and other

16  assets in Beverly Hills, Studio City, and elsewhere and to fund business entities,

17  including the Entity Defendants, in furtherance of the Khrapunov Racketeering

18  Enterprise, knowing that such funds were stolen from the people of Almaty and

19  with the intent of concealing the source of those funds.

20      185.   Defendants engaged and conspired to engage in money transactions in

21  property derived from specified unlawful activity in violation of 18 U.S.C. § 1957

22  by, among other things, knowingly transferring funds in excess of $10,000 stolen

23  from Almaty into and within the United States via United States financial

24  institutions to purchase real estate and other assets in Beverly Hills, Studio City,

25  and elsewhere and to fund business entities, including the Entity Defendants,

26  knowing that such funds were derived from and traceable to funds stolen from the

27  people of Almaty.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
US-DOCS\97422225
46
FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

186.   Defendants engaged and conspired to engage in the foreign transport of stolen money or property known to be stolen, converted or taken by fraud in violation of 18 U.S.C. § 2314 by transferring funds derived from and traceable to funds stolen from the people of Almaty into and within the United States, in excess of $5,000, knowing those funds to have been stolen from the people of Almaty and/or obtained from the people of Almaty by means of false or fraudulent pretenses, representations, or promises by, among other things, transferring such funds from bank accounts in Switzerland into the United States via United States financial institutions and using those funds to purchase real estate and other assets in Beverly Hills, Studio City, and elsewhere and to fund business entities, including the Entity Defendants.

187.   Defendants, and each of them, conspired with each other and with others to commit the violations of U.S. law described herein, and one or more of the Defendants or their co-conspirators acted to violate such laws.  Defendants, and each of them, thus also violated 18 U.S.C. § 371.

188.   Defendants engaged and conspired to engage in mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by knowingly using the United States mails and wires to transfer illegally obtained funds into and within the United States, for the purpose of furthering the Khrapunov Racketeering Enterprise and, while concealing the funds' illegal source, used those funds to purchase real estate in Beverly Hills and Studio City, California and to fund business entities, including the Entity Defendants, to enable those entities to conduct business in the United States using the illegally-obtained funds.

189.   Defendants engaged and conspired to engage in the above violations of U.S. law in order to implement the objectives and accomplish the unlawful purposes of the Khrapunov Racketeering Enterprise as set forth herein, and thereby

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

47

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   engaged in predicate acts of racketeering within the meaning of 18 U.S.C. §

2   1961(1)(B).

3        190.   Furthermore, each Defendant received income derived directly or

4   indirectly from a pattern of racketeering in which each of said Defendants

5   participated as a principal within the meaning of 18 U.S.C. § 2.

6        191.   During the period commencing in or about 1997 and continuing to the

7   present, the Defendants, having received income derived, directly or indirectly,

8   from a pattern of racketeering activity, used or invested, directly or indirectly, in

9   violation of 18 U.S.C. § 1962(a), income or the proceeds of income from said

10  illegal racketeering activity in the acquisition of an interest in, or the establishment

11  or operation of the Khrapunov Racketeering Enterprise or one or more affiliated

12  entities, including without limitation, the Entity Defendants.  Said uses and

13  investments in enterprises affecting interstate or foreign commerce include without

14  limitation the uses and investments described herein.

15       192.   In so doing, Defendants unlawfully, willfully, and knowingly did

16  combine, conspire, confederate, and agree together, with each other and with

17  others to commit RICO violations under 18 U.S.C. § 1962(c) and, thereby, violated

18  18 U.S.C. § 1962(d).  In furtherance of the conspiracy and to effect the objects

19  thereof, Defendants and their co-conspirators committed in the Central District of

20  California and elsewhere the overt acts as described herein, among others.

21       193.   As a direct and proximate result of RICO violations by the Defendants

22  of 18 U.S.C. § 1962(a) and/or 18 U.S.C. § 1962(d), Almaty has suffered damages

23  in an amount to be determined at trial and presently estimated to be not less than

24  $300 million.  Almaty has been injured in its business or property by reason of

25  each such Defendant's violations in that financial assets stolen or otherwise

26  diverted from and thereby lost to Almaty have been used and invested, directly or

27  indirectly, to acquire an interest in and to establish and operate numerous

28  enterprises affecting interstate or foreign commerce without benefit to Almaty or

LATHAM&WATKINS LLP   US-DOCS\97422225
ATTORNEYS AT LAW
LOS ANGELES                                                   48

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1  its people.  Accordingly, pursuant to the civil remedy provisions of 18 U.S.C. §

2  1964(c), Almaty is entitled to recover threefold the damages it has suffered,

3  together with its costs of suit and reasonable attorneys' fees.

4  **THIRD CLAIM FOR RELIEF**

5  (For Breach of Fiduciary Duty against Viktor)

6  194.   Almaty hereby incorporates by reference the allegations in paragraphs

7  1 through 193, as though fully set forth herein.

8  195.   As alleged above, Viktor owed a fiduciary duty to Almaty and its

9  people to hold and control the assets of the Almaty government for the benefit of

10  Almaty and its people, and not for his personal benefit or the personal benefit of

11  his relatives, associates, and accomplices.

12  196.   By engaging in the acts alleged above, Viktor breached his fiduciary

13  duty to Almaty and its people.  As a direct and proximate result of such breaches,

14  Almaty has suffered damages in an amount to be determined at trial and presently

15  estimated to be not less than $300 million.

16  197.   In committing the acts and perpetrating the schemes alleged herein,

17  Viktor intended to injure Almaty and acted with malice and oppression and with a

18  willful and conscious disregard for the rights of Almaty and its people.  In so

19  doing, Viktor has acted toward Almaty and its people in such manner as to warrant

20  disgorgement of his uses and investments of Almaty's money and property

21  together with an award of punitive and exemplary damages in an amount no less

22  than $300 million.

23  **FOURTH CLAIM FOR RELIEF**

24  (For Conversion and Conspiracy to Convert against all Defendants)

25  198.   Almaty hereby incorporates by reference the allegations in paragraphs

26  1 through 197, as though fully set forth herein.

27  199.   Defendants, and each of them, together with other individuals and

28  entities, both known and unknown to Almaty, have wrongfully converted, aided

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

49

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

and abetted, and caused to be converted, to their own use, and that of their friends, families, associates, and accomplices, money, funds, and property belonging to Almaty and its people.  Such conversions have been for the benefit of the Defendants and their friends, families, associates, and accomplices, and to the detriment of the true owners of the property, Almaty and its people.  Such acts of conversion include the acts alleged herein.

200.   Defendants unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together, with each other, and with others to convert money, funds, and property belonging to Almaty and its people to their own use, and that of their friends, families, associates, and accomplices.  In furtherance of the conspiracy and to affect the objects thereof, Defendants committed the overt acts, among others, referenced above.

201.   As a direct and proximate result of these acts of conversion by Defendants, Almaty has suffered damages in an amount to be determined at trial, and presently estimated to be not less than $300 million.

202.   In committing the acts and perpetrating the schemes alleged herein, Defendants intended to injure Almaty and acted with malice and oppression and with a willful and conscious disregard for the rights of Almaty and its people.  In so doing, Defendants acted toward Almaty and its people in such manner as to warrant disgorgement of their uses and investments of Almaty's money and property together with an award of punitive and exemplary damages in an amount no less than $300 million.

## FIFTH CLAIM FOR RELIEF

(For Fraud and Deceit and Conspiracy to Defraud against Viktor and Leila)

203.   Almaty hereby incorporates by reference the allegations in paragraphs 1 through 202, as though fully set forth herein.

204.   In the course of conducting and participating in the conduct of the affairs of the Khrapunov Racketeering Enterprise, Viktor and Leila made

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

50

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

representations to Almaty and others, which representations were false and necessary to implement the unlawful looting, laundering, investment and obstruction schemes described above.

205.   As set forth above, Viktor, who owed a fiduciary duty to Almaty, and Leila failed to disclose and otherwise concealed facts from Almaty and others, the disclosure of which was necessary to make the representations made by them to Almaty not materially misleading.  Viktor and Leila knew that said facts were not being disclosed and were material, and they intended by concealment of these facts to facilitate continuation of their unlawful diversion of assets belonging to Almaty and its people.

206.   Almaty relied to its detriment on the representations of integrity by Viktor and Leila.  Viktor and Leila flagrantly breached the trust and confidence of Almaty by committing numerous acts of fraud, deceit, conversion, and racketeering alleged herein, through which they plundered the assets of Almaty.

207.   In the course of developing their elaborate scheme to defraud, Viktor and Leila secured the assistance, among others, of associates and accomplices, who with Viktor and Leila unlawfully, willfully and knowingly did combine, conspire, confederate, and agree together, with each other and with others to facilitate, aid and abet, and conceal the scheme and artifice to defraud, and to obtain money and property by false representations and promises, thereby enabling the massive diversions and concealment of looted funds identified in this Complaint.

208.   As a direct and proximate result of the foregoing fraudulent conduct and conspiracy to defraud, Almaty has suffered damages in an amount to be determined at trial, and presently estimated to be not less than $300 million.

209.   In committing the acts and perpetrating the schemes alleged herein, Viktor and Leila intended to injure Almaty and acted with malice and oppression and with a willful and conscious disregard for the rights of Almaty and its people. In so doing, Defendants acted toward Almaty and its people in such manner as to

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

51

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   warrant disgorgement of their uses and investments of Almaty's money and

2   property together with an award of punitive and exemplary damages in an amount

3   no less than $300 million.

4   **SIXTH CLAIM FOR RELIEF**

5   (For an Accounting, Imposition of a Constructive Trust and Equitable Lien against

6   all Defendants)

7   210.   Almaty hereby incorporates by reference the allegations in paragraphs

8   1 through 209, as though fully set forth herein.

9   211.   During Viktor's mayoralty of Almaty, he, acting as mayor, controlled

10   virtually all of the valuable assets of the Almaty government.  These assets

11   included money and real and personal property owned by the Almaty government,

12   the right to convey, for the benefit of the people of Almaty, real and personal

13   property owned by the Almaty government, and the right to decide who could do

14   business in Almaty through the granting of licenses, concessions, and permits.

15   Viktor further was entrusted with the ability to cause privately owned property to

16   be seized by the Almaty government, purportedly for the benefit of Almaty and its

17   people.

18   212.   Viktor owed a fiduciary duty to Almaty and its people to hold and

19   control these assets for the benefit of Almaty and its people, and not for his

20   personal benefit or the personal benefit of his friends, families, associates, and

21   accomplices.  As alleged above, Viktor, aided and abetted by the other Defendants

22   and co-conspirators, both known and unknown to Almaty, converted the assets of

23   the Almaty government to his personal benefit and the personal benefit of his

24   friends, families, associates, and accomplices.  They did so by looting money and

25   property owned by the Almaty government and/or by private parties and by

26   accepting bribes, kickbacks, gratuities, and commissions in exchange for the

27   granting of the legal right to do business in Almaty.  All such conversions of assets

28   were done in violation of Viktor's duties to the beneficial owners of such assets,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

52

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1   Almaty and its people.  If Viktor or the other Defendants are permitted to retain

2   these assets, they will be unjustly enriched at Almaty's expense.

3        213.   Defendants other than Viktor received money and property stolen

4   from the Almaty government by Viktor and other economic benefits taken or

5   conferred upon them by Viktor in violation of his fiduciary duty.  These

6   Defendants received such money, property, and other economic benefits without

7   giving value for them or with notice to Almaty that such assets had been stolen or

8   otherwise acquired in violation of Viktor's duties to Almaty and its people.  If

9   these Defendants are permitted to retain such assets, they will be unjustly enriched

10   at Almaty's expense.

11        214.   As a result of the foregoing, Almaty is entitled to an accounting by

12   each of the Defendants of all real and personal property held, acquired, or disposed

13   of by them at any time since 1997.

14        215.   As a result of the foregoing, Almaty is entitled to an imposition of a

15   constructive trust for the benefit of Almaty over all monies or assets belonging to

16   Almaty currently held or controlled by Defendants and Almaty is further entitled to

17   an  equitable lien upon all real and personal property of Defendants, wherever

18   located worldwide.

19        216.   Defendants regularly misused and continue to misuse the corporate

20   and other forms of business organization as a cloak for committing fraud and as a

21   means of perpetrating injustice.  By reason of the elaborate and fraudulent schemes

22   used by Defendants to conceal transfers of stolen money and property and to

23   conceal ownership of Defendants' assets, it would be unjust and inequitable to

24   require Almaty to trace the source of money used to acquire specific assets, or to

25   prove that specific assets were acquired with money or property stolen from

26   Almaty.  Instead, the burden should be shifted to Defendants to prove that they had

27   sources of income other than the unlawful looting and investment schemes

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

53

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF

1 described herein, and to prove that particular assets were acquired by them with

2 such independent, lawful income.

3 **PRAYER**

4     WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

5     A.    For compensatory damages;

6     B.    For treble damages;

7     C.    For punitive damages;

8     D.    For prejudgment interest;

9     E.    For a constructive trust;

10     F.    For an accounting;

11     G.    For injunctive relief;

12     H.    For disgorgement;

13     I.    For all costs and fees incurred in prosecuting this Complaint; and

14     J.    For such other and further relief as this Court deems just and proper.

15 **JURY DEMAND**

16     Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Civil L.R.

17 38-1, Plaintiff hereby demands a trial by jury.

18 Dated:  December 15, 2017           LATHAM & WATKINS LLP

19

20                     By: /s/ David J. Schindler____
                       David J. Schindler

21                        Jonathan M. Jackson
                       Kendall M. Howes

22                     *Attorneys for Plaintiff*

23                     The City of Almaty

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

US-DOCS\97422225

54

FIRST CONSOLIDATED AMENDED COMPLAINT
FOR DAMAGES, INJUNCTIVE RELIEF
AND OTHER EQUITABLE RELIEF