# EXHIBIT 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF ALMATY, KAZAKHSTAN
AND BTA BANK JSC,

Crossclaim Plaintiffs,

-against-

MUKHTAR ABLYAZOV, VIKTOR
KHRAPUNOV, ILYAS KHRAPUNOV,
AND TRIADOU SPV S.A.,

Crossclaim Defendants.

15 Civ. 5345 (AJN) (KHP)

**DECLARATION OF MATTHEW
GEORGE JENKINS**

I, Matthew George Jenkins, declare as follows:

1.     I am a solicitor and partner in the firm of Hughmans located at 32 Farringdon Street, London, United Kingdom.  My firm has represented Ilyas Khrapunov ("Mr. Khrapunov") in connection with the proceedings JSC BTA Bank has brought against Mr Khrapunov in the United Kingdom.  I submit this declaration in support of Mr. Khrapunov's response to the Letter Motion of April 19, 2017 filed by JSC BTA Bank and the City of Almaty (together, "BTA/Almaty") requesting an order that the deposition of Mr Khrapunov take place at an agreed location other than Switzerland.

**Mr. Khrapunov Was Added to INTERPOL'S List of Wanted Persons in 2014 and Since Being Added to the List, He Has Not Left Switzerland**

2.     Mr. Khrapunov is a Kazakh national and is a resident of Switzerland.  He lives in Geneva with his wife and two young children.

3.     The Kazakh government authorities, based on allegations made by the City of Almaty, allege that Mr. Khrapunov has been involved in illegal criminal activity.  At their instigation, an INTERPOL Red Notice was issued in April 2014.  An extract from this Red Notice

is displayed online at: https://www.interpol.int/notice/search/wanted/2014-26980, (*See* INTERPOL Red Notice, attached hereto as **Exhibit 1**).

4. This is not the full version of the INTERPOL Red Notice that would have been distributed to law enforcement authorities, as is stated on the page: "This extract of the Red Notice has been approved for public dissemination."

5. In the extract published online, it is stated that Mr. Khrapunov is "WANTED BY THE JUDICIAL AUTHORITIES OF KAZAKHSTAN FOR PROSECUTION / TO SERVE A SENTENCE". Also, under the heading "Charges" it is stated: "The creation and guidance of an organised criminal group or criminal association (criminal organisation), and participation in a criminal association; Legalization of monetary funds or other property obtained illegally".

6. The fact of the issued and maintained an INTERPOL Red Notice demonstrates that the Kazakh authorities are actively interested in securing Mr. Khrapunov's extradition. It is apparent from the gravity of the alleged crimes as to why this is the case.

7. Mr. Khrapunov has advised me that he has not left Switzerland since the INTERPOL Red Notice was issued. He has not done so because of the effect of the INTERPOL Red Notice and the risk to his liberty were he to leave Switzerland.

**The Effects of Being Subject to an INTERPOL Red Notice**

8. Should Mr. Khrapunov leave Switzerland, he must expect to be stopped at the Swiss border or a foreign airport upon arrival to identify himself. Although the existence of the Schengen Area, an area created by the Schengen Agreement which allows citizens to cross internal borders without being subjected to border checks, has eliminated border control between some European countries, the UK is outside of the Schengen Area.

9. Essentially, a Red Notice status is a request for any country to identify or locate an individual with a view to their provisional arrest and extradition in accordance with the country's national laws. An individual who is subject to an INTERPOL Red Notice is subject to arrest in any member country. The UK and Spain are INTERPOL member countries.

10. There is no formal extradition treaty between the UK and Kazakhstan. However, that is not a bar to the extradition of a person from the UK to Kazakhstan. For instance, extradition could be effected by the governments entering into an *ad hoc* special extradition arrangement (provided for under the Extradition Act of 2003).

11. In this regard, it is highly relevant that co-operation between the UK and Kazakhstan in respect of criminal matters is ever growing. On April 4, 2016, a new treaty came into force, "Treaty between the United Kingdom of Great Britain and Northern Ireland and the Republic of Kazakhstan on Mutual Legal Assistance in Criminal Matters." The Home Office's Explanatory Memorandum (command paper no. 9179) states: "[t]his Treaty is a clear commitment by both parties to mutual-cooperation in the cross-border fight against crime and will strengthen bilateral relations more generally."

12. It is in this context that the prospect of an agreement being reached between the UK and Kazakh authorities to facilitate the extradition of Mr. Khrapunov can be readily anticipated.

**There is a High Likelihood that Kazakhstan Could Generate a "Surrogate" Extradition Request**

13. The Kazakh authorities have worked closely with other former Soviet countries which have standing extradition processes with the United Kingdom and Spain to generate "surrogate" extradition requests.

14.     Both the Russian Federation and Ukraine are designated as "category 2" territories for the purposes of the UK's Extradition Act 2003, and as such, any requests for Mr. Khrapunov's provisional arrest or extradition from either of these countries would follow a more stream-lined procedure than were the request to come directly from Kazakhstan. Were an extradition request (or provisional arrest request) for Mr. Khrapunov to be received by the UK from Russia or Ukraine it would be certified and executed in the normal way.

15.     Therefore, the absence of an extradition treaty in place between Kazakhstan and the UK is clearly not an impediment to the possible detention and attempted extradition of Mr. Khrapunov.

**Ukrainian Criminal Proceedings**

16.     Indeed, November 2016 Mr. Khrapunov discovered that there are unfounded extant criminal proceedings against him in the Ukraine and that these were commenced as far back as October 2015. The Ukrainian criminal proceedings are in relation to unsupported allegations that Mr. Khrapunov illegally intervened in the work of computers owned and used by the attorneys of Ilyashev & Partners Law Firm, the firm that represents JSC BTA Bank. This first came to his attention when a journalist provided him with a copy of a bundle of documents (the "Ukraine Documents Bundle"), a copy of which is attached hereto as **Exhibit 2**.

17.     The Ukraine Document Bundle also includes English language versions of the various stamped, sealed and signed original documents. It is not apparent if the English language versions are official translations from the official bodies who authored the original documents. I believe that they faithfully translate the meaning and words of the original documents into English.

18.     I describe the documents in the Ukraine Documents Bundle by reference to the contents of those English language versions:

(a)     A document entitled *"RESOLUTION on putting the accused on the wanted list"* dated 17.03.16. It is a document from a police major at the *"the National Police of Ukraine; Head Administration of the National Police; in the city of Kyiv; Investigation Department"*. This letter refers to a criminal case against Mr Khrapunov opened on 29.10.15 in connection with the alleged conspiracy by Mr Khrapunov from late summer – early autumn 2013 to interfere in the computer systems of the Bank's Ukrainian lawyers, Ilyashev & Partners, executed on 13.11.13, contrary to various provisions of the Ukrainian Criminal Code. It says that a 'notice of suspicion' was approved on 17.03.16. By this document it resolved to put Mr Khrapunov on the wanted list. This document expressly identifies Ilyashev & Partners as: *"represent[ing] interests of JSC "BTA Bank" (Republic of Kazakhstan)"*.

(b)     A document entitled *"RULING"* which, on its face, is a record of the ruling of a Ukrainian investigating judge dated 22.03.16 upon an application by the Ukrainian police authorities for permission to detain Mr Khrapunov to bring him to Court on the basis of the Hacking Allegations. The document sets out that an investigating judge in Kiev ruled in a <u>closed</u> court session that it is necessary to permit detention of Mr Khrapunov to bring him to Court. It also states that on 17.03.16, Mr Khrapunov was put on the wanted list (as per the resolution in the preceding document).

(c)     A document entitled *"RULING"* which, on its face, is a record of the ruling of the same Ukrainian investigating judge dated 19.08.16 upon an application by the Ukrainian police authorities for permission to detain Mr Khrapunov in custody on the basis of the Hacking Allegations. The document sets out that the investigating judge ruled that Mr Khrapunov be detained in custody as a preventative measure. This document states that Mr Khrapunov was put on the international wanted list by way of a letter from the Ukrainian bureau of Interpol on 10.05.16.

(d)     A letter dated 15.09.16 to Mr Herasymiv of Ilyashev & Partners (the Bank's Ukrainian lawyers), in which the police authority set out details of the listing on

5

Interpol's wanted list of persons connected with allegations of fraud against the Bank. This letter states that it is in response to his "*attorney's request*" – presumably this is a reference to a formal legal request Mr Herasymiv made on 08.09.16. I note that the top left hand side of the letter reads: "*Your ref. no.: No number of September 08, 2016*". In this letter, it states that according to the records of the Interpol General Secretariat that Mr Khrapunov is searched for at the instance of both the Ukrainian and Kazakh bureaux of Interpol.

19.    Given that Mr. Khrapunov's attendance of a deposition is a pre-planned scheduled event the existence of which is known to the Kazakh authorities, they will have plenty of time to set the necessary procedures in place, including organizing surrogate extradition requests. Furthermore, as explained above, due to the INTERPOL Red Notice, it is very likely that upon entering the UK the relevant UK authorities would communicate the fact of Mr. Khrapunov's presence in the UK back to the Kazakh and Ukrainian authorities.

20.    In light of all of the foregoing, there is every reason to believe that the Kazakh and/or Ukrainian authorities would take advantage of the occasion of a scheduled visit by Mr. Khrapunov to England for an appearance at a deposition in this case to seek his detention and extradition. Indeed, this is exactly what they seem to have done in relation to a hearing scheduled for 26 May 2016 at which they expected Mr. Khrapunov to attend Court in London.

**Misleading of the Court by the Bank in relation to the Ukrainian criminal proceedings**

21.    On 26 May 2016 Mr. Khrapunov was due to attend Court in London but he instead applied for permission to give evidence by video link from Switzerland. The Judge refused the application on the basis of submissions from the Bank that there was no reason to suspect the Ukrainian authorities were likely to seek Mr. Khrapunov's extradition. On 26 November 2016 the Court of Appeal initially refused Mr. Khrapunov's application for permission to appeal against that decision.

22.      However, on 26 April 2017 the Court of Appeal set aside its initial order, on the grounds that both the Court of Appeal and Mr. Justice Philips had been misled by the Bank: in direct contradiction to the submissions it made to the Court, the Bank knew at all material times that there were outstanding criminal proceedings against Mr. Khrapunov in Ukraine and that the Ukrainian authorities had placed Mr. Khrapunov on the INTERPOL wanted list on 10 May 2016, 16 days before he was due to attend Court in London to give evidence (see Court of Appeal's order attached hereto as **Exhibit 3**).

**Mr. Khrapunov's View that He is Safe From Extradition in Switzerland is Justified**

23.      Both Switzerland and France have seen through Kazakhstan's efforts to extradite by generating surrogate extradition requests made by Russia and Ukraine.[1]  Furthermore, the Swiss authorities have twice previously rejected requests to extradite Mr. Khrapunov's father, Viktor Khrapunov, to Kazakhstan.  (*See* certified translated copy of a letter dated June 19, 2014 from the Swiss Federal Office of Justice, attached hereto as **Exhibit 4**).  The basis for this refusal to grant extradition was Article 2 of the Swiss Federal Act on International Mutual Assistance in Criminal Matters, which provides:

> A request for cooperation in criminal matters shall not be granted if there are reasons to believe that the foreign proceedings

---

[1] France refused to extradite to Russia after finding that the individual whose extradition was sought was an opponent of the political regime of Kazakhstan and further finding that the evidence showed Kazakhstan sought to pressure the Russian authorities to initiate criminal prosecution against the individual and to request his extradition to Russia.  The French opinion cites Article 3(§ 2) of the European Convention on Extradition, which states that extradition shall not be granted "if the requested Party has substantial grounds for believing that a request for extradition for an ordinary criminal offence has been made for the purpose of prosecuting or punishing a person on account of his race, religion, nationality or political opinion, or that that person's position may be prejudiced for any of these reasons".  The opinion goes on to find that the individual's extradition to Russia was sought for a political purpose.  (*See* December 9, 2016 Decision of The French *Conseil D'Etat* (Counsel of State) and Administrative Justice, attached hereto as **Exhibit 5**).

     a.     do not meet the procedural requirements of the European Convention for the Protection of Human Rights and Fundamental Freedoms of 4 November 1950, or the International Covenant on Civil and Political Rights of 16 December 1966;

     b.     are being conducted so as to prosecute or punish a person on account of his political opinions, his belonging to a certain social group, his race, religion, or nationality;

     c.     could result in aggravating the situation of the defendant for any of the reasons mentioned under letter b; or

     d.     have other serious defects.

In the circumstances of the failed attempts to extradite his father, one can see why it would be unlikely that the Kazakh authorities would spend time and money seeking to have Mr. Khrapunov extradited from Switzerland, and indeed, why Mr. Khrapunov would feel a high degree of assurance that any such attempt would be unsuccessful.

24.     The Swiss refusal to extradite to Kazakhstan, directly or indirectly, is a product of Swiss law, procedure and policy.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 2, 2017

_____

Matthew George Jenkins

8

EXHIBIT 1

CONNECTING POLICE FOR A SAFER WORLD

**Back to Search result**



## KHRAPUNOV, ILYAS (ILIYAS)
WANTED BY THE JUDICIAL AUTHORITIES OF KAZAKHSTAN FOR PROSECUTION / TO SERVE A SENTENCE

### IDENTITY PARTICULARS

| | |
|---|---|
| Present family name: | **KHRAPUNOV** |
| Forename: | **ILYAS (ILIYAS)** |
| Sex: | **Male** |
| Date of birth: | **15/01/1984 (33 years old)** |
| Place of birth: | **TARAZ CITY, ZHAMBYL REGION, Kazakhstan** |
| Language spoken: | **Kazakh, Russian, English, French** |
| Nationality: | **Kazakhstan** |

### CHARGES   Published as provided by requesting entity

Charges:   **The creation and guidance of an organised criminal group or criminal association (criminal organisation), and participation in a criminal association; Legalization of monetary funds or other property obtained illegally**

### PHOTOS




### IF YOU HAVE ANY INFORMATION PLEASE CONTACT

Your national or local police
General Secretariat of INTERPOL

**This extract of the Red Notice has been approved for public dissemination**

Site map    |    FAQs    |    Terms of use    |    Calls for tender    |    Recruitment    |    Contact INTERPOL    |    e-Learning

© INTERPOL 2017. All rights reserved.

# Exhibit 2



## THE NATIONAL POLICE OF UKRAINE
## HEAD ADMINISTRATION OF THE NATIONAL POLICE
## IN THE CITY OF KYIV
## INVESTIGATION DEPARTMENT
15 Volodymyrska St., Kyiv, 01601

### RESOLUTION
**on putting the accused on the wanted list**

city of Kyiv                                                           March 17, 2016

A.P. Pomitalkina, Police major, Senior Investigator of the Investigation Department of the Head Administration of the National Police in the city of Kyiv, having considered the criminal case files No. 12015100000000941, initiated on October 29, 2015,-

### FOUND:

The pretrial investigation files entered on October 29, 2015 to the Unified Register of Pretrial Investigations under No. 12015100000000941, on suspicion of I.V. Khrapunov of a criminal offence under Art. 361(2) of the Criminal Code of Ukraine are pending in the Investigation Department of the Head Administration of the National Police in the city of Kyiv.

The pretrial investigation established that in late summer – early autumn 2013, I.V. KHRAPUNOV having family ties with Mukhtar Kabulovych Ablyazov, born on May 16, 1962, who is suspected of criminal proceedings No. 12012110000000147 for criminal offenses under Art. 190(4), Art. 191(5), Art. 15(2) and Art. 209(1) of the Criminal Code of Ukraine, being aware of the pre-trial investigation against M.K. Ablyazov and officials of JSC "BTA Bank" (Republic of Kazakhstan) by the investigators of the agencies of internal affairs of Ukraine, reliably knowing that M.K. Ablyazov is on the international wanted list on the initiative of the Investigation Department of the Head Administration of the National Police in the city of Kyiv, and is under extradition arrest in connection with consideration by the competent law enforcement agencies of the Republic of France of the requested for extradition of Ablyazov for bringing to responsibility in Ukraine, by previous concert with the persons unidentified by the pretrial investigation, decided to illegally intervene in the work of electronic computing machines (computers), owned and used by the lawyers, attorneys of Ilyashev & Partners Law Firm (11 Kudryavska St., Kyiv), who represent JSC "BTA Bank" (Republic of Kazakhstan), to obtain information stored on hard drives of the said computers and electronic data storage devices.

To implement his criminal intent, in late August – early September 2013, I.V. KHRAPUNOV acting together with the persons unidentified by the pretrial investigation turned to Olena Yuriivna Tyshchenko, born on August 26, 1976, who has long represented M.K. Ablyazov in foreign courts, speaks Russian, Ukrainian, and English fluently, and was not aware of the actual intentions of I.V. KHRAPUNOV, with a request to provide information about email addresses of attorneys of Ilyashev & Partners Law Firm, who represent interests of JSC "BTA Bank" (Republic of Kazakhstan), including the representative – attorney Arseniy Yosypovych Herasymiv.

Later, O. Tyshchenko, fulfilling the request, using the Ukrainian information sources received information about email addresses of attorneys of Ilyashev & Partners Law Firm, including the attorney Arseniy Yosypovych Herasymiv, the representative of JSC "BTA Bank" (Republic of Kazakhstan), which she provided to I.V. KHRAPUNOV.

Then, I.V. KHRAPUNOV to implement criminal intent, in time and place unidentified by the pretrial investigation, by previous concert, gave to the persons, who have appropriate knowledge in the field of electronic computing machines and computer software, unidentified by the pretrial investigation, email boxes of Ilyashev & Partners Law Firm, including the attorney Arseniy Yosypovych Herasymiv, the representative of JSC "BTA Bank" (Republic of Kazakhstan), to interfere with the electronic computing machines (computers), which belong to and are used by the lawyers, attorneys of Ilyashev and Partners Law Firm, using malware intended for illegal interference in the work of electronic computing machines.

On November 13, 2013, during the day, the persons unidentified by the pretrial investigation acting by prior concert with I.V. KHRAPUNOV, by sending to the email box of a representative of JSC "BTA Bank" (Republic of Kazakhstan) - attorney of Ilyashev & Partners Law Firm Arseniy Yosypovych Herasymiv by link herasymiv@attorneys.ua of a malware - virus that looked like a usual email. On the same day A.J. Herasymiv without being aware of the real criminal intent of I.V. KHRAPUNOV and the persons unidentified by the pre-trial investigation opened the email sent to his mailbox, and thus using a malware – virus the persons unidentified by the pre-trial investigation illegally interfered in the electronic computing machine (computer) belonging to Ilyashev & Partners Law Firm and used by the representative of JSC "BTA Bank" (Republic of Kazakhstan) - attorney Arseniy Yosypovych Herasymiv and obtained open access to the information that was placed by A.J. Herasymiv on the hard disc of the computer and used him during representation of JSC "BTA Bank" (Republic of Kazakhstan) in criminal proceedings No. 1201211000000147 of November 23, 2012 and during carrying out of advocacy according to the certificate of advocacy of April 27, 2000 No. 1750/10.

3

Further, in time, place and manner unidentified by the pretrial investigation, the persons unidentified by the pretrial investigation acting by previous concert, gave to I.V. KHRAPUNOV the information obtained as a result of unauthorized interference in work of electronic computing machine (computer), which belongs to Ilyashev & Partners Law Firm and is used by the representative of JSC "BTA Bank" (Republic of Kazakhstan) – the attorney Arseniy Yosypovych Herasymiv, used by him during representation of JSC "BTA Bank" (Republic of Kazakhstan) in criminal proceedings No. 1201211000000147 of November 23, 2012 during carrying out of advocacy.

Thereafter, the information illegally obtained by I.V. KHRAPUNOV from the electronic computing machine (computer) of the representative of JSC "BTA Bank" (Republic of Kazakhstan) – the attorney of Ilyashev & Partners Law Firm Arseniy Yosypovych Herasymiv was used by him by transfer to the persons unidentified by the pretrial investigation and further posting in the Internet edition "TRUST.UA", in column "Economy and Policy" as article entitled "Corruption and Partners" by hyperlink www.odfoundation.eu/en/urgents/1676/kazakhstan_lobby_contrives_case_against_b ta_bank_in_ukraine_in_order_to_oppress_the_opposition,http://we.tl/hP1w7exHIV, http://we.tl/73pDahc0OZ and http://ura-inform.com/ru/economics/2014/03/12/korruptsija-i-partnery-chast-2, http://www.viktor-khrapunov.com/publications/respkz-39/, and was posted on the page of a citizen of the Republic of Kazakhstan Muratbek Ketebayev in the social network Facebook, which resulted in leak of the above information, including leak of professional secret of A.J. Herasymiv as attorney and representative of JSC "BTA Bank" (Republic of Kazakhstan) in criminal proceedings No. 12012110000000147, as access to it on the Internet was not limited and any user could review it freely.

Therefore, I.V. KHRAPUNOV and the persons unidentified by the pretrial investigation interfered illegally in work of electronic computing machines (computers) that resulted in leak of information by previous concert of a group of people.

On March 17, 2016, the notice of suspicion against I.V. KHRAPUNOV of a criminal offence under Art. 361(2) of the Criminal Code of Ukraine was approved in criminal proceedings No. 12015100000000941.

During investigation of the criminal proceedings, a number of measures aimed at establishing the actual location of the suspect I.V. KHRAPUNOV were taken for carrying out investigation (search) actions, but no positive result was obtained, i.e. the latter being aware of the significance of his actions and criminal liability he will bear as a result of intentionally hiding from investigation and court. It was also found that I.V. KHRAPUNOV is wanted by the Department of the Agency of the Republic of Kazakhstan for struggle against economic crimes and corruption in the city of

4

Almaty for crimes connected with embezzlement of property of JSC "BTA Bank" (Republic of Kazakhstan).

Considering that location of the accused Ilyas Viktorovych KHRAPUNOV, born on January 15, 1984, is unknown, he is hiding from the pretrial investigation agencies, prosecutor and court, and that he is wanted for commitment of offences by the law enforcement agencies of the Republic of Kazakhstan, guided by Arts. 41, 110 and 281 of the Code of Criminal Procedure of Ukraine, -

### RESOLVED:

1. To put on the wanted list the accused Ilyas Viktorovych KHRAPUNOV, born on January 15, 1984 in the town of Taraz, Zhambylska oblast, Republic of Kazakhstan, higher education, a citizen of the Republic of Kazakhstan, previously unconvicted, put on the wanted list by the Prosecutor's Office of the Republic of Kazakhstan, put on the international wanted list since 2014, place of registration: 177 Gorna St., Almaty, Republic of Kazakhstan.

2. To entrust the service division of the Shevchenkivskyi district of the Administration for protection of Economy in the city of Kyiv of the Department for Protection of Economy of the National Police of Ukraine with conducting search of the accused.

3. To forward a copy of resolution for execution.

**Police major, Senior Investigator of the Investigation Department of the Head Administration of the National Police in the city of Kyiv**   **A.P. Pomitalkina**



## НАЦІОНАЛЬНА ПОЛІЦІЯ УКРАЇНИ
### ГОЛОВНЕ УПРАВЛІННЯ НАЦІОНАЛЬНОЇ ПОЛІЦІЇ У МІСТІ КИЄВІ
### СЛІДЧЕ УПРАВЛІННЯ
вул. Володимирська, 15, м. Київ, 01601

### ПОСТАНОВА
про оголошення розшуку підозрюваного

м. Київ                                                                 17 березня 2016 року

Старший слідчий СУ Головного управління Національної поліції у місті Києві майор поліції Помiталкіна А.П., розглянувши матеріали кримінального провадження № 12015100000000941, розпочатого 29.10.2015,-

### ВСТАНОВИВ:

У слідчого управління Головного управління Національної поліції у місті Києві знаходяться матеріали досудового розслідування внесені 29.10.2015 до ЄРДР за № № 12015100000000941, за підозрою Храпунова І.В. у вчиненні кримінального правопорушення. передбаченого ч. 2 ст. 361 КК України.

Досудовим розслідуванням встановлено, що В кінці літа – на початку осені 2013 року Храпунов І.В. перебуваючи у родинних стосунках з Аблязовим Мухтаром Кабуловичем, 16.05.1962 року народження, який є підозрюваним кримінальному провадженні № 12012110000000147, за вчинення кримінальних правопорушень, передбачених ч. 4 ст. 190, ч. 5 ст. 191, ч. 2 ст. 15 та ч. 1 ст. 209 КК України, будучи обізнаним про факт проведення досудового розслідування відносно Аблязова М.К. та службових осіб АТ «БТА Банк» (Республіка Казахстан) слідчими органів внутрішніх справ України, достовірно знаючи, що Аблязов М.К. перебуває у міжнародному розшуку за ініціативою слідчого управління Головного управління Національної поліції у місті Києві, а також перебуває під екстрадиційним арештом у зв'язку із розглядом компетентними правоохоронними органами Французької Республіки запит про видачу Аблязова для притягнення на території України, за попередньою з мовою із невстановленими досудовим розслідуванням особами, вирішив незаконно втрутитись у роботу електронно – обчислювальних машин (комп'ютерів), які належать та які використовуються юристами, адвокатами юридичною фірмою «Ілляшев та Партнери» (місто Київ, вул. Кудрявська, 11), які представляють АТ «БТА Банк» (Республіка Казахстан), з метою отримання інформації, що зберігалася на жорстких дисках зазначених комп'ютерів та електронних носіях інформації.

2

з метою реалізації свого злочинного умислу, на при кінці початку вересня 2013 року, Храпунов І.В. діючи спільно з встановленими досудовим розслідуванням особами, звернувся до Тищенко Олени Юріївни, 26.08.1976 року народження, яка тривалий час представляла інтереси Аблязова М.К. у закордонних судах, вільно володіє російською, українською, англійською мовою та не була обізнана про реальні наміри Храпунова І.В., з проханням передати йому інформацію про адреси електронних поштових скриньок юристів юридичної фірми «Ілляшев та Партнери», які здійснюють представництво інтересів АТ «БТА Банк» (Республіка Казахстан), у тому числі представника - адвоката Герасиміва Арсенія Йосиповича.

У подальшому, Тищенко О.Ю., виконуючи на прохання, використовуючи українські інформаційні джерела, отримала інформацію щодо адрес електронних поштових скриньок юристів юридичної фірми «Ілляшев та Партнери» у тому числі адвоката Герасиміва Арсенія Йосиповича – представника АТ «БТА Банк» (Республіка Казахстан), які передала їх Храпунову І.В.

Після цього, Храпунов І.В. з метою реалізації злочинного умислу, в невстановлений досудовим розслідуванням час та місці, за попередньою змовою, передав невстановленим досудовим розслідуванням особам, які мають відповідні знання в сфері роботи електронно – обчислювальних машин та комп'ютерних програм, адреси електронних поштових скриньок юридичної фірми «Ілляшев та Партнери» у тому числі адвоката Герасиміва Арсенія Йосиповича – представника АТ «БТА Банк» (Республіка Казахстан), для внесення втручання у роботу електронно – обчислювальних машин (комп'ютерів), які належать та які використовуються юристами, адвокатами юридичною фірмою «Ілляшев та Партнери», шляхом використання шкідливих програм, призначених для незаконного втручання у роботу електронно – обчислювальних машин.

13.11.2013 у денний час, невстановлені досудовим розслідуванням особи, які діяли за попередньою змовою із Храпуновим І.В., шляхом надсилання на електронну поштову скриньку представника АТ «БТА Банк» (Республіка Казахстан) – адвоката юридичної фірми «Ілляшев та Партнери» Герасиміва Арсенія Йосиповича за посиланням herasymiv@attorneys.ua шкідливу програму – вірус, яка була законспірована під звичайний електронний лист. Цього ж дня Герасимів А.Й., не будучи обізнаним про реальні злочинні наміри Харпунова І.В. та невстановлених досудовим розслідування осіб, відкрив надісланого йому на електронну поштову скриньку листа, внаслідок чого за допомогою шкідливої програми - вірусу, невстановлені досудовим розслідуванням особи несанкціоновано втрутилися у діяльність електронно – обчислювальної машини (комп'ютера), який належить представником юридичної фірми «Ілляшев та Партнери» та використовується представником АТ «БТА Банк» (Республіка Казахстан) – адвокатом Герасимівом Арсенія Йосиповичем та отримали відкритий доступ до його інформації, яка була розміщена Герасимівом А.Й. на жорстких дисках комп'ютера та

3

...користовувалась ним у представництві інтересів АТ «БТА ...анк» (Республіка Казахстан) у кримінальному провадженні від 23.11.2012 ...у 1201211000000147 та у здійсненні ним професіональної адвокатської ...яльності, на підставі свідоцтва про право на заняття адвокатською ...яльністю від 27.04.2000 за №1750/10.

У подальшому, у невстановлений досудовим розслідуванням час, місце ...в спосіб, невстановлені досудовим розслідуванням особи, діючи за ...попередньою змовою, передали Храпунову І.В. отриману внаслідок ...есанкціонованого втручання у роботу електронно – обчислювальної машини ...комп'ютера), який належить юридичної фірми «Ілляшев та Партнери» та ...користовується представником АТ «БТА Банк» (Республіка Казахстан) – ...двокатом Герасимівом Арсенієм Йосиповичем інформації, яка ...використовувалась ним у представництві інтересів АТ «БТА Банк» ...Республіка Казахстан) у кримінальному провадженні від 23.11.2012 ...№ 1201211000000147 у здійсненні ним професіональної адвокатської ...яльності.

Після цього, отримана Храпуновим І.В. у незаконний спосіб інформація ...у електронно – обчислювальної машини (комп'ютера), представником ...АТ «БТА Банк» (Республіка Казахстан) – адвоката юридичної фірми «Ілляшев ...та Партнери» Герасиміва А.Й., була використана ним шляхом передачі ...невстановленими досудовим розслідуванням особам та подальшим ...розміщенням в Інтернет – виданні «TRUST.UA», у рубриках «Экономика та ...Политика», в матеріалі під назвою «Коррупция и партнеры» та за ...гіперпосиланнямиwww.odfoundation.eu/en/urgents/1676/kazakhstan_lobby_contri ...ues_case_against_bta_bank_in_ukraine_in_order_to_oppress_the_opposition,http:// ...we.tl/hP1w7exHIV, http://we.tl/73pDahc0OZ та ...http://ura-inform.com/ru/economics/2014/03/12/korruptsija-i-partnery-chast-2, ...http://www.viktor-khrapunov.com/publications/respkz-39/, а також була ...розміщена на сторінці громадянина Республіки Казахстан Муратбеком ...Кетебаєвим у соціальній мережі Facebook, що призвело до витоку ...вищевказаної інформації у тому числі витоку професійної таємниці ...Герасиміва А.Й. , як адвоката та представника АТ «БТА Банк» (Республіка ...Казахстан) у кримінальному провадженні № 12012110000000147, так як ...доступ до неї у мережі Інтернет не був обмежений та будь – який користувач ...міг з нею вільно ознайомитись.

Таким чином Храпунов І.В. та невстановлені досудовим розслідування ...особи учинили несанкціоноване втручання в роботу електронно – ...обчислювальних машин (комп'ютерів), що призвело до витоку інформації, за ...попередньою змовою групою осіб.

17.03.2016 у кримінальному провадженні № 12015100000000941 ...винесено повідомлення про підозру Храпунову І.В. у вчиненні кримінального ...правопорушення, передбаченого ч. 2 ст. 361 КК України.

У ході проведення розслідування даного кримінального провадження ...проведено ряд заходів направлених на встановлення фактичного місця ...перебування підозрюваного Храпунова І.В. з метою проведення слідчих

4

(розшукових) дій, однак позитивного результату отримано не було, тобто установки, усвідомлюючи значення своїх дій та відповідно кримінальну відповідальність яку вона буде нести як наслідок, умисно переховується від органів слідства та суду. Крім того встановлено, що Храпунов І.В. розшукується Департаментом Агентства Республіки Казахстан по боротьбі з економічною та корупційною злочинністю по місту Алмати за вчинення злочинів пов'язаних із розкраданням майна АТ «БТА Банк» (Республіка Казахстан).

Враховуючи те, що місцезнаходження підозрюваного Храпунова Ільяса Вікторовича, 15.01.1984 року народження, невідоме, він переховується від органів досудового розслідування, прокурора та суду, а також те, що він розшукується за вчинення злочинів правоохоронними органами Республіки Казахстан, керуючись ст. ст. 41, 110 та 281 КПК України, -

## ПОСТАНОВИВ:

1. Оголосити розшук підозрюваного Храпунова Ільяса Вікторовича, 15.01.1984 року народження, народився в місті Тараз Жамбилської області Республіки Казахстан, освіта вища, громадянин Республіки Казахстан, раніше не судимий, оголошений у розшук прокуратурою Республіки Казахстан, з 2014 року оголошений у міжнародний розшук, місце реєстрації: Республіка Казахстан, місто Алмати, вул. Горна, 177.

2. Здійснення розшуку підозрюваного доручити відділу з обслуговування Шевченківського району УЗЕ у місті Києві ДЗЕ Національної поліції України.

3. Копію постанови направити для виконання.

Старший слідчий СУ Головного управління
Національної поліції у місті Києві
майор поліції

А.П. Помігалкіна

COPY

Case No. 752/4436/16-k
Proceedings No. 1-kc/752/1135/16

**RULING**

On March 22, 2016, N.P. Cherednichenko, the investigating judge of the Golosiivskyi District Court of the city of Kyiv, with the secretary T.S. Mykolenko, with participation of O.V. Kovalchuk, Senior Prosecutor of the Division of the Prosecutor's Office of the city of Kyiv, having considered in the closed court session the motion lodged in criminal proceedings No. 12015100000000941 by A.P. Pomitalkina, Senior Investigator of the Investigation Department of the Head Administration of the National Police in the city of Kyiv, approved by O.V. Kovalchuk, Prosecutor of the Division of the Prosecutor's Office of the city of Kyiv, for detention for bringing to court of I.V. Khrapunov suspected of criminal offence under Art. 361(2) of the Criminal Code of Ukraine,

**FOUND:**

On March 22, 2016, A.P. Pomitalkina, Senior Investigator of the Investigation Department of the Head Administration of the National Police in the city of Kyiv, lodged the motion approved by O.V. Kovalchuk, Prosecutor of the Prosecutor's Office of the city of Kyiv, for permit to detain for bringing to court of Ilyas Viktorovych Khrapunov, born on January 15, 1984, suspected of criminal offence under Art. 361(2) of the Criminal Code of Ukraine.

To substantiate the motion the investigator notes that the pretrial investigation files entered on October 29, 2015 to the Unified Register of Pretrial Investigations under No. 12015100000000941, on suspicion of I.V. Khrapunov of a criminal offence under Art. 361(2) of the Criminal Code of Ukraine are pending in the investigating group of the Investigation Department of the Head Administration of the National Police in the city of Kyiv.

The pretrial investigation established that in late summer – early autumn 2013, I.V. KHRAPUNOV having family ties with Mukhtar Kabulovych Ablyazov, born on May 16, 1962, who is suspected of criminal proceedings No. 12012110000000147 for criminal offenses under Art. 190(4), Art. 191(5), Art. 15(2) and Art. 209(1) of the Criminal Code of Ukraine, being aware of the pre-trial investigation against M.K. Ablyazov and officials of JSC "BTA Bank" (Republic of Kazakhstan) by the investigators of the agencies of internal affairs of Ukraine, reliably knowing that M.K. Ablyazov is on the international wanted list on the initiative of the Investigation Department of the Head Administration of the National Police in the city of Kyiv, and is under extradition arrest in connection with consideration by the competent law enforcement agencies of the Republic of France of the requested for extradition of Ablyazov for bringing to responsibility in Ukraine, by previous concert with the persons unidentified by the pretrial investigation, decided to illegally intervene in the work of electronic computing machines (computers), owned and used by the lawyers, attorneys of Ilyashev & Partners Law Firm (11 Kudryavska St., Kyiv), who represent JSC "BTA Bank" (Republic of Kazakhstan), to obtain information stored on hard drives of the said computers and electronic data storage devices.

To implement his criminal intent, in late August – early September 2013, I.V. KHRAPUNOV acting together with the persons unidentified by the pretrial investigation turned to Olena Yuriivna Tyshchenko, born on August 26, 1976, who has long represented M.K. Ablyazov in foreign courts, speaks Russian, Ukrainian, and English fluently, and was not aware of the actual intentions of I.V. KHRAPUNOV, with a request to provide information about email addresses of attorneys of Ilyashev & Partners Law Firm, who represent interests of JSC "BTA Bank" (Republic of Kazakhstan), including the representative – attorney Arseniy Yosypovych Herasymiv.

[Seal: Golosiivskyi District Court of Kyiv, Ukraine]

Later, O. Tyshchenko, fulfilling the request, using the Ukrainian information sources received information about email addresses of attorneys of Ilyashev & Partners Law Firm, including the attorney Arseniy Yosypovych Herasymiv, the representative of JSC "BTA Bank" (Republic of Kazakhstan), which she provided to I.V. KHRAPUNOV.

Then, I.V. KHRAPUNOV to implement criminal intent, in time and place unidentified by the pretrial investigation, by previous concert, gave to the persons, who have appropriate knowledge in the field of electronic computing machines and computer software, unidentified by the pretrial investigation, email boxes of Ilyashev & Partners Law Firm, including the attorney Arseniy Yosypovych Herasymiv, the representative of JSC "BTA Bank" (Republic of Kazakhstan), to interfere with the electronic computing machines (computers), which belong to and are used by the lawyers, attorneys of Ilyashev and Partners Law Firm, using malware intended for illegal interference in the work of electronic computing machines.

On November 13, 2013, during the day, the persons unidentified by the pretrial investigation acting by prior concert with I.V. KHRAPUNOV, by sending to the email box of a representative of JSC "BTA Bank" (Republic of Kazakhstan) - attorney of Ilyashev & Partners Law Firm Arseniy Yosypovych Herasymiv by link herasymiv@attorneys.ua of a malware - virus that looked like a usual email. On the same day A.Y. Herasymiv without being aware of the real criminal intent of I.V. KHRAPUNOV and the persons unidentified by the pre-trial investigation opened the email sent to his mailbox, and thus using a malware – virus the persons unidentified by the pre-trial investigation illegally interfered in the electronic computing machine (computer) belonging to Ilyashev & Partners Law Firm and used by the representative of JSC "BTA Bank" (Republic of Kazakhstan) - attorney Arseniy Yosypovych Herasymiv and obtained open access to the information that was placed by A.Y. Herasymiv on the hard disc of the computer and used him during representation of JSC "BTA Bank" (Republic of Kazakhstan) in criminal proceedings No. 1201211000000147 of November 23, 2012 and during carrying out of advocacy according to the certificate of advocacy of April 27, 2000 No. 1750/10.

Further, in time, place and manner unidentified by the pretrial investigation, the persons unidentified by the pretrial investigation acting by previous concert, gave to I.V. KHRAPUNOV the information obtained as a result of unauthorized interference in work of electronic computing machine (computer), which belongs to Ilyashev & Partners Law Firm and is used by the representative of JSC "BTA Bank" (Republic of Kazakhstan) – the attorney Arseniy Yosypovych Herasymiv, used by him during representation of JSC "BTA Bank" (Republic of Kazakhstan) in criminal proceedings No. 1201211000000147 of November 23, 2012 during carrying out of advocacy.

Thereafter, the information illegally obtained by I.V. KHRAPUNOV from the electronic computing machine (computer) of the representative of JSC "BTA Bank" (Republic of Kazakhstan) – the attorney of Ilyashev & Partners Law Firm Arseniy Yosypovych Herasymiv was used by him by transfer to the persons unidentified by the pretrial investigation and further posting in the Internet edition "TRUST.UA", in column "Economy and Policy" as article entitled "Corruption and Partners", and was posted on the page of a citizen of the Republic of Kazakhstan Muratbek Ketebayev in the social network Facebook, which resulted in leak of the above information, including leak of professional secret of A.Y. Herasymiv as attorney and representative of JSC "BTA Bank" (Republic of Kazakhstan) in criminal proceedings No. 12012110000000147, as access to it on the Internet was not limited and any user could review it freely.

On March 17, 2016, the notice of suspicion against I.V. KHRAPUNOV of a criminal offence under Art. 361(2) of the Criminal Code of Ukraine was approved in criminal proceedings No. 12015100000000941.

On the same day the suspect I.V. KHRAPUNOV was put on the wanted list.

[Seal: Golosiivskyi District Court of Kyiv, Ukraine]

According to files collected in criminal proceedings it is established that the suspect I.V. KHRAPUNOV is hiding from the pretrial investigation agencies, the prosecutor's agencies and the court abroad.

It was also established that I.V. KHRAPUNOV was put on the international wanted list by the law enforcement agencies of the Republic of Kazakhstan.

Currently, location of I.V. KHRAPUNOV is unknown, he is absent at the place of residence: 177 Gorna St., Almaty, Republic of Kazakhstan, he was put on the international wanted list by the law enforcement agencies of the Republic of Kazakhstan, i.e. there is every reason to believe that the latter is hiding from the pretrial investigation agencies.

Having reviewed the criminal case files, having heard the opinion of the prosecutor who supported the motion and requested to grant it, taking into account that I.V. KHRAPUNOV is absent at the place of his residence, was put on the international wanted list by the law enforcement agencies of the Republic of Kazakhstan, which points to his intent to hide from the pretrial investigation agencies and court, I deem it necessary to permit detention for bringing to court.

The motion for permitting detention of the suspect for bringing to court was lodged concurrently with the motion for imposition of detention as a preventive measure, which complies with clause 1, Art. 188(2) of the Code of Criminal Procedure of Ukraine.

In view of the foregoing, the court found that the motion of the investigator for permitting detention of the suspect I.V. KHRAPUNOV for his bringing for participation in consideration of the motion for imposition of detention in custody as a preventive measure shall be granted.

Guided by Art. 29 of the Constitution of Ukraine, Arts. 177, 188, 189, 190, 369 of the Code of Criminal Procedure of Ukraine, -

### RULED:

To grant the motion lodged by the investigator.

To permit detention of Ilyas Viktorovych KHRAPUNOV, born on January 15, 1984 in the town of Taraz, Zhambylska oblast, Republic of Kazakhstan, higher education, a citizen of the Republic of Kazakhstan, with no record of previous convictions, put on the wanted list by the Prosecutor's Office of the Republic of Kazakhstan, registered at the address: 177 Gorna St., Almaty, Republic of Kazakhstan for his bringing to court for ensuring participation in consideration of motion for imposition of detention in custody as a preventive measure.

Ruling on permit of detention for bringing to police becomes invalid after bringing of the suspect to the court.

Ruling is not subject to appeal, it may be objected during preliminary proceedings in court.

Investigating judge:
[Stamp: A TRUE COPY OF THE ORIGINAL
Judge of Golosiivskyi District Court of Kyiv
N.P. Cherednichenko *[signature]*
Secretary *[signature]* T.S. Mykolenko]

[Seal: Golosiivskyi District Court of Kyiv, Ukraine]

[Seal: Golosiivskyi District Court of Kyiv, Ukraine]



Справа № 752/4436/16-к
Провадження №: 1-кс/752/1135/16

У Х В А Л А

22.03.2016 року слідчий суддя Голосіївського районного суду м. Києва Чередніченко Н.П., з участю секретаря Миколенко Т.С., при секретарі Миколенко Т.С., за участю старшого прокурора відділу прокуратури міста Києва Ковальчук О.В., розглянувши в закритому судовому засіданні, внесене в кримінальному провадженні № 12015100000000941 старшим слідчим СУ ГУ Національної поліції у місті Києві Поміталкіною А.П., погоджене прокурором відділу прокуратури міста Києва Ковальчук О.В., клопотання про дозвіл на затримання з метою приводу Храпунова І.В., підозрюваного у вчиненні кримінального правопорушення, передбаченого ч. 2 ст. 361 КК України,

ВСТАНОВИВ:

22.03.2016 року до Голосіївського районного суду м. Києва звернувся старший слідчий СУ ГУ Національної поліції у місті Києві Поміталкіна А.П. із клопотанням погодженим прокурором прокуратури міста Києва Ковальчук О.В. про дозвіл на затримання з метою приводу Храпунова Ільяса Вікторовича, 15.01.1984 року народження, підозрюваного у вчиненні кримінального правопорушення, передбаченого ч. 2 ст. 361 КК України.

В обґрунтування клопотання слідчий зазначає, що у провадженні слідчої групи СУ ГУ НП у м. Києві знаходяться матеріали досудового розслідування, внесені 29.10.2015 до ЄРДР за № 12015100000000941 за підозрою Храпунова І.В. у вчиненні кримінального правопорушення, передбаченого ч. 2 ст. 361 КК України

Досудовим розслідуванням встановлено, що в кінці літа – на початку осені 2013 року Храпунов І.В., перебуваючи у родинних стосунках з Аблязовим Мухтаром Кабуловичем, 16.05.1962 року народження, який є підозрюваним у кримінальному провадженні № 12012110000000147, за вчинення кримінальних правопорушень, передбачених ч. 4 ст. 190, ч. 5 ст. 191, ч. 5 ст. 209 КК України, будучи обізнаним про факт проведення досудового розслідування відносно Аблязова М.К. та службових осіб АТ «БТА Банк» (Республіка Казахстан) слідчими органами внутрішніх справ України, достовірно знаючи, що Аблязов М.К. перебуває у міжнародному розшуку за ініціативою слідчого управління Головного управління Національної поліції у місті Києві, а також перебуває під екстрадиційним арештом у зв'язку із розглядом компетентними правоохоронними органами Французької

26017755523*2*1*1*

вирішив незаконно втрутитись у роботу електронно – обчислювальних машин (комп'ютерів), які належать та які використовуються юристами, адвокатами юридичною фірмою «Іляшев та Партнери» (місто Київ, вул. Кудрявська, 11), які представляють АТ «БТА Банк» (Республіка Казахстан), з метою отримання інформації, що зберігалася на жорстких дисках зазначених комп'ютерів та електронних носіях інформації.

З метою реалізації свого злочинного умислу, на при кінці серпня – початку вересня 2013 року, Храпунов І.В. діючи спільно з невстановленими досудовим розслідуванням особами, звернувся до Тищенко Олени Юріївни, 26.08.1976 року народження, яка тривалий час представляла інтереси Аблязова М.К. у закордонних судах, вільно володіє російською, українською, англійською мовою та не була обізнана про реальні наміри Храпунова І.В, з проханням передати йому інформацію про адреси електронних поштових скриньок юристів юридичної фірми «Іляшев та Партнери», які здійснюють представництво інтересів АТ «БТА Банк» (Республіка Казахстан), у тому числі представника - адвоката Герасиміва Арсенія Йосиповича.

У подальшому, Тищенко О.Ю., виконуючи на прохання, використовуючи українські інформаційні джерела, отримала інформацію щодо адрес електронних поштових скриньок юристів юридичної фірми «Іляшев та Партнери» у тому числі адвоката Герасиміва Арсенія Йосиповича – представника АТ «БТА Банк» (Республіка Казахстан), які передала їх Храпунову І.В.

Після цього, Храпунов І.В. з метою реалізації злочинного умислу, в невстановлений досудовим розслідуванням час та місці, за попередньою змовою, передав невстановленим досудовим розслідуванням особам, які мають відповідні знання в сфері роботи електронно – обчислювальних машин та комп'ютерних програм, адреси електронних поштових скриньок юридичної фірми «Іляшев та Партнери» у тому числі адвоката Герасиміва Арсенія Йосиповича – представника АТ «БТА Банк» (Республіка Казахстан), для вчинення втручання у роботу електронно – обчислювальних машин (комп'ютерів), які належать та які використовуються юристами, адвокатами юридичною фірмою «Іляшев та Партнери», шляхом використання шкідливих програм, призначених для незаконного втручання у роботу електронно – обчислювальних машин.

13.11.2013 у денний час, невстановлені досудовим розслідуванням особи, які діяли за попередньою змовою із Храпуновим І.В., шляхом надсилання на електронну поштову скриньку представника АТ «БТА Банк» (Республіка Казахстан) – адвоката юридичної фірми «Іляшев та Партнери» Герасиміва Арсенія Йосиповича за посиланням herasymiv@attorneys.ua шкідливу програму - вірус, яка була законспірована під звичайний електронний лист. Цього дня, Герасимів А.Й., не будучи обізнаним про реальні злочинні наміри Храпунова та невстановлених досудовим розслідуванням осіб, відкрив надісланого йому електронну поштову скриньку листа, внаслідок чого за допомогою шкідливої програми - вірусу, невстановлені досудовим розслідуванням особи несанкціоновано втрутились у діяльність електронно – обчислювальної машини (комп'ютер), який належить юридичної фірми «Іляшев та Партнери» та використовується представником АТ «БТА Банк» (Республіка Казахстан) – адвокатом Герасимівом Арсенієм Йосиповичем та отримали відкритий доступ до його інформації, яка була розміщена

провадженні № 12012110000000147 від 23.11.2012 та у здійсненні ним професіональної адвокатської діяльності, на підставі свідоцтва про право на заняття адвокатською діяльністю від 27.04.2000 за №1750/10.

У подальшому, у невстановлений досудовим розслідуванням час, місце та спосіб, невстановлені досудовим розслідуванням особи, діючи за попередньою змовою, передали Храпунову І.В. отриману внаслідок несанкціонованого втручання у роботу електронно – обчислювальної машини (комп'ютера), який належить до юридичної фірми «Іляшев та Партнери» та використовується представником АТ «БТА Банк» (Республіка Казахстан) – адвокатом Герасімовим Арсенієм Йосиповичем інформації, яка використовувалась ним у представництві інтересів АТ «БТА Банк» (Республіка Казахстан) у кримінальному провадженні від 23.11.2012 № 12012110000000147 у здійсненні ним професіональної адвокатської діяльності.

Після цього, отримана Храпуновим І.В. у незаконний спосіб інформація з електронно – обчислювальної машини (комп'ютера), представником АТ «БТА Банк» (Республіка Казахстан) – адвоката юридичної фірми «Іляшев та Партнери» Герасімова А.Й., була використана ним шляхом передачі невстановленими досудовим розслідуванням особам та подальшим розміщенням в Інтернет – виданні «TRUST.UA», у рубриках «Экономика та Политика», в матеріалі під назвою «Коррупция и партнеры», а також була розміщена на сторінці громадянина Республіки Казахстан Муратбеком Кетебаєвим у соціальній мережі Facebook, що призвело до витоку вищевказаної інформації у тому числі витоку професійної таємниці Герасімова А.Й. , як адвоката та представника АТ «БТА Банк» (Республіка Казахстан) у кримінальному провадженні № 12012110000000147, так як доступ до неї у мережі Інтернет не був обмежений та будь – який користувач міг з нею вільно ознайомитись.

17.03.2016 у кримінальному провадженні № 12015100000000941 винесено повідомлення про підозру Храпунову І.В. у вчиненні кримінального правопорушення, передбаченого ч. 2 ст. 361 КК України.

Цього ж дня підозрюваного Храпунова І.В. оголошено у розшук.

Відповідно до зібраних у кримінальному провадженні матеріалів встановлено, що підозрюваний Храпунов І.В. переховується від органів досудового розслідування, прокуратури та суду за кордоном.

Також встановлено, що Харпунов І.В. оголошений у міжнародний розшук правоохоронними органами Республіки Казахстан.

На даний час місце перебування Харпунова І.В. не відомо, за місцем проживання: Республіка Казахстан, місто Алмати, вул. Горная 117 відсутній, оголошений у міжнародний розшук правоохоронними органами Республіки Казахстан, тобто є всі підстави вважати, що останній переховується від органів досудового розслідування.

Дослідивши матеріали кримінального провадження, заслухавши думку прокурора, який підтримав клопотання та просив його задовольнити, а також беручи до уваги те, що Харпунов І.В. за місцем свого проживання відсутній, оголошений у міжнародний розшук правоохоронними органами Республіки Казахстан, що вказує про наявність наміру переховування від органів досудового розслідування та суду.

приводу внесене одночасно з клопотанням про застосування запобіжного заходу у вигляді тримання під вартою, що відповідає вимогам п. 1 ч. 2 ст. 188 КПК України.

З огляду на викладене, суд дійшов висновку, що клопотання слідчого про дозвіл на затримання підозрюваного Храпунова І.В. з метою його приводу для участі у розгляді клопотання про застосування щодо нього запобіжного заходу у виді тримання під вартою підлягає задоволенню.

Керуючись ст. 29 Конституції України, ст.ст. 177, 188, 189, 190, 369 КПК України, -

## УХВАЛИВ:

Клопотання слідчого задовольнити.

Надати дозвіл на затримання Храпунова Ільяса Вікторовича, 15.01.1984 року народження, уродженця міста Тараз Жамбилської області Республіки Казахстан, освіта вища, громадянина Республіки Казахстан, раніше не судимого, оголошеного у розшук прокуратурою Республіки Казахстан, зареєстрованого за адресою: Республіка Казахстан, місто Алмати, вул. Горна, 177, з метою його приводу для забезпечення участі в розгляді клопотання про застосування запобіжного заходу у виді тримання під вартою.

Ухвала про дозвіл на затримання з метою приводу втрачає законну силу з моменту приводу підозрюваного до суду.

Ухвала оскарженню не підлягає, заперечення проти неї може бути подане під час підготовчого провадження в суді.

Слідчий суддя:

COPY

Case No. 752/4443/16-k
Proceedings No. 1-kc/752/1140/16

**RULING**

On August 19, 2016, N.P. Cherednichenko, the investigating judge of the Golosiivskyi District Court of the city of Kyiv, with the secretary T.S. Mykolenko, with participation of the prosecutor O.V. Kovalchuk, having considered the motion lodged by A.P. Pomitalkina, senior investigator of the Investigation Department of the Head Administration of the National Police in the city of Kyiv, for imposition of detention in custody as a preventive measure on Ilyas Viktorovych Khrapunov,

**FOUND:**

A.P. Pomitalkina, senior investigator of the Investigation Department of the Head Administration of the National Police in the city of Kyiv, lodged the motion for imposition of detention in custody as a preventive measure on Ilyas Viktorovych Khrapunov, substantiating it as follows.

The pre-trial investigation in criminal proceedings No. 12015100000000941 of October 29, 2015 on suspicion of Ilyas Viktorovych Khrapunov, born on January 15, 1984, of criminal offence under Art. 361(2) of the Criminal Code of Ukraine is pending in the Investigation Department of the Head Administration of the National Police in the city of Kyiv.

The pretrial investigation established that in late summer – early autumn 2013, I.V. Khrappunov, having family ties with Mukhtar Kabulovych Ablyazov, born on May 16, 1962, who is suspected in criminal proceedings No. 12012110000000147 for criminal offenses under Art. 190(4), Art. 191(5), Art. 15(2) and Art. 209(1) of the Criminal Code of Ukraine, being aware of the pre-trial investigation against M.K. Ablyazov and officials of JSC "BTA Bank" (Republic of Kazakhstan) by the investigators of the agencies of internal affairs of Ukraine, reliably knowing that M.K. Ablyazov is on the international wanted list on the initiative of the Investigation Department of the Head Administration of the National Police in the city of Kyiv, and is under extradition arrest in connection with consideration by the competent law enforcement agencies of the Republic of France of the request for extradition of Ablyazov for bringing to responsibility in Ukraine, by previous concert with the persons unidentified by the pretrial investigation, decided to illegally intervene in the work of electronic computing machines (computers), owned and used by the lawyers, attorneys of Ilyashev & Partners Law Firm (11 Kudryavska St., Kyiv), who represent JSC "BTA Bank" (Republic of Kazakhstan), to obtain information stored on hard drives of the said computers and electronic data storage devices.

To implement his criminal intent, in late August – early September 2013, I.V. Khrapunov acting together with the persons unidentified by the pretrial investigation turned to Olena Yuriivna Tyshchenko, born on August 26, 1976, who has long represented M.K. Ablyazov in foreign courts, speaks Russian, Ukrainian, and English fluently, and was not aware of the actual intentions of I.V. Khrapunov, with a request to provide information about email addresses of attorneys of Ilyashev & Partners Law Firm, who represent interests of JSC "BTA Bank" (Republic of Kazakhstan), including the representative – attorney Arseniy Yosypovych Herasymiv.

Later, O.Y. Tyshchenko, fulfilling the request, using the Ukrainian information sources received information about email addresses of attorneys of Ilyashev & Partners Law Firm, including the attorney Arseniy Yosypovych Herasymiv, the representative of JSC "BTA Bank" (Republic of Kazakhstan), which she provided to I.V. Khrapunov.

Then, I.V. Khrapunov to implement criminal intent, in time and place unidentified by the pretrial investigation, by previous concert, gave to the persons unidentified by the pretrial investigation, who have appropriate knowledge in the field of electronic computing machines and computer software, email addresses of Ilyashev & Partners Law Firm, including the attorney Arseniy Yosypovych Herasymiv, the representative of JSC "BTA Bank" (Republic of Kazakhstan), to interfere with the operation of electronic computing machines (computers), which belong to and are used by the lawyers, attorneys of Ilyashev and Partners Law Firm, using malware intended for illegal interference in the work of electronic computing machines.

On November 13, 2013, during the day, the persons unidentified by the pretrial investigation acting by previous concert with I.V. Khrapunov, by sending to the email box of a representative of JSC "BTA Bank" (Republic of Kazakhstan) - attorney of Ilyashev & Partners Law Firm Arseniy Yosypovych Herasymiv by link herasymiv@attorneys.ua of a malware - virus that looked like a usual email. On the same day A.Y. Herasymiv without being aware of the real criminal intent of I.V. Khrapunov and the persons unidentified by the pre-trial investigation opened the email sent to his mailbox, and thus using a malware – virus the persons unidentified by the pre-trial investigation illegally interfered in the electronic computing machine (computer) belonging to Ilyashev & Partners Law Firm and used by the representative of JSC "BTA Bank" (Republic of Kazakhstan) - attorney Arseniy Yosypovych Herasymiv and obtained open access to the information that was placed by A.Y. Herasymiv on the hard discs of the computer and used by him during representation of JSC "BTA Bank" (Republic of Kazakhstan) in criminal proceedings No. 1201211000000147 of November 23, 2012 and during carrying out of advocacy according to the certificate of advocacy of April 27, 2000 No. 1750/10.

Further, in time, place and manner unidentified by the pretrial investigation, the persons unidentified by the pretrial investigation acting by previous concert, gave to I.V. Khrapunov the information obtained as a result of unauthorized interference in work of electronic computing machine (computer), which belongs to Ilyashev & Partners Law Firm and is used by the representative of JSC "BTA Bank" (Republic of Kazakhstan) – the attorney Arseniy Yosypovych Herasymiv, used by him during representation of JSC "BTA Bank" (Republic of Kazakhstan) in criminal proceedings No. 1201211000000147 of November 23, 2012 during carrying out of advocacy.

Thereafter, the information illegally obtained by I.V. Khrapunov from the electronic computing machine (computer) of the representative of JSC "BTA Bank" (Republic of Kazakhstan) – the attorney of Ilyashev & Partners Law Firm Arseniy Yosypovych Herasymiv was used by him by transfer to the persons unidentified by the pretrial investigation and further posting in the Internet edition "TRUST.UA", in column "Economy and Policy" as article entitled "Corruption and Partners", and was posted on the page of a citizen of the Republic of Kazakhstan Muratbek Ketebayev in the social network Facebook, which resulted in leak of the above information, including leak of professional secret of A.Y. Herasymiv as attorney and representative of JSC "BTA Bank" (Republic of Kazakhstan) in criminal proceedings No. 12012110000000147, as access to it on the Internet was not limited and any user could review it freely.

On March 17, 2016, the notice of suspicion against I.V. Khrapunov on commitment of a criminal offence under Art. 361(2) of the Criminal Code of Ukraine was approved in criminal proceedings No. 12015100000000941.

On the same day the suspect I.V. Khrapunov was put on the wanted list.

According to files collected in criminal proceedings it was established that the suspect I.V. Khrapunov was hiding from the pretrial investigation agencies, the prosecutor's agencies and the court abroad.

It was also established that I.V. Khrapunov was put on the international wanted list by the law enforcement agencies of the Republic of Kazakhstan.

On March 22, 2016, the Golosiivskyi District Court of the city of Kyiv issued a ruling on provision of a permit for detention of Ilyas Viktorovych Khrapunov.

Pursuant to the letter of the Ukrainian Bureau of Interpol of the Head Administration of the National Police in the city of Kyiv of May 10, 2016 Ilyas Viktorovych Khrapunov was put on the international wanted list.

During consideration of the motion, the prosecutor supported the motion and requested to satisfy it in view of the circumstances stated therein.

Upon hearing the explanations of the prosecutor, studying the files of the motion, I come to the conclusion that the motion shall be satisfied under the following grounds.

The Investigation Department of the Head Administration of the National Police in the city of Kyiv is carrying out the pre-trial investigation in criminal proceedings No. 12015100000000941 of October 29, 2015 under the suspicion of I.V. Khrapunov of commitment of the offence stipulated by Article 361(2) of the Criminal Code of Ukraine.

On March 17, 2016, the notice of suspicion against I.V. Khrapunov on commitment of a criminal offence under Art. 361(2) of the Criminal Code of Ukraine was approved in criminal proceedings.

According to the files collected in criminal proceedings it was established that the suspect I.V. Khrapunov was hiding from the pretrial investigation agencies, prosecutor's office and court abroad.

It was also found that I.V. Khrapunov is put on the international wanted list for the offences committed in the Republic of Kazakhstan.

On March 22, 2016, the Golosiivskyi District Court of the city of Kyiv approved the ruling on granting permit to detention of Ilyas Viktorovych Khrapunov.

According to the letter of the National Central Bureau of Interpol in Ukraine of the Head Administration of the National Police in the city of Kyiv of May 10, 2016 Ilyas Viktorovych Khrapunov was put on the international wanted list.

Pursuant to Art. 193(6) of the Criminal Procedure Code of Ukraine, the investigating judge, the court may consider the motion for imposition of detention in custody as a preventive measure and choose such preventive measure in absentia of the suspect only if the prosecutor, except for availability of reasons envisaged in Art. 177 of the Criminal Procedure Code of Ukraine, proves that the suspect, the accused is put on the international wanted list. In this case after detention of the person and not later than within forty-eight hours after his/her delivery to the place of criminal proceedings the investigating judge, the court with participation of the suspect, the accused considers the issue on imposition of detention in custody as the chosen preventive measure, or its replacement by a more lenient preventive measure and approves the appropriate ruling.

According to clause 4, paragraph 1, Art. 184 of the Criminal Procedure Code of Ukraine, during the pre-trial investigation the risks were established, which are envisaged in sub-clause 1.3, paragraph 1, Art. 177 of the Criminal Procedure Code of Ukraine, and in support of imposition of a preventive measure on I.V. Khrapunov it is deemed necessary to prevent further attempts of hiding from the pre-trial investigation agencies and court. Taking into account that the court found that I.V. Khrapunov is hiding from the investigation, is put on the international wanted list, for prevention of

hiding from the pre-trial investigation agencies and court, illegal influence on the witnesses, other persons suspected in the same criminal proceedings, guided by Arts. 32, 110, 131, 132, 176-178, 183, 193-196, 199, 369-372 of the Criminal Procedure Code of Ukraine, -

**RULED:**

To grant the motion.

To choose detention in custody as a preventive measure for Ilyas Viktorovych Khrapunov, born on January 15, 1984 in the town of Taraz, Zhambylskyi Region, Republic of Kazakhstan, higher education, a citizen of the Republic of Kazakhstan, with no record of previous convictions, registered at: 177 Gorna St., Almaty, Republic of Kazakhstan.

Not later than within forty-eight hours after delivery of I.B. Khrapunov to the place of criminal proceedings to ensure his appearance to the Golosiivskyi District Court of the city of Kyiv for consideration of issue on application of the chosen detention in custody as a preventive measure, or its replacement by a more lenient preventive measure.

The ruling may be appealed to the Kyiv Court of Appeal within five days.

Investigating judge: [signature]
    [Stamp: A TRUE COPY OF THE ORIGINAL
    Judge of the Golosiivskyi District Court of Kyiv
    N.P. Cherednichenko *[signature]*
    Secretary *[signature]* T.S. Mykolenko]



КОПІЯ

Справа № 752/4443/16-к
Провадження № 1-кс/752/1140/16

## УХВАЛА

19.08.2016 року слідчий суддя Голосіївського районного суду м. Києва Чередніченко Н.П., з участю секретаря Миколенко Т.С., за участю прокурора Ковальчук О.В., розглянувши клопотання старшого слідчого СУ ГУ НП у місті Києві Помітелкіної А.П., про застосування запобіжного заходу у вигляді тримання під вартою відносно Храпунова Ільяса Вікторовича,

встановив:

Старший слідчий СУ ГУ НП у місті Києві Помітелкіна А.П. звернулась до суду з клопотанням про застосування запобіжного заходу у вигляді тримання під вартою до Храпунова Ільяса Вікторовича, мотивуючи його наступним.

Слідчим управлінням Головного управління Національної поліції у місті Києві проводиться досудове розслідування в кримінальному провадженні № 12015100000000941 від 29.10.2015, за підозрою Храпунова Ільяса Вікторовича, 15.01.1984 року народження у вчинені кримінального правопорушення, передбаченого ч. 2 ст. 361 КК України.

Досудовим розслідуванням встановлено, що в кінці літа – на початку осені 2013 року Храпунов І.В., перебуваючи у родинних стосунках з Аблязовим Мухтаром Кабуловичем, 16.05.1962 року народження, який є підозрюваним у кримінальному провадженні № 12012110000000147, за вчинення кримінальних правопорушень, передбачених ч. 4 ст. 190, ч. 5 ст. 191, ч. 2 ст. 15 та ч. 1 ст. 209 КК України, будучи обізнаним про факт проведення досудового розслідування відносно Аблязова М.К. та службових осіб АТ «БТА Банк» (Республіка Казахстан) слідчими органів внутрішніх справ України, достовірно знаючи, що Аблязов М.К. перебуває у міжнародному розшуку за ініціативою слідчого управління Головного управління Національної поліції у місті Києві, а також перебуває під екстрадиційним арештом у зв'язку із розглядом компетентними правоохоронними органами Французької Республіки запит про видачу Аблязова для притягнення на території України, за попередньою з мовою із невстановленими досудовим розслідуванням особами, вирішив незаконно втрутитись у роботу електронно – обчислювальних машин (комп'ютерів), які належать та які використовуються юристами, адвокатами юридичною фірмою «Іллящев та Партнери» (місто Київ, вул. Кудрявська, 11), які представляють АТ «БТА Банк» (Республіка Казахстан), з метою отримання

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

...тановлено, що підозрюваний Храпунов І.В. переховується від органів досудового розслідування, прокуратури та суду за кордоном.

Крім того встановлено, що Храпунов І.В. перебуває у міжнародному розшуку за вчинення злочинів на території Республіки Казахстан.

22.03.2016 Голосіївським районним судом міста Києва винесено ухвалу про надання дозволу на затримання Храпунова Ільяса Вікторовича.

Відповідно до листа відділу Укрбюро Інтерполу ГУ НП у місті Києві від 10.05.2016, Храпунова Ільяса Вікторовича оголошено у міжнародний розшук

Відповідно до ч.6 ст. 193 КПК України слідчий суддя, суд може розглянути клопотання про обрання запобіжного заходу у вигляді тримання під вартою та обрати такий запобіжний захід, за відсутності підозрюваного лише у разі, якщо прокурором, крім наявності підстав передбачених ст. 177 КПК України буде доведено, що підозрюваний, обвинувачений, оголошений в міжнародний розшук. У такому разі, після затримання особи, і не пізніш як через сорок вісім годин з часу її доставки до місця кримінального провадження слідчий суддя, суд за участю підозрюваного, обвинуваченого розглядає питання про застосування обраного запобіжного заходу у вигляді тримання під вартою або його заміну на більш м'який запобіжний захід, про що постановляє ухвалу.

Відповідно до п.4 ч.1 ст. 184 КПК України, під час досудового слідства встановлено наявність ризиків, передбачених у п.п. 1,3 ч.1 ст. 177 КПК України і в обґрунтування застосування запобіжного заходу щодо Храпунова І.В. покладається необхідність запобігання подальшим спробам переховуватися від органів досудового розслідування та суду. Зважаючи на те, що судом встановлено, що Храпунов І.В. переховується від слідства, оголошений у міжнародний розшук, з метою запобігання переховування від органів досудового розслідування та суду, незаконно впливати на свідків, інших підозрюваних у цьому ж кримінальному провадженні, керуючись вимогами ст. ст. 32, 110, 131, 132, 176-178, 183, 193-196, 199, 369-372 КПК України,-

ухвалив :

Клопотання задовольнити.

Обрати запобіжний захід у вигляді тримання під вартою до Храпунова Ільяса Вікторовича, 15.01.1984 року народження, уродженця м. Тараз Жамбилської області Республіки Казахстан, освіта вища, громадянина Республіки Казахстан, раніше не судимого, місце реєстрації: Республіка Казахстан, місто Алмати, вул. Горна, 177.

Не пізніш як через сорок вісім годин з часу доставлення Храпунова І.В. до місця кримінального провадження забезпечити його явку до Голосіївського районного суду міста Києва для розгляду питання про застосування обраного запобіжного заходу у вигляді тримання під вартою або його зміну на більш м'який запобіжний захід.

Ухвала може бути оскаржена до Апеляційного суду міста Києва у п'ятиденний строк.

Слідчий суддя .

## NATIONAL POLICE OF UKRAINE
### National Central Bureau of Interpol in Ukraine

Tel.: +380 44 256-1253          E-mail: interpol@police.gov.ua          Postal address: 10 Bogomoltsa Str.,
Fax: +380 44 226-2057                                                   Kyiv, Ukraine, 01601

September 15, 2016

To: **A.Y. Herasymiv**, attorney
11 Kudryavska Str., Kyiv,
04053

Our ref. No.: IP/5340/05/C63/      /FF10/A3/1
Your. ref. No.: No number of September 08, 2016

Dear Arseniy Yosypovych,

The Working Office of the Ukrainian National Central Bureau of Interpol considered your attorney's request for international search of persons in the case on embezzlement of property of JSC "BTA Bank".

We hereby inform that according to records of the Interpol General Secretariat as of September 15, 2016 the following persons were put on the international wanted list:

1. Mukhtar Kabulovych Ablyazov, born on May 16, 1963, searched at the initiative of the Working Office of the Ukrainian National Central Bureau of Interpol, the National Central Bureau of Interpol in the Republic of Kazakhstan and the Russian Federation;

2. Zhaksylyk Zharymbetov, born on March 17, 1967, searched at the initiative of the Working Office of the Ukrainian National Central Bureau of Interpol;

3. Oleksandr Udovenko, born on May 26, 1973, searched at the initiative of the Working Office of the Ukrainian National Central Bureau of Interpol, the National Central Bureau of Interpol in the Republic of Kazakhstan and the Russian Federation;

4. Igor Kononko, born on February 24, 1973, searched at the initiative of the Working Office of the Ukrainian National Central Bureau of Interpol and the National Central Bureau of Interpol in the Russian Federation;

5. Anvar Dzhaksybergenov, born on September 04, 1974, searched at the initiative of the National Central Bureau of Interpol in the Republic of Kazakhstan;

6. Yerzhan Tlegenovych Kadessov (Kadesov), born on September 13, 1976, searched at the initiative of the Working Office of the Ukrainian National Central Bureau of Interpol and the National Central Bureau of Interpol in the Republic of Kazakhstan;

7. Ilias Viktorovych Khrapunov, born on January 15, 1984, searched at the initiative of the Working Office of the Ukrainian National Central Bureau of Interpol, the National Central Bureau of Interpol in the Republic of Kazakhstan;

The information about international search of Tetyana Paraskevich, born on November 02, 1964, is closed temporary by the Interpol General Secretariat for the time of examination by the Commission for the Control of Interpol's Files.

**Sincerely,**                    *[signature]*          **V.V. Nevolya**
**Chief Executive**



НАЦІОНАЛЬНА ПОЛІЦІЯ УКРАЇНИ
РОБОЧИЙ АПАРАТ УКРБЮРО ІНТЕРПОЛУ

NATIONAL POLICE OF UKRAINE
National Central Bureau of Interpol in Ukraine



| | | |
|---|---|---|
| Тел.<br>Tel.+380 44 256-1253<br>Факс:<br>Fax. +380 44 226-2057 | Е-пошта<br>E-mail.<br>interpol@police.gov.ua | Поштова адреса:<br>01601, Україна,м. Київ, вул. Богомольця, 10<br>Postal address:<br>10 Bogomolsa Str., Kiev, Ukraine, 01601 |

"_15_ _09_ 2016 р

Адвокату
**Герасиміву А.Й.**
04053, м. Київ, вул.
Кудрявська, 11

_20400_

Наш н-р: ІР/5340/05/С63/  /FF10/A3/1
Ваш н-р: б/н від 08.09.2016

*Шановний Арсенію Йосиповичу!*

У Робочому апараті Укрбюро Інтерполу розглянуто Ваш адвокатський запит щодо міжнародного розшуку осіб у справі про розкрадання майна АТ «БТА Банк».

Повідомляємо, що згідно з обліками Генерального секретаріату Інтерполу, станом на 15.09.2016 у міжнародному розшуку значаться наступні особи:

1. Аблязов Мухтар Кабулович, 16.05.1963 р.н., розшукується за ініціативи РА Укрбюро Інтерполу, НЦБ Інтерполу в Республіці Казахстан та Російській Федерації;
2. Жаримбетов Жаксилик, 17.03.1967 р.н., розшукується за ініціативи РА Укрбюро Інтерполу;
3. Удовенко Олександр, 26.05.1973 р.н., розшукується за ініціативи РА Укрбюро Інтерполу, НЦБ Інтерполу в Республіці Казахстан та Російській Федерації;
4. Кононко Ігор, 24.02.1973 р.н., розшукується за ініціативи РА Укрбюро Інтерполу та НЦБ Інтерполу в Російській Федерації;
5. Джаксибергенов Анвар, 04.09.1974 р.н., розшукується за ініціативи НЦБ Інтерполу в Республіці Казахстан;
6. Кадессов (Кадесов) Ержан Тлегенович, 13.09.1976 р.н., розшукується за ініціативи РА Укрбюро Інтерполу та НЦБ Інтерполу в Республіці Казахстан;
7. Храпунов Ільяс Вікторович, 15.01.1984 р.н., розшукується за ініціативи РА Укрбюро Інтерполу, НЦБ Інтерполу в Республіці Казахстан;

Інформація про міжнародний розшук Параскевич Тетяни, 02.11.1964 р.н. тимчасово заблокована Генеральним секретаріатом Інтерполу на час проведення перевірки Комісією по контролю за файлами Інтерполу.

З повагою
начальник

В.В. Неволя

EXHIBIT 3

PTA Template 269F1 - OCT16 - Re-open



## IN THE COURT OF APPEAL, CIVIL DIVISION

REF: **A3/2016/2264 A**



Her Majesty's
Court of Appeal SEAL

2 6 APR 2017

**JSC BTA BANK** —v— **ABLYAZOV & ANR**

## ORDER made by the Rt. Hon. Lady Justice Gloster

On consideration of an application to reopen an application or appeal, previously refused or dismissed

---

**Decision: granted, refused, adjourned.**

I order that:

1. that the applicant (2nd defendant's) application for permission to re-open Longmore LJ's decision be granted; and

2. that the applicant's application for permission to appeal and (if permission is granted) the appeal be heard at a rolled-up hearing, with the appeal following straight after the application.

---

### Reasons

1. It is necessary to re-open the appeal to avoid real injustice.

2. The possible liberty of the subject (Mr Khrapunov) is in issue.

3. Neither Phillips J nor Longmore LJ were aware when they made their respective decisions that there were extant criminal proceedings against Mr Khrapunov in Ukraine, and that, as a result of a request made by Ukraine on 10 May 2016, Mr Khrapunov was placed on Interpol's international wanted list.

4. Although the respondent Bank was aware of the criminal proceedings, it did not so inform Phillips J or Longmore LJ. Irrespective of whether the Bank's legal team were aware of the fact, that resulted in both courts being misled about the position. Given the nature and circumstances surrounding the application of Mr Khrapunov, that was unfair.

5. The absence of the fresh evidence may well have led to an erroneous result.

6. Permission to rely on the further evidence.



---

Note: Where the application is refused the decision of the judge is final and the application cannot be renewed to an oral hearing - see rule 52.30(7) and *Taylor v Lawrence [2002] EWCA Civ 90*

Signed:

Date: 26 April 2017

*By the Court*

DATED  26TH APRIL 2017
IN THE COURT OF APPEAL


ILYAS KHRAPUNOV

- and -

JSC BTA BANK

- and -

MUKHTAR ABLYAZOV


# O R D E R

Copies to:

Hughmans Solicitors
DX 53321
Clerkenwell
Ref: L3.KHR.001/001

Hogan Lovells International LLP
DX 57
Chancery Lane
Ref: D3/CGH/ITJ/WJM/5327078

Lower Court Ref: 2015-CL-000549

EXHIBIT 4



3

Copy for information purposes sent to:

Geneva Public Prosecutor
Route de Chancy 6b
1211 Geneva 3


Mr. Viktor Khrapunov
Chemin du Petit-Saconnex 28b
1209 Geneva

**Ex. F**
**Page 112**



5   SL. OFJ, Bundesrain 20, 3003, Berne, Switzerland

Mr. Viktor Khrapunov
Chemin du Petit-Saconnex 28b
1209 Geneva



Schweizerische Eidgenosssenschaft
Confédération Suisse
Confederazione Svizzera
Confederziun svizra

Federal Department of Justice DF JP
**Federal office of justice OFJ**
Extraditions Unit

SL. OFJ, Bundesrain 20, 3003, Berne, Switzerland
**Sent by certified mail**
General Prosecutor Office of the
Republic of Kazakhstan
14 Orynbor street
Astana 010000

Your reference: 2-013610-14-14131
Our reference: B 229'674 /SL

Berne, June 19, 2014

**Kazakhstan's extradition request against Viktor KHRAPUNOV, born on November 24, 1948**

Dear Sir, Dear Madam:

We refer to your extradition request of March 17, 2014 made by the Embassy of Kazakhstan by diplomatic memorandum no. 31-31-70 of April 1, 2014 and reply to you as follows:

The Swiss Federal Office of Justice, the authority with jurisdiction for extradition matters, would like to point out that since there is no extradition treaty between Switzerland and Kazakhstan, Swiss domestic law governs this matter.

In the case in point, Mr. Khrapunov cannot be extradited to Kazakhstan as a result of the criteria set forth in Swiss domestic law, in particular, Article 2 of the Federal Act on Mutual Assistance in Criminal Matters (EIMP; RS 351. 1[1]).

However, we inform that the authorities of Kazakhstan may file a delegation request for the criminal prosecution of Mr. Khrapunov with our Office in addition to the criminal file, the relevant evidence and the applicable criminal provisions as well as the translation into the French language of the all the documentation.

---

[1] Web link: http://www.admin.ch/opc/fr/classified-compilation/19810037/index.html

Laura Nolfo
Bundesrain 20, 3003 Berne, Switzerland
Telephone:  +41 58 462 43 26. Fax: +41 58 462 53 80
irh@bi.admin.ch

**Ex. F**
**Page 114**



2

We remind you that as a result of a mutual assistance request sent to Switzerland by the Public Prosecutor of Kazakhstan, the Public Prosecutor of the Canton of Geneva has opened a proceeding for money-laundering against Mr. Khrapunov.

Mr. Khrapunov will receive a copy of this letter.

Sincerely,

[signature]

Laura Nolfo

Case 2:14-cv-01650-FMO-AFM Document 206 Filed 06/01/20 Page 44 of 363 Page ID #:9480



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Artem Furman, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the attached document "Attachment 1, correspondence dated June 19, 2014" from French into English.

Artem Furman

Sworn to before me this

15th day of August 2014

Signature, Notary Public

ADAM M SCHEFFLAN
Notary Public – State of New York
No. 01SC6298049
Qualified in NEW YORK County
My Commission Expires MAR 10, 2018

Stamp, Notary Public

EXHIBIT 5



# THE FRENCH *CONSEIL D'ETAT* (COUNCIL OF STATE) AND ADMINISTRATIVE JUSTICE

December 9, 2016

## CE, December 9, 2016, Mr. O…

## N° 394399, 400239

> *[> Read the press release](#)*

The *Conseil d'Etat,* in a final decision (Litigation Section) on the report of the 2nd Chamber of the Litigation Section

Session of December 9, 2016 - Reading of December 9, 2016

Considering the following procedures:

1° Under ref. N°394399, Mr. M…O… filed a summary application, a supplementary brief, a reply brief and three new briefs on November 4, 2015, February 4, May 10, July 5, July 7 and October 21, 2016, requesting that the *Conseil d'Etat* annul a September 17, 2015 decree granting his extradition to the Russian authorities, on the grounds of ultra vires.

2° Under ref. N°400239, Mr. O… filed an application, a supplementary brief and a new brief on May 30, July 7 and October 21, 2016, requesting that the *Conseil d'Etat*:

1°) annul the Prime Minister's implied refusal to withdraw the decree of September 17, 2015, granting his extradition to the Russian authorities on the grounds of ultra vires;

2°) order the State to pay the sum of 5,000 euros pursuant to Article L. 761-1 of the French Code of Administrative Justice.

Given the other supporting documents provided;

Considering:

- The Constitution, in particular its Preamble;

- The European Convention for the Protection of Human Rights and Fundamental Freedoms;

- The European Convention on Extradition of December 13, 1957;

- The Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment of December 10, 1984;

- The Criminal Code;

- The Code of Criminal Procedure;

- The Code of Administrative Justice;

TRANSLATION

After hearing in open session:

- A report by Mr. Clément Malverti, "auditeur" for the *Conseil d'Etat*,

- Conclusions by Ms. Béatrice Bourgeois-Machureau, public rapporteur;

and counsel for Mr. O… from the Waquet, Farge, Hazan, law firm who spoke before and after the conclusions.

1.  Whereas, by decree of September 17, 2015, the Prime Minister granted to the Russian authorities the extradition of Mr. M…O…, a Kazakh national, on the basis of an order dated October 7, 2010 by a judge of the Tver District Court demanding his detention in connection with an investigation for acts of fraud and breach of trust on a large scale in an organized group, laundering on a large scale in an organized group, with prior agreement, attempted abuse of power by a person in a management position in a trading company with serious consequences and large-scale subtraction by fraud and breach of trust, falsification of official documents with intention to grant a right or release from an obligation in order to conceal another crime; that the applications filed by Mr. O... request the annulment on the grounds of ultra vires of such decree and implicit refusal to withdraw it; whereas it is necessary to combine those two applications in order to render a single decision;

2. Whereas, by virtue of a fundamental principle recognized by the laws of the Republic, the State shall refuse the extradition of a foreigner when it is requested for a political purpose; whereas, according to Article 3 (§2) of the European Convention on Extradition, extradition shall not be granted "if the requested Party has substantial grounds for believing that a request for extradition for an ordinary criminal offence has been made for the purpose of prosecuting or punishing a person on account of his race, religion, nationality or political opinion, or that that person's position may be prejudiced for any of these reasons";

3. Whereas it appears from the documents brought before this Court that Mr. O… is an opponent of the political regime in Kazakhstan and that he has been recognized as a political refugee by the British authorities to protect him against the risks he would incur in his homeland; that the evidence brought forth shows that the Kazakh authorities, who had previously pressured the Ukrainian authorities to request the extradition of Mr. O…, sought to pressure Russia to initiate criminal prosecution against Mr. O… and pressure the Russian authorities to request the applicant's extradition to Russia; that it is also clear from the evidence brought forth that the extradition procedure was monitored by the Kazakh authorities and was the subject of repeated exchanges between the Russian and Kazakh authorities during the investigation; whereas all circumstances in this case show clearly that Mr. O…'s extradition to Russia was sought for a political purpose; therefore, such extradition could not be lawfully granted; whereas, without need to examine further the other pleas in the applications, Mr. O… is justified in seeking the annulment, on the grounds of ultra vires, of the decree of September 17, 2015 by which the Prime Minister granted his extradition to the Russian authorities and of the Prime Minister's implied refusal to withdraw it.

4. Whereas there is cause, in the circumstances of the present case, to order the State to pay the sum of 3,000 euros to Mr. O… under the provisions of Article L. 761-1 of the Code of Administrative Justice;

THE COURT RENDERS THE FOLLOWING DECISION:

Article 1: The decree of September 17, 2015 granting the extradition of Mr. M…O…to the Russian authorities and the implied refusal to withdraw it are annulled.

Article 2: The State shall pay Mr. O… a sum of 3,000 euros under Article L. 761-1 of the Code of Administrative Justice.

Article 3: This decision shall be notified to Mr. M…O…and to the French Minister of Justice.

http://www.conseil-etat.fr/Decisions-Avis-Publications/Decisions/Selection-des-decisions-faisant-l-objet-d-une-communication-particuliere/CE-9-decembre-2016-M.-O

# EXHIBIT 10

**BSF** | BOIES
SCHILLER
FLEXNER

MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

April 19, 2017

**<u>BY ECF AND HAND DELIVERY</u>**

Honorable Katherine H. Parker
United States Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *City of Almaty, Kazakhstan, et ano. v. Mukhtar Ablyazov, et al.*,
              **Case No. 15 Civ. 5345 (AJN) (KHP)**

Dear Judge Parker:

      We represent the City of Almaty, Kazakhstan and BTA Bank (the "Kazakh Entities") and
write regarding the noticed deposition of defendant Ilyas Khrapunov. Khrapunov refuses to be
deposed in any other location than Switzerland – a forum that Judge Nathan has already found is
not suitable for U.S. discovery – based on nothing other than an unsubstantiated fear of being
arrested if he travels. The Kazakh Entities respectfully request an order requiring Ilyas
Khrapunov to sit for a deposition at a mutually-agreeable location pursuant to the Federal Rules.[1]

<u>**Relevant Background**</u>

      On March 20, 2017, the Kazakh Entities served a deposition notice on Ilyas Khrapunov,
through his counsel. *See* Exh. 1. All parties agree that it was Khrapunov who secured funding for
the New York real estate investments at issue in this case: the Kazakh Entities allege that he
conspired to invest money stolen by his father-in-law (defendant Mukhtar Ablyazov) and his
father (defendant Viktor Khrapunov), while defendants claim that Khrapunov acquired funding
from his sister's father-in-law, Gennady Petelin. Judge Nathan preliminarily found that the funds
were traceable to Ablyazov. *See* ECF No. 175, at 6. Nonetheless, because the defendants
continue to hide behind the Petelins, further evidence on this point is critical, and Khrapunov is
obviously uniquely positioned to testify about whom he got the money from.

      Recent disclosures highlight the need for Khrapunov's sworn testimony. Counsel for
defendant Triadou SPV S.A. has disclosed that some or all of Khrapunov's e-mail accounts were
intentionally destroyed in August or September of 2014 – four months *after* he was named as a
defendant in a RICO action brought by the City of Almaty in California (filed on May 13, 2014).
*See* ECF No. 219, ¶ 114. With his documents destroyed, there is an even greater need for
Khrapunov's testimony as to his communications and financing of the investments at issue here.[2]

      Considering the importance of Khrapunov's testimony, the Kazakh Entities offered to

---

[1]     In accordance with Your Honor's Individual Practices, the parties met and conferred on
April 13, 2017 at 10:00 a.m. and could not reach a resolution on this issue.

[2]     Judge Nathan preliminarily found that the threat of that lawsuit in California precipitated
the allegedly fraudulent transactions by Khrapunov in New York, *see* ECF No. 175, at 21, and the
subsequent destruction of his documents raises extremely serious issues of possible spoliation.

conduct his deposition at a location in Europe, such as Spain or England, that would require only limited travel while ensuring a full deposition under the Federal Rules. But Khrapunov refuses to travel even within Europe to give testimony, claiming through counsel that he fears he will be arrested if he leaves Switzerland because he is the subject of an INTERPOL Red Notice. Instead, he demands to be deposed in Switzerland by a Swiss commissioner under the Hague Convention.

## Argument

Khrapunov's purported fear of arrest is neither credible nor a justification for evading a deposition under the Federal Rules. His demand to testify only under the limited Swiss Hague process is a transparent ploy to avoid giving full and admissible testimony. Khrapunov should be ordered to be deposed pursuant to the Federal Rules at a mutually-agreeable location, as Judge Nathan has already recognized that Switzerland is not an acceptable location because of the restrictions imposed on testimony under Swiss law. Moreover, Khrapunov's claimed basis for refusing to travel is factually baseless, and even if it were not, fear of arrest is not a legitimate excuse for avoiding a full deposition. To the contrary, courts routinely order parties to be deposed in locations that expose them to a legitimate fear of arrest.

As an initial matter, Khrapunov's proclaimed fear of travel is unsupported by any evidence. As Judge Nathan has already found, Khrapunov was added to INTERPOL's list of wanted persons at some time in 2012. *See* ECF No. 175, at 6. Since then, Khrapunov has remained at liberty, traveling both within Switzerland and internationally, including travel to the United States, the United Kingdom, Belgium, Greece, and various locations in Africa.

He has remained at liberty because an INTERPOL Red Notice is not an arrest warrant and does not compel anyone to be arrested. It is a notification that a person is wanted by a third country and that this country is seeking international police cooperation. *See* "Red Notices," INTERPOL, *available at* http://bit.ly/2o45fCb, *last visited* April 18, 2017 ("When INTERPOL publishes a Red Notice this is simply to inform all member countries that the person is wanted based on an arrest warrant or equivalent judicial decision issued by a country or an international tribunal. INTERPOL does not issue arrest warrants."). Khrapunov has remained at liberty despite traveling between Switzerland, Greece, the United States, and other INTERPOL member states. He has not offered any evidence establishing that traveling within Europe for a deposition would place him at a greater risk of arrest than he currently faces, although that is his burden to carry. *See Restis v. Am. Coal. Against Nuclear Iran, Inc.*, No. 13 CIV. 5032 ER KNF, 2014 WL 1870368, at *3 (S.D.N.Y. Apr. 25, 2014) (statements by counsel of party's fear of arrest are not evidence of inability to travel).

Yet even if Khrapunov's purported fear of arrest were credible, it would still not be justification for avoiding a deposition. "It is well settled under federal law that a party may not avoid a deposition to evade an outstanding warrant." *Erichsen v. Cty. of Orange*, No. CV 14-2357 JAK (SS), 2016 WL 6921610, at *5 (C.D. Cal. Mar. 31, 2016). Neither is a party's fear of arrest good cause to justify alternate testimonial arrangements. *See In re Emanuel*, 406 B.R. 634, 637 (Bankr. S.D.N.Y. 2009) (fear of arrest a "neither good nor compelling" reason for ordering alternate means of testimony); *see also Collazos v. United States*, 368 F.3d 190, 204 (2d Cir. 2004) (refusal to appear for deposition based on fear of arrest supported an adverse inference).

Khrapunov's real fear is of having to give admissible testimony. Khrapunov insists (through counsel) that he will testify only in Switzerland pursuant to the Hague Convention, but as courts – including this one, in this case – have recognized, the Swiss Hague procedures

present serious evidentiary issues. Depositions taken in Switzerland are conducted not by the parties but by a Swiss commissioner who provides only an abbreviated summary of the testimony. *See, e.g.*, *Triple Crown Am., Inc. v. Biosynth AG*, No. CIV.A. 96-7476, 1998 WL 227886, at *4 (E.D. Pa. Apr. 30, 1998) (deposition in Switzerland "would be conducted in German by a judicial officer who would issue a report from handwritten notes, that the proceedings could not be transcribed by a party and that the ability of any Swiss attorney engaged by a party to pose questions to a deponent is not assured."). Indeed, as noted, Judge Nathan already ordered Triadou's corporate representative to appear at a mutually-agreeable location over its objection, rather than in Switzerland, for precisely this reason. ECF No. 284.

In *Schindler Elevator Corp. v. Otis Elevator Co.* – a case relied on by Judge Nathan already here (ECF No 284, at 4) – the court denied a party's request to be deposed in Switzerland, finding that the Swiss Hague procedure "would not comport with the general procedures and practices of a deposition recognized by the Federal Rules" and that "[t]he differences between the procedures applicable to a Convention deposition and those applicable to a general 'question-and-answer' deposition under the Federal Rules raise legitimate concerns about the sufficiency of a Hague deposition and the specter of prejudice." 657 F. Supp. 2d 525, 531 (D.N.J. 2009). In short, Khrapunov's demand to be deposed under Swiss Hague procedures is merely an attempt to avoid probing questioning and to muddy the evidentiary record.

Khrapunov's unwillingness to be deposed under the Federal Rules is particularly suspicious in light of his previous refusals to provide sworn testimony. In litigation in the U.K. between BTA Bank and Ablyazov and Khrapunov, Khrapunov was found to be aiding Ablyazov's efforts to circumvent asset freezing orders, and ordered to provide testimony disclosing his assets. *See* Exh. 2 ¶¶ 10–12. Khrapunov declined to give testimony, and instead, invoked his privilege against self-incrimination. *Id*. It appears that Khrapunov is now resorting to the notoriously unreliable Hague process in hopes that he might save himself from having to invoke the privilege again – and the negative inference that would bring. *See Brinks Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir.1983).

Finally, Khrapunov cannot hide from discovery behind a purported fear of arrest while demanding discovery from the Kazakh Entities. If Khrapunov is truly remaining in Switzerland to avoid arrest, then he is a fugitive, and a fugitive cannot use the discovery process to his benefit while avoiding arrest. *See S.E.C. v. Roman*, No. 94 CIV. 3621 (SAS), 1996 WL 34146, at *1 (S.D.N.Y. Jan. 30, 1996). The fugitive disentitlement doctrine explicitly prevents a fugitive from avoiding discovery obligations while using the courts to gain evidence from his opponents, as "one who flaunts the legal system is not entitled to benefit from it." *Id*. Khrapunov has served numerous document requests and deposition notices on the Kazakh Entities, and received tens of thousands of documents in response (while he has produced virtually none). If Khrapunov prioritizes evading arrest over being deposed or participating in this lawsuit, then he has no right to seek discovery from the Kazakh Entities as they attempt to recover the assets his co-conspirators stole, and he should be barred from doing so going forward.

For the foregoing reasons, the Court should order Ilyas Khrapunov to be deposed at a mutually agreeable location under the Federal Rules. Thank you for your consideration.

Respectfully,

  /s/  Matthew L. Schwartz
Matthew L. Schwartz

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC, | |
|            Crossclaim Plaintiffs, | 15 Civ. 5345 (AJN) (SN) |
|    -against- | |
| MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A., | |
|            Crossclaim Defendants. | |

## CROSSCLAIM PLAINTIFFS' NOTICE OF VIDEOTAPED DEPOSITION OF ILYAS KHRAPUNOV

PLEASE TAKE NOTICE that pursuant to Rule 30 of the Federal Rules of Civil Procedure, Crossclaim Plaintiffs, by and through their undersigned attorneys, will take the videotaped deposition, upon oral examination, of Ilyas Khrapunov on the following date and time, and at the following location:

| Date/Time | Location |
|---|---|
| April 3, 2017 | Offices of Boies, Schiller & Flexner LLP |
| 9:00 a.m. | 575 Lexington Ave., 7th Floor |
| | New York, NY 10022 |

The deposition will be taken before a notary public or some other person authorized to administer oaths, pursuant to Fed. R. Civ. P. 28. The testimony shall be recorded by sound-and-visual stenographic means, and real-time transcription will be available.

1

Crossclaim Plaintiffs reserve their right to request additional deposition time as related documents are produced by Defendants.

Dated:          March 20, 2017

                      Respectfully Submitted,

                      BOIES, SCHILLER & FLEXNER LLP

                      By:    /s/ Matthew L. Schwartz
                              Matthew L. Schwartz

                      Peter M. Skinner
                      Daniel G. Boyle

                      BOIES, SCHILLER & FLEXNER LLP
                      575 Lexington Avenue
                      New York, NY 10022
                      Telephone: 212-446-2300
                      Facsimile: 212-446-2350

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2017, a copy of Crossclaim Plaintiffs' Notice of Videotaped Deposition of Ilyas Khrapunov was served on counsel of record for Mukhtar Ablyazov, Viktor Khrapunov, Ilyas Khrapunov and Triadou SPV S.A., as follows:

**BY E-MAIL:**

Deborah A. Skakel
Alex E. Hassid
Robyn L. Michaelson
BLANK ROME LLP
405 Lexington Avenue
New York, NY 10174
dskakel@blankrome.com
ahassid@blankrome.com
rmichaelson@blankrome.com
*Counsel for Triadou SPV S.A.*

Jonathan D. Cogan
KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
jonathan.cogan@kobrekim.com
*Counsel for Mukhtar Ablyazov*

John J. Kenney
John P. Curley
HOGUE NEWMAN REGAL & KENNEDY LLP
10 East 40th Street
New York, NY 10016
jkenney@hnrklaw.com
jcurley@hnrklaw.com
*Counsel for Viktor and Ilyas Khrapunov*

      /s/ Matthew L. Schwartz
      Matthew L. Schwartz

Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, NY 10022
Telephone: 212-446-2300
Facsimile: 212-446-2350

3

IN THE HIGH COURTS OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

Case No: CL-2015-000549
NCN: 2016 EWHC 289 (Comm)

The Royal Courts of Justice
7 Rolls Building
London EC4A 1NL

20 January 2016

Before:

**MR JUSTICE PHILLIPS**

BETWEEN:

**JSC BTA BANK**

**Claimant/Applicant**

-v-

**(1) MUKHTAR ABLYAZOV**

**1st Defendant**

**(2) ILYAS KHRAPUNOV**

**2nd Defendant/Respondent**

**Stephen Smith QC** and **Tim Akkouh** (instructed by **Hogan Lovells International LLP**) appeared on behalf of the **Claimant/Applicant**

**Charles Samek QC** and **Marc Delehanty** (instructed by **Hughmans Solicitors**) appeared on behalf of the **Second Defendant/Respondent**

**APPROVED JUDGMENT**

MR JUSTICE PHILLIPS:

1.    This is an application by the claimant ("the Bank") for an order that the second defendant ("Mr Khrapunov"), be required to give disclosure of his assets pursuant to a provision to that effect in a worldwide freezing order ("WFO"), notwithstanding that Mr Khrapunov claims that such disclosure might reasonably be expected to expose him to the risk of criminal prosecution in overseas jurisdictions. The Bank does not accept that any such risk has been made out to the requisite standard, but in any event contends that such risk has been removed by the existing requirement that such disclosure be made only to solicitors and counsel directly involved in the case and kept confidential by them.

2.    The proceedings arise from the substantial judgments the Bank has obtained in proceedings in this jurisdiction against the first defendant ("Mr Ablyazov") in respect of the misappropriation of the Bank's assets whilst Mr Ablyazov was its Chairman. The judgments total in the region of US$4.5 billion. In these proceedings, the Bank claims that Mr Khrapunov has conspired with Mr Ablyazov, his father-in-law, to injure the Bank by unlawful means. The gist of the allegation is that Mr Khrapunov has assisted Mr Ablyazov to conceal various assets by a series of unlawful dealings and sham agreements in breach of freezing orders and receivership orders made by the courts of this jurisdiction. The Bank claims damages for losses thereby suffered.

3.    On 17 July 2015 Males J granted, without notice, an unlimited WFO against Mr Khrapunov. Paragraph 7(1)(a) of that order required Mr Khrapunov within 10

days of service of the order, and to the best of his ability, to inform the Bank's solicitors of all his assets worldwide exceeding £10,000 in value, whether in his own name or not and whether solely or jointly owned, and whether Mr Khrapunov is interested in the said assets legally, beneficially or otherwise, giving the value, location and details of all such assets.

Paragraph 7(2) provided as follows:

> "*If the provision of any of this information is likely to incriminate the Respondent in any jurisdiction, he may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide this information. Wrongful refusal to provide the information is contempt of court and may render the Respondent liable to be imprisoned, fined or have his assets seized.*"

4.    It is common ground that a party does not have an automatic right to the privilege against self-incrimination in relation to prosecution in overseas jurisdictions, but that there is a discretion for the court to allow such a privilege from giving self-incriminatory evidence: see Brannigan v Davison [1997] AC 238 (PC). It is also common ground that the effect of paragraph 7(2) of the WFO is that Mr Khrapunov is entitled to refuse to give disclosure under paragraph 7(1)(a) if the effect of doing so would be to incriminate himself in relation to prosecutions overseas. The Claimant has not sought to resile from that position on this application.

5.    On 30 October 2015 Mr Khrapunov wrote to Hogan Lovells, solicitors for the Bank. At that stage Mr Khrapunov was acting in person, although he has subsequently acknowledged that he was in receipt of legal advice and assistance. In that letter, he

invited the Bank's agreement to a number of matters, including that:

> "The affidavit, information and documentation to be provided pursuant
> to paragraphs 7 and 8 of the Freezing Order be provided ... subject to
> the following ... the asset disclosure shall be confidential, the
> information being limited to a club comprising only specific named
> solicitors of your firm and counsel (with appropriate safeguards in
> place to avoid wider dissemination of the information), the members of
> whom can be varied by agreement in writing or by Order of the
> Court."

6.    On 5 November 2015, in a further letter, Mr Khrapunov stated in relation to asset

disclosure as follows:

> "There are serious concerns about the manner in which the disclosure
> order has been obtained on a without notice basis. There are also
> serious concerns as to what your client will do with that disclosure
> once it has been provided. The restriction to a confidentiality club of
> Solicitors and Counsel, pending argument at an 'on notice' application,
> will prevent the risk that I will be irreparably harmed by the provision
> of asset disclosure to your client, who has it appears employed illegal
> methods of pursuing parties close to Mr Ablyazov for the purposes of
> extracting evidence."

7.    On 6 November 2015, the day after that letter, the Bank appeared before

Popplewell J seeking various further relief. Popplewell J made an order, which

included at paragraph 3 a provision that Mr Khrapunov should comply with

paragraph 7(1)(a) of the WFO by 4 pm on 13 November 2015, giving disclosure of

his asset position as of 11 September 2015 and addressing any dealings with assets

of value of more than £10,000 that had taken place thereafter. Paragraph 4 of the

order provided as follows:

> "Until the return date or further order, the disclosure to be given

> *pursuant to paragraph 7 of the Freezing Order shall only be provided
> to, and shall be kept confidential by, partners and employees of
> Hogan Lovells International LLP who are concerned with the case and
> counsel who are instructed in relation to the case."*

8.  It will be seen that that provision reflected the restriction proposed by
    Mr Khrapunov himself in his earlier letters.

9.  On the date disclosure was required by that order, Mr Khrapunov, now represented
    by solicitors and counsel, applied to Cooke J for an order that the disclosure
    required that day be postponed or stayed until the return date of the WFO listed for
    26 and 27 January 2016. Cooke J refused that application but granted a short
    extension until 23 November 2015 for the provision of the disclosure. Cooke J also
    made a slight variation to the confidentiality regime, requiring that disclosure be
    made only to those directly concerned in the case, the word "directly" being
    inserted.

10  On 23 November 2015, Hughmans Solicitors, acting for Mr Khrapunov, wrote to
    Hogan Lovells, stating:

    > *"We refer to para 7(1)(a) of the Order of 17 July 2015 as varied by
    > Popplewell J on 6 November 2015 and by Cooke J on
    > 13 November 2015.*
    >
    > *Having taken appropriate foreign legal advice in accordance with
    > para 7(2), without intending any discourtesy to the court our client
    > declines to provide the relevant disclosure."*

11. The Bank issued the present application on 24 November 2015, seeking an order
    that Mr Khrapunov do provide proper particulars of the claim to the privilege

against self-incrimination. That application came before me on 1 December 2015. The day before, Mr Khrapunov had sworn an affidavit giving further details of his claim under paragraph 7(2) of the WFO. At paragraph 5 he set out the investigations and proceedings in other jurisdictions upon which he relied:

> "*(a) Mr Ablyazov is currently in prison in France awaiting extradition to Russia to face criminal charges based on allegations made by the Bank;*
>
> *(b) My father and I are both subject to a criminal investigation by the Kazakhstan authorities based on allegations made by the City of Almaty. In 2012 both our names were added to the Interpol list of wanted persons at the request of the Government of Kazakhstan;*
>
> *(c) The Swiss authorities are currently carrying out a criminal investigation into me and my father involving allegations of money laundering;*
>
> *(d) In May 2014 civil proceedings were brought against me, my father and others by the City of Almaty in the United States District Court, Central District of California alleging (amongst other things) violations of the Racketeer Influenced and Corrupt Organisations Act ('RICO'), breach of fiduciary duty, conversion and fraud. Those proceedings were stayed on 21 September 2015 on the grounds of forum non conveniens;*
>
> *(e) Civil proceedings are also ongoing in United States District Court, Southern District of New York ('the New York proceedings') in which the Bank and the City of Almaty (who are working together and instructing the same lawyers) are applying to add me, my father and Mr Ablyazov as Defendants to a claim for (amongst other things) breaches of RICO, fraudulent transfer, unjust enrichment, fraud and conversion.*"

12. At paragraph 7 Mr Khrapunov referred to the advice he had received, without waiving any legal professional privilege, stating in subparagraph (d) that, as a result of the legal advice he had received, he believed that he was entitled to claim to refuse to provide any of the information he would otherwise be required to disclose

under 7(1)(a) of the worldwide freezing order, on the grounds that provision of such information is likely to incriminate him in those foreign jurisdictions. He further confirmed in subparagraph (e) that he had carefully considered the position separately in relation to each of the assets that fall within the definition of paragraph 7(1)(a); and in subparagraph (f) that the advice had taken into account the confidentiality provisions made in the order of 6 November of Popplewell J. Mr Khrapunov further confirmed at paragraph 14 that he did not seek to claim any privilege against self-incrimination under English law; that is, in relation to any English criminal process or sanction.

13. In light of that material, the Bank's stance changed. The Bank sought to argue that the matters set out by Mr Khrapunov did not amount to a sufficient claim for privilege on any basis, but particularly given the confidentiality regime in place. Given that change of stance, and the lack of court time, I adjourned the application to the first available date. The hearing resumed yesterday, 19 January.

14. Mr Smith QC, who appeared for the Bank on the adjourned hearing, leading Mr Akkouh who had appeared alone on 1 December, submitted that Mr Khrapunov's evidence was wholly insufficient to demonstrate a proper claim for privilege against self-incrimination. He referred to a number of statements of principle, as follows. In <u>Triplex Safety Glass Co Ltd v Lancegaye Safety Glass</u> [1939] 2 KB 395, Du Parcq LJ, giving the judgment of the court, stated as follows:

> "*The court has, none the less, a duty to make sure, so far as may be, that the protection of the rule is not accorded to persons who have in*

> *truth no claim to it. To this end certain principles have in course of time been established which may be stated shortly as follows:*
>
> *(1) The mere fact that a party or a witness swears that his answer would tend to criminate him is not conclusive. The Court may have a duty, notwithstanding this assertion of a claim to privilege, to compel him to answer.*
>
> *(2) The Court will insist upon an answer if, in the words of Pollock CB, 'the witness is trifling with the authority of the Court, and availing himself of the rule of law to keep back the truth, having in reality no ground whatever for claiming the privilege'..."*

15.   In <u>Sociedade Nacional v Lundqvist</u> [1991] 2 QB 310, Staughton LJ, at page 324F,

stated as follows:

> *"The substance of the test is thus that there must be grounds to apprehend danger to the witness, and those grounds must be reasonable, rather than fanciful."*

16.   Beldam LJ stated at page 331G:

> *"I would therefore hold that the court is not simply bound by the statement of the defendants that to give the information requested would put them in peril of incrimination. The court is not only entitled but is bound to look further and to consider the merits of the claim which is advanced."*

17.   In <u>JSC BTA Bank v Ablyazov</u> [2010] 1 All ER (Comm) 1029, Sedley LJ

emphasised that in order to redress the balance, the court must expose a claim to

privilege to "close scrutiny".

18.   Mr Samek QC, who appeared for Mr Khrapunov, did not dispute those principles,

but referred to the other side of the equation, and in particular to a summary by

Mann J of the relevant principles in <u>Phillips v Newsgroup Newspapers</u> [2010]

EWHC 2952 (Ch):

"23. The question for the court is whether the risk of exposure to criminal proceedings is sufficient to give rise to the privilege. The classic statement of the relevant level of risk is in <u>R v Boyes</u> [1861] 1B&S 311 at page 330:

'To entitle a witness to the privilege of not answering a question as tending to incriminate him, the court must see, from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is reasonable grounds to apprehend danger to the witness from his being compelled to answer. If the facts of the witness being endangered be once made to appear, great latitude should be allowed to him in judging the effect of any particular question. The danger to be apprehended must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things, and not a danger of imaginary character having reference to some barely possible contingency.'

24. The degree or level of risk was further amplified in <u>Rio Tinto Zinc v Westinghouse Electric Co.</u> [1978] AC547 at page 574:

'There is the further point: once it appears that a witness is at risk, then 'great latitude should be allowed to him in judging for himself the effect of any particular question': see <u>R v Boyes</u> ... It may only be one link in the chain, or only corroborative of existing material, but still he is not bound to answer if he believes on reasonable grounds that it could be used against him. It is not necessary for him to show that proceedings are likely to be taken against him, or would probably be taken against him. It may be improbable that they will be taken, but nevertheless, if there is some risk of their being taken − a real and appreciable risk − as distinct from a remote or insubstantial risk, then he should not be made to answer or to disclose the documents ... But where there is a real and appreciable risk, or an increase of an existing risk, then his objection should be upheld.'

25. Roskill LJ added:

'It cannot, I think, be right in these cases for the court to attempt a quantitive assessment of the probability one way or the other of the risk of proceedings ultimately being taken, and then to seek to draw the line, one way where the probabilities in the view of the court are thought to be more or less evenly balanced and the other where the balance is more disparate. It is not for the court to resolve problems of this kind by calculating odds. I think that the right question is to ask that posed by Shaw LJ on Friday afternoon. Can exposure to the risk of penalties (or in other cases to the risk of prosecution for a criminal offence) be regarded as so far beyond the bounds of reason

> *as to be no more than a fanciful possibility?"'*

19. On the basis of those principles, Mann J concluded that:

> *"... considerable latitude is given to the person claiming the privilege and, putting the matter slightly colloquially, he is entitled to the benefit of any doubt."*

20. I accept Mr Smith's contention that Mr Khrapunov's own summary in his affidavit is lacking in particulars, and in itself would not amount to a sufficient basis for claiming privilege against self-incrimination. But there is also in evidence, exhibited to a witness statement of Mr Khrapunov's solicitor dated 13 November 2015, a pleading served in proceedings in the United States District Court Southern District of New York to which both the Bank and Mr Khrapunov are party. The pleading is entitled "Answer, Counterclaims and Crossclaims" and was served by three parties, including the City of Almaty in Kazakhstan and the Bank. It is a lengthy document. The gist of the contentions is that various parties, including Mr Ablyazov and Mr Khrapunov and his father, were involved in an international scheme to launder and conceal at least US$40 million stolen from the Kazakhstan plaintiffs, and that amongst the purposes of the scheme, one was converting stolen funds into valuable New York City real estate. At paragraph 22, it is asserted that:

> *"The Khrapunovs and Ablyazov, both fighting law enforcement investigations and asset seizures by Kazakh authorities, joined forces and commingled their stolen funds. Through joint investments across the globe, the two renegade families combined and conspired to launder their illicit wealth into real estate, energy assets, and other investments in locales they deemed safe from seizure. Ilyas Khrapunov [the second Defendant in these proceedings], related by marriage to Ablyazov, orchestrated these efforts and steered the families' joint*

*investments."*

21. Paragraph 23 refers to the fact of an alleged theft of billions of dollars from entities and municipalities in the Republic of Kazakhstan. In paragraph 77 the pleading starts to set out the case of money laundering, and at 79 refers to the Ablyazov-Khrapunov group creating "*a series of entities in Switzerland and overseas to launder these illicit funds into outwardly-legitimate investments*" and referring to Swiss Development Group, an entity which is referred to in the present proceedings in England.

22. At paragraph 84, the pleading refers to the fact that charges were brought in Kazakhstan against, among others, Mr Khrapunov, arising from theft of public property and laundering of funds during Mr Khrapunov's father's tenure as Mayor of Almaty. Paragraph 85 refers to the Investigation Department applying to the Federal Office of Justice in Switzerland for legal assistance in connection with the effort to prosecute the Khrapunovs for crimes in Switzerland and Kazakhstan relating to their corrupt acts in Almaty and the laundering of the resulting funds, and that "*in response to this request, in mid-2012 the Public Prosecutor of Geneva opened an investigation into the Ablyazov-Khrapunov Group on suspicion of violating Swiss money laundering laws*". It further refers to the fact that "*this investigation by the Swiss authorities is ongoing, and in August 2013 the Public Prosecutor of Geneva froze additional assets belonging to the Ablyazov-Khrapunov Group.*" Then paragraph 86 refers to "*additional charges pending against Leila Khrapunov and Ilyas Khrapunov in Kazakhstan for, among other offences, money laundering and establishing and directing an organised criminal group for*

*criminal purposes."*

23. Paragraph 139 sets out the legal allegations against the Defendants in the United States, including numerous accounts of racketeering activity under the RICO statute, 18 USC, and includes allegations of engaging in mail fraud and wire fraud, *"knowingly using mails and wires to transfer illegally obtained funds into and within the United States, for the purpose of furthering the Count 1 Enterprise and, while concealing the funds' illegal source, used those funds to purchase real estate in New York City and to fund business entities, including SDG and Triadou, that enabled those entities to conduct business in the United States using the illegally obtained funds"*; and *"the Defendants unlawfully transported or caused to be transported in interstate or foreign commerce securities or money having a value of $5,000 or more which was stolen, converted or taken by fraud from Almaty and BTA Bank, and knowing the same to be stolen, converted or taken by fraud."* Paragraph 140 alleges that each of the Defendants *"engaged or conspired to engage in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO."* Then there is an allegation that from *"in or about 1997, and continuing to the present, the ... Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Count 1 Enterprise."*

24. Given that the Bank has itself recently and is still currently alleging such a wide range of serious and continuing criminal offences against Mr Khrapunov in New York, and refers to criminal charges against him in Kazakhstan and criminal

investigations ongoing in Switzerland, I readily accept that Mr Khrapunov faces the risk of prosecution in each of those jurisdictions. Further, given the nature of the allegations relates to the movement of assets (including, as I have mentioned, wire fraud, transportation, et cetera), in my judgment it is certainly not fanciful that the disclosure of his assets will increase the risk of criminal charges and the likelihood of incrimination in relation to such charges.

25.    Against that background, I am satisfied that Mr Khrapunov is entitled to the latitude referred to by Mann J and that regard must be had to his assertion, based on, he says, legal advice (and Mr Smith does not suggest that Mr Khrapunov has not had such advice) that disclosing his assets would incriminate him.

26.    The further question is, therefore, whether the provision relating to disclosure to a "confidentiality club" removes that risk to such a degree that it becomes merely fanciful and ceases to be a real risk. The use of a restricted information regime or confidentiality club or some other such device to remove the risk of self-incrimination has been recognised in a number of authorities. In <u>Crédit Suisse Fides Trust SA v Cuoghi</u> [1998] QB 818, Millett LJ, at page 830E, stated as follows:

> "*It will still be open to CSFT to suggest measures which will ensure that there is no significant risk that incriminating information will come into the possession of the Swiss prosecuting authorities. The best way of doing this is to prevent it coming into the possession of CSFT. There are various mechanisms that could be put in place to ensure this without reducing the effectiveness of the <u>Mareva</u> relief. Some of them were suggested in the course of argument. So far as bank accounts are concerned, it appears to be the entries in the*

*accounts which are thought to be sensitive rather than the location
and amount of the final balances. It should not be beyond the skill of
those advising Mr Cuoghi to find a means of providing the latter
information without disclosing the former."*

27. Lord Bingham of Cornhill CJ stated at 833D:

*"It is still open to CSFT to show that there will be no significant risk of
self-incrimination in practice because effective measures can and will
be taken to ensure that incriminating disclosures do not become
known to the prosecuting authorities in Switzerland..."*

28. In the earlier proceedings by the Bank against Mr Ablyazov, in a decision dated
    11 September 2009, Flaux J considered the question of Mr Ablyazov's privilege
    against self-incrimination in relation to prosecution in England but also in relation
    to proceedings in Kazakhstan or Latvia. He referred to the fact that the Claimant's
    solicitors, then known as Lovells, had proposed a confidentiality club on a similar
    basis to that contained in the order of Popplewell J. Flaux J concluded:

    *"On the basis of that offer it seems to me that there is no ground for
    any suggestion that disclosure to the claimant's legal advisors would
    expose the fourth defendant to the risk of proceedings against it in
    Kazakhstan or Latvia. In the circumstances, it seems to me that the
    fourth defendant has not demonstrated any basis upon which it can
    justify refusing to disclose its assets in accordance with the order of
    the court and the claimants are entitled to the relief they seek."*

29. In the decision in the Court of Appeal in JSC BTA Bank v Ablyazov [2010] 1
    All ER (Comm) 1029, to which I have already referred above, Pill LJ stated at
    paragraph 26:

    *"At the hearing before this court, the claimants offered a concession.
    Disclosure need only be to their solicitors and counsel. That
    concession, if acted upon, greatly diminishes the risk of information
    reaching the prosecuting authorities in Kazakhstan as a result of an*

> *order for disclosure. The court indicated that it was prepared to act on that concession though reservations were expressed, repeated by Sedley LJ in his judgment, about problems which may result. In post-hearing written submissions, the defendants argued that only named counsel and named representatives of the claimants' solicitors should be entitled to see the documents. That submission was rejected but the documents may be seen only by those representatives directly concerned with the case."*

30.  Sedley LJ did indeed, at paragraph 41, express concerns as to potential complications which might arise from such a confidentiality regime, but he did not dissent from the imposition of that regime as a way forward in that case. I should add that I am told by Mr Smith, who has acted throughout the Ablyazov litigation, that there have been no problems with the operation of the confidentiality club in relation to disclosure by Mr Ablyazov.

31.  There is, of course, also the standard provision in the worldwide freezing order in the form of an undertaking by the Bank that it *"will not without permission of the court use any information obtained as a result of this order for the purposes of any civil or criminal proceedings, either in England or Wales or in any other jurisdiction, other than this claim."* Therefore, the Bank is not entitled to use any information disclosed to take proceedings abroad without permission of the court. The confidentiality provisions add a further significant layer of protection to Mr Khrapunov, in that, self-evidently, the material cannot be disclosed to anyone other than the lawyers directly involved in the case, and in particular the Bank itself will not have access to the materials.

32.  Mr Samek argued that the confidentiality club provisions did not, in fact, remove

the risk of incrimination sufficiently, or indeed barely at all. He submitted that once the documents were, as he put it, "out there", there were numerous ways in which they could, whether inadvertently or otherwise, come into the hands of the prosecuting authorities in one or more of the relevant jurisdictions. By way of specific examples, Mr Samek relied upon evidence from two foreign lawyers. In relation to Switzerland, he relied upon the evidence of Mr Chandrasekharan, an attorney-at-law in the firm of Des Gouttes & Associés. His evidence was that the Swiss prosecutor or court could only directly obtain disclosure from the Claimant's solicitors, Hogan Lovells, if either they or the disclosure documents were located at any moment in Switzerland. Mr Samek suggested that this was a risk for Mr Khrapunov, because the disclosure would be in Mr Khrapunov's hands, physically or electronically, at the point at which he transmitted it, presumably to his solicitors in England, and therefore would be liable to disclosure.

33. In my judgment, that is a difficult position to follow. If the documents to be disclosed are in his hands in Switzerland, either the Swiss authorities can obtain them from him by ordinary means or they cannot. The fact that the documents are going to be given by way of disclosure in England does not seem to me to affect that position. But in any event, it is difficult to see why arrangements cannot be made so that the disclosure, in such form as it is, is not constituted or retained by Mr Khrapunov in Switzerland.

34. Mr Chandrasekharan also confirmed that a Swiss prosecutor could seek disclosure through the European Convention on Mutual Assistance in Criminal Matters by

requesting the authorities in the United Kingdom to obtain such disclosure on its behalf. It was common ground that any such process would involve a hearing and discretionary decision by an English court, which certainly would take into account the privilege and the confidentiality regime, and I do not consider that it is a significant risk that such a process would be utilised and would result in disclosure, particularly as it is confirmed in Mr Chandrasekharan's report that the Swiss authorities fully recognise the privilege against self-incrimination.

35. In relation to the United States, and in particular the State of New York, Mr Khrapunov relied upon the witness report of Mr Burlingame, an experienced and highly qualified attorney-at-law who has, as well as working in private practice, worked for nine years as a federal prosecutor. His evidence is that it was at least in principle possible that a grand jury could be empanelled in New York, and that the US Government, through the grand jury, could issue a subpoena to the Hogan Lovells US firm. Although accepting that the Hogan Lovells United States firm is a separate legal entity from Hogan Lovells International LLP (the Bank's solicitors in these proceedings), Mr Burlingame suggests that there is a prospect that arguments could be mounted that the US firm was acting as agent for Hogan Lovells International, and therefore that Hogan Lovells International would be subject to its jurisdiction, and thereupon would be required to produce the documents.

36. Whilst on that evidence it cannot be said that that theoretical possibility does not exist, in my judgment it is a remote and indeed fanciful possibility. In neither

Switzerland nor the United States has there been any indication of criminal proceedings, notwithstanding that the allegations against Mr Ablyazov and Mr Khrapunov have been extant and well known for some considerable period of time. The suggestion that now a grand jury might seek to obtain disclosure of this confidential material through this route is particularly fanciful, and I do not consider it to be a real risk. One question which arises is, how would the foreign authorities even know that this material was in the hands of Hogan Lovells? Certainly it is the case that if an order is made, that order will, in the ordinary event, be a public order which could be transmitted to the Bank and then on to third parties. However, steps could be taken to deal with that concern if it is thought to be a real one.

37. Mr Samek further contended that there was a risk that, notwithstanding that the materials would be kept confidential, perfectly proper steps or enquiries, taken without disclosing the confidential material, might nonetheless tip off the authorities as to the existence of those assets, and would thereby indirectly result in incrimination by virtue of the disclosure, and that should be a factor which militated against the confidentiality club being a sufficient answer. Again, in my judgment, that is a highly unlikely scenario. Hogan Lovells would be required to keep such material confidential and only to take further proceedings abroad with the leave of the court. Any enquiries they made would have to be without referring to the confidential material. If those enquiries independently obtained independent evidence of assets, then there does not seem any reason why that material should be treated as subject to a privilege against self-incrimination.

38. My conclusion that the confidentiality regime is sufficient to remove any real risk to Mr Khrapunov is reinforced by the fact that this was the view initially taken by Mr Khrapunov himself, with the benefit of legal advice. Mr Khrapunov's subsequent changed stance in relation to the effectiveness of a regime he himself had proposed suggests that his present motivation is to avoid giving proper disclosure to the Bank, not a genuine concern as to an increased risk of prosecution.

39. I raised the question of how Hogan Lovells would be able to enforce and police the freezing order if they are subject to the confidentiality regime in relation to their client, the Bank. The answer is that Hogan Lovells have a broad mandate from the Bank to take measures to protect assets. In my judgment, there is no reason why the Bank should be deprived of the opportunity to protect their assets in circumstances where they can do so by this regime without prejudicing any rights Mr Khrapunov has in relation to self-incrimination.

40. In any event, to the extent that the recognition of a privilege against self-incrimination in relation to foreign proceedings is a matter of the court's discretion, it must also be a matter of discretion as to the circumstances and conditions upon which that privilege should be recognised and given effect. In my judgment, and as an exercise of my discretion, I will only recognise any such privilege to the extent that the documents should only be disclosed to the confidentiality club. Provided they are disclosed subject to that restriction, I do not consider that any further protection is necessary, proper or proportionate as a matter of discretion. I will therefore order disclosure subject to the existing confidentiality

regime.

41. It might be said that there is a degree of uncertainty in the order as to exactly who is bound by what aspect and in what way. If Mr Samek were to invite me to do so, I would suggest that, rather than an order, the matter be dealt with by way of undertakings clarifying exactly who is undertaking what obligations. The application is so determined.

# EXHIBIT 11



Matthew L. Schwartz
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

July 25, 2017

**BY ECF AND HAND DELIVERY**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
40 Foley Square, Room 2102
New York, New York 10007

> Re:   *City of Almaty, Kazakhstan, et ano. v. Mukhtar Ablyazov, et al.,*
>        **Case No. 15 Civ. 5345 (AJN) (KHP)**

Dear Judge Nathan:

We represent the City of Almaty, Kazakhstan and BTA Bank (the "Kazakh Entities"). Pursuant to 28 U.S.C. § 1781(b) and the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970, 23 U.S.T. 2555, 847 U.N.T.S. 231, we respectfully submit this application requesting that the Court issue the enclosed Hague Convention Requests for International Judicial Assistance to the Central Authorities of Switzerland, the United Kingdom, and France, in the forms attached hereto as Exhibits 1 & 2 (Switzerland), 3 (the United Kingdom), and 4 (France).[1] The Kazakh Entities have conferred with all parties and shared with them copies of these letters of request, and none of the parties have opposed the issuance of the enclosed Letters of Request in the attached forms.[2] Some of the Defendants have expressed a desire to participate in questioning in any deposition resulting from these requests,

---

[1]     The Kazakh Entities are transmitting this letter to the Court by both ECF and hand delivery.  The hand-delivered version will have attached two copies of each proposed Letter of Request, to comply with the U.S. Department of State's recommendation that Hague Convention requests be prepared in duplicate.  Both copies will be labeled Exhibits 1 & 2 (Switzerland), 3 (United Kingdom), and 4 (France).

[2]     Counsel for Defendant Mukhtar Ablyazov has recently moved to withdraw from their representation of Defendant Ablyazov [ECF No. 351], and accordingly, declined to take a position on the draft Hague Requests. The Kazakh Entities agreed to postpone the filing of these requests until after counsel for Ablayzov had moved to withdraw, but were not aware at the time we reached that agreement that Ablyazov did not intend to retain new counsel to defend himself in this action going forward. [ECF No. 352, ¶ 6]. In light of Ablyazov's representation that he will not be retaining new counsel [ECF No. 352, ¶ 6], the Kazakh Entities' current inability to contact Ablyazov directly, and the time delay involved in the Hague process, the Kazakh Entities respectfully request that the Court issue the enclosed letters of request at this time.



and the Kazakh Entities do not oppose sharing time for questioning. We therefore respectfully request that the Court issue the attached letters of request.

Enclosed are three Letters of Request, to Switzerland, the United Kingdom, and France, respectively:

Switzerland (Exs. 1 & 2): On June 7, 2017, Magistrate Judge Parker issued a memorandum and order directing that the Kazakh Entities take Defendant Ilyas Khrapunov's deposition pursuant to the Hague process in the first instance. [ECF No. 330].[3] Pursuant to the Conditions for a Commissioner or Diplomatic or Consular Officer to Obtain Evidence in Switzerland, as set forth by the Swiss Federal Office of Justice as of May 2013 (the "Conditions"), this Court may appoint a commissioner or commissioners to collect evidence in Switzerland, and such a court-appointed commissioner may be authorized by the Swiss Central Authority to take the depositions of voluntary witnesses located in Switzerland. In accordance with the Conditions, the Kazakh Entities have prepared the attached Letter of Request (Ex. 1) and Commission (Ex. 2), which designate the parties' counsel and accompanying Swiss co-counsel as commissioners for the purpose of taking the testimony of Defendants Ilyas & Viktor Khrapunov, and identify the proposed topics for examination.

The United Kingdom (Ex. 3): The proposed Amended Letter of Request to the United Kingdom responds to the concerns expressed in the letter to Your Honor from Senior Master B.J. Fontaine of the Queen's Bench Division, dated May 16, 2017 [ECF No. 327], instructing the parties to file an amended Hague Request conforming to certain requirements under United Kingdom law. This Amended Letter of Request seeks documents and testimony related to Eesh Aggarwal and companies controlled by him relating to his provision of financial services for the benefit of the Defendants, including the shell company Telford International Limited. The Court has preliminarily found that Telford was "an Ablyazov investment entity used to move Ablyazov's funds," ECF No. 175, at 6, and the Kazakh Entities are seeking the assistance of the Central Authority of the United Kingdom in securing documentary evidence and testimony from Aggarwal regarding the sources of the funds transferred for the Defendants' benefit.

France (Ex. 4): Similar to the position taken by Defendants Ilyas & Viktor Khrapunov, prior to his counsel's motion to withdraw, Ablyazov expressed (through counsel) that he could only be deposed in France pursuant to the Hague Convention.[4] The attached proposed Letter of

---

[3]    In that order, Magistrate Judge Parker noted that while the Kazakh Entities were required to seek Ilyas Khrapunov's testimony through the Hague process in the first instance, "in light of the materiality of Khrapunov's testimony to this action, should the Hague procedures ultimately prove ineffective, the Kazakh Entities may apply for permission to seek additional testimony from Khrapunov outside of Switzerland." [ECF No. 330, at 13].

[4]    While Ablyazov was previously incarcerated, he has now been released and news reports indicate that the Interpol red notice against him has been withdrawn. Interpol's website likewise does not indicate that he is the subject of any pending red notice for his detention (see https://www.interpol.int/notice/search/wanted), and a July 20, 2017 post on Ablyazov's public Facebook page indicates the same (available at http://bit.ly/2tUeIeZ, last visited July 24, 2017). The Kazakh Entities therefore no longer believe that the logic of Judge Parker's order with



Request to France seeks the permission of the French Ministry of Justice in deposing Ablyazov in that country, and identifies the topics for the proposed deposition.

If the attached proposed Letters of Request are acceptable to the Court, we respectfully request that Your Honor endorse these letter applications, and take the following actions:

1. The Kazakh Entities respectfully request that Your Honor sign both of the duplicates for each Letter of Request (including the Commission to take the Depositions of Ilyas & Viktor Khrapunov in Switzerland) attached to the hand-delivered copy of this application.

2. The Kazakh Entities respectfully request that Your Honor then direct the Clerk of the Court to:

   a. apply the seal of the Court to both signed copies of each Letter of Request;

   b. file a copy of each signed Letter of Request in the docket of this action; and

   c. return the two signed copies of each Letter of Request and Commission to undersigned counsel to be transmitted to the designated Hague Convention Central Authorities, at the below addresses.

   > Switzerland:
   > Tribunal civil - Tribunal de première instance
   > Place du Bourg-de-Four 1
   > Case postale 3736
   > CH-1211 Genève 3, Switzerland
   > tpi.securise@justice.ge.ch
   >
   > With a copy to:
   >
   > Federal Office of Justice FOJ
   > Private International Law Unit
   > CH-3003 Bern, Switzerland
   >
   > The United Kingdom:
   > The Senior Master
   > For the attention of the Foreign Process Section

---

respect to Ilyas Khrapunov's deposition [ECF No. 330] would control here. As such, the Kazakh Entities intend to move to compel Ablyazov's deposition in the United States, but are continuing to pursue the Hague process as an alternative to ensure the timely completion of necessary discovery. *See generally* ECF No. 362 (7/13/2017 Hearing Tr.) at 50 (Judge Parker suggesting that the parties may wish to pursue Hague Convention and party discovery "in tandem" to promote efficiency).

Room E16
Royal Courts of Justice
Strand
LONDON WC2A 2LL

France:
Ministère de la Justice
Direction des Affaires Civiles et du Sceau
Bureau du droit de l'Union, du droit international privé et de l'entraide civile (BDIP)
13, Place Vendôme
75042 Paris Cedex 01

In keeping with the Court's practice in other Hague requests in this action, we will send a messenger to the Courthouse to pick up all originals from the Clerk's Office once executed.

Thank you for your consideration of this request.

Respectfully submitted,

 /s/ Matthew L. Schwartz
Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————

|  |  |
|---|---|
| CITY OF ALMATY, KAZAKHSTAN, and BTA BANK JSC | ) ) ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) No. 15-cv-05345 (AJN) (KHP) |
|  | ) |
| MUKHTAR ABLYAZOV, ILYAS KHRAPUNOV, VIKTOR KHRAPUNOV and TRIADOU SPV S.A., | ) ) ) |
|  | ) |
| Defendants. | ) |

———————————————————————

## LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

The United States District Court for the Southern District of New York (the "Court"), presents its compliments to the Geneva Civil Court of the First Instance of the Swiss Confederation under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention"), and pursuant to Article 17 of the Hague Convention, requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above-captioned matter. This Court respectfully requests that the Geneva Civil Court recognize this Letter of Request from this Court and accompanying Commission, and that the Federal Department of Justice and Police authorizes the taking of evidence in the territory of Switzerland by the commissioners appointed for this purpose as developed below, in adherence to Article 17 of the Hague Convention and in the interest of comity.

1

### A.      Sender

The Honorable Alison J. Nathan, United States District Judge for the Southern District of

New York, New York, New York, United States of America.

### B.      Central Authority of the Requested State

The present Letter of Request is addressed to:

Tribunal civil - Tribunal de première instance
Place du Bourg-de-Four 1
Case postale 3736
CH-1211 Genève 3, Switzerland
tpi.securise@justice.ge.ch

With a copy to:

Federal Office of Justice FOJ
Private International Law Unit
CH-3003 Bern, Switzerland

### C.      Person to Whom the Authorized Commission is to Be Returned

This Court hereby requests that this executed Letter of Request and authorized

Commission be returned to the following attorneys for the Plaintiffs, the City of Almaty,

Kazakhstan and BTA Bank (collectively, the "Plaintiffs"), as an officer of this Court:

Matthew L. Schwartz, Esq.
Boies Schiller & Flexner, LLP
575 Lexington Avenue
New York, New York 10022
Telephone Number: +1 (212) 446-2300
Fax Number: +1 (212) 446-2350
mlschwartz@bsfllp.com

Represented in Switzerland by the Plaintiffs' Swiss attorney:

Balz Gross, Esq.
Claudio Bazzani, Esq.
Homburger AG
Prime Tower
Hardstrasse 201
CH-8005 Zurich, Switzerland

2

Telephone: +41 43 222 1000
Fax:_ +1 43 222 1500
Email: balz.gross@homburger.ch
Email: claudio.bazzani@homburger.ch

As an officer of this Court, he will act as confidential courier of this Court and deliver the executed Letter of Request, authorized Commission, and any related documents and materials directly to me at the following address:

The Honorable Alison J. Nathan
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Room 2102
New York, New York 10007

All documents and materials deposited with the Court in accordance with this Letter of Request and Commission will be available to all parties and their counsel.

### D.  Purpose of Evidence Sought and Requested Date of Receipt of Response

The requested commission will permit the collection of evidence to be used by the parties in support of their claims or defenses. The Court accordingly respectfully requests a prompt response to this Letter of Request.

## I.  HAGUE CONVENTION REQUIREMENTS

This Court requests the assistance more specifically described herein as necessary in the interests of justice. In conformity with Article 3 of the Hague Convention, the undersigned applicant has the honor to submit the following request:

### A.  Requesting Judicial Authority

The Honorable Alison J. Nathan
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square

New York, New York 10007, USA

**B.    Central Authority of the Requested State**

Tribunal Civil - Tribunal de Première Instance
Place du Bourg-de-Four 1
Case postale 3736
CH-1211 Genève 3, Switzerland

**C.    Name of the Case and Identifying Number**

All evidence requested will be used in relation to the above-captioned civil lawsuit,

which can be identified by the following information:

Case Name:    *City of Almaty, Kazakhstan, et al. v. Mukhtar Ablyazov, et al.*
Court:          United States Federal District Court for the Southern District of New York
Case Number: 15-cv-05345 (AJN)

**D.    Names and Addresses of the Parties and their Representatives**

        1.    <u>Plaintiffs</u>

The City of Almaty, Kazakhstan ("Almaty") and BTA Bank JSC ("BTA") are,

respectively, a political subdivision and a citizen of the Republic of Kazakhstan.

        2.    <u>Plaintiffs' Representative</u>

Matthew L. Schwartz, Esquire
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, NY  10022
Telephone: +1 (212) 446-2300
Fax: +1 (212) 446-2350
Email: mschwartz@bsfllp.com

and

Balz Gross, Esq.
Claudio Bazzani, Esq.
Homburger AG
Prime Tower
Hardstrasse 201
CH-8005 Zurich, Switzerland
Telephone: +41 43 222 1000

4

Fax:_ +1 43 222 1500
Email: balz.gross@homburger.ch
Email: claudio.Bazzani@homburger.ch

      3.    <u>Defendants</u>

     Defendant Mukhtar Ablyazov is a national of the Republic of Kazakhstan, currently domiciled in Paris, France. Defendant Ilyas Khrapunov is a national of the Republic of Kazakhstan, currently domiciled in Geneva, Switzerland.  Defendant Viktor Khrapunov is a national of the Republic of Kazakhstan, currently domiciled in Geneva, Switzerland.  Defendant Triadou SPV S.A. is a company established under the laws of Luxembourg, with a registered address at 60 Grand-Rue, L-1660 Luxembourg.

      4.    <u>Defendants' Representatives</u>

<u>Mukhtar Ablyazov</u>
Jonathan D. Cogan, Esquire
Kobre & Kim LLP
800 Third Avenue, 6th Floor
New York, New York  10022
Telephone: +1 (212) 488-1200
Facsimile:  +1 (212) 488-1220
Email: jonathan.cogan@kobrekim.com

<u>Triadou SPV S.A.</u>
Deborah A. Skakel, Esquire
Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
Telephone: +1 (212) 885-5000
Facsimile:  +1 (212) 885-5001
Email: dskakel@blankrome.com

<u>Ilyas and Viktor Khrapunov</u>
John J. Kenney, Esquire
John P. Curley, Esquire
Hoguet, Newman, Regal & Kenney, LLP
10 East 40th Street.
New York, NY 10016
Telephone: +1 (222) 689-8808
Facsimile:  +1 (212) 689-5101
Email: jkenney@hnrklaw.com
Email: jcurley@hnrklaw.com

**E.    Nature of the Proceedings and Summary of the Case and Relevant Facts**

     The above-captioned case is a civil lawsuit brought by Plaintiffs seeking equitable relief and money damages for injuries resulting from the alleged embezzlement and laundering of funds belonging to Plaintiffs, and enforcement of a foreign judgment under New York law. *See*

Ex. A (Plaintiffs' Amended Crossclaims). Defendant Viktor Khrapunov is the former mayor of the City of Almaty. Defendant Mukhtar Ablyazov is the former chairman of BTA Bank. Defendant Ilyas Khrapunov is Viktor Khrapunov's son and Defendant Ablyazov's son-in-law. Defendant Triadou SPV S.A. ("Triadou") is an entity established in Luxembourg and allegedly controlled by Ilyas Khrapunov.

Plaintiffs allege that Viktor Khrapunov abused his office as the Mayor of Almaty, Kazakhstan to enrich himself and his family members through a series of corrupt property dealings, channeling state-owned property to his family members and associates for below-market values, which were then resold to third parties for enormous profits. *See* Ex. A, at ¶ 45-61. Plaintiffs also allege that Defendant Ablyazov embezzled billions of dollars by abuse of his office at BTA Bank, one of Kazakhstan's largest banks, which was subsequently nationalized by the Government of Kazakhstan. *See* Ex. A, at ¶ 28-44.  When his actions were uncovered by bank regulators in Kazakhstan, Ablyazov fled to the United Kingdom, where BTA brought a series of civil fraud actions against him. Ablyazov repeatedly defied orders of the U.K. courts to disclose his assets, leading to his being sentenced to 22 months imprisonment for contempt. Ablyazov fled sentencing in the U.K. and went into hiding, and the U.K. courts awarded BTA billions of dollars in judgments against Ablyazov and his associates for their theft from BTA. Ablyazov was subsequently discovered and arrested in France. Plaintiffs have alleged that while fighting extradition, Ablyazov conspired with his son-in-law, Ilyas Khrapunov, to hack the mobile phones and computers of French judicial authorities and prosecutors. *See* Ex. A ¶ 73 – 76.  Ablyazov has since been released from French prison, but claims that he is applying for asylum in France and thus cannot travel to give testimony in this matter.

As specifically relevant to the above-captioned action, Ablyazov and Viktor Khrapunov are alleged to have laundered some of the commingled proceeds of their actions into the United States through a special purpose vehicle, Defendant Triadou SPV S.A ("Triadou") controlled by Ilyas Khrapunov. *See* Ex. A, at ¶ 77 – 97. Once those assets were discovered, the Defendants are alleged to have entered into transactions in the United States that caused further and distinct injuries to the Plaintiffs, including allegedly engaging in fraudulent conveyances that diminished the value of those assets. The Court has granted attachment of Triadou's assets in New York in the amount of $69,275,810.00.

Plaintiffs and Defendants currently are engaged in discovery, where the parties exchange information concerning their claims and defenses. The Court accordingly has not addressed the merits of Plaintiffs' allegations.

Plaintiffs contend that the information sought by this request is available to the Geneva Civil Court. This Court respectfully requests that the Geneva Civil Court act on this request expeditiously.

**F.      Evidence to Be Obtained**

Based on the foregoing, this Court respectfully requests that the Geneva Civil Court recognize the attached Commission, so that the appointed commissioners may lawfully obtain testimony from the following witnesses, on the below-stated topics:

1.      A deposition of Ilyas Khrapunov, who resides at 295, Route d'Hermance, 1247 Anieres, Geneva, Switzerland, on the following topics:

> 1)    Triadou SPV S.A., including its formation, operation, funding, and its investments, including but not limited to:
>
>> a.  The Flatotel condominium conversion in New York, NY;
>>
>> b.  The Cabrini Medical Center conversion in New York NY;
>>
>> c.  The Syracuse Mixed Use Complex in Syracuse, NY;

    d. The Tri-County Mall in Cincinnati, OH;

2)  Telford International Limited ("Telford"), including

    a. Funding provided by Telford for Triadou's investments;

    b. The sources of funds Triadou received from Telford;

    c. Due diligence done on Telford and its beneficial owners;

    d. Funding provided by Telford for any investment by SDG or Ilyas Khrapunov, including the purchase of any securities;

    e. Any connection or relationship between Telford Financiers and Telford International Limited

3)  The formation of a real estate investment fund incorporated in Luxembourg including Triadou's assets and investments;

4)  The structure and operations of SDG Capital SA ("SDG"), including any current or former subsidiaries or affiliates, including:

    a. The sources of SDG's funding;

    b. SDG's investments through Porto Heli SPV;

    c. SDG's investments through Igloo SPV;

5) The purported sale of SDG to Philippe Glatz in 2013, including:

    a. Ilyas Khrapunov's relationship and communications with Philippe Glatz;

    b. The source(s) of funds used to acquire SDG; and

    c. Ilyas Khrapunov's employment or services to SDG before and after the purported sale;

6)  FBME Bank ("FBME"), including:

    a. Any accounts held at FBME by Ilyas Khrapunov or entities he or his family members (including in-laws) own or control;

    b. Any transfers of funds from accounts at FBME for the benefit of Triadou or SDG;

    c. Any communications between officers or employees of FBME and Ilyas Khrapunov or his agents;

7)  Transfers of funds involving the following entities:

    a. VILDER Company

    b. Northern Seas Waterage

    c. Crownway Limited

    d. Beford Limited

    e. Beron Holdings

    f.   Ignoramus Limited

    g.   Ramasita Investments

    h.   Lampwood Limited

    i.   Sartfield Limited

    j.   Claremont Holdings Limited

    k.   RPM USA

    l.   RPM-Maro

    m.   San Vito Investments Corp.

    n.   Adlux Group

    o.   SWISS TV

8)    Ilyas Khrapunov's relationship and communications with Peter Sztyk (a/k/a Petro Sztyk), including:

    a.   The involvement of Mr. Sztyk in funding Triadou, SDG, or any of their subsidiaries of affiliates;

    b.   Any intended or planned sale of Triadou, in whole or part, to Mr. Sztyk or any entity owned or controlled by him;

    c.   Any services or representation Mr. Sztyk provided to Ilyas Khrapunov or Ablyazov;

9)    Ablyazov's assets, both in his name and held by associates for his benefit;

10)    Ablyazov's ownership or control of any corporate entities;

11)    The sources of funding for Ablyazov's legal expenses in the United Kingdom;

12)    Disclosures made by Ilyas Khrapunov pursuant to any freezing or receivership orders of the courts of the United Kingdom;

13)    Acts of hacking or unauthorized access to the electronic communications of any government officials, including:

    a.   the employment of or payments to any their-party computer hackers;

    b.   Ilyas Khrapunov's receipt of electronic communications obtained without authorization;

14)    Ilyas Khrapunov's relationship and communications with Nicolas Bourg, including those related to Bourg's companies the Niel entities;

15)    Ilyas Khrapunov's communications with Laurent Foucher;

16)    Ilyas Khrapunov's communications with Kevin Meyer;

17)    Ilyas Khrapunov's communications with Mukhtar Ablyazov;

18)    Ilyas Khrapunov's communications with Eesh Aggarwal;

19) Ilyas Khrapunov's communications with Viktor Khrapunov;

20) Ilyas Khrapunov's communications with Gennady Petelin;

21) Ilyas Khrapunov's communications with Elena Petelina;

22) Ilyas Khrapunov's communications with Petr Krasnov;

23) Ilyas Khrapunov's communications with Alexander Yassik;

24) Ilyas Khrapunov's communications with Joseph Chetrit;

25) Ilyas Khrapunov's communications with Felix Sater;

26) Ilyas Khrapunov's communications with Daniel Ridloff;

27) Ilyas Khrapunov's communications with Botagoz Dzhardemali (a/k/a Bota Jardemalie);

28) Ilyas Khrapunov's retention of relevant documents or electronic communications, or maintenance of such documents by SDG, Triadou, or any of Ilyas Khrapunov's employees, counsel, or agents.

29) The allegations in the Amended Crossclaims.

2.    A deposition of Viktor Khrapunov, who resides at 28b Chemin du Petit-Saconnex, 1209 Geneva, Switzerland, on the following topics:

1) Viktor Khrapunov's actions as Mayor of the City of Almaty Kazakhstan, including:

   a. Viktor Khrapunov's oath of office and ethical and legal obligations as Mayor of Almaty;

   b. The transfer of property in the "Two Rivers" area of Almaty, as referenced in ¶ 51 of the Amended Crossclaims;

   c. The April 2001 transfer of property to "KRI", as referenced in ¶ 53 of the Amended Crossclaims;

   d. The 2003 seizure and resale of property from Shadid Engineering, as referenced in ¶ 54 of the Amended Crossclaims;

   e. The transfer for sale of any property owned or controlled by the City of Almaty to Leila Khrapunova or entities owned or controlled by her;

2) Transfers of funds involving the following entities:

   a. TOO KazRealIncom

   b. TOO KarashaPlus

   c. TOO Building Service Company

   d. TOO Compania Stroytech

   e. TOO Altay

f. Viled Establishment

3) The formation, funding, and investments of SDG Capital SA ("SDG"), including any current or former subsidiaries or affiliates, including:

   a. The sources of SDG's funding;

   b. SDG's investments through Porto Heli SPV;

   c. SDG's investments through Igloo SPV;

   d. The purported sale of SDG to Philippe Glatz in 2013;

4) The formation, operation, funding, and investments of Triadou SPV S.A., including Triadou's investments in:

   a. The Flatotel condominium conversation in New York, NY;

   b. The Cabrini Medical Center conversion in New York NY;

   c. The Syracuse Mixed Use Complex in Syracuse, NY;

   d. The Tri-County Mall in Cincinnati, OH;

5) Telford International Limited ("Telford"), including

   a. Funding provided by Telford for Triadou's investments;

   b. The sources of funds Triadou received from Telford;

   c. Due diligence done on Telford and its beneficial owners;

   d. Any connection between Telford International Limited and Telford Financiers Corp.;

6) FBME Bank ("FBME"), including:

   a. Any accounts held at FBME by Viktor Khrapunov or entities he or his family members (or in-laws) own or control;

   b. Any transfers of funds from accounts at FBME for the benefit of Triadou or SDG;

   c. Any communications between officers or employees of FBME and Ilyas Khrapunov or his agents;

7) The net worth of Viktor Khrapunov and his immediate family, as referenced in public reports and ¶ 61 of the Amended Crossclaims;

8) Tax reporting by Viktor Khrapunov and his spouse, as referenced in ¶ 61 of the Amended Crossclaims;

9) Viktor Khrapunov's disclosures and statements to Swiss law enforcement authorities;

10) Investments by Viktor Khrapunov and his immediate family members in the United States, including the purchase and sale of any real property;

11) Acts of hacking or unauthorized access to the electronic communications of any government officials, including:

11

      a.   the employment of or payments to any third-party computer hackers;

      b.   Viktor Khrapunov's receipt of electronic communications obtained without authorization;

12)    Viktor Khrapunov's communications with Mukhtar Ablyazov;

13)    Viktor Khrapunov's communications with Abylaykhan Karymsakov;

14)    Viktor Khrapunov's communications with Eesh Aggarwal;

15)    Viktor Khrapunov's communications with Ilyas Khrapunov;

16)    Viktor Khrapunov's communications with Leila Khrapunova;

17)    Viktor Khrapunov's communications with Gennady Petelin;

18)    Viktor Khrapunov's communications with Elena Petelina;

19)    Viktor Khrapunov's communications with Petr Krasnov;

20)    Viktor Khrapunov's communications with Alexander Yassik;

21)    Viktor Khrapunov's communications with Peter Sztyk (a/k/a Petro Sztyk);

22)    Viktor Khrapunov's communications with Nicolas Bourg;

23)    Viktor Khrapunov's retention of relevant documents or electronic communications, any of Viktor Khrapunov's employees, counsel, or agents.

24)    The allegations in the Amended Crossclaims.

The witnesses Ilyas Khrapunov and Viktor Khrapunov have voluntarily agreed to be deposed in connection with the above-captioned case and know that they cannot be subjected to any coercive measures, that they cannot be forced to participate or to appear and that they have the right to invoke any exemption or prohibition to give evidence provided for by the laws of Switzerland or of the United States of America.  *See* Exs. A, B.

**G.    Procedure for Obtaining the Evidence**

If authorized, testimony from the witnesses will be obtained by the commissioners at the offices of one of the appointed commissioners in Switzerland, and will be under oath and recorded by video and stenography. Cross-examination of the witnesses is requested, and it is requested that each of the commissioners be authorized to conduct examination.

The testimonies from the witnesses should be obtained as soon as practically possible. The exact date(s) will be scheduled once the Federal Department of Justice and Police has issued its authorization.  The parties will notify the date(s) to the Geneva Civil Court. The Parties expect the Commissioners, if authorized, would seek to collect the identified evidence on or about September 11-15, 2017.

## II.    OTHER REQUIREMENTS

### A.    Fees and Costs

Plaintiffs are responsible for reasonable copy costs and charges associated with the processing and handling of this request by the Geneva Civil Court.

For the purpose of determining the court fees, the parties estimate the amount in dispute to be in excess of USD 70 million.

### B.    Reciprocity

This Court expresses its sincere willingness to provide similar assistance to the courts of the Swiss Confederation, if future circumstances so require.

## III.    CONCLUSION

This Court, in the spirit of comity and reciprocity, hereby requests international judicial assistance in the form of this Letter of Request seeking information, testimony, and things described herein, from the Geneva Civil Court. This Court extends to all judicial and other authorities of the Swiss Confederation the assurances of its highest consideration.

Date: _____          _____

The Honorable Alison J. Nathan
United States District Court for the

13

Southern District of New York
Thurgood Marshall United States Courthouse
500 Pearl Street, Room 1620
New York, New York 10007-1312

SEAL OF THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBERS LLC and THE CHETRIT GROUP, LLC, | ) ) ) Case No. 15-cv-05345-AJN ) ) |
| Interpleader Plaintiffs, | ) ) |
| -against- | ) **AMENDED CROSSCLAIMS** ) |
| TRIADOU SPV S.A., CITY OF ALMATY, a foreign city, and BTA Bank, | ) ) ) ) |
| Interpleader Defendants. | ) ) ) |
| CITY OF ALMATY, KAZAKHSTAN and BTA BANK, | ) ) ) ) |
| Crossclaim Plaintiffs, | ) ) |
| -against- | ) ) ) |
| MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, TRIADOU SPV S.A., AND FBME BANK LTD., | ) ) ) ) ) ) |
| Crossclaim Defendants. | ) |

# **Table of Contents**

INTRODUCTION ................................................................................................ 1

THE PARTIES .................................................................................................... 5

JURISDICTION AND VENUE ......................................................................... 6

FACTUAL BACKGROUND ............................................................................. 8

    *Mukhtar Ablyazov Defrauded BTA Bank of in Excess of $6 billion.* ................................. 8

    *Viktor Khrapunov Defrauded the City of Almaty of Approximately $300 million.* .......... 13

    *The Khrapunovs and Ablyazov Join Together to Launder Their Stolen Money.* ............... 15

    *The Ablyazov-Khrapunov Group Conspires to Transfer and Hide Illicit Funds in the United States.* ................................................................................................................... 21

    *Through SDG, the Ablyazov-Khrapunov Group Creates Triadou to Hide their Illicit Funds in New York Real Estate Transactions with the Chetrit Group.* ........................... 22

    *Kazakh Authorities Target the Ablyazov-Khrapunov Group's Holdings in the United States, and the Ablyazov-Khrapunov Group Liquidates Those Assets at Below-Market Value with the Chetrit Group's Assistance.* ....................................................... 30

FIRST CAUSE OF ACTION ........................................................................... 33

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

SECOND CAUSE OF ACTION ....................................................................... 38

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

THIRD CAUSE OF ACTION ........................................................................... 40

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)) Against All Defendants*

FOURTH CAUSE OF ACTION ....................................................................... 41

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

FIFTH CAUSE OF ACTION ............................................................................ 42

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)) Against All Defendants*

SIXTH CAUSE OF ACTION ........................................................................... 43

    *(ACTUAL FRAUDULENT TRANSFER) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

SEVENTH CAUSE OF ACTION ..................................................................... 44

    *(CONSTRUCTIVE FRAUDULENT TRANSFER) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

EIGHTH CAUSE OF ACTION ........................................................................ 45

    *(UNJUST ENRICHMENT) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

NINTH CAUSE OF ACTION .................................................................................... 46

    *(CONVERSION) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

TENTH CAUSE OF ACTION ..................................................................................... 46

    *(CONSTRUCTIVE TRUST) Against All Defendants*

ELEVENTH CAUSE OF ACTION ............................................................................. 47

    *(PURSUANT TO CPLR § 5239 FOR FRAUD AND CONVERSION) Against All Defendants*

TWELFTH CAUSE OF ACTION ............................................................................... 48

    *(PURSUANT TO CPLR § 5303 FOR RECOGNITION AND ENFORCEMENT OF A FOREIGN JUDGMENT UNDER NEW YORK LAW) Against Defendant Ablyazov*

THIRTEENTH CAUSE OF ACTION .......................................................................... 49

    *(AIDING AND ABETTING) Against Defendant FBME*

DEMAND FOR JURY TRIAL .................................................................................... 50

DEMAND FOR RELIEF .............................................................................................. 50

Crossclaim Plaintiffs City of Almaty ("Almaty") and BTA Bank ("BTA" or "BTA Bank," and together with Almaty, the "Kazakhstan Plaintiffs"), by and through their undersigned counsel, for the Kazakhstan Plaintiffs' crossclaims against Defendants Triadou SPV S.A., Viktor Khrapunov, Mukhtar Ablyazov, Ilyas Khrapunov, and FBME Bank Ltd. (collectively the "Ablyazov-Khrapunov Group") allege as follows:

## INTRODUCTION

1.      Joseph Chetrit ("Chetrit") is a well-known New York based real estate developer, who, along with crossclaim defendants Mukhtar Ablyazov ("Ablyazov"), Victor Khrapunov, Ilyas Khrapunov and others known and unknown, combined, conspired, and confederated in the commission of an international scheme to launder and conceal at least $40 million stolen from the Kazakhstan Plaintiffs.  Chetrit conspired with these international criminals by, among other things, partnering with Triadou SPV S.A. ("Triadou"), a nominee entity owned, controlled, and funded by the Ablyazov-Khrapunov Group, for the purposes of converting the stolen funds into valuable New York City real estate.

2.      BTA, a bank based in Almaty, Kazakhstan, seeks to regain assets looted by its former Chairman, Mukhtar Ablyazov, who abused his position to enrich himself and treat BTA as his personal property.  BTA has commenced and successfully obtained judgments in proceedings against Ablyazov in the courts of the United Kingdom for defrauding BTA Bank of no less than $4 billion.

3.      Almaty, the largest city in the Republic of Kazakhstan, seeks to regain assets looted by its former mayor, Victor Khrapunov ("Khrapunov"), and his family and co-conspirators, to be returned for the benefit of the people of Almaty.  Khrapunov abused and corrupted his position as the mayor of Almaty for the purposes of embezzlement, fraudulent self-

1

dealing, and blatant looting of public assets. He reaped an estimated $300 million or more through various fraudulent activities, including rigged auctions, the improper sale of public property to friends and co-conspirators, and fraudulent abuse of eminent domain powers, before fleeing Kazakhstan and secreting these stolen funds across the globe.

4.      The Khrapunovs and Ablyazov, both fighting law enforcement investigations and asset seizures by Kazakh authorities, joined forces and commingled their stolen funds. Through joint investments across the globe, the two renegade families combined and conspired to launder their illicit wealth into real estate, energy assets, and other investments in locales they deemed safe from seizure. Ilyas Khrapunov, related by marriage to Ablyazov, helped orchestrate these efforts and steered the families' joint investments into assets within this Court's jurisdiction.

5.      The Ablyazov-Khrapunov Group's money laundering schemes relied heavily on the cooperation of officers within FBME Bank, Ltd ("FBME"), a Tanzanian-incorporated financial institution operating primarily out of the Republic of Cyprus. Until 2014, FBME had long been known as a financial institution open for business to money launderers and international criminals. FBME joined the Ablyazov-Khrapunov Group's money laundering conspiracy by knowingly aiding the Ablyazov-Khrapunov Group's members in hiding and laundering funds and evading asset freezes and investigations. In 2014, FBME was designated a "foreign financial institution of primary money laundering concern" and effectively banned from the legitimate international financial system by the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of the Treasury, a decision subsequently described by FBME as a "death sentence."

6.      Collectively, the Ablyazov-Khrapunov Group has been the subject of numerous proceedings and investigations across the globe, arising from their theft of billions of dollars from

entities and municipalities in the Republic of Kazakhstan. They have sought to hide their stolen wealth from investigators and law enforcement through a vast network of shell corporations and outwardly-legitimate investments, including major New York real estate developments such as the Flatotel and Cabrini Medical Center condominium conversions. Through these investments, the Chetrit Group allied itself with the Ablyazov-Khrapunov Group and their global money laundering endeavor.

7.     The Ablyazov-Khrapunov Group laundered their ill-gotten assets through a number of shell corporations, including Triadou. With the help of Chetrit and the Chetrit Group, the Ablyazov-Khrapunov Group parked these corrupt assets in New York City real estate, hoping to avoid the scrutiny of escalating international investigations into the Ablyazov-Khrapunov Group's illicit activities.

8.     Due to heavy scrutiny by international law enforcement, including criminal investigations by the Kazakh and Swiss authorities, the funds that the Ablyazov-Khrapunov Group, through Triadou, invested into the Flatotel and Cabrini Medical Center projects could not pass through legitimate banking channels. The Crossclaim Defendants devised a plan to circumvent legitimate banks and transfer funds directly from the Ablyazov-Khrapunov Group's offshore accounts with FBME to the escrow account of the Chetrit Group's long-time attorneys.

9.     In return for facilitating the Ablyazov-Khrapunov Group's money laundering scheme, the Chetrit Group got access to the stolen funds to fund its real estate projects, and entered into deals that entitled the Chetrit Group to a disproportionate share of the projects' profits.

10.     Due to concern that he was partnering with reputed international criminals, however, Chetrit conducted his communications with the Ablyazov-Khrapunov Group by using

code names. For example, Chetrit used code names such as "Jose" and "Pedro" to refer to and communicate with crossclaim defendant Ilyas Khrapunov. It was only in face-to-face meetings, many of which were secretly recorded, that Ablyazov's involvement, legal difficulties and incarceration were openly discussed.

11.     Ultimately, Almaty and BTA Bank were able to trace the stolen assets to the United States. Rather than let Almaty and BTA reclaim their rightful property, the Ablyazov-Khrapunov Group, through Triadou, began to urgently liquidate their real estate holdings, hoping to spirit their illicit funds to more permissive locales. In an attempt to monetize the Ablyazov-Khrapunov Group's real estate interests as quickly as possible, Triadou entered into a fraudulent, below-market assignment with the Chetrit Group for Triadou's principal New York assets, interests in the Flatotel and Cabrini Medical Center real estate developments.

12.     Specifically, in May 2014, the City of Almaty filed an action in federal court in California against members of the Ablyazov-Khrapunov Group. With the Kazakhstan Plaintiffs' collection efforts having expanded to the United States, and with the Ablyazov-Khrapunov Group in imminent danger of having its stolen assets seized or attached, the Ablyazov-Khrapunov Group, through Triadou, took immediate steps to liquidate its U.S. assets and move its money offshore again. The Chetrit Group's assistance was essential to placing the stolen assets out of the reach of the Kazakhstan authorities.

13.     Upon information and belief, Chetrit seized on this opportunity to double cross his co-conspirators. Understanding that the potential asset seizures or restraints put the Ablyazov-Khrapunov Group in a desperate situation, he devised scheme to acquire Triadou's investments for a fraction of their value. To achieve this result, Chetrit bribed Triadou's Director to drive down the purchase price of the assignment. The Chetrit Group ultimately succeeded in acquiring

4

Triadou's interest in both the Flatotel and Cabrini properties for as little as $26,000,000.00 — far less than even what Triadou had originally invested — at a time when real estate values in New York were at an all-time high.

14.    Almaty and BTA Bank now seek, among other relief, to unwind and recover the proceeds of these fraudulent transactions.  Doing so will hold  the Crossclaim Defendants liable for their corruption and fraud, and  return the full value of Triadou's New York assets to their rightful owners: BTA Bank and the City of Almaty.

## THE PARTIES

15.    Crossclaim plaintiff Almaty is a legal subdivision of the Republic of Kazakhstan. Almaty is the former capital of the country, and continues to be the largest city in the Republic of Kazakhstan, with more than 1.5 million residents.

16.    Crossclaim plaintiff BTA Bank is a Joint Stock Company and Kazakhstan bank with its headquarters in Almaty, Kazakhstan.  Until in or about September 2014, BTA Bank was majority owner and controlled by the Republic of Kazakhstan.

17.    Crossclaim defendant Triadou SPV S.A. is a special purpose  investment vehicle incorporated under the laws of Luxembourg, with a principal place of business at  3, Rue du Mont-Blanc, 1201 Geneva, Switzerland.  Triadou SPV S.A. is wholly-owned by SDG Capital S.A.

18.    Crossclaim defendant Viktor Khrapunov, an individual, is the former  Mayor of the City of Almaty, who, upon information and belief, currently resides in the  city of Geneva, Switzerland.

19.    Crossclaim defendant Mukhtar Ablyazov, an individual, is the former Chairman of BTA Bank and has been found liable for defrauding BTA of in excess of $6 billion.  Ablyazov

5

was the subject of eleven proceedings commenced by BTA Bank in the United Kingdom to recover assets Ablyazov stole. During those proceedings, Ablyazov was found by multiple international courts to have lied, misled, misconstrued, and concealed assets in blatant disregard of Court orders, and was ordered imprisoned for 22 months. During these proceedings, Ablyazov fled the United Kingdom to avoid the many judgments against him. He is currently incarcerated in France pending extradition to Russia or Ukraine.

20. Crossclaim defendant Ilyas Khrapunov, an individual, is the son of Viktor Khrapunov, as well as the former president of SDG Capital S.A., who, upon information and belief, currently resides in the city of Geneva, Switzerland. Ilyas Khrapunov is married to Ablyazov's daughter, Madina.

21. Crossclaim defendant FBME Bank Ltd. is a financial institution headquartered in Dar es Salaam, Tanzania and operating primarily out of Cyprus. FBME is jointly owned by Ayoub-Farid Saab and Fady Saab, but is currently controlled and administered by representatives of the Central Bank of Cyprus.

## JURISDICTION AND VENUE

22. The Crossclaims are brought under Rule 13 of the Federal Rules of Civil Procedure. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) over the claims for relief alleging violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq. and for conspiracy to violate RICO. This Court has supplemental jurisdiction over the sixth through thirteenth claims for relief pursuant to 28 U.S.C. § 1367, as those claims are substantially related to Almaty's and BTA Bank's claims under RICO and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

23.     Alternatively, this Court has supplemental jurisdiction over Almaty's and BTA Bank's claims under 28 U.S.C. § 1367, as those claims are substantially related to the original interpleader suit brought by Chetrit and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

24.     Alternatively, the City of Almaty is a "foreign state" as that term is defined in 28 U.S.C. § 1603, and this Court has jurisdiction over Almaty's and BTA Bank's claims under 28 U.S.C. §§ 1330, 1441(d), which provide for the removal of any civil action brought in a State court against a foreign state.

25.     Alternatively, this Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because at the time this action was filed (i) there was complete diversity of citizenship between the parties, and (ii) more than $75,000, exclusive of interest and costs, is at stake.

26.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Almaty's and BTA Bank's claims occurred in this District, including, among other things, the negotiation, investment and subsequent transfer of interest in the Flatotel and Cabrini Medical Center properties located in New York, New York.

27.     This Court has personal jurisdiction over Triadou, Ablyazov, Viktor Khrapunov, Ilyas Khrapunov, and FBME because each of them knowingly committed acts in New York that form the basis of this action, directed or conspired with others to commit acts in New York, and/or purposely availed themselves of the privileges of doing business in New York, as fully set forth herein.

# FACTUAL BACKGROUND

## *Mukhtar Ablyazov Defrauded BTA Bank of in Excess of $6 billion.*

28.     Ablyazov was the Chairman of BTA Bank from May 2005 until February 2009. He is the father-in-law of crossclaim defendant Ilyas Khrapunov, who is married to Ablyazov's daughter, Madina.  Along with crossclaim defendant Viktor Khrapunov, Ablyazov is a central member of the Ablyazov-Khrapunov Group money laundering and embezzlement conspiracy.

29.     As the Courts of the United Kingdom have found, while Chairman of BTA Bank, Ablyazov exercised virtually unfettered control over the bank's operations while hiding that control from Kazakhstan's banking regulators, and used this influence to treat BTA's assets as his own. As Justice Teare of the High Court of England and Wales (Commercial Court) found:

> [P]rior to the nationalisation of the Bank in February 2009, Mr. Ablyazov admitted to owning over 75% of the shares in the Bank. Those shares were not held by Mr. Ablyazov personally but by nine companies on his behalf. However, Mr. Ablyazov did not admit that ownership to the AFN, the banking regulator in Kazakhstan. In January 2009, shortly before the nationalisation of the Bank, the AFN requested Mr. Ablyazov to state whether he owned more than 10% of the shares in the Bank. He replied on 19 January 2009 that he did not own directly or indirectly more than 10% of the shares in the Bank. That statement was untrue.
>
> . . .
>
> Banks in Kazakhstan tend to be operated in a different manner from that in which they are typically operated in the West. It is common for banks to be owned by a single shareholder who is both chairman of the board of directors and also closely involved in the management of the bank. He therefore has considerable influence over the operation of the bank. Mr. Ablyazov's relationship with the Bank conformed with this general description of Kazakh banking practice. Thus Mr. Talvitie, the independent member of the Board of Directors of the Bank from East Capital, gave evidence that it seemed to him that at board meetings Mr. Ablyazov had already made the decisions. He described the other members of the board as "straw men". Others in the Bank, below board level, had the same impression. Thus Ms. Tleukulova (a member of the Credit Committee) gave evidence in Russia in 2012 that "all top managers of the bank, including Board Members, have to obey him". Mr. Khazhaev also gave evidence in Russia in 2012 that Mr. Ablyazov was "the main" person in the Bank who controlled the granting of the largest and most important loans. Mr. Ablyazov's control of the Bank is illustrated by his issue of an order ("the Ablyazov Order") whereby he, as Chairman, amended certain procedural rules governing the grant of loans.

8

> . . .
>
> [O]fficers and staff in the Bank did not draw a clear distinction between the Bank having an interest in a project and Mr. Ablyazov, as shareholder in the Bank, having a personal interest in a project. Thus [Deputy Chairman] Zharimbetov, when being crossexamined, failed to draw a clear distinction, in the context of the offshore companies with which he dealt, between Mr. Ablyazov and the Bank. Thus the unfortunate reality appears to have been that little, if any, distinction was drawn by personnel in the Bank between the Bank's property and Mr. Ablyazov's property. The Vitino port project was an example of that reality. Mr. Khazhaev told a Russian court in 2012 that Mr. Ablyazov treated the Bank as his property.

30.     Ablyazov's abuse of his position as chairman took many forms, principally through enormous loans to valueless entities owned by Ablyazov, which would then be obscured by transfers among different shell corporations, and never repaid.

31.     For example, in one series of loans (referred to as the "Original Loans" by the UK court in the "Granton Action"), between March 2006 and August 2008, Ablyazov directed twenty loans totaling $1,428,840,000 to entities with minimal assets and for no apparent reason.  These loans were made to entities outwardly unaffiliated with Ablyazov ("Original Borrowers"), but were actually transferred to entities controlled by Ablyazov ("Original Real Borrowers").  As the UK court found:

> Mr. Ablyazov did not disclose to the Board that he owned or controlled those [Original] Borrowers. He has never claimed that he did so and there is no evidence that he did. None of the represented Defendants has suggested that he did. In those circumstances there can be only one explanation for the fact that the very large sums of money which were advanced were immediately transferred to companies owned or controlled by Mr. Ablyazov, namely, that the Original Loans were part of a dishonest scheme whereby Mr. Ablyazov sought to misappropriate monies which belonged to the Bank. The scheme was fraudulent because Mr. Ablyazov did not disclose to the Board his interest in the Original Borrowers or that the real purpose of the loans was to pay out the Bank's money to the Original Real Borrowers who were to use the monies for Mr. Ablyazov's purposes. The purpose of such nondisclosure must have been to deceive the Board so that it remained in ignorance of the "related party" nature of the Original Loans and of their true purpose.

32.     When, in or about 2008, Ablyazov's involvement in the Original Loans was in

danger of discovery, he directed that additional fraudulent loans be made in an attempt to cover up his earlier fraud.

33.     Between November 4, 2008, and December 4, 2008 a number of loans (the "Later Loans") totaling $1,031,263,000 were made, ostensibly for the purchase of oil and gas resources. The UK court, however, found it "beyond argument" that these loans of BTA funds were made only to hide Ablyazov's earlier theft:

> The Later Loans were made between 5 November and 8 December 2012 but they were paid out, not to the Later Borrowers, but to Intermediaries who paid them on to other companies, the Recipients, who in turn paid them to the Bank in apparent discharge of the Original Loans. They were not used for the purchase of oil and gas equipment. Documents said to support and evidence the Later Loans were created after the monies had been paid out by the Bank but backdated. Thus contracts for the purchase of oil and gas equipment supposedly by the Later Borrowers were still being prepared in late November 2008 and backdated to 23 October 2008.
>
> . . .
>
> Expert evidence as to the oil and gas industry was adduced by the Bank to establish that the oil and gas contracts were shams because of the lack of specific provisions which would be appropriate for contracts of their size. But such evidence was unnecessary. The email evidence shows that the contracts were prepared by persons within the Bank.
>
> . . .
>
> It is beyond argument that the Later Loans were a mere cloak which sought to hide from view the reality, which was that money was being extracted from the Bank for the purpose of paying back the Original Loans. Since this circular exercise benefitted Mr. Ablyazov (because he owned or controlled the Original Borrowers) it is also clear that he must have orchestrated or, at the least, authorised this fraud.

34.     As a result of Ablyazov's siphoning billions out of the company, in 2009, BTA Bank defaulted on billions of dollars of debt held by investors including Credit Suisse Group AG, HSBC Holdings Plc, JPMorgan Chase & Co. and Royal Bank of Scotland Group Plc. Kazakhstan's sovereign wealth fund, Samruk-Kazyna, was forced to take control of BTA Bank, and Ablyazov fled to London.

35.    BTA then commenced the first in a series of lawsuits against Ablyazov, claiming that he had misappropriated approximately $295,000,000 pursuant to this fraudulent scheme. Other proceedings followed against Ablyazov in the Chancery Division and England High Court. In every proceeding, BTA alleged (and ultimately proved) that Ablyazov treated BTA as his own private source of funds. In all, BTA commenced eleven proceedings against Ablyazov and his lieutenants for defrauding BTA in excess of $6 billion. The UK courts took the unprecedented legal step of granting BTA a Worldwide Freezing Order over Ablyazov's assets.

36.    As part of these UK proceedings, in late 2010 BTA obtained a number of search and disclosure orders that uncovered a vast network of undisclosed companies and assets used by Ablyazov to hold and invest his stolen wealth. The UK courts ordered Ablyazov's assets to be put in the receivership of the accounting firm KPMG (the "Receivership Order"), finding that Ablyazov had breached various disclosure and freezing orders against him. The Receivership Order gave the receiver the right to recover a network of many hundreds of entities, worth billions of dollars.

37.    On January 26, 2011, a further 212 companies were added to the scope of the Receivership Order and on April 8, 2011, a further 3,890 companies were added.

38.    After Ablyazov defied the Receivership Order entered by the UK courts, BTA obtained judgments and sanctions against him for, among other acts, flaunting court orders, fleeing and hiding from judicial proceedings, lying during proceedings, and refusing to comply with orders directing him to uncover assets. For his numerous actions in contempt of court, Ablyazov was sentenced to 22 months imprisonment for his conduct.

39.    On February 16, 2012, despite having promised the court his attendance at his contempt hearing, Ablyazov did not appear. Ablyazov left behind a 100-acre estate in the English

11

countryside and a London mansion, valued at least 20 million pounds sterling (approximately $31 million) each, and no fewer than 750 shell companies used to invest his stolen funds in oil production, property development, and agriculture.

40.     On November 6, 2012, the Court of Appeal unanimously upheld the judgments and contempt orders against Ablyazov.  Concurring in the judgment, Lord Justice Maurice Kay stated that it was "difficult to imagine a party to commercial litigation who has acted with more cynicism, opportunism and deviousness towards court orders than Mr. Ablyazov."

41.     Following Ablyazov's flight from justice, BTA has been granted judgments in 5 of the 11 claims against Ablyazov and his associates, with others still pending, and has been awarded over $4 billion in damages by the UK courts, with interest continuing to accrue. (the "Ablyazov Judgments").

42.     After a global search spearheaded by BTA Bank, French special forces found and arrested Ablyazov in a luxury villa in France on July 31, 2013.  He remains detained in a French prison pending extradition, and the courts of France have refused to release him on bail three times.

43.     Following Ablyazov's capture and imprisonment, through his counsel and other channels, Ablyazov remained in regular communication with his son-in-law, Ilyas Khrapunov, who assumed operational control of much of Ablyazov's money laundering operations and, in concert with Ablyazov and Viktor Khrapunov, has continued the Ablyazov-Khrapunov Group's combined efforts to hide their wealth.

44.     Ilyas Khrapunov's continuing role in facilitating the Ablyazov-Khrapunov Group's money laundering efforts was confirmed on July 17, 2015, when Justice Males of the Commercial Division of the Queen's Bench of the U.K. High Court of Justice expanded the

freezing order against Ablyazov to encompass specified assets of Ilyas Khrapunov. In response to the disclosure obligations imposed by the freezing order, Ilyas Khrapunov invoked his privilege against self-incrimination.

### *Viktor Khrapunov Defrauded the City of Almaty of Approximately $300 million.*

45.    In 1991, the Republic of Kazakhstan declared its independence from the  former Soviet Union and began the process of transitioning from communism to an open  market economy.  This transition required substantial privatization of vast state assets in  order to restart the nation's economy and raise revenue for improvements to the nation's  infrastructure and public services.

46.    Viktor Khrapunov became mayor of the City of Almaty on or about June  16, 1997, and remained in that position until approximately December 2004.  At the time  Viktor Khrapunov took office, the Republic of Kazakhstan was experiencing the  beginning of a natural resources boom and accompanying drive for investment,  infrastructure upgrades, and new construction.  Almaty was the nation's former capital  and largest city, and held enormous public assets remaining to be privatized and  developed, a responsibility which the office of the mayor oversaw and directed.

47.    Before Viktor Khrapunov assumed the office of the mayor of Almaty, he took an oath of office to obey the Constitution and laws of the Republic of  Kazakhstan.  Among other things, he expressly and impliedly promised that he would  uphold his fiduciary duties to the people of Almaty, would honor his obligation to provide honest services, and would not convert money, property, or assets belonging to the City of Almaty for his own use or that of his family, friends, or associates.

48.    In reality, Viktor Khrapunov, along with his son, Ilyas Khrapunov, and other

Khrapunov family members and co-conspirators, almost immediately began a multi-year scheme to enrich themselves through the corrupt abuse of Khrapunov's public position as mayor.

49.     Viktor Khrapunov repeatedly and systemically used the powers of the office of the mayor to transfer public assets belonging to the City of Almaty to his family and their co-conspirators for prices that were a fraction of their fair value.  This  was often achieved by arranging fraudulent auctions to ensure that interested bidders won  these assets at nominal prices.  In other instances, Viktor Khrapunov used the  eminent domain powers of the office of the mayor to seize private property ostensibly for  the City of Almaty, but then promptly transferred that property to entities owned or  controlled by the Khrapunovs.  They would then pass these assets through a series  of shell or holding corporations to conceal the destination of these assets, before reselling  them for prices an order of magnitude greater than what they had paid the City of  Almaty.

50.     Three examples of these corrupt schemes to subvert and acquire the public property of the City of Almaty follow:

*Transaction One*

51.     In or about 2000, Viktor Khrapunov used his position as mayor of Almaty  to transfer a large tract of state-owned land near the two rivers area of Almaty to his  spouse and co-conspirator, Leila Khrapunov, for a total price of approximately $121,000.  The final recipient of this transfer was concealed through a series of fraudulent transactions and front  companies controlled by the Khrapunovs.  The Khrapunovs ultimately resold  this parcel of real estate for an estimated $15.57 million, a more than $15 million profit  on one interested transaction.

52.     In short, the Khrapunovs paid approximately $121,000 for a parcel of  public real estate which they later resold for a total of $15.57 million; a 128,000 percent  profit.

14

*Transaction Two*

53.     On or about April 16, 2001, Viktor Khrapunov used his position as mayor to cause a public building in Almaty to be sold at a fixed and rigged public auction to KRI, a company owned by Leila Khrapunov, for approximately $347,000. The property was ultimately resold to an unrelated third party for approximately $4.1 million.

*Transaction Three*

54.     In addition to the sale of state-owned assets to Leila Khrapunov and other family members and co-conspirators, Viktor Khrapunov also abused his authority as mayor to enrich the Khrapunovs by seizing privately-owned property and transferring it to the Khrapunovs and others for resale. For example, on or about August 25, 2003, Viktor Khrapunov caused the City of Almaty to seize land owned by privately-owned third party Shadid Engineering LLP. Approximately one month later, he caused the property to be sold to Leila Khrapunov's company, Karasha, for approximately $105,000. Leila Khrapunov then caused Karasha to sell the property directly to her, whereupon she transferred it to another company, BSC, and it was sold as part of BSC to an unrelated third party, in a transaction that valued the parcel at approximately $2 million. As a result, the Khrapunovs obtained nearly $1.9 million in unjustified profit.

55.     In short, through similar transactions uncovered and still under investigation, the Khrapunovs are estimated to have illegally acquired at least 80 pieces of real estate, which they converted into approximately $300 million in illicit funds.

**The Khrapunovs and Ablyazov Join Together to Launder Their Stolen Money.**

56.     Seeking to avoid law enforcement attention and possible seizure of this ill-gotten wealth, the Ablyazov-Khrapunov Group funneled their corrupt assets into real estate and development entities located in, among other places, the United States and Switzerland.

15

57.     Among other locations, the Ablyazov-Khrapunov Group transferred their stolen funds to Switzerland, where Ilyas Khrapunov and Madina Ablyazov reside, using accounts and sham entities owned or ultimately controlled by the Ablyazov-Khrapunov Group. The Ablyazov-Khrapunov Group ultimately transferred to Switzerland hundreds of millions of dollars, moved out of Kazakhstan by Viktor Khrapunov and laundered through offshore holding companies to appear legitimate.

58.     Seeking to hide the proceeds of their frauds, the Ablyazov-Khrapunov Group created a series of entities in Switzerland and overseas to launder these illicit funds into outwardly-legitimate investments. One such entity was Swiss Development Group, formally SDG Capital S.A., formed and controlled by Ilyas Khrapunov for the benefit of the Ablyazov-Khrapunov Group. Between 2008 and 2012, the Ablyazov-Khrapunov Group and sham companies they controlled funneled at least $115 million into SDG derived from the Ablyazov-Khrapunov Group's self-dealing and fraud.

59.     Through these foreign investment vehicles, the Ablyazov-Khrapunov Group sought to obscure their wealth from law enforcement in the Republic of Kazakhstan and abroad, by maintaining the appearance of a modest family of civil servants.

60.     The Ablyazov-Khrapunov Group took numerous steps to maintain this facade and conceal their looting of the City of Almaty's public assets from authorities. Among other schemes, Viktor Khrapunov regularly filed false annual tax returns with Kazakhstan's taxation authority, the Tax Committee of the Ministry of Finance of Kazakhstan. The false returns concealed millions of dollars in monies, properties, and assets the Ablyazov-Khrapunov Group had acquired and laundered through their corrupt enterprise.

61.     For example, according to their 2007 tax returns, which required Viktor and

16

Leila Khrapunov to list their entire net worth accumulated through all sources as of December 31, 2007, Viktor Khrapunov reported a combined net worth equivalent to $113,298, in addition to three vehicles, five modest pieces of real estate, and two parking stalls. While claiming to have a total net worth of less than $120,000, Viktor Khrapunov had in fact amassed a fortune estimated at no less than $300 million. Indeed, according to public news reports, in 2009 Viktor Khrapunov was one of the richest people in Switzerland with a fortune of over $300 million. Similarly, in 2012 Viktor Khrapunov was again listed among Switzerland's 300 richest people, with a fortune estimated at $324– $432 million.

### *The Ablyazov-Khrapunov Group's Corruption is Exposed and Investigations Begin in Kazakhstan and Switzerland*

62.    In late 2007, Viktor Khrapunov was tipped off that the Kazakh government had begun investigating the financial dealings of the Ablyazov-Khrapunov Group and their associates for a range of criminal acts and self-dealing. In anticipation of possible criminal charges, on or about November 9, 2007, Viktor and Leila Khrapunov boarded a private jet and fled Kazakhstan for Switzerland, where Ilyas Khrapunov and Madina Ablyazov resided, and the bulk of their looted funds were held.

63.    On or about May 27, 2011, the Investigation Department of the Agency for Economic and Corruption-Related Crimes of Kazakhstan (the "Investigation Department") filed two criminal cases against Viktor Khrapunov for abuse of power and fraudulent acts, and on or about July 21, 2011, obtained a court-ordered arrest warrant for Viktor Khrapunov. Through 2011 and 2012 additional charges were brought in Kazakhstan against Viktor, Leila, and Ilyas Khrapunov, arising from the theft of public property and the ultimate laundering of funds during Viktor Khrapunov's tenure as Mayor of Almaty.

64.    On or about February 20, 2012 and September 14, 2012, the Investigation

Department applied to the Federal Office of Justice in Switzerland for legal assistance in connection with the effort to prosecute Viktor, Leila, and Ilyas Khrapunov for crimes in Switzerland and Kazakhstan relating to their corrupt acts in Almaty and the laundering of the resulting funds. In response to this request, in mid-2012 the Public Prosecutor of Geneva opened an investigation into the Ablyazov-Khrapunov Group on suspicion of violating Swiss money laundering laws. The Public Prosecutor of Geneva subsequently seized financial and banking documents from the Ablyazov-Khrapunov Group and ordered Swiss accounts and assets belonging to them be frozen, including accounts held at Swiss banks Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co. This investigation by the Swiss authorities is ongoing, and in August 2013 the Public Prosecutor of Geneva froze additional assets belonging to the Ablyazov-Khrapunov Group.

65. At this time, in addition to the numerous judgments against Ablyazov in the United Kingdom, there are no less than 24 criminal charges pending against Viktor Khrapunov in Kazakhstan for embezzlement, fraud, money laundering, establishing and directing an organized criminal group for criminal purposes, abuse of power, and bribery. There are additional charges pending against Leila Khrapunov and Ilyas Khrapunov in Kazakhstan for, among other offenses, money laundering and establishing and directing an organized criminal group for criminal purposes. Assets of the Ablyazov-Khrapunov Group remain frozen by Swiss authorities, and the Government of the Republic of Kazakhstan has formally requested extradition of Viktor Khrapunov.

66. Despite the numerous investigations and freezing orders against the members of the Ablyazov-Khrapunov Group, the conspirators continue to launder their commingled stolen wealth through acts of fraud and in furtherance of the conspiracy.

67.     As one example, from 2011 through the present, members of the Ablyazov-Khrapunov Group, including Ilyas Khrapunov and Ablyazov himself, conspired to fund Ablyazov's widespread global legal campaign with laundered funds, despite global freezing and receivership orders against Ablyazov's assets.

68.     In May of 2011, two entities that Ablyazov had been using to fund his various litigations were put in receivership, based on findings that they were not arms-length lenders, but in fact controlled and funded by Ablyazov himself. Deprived of a funding source, Ablyazov conspired with other members of the Ablyazov-Khrapunov Group to circumvent the receivership and freezing orders against him and began funding his litigation – including litigation against the Republic of Kazakhstan – through loans from a series of shell companies, including the Belizean-registered entity Green Life International SA ("Green Life").

69.     The conspirators represented to the U.K. receivers and courts that Green Life was an arms-length entity owned and funded by Gennady Petelin, but did not disclose that Petelin was related by marriage to the Ablyazov and Khrapunov families.

70.     In fact, Green Life was one more in a long series of shell entities used by the Ablyazov-Khrapunov Group to launder their stolen funds. At Ablyazov's direction, Ilyas Khrapunov and other members of the Ablyazov-Khrapunov Group transferred millions of dollars in funds from accounts controlled by the Ablyazov-Khrapunov Group through Petelin and Green Life to Ablyazov's counsel. To obscure this scheme, all funds were transferred from Green Life to Chabrier Avocats, the Swiss counsel for the Khrapunov family and SDG, before being paid to Ablyazov's counsel.

71.     Using Petelin's name to deter suspicion, the conspirators were able to launder and spend millions of dollars in stolen funds that should rightly have been placed in receivership.

72.     The use of Petelin as a front for Ablyazov shell corporations such as Green Life was based in part on the close relationship between Petelin and Viktor Khrapunov. Viktor Khrapunov, whose daughter is married to Petelin's son, collaborated with Petelin on investments of the Ablyazov-Khrapunov Group's funds in Russia, where Petelin resided and had an extensive network of contacts. For example, in 2013, Viktor Khrapunov engaged in discussions with Petelin for the purpose of utilizing Petelin's contacts in Russia to facilitate the investment of the Ablyazov-Khrapunov Group's funds in Russian oil and energy assets.

73.     As another example of the Ablyazov-Khrapunov Group's continuing operations, members of the Ablyazov-Khrapunov Group hired computer hackers to illegally surveil French prosecutors and other public officials in an effort to free Ablyazov from French prison.

74.     Ablyazov was arrested by French special forces in 2013 after fleeing the U.K., but has remained in continuous contact with his coconspirators during his imprisonment. During his incarceration, Ablyazov directed his coconspirators, and his son-in-law Ilyas Khrapunov in particular, to use an array of unlawful means to secure his release.

75.     At Ablyazov's direction, in 2013 Ilyas Khrapunov hired a "black hat" computer security group to hack into the personal and work communications of numerous French public officials, including the prosecutors in Ablyazov's French extradition proceedings. Without permission and in violation of law, these hackers successfully breached the computers and mobile phones of numerous French law enforcement and justice officials, intercepted their electronic communications, and installed malicious software permitting them to remotely activate the microphones on these public officials' mobile phones to eavesdrop on and record their conversations. The hackers then transmitted French officials' intercepted communications, including emails, text messages, documents, and photographs, to Ilyas Khrapunov, who shared

20

and discussed this illegally-obtained surveillance with Ablyazov himself. Ablyazov then used this information as part of his legal campaign to avoid extradition.

76.     In return for this illegally-intercepted information, the Ablyazov-Khrapunov Group paid hundreds of thousands of dollars to these hackers-for-hire, from funds traceable to the thefts from BTA Bank and the City of Almaty.

**The Ablyazov-Khrapunov Group Conspires to Transfer and Hide Illicit Funds in the United States.**

77.     In 2011 and 2012, in response to escalating pressure on the Ablyazov-Khrapunov Group from both Kazakh and Swiss authorities and legal proceedings in the United Kingdom, the Ablyazov-Khrapunov Group embarked on a  scheme to secret the families' illicit wealth in real estate investments in the United States.  Upon information and belief, the Ablyazov-Khrapunov Group selected the United States as a harbor  for these stolen funds because they believed real estate investments in the United States would be difficult for Kazakh authorities to access.

78.     To execute this scheme the Ablyazov-Khrapunov Group used SDG, their Swiss real estate vehicle, and Telford International Limited ("Telford"), a Dubai-based private contracting entity controlled by the Ablyazov-Khrapunov Group.

79.     To create the appearance that SDG was independent of the Ablyazov-Khrapunov Group, in 2012 SDG was purportedly sold to a close friend and political ally of the Ablyazov-Khrapunov Group, Philippe Glatz.  This sale was in fact a sham  transaction, with the Ablyazov-Khrapunov Group maintaining beneficial ownership and control of SDG.

80.     Upon information and belief, the Ablyazov-Khrapunov Group paid Mr. Glatz to purchase SDG using the Ablyazov-Khrapunov Group's own funds:  Glatz accepted a loan from the Ablyazov-Khrapunov Group and then repaid that loan while  outwardly claiming that this payment to the Ablyazov-Khrapunov Group was for the purchase of  SDG.  In fact, the transfer

of SDG was illusory, as Mr. Glatz was merely repaying a prior obligation, and effectively getting SDG for free.

81.     To reduce the amount of cash needed to effectuate this sham sale, Ilyas Khrapunov offered SDG to Glatz at an incredibly discounted price. Although at the time of the purported sale SDG's assets were valued at approximately $150 million, Glatz only transferred approximately $3.5 million in cash to the Khrapunov family for SDG – roughly two percent of SDG's assessed asset value.

82.     To justify this incredible discount to asset value, Ilyas Khrpaunov used his control of SDG to falsely book millions of dollars in supposed debt and liabilities to hide the fraudulent nature of the transition he had orchestrated.

83.     This sham transaction served the Ablyazov-Khrapunov Group's purposes by creating the appearance that SDG had changed ownership, although the Ablyazov-Khrapunov Group received no net consideration for the purported sale, and Glatz was left beholden to the Ablyazov-Khrapunov Group and explicitly obligated to hold their interest in the investment.

84.     The capital structure, organization, management, and illicit purpose of SDG remained the same after the purported sale, and the Ablyazov-Khrapunov Group still profits from and manages SDG's operations. Ilyas Khrapunov continues to control SDG while holding himself out to be a mere "outside advisor" to the company, all the while protecting and reaping the benefits of the Ablyazov-Khrapunov Group's investments in SDG.

**_Through SDG, the Ablyazov-Khrapunov Group Creates Triadou to Hide their Illicit Funds in New York Real Estate Transactions with the Chetrit Group._**

85.     In or about 2011, Ilyas Khrapunov, on behalf of the Ablyazov-Khrapunov Group, approached Nicolas Bourg, a Belgium-based real estate fund manager, seeking to create a new entity controlled by SDG to mask the Ablyazov-Khrapunov Group's efforts to invest in real

estate opportunities in the United States.

86.    In consultation with Ilyas Khrapunov, Bourg formed a series of entities  under the laws of Luxembourg for the specific purpose of investing the Ablyazov-Khrapunov Group's funds in real estate in the United States.  These entities included Triadou, an investment vehicle wholly owned and controlled by SDG, which  was itself a front for the Ablyazov-Khrapunov Group's activities.

87.    Triadou is a special purpose vehicle:  a limited-liability legal  entity created to fulfill a specific purpose, often used to insulate a parent entity  from financial risk or liability. SPVs can also be used, as Triadou was, to hide the true ownership of assets held by the SPV, or to obscure relationships between individuals and  entities.  Bourg became the sole director of Triadou, operating at the direction of the   Ablyazov-Khrapunov Group, who continued to control SDG, Triadou's sole shareholder.

88.    At the direction of Ilyas Khrapunov, Bourg made contact with Eric Elkain,  an agent of Chetrit and the Chetrit Group.  Bourg and  Elkain agreed to arrange a meeting between Chetrit and Ilyas Khrapunov for the purpose  of exploring concealed investments by the Ablyazov-Khrapunov Group in the United States with the Chetrit Group.

89.    In or about 2012, Chetrit and his brother and partner Meyer  Chetrit met with Ilyas Khrapunov and Bourg in Geneva, Switzerland.  While the Ablyazov-Khrapunov Group had purportedly divested  itself of any interest in SDG by this time, Ilyas Khrapunov held himself out to Chetrit as having a controlling ownership interest in SDG.

90.    At this meeting, Chetrit and Ilyas Khrapunov discussed  possible investment strategies for the Ablyazov-Khrapunov Group in the United  States real estate sector.  In these discussions, Ilyas Khrapunov disclosed the fact that the  Ablyazov-Khrapunov Group was facing

criminal charges and asset freezes directed by the  governments of Kazakhstan, Switzerland, and the United Kingdom, and needed to move funds to other  jurisdictions.    During the continuing course of his dealings with the Ablyazov-Khrapunov Group, this situation was repeatedly and unequivocally made clear to Chetrit.  Specifically, the Ablyazov-Khrapunov Group needed to move funds that were the subject of criminal charges and asset freezes as a result of the proceedings both against Ablyazov and the Ablyazov-Khrapunov Group.  Chetrit expressed sympathy with this situation, stating that his own family  had faced political sanctions in his native Morocco, a result of having defrauded the King and being forced to flee.  Chetrit and Ilyas Khrapunov agreed  in principle to seek joint investments in the United States, and agreed to meet further.

91.     Following this meeting in Geneva, Ilyas Khrapunov and Bourg met with  Chetrit again in New York City, to evaluate potential investment options.  While  discussing specific investment opportunities, the parties again openly and repeatedly  discussed the criminal charges against the Ablyazov-Khrapunov Group and the efforts of the  governments of Switzerland and Kazakhstan to locate and seize the assets of the  Ablyazov-Khrapunov Group.  Again, Ilyas Khrapunov acted on behalf of SDG and Triadou, despite the Ablyazov-Khrapunov Group's purported sale of SDG a year prior.

92.     As a result of these discussions, the Ablyazov-Khrapunov Group invested, through Triadou, with Chetrit and the  Chetrit Group in a number of real estate opportunities in New York  City.  The most significant of these were investments in the Flatotel and Cabrini Medical Center developments in New York City.

93.     The Flatotel is a 289-room business hotel opened in 1991, located at 135 West 52nd St, New York, New York.

94. The Cabrini Medical Center hospital campus closed in 2008 and is now comprised of several buildings containing approximately 250 condominium units.

95. Both the Flatotel and the Cabrini Medical Center properties were purchased by members of the Chetrit Group, along with co-investors. The developers have been executing plans to convert both properties into luxury condominiums, and are close to completion.

96. The Chetrit Group owned a 75% interest in the Flatotel, and created a series of limited liability entities to hold that interest, including Counterclaim Defendants CF 135 FLAT LLC and CF 135 West Member LLC.

97. The Chetrit Group offered to sell half of their 75% investment in the Flatotel to Triadou, after which the Chetrit Group and Triadou would each own 37.5%. Triadou would provide 70% of the capital needed – against Chetrit's 30%, the difference amounting to an above-market "promote fee" for Chetrit that ensured that the Chetrit Group would reap the largest profits from the Flatotel development, even as it put in the least capital – and the parties would then divide the profits from the investment. In or about March 25, 2013, Triadou accepted this offer, notwithstanding the fact that the terms strongly favored Chetrit, and committed to transmit funds to the Chetrit Group to secure the 37.5% interest in the Flatotel property.

### The Ablyazov-Khrapunov Group Enlists FBME to Facilitate Their Money Laundering Scheme in the United States

98. The Ablyazov-Khrapunov Group sought to fund Triadou's investments with money from the Ablyazov-controlled entity Telford, held in accounts with FBME.

99. Telford's FBME accounts were managed by Eesh Aggarwal, Chairman of Azure Consultants DMCC, and a close financial advisor to Ablyazov. Aggarwal had connected Ablyazov and other members of the Ablyazov-Khrapunov Group to FBME through Aggarwal's

contacts with high-level officers at FBME, and in time FBME became one of the Ablyazov-Khrapunov Group's primary banks. On information and belief, the conspirators favored FBME due to its presence inside of the European Union, its lack of anti-money laundering protections, and its eagerness to service high-risk clientele and shell corporations such as Telford.

100.    FBME promoted its weak due diligence standards to attract high-risk, high-value clients just like the Ablyazov, and was known for its willingness to do business with clients seeking to avoid regulatory oversight. In particular, FBME relied on an "Approved Third Party" program, where FBME's contacts could introduce new, high-value clients to the bank with virtually no due diligence of these new relationships. Upon information and belief, Aggarwal was one such "Approved Third Party," and with the approval of certain FBME officers, was able to launder the Ablyazov-Khrapunov Group's funds through FBME by way of entities such as the Ablyazov-controlled Telford, with effectively no scrutiny or due diligence by FBME.

101.    FBME had a history of moving funds for Aggarwal and Ablyazov with no questions asked, which led the conspirators to favor FBME for their criminal schemes aimed at the United States. For example, on June 11, 2011, FBME executed more than $27 million in transfers of Ablyazov's stolen funds to Amber Limited, a shell company registered in the U.A.E. (where Aggerwal operates) subsequently found to be an undisclosed Ablyazov asset and added to the U.K. courts' freezing and receivership orders.

102.    Telford's accounts at FBME bank were used to covertly move and invest funds stolen by Ablyazov from BTA Bank. Because the Telford accounts consisted of Ablyazov's stolen funds, Ilyas Khrapunov conferred with Ablyazov regarding investments of funds from Telford, and Ablyazov's approval was required for transfers from Telford. Even after Ablyazov's incarceration in France he remained in contact with his coconspirators, and while Ilyas

Khrapunov took operational control of much of the Ablyazov-Khrapunov Group's network, Ablyazov continued to direct specific transfers of funds, including those from Telford's FBME accounts.

103.    Triadou attempted to transfer Telford's funds held in FBME for the Flatotel and Cabrini deals through banks in Luxembourg, but those banks refused to  accept wire transfers from the Ablyazov-Khrapunov Group's FBME accounts due in part to the investigations or proceedings led  by the Kazakh, Swiss, and United Kingdom authorities.

104.    Bourg then contacted Chetrit about alternative wire transfer arrangements. Informed that   commercial banks refused to handle Triadou's funds from Telford, Chetrit conspired to launder the money, instructing Bourg to  disregard the banks and transfer funds directly from the Ablyazov-Khrapunov Group's  offshore accounts to the escrow account of Chetrit's personal and corporate attorneys.  Bourg then directed a series of wire transfers, on behalf of Triadou, from Telford's accounts at FBME directly to Chetrit's counsel.

105.    FBME executed these transfers despite their blatant indicia of money laundering, including that (1) Telford was a recently incorporated offshore shell company with no obvious business purpose, (2) Telford was purportedly owned by another offshore nominee-shareholder trust, (3) Telford was seeking to transfer millions of dollars into escrow accounts with no due diligence, and (4) Telford was transferring these funds from a high-risk jurisdiction for the benefit of an unrelated third party operating in a more financially-rigorous jurisdiction.

106.    This was not the only instance of FBME executing such obviously suspicious transfers for Aggerwal and the Ablyazov-Khrapunov Group without concern for money laundering red flags. At the same time FBME began to execute transfers from Telford to the accounts of Chetrit's counsel, on or about October 9, 2013, FBME executed wire transfers for $25

million from Telford's accounts for an investment in overseas telecommunications assets. Again Telford was transferring millions of dollars of Ablyazov's money for the benefit of another entity linked to the Ablyazov-Khrapunov Group.

107.    Subsequent to these transfers, on July 22, 2014, the U.S. Financial Crimes Enforcement Network ("FinCEN") designated FBME Bank a "foreign financial institution of primary money laundering concern."  FinCEN found that FBME Bank was regularly "used by its customers to facilitate money laundering, terrorist financing, transnational organized crime," had "systemic failures in its anti-money laundering controls that attract high-risk shell companies," and performed a "significant volume of transactions and activities that have little or no transparency and often no apparent legitimate business purpose."

108.    Under Section 311 of the PATRIOT Act, FinCEN barred U.S. financial institutions from opening or maintaining "payable-through" accounts with FBME.[1]  In the accompanying official announcement, FinCEN's then-Director emphasized that FBME was not merely negligent, but rather "promotes itself on the basis of its weak Anti Money Laundering (AML) controls in order to attract illicit finance business from the darkest corners of the criminal underworld," and "openly advertises the bank to its potential customer base as willing to facilitate the evasion of AML regulations."

109.    In its updated rule barring U.S financial institutions from dealing with FBME, FinCEN noted in particular FBME's pervasive dealings with obscure shell companies just like Telford, serving no purpose but to facilitate money laundering:

FinCEN considered all of the relevant information and is particularly

---

[1]     FBME challenged FinCEN's rulemaking in the United States District Court for the District of Columbia and won a temporary reprieve, but FinCIN reissued the rule in substantially the same form on March 31, 2016. That updated rule is now undergoing judicial review.

concerned with: (1) The large number of FBME customers that are either shell companies or that conduct transactions with shell companies; (2) the lack of transparency with respect to beneficial ownership or legitimate business purposes of many of FBME's shell company customers; (3) the location of many of its shell company customers in other high-risk money laundering jurisdictions outside of Cyprus; (4) the high volume of U.S. dollar transactions conducted by these shell companies with no apparent business purpose; and (5) FBME's longtime facilitation of its shell company customers' anonymity by allowing thousands of customers to use the bank's physical address in lieu of their own.

110.    The Central Bank of Cyprus has frozen all assets transfers to or from FBME, and taken control of the bank pending completion of an investigation into its operations. FBME remains under the control of the Central Bank of Cyprus, and upon information and belief, continues to hold millions in funds belonging to the Ablyazov-Khrapunov Group and shell companies they control.

### The Ablyazov-Khrapunov Group Enters a Second Deal with Chetrit, Again Funded By Telford through FBME

111.    Through Triadou, the Ablyazov-Khrapunov Group entered a second investment with the Chetrit Group shortly thereafter.   In late 2012, Triadou agreed to invest $12  million in the Cabrini Medical Center conversion, a joint venture between the Chetrit  Group and another private developer to convert a former medical center in New  York City into luxury condominiums.

112.    Due to increasing scrutiny on the Ablyazov-Khrapunov Group's  finances, the contemplated $12 million investment became impossible.  Bourg discussed this obstacle  with Chetrit, who agreed that Triadou should invest $6 million, half the originally-agreed  amount, until further funds became available.  In return for this $6 million investment, Triadou would receive a promissory note and the right to convert that note into equity in the entity holding the Chetrit Group's interest in the Cabrini deal, 227 East 19th Holder, LLC.

113.    Again, the funds to execute the Cabrini deal were  transferred, on May 20, 2013,

directly from the Ablyazov-Khrapunov Group's Telford accounts at FBME Bank to a law firm in New York working on Chetrit's behalf. Again, this transfer of funds from Telford was only executed after Ilyas Khrapunov received explicit direction from Ablyazov.

> ### *Kazakh Authorities Target the Ablyazov-Khrapunov Group's Holdings in the United States, and the Ablyazov-Khrapunov Group Liquidates Those Assets at Below-Market Value with the Chetrit Group's Assistance.*

114.     In 2014, Almaty filed an action in California federal court against members of the Ablyazov-Khrapunov Group seeking to seize assets that they had attempted to launder through real estate investments in California. That action is *City of Almaty v. Viktor Khrapunov, et al*, Case No. 2:14-cv-03650-FMO-CW (filed May 13, 2014; dismissed September 21, 2015) (the "California Litigation"). On information and belief, this lawsuit led the Ablyazov-Khrapunov Group to believe their assets in the U.S. were no longer safe from seizure by the government of Kazakhstan.

115.     In response, in late 2014, Ilyas Khrapunov directed Bourg, Triadou's director, to begin liquidating Triadou's assets in New York so that the funds could be removed from the United States and hidden. Specifically, Ilyas Khrapunov told Bourg to liquidate Triadou's investments in Flatotel and the Cabrini Medical Center as quickly as possible.

116.     Bourg approached Chetrit, explaining that the threat of the California Litigation was pressuring Triadou and the Ablyazov-Khrapunov Group into moving their assets out of the United States. Chetrit offered to purchase an assignment of Triadou's interest in the Flatotel at a substantial discount from the price originally paid by Triadou. By this point, the value of Triadou's investment had in fact increased substantially beyond the funds originally invested.

117.     Chetrit simultaneously proposed to bribe Bourg, so Chetrit could further take advantage of Triadou and secretly influence it to obtain a discounted price. Specifically, Chetrit

proposed that Bourg covertly use his position as director of Triadou to accept a lower price for the Chetrit Group's purchase of an assignment, thus decreasing Triadou's recovery from the investment and increasing the Chetrit Group's profit. In return for securing for Chetrit a lower assignment price, Chetrit agreed to surreptitiously pay Bourg $3 million.

118.     In or about August of 2014, Bourg, acting on behalf of Triadou and at the direction of the Ablyazov-Khrapunov Group, agreed to assign Triadou's interest in the Flatotel back to the Chetrit Group for a price as low as $26 million, only a fraction of the fair market value of the properties. At the same time, Bourg executed a release of the promissory note that Triadou held entitling it to equity in the Cabrini Medical Center development. At the time of this assignment and release, Viktor Khrapunov was facing criminal charges as well as possible fines and disgorgement in Kazakhstan; the Kazakh government had formally sought extradition of Viktor Khrapunov from Switzerland; Ablyazov was being held in French prison awaiting extradition; and the Swiss assets of the Ablyazov-Khrapunov Group remained frozen. Not only were all of these facts widely disseminated in the news, they were known by all parties to the assignment and release transactions, including Chetrit, and it was not uncommon for their meetings to begin with a discussion of the possibility of the incarceration of members of the Ablyazov-Khrapunov Group.

119.     Following the assignment and release, Bourg invoiced Chetrit for $1 million of the agreed-upon $3 million bribe. After receiving the invoice, Chetrit paid Bourg $400,000, but refused to pay the full amount demanded by Bourg.

120.     In or about March 2015, Bourg met with Chetrit, and recorded the meeting. As captured on audio, Bourg demanded the remainder of his promised compensation. Chetrit acknowledged that he had paid Bourg "400 or 500," but responded that Bourg would receive the

additional $600,000 only when Chetrit paid what he owed Triadou for the assignment, and that he had no intention of paying Triadou until forced to do so. Chetrit further stated on tape that Bourg would not receive any remaining money.

121. At that meeting, Bourg and Chetrit repeatedly discussed the legal troubles of Mukhtar Ablyazov and Victor and Ilyas Khrapunov. Chetrit repeatedly avoided using Ilyas Khrapunov's actual name, referring to him instead by the code name "Pedro." Chetrit and Bourg discussed how "Pedro" was "sought by Interpol" and his "father-in-law [was] still in prison," and Chetrit agreed that law enforcement was "coming at [the Ablyazov-Khrapunov Group] from all sides."

122. Also at that meeting, Chetrit and Bourg discussed the fact that due to the investigation in Switzerland, Ilyas Khrapunov could not leave the country and was under intense law enforcement pressure. In addition, Chetrit once again acknowledged his longstanding understanding that Ablyazov and his criminal situation was behind the motivations of the Ablyazov-Khrapunov investments in the United States. Chetrit further acknowledged his longstanding understanding that the Ablyazov-Khrapunov Group had made similar investments in other countries, such as Greece, to conceal and launder the proceeds of their crimes.

123. On or about March 22, 2015, after his meeting with Chetrit, Bourg contacted Elkain, Chetrit's agent in Europe, and also recorded that phone call. In that call, Bourg sought to confirm the terms of his secret deal with Chetrit. During this recorded conversation, Bourg and Elkain agreed that the secret deal between Chetrit and Bourg called for $3 million in compensation for Bourg. Elkain agreed that he "confirmed the deal" between Chetrit and Bourg, and "would have never said that if [Chetrit] hadn't told [him] so." Bourg requested Elkain's aid in receiving the remainder of his payment, but Elkain responded that whether or not the

agreement would be honored was up to Chetrit.

124.    Despite the finalized assignment agreement and release, the Chetrit Group refused to make any payments to Triadou following the sale. In response, Triadou filed a series of actions in New York state courts, seeking summary judgment and payment of these obligations under the assignment agreement. Those actions are *Triadou SPV S.A. v. CF 135 FLAT LLC, et al*., No. 653462/2014 (Nov. 10, 2014); *Triadou SPV S.A. v. CF 135 FLAT LLC, et al*., No. 650239/2015 (Jan. 26, 2015); *Triadou SPV S.A. v. CF 135 FLAT LLC, et al*., No. 154681/2015 (May 11, 2015), and *Triadou SPV S.A. v. CF 135 FLAT LLC, et al*., No. 156907/2015 (July 9, 2015),

125.    Each of these actions seeks the payment of money to Triadou derived from the sale of property illicitly obtained by the Ablyazov-Khrapunov Group, and rightfully owned by BTA and Almaty.

126.    By this lawsuit, BTA Bank and the City of Almaty seek to hold Crossclaim Defendants responsible for their illegal conduct in the United States in violation of U.S. law.

## FIRST CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
### *Against All Defendants*

127.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 126 as if fully set forth herein.

128.    This cause of action is against all Crossclaim Defendants (the "Count 1 Defendants").

129.    From 1997 and continuing to the present, the Ablyazov-Khrapunov Group and numerous other individuals and entities, including SDG and Telford, have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 1

Enterprise").

130.     In 2012, the Chetrit Group knowingly and willfully joined the Count 1 Enterprise by aiding the Ablyazov-Khrapunov Group's schemes to hide and launder their illicit assets through investments by SDG through Triadou in properties owned by the Chetrit Group.

131.     The Count 1 Enterprise was engaged in, and the activities of the Count 1 Defendants affected, interstate and foreign commerce.

132.     The Count 1 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity consisting of the following predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B):

   a.   The Count 1 Defendants engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting numerous financial transactions using illegally obtained funds to purchase real estate investments in New York City and elsewhere and to fund business entities including SDG and Triadou, knowing that such funds were unlawfully converted from the City of Almaty and BTA Bank, with the goal of concealing the source of those funds. The Count 1 Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or transferring funds stolen from Almaty and BTA into and within the United States in order to conceal their source and existence from lawful investigations conducted by Swiss, Kazakh, and United Kingdom authorities.

   b.   The Count 1 Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting financial transactions

using those stolen funds by, among other things, using stolen funds to purchase
real estate and other assets in New York City and elsewhere and to fund business
entities, including Triadou and SDG, with the intent to further the Count 1
Enterprise and to conceal the source of those funds.

c. The Count 1 Defendants engaged and conspired to engage in money transactions
in property derived from specified unlawful activity in violation of 18 U.S.C.
§ 1957 by, among other things, knowingly transferring funds in excess of $10,000
stolen from Almaty and BTA into and within the United States to invest in real
estate and other assets in New York City with the aid of the Chetrit Group,
knowing that such funds were stolen from the City of Almaty and BTA Bank.

d. The Count 1 Defendants engaged and conspired to engage in mail fraud in
violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by
knowingly using the mails and wires to transfer illegally obtained funds into and
within the United States, for the purpose of furthering the Count 1 Enterprise and,
while concealing the funds' illegal source, used those funds to purchase real estate
in New York City and to fund business entities, including SDG and Triadou, that
enabled those entities to conduct business in the United States using the illegally-
obtained funds.

e. The Count 1 Defendants unlawfully transported or caused to be transported in
interstate or foreign commerce securities or money having a value of $5,000 or
more which was stolen, converted or taken by fraud from Almaty and BTA Bank,
and knowing the same to be stolen, converted or taken by fraud in violation of 18
U.S.C. § 2314.

    f.   The Count 1 Defendants received, possessed, concealed, sold, or disposed of securities or money having the value of $5,000 or more, or conspired to do the same, which crossed a state or United States boundary after being stolen, unlawfully converted, or taken from Almaty and BTA Bank, and knowing the securities or money to have been stolen, unlawfully converted, or taken in violation of 18 U.S.C. § 2315.

133.    Each of the Count 1 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 1 Defendants engaged or conspired to engage in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. From in or about 1997, and continuing to the present, Count 1 Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Count 1 Enterprise and in order to implement the schemes and employ the devices described herein. The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, the following acts of money laundering, transactions in money and property derived from specified unlawful activity, foreign transport of stolen money or property known to be stolen, converted or taken by fraud, mail fraud, and/or wire fraud:

    a.   The 2012 sham sale of SDG to Philippe Glatz to create the appearance that SDG was independent of the Ablyazov-Khrapunov Group;

    b.   the fraudulent loan from the Ablyazov-Khrapunov Group to Mr. Glatz to facilitate the SDG sale transaction;

c. the formation of Triadou and other entities by SDG at the direction of Bourg and in consultation with Ilyas Khrapunov;

d. Chetrit's meetings with Ilyas Khrapunov in or about 2012 in Switzerland and New York City, and their subsequent agreement to invest the Ablyazov-Khrapunov Group's unlawfully obtained money in real estate in New York City;

e. E-mails directly between Chetrit and Ilyas Khrapunov as well as through intermediaries discussing the Ablyazov-Khrapunov Group's possible investments in New York real estate;

f. the formation of the investment vehicles necessary to facilitate the Flatotel and Cabrini investments;

g. Telford's failed attempt to transfer funds held in FBME Bank for the Flatotel and Cabrini deals through banks in Luxembourg;

h. the May 20, 2013 transfer of funds from Telford to Chetrit's attorney representing Triadou's investment of $6 million in the Cabrini deal, along with Chetrit's promissory note and Triadou's right to convert that debt into equity in Cabrini;

i. a series of other wire transfers on behalf of Triadou from Telford's accounts at FBME Bank Ltd. to Chetrit's counsel in New York, including transfers on November 9, 2012, and January 22, February 13, February 19, April 8, April 16, and April 24, 2013;

j. a May 22, 2013 wire transfer of $28 million from Telford to a different law firm's Citibank account in New York used for a separate New York real estate investment with Chetrit;

k. a May 2014 agreement (executed August 2014) to transfer Triadou's interest in the

Flatotel to the Chetrit Group at a below-market price;

l.  Chetrit's and Triadou's signed May 2014 release of the promissory note regarding Triadou's $6 million investment in the Cabrini Medical Center development;

m.  Chetrit's payment of $400,000 to Bourg in partial satisfaction of Chetrit's agreement with Bourg to pay him $3 million in exchange for securing Chetrit a lower assignment price for Triadou's interests in the Flatotel and Cabrini deals; and

n.  a payment of $1 million from Chetrit to Triadou in partial satisfaction of Chetrit's obligations under the fraudulent assignment.

134.  As a direct and proximate result of RICO violations by the Count 1 Defendants of 18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at trial and presently estimated to be not less than $6 billion. Almaty and BTA have been injured in their business or property by reason of each Count 1 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
### *Against All Defendants*

135.  The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 134 as if fully set forth herein.

136.  This cause of action is against all Crossclaim Defendants (the "Count 2 Defendants").

137.  From its formation and continuing to the present, CF 135 West Member LLC, has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 2

Enterprise").

138.     The Count 2 Enterprise was engaged in, and the activities of the Count 2 Defendants affected, interstate and foreign commerce.

139.     The Count 2 Defendants engaged in a pattern of racketeering activity consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in paragraph 132 above.

140.     Each of the Count 2 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 2 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 2 Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Count 2 Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Count 2 Enterprise and in order to implement the schemes and employ the devices described herein. The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, those acts described in paragraph 133 above.

141.     As a direct and proximate result of RICO violations by the Count 2 Defendants of 18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at trial. Almaty and BTA have been injured in their business or property by reason of each Count 2 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## THIRD CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(a))
#### *Against All Defendants*

142.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 141 as if fully set forth herein.

143.     This cause of action is against all Crossclaim Defendants (the "Count 3 Defendants").

144.     From its formation and continuing to the present, CF 135 West Member LLC, has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 3 Enterprise").

145.     The Count 3 Enterprise was engaged in, and the activities of the Count 3 Defendants affected, interstate and foreign commerce.

146.     The Count 3 Defendants received income derived from a pattern of racketeering activity consisting of the related predicate acts of racketeering described in paragraphs 132 and 133 above.

147.     The Count 3 Defendants used or invested the income derived from their racketeering activity in the acquisition of an interest in, or the establishment or operation of, the Count 3 Enterprise in violation of 18 U.S.C. § 1962(a).

148.     The Count 3 Defendants used or invested the income derived from their racketeering activity in the Count 3 Enterprise in fraudulent and below-market transactions, including by accepting unreasonable contractual terms to transfer wealth to the Chetrit Group.

149.     As a direct and proximate result of RICO violations by the Count 3 Defendants of 18 U.S.C. § 1962(a), Almaty and BTA have suffered damages in an amount to be determined at trial. Almaty and BTA have been injured in their business or property by reason of each Count 3

Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
*Against All Defendants*

150.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 149 as if fully set forth herein.

151.    This cause of action is against all Crossclaim Defendants (the "Count 4 Defendants").

152.    From its incorporation and continuing to the present, 227 East 19th Holder LLC has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 4 Enterprise").

153.    The Count 4 Enterprise was engaged in, and the activities of the Count 4 Defendants affected, interstate and foreign commerce.

154.    The Count 4 Defendants engaged a pattern of racketeering activity consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in paragraph 132 above.

155.    Each of the Count 4 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 4 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 4 Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Count 4 Defendants associated together, with one another and with others, and acted in concert for the common and

unlawful purposes of the Count 4 Enterprise and in order to implement the schemes and employ the devices described herein. The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, those acts described in paragraph 133 above.

156. As a direct and proximate result of RICO violations by the Count 4 Defendants of 18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at trial. Almaty and BTA have been injured in their business or property by reason of each Count 4 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## FIFTH CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(d))
### *Against All Defendants*

157. The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 156 as if fully set forth herein.

158. This cause of action is against all Crossclaim Defendants (the "Count 5 Defendants").

159. As alleged herein, Count 5 Defendants conspired to engage in the acts described above in the United States to further the goals of their criminal enterprises in violation of U.S. law.

160. In so doing, Count 5 Defendants unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together, with each other and with others to commit RICO violations under 18 U.S.C. § 1962(c) and, thereby, violated 18 U.S.C. § 1962(d). In furtherance of the conspiracy and to achieve its objectives, Count 5 Defendants committed the

overt acts as described in paragraph 133 in the Southern District of New York and elsewhere.

161.     As a direct and proximate result of RICO violations by the Count 5 Defendants of 18 U.S.C. § 1962(d),  Almaty and BTA have suffered damages in an amount to be determined at trial.  Almaty and BTA have been injured in their business or  property by reason of each Count 5 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to  recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION

### (ACTUAL FRAUDULENT TRANSFER)
### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

162.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 161 as if fully set forth herein.

163.     At all relevant times, the City of Almaty and BTA Bank have held an interest in the illicit funds  taken by the Ablyazov-Khrapunov Group and invested by and through Triadou, as these funds were  the unlawful profits of embezzlement, fraud, and the corruption of the public office of the mayor of Almaty.   The intermediary transfers or investment of those funds did not alter or diminish either Almaty or BTA's interest.

164.     The 2014 assignment of Triadou's interest in the Flatotel and Cabrini Medical Center was not for  adequate consideration, and in fact, represented a value significantly below the fair value of that interest, due to the improper motivations of Triadou's ownership, the Ablyazov-Khrapunov Group, to hide their illicit assets and move them offshore, and the Chetrit Group's  secret deal to drive down the price of the assignment through bribery.

165.     This assignment was made for the specific purpose of liquidating a fixed  asset to frustrate a future creditor.  Defendants knew of the numerous judgments against Ablyazov in the

United Kingdom, and of Almaty's claims against the Ablyazov-Khrapunov Group in the California Litigation, and knew that Triadou was owned and controlled by the defendants in those actions. Defendants intended and believed that the assignment of the Ablyazov-Khrapunov Group's interest in the Flatotel and Cabrini Medical Center would hinder, delay, and defraud current and future judgment creditors, specifically the City of Almaty and BTA Bank.

166.    For these reasons, the assignment was fraudulently and illegally intended to remove an asset from the jurisdiction of the United States, namely Triadou's interests in the Flatotel and Cabrini Medical Center, convert those assets to cash, and transfer those funds beyond the reach of the Swiss, Kazakh, and United Kingdom authorities

167.    As a result of the foregoing, pursuant to sections 275, 276, and 279 of the New York Debtor and Creditor Law, the August 2014 assignment agreement should be set aside as the product of clearly-inequitable conduct.

## SEVENTH CAUSE OF ACTION

### (CONSTRUCTIVE FRAUDULENT TRANSFER)
***Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov***

168.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 167 as if fully set forth herein.

169.    At all relevant times, the City of Almaty and BTA Bank have held an interest in the illicit funds taken by the Ablyazov-Khrapunov Group and invested by and through Triadou, as these funds were the unlawful profits of embezzlement, fraud, and corruption of the public office of the mayor of Almaty. The intermediary transfers or investment of those funds did not alter or diminish either Almaty or BTA's interest.

170.    Triadou, although an arm of a massive international fraud and money laundering conspiracy, is and has been insolvent itself. Triadou holds no funds or other assets of its own,

and relies on funding from other Ablyazov-Khrapunov Group entities, such as Telford, to meet its obligations. Assets that flow to Triadou are promptly moved to other Ablyazov-Khrapunov Group entities offshore.

171.     As Triadou is controlled by the Ablyazov-Khrapunov Group, whose members face multi-billion dollar judgments in other jurisdictions, Triadou is effectively kept insolvent at all times, so as to limit the Ablyazov-Khrapunov Group's exposure in the United States.

172.     Similarly, because Triadou is controlled by and is an alter ego of the Ablyazov-Khrapunov Group, at the time it liquidated the Flatotel and Cabrini interests and transferred the proceeds to other entities, it had liabilities – including resulting from the UK judgments – that far outstripped its assets.

173.     As a result of the foregoing, pursuant to sections 273 and 273-a of the New York Debtor and Creditor Law, the August 2014 assignment agreement should be set aside.

## EIGHTH CAUSE OF ACTION

### (UNJUST ENRICHMENT)
### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

174.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 173 as if fully set forth herein.

175.     The Crossclaim Defendants were unjustly enriched at the expense of the City of Almaty and BTA Bank when they invested funds embezzled from the City of Almaty and BTA Bank to acquire assets in the United States including an interest in the Flatotel project, and did so knowing that authorities of Switzerland, the Republic of Kazakhstan, and the United Kingdom were seeking the wrongfully-taken assets held by the Ablyazov-Khrapunov Group, and that further sales of the same assets would potentially frustrate their identification by the lawful authorities.

176.     It would be against equity and good conscience to permit the Crossclaim Defendants to retain the profits derived from the looting of assets rightfully belonging to the City of Almaty and BTA Bank.

## NINTH CAUSE OF ACTION

### (CONVERSION)
*Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

177.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 176 as if fully set forth herein.

178.     None of the Defendants has a superior interest to the City of Almaty or BTA in the assets wrongfully taken by the Ablyazov-Khrapunov Group.  These  funds, and the assets they were used to purchase, are the rightful property of the people of  Almaty and BTA.

179.     Defendants knowingly bought and sold assets obtained with these funds derived from the corruption of the office of the mayor of the City of Almaty and control of BTA Bank.

180.     As a result, Defendants have wrongfully and without authorization exercised of dominion and control over property of Almaty and BTA, and thus are liable for converting the same.

## TENTH CAUSE OF ACTION

### (CONSTRUCTIVE TRUST)
*Against All Defendants*

181.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 180 as if fully set forth herein.

182.     As mayor of Almaty, Viktor Khrapunov owed fiduciary duties  to the people of Almaty, and through his oath of office, expressly promised to execute  those duties.

183.     Despite that promise, Viktor Khrapunov breached those fiduciary duties repeatedly by transferring public assets of the City of Almaty to other members of the  Ablyazov-

Khrapunov Group for fractions of their market value, and then assisted the Ablyazov-Khrapunov Group in laundering the funds resulting from those illicit transfers of public property.  Through these breaches of fiduciary duty, the Ablyazov-Khrapunov Group has been unjustly  enriched.

184.     A constructive trust over the 50% interest in CF 135 West Member LLC assigned by Triadou, and all profits therefrom, is the appropriate equitable remedy to prevent further  dissipation of the funds resulting from these breaches of fiduciary duty.

185.     Defendants have also conspired to  fraudulently transfer Triadou's interest in the Flatotel for the purpose of hiding the  Ablyazov-Khrapunov Group's assets and frustrating any recovery resulting from Almaty and BTA's investigations and pursuits of their stolen assets. Separate and aside from the Ablyazov-Khrapunov Group's breaches of fiduciary duty,  this knowingly fraudulent transfer by Cross- and Counterclaim Defendants justifies imposition of a constructive trust to prevent any further transfers or encumbrances of this  property.

186.     Absent this remedy, the Ablyazov-Khrapunov Group will continue to use Triadou  and SDG to launder the fruits of these breaches of fiduciary duty and hide these assets from law enforcement, and the Chetrit Group will continue to be unjustly enriched by these acts of fraud.

## ELEVENTH CAUSE OF ACTION

### (PURSUANT TO CPLR § 5239 FOR FRAUD AND CONVERSION)
### *Against All Defendants*

187.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 186 as if fully set forth herein.

188.     Triadou has filed serial actions in the courts of the state of New York  seeking payment on the fraudulent assignment agreement between Triadou and the Chetrit  Group.  While Triadou has been awarded summary judgment in some of these  actions, none of these judgments

have been satisfied by any sheriff or receiver.

189.    The City of Almaty and BTA Bank are the rightful owners of Triadou's interest in the Flatotel and Cabrini Medical Center and/or any funds derived from the sale of that interest, as the interest was purchased with funds unlawfully converted by the Ablyazov-Khrapunov Group and laundered through SDG and Triadou.

190.    Pursuant to CPLR § 5239, this court is empowered to vacate any such judgments and direct the disposition of the property in question, as well as direct which party should keep possession of the property during the pendency of this action.

191.    The court should set aside any judgments in Triadou's favor in light of the City of Almaty's and BTA's superior interest in this illicitly-obtained property, direct that Triadou's interest in the Flatotel and Cabrini Medical Center be transferred to the City of Almaty and BTA Bank, and pursuant to CPLR § 5239, award the City of Almaty and BTA Bank its reasonable attorneys' fees in bringing this claim.

## TWELFTH CAUSE OF ACTION

### (PURSUANT TO CPLR § 5303 FOR RECOGNITION AND ENFORCEMENT OF A FOREIGN JUDGMENT UNDER NEW YORK LAW)
### *Against Defendant Ablyazov*

192.    BTA Bank repeats and realleges paragraphs 1 through 191 as if fully set forth herein.

193.    The United Kingdom of Great Britain and Northern Ireland is a "foreign state" within the meaning of N.Y. C.P.L.R. § 5301(a).

194.    The Ablyazov Judgments are "foreign country judgments" within the meaning of N.Y. C.P.L.R. § 5301(b).

195.    The Ablyazov Judgments are "final, conclusive and enforceable" in England within the meaning of N.Y. C.P.L.R. § 5302.

196.     The Ablyazov Judgments grant recovery of a sum of money and are enforceable by an action on the judgments in New York pursuant to N.Y. C.P.L.R. § 5303.

197.     None of the grounds for non-recognition of a foreign country judgment set forth in N.Y. C.P.L.R. § 5304 applies to the Ablyazov Judgments.

198.     The Ablyazov Judgments are required to be enforced pursuant to N.Y. C.P.L.R. § 5303.

199.     Triadou is the alter ego of the Ablyazov-Khrapunov Group, and is thus liable for all current and future obligations against the Ablyazov-Khrapunov Group. Maintaining the separateness of Triadou and its alter ego, the Ablyazov-Khrapunov Group, would allow the Ablyazov-Khrapunov Group to avoid otherwise enforceable obligations and would be highly inequitable to the people of the city of Almaty and BTA Bank.

## THIRTEENTH CAUSE OF ACTION

### (AIDING AND ABETTING)
### *Against Defendant FBME*

200.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 199 as if fully set out herein.

201.     The Ablyazov-Khrapunov Group converted property that rightfully belongs to the Kazakhstan Plaintiffs through wire transfers executed by FBME Bank, and the Ablyazov-Khrapunov Group was unjustly enriched by the use and investment of the same funds.

202.     FBME Bank was aware that the funds wired were the proceeds of crime and that the wire transfers were an effort by the Ablyazov-Khrapunov Group to obscure the illicit nature of those funds.

203.     Due to its longstanding relationship with the Ablyazov-Khrapunov Group and deliberately ineffective protocols for preventing money laundering, FBME Bank aided and

abetted the Ablyazov-Khrapunov Group's laundering scheme.

204.     FBME's active participation in the Ablyazov-Khrapunov Group's money laundering network rendered substantial assistance to the Ablyazov-Khrapunov Group's acts of conversion, fraud, and subsequent unjust enrichment, and the Kazakhstan Plaintiffs seek relief from FBME to the extent Defendants are found liable for these acts.

## DEMAND FOR JURY TRIAL

Almaty and BTA Bank demand a jury trial on all claims for which trial by jury is available, including on the underlying interpleader action.

## DEMAND FOR RELIEF

WHEREFORE, Almaty and BTA Bank demand the Court enter judgment as follows:

A.     For injunctive relief and rescission of the 2014 assignment agreement and release;

B.     For compensatory, punitive, and treble damages;

C.     For declaratory relief;

D.     For all costs and fees incurred in prosecuting this Complaint;

E.     For such other and further relief as this Court deems just and proper.

Dated: New York, New York
        September 7, 2016

                        Respectfully Submitted,

                        BOIES, SCHILLER & FLEXNER LLP

        By:    /s/ Matthew L. Schwartz
               Matthew L. Schwartz
               Randall W. Jackson
               Daniel G. Boyle
               Craig Wenner

               BOIES, SCHILLER & FLEXNER LLP
               575 Lexington Avenue
               New York, New York 10022
               Telephone: 212-446-2300
               Facsimile: 212-446-2350

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

              Crossclaim Plaintiffs,

              -against-

MUKHTAR ABLYAZOV, VIKTOR
KHRAPUNOV, ILYAS KHRAPUNOV, and
TRIADOU SPV S.A.,

              Crossclaim Defendants.

No. 15-CV-05345(AJN) (KHP)

## DECLARATION OF VIKTOR KHRAPUNOV

I, Viktor Khrapunov, hereby declare under penalty of perjury under the laws of the
United States of America that the foregoing is true and correct:

1. I submit this declaration in connection with the accompanying request for
international judicial assistance.

2. have voluntarily agreed to be deposed in connection with the above-captioned
case and know that I cannot be subjected to any coercive measures, that I cannot be forced to
participate or to appear, and that I have the right to invoke any exemption or prohibition to give
evidence provided for by the laws of Switzerland or of the United States of America.

Dated: July 21, 2017

                                        Viktor Khrapunov

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

               Crossclaim Plaintiffs,

               -against-

MUKHTAR ABLYAZOV, VIKTOR
KHRAPUNOV, ILYAS KHRAPUNOV, and
TRIADOU SPV S.A.,

               Crossclaim Defendants.

No. 15-CV-05345(AJN) (KHP)

## DECLARATION OF ILYAS KHRAPUNOV

I, Ilyas Khrapunov, hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct:

1. I submit this declaration in connection with the accompanying request for international judicial assistance.

2. have voluntarily agreed to be deposed in connection with the above-captioned case and know that I cannot be subjected to any coercive measures, that I cannot be forced to participate or to appear, and that I have the right to invoke any exemption or prohibition to give evidence provided for by the laws of Switzerland or of the United States of America.

Dated: July 21, 2017

_____
Ilyas Khrapunov

# Exhibit 2

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| _____ ) | |
| CITY OF ALMATY, KAZAKHSTAN, ) and BTA BANK JSC ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 15-cv-05345 (AJN) |
| ) | |
| MUKHTAR ABLYAZOV, ILYAS ) KHRAPUNOV, VIKTOR KHRAPUNOV ) and TRIADOU SPV S.A., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## COMMISSION TO TAKE THE DEPOSITIONS OF ILYAS KHRAPUNOV AND VIKTOR KHRAPUNOV IN SWITZERLAND

Pursuant to this Order of the above-titled Court, the individuals set forth below ("the Commissioners") are hereby commissioned, pursuant to Article 17 of the Hague Convention On The Taking Of Evidence Abroad In Civil Or Commercial Matters ("Hague Evidence Convention"), T.I.A.S. 7444, 23 U.S.T. 2555, reprinted in 28 U.S.C.A. § 1781, to take the depositions of Ilyas Khrapunov, a resident of Switzerland, who is a party and whose elected domicile is 295, Route d'Hermance, 1247 Anieres, Geneva, Switzerland, and Viktor Khrapunov, a resident of Switzerland, who is a party and whose elected domicile is 28b Chemin du Petit-Saconnex, 1209 Geneva, Switzerland.

The Commissioners shall include:

1. Matthew L. Schwartz, of Boies, Schiller Flexner LLP, 575 Lexington Ave, New York NY, 10022 (Plaintiffs' U.S. counsel)

2. Balz Gross and Claudio Bazzani, of Homburger AG, Prime Tower, Hardstrasse 201, CH-8005 Zurich (Plaintiffs' Swiss counsel);

1

3. John Kenney and/or John P. Curley, of Hoguet Newman Regal & Kenney LLP, 10 E 40th St #35, New York, NY 10016 (Viktor & Ilyas Khrapunov's U.S. counsel)

4. Grégoire Mangeat and/or Fanny Margairaz, of Mangeat Law firm, Passage des Lions 6, Case postale 5653, 1204 Geneva, Switzerland (Ilyas Khrapunov's Swiss counsel)

5. Marc Henzelin and/or Maria Vinogradova, of Lalive Law Firm, Rue de la Mairie 35, 1207 Genève, Switzerland (Viktor Khrapunov's Swiss counsel).

6. Alex Hassid, of Blank Rome, LLP, 1825 Eye Street, NW, Washington, D.C. 20006 (Triadou SPV S.A.'s U.S. counsel).

The deposition of Ilyas Khrapunov shall be limited to the following topics:

1. Triadou SPV S.A. including its formation, operation, funding, and its investments, including but not limited to:

   - The Flatotel condominium conversion in New York, NY;

   - The Cabrini Medical Center conversion in New York NY;

   - The Syracuse Mixed Use Complex in Syracuse, NY;

   - The Tri-County Mall in Cincinnati, OH;

2. Telford International Limited ("Telford"), including

   - Funding provided by Telford for Triadou's investments;

   - The sources of funds Triadou received from Telford;

   - Due diligence done on Telford and its beneficial owners;

   - Funding provided by Telford for any investment by SDG or Ilyas Khrapunov, including the purchase of any securities;

   - Any connection or relationship between Telford Financiers and Telford International Limited

3. The formation of a real estate investment fund incorporated in Luxembourg including Triadou's assets and investments;

4. The structure and operations of SDG Capital SA ("SDG"), including any current or former subsidiaries or affiliates, including:

   - The sources of SDG's funding;

   - SDG's investments through Porto Heli SPV;

   - SDG's investments through Igloo SPV;

5. The purported sale of SDG to Philippe Glatz in 2013, including:

   - Ilyas Khrapunov's relationship with Philippe Glatz;

- The source(s) of funds use to acquire SDG;

- Ilyas Khrapunov's employment or services to SDG before and after the purported sale;

6.   FBME Bank ("FBME"), including:

- Any accounts held at FBME by Ilyas Khrapunov or entities he or his family members (including in-laws) own or control;

- Any transfers of funds from accounts at FBME for the benefit of Triadou or SDG;

- Any communications between officers or employees of FBME and Ilyas Khrapunov or his agents;

7.   Transfers of funds involving the following entities:

- VILDER Company

- Northern Seas Waterage

- Crownway Limited

- Beford Limited

- Beron Holdings

- Ignoramus Limited

- Ramasita Investments

- Lampwood Limited

- Sartfield Limited

- Claremont Holdings Limited

- RPM USA

- RPM-Maro

- San Vito Investments Corp.

- Adlux Group

- SWISS TV

8.   Ilyas Khrapunov's relationship and communications with Peter Sztyk (a/k/a Petro Sztyk), including:

- The involvement of Mr. Sztyk in funding Triadou, SDG, or any of their subsidiaries of affiliates;

-  Any intended or planned sale of Triadou, in whole or part, to Mr. Sztyk or any entity owned or controlled by him;

- Any services or representation Mr. Sztyk provided to Ilyas Khrapunov or Ablyazov;

3

9. Ablyazov's assets, both in his name and held by associates for his benefit;

10. Ablyazov's ownership or control of any corporate entities;

11. The sources of funding for Ablyazov's legal expenses in the United Kingdom;

12. Disclosures made by Ilyas Khrapunov pursuant to any freezing or receivership orders of the courts of the United Kingdom;

13. Acts of hacking or unauthorized access to the electronic communications of any government officials, including:

- the employment of or payments to any their-party computer hackers;

- Ilyas Khrapunov's receipt of electronic communications obtained without authorization;

14. Ilyas Khrapunov's relationship and communications with Nicolas Bourg, including those related to Bourg's companies the Niel entities;

15. Ilyas Khrapunov's communications with Laurent Foucher;

16. Ilyas Khrapunov's communications with Kevin Meyer;

17. Ilyas Khrapunov's communications with Mukhtar Ablyazov;

18. Ilyas Khrapunov's communications with Nicolas Bourg;

19. Ilyas Khrapunov's communications with Eesh Aggarwal;

20. Ilyas Khrapunov's communications with Viktor Khrapunov;

21. Ilyas Khrapunov's communications with Gennady Petelin;

22. Ilyas Khrapunov's communications with Elena Petelina;

23. Ilyas Khrapunov's communications with Petr Krasnov;

24. Ilyas Khrapunov's communications with Alexander Yassik;

25. Ilyas Khrapunov's communications with Joseph Chetrit;

26. Ilyas Khrapunov's communications with Felix Sater;

27. Ilyas Khrapunov's communications with Daniel Ridloff;

28. Ilyas Khrapunov's communications with Botagoz Dzhardemali (a/k/a Bota Jardemalie);

29. Ilyas Khrapunov's retention of relevant documents or electronic communications, or maintenance of such documents by SDG, Triadou, or any of Ilyas Khrapunov's employees, counsel, or agents.

30. The allegations in the Amended Crossclaims.

The deposition of Viktor Khrapunov shall be limited to the following topics:

4

1. Viktor Khrapunov's actions as Mayor of the City of Almaty Kazakhstan, including:

   - Viktor Khrapunov's oath of office and ethical and legal obligations as Mayor of Almaty;

   - The transfer of property in the "Two Rivers" area of Almaty, as referenced in ¶ 51 of the Amended Crossclaims;

   - The April 2001 transfer of property to "KRI", as referenced in ¶ 53 of the Amended Crossclaims;

   - The 2003 seizure and resale of property from Shadid Engineering, as referenced in ¶ 54 of the Amended Crossclaims;

   - The transfer for sale of any property owned or controlled by the City of Almaty to Leila Khrapunova or entities owned or controlled by her;

2. Transfers of funds involving the following entities:

   - TOO KazRealIncom

   - TOO KarashaPlus

   - TOO Building Service Company

   - TOO Compania Stroytech

   - TOO Altay

   - Viled Establishment

3. The formation, funding, and investments of SDG Capital SA ("SDG"), including any current or former subsidiaries or affiliates, including:

   - The sources of SDG's funding;

   - SDG's investments through Porto Heli SPV;

   - SDG's investments through Igloo SPV;

   - The purported sale of SDG to Philippe Glatz in 2013;

4. The formation, operation, funding, and investments of Triadou SPV S.A., including Triadou's investments in:

   - The Flatotel condominium conversation in New York, NY;

   - The Cabrini Medical Center conversion in New York NY;

   - The Syracuse Mixed Use Complex in Syracuse, NY;

   - The Tri-County Mall in Cincinnati, OH;

5. Telford International Limited ("Telford"), including

   - Funding provided by Telford for Triadou's investments;

   - The sources of funds Triadou received from Telford;

- Due diligence done on Telford and its beneficial owners;
- Any connection between Telford International Limited and Telford Financiers Corp.;

6. FBME Bank ("FBME"), including:

- Any accounts held at FBME by Viktor Khrapunov or entities he or his family members (or in-laws) own or control;
- Any transfers of funds from accounts at FBME for the benefit of Triadou or SDG;
- Any communications between officers or employees of FBME and Ilyas Khrapunov or his agents;

7. The net worth of Viktor Khrapunov and his immediate family, as referenced in public reports and ¶ 61 of the Amended Crossclaims;

8. Tax reporting by Viktor Khrapunov and his spouse, as referenced in ¶ 61 of the Amended Crossclaims;

9. Viktor Khrapunov's disclosures and statements to Swiss law enforcement authorities;

10. Investments by Viktor Khrapunov and his immediate family members in the United States, including the purchase and sale of any real property;

11. Acts of hacking or unauthorized access to the electronic communications of any government officials, including:

- the employment of or payments to any third-party computer hackers;
- Viktor Khrapunov's receipt of electronic communications obtained without authorization;

12. Viktor Khrapunov's communications with Mukhtar Ablyazov;

13. Viktor Khrapunov's communications with Abylaykhan Karymsakov;

14. Viktor Khrapunov's communications with Eesh Aggarwal;

15. Viktor Khrapunov's communications with Ilyas Khrapunov;

16. Viktor Khrapunov's communications with Leila Khrapunova;

17. Viktor Khrapunov's communications with Gennady Petelin;

18. Viktor Khrapunov's communications with Elena Petelina;

19. Viktor Khrapunov's communications with Petr Krasnov;

20. Viktor Khrapunov's communications with Alexander Yassik;

21. Viktor Khrapunov's communications with Peter Sztyk (a/k/a Petro Sztyk);

22. Viktor Khrapunov's communications with Nicolas Bourg;

23. Viktor Khrapunov's retention of relevant documents or electronic communications, any of Viktor Khrapunov's employees, counsel, or agents.

6

24. The allegations in the Amended Crossclaims.

The Commissioners must comply with the Conditions for a Commissioner or Diplomatic or Consular Officer to Obtain Evidence in Switzerland, as set forth by the Swiss Federal Office of Justice as of May 2013 (the "Conditions"). Consistent with the Conditions, the Commissioners must obtain prior authorization from the Swiss authorities to validate this Commission and pay all required fees.

     IT IS SO ORDERED.

Date: _____          _____

                                      The Honorable Alison J. Nathan
                                      United States District Court for the
                                      Southern District of New York
                                      Thurgood Marshall United States Courthouse
                                      500 Pearl Street, Room 1620
                                      New York, New York 10007-1312

                                      SEAL OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ⸻ | ) |
| CITY OF ALMATY, KAZAKHSTAN, and BTA BANK JSC | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) No. 15-cv-05345 (AJN) |
| MUKHTAR ABLYAZOV, ILYAS KHRAPUNOV, VIKTOR KHRAPUNOV and TRIADOU SPV S.A., | ) ) ) ) |
| Defendants. | ) ) |
| ⸻ | ) |

## AMENDED LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

The United States District Court for the Southern District of New York (the "Court"), presents its compliments to the Senior Master of the Royal Courts of Justice under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention"), and requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above-captioned matter. This Court respectfully requests that The Senior Master of the Royal Courts of Justice recognize this Amended Letter of Request from this Court and arrange for its execution, in adherence to the Hague Convention and in the interest of comity.

### A.    Sender

The Honorable Alison J. Nathan, United States District Judge for the Southern District of New York, New York, New York, United States of America.

**B.     Central Authority of the Requested State**

The Senior Master (for the attention of the Foreign Process Section), Room E16, Royal Courts of Justice, Strand, LONDON WWC2A 2LL (foreignprocess.rcj@hmcts.gsi.gov.uk).

**C.     Person to Whom the Executed Request Is to Be Returned**

This Court hereby requests that the executed Amended Letter of Request and all documents and materials covered by this Amended Letter of Request be returned to the following attorney for the Plaintiffs, the City of Almaty, Kazakhstan and BTA Bank JSC (collectively, the "Plaintiffs"), as an officer of this Court:

> Matthew L. Schwartz
> Boies Schiller Flexner LLP
> 575 Lexington Avenue
> New York, New York 10022
> Telephone Number: (212) 446-2300
> Fax Number: (212) 446-2350

As an officer of this Court, he will act as confidential courier of this Court and deliver the executed Amended Letter of Request and all related documents and materials directly to me at the following address:

> The Honorable Alison J. Nathan
> United States District Court for the Southern District of New York
> Thurgood Marshall United States Courthouse
> 40 Foley Square, Room 2102
> New York, New York 10007

All documents and materials deposited with the Court in accordance with this Revised Letter of Request will be available to all parties and their counsel.

**D.     Purpose of Evidence Sought and Requested Date of Receipt of Response**

The requested documents and evidence will be used by the parties in support of their claims or defenses.  Specifically, the requested evidence will be used by the plaintiffs at trial in support of allegations described in paragraphs 98–106 of Plaintiffs' Amended Crossclaims,

attached as Exhibit A to this Revised Letter of Request. The Court accordingly respectfully requests a prompt response to this Amended Letter of Request.

## I.     HAGUE CONVENTION REQUIREMENTS

This Court requests the assistance more specifically described herein as necessary in the interests of justice. In conformity with Article 3 of the Hague Convention, the undersigned applicant has the honor to submit the following request:

### A.     Requesting Judicial Authority

The Honorable Alison J. Nathan
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007, USA

### B.     Central Authority of the Requested State

The Senior Master
For the attention of the Foreign Process Section
Room E16
Royal Courts of Justice
Strand
LONDON WC2A 2LL, United Kingdom

### C.     Name of the Case and Identifying Number

All documents and materials requested will be used in relation to the above-captioned civil lawsuit, which can be identified by the following information:

Case Name: *City of Almaty, Kazakhstan, et al. v. Mukhtar Ablyazov, et al.*
Court: United States Federal District Court for the Southern District of New York
Case Number: 15-cv-05345 (AJN)

### D.     Names and Addresses of the Parties and their Representatives

1.     Plaintiffs

3

The City of Almaty, Kazakhstan ("Almaty") and BTA Bank JSC ("BTA") are, respectively, a political subdivision and a citizen of the Republic of Kazakhstan.

2.    Plaintiffs' Representative

Matthew L. Schwartz
Boies Schiller Flexner LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: mlschwartz@bsfllp.com

3.    Defendants

Defendant Mukhtar Ablyazov is a national of the Republic of Kazakhstan, currently domiciled in Paris, France. Defendant Ilyas Khrapunov is a national of the Republic of Kazakhstan, currently domiciled in Geneva, Switzerland.  Defendant Viktor Khrapunov is a national of the Republic of Kazakhstan, currently domiciled in Geneva, Switzerland.  Defendant Triadou SPV S.A. is a company established under the laws of Luxembourg, with its registered address at 60 Grand-Rue, L-1660 Luxembourg.

4.    Defendants' Representatives

Mukhtar Ablyazov
Jonathan D. Cogan
Kobre & Kim LLP
800 Third Avenue, 6th Floor
New York, New York  10022
Telephone: (212) 488-1200
Facsimile:  (212) 488-1220
Email: jonathan.cogan@kobrekim.com

Ilyas and Viktor Khrapunov
John J. Kenney
Hoguet Newman & Kenney, LLP
10 East 40th Street.
New York, New York 10016
Telephone: (222) 689-8808
Facsimile:  (212) 689-5101
Email: jkenney@hnrklaw.com

Triadou SPV S.A.
Deborah A. Skakel
Blank Rome LLP
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 885-5000
Facsimile:  (212) 885-5001

Email: dskakel@blankrome.com

### E.     Nature of the Proceedings and Summary of the Case and Relevant Facts

The above-captioned case is a civil lawsuit brought by Plaintiffs seeking equitable relief and money damages for injuries resulting from alleged embezzlement and laundering of funds belonging to Plaintiffs, and for enforcement of a foreign judgment under New York law.  *See* Exhibit A, Plaintiffs' Amended Crossclaims. Defendant Mukhtar Ablyazov is the former chairman of BTA Bank.  Defendant Viktor Khrapunov is the former mayor of the City of Almaty.  Defendant Ilyas Khrapunov is Viktor Khrapunov's son and Mukhtar Ablyazov's son-in-law.  Defendant Triadou SPV S.A. ("Triadou") is an entity established in Luxembourg and allegedly controlled by Ilyas Khrapunov to invest funds stolen by Mukhtar Ablyazov and Viktor Khrapunov.

Plaintiffs contend that Ablyazov and the Khrapunovs stole billions of dollars in Kazakhstan by abuse of their offices; Ablyazov through embezzlement from BTA Bank (*see* Ex. A, at ¶ 28-44), and Viktor Khrapunov through the corruption of his office as Mayor of Almaty. *See* Ex. A, at ¶ 45-61. They are alleged to have then laundered some of the proceeds of their crimes into the United States through a special purpose vehicle, Defendant Triadou SPV S.A. *See* Ex. A, at ¶ 77-97. Once those assets were discovered, the Defendants are alleged to have entered into transactions in the United States that caused further and distinct injuries to the Plaintiffs, including allegedly engaging in fraudulent conveyances that diminished the value of those assets.

The courts of the United Kingdom have already awarded BTA Bank billions of dollars in judgments against Ablyazov and his associates for their theft from BTA,[1] and this Court has granted attachment of Triadou's assets in the State of New York. Ablyazov is also currently the subject of freezing and receivership orders issued by the Courts of the United Kingdom. *See* Freezing Order as to Mukhtar Ablyazov, dated 23 November, 2012 and updated March 24, 2014, issued in *JSC BTA Bank v. Ablyazov*, EWHC (QB) 2009 Folio 1099.

As specifically relevant to this request, Plaintiffs contend that the Khrapunov and Ablyazov families used the services of a U.K. national, Eesh Aggarwal ("Aggarwal") to move and launder stolen funds through the Federal Bank of the Middle East ("FBME").[2] *See* Ex. A, at ¶ 99. Aggarwal is located in the U.K, and conducts business through at least six companies: Eesh Aggarwal, Limited; Azure Consultants, Limited; Appleby Windsor, Limited; Sterling Tax Advisers, Limited; Offshore Direct, LLP; and the Society of Offshore Corporate and Trust Administrators. Either Aggarwal or his spouse are directors or owners of each of these companies.

Plaintiffs contend that Aggarwal utilized connections at FBME that allowed him to execute millions of dollars in suspicious transfers on behalf of the Ablyazov and Khrapunov families. Specifically, Plaintiffs allege that Aggarwal was responsible for transferring not less

---

[1] *See JSC BTA Bank v. Ablyazov et al.*, 201 EWHC 510 (comm); *JSC BTA Bank v. Ablyazov*, 2013 EWHC 3691 (ch); *JSC BTA Bank v. Ablyazov* [2015] UKSC 64; *JSC BTA Bank v. Ablyazov and Khrapunov*, 2016 EWHC 289 (comm).

[2] FBME is headquartered in both Tanzania and Cyprus, but until recently, conducted the majority of its operations in Cyprus. In 2014 FBME was designated a "foreign financial institution of primary money laundering concern" and effectively banned from the legitimate international financial system by the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of the Treasury, a decision subsequently described by FBME as a "death sentence." The Central Banks of Cyprus and Tanzania have frozen all assets transfers to or from FBME and taken control of the bank pending completion of an investigation into its operations. *See* Ex. A, at ¶ 107-110.

than $70 million from accounts at FBME in the name of "Telford International Limited" to escrow accounts in the United States on behalf of Triadou. *See* Ex. A, at ¶ 100. In granting attachment of Triadou SPV S.A.'s assets, this Court preliminarily found that these funds transferred from Telford International Limited were traceable to Defendant Ablyazov. The requested evidence will be used at trial in support of these allegations as described in paragraphs 98–106 of the Amended Crossclaims.

On April 24, 2017, this Court issued an initial Letter of Request under the Hague Convention to the Senior Master of the Royal Courts of Justice of the United Kingdom. On May 23, 2017, this Court received a responsive letter from Senior Master B.J. Fontaine of the Queen's Bench Division, stating that the initial Request could not be executed under Section 2.4 of the Evidence (Proceedings in Other Jurisdictions) Act 1975, and detailing the requirements for this Amended Request.

Plaintiffs and Defendants currently are engaged in discovery, where the parties exchange information concerning their claims and defenses. The Court accordingly has not finally addressed the merits of Plaintiffs' allegations. Plaintiffs contend that the information sought by this request is in the custody and control of the Senior Master of the Royal Courts of Justice of the United Kingdom. This Court respectfully requests that the United Kingdom act on this amended request expeditiously.

## F.     Evidence to Be Obtained

Based on the foregoing, this Court respectfully requests that the Senior Master of the Royal Courts of Justice of the United Kingdom provide assistance to obtain the following documents and testimony in response to this Revised Letter of Request that are in the possession or control of the Senior Master of the Royal Courts of Justice, or that may be lawfully obtained

by any other department, division, or office of the government of the United Kingdom (collectively, the "U.K. Government"), that relate to Plaintiffs' allegations against Defendants:

1. A deposition of Eesh Aggerwal in the United Kingdom on the topics of

- Financial services he provided, directly or indirectly, to the Ablyazov and Khrapunov families whether or not on behalf of Telford International Limited;

- The nature of his relationship with the Ablyazov and Khrapunov families;

- Documents, witness statements, and testimony he provided to the High Court of Justice in the matter of *JSC BTA Bank v. Mukhtar Ablyazov*, et al., Claim no. 2009 Folio 1099, in the High Court of Justice, Queen's Bench Division Commercial Court;

- Eesh Aggarwal may be served at Suite 319-3, 32 Threadneedle Street, London, EC2R 8AY, sometimes listed as Suite 319-3, 1 Royal Exchange Avenue, London, EC2R 8AY

2. Account records from January 1, 2011, to the present for the following accounts at ING Bank N.V., located in London, England:

- Account Number 20417496, identified as belonging to Claremont Holdings Limited;

- Account Number 20426691, identified as belonging to Sartfield Limited.

3. Documents submitted by Eesh Aggarwal to the High Court of Justice in the matter of *JSC BTA Bank* v. *Mukhtar Ablyazov,* et al., Claim no. 2009 Folio 1099, in the High Court of Justice, Queen's Bench Division, Commercial Court. These documents, which include a witness statement and statement of facts by Eesh Aggarwal, were submitted by Mr. Aggarwal confidentially and subject to undertakings and related to BTA's claims in that case, which are based on the same underlying wrongs as those alleged by BTA Bank here. Those allegations include Eesh Aggarwal's facilitation of the money laundering efforts of defendant Mukhtar Ablyazov, with help from the Khrapunov defendants, including through the Telford entities. These documents generally include:

8

- Communications between Eesh Aggarwal and Ilyas Khrapunov from the period January 1, 2012, to the present.
- Financial models, payments, memoranda, and documents regarding sources of funds and investment proceeds to and from Telford for the period January 1, 2012, to the present.
- Lists or charts of entities incorporated or operated by Eesh Aggarwal for the defendants for the period January 1, 2012, to the present.
- Account statements and records for bank accounts held by FBME Bank including the following accounts:
  - Telford International, Account Number CY4511501001402320USDCACC001
  - Northern Seas Waterage, Account Number CY9711501001400677USDCACC001

## II.  OTHER REQUIREMENTS

### A.  Fees and Costs

Plaintiffs are responsible for reasonable copy costs and charges associated with the processing and handling of this request by the Senior Master of the Royal Courts of Justice.

### B.  Reciprocity

This Court expresses its sincere willingness to provide similar assistance to the courts of the United Kingdom, if future circumstances so require.

## III.  CONCLUSION

This Court, in the spirit of comity and reciprocity, hereby requests international judicial assistance in the form of this Amended Letter of Request seeking information, documents, testimony, and things described herein, from the Senior Master of the Royal Courts of Justice. This Court extends to all judicial and other authorities of the United Kingdom the assurances of its highest consideration.

Date: _____          _____
                                The Honorable Alison J. Nathan
                                United States District Court for the
                                Southern District of New York
                                Thurgood Marshall United States Courthouse
                                500 Pearl Street, Room 1620
                                New York, New York 10007-1312

                                SEAL OF THE UNITED STATES DISTRICT
                                COURT FOR THE SOUTHERN DISTRICT OF
                                NEW YORK

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBERS LLC and THE CHETRIT GROUP, LLC, | ) ) ) Case No. 15-cv-05345-AJN ) |
| Interpleader Plaintiffs, | ) ) ) |
| -against- | ) **AMENDED CROSSCLAIMS** ) |
| TRIADOU SPV S.A., CITY OF ALMATY, a foreign city, and BTA Bank, | ) ) ) ) |
| Interpleader Defendants. | ) ) ) |
| CITY OF ALMATY, KAZAKHSTAN and BTA BANK, | ) ) ) ) |
| Crossclaim Plaintiffs, | ) ) ) |
| -against- | ) ) ) |
| MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, TRIADOU SPV S.A., AND FBME BANK LTD., | ) ) ) ) ) ) |
| Crossclaim Defendants. | ) |

# **Table of Contents**

INTRODUCTION ................................................................................................. 1

THE PARTIES .................................................................................................... 5

JURISDICTION AND VENUE ............................................................................ 6

FACTUAL BACKGROUND ............................................................................... 8

    *Mukhtar Ablyazov Defrauded BTA Bank of in Excess of $6 billion.* ................................. 8

    *Viktor Khrapunov Defrauded the City of Almaty of Approximately $300 million.* .......... 13

    *The Khrapunovs and Ablyazov Join Together to Launder Their Stolen Money.* ............... 15

    *The Ablyazov-Khrapunov Group Conspires to Transfer and Hide Illicit Funds in the
United States.* ................................................................................................ 21

    *Through SDG, the Ablyazov-Khrapunov Group Creates Triadou to Hide their Illicit
Funds in New York Real Estate Transactions with the Chetrit Group.* ........................... 22

    *Kazakh Authorities Target the Ablyazov-Khrapunov Group's Holdings in the United
States, and the Ablyazov-Khrapunov Group Liquidates Those Assets at Below-
Market Value with the Chetrit Group's Assistance.* ...................................................... 30

FIRST CAUSE OF ACTION ............................................................................. 33

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

SECOND CAUSE OF ACTION ......................................................................... 38

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

THIRD CAUSE OF ACTION ............................................................................. 40

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)) Against All Defendants*

FOURTH CAUSE OF ACTION ......................................................................... 41

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

FIFTH CAUSE OF ACTION .............................................................................. 42

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)) Against All Defendants*

SIXTH CAUSE OF ACTION ............................................................................. 43

    *(ACTUAL FRAUDULENT TRANSFER) Against Defendants Triadou, Ablyazov, Viktor
Khrapunov and Ilyas Khrapunov*

SEVENTH CAUSE OF ACTION ....................................................................... 44

    *(CONSTRUCTIVE FRAUDULENT TRANSFER) Against Defendants Triadou, Ablyazov,
Viktor Khrapunov and Ilyas Khrapunov*

EIGHTH CAUSE OF ACTION .......................................................................... 45

    *(UNJUST ENRICHMENT) Against Defendants Triadou, Ablyazov, Viktor Khrapunov
and Ilyas Khrapunov*

NINTH CAUSE OF ACTION .................................................................................. 46

    *(CONVERSION) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

TENTH CAUSE OF ACTION ................................................................................. 46

    *(CONSTRUCTIVE TRUST) Against All Defendants*

ELEVENTH CAUSE OF ACTION ......................................................................... 47

    *(PURSUANT TO CPLR § 5239 FOR FRAUD AND CONVERSION) Against All Defendants*

TWELFTH CAUSE OF ACTION ........................................................................... 48

    *(PURSUANT TO CPLR § 5303 FOR RECOGNITION AND ENFORCEMENT OF A FOREIGN JUDGMENT UNDER NEW YORK LAW) Against Defendant Ablyazov*

THIRTEENTH CAUSE OF ACTION .................................................................... 49

    *(AIDING AND ABETTING) Against Defendant FBME*

DEMAND FOR JURY TRIAL ............................................................................... 50

DEMAND FOR RELIEF ......................................................................................... 50

Crossclaim Plaintiffs City of Almaty ("Almaty") and BTA Bank ("BTA" or "BTA Bank," and together with Almaty, the "Kazakhstan Plaintiffs"), by and through their undersigned counsel, for the Kazakhstan Plaintiffs' crossclaims against Defendants Triadou SPV S.A., Viktor Khrapunov, Mukhtar Ablyazov, Ilyas Khrapunov, and FBME Bank Ltd. (collectively the "Ablyazov-Khrapunov Group") allege as follows:

## INTRODUCTION

1.        Joseph Chetrit ("Chetrit") is a well-known New York based real estate developer, who, along with crossclaim defendants Mukhtar Ablyazov ("Ablyazov"), Victor Khrapunov, Ilyas Khrapunov and others known and unknown, combined, conspired, and confederated in the commission of an international scheme to launder and conceal at least $40 million stolen from the Kazakhstan Plaintiffs.  Chetrit conspired with these international criminals by, among other things, partnering with Triadou SPV S.A. ("Triadou"), a nominee entity owned, controlled, and funded by the Ablyazov-Khrapunov Group, for the purposes of converting the stolen funds into valuable New York City real estate.

2.        BTA, a bank based in Almaty, Kazakhstan, seeks to regain assets looted by its former Chairman, Mukhtar Ablyazov, who abused his position to enrich himself and treat BTA as his personal property.  BTA has commenced and successfully obtained judgments in proceedings against Ablyazov in the courts of the United Kingdom for defrauding BTA Bank of no less than $4 billion.

3.        Almaty, the largest city in the Republic of Kazakhstan, seeks to regain assets looted by its former mayor, Victor Khrapunov ("Khrapunov"), and his family and co-conspirators, to be returned for the benefit of the people of Almaty.  Khrapunov abused and corrupted his position as the mayor of Almaty for the purposes of embezzlement, fraudulent self-

1

dealing, and blatant looting of public assets. He reaped an estimated $300 million or more through various fraudulent activities, including rigged auctions, the improper sale of public property to friends and co-conspirators, and fraudulent abuse of eminent domain powers, before fleeing Kazakhstan and secreting these stolen funds across the globe.

4. The Khrapunovs and Ablyazov, both fighting law enforcement investigations and asset seizures by Kazakh authorities, joined forces and commingled their stolen funds. Through joint investments across the globe, the two renegade families combined and conspired to launder their illicit wealth into real estate, energy assets, and other investments in locales they deemed safe from seizure. Ilyas Khrapunov, related by marriage to Ablyazov, helped orchestrate these efforts and steered the families' joint investments into assets within this Court's jurisdiction.

5. The Ablyazov-Khrapunov Group's money laundering schemes relied heavily on the cooperation of officers within FBME Bank, Ltd ("FBME"), a Tanzanian-incorporated financial institution operating primarily out of the Republic of Cyprus. Until 2014, FBME had long been known as a financial institution open for business to money launderers and international criminals. FBME joined the Ablyazov-Khrapunov Group's money laundering conspiracy by knowingly aiding the Ablyazov-Khrapunov Group's members in hiding and laundering funds and evading asset freezes and investigations. In 2014, FBME was designated a "foreign financial institution of primary money laundering concern" and effectively banned from the legitimate international financial system by the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of the Treasury, a decision subsequently described by FBME as a "death sentence."

6. Collectively, the Ablyazov-Khrapunov Group has been the subject of numerous proceedings and investigations across the globe, arising from their theft of billions of dollars from

2

entities and municipalities in the Republic of Kazakhstan. They have sought to hide their stolen wealth from investigators and law enforcement through a vast network of shell corporations and outwardly-legitimate investments, including major New York real estate developments such as the Flatotel and Cabrini Medical Center condominium conversions. Through these investments, the Chetrit Group allied itself with the Ablyazov-Khrapunov Group and their global money laundering endeavor.

7.     The Ablyazov-Khrapunov Group laundered their ill-gotten assets through a number of shell corporations, including Triadou. With the help of Chetrit and the Chetrit Group, the Ablyazov-Khrapunov Group parked these corrupt assets in New York City real estate, hoping to avoid the scrutiny of escalating international investigations into the Ablyazov-Khrapunov Group's illicit activities.

8.     Due to heavy scrutiny by international law enforcement, including criminal investigations by the Kazakh and Swiss authorities, the funds that the Ablyazov-Khrapunov Group, through Triadou, invested into the Flatotel and Cabrini Medical Center projects could not pass through legitimate banking channels. The Crossclaim Defendants devised a plan to circumvent legitimate banks and transfer funds directly from the Ablyazov-Khrapunov Group's offshore accounts with FBME to the escrow account of the Chetrit Group's long-time attorneys.

9.     In return for facilitating the Ablyazov-Khrapunov Group's money laundering scheme, the Chetrit Group got access to the stolen funds to fund its real estate projects, and entered into deals that entitled the Chetrit Group to a disproportionate share of the projects' profits.

10.     Due to concern that he was partnering with reputed international criminals, however, Chetrit conducted his communications with the Ablyazov-Khrapunov Group by using

code names.  For example, Chetrit used code names such as "Jose" and "Pedro" to refer to and communicate with crossclaim defendant Ilyas Khrapunov.  It was only in face-to-face meetings, many of which were secretly recorded, that Ablyazov's involvement, legal difficulties and incarceration were openly discussed.

11.     Ultimately, Almaty and BTA Bank were able to trace the stolen assets to the United States.  Rather than let Almaty and BTA reclaim their rightful property, the Ablyazov-Khrapunov Group, through Triadou, began to urgently liquidate their real estate holdings, hoping to spirit their illicit funds to more permissive locales.  In an attempt to monetize the Ablyazov-Khrapunov Group's real estate interests as quickly as possible, Triadou entered into a fraudulent, below-market assignment with the Chetrit Group for Triadou's principal New York assets, interests in the Flatotel and Cabrini Medical Center real estate developments.

12.     Specifically, in May 2014, the City of Almaty filed an action in federal court in California against members of the Ablyazov-Khrapunov Group.  With the Kazakhstan Plaintiffs' collection efforts having expanded to the United States, and with the Ablyazov-Khrapunov Group in imminent danger of having its stolen assets seized or attached, the Ablyazov-Khrapunov Group, through Triadou, took immediate steps to liquidate its U.S. assets and move its money offshore again. The Chetrit Group's assistance was essential to placing the stolen assets out of the reach of the Kazakhstan authorities.

13.     Upon information and belief, Chetrit seized on this opportunity to double cross his co-conspirators.  Understanding that the potential asset seizures or restraints put the Ablyazov-Khrapunov Group in a desperate situation, he devised scheme to acquire Triadou's investments for a fraction of their value.  To achieve this result, Chetrit bribed Triadou's Director to drive down the purchase price of the assignment.  The Chetrit Group ultimately succeeded in acquiring

Triadou's interest in both the Flatotel and Cabrini properties for as little as $26,000,000.00 — far less than even what Triadou had originally invested — at a time when real estate values in New York were at an all-time high.

14.     Almaty and BTA Bank now seek, among other relief, to unwind and recover the proceeds of these fraudulent transactions.  Doing so will hold  the Crossclaim Defendants liable for their corruption and fraud, and  return the full value of Triadou's New York assets to their rightful owners: BTA Bank and the City of Almaty.

## THE PARTIES

15.     Crossclaim plaintiff Almaty is a legal subdivision of the Republic of Kazakhstan. Almaty is the former capital of the country, and continues to be the largest city in the Republic of Kazakhstan, with more than 1.5 million residents.

16.     Crossclaim plaintiff BTA Bank is a Joint Stock Company and Kazakhstan bank with its headquarters in Almaty, Kazakhstan.  Until in or about September 2014, BTA Bank was majority owner and controlled by the Republic of Kazakhstan.

17.     Crossclaim defendant Triadou SPV S.A. is a special purpose  investment vehicle incorporated under the laws of Luxembourg, with a principal place of business at  3, Rue du Mont-Blanc, 1201 Geneva, Switzerland.  Triadou SPV S.A. is wholly-owned by SDG Capital S.A.

18.     Crossclaim defendant Viktor Khrapunov, an individual, is the former  Mayor of the City of Almaty, who, upon information and belief, currently resides in the  city of Geneva, Switzerland.

19.     Crossclaim defendant Mukhtar Ablyazov, an individual, is the former Chairman of BTA Bank and has been found liable for defrauding BTA of in excess of $6 billion.  Ablyazov

5

was the subject of eleven proceedings commenced by BTA Bank in the United Kingdom to recover assets Ablyazov stole. During those proceedings, Ablyazov was found by multiple international courts to have lied, misled, misconstrued, and concealed assets in blatant disregard of Court orders, and was ordered imprisoned for 22 months. During these proceedings, Ablyazov fled the United Kingdom to avoid the many judgments against him. He is currently incarcerated in France pending extradition to Russia or Ukraine.

20. Crossclaim defendant Ilyas Khrapunov, an individual, is the son of Viktor Khrapunov, as well as the former president of SDG Capital S.A., who, upon information and belief, currently resides in the city of Geneva, Switzerland. Ilyas Khrapunov is married to Ablyazov's daughter, Madina.

21. Crossclaim defendant FBME Bank Ltd. is a financial institution headquartered in Dar es Salaam, Tanzania and operating primarily out of Cyprus. FBME is jointly owned by Ayoub-Farid Saab and Fady Saab, but is currently controlled and administered by representatives of the Central Bank of Cyprus.

## JURISDICTION AND VENUE

22. The Crossclaims are brought under Rule 13 of the Federal Rules of Civil Procedure. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) over the claims for relief alleging violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq. and for conspiracy to violate RICO. This Court has supplemental jurisdiction over the sixth through thirteenth claims for relief pursuant to 28 U.S.C. § 1367, as those claims are substantially related to Almaty's and BTA Bank's claims under RICO and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

23.     Alternatively, this Court has supplemental jurisdiction over Almaty's and BTA Bank's claims under 28 U.S.C. § 1367, as those claims are substantially related to the original interpleader suit brought by Chetrit and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

24.     Alternatively, the City of Almaty is a "foreign state" as that term is defined in 28 U.S.C. § 1603, and this Court has jurisdiction over Almaty's and BTA Bank's claims under 28 U.S.C. §§ 1330, 1441(d), which provide for the removal of any civil action brought in a State court against a foreign state.

25.     Alternatively, this Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because at the time this action was filed (i) there was complete diversity of citizenship between the parties, and (ii) more than $75,000, exclusive of interest and costs, is at stake.

26.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Almaty's and BTA Bank's claims occurred in this District, including, among other things, the negotiation, investment and subsequent transfer of interest in the Flatotel and Cabrini Medical Center properties located in New York, New York.

27.     This Court has personal jurisdiction over Triadou, Ablyazov, Viktor Khrapunov, Ilyas Khrapunov, and FBME because each of them knowingly committed acts in New York that form the basis of this action, directed or conspired with others to commit acts in New York, and/or purposely availed themselves of the privileges of doing business in New York, as fully set forth herein.

## FACTUAL BACKGROUND

### *Mukhtar Ablyazov Defrauded BTA Bank of in Excess of $6 billion.*

28.    Ablyazov was the Chairman of BTA Bank from May 2005 until February 2009.
He is the father-in-law of crossclaim defendant Ilyas Khrapunov, who is married to Ablyazov's
daughter, Madina.  Along with crossclaim defendant Viktor Khrapunov, Ablyazov is a central
member of the Ablyazov-Khrapunov Group money laundering and embezzlement conspiracy.

29.    As the Courts of the United Kingdom have found, while Chairman of BTA Bank,
Ablyazov exercised virtually unfettered control over the bank's operations while hiding that
control from Kazakhstan's banking regulators, and used this influence to treat BTA's assets as his
own. As Justice Teare of the High Court of England and Wales (Commercial Court) found:

> [P]rior to the nationalisation of the Bank in February 2009, Mr. Ablyazov admitted
> to owning over 75% of the shares in the Bank. Those shares were not held by Mr.
> Ablyazov personally but by nine companies on his behalf. However, Mr. Ablyazov
> did not admit that ownership to the AFN, the banking regulator in Kazakhstan. In
> January 2009, shortly before the nationalisation of the Bank, the AFN requested
> Mr. Ablyazov to state whether he owned more than 10% of the shares in the Bank.
> He replied on 19 January 2009 that he did not own directly or indirectly more than
> 10% of the shares in the Bank. That statement was untrue.
>
> . . .
>
> Banks in Kazakhstan tend to be operated in a different manner from that in which
> they are typically operated in the West. It is common for banks to be owned by a
> single shareholder who is both chairman of the board of directors and also closely
> involved in the management of the bank. He therefore has considerable influence
> over the operation of the bank. Mr. Ablyazov's relationship with the Bank
> conformed with this general description of Kazakh banking practice. Thus Mr.
> Talvitie, the independent member of the Board of Directors of the Bank from East
> Capital, gave evidence that it seemed to him that at board meetings Mr. Ablyazov
> had already made the decisions. He described the other members of the board as
> "straw men". Others in the Bank, below board level, had the same impression.
> Thus Ms. Tleukulova (a member of the Credit Committee) gave evidence in
> Russia in 2012 that "all top managers of the bank, including Board Members, have
> to obey him". Mr. Khazhaev also gave evidence in Russia in 2012 that Mr.
> Ablyazov was "the main" person in the Bank who controlled the granting of the
> largest and most important loans. Mr. Ablyazov's control of the Bank is illustrated
> by his issue of an order ("the Ablyazov Order") whereby he, as Chairman,
> amended certain procedural rules governing the grant of loans.

. . .

[O]fficers and staff in the Bank did not draw a clear distinction between the Bank having an interest in a project and Mr. Ablyazov, as shareholder in the Bank, having a personal interest in a project. Thus [Deputy Chairman] Zharimbetov, when being crossexamined, failed to draw a clear distinction, in the context of the offshore companies with which he dealt, between Mr. Ablyazov and the Bank. Thus the unfortunate reality appears to have been that little, if any, distinction was drawn by personnel in the Bank between the Bank's property and Mr. Ablyazov's property. The Vitino port project was an example of that reality. Mr. Khazhaev told a Russian court in 2012 that Mr. Ablyazov treated the Bank as his property.

30.     Ablyazov's abuse of his position as chairman took many forms, principally through enormous loans to valueless entities owned by Ablyazov, which would then be obscured by transfers among different shell corporations, and never repaid.

31.     For example, in one series of loans (referred to as the "Original Loans" by the UK court in the "Granton Action"), between March 2006 and August 2008, Ablyazov directed twenty loans totaling $1,428,840,000 to entities with minimal assets and for no apparent reason.  These loans were made to entities outwardly unaffiliated with Ablyazov ("Original Borrowers"), but were actually transferred to entities controlled by Ablyazov ("Original Real Borrowers").  As the UK court found:

Mr. Ablyazov did not disclose to the Board that he owned or controlled those [Original] Borrowers. He has never claimed that he did so and there is no evidence that he did. None of the represented Defendants has suggested that he did. In those circumstances there can be only one explanation for the fact that the very large sums of money which were advanced were immediately transferred to companies owned or controlled by Mr. Ablyazov, namely, that the Original Loans were part of a dishonest scheme whereby Mr. Ablyazov sought to misappropriate monies which belonged to the Bank. The scheme was fraudulent because Mr. Ablyazov did not disclose to the Board his interest in the Original Borrowers or that the real purpose of the loans was to pay out the Bank's money to the Original Real Borrowers who were to use the monies for Mr. Ablyazov's purposes. The purpose of such nondisclosure must have been to deceive the Board so that it remained in ignorance of the "related party" nature of the Original Loans and of their true purpose.

32.     When, in or about 2008, Ablyazov's involvement in the Original Loans was in

danger of discovery, he directed that additional fraudulent loans be made in an attempt to cover up his earlier fraud.

33.    Between November 4, 2008, and December 4, 2008 a number of loans (the "Later Loans") totaling $1,031,263,000 were made, ostensibly for the purchase of oil and gas resources. The UK court, however, found it "beyond argument" that these loans of BTA funds were made only to hide Ablyazov's earlier theft:

> The Later Loans were made between 5 November and 8 December 2012 but they were paid out, not to the Later Borrowers, but to Intermediaries who paid them on to other companies, the Recipients, who in turn paid them to the Bank in apparent discharge of the Original Loans. They were not used for the purchase of oil and gas equipment. Documents said to support and evidence the Later Loans were created after the monies had been paid out by the Bank but backdated. Thus contracts for the purchase of oil and gas equipment supposedly by the Later Borrowers were still being prepared in late November 2008 and backdated to 23 October 2008.
>
>    . . .
>
> Expert evidence as to the oil and gas industry was adduced by the Bank to establish that the oil and gas contracts were shams because of the lack of specific provisions which would be appropriate for contracts of their size. But such evidence was unnecessary. The email evidence shows that the contracts were prepared by persons within the Bank.
>
>    . . .
>
> It is beyond argument that the Later Loans were a mere cloak which sought to hide from view the reality, which was that money was being extracted from the Bank for the purpose of paying back the Original Loans. Since this circular exercise benefitted Mr. Ablyazov (because he owned or controlled the Original Borrowers) it is also clear that he must have orchestrated or, at the least, authorised this fraud.

34.    As a result of Ablyazov's siphoning billions out of the company, in 2009, BTA Bank defaulted on billions of dollars of debt held by investors including Credit Suisse Group AG, HSBC Holdings Plc, JPMorgan Chase & Co. and Royal Bank of Scotland Group Plc. Kazakhstan's sovereign wealth fund, Samruk-Kazyna, was forced to take control of BTA Bank, and Ablyazov fled to London.

35.     BTA then commenced the first in a series of lawsuits against Ablyazov, claiming that he had misappropriated approximately $295,000,000 pursuant to this fraudulent scheme. Other proceedings followed against Ablyazov in the Chancery Division and England High Court. In every proceeding, BTA alleged (and ultimately proved) that Ablyazov treated BTA as his own private source of funds.  In all, BTA commenced eleven proceedings against Ablyazov and his lieutenants for defrauding BTA in excess of $6 billion.  The UK courts took the unprecedented legal step of granting BTA a Worldwide Freezing Order over Ablyazov's assets.

36.     As part of these UK proceedings, in late 2010 BTA obtained a number of search and disclosure orders that uncovered a vast network of undisclosed companies and assets used by Ablyazov to hold and invest his stolen wealth.  The UK courts ordered Ablyazov's assets to be put in the receivership of the accounting firm KPMG (the "Receivership Order"), finding that Ablyazov had breached various disclosure and freezing orders against him.  The Receivership Order gave the receiver the right to recover a network of many hundreds of entities, worth billions of dollars.

37.     On January 26, 2011, a further 212 companies were added to the scope of the Receivership Order and on April 8, 2011, a further 3,890 companies were added.

38.     After Ablyazov defied the Receivership Order entered by the UK courts, BTA obtained judgments and sanctions against him for, among other acts, flaunting court orders, fleeing and hiding from judicial proceedings, lying during proceedings, and refusing to comply with orders directing him to uncover assets.  For his numerous actions in contempt of court, Ablyazov was sentenced to 22 months imprisonment for his conduct.

39.     On February 16, 2012, despite having promised the court his attendance at his contempt hearing, Ablyazov did not appear.  Ablyazov left behind a 100-acre estate in the English

countryside and a London mansion, valued at least 20 million pounds sterling (approximately $31 million) each, and no fewer than 750 shell companies used to invest his stolen funds in oil production, property development, and agriculture.

40.     On November 6, 2012, the Court of Appeal unanimously upheld the judgments and contempt orders against Ablyazov.  Concurring in the judgment, Lord Justice Maurice Kay stated that it was "difficult to imagine a party to commercial litigation who has acted with more cynicism, opportunism and deviousness towards court orders than Mr. Ablyazov."

41.     Following Ablyazov's flight from justice, BTA has been granted judgments in 5 of the 11 claims against Ablyazov and his associates, with others still pending, and has been awarded over $4 billion in damages by the UK courts, with interest continuing to accrue. (the "Ablyazov Judgments").

42.     After a global search spearheaded by BTA Bank, French special forces found and arrested Ablyazov in a luxury villa in France on July 31, 2013.  He remains detained in a French prison pending extradition, and the courts of France have refused to release him on bail three times.

43.     Following Ablyazov's capture and imprisonment, through his counsel and other channels, Ablyazov remained in regular communication with his son-in-law, Ilyas Khrapunov, who assumed operational control of much of Ablyazov's money laundering operations and, in concert with Ablyazov and Viktor Khrapunov, has continued the Ablyazov-Khrapunov Group's combined efforts to hide their wealth.

44.     Ilyas Khrapunov's continuing role in facilitating the Ablyazov-Khrapunov Group's money laundering efforts was confirmed on July 17, 2015, when Justice Males of the Commercial Division of the Queen's Bench of the U.K. High Court of Justice expanded the

freezing order against Ablyazov to encompass specified assets of Ilyas Khrapunov. In response to the disclosure obligations imposed by the freezing order, Ilyas Khrapunov invoked his privilege against self-incrimination.

### *Viktor Khrapunov Defrauded the City of Almaty of Approximately $300 million.*

45.     In 1991, the Republic of Kazakhstan declared its independence from the former Soviet Union and began the process of transitioning from communism to an open market economy. This transition required substantial privatization of vast state assets in order to restart the nation's economy and raise revenue for improvements to the nation's infrastructure and public services.

46.     Viktor Khrapunov became mayor of the City of Almaty on or about June 16, 1997, and remained in that position until approximately December 2004. At the time Viktor Khrapunov took office, the Republic of Kazakhstan was experiencing the beginning of a natural resources boom and accompanying drive for investment, infrastructure upgrades, and new construction. Almaty was the nation's former capital and largest city, and held enormous public assets remaining to be privatized and developed, a responsibility which the office of the mayor oversaw and directed.

47.     Before Viktor Khrapunov assumed the office of the mayor of Almaty, he took an oath of office to obey the Constitution and laws of the Republic of Kazakhstan. Among other things, he expressly and impliedly promised that he would uphold his fiduciary duties to the people of Almaty, would honor his obligation to provide honest services, and would not convert money, property, or assets belonging to the City of Almaty for his own use or that of his family, friends, or associates.

48.     In reality, Viktor Khrapunov, along with his son, Ilyas Khrapunov, and other

13

Khrapunov family members and co-conspirators, almost immediately began a multi-year scheme to enrich themselves through the corrupt abuse of Khrapunov's public position as mayor.

49.     Viktor Khrapunov repeatedly and systemically used the powers of the office of the mayor to transfer public assets belonging to the City of Almaty to his family and their co-conspirators for prices that were a fraction of their fair value.  This  was often achieved by arranging fraudulent auctions to ensure that interested bidders won  these assets at nominal prices.  In other instances, Viktor Khrapunov used the  eminent domain powers of the office of the mayor to seize private property ostensibly for  the City of Almaty, but then promptly transferred that property to entities owned or  controlled by the Khrapunovs.  They would then pass these assets through a series  of shell or holding corporations to conceal the destination of these assets, before reselling  them for prices an order of magnitude greater than what they had paid the City of  Almaty.

50.     Three examples of these corrupt schemes to subvert and acquire the public property of the City of Almaty follow:

*Transaction One*

51.     In or about 2000, Viktor Khrapunov used his position as mayor of Almaty  to transfer a large tract of state-owned land near the two rivers area of Almaty to his  spouse and co-conspirator, Leila Khrapunov, for a total price of approximately $121,000.  The final recipient of this transfer was concealed through a series of fraudulent transactions and front  companies controlled by the Khrapunovs.  The Khrapunovs ultimately resold  this parcel of real estate for an estimated $15.57 million, a more than $15 million profit  on one interested transaction.

52.     In short, the Khrapunovs paid approximately $121,000 for a parcel of  public real estate which they later resold for a total of $15.57 million; a 128,000 percent  profit.

14

*Transaction Two*

53.　　On or about April 16, 2001, Viktor Khrapunov used his position as mayor to cause a public building in Almaty to be sold at a fixed and rigged public auction to KRI, a company owned by Leila Khrapunov, for approximately $347,000. The property was ultimately resold to an unrelated third party for approximately $4.1 million.

*Transaction Three*

54.　　In addition to the sale of state-owned assets to Leila Khrapunov and other family members and co-conspirators, Viktor Khrapunov also abused his authority as mayor to enrich the Khrapunovs by seizing privately-owned property and transferring it to the Khrapunovs and others for resale. For example, on or about August 25, 2003, Viktor Khrapunov caused the City of Almaty to seize land owned by privately-owned third party Shadid Engineering LLP. Approximately one month later, he caused the property to be sold to Leila Khrapunov's company, Karasha, for approximately $105,000. Leila Khrapunov then caused Karasha to sell the property directly to her, whereupon she transferred it to another company, BSC, and it was sold as part of BSC to an unrelated third party, in a transaction that valued the parcel at approximately $2 million. As a result, the Khrapunovs obtained nearly $1.9 million in unjustified profit.

55.　　In short, through similar transactions uncovered and still under investigation, the Khrapunovs are estimated to have illegally acquired at least 80 pieces of real estate, which they converted into approximately $300 million in illicit funds.

**The Khrapunovs and Ablyazov Join Together to Launder Their Stolen Money.**

56.　　Seeking to avoid law enforcement attention and possible seizure of this ill-gotten wealth, the Ablyazov-Khrapunov Group funneled their corrupt assets into real estate and development entities located in, among other places, the United States and Switzerland.

15

57.     Among other locations, the Ablyazov-Khrapunov Group transferred their stolen funds to Switzerland,  where Ilyas Khrapunov and Madina Ablyazov reside, using accounts and sham entities owned or ultimately  controlled by the Ablyazov-Khrapunov Group.  The Ablyazov-Khrapunov Group ultimately transferred to  Switzerland hundreds of millions of dollars, moved out of Kazakhstan by  Viktor Khrapunov and laundered through offshore holding companies to appear  legitimate.

58.     Seeking to hide the proceeds of their frauds, the Ablyazov-Khrapunov Group created a series of entities in Switzerland and overseas to launder these illicit funds into outwardly-legitimate investments.  One such entity was Swiss  Development Group, formally SDG Capital S.A., formed and controlled by Ilyas  Khrapunov for the benefit of the Ablyazov-Khrapunov Group.  Between 2008 and 2012, the  Ablyazov-Khrapunov Group and sham companies they controlled funneled at least $115 million  into SDG derived from the Ablyazov-Khrapunov Group's self-dealing and fraud.

59.     Through these foreign investment vehicles, the Ablyazov-Khrapunov Group sought  to obscure their wealth from law enforcement in the Republic of Kazakhstan and abroad, by maintaining the appearance of a modest family of civil servants.

60.     The Ablyazov-Khrapunov Group took numerous steps to maintain this facade and  conceal their looting of the City of Almaty's public assets from authorities.  Among other schemes,  Viktor Khrapunov regularly filed false annual tax returns with Kazakhstan's  taxation authority, the Tax Committee of the Ministry of Finance of Kazakhstan.  The false returns concealed millions of dollars in monies, properties, and assets the  Ablyazov-Khrapunov Group had acquired and laundered through their corrupt enterprise.

61.     For example, according to their 2007 tax returns, which required Viktor  and

Leila Khrapunov to list their entire net worth accumulated through all sources as of December 31, 2007, Viktor Khrapunov reported a combined net worth equivalent to $113,298, in addition to three vehicles, five modest pieces of real estate, and two parking stalls. While claiming to have a total net worth of less than $120,000, Viktor Khrapunov had in fact amassed a fortune estimated at no less than $300 million. Indeed, according to public news reports, in 2009 Viktor Khrapunov was one of the richest people in Switzerland with a fortune of over $300 million. Similarly, in 2012 Viktor Khrapunov was again listed among Switzerland's 300 richest people, with a fortune estimated at $324– $432 million.

### The Ablyazov-Khrapunov Group's Corruption is Exposed and Investigations Begin in Kazakhstan and Switzerland

62.     In late 2007, Viktor Khrapunov was tipped off that the Kazakh government had begun investigating the financial dealings of the Ablyazov-Khrapunov Group and their associates for a range of criminal acts and self-dealing. In anticipation of possible criminal charges, on or about November 9, 2007, Viktor and Leila Khrapunov boarded a private jet and fled Kazakhstan for Switzerland, where Ilyas Khrapunov and Madina Ablyazov resided, and the bulk of their looted funds were held.

63.     On or about May 27, 2011, the Investigation Department of the Agency for Economic and Corruption-Related Crimes of Kazakhstan (the "Investigation Department") filed two criminal cases against Viktor Khrapunov for abuse of power and fraudulent acts, and on or about July 21, 2011, obtained a court-ordered arrest warrant for Viktor Khrapunov. Through 2011 and 2012 additional charges were brought in Kazakhstan against Viktor, Leila, and Ilyas Khrapunov, arising from the theft of public property and the ultimate laundering of funds during Viktor Khrapunov's tenure as Mayor of Almaty.

64.     On or about February 20, 2012 and September 14, 2012, the Investigation

Department applied to the Federal Office of Justice in Switzerland for legal assistance in connection with the effort to prosecute Viktor, Leila, and Ilyas Khrapunov for crimes in Switzerland and Kazakhstan relating to their corrupt acts in Almaty and the laundering of the resulting funds. In response to this request, in mid-2012 the Public Prosecutor of Geneva opened an investigation into the Ablyazov-Khrapunov Group on suspicion of violating Swiss money laundering laws. The Public Prosecutor of Geneva subsequently seized financial and banking documents from the Ablyazov-Khrapunov Group and ordered Swiss accounts and assets belonging to them be frozen, including accounts held at Swiss banks Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co. This investigation by the Swiss authorities is ongoing, and in August 2013 the Public Prosecutor of Geneva froze additional assets belonging to the Ablyazov-Khrapunov Group.

65.     At this time, in addition to the numerous judgments against Ablyazov in the United Kingdom, there are no less than 24 criminal charges pending against Viktor Khrapunov in Kazakhstan for embezzlement, fraud, money laundering, establishing and directing an organized criminal group for criminal purposes, abuse of power, and bribery. There are additional charges pending against Leila Khrapunov and Ilyas Khrapunov in Kazakhstan for, among other offenses, money laundering and establishing and directing an organized criminal group for criminal purposes. Assets of the Ablyazov-Khrapunov Group remain frozen by Swiss authorities, and the Government of the Republic of Kazakhstan has formally requested extradition of Viktor Khrapunov.

66.     Despite the numerous investigations and freezing orders against the members of the Ablyazov-Khrapunov Group, the conspirators continue to launder their commingled stolen wealth through acts of fraud and in furtherance of the conspiracy.

67.     As one example, from 2011 through the present, members of the Ablyazov-
Khrapunov Group, including Ilyas Khrapunov and Ablyazov himself, conspired to fund
Ablyazov's widespread global legal campaign with laundered funds, despite global freezing and
receivership orders against Ablyazov's assets.

68.     In May of 2011, two entities that Ablyazov had been using to fund his various
litigations were put in receivership, based on findings that they were not arms-length lenders, but
in fact controlled and funded by Ablyazov himself. Deprived of a funding source, Ablyazov
conspired with other members of the Ablyazov-Khrapunov Group to circumvent the receivership
and freezing orders against him and began funding his litigation – including litigation against the
Republic of Kazakhstan – through loans from a series of shell companies, including the Belizean-
registered entity Green Life International SA ("Green Life").

69.     The conspirators represented to the U.K. receivers and courts that Green Life was
an arms-length entity owned and funded by Gennady Petelin, but did not disclose that Petelin was
related by marriage to the Ablyazov and Khrapunov families.

70.     In fact, Green Life was one more in a long series of shell entities used by the
Ablyazov-Khrapunov Group to launder their stolen funds. At Ablyazov's direction, Ilyas
Khrapunov and other members of the Ablyazov-Khrapunov Group transferred millions of dollars
in funds from accounts controlled by the Ablyazov-Khrapunov Group through Petelin and Green
Life to Ablyazov's counsel. To obscure this scheme, all funds were transferred from Green Life to
Chabrier Avocats, the Swiss counsel for the Khrapunov family and SDG, before being paid to
Ablyazov's counsel.

71.     Using Petelin's name to deter suspicion, the conspirators were able to launder and
spend millions of dollars in stolen funds that should rightly have been placed in receivership.

72.     The use of Petelin as a front for Ablyazov shell corporations such as Green Life was based in part on the close relationship between Petelin and Viktor Khrapunov. Viktor Khrapunov, whose daughter is married to Petelin's son, collaborated with Petelin on investments of the Ablyazov-Khrapunov Group's funds in Russia, where Petelin resided and had an extensive network of contacts. For example, in 2013, Viktor Khrapunov engaged in discussions with Petelin for the purpose of utilizing Petelin's contacts in Russia to facilitate the investment of the Ablyazov-Khrapunov Group's funds in Russian oil and energy assets.

73.     As another example of the Ablyazov-Khrapunov Group's continuing operations, members of the Ablyazov-Khrapunov Group hired computer hackers to illegally surveil French prosecutors and other public officials in an effort to free Ablyazov from French prison.

74.     Ablyazov was arrested by French special forces in 2013 after fleeing the U.K., but has remained in continuous contact with his coconspirators during his imprisonment. During his incarceration, Ablyazov directed his coconspirators, and his son-in-law Ilyas Khrapunov in particular, to use an array of unlawful means to secure his release.

75.     At Ablyazov's direction, in 2013 Ilyas Khrapunov hired a "black hat" computer security group to hack into the personal and work communications of numerous French public officials, including the prosecutors in Ablyazov's French extradition proceedings. Without permission and in violation of law, these hackers successfully breached the computers and mobile phones of numerous French law enforcement and justice officials, intercepted their electronic communications, and installed malicious software permitting them to remotely activate the microphones on these public officials' mobile phones to eavesdrop on and record their conversations. The hackers then transmitted French officials' intercepted communications, including emails, text messages, documents, and photographs, to Ilyas Khrapunov, who shared

20

and discussed this illegally-obtained surveillance with Ablyazov himself. Ablyazov then used this information as part of his legal campaign to avoid extradition.

76.     In return for this illegally-intercepted information, the Ablyazov-Khrapunov Group paid hundreds of thousands of dollars to these hackers-for-hire, from funds traceable to the thefts from BTA Bank and the City of Almaty.

**The Ablyazov-Khrapunov Group Conspires to Transfer and Hide Illicit Funds in the United States.**

77.     In 2011 and 2012, in response to escalating pressure on the Ablyazov-Khrapunov Group from both Kazakh and Swiss authorities and legal proceedings in the United Kingdom, the Ablyazov-Khrapunov Group embarked on a scheme to secret the families' illicit wealth in real estate investments in the United States. Upon information and belief, the Ablyazov-Khrapunov Group selected the United States as a harbor for these stolen funds because they believed real estate investments in the United States would be difficult for Kazakh authorities to access.

78.     To execute this scheme the Ablyazov-Khrapunov Group used SDG, their Swiss real estate vehicle, and Telford International Limited ("Telford"), a Dubai-based private contracting entity controlled by the Ablyazov-Khrapunov Group.

79.     To create the appearance that SDG was independent of the Ablyazov-Khrapunov Group, in 2012 SDG was purportedly sold to a close friend and political ally of the Ablyazov-Khrapunov Group, Philippe Glatz. This sale was in fact a sham transaction, with the Ablyazov-Khrapunov Group maintaining beneficial ownership and control of SDG.

80.     Upon information and belief, the Ablyazov-Khrapunov Group paid Mr. Glatz to purchase SDG using the Ablyazov-Khrapunov Group's own funds: Glatz accepted a loan from the Ablyazov-Khrapunov Group and then repaid that loan while outwardly claiming that this payment to the Ablyazov-Khrapunov Group was for the purchase of SDG. In fact, the transfer

of SDG was illusory, as Mr. Glatz was merely repaying a prior obligation, and effectively getting SDG for free.

81.     To reduce the amount of cash needed to effectuate this sham sale, Ilyas Khrapunov offered SDG to Glatz at an incredibly discounted price. Although at the time of the purported sale SDG's assets were valued at approximately $150 million, Glatz only transferred approximately $3.5 million in cash to the Khrapunov family for SDG – roughly two percent of SDG's assessed asset value.

82.     To justify this incredible discount to asset value, Ilyas Khrpaunov used his control of SDG to falsely book millions of dollars in supposed debt and liabilities to hide the fraudulent nature of the transition he had orchestrated.

83.     This sham transaction served the Ablyazov-Khrapunov Group's purposes by creating the appearance that SDG had changed ownership, although the Ablyazov-Khrapunov Group received no net consideration for the purported sale, and Glatz was left beholden to the Ablyazov-Khrapunov Group and explicitly obligated to hold their interest in the investment.

84.     The capital structure, organization, management, and illicit purpose of SDG remained the same after the purported sale, and the Ablyazov-Khrapunov Group still profits from and manages SDG's operations. Ilyas Khrapunov continues to control SDG while holding himself out to be a mere "outside advisor" to the company, all the while protecting and reaping the benefits of the Ablyazov-Khrapunov Group's investments in SDG.

### *Through SDG, the Ablyazov-Khrapunov Group Creates Triadou to Hide their Illicit Funds in New York Real Estate Transactions with the Chetrit Group.*

85.     In or about 2011, Ilyas Khrapunov, on behalf of the Ablyazov-Khrapunov Group, approached Nicolas Bourg, a Belgium-based real estate fund manager, seeking to create a new entity controlled by SDG to mask the Ablyazov-Khrapunov Group's efforts to invest in real

estate opportunities in the United States.

86.    In consultation with Ilyas Khrapunov, Bourg formed a series of entities  under the laws of Luxembourg for the specific purpose of investing the Ablyazov-Khrapunov Group's funds in real estate in the United States.  These entities included Triadou, an investment vehicle wholly owned and controlled by SDG, which  was itself a front for the Ablyazov-Khrapunov Group's activities.

87.    Triadou is a special purpose vehicle:  a limited-liability legal  entity created to fulfill a specific purpose, often used to insulate a parent entity  from financial risk or liability. SPVs can also be used, as Triadou was, to hide the true ownership of assets held by the SPV, or to obscure relationships between individuals and  entities.  Bourg became the sole director of Triadou, operating at the direction of the   Ablyazov-Khrapunov Group, who continued to control SDG, Triadou's sole shareholder.

88.    At the direction of Ilyas Khrapunov, Bourg made contact with Eric Elkain,  an agent of Chetrit and the Chetrit Group.  Bourg and  Elkain agreed to arrange a meeting between Chetrit and Ilyas Khrapunov for the purpose  of exploring concealed investments by the Ablyazov-Khrapunov Group in the United States with the Chetrit Group.

89.    In or about 2012, Chetrit and his brother and partner Meyer  Chetrit met with Ilyas Khrapunov and Bourg in Geneva, Switzerland.  While the Ablyazov-Khrapunov Group had purportedly divested  itself of any interest in SDG by this time, Ilyas Khrapunov held himself out to Chetrit as having a controlling ownership interest in SDG.

90.    At this meeting, Chetrit and Ilyas Khrapunov discussed  possible investment strategies for the Ablyazov-Khrapunov Group in the United  States real estate sector.  In these discussions, Ilyas Khrapunov disclosed the fact that the  Ablyazov-Khrapunov Group was facing

criminal charges and asset freezes directed by the governments of Kazakhstan, Switzerland, and the United Kingdom, and needed to move funds to other jurisdictions. During the continuing course of his dealings with the Ablyazov-Khrapunov Group, this situation was repeatedly and unequivocally made clear to Chetrit. Specifically, the Ablyazov-Khrapunov Group needed to move funds that were the subject of criminal charges and asset freezes as a result of the proceedings both against Ablyazov and the Ablyazov-Khrapunov Group. Chetrit expressed sympathy with this situation, stating that his own family had faced political sanctions in his native Morocco, a result of having defrauded the King and being forced to flee. Chetrit and Ilyas Khrapunov agreed in principle to seek joint investments in the United States, and agreed to meet further.

91.     Following this meeting in Geneva, Ilyas Khrapunov and Bourg met with Chetrit again in New York City, to evaluate potential investment options. While discussing specific investment opportunities, the parties again openly and repeatedly discussed the criminal charges against the Ablyazov-Khrapunov Group and the efforts of the governments of Switzerland and Kazakhstan to locate and seize the assets of the Ablyazov-Khrapunov Group. Again, Ilyas Khrapunov acted on behalf of SDG and Triadou, despite the Ablyazov-Khrapunov Group's purported sale of SDG a year prior.

92.     As a result of these discussions, the Ablyazov-Khrapunov Group invested, through Triadou, with Chetrit and the Chetrit Group in a number of real estate opportunities in New York City. The most significant of these were investments in the Flatotel and Cabrini Medical Center developments in New York City.

93.     The Flatotel is a 289-room business hotel opened in 1991, located at 135 West 52nd St, New York, New York.

94.     The Cabrini Medical Center hospital campus closed in 2008 and is now comprised of several buildings containing approximately 250 condominium units.

95.     Both the Flatotel and the Cabrini Medical Center properties were purchased by members of the Chetrit Group, along with co-investors.  The developers have  been executing plans to convert both properties into luxury condominiums, and are close to completion.

96.     The Chetrit Group owned a 75% interest in the Flatotel, and created a series of limited liability entities to hold that interest, including Counterclaim Defendants CF 135 FLAT LLC and CF 135 West Member LLC.

97.     The Chetrit Group offered to sell half of their 75% investment in the Flatotel to Triadou, after which the Chetrit Group and Triadou would each own 37.5%.  Triadou would provide 70% of the capital needed – against Chetrit's 30%, the difference amounting to an above-market "promote fee" for Chetrit that ensured that the Chetrit Group would reap the largest profits from the Flatotel development, even as it put in the least capital – and the parties would then divide the profits  from the investment.  In or about March 25, 2013, Triadou accepted this  offer, notwithstanding the fact that the terms strongly favored Chetrit, and committed to transmit funds to the Chetrit Group to secure the 37.5% interest in the Flatotel property.

### The Ablyazov-Khrapunov Group Enlists FBME to Facilitate Their Money Laundering Scheme in the United States

98.     The Ablyazov-Khrapunov Group sought to fund Triadou's investments with money from the Ablyazov-controlled entity Telford, held in accounts with FBME.

99.     Telford's FBME accounts were managed by Eesh Aggarwal, Chairman of Azure Consultants DMCC, and a close financial advisor to Ablyazov. Aggarwal had connected Ablyazov and other members of the Ablyazov-Khrapunov Group to FBME through Aggarwal's

contacts with high-level officers at FBME, and in time FBME became one of the Ablyazov-Khrapunov Group's primary banks. On information and belief, the conspirators favored FBME due to its presence inside of the European Union, its lack of anti-money laundering protections, and its eagerness to service high-risk clientele and shell corporations such as Telford.

100.    FBME promoted its weak due diligence standards to attract high-risk, high-value clients just like the Ablyazov, and was known for its willingness to do business with clients seeking to avoid regulatory oversight. In particular, FBME relied on an "Approved Third Party" program, where FBME's contacts could introduce new, high-value clients to the bank with virtually no due diligence of these new relationships. Upon information and belief, Aggarwal was one such "Approved Third Party," and with the approval of certain FBME officers, was able to launder the Ablyazov-Khrapunov Group's funds through FBME by way of entities such as the Ablyazov-controlled Telford, with effectively no scrutiny or due diligence by FBME.

101.    FBME had a history of moving funds for Aggarwal and Ablyazov with no questions asked, which led the conspirators to favor FBME for their criminal schemes aimed at the United States. For example, on June 11, 2011, FBME executed more than $27 million in transfers of Ablyazov's stolen funds to Amber Limited, a shell company registered in the U.A.E. (where Aggerwal operates) subsequently found to be an undisclosed Ablyazov asset and added to the U.K. courts' freezing and receivership orders.

102.    Telford's accounts at FBME bank were used to covertly move and invest funds stolen by Ablyazov from BTA Bank. Because the Telford accounts consisted of Ablyazov's stolen funds, Ilyas Khrapunov conferred with Ablyazov regarding investments of funds from Telford, and Ablyazov's approval was required for transfers from Telford. Even after Ablyazov's incarceration in France he remained in contact with his coconspirators, and while Ilyas

26

Khrapunov took operational control of much of the Ablyazov-Khrapunov Group's network, Ablyazov continued to direct specific transfers of funds, including those from Telford's FBME accounts.

103.     Triadou attempted to transfer Telford's funds held in FBME for the Flatotel and Cabrini deals through banks in Luxembourg, but those banks refused to accept wire transfers from the Ablyazov-Khrapunov Group's FBME accounts due in part to the investigations or proceedings led by the Kazakh, Swiss, and United Kingdom authorities.

104.     Bourg then contacted Chetrit about alternative wire transfer arrangements. Informed that commercial banks refused to handle Triadou's funds from Telford, Chetrit conspired to launder the money, instructing Bourg to disregard the banks and transfer funds directly from the Ablyazov-Khrapunov Group's offshore accounts to the escrow account of Chetrit's personal and corporate attorneys. Bourg then directed a series of wire transfers, on behalf of Triadou, from Telford's accounts at FBME directly to Chetrit's counsel.

105.     FBME executed these transfers despite their blatant indicia of money laundering, including that (1) Telford was a recently incorporated offshore shell company with no obvious business purpose, (2) Telford was purportedly owned by another offshore nominee-shareholder trust, (3) Telford was seeking to transfer millions of dollars into escrow accounts with no due diligence, and (4) Telford was transferring these funds from a high-risk jurisdiction for the benefit of an unrelated third party operating in a more financially-rigorous jurisdiction.

106.     This was not the only instance of FBME executing such obviously suspicious transfers for Aggerwal and the Ablyazov-Khrapunov Group without concern for money laundering red flags. At the same time FBME began to execute transfers from Telford to the accounts of Chetrit's counsel, on or about October 9, 2013, FBME executed wire transfers for $25

million from Telford's accounts for an investment in overseas telecommunications assets. Again Telford was transferring millions of dollars of Ablyazov's money for the benefit of another entity linked to the Ablyazov-Khrapunov Group.

107.    Subsequent to these transfers, on July 22, 2014, the U.S. Financial Crimes Enforcement Network ("FinCEN") designated FBME Bank a "foreign financial institution of primary money laundering concern."  FinCEN found that FBME Bank was regularly "used by its customers to facilitate money laundering, terrorist financing, transnational organized crime," had "systemic failures in its anti-money laundering controls that attract high-risk shell companies," and performed a "significant volume of transactions and activities that have little or no transparency and often no apparent legitimate business purpose."

108.    Under Section 311 of the PATRIOT Act, FinCEN barred U.S. financial institutions from opening or maintaining "payable-through" accounts with FBME.[1]  In the accompanying official announcement, FinCEN's then-Director emphasized that FBME was not merely negligent, but rather "promotes itself on the basis of its weak Anti Money Laundering (AML) controls in order to attract illicit finance business from the darkest corners of the criminal underworld," and "openly advertises the bank to its potential customer base as willing to facilitate the evasion of AML regulations."

109.    In its updated rule barring U.S financial institutions from dealing with FBME, FinCEN noted in particular FBME's pervasive dealings with obscure shell companies just like Telford, serving no purpose but to facilitate money laundering:

> FinCEN considered all of the relevant information and is particularly

---

[1]    FBME challenged FinCEN's rulemaking in the United States District Court for the District of Columbia and won a temporary reprieve, but FinCIN reissued the rule in substantially the same form on March 31, 2016. That updated rule is now undergoing judicial review.

28

concerned with: (1) The large number of FBME customers that are either shell companies or that conduct transactions with shell companies; (2) the lack of transparency with respect to beneficial ownership or legitimate business purposes of many of FBME's shell company customers; (3) the location of many of its shell company customers in other high-risk money laundering jurisdictions outside of Cyprus; (4) the high volume of U.S. dollar transactions conducted by these shell companies with no apparent business purpose; and (5) FBME's longtime facilitation of its shell company customers' anonymity by allowing thousands of customers to use the bank's physical address in lieu of their own.

110.    The Central Bank of Cyprus has frozen all assets transfers to or from FBME, and taken control of the bank pending completion of an investigation into its operations. FBME remains under the control of the Central Bank of Cyprus, and upon information and belief, continues to hold millions in funds belonging to the Ablyazov-Khrapunov Group and shell companies they control.

### The Ablyazov-Khrapunov Group Enters a Second Deal with Chetrit, Again Funded By Telford through FBME

111.    Through Triadou, the Ablyazov-Khrapunov Group entered a second investment with the Chetrit Group shortly thereafter. In late 2012, Triadou agreed to invest $12 million in the Cabrini Medical Center conversion, a joint venture between the Chetrit Group and another private developer to convert a former medical center in New York City into luxury condominiums.

112.    Due to increasing scrutiny on the Ablyazov-Khrapunov Group's finances, the contemplated $12 million investment became impossible. Bourg discussed this obstacle with Chetrit, who agreed that Triadou should invest $6 million, half the originally-agreed amount, until further funds became available. In return for this $6 million investment, Triadou would receive a promissory note and the right to convert that note into equity in the entity holding the Chetrit Group's interest in the Cabrini deal, 227 East 19th Holder, LLC.

113.    Again, the funds to execute the Cabrini deal were transferred, on May 20, 2013,

29

directly from the Ablyazov-Khrapunov Group's Telford accounts at FBME Bank to a law firm in New York working on Chetrit's behalf. Again, this transfer of funds from Telford was only executed after Ilyas Khrapunov received explicit direction from Ablyazov.

> ### *Kazakh Authorities Target the Ablyazov-Khrapunov Group's Holdings in the United States, and the Ablyazov-Khrapunov Group Liquidates Those Assets at Below-Market Value with the Chetrit Group's Assistance.*

114.     In 2014, Almaty filed an action in California federal court against members of the Ablyazov-Khrapunov Group seeking to seize assets that they had attempted to launder through real estate investments in California.   That action is *City of Almaty v.  Viktor Khrapunov, et al*, Case No. 2:14-cv-03650-FMO-CW (filed May 13, 2014; dismissed September 21, 2015) (the "California Litigation").  On information and belief, this lawsuit led the Ablyazov-Khrapunov Group to believe their assets in the U.S. were no longer safe from seizure by the government of Kazakhstan.

115.     In response, in late 2014, Ilyas Khrapunov directed Bourg, Triadou's director, to begin liquidating Triadou's assets in New York so that the funds could be removed from the United States and hidden.  Specifically, Ilyas Khrapunov told Bourg to liquidate Triadou's investments in Flatotel and the Cabrini Medical Center as quickly as possible.

116.     Bourg approached Chetrit, explaining that the threat of the California Litigation was pressuring Triadou and the Ablyazov-Khrapunov Group into moving their assets out of the United States.  Chetrit offered to purchase an assignment of Triadou's interest in the Flatotel at a substantial discount from the price originally paid by Triadou.  By this point, the value of Triadou's investment had in fact increased substantially beyond the funds originally invested.

117.     Chetrit simultaneously proposed to bribe Bourg, so Chetrit could further take advantage of Triadou and secretly influence it to obtain a discounted price.  Specifically, Chetrit

proposed that Bourg covertly use his position as director of Triadou to accept a lower price for the Chetrit Group's purchase of an assignment, thus decreasing Triadou's recovery from the investment and increasing the Chetrit Group's profit. In return for securing for Chetrit a lower assignment price, Chetrit agreed to surreptitiously pay Bourg $3 million.

118.     In or about August of 2014, Bourg, acting on behalf of Triadou and at the direction of the Ablyazov-Khrapunov Group, agreed to assign Triadou's interest in the Flatotel back to the Chetrit Group for a price as low as $26 million, only a fraction of the fair market value of the properties. At the same time, Bourg executed a release of the promissory note that Triadou held entitling it to equity in the Cabrini Medical Center development. At the time of this assignment and release, Viktor Khrapunov was facing criminal charges as well as possible fines and disgorgement in Kazakhstan; the Kazakh government had formally sought extradition of Viktor Khrapunov from Switzerland; Ablyazov was being held in French prison awaiting extradition; and the Swiss assets of the Ablyazov-Khrapunov Group remained frozen. Not only were all of these facts widely disseminated in the news, they were known by all parties to the assignment and release transactions, including Chetrit, and it was not uncommon for their meetings to begin with a discussion of the possibility of the incarceration of members of the Ablyazov-Khrapunov Group.

119.     Following the assignment and release, Bourg invoiced Chetrit for $1 million of the agreed-upon $3 million bribe. After receiving the invoice, Chetrit paid Bourg $400,000, but refused to pay the full amount demanded by Bourg.

120.     In or about March 2015, Bourg met with Chetrit, and recorded the meeting. As captured on audio, Bourg demanded the remainder of his promised compensation. Chetrit acknowledged that he had paid Bourg "400 or 500," but responded that Bourg would receive the

31

additional $600,000 only when Chetrit paid what he owed Triadou for the assignment, and that he had no intention of paying Triadou until forced to do so. Chetrit further stated on tape that Bourg would not receive any remaining money.

121. At that meeting, Bourg and Chetrit repeatedly discussed the legal troubles of Mukhtar Ablyazov and Victor and Ilyas Khrapunov. Chetrit repeatedly avoided using Ilyas Khrapunov's actual name, referring to him instead by the code name "Pedro." Chetrit and Bourg discussed how "Pedro" was "sought by Interpol" and his "father-in-law [was] still in prison," and Chetrit agreed that law enforcement was "coming at [the Ablyazov-Khrapunov Group] from all sides."

122. Also at that meeting, Chetrit and Bourg discussed the fact that due to the investigation in Switzerland, Ilyas Khrapunov could not leave the country and was under intense law enforcement pressure. In addition, Chetrit once again acknowledged his longstanding understanding that Ablyazov and his criminal situation was behind the motivations of the Ablyazov-Khrapunov investments in the United States. Chetrit further acknowledged his longstanding understanding that the Ablyazov-Khrapunov Group had made similar investments in other countries, such as Greece, to conceal and launder the proceeds of their crimes.

123. On or about March 22, 2015, after his meeting with Chetrit, Bourg contacted Elkain, Chetrit's agent in Europe, and also recorded that phone call. In that call, Bourg sought to confirm the terms of his secret deal with Chetrit. During this recorded conversation, Bourg and Elkain agreed that the secret deal between Chetrit and Bourg called for $3 million in compensation for Bourg. Elkain agreed that he "confirmed the deal" between Chetrit and Bourg, and "would have never said that if [Chetrit] hadn't told [him] so." Bourg requested Elkain's aid in receiving the remainder of his payment, but Elkain responded that whether or not the

agreement would be honored was up to Chetrit.

124.     Despite the finalized assignment agreement and release, the Chetrit Group refused to make any payments to Triadou following the sale.  In response, Triadou filed a  series of actions in New York state courts, seeking summary judgment and payment of  these obligations under the assignment agreement.  Those actions are *Triadou SPV S.A. v.  CF 135 FLAT LLC, et al*., No. 653462/2014 (Nov. 10, 2014); *Triadou SPV S.A. v. CF  135 FLAT LLC, et al*., No. 650239/2015 (Jan. 26, 2015); *Triadou SPV S.A. v. CF 135  FLAT LLC, et al*., No. 154681/2015 (May 11,  2015), and *Triadou SPV S.A. v. CF 135  FLAT LLC, et al*., No. 156907/2015 (July 9,  2015),

125.     Each of these actions seeks the payment of money to Triadou derived from  the sale of property illicitly obtained by the Ablyazov-Khrapunov Group, and rightfully owned by BTA and Almaty.

126.     By this lawsuit, BTA Bank and the City of Almaty seek to hold Crossclaim Defendants responsible for their illegal conduct in the United States in violation of U.S. law.

## **FIRST CAUSE OF ACTION**

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
### *Against All Defendants*

127.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 126 as if fully set forth herein.

128.     This cause of action is against all Crossclaim Defendants (the "Count 1 Defendants").

129.     From 1997 and continuing to the present, the Ablyazov-Khrapunov Group and numerous other individuals and entities, including SDG and Telford, have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 1

Enterprise").

130.     In 2012, the Chetrit Group knowingly and willfully joined the Count 1 Enterprise
by aiding the Ablyazov-Khrapunov Group's schemes to hide and launder their illicit assets
through investments by SDG through Triadou in properties owned by the Chetrit Group.

131.     The Count 1 Enterprise was engaged in, and the activities of the Count 1
Defendants affected, interstate and foreign commerce.

132.     The Count 1 Defendants conducted or participated, directly or indirectly, in the
conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity
consisting of the following predicate acts of racketeering within the meaning of 18 U.S.C.
§ 1961(1)(B):

    a.  The Count 1 Defendants engaged and conspired to engage in money laundering
        in violation of 18 U.S.C. § 1956 by conducting numerous financial transactions
        using illegally obtained funds to purchase real estate investments in New York
        City and elsewhere and to fund business entities including SDG and Triadou,
        knowing that such funds were unlawfully converted from the City of Almaty and
        BTA Bank, with the goal of concealing the source of those funds. The Count 1
        Defendants further engaged and conspired to engage in money laundering in
        violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or transferring
        funds stolen from Almaty and BTA into and within the United States in order to
        conceal their source and existence from lawful investigations conducted by
        Swiss, Kazakh, and United Kingdom authorities.

    b.  The Count 1 Defendants further engaged and conspired to engage in money
        laundering in violation of 18 U.S.C. § 1956 by conducting financial transactions

using those stolen funds by, among other things, using stolen funds to purchase real estate and other assets in New York City and elsewhere and to fund business entities, including Triadou and SDG, with the intent to further the Count 1 Enterprise and to conceal the source of those funds.

c. The Count 1 Defendants engaged and conspired to engage in money transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 by, among other things, knowingly transferring funds in excess of $10,000 stolen from Almaty and BTA into and within the United States to invest in real estate and other assets in New York City with the aid of the Chetrit Group, knowing that such funds were stolen from the City of Almaty and BTA Bank.

d. The Count 1 Defendants engaged and conspired to engage in mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by knowingly using the mails and wires to transfer illegally obtained funds into and within the United States, for the purpose of furthering the Count 1 Enterprise and, while concealing the funds' illegal source, used those funds to purchase real estate in New York City and to fund business entities, including SDG and Triadou, that enabled those entities to conduct business in the United States using the illegally-obtained funds.

e. The Count 1 Defendants unlawfully transported or caused to be transported in interstate or foreign commerce securities or money having a value of $5,000 or more which was stolen, converted or taken by fraud from Almaty and BTA Bank, and knowing the same to be stolen, converted or taken by fraud in violation of 18 U.S.C. § 2314.

f. The Count 1 Defendants received, possessed, concealed, sold, or disposed of securities or money having the value of $5,000 or more, or conspired to do the same, which crossed a state or United States boundary after being stolen, unlawfully converted, or taken from Almaty and BTA Bank, and knowing the securities or money to have been stolen, unlawfully converted, or taken in violation of 18 U.S.C. § 2315.

133. Each of the Count 1 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 1 Defendants engaged or conspired to engage in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. From in or about 1997, and continuing to the present, Count 1 Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Count 1 Enterprise and in order to implement the schemes and employ the devices described herein. The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, the following acts of money laundering, transactions in money and property derived from specified unlawful activity, foreign transport of stolen money or property known to be stolen, converted or taken by fraud, mail fraud, and/or wire fraud:

a. The 2012 sham sale of SDG to Philippe Glatz to create the appearance that SDG was independent of the Ablyazov-Khrapunov Group;

b. the fraudulent loan from the Ablyazov-Khrapunov Group to Mr. Glatz to facilitate the SDG sale transaction;

c.   the formation of Triadou and other entities by SDG at the direction of Bourg and in consultation with Ilyas Khrapunov;

d.   Chetrit's meetings with Ilyas Khrapunov in or about 2012 in Switzerland and New York City, and their subsequent agreement to invest the Ablyazov-Khrapunov Group's unlawfully obtained money in real estate in New York City;

e.   E-mails directly between Chetrit and Ilyas Khrapunov as well as through intermediaries discussing the Ablyazov-Khrapunov Group's possible investments in New York real estate;

f.   the formation of the investment vehicles necessary to facilitate the Flatotel and Cabrini investments;

g.   Telford's failed attempt to transfer funds held in FBME Bank for the Flatotel and Cabrini deals through banks in Luxembourg;

h.   the May 20, 2013 transfer of funds from Telford to Chetrit's attorney representing Triadou's investment of $6 million in the Cabrini deal, along with Chetrit's promissory note and Triadou's right to convert that debt into equity in Cabrini;

i.   a series of other wire transfers on behalf of Triadou from Telford's accounts at FBME Bank Ltd. to Chetrit's counsel in New York, including transfers on November 9, 2012, and January 22, February 13, February 19, April 8, April 16, and April 24, 2013;

j.   a May 22, 2013 wire transfer of $28 million from Telford to a different law firm's Citibank account in New York used for a separate New York real estate investment with Chetrit;

k.   a May 2014 agreement (executed August 2014) to transfer Triadou's interest in the

Flatotel to the Chetrit Group at a below-market price;

l.   Chetrit's and Triadou's signed May 2014 release of the promissory note regarding Triadou's $6 million investment in the Cabrini Medical Center development;

m.   Chetrit's payment of $400,000 to Bourg in partial satisfaction of Chetrit's agreement with Bourg to pay him $3 million in exchange for securing Chetrit a lower assignment price for Triadou's interests in the Flatotel and Cabrini deals; and

n.   a payment of $1 million from Chetrit to Triadou in partial satisfaction of Chetrit's obligations under the fraudulent assignment.

134.   As a direct and proximate result of RICO violations by the Count 1 Defendants of 18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at trial and presently estimated to be not less than $6 billion. Almaty and BTA have been injured in their business or property by reason of each Count 1 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**

**(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))**
*Against All Defendants*

135.   The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 134 as if fully set forth herein.

136.   This cause of action is against all Crossclaim Defendants (the "Count 2 Defendants").

137.   From its formation and continuing to the present, CF 135 West Member LLC, has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 2

Enterprise").

138.     The Count 2 Enterprise was engaged in, and the activities of the Count 2 Defendants affected, interstate and foreign commerce.

139.     The Count 2 Defendants engaged in a pattern of racketeering activity consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in paragraph 132 above.

140.     Each of the Count 2 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 2 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 2 Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Count 2 Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Count 2 Enterprise and in order to implement the schemes and employ the devices described herein. The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, those acts described in paragraph 133 above.

141.     As a direct and proximate result of RICO violations by the Count 2 Defendants of 18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at trial. Almaty and BTA have been injured in their business or property by reason of each Count 2 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## THIRD CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(a))
### *Against All Defendants*

142.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 141
as if fully set forth herein.

143.    This cause of action is against all Crossclaim Defendants (the "Count 3
Defendants").

144.    From its formation and continuing to the present, CF 135 West Member LLC,
has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 3
Enterprise").

145.    The Count 3 Enterprise was engaged in, and the activities  of the Count 3
Defendants affected, interstate and foreign commerce.

146.    The Count 3 Defendants received income derived from a pattern of racketeering
activity consisting of the related predicate acts of racketeering described in paragraphs 132 and
133 above.

147.    The Count 3 Defendants used or invested the income derived from their
racketeering activity in the acquisition of an interest in, or the establishment or operation of, the
Count 3 Enterprise in violation of 18 U.S.C. § 1962(a).

148.    The Count 3 Defendants used or invested the income derived from their
racketeering activity in the Count 3 Enterprise in fraudulent and below-market transactions,
including by accepting unreasonable contractual terms to transfer wealth to the Chetrit Group.

149.    As a direct and proximate result of RICO violations by the Count 3 Defendants of
18 U.S.C. § 1962(a),  Almaty and BTA have suffered damages in an amount to be determined at
trial.  Almaty and BTA have been injured in their business or  property by reason of each Count 3

Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
### *Against All Defendants*

150. The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 149 as if fully set forth herein.

151. This cause of action is against all Crossclaim Defendants (the "Count 4 Defendants").

152. From its incorporation and continuing to the present, 227 East 19th Holder LLC has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 4 Enterprise").

153. The Count 4 Enterprise was engaged in, and the activities of the Count 4 Defendants affected, interstate and foreign commerce.

154. The Count 4 Defendants engaged a pattern of racketeering activity consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in paragraph 132 above.

155. Each of the Count 4 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 4 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 4 Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Count 4 Defendants associated together, with one another and with others, and acted in concert for the common and

unlawful purposes of the Count 4 Enterprise and in order to implement the schemes and employ

the devices described herein. The specific related predicate acts that constitute the pattern of

racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to,

those acts described in paragraph 133 above.

156.    As a direct and proximate result of RICO violations by the Count 4 Defendants of

18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at

trial. Almaty and BTA have been injured in their business or property by reason of each Count 4

Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are

thereby entitled to recover threefold the damages suffered, together with the costs of this suit and

reasonable attorneys' fees.

### FIFTH CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(d))
### *Against All Defendants*

157.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 156

as if fully set forth herein.

158.    This cause of action is against all Crossclaim Defendants (the "Count 5

Defendants").

159.    As alleged herein, Count 5 Defendants conspired to engage in the acts described

above in the United States to further the goals of their criminal enterprises in violation of U.S.

law.

160.    In so doing, Count 5 Defendants unlawfully, willfully, and knowingly did

combine, conspire, confederate, and agree together, with each other and with others to commit

RICO violations under 18 U.S.C. § 1962(c) and, thereby, violated 18 U.S.C. § 1962(d). In

furtherance of the conspiracy and to achieve its objectives, Count 5 Defendants committed the

overt acts as described in paragraph 133 in the Southern District of New York and elsewhere.

161. As a direct and proximate result of RICO violations by the Count 5 Defendants of 18 U.S.C. § 1962(d), Almaty and BTA have suffered damages in an amount to be determined at trial. Almaty and BTA have been injured in their business or property by reason of each Count 5 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION

### (ACTUAL FRAUDULENT TRANSFER)
### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

162. The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 161 as if fully set forth herein.

163. At all relevant times, the City of Almaty and BTA Bank have held an interest in the illicit funds taken by the Ablyazov-Khrapunov Group and invested by and through Triadou, as these funds were the unlawful profits of embezzlement, fraud, and the corruption of the public office of the mayor of Almaty. The intermediary transfers or investment of those funds did not alter or diminish either Almaty or BTA's interest.

164. The 2014 assignment of Triadou's interest in the Flatotel and Cabrini Medical Center was not for adequate consideration, and in fact, represented a value significantly below the fair value of that interest, due to the improper motivations of Triadou's ownership, the Ablyazov-Khrapunov Group, to hide their illicit assets and move them offshore, and the Chetrit Group's secret deal to drive down the price of the assignment through bribery.

165. This assignment was made for the specific purpose of liquidating a fixed asset to frustrate a future creditor. Defendants knew of the numerous judgments against Ablyazov in the

United Kingdom, and of Almaty's claims against the Ablyazov-Khrapunov Group in the California Litigation, and knew that Triadou was owned and controlled by the defendants in those actions. Defendants intended and believed that the assignment of the Ablyazov-Khrapunov Group's interest in the Flatotel and Cabrini Medical Center would hinder, delay, and defraud current and future judgment creditors, specifically the City of Almaty and BTA Bank.

166. For these reasons, the assignment was fraudulently and illegally intended to remove an asset from the jurisdiction of the United States, namely Triadou's interests in the Flatotel and Cabrini Medical Center, convert those assets to cash, and transfer those funds beyond the reach of the Swiss, Kazakh, and United Kingdom authorities

167. As a result of the foregoing, pursuant to sections 275, 276, and 279 of the New York Debtor and Creditor Law, the August 2014 assignment agreement should be set aside as the product of clearly-inequitable conduct.

## SEVENTH CAUSE OF ACTION

### (CONSTRUCTIVE FRAUDULENT TRANSFER)
### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

168. The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 167 as if fully set forth herein.

169. At all relevant times, the City of Almaty and BTA Bank have held an interest in the illicit funds taken by the Ablyazov-Khrapunov Group and invested by and through Triadou, as these funds were the unlawful profits of embezzlement, fraud, and corruption of the public office of the mayor of Almaty. The intermediary transfers or investment of those funds did not alter or diminish either Almaty or BTA's interest.

170. Triadou, although an arm of a massive international fraud and money laundering conspiracy, is and has been insolvent itself. Triadou holds no funds or other assets of its own,

and relies on funding from other Ablyazov-Khrapunov Group entities, such as Telford, to meet its obligations. Assets that flow to Triadou are promptly moved to other Ablyazov-Khrapunov Group entities offshore.

171.     As Triadou is controlled by the Ablyazov-Khrapunov Group, whose members face multi-billion dollar judgments in other jurisdictions, Triadou is effectively kept insolvent at all times, so as to limit the Ablyazov-Khrapunov Group's exposure in the United States.

172.     Similarly, because Triadou is controlled by and is an alter ego of the Ablyazov-Khrapunov Group, at the time it liquidated the Flatotel and Cabrini interests and transferred the proceeds to other entities, it had liabilities – including resulting from the UK judgments – that far outstripped its assets.

173.     As a result of the foregoing, pursuant to sections 273 and 273-a of the New York Debtor and Creditor Law, the August 2014 assignment agreement should be set aside.

## EIGHTH CAUSE OF ACTION

### (UNJUST ENRICHMENT)
### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

174.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 173 as if fully set forth herein.

175.     The Crossclaim Defendants were unjustly enriched at the expense of the City of Almaty and BTA Bank when they invested funds embezzled from the City of Almaty and BTA Bank to acquire assets in the United States including an interest in the Flatotel project, and did so knowing that authorities of Switzerland, the Republic of Kazakhstan, and the United Kingdom were seeking the wrongfully-taken assets held by the Ablyazov-Khrapunov Group, and that further sales of the same assets would potentially frustrate their identification by the lawful authorities.

176.     It would be against equity and good conscience to permit the Crossclaim Defendants to retain the profits derived from the looting of assets rightfully belonging to the City of Almaty and BTA Bank.

## NINTH CAUSE OF ACTION

### (CONVERSION)
### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

177.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 176 as if fully set forth herein.

178.     None of the Defendants has a superior interest to the City of Almaty or BTA in the assets wrongfully taken by the Ablyazov-Khrapunov Group. These funds, and the assets they were used to purchase, are the rightful property of the people of Almaty and BTA.

179.     Defendants knowingly bought and sold assets obtained with these funds derived from the corruption of the office of the mayor of the City of Almaty and control of BTA Bank.

180.     As a result, Defendants have wrongfully and without authorization exercised of dominion and control over property of Almaty and BTA, and thus are liable for converting the same.

## TENTH CAUSE OF ACTION

### (CONSTRUCTIVE TRUST)
### *Against All Defendants*

181.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 180 as if fully set forth herein.

182.     As mayor of Almaty, Viktor Khrapunov owed fiduciary duties to the people of Almaty, and through his oath of office, expressly promised to execute those duties.

183.     Despite that promise, Viktor Khrapunov breached those fiduciary duties repeatedly by transferring public assets of the City of Almaty to other members of the Ablyazov-

Khrapunov Group for fractions of their market value, and then assisted the Ablyazov-Khrapunov Group in laundering the funds resulting from those illicit transfers of public property. Through these breaches of fiduciary duty, the Ablyazov-Khrapunov Group has been unjustly enriched.

184.     A constructive trust over the 50% interest in CF 135 West Member LLC assigned by Triadou, and all profits therefrom, is the appropriate equitable remedy to prevent further dissipation of the funds resulting from these breaches of fiduciary duty.

185.     Defendants have also conspired to fraudulently transfer Triadou's interest in the Flatotel for the purpose of hiding the Ablyazov-Khrapunov Group's assets and frustrating any recovery resulting from Almaty and BTA's investigations and pursuits of their stolen assets. Separate and aside from the Ablyazov-Khrapunov Group's breaches of fiduciary duty, this knowingly fraudulent transfer by Cross- and Counterclaim Defendants justifies imposition of a constructive trust to prevent any further transfers or encumbrances of this property.

186.     Absent this remedy, the Ablyazov-Khrapunov Group will continue to use Triadou and SDG to launder the fruits of these breaches of fiduciary duty and hide these assets from law enforcement, and the Chetrit Group will continue to be unjustly enriched by these acts of fraud.

**ELEVENTH CAUSE OF ACTION**

**(PURSUANT TO CPLR § 5239 FOR FRAUD AND CONVERSION)**
***Against All Defendants***

187.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 186 as if fully set forth herein.

188.     Triadou has filed serial actions in the courts of the state of New York seeking payment on the fraudulent assignment agreement between Triadou and the Chetrit Group. While Triadou has been awarded summary judgment in some of these actions, none of these judgments

have been satisfied by any sheriff or receiver.

189.     The City of Almaty and BTA Bank are the rightful owners of Triadou's interest in the  Flatotel and Cabrini Medical Center and/or any funds derived from the sale of that interest, as the interest was  purchased with funds unlawfully converted by the Ablyazov-Khrapunov Group and laundered  through SDG and Triadou.

190.     Pursuant to CPLR § 5239, this court is empowered to vacate any such  judgments and direct the disposition of the property in question, as well as direct which  party should keep possession of the property during the pendency of this action.

191.     The court should set aside any judgments in Triadou's favor in light of the City of Almaty's and BTA's superior interest in this illicitly-obtained property, direct that Triadou's interest in the Flatotel and Cabrini Medical Center be transferred to the City of Almaty and BTA Bank, and pursuant to CPLR § 5239,  award the City of Almaty and BTA Bank its reasonable attorneys' fees in bringing this claim.

## TWELFTH CAUSE OF ACTION

### (PURSUANT TO CPLR § 5303 FOR RECOGNITION AND ENFORCEMENT OF A FOREIGN JUDGMENT UNDER NEW YORK LAW)
### *Against Defendant Ablyazov*

192.     BTA Bank repeats and realleges paragraphs 1 through 191 as if fully set forth herein.

193.     The United Kingdom of Great Britain and Northern Ireland is a "foreign state" within the meaning of N.Y. C.P.L.R. § 5301(a).

194.     The Ablyazov Judgments are "foreign country judgments" within the meaning of N.Y. C.P.L.R. § 5301(b).

195.     The Ablyazov Judgments are "final, conclusive and enforceable" in England within the meaning of N.Y. C.P.L.R. § 5302.

196.    The Ablyazov Judgments grant recovery of a sum of money and are enforceable by an action on the judgments in New York pursuant to N.Y. C.P.L.R. § 5303.

197.    None of the grounds for non-recognition of a foreign country judgment set forth in N.Y. C.P.L.R. § 5304 applies to the Ablyazov Judgments.

198.    The Ablyazov Judgments are required to be enforced pursuant to N.Y. C.P.L.R. § 5303.

199.    Triadou is the alter ego of the Ablyazov-Khrapunov Group, and is thus liable for all current and future obligations against the Ablyazov-Khrapunov Group. Maintaining the separateness of Triadou and its alter ego, the Ablyazov-Khrapunov Group, would allow the Ablyazov-Khrapunov Group to avoid otherwise enforceable obligations and would be highly inequitable to the people of the city of Almaty and BTA Bank.

## THIRTEENTH CAUSE OF ACTION

### (AIDING AND ABETTING)
### *Against Defendant FBME*

200.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 199 as if fully set out herein.

201.    The Ablyazov-Khrapunov Group converted property that rightfully belongs to the Kazakhstan Plaintiffs through wire transfers executed by FBME Bank, and the Ablyazov-Khrapunov Group was unjustly enriched by the use and investment of the same funds.

202.    FBME Bank was aware that the funds wired were the proceeds of crime and that the wire transfers were an effort by the Ablyazov-Khrapunov Group to obscure the illicit nature of those funds.

203.    Due to its longstanding relationship with the Ablyazov-Khrapunov Group and deliberately ineffective protocols for preventing money laundering, FBME Bank aided and

abetted the Ablyazov-Khrapunov Group's laundering scheme.

204.    FBME's active participation in the Ablyazov-Khrapunov Group's money laundering network rendered substantial assistance to the Ablyazov-Khrapunov Group's acts of conversion, fraud, and subsequent unjust enrichment, and the Kazakhstan Plaintiffs seek relief from FBME to the extent Defendants are found liable for these acts.

## DEMAND FOR JURY TRIAL

Almaty and BTA Bank demand a jury trial on all claims for which trial by jury is available, including on the underlying interpleader action.

## DEMAND FOR RELIEF

WHEREFORE, Almaty and BTA Bank demand the Court enter judgment as follows:

A.    For injunctive relief and rescission of the 2014 assignment agreement and release;

B.    For compensatory, punitive, and treble damages;

C.    For declaratory relief;

D.    For all costs and fees incurred in prosecuting this Complaint;

E.    For such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        September 7, 2016

                                    Respectfully Submitted,

                                    BOIES, SCHILLER & FLEXNER LLP

By:  /s/ Matthew L. Schwartz
       Matthew L. Schwartz
       Randall W. Jackson
       Daniel G. Boyle
       Craig Wenner

       BOIES, SCHILLER & FLEXNER LLP
       575 Lexington Avenue
       New York, New York 10022
       Telephone: 212-446-2300
       Facsimile: 212-446-2350

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————

)
CITY OF ALMATY, KAZAKHSTAN,           )
and BTA BANK JSC                      )
                                      )
        Plaintiffs,                   )
                                      )
        v.                            )       No. 15-cv-05345 (AJN) (KHP)
                                      )
MUKHTAR ABLYAZOV, ILYAS               )
KHRAPUNOV, VIKTOR KHRAPUNOV           )
and TRIADOU SPV S.A.,                 )
                                      )
        Defendants.                   )
———————————————————————)

**LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE**
**PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON**
**THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

The United States District Court for the Southern District of New York (the "Court"), presents its compliments to the Ministry of Justice of the French Republic under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention"), and requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above-captioned matter. This Court respectfully requests that the Ministry of Justice recognize this Letter of Request from this Court and arrange for its execution, in adherence to the Hague Convention and in the interest of comity.

**A.      Sender**

The Honorable Alison J. Nathan, United States District Judge for the Southern District of New York, New York, New York, United States of America.

1

**B.      Central Authority of the Requested State**

Ministère de la Justice
Direction des Affaires Civiles et du Sceau
Bureau du droit de l'Union, du droit international privé et de l'entraide civile (BDIP)
13, Place Vendôme
75042 Paris Cedex 01

**C.      Person to Whom the Executed Request Is to Be Returned**

This Court hereby requests that the executed Letter of Request and all documents and materials covered by this Letter of Request be returned to the following attorney for the Plaintiffs, the City of Almaty, Kazakhstan and BTA Bank (collectively, the "Plaintiffs"), as an officer of this Court:

Matthew L. Schwartz, Esq.
Boies Schiller & Flexner, LLP
575 Lexington Avenue
New York, New York 10022
Telephone Number: (212) 446-2300
Fax Number: (212) 446-2350
mlschwartz@bsfllp.com

As an officer of this Court, he will act as confidential courier of this Court and deliver the executed Letter of Request and all related documents and materials directly to me at the following address:

The Honorable Alison J. Nathan
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Room 2102
New York, New York 10007

All documents and materials deposited with the Court in accordance with this Letter of Request will be available to all parties and their counsel.

### D. Purpose of Evidence Sought and Requested Date of Receipt of Response

The requested deposition will be used by the parties in support of their claims or defenses. The Court accordingly respectfully requests a prompt response to this Letter of Request.

## I. HAGUE CONVENTION REQUIREMENTS

This Court requests the assistance more specifically described herein as necessary in the interests of justice. In conformity with Article 3 of the Hague Convention, the undersigned applicant has the honor to submit the following request:

### A. Requesting Judicial Authority

The Honorable Alison J. Nathan
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007, USA

### B. Central Authority of the Requested State

Ministère de la Justice
Direction des Affaires Civiles et du Sceau
Bureau du droit de l'Union, du droit international privé et de l'entraide civile (BDIP)
13, Place Vendôme
75042 Paris Cedex 01

### C. Name of the Case and Identifying Number

All evidence requested will be used in relation to the above-captioned civil lawsuit, which can be identified by the following information:

Case Name: *City of Almaty, Kazakhstan, et al. v. Mukhtar Ablyazov, et al.*
Court: United States Federal District Court for the Southern District of New York
Case Number: 15-cv-05345 (AJN)

### D. Names and Addresses of the Parties and their Representatives

1. Plaintiffs

3

The City of Almaty, Kazakhstan ("Almaty") and BTA Bank JSC ("BTA") are, respectively, a political subdivision and a citizen of the Republic of Kazakhstan.

        2.     <u>Plaintiffs' Representative</u>

Matthew L. Schwartz, Esquire
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: mschwartz@bsfllp.com

        3.     <u>Defendants</u>

Defendant Mukhtar Ablyazov is a national of the Republic of Kazakhstan, currently domiciled in Paris, France. Defendant Ilyas Khrapunov is a national of the Republic of Kazakhstan, currently domiciled in Geneva, Switzerland. Defendant Viktor Khrapunov is a national of the Republic of Kazakhstan, currently domiciled in Geneva, Switzerland. Defendant Triadou SPV S.A. is a company established under the laws of Luxembourg, with its registered address at 60 Grand-Rue, L-1660 Luxembourg.

        4.     <u>Defendants' Representatives</u>

| <u>Mukhtar Ablyazov</u> | <u>Ilyas and Viktor Khrapunov</u> |
|---|---|
| Jonathan D. Cogan, Esquire | John J. Kenney, Esquire |
| Kobre & Kim LLP | Hoguet, Newman, Regal & Kenney, LLP |
| 800 Third Avenue, 6th Floor | 10 East 40th Street. |
| New York, New York 10022 | New York, NY 10016 |
| Telephone: (212) 488-1200 | Telephone: (222) 689-8808 |
| Facsimile: (212) 488-1220 | Facsimile: (212) 689-5101 |
| Email: jonathan.cogan@kobrekim.com | Email: jkenney@hnrklaw.com |

<u>Triadou SPV S.A.</u>
Deborah A. Skakel, Esquire
Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
Telephone: (212) 885-5000
Facsimile: (212) 885-5001

Email: dskakel@blankrome.com

### E. Nature of the Proceedings and Summary of the Case and Relevant Facts

The above-captioned case is a civil lawsuit brought by Plaintiffs seeking equitable relief and money damages for injuries resulting from the alleged embezzlement and laundering of funds belonging to Plaintiffs and enforcement of a foreign judgment under New York law. *See* Ex. A (Plaintiffs' Amended Crossclaims). Defendant Mukhtar Ablyazov is the former chairman of BTA Bank. Defendant Viktor Khrapunov is the former mayor of the City of Almaty. Defendant Ilyas Khrapunov is Viktor Khrapunov's son. Defendant Triadou SPV S.A. ("Triadou") is an entity established in Luxembourg and allegedly controlled by Ilyas Khrapunov at the direction of Ablyazov.

Plaintiffs allege that Ablyazov embezzled billions of dollars by abuse of his office at BTA Bank, one of Kazakhstan's largest banks, which was subsequently nationalized by the Government of Kazakhstan. *See* Ex. A, at ¶ 28-44. When his actions were uncovered by bank regulators in Kazakhstan, Ablyazov fled to the United Kingdom, where BTA brought a series of civil fraud actions against him. Ablyazov repeatedly defied orders of the U.K. courts to disclose his assets, leading to his being sentenced to 22 months imprisonment for contempt. Ablyazov fled sentencing in the U.K. and went into hiding, and the U.K. courts awarded BTA billions of dollars in judgments against Ablyazov and his associates for their theft from BTA.[1] Ablyazov was subsequently discovered and arrested in France. Plaintiffs have alleged that while fighting extradition, Ablyazov conspired with his son-in-law, Ilyas Khrapunov, to hack the mobile phones and computers of French judicial authorities and prosecutors. *See* Ex. A ¶ 73 – 76.

---

[1] *See JSC BTA Bank v. Ablyazov et al.*, 201 EWHC 510 (comm); *JSC BTA Bank v. Ablyazov*, 2013 EWHC 3691 (ch); *JSC BTA Bank v. Ablyazov* [2015] UKSC 64; *JSC BTA Bank v. Ablyazov and Khrapunov*, 2016 EWHC 289 (comm).

Ablyazov has since been released from French prison, but claims that he is applying for asylum in France and thus cannot travel to give testimony in this matter.

As specifically relevant to the above-captioned action, Ablyazov is alleged to have laundered some of the proceeds of his actions into the United States through a special purpose vehicle, Defendant Triadou SPV S.A. *See* Ex. A, at ¶ 77–97. Once those assets were discovered, the Defendants are alleged to have entered into transactions in the United States that caused further and distinct injuries to the Plaintiffs, including allegedly engaging in fraudulent conveyances that diminished the value of those assets. This Court has already granted attachment of Triadou's assets in the State of New York, preliminarily finding that the assets in question were traceable to Ablyazov. *See* Ex. B, at 6 (Order of Attachment).

Plaintiffs and Defendants currently are engaged in discovery, where the parties exchange information concerning their claims and defenses. The Court accordingly has not addressed the merits of Plaintiffs' allegations.

Plaintiffs contend that the information sought by this request is available to the Ministry of Justice of the French Republic. This Court respectfully requests that the French Republic act on this request expeditiously.

**F.     Evidence to Be Obtained**

Based on the foregoing, this Court respectfully requests that the Ministry of Justice of the French Republic provide assistance to obtain the following testimony in response to this Letter of Request that may be lawfully obtained by the Ministry of Justice or any other department, division, or office of the government of the French Republic, that relates to Plaintiffs' allegations against Defendants. Mr. Ablyazov has consented to this request.

1.     A deposition of Mukhtar Ablyazov on the following topics:

1) Ablyazov's chairmanship of BTA Bank;

2) Ablyazov's relationship with Eesh Aggarwal and any entities controlled or operated by Eesh Aggarwal;

3) Ablyazov's knowledge regarding Triadou SPV S.A., including but not limited to:

    a. Any involvement or communications he had with Triadou;

    b. The sources of Triadou's funding;

    c. Triadou's investments in the United States;

4) Ablyazov's knowledge regarding any hacking of electronic devices of French prosecutors and judicial authorities, as well as communications with Ilyas Khrapunov regarding information obtained through such conduct;

5) Ablyazov's knowledge regarding Telford International Limited;

6) Ablyazov's knowledge regarding Telford Financiers;

7) Ablyazov's knowledge regarding Green Life International SA;

8) Ablyazov's knowledge regarding Fitcherly Holdings Ltd;

9) Ablyazov's knowledge regarding Wintop Services Ltd;

10) Ablyazov's knowledge regarding accounts held at Trasta Komercbanka which received transfers of funds from BTA Bank;

11) Ablyazov's knowledge regarding the sources of funding for his legal expenses in the United Kingdom;

12) Ablyazov's assets, both in his name and held by associates for his benefit;

13) Ablyazov's ownership or control of any corporate entities, either in his name and held by associates for his benefit;

14) Ablyazov's knowledge regarding his disclosures to the courts of the United Kingdom and subsequent sentence of criminal contempt;

15) Ablyazov's communications with Ilyas Khrapunov;

16) Ablyazov's communications with Viktor Khrapunov;

17) Ablyazov's communications with Gennady Petelin;

18) Ablyazov's communications with Elena Petelina;

19) Ablyazov's communications with Peter Sztyk (a/k/a Petro Sztyk);

20) Ablyazov's communications with Nicolas Bourg;

21) Ablyazov's communications with Philippe Glatz;

22) Ablyazov's communications with Botagoz Dzhardemali (a/k/a Bota Jardemalie);

23) Ablyazov's retention of relevant documents or financial records, or

7

maintenance of such records by Ablyazov's employees or agents.

## II.     OTHER REQUIREMENTS

### A.     Fees and Costs

Plaintiffs are responsible for reasonable copy costs and charges associated with the processing and handling of this request by the Ministry of Justice.

### B.     Reciprocity

This Court expresses its sincere willingness to provide similar assistance to the courts of the French Republic, if future circumstances so require.

## III.     CONCLUSION

This Court, in the spirit of comity and reciprocity, hereby requests international judicial assistance in the form of this Letter of Request seeking information, testimony, and things described herein, from the Ministry of Justice. This Court extends to all judicial and other authorities of the French Republic the assurances of its highest consideration.


Date: _____           _____
                                 The Honorable Alison J. Nathan
                                 United States District Court for the
                                 Southern District of New York
                                 Thurgood Marshall United States Courthouse
                                 500 Pearl Street, Room 1620
                                 New York, New York 10007-1312

                                 SEAL OF THE UNITED STATES DISTRICT
                                 COURT FOR THE SOUTHERN DISTRICT OF
                                 NEW YORK

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBERS LLC and THE CHETRIT GROUP, LLC, | ) ) ) Case No. 15-cv-05345-AJN ) ) |
| Interpleader Plaintiffs, | ) ) |
| -against- | ) **AMENDED CROSSCLAIMS** ) |
| TRIADOU SPV S.A., CITY OF ALMATY, a foreign city, and BTA Bank, | ) ) ) ) |
| Interpleader Defendants. | ) ) |
| | ) |
| CITY OF ALMATY, KAZAKHSTAN and BTA BANK, | ) ) ) |
| Crossclaim Plaintiffs, | ) ) |
| -against- | ) ) |
| MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, TRIADOU SPV S.A., AND FBME BANK LTD., | ) ) ) ) ) ) |
| Crossclaim Defendants. | ) |

# **Table of Contents**

INTRODUCTION ................................................................................................ 1

THE PARTIES ................................................................................................... 5

JURISDICTION AND VENUE ........................................................................... 6

FACTUAL BACKGROUND ............................................................................... 8

*Mukhtar Ablyazov Defrauded BTA Bank of in Excess of $6 billion.* .................. 8

*Viktor Khrapunov Defrauded the City of Almaty of Approximately $300 million.* .......... 13

*The Khrapunovs and Ablyazov Join Together to Launder Their Stolen Money.* .............. 15

*The Ablyazov-Khrapunov Group Conspires to Transfer and Hide Illicit Funds in the United States.* ........................................................................................... 21

*Through SDG, the Ablyazov-Khrapunov Group Creates Triadou to Hide their Illicit Funds in New York Real Estate Transactions with the Chetrit Group.* ........................ 22

*Kazakh Authorities Target the Ablyazov-Khrapunov Group's Holdings in the United States, and the Ablyazov-Khrapunov Group Liquidates Those Assets at Below-Market Value with the Chetrit Group's Assistance.* ................................................ 30

FIRST CAUSE OF ACTION ............................................................................ 33

*(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

SECOND CAUSE OF ACTION ........................................................................ 38

*(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

THIRD CAUSE OF ACTION ........................................................................... 40

*(VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)) Against All Defendants*

FOURTH CAUSE OF ACTION ........................................................................ 41

*(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

FIFTH CAUSE OF ACTION ............................................................................ 42

*(VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)) Against All Defendants*

SIXTH CAUSE OF ACTION ............................................................................ 43

*(ACTUAL FRAUDULENT TRANSFER) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

SEVENTH CAUSE OF ACTION ...................................................................... 44

*(CONSTRUCTIVE FRAUDULENT TRANSFER) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

EIGHTH CAUSE OF ACTION ........................................................................ 45

*(UNJUST ENRICHMENT) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

NINTH CAUSE OF ACTION .................................................................................... 46

    *(CONVERSION) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

TENTH CAUSE OF ACTION .................................................................................... 46

    *(CONSTRUCTIVE TRUST) Against All Defendants*

ELEVENTH CAUSE OF ACTION ............................................................................ 47

    *(PURSUANT TO CPLR § 5239 FOR FRAUD AND CONVERSION) Against All Defendants*

TWELFTH CAUSE OF ACTION .............................................................................. 48

    *(PURSUANT TO CPLR § 5303 FOR RECOGNITION AND ENFORCEMENT OF A FOREIGN JUDGMENT UNDER NEW YORK LAW) Against Defendant Ablyazov*

THIRTEENTH CAUSE OF ACTION ......................................................................... 49

    *(AIDING AND ABETTING) Against Defendant FBME*

DEMAND FOR JURY TRIAL ................................................................................... 50

DEMAND FOR RELIEF ............................................................................................ 50

Crossclaim Plaintiffs City of Almaty ("Almaty") and BTA Bank ("BTA" or "BTA Bank," and together with Almaty, the "Kazakhstan Plaintiffs"), by and through their undersigned counsel, for the Kazakhstan Plaintiffs' crossclaims against Defendants Triadou SPV S.A., Viktor Khrapunov, Mukhtar Ablyazov, Ilyas Khrapunov, and FBME Bank Ltd. (collectively the "Ablyazov-Khrapunov Group") allege as follows:

## INTRODUCTION

1.       Joseph Chetrit ("Chetrit") is a well-known New York based real estate developer, who, along with crossclaim defendants Mukhtar Ablyazov ("Ablyazov"), Victor Khrapunov, Ilyas Khrapunov and others known and unknown, combined, conspired, and confederated in the commission of an international scheme to launder and conceal at least $40 million stolen from the Kazakhstan Plaintiffs.  Chetrit conspired with these international criminals by, among other things, partnering with Triadou SPV S.A. ("Triadou"), a nominee entity owned, controlled, and funded by the Ablyazov-Khrapunov Group, for the purposes of converting the stolen funds into valuable New York City real estate.

2.       BTA, a bank based in Almaty, Kazakhstan, seeks to regain assets looted by its former Chairman, Mukhtar Ablyazov, who abused his position to enrich himself and treat BTA as his personal property.  BTA has commenced and successfully obtained judgments in proceedings against Ablyazov in the courts of the United Kingdom for defrauding BTA Bank of no less than $4 billion.

3.       Almaty, the largest city in the Republic of Kazakhstan, seeks to regain assets looted by its former mayor, Victor Khrapunov ("Khrapunov"), and his family and co-conspirators, to be  returned for the benefit of the people of Almaty.  Khrapunov abused and corrupted his position as the mayor of Almaty for the purposes of embezzlement, fraudulent self-

1

dealing, and blatant looting of public assets. He reaped an estimated $300 million or more through various fraudulent activities, including rigged auctions, the improper sale of public property to friends and co-conspirators, and fraudulent abuse of eminent domain powers, before fleeing Kazakhstan and secreting these stolen funds across the globe.

4.      The Khrapunovs and Ablyazov, both fighting law enforcement investigations and asset seizures by Kazakh authorities, joined forces and commingled their stolen funds. Through joint investments across the globe, the two renegade families combined and conspired to launder their illicit wealth into real estate, energy assets, and other investments in locales they deemed safe from seizure. Ilyas Khrapunov, related by marriage to Ablyazov, helped orchestrate these efforts and steered the families' joint investments into assets within this Court's jurisdiction.

5.      The Ablyazov-Khrapunov Group's money laundering schemes relied heavily on the cooperation of officers within FBME Bank, Ltd ("FBME"), a Tanzanian-incorporated financial institution operating primarily out of the Republic of Cyprus. Until 2014, FBME had long been known as a financial institution open for business to money launderers and international criminals. FBME joined the Ablyazov-Khrapunov Group's money laundering conspiracy by knowingly aiding the Ablyazov-Khrapunov Group's members in hiding and laundering funds and evading asset freezes and investigations. In 2014, FBME was designated a "foreign financial institution of primary money laundering concern" and effectively banned from the legitimate international financial system by the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of the Treasury, a decision subsequently described by FBME as a "death sentence."

6.      Collectively, the Ablyazov-Khrapunov Group has been the subject of numerous proceedings and investigations across the globe, arising from their theft of billions of dollars from

entities and municipalities in the Republic of Kazakhstan. They have sought to hide their stolen wealth from investigators and law enforcement through a vast network of shell corporations and outwardly-legitimate investments, including major New York real estate developments such as the Flatotel and Cabrini Medical Center condominium conversions. Through these investments, the Chetrit Group allied itself with the Ablyazov-Khrapunov Group and their global money laundering endeavor.

7.     The Ablyazov-Khrapunov Group laundered their ill-gotten assets through a number  of shell corporations, including Triadou.  With the help of Chetrit and the Chetrit Group, the  Ablyazov-Khrapunov Group parked these corrupt assets in New York City real estate, hoping to  avoid the scrutiny of escalating international investigations into the Ablyazov-Khrapunov Group's  illicit activities.

8.     Due to heavy scrutiny by international law enforcement, including criminal investigations by the Kazakh and Swiss authorities, the funds that the Ablyazov-Khrapunov Group, through Triadou, invested into the Flatotel and Cabrini Medical Center projects could not pass through legitimate banking channels.  The Crossclaim Defendants devised a plan to circumvent legitimate banks and transfer funds directly from the Ablyazov-Khrapunov Group's offshore accounts with FBME to the escrow account of the Chetrit Group's long-time attorneys.

9.     In return for facilitating the Ablyazov-Khrapunov Group's money laundering scheme, the Chetrit Group got access to the stolen funds to fund its real estate projects, and entered into deals that entitled the Chetrit Group to a disproportionate share of the projects' profits.

10.     Due to concern that he was partnering with reputed international criminals, however, Chetrit conducted his communications with the Ablyazov-Khrapunov Group by using

code names. For example, Chetrit used code names such as "Jose" and "Pedro" to refer to and communicate with crossclaim defendant Ilyas Khrapunov. It was only in face-to-face meetings, many of which were secretly recorded, that Ablyazov's involvement, legal difficulties and incarceration were openly discussed.

11. Ultimately, Almaty and BTA Bank were able to trace the stolen assets to the United States. Rather than let Almaty and BTA reclaim their rightful property, the Ablyazov-Khrapunov Group, through Triadou, began to urgently liquidate their real estate holdings, hoping to spirit their illicit funds to more permissive locales. In an attempt to monetize the Ablyazov-Khrapunov Group's real estate interests as quickly as possible, Triadou entered into a fraudulent, below-market assignment with the Chetrit Group for Triadou's principal New York assets, interests in the Flatotel and Cabrini Medical Center real estate developments.

12. Specifically, in May 2014, the City of Almaty filed an action in federal court in California against members of the Ablyazov-Khrapunov Group. With the Kazakhstan Plaintiffs' collection efforts having expanded to the United States, and with the Ablyazov-Khrapunov Group in imminent danger of having its stolen assets seized or attached, the Ablyazov-Khrapunov Group, through Triadou, took immediate steps to liquidate its U.S. assets and move its money offshore again. The Chetrit Group's assistance was essential to placing the stolen assets out of the reach of the Kazakhstan authorities.

13. Upon information and belief, Chetrit seized on this opportunity to double cross his co-conspirators. Understanding that the potential asset seizures or restraints put the Ablyazov-Khrapunov Group in a desperate situation, he devised scheme to acquire Triadou's investments for a fraction of their value. To achieve this result, Chetrit bribed Triadou's Director to drive down the purchase price of the assignment. The Chetrit Group ultimately succeeded in acquiring

Triadou's interest in both the Flatotel and Cabrini properties for as little as $26,000,000.00 — far less than even what Triadou had originally invested — at a time when real estate values in New York were at an all-time high.

14.  Almaty and BTA Bank now seek, among other relief, to unwind and recover the proceeds of these fraudulent transactions. Doing so will hold the Crossclaim Defendants liable for their corruption and fraud, and return the full value of Triadou's New York assets to their rightful owners: BTA Bank and the City of Almaty.

<u>**THE PARTIES**</u>

15.  Crossclaim plaintiff Almaty is a legal subdivision of the Republic of Kazakhstan. Almaty is the former capital of the country, and continues to be the largest city in the Republic of Kazakhstan, with more than 1.5 million residents.

16.  Crossclaim plaintiff BTA Bank is a Joint Stock Company and Kazakhstan bank with its headquarters in Almaty, Kazakhstan. Until in or about September 2014, BTA Bank was majority owner and controlled by the Republic of Kazakhstan.

17.  Crossclaim defendant Triadou SPV S.A. is a special purpose investment vehicle incorporated under the laws of Luxembourg, with a principal place of business at 3, Rue du Mont-Blanc, 1201 Geneva, Switzerland. Triadou SPV S.A. is wholly-owned by SDG Capital S.A.

18.  Crossclaim defendant Viktor Khrapunov, an individual, is the former Mayor of the City of Almaty, who, upon information and belief, currently resides in the city of Geneva, Switzerland.

19.  Crossclaim defendant Mukhtar Ablyazov, an individual, is the former Chairman of BTA Bank and has been found liable for defrauding BTA of in excess of $6 billion. Ablyazov

was the subject of eleven proceedings commenced by BTA Bank in the United Kingdom to recover assets Ablyazov stole. During those proceedings, Ablyazov was found by multiple international courts to have lied, misled, misconstrued, and concealed assets in blatant disregard of Court orders, and was ordered imprisoned for 22 months. During these proceedings, Ablyazov fled the United Kingdom to avoid the many judgments against him. He is currently incarcerated in France pending extradition to Russia or Ukraine.

20. Crossclaim defendant Ilyas Khrapunov, an individual, is the son of Viktor Khrapunov, as well as the former president of SDG Capital S.A., who, upon information and belief, currently resides in the city of Geneva, Switzerland. Ilyas Khrapunov is married to Ablyazov's daughter, Madina.

21. Crossclaim defendant FBME Bank Ltd. is a financial institution headquartered in Dar es Salaam, Tanzania and operating primarily out of Cyprus. FBME is jointly owned by Ayoub-Farid Saab and Fady Saab, but is currently controlled and administered by representatives of the Central Bank of Cyprus.

## JURISDICTION AND VENUE

22. The Crossclaims are brought under Rule 13 of the Federal Rules of Civil Procedure. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) over the claims for relief alleging violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq. and for conspiracy to violate RICO. This Court has supplemental jurisdiction over the sixth through thirteenth claims for relief pursuant to 28 U.S.C. § 1367, as those claims are substantially related to Almaty's and BTA Bank's claims under RICO and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

23.     Alternatively, this Court has supplemental jurisdiction over Almaty's and BTA Bank's claims under 28 U.S.C. § 1367, as those claims are substantially related to the original interpleader suit brought by Chetrit and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

24.     Alternatively, the City of Almaty is a "foreign state" as that term is defined in 28 U.S.C. § 1603, and this Court has jurisdiction over Almaty's and BTA Bank's claims under 28 U.S.C. §§ 1330, 1441(d), which provide for the removal of any civil action brought in a State court against a foreign state.

25.     Alternatively, this Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because at the time this action was filed (i) there was complete diversity of citizenship between the parties, and (ii) more than $75,000, exclusive of interest and costs, is at stake.

26.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Almaty's and BTA Bank's claims occurred in this District, including, among other things, the negotiation, investment and subsequent transfer of interest in the Flatotel and Cabrini Medical Center properties located in New York, New York.

27.     This Court has personal jurisdiction over Triadou, Ablyazov, Viktor Khrapunov, Ilyas Khrapunov, and FBME because each of them knowingly committed acts in New York that form the basis of this action, directed or conspired with others to commit acts in New York, and/or purposely availed themselves of the privileges of doing business in New York, as fully set forth herein.

## FACTUAL BACKGROUND

*Mukhtar Ablyazov Defrauded BTA Bank of in Excess of $6 billion.*

28.     Ablyazov was the Chairman of BTA Bank from May 2005 until February 2009. He is the father-in-law of crossclaim defendant Ilyas Khrapunov, who is married to Ablyazov's daughter, Madina.  Along with crossclaim defendant Viktor Khrapunov, Ablyazov is a central member of the Ablyazov-Khrapunov Group money laundering and embezzlement conspiracy.

29.     As the Courts of the United Kingdom have found, while Chairman of BTA Bank, Ablyazov exercised virtually unfettered control over the bank's operations while hiding that control from Kazakhstan's banking regulators, and used this influence to treat BTA's assets as his own. As Justice Teare of the High Court of England and Wales (Commercial Court) found:

> [P]rior to the nationalisation of the Bank in February 2009, Mr. Ablyazov admitted to owning over 75% of the shares in the Bank. Those shares were not held by Mr. Ablyazov personally but by nine companies on his behalf. However, Mr. Ablyazov did not admit that ownership to the AFN, the banking regulator in Kazakhstan. In January 2009, shortly before the nationalisation of the Bank, the AFN requested Mr. Ablyazov to state whether he owned more than 10% of the shares in the Bank. He replied on 19 January 2009 that he did not own directly or indirectly more than 10% of the shares in the Bank. That statement was untrue.
>
> . . .
>
> Banks in Kazakhstan tend to be operated in a different manner from that in which they are typically operated in the West. It is common for banks to be owned by a single shareholder who is both chairman of the board of directors and also closely involved in the management of the bank. He therefore has considerable influence over the operation of the bank. Mr. Ablyazov's relationship with the Bank conformed with this general description of Kazakh banking practice. Thus Mr. Talvitie, the independent member of the Board of Directors of the Bank from East Capital, gave evidence that it seemed to him that at board meetings Mr. Ablyazov had already made the decisions. He described the other members of the board as "straw men". Others in the Bank, below board level, had the same impression. Thus Ms. Tleukulova (a member of the Credit Committee) gave evidence in Russia in 2012 that "all top managers of the bank, including Board Members, have to obey him". Mr. Khazhaev also gave evidence in Russia in 2012 that Mr. Ablyazov was "the main" person in the Bank who controlled the granting of the largest and most important loans. Mr. Ablyazov's control of the Bank is illustrated by his issue of an order ("the Ablyazov Order") whereby he, as Chairman, amended certain procedural rules governing the grant of loans.

> . . .
>
> [O]fficers and staff in the Bank did not draw a clear distinction between the Bank having an interest in a project and Mr. Ablyazov, as shareholder in the Bank, having a personal interest in a project. Thus [Deputy Chairman] Zharimbetov, when being crossexamined, failed to draw a clear distinction, in the context of the offshore companies with which he dealt, between Mr. Ablyazov and the Bank. Thus the unfortunate reality appears to have been that little, if any, distinction was drawn by personnel in the Bank between the Bank's property and Mr. Ablyazov's property. The Vitino port project was an example of that reality. Mr. Khazhaev told a Russian court in 2012 that Mr. Ablyazov treated the Bank as his property.

30.    Ablyazov's abuse of his position as chairman took many forms, principally through enormous loans to valueless entities owned by Ablyazov, which would then be obscured by transfers among different shell corporations, and never repaid.

31.    For example, in one series of loans (referred to as the "Original Loans" by the UK court in the "Granton Action"), between March 2006 and August 2008, Ablyazov directed twenty loans totaling $1,428,840,000 to entities with minimal assets and for no apparent reason.  These loans were made to entities outwardly unaffiliated with Ablyazov ("Original Borrowers"), but were actually transferred to entities controlled by Ablyazov ("Original Real Borrowers").  As the UK court found:

> Mr. Ablyazov did not disclose to the Board that he owned or controlled those [Original] Borrowers. He has never claimed that he did so and there is no evidence that he did. None of the represented Defendants has suggested that he did. In those circumstances there can be only one explanation for the fact that the very large sums of money which were advanced were immediately transferred to companies owned or controlled by Mr. Ablyazov, namely, that the Original Loans were part of a dishonest scheme whereby Mr. Ablyazov sought to misappropriate monies which belonged to the Bank. The scheme was fraudulent because Mr. Ablyazov did not disclose to the Board his interest in the Original Borrowers or that the real purpose of the loans was to pay out the Bank's money to the Original Real Borrowers who were to use the monies for Mr. Ablyazov's purposes. The purpose of such nondisclosure must have been to deceive the Board so that it remained in ignorance of the "related party" nature of the Original Loans and of their true purpose.

32.    When, in or about 2008, Ablyazov's involvement in the Original Loans was in

danger of discovery, he directed that additional fraudulent loans be made in an attempt to cover up his earlier fraud.

33.     Between November 4, 2008, and December 4, 2008 a number of loans (the "Later Loans") totaling $1,031,263,000 were made, ostensibly for the purchase of oil and gas resources. The UK court, however, found it "beyond argument" that these loans of BTA funds were made only to hide Ablyazov's earlier theft:

> The Later Loans were made between 5 November and 8 December 2012 but they were paid out, not to the Later Borrowers, but to Intermediaries who paid them on to other companies, the Recipients, who in turn paid them to the Bank in apparent discharge of the Original Loans. They were not used for the purchase of oil and gas equipment. Documents said to support and evidence the Later Loans were created after the monies had been paid out by the Bank but backdated. Thus contracts for the purchase of oil and gas equipment supposedly by the Later Borrowers were still being prepared in late November 2008 and backdated to 23 October 2008.
>
> . . .
>
> Expert evidence as to the oil and gas industry was adduced by the Bank to establish that the oil and gas contracts were shams because of the lack of specific provisions which would be appropriate for contracts of their size. But such evidence was unnecessary. The email evidence shows that the contracts were prepared by persons within the Bank.
>
> . . .
>
> It is beyond argument that the Later Loans were a mere cloak which sought to hide from view the reality, which was that money was being extracted from the Bank for the purpose of paying back the Original Loans. Since this circular exercise benefitted Mr. Ablyazov (because he owned or controlled the Original Borrowers) it is also clear that he must have orchestrated or, at the least, authorised this fraud.

34.     As a result of Ablyazov's siphoning billions out of the company, in 2009, BTA Bank defaulted on billions of dollars of debt held by investors including Credit Suisse Group AG, HSBC Holdings Plc, JPMorgan Chase & Co. and Royal Bank of Scotland Group Plc. Kazakhstan's sovereign wealth fund, Samruk-Kazyna, was forced to take control of BTA Bank, and Ablyazov fled to London.

35.    BTA then commenced the first in a series of lawsuits against Ablyazov, claiming that he had misappropriated approximately $295,000,000 pursuant to this fraudulent scheme. Other proceedings followed against Ablyazov in the Chancery Division and England High Court. In every proceeding, BTA alleged (and ultimately proved) that Ablyazov treated BTA as his own private source of funds.  In all, BTA commenced eleven proceedings against Ablyazov and his lieutenants for defrauding BTA in excess of $6 billion.  The UK courts took the unprecedented legal step of granting BTA a Worldwide Freezing Order over Ablyazov's assets.

36.    As part of these UK proceedings, in late 2010 BTA obtained a number of search and disclosure orders that uncovered a vast network of undisclosed companies and assets used by Ablyazov to hold and invest his stolen wealth.  The UK courts ordered Ablyazov's assets to be put in the receivership of the accounting firm KPMG (the "Receivership Order"), finding that Ablyazov had breached various disclosure and freezing orders against him.  The Receivership Order gave the receiver the right to recover a network of many hundreds of entities, worth billions of dollars.

37.    On January 26, 2011, a further 212 companies were added to the scope of the Receivership Order and on April 8, 2011, a further 3,890 companies were added.

38.    After Ablyazov defied the Receivership Order entered by the UK courts, BTA obtained judgments and sanctions against him for, among other acts, flaunting court orders, fleeing and hiding from judicial proceedings, lying during proceedings, and refusing to comply with orders directing him to uncover assets.  For his numerous actions in contempt of court, Ablyazov was sentenced to 22 months imprisonment for his conduct.

39.    On February 16, 2012, despite having promised the court his attendance at his contempt hearing, Ablyazov did not appear.  Ablyazov left behind a 100-acre estate in the English

11

countryside and a London mansion, valued at least 20 million pounds sterling (approximately $31 million) each, and no fewer than 750 shell companies used to invest his stolen funds in oil production, property development, and agriculture.

40.     On November 6, 2012, the Court of Appeal unanimously upheld the judgments and contempt orders against Ablyazov.  Concurring in the judgment, Lord Justice Maurice Kay stated that it was "difficult to imagine a party to commercial litigation who has acted with more cynicism, opportunism and deviousness towards court orders than Mr. Ablyazov."

41.     Following Ablyazov's flight from justice, BTA has been granted judgments in 5 of the 11 claims against Ablyazov and his associates, with others still pending, and has been awarded over $4 billion in damages by the UK courts, with interest continuing to accrue. (the "Ablyazov Judgments").

42.     After a global search spearheaded by BTA Bank, French special forces found and arrested Ablyazov in a luxury villa in France on July 31, 2013.  He remains detained in a French prison pending extradition, and the courts of France have refused to release him on bail three times.

43.     Following Ablyazov's capture and imprisonment, through his counsel and other channels, Ablyazov remained in regular communication with his son-in-law, Ilyas Khrapunov, who assumed operational control of much of Ablyazov's money laundering operations and, in concert with Ablyazov and Viktor Khrapunov, has continued the Ablyazov-Khrapunov Group's combined efforts to hide their wealth.

44.     Ilyas Khrapunov's continuing role in facilitating the Ablyazov-Khrapunov Group's money laundering efforts was confirmed on July 17, 2015, when Justice Males of the Commercial Division of the Queen's Bench of the U.K. High Court of Justice expanded the

freezing order against Ablyazov to encompass specified assets of Ilyas Khrapunov. In response to the disclosure obligations imposed by the freezing order, Ilyas Khrapunov invoked his privilege against self-incrimination.

***Viktor Khrapunov Defrauded the City of Almaty of Approximately $300 million.***

45.      In 1991, the Republic of Kazakhstan declared its independence from the  former Soviet Union and began the process of transitioning from communism to an open  market economy.  This transition required substantial privatization of vast state assets in  order to restart the nation's economy and raise revenue for improvements to the nation's  infrastructure and public services.

46.       Viktor Khrapunov became mayor of the City of Almaty on or about June  16, 1997, and remained in that position until approximately December 2004.  At the time  Viktor Khrapunov took office, the Republic of Kazakhstan was experiencing the  beginning of a natural resources boom and accompanying drive for investment,  infrastructure upgrades, and new construction.  Almaty was the nation's former capital  and largest city, and held enormous public assets remaining to be privatized and  developed, a responsibility which the office of the mayor oversaw and directed.

47.      Before Viktor Khrapunov assumed the office of the mayor of Almaty, he took an oath of office to obey the Constitution and laws of the Republic of  Kazakhstan.  Among other things, he expressly and impliedly promised that he would  uphold his fiduciary duties to the people of Almaty, would honor his obligation to provide honest services, and would not convert money, property, or assets belonging to the City of Almaty for his own use or that of his family, friends, or associates.

48.      In reality, Viktor Khrapunov, along with his son, Ilyas Khrapunov, and other

Khrapunov family members and co-conspirators, almost immediately began a multi-year scheme to enrich themselves through the corrupt abuse of Khrapunov's public position as mayor.

49.     Viktor Khrapunov repeatedly and systemically used the powers of the office of the mayor to transfer public assets belonging to the City of Almaty to his family and their co-conspirators for prices that were a fraction of their fair value.  This  was often achieved by arranging fraudulent auctions to ensure that interested bidders won  these assets at nominal prices.  In other instances, Viktor Khrapunov used the  eminent domain powers of the office of the mayor to seize private property ostensibly for  the City of Almaty, but then promptly transferred that property to entities owned or  controlled by the Khrapunovs.  They would then pass these assets through a series  of shell or holding corporations to conceal the destination of these assets, before reselling  them for prices an order of magnitude greater than what they had paid the City of  Almaty.

50.     Three examples of these corrupt schemes to subvert and acquire the public property of the City of Almaty follow:

*Transaction One*

51.     In or about 2000, Viktor Khrapunov used his position as mayor of Almaty  to transfer a large tract of state-owned land near the two rivers area of Almaty to his  spouse and co-conspirator, Leila Khrapunov, for a total price of approximately $121,000.  The final recipient of this transfer was concealed through a series of fraudulent transactions and front  companies controlled by the Khrapunovs.  The Khrapunovs ultimately resold  this parcel of real estate for an estimated $15.57 million, a more than $15 million profit  on one interested transaction.

52.     In short, the Khrapunovs paid approximately $121,000 for a parcel of  public real estate which they later resold for a total of $15.57 million; a 128,000 percent  profit.

*Transaction Two*

53.     On or about April 16, 2001, Viktor Khrapunov used his position as mayor to cause a public building in Almaty to be sold at a fixed and rigged public auction to KRI, a company owned by Leila Khrapunov, for approximately $347,000.  The property was ultimately resold to an unrelated third party for approximately $4.1 million.

*Transaction Three*

54.      In addition to the sale of state-owned assets to Leila  Khrapunov and other family members and co-conspirators, Viktor Khrapunov also  abused his authority as mayor to enrich the Khrapunovs by seizing privately-owned property and transferring it to the Khrapunovs and others for resale.  For example, on or  about August 25, 2003, Viktor Khrapunov caused the City of Almaty to seize land owned  by privately-owned third party Shadid Engineering LLP. Approximately one month  later, he caused the property to be sold to Leila Khrapunov's company, Karasha, for  approximately $105,000.  Leila Khrapunov then caused Karasha to sell the property  directly to her, whereupon she transferred it to another company, BSC, and it was sold as part of BSC to an  unrelated third party, in a transaction that valued the parcel at approximately $2 million.  As a result, the Khrapunovs obtained nearly $1.9 million in unjustified profit.

55.     In short, through similar transactions uncovered and  still under investigation, the Khrapunovs are estimated to have illegally acquired at  least 80 pieces of real estate, which they converted into approximately $300 million in  illicit funds.

**The Khrapunovs and Ablyazov Join Together to Launder Their Stolen Money.**

56.     Seeking to avoid law enforcement attention and possible seizure of this ill-gotten wealth, the Ablyazov-Khrapunov Group funneled their corrupt assets into real estate and development entities located in, among other places, the United States and Switzerland.

15

57.     Among other locations, the Ablyazov-Khrapunov Group transferred their stolen funds to Switzerland,  where Ilyas Khrapunov and Madina Ablyazov reside, using accounts and sham entities owned or ultimately  controlled by the Ablyazov-Khrapunov Group.  The Ablyazov-Khrapunov Group ultimately transferred to  Switzerland hundreds of millions of dollars, moved out of Kazakhstan by  Viktor Khrapunov and laundered through offshore holding companies to appear  legitimate.

58.     Seeking to hide the proceeds of their frauds, the Ablyazov-Khrapunov Group created a series of entities in Switzerland and overseas to launder these illicit funds into outwardly-legitimate investments.  One such entity was Swiss  Development Group, formally SDG Capital S.A., formed and controlled by Ilyas  Khrapunov for the benefit of the Ablyazov-Khrapunov Group.  Between 2008 and 2012, the  Ablyazov-Khrapunov Group and sham companies they controlled funneled at least $115 million  into SDG derived from the Ablyazov-Khrapunov Group's self-dealing and fraud.

59.     Through these foreign investment vehicles, the Ablyazov-Khrapunov Group sought  to obscure their wealth from law enforcement in the Republic of Kazakhstan and abroad, by maintaining the appearance of a modest family of civil servants.

60.     The Ablyazov-Khrapunov Group took numerous steps to maintain this facade and  conceal their looting of the City of Almaty's public assets from authorities.  Among other schemes,  Viktor Khrapunov regularly filed false annual tax returns with Kazakhstan's  taxation authority, the Tax Committee of the Ministry of Finance of Kazakhstan.  The false returns concealed millions of dollars in monies, properties, and assets the  Ablyazov-Khrapunov Group had acquired and laundered through their corrupt enterprise.

61.     For example, according to their 2007 tax returns, which required Viktor  and

Leila Khrapunov to list their entire net worth accumulated through all sources as of December 31, 2007, Viktor Khrapunov reported a combined net worth equivalent to $113,298, in addition to three vehicles, five modest pieces of real estate, and two parking stalls. While claiming to have a total net worth of less than $120,000, Viktor Khrapunov had in fact amassed a fortune estimated at no less than $300 million. Indeed, according to public news reports, in 2009 Viktor Khrapunov was one of the richest people in Switzerland with a fortune of over $300 million. Similarly, in 2012 Viktor Khrapunov was again listed among Switzerland's 300 richest people, with a fortune estimated at $324– $432 million.

### The Ablyazov-Khrapunov Group's Corruption is Exposed and Investigations Begin in Kazakhstan and Switzerland

62.     In late 2007, Viktor Khrapunov was tipped off that the Kazakh government had begun investigating the financial dealings of the Ablyazov-Khrapunov Group and their associates for a range of criminal acts and self-dealing. In anticipation of possible criminal charges, on or about November 9, 2007, Viktor and Leila Khrapunov boarded a private jet and fled Kazakhstan for Switzerland, where Ilyas Khrapunov and Madina Ablyazov resided, and the bulk of their looted funds were held.

63.     On or about May 27, 2011, the Investigation Department of the Agency for Economic and Corruption-Related Crimes of Kazakhstan (the "Investigation Department") filed two criminal cases against Viktor Khrapunov for abuse of power and fraudulent acts, and on or about July 21, 2011, obtained a court-ordered arrest warrant for Viktor Khrapunov. Through 2011 and 2012 additional charges were brought in Kazakhstan against Viktor, Leila, and Ilyas Khrapunov, arising from the theft of public property and the ultimate laundering of funds during Viktor Khrapunov's tenure as Mayor of Almaty.

64.     On or about February 20, 2012 and September 14, 2012, the Investigation

Department applied to the Federal Office of Justice in Switzerland for legal assistance in connection with the effort to prosecute Viktor, Leila, and Ilyas Khrapunov for crimes in Switzerland and Kazakhstan relating to their corrupt acts in Almaty and the laundering of the resulting funds. In response to this request, in mid-2012 the Public Prosecutor of Geneva opened an investigation into the Ablyazov-Khrapunov Group on suspicion of violating Swiss money laundering laws. The Public Prosecutor of Geneva subsequently seized financial and banking documents from the Ablyazov-Khrapunov Group and ordered Swiss accounts and assets belonging to them be frozen, including accounts held at Swiss banks Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co. This investigation by the Swiss authorities is ongoing, and in August 2013 the Public Prosecutor of Geneva froze additional assets belonging to the Ablyazov-Khrapunov Group.

65.     At this time, in addition to the numerous judgments against Ablyazov in the United Kingdom, there are no less than 24 criminal charges pending against Viktor Khrapunov in Kazakhstan for embezzlement, fraud, money laundering, establishing and directing an organized criminal group for criminal purposes, abuse of power, and bribery. There are additional charges pending against Leila Khrapunov and Ilyas Khrapunov in Kazakhstan for, among other offenses, money laundering and establishing and directing an organized criminal group for criminal purposes. Assets of the Ablyazov-Khrapunov Group remain frozen by Swiss authorities, and the Government of the Republic of Kazakhstan has formally requested extradition of Viktor Khrapunov.

66.     Despite the numerous investigations and freezing orders against the members of the Ablyazov-Khrapunov Group, the conspirators continue to launder their commingled stolen wealth through acts of fraud and in furtherance of the conspiracy.

67. As one example, from 2011 through the present, members of the Ablyazov-Khrapunov Group, including Ilyas Khrapunov and Ablyazov himself, conspired to fund Ablyazov's widespread global legal campaign with laundered funds, despite global freezing and receivership orders against Ablyazov's assets.

68. In May of 2011, two entities that Ablyazov had been using to fund his various litigations were put in receivership, based on findings that they were not arms-length lenders, but in fact controlled and funded by Ablyazov himself. Deprived of a funding source, Ablyazov conspired with other members of the Ablyazov-Khrapunov Group to circumvent the receivership and freezing orders against him and began funding his litigation – including litigation against the Republic of Kazakhstan – through loans from a series of shell companies, including the Belizean-registered entity Green Life International SA ("Green Life").

69. The conspirators represented to the U.K. receivers and courts that Green Life was an arms-length entity owned and funded by Gennady Petelin, but did not disclose that Petelin was related by marriage to the Ablyazov and Khrapunov families.

70. In fact, Green Life was one more in a long series of shell entities used by the Ablyazov-Khrapunov Group to launder their stolen funds. At Ablyazov's direction, Ilyas Khrapunov and other members of the Ablyazov-Khrapunov Group transferred millions of dollars in funds from accounts controlled by the Ablyazov-Khrapunov Group through Petelin and Green Life to Ablyazov's counsel. To obscure this scheme, all funds were transferred from Green Life to Chabrier Avocats, the Swiss counsel for the Khrapunov family and SDG, before being paid to Ablyazov's counsel.

71. Using Petelin's name to deter suspicion, the conspirators were able to launder and spend millions of dollars in stolen funds that should rightly have been placed in receivership.

72.     The use of Petelin as a front for Ablyazov shell corporations such as Green Life was based in part on the close relationship between Petelin and Viktor Khrapunov. Viktor Khrapunov, whose daughter is married to Petelin's son, collaborated with Petelin on investments of the Ablyazov-Khrapunov Group's funds in Russia, where Petelin resided and had an extensive network of contacts. For example, in 2013, Viktor Khrapunov engaged in discussions with Petelin for the purpose of utilizing Petelin's contacts in Russia to facilitate the investment of the Ablyazov-Khrapunov Group's funds in Russian oil and energy assets.

73.     As another example of the Ablyazov-Khrapunov Group's continuing operations, members of the Ablyazov-Khrapunov Group hired computer hackers to illegally surveil French prosecutors and other public officials in an effort to free Ablyazov from French prison.

74.     Ablyazov was arrested by French special forces in 2013 after fleeing the U.K., but has remained in continuous contact with his coconspirators during his imprisonment. During his incarceration, Ablyazov directed his coconspirators, and his son-in-law Ilyas Khrapunov in particular, to use an array of unlawful means to secure his release.

75.     At Ablyazov's direction, in 2013 Ilyas Khrapunov hired a "black hat" computer security group to hack into the personal and work communications of numerous French public officials, including the prosecutors in Ablyazov's French extradition proceedings. Without permission and in violation of law, these hackers successfully breached the computers and mobile phones of numerous French law enforcement and justice officials, intercepted their electronic communications, and installed malicious software permitting them to remotely activate the microphones on these public officials' mobile phones to eavesdrop on and record their conversations. The hackers then transmitted French officials' intercepted communications, including emails, text messages, documents, and photographs, to Ilyas Khrapunov, who shared

and discussed this illegally-obtained surveillance with Ablyazov himself. Ablyazov then used this information as part of his legal campaign to avoid extradition.

76.     In return for this illegally-intercepted information, the Ablyazov-Khrapunov Group paid hundreds of thousands of dollars to these hackers-for-hire, from funds traceable to the thefts from BTA Bank and the City of Almaty.

### The Ablyazov-Khrapunov Group Conspires to Transfer and Hide Illicit Funds in the United States.

77.     In 2011 and 2012, in response to escalating pressure on the Ablyazov-Khrapunov Group from both Kazakh and Swiss authorities and legal proceedings in the United Kingdom, the Ablyazov-Khrapunov Group embarked on a  scheme to secret the families' illicit wealth in real estate investments in the United States.  Upon information and belief, the Ablyazov-Khrapunov Group selected the United States as a harbor  for these stolen funds because they believed real estate investments in the United States would be difficult for Kazakh authorities to access.

78.     To execute this scheme the Ablyazov-Khrapunov Group used SDG, their Swiss real estate vehicle, and Telford International Limited ("Telford"), a Dubai-based private contracting entity controlled by the Ablyazov-Khrapunov Group.

79.     To create the appearance that SDG was independent of the Ablyazov-Khrapunov Group, in 2012 SDG was purportedly sold to a close friend and political ally of the Ablyazov-Khrapunov Group, Philippe Glatz.  This sale was in fact a sham  transaction, with the Ablyazov-Khrapunov Group maintaining beneficial ownership and control of SDG.

80.     Upon information and belief, the Ablyazov-Khrapunov Group paid Mr. Glatz to purchase SDG using the Ablyazov-Khrapunov Group's own funds:  Glatz accepted a loan from the Ablyazov-Khrapunov Group and then repaid that loan while  outwardly claiming that this payment to the Ablyazov-Khrapunov Group was for the purchase of  SDG.  In fact, the transfer

of SDG was illusory, as Mr. Glatz was merely repaying a prior obligation, and effectively getting SDG for free.

81.     To reduce the amount of cash needed to effectuate this sham sale, Ilyas Khrapunov offered SDG to Glatz at an incredibly discounted price. Although at the time of the purported sale SDG's assets were valued at approximately $150 million, Glatz only transferred approximately $3.5 million in cash to the Khrapunov family for SDG – roughly two percent of SDG's assessed asset value.

82.     To justify this incredible discount to asset value, Ilyas Khrpaunov used his control of SDG to falsely book millions of dollars in supposed debt and liabilities to hide the fraudulent nature of the transition he had orchestrated.

83.     This sham transaction served the Ablyazov-Khrapunov Group's purposes by creating the appearance that SDG had changed ownership, although the Ablyazov-Khrapunov Group received no net consideration for the purported sale, and Glatz was left beholden to the Ablyazov-Khrapunov Group and explicitly obligated to hold their interest in the investment.

84.     The capital structure, organization, management, and illicit purpose of SDG remained the same after the purported sale, and the Ablyazov-Khrapunov Group still profits from and manages SDG's operations. Ilyas Khrapunov continues to control SDG while holding himself out to be a mere "outside advisor" to the company, all the while protecting and reaping the benefits of the Ablyazov-Khrapunov Group's investments in SDG.

***Through SDG, the Ablyazov-Khrapunov Group Creates Triadou to Hide their Illicit Funds in New York Real Estate Transactions with the Chetrit Group.***

85.     In or about 2011, Ilyas Khrapunov, on behalf of the Ablyazov-Khrapunov Group, approached Nicolas Bourg, a Belgium-based real estate fund manager, seeking to create a new entity controlled by SDG to mask the Ablyazov-Khrapunov Group's efforts to invest in real

estate opportunities in the United States.

86.     In consultation with Ilyas Khrapunov, Bourg formed a series of entities under the laws of Luxembourg for the specific purpose of investing the Ablyazov-Khrapunov Group's funds in real estate in the United States. These entities included Triadou, an investment vehicle wholly owned and controlled by SDG, which was itself a front for the Ablyazov-Khrapunov Group's activities.

87.     Triadou is a special purpose vehicle: a limited-liability legal entity created to fulfill a specific purpose, often used to insulate a parent entity from financial risk or liability. SPVs can also be used, as Triadou was, to hide the true ownership of assets held by the SPV, or to obscure relationships between individuals and entities. Bourg became the sole director of Triadou, operating at the direction of the Ablyazov-Khrapunov Group, who continued to control SDG, Triadou's sole shareholder.

88.     At the direction of Ilyas Khrapunov, Bourg made contact with Eric Elkain, an agent of Chetrit and the Chetrit Group. Bourg and Elkain agreed to arrange a meeting between Chetrit and Ilyas Khrapunov for the purpose of exploring concealed investments by the Ablyazov-Khrapunov Group in the United States with the Chetrit Group.

89.     In or about 2012, Chetrit and his brother and partner Meyer Chetrit met with Ilyas Khrapunov and Bourg in Geneva, Switzerland. While the Ablyazov-Khrapunov Group had purportedly divested itself of any interest in SDG by this time, Ilyas Khrapunov held himself out to Chetrit as having a controlling ownership interest in SDG.

90.     At this meeting, Chetrit and Ilyas Khrapunov discussed possible investment strategies for the Ablyazov-Khrapunov Group in the United States real estate sector. In these discussions, Ilyas Khrapunov disclosed the fact that the Ablyazov-Khrapunov Group was facing

criminal charges and asset freezes directed by the governments of Kazakhstan, Switzerland, and the United Kingdom, and needed to move funds to other jurisdictions. During the continuing course of his dealings with the Ablyazov-Khrapunov Group, this situation was repeatedly and unequivocally made clear to Chetrit. Specifically, the Ablyazov-Khrapunov Group needed to move funds that were the subject of criminal charges and asset freezes as a result of the proceedings both against Ablyazov and the Ablyazov-Khrapunov Group. Chetrit expressed sympathy with this situation, stating that his own family had faced political sanctions in his native Morocco, a result of having defrauded the King and being forced to flee. Chetrit and Ilyas Khrapunov agreed in principle to seek joint investments in the United States, and agreed to meet further.

91. Following this meeting in Geneva, Ilyas Khrapunov and Bourg met with Chetrit again in New York City, to evaluate potential investment options. While discussing specific investment opportunities, the parties again openly and repeatedly discussed the criminal charges against the Ablyazov-Khrapunov Group and the efforts of the governments of Switzerland and Kazakhstan to locate and seize the assets of the Ablyazov-Khrapunov Group. Again, Ilyas Khrapunov acted on behalf of SDG and Triadou, despite the Ablyazov-Khrapunov Group's purported sale of SDG a year prior.

92. As a result of these discussions, the Ablyazov-Khrapunov Group invested, through Triadou, with Chetrit and the Chetrit Group in a number of real estate opportunities in New York City. The most significant of these were investments in the Flatotel and Cabrini Medical Center developments in New York City.

93. The Flatotel is a 289-room business hotel opened in 1991, located at 135 West 52nd St, New York, New York.

24

94.     The Cabrini Medical Center hospital campus closed in 2008 and is now comprised of several buildings containing approximately 250 condominium units.

95.     Both the Flatotel and the Cabrini Medical Center properties were purchased by members of the Chetrit Group, along with co-investors.  The developers have  been executing plans to convert both properties into luxury condominiums, and are close to completion.

96.     The Chetrit Group owned a 75% interest in the Flatotel, and created a series of limited liability entities to hold that interest, including Counterclaim Defendants CF 135 FLAT LLC and CF 135 West Member LLC.

97.     The Chetrit Group offered to sell half of their 75% investment in the Flatotel to Triadou, after which the Chetrit Group and Triadou would each own 37.5%.  Triadou would provide 70% of the capital needed – against Chetrit's 30%, the difference amounting to an above-market "promote fee" for Chetrit that ensured that the Chetrit Group would reap the largest profits from the Flatotel development, even as it put in the least capital – and the parties would then divide the profits  from the investment.  In or about March 25, 2013, Triadou accepted this  offer, notwithstanding the fact that the terms strongly favored Chetrit, and committed to transmit funds to the Chetrit Group to secure the 37.5% interest in the Flatotel property.

### *The Ablyazov-Khrapunov Group Enlists FBME to Facilitate Their Money Laundering Scheme in the United States*

98.     The Ablyazov-Khrapunov Group sought to fund Triadou's investments with money from the Ablyazov-controlled entity Telford, held in accounts with FBME.

99.     Telford's FBME accounts were managed by Eesh Aggarwal, Chairman of Azure Consultants DMCC, and a close financial advisor to Ablyazov. Aggarwal had connected Ablyazov and other members of the Ablyazov-Khrapunov Group to FBME through Aggarwal's

contacts with high-level officers at FBME, and in time FBME became one of the Ablyazov-Khrapunov Group's primary banks. On information and belief, the conspirators favored FBME due to its presence inside of the European Union, its lack of anti-money laundering protections, and its eagerness to service high-risk clientele and shell corporations such as Telford.

100.    FBME promoted its weak due diligence standards to attract high-risk, high-value clients just like the Ablyazov, and was known for its willingness to do business with clients seeking to avoid regulatory oversight. In particular, FBME relied on an "Approved Third Party" program, where FBME's contacts could introduce new, high-value clients to the bank with virtually no due diligence of these new relationships. Upon information and belief, Aggarwal was one such "Approved Third Party," and with the approval of certain FBME officers, was able to launder the Ablyazov-Khrapunov Group's funds through FBME by way of entities such as the Ablyazov-controlled Telford, with effectively no scrutiny or due diligence by FBME.

101.    FBME had a history of moving funds for Aggarwal and Ablyazov with no questions asked, which led the conspirators to favor FBME for their criminal schemes aimed at the United States. For example, on June 11, 2011, FBME executed more than $27 million in transfers of Ablyazov's stolen funds to Amber Limited, a shell company registered in the U.A.E. (where Aggerwal operates) subsequently found to be an undisclosed Ablyazov asset and added to the U.K. courts' freezing and receivership orders.

102.    Telford's accounts at FBME bank were used to covertly move and invest funds stolen by Ablyazov from BTA Bank. Because the Telford accounts consisted of Ablyazov's stolen funds, Ilyas Khrapunov conferred with Ablyazov regarding investments of funds from Telford, and Ablyazov's approval was required for transfers from Telford. Even after Ablyazov's incarceration in France he remained in contact with his coconspirators, and while Ilyas

26

Khrapunov took operational control of much of the Ablyazov-Khrapunov Group's network, Ablyazov continued to direct specific transfers of funds, including those from Telford's FBME accounts.

103.     Triadou attempted to transfer Telford's funds held in FBME for the Flatotel and Cabrini deals through banks in Luxembourg, but those banks refused to  accept wire transfers from the Ablyazov-Khrapunov Group's FBME accounts due in part to the investigations or proceedings led  by the Kazakh, Swiss, and United Kingdom authorities.

104.     Bourg then contacted Chetrit about alternative wire transfer arrangements. Informed that   commercial banks refused to handle Triadou's funds from Telford, Chetrit conspired to launder the money, instructing Bourg to  disregard the banks and transfer funds directly from the Ablyazov-Khrapunov Group's  offshore accounts to the escrow account of Chetrit's personal and corporate attorneys.  Bourg then directed a series of wire transfers, on behalf of Triadou, from Telford's accounts at FBME directly to Chetrit's counsel.

105.     FBME executed these transfers despite their blatant indicia of money laundering, including that (1) Telford was a recently incorporated offshore shell company with no obvious business purpose, (2) Telford was purportedly owned by another offshore nominee-shareholder trust, (3) Telford was seeking to transfer millions of dollars into escrow accounts with no due diligence, and (4) Telford was transferring these funds from a high-risk jurisdiction for the benefit of an unrelated third party operating in a more financially-rigorous jurisdiction.

106.     This was not the only instance of FBME executing such obviously suspicious transfers for Aggerwal and the Ablyazov-Khrapunov Group without concern for money laundering red flags. At the same time FBME began to execute transfers from Telford to the accounts of Chetrit's counsel, on or about October 9, 2013, FBME executed wire transfers for $25

million from Telford's accounts for an investment in overseas telecommunications assets. Again Telford was transferring millions of dollars of Ablyazov's money for the benefit of another entity linked to the Ablyazov-Khrapunov Group.

107.    Subsequent to these transfers, on July 22, 2014, the U.S. Financial Crimes Enforcement Network ("FinCEN") designated FBME Bank a "foreign financial institution of primary money laundering concern."  FinCEN found that FBME Bank was regularly "used by its customers to facilitate money laundering, terrorist financing, transnational organized crime," had "systemic failures in its anti-money laundering controls that attract high-risk shell companies," and performed a "significant volume of transactions and activities that have little or no transparency and often no apparent legitimate business purpose."

108.    Under Section 311 of the PATRIOT Act, FinCEN barred U.S. financial institutions from opening or maintaining "payable-through" accounts with FBME.[1]  In the accompanying official announcement, FinCEN's then-Director emphasized that FBME was not merely negligent, but rather "promotes itself on the basis of its weak Anti Money Laundering (AML) controls in order to attract illicit finance business from the darkest corners of the criminal underworld," and "openly advertises the bank to its potential customer base as willing to facilitate the evasion of AML regulations."

109.    In its updated rule barring U.S financial institutions from dealing with FBME, FinCEN noted in particular FBME's pervasive dealings with obscure shell companies just like Telford, serving no purpose but to facilitate money laundering:

FinCEN considered all of the relevant information and is particularly

---

[1]     FBME challenged FinCEN's rulemaking in the United States District Court for the District of Columbia and won a temporary reprieve, but FinCIN reissued the rule in substantially the same form on March 31, 2016. That updated rule is now undergoing judicial review.

concerned with: (1) The large number of FBME customers that are either shell companies or that conduct transactions with shell companies; (2) the lack of transparency with respect to beneficial ownership or legitimate business purposes of many of FBME's shell company customers; (3) the location of many of its shell company customers in other high-risk money laundering jurisdictions outside of Cyprus; (4) the high volume of U.S. dollar transactions conducted by these shell companies with no apparent business purpose; and (5) FBME's longtime facilitation of its shell company customers' anonymity by allowing thousands of customers to use the bank's physical address in lieu of their own.

110.    The Central Bank of Cyprus has frozen all assets transfers to or from FBME, and taken control of the bank pending completion of an investigation into its operations. FBME remains under the control of the Central Bank of Cyprus, and upon information and belief, continues to hold millions in funds belonging to the Ablyazov-Khrapunov Group and shell companies they control.

### *The Ablyazov-Khrapunov Group Enters a Second Deal with Chetrit, Again Funded By Telford through FBME*

111.    Through Triadou, the Ablyazov-Khrapunov Group entered a second investment with the Chetrit Group shortly thereafter.   In late 2012, Triadou agreed to invest $12 million in the Cabrini Medical Center conversion, a joint venture between the Chetrit Group and another private developer to convert a former medical center in New York City into luxury condominiums.

112.    Due to increasing scrutiny on the Ablyazov-Khrapunov Group's finances, the contemplated $12 million investment became impossible. Bourg discussed this obstacle with Chetrit, who agreed that Triadou should invest $6 million, half the originally-agreed amount, until further funds became available. In return for this $6 million investment, Triadou would receive a promissory note and the right to convert that note into equity in the entity holding the Chetrit Group's interest in the Cabrini deal, 227 East 19th Holder, LLC.

113.    Again, the funds to execute the Cabrini deal were transferred, on May 20, 2013,

directly from the Ablyazov-Khrapunov Group's Telford accounts at FBME Bank to a law firm in New York working on Chetrit's behalf. Again, this transfer of funds from Telford was only executed after Ilyas Khrapunov received explicit direction from Ablyazov.

> ### Kazakh Authorities Target the Ablyazov-Khrapunov Group's Holdings in the United States, and the Ablyazov-Khrapunov Group Liquidates Those Assets at Below-Market Value with the Chetrit Group's Assistance.

114.     In 2014, Almaty filed an action in California federal court against members of the Ablyazov-Khrapunov Group seeking to seize assets that they had attempted to launder through real estate investments in California.   That action is *City of Almaty v.  Viktor Khrapunov, et al*, Case No. 2:14-cv-03650-FMO-CW (filed May 13, 2014; dismissed September 21, 2015) (the "California Litigation").  On information and belief, this lawsuit led the Ablyazov-Khrapunov Group to believe their assets in the U.S. were no longer safe from seizure by the government of Kazakhstan.

115.     In response, in late 2014, Ilyas Khrapunov directed Bourg, Triadou's director, to begin liquidating Triadou's assets in New York so that the funds could be removed from the United States and hidden.  Specifically, Ilyas Khrapunov told Bourg to liquidate Triadou's investments in Flatotel and the Cabrini Medical Center as quickly as possible.

116.     Bourg approached Chetrit, explaining that the threat of the California Litigation was pressuring Triadou and the Ablyazov-Khrapunov Group into moving their assets out of the United States.  Chetrit offered to purchase an assignment of Triadou's interest in the Flatotel at a substantial discount from the price originally paid by Triadou.  By this point, the value of Triadou's investment had in fact increased substantially beyond the funds originally invested.

117.     Chetrit simultaneously proposed to bribe Bourg, so Chetrit could further take advantage of Triadou and secretly influence it to obtain a discounted price.  Specifically, Chetrit

proposed that Bourg covertly use his position as director of Triadou to accept a lower price for the Chetrit Group's purchase of an assignment, thus decreasing Triadou's recovery from the investment and increasing the Chetrit Group's profit. In return for securing for Chetrit a lower assignment price, Chetrit agreed to surreptitiously pay Bourg $3 million.

118.    In or about August of 2014, Bourg, acting on behalf of Triadou and at the direction of the Ablyazov-Khrapunov Group, agreed to assign Triadou's interest in the Flatotel back to the Chetrit Group for a price as low as $26 million, only a fraction of the fair market value of the properties. At the same time, Bourg executed a release of the promissory note that Triadou held entitling it to equity in the Cabrini Medical Center development. At the time of this assignment and release, Viktor Khrapunov was facing criminal charges as well as possible fines and disgorgement in Kazakhstan; the Kazakh government had formally sought extradition of Viktor Khrapunov from Switzerland; Ablyazov was being held in French prison awaiting extradition; and the Swiss assets of the Ablyazov-Khrapunov Group remained frozen. Not only were all of these facts widely disseminated in the news, they were known by all parties to the assignment and release transactions, including Chetrit, and it was not uncommon for their meetings to begin with a discussion of the possibility of the incarceration of members of the Ablyazov-Khrapunov Group.

119.    Following the assignment and release, Bourg invoiced Chetrit for $1 million of the agreed-upon $3 million bribe. After receiving the invoice, Chetrit paid Bourg $400,000, but refused to pay the full amount demanded by Bourg.

120.    In or about March 2015, Bourg met with Chetrit, and recorded the meeting. As captured on audio, Bourg demanded the remainder of his promised compensation. Chetrit acknowledged that he had paid Bourg "400 or 500," but responded that Bourg would receive the

31

additional $600,000 only when Chetrit paid what he owed Triadou for the assignment, and that he had no intention of paying Triadou until forced to do so. Chetrit further stated on tape that Bourg would not receive any remaining money.

121.     At that meeting, Bourg and Chetrit repeatedly discussed the legal troubles of Mukhtar Ablyazov and Victor and Ilyas Khrapunov. Chetrit repeatedly avoided using Ilyas Khrapunov's actual name, referring to him instead by the code name "Pedro." Chetrit and Bourg discussed how "Pedro" was "sought by Interpol" and his "father-in-law [was] still in prison," and Chetrit agreed that law enforcement was "coming at [the Ablyazov-Khrapunov Group] from all sides."

122.     Also at that meeting, Chetrit and Bourg discussed the fact that due to the investigation in Switzerland, Ilyas Khrapunov could not leave the country and was under intense law enforcement pressure. In addition, Chetrit once again acknowledged his longstanding understanding that Ablyazov and his criminal situation was behind the motivations of the Ablyazov-Khrapunov investments in the United States. Chetrit further acknowledged his longstanding understanding that the Ablyazov-Khrapunov Group had made similar investments in other countries, such as Greece, to conceal and launder the proceeds of their crimes.

123.     On or about March 22, 2015, after his meeting with Chetrit, Bourg contacted Elkain, Chetrit's agent in Europe, and also recorded that phone call. In that call, Bourg sought to confirm the terms of his secret deal with Chetrit. During this recorded conversation, Bourg and Elkain agreed that the secret deal between Chetrit and Bourg called for $3 million in compensation for Bourg. Elkain agreed that he "confirmed the deal" between Chetrit and Bourg, and "would have never said that if [Chetrit] hadn't told [him] so." Bourg requested Elkain's aid in receiving the remainder of his payment, but Elkain responded that whether or not the

agreement would be honored was up to Chetrit.

124.    Despite the finalized assignment agreement and release, the Chetrit Group refused to make any payments to Triadou following the sale.  In response, Triadou filed a  series of actions in New York state courts, seeking summary judgment and payment of  these obligations under the assignment agreement.  Those actions are *Triadou SPV S.A. v.  CF 135 FLAT LLC, et al.*, No. 653462/2014 (Nov. 10, 2014); *Triadou SPV S.A. v. CF  135 FLAT LLC, et al.*, No. 650239/2015 (Jan. 26, 2015); *Triadou SPV S.A. v. CF 135  FLAT LLC, et al.*, No. 154681/2015 (May 11,  2015), and *Triadou SPV S.A. v. CF 135  FLAT LLC, et al.*, No. 156907/2015 (July 9,  2015),

125.    Each of these actions seeks the payment of money to Triadou derived from  the sale of property illicitly obtained by the Ablyazov-Khrapunov Group, and rightfully owned by BTA and Almaty.

126.    By this lawsuit, BTA Bank and the City of Almaty seek to hold Crossclaim Defendants responsible for their illegal conduct in the United States in violation of U.S. law.

## **FIRST CAUSE OF ACTION**

### **(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))**
### *Against All Defendants*

127.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 126 as if fully set forth herein.

128.    This cause of action is against all Crossclaim Defendants (the "Count 1 Defendants").

129.    From 1997 and continuing to the present, the Ablyazov-Khrapunov Group and numerous other individuals and entities, including SDG and Telford, have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 1

Enterprise").

130.    In 2012, the Chetrit Group knowingly and willfully joined the Count 1 Enterprise by aiding the Ablyazov-Khrapunov Group's schemes to hide and launder their illicit assets through investments by SDG through Triadou in properties owned by the Chetrit Group.

131.    The Count 1 Enterprise was engaged in, and the activities of the Count 1 Defendants affected, interstate and foreign commerce.

132.    The Count 1 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity consisting of the following predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B):

    a.    The Count 1 Defendants engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting numerous financial transactions using illegally obtained funds to purchase real estate investments in New York City and elsewhere and to fund business entities including SDG and Triadou, knowing that such funds were unlawfully converted from the City of Almaty and BTA Bank, with the goal of concealing the source of those funds. The Count 1 Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or transferring funds stolen from Almaty and BTA into and within the United States in order to conceal their source and existence from lawful investigations conducted by Swiss, Kazakh, and United Kingdom authorities.

    b.    The Count 1 Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting financial transactions

using those stolen funds by, among other things, using stolen funds to purchase real estate and other assets in New York City and elsewhere and to fund business entities, including Triadou and SDG, with the intent to further the Count 1 Enterprise and to conceal the source of those funds.

c.  The Count 1 Defendants engaged and conspired to engage in money transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 by, among other things, knowingly transferring funds in excess of $10,000 stolen from Almaty and BTA into and within the United States to invest in real estate and other assets in New York City with the aid of the Chetrit Group, knowing that such funds were stolen from the City of Almaty and BTA Bank.

d.  The Count 1 Defendants engaged and conspired to engage in mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by knowingly using the mails and wires to transfer illegally obtained funds into and within the United States, for the purpose of furthering the Count 1 Enterprise and, while concealing the funds' illegal source, used those funds to purchase real estate in New York City and to fund business entities, including SDG and Triadou, that enabled those entities to conduct business in the United States using the illegally-obtained funds.

e.  The Count 1 Defendants unlawfully transported or caused to be transported in interstate or foreign commerce securities or money having a value of $5,000 or more which was stolen, converted or taken by fraud from Almaty and BTA Bank, and knowing the same to be stolen, converted or taken by fraud in violation of 18 U.S.C. § 2314.

f.  The Count 1 Defendants received, possessed, concealed, sold, or disposed of securities or money having the value of $5,000 or more, or conspired to do the same, which crossed a state or United States boundary after being stolen, unlawfully converted, or taken from Almaty and BTA Bank, and knowing the securities or money to have been stolen, unlawfully converted, or taken in violation of 18 U.S.C. § 2315.

133.   Each of the Count 1 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 1 Defendants engaged or conspired to engage in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. From in or about 1997, and continuing to the present, Count 1 Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Count 1 Enterprise and in order to implement the schemes and employ the devices described herein. The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, the following acts of money laundering, transactions in money and property derived from specified unlawful activity, foreign transport of stolen money or property known to be stolen, converted or taken by fraud, mail fraud, and/or wire fraud:

a.  The 2012 sham sale of SDG to Philippe Glatz to create the appearance that SDG was independent of the Ablyazov-Khrapunov Group;

b.  the fraudulent loan from the Ablyazov-Khrapunov Group to Mr. Glatz to facilitate the SDG sale transaction;

c.   the formation of Triadou and other entities by SDG at the direction of Bourg and in consultation with Ilyas Khrapunov;

d.   Chetrit's meetings with Ilyas Khrapunov in or about 2012 in Switzerland and New York City, and their subsequent agreement to invest the Ablyazov-Khrapunov Group's unlawfully obtained money in real estate in New York City;

e.   E-mails directly between Chetrit and Ilyas Khrapunov as well as through intermediaries discussing the Ablyazov-Khrapunov Group's possible investments in New York real estate;

f.   the formation of the investment vehicles necessary to facilitate the Flatotel and Cabrini investments;

g.   Telford's failed attempt to transfer funds held in FBME Bank for the Flatotel and Cabrini deals through banks in Luxembourg;

h.   the May 20, 2013 transfer of funds from Telford to Chetrit's attorney representing Triadou's investment of $6 million in the Cabrini deal, along with Chetrit's promissory note and Triadou's right to convert that debt into equity in Cabrini;

i.   a series of other wire transfers on behalf of Triadou from Telford's accounts at FBME Bank Ltd. to Chetrit's counsel in New York, including transfers on November 9, 2012, and January 22, February 13, February 19, April 8, April 16, and April 24, 2013;

j.   a May 22, 2013 wire transfer of $28 million from Telford to a different law firm's Citibank account in New York used for a separate New York real estate investment with Chetrit;

k.   a May 2014 agreement (executed August 2014) to transfer Triadou's interest in the

37

Flatotel to the Chetrit Group at a below-market price;

l.  Chetrit's and Triadou's signed May 2014 release of the promissory note regarding Triadou's $6 million investment in the Cabrini Medical Center development;

m.  Chetrit's payment of $400,000 to Bourg in partial satisfaction of Chetrit's agreement with Bourg to pay him $3 million in exchange for securing Chetrit a lower assignment price for Triadou's interests in the Flatotel and Cabrini deals; and

n.  a payment of $1 million from Chetrit to Triadou in partial satisfaction of Chetrit's obligations under the fraudulent assignment.

134.    As a direct and proximate result of RICO violations by the Count 1 Defendants of 18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at trial and presently estimated to be not less than $6 billion. Almaty and BTA have been injured in their business or property by reason of each Count 1 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
### *Against All Defendants*

135.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 134 as if fully set forth herein.

136.    This cause of action is against all Crossclaim Defendants (the "Count 2 Defendants").

137.    From its formation and continuing to the present, CF 135 West Member LLC, has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 2

Enterprise").

138.     The Count 2 Enterprise was engaged in, and the activities of the Count 2 Defendants affected, interstate and foreign commerce.

139.     The Count 2 Defendants engaged in a pattern of racketeering activity consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in paragraph 132 above.

140.     Each of the Count 2 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 2 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 2 Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Count 2 Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Count 2 Enterprise and in order to implement the schemes and employ the devices described herein. The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, those acts described in paragraph 133 above.

141.     As a direct and proximate result of RICO violations by the Count 2 Defendants of 18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at trial. Almaty and BTA have been injured in their business or property by reason of each Count 2 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## THIRD CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(a))
*Against All Defendants*

142.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 141 as if fully set forth herein.

143.     This cause of action is against all Crossclaim Defendants (the "Count 3 Defendants").

144.     From its formation and continuing to the present, CF 135 West Member LLC, has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 3 Enterprise").

145.     The Count 3 Enterprise was engaged in, and the activities  of the Count 3 Defendants affected, interstate and foreign commerce.

146.     The Count 3 Defendants received income derived from a pattern of racketeering activity consisting of the related predicate acts of racketeering described in paragraphs 132 and 133 above.

147.     The Count 3 Defendants used or invested the income derived from their racketeering activity in the acquisition of an interest in, or the establishment or operation of, the Count 3 Enterprise in violation of 18 U.S.C. § 1962(a).

148.     The Count 3 Defendants used or invested the income derived from their racketeering activity in the Count 3 Enterprise in fraudulent and below-market transactions, including by accepting unreasonable contractual terms to transfer wealth to the Chetrit Group.

149.     As a direct and proximate result of RICO violations by the Count 3 Defendants of 18 U.S.C. § 1962(a),  Almaty and BTA have suffered damages in an amount to be determined at trial.  Almaty and BTA have been injured in their business or  property by reason of each Count 3

Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
### *Against All Defendants*

150.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 149 as if fully set forth herein.

151.    This cause of action is against all Crossclaim Defendants (the "Count 4 Defendants").

152.    From its incorporation and continuing to the present, 227 East 19th Holder LLC has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 4 Enterprise").

153.    The Count 4 Enterprise was engaged in, and the activities of the Count 4 Defendants affected, interstate and foreign commerce.

154.    The Count 4 Defendants engaged a pattern of racketeering activity consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in paragraph 132 above.

155.    Each of the Count 4 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 4 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 4 Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Count 4 Defendants associated together, with one another and with others, and acted in concert for the common and

unlawful purposes of the Count 4 Enterprise and in order to implement the schemes and employ the devices described herein.  The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, those acts described in paragraph 133 above.

156.    As a direct and proximate result of RICO violations by the Count 4 Defendants of 18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at trial.  Almaty and BTA have been injured in their business or  property by reason of each Count 4 Defendants' violations and,   pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to  recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## FIFTH CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(d))
### *Against All Defendants*

157.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 156 as if fully set forth herein.

158.    This cause of action is against all Crossclaim Defendants (the "Count 5 Defendants").

159.     As alleged herein, Count 5 Defendants conspired to engage in the acts described above in the United States to further the goals of their criminal enterprises in violation of U.S. law.

160.     In so doing, Count 5 Defendants unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together, with  each other and with others to commit RICO violations under 18 U.S.C. § 1962(c) and,  thereby, violated 18 U.S.C. § 1962(d).  In furtherance of the conspiracy and to achieve its  objectives, Count 5 Defendants committed the

overt acts as described in paragraph 133 in the Southern District of New York and elsewhere.

161.    As a direct and proximate result of RICO violations by the Count 5 Defendants of 18 U.S.C. § 1962(d),  Almaty and BTA have suffered damages in an amount to be determined at trial.  Almaty and BTA have been injured in their business or  property by reason of each Count 5 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to  recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

### SIXTH CAUSE OF ACTION

### (ACTUAL FRAUDULENT TRANSFER)
***Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov***

162.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 161 as if fully set forth herein.

163.    At all relevant times, the City of Almaty and BTA Bank have held an interest in the illicit funds  taken by the Ablyazov-Khrapunov Group and invested by and through Triadou, as these funds were  the unlawful profits of embezzlement, fraud, and the corruption of the public office of the mayor of Almaty.   The intermediary transfers or investment of those funds did not alter or diminish either Almaty or BTA's interest.

164.    The 2014 assignment of Triadou's interest in the Flatotel and Cabrini Medical Center was not for  adequate consideration, and in fact, represented a value significantly below the fair value of that interest, due to the improper motivations of Triadou's ownership, the Ablyazov-Khrapunov Group, to hide their illicit assets and move them offshore, and the Chetrit Group's  secret deal to drive down the price of the assignment through bribery.

165.    This assignment was made for the specific purpose of liquidating a fixed  asset to frustrate a future creditor.  Defendants knew of the numerous judgments against Ablyazov in the

United Kingdom, and of Almaty's claims against the Ablyazov-Khrapunov Group in the California Litigation, and knew that Triadou was owned and controlled by the defendants in those actions. Defendants intended and believed that the assignment of the Ablyazov-Khrapunov Group's interest in the Flatotel and Cabrini Medical Center would hinder, delay, and defraud current and future judgment creditors, specifically the City of Almaty and BTA Bank.

166. For these reasons, the assignment was fraudulently and illegally intended to remove an asset from the jurisdiction of the United States, namely Triadou's interests in the Flatotel and Cabrini Medical Center, convert those assets to cash, and transfer those funds beyond the reach of the Swiss, Kazakh, and United Kingdom authorities

167. As a result of the foregoing, pursuant to sections 275, 276, and 279 of the New York Debtor and Creditor Law, the August 2014 assignment agreement should be set aside as the product of clearly-inequitable conduct.

## SEVENTH CAUSE OF ACTION

### (CONSTRUCTIVE FRAUDULENT TRANSFER)
### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

168. The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 167 as if fully set forth herein.

169. At all relevant times, the City of Almaty and BTA Bank have held an interest in the illicit funds taken by the Ablyazov-Khrapunov Group and invested by and through Triadou, as these funds were the unlawful profits of embezzlement, fraud, and corruption of the public office of the mayor of Almaty. The intermediary transfers or investment of those funds did not alter or diminish either Almaty or BTA's interest.

170. Triadou, although an arm of a massive international fraud and money laundering conspiracy, is and has been insolvent itself. Triadou holds no funds or other assets of its own,

and relies on funding from other Ablyazov-Khrapunov Group entities, such as Telford, to meet its obligations. Assets that flow to Triadou are promptly moved to other Ablyazov-Khrapunov Group entities offshore.

171.    As Triadou is controlled by the Ablyazov-Khrapunov Group, whose members face multi-billion dollar judgments in other jurisdictions, Triadou is effectively kept insolvent at all times, so as to limit the Ablyazov-Khrapunov Group's exposure in the United States.

172.    Similarly, because Triadou is controlled by and is an alter ego of the Ablyazov-Khrapunov Group, at the time it liquidated the Flatotel and Cabrini interests and transferred the proceeds to other entities, it had liabilities – including resulting from the UK judgments – that far outstripped its assets.

173.    As a result of the foregoing, pursuant to sections 273 and 273-a of the New York Debtor and Creditor Law, the August 2014 assignment agreement should be set aside.

## EIGHTH CAUSE OF ACTION

### (UNJUST ENRICHMENT)
### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

174.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 173 as if fully set forth herein.

175.    The Crossclaim Defendants were unjustly enriched at the expense of the City of Almaty and BTA Bank when they invested funds embezzled from the City of Almaty and BTA Bank to acquire assets in the United States including an interest in the Flatotel project, and did so knowing that authorities of Switzerland, the Republic of Kazakhstan, and the United Kingdom were seeking the wrongfully-taken assets held by the Ablyazov-Khrapunov Group, and that further sales of the same assets would potentially frustrate their identification by the lawful authorities.

176.     It would be against equity and good conscience to permit the Crossclaim Defendants to retain the profits derived from the looting of assets rightfully belonging to the City of Almaty and BTA Bank.

## NINTH CAUSE OF ACTION

### (CONVERSION)
### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

177.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 176 as if fully set forth herein.

178.     None of the Defendants has a superior interest to the City of Almaty or BTA in the assets wrongfully taken by the Ablyazov-Khrapunov Group.  These  funds, and the assets they were used to purchase, are the rightful property of the people of  Almaty and BTA.

179.     Defendants knowingly bought and sold assets obtained with these funds derived from the corruption of the office of the mayor of the City of Almaty and control of BTA Bank.

180.     As a result, Defendants have wrongfully and without authorization exercised of dominion and control over property of Almaty and BTA, and thus are liable for converting the same.

## TENTH CAUSE OF ACTION

### (CONSTRUCTIVE TRUST)
### *Against All Defendants*

181.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 180 as if fully set forth herein.

182.     As mayor of Almaty, Viktor Khrapunov owed fiduciary duties  to the people of Almaty, and through his oath of office, expressly promised to execute  those duties.

183.     Despite that promise, Viktor Khrapunov breached those fiduciary duties repeatedly by transferring public assets of the City of Almaty to other members of the  Ablyazov-

Khrapunov Group for fractions of their market value, and then assisted the Ablyazov-Khrapunov Group in laundering the funds resulting from those illicit transfers of public property. Through these breaches of fiduciary duty, the Ablyazov-Khrapunov Group has been unjustly enriched.

184.     A constructive trust over the 50% interest in CF 135 West Member LLC assigned by Triadou, and all profits therefrom, is the appropriate equitable remedy to prevent further dissipation of the funds resulting from these breaches of fiduciary duty.

185.     Defendants have also conspired to fraudulently transfer Triadou's interest in the Flatotel for the purpose of hiding the Ablyazov-Khrapunov Group's assets and frustrating any recovery resulting from Almaty and BTA's investigations and pursuits of their stolen assets. Separate and aside from the Ablyazov-Khrapunov Group's breaches of fiduciary duty, this knowingly fraudulent transfer by Cross- and Counterclaim Defendants justifies imposition of a constructive trust to prevent any further transfers or encumbrances of this property.

186.     Absent this remedy, the Ablyazov-Khrapunov Group will continue to use Triadou and SDG to launder the fruits of these breaches of fiduciary duty and hide these assets from law enforcement, and the Chetrit Group will continue to be unjustly enriched by these acts of fraud.

## ELEVENTH CAUSE OF ACTION

### (PURSUANT TO CPLR § 5239 FOR FRAUD AND CONVERSION)
### *Against All Defendants*

187.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 186 as if fully set forth herein.

188.     Triadou has filed serial actions in the courts of the state of New York seeking payment on the fraudulent assignment agreement between Triadou and the Chetrit Group. While Triadou has been awarded summary judgment in some of these actions, none of these judgments

have been satisfied by any sheriff or receiver.

189.     The City of Almaty and BTA Bank are the rightful owners of Triadou's interest in the  Flatotel and Cabrini Medical Center and/or any funds derived from the sale of that interest, as the interest was  purchased with funds unlawfully converted by the Ablyazov-Khrapunov Group and laundered  through SDG and Triadou.

190.     Pursuant to CPLR § 5239, this court is empowered to vacate any such  judgments and direct the disposition of the property in question, as well as direct which  party should keep possession of the property during the pendency of this action.

191.     The court should set aside any judgments in Triadou's favor in light of the City of Almaty's and BTA's superior interest in this illicitly-obtained property, direct that Triadou's interest in the Flatotel and Cabrini Medical Center be transferred to the City of Almaty and BTA Bank, and pursuant to CPLR § 5239,  award the City of Almaty and BTA Bank its reasonable attorneys' fees in bringing this claim.

## TWELFTH CAUSE OF ACTION

### (PURSUANT TO CPLR § 5303 FOR RECOGNITION AND ENFORCEMENT OF A FOREIGN JUDGMENT UNDER NEW YORK LAW)
### *Against Defendant Ablyazov*

192.     BTA Bank repeats and realleges paragraphs 1 through 191 as if fully set forth herein.

193.     The United Kingdom of Great Britain and Northern Ireland is a "foreign state" within the meaning of N.Y. C.P.L.R. § 5301(a).

194.     The Ablyazov Judgments are "foreign country judgments" within the meaning of N.Y. C.P.L.R. § 5301(b).

195.     The Ablyazov Judgments are "final, conclusive and enforceable" in England within the meaning of N.Y. C.P.L.R. § 5302.

196.     The Ablyazov Judgments grant recovery of a sum of money and are enforceable by an action on the judgments in New York pursuant to N.Y. C.P.L.R. § 5303.

197.     None of the grounds for non-recognition of a foreign country judgment set forth in N.Y. C.P.L.R. § 5304 applies to the Ablyazov Judgments.

198.     The Ablyazov Judgments are required to be enforced pursuant to N.Y. C.P.L.R. § 5303.

199.     Triadou is the alter ego of the Ablyazov-Khrapunov Group, and is thus liable for all current and future obligations against the Ablyazov-Khrapunov Group. Maintaining the separateness of Triadou and its alter ego, the Ablyazov-Khrapunov Group, would allow the Ablyazov-Khrapunov Group to avoid otherwise enforceable obligations and would be highly inequitable to the people of the city of Almaty and BTA Bank.

### THIRTEENTH CAUSE OF ACTION

### (AIDING AND ABETTING)
### *Against Defendant FBME*

200.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 199 as if fully set out herein.

201.     The Ablyazov-Khrapunov Group converted property that rightfully belongs to the Kazakhstan Plaintiffs through wire transfers executed by FBME Bank, and the Ablyazov-Khrapunov Group was unjustly enriched by the use and investment of the same funds.

202.     FBME Bank was aware that the funds wired were the proceeds of crime and that the wire transfers were an effort by the Ablyazov-Khrapunov Group to obscure the illicit nature of those funds.

203.     Due to its longstanding relationship with the Ablyazov-Khrapunov Group and deliberately ineffective protocols for preventing money laundering, FBME Bank aided and

abetted the Ablyazov-Khrapunov Group's laundering scheme.

204.     FBME's active participation in the Ablyazov-Khrapunov Group's money laundering network rendered substantial assistance to the Ablyazov-Khrapunov Group's acts of conversion, fraud, and subsequent unjust enrichment, and the Kazakhstan Plaintiffs seek relief from FBME to the extent Defendants are found liable for these acts.

## DEMAND FOR JURY TRIAL

Almaty and BTA Bank demand a jury trial on all claims for which trial by jury is available, including on the underlying interpleader action.

## DEMAND FOR RELIEF

WHEREFORE, Almaty and BTA Bank demand the Court enter judgment as follows:

A.     For injunctive relief and rescission of the 2014 assignment agreement and release;

B.     For compensatory, punitive, and treble damages;

C.     For declaratory relief;

D.     For all costs and fees incurred in prosecuting this Complaint;

E.     For such other and further relief as this Court deems just and proper.

Dated: New York, New York
September 7, 2016

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By:  /s/ Matthew L. Schwartz
Matthew L. Schwartz
Randall W. Jackson
Daniel G. Boyle
Craig Wenner

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: 212-446-2300
Facsimile: 212-446-2350

# EXHIBIT 12

**Parliamentary Assembly
Assemblée parlementaire**

http://assembly.coe.int



COUNCIL OF EUROPE

CONSEIL DE L'EUROPE

**Provisional version**

## Committee on Legal Affairs and Human Rights

# Abusive use of the INTERPOL system: the need for more stringent legal safeguards

## Report[*]
Rapporteur: Bernd FABRITIUS, Germany, Group of the European People's Party

### A.    Draft resolution

1.    The Assembly stresses the importance of INTERPOL as an efficient instrument for international cooperation in the fight against transnational crime, including terrorism.

2.    INTERPOL is based on mutual assistance by national law enforcement authorities and should function in full neutrality and with respect for the suspects' human rights.

3.    The International Notice System allows police in member countries to share critical crime-related information. Police can use notices to alert law enforcement bodies in other countries of potential threats, or to ask for assistance in solving crimes. "Red Notices", in particular, are used to seek the location and arrest of a person wanted by a national jurisdiction or an international tribunal with a view to extradition. The number of Red Notices increased dramatically over the last decade.

4.    Article 2 of its Constitution requires INTERPOL to act in the spirit of the Universal Declaration of Human Rights and Article 3 strictly prohibits any intervention or activities of a political, military, religious or racist character. But in a number of cases in recent years, INTERPOL and its Red Notice system has been abused by some member States in the pursuit of political objectives, repressing the freedom of expression or persecuting members of the political opposition beyond their borders.

5.    Red Notices have a serious negative impact on the human rights of targeted persons, including the rights to liberty and security and the right to a fair trial. Red Notices should therefore be requested by National Central Bureaus (NCBs) and circulated by INTERPOL only when there are serious grounds for suspicion against the targeted person. These grounds should be verified following procedures designed to minimise the possibility for abuse without hindering international police cooperation in the vast majority of legitimate cases.

6.    Targeted persons cannot successfully challenge Red Notices before any national or international courts. Such jurisdictional immunity can only be justified to the extent that an internal appeals mechanism provides an effective remedy within the meaning of applicable human rights standards. In this respect, INTERPOL's "Commission for the Control of Files" (CCF) has been criticized for being ill-equipped to deal with the large and growing number and complexity of complaints.

7.    The Assembly notes that INTERPOL has reacted to these criticisms by engaging in a dialogue including civil society. INTERPOL's Working Group on the Processing of Information (GTI) submitted a number of reform proposals adopted at INTERPOL's General Assembly in Bali (Indonesia) in November 2016. Recent improvements, including those decided in Bali, include:

---

[*] Draft resolution adopted unanimously by the committee on 7 March 2017.

7.1.   further strengthening INTERPOL's internal vetting procedures before Red Notices are published, by setting up a "task force" consisting of lawyers, policemen and analysts;

7.2.   appointing a Data Protection Officer within INTERPOL's Secretariat General;

7.3.   strengthening the CCF, whose new Statute will enter into force in March 2017; in particular by separating its advisory from its appeals function, increasing the number of members of the appeals chamber to five, setting clear timetables for its work, making its findings binding on INTERPOL, and increasing the resources at its disposal.

8.   The Assembly welcomes these reforms as so many steps in the right direction. It stresses the importance of their implementation in practice and calls on INTERPOL to continue improving its Red Notice procedure in order to prevent and redress abuses even more effectively, including by:

8.1.   further strengthening the preventive checks before Red Notices are circulated; in particular by

8.1.1. increasing the capacity of INTERPOL's "task force" entrusted with such checks by bolstering the resources placed at its disposal;

8.1.2. ensuring that information on relevant cases made available by international or regional intergovernmental human rights bodies (in particular, the United Nations High Commissioner for Refugees, the United Nations High Commissioner for Human Rights, and the competent bodies of the Council of Europe) and, if appropriate, by non-governmental human rights organisations is duly taken into account;

8.1.3. publishing sufficiently detailed, authoritative interpretations ("repositories of practice") of Articles 2 and 3 of the Constitution and of INTERPOL's policy in refugee and asylum cases;

8.1.4. reexamining Red Notices periodically so as to ensure that they are deleted when they have not given rise to successful extradition requests within a reasonable amount of time;

8.1.5. examining with particular care repetitive Red Notice requests emanating from the same NCB targeting the same person after earlier requests were either rejected by INTERPOL or their deletion ordered by the CCF.

8.2.   strengthening the CCF as an appeals mechanism by

8.2.1. making it fully independent from INTERPOL, in particular by continuing to ensure that staff members dealing with preventive checks are not involved in assessing complaints against Red Notices which had passed these checks;

8.2.2. increasing its capacity – in particular by making sufficient staff available with expertise in the fields of human rights and criminal law and procedure;

8.2.3. ensuring that the CCF fulfills minimum procedural standards, in particular by enabling the targeted persons and their lawyers to be informed of and comment on the reasons for the Red Notice request given by the requesting NCB;

8.2.4. ensuring that the CCF responds to and resolves appeals within a reasonable time, taking into account the gravity of the consequences of a Red Notice for a targeted person;

8.2.5. ensuring that the CCF publishes its decisions, provided the applicants agree; the decisions shall be sufficiently motivated in order to contribute to the development of consistent and predictable case-law.

8.3.   dealing appropriately with NCBs, which have repeatedly requested the publication of abusive Red Notices, in particular by

8.3.1. keeping statistics on Red Notices filtered out upstream by INTERPOL's preventive mechanism and downstream by successful challenges before the CCF;

8.3.2. subjecting new Red Notice requests by NCBs with a high number of abusive requests to more intensive *ex ante* scrutiny;

8.3.3. giving priority to complaints against Red Notices requested by NCBs with a high number of abusive requests also for *ex post* scrutiny by the CCF;

8.3.4. charging NCBs with a high number of abusive requests for the additional budgetary costs generated by more intensive scrutiny of their request required both *ex ante* and *ex post*.

8.4.    setting up a fund for compensation of victims of abusive or otherwise unjustified Red Notices fed by member States in proportion to the number of unjustified Red Notices emanating from their NCBs.

9.    The Assembly calls on all member States of the Council of Europe to

9.1.    set a positive example by ensuring that their own NCB's Red Notice requests clearly specify the targeted persons, the suspected crime and the elements of proof linking the targeted person to the alleged crime;

9.2.    swiftly communicate to INTERPOL relevant information on persons targeted by Red Notices (e.g. the granting of political asylum, judicial decisions refusing extradition);

9.3.    refrain from carrying out arrests on the basis of Red Notices, when they have serious concerns that the Notice in question could be abusive;

9.4.    make use of their influence within INTERPOL in order to ensure the implementation of necessary reforms so that INTERPOL respects human rights and the rule of law whilst remaining an effective tool for legitimate international police cooperation.

AS/Jur (2017) 02

**B.      Explanatory Memorandum by Mr Bernd Fabritius, rapporteur**

**1.      Introductory remarks**

1.      The internationalisation of (serious) crime alongside with globalisation and increased mobility in general have made international cooperation between law enforcement bodies essential in order to ensure that suspects cannot escape prosecution or serving a sentence by hiding abroad.

2.      The International Criminal Police Organisation (INTERPOL)'s main goal is to help combat international crime. Arresting fugitives with a view to extraditing them to the country where they are wanted for prosecution or to serve a sentence can make an essential contribution to that goal.[1] INTERPOL has set up highly efficient channels for mutual assistance by national law enforcement authorities and should function in full neutrality and with respect for human rights.

3.      The International Notice System allows police in member countries to share critical crime-related information. Police can use notices to alert law enforcement bodies in other countries to potential threats, or to ask for assistance in solving crimes. Notices can also be used by the United Nations Security Council and the International Criminal Court and other international criminal tribunals to inform the authorities that certain individuals and entities are subject to UN sanctions or sought by international tribunals. Over the last decade, thanks to advances in information technology, the International Notice System has become far more efficient and also far more widely-used. Between 2005 and 2015, the annual number of Red Notices alone increased almost five-fold, from 2 343 to 11 492.[2] In 2016, a total of 12 787 Red Notices were issued.

4.      Whilst it is 'strictly prohibited for INTERPOL to undertake any intervention or activities of a political, military, religious or racial character',[3] over recent years, there have been numerous alleged cases of abuse of the "Red Notice" system by some member States in the pursuit of political objectives, repressing the freedom of expression or persecuting members of the political opposition beyond their borders.[4] It would appear that legal safeguards have indeed been lagging behind technological advances and increased usage.

5.      The motion for a resolution[5] underlying this report defines the parameters of my mandate so as to "study the issue more profoundly and provide conclusions in the form of a report on the issue of misuse of the INTERPOL system for political aims." Law enforcement bodies around the world should co-operate to prevent or elucidate serious crimes and bring perpetrators to justice. INTERPOL's main objective is to enable and facilitate this cooperation. Therefore, I should like to make it clear that the purpose of my mandate is to assist INTERPOL in improving the effectiveness of its procedures aimed at ensuring respect for human rights. Improving the prevention of human rights violations serves to strengthen the credibility of INTERPOL and thus its effectiveness as a tool in the fight against international crime. I have resisted any attempts to abuse this report for promoting or legitimising impunity in any way.

**2.      INTERPOL's international notices system**

6.      INTERPOL's main objectives are to "ensure and promote the widest possible mutual assistance between all criminal police authorities within the limits of the laws existing in the different countries and in the spirit of the Universal Declaration of Human Rights".[6]

7.      INTERPOL allows for a wide exchange of information by maintaining different databases with information on lost and stolen travel documents, data on known offenders, missing persons and dead bodies.

8.      The proper functioning of this system relies on mutual trust between the various actors and the belief that member States would only use INTERPOL in good faith, solely for the purposes for which the Organisation was established. Those who abuse INTERPOL's infrastructures for the persecution of their adversaries undermine the very foundations of international police cooperation.

---

[1] INTERPOL General Assembly, *Resolution AGN/66/RES/7*, adopted during the 66th INTERPOL General Assembly – New Delhi, India, 15-21 October 1997.
[2] INTERPOL, Annual Report 2015, page 17.
[3] Article 3 of the INTERPOL Constitution, I/CONS/GA/1956(2008).
[4] See Herta Däubler-Gmelin,, "How rogue regimes have weaponised Interpol", in: Wall Street Journal, 28 June; see also Fair Trials International, Strengthening respect for human rights; strengthening INTERPOL, November 2013,, page 14.
[5] Doc. 13566 of 02 July 2014, Reference no. 4074 of 03 October 2014, election of rapporteur on 30 October 2014.
[6] Article 2 of the INTERPOL Constitution, I/CONS/GA/1956(2008).

### 2.1.   Processing of International Notices and Diffusions

9.    Notices are international alerts used by police to communicate to their counterparts around the world information on crimes, criminals and security threats. Such notices are circulated by INTERPOL to all member countries at the request of a country or an authorised international body. The information disseminated via notices concerns individuals wanted for serious crimes, missing persons, unidentified bodies, possible security threats, prison escapes and criminals' *modi operandi*. Notices increase international visibility for serious crimes or incidents.[7] They are color-coded according to their functions: black, purple, blue, orange, yellow, green, and red.

10.    Of particular interest in the context of allegations of abuses of INTERPOL procedures are "Red Notices", used "to seek the location and arrest of a person wanted by a judicial jurisdiction or an international tribunal with a view to his/her extradition".[8]

11.    International notices are regulated by <u>INTERPOL's Rules on the Processing of Data</u>[9] adopted by its General Assembly in 2011, which introduced a major revision of the legal framework governing the functioning of its police information system. Article 73(3) of these rules states that "the conditions for publishing notices are defined for each category of notice or special notice."

12.    Notices are distributed by INTERPOL's General Secretariat at the request of National Central Bureaus (NCBs) and other authorised entities in Arabic, English, French or Spanish. All notices are distributed through INTERPOL's secure website. Extracts of notices may also be published on the Organisation's public website if the requesting entity agrees. Red Notices may only be distributed if the request concerns a serious ordinary-law crime and is of interest for the purposes of international police cooperation. When submitting their requests, NCBs should also provide INTERPOL with a summary of the facts of the alleged crime, and specify the offence in question, the relevant laws creating that offence and the maximum sentence, or the actual sentence imposed if the person has already been convicted. The request must also include identifiers for the person: his or her name, photograph, nationality and other items, including biometric data such as fingerprints and DNA profiles. In addition to "notices", member countries can send requests for the same purposes directly to countries of their choice. These so-called "diffusions" are also recorded in INTERPOL's police databases. In 2014, INTERPOL published a total of 21,922 notices and diffusions, 10,718 of which were Red Notices. A total of 60,187 notices and 74,625 diffusions were in circulation at the end of 2014.[10]

### 2.2.   Levels of control

13.    It must be recalled that INTERPOL's objective is to assist in international police cooperation in order to fight serious crimes. Nevertheless, in pursuing its activities, situations may arise where human rights and individual freedoms are affected. Therefore, it is of paramount importance that appropriate safeguards prevent any abuses and ensure the respect of INTERPOL's commitments to human rights and political neutrality.

14.    Three levels of control have been established in order to ensure compliance with general standards of international law and fundamental rights.

15.    Firstly, the NCBs set up for liaison with INTERPOL in each member State are responsible for the accuracy, relevance, and conformity with INTERPOL's rules of any information provided to INTERPOL for inclusion in its databases or information system. Moreover, any national authorities accessing INTERPOL's information are under the supervision of their own respective NCBs. National Central Bureaus may also exercise a control over requests submitted by other NCBs, which can be referred to INTERPOL's General Secretariat whenever they suspect that INTERPOL rules may have been violated.[11] Prior to requesting the publication of a notice, the NCB or, as the case may be, the authorised international body[12] shall ensure: (a) that the quality and lawfulness of the data it provides in support of its request; (b) that the conditions for publication attached to its request are met; (c) that the data are of interest for the purposes of international police cooperation; (d) that its request complies with INTERPOL's rules, in particular with Articles 2(1) and 3 of INTERPOL's Constitution, as well as with the obligations imposed on the requesting entity under

---

[7] INTERPOL Fact Sheet, International Notices System (accessed 19.1.2017).
[8] Ibid.
[9] INTERPOL's Rules on the Processing of Data, INTERPOL General Assembly, III/IRPD/GA/2011(2014).
[10] The factual information in this paragraph was gleaned from INTERPOL's Fact Sheet (supra note 7).
[11] http://www.INTERPOL.int/en/About-INTERPOL/Legal-materials/Compliance-with-the-rules. (accessed 19.1.2017).
[12] Such as the United Nations Security Council, the International Criminal Court or similar bodies.

international law.[13]

16.     Secondly, INTERPOL's General Secretariat is responsible for processing the information it receives or collects and for ensuring that INTERPOL's rules are observed during any operation to process information through the Organisation's channels. In case of doubt, the General Secretariat may take all appropriate steps to prevent any direct or indirect prejudice that might be caused by processing of incorrect information, including, amongst other things, by deleting information provided or temporarily restricting access to it.[14] Given the high number of requests for notices and diffusions, it is important that these preventive controls are adequately resourced. I was informed by INTERPOL that one of the changes put in place in 2016 was the creation of a dedicated "task force" which comprises multidisciplinary teams of lawyers, police officers and analysts. In addition, extra support and expertise is provided as or when needed, so the number of people conducting reviews, or providing assistance as part of a review, fluctuates (around 30-40 professional staff).

17.     Thirdly, a check is carried out by the Commission for the Control of INTERPOL's Files (CCF), responsible for verifying that information is obtained, processed and stored in accordance with INTERPOL's rules and regulations. The CCF is an independent monitoring body with three main functions: (a) monitoring the application of the Organisation's data protection rules to personal data processed by INTERPOL; (b) advising the Organisation with regard to any operations or projects concerning the processing of personal information and (c) processing requests for access to INTERPOL's files.[15] It can, for example, conduct spot checks or provide advice on issues it considers in need of improvement. The CCF is also competent to receive requests from persons wishing to exercise their right of access to information about them recorded in INTERPOL's databases. This right of access includes the right to have information corrected or deleted, as the case may be.[16] This appeals function is examined more closely below.

## 3.     The Commission for the Control of Files (CCF) – INTERPOL's appeals body

### 3.1.    Origin and composition

18.     The Commission for the Control of INTERPOL's Files[17] was set up in 1984 after INTERPOL renegotiated its agreement with the French Government regarding INTERPOL's headquarters. The French authorities asserted that a 1978 law concerning information technology, files and freedoms, was applicable to the nominal data stored in INTERPOL's premises in Saint-Cloud, France and that individuals should have access to data concerning them. From INTERPOL's point of view, this law was not applicable as information was made available by member countries and did not belong to INTERPOL; and international police cooperation could be threatened if information were to be disclosed by application of the French 1978 law. An agreement was reached when France accepted to refrain from applying the 1978 law to INTERPOL's files, guaranteeing the inviolability of its archives and official correspondence, provided that INTERPOL's archives would be subjected to internal controls by an independent body: the Commission for the Control of INTERPOL's Files (Control Commission/CCF).[18]

19.     As of 11 March 2017 (entry into force of the CCF's new Statute), the Control Commission will have 7 members. Since September 2014, Ms Nina Vajić, Former Judge and Section President of the European Court of Human Rights in respect of Croatia, chairs the Commission. As part of the reform package adopted in Bali, the CCF has been divided into two chambers, separating its advisory from its appeals function. The appeals chamber will have five members; two other members will fulfill the advisory and supervisory functions.[19] The reform package also includes setting clear timetables for the CCF's work, making its findings binding, and increasing the resources at its disposal. In 2015, seven staff members were assisting the CCF.[20] Currently, a staff of eight persons (six lawyers and two administrative staff) are assisting the CCF.

---

[13] See Rules for the Processing of Data (note 9), Article 76(2), page 32.

[14] Ibid. (note 9), Articles 78 and 81.

[15] The Commission's roles are explained in greater detail in the newly adopted Statute of the CCF, which will enter into force on 11 March 2017 (at: https://www.interpol.int/About-INTERPOL/Legal-materials); see also the Operating rules of the Commission for the Control of INTERPOL's files, [II.E/RCCF/CCF/2008], which entered into force 1 November 2008.

[16] http://www.INTERPOL.int/en/About-INTERPOL/Structure-and-governance/CCF/Commission-for-the-Control-of-INTERPOL%27s-Files.

[17] It was then known as the Supervisory Board for the Control of INTERPOL's Archives.

[18] http://www.INTERPOL.int/About-INTERPOL/Structure-and-governance/CCF/History (Accessed 19.01.2017).

[19] INTERPOL website.

[20] Activity Report of the CCF for 2015 (1986-2016), CCF/96/12/d461, para. 33.

### 3.2.  Supervisory Role

20.    The Control Commission is responsible for checking that the information stored by the General Secretariat is obtained, processed and stored in compliance with INTERPOL's rules and regulations, which are part of INTERPOL's internal legal order. For this purpose, it also carries out spot checks.

21.    As part of its supervisory role, the Control Commission examines individual requests. Accordingly, Article 9 of the Rules on the Control of Information and Access to INTERPOL's Files states that "any person who so wishes may, freely and free of charge, exercise the right of access to personal information concerning him which has been recorded in INTERPOL's files."

22.    However, specialised lawyers and NGO's expressed concerns with regard to the fairness of the proceedings before the CCF, and its ability to provide an effective remedy for individuals. Indeed, the outcome of such request remains uncertain, as disclosure of relevant personal information, let alone substantive redress by the CCF is not automatic. According to the principle of 'national sovereignty', INTERPOL's data remain, as a rule, under the control of the National Central Bureau (NCB) which supplied it, and whose authorisation is required before any information is released. In some cases, national authorities will allow disclosure. In other cases they will refuse to even confirm or deny whether any information exists about the person.

23.    In 2013, when the motion underlying this report was launched, the CCF was widely criticised for the ineffectiveness of the recourse it offered:

> "its proceedings took years; its members had insufficient expertise; its decisions were insufficiently reasoned – literally one-page, cryptic letters with no substantive reasoning at all – and not formally binding on INTERPOL; and, perhaps the worst feature for the practising lawyer, the evidence put forward by countries seeking to justify maintaining their Red Notices was not disclosed to the individuals challenging them."[21]

24.    During the exchange of views with our Committee, in December 2016, the Secretary General of INTERPOL argued that the very nature of police work requires that disclosure of information to suspects must remain a case-by-case decision. But in my view, when restrictive measures are taken against individuals that have a serious impact on their fundamental rights, human rights law requires that the individuals are given a minimum of information on the grounds for these measures so that they can defend themselves. Such a requirement was strongly supported by the Assembly in its Resolution 1597 (2008) on "UN Security Council and EU Anti-terrorism Blacklists", and relevant reforms have indeed been implemented regarding both the UN Security Council's and the EU Council's sanctions procedures.[22] How much information must be disclosed depends on the circumstances of each case. The right to defend oneself against unfounded accusations must be balanced against the legitimate interest in the integrity of the on-going investigation and in particular the protection of witnesses.

25.    The CCF has therefore rightly, in my view, developed a number of exceptions to the principle of national sovereignty and claimed for itself the authority to disclose information from INTERPOL's files even without the consent of the State concerned in certain circumstances. For example, if the NCB decided to have an extract of the Red Notice placed on INTERPOL's public website, the Commission will, in principle, disclose to the person copies of any other documents held by INTERPOL, unless the NCB can demonstrate why this should not be done. The CCF has also granted requests to access information whenever the person can prove that INTERPOL possesses information on them. But according to specialised lawyers, such proof is seldom possible in practice.[23]

26.    In addition, legal practitioners have denounced the length of these control proceedings. Indeed, in theory, if an NCB fails to respond to a request for permission to disclose information before the deadline fixed by the CCF, the latter will presume that the NCB is not opposed to disclosure. But in practice, proceedings were kept pending for over a year, prolonging the negative effects that a Red Notice alert has on the concerned person's life.[24]

---

[21] Alex Tinsley, Echoes of *Kadi*: reforms to internal remedies at INTERPOL, with further references.
[22] See also the explanatory report, with references to the case law of the European Court of Human Rights (Doc. 11454, Rapporteur: Dick Marty, Switzerland/ALDE).
[23] See Fair Trials (note 4), page 55 paras. 198-199.
[24] See Fair Trials (note 4), para. 200.

27.     In parallel, the CCF examines individual requests to delete information or notices. The procedure resembles that applicable to requests for access to information, including the absence of an explicit provision giving an individual the possibility to challenge information concerning them held by INTERPOL. More generally, the proceedings before the CCF were found to lack transparency, fairness and effectiveness, endangering in particular the right to a fair trial and to an effective remedy as set forth in Articles 6 and 13 of the European Convention on Human Rights. This could create a problem for the continued jurisdictional immunity of INTERPOL.

28.     As independent legal experts pointed out, INTERPOL's activities fall outside the scope of national courts as INTERPOL is protected by jurisdictional immunity. INTERPOL has immunity agreements with the countries in which it has a physical presence, including France and the United States (and more recently, Singapore). Fair Trials International replied to my question that they are unaware of any countries in which victims are able to challenge INTERPOL over Red Notices before a domestic court of law; similar challenges lodged against NCBs before domestic courts have also failed because of the lack of a sufficient connection between the NCBs and INTERPOL. As pointed out by Mr Alex Tinsley (one of the experts who addressed the Committee in May 2015 in Erevan) in his recent article[25], the individual who is subject to a Red Notice can attack some of the effects of the Notice before national courts when they are brought about by a national authority. But the ongoing effect of a Red Notice as such (e.g. inability to travel without a serious risk of being arrested at border points; distress of being "wanted"; reputational harm) is attributable to INTERPOL, which is alone competent for issuing and maintaining Red Notices.

29.     The Secretary General of INTERPOL noted at the hearing in December 2016 that technically, jurisdictional immunity is foreseen only in the seat agreements with the small number of countries where INTERPOL has a physical presence. Its legal director specified that INTERPOL maintains its position that as an international organisation it enjoys immunity and that the CCF has exclusive jurisdiction to address requests from individuals and therefore no national court or other tribunal may attempt to exercise jurisdiction, or otherwise intervene in cases related to notices/diffusions or other data processed via INTERPOL's channels.

30.     According to the case law of the European Court of Human Rights[26] as well as the European Court of Justice[27], such immunity is only acceptable, and an international organisation may escape the jurisdiction of national courts only when it offers an alternative system ensuring access to justice. The question is therefore whether the CCF, which is (de facto or de jure) the only redress available for an individual trying to ward off an abusive Red Notice, can be seen as an effective remedy, or, in the words of the Strasbourg Court, a "reasonable alternative means to protect effectively their rights". It is thus in the interest of INTERPOL itself that the CCF fulfills the criteria to be recognised as an effective remedy. The CCF's main function is to provide effective redress to anyone targeted by an abusive Red Notice – which would then also justify INTERPOL's judicial immunity.

31.     Whether or not the CCF can be seen as an effective remedy, or a reasonable alternative means ensuring access to justice, depends on a number of factors, including the CCF's independence, the fairness of its proceedings (in particular, the right of the applicant to be heard and to be informed of the grounds of suspicion against him or her), and the effectiveness of the relief granted by the CCF (in terms, for example, of the length of proceedings, the possibility of interim relief, and the binding effect of the CCF's findings on INTERPOL).

32.     In my view, the CCF could hardly be considered an effective remedy before the reforms decided in Bali in November 2016. As regards independence, the CCF had made some progress by 2015 in that the Secretariat General was no longer a party in the review of the cases, which was undertaken by the Commission alone. Regarding effectiveness of the redress granted, the General Secretariat "usually" implemented the Commission's conclusions.[28] But in 2015, the CCF was in session for just 12 days and had a staff of 7 persons assisting it – to deal with a total of 552 individual requests introduced in 2015 alone, on top of the general supervisory and advisory functions the same members of the CCF had to fulfil. The CCF, in its 2015 annual report, indicates itself that

---

[25] Note 21 above.
[26] *Waite and Kennedy v. Germany*, judgment of 18 February 1999 (GC), application no. 26083/94 (at paras. 68-69); *Nada v. Switzerland*, judgment of 12 September 2012 (GC), application no. 10593/08 (at para. 211).
[27] *Kadi and Al Barakaat v. Commission and Council, judgment of the European Court of Justice* (Grand Chamber) of 3 September 2008.
[28] See Activity Report of the CCF for 2015 (note 20 above), paras. 110-113.

"[t]he profile of the requesting parties has changed over the years. The Commission used to deal directly with individuals wanted for offences of murder, drug trafficking, or other ordinary law crimes. Now the Commission frequently processes requests from politicians, former Heads of State or Government, or businessmen wanted for fraud offences, who are represented by law firms specialised in data protection and/or in requesting deletion of data registered on Articles 2 or 3 of INTERPOL's Constitution. Recent requests tend to be more complex and often involve the submission of extensive legal arguments, and large volumes of documentation, that require more back and forth communication with NCBs."[29]

33.     In view of these developments, and of the very rapidly increasing number of Red Notices, the resources available to the CCF, at least until 2015, were simply insufficient. The previously-mentioned complaints by lawyers handling such requests about long delays and insufficient reasoning provide ample anecdotal evidence for this conclusion.

34.     The question is whether the above-mentioned reforms adopted in Bali in November 2016 are sufficient to ensure that the CCF can henceforth provide an effective remedy to putative victims of abusive Red Notices. In my view, much will depend on how these reforms will be implemented in actual practice. This concerns, firstly, the resources in terms of meeting time of the CCF and staff that will be placed at the disposal of the Commission. Regarding staff, the CCF has its own secretariat (six lawyers and two administrative staff members). I was assured by Interpol's legal director that the CCF's secretariat is completely separate from the task force that conducts the *ex-ante* review. It is indeed important that an effective "firewall" exists between staff members who carry out the checks "upstream", before issuing a Red Notice, and those who work on the applications to the CCF challenging the earlier decisions of the former.

35.     Secondly, the creation of a separate Requests Chamber whose members are lawyers with relevant backgrounds is definitely a step in the right direction; so are the new rules placing stricter limits on time frames, mandating reasoned decisions, making them binding on INTERPOL and providing for the possibility of interim relief. The procedure before the reformed CCF should become truly adversarial, allowing both sides to present their arguments, and in particular allowing the person concerned by the notice to comment on the information presented by the requesting NCB in support of the notice. Very importantly, the procedure should lead to a decision within a reasonable period of time – the standard should be analogous to that set by the European Court of Human Rights in its case law of on the length of criminal proceedings, which have similarly harsh consequences on the daily lives of suspects.[30] It must therefore be welcomed that the new Statute of the CCF lays down in its Article 32 that a decision on admissibility of a complaint must be taken within one month from its receipt and that an explanation must be given in case of a finding of inadmissibility. Under Article 40, a request for access to data must, as a rule, be decided within 4 months and one for correction or deletion of data within 9 months of the admissibility decision.

36.     Thirdly and lastly, it will be crucial how the Commission will apply its new Statute in practice, in particular Article 35. This article provides some guidance for balancing the conflicting interests of the applicant and the requesting NCB regarding disclosure of information. The first paragraph of this article states the principle of mutual access to evidence both for the applicant and for the NCB having requested the Red Notice. But the second paragraph reiterates the need for consultation prior to disclosure. The third paragraph clarifies on which basis NCBs may object to disclosure (including, understandably, the need to protect the confidentiality of an ongoing investigation). The fourth paragraph of Article 35 attempts to strike a balance when an objection to disclosure is raised by the NCB. The CCF could then disclose a summary instead of the actual evidence. Article 35 paragraph 4 also notes that "the failure to establish a justification [author's note: for objecting to disclosure] will not lead to the disclosure of the evidence, but may be taken into account by the CCF in deciding on the request." This could be read as meaning that the CCF may continue to rely on evidence undisclosed and unseen (and uncommented) by the applicant if an NCB can convince the CCF that it has acceptable reasons for objecting to disclosure. This would be less protective of the applicant's procedural rights than the case law of the Court of Justice of the European Union on disclosure of evidence in security-related cases. Article 35 thus leaves gaps for the CCF to fill in by interpretation and practice.[31]

---

[29] Activity Report 2015, paras. 76 et 77; voir aussi para. 84.
[30] See for example *Dimitrov and Hamanov v Bulgaria*, Nos 48059/06 and 2708/09, 10 May 2011, at para 70 and case law cited; *Pimentel Lourenço v Portugal*, No. 9223/10, 23 October 2012, at para 32; *Ardelean v Romania*, No. 28766/04, 30 October 2012, at para 82; see presentation of the Strasbourg Court's case law by Marc Henzelin and Héloïse Rordorf, "When does the length of criminal proceedings become unreasonable according to the European Court of Human Rights?".
[31] See Tinsley (note 21), *in fine*, with reference to relevant judgments.

AS/Jur (2017) 02

## 4.    Substantive standards: Articles 2 and 3 of INTERPOL's Constitution and its Refugee Policy

37.    Respect for human rights is enshrined in **Article 2** of INTERPOL's <u>Constitution</u>, which mandates the Organisation to ensure and promote international police cooperation "in the spirit of the Universal Declaration of Human Rights". It is also emphasised in Article 2(a) of INTERPOL's <u>Rules on the Processing of Information</u>, which provides that information is to be processed by the Organisation or through its channels "with due respect for the basic rights of individuals in conformity with Article 2 of the Organization's Constitution and the Universal Declaration of Human Rights". In 2014, the Secretariat of INTERPOL was invited by its General Assembly to develop and publish a "Repository of Practice" on Article 2[32], which is eagerly awaited by civil society. This document should explain, *inter alia*, how INTERPOL takes into consideration extradition refusals by States on human rights grounds, and how it interprets and applies the prohibition of torture and of the use of evidence obtained by torture.

38.    An important aspect of the duty to respect human rights is spelt out in **Article 3** of INTERPOL's Constitution, according to which

"It is strictly forbidden for the Organization to undertake any intervention or activities of a political, military, religious or racial character."

39.    This rule should protect individuals from political, religious or racial persecution and ensure INTERPOL's independence and neutrality. It also reflects international extradition law, thus stressing the required purposive link between Red Notices and extradition. When extradition was never requested, was refused or is otherwise impossible, the Red Notice has no more (legitimate) reason to exist and must therefore be deleted. This should be verified at regular intervals in order to prevent Red Notices with all their negative consequences for the individual from "lingering" indefinitely.

40.    One difficulty for the implementation of Article 3 is that there are not only offences that are political, military, religious or racial per se (so-called "pure" offenses), i.e. acts criminalised solely due to their political/military/religious/racial nature, directed against the State and affecting exclusively the public interest – for example, the crimes of treason, espionage, apostasy, or provisions criminalising the violation of apartheid rules; but also ordinary law crimes with a political/military/religious/racial background (so-called "relative" offenses), i.e. acts that also contain ordinary-law elements and also affect private interests. In the presence of "relative" offenses, INTERPOL applies the so-called "predominance test" (Resolution <u>AGN/20/RES/11</u>), on a case-by-case basis. Article 34 of <u>INTERPOL's Rules on the Processing of Data</u> indicates that the following elements should be taken into account:

-    The nature of the offence, namely the charges and the underlying facts;
-    The status of the person concerned;
-    The identity of the source of data;
-    The position expressed by another country or another international entity (such as an international tribunal);
-    Obligations under international law;
-    Implications for the neutrality of the Organization; and
-    The general context of the case.

41.    These elements are very general and provide little guidance for the assessment of individual cases. In line with proposals by representatives of civil society, INTERPOL has therefore developed a "Repository of Practice" on Article 3. According to INTERPOL's website, "[t]he Repository provides guidance on the evolution and development of INTERPOL's practice in application of Article 3 in a variety of circumstances, including offences committed by politicians and former politicians; offences committed in an unconstitutional seizure of power; offences with military, religious or racial aspects and offences against the security of the state." This repository could be an important resource for putative victims of abusive Red Notices and their lawyers – but it is still not published on INTERPOL's website.[33] This is particularly regrettable as the CCF's decisions (to date) lack meaningful justifications and are in any case not available to the public. This means that the "Repository of Practice" is really the only possible source to access INTERPOL's "case law" as to the interpretation of Article 3.

---

[32] Resolution No. 18, <u>AG-2014-RES-18</u>, and Art. 34(4), INTERPOL's Rules on the Processing of Data.
[33] It is not available on INTERPOL's website (as of 19.1.2017); but an older version is available on the internet in the form of a Council of Europe document <u>(CAHDI (2011) Inf 3 distributed</u> at the 41st meeting of the Committee of Legal Advisers on Public International Law (CAHDI) in Strasbourg on 17-18 March 2011 (Contribution from Interpol, "Repository of Practice: Application of Article 3 of INTERPOL's Constitution in the Context of the Processing of Information via INTERPOL's Channels").

42.    INTERPOL's new **refugee policy** was made public during a series of meetings in 2015, including at our Committee hearing in Erevan (Armenia) on 19 May 2015.[34] UNHCR also indicated to me that it is aware of this policy. But it can unfortunately still not be found on INTERPOL's website.

43.    In substance, the new refugee policy implies that a Red Notice or diffusion will generally be withdrawn if the wanted person's status as a refugee or asylum-seeker is confirmed by the country of asylum, the notice/diffusion has been requested by the country where the individual fears persecution, and the granting of refugee status is not itself a political act directed at the country that initiated the Red Notice/diffusion. Also, if the country of asylum, in confirming the wanted person's refugee status, requests not to be named in communications with the country of origin, INTERPOL does not reveal the country of asylum.

44.    This revised policy is seen among specialised practitioners as a clear progress in relation to the earlier practice of maintaining the Red Notice and merely attaching a "note" or "caveat" on the wanted person's refugee status.[35] By leaving the assessment of the accusation directed at a refugee to the country of asylum, which is best placed to assess all the circumstances of the case, this policy also contributes to safeguarding the integrity of the institution of asylum in those cases where wanted persons may be hiding behind their refugee status to escape accountability for their crime.[36] The policy clearly deserves to be properly publicised so that it can develop its full potential.

45.    It should finally be noted with appreciation that in 2015, the CCF decided to put in place special procedures for refugees and gave a specially designated "rapporteur" authority to deal with such cases in the interval between the CCF's meetings.

## 5.    Allegations of abuse

46.    Over the last years, there have been allegations that in a number of cases INTERPOL and the "Red Notices" system in particular was abused by some member States in the pursuit of political goals, including repressing the freedom of expression or persecuting members of the political opposition abroad.

47.    Cases of suspected abuses of INTERPOL for political purposes, including the persecution of human rights activists, political opponents, and journalists, were documented by a number of non-governmental organisations, including Fair Trials International and the Open Dialogue Foundation, whose representatives also spoke before the committee during the hearings in Erevan in May 2015 and in Paris in December 2016.

48.    For instance, **Mr Akhmed Zakaev**, President of the so-called Chechen Republic of Ichkeria (the unrecognised secessionist government of Chechnya) was arrested in Denmark on a Red Notice on the basis of allegations of terrorism. After a month in custody he was released for lack of evidence supporting the extradition request. He was arrested again in the United Kingdom on the strength of the same Red Notice. In 2003, he was granted asylum by the United Kingdom after Russia's extradition request was dismissed by the British courts because it was found to be politically motivated.[37]

49.    In 2011, **Mr Benny Wenda**, the leader of the West Papuan independence movement, recognised as a political refugee in the United Kingdom, discovered that he was subject to a Red Notice seeking his arrest.[38]

50.    **Mr Baran Kimyongür**, a Belgian-Turkish activist, had disturbed an exchange of views between the EP's foreign affairs committee (AFET) with the Turkish foreign minister, in 2000. Years later, the Turkish authorities circulated via INTERPOL an arrest warrant alleging that this action evidenced his membership in a "terrorist organisation". As a result, Mr Kimyongür was arrested three times in three different countries, spending over 100 days in detention. Three courts, in the Netherlands (2006), Spain (2014) and Italy (2014) refused his extradition on the ground that the Turkish authorities did not provide any proof of participation in a terrorist organisation, bearing in mind Mr Kimyongür's right to freedom of expression. Following an intervention by Fair Trials International on his behalf, INTERPOL duly deleted the alert. But in April 2015, Mr Kimyongür and his family were stopped at Zurich airport on the way to a family holiday in Thailand, on the

---

[34] See declassified minutes of the hearing and https://www.fairtrials.org/INTERPOL-announces-new-asylum-policy-at-council-of-europe-meeting/.
[35] See for example https://www.fairtrials.org/guest-post-INTERPOLs-new-political-refugee-policy-is-already-affecting-lives-for-the-better/.
[36] For general information on UNHCR's position, see the 2008 "Guidance Note on Extradition and International Refugee Protection".
[37] FTI report (note 13), page 78.
[38] FTI report (note 13) page 6.

basis of "very old" facts, in the words of the border agent. The arrest was not made on the basis of a new Red Notice, but it is assumed to have taken place because of traces of the previous Red Notice remaining in the system.

51.    **Mr Azer Samadov** left Azerbaijan for fear of political persecution after having supported a candidate opposing President Aliyev in 2003. He was first arrested in Georgia, accused of "participating in public disorder" under Article 220 of the Azerbaijani criminal code. He was later recognised as a refugee by UNHCR and granted protection by the Netherlands. But in 2009 he was again detained, at Amsterdam airport, due to an INTERPOL alert issued by Azerbaijan. His application to the CCF in 2010 did not receive any answer. In 2014, the Chief of the Dutch National Police Central Unit contacted the CCF, reminding them that they had been silent for over four years and pointing out that Mr Samadov was considered as welcome in the Netherlands. Having still not received an answer, Mr Samadov remained unable to travel, including for receiving crucial medical treatment in Germany, because of the Red Notice. The notice was finally removed in 2015, eight years after it was first issued, on the basis of INTERPOL's Refugee Policy.[39]

52.    **Mr Djamel Ktiti**, a French national, was arrested first in Morocco and then in Spain on the basis of an INTERPOL Red Notice issued at the request of Algeria. He spent altogether two and a half years in detention. On both occasions, his extradition was refused on the basis of a finding by the UN Committee against Torture (UNCAT) in 2011 that his extradition would present an unacceptable risk of his being exposed to torture and being prosecuted on the basis of evidence obtained by torture. An application to the CCF by FTI and Redress was made in January 2015, and the Red Notice was removed later that year.[40]

53.    **Captain Paul Watson**, a Canadian environmental activist, was arrested in Frankfurt on the basis of a Red Notice requested by Costa Rica ten years after an incident in 2002, when his ship "Sea Shepard" intervened against a poaching (shark-finning) Costa Rican fishing boat in Guatemalan waters at the request of the Guatemalan government. Shortly after the incident, he was acquitted by a Costa Rican court of charges first of attempted murder, then of assault (against the Costa Rican fishermen). The Costa Rican court was clearly convinced of Mr Watson's innocence by the extensive film footage of the incident, which was later also shown in the documentary film "Sharkwater".[41] But according to his lawyer, Captain Watson is still, or again, subject to a Red Notice, based on the same facts.

54.    In some cases INTERPOL has itself rejected requests when suspecting that charges were politically motivated, for example in the case of **Mr William Browder**. Mr Browder, a British businessman and financier, had successfully lobbied for the adoption of the 'Magnitsky Law' in the US, which imposed sanctions on Russian officials involved in the killing of Mr Browder's former Russian lawyer, Sergei Magnitsky and in the cover-up of the crime Mr Magnitsky had denounced, which was subsequently blamed on Mr Browder. Mr Browder is lobbying governments and parliaments across Europe to pass similar legislation.[42] In May 2013, the CCF ruled that the Russian Federation's request to seek the location of William Browder was predominantly political in nature and therefore recommended that all data relating to the Russian Federation's request concerning Mr Browder be deleted.[43] In July 2013, INTERPOL dismissed another request from Moscow's NCB seeking to locate and arrest Mr Browder with a view to his extradition on a charge of 'qualified swindling' as defined by the Russian Penal Code.[44] Nevertheless, Russian authorities continued to pursue Mr Browder, and allegations were made that President Putin himself tried to influence INTERPOL during a meeting with Mr Noble, INTERPOL's outgoing Secretary General in October 2014.[45] In January 2015, Russia's third attempt to have a Red Notice issued against Mr Browder was rejected, the CCF ruling once again that the request was ill-founded because it was "predominantly political."[46]

---

[39] More detailed information on the case of Mr Samadov.

[40] More detailed information on the case of Mr Ktiti.

[41] See http://www.sharkwater.com/ (accessed 23.02.2017).

[42] On 28 January 2014, PACE has adopted Resolution 1966 (2014): Refusing impunity for the killers of Sergei Magnitsky.

[43] http://www.INTERPOL.int/News-and-media/News/2013/N20130528, (accessed 12.02.2015).

[44] Law and Order in Russia 'Russia Ignores INTERPOL's Ruling and Re-Applies to INTERPOL for a Red Notice for William Browder to Block Magnitsky Justice Campaign', 5 June 2013.

[45] http://www.rednoticelawjournal.com/2015/01/INTERPOLs-third-decision-on-russias-red-notice-request-for-william-browder-no-red-notice/; see also http://www.telegraph.co.uk/news/worldnews/vladimir-putin/11240371/INTERPOL-must-not-collude-with-Vladimir-Putins-thugs.html and the item on INTERPOL's website covering the meeting between Mr Noble and Mr Putin at: https://www.interpol.int/News-and-media/News/2014/N2014-208.

[46] Law and Order in Russia 'INTERPOL Definitively Rejects Russia's Request to Issue an International Arrest Warrant for Bill Browder', 26 January 2015.

55.     Here are some more recent examples, in brief:

-     Mr **Nikita Kulachenkov**, a Russian national recognised as a refugee in Lithuania for his links with
a prominent anti-corruption activist, was arrested in Cyprus in January 2016 on the basis of a Russian
INTERPOL Red Notice. His extradition was sought over the alleged theft of a drawing valued a little
more than one Euro made by a street sweeper, who reportedly had no objections that the artwork was
taken by someone. Mr Kulachenkov was detained for nearly three weeks before the Cypriot authorities
decided to refuse extradition and release him.
-     Mr **Mehdi Khosravi** was arrested in northern Italy in August 2016 on the basis of an Iranian
INTERPOL Red Notice. Mr Khosravi had fled Iran following political protests in 2009, and had
successfully claimed asylum in the United Kingdom. Mr Khosravi's arrest was subject to intense
international criticism, including from Reza Pahlavi, before he was released, and his Red Notice was
deleted further to a request made by his lawyer to the CCF.
-     Mr **Oleg Vorotnikov** is a leader of a street art collective, who has been living in exile since 2011
due to fears of reprisals in Russia against his controversial public works. He was detained in the
Czech Republic on the basis of a Russian Red Notice in September 2016. Although he has since
been released, his Red Notice has yet to be withdrawn.
-     Mr **Dolkun Isa** is an award winning activist and the Secretary General of the World Uyghur
Congress who was granted refugee status in Germany, where he was in the meantime naturalised as
a citizen. He has been subject to a Red Notice requested by China since 2003. As a result, Mr Isa has
faced difficulties travelling abroad to carry out his advocacy activities promoting Uyghur self-
determination, and most recently in April 2016, his visa to India was revoked, preventing him from
attending a conference organised by the Tibetan government in exile.
-     Ms **Aysen Furhoff** is a Turkish national who was naturalised as a Swedish citizen after having
been granted human rights protection on the basis of the risk that she could be tortured if she returned
to Turkey. She was arrested in Georgia on the basis of a Red Notice requested by Turkey in 2015,
and had to stay there for over a year due to delays in her extradition proceedings. In December 2016,
she left Georgia and made her way back to Sweden, before any conclusion could be made on her
extradition proceedings, but her Red Notice remains.
-     Ms **Natalya Bushueva** was stopped in transit at an airport in Moscow on the basis of a Red Notice
requested by Uzbekistan in July 2016. She had previously been a correspondent for the German
international radio service Deutsche Welle and fled Uzbekistan after covering the events of the
Andjian massacre in 2005. She was subsequently granted refugee status in Sweden, where she was
naturalised. Although she managed to avoid arrest, Ms Bushueva remains at risk of arrest and
extradition to Uzbekistan due to the Red Notice that has still not been deleted.[47]
-     Mr **Mukhtar Ablyazov** is a Khazak opposition leader and businessman, who was granted political
asylum in the United Kingdom in 2011. Despite the fact that Interpol was promptly informed of this, he
was subjected to Red Notices issued following requests by Kazakhstan and, upon this country's
request, by the Russian Federation and Ukraine, between 2010 and 2013. He was arrested in France
in July 2013 and released on 9 December 2016, the day of the final refusal of the extradition request
by the French *Conseil d'Etat*. Dozens of family members and supporters of Mr Ablyazov are still being
persecuted, including through Red Notices.[48]
-     Mr **Alexander Lapshin**, a "travel blogger" holding Russian, Ukraine and Israeli nationality, was
arrested in Minsk in mid-December 2016 on the strength of a Red Notice requested by Azerbaijan on
the basis of visits to Nagorno-Kharabakh in 2011 and 2012, which he had commented on in his blog.[49]
-     Last but not least, I have also been informed of a number of cases in which Kurdish refugees from
Turkey have been targeted through the use of INTERPOL Red Notices by Turkey. These cases
appear to be increasingly common following the political unrest in Turkey last year.

56.     These – recent – cases have me worried about the practical effectiveness of the policies put into place
by INTERPOL, in particular the Refugee Policy, which should have prevented cases such as those of
MM. Kulachenko, Khosravi and Isa as well as those of Ms Furhoff and Ms Bushueva.

---

[47]     See also the database collated by John Heathershaw at the University of Exeter
(http://www.centimedia.org/excas/exiles/), which contains information about political activists in exile from Central Asia.
One of the individuals included in the database is Muhiddin Kabiri, the leader of Tajikistan's Islamic Renaissance Party,
who is currently in exile in an undisclosed country.
[48]     See Open Dialog, Report: Kazakhstan pursues former top managers of BTA Bank in order to obtain their testimonies
against Mukhtar Ablyazov, 10 February 2017.
[49]     See "The blogger jailed for visiting a country that 'doesn't exist'", BBC, 7 February 2017.

57.     As part of my fact-finding efforts concerning possible abuses, I also followed up the European Commission's reply to a question in the European Parliament in which the Commission declared that it "stands ready to assist the Parliamentary Assembly of the Council of Europe in the preparation of its report, and is available to share its findings on the issue of possible abuses of Interpol's system for politically motivated purposes as part of the planned consultation of the PACE AS/Jur Committee."[50] I was informed that no written document reflecting the results of the survey carried out by the Commission exists. Its results were presented to the Council's Law Enforcement Working Party in October 2015. According to the summary by the competent service of the Commission[51] of the replies collected from the relevant authorities of EU member countries (replies received from 22 of the 28 Member States), a significant proportion of respondents had signalled problems with the reliability of INTERPOL Red Notices – mostly in terms of lack of sufficient information and clarity. About one half of the replies submitted by the EU Member States NCB's mentioned that they had experienced unlawful Red Notices. Only a minority of the NCB's who replied to the questionnaire accept and act on Red Notices without further checks. The others do not consider a Red Notice as such as a valid reason to arrest someone. In reply to the question of what possible improvements could be made, proposals included the suggestion that INTERPOL tighten its own rules and allocate more resources to checks and that INTERPOL should sanction NCB's from which numerous abusive requests emanated. A number of respondents also said they are concentrating checks on Notices emanating from certain countries. But it should be recalled that the objective of the Commission's survey was not to collect information on possible politically-motivated abuses of the Red Notice procedure, but "to contribute to Interpol's further work in the field of data protection, notably by providing it with an overview of how EU Member States currently use Interpol's notices and diffusions and how these tools could be further improved, in particular in the field of data protection."[52]

## 6.     Weaknesses of the existing system and possible remedies – application of the "principle of causal responsibility"

58.     Given the damage abusive Red Notices can do to the lives of innocent people, it is important that weaknesses of the system are identified and remedied. The examples of actual abuses show that weaknesses exist both with regard to preventing abuses and remedying abuses that have already occurred. The weakness residing in the limited resources available to INTERPOL concern both *ex ante* checks to filter out possible abuses and *ex post* relief by the CCF. Red Notice requests need to be assessed prior to publication by appropriately qualified staff members who have the time to take into account information available from open sources on the cases in question and to ask requesting NCB's for supplementary information. Complaints before the CCF must be examined in such a way that all relevant information is collected from both sides and that it is assessed in light of applicable legal rules, including INTERPOL's own Constitution and all relevant legal and human rights standards. The exponential growth in the number of Red Notices in recent years has not been matched with a similar increase in the resources available for *ex ante* and *ex post* scrutiny.

59.     So the first measure that needs to be taken is to give INTERPOL the resources needed to cope with the increased use made of its services. But in today's budgetary landscape, as in all international organisations, it is not likely that sufficient extra funds will be allocated any time soon. It is therefore vital that existing resources are used efficiently. One approach would be to implement the "principle of causal responsibility", making those users (NCB's) pay for the cost of extra scrutiny made necessary by a higher case-count of abusive requests introduced by them. The "principle of causal responsibility" has first been recognised in environmental law ("polluter pays"), and it would have the same beneficial effects – incentivising a reduction in damaging behaviour and at the same time generating additional resources for prevention and *ex-post* redress. In my view, such an approach, if based on solid statistical data, would not violate the fundamental principle of the equality of all member States. Differentiated treatment based on different facts is not a violation of the principle of equality. In addition to "causal responsibility" for the budgetary costs generated by abusive requests, the efficiency of *ex-ante* and *ex-post* scrutiny of Red Notices could also benefit from a concentration of available resources on requests emanating from NCB's with a high case count of Red Notices found abusive in the past. "Profiling" is a widespread police technique. It is not a violation of the equality principle as long as the profiling criteria are non-discriminatory and applied on the basis of solidly established, verifiable facts.

---

[50]   Link question and thereply:   http://www.europarl.europa.eu/sides/getDoc.do?pubRef=-//EP//TEXT+WQ+E-2015-002608+0+DOC+XML+V0//EN.
[51]   In the form of a telephone conference at working level on 20 December 2016.
[52]   Commission reply (note 52).

60.     A good start would be for INTERPOL to make more intensive use of the facilities available to it under Articles 130 and 131 of its Rules on the Processing of Data (RPD).[53] These include the possibility, for INTERPOL's Secretariat, to invite NCB's to suspend or withdraw access rights, or to do so itself, and even to take one or more of the corrective measures listed in Article 131. According to the information received from INTERPOL, these facilities are indeed not used very frequently. Again, the use of these facilities, which can be resource-intensive (such as dispatching an assessment team to the NCB) could be concentrated on NCB's with a high case count of past abuses.

61.     INTERPOL is in effect a police organisation that is not subjected to any direct judicial or parliamentary controls. In my view, such a privileged status can only be accepted if all participating States, or more precisely, INTERPOL's national interlocutors, the NCB's, are in turn subject to such controls. This is surely the case in many member States of INTERPOL, but unfortunately not in all, as numerous examples of abuses show. It is precisely in those countries which have a high case count of abuses of the INTERPOL system that the national courts also tend to lack independence and/or professionalism. It would therefore not be very helpful for victims to grant them judicial recourse against Red Notices before the courts of the requesting country.

62.     For this reason, an international recourse mechanism for putative Red Notice victims, such as the CCF, makes good sense. This mechanism must fulfil the minimum standards laid down in Article 6 ECHR and Article 14 ICCPR. These minimum standards include the independence of the "tribunal" and that it is empowered to actually adjudicate the cases before it, and not merely express recommendations – an issue that has now been settled in the reform package adopted in Bali, which makes the CCF's decisions binding on INTERPOL. The separation of the CCF's advisory functions from its adjudicatory role decided in Bali will allow INTERPOL to ensure that members and staff of the future advisory and adjudicatory bodies will be appropriately qualified in their respective fields – i.e. criminal law and procedure and human rights law for the adjudicatory body and information technology and data protection for the advisory body.

63.     In order to create and maintain a sound factual basis for policy decisions aimed at minimising abuse, the INTERPOL secretariat, in cooperation with NCB's, should collect statistical information on the total number of alerts issued, broken down by countries; the number of CCF complaints, by country of origin of the Notice; the number of deletions (including reasons for the deletions); and the number of Red Notices that have given rise to extradition (or not). A summary of this information should be made public at regular intervals, in order to improve the accountability of INTERPOL vis-à-vis its member States and vice versa, and in order to give member States an objective basis to assess the reliability of alerts coming from different NCB's. Weaknesses that become apparent from these statistics can then be addressed in a targeted manner, with a view to correcting them through cooperation measures such as training and technical assistance. As a last resort, these statistics can also serve as an objective, non-discriminatory basis for appropriate sanctions, targeted resource allocation ("profiling") or the application of the principle of causal responsibility ("polluter pays", see para. 59).

64.     Even the best possible *ex-ante* and *ex-post* checks cannot prevent all (intentional) abuses of Red Notices, and *bona fide* errors also happen, as in any human activity. In the fight against transnational crime, speedy action can be essential, which increases the risk of mistakes. As at the national level, some risk for innocent persons to find themselves arrested and imprisoned on remand for some time must be accepted as the price to be paid for efficient law enforcement, which is in turn needed to keep many more innocent persons safe from crime. This is also accepted at the national level. But at the national level, persons who were innocently imprisoned are entitled to financial compensation. Such compensation is in principle also available to persons who were held in detention following an abusive or erroneous Red Notice, according to the laws of the arresting country. The mere existence of a Red Notice does not exonerate the arresting authorities when the person arrested turns out to be innocent. But the mere existence of a Red Notice, even without an arrest, can also cause much damage in itself, in particular when the target is a businessperson whose livelihood depends on international mobility. The best remedy is of course the speedy deletion of unjustified notices. But if there are delays, especially when the CCF is overwhelmed by a large number of complaints, or when the requesting NCB fails to answer requests for additional information in good time, it would only be fair to provide pecuniary compensation for losses that can be established with reasonable certainty, as well as for the aggravation and anguish caused by Red Notices that turn out to be unjustified. As it would be impractical for victims to sue the requesting NCB before the courts of the country concerned, it would make sense to establish a fund for the compensation of victims of abusive Notices located at INTERPOL. In accordance with the principle of causal responsibility ("polluter pays"), this fund should be fed by contributions from States proportionately to the number of unjustified notices requested by their NCB's.

---

[53] Available at: http://www.INTERPOL.int/fr/About-INTERPOL/Legal-materials/Fundamental-texts.

## 7.    Conclusion

65.    There is no doubt that 'Red Notices' can cause serious human rights violations when they are abused, or "weaponised", as a former German Federal Minister of Justice recently wrote in the Wall Street Journal[54], by oppressive regimes in order to persecute their opponents even beyond their borders. Even unintentional mistakes, for example due to haste or lack of professionalism can cause much damage. They impede on an individual's freedom of movement, restrict employment possibilities and business activities and more generally, they damage an individual's reputation. Sometimes, people are arrested and extradited to countries where they cannot expect a fair trial, or where they are threatened by torture or inhuman and degrading treatment, without even knowing that they were the subject of an INTERPOL notice.

66.    By contrast, when the suspect of a crime is arrested in conformity with relevant human rights standards such as those laid down in Articles 5 and 6 of the European Convention of Human Rights, any unavoidable interference with the suspect's rights to liberty, property etc. is not a human rights violation, though it should give rise to compensation when an innocent person has been targeted due to a *bona fide* mistake.

67.    As we have seen in the course of the fact-finding for this report, INTERPOL Red Notice procedures have been abused by certain member States, and INTERPOL has been unable to prevent many such abuses or provide relief in good time, despite considerable efforts made to strengthen *ex ante* and *ex post* scrutiny. A number of reforms have therefore been decided, and more are needed in my view, in order to further strengthen the credibility of INTERPOL for the sake of protecting its important mission in the fight against serious transnational crime, including terrorism. This would in turn strengthen the protection of fundamental rights and freedoms not only of the targets of abusive or otherwise unjustified Red Notices, but also of the victims of criminals walking free because of malfunctioning international police cooperation.

68.    This report assesses the principal weaknesses of the existing system and ways and means to remedy them. Targeted individuals must be able to challenge Red Notices following fair procedures that are in conformity with national and international human rights guarantees – in particular, the rights to an effective remedy and to a fair trial, adapted as needed to the context of international cooperation. The principle of causal responsibility ("polluter pays"), applied on the basis of sound statistics, can justify a more targeted use of limited resources available for review purposes and incentivise States or NCB's to reduce unjustified notice requests. Unchecked abuses of INTERPOL's procedures clearly raise issues of judicial accountability, both of States involved in abuses, either by making abusive requests or by executing them, and of INTERPOL, to the extent that its responsibility is engaged for providing assistance to States violating human rights.[55] It is therefore very much in both INTERPOL's and its member States interest that the CCF continues to successfully grow into the "effective remedy" within the meaning of relevant international human rights standards in order to justify the continued judicial immunity of the Organisation.

69.    In light of Professor Nina Vajic's speech as Chair of the CCF at INTERPOL's General Assembly in Bali in November 2016[56], I trust that the CCF will indeed ensure that it provides such an "effective remedy". As part of my follow-up mandate after the adoption of this report, I will not fail to observe the evolution of the CCF and the interpretation it gives to its new Statute in actual practice. The preliminary draft resolution includes a number of constructive proposals and recommendations designed to promote our common goal to further strengthen INTERPOL as a key tool in the fight against international crime, including terrorism.

---

[54] See Däubler-Gmelin (note 4).
[55] See report by José Maria Beneyto (Spain/EPP) on Accountability of International Organisations for human rights violations, pages 8-9 (Assembly Doc. 13370 dated 17 December 2013), adopted during the January 2014 part-session (see Resolution 1979 (2014) and Recommendation 2037 (2014). In his report, Mr Beneyto has referred to some issues regarding INTERPOL, which were taken up in the motion underlying the present report (see paragraphs 56 and 57 of the explanatory report).
[56] Professor Nina Vajic's speech as Chair of the CCF at INTERPOL's General Assembly in Bali in November 2016.

# EXHIBIT 13

Search : [Keyword]  🔍   English

## CONNECTING POLICE FOR A SAFER WORLD

HOME        ABOUT INTERPOL        NEWS AND MEDIA        MEMBER COUNTRIES        INTERPOL EXPERTISE        CRIME AREAS

Back to Search result



### 🛡 KHRAPUNOV, VIKTOR

**WANTED BY THE JUDICIAL AUTHORITIES OF KAZAKHSTAN**

#### IDENTITY PARTICULARS

|                    |                                      |
|--------------------|--------------------------------------|
| Present family name: | **KHRAPUNOV**                      |
| Forename:          | **VIKTOR**                           |
| Sex:               | **Male**                             |
| Date of birth:     | **24/11/1948 (69 years old)**        |
| Place of birth:    | **EAST-KAZAKHSTAN REGION, Kazakhstan** |
| Language spoken:   | **Russian**                          |
| Nationality:       | **Kazakhstan**                       |

#### CHARGES   Published as provided by requesting entity

Charges:   **The Creation and Guidance of an Organised Criminal Group or Criminal Association (Criminal Organisation), and Participation in a Criminal Association; Expropriation or Embezzlement of Trusted Property; Fraud; Legalization of Monetary Funds or Other Property Obtained Illegally; Abuse of Official Powers; Receipt of a Bribe**

#### PHOTOS



#### IF YOU HAVE ANY INFORMATION PLEASE CONTACT

Your national or local police
General Secretariat of INTERPOL

**This extract of the Red Notice has been approved for public dissemination**

Site map      |      FAQs      |      Terms of use      |      Calls for tender      |      Recruitment      |      Contact INTERPOL      |      e-Learning

© INTERPOL 2018. All rights reserved.

# EXHIBIT 14



Law . Tax

CMS von Erlach Poncet Ltd
Rue Bovy-Lysberg 2
P.O. Box 5824
1211 Geneva 11
Switzerland

**T** +41 22 311 00 10
**F** +41 22 311 00 20

www.cms-vep.com

**Christian LÜSCHER**
Lawyer
christian.luscher@cms-vep.com

## TO WHOM IT MAY CONCERN

**Viktor and Leila KHRAPUNOV's application for asylum**          July 19th, 2016

Dear Sir,
Dear Madam,

In my capacity as attorney-at-law, registered at the Geneva Bar (Switzerland) and duly authorized to practice in Switzerland, I hereby confirm that my firm represents Viktor and Leila KHRAPUNOV in the context of their application for asylum in Switzerland.

The current state of the proceedings can be summarized as follows.

Though they have been granted permits to reside in Switzerland, Viktor and Leila filed an application for asylum in order to be recognized as refugees and persons being persecuted by the Government of Kazakhstan.

The requests for asylum have been filed on December 6th, 2013 along with five binders of exhibits proving the status of refugees of Viktor and Leila KHRAPUNOV.

Leila KHRAPUNOV was heard on June 11th, 2014 by the Swiss authorities.

Viktor KHRAPUNOV was heard on July 16th, 2014 by the Swiss authorities.

Taking into account the importance of the matter, Viktor and Leila KHRAPUNOV were allowed to file a "final brief" summarizing the key points of their applications, which they did on February 2nd, 2016.

We are currently awaiting a decision from the Swiss authorities.

CMS von Erlach Poncet SA is registered in the Attorneys' Register.
CMS von Erlach Poncet SA is a member of CMS, the organisation of European law firms. In certain circumstances, CMS is used as a brand or business name of some or all of the member firms. Further information can be found at www.cmslegal.com.
**CMS locations:** Aberdeen, Alger, Amsterdam, Anvers, Barcelone, Belgrade, Berlin, Bratislava, Bristol, Bruxelles, Budapest, Bucarest, Casablanca, Dubaï, Düsseldorf, Edimbourg, Francfort/Main, Genève, Glasgow, Hambourg, Kiev, Cologne, Leipzig, Lisbonne, Ljubljana, Londres, Luxembourg, Lyon, Madrid, Milan, Mexico, Moscou, Munich, Muscate, Paris, Pékin, Podgorica, Prague, Rio de Janeiro, Rome, Sarajevo, Séville, Shanghai, Sofia, Strasbourg, Stuttgart, Tehran, Tirana, Utrecht, Varsovie, Vienne, Zagreb et Zurich.



The Swiss law on asylum makes it mandatory for the asylum seekers to surrender their passport to the Swiss authorities during the proceedings. They are also prohibited to leave Switzerland. Considering the current proceedings, Viktor and Leila KHRAPUNOV are unable to travel to other countries for the time being.

I remain at your disposal for any further query.

Yours sincerely,

Christian LÜSCHER

# EXHIBIT 15

| 628 HOLDINGS REQUESTS FOR PRODUCTION | |
|---|---|
| 2017 (Set 3) | 2015 (Set 1) |
| **REQUEST FOR PRODUCTION NO. 57:** All DOCUMENTS RELATING to any KAZAKHSTAN TRANSACTION that YOU and/or any DEFENDANT, INDIVIDUAL, or ENTITY participated in, directly or indirectly, in any way. | **REQUEST FOR PRODUCTION NO. 28:** All DOCUMENTS relating to the transfer of title of any real property located in Kazakhstan.  (Set 1) (Dkt. 96-1, pp. 155-159) **REQUEST FOR PRODUCTION NO. 36:** All DOCUMENTS relating to the transfer of monies to or from any PERSON located in Kazakhstan. (Set 1) (Dkt. 96-1, pp. 185-189) |
| **REQUEST FOR PRODUCTION NO. 58:** All DOCUMENTS RELATING to any U.S. TRANSACTION that YOU and/or any DEFENDANT, INDIVIDUAL, or ENTITY participated in, directly or indirectly, in any way. | **REQUEST FOR PRODUCTION NO. 5:** All DOCUMENTS RELATING TO any monies transferred to YOU, directly or indirectly, by any DEFENDANT. (Set 1) (Dkt. 96-1, pp. 61-65) **REQUEST FOR PRODUCTION NO. 6:** All DOCUMENTS RELATING TO any monies transferred by YOU, directly or indirectly, to any DEFENDANT. (Set 1) (Dkt. 96-1, pp. 65-69) **REQUEST FOR PRODUCTION NO. 7:** All DOCUMENTS RELATING TO any monies transferred to YOU, directly or indirectly, by any entity owned or controlled, in whole or in part, by any DEFENDANT. (Set 1) (Dkt. 96-1, pp. 70-74) **REQUEST FOR PRODUCTION NO. 8:** All DOCUMENTS RELATING TO any monies transferred by YOU, directly or indirectly, to any entity owned or controlled, in whole or in part, by any DEFENDANT. (Set 1) (Dkt. 96-1, pp. 74-77) **REQUEST FOR PRODUCTION NO. 9:** All DOCUMENTS RELATING TO any financial transaction engaged in by, on behalf of, or involving YOU. (Set 1) (Dkt. 96-1, pp.78-81) |
| **REQUEST FOR PRODUCTION NO. 59:** All DOCUMENTS RELATING to any ASSET in the United States directly or indirectly transferred to or from, borrowed against by, leased by, or in any other way associated with YOU and/or any DEFENDANT, INDIVIDUAL, or ENTITY where the proposed | **REQUEST FOR PRODUCTION NO. 13:** All DOCUMENTS RELATING TO any acquisition, sale, or transfer of real property engaged in by, on behalf of, or involving YOU. (Set 1) (Dkt. 96-1, pp. 94-98) **REQUEST FOR PRODUCTION NO. 14:** All DOCUMENTS RELATING TO any acquisition, sale, or transfer of real property |

| | |
|---|---|
| or actual transfer price or financing value was equal to or greater than $100,000 USD. | engaged in by, on behalf of, or involving any DEFENDANT. (Set 1)(Dkt. 96-1, pp. 98-102) |
| **REQUEST FOR PRODUCTION NO. 61:** All DOCUMENTS RELATING TO any ACCOUNTS owned, controlled, associated with, for the benefit of, or administered by (a) YOU, (b) any DEFENDANT, INDIVIDUAL, or ENTITY, or (c) any RELATED PARTY of(a) or (b), including without limitation: 1) All DOCUMENTS identifying the ACCOUNT, including the name of the institution and the ACCOUNT number or other identifying characteristic; 2) All DOCUMENTS regarding the ownership, control, or operation of the ACCOUNT; 3) All ACCOUNT statements; 4) All DOCUMENTS or COMMUNICATIONS regarding the transfer of any ASSET to or from the ACCOUNT, including without limitation any wire transaction; and 5) All ACCOUNTS anywhere in the world, including without limitation Kazakhstan, the United States, the United Kingdom, Switzerland, Tanzania, Dubai, and Cyprus. | **REQUEST FOR PRODUCTION NO. 5:** All DOCUMENTS RELATING TO any monies transferred to YOU, directly or indirectly, by any DEFENDANT. (Set 1) (Dkt. 96-1, pp. 61-65) **REQUEST FOR PRODUCTION NO.15:** All DOCUMENTS RELATING TO any accounts, funds, bonds, stocks, or monetary instruments, or any real property, currently held or that ever has been held by YOU, on YOUR behalf, or for YOUR benefit. (Set 1) (Dkt. 96-1, pp. 102-106) **REQUEST FOR PRODUCTION NO. 16:** All DOCUMENTS RELATING TO any accounts, funds, bonds, stocks, or monetary instruments, or any real property, currently held or that ever have been held by any other DEFENDANT, on behalf of any other DEFENDANT, or for any other DEFENDANT's benefit. (Set 1) (Dkt. 96-1, pp. 106-110) **REQUEST FOR PRODUCTION NO. 19:** All COMMUNICATIONS between YOU and any DEFENDANT. (Set 1) (Dkt. 96-1, pp. 118-122) **REQUEST FOR PRODUCTION NO. 20:** All COMMUNICATIONS between YOU and any DEFENDANT RELATING TO any transfer of monies, financial transaction, or transfer of real property. (Set 1) (Dkt. 96-1, pp. 122-126) **REQUEST FOR PRODUCTION NO. 21:** All COMMUNICATIONS RELATING TO any transfer of monies, financial transaction, or transfer of real property involving YOU or for YOUR benefit. (Set 1) (Dkt. 96-1, pp. 126-130) |
| **REQUEST FOR PRODUCTION NO. 62:** All DOCUMENTS or COMMUNICATIONS between YOU and any DEFENDANT, INDIVIDUAL, or ENTITY, or between YOU and any RELATED PARTY of any | **REQUEST FOR PRODUCTION NO. 21:** All COMMUNICATIONS RELATING TO any transfer of monies, financial transaction, or transfer of real property involving YOU or for YOUR benefit. (Set 1) (Dkt. 96-1, pp. 126-130) |

| | |
|---|---|
| DEFENDANT, INDIVIDUAL or ENTITY, RELATING to<br>(a) any KAZAKHSTAN TRANSACTION,<br>(b) any U.S. TRANSACTION,<br>(c) any ASSET, or<br>(d) any ACCOUNT or transfer of monies to or from any ACCOUNT, including any COMMUNICATIONS REFERRING TO the intent or purpose behind any transfer to or from any ACCOUNT or the creation of any ACCOUNT. | **REQUEST FOR PRODUCTION NO. 22:**<br>All COMMUNICATIONS RELATING TO any transfer of monies, financial transaction, or transfer of real property involving any DEFENDANT or for any DEFENDANT's benefit. (Set 1) (Dkt. 96-1, pp. 130-134)<br>**REQUEST FOR PRODUCTION NO. 23:**<br>All DOCUMENTS RELATING TO the purpose, intent, or goal of any transfer of monies, financial transaction, or transfer of real property involving YOU or for YOUR benefit. (Set 1) (Dkt. 96-1, pp. 134-138)<br>**REQUEST FOR PRODUCTION NO. 24:**<br>All DOCUMENTS RELATING TO the purpose, intent, or goal of any transfer of monies, financial transaction, or transfer of real property involving any DEFENDANT or for any DEFENDANT's benefit. (Set 1) (Dkt. 96-1, pp. 138-142) |
| **REQUEST FOR PRODUCTION NO. 63:**<br>All DOCUMENTS containing, reflecting or RELATING TO the current or former ownership, control, beneficiaries, employees, representatives, managers, or agents of any of the ENTITIES or their RELATED PARTIES, including without limitation list of shareholders, capitalization tables, directories of officers, directors, employees or shareholders. | **REQUEST FOR PRODUCTION NO. 3:**<br>All DOCUMENTS REFERRING TO YOUR current and former directors from the date YOU were incorporated to the present. (Set 1) (Dkt. 96-1, pp. 55-58)<br>**REQUEST FOR PRODUCTION NO. 4:**<br>DOCUMENTS REFERRING TO all PERSONS who currently have or ever have had any direct or indirect ownership interest in YOU, from the date YOU were incorporated to the present. (Set 1) (Dkt. 96-1, pp. 58-61) |
| **REQUEST FOR PRODUCTION NO. 65:**<br>All DOCUMENTS relating to any legal and/or administrative proceedings involving (a) YOU, (b) any DEFENDANT, INDIVIDUAL, or ENTITY, or (c) any RELATED PARTY of (a) or (b), including without limitation non-privileged information regarding prosecutions, investigations, and/or civil actions in Switzerland, Kazakhstan, or the United States. | **REQUEST FOR PRODUCTION NO. 44:**<br>All DOCUMENTS relating to any legal and/or administrative proceedings involving any DEFENDANT. (Set 1) (Dkt. 96-1, pp. 221-225)<br>**REQUEST FOR PRODUCTION NO. 45:**<br>All DOCUMENTS relating to any law enforcement or governmental investigation of YOU (Set 1) (Dkt. 96-1, pp. 225-229)<br>**REQUEST FOR PRODUCTION NO. 46:**<br>All DOCUMENTS relating to any law enforcement or governmental investigation of any DEFENDANT. (Set 1) (Dkt. 96-1, pp. 229-234) |

| | |
|---|---|
| **REQUEST FOR PRODUCTION NO. 71**:<br>All DOCUMENTS relating to any corporation, limited liability company, partnership, enterprise, business, or other entity or organization inside the United States in which (a) YOU, (b) any DEFENDANT, INDIVIDUAL, or ENTITY, or (c) any RELATED PARTY of (a) or (b), serve or served as an officer, director, manager, representative, consultant, employee, fiduciary, trustee, beneficiary, attorney, accountant, or agent, including without limitation any corporate DOCUMENTS, tax DOCUMENTS, financial DOCUMENTS, applications for loans or other lines of credit, ACCOUNT statements, and purchase or sale DOCUMENTS. | **REQUEST FOR PRODUCTION NO. 3:**<br>All DOCUMENTS REFERRING TO YOUR current and former directors from the date YOU were incorporated to the present. (Set 1) (Dkt. 96-1, pp. 55-58)<br><br>**REQUEST FOR PRODUCTION NO. 15:**<br>All DOCUMENTS RELATING TO any accounts, funds, bonds, stocks, or monetary instruments, or any real property, currently held or that ever has been held by YOU, on YOUR behalf, or for YOUR benefit. (Set 1) (Dkt. 96-1, pp. 102-106) |

| **628 HOLDINGS Interrogatories** | |
|---|---|
| 2017 (Set 3) | 2015(Set 1) |
| **INTERROGATORY NO. 22:**<br>IDENTIFY all PERSONS involved in YOUR formation, operations, and financial transactions, either directly or indirectly, and the role of each PERSON including but not limited to any DEFENDANT, MUKHTAR, ELENA, GENNADY, SDG CAPITAL, SPG, or ADLUX. | **INTERROGATORY NO. 2:**<br>From the date of YOUR incorporation to the present, IDENTIFY each natural person who has served as:<br>(a) an officer for 628 HOLDINGS, and/or (b) on YOUR board of directors. (Set 1) (Dkt. 96-1, pp. 7-9) . |
| **INTERROGATORY NO. 23:**<br>IDENTIFY (in U.S. dollars) all transactions having a value of $5,000 or more between YOU, including entities or individuals under your control, and any DEFENDANT, ENTITY, INDIVIDUAL or RELATED PARTY of any DEFENDANT, ENTITY or INDIVIDUAL from 1997 to the present, and for each transaction, IDENTIFY: | **INTERROGATORY NO. 6:**<br>State (in U.S. dollars) the amount of each transaction involving monies transferred to and/or by YOU, directly or indirectly, by and/or to any DEFENDANT or any entity owned or controlled, in whole or in part, by any DEFENDANT, from the date of YOUR incorporation to the present, and for each transaction described herein, state: |

| | |
|---|---|
| (a) the name of each DEFENDANT, ENTITY, INDIVIDUAL, or PERSON involved in each transaction;<br>(b) the business address of each DEFENDANT, ENTITY, INDIVIDUAL, or PERSON involved in each transaction;<br>(c) the amount of each transaction;<br>(d) the date of each transaction; and<br>(e) the purpose of each transaction. | (a) the name of each DEFENDANT, PERSON, and/or entity involved in each transaction;<br>(b) the business address of each DEFENDANT, PERSON and/or entity involved in each transaction;<br>(c) the date of each transaction; and<br>(d) the purpose of each transaction (Set 1) (Dkt. 96-1, pp. 15-20)<br><br>**INTERROGATORY NO. 7:**<br>State the name and business address of any DEFENDANT and/or entity owned or controlled, in whole or in part, by any DEFENDANT to whom you sold, transferred, or from whom YOU acquired any real property, directly or indirectly, between the date of YOUR incorporation and the present, and for each transaction described herein, state:<br>(a) the amount YOU received or paid in exchange for the sale, transfer or acquisition of each property;<br>(b) the name of each DEFENDANT, PERSON, and/or entity involved in each transaction;<br>(c) the business address of each DEFENDANT, PERSON and/or entity involved in each transaction;<br>(d) the date of each transaction; and<br>(e) the purpose of each transaction. (Set 1) (Dkt. 96-1, pp. 20-23) |
| **Dmitri Kudryashov Interrogatories** | |
| 2017 (Set 3) | 2015 (Set 1) |
| **INTERROGATORY NO. 23:**<br>IDENTIFY all ENTITIES and RELATED PARTIES for which you are or have been the beneficial owner. | **INTERROGATORY NO. 15:**<br>State the names and business address(es) of each entity owned or controlled, directly or indirectly, by any DEFENDANT. (Set 1) (Dkt. 96-3, pp. 76-81) |
| **INTERROGATORY NO. 24:**<br>IDENTIFY (in U.S. dollars) all transactions having a value of $5,000 or more between YOU, including entities or individuals under your control, and any | **INTERROGATORY NO. 6:**<br>State (in U.S. dollars) the amount of each transaction involving monies transferred to and/or by YOU, directly or indirectly, by and/or to any |

| | |
|---|---|
| DEFENDANT, ENTITY, INDIVIDUAL or RELATED PARTY of any DEFENDANT, ENTITY or INDIVIDUAL from 1997 to the present, and for each transaction, IDENTIFY:<br>(a) the name of each DEFENDANT, ENTITY, INDIVIDUAL, or PERSON involved in each transaction;<br>(b) the business address of each DEFENDANT, ENTITY, INDIVIDUAL, or PERSON involved in each transaction;<br>(c) the amount of each transaction;<br>(d) the date of each transaction; and<br>(e) the purpose of each transaction. | DEFENDANT or any entity owned or controlled, in whole or in part, by any DEFENDANT, from 1997 to the present, and for each transaction described herein, state:<br>(a) the name of each DEFENDANT, PERSON, and/or entity involved in each transaction;<br>(b) the business address of each DEFENDANT, PERSON and/or entity involved in each transaction;<br>(c) the date of each transaction; and<br>(d) the purpose of each transaction. (Set 1) (Dkt. 96-3, pp. 28-34) |
| **INTERROGATORY NO. 25:**<br>DESCRIBE your current and/or any prior role at any of the ENTITIES or DEFENDANTS, including but not limited to RPM-MARO and WHN. | **INTERROGATORY NO. 2:**<br>State the name and business address of every entity for which you have served as an officer and/or director, and all titles you held within each entity. (Set 1) (Dkt. 96-3, pp. 12-16) |

# EXHIBIT 16

# MANGEAT

# Memorandum

| From | MANGEAT ATTORNEYS-AT-LAW | Place, date | Geneva, 19 January 2017 |
|------|--------------------------|-------------|-------------------------|
| To | BOERSCH SHAPIRO LLP | Matter | 00944938/FMA |
| | | Doc. n° | 00980116 |

## 1.        QUESTION

We have been requested to briefly describe the process of taking a deposition in Switzerland within the context of foreign civil proceedings.

Note that the Swiss Federal Office of Justice (here-after: the "**FOJ**") has issued very useful official Guidelines on the International Judicial Assistance in Civil Matters (attached[1]). All the details regarding the procedure can be found on pages 20 and following.

## 2.        PRINCIPLE

It is a criminal offence to proceed with the taking of evidence for a foreign court on the Swiss territory without an authorisation[2].

If US plaintiffs or US jurisdictions want to take a deposition in Switzerland, they thus need to go through the administrative channels provided through THE HAGUE CONVENTION ON TAKING OF EVIDENCE (here-after: "**the Convention**"), signed by both Switzerland and the US[3].

## 3.        THE HAGUE CONVENTION ON TAKING OF EVIDENCE

The more flexible option provided for by the Convention is to request an authorisation from the FOJ to have a Court appointed commissioner (typically on or several lawyers), to proceed with the party's deposition, according to article 17 of the Convention[4].

## A.        Application process

Formally, the application to obtain such authorization needs to be translated into French and filed before the Geneva Tribunal[5], in principle by the US Court. The parties' lawyers might choose to file the

---

[1]    Also available online : https://www.rhf.admin.ch/dam/data/rhf/zivilrecht/wegleitungen/wegleitung-zivilsachen-e.pdf

[2]    See Guidelines for International Judicial Assistance in Civil Matters, p 2.

[3]    https://assets.hcch.net/docs/dfed98c0-6749-42d2-a9be-3d41597734f1.pdf

[4]    More precisely described in the Guidelines for International Judicial Assistance in Civil Matters, p. 28 and following.

**Mangeat Attorneys at Law LLC**
**Passage des Lions 6**                    **Tel. +41 22 319 22 00**
**P.O. Box 5653**                          **Fax +41 22 319 22 01**
CH-**1211 Geneva 11**                      **www.mangeat.ch**

request for authorization themselves, but in such case, they will still need to attach a decision from the US Court that appoints the commissioners. The parties should therefore first obtain such decision from the competent US Court and then file the application for authorisation in Switzerland.

According to our experience, the FOJ does not set any strict restrictions regarding the nationality or number of the commissioners. This option leaves thus much flexibility as the authorisation can be granted to each involved lawyer, provided they were all previously appointed as commissioner by the foreign Court, so that each of them will be allowed to conduct the examination[6].

Among others, the application for authorisation must briefly describe the nature and subject matter of the proceedings, as well as the name and address of the commissioners[7].

After careful examination by the FOJ of these elements, the authorization is granted for the specific acts requested and to the appointed commissioner named in the foreign decision.

The FOJ demands that this request is filed at least two months before the date set for the hearing.

## B.    Execution

Once appointed and authorised, the commissioners can take any evidence insofar as the procedural steps considered are compatible with the law of the state of execution and accord with the authorisation granted[8].

The deposition will thus need to be executed within the limits set by the authorisation. In particular, new topics of discussion that fall outside the scope specified in the application request cannot be added, and new, unnamed in the authorisation and therefore unauthorized, commissioners will not be allowed to conduct the examination. A new letter of request need in these cases to be filed.

As a rule, the evidence is to be taken according to the procedures provided for by the law of the requesting court, unless the specified procedures are against the law of the state of execution.

In this respect, if every party agrees on the **videotaping** of the deposition and a **verbatim transcript** of it, the FOJ will in principle allow it. **Cross-examination** is also authorised, during which the witness is examined by the lawyers of both parties[9]. The FOJ will also in principle authorise the examination of a witness under **oath** or **solemn declaration**, if such a request is made[10].

As an example, within the context of a pending US civil claim, we recently obtained the authorisation from the FOJ for ten Swiss and US lawyers - previously appointed commissioners by the competent US court - to conduct the audition of two parties in Geneva. The videotaping, the verbatim record and the cross-examination were expressly authorised.

*** 

---

5    The request must be addressed to: TRIBUNAL DE PREMIERE INSTANCE, Place du Bourg-de-Four 1, Case postale 3736, 1211 Genève 3, F: +41 22 327 66 78, tpi.securise@justice.ge.ch

6    See Guidelines for International Judicial Assistance in Civil Matters, p 29.

7    See Guidelines for International Judicial Assistance in Civil Matters, p 29.

8    See Guidelines for International Judicial Assistance in Civil Matters, p 28.

9    See Guidelines for International Judicial Assistance in Civil Matters, p 29.

10    See Guidelines for International Judicial Assistance in Civil Matters, p 28.

Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

Swiss Confederation

Federal Department of Justice and Police FDJP

**Federal Office of Justice FOJ**

3rd edition 2003 (latest update January 2013)

# International Judicial Assistance in Civil Matters

# Guidelines

©2003 by the Private International Law Unit of the Federal Office of Justice FOJ, together with the Division for International Legal Assistance (FOJ), the Directorate of International Law (DFA) and the Office of the Attorney General of Switzerland

Internet: http://www.rhf.admin.ch/dam/data/rhf/zivilrecht/wegleitungen/wegleitung-zivilsachen-e.pdf

# CONTENTS

ABBREVIATIONS .................................................................................................................III

FOREWORD - DISCLAIMER ................................................................................................. 1

I.          GENERAL REMARKS .......................................................................................... 1

   I.A.    THE CONCEPT OF INTERNATIONAL JUDICIAL ASSISTANCE IN CIVIL MATTERS .......................... 1
   I.B.    ASSISTANCE AND SOVEREIGNTY ................................................................................ 2
   I.C.    LEGAL BASIS AND APPLICABLE LAW ........................................................................... 2
      1.    Hague Conventions ....................................................................................... 2
      2.    Bilateral Agreements ..................................................................................... 3
      3.    Absence of an agreement .............................................................................. 3
      4.    Applicable Law .............................................................................................. 3
      5.    Principle of Reciprocity ................................................................................. 4
   I.D.    CIVIL OR COMMERCIAL MATTER ................................................................................ 4

II.          SERVICE OF DOCUMENTS ................................................................................. 6

   II.A.    THE CONCEPT OF SERVICE ...................................................................................... 6
   II.B.    DOCUMENTS THAT MUST BE SERVED BY MEANS OF JUDICIAL ASSISTANCE ......................... 6
   II.C.    COMPETENT AUTHORITIES ....................................................................................... 7
      1.    Hague Service Convention ............................................................................ 7
         1.1    Forwarding authority ............................................................................. 7
         1.2    Receiving Authority ............................................................................... 7
      2.    1954 Hague Convention ................................................................................ 8
      3.    Absence of an agreement .............................................................................. 8
   II.D.    CHANNELS OF TRANSMISSION .................................................................................. 8
      1.    Hague Service Convention ............................................................................ 8
         1.1    Ordinary Channel (Arts. 2 to 7 Hague Service Convention) .................... 8
         1.2    Alternative Channels (Arts. 8 to 10 Hague Service Convention) .............. 9
         1.2.1 Reservations and declarations made by Switzerland ......................... 9
         1.2.2 Consequences of the Principle of Reciprocity ................................. 10
      2.    1954 Hague Convention .............................................................................. 10
         2.1    Ordinary Channel (Arts. 1 to 4) ........................................................... 10
         2.2    Alternative Channels (Art. 1 paras. 3 and 6 1954 Hague Convention) .... 10
      3.    Absence of an agreement ............................................................................ 11
      4.    Other Transmission Channels ..................................................................... 11
   II.E.    REQUIREMENTS FOR THE REQUEST .......................................................................... 11
      1.    Hague Service Convention .......................................................................... 11
         1.1    Form .................................................................................................. 11
         1.2    Execution and Languages ................................................................... 12
         1.3    Protection given to addressees, sanctions ........................................... 13
         1.4    Grounds for refusing service ............................................................... 14
         1.5    Costs ................................................................................................. 15
      2.    1954 Hague Convention .............................................................................. 15
         2.1    Form .................................................................................................. 15
         2.2    Execution and language ...................................................................... 15
         2.3    Protection for the addressee ................................................................ 16
         2.4    Costs ................................................................................................. 16
      3.    Absence of an agreement ............................................................................ 16
   II.F.    SPECIAL QUESTIONS ............................................................................................ 16
      1.    Service addressed to foreign states or foreign state-owned companies ....... 16
      2.    Service addressed to Swiss nationals abroad .............................................. 16
      3.    Service of documents which institute proceedings and Recognition of Judgments ..................... 17
      4.    Address of addressee unknown – Service by Public Notice ........................... 17
      5.    Agreement between the European Community and Switzerland relating to the Free Movement of Persons, Federal Act on the Free Movement of Lawyers and Assistance ....................... 18
      6.    Domicile for service ..................................................................................... 19
      7.    Deadline compliance ................................................................................... 19

III.     OBTAINING EVIDENCE ..................................................................................................20

III.A.   FOREWORD ...............................................................................................................20
  1.     Overview..............................................................................................................20
  2.     Cases in which procedures for assistance need not be followed ...............................20
III.B.   THE COMPETENT AUTHORITIES AND TRANSMISSION PROCEDURES ...........................21
  1.     Hague Evidence Convention...................................................................................21
    1.1    Under Chapter I of the Hague Evidence Convention .......................................... 21
    1.2    Under Chapter II Hague Evidence Convention ................................................. 22
  2.     1954 Hague Convention.........................................................................................22
  3.     Absence of an agreement .....................................................................................22
  4.     Other channels of transmission .............................................................................23
III.C.   REQUIREMENTS FOR THE APPLICATION ......................................................................23
  1.     Hague Evidence Convention...................................................................................23
    1.1    Application under Chapter I ........................................................................... 23
      1.1.1 Form ..................................................................................................... 23
      1.1.2 Contents (Art. 3 Hague Evidence Convention) ........................................ 23
      1.1.3 Language and translations (Art. 4 Hague Evidence Convention) ............... 23
      1.1.4 Execution .............................................................................................. 24
        a. Applicable Law (Art. 9 Hague Evidence Convention) ........................... 24
        b. Obtaining evidence via a person appointed by the authorities addressed
           (Art. 14 para. 3 Hague Evidence Convention) .................................... 24
        c. The right to refuse to testify / Banking secrecy ................................. 25
        d. Participation of the members of the court of the requesting authority (Art. 8 Hague
           Evidence Convention) and/or of the parties or of their representatives (Art. 7 Hague
           Evidence Convention) ...................................................................... 25
        e. Grounds for refusal ......................................................................... 25
        f. Costs .............................................................................................. 26
      1.1.5 Letter of request relating to "pre-trial discovery" proceedings ................. 26
    1.2    Request under Chapter II of the Hague Evidence Convention (Art. 15 to 22 Hague
           Evidence Convention)................................................................................... 28
      1.2.1 General ................................................................................................. 28
      1.2.2 Conditions laid down in Article 21 Hague Evidence Convention – Procedural safeguards .. 28
      1.2.3 Authorisation procedure before the Swiss authorities, and content of the application ......... 29
      1.2.4 Swiss applications to a foreign country or evidence taken by Swiss diplomatic or
           consular representatives.......................................................................... 30
  2.     1954 Hague Convention.........................................................................................31
    2.1    Basis ......................................................................................................... 31
    2.2    Form and content......................................................................................... 31
    2.3    Language and translation .............................................................................. 31
    2.4    Applicable law ............................................................................................. 32
    2.5    Grounds for refusal ...................................................................................... 32
    2.6    Costs.......................................................................................................... 32
    2.7    Obtaining evidence directly by the parties in Switzerland or the diplomatic officers or
           consular agents under the 1954 Hague Convention .......................................... 32
      2.7.1 Activities carried out by the parties in Switzerland .................................. 32
      2.7.2 Activities carried out by diplomatic officers or consular agents ................ 32
  3.     Obtaining evidence in the absence of an agreement .................................................33
III.D.   SPECIAL ISSUES .......................................................................................................33
  1.     Hearing by video conference...................................................................................33
  2.     Hearing by Telephone ...........................................................................................34

CONTACTS.............................................................................................................................35

## ABBREVIATIONS

| | |
|---|---|
| ACLFA | Administrative Case Law of the Federal Authorities |
| Art. | Article(s) |
| CPC | Civil Procedure Code |
| FDJP | Federal Department of Justice and Police |
| FDFA | Federal Department of Foreign Affairs |
| FOJ | Federal Office of Justice |
| JU | Canton Jura |
| NE | Canton Neuchâtel |
| PILA | Federal Act of 18 December 1987 on Private International Law (SR 291) |
| RSJ | Revue suisse de jurisprudence: Swiss Law Review |
| SCC | Swiss Criminal Code of 21 December 1937 (SR 311.0) |
| SJ | La semaine judiciaire |
| SR | Classified Compilation of Swiss Legislation |
| SZ | Canton Schwyz |
| ZH | Canton Zurich |

## FOREWORD - DISCLAIMER

These Guidelines are intended for practitioners (central authorities, judges, lawyers, diplomatic and consular agents) confronted with questions on international judicial assistance in civil matters. Above all, they provide practical advice and information. However, in addition to this advice, the Private International Law Unit of the Federal Office of Justice FOJ feels it would be useful to give its opinion on certain frequently asked questions which are controversial and which have not yet been ruled on by a court. In such cases, the FOJ is unable to provide any guarantee as to the outcome of the proceedings should such matters arise during litigation brought before a court.

In addition to these Guidelines, we would also recommend you consult the "Guide pratique de l'entraide judiciaire international en matière civile et pénale" (Guide on Judicial Assistance). This guide is updated on a regular basis. It gives practical recommendations with regard to the procedures to follow for Swiss requests abroad on a country-by-country basis (To which authority should the request be addressed? How many copies? In which languages? How long does it take for the request to be executed? etc.).

Finally, the FOJ has put together information which can be downloaded from the Internet on the locally competent Swiss authority to contact in a given case (http://www.elorge.admin.ch).

## I.        GENERAL REMARKS

### I.A.    The Concept of International Judicial Assistance in Civil Matters

International judicial assistance in civil matters forms part of the law on international civil procedure, which, besides the issue of assistance, deals with questions relating to the international competence of the courts as well as those relating to the recognition and execution of judgements.

The object of international judicial assistance is the provision of support to the authorities or courts of a requesting state by the state to which the request is made, by carrying out procedural or other official acts and communicating the results to the authorities or courts of the requesting state, so that these can be used in specific proceedings (ACLFA 1985 [49/I], p. 93).

Judicial assistance in the normal sense includes the service of judicial and extra-judicial documents as well as the obtaining of evidence.[1] These Guidelines deal with this category of assistance. Judicial assistance in the broader sense includes other official measures in relation to foreign proceedings, such as international judicial assistance (see e.g. Convention of 25 October 1980 on International Access to Justice [SR 0.274.133] and European Agreement of 27 January 1977 on the Transmission of Applications for Legal Aid [SR 0.274.137]), the enforcement of decisions (see e.g. the Convention of 2 October 1973 on the Recognition and Enforcement of Decisions relating to Maintenance Obligations [SR 0.211.213.02], the Convention of 20 June 1956 on the Recovery Abroad of Maintenance [SR 0.274.15]), assistance in connec-

---

[1]   Such as local inspections, taking statements from witnesses and parties, production of documents, providing expert opinions, etc.

tion with the abduction of children (c.f. Convention of 25 October 1980 on the Civil Aspects of International Child Abduction [SR 0.211.230.02] ; European Convention of 20 May 1980 on Recognition and Enforcement of Decisions concerning Custody of Children and on Restoration of Custody of Children [SR 0.211.230.01]) and in connection with the application of the law (c.f. European Convention of 7 June 1968 on Information on Foreign Law [SR 0.274.161]).

## I.B.   Assistance and Sovereignty

In terms of Article 271 paragraph 1 of the Swiss Criminal Code (SCC; SR 311.0), it is an offence for anyone to carry out "activities on behalf of a foreign state on Swiss territory without lawful authority, where such activities are the responsibility of a public authority or public official" as well as for anyone to carry out "such activities for a foreign party or organisation" or to encourage such activities. This provision strikes against acts that violate Swiss territorial sovereignty and which as a consequence cannot be carried out without the permission of the Swiss authorities. According to Article 299 paragraph 1 SCC it is an offence for anyone to violate "the territorial sovereignty of a foreign state, in particular by conducting official activities without authorisation on foreign territory." These provisions express the general principle of international law according to which the sovereignty of any state extends only to its national frontiers; accordingly, the authorities of a state cannot, in principle, exercise their public powers outside their territory.

According to the Swiss view – as well as that of numerous other states – the service of judicial or extra-judicial documents as well as the obtaining of evidence for court proceedings constitute the exercise of public powers (on the subject of service see Federal Supreme Court Decision 124 V 47 [50]). Accordingly, these procedures cannot simply be undertaken from beyond the frontiers of the state concerned without authorisation. The authority in question must therefore resort to the mechanisms of assistance, otherwise it will violate the sovereignty of the state in which it is carrying out these acts. The concept of sovereignty under public international law, however, may come into conflict with the prerogative of the judge appointed in another state which results from his or her jurisdiction to rule on a case. We will examine in greater detail the interaction between sovereignty under public international law and the prerogatives of the judge who has local jurisdiction to rule on the case (see III.A.2, p. 20). Finally, the service of certain documents without resorting to judicial assistance is permitted in certain circumstances (see II.B, p. 6).

## I.C.   Legal Basis and Applicable Law

## 1.   Hague Conventions

The multilateral conventions in the field of international judicial assistance in civil cases are as follows:

- The Hague Convention relating to civil procedure of 1 March 1954 (1954 Hague Convention; SR 0.274.12);
- The Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (Hague Service Convention; SR 0.274.131)2; and

- The Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (Hague Evidence Convention; SR 0.274.132).[2]

## 2.    Bilateral Agreements

There are also a number of bilateral agreements between Switzerland and certain states that authorise direct contact between *judicial authorities* or which serve to complement the aforementioned Hague Conventions. Switzerland has entered into such agreements with:

- Germany (SR 0.274.181.361),
- Austria (SR 0.274.181.631; with Austria, not only is direct contact between authorities permitted, but also contact between the authority and the addressee of the proceedings),
- Belgium (SR 0.274.181.721),
- France (SR 0.274.183.491),
- Italy (SR 0.274.184.542),
- Luxembourg (SR 0.274.185.181),
- Greece (SR 0.274.183.721),
- Monaco (SR 0.274.185.671),
- Pakistan (SR 0.274.186.231),
- Poland (SR 0.274.186.491),
- Turkey (SR 0.274.187.631),
- Hungary (SR 0.274.184.181),
- the Czech Republic (SR 0.274.187.411),
- Slovakia (SR 0.274.187.411),
- Estonia (SR 0.274.721).

Although there is no such agreement with Liechtenstein, direct contact between authorities has become customary.

## 3.    Absence of an agreement

Where there is no international agreement, Switzerland applies as an autonomous right the 1954 Hague Convention to the foreign requests that it receives and Swiss requests to other countries (see Art. 11*a* para. 4 PILA; SR 291).

Where there is no agreement and unless there is an established practice to the contrary, Swiss requests must follow diplomatic channels (see II.D.2.2, p. 10).

## 4.    Applicable Law

Judicial assistance in civil matters, which is an area of public international law, falls under federal jurisdiction (Art. 54 para. 1, Art. 122 para. 1 and Art. 166 para. 2 of the Swiss Constitution). There is however only one brief provision at a federal level in Article 11 to 11*c* of the Federal Act of 18 December 1987 on Private International Law (PILA, SR 291). Since acts of judicial assistance in Switzerland are carried out in

---

[2]   The application of Hague Service and Evidence Conventions in the various countries is explained in the "Practical Handbook on the operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters" and the "Practical Handbook on the Operation of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters", which can be ordered from *Permanent Bureau, Hague Conference on Private International Law, 6, Scheveningseweg, 2517 KT The Hague, the Netherlands, www.hcch.net; secretariat@hcch.net.*

accordance with Swiss law (see Article 11*a*, para. 1 PILA), the Swiss Code of Civil Procedure (CPC, SR 272) should be referred to when service is effected and evidence obtained.

## 5.      Principle of Reciprocity

Under Article 21 paragraph 1 of the Vienna Convention on the Law of Treaties of 23 May 1969 (SR 0.111), a state that has not established a reservation in respect of a Convention may take advantage of a reservation established by another state in its relations with that state. Article 21 of the Vienna Convention reflects the principle of reciprocity in public international law. The legal effect of a reservation is that it modifies for the reserving party in its relations with other parties the provisions of the treaty to which the reservation relates to the extent of the reservation. The reservation also modifies those provisions to the same extent for these other parties in their relations with the reserving State. Thus in matters of judicial assistance, the Swiss authorities must refrain from conducting proceedings abroad that are not authorised on Swiss territory, due to the reservations made by Switzerland in respect of the aforementioned Hague Conventions. This applies in particular to reservations relating to the methods by which requests are transmitted (see II.D.1.2.1, p. 9 and II.D.2.2, p. 10). Be that as it may, states may renounce to invoke the principle of reciprocity (see II.D.1.2.2, p. 10). It is important to note here that, in an unpublished judgement (5P.225/1996), the Swiss Federal Supreme Court indicated in an *obiter dictum* that direct service by post to a state that was party to Hague Service Convention and which had not made a reservation in this regard was admissible. In this decision, however, the Swiss Federal Supreme Court failed to mention Article 21 of the Vienna Convention. It also failed to indicate if the recipient state had waived its right to invoke the principle of reciprocity.[3]

### I.D.    Civil or Commercial Matter

The aforementioned Hague conventions all apply to "civil and commercial matters". This concept should be defined in the same manner regardless which of the three Hague Conventions applies.

This concept is not defined in the conventions and is the object of some controversy. However, one special commission of the Hague Conference on International Private Law in which Switzerland participated stated in relation to the Hague Service and Evidence Conventions, that the expression "civil or commercial matter" would have to be interpreted autonomously, without exclusive reference to the law of the requesting state or the requested state, and without the joint application of the laws of both states (see Practical Handbook on the Operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, 3rd edition, Wilson & Lafleur Ltée, Montreal, 2006 ["Handbook Hague Service Convention"], p. 26[4]; see also Art. 31 para. 1 Vienna Convention on the Law of Treaties of 23 May 1969). The Special Commission then considered that bankruptcy law, insurance law, and employment law can also fall within the concept of a "civil or commercial matter" (for Switzerland see Federal Supreme Court Decision 94 III 37 and 96 III 65, in which the Federal Supreme Court accepted that this concept also included the proceedings in relation to debts and bankruptcy when the claims are of a civil nature, as well as Federal Insurance Court Decision

---

3   See also 5A 128/2010 and 5F.6/2010
4   See footnote 2.

1966, 67-73, in which the Swiss Federal Insurance Court stated that it was important to grant assistance in the same manner in the matters relating to social insurance as in civil matters).

The Federal Office of Justice has come around to this point of view and is thus of the opinion that the concept of the "civil or commercial matter" should be understood in the broader sense and need not necessarily correspond to the concept used at a domestic level. It is, however, difficult to give a precise definition of what could be a "civil or commercial" matter in terms of the Hague Conventions. To take a negative approach, it can be said that the Hague Conventions envisage neither a criminal law matter nor a tax matter. Moreover, the fact that in the requesting state the case is designated to be "civil" is of no relevance. Finally, when the case relates to litigation between a public authority and a private individual, where the public authority is acting in the exercise of public powers, the case cannot be considered to have a "civil or commercial" nature. The same applies, in general, when an authority brings civil proceedings against an individual in order to safeguard public interests.[5] In litigation where the plaintiff is a private individual and the defendant is the state, in designating an action as "civil or commercial" account may be taken of the fact that it is a case in which the plaintiff is asserting *i*) a *right* (the state does not have a discretionary power) *ii*) *of a pecuniary nature*, even if under national Swiss law this right relates to an administrative matter (in this sense, Federal Insurance Court Decision 1966, 67-73; see also ruling by the Federal Insurance Court K 18/04 of 18 July 2006).

However, a large number of cases in civil matters – in the traditional sense of the term (family law, law of succession, company law, law of contract, intellectual property law, etc.) – are not necessarily pecuniary in their nature, but nevertheless come within the scope of application of the Hague Conventions. In such cases, when service is effected, the fact that the requesting authority is an administrative authority (e.g. a guardianship authority) is of no significance.

The FOJ is also of the opinion that in cases in which a state court participates in arbitration proceedings (see Articles 184 and 185 PILA), the broad concept of "civil or commercial matters" covered within the meaning of the Hague Conventions on judicial assistance shall apply to the court proceedings.[6]

---

[5]   E.g.: the procedures introduced by the American administrative authorities, such as the Anti-Trust Division of the Justice Department.
[6]   A special commission of the Hague Conference on International Private Law issued a statement on this in January 2003.

| II. | SERVICE OF DOCUMENTS |
|-----|----------------------|

## II.A.   The Concept of Service

Most procedural laws provide that in order to allow proceedings to begin the communications to the parties must be served on them or notified to them in order to have legal effect. Service is the transmission of documents by an official method: at the request of a foreign authority, the authorities of a state pass on the documents to the addressee in return for a simple receipt or by means of a special certificate that proves that service has been effected. In the Swiss view, this constitutes an official act (see I.B, p. 2).

Countries with common law legal systems deal with service in a fundamentally different way. According to their law, it is the responsibility of the parties to inform their opponents by serving them with the important documents in the case. Thus there is not necessarily an official act involved. This completely divergent system can be the source of some conflict. When seeking solutions, this different approach will be taken into account.

## II.B.   Documents that must be served by means of Judicial Assistance

The Hague Conventions are directed as much at "judicial documents" as at "extrajudicial documents". A "judicial document" is understood as "*any document that relates to contentious or non-contentious proceedings or the arrest of the assets of a debtor*" (CAPATINA, L'entraide judiciaire internationale en matière civile and commerciale, Recueil des Cours 1983 [179], p. 347). "Extra-judicial documents" include "*documents intended to produce effects beyond any procedure that is ongoing in a court of law*" (CAPATINA, op. cit., p. 348). Extra-judicial documents must, however, emanate from an authority or a judicial officer. Notaries are regarded as judicial officials inasmuch as they undertake a public duty in this particular case.

In general, any judicial or extra-judicial document must be communicated by means of judicial assistance. Indeed, on the one hand, assistance provides a better guarantee that the rights of the addressee will be respected, particularly the right to be heard[7]. On the other hand, from the point of view of public international law, the service of such documents on Swiss territory without passing through the judicial assistance channel constitutes a violation of territorial sovereignty. However, it is accepted that when the document in question has no legal effect or is not liable to have any legal effects on the addressee, the judicial assistance channels need not necessarily be followed (ACLFA 1976 [40/I], p. 105 s.; Circular of 5.12.1956 from the Administrative Commission of the Supreme Court of the Canton of Zurich, RSJ 1957, p. 16).

---

[7]   The fact, for instance, to ask from the requesting State to furnish translations aims to guaranty the right to be heard of the addressee.

**II.C.   Competent Authorities**

**1.        Hague Service Convention**

*1.1     Forwarding authority*

Article 3 of the Hague Service Convention provides that the authority or judicial officer competent under the law of the state in which the documents originate should forward his request to the Central Authority of the state addressed. It is thus the law of the requesting state that primarily determines the competent authority for forwarding the requests for foreign assistance. It is, however, important to note that it has been accepted that lawyers, to the extent that their law permits them to serve documents, must be regarded as *judicial officers* and hence as persons authorised to approach the Central Authority of the state addressed. Private individuals, however, (for example the parties) are not, in themselves, authorised to approach the Central Authority directly, even if, under their law, they are entitled to serve documents (Explanatory Report by TABORDA FERREIRA, Acts and Documents of the 10th session (1964), Volume III, Service of Process, p. 368; the competent authorities in each country can be found on the website of the Hague Conference on International Private Law).

The competent Swiss authorities forward their requests abroad via the Central Authority of the requested State.[8] However, they address their requests to the competent authority or court in the place where the relevant proceedings are taking place (e.g.: "to the competent civil court ..."). As previously mentioned, Switzerland has concluded bilateral agreements with certain countries that permit direct contact between authorities (see I.C.2, p. 3). For additional information, please consult the Guide on Judicial Assistance.

*1.2     Receiving Authority*

Article 2 of Hague Service Convention provides for the designation of central authorities that are responsible for receiving requests for assistance. Article 18 paragraph 3 of the Hague Service Convention permits states to designate more than one Central Authority.

In Switzerland, the receipt of requests from foreign states and the processing of these is a cantonal responsibility. Accordingly, there are 26 cantonal Central Authorities. These authorities ensure, on the one hand, that the requests conform to the formal requirements of Hague Service Convention or any other provisions that must be taken into consideration, and, on the other hand, that judicial assistance does not clearly appear to be excluded for any other reason. If there is no reason to do otherwise, they take the action required. If a request does not satisfy the requirements of the Service Convention, the Central Authority informs the requesting authority without delay (Art. 4 of the Service Convention).

Since it can prove very difficult for the requesting state to know which of the 26 central cantonal authorities has jurisdiction, the FOJ is also designated to be a Central Authority to which requests may be addressed irrespective of where they may have

---

[8]   JU, NE, SZ (for all requesting authorities, apart from courts) and ZH require that outgoing requests be transmitted via the central cantonal authority. This authority transmits them to the Central Authority of the state addressed.

to be executed. The jurisdiction of the FOJ is secondary. It does not subject the requests to any examination before passing them on to the competent cantonal authorities, but it consults with the Cantons and provides any coordination that may be necessary. Please note that the FOJ has created a database listing all the competent authorities in Switzerland (http://www.elorge.admin.ch).

For Swiss requests addressed to foreign states, see the Guide on Judicial Assistance.

## 2.    1954 Hague Convention

The 1954 Hague Convention does not provide for the designation of central authorities. Under Article 1 paragraph 1 of the 1954 Hague Convention, requests for assistance must follow "consular" channels. This means that foreign authorities – this can be a lawyer if, under the law of the requesting state, he is entitled to serve documents – send the documents to be served to the consulate, embassy or other representation of its country in Switzerland. This representation addresses a request to the FOJ, which in turn passes it on to the competent cantonal authority (see Art. 11 PILA; Ordinance of 17.11.1999 on the Organisation of the FDJP [SR 172.213.1].

Requests from Swiss authorities must also pass through the FOJ (see Art. 11 PILA; Ordinance of 17.11.1999 on the Organisation of the FDJP [SR 172.213.1].The FOJ passes these on to the relevant Swiss representation in the receiving state, which in turn passes the requests on to the authority designated by the receiving state (Art. 1 para. 1 1954 Hague Convention; see Guide on Judicial Assistance).

In relation to incoming or outgoing requests for assistance, the FOJ confines itself to examining whether these comply with the formal requirements of the applicable international conventions and ensuring that international judicial assistance does not appear to be excluded for any other reason.

## 3.    Absence of an agreement

Where there is no international agreement, Switzerland applies the 1954 Hague Convention to any foreign requests and Swiss requests to other countries (see Art. 11*a* para. 4 PILA; I.C.3, p. 3). Reference is therefore made to the comments made in II.C.2, p. 8.

Swiss requests made to foreign states must, in the absence of contrary practices, follow diplomatic channels (see II.D.2.2, p. 10). For a description of the procedure applicable in each country, reference is made to the Guide on Judicial Assistance.

## II.D.   Channels of Transmission

## 1.    Hague Service Convention

### 1.1    Ordinary Channel (Arts. 2 to 7 Hague Service Convention)

As already indicated, under Article 2 of the Hague Service Convention, each contracting state must designate a Central Authority that has the task of receiving and dealing with requests for service from another contracting state. The Hague Service Convention only requires the creation of a Central Authority for the purpose of *receiv-*

ing requests for service. Thus a request that is being sent is not required to pass through the forwarding country's own Central Authority.[9] The authority designated as competent according to the law of the requesting state (see II.C.1.1, p. 7) addresses its request to the Central Authority of the requested state.

### 1.2   Alternative Channels (Arts. 8 to 10 Hague Service Convention)

#### 1.2.1   Reservations and declarations made by Switzerland

In addition to the ordinary channel, the Hague Service Convention, in its Articles 8 to 10, provides for alternative channels for effecting service.

Switzerland has, however, made reservations to Articles 8 and 10.

Thus in relation to Article 8 of the Hague Service Convention, Switzerland permits service of documents through consular or diplomatic agents only with regard to persons who are nationals of the originating state (see ACLFA 1968-1969 [34/15], p. 34).[10] If that is not the case, the ordinary channel has to be followed. Consular and diplomatic agents are not permitted in any case to resort to coercive measures in order to effect service.

With regard to Article 10 of the Hague Service Convention, Switzerland declares its opposition to *direct service abroad by postal channels* as provided for in letters a), b) and c) of that Article. Nevertheless, it sometimes happens that documents are sent directly from abroad to parties resident in Switzerland. This occurs primarily from countries with common law legal systems, in which the service of documents is the responsibility of the parties and not of the authorities. In other words, and contrary to the Swiss view, such a procedure is not necessarily considered an official act in those countries. The recipient of documents served in this way can notify the matter to the Federal Department of Foreign Affairs (FDFA). If Swiss sovereignty is violated, the FDFA will instruct the relevant Swiss Embassy to intervene with the originating authorities and explain that this method of service is punishable under Article 271 of the Swiss Penal Code.[11,12] *It should, however, be noted that the inadmissibility of direct service by mail in Switzerland does not automatically invalidate the service of the document as part of the foreign proceedings. It may, however, have repercussions with regard to whether the judgment will be recognised*.[13] At any rate, the FDFA regularly gives notice that errors in the service of documents can under Swiss law result in the non-execution of foreign civil judgments (see II.F.3, p. 17). Occasionally, service is effected again by means of judicial assistance.

Finally, Article 9 of the Hague Service Convention provides for the use of consular channels, that is, the ordinary channel stipulated in Article 1 of the 1954 Hague Convention (see II.D.2.1, p. 10). With regard to this, Switzerland has also designated the cantonal central authorities as recipient authorities for requests from abroad.

---

[9]   For Switzerland, see footnote 8.

[10]  However, if the addressee of the document is a national of both the requesting state and the state receiving the request, service by consular or diplomatic agents is not permitted. It remains possible if the addressee is a national of the requesting state and a third state.

[11]  See I.B, p. 7

[12]  However, only an intentional act is unlawful, and it is practically impossible to prove that an act was intentional.

[13]  See also II.F.3, p. 23

1.2.2   Consequences of the Principle of Reciprocity

In application of the *principle of reciprocity*, the Swiss reservations may be invoked by the recipient state in relation to requests for service coming from Switzerland, even if the recipient state has not made the same reservations (see I.C.5, p. 4). Thus, the Swiss authorities may not use the transmission channels in respect of which Switzerland has stipulated reservations. Recipient states may, however, waive their right to invoke the principle of reciprocity. The Guide on Judicial Assistance mentions several options open to the Swiss authorities (as the FOJ's primary recommendation or as an alternative channel of transmission), depending on the state in question, to use channels that Switzerland has objected to but which may be nonetheless used when the requested state has refused to invoke the principle of reciprocity. For example, according to the FOJ's primary recommendation, in relations between Switzerland and *Ireland, Canada* and *India* it is permitted for requests for service coming from Swiss authorities to be sent via the FOJ to the competent Swiss representation. The Swiss representation serves the documents on the addressees by registered mail with acknowledgement of receipt. In matters between Switzerland and the *United States of America*, the cantonal central authorities can address their request to the competent Swiss representation, which in turn serves the documents directly on the addressee (see Federal Supreme Court Decision 109 III 100; for the requirements in relation to form, see II.E.1.1, p. 12).

## 2.   1954 Hague Convention

### 2.1   Ordinary Channel (Arts. 1 to 4)

The 1954 Hague Convention provides for the service of documents via the consular channel (Art. 1).

This means that the competent foreign authorities address their requests to the consulate, embassy or any other representation of their country in Switzerland. This representation forwards the request to the Federal Office of Justice, which, in turn, forwards it to the relevant cantonal authority.

Requests from a Swiss authority are addressed to the FOJ, which forwards them to the competent Swiss representation in the receiving state, which, in turn, sends them on to the authority designated by the recipient state (Art. 1 para. 1 1954 Hague Convention).

### 2.2   Alternative Channels (Art. 1 paras. 3 and 6 1954 Hague Convention)

First of all, the states that are parties to the 1954 Hague Convention may declare that they wish to use the diplomatic channel instead of the consular channel (Art. 1 para. 3). In such a case, requests from Switzerland must be addressed to the FOJ, which forwards them to the Swiss representation in the receiving state, which, in turn, forwards the request to the foreign affairs department of the receiving state. The latter sends the request on to the competent local authority.

Moreover, Article 6 of the 1954 Hague Convention permits direct service by mail to an addressee resident abroad, or via the competent judicial or public officials of the recipient country, or, alternatively, through diplomatic or consular agents. *Although Switzerland has not made any specific reservation in relation to this, it does not permit service by mail on its own territory.* However, Switzerland permits service by dip-

lomatic or consular agents as provided for in the Hague Service Convention, that is to say, if the addressee is a national of the state of origin of the documents (see ACLFA 1968-1969 [34/15], p. 34 and footnote n°10 above). The consular or diplomatic agents are not permitted to make any use of coercive measures.

Just as is the case under the Hague Service Convention, the *principle of reciprocity* applies under the 1954 Hague Convention. Thus the Swiss authorities may not use channels for service abroad that are not permitted in Switzerland (see I.C.5, p. 4).

### 3.    Absence of an agreement

Where there is no international agreement, Switzerland applies the provisions of the 1954 Hague Conventions to requests received from abroad and to Swiss requests to other countries (see Art. 11*a* para. 4 PILA; I.C.3, p. 3). Switzerland also accepts the service of documents by consular or diplomatic agents on the requesting country's own nationals. Finally, Switzerland does not accept direct service from abroad by mail.

Swiss requests to other countries must, unless there is a contrary custom, for example in favour of consular channels, follow diplomatic channels (see II.D.2.2, p. 10). Direct service by mail is permitted only if the recipient state accepts this form of service. For a description of the procedure applicable to each country, please see the Guide on Judicial Assistance.

### 4.    Other Transmission Channels

All Hague Conventions authorise states to enter into bilateral agreements that provide more favourable conditions. As a result, direct correspondence between requesting and recipient authorities or courts in certain countries remains possible (see I.C.2, p. 3).

Diplomatic channels can always be used (see II.D.2.2, p. 10), even where a convention provides for a quicker means of service. Where the Hague Service Convention applies, its Article 9 paragraph 2 provides for a special rule in this regard.

### II.E.    Requirements for the Request

### 1.    Hague Service Convention

### *1.1    Form*

Article 3 of the Hague Service Convention provides for the use by contracting states of a model form for requesting the service of judicial or extra-judicial documents. The text printed on the form must include a version in either English or French.[14] It consists of three parts, the request for service, a certificate containing the details of execution, and a summary of the document being served (Art. 7 para. 1 Hague Service Convention). The blanks corresponding to the printed text are completed either in the language of the state receiving the request, or in English or French (Art. 7 para. 2 Hague Service Convention). Some states require, in our opinion wrongly, that the

---

[14]   Under article 7 the Hague Service Convention, the additional printing of the text in one or more official languages of the requesting state (state of origin) is permitted.

printed text and/or the responses be written in their language (Guide on Judicial Assistance).

The model form and the documents to be served are to be sent in duplicate (Art. 3 para. 2 Hague Service Convention). The authentication of the documents or any similar formality is not required (Art. 3 para. 1 Hague Service Convention). Regarding the necessity to join the translation of the exhibits, see II.E.1.2, p. 12.

When the alternative channels of service provided for in Articles 8 and 10 Hague Service Convention are used (see II.D.1.2, p. 9), the model forms do not need to be used, and no translation is required. It should, however, be noted that if the addressee is unable to understand the nature and significance of the documents served, this may pose problems should the judgment be recognised abroad (violation of the right to be heard)[15] and this may remain a problem even where the receiving state permits the use of the alternative channels for service. Accordingly, it is recommended that the Hague Service Convention forms are used for the alternative channels as well (at least the section "Summary of the document to be served" of the model form [pp. 3 and 4]) or that a translation of the documents in the language of the recipient state is enclosed, in order to ensure that the addressee is informed of the nature of the documents served. The Hague Conference on Private International Law adopted a recommendation to this effect in 2003 and 2009 (see points 65 - 68; point 31). The FOJ recommends that the form be completed in the language of the requested state.

### 1.2    Execution and Languages

The Swiss authorities effect the service of documents requested by a foreign state, on the first occasion and in the absence of any special requests by the requesting state, by "informal delivery" to the addressee. Simple delivery is covered by Article 5 paragraph 2 of the Hague Service Convention. The translation of the documents to be served is not necessary for this mode of service; service is effected, as a general rule, by registered mail or by judicial act.[16] This form of service is, however, permitted only if the addressee accepts service (Art. 5 para. 2 Hague Service Convention). If the addressee refuses to accept service by simple delivery, the Central Authority or the competent cantonal court will make a note of this on the certificate and will notify the requesting state that formal service has to be effected. For formal service, however, the Swiss authorities require the translation of the documents into German, French, or Italian, depending on the region in question, before attempting to service the document again (see the Swiss reservation to Art. 5 para. 3 of the Hague Service Convention). In order to guarantee the right of the addressee as provided by Article 5 paragraph 2 of the Hague Service Convention to refuse service by simple delivery and to require a translation, it is advisable to inform the addressee in an appropriate manner. The FOJ has thus recommended the cantonal authorities to inform addressees of their rights at the moment of service and to fix, where appropriate, a short period within which to exercise such rights. For example, if service is effected by mail, an accompanying letter or a notice on the envelope could inform addressees of their rights and the way in which they should be exercised. Simple service by the

---

[15]   However, the judgment will not have to be recognised abroad in each Swiss procedure.
[16]   Delivery of a "judicial document" is regulated in the general terms and conditions of the Swiss Post Office and its information brochure. Article 138 CPC on the form in which judicial documents are served states in paragraph 1: "The summons, rulings and decisions are served by registered mail or by other means against confirmation of receipt".

procedure used for court documents is not sufficient to allow addressees to exercise rights.

With regard to Swiss requests to other countries, it is recommended to consult the Guide on Judicial Assistance to find the requirements specified by the recipient country. Certain countries require the immediate translation of the documents to be served and will therefore not proceed in the first instance with service by simple delivery.

The requesting authority can demand that service be made formally from the beginning either according to one of the forms prescribed by the law of the receiving state (Art. 5 para. 1 let. a Hague Service Convention), or according to a special form prescribed by the law of the requesting state (Art. 5 para. 1 let. b Hague Service Convention). In the latter case, the demand will only be met if the required form is compatible with the law of the receiving state. If a request is made for formal service or if this form of service proves to be necessary due to the refusal of the addressee to accept service, the requesting state may have to pay the resultant costs (Art. 12 para. 2 Hague Service Convention; see II.E.1.5, p. 15).

It is important to note that the effects of the impossibility or refusal of service are not governed by the Hague Service Convention. It is not easy to answer the question as to which law – that of the requested state or that of the requesting state – service is to be considered to be legally valid. The Swiss Federal Supreme Court has attempted to answer this question (SJ 2000, p. 89 et seq.). In the view of the FOJ it is generally the law of the requested state that should apply, unless the law of the requesting state imposes particular requirements to be met. In the latter case, in the view of the FOJ, it will be up to the requesting authority to request a special form of service (Art. 5 para. 1 let. b Hague Service Convention).

With regard to a foreign request for service in Switzerland, the authority effecting service must complete *the relevant certificate in every case, even if it is not enclosed with the request.*

## 1.3    Protection given to addressees, sanctions

Articles 15 and 16 of the Hague Service Convention provide for a mechanism intended to protect the defendant who has not received a served document.[17] The aim of Article 15 is therefore to ensure rights of defence (Report by TABORDA FERREIRA, Acts and Documents of the 10th session (1964), Volume III, Service of Process, p. 93).

Article 15 of the Hague Service Convention deals with the service of a summons or equivalent document in accordance with the provisions of the Convention when the defendant fails to appear.

Article 15 therefore provides in its first paragraph that when a summons or equivalent document has to be transmitted abroad for the purpose of service, under the provisions of the Hague Service Convention and the defendant fails to appear, the court is required to *defer judgment* until it is established that *the document was either served in accordance with the methods prescribed by the internal law of the state addressed*

---

[17]  With reference to Article 15 of the Hague Service Convention see also Article 26 paragraph 3 Lugano Convention (Convention of 30 October 2007 on jurisdiction and the recognition and enforcement of decisions in civil and commercial matters (SR 0.275.12, revised version of the Convention of 16 September 1988 on jurisdiction and the enforcement of judgments in civil and commercial matters).

(Art. 15 para. 1 let. a Hague Service Convention), *or the document was actually delivered to the defendant or to his residence by another method provided for by the Hague Service Convention* (Art. 15 para. 1 let. b). The first possibility envisages cases where service has been effected in accordance with Article 5 paragraph 1 let. a of the Hague Service Convention. The second possibility is aimed at cases of transmission in accordance with Article 5 paragraph 1 let. b of the Hague Service Convention as well as cases where alternative channels of transmission (see II.D.1.2, p. 9) are used. In this second case, it is not sufficient that the alternative channels of transmission or a method of transmission peculiar to the requesting state (Art. 5 para. 1 let. b Hague Service Convention) was used, it is also necessary for *service to be effected on the defendant in person or at least at his residence* (Report of TABORDA FERREIRA, op. cit., p. 95). With regard to alternative channels of transmission, the reservations made by contracting states in relation to certain methods of transmission should be taken into account. In addition, the court may only defer judgement, whatever the situation, if service has been effected in sufficient time for the defendant to be able to defend himself.

Article 15 paragraph 2 of the Hague Service Convention qualifies the protection given by the first paragraph to the extent that it allows contracting states to declare that their courts may give judgment irrespective of paragraph 1, subject to the conditions, however, that *i)* the document has been transmitted by one of the methods provided for by Hague Service Convention *ii)* that a period of not less than six months has elapsed and *iii)* that no certificate has been obtained despite every reasonable effort being made by the competent authorities. Switzerland has not made any declaration in terms of Article 15 paragraph 2 of the Hague Service Convention. This option is, however, open to any Swiss court through the application of the principle of reciprocity (see I.C.5, p. 4) when service should have taken place in a state which has made such a declaration.

If, however, a judgment has been given against a defendant who has not been able to appear, the defendant may, under Article 16 of the Hague Service Convention, request the court to relieve him of the effects of failing to appeal against the judgment within the given time. Article 16 does not, however, apply to judgments relating to the status or capacity of persons (Art. 16 para. 4 Hague Service Convention).

*1.4    Grounds for refusing service*

If the Central Authority concludes that the provisions of the Hague Service Convention have not been complied with, Article 4 of the Convention mandates that the Central Authority promptly inform the applicant.

Furthermore, service may be refused if the document does not relate to a civil or commercial matter (Art. 1 para. 1 Hague Service Convention; see I.D, p. 4), if a particular form is required that is contrary to the law of the state addressed (Art. 5 para. 1 let. b), or if the execution of service is such that it would infringe upon the sovereignty or security of the state addressed (Art. 13 para. 1). The term "sovereignty" must be interpreted restrictively. It cannot be understood as being equivalent to public policy. In this sense, Article 13 paragraph 2 of the Hague Service Convention indicates that the execution of a request may not be refused solely on the ground that the law of the state addressed claims exclusive jurisdiction over the subject matter of the action or does not permit the action upon which the application is based. In

other words, these grounds are not considered relevant to the sovereignty of the state addressed.[18]

### 1.5   Costs

In principle, no charges may be made for services relating to the service of documents relating to judicial assistance (Art. 12 para. 1 Hague Service Convention). There is, however, an exception for cases requiring the involvement of a judicial officer or the use of a particular method of service (Art. 12 para. 2 let. a and b Hague Service Convention). Moreover, bilateral agreements may provide different rules (see I.C.2, p. 3).

## 2.      1954 Hague Convention

The 1954 Hague Convention served as the basis for the Hague Service Convention of 1965. The requirements and conditions applicable to the service of documents under the Hague Service Convention were largely restated and differ from those contained in the 1954 Hague Convention only in a few points. Only these differences are considered below.

### 2.1   Form

Requests for service based on the 1954 Hague Convention need not be transmitted in a standardised form.

Under Article 1 paragraph 1 of the 1954 Hague Convention, the consul's request must indicate the authority issuing or forwarding the document, the names and capacities of the parties, and the address of the addressee. In addition, the nature of the document in question must be mentioned, i.e. it should state the subject matter of the action and describe in detail the documents to be served (e.g.: legal claim, response to the claim, judgment on the evidence; Art. 1 para. 1 1954 Hague Convention). The request shall be in the language of the requested authority. A receipt should always be attached to the request. If service must be effected in a special form (e.g. according to the law of the requesting state), it is advisable to request this expressly and to justify the request (Art. 3 1954 Hague Convention).

### 2.2   Execution and language

Here too, service can be effected either by simple delivery (Art. 3 1954 Hague Convention together with Art. 2 1954 Hague Convention; without translation; see II.E.1.2, p. 12), subject to refusal by the addressee, or by formal service (with certified[19] translation; in Switzerland either in German, French or Italian, depending on the place of execution of the request, see Federal Supreme Court Decision 103 III 69). With regard to simple delivery, it should be borne in mind that the FOJ is of the opinion that it is advisable to inform the addressee of his right to refuse service if the documents have not been translated (see II.E.1.2, p. 12). The court is not obliged to complete the certificate; a receipt signed by the addressee is sufficient.

---

[18]   On the subject of third party debt orders see A. R. MARKUS, Drittschuldners Dilemma, in: Rechtsetzung und Rechtsdurchsetzung, Festschrift für Franz Kellerhals zum 65. Geburtstag, Stämpfli Verlag Bern 2005; also appeared in: BlSchK, 2005, H 1, p. 1 ff.

[19]   This means certification that the translation is complete and correct.

*2.3    Protection for the addressee*

In contrast to the Hague Service Convention, the 1954 Hague Convention does not provide any mechanism for the protection of the rights of the defendant.

*2.4    Costs*

The execution of the request for service may not give rise to the right to the reimbursement of costs, unless service is made forcibly or if a special form is required (Art. 7 para. 2 Hague Service Convention). Moreover, bilateral agreements may provide different rules (see I.C.2, p. 3).

## 3.    Absence of an agreement

Where there is no international agreement, Switzerland applies the provisions of the 1954 Hague Conventions to requests received from abroad and to Swiss requests to other countries (see Art. 11*a* para. 4 PILA; see also Art. 11*a* para. 1 - 3 PILA).

With regard to requests made by Switzerland to other countries, reference is made to the Guide on Judicial Assistance. It is, however, worth noting that, in relation to costs, Swiss representations in those states where no agreement exists in this regard will request the Swiss authority to guarantee a refund in the event that charges are made.

## II.F.    Special Questions

## 1.    Service addressed to foreign states or foreign state-owned companies

In the case of service addressed to foreign states (including embassies and consulates) or to foreign state-owned companies, Article 16 of the European Convention on State Immunity applies (SR 0.273.1). Under paragraph 4 of this provision, the periods for entering into the proceedings and the methods of appeal against a judgment by default begin to run two months after the service of the document or the judgment with the department of foreign affairs of the state addressed. In addition, the courts having jurisdiction may not assign a period shorter than two months from the receipt of the documents by the department of foreign affairs (Art. 16, para. 5). These rules, which are in keeping with normal practices, should also be respected outside the scope of application of the said Convention.
The FOJ is willing to provide support and explanation of the procedures in the different countries.

## 2.    Service addressed to Swiss nationals abroad

Reference should be made to the explanations on alternative channels for affecting service addressed to Swiss nationals abroad by Swiss diplomatic or consular representatives. These can be found under II.D.1.2.1, p. 9, II.D.2.2, p. 10, II.D.3, p. 11 and on the pages relating to each country in the Guide on Judicial Assistance. For requirements regarding translation and form and the explanations under II.E.1, p. 11 and II.E.2, p. 15 apply mutatis mutandis.

If the Swiss citizen has more than one nationality, i.e. is also a national of the requested state, the ordinary channel should be followed; the Swiss consular or diplo-

matic representative may not serve documents (for exceptions see II.D.1.2.2, p. 10). If the Swiss citizen is also a national of a third state, the Swiss consular or diplomatic representative is permitted to serve documents.[20]

Besides the alternative channels described, there are further ways of serving documents listed on the pages referring to each country.

### 3.  Service of documents which institute proceedings and Recognition of Judgments

The Hague Conventions do not regulate the legal effects of serving documents.

Furthermore, the regulations that govern the service of documents in relation to the main proceedings are not necessarily the same as those applied in relation to the recognition procedure, in which, as a condition for the recognition of a judgment, it must be ensured that the document instituting the proceedings was duly served (see for the respective requirements e.g. Art. 27 para. 2 let. a PILA; but see also Art. 34 no 2 of the Convention of 30 October 2007 on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters [LugC[21], SR 0.275.12] and the declaration issued by Switzerland on Article III para. 1 of Protocol 1;[22]). Thus, as we have already indicated, although the USA does not object to the service of documents on its territory by diplomatic agents, the subsequent judgment will not necessarily be recognised, for example, when the documents have been served in a language that the addressee did not understand (see II.E.1.1, p. 12). For the precedents and doctrine relating to these questions in Switzerland, which are not always consistent, see for example DUTOIT, Commentaire de la loi fédérale du 18 décembre 1987, 4th ed., Basel 2005, no 8 ad Art. 27 ; HONSEL/VOGT/SCHNYDER/BERTI (edit.), Basler Kommentar, Internationales Privatrecht, 2nd edition, Basel 2007, no 9 ff ad Art. 27 ; GIRSBERGER/HEINI/KELLER/KREN KOSTKIEWICZ/SIEHR/VISCHER/VOLKEN (edit.), Zürcher Kommentar zum IPRG, 2nd ed., Zurich 2004, no 74 ff ad Art. 27; Federal Supreme Court Decision 122 III 439 (447 f) also published in SRIEL 1998, p. 441 with a commentary by I. SCHWANDER; Federal Supreme Court Decision 135 III 623, with a commentary by I. SCHWANDER in AJP/PJA 1/2010, p. 110 ff; Federal Supreme Court judgment 4A_161/2008 (01.07.2008), already with a consideration on LugC of 2007; Supreme Court judgment 5A_544/2007 (04.02.2008); F. DASSER / M. FREY, Übergangsrechtliche Stolpersteine des revidierten Lugano-Übereinkommens, in: Jusletter 11 April 2011, margin no 18 ff.; Aargau Cantonal Supreme Court, 17.12.1999, SRIEL 2001, p. 224.

### 4.  Address of addressee unknown – Service by Public Notice

When the address of the addressee of service is unknown, the Hague Conventions do not apply (Art. 1 para. 2 Hague Service Convention; Art. 1 para. 1 1954 Hague Convention). Therefore, when an authority wishes to proceed with service by means of public notice in a foreign country, it is recommended in principle to follow diplomatic channels. In addition, as the obligation to grant assistance no longer follows from a convention, the state addressed is free to decide whether it cooperates or not. It

---

[20] See footnote 10
[21] Revised version of the Convention of 16 September 1988 on jurisdiction and the enforcement of judgments in civil and commercial matters
[22] See also Art. 27 no 2 LugC 1988 in conjunction with Art. 63 LugC

should be noted here that the Swiss Civil Procedure Code permits the authorities to proceed with a public notice in Switzerland when the address of the addressee is unknown and cannot be ascertained despite making reasonable enquiries or when service is impossible (see Art. 141 CPC).

To the knowledge of the FOJ, the central cantonal authorities do not automatically refuse to proceed with publication in response to a request from a foreign authority when the address of the addressee is unknown, but prefer to investigate the matter. Furthermore, in general, the Swiss authorities do not reject requests that have not followed diplomatic channels, but which have followed a channel provided for by the Conventions.

In the opinion of the FOJ, a Swiss or a foreign authority may proceed with the publication of notices addressed to an indeterminate number of persons whose identities are unknown (notice to creditors, appeal for beneficiaries of a will) by addressing their request to their representation in the country of publication. The representation is then charged with arranging publication.

5.    **Agreement between the European Community and Switzerland relating to the Free Movement of Persons, Federal Act on the Free Movement of Lawyers and Assistance**

With the entry into force on 1 June 2002 of the Agreement between Switzerland on the one hand, and the European Community and its member states on the other relating to the free movement of persons (SR 0.142.112.681) and the Federal Act on the Free Movement of Lawyers (SR 935.61; Lawyers' Act), a lawyer domiciled in the territory of the European Union may, under certain conditions, represent clients in Switzerland. Against this background, several judicial authorities have asked the FOJ whether the new law permits them to effect service without using the assistance channels.

First of all, it should be noted that this legislation does not regulate questions of assistance. Furthermore, under Article 140 of the Swiss Civil Procedure Code, the court may instruct parties with domicile or registered office abroad to provide a domicile for service in Switzerland.

There are two different cases: either a party domiciled in Switzerland is represented in a Swiss court by a lawyer whose registered office is on EU territory, or both the party and his or her legal representative are domiciled on EU territory.

In the first case, the FOJ is of the opinion that the assistance channels do not have to be followed. Indeed, due to the fact that the party concerned by service is domiciled in Switzerland, service made to his or her lawyer (see Art. 137 CPC) has no effect abroad and consequently is not capable of undermining the sovereignty of the state in which the lawyer has his or her registered office. Postal service to the lawyer for the parties is, as a result, permissible in such a case.

In the second case, due to the fact that the party is domiciled abroad, service has legal effects abroad and is, as a result, capable of infringing on the sovereignty of the state involved. It is advisable, therefore, to follow the assistance channels. It should be recalled that there are bilateral agreements between Switzerland and the coun-

tries bordering it that permit direct correspondence between authorities (see I.C.2, p. 3).

## 6.    Domicile for service

Under Article 140 of the Swiss Civil Procedure Code, the court may instruct parties with domicile or registered office abroad to provide a domicile for service in Switzerland. This instruction should also include a reference to what happens if a domicile for service is not provided (see Art. 141 CPC: Public notice) and has legal effects, so notice of this should be served abroad via judicial assistance channels (see e.g. Federal Insurance Court ruling K 18/04 of 18 July 2006).

## 7.    Deadline compliance

Submissions to the Swiss authorities must be filed no later than the last day of the limitation period with the relevant authority (e.g. the court dealing with the case) or by handing over documents to Swiss Post, a diplomatic mission or consular office of Switzerland for forwarding to the court (see Art. 143 CPC). When setting the limitation period the relevant authority can, provided it has the discretion to do so, take account of particular circumstances in the state in which service is effected (e.g. poor or unreliable postal service; nearest Swiss representation is in another country).

| III. | OBTAINING EVIDENCE |
|------|--------------------|

### III.A.   Foreword

### 1.   Overview

In addition to requests for service of documents, which in practice account for two thirds of all applications, judicial assistance in civil proceedings also includes requests made in order to obtain evidence (letters of request). The object of such applications is for example to obtain statements from witnesses, the production of documents, or an expert opinion.

The 1954 Hague Convention deals with requests relating to obtaining evidence in Chapter II: "Letters of request". The Hague Evidence Convention is devoted exclusively to this subject. It makes provision for obtaining evidence by means of letters of request (Chapter I), on the one hand, and through diplomatic or consular officers and through commissioners (Chapter II), on the other.

### 2.   Cases in which procedures for assistance need not be followed

According to international law, each state is obliged to respect the territorial sovereignty of other states. The territorial sovereignty of a state can, however, occasionally come into conflict with the judicial jurisdiction of the court in another state. It is generally accepted that a party domiciled in one state may come under the jurisdiction of another state. In relation to obtaining evidence, taking account of the judicial jurisdiction of a foreign court has, depending on the scenario, the following consequences.

The act of a foreign judge or a person appointed by him or, as permitted under the common law system, of the representatives of the parties coming to Switzerland to carry out legal procedures *always* constitutes an official act that may only be carried out in accordance with the rules relating to judicial assistance. Failing to do so is regarded as a violation of Swiss sovereignty whether or not the persons affected by these legal procedures are willing to cooperate.

In cases where a foreign judge or a person appointed by him or her or the representatives of the parties in common law systems do not come to Switzerland, but require a party domiciled in Switzerland to provide evidence (for the limits see Federal Supreme Court Decision 114 IV 128[23]), to fill in a questionnaire, or to appear before a foreign court, the submission of a letter of request to the Swiss authorities is not necessarily required. Letters of request are therefore not necessary in the event that a refusal to cooperate leads only to consequences of a procedural nature (e.g. a factual claim of the other party is accepted as true or the loss of the right to prove the claim at a later stage). The party concerned is free to cooperate. The *service* of this type of invitation must, however, be carried out according to the proper procedure for judicial assistance.

---

[23] For the somewhat controversial discussion of the practice of the Federal Supreme Court, see for example DOROTHEE SCHRAMM, Entwicklungen bei der Strafbarkeit von privaten Zeugenbefragungen in der Schweiz durch Anwälte für ausländische Verfahren, AJP 2006 p. 491 ff., additional comments on p. 494

Where non-compliance by a party to the proceedings leads to sanctions that are not of a procedural nature (e.g. the criminal offence of *contempt of court*) the procedure for judicial assistance must be followed and thus a letter of request is required. This is because only the Swiss authorities may apply coercive measures on Swiss territory.

In the event that the person to whom the invitation is directed is *not a litigant*, but a *third party* (witness, expert), he or she may not be regarded as being subject to the judicial jurisdiction of the court involved. In such cases, the legal proceedings must be carried out according to the proper procedure for judicial assistance. The mere invitation to go abroad does not have to follow the procedure for judicial assistance, provided, however, that it is not accompanied by any kind of coercive measure or that such a measure will not automatically result in the event of a refusal.

### III.B.   The competent authorities and transmission procedures

### 1.   Hague Evidence Convention

#### 1.1   Under Chapter I of the Hague Evidence Convention

In Chapter I, which governs letters of request, Article 1 paragraph 1 of the Hague Evidence Convention provides that the judicial authority of a contracting state may request by letters of request the competent authority of another state to perform any judicial act. The FOJ is of the opinion that the application for judicial assistance must in fact be issued by an *authority* and not by a private person, such as a lawyer. This interpretation follows from the text of the Convention.[24] It also provides for the limitation of any possible abuse by those receiving a request to the extent that the authority in question may proceed to filter the evidence required according to its relevance to the case at issue. Swiss authorities may only refuse an application within the limits of Article 12 of the Hague Evidence Convention.

The request for judicial assistance is sent to the Central Authority of the state addressed (the receiving authority), where applicable, via the Central Authority of the requesting state.[25] The central cantonal authority of the place in which the request is executed is therefore the receiving authority when the application comes from a foreign country. Such applications may, however, be lodged with the FOJ, which will transfer them to the competent central cantonal authority.

Swiss applications are transferred to the Central Authority designated by the state addressed (see the Guide on Judicial Assistance) or directly to the executing authority if there is a bilateral agreement allowing direct communication between authorities (see I.C.2, p. 3).

In the event that an authority receives an application for the execution of which it is not competent, it is required under Article 6 of the Hague Evidence Convention to forward the application without delay to the competent authority.

---

[24]  In contrast to the Hague Service Convention, the Hague Evidence Convention does not mention "judicial officers".
[25]  In Switzerland, the following cantons require that requests be filed via the central cantonal authority: JU, NE, SZ (for all requesting authorities apart from courts) and ZH.

*1.2    Under Chapter II Hague Evidence Convention*

The requesting authority will generally be the authority dealing with the case in the requesting state. Under Article 17 of the Hague Evidence Convention, however, it is sometimes the parties or their representatives who file the request by attaching the relevant court decision relating to the appointment of a commissioner to take evidence.

As under Chapter I of the Hague Evidence Convention, the application for judicial assistance shall be sent to the Central Authority of the state addressed (receiving authority) if applicable via the Central Authority of the requesting state.[26] The central cantonal authority of the place in which the request is executed is therefore the receiving authority when the application comes from a foreign country. Such applications may, however, be lodged with the FOJ, which will transfer them to the competent central cantonal authority. Under Articles 15 to 17 of the Hague Evidence Convention, where FDJP authorisation is necessary, we recommend sending a copy of the application to the FOJ in order to accelerate the decision process (see III.C.1.2, p. 28).

Swiss applications are transferred to the (Central) Authority designated by the state addressed. The explanations provided by the contracting states should be referred to.

In the event that an authority receives an application for the execution of which it is not competent, it is required under Article 6 of the Hague Evidence Convention to forward the application without delay to the competent authority.

## 2.     1954 Hague Convention

Letters of request must be issued by a *judicial authority*, in the same way as stipulated in the Hague Evidence Convention.

The foreign judicial authority must send its application to the diplomatic representation of its nation in Switzerland. The diplomatic representation will send the application to the FOJ, which, in turn, will send it to the competent cantonal authority.

A Swiss request must be sent to the FOJ, which will send it to the competent Swiss diplomatic representation in the country of destination, which, in turn, will send it to the authority designated as being competent by the country of destination in accordance with Article 9 of the 1954 Hague Convention. For detailed information, see the Guide on Judicial Assistance.

## 3.     Absence of an agreement

Where there is no international agreement, Switzerland applies the 1954 Hague Convention to foreign requests and to Swiss requests to other countries (see Art. 11*a* para. 4 PILA).

Swiss requests, if there is not a contrary custom, follow diplomatic channels (see, II.D.2.2, p. 10). See also the Guide on Judicial Assistance.

---

[26]  See footnote 25.

Case 2:14-cv-03650-FMO-FFM   Document 208-1   Filed 01/30/18   Page 351 of 363   Page ID
#:9787
III OBTAINING EVIDENCE                                                latest update January 2013

**4.       Other channels of transmission**

See II.D.4, p. 11.

**III.C.   Requirements for the Application**

**1.       Hague Evidence Convention**

*1.1     Application under Chapter I*

1.1.1   Form

The Hague Evidence Convention does not require the use of a standard form for the application. In order to avoid omitting any information in the application, it is, however, recommended to use the example provided on our website based on the model proposed by the Hague Conference on Private International Law.[27]

1.1.2   Contents (Art. 3 Hague Evidence Convention)

In accordance with Article 3 of the Hague Evidence Convention, the letter of request must specify the following:

- The requesting authority and, if possible, the requested authority;
- The names and addresses of the parties, and, if applicable, of their representatives;
- The nature and the purpose of the proceedings, and a summary of the case;
- The evidence to be obtained or other judicial act to be performed.

If appropriate, the letters of request shall also specify:

- The names and addresses of the persons to be questioned;
- The questions to be put to these persons, or a statement of the subject matter about which the persons are to be questioned;
- The documents or other property to be inspected;
- Any request for the evidence to be given on oath or affirmation and, if necessary, any special form to be used;
- Any special procedures required in accordance with Article 9 of the Hague Evidence Convention;
- Any additional indications based on the model available on the Internet following the model proposed by the Hague Conference on Private International Law (see the User's Guide 1970, p. 69 f.).

No legalisation or analogous formality is required.

1.1.3   Language and translations (Art. 4 Hague Evidence Convention)

Each contracting state must accept letters of request written in French or in English, or with an attached certified[28] translation in one of these languages, unless a reservation prevents it from doing so.

---

[27]   See Practical Handbook on the operation of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matter, Antwerp – Apeldoorn 1984 [hereinafter: Practical Handbook Hague Evidence Convention], p. 69 f.; see footnote 2.

[28]   This means certification that the translation is complete and correct.

Case 2:14-cv-03650-FMO-FFM   Document 208-1   Filed 01/30/18   Page 352 of 363   Page ID
#:9788
III OBTAINING EVIDENCE                                                    latest update January 2013

Switzerland has issued a reservation in accordance with which the letters of request and their annexes must be written in German, French or Italian or translated into one of these languages, depending on where the request is executed.

For letters of request intended for a foreign country, please refer to the Guide on Judicial Assistance.

### 1.1.4   Execution

*a.       Applicable Law (Art. 9 Hague Evidence Convention)*

In general, the execution of a letter of request is carried out in accordance with the law of the requested authorities. In Switzerland this means the cantonal laws on the administration of justice and the Swiss Civil Procedure Code, in accordance with Article 122 of the Federal Constitution.

The requested court shall apply the appropriate measures of compulsion in the instances and to the same extent as are provided by its internal law for the execution of orders issued by authorities of its own country or of requests made by parties in internal proceedings (Art. 10 Hague Evidence Convention).

When the application of the law of the requesting state is requested (Art. 9 para. 2 Hague Evidence Convention), the request shall be met unless the form is incompatible with the law of the state addressed or if its application is not possible due to practical difficulties.

This means that affidavits, which should be provided with the witness' statements and which are often required in the US instead of an oath, can be approved without problem. It should be noted that the witness must consent to this. If the witness is unwilling, he or she cannot be forced to act.

*Cross-examination* may also be admissible. In such cases, however, the Swiss judge remains in control of the questioning and must intervene when he or she considers it necessary. It is in particular the judge's responsibility to inform the witness of the right to refuse to give evidence or of prohibitions to give evidence. The judge is also the only person authorised to use coercive measures against the witness.

When, on request of the requesting state, a special form is used, the said state must meet the expenses thereof (Art. 14 para. 2 Hague Evidence Convention).

*b.       Obtaining evidence via a person appointed by the authorities addressed
         (Art. 14 para. 3 Hague Evidence Convention)*

Authorities that receive but are not in a position to execute a letter of request may instruct an authorised person to do so. In particular, when a request is sent to countries with a system of common law, the requested court may be unable to execute the letter of request by itself because, according to its procedural rules, it is the parties' responsibility to gather the evidence.

In accordance with Article 14 paragraph 3 of the Hague Evidence Convention, the requested authorities may, in such a situation, authorise a qualified person to execute the letter of request if the requesting authority agrees. By giving its consent, the requesting authority declares itself willing to meet the ensuing costs (see III.C.1.1.4f, p. 26).

*c.     The right to refuse to testify / Banking secrecy*

The person to be questioned or who is requested to produce documents may claim to be exempt or prohibited from providing evidence, either on the basis of the law of the state addressed, or of the law of the requesting state (Art. 11 Hague Evidence Convention).

It should be noted that Article 47 paragraph 5 of the Federal Act of 8 November 1934 on Banks and Savings Banks (SR 952.0) makes a reservation in favour of federal and cantonal provisions relating to the duty to inform the authority and to testify in court. Bankers, who are essentially required to cooperate, are subject to Article 166 paragraph 2 of the Swiss Code of Civil Procedure as confidants of professional secrets. They may refuse to cooperate if they can show credibly that the interest in protecting confidentiality outweighs the interest in establishing the truth (limited right of refusal). The judge in this case weighs up the interests and decides on a case-by-case basis if the disclosure duty outweighs professional confidentiality and if banking secrecy should be lifted.

*d.     Participation of the members of the court of the requesting authority (Art. 8 Hague Evidence Convention) and/or of the parties or of their representatives (Art. 7 Hague Evidence Convention)*

If the requesting authority wishes that certain of its court officers witness the execution of a letter of request, it must ask the authority in charge of the execution for preliminary authorisation (Art. 8 together with Art. 35 para. 2 let. c Hague Evidence Convention; reservation by Switzerland). The parties and/or their representatives may also be present at the execution of the letter of request if they so desire (Art. 7 Hague Evidence Convention).

In our view, in such cases the foreign requesting authority and/or the parties and/or their representatives must be able to intervene if they so desire. The Swiss judge, however, remains the master of the proceedings and the only person authorised to take coercive measures against the person addressed by the letter of request. He may furthermore remind the witness of his or her right to refuse to give evidence or that he or she is forbidden to give evidence.

*e.     Grounds for refusal*

The authorities addressed may only refuse a request in the following cases:

- Where the case is not civil or commercial in nature (see I.D, p. 4);
- If the application does not fulfil the formal requirements (Art. 3 Hague Evidence Convention) or was not sent with the required translation (Art. 4 Hague Evidence Convention). In this case, the requesting authority should first of all be asked to complete its application (Art. 5 Hague Evidence Convention);
- If the authenticity of the application is unclear (generally, the fact that the application has been sent through the proper channels is sufficient proof of its authenticity; see also the different agreements on the abolition of legalisation on foreign public documents that have been ratified by Switzerland; SR 0.172.030.3/.037.43);
- If the execution of the application is not within the jurisdiction of the courts (Art. 12 para. 1 let. a Hague Evidence Convention; e.g. in the event that an amount of money needs to be collected in Switzerland and that the parties themselves have to act by way of forcible execution);
- If the state addressed is of the opinion that the execution of the application is liable to violate its sovereignty (e.g. coercive measures ordered in support of foreign

decisions that influence the proceedings) or its security (Art. 12 para. 1 let. b Hague Evidence Convention);

- If the requested form of execution of the application is contrary to the legislation of the state addressed (before finally refusing the application, the foreign country should be asked if the requesting court accepts the execution being carried out in the forms authorised by the laws of the state addressed; Art. 9 Hague Evidence Convention).

### f.    Costs

It is not possible in principle to charge any costs for the services carried out to the requesting state (Art. 14 para. 1 Hague Evidence Convention). The state addressed, however, may claim the reimbursement of compensation paid to experts and interpreters, and of costs ensuing from the enforcement of a special procedure called for by the requesting state, in accordance with Article 9 paragraph 2 of the Hague Evidence Convention.

Once the authority addressed has authorised a person to initiate the obtaining of evidence according to Article 14 paragraph 3 of the Hague Evidence Convention (see III.C.1.1.4b, p. 24), and has obtained consent of the requesting authority after indicating the approximate amount of the costs, it has the right to charge the requesting authority for the costs engendered. The consent of the requesting authority implies an obligation to reimburse the costs that result from using the services of a third party. If the requesting authority does not give its consent, it will not be liable for these costs.

It is provided in Article 26 of the Hague Evidence Convention that each contracting state may, in the event that it is so liable in terms of its constitution, invite the requesting state to reimburse the execution costs of the letter of request, and in relation to the summons, the expenses due to the person who gives evidence and who makes a record of the judicial enquiries. When a state makes use of this provision, any other contracting state can invite this state to reimburse the aforementioned costs.

It should be emphasised that the aforementioned provision must be regarded as an exception. As a rule, the costs are settled as indicated above, in accordance with the provisions of Article 14 of the Hague Evidence Convention.

In relation to Switzerland, the special terms of Article 26 of the Hague Evidence Convention are not applicable, as there is no corresponding constitutional provision. In the event that another contracting state relies on Article 26 of the Hague Evidence Convention, it must first indicate its pertinent constitutional provision. Switzerland could, in this case, demand reciprocity.

### 1.1.5  Letter of request relating to "*pre-trial discovery*" proceedings

The Swiss Civil Procedure Code imposes an obligation to produce exhibits that are likely to be relevant to the case. Persons who are not party to the proceedings may be exempt from this obligation provided they can claim the total or limited right to refuse to give evidence (see Art. 160 ff. CPC). It is incumbent upon the judge to decide which documents need to be produced.

The states with common law legal system have a stage in the proceedings called "*pre-trial discovery*", which takes place after the commencement of the action but before the main hearing. According to the American "discovery" system, each party has the obligation to inform the opposing party of all information that is relevant to the

case, the concept of relevance being interpreted in the broadest sense. This stage of the proceedings is conducted largely without judicial intervention. The judge only intervenes if the parties fail to reach an agreement, in particular if one of the parties fails to collaborate. The judge may, in this case, use coercive measures.

For the majority of countries in Europe, including Switzerland, the relevance and the specification of the facts to be established in civil proceedings must meet very demanding requirements. This is why Article 23 of the Hague Evidence Convention makes it possible for contracting states to declare that they will not execute a letter of request filed by states governed by common law relating to a pre-trial discovery of documents. Switzerland, without completely excluding assistance in the context of a pre-trial discovery, reserves the right, according to the conditions established below, to refuse requests for assistance that have such proceedings as their objective.

Switzerland therefore executes applications by foreign countries for judicial assistance formulated in the framework of pre-trial discovery, but always requires *i)* that applications be sent to Switzerland by a competent foreign court and not directly by the parties concerned, and *ii)* that applications precisely describe the evidence required and the purpose for which it is requested. Requests that are formulated in general terms and require the opposing party to indicate the documents in his or her possession with the aim of obtaining information that bears no relation to the case or to attempt to discover evidence to substantiate a claim ("*fishing expeditions*") are rejected. In other words, this means that applications by foreign countries for judicial assistance relating to pre-trial discovery are dealt with in the same way as internal Swiss applications for the production of documents.

A direct and necessary relationship therefore needs to exist between the request and the proceedings pending abroad. The letter of request must prove to be sufficiently relevant on a factual level.

The request will be refused if a person is asked to indicate the exhibits relating to the case that are or were in his or her possession or care, or over which he or she has or had a power of disposal. The same holds true when a person is expected to submit any document other than those stated in the application for judicial assistance. The aim is to prevent the party who bears the burden of proof to shift his or her obligation to the opposing party, or even to a third party.

Such letters of request must not, however, damage the interests of the persons concerned that are worthy of protection. This provision, which is a general clause in itself[29], is intended to take the banking and professional secrecy that is characteristic of Swiss law into consideration, without however leading to an automatic refusal of applications for judicial assistance based on a pre-trial discovery procedure.

---

[29] Article 156 CPC: Safeguarding legitimate interests, reads "The court shall take appropriate measures to ensure that taking evidence does not infringe the legitimate interests of any parties or third party, such as business secrets."

1.2     *Request under Chapter II of the Hague Evidence Convention (Art. 15 to 22 Hague Evidence Convention)*

### 1.2.1   General

As mentioned above, in accordance with Article 271 paragraph 1 SCC, those persons who carry out activities on behalf of a foreign state on Swiss territory without lawful authority, where such activities are the responsibility of a public authority or public official, are committing an offence (see I.B, p. 2). Thus, unless they have authorisation, foreign parties who proceed with the hearing of witnesses or obtaining evidence on their own initiative in Switzerland are liable to be punished (the ordinary preparation of a case[30] by a lawyer has, however, always been possible without authorisation). This situation presents certain disadvantages for countries, such as the United States, which consider that the parties have authority to obtain evidence.

The Hague Evidence Convention compensates for this disadvantage by providing in its Articles 15, 16 and 17 that diplomatic or consular officials and court-appointed commissioners may take procedural steps in preparation for a trial, subject to certain conditions (Art. 21 Hague Evidence Convention). In conformity with these provisions, Switzerland has made use of its right to issue a reservation in relation to this provision whereby the aforementioned persons need to obtain authorisation with the Federal Department of Justice and Police before executing procedural steps in preparation for a trial.

### 1.2.2   Conditions laid down in Article 21 Hague Evidence Convention – Procedural safeguards

Article 21 of the Hague Evidence Convention imposes the following conditions:

*   The consular representative or commissioner can take any evidence insofar as the procedural steps considered are compatible with the law of the state of execution and accord with the authorisation granted (for foreign applications relating to this issue, see III.C.1.2.3, p. 29). Under the same conditions, he may also examine a witness under oath or solemn declaration (Art. 21 let. a Hague Evidence Convention).
*   With the exception of the cases in which the person specified by the procedural measure is a national of the state in which the proceedings have begun, any request to appear or to give evidence must be written in the language of the place where the evidence is taken or be accompanied by a translation into such language (Art. 21 let. b Hague Evidence Convention).
*   The summons must indicate the fact that the person concerned may be assisted by his counsel, and that he is not obliged to appear or to participate in the evidence-taking. The person in question is therefore free not to cooperate at all or to interrupt the taking of evidence (Art. 21 let. c Hague Evidence Convention). The consular or diplomatic official or the commissioner may not take any coercive measures against the witness. Article 18 Hague Evidence Convention, however, provides that states may declare that foreign persons authorised to take evidence may apply to the competent authority to obtain the assistance required to carry out such acts by using coercive measures. Switzerland has made no declaration in relation to this subject, which makes it impossible to force the persons specified

---

[30] Obtaining of evidence taken into consideration in terms of the place of residence of the witnesses, etc.

by the procedural steps to collaborate in terms of Chapter II of Hague Evidence Convention. In the event of a refusal to collaborate, the only available procedure is the one provided for in Chapter I of the Hague Evidence Convention.

- In contrast to the proceedings under Chapter I of the Hague Evidence Convention, the evidence is to be taken, as a rule, according to the procedures provided for by the law of the requesting court. However, if the specified procedures are against the law of the state of execution, they may not be used.
- Cross-examination is also authorised, during which the witness is examined by the lawyers of both parties (Art. 21 let. d Hague Evidence Convention). For applications sent to Swiss authorities, see III.C.1.2.3, p. 29.
- The person to be heard may invoke, as in the context of a letter of request according to Chapter I of the Hague Evidence Convention, a privilege (Art. 21 let. e, together with Art. 11 Hague Evidence Convention).

### 1.2.3  Authorisation procedure before the Swiss authorities, and content of the application

In Switzerland, a foreign request for obtaining evidence is subject to prior authorisation by the FDJP (see the Swiss reservation in this respect as well as our Fact sheet, according to Articles 15 to 17 Hague Evidence Convention.

Foreign applications must, however, first be addressed to the Central Authority of the canton where evidence will be taken (see the Swiss reservation); they (and the enclosures) must be submitted in the official language of this canton. To speed up the procedure, we recommend you send a copy at the same time to the Federal Office of Justice FOJ, Private International Law Unit, 3003 Bern. After examining the request, the central cantonal authority forwards the application to the FOJ, indicating, if need be, whether it is opposed to granting the authorisation or if it would like the authorisation to have certain accompanying conditions. When the procedural conditions and safeguards according to Article 21 Hague Evidence Convention are met, the FDJP grants the authorisation. An advance of fees will, however, be necessary beforehand (Art. 5 and 13 of the Ordinance on Costs and Remuneration in Administrative Proceedings [SR 172.041.0]; CHF 100 to 5000).

If cross-examination is intended, there are two possible approaches. First, a sole commissioner can be appointed – for example, a neutral person – who will chair the taking of evidence and will see to it that the examination by the lawyers of the parties is conducted in accordance with Swiss law (no coercion, reminder of exemptions or any prohibition from giving evidence). In this case only one authorisation will be given. Second, it is also possible that each agent is appointed commissioner. In this case, authorisation will be granted to each person to conduct the examination.

The application for authorisation must:
- Briefly describe the nature and subject matter of the proceedings;
- Indicate the amount in controversy; this is necessary in order to fix the amount of the advance on procedural costs. The decision on the authorisation will be taken only after payment of the advance on procedural costs.
- Indicate the identity and the address (fax number, e-mail included) of the litigants;
- Indicate the identity and the address (fax number, e-mail included) of the counsels of the litigants;
- Indicate the form of, and the grounds for, the intended procedural formalities; it is recommended to describe in sufficient detail the modalities of the procedural formalities to insure that the authorisation will cover all the procedural formalities en-

visaged. If possible, the name and address of all participants in the procedural formalities should figure in the application;

- Indicate the name and address of the persons involved in the intended procedural formalities;
- Indicate the name and address of the person or persons who are to supervise the evidentiary proceedings if the application is one under Article 17 of the Hague Evidence Convention. Under Articles 15 and 16, on the other hand, all consular or diplomatic officials in the relevant embassy or consular agency will be given authorisation to supervise the taking of evidence;
- Propose a date for the intended taking of evidence. The request should be filed two months before the proposed date.

In addition, the application has to include a copy of the court decision appointing the commissioner.

Before sending the application, it is recommended that written confirmation is requested from prospective witnesses to the effect that they are cooperating of their own accord, that they know they cannot be subjected to any coercive measures, cannot be forced to participate or to appear and have the right to refuse to give evidence on the basis of privileges both under the law of the state addressed and of the state of origin (Art. 21 Hague Evidence Convention). In the event that the person concerned subsequently does not wish to cooperate, the entire procedure will have been unnecessary while having generated costs.

Finally, the application need not be made by the foreign court; it may be made by a party or its attorney. The application should then be accompanied by a power of attorney or by an authorisation of the foreign court. As mentioned, the application needs to be accompanied by the court decision appointing the commissioner.

The Federal Department of Justice and Police must serve the authorisation. In order for this service to be made in time it is suggested that the applicant designate a person in Switzerland who will accept service of the authorisation. In the absence of such an agent for service, the authorisation will have to be served through the channels of judicial cooperation, which unavoidably prolongs the proceedings.

### 1.2.4   Swiss applications to a foreign country or evidence taken by Swiss diplomatic or consular representatives

The FOJ refers to the declarations made by the contracting states on the Hague Evidence Convention. The explanations under III.C.1.2.2, p. 28 should be referred to for conditions and procedural safeguards laid down by Article 21 of the Hague Evidence Convention.

Generally speaking, the Swiss embassies and consulates (Swiss diplomatic or consular representatives) may take evidence in civil and commercial matters from Swiss citizens and other individuals they represent if the host country permits (Article 15 Hague Evidence Convention).

Evidence in civil and commercial matters may only be taken by a Swiss diplomatic officer or consular agent from host state's citizens or from citizens of other countries (Art. 16 Hague Evidence Convention) if the competent authorities of the host state have given their permission, unless the host state has declared that evidence may be taken without its prior permission.

The FOJ is willing to provide support and explanation of the procedures in the different countries. In order to ensure coordination with the Swiss diplomatic and consular representatives and that they are properly instructed, it is recommended that the FOJ is contacted in good time.

## 2.      1954 Hague Convention

### 2.1    Basis

Chapter II of the 1954 Hague Convention served as the basis for Chapter I of the Hague Evidence Convention, which is why only the differences between the two conventions will be dealt with below. For further information see III.C.1.1.1 - 1.1.4, p. 23 et seq.

Chapter II of the Hague Service Convention is new. There is no corresponding chapter in the 1954 Hague Convention. For the obtaining of evidence by private persons or by diplomatic officers and consular agents in the context of the 1954 Hague Convention, see III.C.2.7, p. 32.

### 2.2    Form and content

As in the case of the Hague Evidence Convention, no form is provided by the 1954 Hague Convention. Furthermore, the 1954 Hague Convention does not indicate what information is required for the application. We recommend using the model on our webpage for the Hague Evidence Convention based on the model used by the Hague Conference on Private International Law (see also Practical Handbook Evidence Convention 1970, p. 69 et seq.).

### 2.3    Language and translation

Requests for judicial assistance are in principle to be made in the language of the authority (i.e. the court) requested to execute them, or must be accompanied by a certified[31] translation in that language (Art. 10 1954 Hague Convention). Unless otherwise stated by a bilateral agreement (see I.C.2, p. 3), foreign applications must be in the language of the canton executing the request. Unlike Article 4 paragraph 3 of the Hague Evidence Convention, Article 10 of the 1954 Hague convention does not invite a contracting state which has more than one official language to specify by declaration the language in which the request or the translation thereof shall be expressed for execution in the specified part of its territory. Switzerland has thus made no declaration; Swiss authorities consequently receive from time to time letters written in one of the Swiss official languages, but not in the one of the place of execution. In such cases, the FOJ recommends executing the request nonetheless, if possible, and inviting the requesting authority to draw up its request in the official language of the place of execution in future. In the case of Swiss requests to a foreign country, please consult the Guide on Judicial Assistance.

---

[31]   This means certification that the translation is complete and correct.

*2.4    Applicable law*

In accordance with Article 14 paragraph 1 of the 1954 Hague Convention, the authorities addressed apply their own law. When the requesting state calls for the request to be executed in accordance with its own law, its request will only be rejected if the required form is contrary to the legislation of the state addressed.

*2.5    Grounds for refusal*

These are the same as those indicated in the Hague Evidence Convention (see III.C.1.1.4e, p. 25).

*2.6    Costs*

As a rule, judicial assistance is free of charge. However, contrary to what is established by the Hague Evidence Convention, expenses paid to witnesses as well as costs due to the appearance of a witness can be charged. Furthermore, as in the Hague Evidence Convention, expenses paid to experts as well as costs resulting from the application of foreign law to execution are subject to reimbursement (Art. 16 para. 2 1954 Hague Convention; however, for Austria, see the supplementary agreement of 26 August 1968; SR 0.274.181.631, Art. 7 para. 2).

*2.7    Obtaining evidence directly by the parties in Switzerland or the diplomatic officers or consular agents under the 1954 Hague Convention*

2.7.1   Activities carried out by the parties in Switzerland

The taking of evidence by a person appointed commissioner is one of the main innovations of the Hague Evidence Convention. The 1954 Hague Convention, on the other hand, does not authorise this. Consequently, Article 271 of the Swiss Criminal Code (SCC) remains fully applicable.[32]

Authorisations under Article 271 SCC are granted only in exceptional cases. Authorisation is not granted unless judicial cooperation is theoretically possible (i.e. when there is no ground for refusal) and in the event that it appears practically impossible, or even absurd, to require Switzerland's public authorities to assist in the matter (see Administrative Case Law of the Federal Authorities 1997 [61/82], p. 789 f.).[33]

2.7.2   Activities carried out by diplomatic officers or consular agents

Article 15 of the 1954 Hague Convention authorises foreign requesting authorities to have their requests executed directly by diplomatic officers or consular agents in the state of execution if an agreement between the interested states expressly permits this or if the state in the territory where the letters of request are to be executed does not object. Switzerland has not entered into an agreement of this type and does not, as a general rule, permit diplomatic officers or consular agents to obtain evidence on its territory (ACLFA 1968-1969 [34/15], p. 31).

In those countries in which procedural actions are to be taken by the parties rather than by the court, the Swiss Embassies and Consulates may, with the consent of the

---

[32]  See also I.B, p. 7
[33]  For example, if a foreign court requests an on-site inspection.

host country, invite Swiss and foreign nationals to appear for questioning or may question those individuals in their homes. The diplomatic and consular officers of Switzerland must not, however, use coercive measures.

### 3.    Obtaining evidence in the absence of an agreement

In the absence of an agreement, the Swiss authorities apply the 1954 Hague Convention to foreign requests and to Swiss requests to other countries (see Art. 11*a* para. 4 PILA and also Art. 11*a* paras. 1 - 3 PILA).

As a general rule, requests must be translated.

For costs relating to foreign requests, see Article 16 of the 1954 Hague Convention. In relation to Swiss requests to other countries, for the countries where there is no agreement in relation to this matter the FOJ will request a guarantee from the Swiss authority that any costs that are charged will be reimbursed.[34]

In the absence of contrary practices or agreements, Swiss requests made to foreign countries follow diplomatic channels (see II.D.2.2, p. 10). For information on the position in specific countries, reference is made to the Guide on Judicial Assistance.

Switzerland does not generally permit diplomatic officers and consular agents to obtain evidence on its territory (ACLFA 1968-1969 [34/15], p. 31; see III.C.2.7.2, p. 32.

As reciprocity is usually required between countries without a mutual agreement, neither is it generally possible for Swiss diplomatic officers and consular agents to obtain evidence in another state.

### III.D.  Special Issues

### 1.    Hearing by video conference

The conduct of a hearing by a foreign authority or foreign lawyers by video conference of witnesses or parties who are physically[35] located in Switzerland constitutes an act by a public authority on Swiss territory, and as such is therefore illegal unless authorised.

Under the Hague Evidence Convention, several case scenarios can be envisaged.

First, the authorities and the agents for the parties may participate at a hearing of the party and/or third parties that is conducted by a Swiss judge (Art. 7 and 8 Hague Evidence Convention). Such participation is possible under the same conditions as when the authority and/or the agents for the parties are physically present in Switzerland (see III.C.1.1.4d, p. 25). In particular, the Swiss judge remains master of the proceedings and is the only person with the authority to order coercive measures.

---

[34]  The entry "Kostengutsprache nötig" in the Guide indicates that such a guarantee will need to be obtained.

[35]  Unlike the case where the parties are required to fill in a questionnaire, a hearing by video conference is interactive. The questions asked and the answers given are therefore to be regarded as a whole and consideration should be given to the location of the persons concerned (see Alexander R. Markus, Neue Entwicklungen bei der internationalen Rechtshilfe in Zivil- und Handelssachen, RSDA 2002, p. 65 et seq., who deals with the problem of hearings by video conference and by telephone).

One can equally imagine recourse to video conference techniques in terms of Chapter II of the Hague Evidence Convention. Authorisation is in this case subject to the same conditions as in the "traditional" cases of authorisation (see III.C.1.2, p. 28). However, the fact that the persons are not in the same location suggests that an identification procedure is required.

The costs related to a hearing by video conference can be charged to the requesting state (Art. 9 para. 2, Art. 14 para. 2 Hague Evidence Convention).

Outside of the framework of the Hague Evidence Convention, i.e. if the procedure takes place in a state that is not a party to that Convention, the FOJ is of the opinion that a hearing by video conference is not possible other than in exceptional circumstances. Firstly, the 1954 Hague Convention – which Switzerland not only applies in its relations with contracting states but also as automonous law in the absence of an agreement (see Art. 11*a* para. 4 PILA) – neither provides for the possibility of a foreign judge participating in the hearing nor for the possibility of consular or diplomatic agents or of a commissioner carrying out a hearing. Secondly, as authorisation in terms of Article 271 of the Swiss Penal Code is granted only in the event that the ordinary channels do not allow satisfactory results to be achieved, it is only possible to grant authorisation on this basis in cases that are highly exceptional.

## 2.    Hearing by Telephone

Under the Hague Evidence Convention, a hearing by telephone is conceivable under the same conditions as a hearing by video conference. However, the problem of identifying the parties is even more pronounced in the case of a telephone hearing than in the case of a video conference hearing. In addition, the formal aspect of a normal hearing, which encourages the witness to respond carefully to the questions asked, is lacking in the case of a telephone hearing.

latest update January 2013

## CONTACTS

If you have any questions, please contact:

- The Federal Office of Justice FOJ, Private International Law Unit, 3003 Bern, Tel.: +41 58 463 88 64; Fax: +41 58 462 78 64; E-mail: ipr@bj.admin.ch or
- The Federal Office of Justice, Division for International Legal Assistance, 3003 Bern, Tel.: +41 58 462 11 20; Fax: +41 58 462 53 80; E-mail: irh@bj.admin.ch.