**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CITY OF ALMATY,<br><br>    Plaintiff,<br><br>    v.<br><br>VICTOR KHRAPUNOV, et al.,<br><br>    Defendants. | Case No. CV 14-3650 FMO (CWx)<br><br>**ORDER RE: PENDING MOTIONS** |

Having reviewed and considered all the briefing filed with respect to defendants' Motion to Dismiss First Consolidated Amended Complaint for Failure to State a Claim (Dkt. 213, "MTD"), defendants' Motion to Dismiss First Consolidated Complaint for Lack of Personal Jurisdiction Over Swiss Defendants, (Dkt. 214, "Jx Motion"), defendant Daniel Khrapunov's Notice of Joinder, (Dkt. 181), and Motion to Dismiss First Consolidated Amended Complaint, (Dkt. 241, "D.K. Motion"), the court finds that oral argument is not necessary to resolve the motions, see Fed. R. Civ. P. 78; Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

**BACKGROUND**

I.    PROCEDURAL BACKGROUND.

On May 13, 2014, the City of Almaty ("plaintiff" or "Almaty") filed a complaint in this court against Viktor Khrapunov ("Viktor"), Leila Khrapunov ("Leila"), Iliyas Khrapunov ("Iliyas"), Madina Ablyazova a/k/a Madina Khrapunova ("Madina" and together with Victor, Leila, Iliyas, "Swiss Defendants"), Elvira Khrapunov a/k/a Elvira Kudryashova a/ka Elvira Balmadani ("Elvira"), Dmitry

Kudryashov ("Dmitry"), RPM USA LLC ("RPM USA"), RPM-Maro, LLC ("RPM-Maro"), Mr. Fumigation Inc., Maro Design LLC ("Maro Design"), Haute Hue LLC ("Haute Hue"), 628 Holdings, Inc. ("628 Holdings"), Candian International Ltd. ("Candian"), Elvira Kudryashova as Trustee of The Kasan Family Trust, and Dimitri Kudryashov as Trustee of The Kasan Family Trust (collectively, "defendants") asserting claims for: (1) violation the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq.; (2) violation of and conspiracy to violate California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; (3) breach of fiduciary duty; (4) conversion and conspiracy to commit conversion; (5) fraud and conspiracy to commit fraud; and (5) an accounting and imposition of a constructive trust and equitable lien. (See Dkt. 1, Complaint). On November 17, 2014, Almaty filed a Second Amended Complaint ("SAC") asserting the same claims against the same defendants with the exception of Mr. Fumigation Inc.[1] (See Dkt. 58, SAC).

On April 5, 2015, plaintiff filed a second action asserting the same claims against the Swiss Defendants. (See City of Almaty v. Victor Khrapunov, et al., CV 15-2628 FMO (CWx) ("Almaty II"), Dkt. 1, Complaint). That action was transferred to the undersigned judge as a related case. (See Almaty II, Dkt. 8).

On August 21, 2017, plaintiff filed a Consolidated Amended Complaint, asserting the same claims against the same defendants, with the addition of defendants Cronway Ltd. ("Cronway"), Vilder Company S.A. ("Vilder"), and World Health Networks, Inc. f/k/a Health Station Networks Inc. ("World Health Networks"). (See Dkt. 144, ("CAC")). On January 19, 2018, plaintiff filed the operative First Consolidated Amended Complaint ("FCAC"), which added Daniel Khrapunov ("Daniel")[2] and Thirtyeight Enterprises, LLC ("Thirtyeight") as defendants.[3] (Dkt. 198, FCAC).

---

[1] Plaintiff dismissed Mr. Fumigation Inc. on October 14, 2014. (See Dkt. 46, Notice of Dismissal).

[2] Victor, Leila, Iliyas, his wife Madina, Elvira, her husband Dmitry, and Daniel are collectively referred to as the "Individual Defendants." (See Dkt. 198, FCAC at ¶ 1).

[3] RPM USA, RPM-Maro, Maro Design, Haute Hue, 628 Holdings, Candian, The Kasan Family Trust, Cronway, Vilder, World Health Networks, and Thirtyeight are collectively referred to as the "Entity Defendants." (See Dkt. 198, CFAC at ¶ 13).

II.  ALLEGATIONS IN FCAC.

Almaty, the former capital, and currently the largest city in the Republic of Kazakhstan ("Kazakhstan"), alleges that Viktor and co-conspirators, including his wife Leila, and their children Iliyas and Elvira, stole hundreds of millions of dollars of assets from Almaty while Viktor was mayor of Almaty from 1997 through 2004.  (See Dkt. 58, SAC at ¶¶ 1-2, 19-22).  Plaintiff alleges that defendants improperly influenced auctions of Almaty real estate, purchased assets at artificially suppressed prices using sham entities and transactions, and sold those assets at a significant profit.  (See id. at ¶¶ 25-26).  Plaintiff describes four examples of the illegal acquisition of property, (see id. at ¶¶ 38-50), and further alleges that over 80 pieces of real estate, valued at approximately $300 million, were illegally acquired.  (See id. at ¶¶ 38, 50).

In 2007, after learning of an investigation by the Kazakh government, Viktor and Leila fled to Switzerland, where their children were then residing, and attempted to launder and hide the stolen money there.  (See Dkt. 198, FCAC at ¶¶ 2, 36).  The Individual Defendants "first transferred Almaty's funds to Switzerland" using accounts and sham entities owned or ultimately controlled by Leila, Iliyas, Elvira, and their co-conspirators."[4]  (Id. at ¶ 29).

In May 2011, the Kazakh "Financial Police" filed two criminal cases against Victor, (see Dkt. 198, FCAC at ¶ 37), and in July 2011, obtained an arrest warrant for him.  (See id.).  In 2011 and 2012, additional charges were brought against Victor, Leila, Iliyas, and Elvira stemming from the theft of public property and laundering of funds.  (See id.).

In 2012, the Financial Police sought legal assistance from the Federal Office of Justice in Switzerland in connection with Almaty's efforts to "prosecute Victor, Leila, Iliyas, and Elvira for their crimes in Switzerland and Kazakhstan against Almaty and its people."  (Dkt. 198, FCAC at ¶ 38).

---

[4] Plaintiff adds that "[i]n an effort to further obscure the funneling of the stolen funds through sham entities and bank accounts based in Switzerland, Cyprus, and elsewhere, the Khrapunovs partnered with Madina's father (Iliyas' father-in-law) Mukhtar Ablyazov ('Ablyazov')[,]" who was the Chairman of BTA Bank, a Kazakh bank headquartered in Almaty. (Dkt. 198, FCAC at ¶ 30).  Almaty alleges that Ablyazov stole over $6 billion from BTA Bank between 2005 and 2009, (see id.), and the Khrapunovs "com[m]ingled certain of their stolen assets with Ablyazov's, and then Iliyas hid these funds in sham investments and entities through which he would move hundreds of millions of dollars in illicit proceeds for both families."  (Id.).

3

In mid-2012, the Public Prosecutor of Geneva opened an investigation into Victor, Leila, Iliyas, and Elvira based on suspicion of money laundering in violation of Swiss law, (see id. at ¶¶ 2, 38), and in November 2012, the Public Prosecutor froze Swiss accounts and assets belonging to Victor, Leila, Lliyas, and Elvira. (See id.).

In 2010, "understanding that they risked losing the proceeds of their fraudulent scheme if they kept the stolen money in Switzerland, the Individual Defendants and their co-conspirators engaged in racketeering activity to launder and hide the stolen money in and through the United States using various sham companies and disguised entities in the United States."[5] (Dkt. 198, FCAC at ¶¶ 3, 31). Once the Swiss authorities began to investigate them and freeze their assets, the Individual Defendants and their co-conspirators "increased their illegal laundering activities in and through the United States to further conceal the proceeds and attempt to prevent their recovery by Almaty." (Id. at ¶ 75).

Plaintiff alleges that "the Individual Defendants and their co-conspirators have used and continue to use numerous holding companies in order to hide and to launder the illicit funds they siphoned out of Kazakhstan through Switzerland and other intermediary countries, and ultimately into and within the United States." (Dkt. 198, FCAC at ¶ 77). Iliyas and Elvira owned and/or controlled a number of companies, including defendants Vilder and Cronway, and at least two Swiss companies, SDG Capital SA ("SDG") and Swiss Promotional Group SA ("SPG"). According to plaintiff, Iliyas, Elvira, and Leila transferred at least $125 million into these two Swiss companies alone. (See id.).

Plaintiff adds that Elvira, Dmitry, Daniel, Iliyas, and Madina "laundered the funds transferred into the United States by making investments in multiple U.S. companies, including World Health Networks[,]" a medical device company registered to do business in New York and California. (Dkt. 198, FCAC at ¶ 104). Approximately, $1.9 million of the $6.3 million investment was provided by RPM USA on RPM-Maro's behalf, (see id.), and the remainder came from RPM-Maro,

---

[5] According to plaintiff, at the time, the United States did not have a mutual legal assistance treaty or extradition treaty with Kazakhstan. (See Dkt. 198, FCAC at ¶ 3).

directly from Elvira and Dmitry, and from other entities controlled by the Individual Defendants, including 628 Holdings, (see id.), which is owned or controlled by Daniel. (See id. at ¶ 11).

Some of the funds have also been used to purchase and sell real estate and other assets in California and New York. (See Dkt. 198, FCAC at ¶¶ 109-162). In California, defendants purchased and sold the following single-family residences: (1) 2578 Hutton Drive in Beverly Hills for $3.65 million; (2) 606 N. Alta Drive in Beverly Hills for $5.45 million; (3) 628 N. Alta Drive in Beverly Hills for $6.2 million; (4) 11986 Lockridge Road in Studio City for $5.7 million; (5) 2 Narbonne in Newport Beach for $4.1 million; and (6) 310 38th Street in Newport Beach for $3.42 million. (See id. at ¶¶ 111, 116, 123-24, 133-34, 139, 142, 144, 150-52). The funds were also used by Elvira to lease and possibly purchase four luxury vehicles. (See id at ¶ 156).

Almaty alleges that defendants also used the stolen funds to: (1) invest in a luxury hotel in New York, (see Dkt. 198, FCAC at ¶ 122); (2) invest in the Cabrini Medical Center in New York, (see id.); and (3) purchase three condominiums – units 3203, 3310, and 3311 – in the Trump Soho tower in New York City. (See id. at ¶ 129).

## LEGAL STANDARD

A motion to dismiss for failure to state a claim should be granted if plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly ("Twombly"), 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007); see Ashcroft v. Iqbal, 550 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) ("Iqbal"); Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 550 U.S. at 678, 129 S.Ct. at 1949; see Cook, 637 F.3d at 1004; Caviness v. Horizon Cmty. Learning Ctr., Inc., 590 F.3d 806, 812 (9th Cir. 2010). Although the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," Twombly, 550 U.S. at 555, 127 S.Ct. at 1965; see Iqbal, 550 U.S. at 678, 129 S.Ct. at 1949; see also Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 973 (9th Cir. 2004), cert. denied, 544 U.S. 974 (2005) ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. Nor is the court required

to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (citations and internal quotation marks omitted), "[s]pecific facts are not necessary; the [complaint] need only give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 2200 (2007) (per curiam) (citations and internal quotation marks omitted); see Twombly, 550 U.S. at 555, 127 S.Ct. at 1964.

In considering whether to dismiss a complaint, the court must accept the allegations of the complaint as true, see Erickson, 551 U.S. at 93-94, 127 S.Ct. at 2200; Albright v. Oliver, 510 U.S. 266, 268, 114 S.Ct. 807, 810 (1994) (plurality opinion), construe the pleading in the light most favorable to the pleading party, and resolve all doubts in the pleader's favor. See Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1849 (1969) (plurality opinion); Berg v. Popham, 412 F.3d 1122, 1125 (9th Cir. 2005). Dismissal for failure to state a claim can be warranted based on either a lack of a cognizable legal theory or the absence of factual support for a cognizable legal theory. See Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). A complaint may also be dismissed for failure to state a claim if it discloses some fact or complete defense that will necessarily defeat the claim. See Franklin v. Murphy, 745 F.2d 1221, 1228-29 (9th Cir. 1984).

Moreover, where a complaint includes allegations of fraud, Federal Rule of Civil Procedure 9(b)[6] requires that those allegations be pled with particularity. Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001) (citations and quotation marks omitted). The complaint must set out the "time, place and specific content of the false

---

[6] All further "Rule" references are to the Federal Rules of Civil Procedure unless otherwise indicated.

representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997)). "'[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false.'" Id. (quoting Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.), 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc) (superseded by statute on other grounds)).

## DISCUSSION

A.  RICO Claims.

Defendants contend that Almaty's RICO claims are fatally deficient in that they are impermissibly extraterritorial.[7] (See Dkt. 213, MTD at 6-12). The court agrees.

"RICO's § 1962 sets forth four specific prohibitions aimed at different ways in which a pattern of racketeering activity may be used to infiltrate, control, or operate 'a[n] enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.'" RJR Nabisco, Inc. v. European Community, 136 S.Ct. 2090, 2097 (2016). These prohibitions are summarized as follows:

> Section 1962(a) makes it unlawful to invest income derived from a pattern of racketeering activity in an enterprise. Section 1962(b) makes it unlawful to acquire or maintain an interest in an enterprise through a pattern of racketeering activity. Section 1962(c) makes it unlawful for a person employed by or associated with an enterprise to conduct the enterprise's affairs through a pattern of racketeering activity. Finally, § 1962(d) makes it

---

[7] Almaty contends that defendants Vilder, Cronway, and World Health Networks waived their right to seek dismissal of the FCAC, (Dkt. 198), since they were not listed in defendants' notice of motion. (See Dkt. 232, MTD Opp. at 1 n. 1). The court declines to find waiver. The motion itself refers to "defendants" generally, (see Dkt. 213, MTD at ECF 9862, 9870), and there is no suggestion that Almaty suffered any prejudice from defendants' "clerical error[.]" (Dkt. 238, Reply at 1 n.1).

unlawful to conspire to violate any of the other three prohibitions.

Id.; 18 U.S.C. § 1962. RICO creates a private right of action that permits "[a]ny person injured in his business or property by reason of a violation" of its substantive provisions to recover civil remedies, including treble damages. 18 U.S.C. § 1964(c); see RJR Nabisco, 136 S.Ct. at 2097.

The Supreme Court recently held that "[a] private RICO plaintiff . . . must allege and prove a domestic injury to its business or property." RJR Nabisco, 136 S.Ct. at 2106 (emphasis in original); see id. at 2111 ("Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries."). The Supreme Court did not address how to determine whether an injury is domestic or foreign, see, generally, id., but it did state that the domestic injury requirement "does not mean that foreign plaintiffs may not sue under RICO." Id. at 2110 n. 12. The Court observed that "application of this rule in any given case will not always be self-evident, as disputes may arise as to whether a particular alleged injury is 'foreign' or 'domestic.'" Id. at 2111.

The Ninth Circuit has not yet addressed the domestic injury requirement in a civil RICO case following the RJR Nabisco decision. However, the Second and Seventh Circuit have, as have several district courts, including the Southern District of New York in a case involving nearly identical claims and some of the same parties. In Bascuñán v. Elsaca, 874 F.3d 806 (2d Cir. 2017), which involved a foreign plaintiff and foreign defendants, the Second Circuit first held that each alleged scheme and injury have to be separately analyzed. See id. at 818 ("[I]f a plaintiff alleges more than one injury, courts should separately analyze each injury to determine whether any of the injuries alleged are domestic. If one fo the alleged injuries is domestic, then the plaintiff may recover for that particular injury even if all of the other injuries are foreign."). In analyzing the four schemes alleged in that case, the Second Circuit concluded that two failed to allege a domestic injury because the only domestic elements were that the defendant "transferred [the stolen] foreign funds to his own [bank] accounts in New York" and "launder[ed] stolen money using bank accounts in the United States[.]" Id. at 818. The court explained that such domestic elements were not enough to satisfy the domestic injury requirement:

We ultimately conclude that an injury to tangible property is generally a

> domestic injury only if the property was physically located in the United States, and that a defendant's use of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one. We thus hold that the use of bank accounts located within the United States to facilitate or conceal the theft of property located outside of the United States does not, on its own, establish a domestic injury.

Id. at 819. Significantly, the court observed: "In addition and importantly, the only domestic connections alleged . . . were acts of the defendant. [Plaintiff] and his relevant property always remained abroad, and the[] injuries did not arise from any preexisting connection between [plaintiff] and the United States." Id. at 819.

The Second Circuit also held that the remaining two schemes, which involved the theft of funds held in a New York bank account, see Bascuñán, 874 F.3d at 820, and theft of bearer shares "located in a safety deposit box in New York[,]" constituted theft of tangible property and were domestic injuries. Id. The court held that "[w]here the injury is to tangible property, . . . absent some extraordinary circumstance, the injury is domestic <u>if the plaintiff's property was located in the United States when it was stolen or harmed</u>, even if the plaintiff himself resides abroad." Id. at 820-21 (emphasis added).

As the Seventh Circuit observed, what set the injuries apart in Bascuñán was the presence of harm to tangible property that was located in the United States. See Armada (Singapore) PTE Limited v. Amcol International Corp., 885 F.3d 1090, 1094 (7th Cir. 2018). In Armada, the Seventh Circuit held that with respect to intangible property, a plaintiff suffers or sustains injury "at its residence[.]" Id. at 1094-95. The Armada court based its holding on RJR Nabisco's repeated reference to where the injury was "suffered." Id. at 1093. With that background in mind, the court turns to the parties' contentions regarding the domestic injury requirement.

Almaty contends that the FCAC alleges "domestic injury" based on (1) "Defendants' injury-producing conduct [which] occurred in the U.S."; and (2) Defendants harm [to] Almaty's property interests, and Almaty itself, in the U.S." (Dkt. 232, MTD Opp. at 3, 11). Almaty argues that under the RJR Nabisco framework, the court is required to resolve "whether 'conduct relevant to the

statute's focus occurred in the United States.'" (Id. at 12 (quoting RJR Nabisco, 136 S.Ct. at 2101)). According to plaintiff, "where a defendant engages in racketeering activities in the U.S. that injure the plaintiff, that plaintiff has suffered a 'domestic injury' under RJR Nabisco." (Id. (citing RJR Nabisco, 136 S.Ct. at 2104)). The court is not persuaded since plaintiff's formulation would focus exclusively on a defendant's conduct without resort to where a plaintiff suffered harm – that is, where the injury to plaintiff's business or property occurred. This contention is contrary to RJR Nabisco's holding that a private RICO plaintiff must allege "domestic injury to business or property." See 136 S.Ct. at 2111. The court "rejects any suggestion that an alleged RICO injury may be deemed 'domestic' or 'foreign' purely by reference to the location of the predicate acts that purportedly caused it. Indeed, to accept such an argument would be to ignore, for all intents and purposes, the Supreme Court's directive that the 'presumption against extraterritoriality must be applied separately to both RICO's substantive prohibitions and its private right of action.'" City of Almaty, Kazakhstan v. Ablyazov, 226 F.Supp.3d 272, 281 (S.D. N.Y. 2016) ("City of Almaty I") (quoting RJR Nabisco, 136 S.Ct. at 2108) (emphasis omitted); see also Cevdet Aksüt Oğullari Koll. Sti v. Cavusoglu, 245 F.Supp.3d 650, 656-57 (D. N.J. 2017) ("Cavusoglu") (surveying post-RJR Nabisco case law and finding that the "cases exhibit a wide array of factual scenarios and justifiable reasoning, with no clear victor in the 'domestic injury' debate" but concluding that "[w]hat is clear from the statute and the Supreme Court is that the 'focus' of § 1964(c) is the injury suffered and not the predicate acts that caused the injury.").

Almaty next contends that it has "amply alleged domestic injuries from crimes committed in the U.S." in connection with the scheme involving "laundering and conversion of [the] stolen money in the U.S." (Dkt. 232, MTD Opp. at 13) (emphasis omitted). Specifically, it points to the FCAC's allegations that defendants' money laundering in the United States injured Almaty "both by (1) concealing Almaty's property and depriving Almaty of its use . . . and (2) causing Almaty to devote substantial monies and time 'in the United States' . . . to trace and recover its stolen property[.]" (Id. (citing Dkt. 198, FCAC at ¶¶ 84, 113)). Such an argument was recently rejected by the court addressing Almaty's New York-based case:

[T]he schemes alleged here are all based on the same alleged

10

misappropriations that occurred in Kazakhstan. The Kazakh Entities artfully attempt to link the Defendants' money laundering activities to the supposed domestic injuries of concealing the Kazakh Entities' property, "depriving them of its use, and causing them to devote substantial time and resources . . . in an attempt to trace and recover their property." However, as this Court already found, the facts here do not present the type of rare case in which the post-theft money laundering proximately caused some portion of the original injury. All of the property that the Kazakh Entities point to in New York was acquired by the Defendants, without any involvement from the Kazakh Entities, thus warranting the admonition of the Bascuñán[] court "that a defendant's use of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one." 874 F.3d at 819. The Kazakh Entities offer no support for the idea that each transfer of property within the United States constitutes a separate act of conversion and a separate domestic injury.

City of Almaty, Kazakhstan v. Ablyazov, 2018 WL 3579100, *5 (S.D. N.Y. 2018) ("City of Almaty II"). The court finds the City of Almaty II's determination persuasive, and rejects Almaty's contentions for the same reasons.[8]

Relying on Bascuñán, Almaty contends that defendants' repeated transfer of stolen assets between individual and entity co-conspirators, and "Defendants extensive laundering and conversion of Almaty's property in the U.S. unquestionably caused Almaty 'domestic injury.'" (Dkt. 232, MTD Opp. at 15 (citing Bascuñán, 874 F.3d at 810)). As an initial matter, the language from

---

[8] Almaty's reliance on Maiz v. Virani, 253 F.3d 641 (11th Cir. 2001) for the proposition that defendants' money laundering caused a domestic injury, (see Dkt. 232, MTD Opp. at 13), is misplaced. The Maiz case suggests "only that there may be circumstances under which the concealment of stolen funds was so critical to facilitating an ongoing theft in the first place that money laundering may be recognized as having proximately caused some portion of the original injury." City of Almaty I, 226 F.Supp.3d at 286-87 (emphasis in original). That circumstance is not present here because the original theft occurred in Kazakhstan years before defendants began laundering money in the United States.

Bascuñán cited by Almaty refers to the two schemes whereby defendants misappropriated money held in a bank account in New York and stole bearer shares from a safety deposit box also in New York. See Bascuñán, 874 F.3d at 810. In other words, the funds stolen by defendants were located in New York at the time of the theft. See id. As discussed above, the Second Circuit also held that the two other schemes did not adequately allege domestic injury since the only domestic elements were that the defendant "transferred [the stolen] foreign funds to his own [bank] accounts in New York" and "launder[ed] stolen money using bank accounts in the United States[.]" Id. at 818.

Like the two latter schemes in Bascuñán, here, the stolen property was located abroad in Kazakhstan, and subsequently laundered into Switzerland and other foreign states before being transferred to the United States. (See Dkt. 198, FCAC at ¶¶ 1, 3, 20-35, 40-162). For instance, Almaty alleges that in 2010, "understanding that they risked losing the proceeds of their fraudulent scheme if they kept the stolen money in Switzerland, the Individual Defendants and their co-conspirators engaged in racketeering activity to launder and hide the stolen money in and through the United States[.]" (Id. at ¶ 3). By 2010, it had been years since the theft of property had occurred in Kazakhstan. (See id. at ¶ 2). Thus, the "only domestic connections alleged here were acts of the defendant[s]," Bascuñán, 874 F.3d at 819 (emphasis in original), undertaken well after the theft of property in Kazakhstan between 1997 and 2004. (See Dkt. 198, FCAC at ¶ 2).

Moreover, to the extent Almaty relies on a conversion theory – specifically that "each act of transferring Almaty's stolen funds to a co-conspirator in the U.S. constituted a separate act of domestic conversion" – to support its domestic injury argument, (see Dkt. 232, MTD Opp. at 15 (emphasis omitted)), it is without merit. As an initial matter, as defendants point out, (see Dkt. 238, Reply at 4), conversion is not a RICO predicate act. See Flores v. Emerich & Fike, 2009 WL 900738, *8 (E.D. Cal. 2009). In any case, the after-the-fact real property purchases in the United States do not constitute domestic injuries since they are merely "downstream effects of the initial injury that impacted" Almaty in Kazakhstan. (See Dkt. 238, Reply at 4); Exceed Industries, LLC v. Younis, 2016 WL 6599949, *3 (N.D. Ill. 2016). Almaty's contention is similar to those rejected by district courts following RJR Nabisco. For instance, in Younis, the plaintiff foreign entities

alleged that the moving defendant's role in the RICO scheme was to "transfer the proceeds derived from an illegal kickback scheme in and out of the United States by use of his bank account, and to assist [co-defendants] in purchasing real estate [in California and Illinois] using the[] illegal proceeds." 2016 WL 6599949, at *1. Addressing the domestic harm requirement, the court found that the plaintiffs had not demonstrated such harm, stating: "Plaintiffs point to the fact that the illegally obtained kickback proceeds ultimately financed land purchases in the United States, but these are downstream effects of the initial injury that impacted Plaintiffs in the UAE[.]" Id. at *3; see also Cavusoglu, 245 F.Supp.3d at 658 (finding that "downstream effect of the initial injury" does not constitute damage to plaintiff's business or property under § 1964(c)).

For the same reasons, Almaty's contention regarding the imposition of a constructive trust, (see Dkt. 232, MTD Opp. at 16-17), also fails.[9] See City of Almaty II, 2018 WL 3579100, at *6 ("Essentially the harm – if any – would be to the Kazakh Entities' right to recovery through its constructive trust claim. However, litigation rights are not tangible property."); Armada, 885 F.3d at 1094-95 (noting that "it is well understood that a party experiences or sustains injuries to its intangible property at is residence and that in that case, any harm to plaintiff's "intangible bundle of litigation rights was suffered" abroad, where it had its principal place of business).

---

[9] Almaty points to Tatung Company, Ltd. v. Hsu, 217 F.Supp.3d 1138 (C.D. Cal. 2016) as support for its position that it has alleged a domestic injury. (See Dkt. 232, MTD Opp. at 17-18). However, the Tatung court did not necessarily rely solely on defendants' domestic conduct. Instead, the court explained that plaintiff was a foreign corporation doing business in the United States with an American company, and that it maintained a "hub" in the United States. Tatung, 217 F.Supp.3d at 1155. It extended credit and delivered goods to its creditor in the United States, and when the plaintiff was not paid by its creditor, it pursued arbitration in the United States pursuant to an arbitration agreement that required arbitration to take place in Los Angeles. See id. at 1156. The arbitration demand was delivered to the creditor at its California address. See id. Plaintiff obtained an arbitration award enforceable in California, which was confirmed by a California state court. See id. Plaintiff was unable to collect on the judgment because it alleged the creditor and others engaged in a RICO conspiracy to render the creditor an empty shell by siphoning assets out of the creditor. See id. Several of the conspirators were American citizens. See id. In light of such facts, the court found that "defendants specifically targeted their conduct at California with the aim of thwarting Tatung's rights in California." Id. (internal quotation marks omitted). Here, Almaty does not have the same connections to California as the plaintiff in Tatung. It does not hold assets or maintain operations of any kind in California, and it was not engaged in California conduct when it incurred its alleged injuries. See City of Almaty I, 226 F.Supp.3d at 284 (distinguishing Tatung).

In short, the court finds that plaintiff has failed to allege a domestic injury stemming from the RICO claims.[10]

B. <u>Leave to Amend</u>.

Rule 15 of the Federal Rules of Civil Procedure provides that the court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); see <u>Morongo Band of Mission Indians v. Rose</u>, 893 F.2d 1074, 1079 (9th Cir. 1990) (The policy favoring amendment must "be applied with extreme liberality."). However, "[i]t is settled that the grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court." <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321, 330, 91 S.Ct. 795, 802 (1971). This discretion is guided by an examination of several factors, including: (1) whether the amendment causes the opposing party undue prejudice; (2) whether the amendment is sought in bad faith; (3) whether the amendment causes undue delay; (4) whether the amendment constitutes an exercise in futility; and (5) whether the plaintiff has previously amended his or her complaint. See <u>DCD Programs, Ltd. v. Leighton</u>, 833 F.2d 183, 186 n. 3 (9th Cir. 1987).

Having liberally construed and assumed the truth of the allegations in the FCAC, the court is persuaded that plaintiff's RICO claims cannot be saved through amendment. See <u>Lopez v. Smith</u>, 203 F.3d 1122, 1129 (9th Cir. 2000) (<u>en</u> <u>banc</u>) ("Courts are not required to grant leave to amend if a complaint lacks merit entirely."). Under the circumstances, it would be futile to afford plaintiff another opportunity to state a RICO claim. See <u>Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc.</u>, 637 F.3d 1047, 1058 (9th Cir. 2011) ("[T]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint."); <u>Wagh v. Metris Direct, Inc.</u>, 363 F.3d 821, 830 (9th Cir. 2003), <u>cert. denied</u>, 541 U.S. 1043 (2004), <u>overruled</u> <u>on</u> <u>other grounds</u>, <u>Odom v. Microsoft Corp.</u>, 486 F.3d 541, 547 (9th Cir.) (<u>en</u> <u>banc</u>), <u>cert. denied</u>, 552 U.S. 985 (2007). Accordingly, plaintiff's RICO claims will be dismissed without leave to amend.

---

[10] In light of this finding, the court does not address defendants' remaining contentions regarding the RICO claims.

C. <u>State-law Claims</u>.

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, the power to exercise supplemental jurisdiction is within the court's discretion. <u>See</u> <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139 (1966) ("It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right."). The court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3); <u>see</u> <u>Gibbs</u>, 383 U.S. at 726, 86 S.Ct. at 1139 ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); <u>Acri v. Varian Assocs., Inc.</u>, 114 F.3d 999, 1001 (9th Cir. 1997) (<u>en banc</u>) ("The Supreme Court has stated, and we have often repeated, that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'") (quoting <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7 (1988)). Unless the court is persuaded by "considerations of judicial economy, convenience and fairness to litigants" it must "hesitate to exercise jurisdiction over state claims[.]" <u>Gibbs</u>, 383 U.S. at 726, 86 S.Ct. at 1139. Here, given that the case is still in the pleading stage, the court declines to exercise supplemental jurisdiction over plaintiff's state-law claims and will dismiss those claims without prejudice.

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1. Defendants' Motion to Dismiss First Consolidated Amended Complaint for Failure to State a Claim **(Document No. 213)** is **granted-in-part** and **denied-in-part** as **moot**. Plaintiff's RICO claims are **dismissed with prejudice**. With respect to the state law claims, the Motion is denied as moot and the claims are **dismissed without prejudice**.

2. Defendants' Motion to Dismiss First Consolidated Complaint for Lack of Personal

Jurisdiction Over Swiss Defendants **(Document No. 214)** is **denied** as **moot**.

3. Daniel Khrapunov's Notice of Joinder; and Motion to Dismiss First Consolidated Amended Complaint **(Document No. 241)** is **granted-in-part** and **denied-in-part** as **moot**. The Joinder is **granted**, and the motion to dismiss is **denied** as **moot**.

4. Judgment shall be entered accordingly.

Dated this 27th day of September, 2018.

                                        /s/
                            Fernando M. Olguin
                        United States District Judge